# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendant. | Case No. 1:23-cv-1854-DLF |

**DECLARATION OF KARA CAIN**

Pursuant to 28 U.S.C. § 1746, I, Kara Cain, declare the following to be a true and correct statement of facts:

1. I am an Attorney-Advisor with the Freedom of Information Act/Privacy Act ("FOIA/PA") staff of the Executive Office for United States Attorneys ("EOUSA"), United States Department of Justice ("DOJ"). In my capacity as Attorney-Advisor, I act as a liaison with other divisions of DOJ in responding to requests and litigation filed under both FOIA, 5 U.S.C. § 552, and the Privacy Act of 1972, 5 U.S.C. §552a. I also review FOIA/PA requests for access to records located in this office and the 94 districts of the United States Attorney's Offices ("USAOs") and the case files arising therefrom, review correspondence related to requests, review searches conducted in response to requests, and prepare EOUSA responses to ensure compliance with FOIA/PA regulations, 28 C.F.R. §§ 16.3 *et. seq.* and §§ 16.40 *et seq.*, and 5 U.S.C. § 552 and 5 U.S.C. § 552a. I have held this position since July of 2019.

2. The statements in this declaration are based on my personal knowledge, information acquired by me in the course of performing my duties, information contained in the

records of the United States Department of Justice ("DOJ" or "the Department"), and information supplied to me by current DOJ employees, including employees under my direction.

3. I am familiar with the FOIA request designated EOUSA-2023-001623. The purpose of this declaration is to provide background on DOJ's processing of this and other FOIA requests. This declaration is filed in support of DOJ's opposition to Plaintiffs' Motion for a Preliminary Injunction in this case.

**EOUSA's GENERAL FOIA PROCESSING**

4. As of July 5, 2023, EOUSA received, for fiscal year 2023, 2,799 FOIA requests; closed 2,522 FOIA requests, and maintains a backlog of 2,258 FOIA requests. As of June 1, 2023, EOUSA had 139 open litigations, 62 open appeals, 236 referrals, and 102 open consultations to other government agencies and DOJ components. Many consultations are also in active litigation and have their own court ordered deadlines. The volume of requests received per month varies, and the processing rate depends on the complexity of each request. For example, in May, EOUSA received 314 new requests and closed 344 requests. In June, EOUSA received 275 requests and closed 276. Many of the requests that EOUSA receives are no longer simple, relatively straightforward, first-party requests from individuals seeking investigative records about themselves. Rather, many of the requests contain numerous and/or multi-faceted subjects and often significantly more responsive pages per request than in previous years. The total number of pages responsive to a request, and the complexity of the records, proportionally impacts the complexity of the FOIA processing required, as well as the resources and time needed to respond to a particular request. EOUSA has finite resources and workflow management. EOUSA's FOIA/PA unit currently has 25 professionals on staff, including administrative staff (3), Government Information Specialists ("GIS") (10), Attorney-Advisors

(11), and law clerk (1), who are dedicated solely to processing FOIA/PA requests for records maintained by EOUSA or one of the USAOs and any litigation.

5. EOUSA currently has a backlog of 15 requests that have been granted expedited processing, including Plaintiff's request, EOUSA-2023-001623.

6. Plaintiffs' was the last of those 15 requests to be received.

7. EOUSA typically processes expedited requests on a first-in, first-out basis.

**PLAINTIFFS' FOIA REQUEST**

8. Plaintiff's FOIA request was dated March 10, 2023. It sought:

> A. All documents and communications sent or received by David Weiss or any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to Special Counsel status for the investigation concerning Hunter Biden; and
>
> B. All documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates in that jurisdiction.

9. On March 20, 2023, the Office of Legal Counsel ("OLC") redirected Plaintiffs' request to EOUSA for processing.

10. On March 21, 2023, the Criminal Division ("CRM) similarly redirected Plaintiffs' request to EOUSA for processing. The same day, CRM notified Plaintiffs that their request had been rerouted.

11. On March 22, 2023, the Office of Public Affairs determined that Plaintiffs' request met the requirements of 28 C.F.R. § 16.5(e)(1)(iv).

12. On March 23, 2023, EOUSA wrote Plaintiffs to acknowledge receipt of their request and to assign tracking number EOUSA-2023-001623.

13. On March 27, 2023, EOUSA wrote Plaintiffs to convey that their request for expedited processing had been granted.

**EOUSA's PROCESSING OF PLAINTIFFS' REQUEST**

14. On March 23, 2023, EOUSA tasked the USAO for the District of Delaware with running searches to find records responsive to Plaintiffs' request.

15. Those searches yielded 2,523 pages of potentially responsive records, from seven different custodians.

16. As of this declaration, EOUSA has commenced the initial review of the potentially responsive records.

17. Although EOUSA has only begun processing Plaintiffs' request, several facts are apparent at the outset.

18. First, the request seeks communications between the District of Delaware and other components of DOJ, including other USAOs. Whenever records implicate the equities of other DOJ components, EOUSA is required to forward those records to the component(s) for consultation. That will slow the processing of Plaintiffs' request.

19. Second, the request on its face seeks communications that are likely to be exempt under Exemption 5 and/or Exemption 7(a) (at least so long as enforcement proceedings remain ongoing). Exemptions 7(d) and 7(e) may also be implicated. If any responsive records fall within those exemptions, I anticipate from my experience that they would be withheld in whole or in part.

20. Given the volume of potentially responsive records and EOUSA's other demands—including the 14 expedited requests that were received before Plaintiffs'—EOUSA

would be prepared to enter a processing schedule of 350 pages per month on a rolling basis, if a production order were entered.

**IMPLICATIONS OF PLAINTIFF' PROPOSED INJUNCTION**

21. As noted above, EOUSA granted expedited processing of Plaintiffs' request. That means that EOUSA is processing Plaintiffs' request ahead of more than 2,000 non-expedited requests.

22. Plaintiffs' proposed injunction would require reordering EOUSA's typical procedure, which tracks FOIA's statutory scheme. Specifically, EOUSA would have to process Plaintiffs' request ahead of the 14 other requestors who were granted expedited processing. By definition, those requests implicate either an "imminent threat to the life or physical safety of an individual"; an "urgency to inform the public"; the "loss of substantial due process rights" or, as in Plaintiffs' case, a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(i)–(iv). Each of these requests would be delayed if Plaintiffs' motion were granted.

23. The other expedited requests deal with sensitive matters such as the January 6th Capitol riots, the search on Mar-A-Lago, classified records and communications related to the Special Counsel's Office, and criminal case files for a Capital Habeas case.

[INTENTIONALLY BLANK]

24. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this 10th day of July 2023.

Kara Cain
Attorney-Advisor
Executive Office for United States Attorneys
Freedom of Information/Privacy Act Staff

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION *et al.*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE,

*Defendant.*

No. 23-cv-1854 (DLF)

**ORDER**

Plaintiffs the Heritage Foundation and one of its officers, Mike Howell, bring this action against the U.S. Department of Justice under the Freedom of Information Act ("FOIA"), seeking the production of certain documents related to DOJ's investigation of Robert Hunter Biden, the son of the President of the United States, Joseph R. Biden.[1] *See* Compl., Dkt. 1. The plaintiffs' request, dated March 10, 2023, seeks (1) "[a]ll documents and communications sent or received by . . . any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to Special Counsel status for the investigation concerning Hunter Biden" and (2) "[a]ll documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates in that jurisdiction." FOIA Request at 1 (March 10, 2023), Pls.' Ex. 1, Dkt. 1-5. The plaintiffs also contemporaneously sought expedited processing, *id.* at 6–11, which was granted on March 27, 2023, Pls.' Ex. 10, Dkt. 1-14. As such, by statute, DOJ is required to process the plaintiffs' request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).

[1] For clarity, the Court will refer separately to "Hunter Biden" and "President Biden."

Roughly three months after the plaintiffs filed their request, on June 20, 2023, Hunter Biden was charged by information in the U.S. District Court for the District of Delaware with one count of knowingly possessing a firearm while an unlawful user of and addicted to a controlled substance, 18 U.S.C. §§ 922(g)(3), 924(a)(2), and two counts of willful failure to pay income tax, 26 U.S.C. § 7203.  *See* Information, *United States v. Biden*, No. 23-cr-61 (D. Del. June 20, 2023), Dkt. 2; Information, *United States v. Biden*, No. 23-mj-274 (D. Del. June 20, 2023), Dkt. 2.  That same day, the government and Hunter Biden jointly requested that the court schedule an initial appearance at which Hunter Biden would plead guilty to the tax charges and enter a pretrial diversion agreement as to the firearm charge.  *See* Letter, *Biden*, No. 23-cr-61, Dkt. 1 (June 20, 2023); Letter, *Biden*, No. 23-mj-274, Dkt. 1 (June 20, 2023).  The hearing was subsequently scheduled for July 26, 2023.  Order, *Biden*, No. 23-cr-61, Dkt. 3 (June 21, 2023).

The plaintiffs filed this suit on June 26, 2023.  Their complaint references the statements of two "IRS whistleblower[s]" regarding alleged efforts from within DOJ to block, delay, or otherwise hinder the criminal investigation of Hunter Biden.  Compl. ¶¶ 47–51; *see id.* ¶¶ 56–94. In particular, the complaint alleges that according to the whistleblowers, "U.S. Attorney [for the District of Delaware David] Weiss sought to charge Hunter Biden with felony tax charges in the District of Columbia and Northern District of California, but in each case, the local U.S. Attorney—both appointed by President Biden—blocked him from doing so."  *Id.* ¶ 4.  Similarly, according to the whistleblowers and as alleged, "U.S. Attorney Weiss further stated . . . that he then requested Special Counsel authority from Main Justice to allow him to bring such charges directly, but was denied."  *Id.*

Before the Court is the plaintiffs' Motion for a Preliminary Injunction, Dkt. 6, which seeks, in light of recent developments and Hunter Biden's forthcoming plea hearing, to "compel the

production by July 21, 2023, of a narrowed subset of the records sought by the" original request. Pls.' Memo. in Support at 5, Dkt. 6-1.[2] The scope of requested documents for purposes of the preliminary injunction is "narrowed" only modestly: As to only the second category of information originally requested, the plaintiffs now seek records only for which the U.S. Attorney for the District of Delaware is the custodian. Mot. for Prelim. Inj. at 1, Dkt. 6.

## I. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).

Failure to show a likelihood of irreparable harm is sufficient to defeat a motion for a preliminary injunction. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The D.C. Circuit "has set a high standard for irreparable injury." *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 52 (D.D.C. 2017) (quoting *Chaplaincy*, 454 F.3d at 297). "First, the injury must be both certain and great; it must be actual and not theoretical.

[2] Although the Court appreciates the concerns raised by DOJ as to the acceptance of the plaintiffs' proposed reply brief, the Court will grant the motions to file a reply and accompanying affidavits due to the arguments raised in DOJ's opposition that were not fully addressed in the plaintiffs' opening brief.

The moving party must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the injury must be beyond remediation." *Chaplaincy*, 454 F.3d at 297 (cleaned up).

## II.    Analysis

On the existing record, the plaintiffs have not made a sufficient showing of irreparable harm. Nor have they shown that they are sufficiently likely to succeed on the merits, or that the balance of the equities or the public interest weigh in favor of an entering an injunction. Accordingly, and for the reasons stated below, the Court will deny their motion for a preliminary injunction without prejudice.

### A.    Irreparable Harm

Because a failure to make a sufficient showing of irreparable harm is alone grounds to deny a motion for a preliminary injunction, *see Chaplaincy*, 454 F.3d at 297, the Court considers this factor before analyzing the other three. Here, the plaintiffs provide two reasons why failure to produce responsive documents ahead of their proposed deadline would cause irreparable harm. Neither is persuasive.

First, the plaintiffs cannot show irreparable harm simply because "[t]he information sought by this Motion goes to the heart of on-going House investigations and raging political controversy." Pls.' Memo. at 32. Undoubtedly, all FOIA requesters prefer to receive responsive records sooner rather than later. And in certain cases—including the one here—an agency will accelerate processing of a request because of a "compelling need" to do so. 5 U.S.C. § 552(a)(6)(E)(i)(I). But for the extraordinary remedy of a preliminary injunction ordering an agency to fulfill its obligations *by a date certain*, "[c]ourts in our district have generally found irreparable harm . . . only where the requested documents are 'time-sensitive and highly probative,

or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Foundation v. EPA*, No. 23-cv-748, 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (quoting *N.Y. Times Co. v. Def. Health Agency*, No. 21-cv-566, 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021)). This fact alone distinguishes many of the cases cited by the plaintiffs. As Chief Judge Boasberg has ably explained:

> For example, courts have granted preliminary injunctions in cases seeking documents regarding potential political interference with mail-in voting ahead of the imminent 2020 Presidential election, *see Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 141 (D.D.C. 2020); documents relevant to the 2020 census where "the value of the information sought . . . would be materially lessened or lost" once the census process concluded, [*Brennan Ctr. for Just. at NYU Sch. of Law v. Dep't of Com.*, 498 F. Supp. 3d 87, 100 (D.D.C. 2020)]; documents related to an ongoing and time-limited impeachment process, [*Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5, 7, 11 (D.D.C. 2019)]; and documents related to a requester's role as a confidential FBI informant ahead of an imminent evidentiary hearing. *Aguilera v. FBI*, 941 F. Supp. 144, 151 (D.D.C. 1996); *see also generally New York Times*, 2021 WL 1614817, at *8 n.9 (canvassing these cases). By contrast, courts have denied preliminary injunctions in cases without a definite impending or time-limited event, such as where plaintiffs sought documents related to FISA surveillance generally, *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 35, 39–40 (D.D.C. 2014); an already existing Consumer Financial Protection Bureau rule, [*Allied Progress v. CFPB*, No. 17-cv-686, 2017 WL 1750263, at *6 (D.D.C. May 4, 2017)]; records related to former Secretary of State Hillary Clinton's use of a private email server well before the election, *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 8–13 (D.D.C. 2015); or records concerning an individual's termination after the event. *Wadelton v. Dep't of State*, 941 F. Supp. 2d 120, 121 (D.D.C. 2013).

*Id.* at *4. The public debate inside and outside of Congress over Hunter Biden's actions, his criminal prosecution, and any involvement therein by the President of the United States will not end on July 26, 2023.[3] Indeed, the issue may become even more salient over time as relevant investigations continue.

[3] Some case law suggests that, in order to secure a preliminary injunction for production by a date certain, a plaintiff need not point to a definite date after which the information's value diminishes. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 38 (D.D.C. 2020). But here, the plaintiffs specifically state in their reply brief that the "correct standard" "to justify injunctive relief" is whether the "utility of the records would be lessened or lost by a date certain." Pls.' Reply at 26,

Second, as to the only specific event on a particular date on which the plaintiffs rely—Hunter Biden's scheduled July 26, 2023 plea hearing—the plaintiffs have not established how their access to this information would have any bearing on a judicial plea proceeding. The plaintiffs are not party to Hunter Biden's criminal case in the U.S. District Court for the District of Delaware; they cannot themselves "use [the information] in relation to Robert Hunter Biden's plea hearing set for July 26, 2023." Mot. for Prelim. Inj. at 2. And whether that court should accept Hunter Biden's guilty plea is not a political question subject to public debate that could be sparked by the production of documents under FOIA; it is a legal question for the presiding judge to determine under Rule 11 of the Federal Rules of Criminal Procedure. The plaintiffs have provided no reason to think that the court in Hunter Biden's case is incapable of deciding for itself whether it has sufficient information to determine whether to accept the plea or whether it must demand more. And the broader questions that are indeed the subject of public debate—the justifiability of DOJ's prosecution decisions with respect to Hunter Biden and any influence the President and his appointees exerted on that decision—will continue to have the same salience long after the July 26, 2023 plea hearing.[4]

Moreover, further undermining a claim of irreparable harm, DOJ has provided substantial reason to think that the requested records "are highly likely to be exempt in whole or significant

---

Dkt. 15-1 (cleaned up). In any event, even if the plaintiffs were not required to identify such a specific date, they have not shown that the information is likely to lose its relevance to public debate in roughly the timeframe they propose. That is, it may be that, at some future point, the delays in processing will have significantly lessened the utility of the records sought. But the plaintiffs have not provided probative, concrete evidence—beyond alleging generally that some committee investigations have begun—that the documents they seek will lose their utility in these congressional proceedings and their accompanying debates after July 26, 2023.

[4] Because the Court finds that the plaintiffs have not established irreparable harm, it need not consider whether, as DOJ argues, Def.'s Opp'n at 12–13, Dkt. 10, the plaintiffs' delay in filing their complaint and motion for preliminary injunction undermines their claim of irreparable harm.

part." Def.'s Opp'n at 9; *see Elec. Privacy Info. Ctr.*, 15 F. Supp. 3d at 46 (explaining that a party "cannot claim to be injured—much less 'irreparably' so—if the [agency] withholds documents that [the requester] is not entitled to access in the first instance"). For example, Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *see, e.g.*, *CREW v. DOJ*, 45 F.4th 963, 971–72 (D.C. Cir. 2022) (deliberative-process privilege); *Jud. Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (work-product privilege). And Exemption 7(A) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7). On its face, the plaintiffs' request appears to call for the production predominantly of documents that would fit squarely within these and other exemptions. Of course, none of this is to prejudge any legal issues that may arise if and when the agency ultimately asserts these exemptions when producing responsive records. As in all cases, these FOIA exemptions do not give the agency a blank check to refuse to produce documents; instead, they simply authorize the withholding of documents in specific circumstances, subject to review by the Court. At least at this stage, however, it appears to the Court that the documents most likely to vindicate the plaintiffs' asserted interests justifying injunctive relief are those that are also most likely to be exempt from disclosure under FOIA.[5]

[5] Indeed, even if the Court were to order the plaintiffs' proposed production deadline, the Court would have to resolve any dispute over these exemptions before a final production. It is thus difficult to conceive of any scenario in which the plaintiffs would receive much of the information they seek by July 26, 2023, the date of the Hunter Biden plea hearing.

**B. Likelihood of Success on the Merits**

In addition, DOJ has raised serious doubts about the plaintiffs' likelihood of success on the merits. Both parties agree that the relevant merits question is whether DOJ is "*actually* processing the request as soon as practicable," Pls.' Memo. at 16 (cleaned up); *accord* Def.'s Opp'n at 8, and so whether it would be "practicable" to process the request in full by July 21, 2023. The plaintiffs have not met their burden of showing a likelihood of success on the merits of this question.

DOJ submitted along with its opposition an affidavit stating that there are "2,523 pages of potentially responsive records," Cain Aff. ¶ 15, Dkt. 10-1,[6] and attesting to several factors contributing to possible delays in processing the plaintiffs' request. Among those factors is the requirement that, for records that contain communications between the U.S. Attorney's Office for the District of Delaware and another DOJ component, the Executive Office for U.S. Attorneys ("EOUSA") must "forward . . . records to th[at] component[]." *Id.* ¶ 18. In addition, and for reasons already explained above, the processing time will be further lengthened by the agency's need to determine withholding and redactions for a high volume of potential exemptions. *See id.* ¶ 19. And in the EOUSA alone, there are "14 expedited requests that were received before" the one at issue in this case. *Id.* ¶ 20.[7] None of this is to say that the Court specifically endorses or tacitly accepts DOJ's proposed production schedule; that will be determined in the near future, after DOJ answers the complaint. But it does cast substantial doubt on the plaintiffs' claim—for which they marshal virtually no supporting evidence—that the "as soon as practicable" standard

---

[6] To be sure, that number might be reduced based on the modest narrowing of the plaintiffs' request for the purposes of this preliminary injunction motion.

[7] That DOJ might reallocate resources from other units to the EOUSA, use up more funding, or otherwise "surge the necessary resources when it considers a matter a priority," Pls.' Reply at 10–12, does not change the fact that the plaintiffs have not met their burden of showing that the production schedule they request would be, at a minimum, "practicable."

demands production on or before July 21, 2023, just 22 days after the filing of the plaintiffs' preliminary injunction motion and just a week after the plaintiffs' last filing in support of it.

It is not enough to respond that production must occur at breakneck speed because of "the extreme gravity and urgency of this case." Pls.' Memo. at 17. DOJ does not contest—for good reason—that the plaintiffs' request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv); *see* Def.'s Opp'n at 4 n.1. But all the statute requires is that, once a request is expedited, the agency process it as soon as practicable. The plaintiffs provide no authority for the proposition that *within* the category of expedited requests, DOJ has an obligation to prioritize productions based on their "gravity and urgency." To the contrary, an agency faces the same obligation for "*any*" expedited request: namely, to process it "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added).

**C. Balance of the Equities and the Public Interest**

Finally, the balance of the equities and the public interest militate against entering a preliminary injunction here. Both parties agree that when the government is a party, these two factors merge. Pls.' Memo. at 34; Def.'s Opp'n at 15; *see Nken v. Holder*, 556 U.S. 418, 435 (2009). Granting this preliminary injunction would mean effectively granting the plaintiffs' request extra-expedited status, jumping the line ahead of other requests deemed similarly time-sensitive under FOIA's expedition standards. *See Nation Mag. v. Dep't of State*, 805 F. Supp. 68, 74 (D.D.C. 1992) (noting as against the public interest that the reordering of request processing under a FOIA preliminary injunction "would severely jeopardize the public's interest in an orderly, fair, and efficient administrative of FOIA"). For that reason, the Court must consider the inherent tradeoffs involved in ordering an agency to complete a particular FOIA request ahead of the rest

of the queue—all without the benefit of hearing from the nonparty requestors whose productions would be delayed.

Here, DOJ has explained that other expedited requests before the EOUSA include "sensitive matters such as the January 6th Capitol riots, the search on Mar-A-Lago, classified records and communications related to the Special Counsel's Office, and criminal case files for a Capital Habeas case." Cain Aff. ¶ 23. The inevitable delay in processing those requests that would result from entering a preliminary injunction here further tilts the scale in DOJ's favor.

* * *

The plaintiffs have brought a FOIA request that all parties involved agree carries exceptional importance, and they have raised many arguments, legal and factual, that DOJ will be required to address over the course of this litigation. The plaintiffs have not shown, however, at least at this juncture, that they are entitled to the extraordinary preliminary injunctive relief they seek.

Accordingly, it is

**ORDERED** that the plaintiffs' Motions for Leave to File Reply Declarations and Reply Memorandum, Dkts. 14, 15, are **GRANTED**; and it is further

**ORDERED** that the plaintiffs' Motion for a Preliminary Injunction, Dkt. 6, is **DENIED WITHOUT PREJUDICE**.

**SO ORDERED.**

Dabney L. Friedrich
DABNEY L. FRIEDRICH
United States District Judge

July 19, 2023

# EXHIBIT 3



**U.S. Department of Justice**

Office of Legislative Affairs

*Office of the Assistant Attorney General* *Washington, DC 20530*

The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Jordan:

This responds to your letter to the Attorney General, dated July 21, 2023, expressing continued interest in an individual ongoing criminal investigation and prosecution led by the U.S. Attorney for the District of Delaware, David Weiss. The Department of Justice (Department) appreciates the Committee on the Judiciary's (Committee's) acceptance of our offer for U.S. Attorney Weiss to testify at a public hearing before the Committee. The Department is ready to offer U.S. Attorney Weiss to testify shortly after Congress returns from the August district work period, as described more fully below.

Across administrations, the Department has long recognized its obligation to protect law enforcement work from even the perception of political interference, including from Congress.[1] Our longstanding principles and duty to take care that the law be faithfully executed require us to maintain the confidentiality of sensitive law enforcement information and to protect line attorneys and agents so they can do their jobs for the American people free from improper political pressures. These concerns are heightened while a matter is open and investigative steps, prosecutorial decisions, or judicial proceedings are ongoing. At the same time, we are deeply concerned by any misrepresentations about our work—whether deliberate or arising from misunderstandings—that could unduly harm public confidence in the evenhanded administration of justice, to which we are dedicated. The Department, therefore, reaffirms U.S. Attorney Weiss's commitment to providing public testimony, consistent with law and Department policy, to protect these principles.

Your letter refers to assertions made by two Internal Revenue Service investigators regarding U.S. Attorney Weiss's authority and asks additional questions about U.S. Attorney Weiss's recent letters explaining the scope of his authority. U.S. Attorney Weiss is the appropriate person to speak to these issues, as he is both the senior Department official

[1] *See, e.g.*, Letter from Assistant Attorney General Robert Raben to Chairman John Linder (Jan. 27, 2000) ("Congressional inquiries during the pendency of a matter pose an inherent threat to the integrity of the Department's law enforcement and litigation functions.").

responsible for the investigation as well as the person with direct knowledge of the facts necessary to respond to the assertions in which you have expressed interest.

The Department believes it is strongly in the public interest for the American people and for Congress to hear directly from U.S. Attorney Weiss on these assertions and questions about his authority at a public hearing. To address these issues, U.S. Attorney Weiss is available to appear at a public hearing before the Committee, consistent with the law and Department policy, after the House returns from its August district work period. U.S. Attorney Weiss is available on September 27, September 28, October 18, and October 19. To be clear, the most appropriate time for any testimony on these subjects is after the matter is closed, especially under the circumstances where the matter is pending before a court and subject to judicial supervision, not to mention legal and ethical bars that limit what the Department can say while the matter is pending in court. While testimony at this early juncture must be appropriately limited to protect the ongoing matter and important confidentiality interests, the Department acknowledges your stated interest in addressing aspects of this matter in the near term, such as U.S. Attorney Weiss's authority and jurisdiction to bring charges wherever he deems appropriate.

As the Department has repeatedly stated, we remain committed to working with you to address the Committee's expressed interests consistent with the Department's duties and policies. We are, therefore, deeply concerned by your notification today that the Committee has authorized deposition subpoenas for the individuals identified in your letter. Any attempts at compulsory process are unjustified and premature. The Committee authorized subpoenas less than a business day after your July 21 letter and *before* the stated deadline in that letter. It has been less than a month since the Committee's original requests, and little more than a week since the Department responded to that letter on the date requested by the Committee. During a staff discussion last week, the Department and Committee agreed to continue discussions. Such discussions would ensure we understand the Committee's interests and that you understand the Department's longstanding approach across administrations regarding such requests, including those that seek information about ongoing aspects of our work and testimony from line personnel. We remain available to discuss your interests further.

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

CARLOS URIARTE
Digitally signed by CARLOS URIARTE
Date: 2023.07.24 18:22:43 -04'00'

Carlos Felipe Uriarte
Assistant Attorney General

cc:

The Honorable Jerrold L. Nadler
Ranking Member
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

The Honorable James Comer
Chairman
Committee on Oversight and Accountability
U.S. House of Representatives
Washington, DC 20515

The Honorable Jamie Raskin
Ranking Member
Committee on Oversight and Accountability
U.S. House of Representatives
Washington, DC 20515

The Honorable Jason Smith
Chairman
House Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

The Honorable Richard Neal
Ranking Member
House Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

# EXHIBIT 4

CQ Newsmaker Transcripts
Jun. 23, 2023

Jun. 23, 2023 Final

# Justice Department Holds News Briefing on China-Based Chemical Manufacturing Companies and Arrests of Executives in Fentanyl Manufacturing

## LIST OF SPEAKERS

MERRICK GARLAND:
All right. Good afternoon. I'm joined today by Deputy Attorney General Lisa Monaco, DEA Administrator Anne Milgram, US Attorney for the Southern District of New York, Damien Williams and US Attorney for the Eastern District of New York, Breon Peace. When I announced in April that the Justice Department had taken significant enforcement actions against the Sinaloa cartel, I promised that the Justice Department would never forget the victims of the fentanyl epidemic.

I also promised that we would never stop working to hold accountable those who bear responsibility for it. That includes not only going after the leaders of the cartels, their drug and gun traffickers, their money launderers, security forces and clandestine lab operators, it also includes stopping the Chinese chemical companies that are supplying the cartels with the building blocks they need to manufacture deadly fentanyl.

We are targeting every step of the movement, manufacturing and sale of fentanyl from start to finish. To that end, we are announcing several

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 25 of 776 PageID #: 86

enforcement actions the Justice Department has taken to disrupt the flow of fentanyl precursor chemicals from China to Mexico and the United States. In three separate indictments, we have charged for the first time ever four chemical companies based in China and eight Chinese nationals for the trafficking of fentanyl precursor chemicals into the United States.

These companies and their employees knowingly conspired to manufacture deadly fentanyl for distribution in the United States as alleged in our filings, just one of these China based chemical companies shipped more than 200 kilograms of fentanyl related precursor chemicals to the US for the purpose of making 50 kilograms of fentanyl, a quantity that could contain enough deadly doses of fentanyl to kill 25 million Americans.

First, as outlined in the indictment unsealed today in the Southern District of New York, we have brought charges against a China based manufacturer and supplier of fentanyl precursor chemicals, its principal executive and two of its employees for their role in international fentanyl trafficking conspiracy.

As outlined in the indictment, we allege that the defendants openly advertised the sale of fentanyl precursors online and sought to evade law enforcement detection by using deceptive packaging. They went as far as to guarantee, quote, 100 percent stealth shipping and they provided proof of their success on their websites, including a screenshot of a shipping confirmation to Culiacan Mexico, the Sinaloa cartel's base of operations.

The indictment also details correspondence and in-person meetings between the defendants and an individual purporting to be a fentanyl trafficker in Mexico with operations in the US. In one message, one of

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 26 of 776 PageID #: 87

the defendants responded to the admission that the chemicals were being used to make fentanyl and that it was not safe with, quote, I know.

In another conversation which took place earlier this month, two of the defendants allegedly discussed the need to take additional measures to protect themselves from detection and interdiction following a recent enforcement action by the US government. This was an apparent reference to the charges that I announced against members and associates of the Sinaloa cartel in April.

One of the defendants indicated that the US government had, quote, seized some Mexican group, end quote, followed the routes to China, which was, quote, bad news for us. Over the past eight months, the defendants are alleged to have shipped more than 200 kilograms of fentanyl related precursor chemicals to the US in order to make 50 kilograms of fentanyl.

As I said, this is a quantity that could contain enough deadly doses of fentanyl to kill 25 million Americans. What the defendants did not know at the time is that the purported traffickers they were dealing with were in fact DEA confidential sources. And the 200 kilograms of fentanyl related precursors they shipped to the US were received by DEA agents.

Two of the defendants, the principal executive of the chemical company and one of its employees have been arrested by federal law enforcement. Additionally, in two separate indictments in the Eastern District of New York, we have charged three other companies based in China and five of their employees with conspiracy to manufacture and distribute fentanyl.

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 27 of 776 PageID #: 88

As alleged in the indictments, each of these companies also supplies precursor chemicals to the US and Mexico, among other places, knowing they will be used to produce fentanyl or other controlled substances. Like the company charged in the Southern District of New York, all three of these companies openly advertise their products all over the world and guarantee that the products they send to the US and Mexico will not be detected or intercepted.

To fulfill this guarantee, they likewise employ deceptive and fraudulent practices such as mislabeling packages and making false declarations at border crossings. But these companies also went a step further to evade testing protocols and relevant regulations. They added what are known as masking molecules to their fentanyl precursor chemicals.

Once these masking molecules are added, the chemical signature of the precursor is changed. That means when it's shipped, it appears to be a new non-fentanyl precursor substance. Upon receipt of the shipment, however, the purchaser is able to easily remove the masking molecules and return the chemical to its original form as a fentanyl precursor.

As alleged in the indictment, these companies not only produced and distributed masked precursors, but also provided instructions about how to remove the masking molecules upon receipt. The actions we are announcing today should make clear that the US Justice Department is accelerating our efforts to disrupt the manufacture and trafficking of fentanyl at every stage and in every part of the world.

Our agents and prosecutors are working relentlessly to get fentanyl out of our communities and hold accountable those who put it there. In 2022, the DEA together with our federal, state and local law

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 28 of 776 PageID #: 89

enforcement partners, seized more than 50.6 million fentanyl laced fake prescription pills. That is more than double the amount seized in 2021. The DEA has also seized more than 10,000 pounds of fentanyl powder.

Together, these seizures represent more than 379 million potentially deadly doses of fentanyl. That much Fentanyl could kill every single American. We are also putting our resources to work to confront the public health challenges of addiction and substance abuse by supporting prevention and treatment programs.

The US government continues to do everything in our power to disrupt fentanyl trafficking and prevent more of our communities from being devastated by the fentanyl epidemic. We also continue to strongly urge the PRC government to take decisive action to address the role that China based chemical and pharmaceutical companies play in fentanyl drug production and trafficking.

We stand ready to work together to address this global challenge. I want to thank the DEA agents for the extraordinary work that they did on these cases and for the difficult work they do every day to protect our communities from deadly drugs. I'm also grateful to the US attorney's offices for the Southern and Eastern districts of New York and to the Office of International Affairs of the Justice Department's Criminal Division.

I'll now turn the podium over to Deputy Attorney General Monaco.

LISA MONACO:

Good afternoon. Thank you, Mr. Attorney General. Two months ago, the Attorney General and I pledged to employ every tool in the government's arsenal at every stage of the fentanyl supply chain in

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 29 of 776 PageID #: 90

every part of the globe to protect American communities. Today's announcement is a down payment on that pledge.

It breaks new ground by attacking the fentanyl supply chain at its origin. For the first time, we are charging Chinese chemical companies and their employees for conspiring to manufacture and export fentanyl precursor chemicals and circumvent customs laws. Fentanyl poses a singular threat, not only because the smallest of doses can be lethal, but because fentanyl does not occur in nature.

It is entirely manmade and in potentially limitless supply. So with our partners across government and across the globe, the Department of Justice is working relentlessly to dismantle the global supply and delivery chain that floods fentanyl into American communities. The fentanyl supply chain all too often begins in China, where the chemical ingredients for fentanyl are produced and exported by the ton.

We allege the Chinese chemical companies charged today combined scientific knowhow with deception to circumvent customs barriers and ship precursors onto our shores and Mexico's. The cartels use those ingredients to manufacture fentanyl, which they then push into our communities, using social media to market pills and cryptocurrency to launder profits.

Today's charges make clear that those who feed the fentanyl supply chain cannot hide behind the facade of legitimate business. When companies and employees, including those in the C-suite, knowingly fuel the fentanyl crisis, they will be held to account. We will expose them as drug traffickers. So let me be clear.

The Justice Department will not rest or relent in investigating and prosecuting every link of the fentanyl supply chain in every corner of

the globe. There can be no safe haven. As we've seen in our efforts to combat terrorism and cyber-crime, we do more when we move together. That's why continued collaboration with Mexico is crucial and why we've dedicated more resources to support Mexico's frontline fentanyl prosecutors.

And that's why we're strengthening our efforts to stem the Southbound flow of illicit high powered firearms across our Southern border, firearms that fuel violence in Mexico and empower cartels to expand their deadly drug trade back into the United States. And that's why we will continue to call on the Chinese government to hold PRC companies accountable for the global harm they are causing.

And today's charges allege those charged knew that they were breaking Chinese law as well as our own. More broadly, compelling evidence shows that PRC companies are selling vast quantities of precursor chemicals to the drug cartels. The United States has urged the PRC to address the serious problem of illicit synthetic drug production and trafficking.

We renew that call today. This is a global problem that demands a global solution. Finally, I want to say a word about the role of social media. In these indictments, the precursor sellers brazenly advertised on social media platforms. The department has encouraged social media platforms to enforce their terms of service and remove this content.

We've encouraged social media platforms to work with us to address this public safety emergency. We will continue to work with these companies so that they can better police their own platforms until they no longer serve as superhighways of drug trafficking. Several

major platforms are now working productively with us on this, and we urge those who are not to join this fight.

Today's actions are the result of the hard work of the women and men of the DEA and the tenacious prosecutors from the Eastern and Southern districts of New York. It is a privilege to work with them. Let me now turn the podium over to the DEA administrator.

ANNE MILGRAM:
Thank you. Thank you. Good afternoon. Thank you, Attorney General Garland and Deputy Attorney General Monaco. Fentanyl is the greatest threat to Americans today. It is devastating families across our country and killing Americans from all walks of life and it is the leading cause of death for Americans between the ages of 18 to 45. The Drug Enforcement Administration is actively targeting every single aspect of the global fentanyl supply chain, so that we can put an end to the most devastating drug crisis that our country has ever seen.

The two drug cartels that are responsible for the influx of fentanyl into the United States, the Sinaloa and Hilco cartels, work with chemical companies based in the People's Republic of China to get their raw materials. Those companies and the individuals who work for them provide drug traffickers with the necessary ingredients to make fentanyl, chemicals called fentanyl precursors.

Nearly all fentanyl precursors are manufactured and shipped from China today. For the first time ever, we have charged four PRC companies with fentanyl trafficking conspiracy. We have also charged eight PRC nationals who work for those companies, and we have taken two of them into custody. We have also seized more than 200 kilograms of fentanyl precursors in this operation alone, enough to make millions of deadly doses of fentanyl.

Make no mistake, the charged defendants knew exactly what they were doing. As alleged in the indictments unsealed today, the defendants provided their customers with the blueprints for making fentanyl, a poison that is killing Americans. They provided the chemicals. They gave advice on how to mix them. They made changes to the recipe when an ingredient wasn't available.

They told a customer to substitute one ingredient for another to make twice as much fentanyl. They employed chemists to troubleshoot when customers had questions. They mislabeled packages and falsified customs forms to get the chemicals across borders. They even disguise the chemicals at a molecular level, adding a molecule to mask the precursors, so they would not be detected as banned substances during transport.

And they taught their customers how to remove that molecule after they received the chemicals. As alleged, these defendants gave their customers, the raw materials and the scientific know how to make fentanyl and they knew exactly who they were working with. They talked freely about having clients in America and Mexico and specifically in Sinaloa, Mexico, where the Sinaloa cartel is based.

These cases show that fentanyl precursors are cheap. In just one example, a defendant sold two kilograms of fentanyl precursors for approximately $1,000 USD. Those same prosecutors can yield 1.75 million lethal doses of fentanyl. Basically, that means that the price per lethal dose is less than $0.01. The amount of fentanyl that can be made today depends only on the amount of precursor chemicals that can be purchased.

And at prices like these, the amounts are limitless. And these cases show that fentanyl precursors are easily bought online. These

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 33 of 776 PageID #: 94

companies advertise fentanyl precursors on social media, on Facebook and on LinkedIn. They used encrypted applications like WhatsApp to speak with customers and to coordinate shipments.

They disguise the shipments as legitimate goods, with fake labels and falsified customs paperwork, that said that what was inside was dog food or raw cosmetic materials, when in fact, they were fentanyl precursors. And they took payment in Bitcoin and other cryptocurrencies to try to hide who they were and to make it harder to follow the money back.

This is the unprecedented threat we are dealing with, synthetic manmade chemicals, advertised on social media, coordinated through encrypted communications, paid for in cryptocurrency, shipped as powders, and that is why more than 110,000 Americans died from drug poisonings last year alone. Today's indictments target the threat where it starts.

I want to thank the men and women of the DEA Special Operations Division, Bilateral Investigation Unit, the DEA's New York Field Division and the DEA's New York Drug Enforcement Task Force. I also want to thank our partners, the prosecutors in the Southern District of New York and the Eastern District of New York, as well as our five other DEA offices who assisted with this investigation.

I also want to thank our law enforcement partners at the Royal Thai Police and the Fiji Police Force for their assistance in this investigation. Today's charges continue DEA's work to target the global fentanyl supply chain. In April, we announced the indictment of 28 members and associates of the Sinaloa cartel, and we track them across the globe from China to Central America to Mexico to the United States.

In May, we announced the arrests of 3,337 associates of the Sinaloa and cartels from a one year operation across the United States. After those announcements, one of the defendants in this case told a confidential source that was, quote, bad news for us. We know that the criminals are watching. Here is our message to them.

There is more bad news coming. With every investigation, with every indictment, we are coming after you and we will not relent until this crisis ends. Thank you and it's now my privilege to introduce to you today the US Attorney for the Southern District of New York, Damien Williams.

DAMIAN WILLIAMS:

Back in April when we announced groundbreaking charges in the Southern District of New York against members of the Sinaloa cartel and others, I said that case was the most important of my tenure as US attorney. That's because fentanyl is the law enforcement and public health crisis of our time. The indictment unsealed today in the southern District of New York is the next step in our fight against fentanyl.

Today, we target the very beginning of the fentanyl supply chain, the Chinese manufacturers of the raw chemicals used to make fentanyl and its analogs. We've charged a Chinese precursor chemical company and that's not all. We've charged and arrested some of the individuals who work at the company, that includes a corporate executive and a marketing manager.

They're in American handcuffs and they're going to face justice in an American courtroom. The company we've charged, Amarvel Biotech, sought to profit off an opioid epidemic that is killing hundreds of thousands of Americans. The company openly advertised and sold

fentanyl precursor chemicals knowing that these chemicals were destined for New York City, knowing that the chemicals would be turned into fentanyl and knowing that that poison could kill.

Over the course of this investigation, Amarvel biotech ship to the United States, more than 200 kilograms of precursor chemicals used to make fentanyl and its analogs. And for this company, 200 kilograms was apparently only a drop in the bucket. As alleged in the indictment, Amarvel Biotech has also made efforts to thwart law enforcement seizure of their shipments, including deceptively packaging precursor chemicals and containers for dog food or motor oil.

This indictment and the other actions my office has announced recently make clear that we will hold accountable every link in this fentanyl distribution chain, and we are not done. We will continue to show that our reach is long and that we will investigate, charge and capture those who profit from this poison.

I want to thank the attorney general and the deputy attorney general for their continued commitment to combating the fentanyl crisis. I also want to thank my friend and Milgrom for her leadership and thank her extraordinary team at DEA. I want to thank our colleagues at the Office of International Affairs.

And finally, I want to thank the SDNY prosecutors who are handling this case, Xander Li and Kevin Sullivan, from my office's National Security and International Narcotics Unit. It's now my pleasure to turn the podium over to my friend, Breon Peace, the US attorney from the Eastern District of New York.

BREON PEACE:

Thank you, US Attorney Williams, and good afternoon. Today, we unsealed two indictments collectively charging eight defendants including three Chinese chemical companies and five Chinese nationals with among other crimes, conspiring to manufacture and import fentanyl to the United States. These indictments are among the first in the nation, but not the last, involving companies that provide raw chemicals to drug traffickers, knowing that these chemicals will be used to make and distribute fentanyl in the United States.

These charges are the culmination of a yearlong investigation which uncovered that the defendant companies manufacture and stockpiled fentanyl precursors the chemicals and substances used to manufacture fentanyl and employ chemists to help them market and sell the substances. The defendant companies openly advertised their products all over the world, including on social media platforms.

And while the defendants largely sold the components of fentanyl, most of which were ostensibly legal, they did so as conspirators and accomplices, knowing these substances would be used in a fentanyl manufacturing scheme. As this prosecution shows, that is a crime. This is akin to a company selling the components for a bomb knowing they would be used to make an explosive.

We know too well that the witch's brew of fentanyl chemicals cooked by the drug traffickers can be just as deadly. The defendants sent their chemicals to the US and Mexico by boat and air using public and private international mail and package carriers and to prevent detection and interception of chemical products at the borders, the defendant companies employed deceptive and fraudulent practices such as mislabeling packages as other innocuous products such as

cosmetics or food additives, falsifying customs forms and making false declarations at border crossings.

The defendants also disguised known fentanyl precursors to avoid detection and seizure by law enforcement by adding masking molecules, thereby changing the chemical signature of the underlying precursor chemicals to make them harder to detect while passing through customs and other inspections. These altered substances could evade testing protocols and relevant regulations by appearing to be a new substance.

Such masking molecules are easily removed, enabling the purchaser to return the substance to its original form. The defendants even provided instructions about how to remove the masking molecules, ensuring their customers were able to use the banned precursor chemicals to manufacture fentanyl. And the defendants gave instructions on how to increase the amount of fentanyl the precursors would produce and advice on which chemicals to buy to replace banned precursor products.

Our investigation also revealed the defendant's connections to Mexican drug cartels. The defendants communicated with suspected associates of the Sinaloa cartel and CJNG in Mexico. They advertise their quote best-selling products in Mexico and even maintain warehouses in Mexico to store precursor chemicals.

The chemicals provided by the defendant companies have enabled cartels and other drug trafficking organizations to produce fentanyl in clandestine laboratories in Mexico on a massive scale for subsequent distribution in the United States and elsewhere. The materials and instructions provided by the defendant companies and companies like

them have directly caused and contributed to the influx of deadly fentanyl into the United States.

Now, the defendants hoped that by selling only the components of fentanyl or by masking the chemical structures of precursors or mislabeling their products that they could escape scrutiny and accountability. This prosecution proves them wrong. And to the companies and the employees that supply fentanyl precursor chemicals, knowing that they will be used to make illegal fentanyl, you are drug suppliers, and you are also drug traffickers.

We will identify you and prosecute you to the fullest extent of the law. The charges brought today exemplify our office's battle against fentanyl, which is inflicting untold tragedy in New York City, Long Island and across the nation. We will not rest until this crisis is brought to an end. So I want to thank people who were involved in this investigation.

I want to first thank you, Attorney General Garland, Deputy Attorney General Monaco and DEA Administrator Milgram for their leadership in combating the fentanyl crisis. I'd also like to give special thanks to our law enforcement and agency partners, including DEA New York, DEA Mexico, DEA Diversion Control Division, DEA Special Testing and Research Laboratory, United States Customs and Border Protections New York Field Office, the Internal Revenue Services New York Division and United States Postal Inspection Services of New York.

I'd also like to thank the team from my office who have worked tirelessly to protect our community, Assistant United States Attorney's Francisco Navarro, Erik Paulsen, Chand Edwards-Balfour and Adam Amir and investigator George Dietz. Thank you.

UNKNOWN:

Questions? [Inaudible].

QUESTION:

Yes. Hi. Thank you. I have an on topic and then an off topic. On the on topic on fentanyl, this is unique in the sense that we're talking now companies. Before, we talked more of individual people in cartels. Where does this idea of going after companies fit into the overall picture of fighting fentanyl Can more companies, should more companies be on alert?

MERRICK GARLAND:

The answer to that is yes. We are applying a network approach to this. We are going to follow fentanyl all the way from the precursor companies to importation either into Mexico or into the United States, to manufacturing clandestine labs, to crossing the border or clandestine labs in the United States to transfer within the United States to sales on the streets.

I'd like to give Administrator Milgrom a chance to explain the strategy for a moment. I promise to get back to you on the other question.

ANNE MILGRAM:

I would echo what the attorney general has said. Our approach right now, our mission is simple, to save American lives by stopping fentanyl, defeating the two cartels that are responsible and by working relentlessly across the entire network of the global fentanyl supply chain, which is right now led by those two cartels that we mentioned, the Sinaloa and Hilco cartels.

As I said, the amount of fentanyl that can be made is limited only by the amount of precursor chemicals that can be purchased and used to make fentanyl. And that's why we have to be relentless at every single part of this supply chain and in particular, starting where it begins which is with the precursor chemicals that right now are coming mostly from the People's Republic of China.

There are companies and individuals, many of whom we've charged today. Other individuals we charged as part of the Cheetos indictment in April, and we have many ongoing investigations into every single part of the network that the attorney general just described.

MERRICK GARLAND:
David, you had another question.

QUESTION:
Sure. My other question, yesterday, whistleblower testimony came out from an IRS supervisory special agent, current supervisory special agent who insists he was in a meeting with US attorney David Weiss who in October 2022 claimed in front of multiple people that he was told not to pursue the Hunter Biden investigation not to bring charges in 2022. You said previously you've stayed out of the Hunter Biden investigation.

It's been on David Weiss to figure that out. Can you once and for all shed a little light? There seems to be a little confusion on what's going on here.

MERRICK GARLAND:
I'd be happy to. As I said at the outset, Mr. Weiss, who was appointed by President Trump as the US attorney in Delaware and assigned this

matter during the previous administration would be permitted to continue his investigation and to make a decision to prosecute any way in which he wanted to and in any district in which he wanted to. Mr. Weiss has since sent a letter to the House Judiciary Committee confirming that he had that authority.

I don't know how it would be possible for anybody to block him from bringing a prosecution, given that he has this authority.

QUESTION:
And he was never no?

MERRICK GARLAND:
I say, he was given complete authority to make all decisions on his own.

UNKNOWN:
Next question. [Inaudible].

QUESTION:
Mr. Garland, just to follow up on that, one of the allegations that one of the IRS supervisors apparently made involved the fact that Mr. Weiss reportedly wanted to have the powers you've conferred on special counsels. Was that request ever made? And if so, why did you reject it?

MERRICK GARLAND:
It was not. The only person with authority to make somebody a special counsel or refuse to make somebody a special counsel is the attorney general. Mr. Weiss never made that request to me.

QUESTION:

Just to follow on that, do you think that a special counsel--can you explain the rationale for not appointing a special counsel in this case?

MERRICK GARLAND:

Mr. Weiss had in fact more authority than a special counsel would have had. He had and has complete authority, as I said, to bring a case anywhere he wants in his discretion.

UNKNOWN:

Last question. [Inaudible].

QUESTION:

Just an on topic question. What do these indictments--

MERRICK GARLAND:

Those are always very much welcomed.

QUESTION:

I have an off topic as well, unfortunately.

MERRICK GARLAND:

Of course.

QUESTION:

But what do these indictments do to actually stop these companies from operating? Obviously, Secretary Blinken met with his Chinese counterparts recently. Did he bring up the need for these specific

companies to be shuttered in China, so they're not allowed to do this further, and to extradite the people that were charged and are still in China?

MERRICK GARLAND:

I don't have a readout from that meeting, so I direct you to the State Department on that question. I think we're talking about a whole of government approach here. We have prosecutions, we have arrests, we have indictments, we have sanctions by the Treasury Department, we have diplomacy by the State Department, altogether intended to make it difficult, if not impossible, for the precursor companies to continue to send the fentanyl precursors to Mexico.

QUESTION:

And on the off topic, I mean with the exception of what you've said today, you've deferred all other questions related to the Hunter Biden investigation to Mr. Weiss. Mr. Weiss has declined to comment on any of this, with the exception of his letter to the House Judiciary that just says that he had the ultimate authority to charge and where to charge.

But on these specific allegations that these whistleblowers have brought forward, there's very detailed allegations. Would you authorize him to answer to some of the more specific allegations that these IRS whistleblowers have come forward with?

MERRICK GARLAND:

Look, I would support Mr. Weiss explaining or testifying on these matters when he deems it appropriate.

UNKNOWN:

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 44 of 776 PageID #: 105

Sorry, one more question. Carrie, go ahead.

QUESTION:

Mr. Attorney General, Republicans in Congress have flirted with the idea of holding the FBI director in contempt. It's become a talking point on the campaign trail, the alleged corruption in the FBI and other federal law enforcement agencies. Do the American people have cause to be concerned about the integrity of the components of this Justice Department, and what do you have to say about how they're acting?

MERRICK GARLAND:

I certainly understand that some have chosen to attack the integrity of the Justice Department and its components and its employees by claiming that we do not treat like cases alike. This constitutes an attack on an institution that is essential to American democracy and essential to the safety of the American people.

Nothing could be further from the truth. You've all heard me say many times that we make our cases based on the facts and the law. These are not just words, these are what we live by. They are the foundation of the way we make these decisions. The agents of the FBI, as well as the DEA, the ATF, our deputy US marshals every day, often at great personal risk, protect the American people and secure its safety.

Our cases are based on their work. I could not be more proud to work with them. Thank you.

UNKNOWN:

Thank you, everyone. Thank you. Thank you.

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 45 of 776 PageID #: 106

List of Speakers

DRUG ENFORCEMENT ADMINISTRATION ADMINISTRATOR ANNE MILGRAM

DEPARTMENT OF JUSTICE DEPUTY ATTORNEY GENERAL LISA O. MONACO

DEPARTMENT OF JUSTICE ATTORNEY GENERAL MERRICK GARLAND

EASTERN DISTRICT OF NEW YORK ATTORNEY BREON PEACE

SOUTHERN DISTRICT OF NEW YORK ATTORNEY DAMIAN WILLIAMS

© 2023 · CQ - Roll Call, Inc · All Rights Reserved.

1201 Pennsylvania Ave NW, 6th floor · Washington, D.C. 20004 · 202-793-5300

About CQ Help Privacy Policy Masthead Terms & Conditions

# EXHIBIT 5

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   GARY A. SHAPLEY, JR.

Friday, May 26, 2023

Washington, D.C.

The interview in the above matter was held in 5480 O'Neill House Office Building, commencing at 9:33 a.m.

Appearances:

For the COMMITTEE ON WAYS AND MEANS:

[redacted], MAJORITY COUNSEL

[redacted], MAJORITY COUNSEL

[redacted], MAJORITY COUNSEL

[redacted], MAJORITY STAFF

[redacted], MAJORITY STAFF

[redacted], MAJORITY COUNSEL

[redacted], MINORITY COUNSEL

[redacted], MINORITY COUNSEL

[redacted], MINORITY COUNSEL

For GARY A. SHAPLEY, JR.:

MARK D. LYTLE,

PARTNER,

NIXON PEABODY LLP

TRISTAN LEAVITT,

PRESIDENT,

EMPOWER OVERSIGHT

MAJORITY COUNSEL 1. Good morning. This is a transcribed interview of Internal Revenue Service Criminal Supervisory Special Agent Gary Shapley.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on April 19th, 2023, indicating Mr. Shapley's desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Would the witness please state your name for the record?

Mr. Shapley. Gary Shapley.

MAJORITY COUNSEL 1. Could counsel for the witness please state your names for the record?

Mr. Lytle. Mark Lytle.

Mr. Leavitt. Tristan Leavitt.

MAJORITY COUNSEL 1. On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is [redacted]. I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else from the committee who is here at the table introduce themselves as well.

MAJORITY COUNSEL 2. [redacted] with the majority staff.

MAJORITY COUNSEL 3. [redacted], majority staff.

MAJORITY STAFF. [redacted], majority staff.

MAJORITY COUNSEL 4. [redacted], majority staff.

MAJORITY STAFF. [redacted], majority staff.

MINORITY COUNSEL 1. [redacted], minority staff.

MINORITY COUNSEL 2. [redacted], minority staff.

MINORITY COUNSEL 3. [redacted], minority.

MAJORITY COUNSEL 1. Thank you.

I'd like to now go over the ground rules and guidelines we'll follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity to make an opening statement.

Following your statement, the questioning will proceed in rounds. The majority will ask questions first for one hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose. We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break apart from that, please just let us know.

As you can see, there is an official court reporter taking down everything we say to make a written record, so we ask that you give verbal responses to all questions.

Do you understand?

Mr. Shapley. Yes, I do.

MAJORITY COUNSEL 1. So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone at the end of the table can hear you. It is important that we don't talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete, truthful manner as possible, so we will take our time.    If you have any questions or if you do not understand one of our questions, please let us know.

Our questions will cover a wide range of topics, so if you need clarification on any point, just say so.    If you honestly don't know the answer to a question or do not remember, it is best not to guess.    Please give us your best recollection.

It is okay to tell us if you learned the information from someone else.    Just indicate how you came to know the information.    If there are things you don't know or can't remember, just say so and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that, by law, you're required to answer questions from Congress truthfully.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    This also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or making a false statement under 18 U.S.C. 1001.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1. Is there any reason you are unable to provide truthful answer to today's questions?

Mr. Shapley. There is not.

MAJORITY COUNSEL 1. Finally, I'd like to note the information discussed here today is confidential. As an IRS agent, I know you understand the significance of our tax privacy laws. Chairman Smith takes our tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

As I'm sure you know, 26 U.S.C. Section 6103 makes tax returns and return information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, that statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. Shapley. Yes.

MAJORITY COUNSEL 1. Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. Shapley. Yes.

MAJORITY COUNSEL 1. Do you wish to disclose such information to the committee today?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    In addition to Section 6103(f)(5), the chairman of the committee on Ways and Means has authority under Section 6103(f)(4)(A) to designate agents to receive and inspect returns and return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has designated the individuals in this room for the purposes of receiving the information you wish to share.    The chairman considers this entire interview and the resulting transcript as protected confidential information under Section 6103.

That means that this interview can only proceed so long as everyone in the room is properly designated to receive the information.    The chairman has designated the court reporter and the related individuals that provide transcription services to the House of Representatives.

I'd like to remind the witness and everyone in the room that 26 U.S.C. Section 7213 makes it unlawful to make any disclosure of returns or return information not authorized by Section 6103.    Unauthorized disclosure of such information can be a felony punishable by fine or imprisonment.

Given the statutory protection for this type of information, we ask that you not speak about what we discuss in this interview to individuals not designated to receive such information.

For the same reason, the marked exhibits that we use today will remain with the court reporter so that they can go in the official transcript, and any copies of those exhibits will be returned to us when we wrap up.

We also understand that you have alleged that you have been retaliated against for seeking to blow the whistle inside your agency and to Congress.    We will discuss that issue in more detail, but I will note that Chairman Smith values whistleblowers and knows

that whistleblowers take significant risks when disclosing wrongdoing. That is why there are legal protections in place for whistleblowers making disclosures to Congress, such as the protections in 5 U.S.C. Section 2302(b)(8)(C), which your counsel identified in your initial letter to the committee.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers. The IRS Commissioner replied, quote, "I can say without hesitation, any hesitation, there will be no retaliation for anyone making an allegation," end quote.

Since that time, you have shared additional information with the committee regarding allegations of retaliation. This is very troubling, particularly given Commissioner Werfel's testimony before the committee. We will discuss your allegations in greater detail today.

That is the end of my preamble. Is there anything my colleagues from the minority would like to add?

MINORITY COUNSEL 1. Thanks, ████.

Thank you very much for appearing before us today. I personally am very happy that you were able to share with us some information in advance, because I think that helped us get prepared for this meeting today. I look forward to hearing what you have to say. Thank you for coming in.

MAJORITY COUNSEL 1. And with that, we invite you to begin with an opening statement, after which we will begin questioning.

Mr. Shapley. So thank you for having me here today.

My name is Gary Shapley. I am a supervisory special agent with the Internal Revenue Service Criminal Investigation. I have been an IRS agent since July 2009, and

have served as a supervisory special agent or acting assistant special agent in charge since April 2018.

I grew up in a little town in upstate New York and never thought that I would be in this position I am today.    I was taught to be proud of this country that had afforded me so many opportunities and to always do the right thing -- the right thing, a simple philosophy that has me sitting here today.    There is no reward for me for becoming a whistleblower.    The only win for me is to not be fired or arrested or retaliated against.

Before October of 2022, I had received the highest awards available to me in my agency and multiple awards from DOJ.    In October 2022, I was a senior leader, assistant special agent in charge of the Chicago Field Office, and received the highest performance rating available that year as an outstanding.

I was planning to transition to a new position in headquarters for an international collaboration of foreign tax organizations that I was picked to help set up and operated since 2018.    I have led, planned, and executed undercover operations and/or search warrants in over a dozen countries.    I have investigated and managed some of the largest cases in U.S. history and of the history of the agency, recovering over $3.5 billion for the United States Government.

Since October 2022, IRS CI has taken every opportunity to retaliate against me and my team.

I was passed over for a promotion for which I was clearly most qualified.

The special agent in charge and assistant special agent in charge of the Washington, D.C. Field Office have sent threats to the field office, suppressing additional potential whistleblowers from coming forward.

Even after IRS CI senior leadership had been made aware on a recurring basis that the Delaware U.S. Attorney's Office and the Department of Justice was acting improperly,

they acquiesced to a DOJ request to remove the entire team from the Hunter Biden investigation, a team that had been investigating it for over 5 years.   Passing the buck and deferring to others was a common theme with IRS CI leadership during this investigation.

After you hear my testimony, I believe you will understand why my conscience would not be silenced.   My oath of office would have been unfulfilled if I did nothing.   I went from a senior leader to a pariah, and the only thing that happened in between was that I blew the whistle.

I am blowing the whistle because the Delaware U.S. Attorney's Office, Department of Justice Tax, and Department of Justice provided preferential treatment and unchecked conflicts of interest in an important and high-profile investigation of the President's son, Hunter Biden.

The mission of IRS CI is to investigate potential criminal violations of Internal Revenue Code and related financial crimes in a manner that fosters confidence in the Code and compliance with the law.

That mission can only be met by treating every taxpayer we encounter the same. The normal process must be followed.   If search warrants or witness interviews or document requests that include the actual subjects' names are not allowed, for example, that is simply a deviation from the normal process that provided preferential treatment, in this case to Hunter Biden.

The case agent on this case is one of the best agents in the entire agency. Without his knowledge and persistence, DOJ would have prevented the investigative team from collecting enough evidence to make an informed assessment, which ultimately included even DOJ agreeing on the recommended criminal charges.

I am alleging, with evidence, that DOJ provided preferential treatment,

slow-walked the investigation, did nothing to avoid obvious conflicts of interest in this investigation.

I have absolutely no political activities in my past.    I vote in the general election and recently voted in the midterms because of an interest in the process for my children, who I took to witness one of the pillars of this Nation, the right to vote.

I have never given a dollar to any campaign, never attended a campaign event at any level of government, never had a campaign sign on my car, lawn, et cetera.    I do not own and have never owned a tee shirt or hat with any election topic.    I vote for the candidate, not the party.    I have voted for Presidents with both an R and/or a D in front of their names.

I speak on this topic so I can try to head off time that might be spent on it.    In the end, a fact is a fact, regardless of the political affiliation of the person who brought it to you.

I am hoping the whistleblower process will allow me to give this protected disclosure and leave it to you to make your determinations based on what my testimony and the documents say about the investigation.

I respect this institution and have faith that the issues I raise will be considered appropriately.    I beg of you to protect me from the coming retaliatory storm.    You are my only hope, and your actions send a message to all those out there that see wrongdoing but are terrified to bring it to light.

In this country, we believe in the rule of law, and that applies to everyone.    There is not a two-track justice system depending on who you are and who you're connected to.

But the criminal tax investigation of Hunter Biden, led by the United States Attorney's Office for the District of Delaware, has been handled differently than any investigation I've ever been a part of for the past 14 years of my IRS service.

Some of the decisions seem to be influenced by politics. But whatever the motivations, at every stage decisions were made that had the effect of benefiting the subject of the investigation. These decisions included slow-walking investigative steps, not allowing enforcement actions to be executed, limiting investigators' line of questioning for witnesses, misleading investigators on charging authority, delaying any and all actions months before elections to ensure the investigation did not go overt well before policy memorandum mandated the pause. These are just only a few examples.

The investigation into Hunter Biden, code name Sportsman, was first opened in November 2018 as an offshoot of an investigation the IRS was conducting into a foreign-based amateur online pornography platform. Special Agent [redacted] developed the investigative lead and was assigned to be the original case agent.

In October 2019, the FBI became aware that a repair shop had a laptop allegedly belonging to Hunter Biden and that the laptop might contain evidence of a crime. The FBI verified its authenticity in November of 2019 by matching the device number against Hunter Biden's Apple iCloud ID.

When the FBI took possession of the device in December 2019, they notified the IRS that it likely contained evidence of tax crimes. Thus, Special Agent [redacted] drafted an affidavit for a Title 26 search warrant, which a magistrate judge approved that month.

In January 2020, I became the supervisor of the Sportsman case. The group, known as the International Tax and Financial Crimes group, or the ITFC, is comprised of 12 elite agents who were selected based on their experience and performance in the area of complex high-dollar international tax investigations.

The IRS direct investigative team, including the co-case agent, case agent, and me, were working closely with the FBI and the Delaware U.S. Attorney's Office and Department of Justice Tax in biweekly prosecution team meetings, or pros meetings.

Yet, it soon became clear to me this case was being handled differently than any I'd seen before.

As early as March 6th, 2020, I sent a sensitive case report up through my chain of command at IRS reporting that by mid-March the IRS would be ready to seek approval for physical search warrants in California, Arkansas, New York, and Washington, D.C.

Special Agent [redacted] drafted an April 1st, 2020, affidavit establishing probable cause for these physical search warrants. We also planned to conduct approximately 15 contemporaneous interviews at that time.

Yet, after former Vice President Joseph Biden became the presumptive Democratic nominee for President in early April 2020, career DOJ officials dragged their feet on the IRS taking these investigative steps.

By June 2020, those same career officials were already delaying overt investigative actions. This was well before the typical 60- to 90-day period when DOJ would historically stand down before an election. It was apparent that DOJ was purposely slow-walking investigative actions in this matter.

On a June 16th, 2020, call Special Agent [redacted] and I had with our chain of command up to the Director of Field Operations, I pointed out that if normal procedures had been followed we already would have executed search warrants, conducted interviews, and served document requests. Nevertheless, my IRS chain of command decided we would defer to DOJ.

Thus, I became the highest-ranking IRS CI leader to participate in our prosecution team calls, be up to date on specific case strategies, to discuss the investigation with DOJ and the Delaware U.S. Attorney's Office, and to address concerns as they arose.

From around October 2020 through October 2022, I was the IRS CI manager who interacted directly with the United States Attorney, David Weiss, and individuals at DOJ

Tax Division the most.

Even after investigative steps were denied, enforcement operations were rejected by DOJ, leading to the election in November 2020, we continued to obtain further leads in the Sportsman's case and prepared for when we could go overt.

For example, in August 2020, we got the results back from an iCloud search warrant.   Unlike the laptop, these came to the investigative team from a third-party record keeper and included a set of messages.   The messages included material we clearly needed to follow up on.

Nevertheless, prosecutors denied investigators' requests to develop a strategy to look into the messages and denied investigators' suggestion to obtain location information to see where the texts were sent from.

For example, we obtained a July 30th, 2017, WhatsApp message from Hunter Biden to Henry Zhao, where Hunter Biden wrote:   "I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled.   Tell the director that I would like to resolve this now before it gets out of hand, and now means tonight.   And, Z, if I get a call or text from anyone involved in this other than you, Zhang, or the chairman, I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction.   I am sitting here waiting for the call with my father."

Communications like these made it clear we needed to search the guest house at the Bidens' Delaware residence where Hunter Biden stayed for a time.

In a September 3rd, 2023 [2020], pros meeting, the Assistant United States Attorney, Lesley Wolf, told us there was more than enough probable cause for the physical search warrant there, but the question was whether the juice was worth the squeeze.   She continued that optics were a driving factor in the decision on whether to

execute a search warrant. She said a lot of evidence in our investigation would be found in the guest house of former Vice President Biden, but said there is no way we will get that approved.

The prosecutors even wanted to remove Hunter Biden's name from electronic search warrants, 2703(d) orders, and document requests. Special Agent [redacted] said on the call he felt uncomfortable with removing the subject's name from those documents just based on what might or might not be approved, as that seemed unethical. But his concerns were ignored.

And Department of Justice Tax Line Attorney Jack Morgan said, doing it without Hunter Biden's name would probably still get us, in quote, "most" of the data we sought. I have never been part of an investigation where only getting most of the data was considered sufficient.

On September 3rd, 2020, the slow-walking of process continued when AUSA Wolf stated that a search warrant for the emails for Blue Star Strategies was being sat on by OEO. That's the Department of Justice Office -- actually, I'm sorry. I don't know what it means, the acronym.

She indicated it would likely not get approved. This was a significant blow to the Foreign Agents Registration Act piece of the investigation.

On September 4th, 2020, Deputy Attorney General Donoghue issued a cease and desist of all overt investigative activities due to the coming election. AUSA Wolf made several odd statements, to include that DOJ was under fire and it was self-inflicted. She stated that DOJ needed to repair their reputation.

At the next pros meeting, on September 21st, 2020, the FBI tried to dictate that we only do five of the planned interviews so FBI management could reevaluate if they wanted to continue assisting. Special Agent [redacted] told them it seems inappropriate for

them to dictate in an IRS investigation who should be interviewed.

Later that day, I learned the FBI case agent in Delaware had only recently moved back to his hometown of Wilmington with his wife and family and was concerned about the consequences for him and his family if they conducted these sensitive interviews and executed a search warrant of the President Biden guest house.

On October 19th, 2020, I emailed Assistant United States Attorney Wolf: "We need to talk about the computer. It appears the FBI is making certain representations about the device, and the only reason we know what is on the device is because of the IRS CI affiant search warrant that allowed access to the documents. If Durham also executed a search warrant on a device, we need to know so that my leadership is informed. My management has to be looped into whatever the FBI is doing with the laptop. It is IRS CI's responsibility to know what is happening. Let me know when I can be briefed on this issue."

My email led to a special meeting on October 22nd, 2020, with the prosecution team and the FBI's computer analysis team to discuss Hunter Biden's laptop. We once again objected that we still had not been given access to the laptop.

Special Agent [REDACTED] asked about the full filter reviewed copy of the contents of the devices. He stated he had not been provided with the data. AUSA Lesley Wolf stated that she would not have seen it because, for a variety of reasons, prosecutors decided to keep it from the investigators. This decision is unprecedented in my experience.

Investigators assigned to this investigation were obstructed from seeing all the available evidence. It is unknown if all the evidence in the laptop was reviewed by agents or by prosecutors.

Based on guidance provided by the prosecutors on a recurring basis to not look

into anything related to President Biden, there is no way of knowing if evidence of other criminal activity existed concerning Hunter Biden or President Biden.

AUSA Wolf acknowledged that there was no reason to believe that any data was manipulated on devices by any third party.   She further supported this belief by mentioning that they corroborated the data with other sources of information received.

Also on an October 22nd, 2020, pros team call, AUSA Wolf stated that United States Attorney David Weiss had reviewed the affidavit for search warrant of Hunter Biden's residence and agreed that probable cause had been achieved.

Even though the legal requirements were met and the investigative team knew evidence would be in these locations, AUSA Wolf stated that they would not allow a physical search warrant on Hunter Biden.

The case agent and I raised the issue to IRS CI leadership on a continued basis, to include in a June 16th, 2020, meeting with the Director of Field Operations, where I stated:   "DOJ Tax has made a concerted effort to drag their feet concerning conducting search warrants and interviewing key witnesses in an effort to push those actions to a timeframe where they can invoke the Department of Justice rule of thumb concerning affecting elections."   No follow-up questions were asked and no action was taken by IRS CI senior leadership.

Because the 2020 election was contested, our original plan to go overt on or around November 17th was delayed.   DOJ pushed back against the day of action date because they did not want to approach Hunter Biden while he was in Delaware, potentially collocated with President Biden.

United States Attorney Weiss stated on November 10th, 2020, that he had to delay the day of action because it was a contested election.   He also stated that because there was no leak in the investigation to date, therefore not public at the time, that the

primary focus was to protect the integrity of the investigation, which meant to keep it concealed from the public.

We began preparing for what we called our day of action on December 8th, 2020. That included document requests and approximately 12 interviews around the country. The search warrant had been rejected by DOJ, and we included a possibility of a potential consent search of Hunter Biden's residence, which was a Hail Mary.

On December 3rd, 2020, we had around a 12-hour long meeting at the United States Attorney's Office in Delaware with the prosecution team.   United States Attorney Weiss came in at the beginning of the meeting and jubilantly congratulated the investigative team for keeping the investigation a "secret," quote.

Weiss was in and out for the rest of the meeting, but it went downhill from there. We shared with prosecutors our outline to interview Hunter Biden's associate, Rob Walker.   Among other things, we wanted to question Walker about an email that said: "Ten held by H for the big guy."   We had obvious questions like who was H, who the big guy was, and why this percentage was to be held separately with the association hidden.

But AUSA Wolf interjected and said she did not want to ask about the big guy and stated she did not want to ask questions about "dad."   When multiple people in the room spoke up and objected that we had to ask, she responded, there's no specific criminality to that line of questioning.

This upset the FBI too.   And as I'll explain in a moment, the IRS and FBI agents conducting this interview tried to skirt AUSA Wolf's direction.

Hunter Biden was assigned Secret Service protection on or around our December 3rd meeting.   So we developed a plan for the FBI Los Angeles special agent in charge to reach out at 8 a.m. on December 8th to the Secret Service Los Angeles special agent in charge and tell them that we would be coming to the residence to seek an interview with

Hunter Biden and that it was part of an official investigation.

However, the night before, December 7th, 2020, I was informed that FBI headquarters had notified Secret Service headquarters and the transition team about the planned actions the following day. This essentially tipped off a group of people very close to President Biden and Hunter Biden and gave this group an opportunity to obstruct the approach on the witnesses.

The next morning, when I saw my FBI counterpart, Supervisory Special Agent Joe Gordon, he was clearly dejected about how our plan had been interfered with. FBI SSA Gordon memorialized the new plan in an email the morning of December 8th, 2020, that stated the subject and the Secret Service protectees would be given the phone numbers of the FBI SSA Joe Gordon and I and the subject would call us if he wanted to speak with us.

SSA Gordon and I waited in the car outside of Hunter Biden's California residence waiting for a phone call. It was no surprise that the phone call SSA Gordon received was from his ASAC Alfred Watson, who informed us that Hunter Biden would contact us through his attorneys.

We received a telephone call later that morning from Hunter Biden's attorneys, who said he would accept service for any document requests, but we couldn't talk to his client. The public news of our investigation hit the press the next day.

I can't know for certain whether FBI's advance notice played a role or not, but of the 12 interviews we hoped to conduct on our day of action, we only got one substantive interview. It was with Rob Walker in Arkansas, and it was exactly the sort of interview we expected to have if the FBI hadn't tipped off Secret Service and the transition team.

In the interview, the FBI agent tried to get Rob Walker to talk about the "ten held by H" email while not directly contradicting AUSA Wolf's direction not to ask about the,

quote, "big guy."    The FBI agent said, this is a quote:    "The famous email that Tony was

pointing out like the equity split, can you tell me your opinion of that, when it's going

through like, you know, ten B dot-dot-dot held by H?"

Walker answered:    "I think that maybe James was wishful thinking or maybe he

was just projecting that, you know, if this was a good relationship and this was something

that was going to happen, the VP was never going to run, just protecting that, you know,

maybe at some point he would be a piece of it, but he was more just, you know -- it looks

terrible, but it's not.    I certainly never was thinking at any time the VP was a part of

anything we were doing."

And yet it was clearly valuable for the investigators to ask about Hunter Biden's

dad, as Walker went on to describe an instance in which the former Vice President

showed up at a CEFC meeting.

Walker said:    "We were at the Four Seasons and we were having lunch and he

stopped in, just said hello to everybody.    I don't even think he drank water.    I think

Hunter Biden said, 'I may be trying to start a company or try to do something with these

guys and could you?'    And I think he was like, if I'm around and he'd show up."

The FBI agent asked:    "So you definitely got the feeling that that was

orchestrated by Hunter Biden to have like an appearance by his dad at that meeting just

to kind of bolster your chances at making a deal work out?"

Walker answered:    "Sure."

The FBI agent continued:    "Any times when he was in office, or did you hear

Hunter Biden say that he was setting up a meeting with his dad with them while dad was

still in office?"

Walker answered:    "Yes."

And, inexplicably, the FBI agent changed the subject.

On December 10th, 2020, the prosecutorial team met again to discuss the next steps.    One piece of information that came out of the day of action was that Hunter Biden vacated the Washington, D.C., office of Owasco.    His documents all went into a storage unit in northern Virginia.    The IRS prepared an affidavit in support of a search warrant for the unit, but AUSA Wolf once again objected.

My special agent in charge and I scheduled a call with United States Attorney Weiss on December 14th just to talk about that specific issue.    United States Attorney Weiss agreed that if the storage unit wasn't accessed for 30 days we could execute a search warrant on it.

No sooner had we gotten off the call then we heard AUSA Wolf had simply reached out to Hunter Biden's defense counsel and told him about the storage unit, once again ruining our chance to get to evidence before being destroyed, manipulated, or concealed.

My special agent in charge at the time emailed that she would be informing the director of field operations and the deputy chief of IRS CI of her, quote, "frustration with the United States Attorney's Office not allowing us to go forward with a search warrant."

To this day, I have no way of knowing if the documents from that unit were among those ultimately provided to our team.

This was the second search warrant where prosecutors agreed that probable cause was achieved, but would not allow the investigators to execute a search warrant, a clear indication of preferential treatment of Hunter Biden.

In a briefing that I requested to make to Director of Field Operations Batdorf and SAC Waldon on March 2nd, 2021, investigators mentioned the possibility of blowing the whistle on how DOJ was handling this case.    My special agent in charge disengaged and was minimally involved moving forward.

This same sort of unprecedented behavior continued through 2021. For example, as I wrote to my chain of command on a May 3rd, 2021, memo: "This investigation has been hampered and slowed by claims of potential election meddling. Through interviews and review of evidence obtained, it appears there may be campaign finance criminal violations. AUSA Wolf stated on the last prosecution team meeting that she did not want any of the agents to look into the allegation. She cited a need to focus on the 2014 tax year, that we could not yet prove an allegation beyond a reasonable doubt, and that she does not want to include their Public Integrity Unit because they would take authority away from her. We do not agree with her obstruction on this matter," end quote.

After we shared on August 18th, 2021, and multiple times thereafter about interviews we had planned, on September 9th, 2021, AUSA Wolf emailed us: "I do not think you are going to be able to do these interviews as planned." She told us they would require approval from the Tax Division.

These delays extended through September and into October. Then the United States Attorney's Office raised other objections. Part of what we examined were charges made with Hunter Biden's card that might conceivably have been done by his children. However, on October 21st, 2021, AUSA Wolf told us it will get us into hot water if we interview the President's grandchildren.

As a result of this behavior, I went to my Director of Field Operations in November 2021 to express how poorly DOJ was handling this case. Despite these obstacles, around this time Special Agent [redacted] began drafting the Special Agent Report, or SAR, which is a document in which IRS recommends what charges should be brought.

A[nother] troubling issue occurred with IRS criminal tax attorneys, commonly known as CT counsel, related to their review of the SAR [that recommended] charging

Hunter Biden that laid out the evidence for each element of each violation.

The CT Counsel Line Attorney Christine Steinbrunner worked with the case agent to get questions answered and to understand the case and the evidence.   She indicated to the case agent that she was going to concur with all the recommended charges in the SAR.

On February 9th, 2022, a CT counsel attorney at the national office reached out to the co-case agent and told her that Ms. Steinbrunner had sent it forward with concur for all charges and that the five members of the review team at the national office concurred with the line attorney.

It then went to CT senior leadership Rick Lunger and Elizabeth Hadden, and direction was given to the line attorney, Ms. Steinbrunner, to change it to a nonconcur for all charges.

I informed SAC Waldon, and he telephoned Ms.   Steinbrunner's supervisor, Veena Luthra.   Ms. Luthra stated it had always been a nonconcur.   I then communicated with SAC Waldon that CT was misrepresenting the facts.

On February 11th, 2022, CT counsel issued the memorandum nonconcurring with all counts.   In a documented exchange with Ms. Steinbrunner, the case agent told her: "Did you know that they were saying that it's always been a nonconcur?"

Ms. Steinbrunner responded:   "What?   No, I sent them a yellow light."

I have no idea why Ms. Luthra would provide false information about this topic.

Since CT counsel's opinion is only advisory, on February 25th, 2022, the IRS sent the SAR to the Delaware U.S. Attorney's Office -- I'm sorry, that's incorrect.   They sent it to the Department of Justice Tax Division.

AUSA Wolf supported charging Hunter Biden for tax evasion and false return in 2014, 2018, and 2019, and failure to file or pay for 2015, 2016, and 2017.   It is my

understanding that the Tax Division then authored a 90-plus-page memo that recommended prosecution.

The proper venue for a tax case is where the subject resides or where the return is prepared or filed.   That meant the proper venue for the years we were looking into would either be Washington, D.C., or California, not Delaware.

In March 2022, DOJ's Tax Division presented its prosecution memo to the United States Attorney's Office for the District of Columbia, which had venue over the 2014 and 2015 tax years.   The case agent and I requested to be part of the presentation to the D.C. U.S. Attorney's Office, but were denied.

Department of Justice Tax Division Mark Daly telephoned the case agent and stated that the First Assistant at the D.C. U.S. Attorney's Office was optimistic and had stated she would assign an AUSA to assist.

Just a couple days later, Mark Daly called the case agent back and told him that the President Biden appointee to the United States Attorney for the District of Columbia, Matthew Graves, personally reviewed the report and did not support it.   We in the IRS didn't realize at the time that meant there was no ability to charge there.

Attorney General Merrick Garland appeared before the Senate Appropriations Committee on April 26th, 2022.   Senator Bill Hagerty asked him how the American people could be confident that the administration was conducting a serious investigation into the President's own son.

Garland testified:   "Because we put the investigation in the hands of a Trump appointee from the previous administration, who is the United States Attorney for the District of Delaware, and because you have me as the Attorney General, who is committed to the independence of the Justice Department from any influence from the White House in criminal matters."

Garland said:    "The Hunter Biden investigation is being run by and supervised by the United States Attorney for the District of Delaware.    He is in charge of that investigation.    There will not be interference of any political or improper kind."

We knew that President Biden-appointed U.S. Attorney Matthew Graves did not support the investigation, but DOJ and United States Attorney Weiss allowed us to believe that he had some special authority to charge.

From March 2022 through October 7th, 2022, I was under the impression that, based on AG Garland's testimony before Congress and statements by U.S. Attorney Weiss and prosecutors, that they were still deciding whether to charge 2014 and 2015 tax violations.

However, I would later be told by United States Attorney Weiss that the D.C. U.S. Attorney would not allow U.S. Attorney Weiss to charge those years in his district.    This resulted in United States Attorney Weiss requesting special counsel authority from Main DOJ to charge in the District of Columbia.    I don't know if he asked before or after the Attorney General's April 26th, 2022, statement, but Weiss said his request for that authority was denied and that he was told to follow DOJ's process.

That process meant no charges would ever be brought in the District of Columbia, where the statute of limitations on the 2014 and '15 charges would eventually expire. The years in question included foreign income from Burisma and a scheme to evade his income taxes through a partnership with a convicted felon.    There were also potential FARA issues relating to 2014 and 2015.    The purposeful exclusion of the 2014 and 2015 years sanitized the most substantive criminal conduct and concealed material facts.

Hunter Biden still has not reported approximately $400,000 in income from Burisma and has not paid the tax due and owing of around $125,000 even after being told multiple times by his partner, Eric Schwerin, that he had to amend his 2014 return to

report that income.

To make matters worse, defense counsel was willing to sign statute of limitations extensions for 2014 and 2015 and had done so several times.    Because United States Attorney Weiss had no ability to charge 2014 and 2015, DOJ allowed the statute of limitations to expire.    There is no mechanism available to collect the tax owed by Hunter Biden for 2014 other than in a voluntary fashion.

In the first week of May 2022, I received a call from FBI Supervisory Special Agent Joe Gordon.    Gordon was preparing a briefing for FBI leadership.    He told me that his field office thought they should push for this case to be given to a special counsel and said, quote:    "My leadership is wondering why your leadership isn't asking for a special counsel in this investigation."

I relayed that information to my Director of Field Operations, who simply responded:    "I wouldn't even know how to go about that."

But since we didn't know D.C., District of Columbia, had refused to bring charges and that United States Attorney Weiss had no authority to overrule them, we believed at that time that the case could still be prosecuted.

It is common practice for DOJ to ask for the case agents' communications in discovery, as they might have to testify in court.    However, it's much more unusual to ask for management communications, because it is simply not discoverable.

In March of 2022, DOJ requested of the IRS and FBI all management-level emails and documents on this case.    I didn't produce my emails, but I provided them with my sensitive case reports and memorandums that included contemporaneous documentation of DOJ's continued unethical conduct.

Much of that information was being provided up my chain of command for over 2 years on how I thought their handling of the case was unethical.    I didn't hear anything

back about this at the time, leading me to believe no one read the discovery I provided.

In our July 29th, 2022, prosecution team call, AUSA Wolf told us that United States Attorney Weiss indicated that the end of September would be his goal to charge the 2014 and 2015 years, because they did not want to get any closer to a midterm election.    She also said:    "The X factor on timing will include any delay defense counsel has requested."

Two weeks later, I learned how defense counsel felt about the case when prosecutors told us on a pros team call that Chris Clark, Hunter Biden's counsel from Latham and Watkins, told them that if they charge Hunter Biden, they would be committing "career suicide," end quote.

Around this time, there began to be discussions of the fact that the remaining tax years, 2016, '17, '18 and '19, needed to be brought in the Central District of California. There was no explanation as to why, after being declined in D.C. for 2014 and 2015, that it took until mid-September 2022 to present the case to the Central District of California United States Attorney's Office.

Prosecutors stated that they presented the case to the Central District of California in mid-September.    That happened to correspond with the confirmation of the President Biden appointee to the United States Attorney, Martin Estrada.    The case agent and I asked to participate in that presentation, but it was denied.

On a September 22nd, 2022, pros team call, AUSA Wolf announced we wouldn't be taking any actions until after the midterm elections, asking:    Why would we shoot ourselves in the foot by charging before the election?    This was decided even though DOJ's Public Integrity Section had provided instruction that there did not need to be a cease and desist on investigative actions due to the upcoming midterms.    It still appeared that decisions were being made to conceal from the public the results of the investigation.

The next meeting was in person on October 7th, 2022, and it took place in the Delaware U.S. Attorney's Office.   This meeting included only senior-level managers from IRS CI, FBI, and the Delaware U.S. Attorney's Office.   This ended up being my red-line meeting in our investigation for me.

United States Attorney Weiss was present for the meeting.   He surprised us by telling us on the charges, quote:   "I'm not the deciding official on whether charges are filed," unquote.

He then shocked us with the earth-shattering news that the Biden-appointed D.C. U.S. Attorney Matthew Graves would not allow him to charge in his district.

To add to the surprise, U.S. Attorney Weiss stated that he subsequently asked for special counsel authority from Main DOJ at that time and was denied that authority. Instead, he was told to follow the process, which was known to send U.S.   Attorney Weiss through another President Biden-appointed U.S. Attorney.

This was troubling, because he stated that, if California does not support charging, he has no authority to charge in California.   Because it had been denied, he informed us the government would not be bringing charges against Hunter Biden for the 2014-2015 tax years, for which the statute of limitations were set to expire in one month.

All of our years of effort getting to the bottom of the massive amounts of foreign money Hunter Biden received from Burisma and others during that period would be for nothing.

Weiss also told us that if the new United States Attorney for the Central District of California declined to support charging for the 2016 through 2019 years, he would have to request special counsel authority again from the Deputy Attorney General and/or the Attorney General.

I couldn't understand why the IRS wasn't told in the summer of 2022 that D.C. had

already declined charges.    Everyone in that meeting seemed shellshocked, and I felt
misled by the Delaware United States Attorney's Office.

At this point, I expressed to United States Attorney Weiss several concerns with
how this case had been handled from the beginning.    The meeting was very contentious
and ended quite awkwardly.    It would be the last in-person meeting I had with United
States Attorney Weiss.

We had one more call 10 days later on October 17th, 2022.    United States
Attorney Weiss wasn't on this call.    In response to questions about more subpoena
requests, we were told there was no grand jury any longer to issue subpoena requests
out of.

When we asked when the Central District of California might make its decision on
the case, DOJ Tax Mark Daly responded, quote:    "I'm not the boss of them."

After this call, DOJ either stopped scheduling prosecution team meetings or else
just stopped inviting the IRS to them.

Disclosing our concerns to United States Attorney Weiss produced other problems
too.    In May, I had produced all my sensitive case reports for enforcement to date.
And now suddenly 5 months later, on October 24th, 2022, DOJ started asking for all those
reports since May.

They also renewed the request for all my emails on the case, saying they needed
to ensure they were aware of any exculpatory or impeachment effort in the case.    But
their extraordinary request looked to us just like a fishing expedition to know what we'd
been saying about their unethical handling of the case.

On November 7th, 2022, the FBI special agent on the case, Mike Dzielak, called me
to tell me the United States Attorney's Office had requested both management- and
senior management-level documents from the FBI related to the investigation.    He said

that had never happened before and that he was shocked at the request.    The FBI refused to provide any further discovery to the Delaware U.S. Attorney's Office.

I also shared with my leadership how inappropriate the whole situation was.    On December 12th, 2022, I emailed – "the United States Attorney's Office was so eager to get my emails, which they already had 95 percent of, then surprise they might have a problem with a few of them that memorialized their conduct.    If the content of what I documented in report or email is the cause of their consternation, I would direct them to consider their actions instead of who documented them.

I documented issues that I would normally have addressed as they occurred, because the United States Attorney's Office and Department of Justice Tax continued visceral reactions to any dissenting opinions or ideas.    Every single day was a battle to do our jobs.

I continually reported these issues up to IRS CI leadership beginning in the summer of 2020.    Now, because they realize I documented their conduct, they separate me out, cease all communication, and are now attempting to salvage their own conduct by attacking mine.    This is an attempt by the U.S. Attorney's Office to tarnish my good standing and position with IRS CI, and I expect IRS CI leadership to understand that.

As recent as the October 7th meeting, the Delaware U.S. Attorney's Office had nothing but good things to say about me and the team.    Then they finally read discovery items which were provided 6 months previous that are actually not discoverable, and they are beginning to defend their own unethical actions.

I have called into question the conduct of the United States Attorneys and DOJ Tax on this investigation on a recurring basis and am prepared to present these issues.

For over a year, I've had trouble sleeping and wake all hours of night thinking about this.    After some time, I realized it was because I subconsciously knew they were

not doing the right thing, but I could not fathom concluding that the United States Attorney's Office or DOJ Tax were in the wrong.

After I wrapped my mind around the fact that they were not infallible, I started to sleep better.    My choice was to turn a blind eye to their malfeasance and not sleep or to put myself in the crosshairs by doing the right thing.    My conscience chose the latter.

I hope IRS CI applauds the incredibly difficult position I have been put into instead of entertaining United States Attorney's Office attacks.    If they bring up something legitimate, I am sure we can address it, because it was not intentional.    Everything I do is with the goal of furthering IRS CI's mission, protecting the fairness of our tax system, and representing IRS CI with honor."

In January of this year, I learned United States Attorney Estrada had declined to bring the charges in the Central District of California.    For all intents and purposes, the case was dead, with the exception of one gun charge that could be brought in Delaware.

And yet, when Senator Chuck Grassley asked Attorney General Garland about the case on March 1st, 2023, Garland testified, quote:    "The United States Attorney had been advised that he has full authority to make those referrals you're talking about or to bring cases in other districts if he needs to do that.    He has been advised that he should get anything he needs.    I have not heard anything from that office that suggests they are not able to do anything that the U.S. Attorney wants them to do."

I don't have any firsthand information into why Garland said that, but to all of us who have been in the October 7th meeting with Weiss, this was clearly false testimony.

On March 16th, 2023, DOJ Tax Mark Daly was overheard on his telephone by one of my agents.    Mark Daly was talking to DOJ Tax Attorney Jack Morgan.    Mr. Daly stated that they would give United States Attorney Weiss the approvals required if he wanted them, but that he had no idea where he planned to charge Hunter Biden.

This indicates that after the Central District of California declined to allow charges to be brought there, the only route to United States Attorney Weiss was to request special counsel authority. It appears that this case was not moving forward until Senator Grassley asked pointed questions that held AG Garland accountable.

After my attorney sent the first letter to Congress on April 19th, I started to hear rumblings that DOJ was picking the case back up again. I don't believe that would have happened were it not for me blowing the whistle.

However, on Monday, May 15th, my special agent in charge called me and told me that DOJ had requested an entirely new team from the IRS and that none of the 12 agents in my group would be able to work the case. This seems like clear retaliation for me making my disclosures.

What's worse, after Special Agent [redacted] emailed the Commissioner to point out the human cost of the IRS simply implementing DOJ's retaliatory direction, my assistant special agent in charge threatened him with leaking (6)(E) material.

And my special agent in charge sent me and other supervisors an email at the same time that said we had to stay within our chain of command. I interpreted this as a clear warning to me and anyone else who might be thinking of blowing the whistle.

I did not choose to sit here before you today. I was compelled by my conscience when decision after decision has been made to deviate from our normal investigative processes. I believe Congress needs to know this information. I trust you'll do the right thing, because we have nothing if I can't trust this body.

MAJORITY COUNSEL 1. Thank you very much for your thorough opening statement.

The time is 10:24. We'll start the clock with majority questions.

To start, I'd like to mark this document as exhibit 1.

[Shapley Exhibit No. 1

Was marked for identification.]

EXHIBIT
tabbies
1

NIXON PEABODY

Nixon Peabody LLP
799 9th Street NW
Suite 500
Washington, DC 20001-5327
Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Mark D. Lytle**
Partner

T /
F /

April 19, 2023

***Via Electronic Transmission***

The Honorable Ron Wyden
Chairman, Committee on Finance
Co-Chair, Whistleblower Protection Caucus
United States Senate

The Honorable Mike Crapo
Ranking Member, Committee on Finance
United States Senate

The Honorable Richard Durbin
Chairman, Committee on the Judiciary
United States Senate

The Honorable Lindsey Graham
Ranking Member, Committee on the Judiciary
United States Senate

The Honorable Charles Grassley
Co-Chair, Whistleblower Protection Caucus
Member, Committee on Finance
United States Senate

The Honorable Jason Smith
Chairman, Committee on Ways & Means
United States House of Representatives

The Honorable Richard Neal
Ranking Member, Committee on Ways & Means
United States House of Representatives

The Honorable Jim Jordan
Chairman, Committee on the Judiciary
United States House of Representatives

The Honorable Jerrold Nadler
Ranking Member, Committee on the Judiciary
United States House of Representatives

Dear Chairs and Ranking Members:

I represent a career IRS Criminal Supervisory Special Agent who has been overseeing the ongoing and sensitive investigation of a high-profile, controversial subject since early 2020 and would like to make protected whistleblower disclosures to Congress. Despite serious risks of retaliation, my client is offering to provide you with information necessary to exercise your constitutional oversight function and wishes to make the disclosures in a non-partisan manner to the leadership of the relevant committees on both sides of the political aisle.

My client has already made legally protected disclosures internally at the IRS, through counsel to the U.S. Treasury Inspector General for Tax Administration, and to the Department of Justice, Office of Inspector General. The protected disclosures: (1) contradict sworn testimony to Congress by a senior political appointee, (2) involve failure to mitigate clear conflicts of interest in the ultimate disposition of the case, and (3) detail examples of preferential treatment

and politics improperly infecting decisions and protocols that would normally be followed by career law enforcement professionals in similar circumstances if the subject were not politically connected.

Some of the protected disclosures contain information that is restricted by statute from unauthorized disclosure to protect taxpayer and tax return information.

My client would like to share the same legally protected disclosures with Congress—pursuant to 26 U.S.C. § 6103(f)(5) and the protections afforded by 5 U.S.C. 2302(b)(8)(C)—that he has already shared with other oversight authorities. Out of an abundance of caution regarding taxpayer privacy laws, my client has refrained from sharing certain information even with me in the course of seeking legal advice. Thus, it is challenging for me to make fully informed judgments about how best to proceed.

My goal is to ensure that my client can properly share his lawfully protected disclosures with congressional committees. Thus, I respectfully request that your committees work with me to facilitate sharing this information with congress legally and with the fully informed advice of counsel. With the appropriate legal protections and in the appropriate setting, I would be happy to meet with you and provide a more detailed proffer of the testimony my client could provide to Congress.

Sincerely,

Mark D. Lytle
Partner

cc: The Honorable Michael Horowitz
Inspector General, U.S. Department of Justice

The Honorable Russell George
Inspector General for Tax Administration, U.S. Department of the Treasury

EXAMINATION

BY MAJORITY COUNSEL 1:

Q Do you recognize this document?

A Yes, I do.

Q What is it?

A This is the April 19th, 2023, letter sent to the chairs and ranking members identified here by my attorneys Mark Lytle and -- oh, it's just from Mark Lytle.

Q And this is the initial reason why we're here today?

A This initiated what's happening, yes.

Q Okay. I'd like to talk a little bit about your background. You mentioned, I believe, that you started at the IRS in 2009. Is that correct?

A Yes, that's correct.

Q And what is your educational background?

A I have an accounting and business degree from the University of Maryland, and I have a master's in business administration from the University of Baltimore.

Q And before you joined the IRS, what did you do for employment?

A I was in the Office of Inspector General with the National Security Agency.

Q And when did you begin in that position?

A 2007.

Q Did you hold any other positions prior to that?

A Internships and stuff like that.

Q What was your motivation for joining the IRS?

A I always planned on going into law enforcement and I really had a desire to serve. And that was why I went with the accounting degree and business degree and I

got my MBA, was for the purpose of getting that special agent job with the Federal

Government.

Q        And you talked through sort of your history at the IRS during your opening

statement.   Can you briefly summarize your roles and responsibilities in your current

position?

A        Yes.   So I oversee 12 agents.   They are handpicked.   They sit all across the

country.   We work all high-dollar, complex, international cases.   We work foreign

financial institutions.   We do undercover operations and search warrants and all that

stuff in other countries and in this country.

And I'm responsible for reviewing all enforcement actions and recommendation

reports and case initiations and so on and so forth.   That's like my main job as the

supervisory special agent of ITFC.

I'm also a representative in the Joint Chiefs of Global Tax Enforcement, working I

guess directly under the Chief of IRS CI.   And it works with four other partner countries

in trying to collaborate and attack tax noncompliance on a global scale and share

information where we can legally.

Q        And who do you directly report to?

A        My current report is Assistant Special Agent in Charge Lola Watson.

BY MAJORITY COUNSEL 2:

Q        Where does she sit?

A        Washington, D.C.

Q        She sits in Washington.   And your office is in Baltimore?

A        Yeah.   I either sit in D.C. or Baltimore.   I kind of split time.

Q        Okay.

BY MAJORITY COUNSEL 1:

Q      In the typical situation in the criminal tax investigation, what is your understanding of the leadership and management structure at the Tax Division at the Department of Justice?

A      Well, with most of our cases, because they're complex and high-dollar and they usually align with the very top priorities in the agency, we usually have Department of Justice Tax attorneys that assist on the cases with us.

That's not typical for small cases, normal cases.    But in our cases and in this particular case, from the very beginning there were two Department of Justice Tax Division attorneys working side by side with us the entire time.    So they worked as prosecutors alongside the AUSAs in Delaware.

And then ultimately what happens is the prosecution recommendation report that is produced by Criminal Investigation gets sent to DOJ Tax.    And they absorb that report, and they usually put out a memo either approving, providing discretion, or declining. And in the normal course, it's usually a pretty quick turnaround, 30 days, 45 days.

Q      You mentioned two prosecutors in this case at DOJ Tax.    Who are those two individuals?

A      At the beginning, it was Jason Poole and Mark Daly.    And Mark Daly was definitely the lead.    Jason Poole took a different position at some point and Jack Morgan took his spot.

Q      And did those individuals sit in Washington, D.C.?

A      I know Mark Daly does.    I'm pretty sure -- yeah, Jack Morgan does as well, yes, yes.

Q      In the course of this investigation, did you interact with anyone else at the DOJ Tax Division?

A      I interacted with Jason Poole a lot, but in his new role, because he became

the chief of the Northern Division of the Department of Justice's Tax Division, and I had to call him on several occasions concerning issues we were having.

MAJORITY COUNSEL 2.    On this case?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Okay.    And in a typical case, what is IRS CI's relationship with any given U.S. Attorney's Office?

Mr. Shapley.    I'm sorry, can I add to my last question there?

MAJORITY COUNSEL 1.    Please.

Mr. Shapley.    So I also interacted with Stuart Goldberg, who I think is a Deputy Assistant Attorney General, I think is his title, on a few occasions.

MAJORITY COUNSEL 2.    And he's the head of the Tax Division?

Mr. Shapley.    I believe he's the head of the Civil Tax Division and the head of the Criminal is different, but there is not currently a person who's been confirmed there, I believe.

Usually Stuart Goldberg would not be the person overseeing the criminal tax stuff. It usually would go to the personal -- the Criminal Division.

MAJORITY COUNSEL 2.    Is it fair to say he was the senior-most official in the Tax Division?

Mr. Shapley.    Yes.    That's fair, yes.

BY MAJORITY COUNSEL 1:

Q      On this investigation?

A      That's correct.

Q      Okay.    What in a typical case would be IRS CI's relationship with the U.S. Attorney's Office?

A      On a case, we would talk strategy.    We would go and get the evidence,

bring the evidence to them.    We would be requesting to do, get certain document requests from them.

There are things like search warrants and undercover operations that all go through the United States Attorney's Office prosecutors.    And generally, the way it works is the agents go out and they get the information, and they have to be proactive in doing so.    And they bring that information to the prosecutor, and we kind of go forward from there.

Q     In your opening statement, you described prosecution team meetings.    In this case, individuals from which organizations participated in those meetings?

[10:32 a.m.]

Mr. Shapley. Sure, yeah. The prosecution team is the United States Attorney's Office for Delaware, Department of Justice Tax Division.

At some point in time, a Department of Justice National Security Division attorney came on.

MAJORITY COUNSEL 2. Who was that?

Mr. Shapley. McKenzie. Brian McKenzie.

And then it was FBI. And that was usually from the SSA to the case agents, and there was around four or five of them.

BY MAJORITY COUNSEL 1:

Q Sorry. What's SSA?

A I'm sorry. Supervisory special agent, SSA.

And then it was IRS. And it was me, [redacted], and the co-case agent, Christine Puglisi. And there was also an IRS CI agent out of the Philadelphia Field Office that was working some ancillary issues, Anthony LoPiccolo, who would also participate in those.

And United States Attorney Weiss would be on those, but it wasn't scheduled. He'd be on some -- pop in, pop out, that type of thing.

Q And is the structure of that prosecution team typical for a case of this size and profile?

A It was -- we met more often, I think, because there were so many moving parts. I wouldn't say that it's typical to have a prosecution team meeting every 2 weeks in other cases. But it was just a way to get everybody at one spot at one time to have the conversations.

Q And how did this specific investigation begin?

A So Special Agent [redacted] was working on another case, and during that case he found some reports that had some individuals' names in it. And it was basically a case development tool he was using, and he looked at those and was seeing if he can initiate criminal investigations on that list of people, and Hunter Biden was one of the people on that list.

Q And from that stage, how does an investigation open? What's the process around that?

A So the agent can write a PI evaluation report, and they send it to my level, the SSA, supervisory special agent. And if it's a Title 26 case, it can just be approved and put on our system.

Now, under a PI, it's kind of unique at IRS CI. There are only a few techniques you can use, and it does [not] include third-party contacts and stuff like that.

So there's a whole other effort to make a subject criminal investigation, and that's a more involved form, called the 9131, and it has a bunch of attachments. And really it's an analysis of all the steps taken in the primary investigative phase.

And that 9131, in this case, if it's -- it goes forward to Department of Justice Tax Division for approval and -- yeah, yeah. I'm sorry.

Generally. If it's generally like a 9131, if it's going to be a grand jury investigation, request a grand jury investigation, generally a 9131 goes to Department of Justice Tax Division, who approves it, and you're allowed to participate in that grand jury.

Q When a matter develops in this way, is there interaction on the civil side related to civil audits? Are audits opened in connection with this process?

A Audits aren't opened in partner with a criminal investigation. Part of the primary investigative phase, as one of the things you would do, you would request all the information from IDRS, our internal system. That would include checks for audits and

things like that in the past, but there would be no request to initiate any civil activity.

It's actually the exact opposite.    A form is issued that says -- the title of the form is Suspend Civil Activity, and the subject's identifiers are included.

Q    So in your opening statement you discussed tax years 2014 through 2019 for this particular taxpayer.    Do you know whether there are any issues related to 2020 or 2021?

A    No.    We never included that as part of the investigation. We did get the returns, but we didn't.

[Shapley Exhibit No. 2

Was marked for identification.]



ROBERT DOE ("RHB")

Years: 2014, 2015, 2016, 2017, 2018, 2019

Violation(s):Title 26, United States Code, Section 7201
Title 26, United States Code, Section 7206(1)
Title 26, United States Code, Section 7203

Special Agent: [redacted]
Revenue Agent: [redacted]

2.

## CONCLUSIONS AND RECOMMENDATIONS

The recommendation for prosecution is based on the facts above and recommends that RHB be prosecuted under the provisions of Title 26 USC Sections 7201 and 7206 (1) for the tax years 2014, 2018 and 2019 and under the provisions of Title 26 USC Section 7203 for the tax years 2015, 2016, 2017, 2018 and 2019.

A draft of this SAR has been given to DOJ-Tax Senior Attorney Mark Daly, as well as Assistant United States Attorney Lesley Wolf. AUSA Wolf has reviewed the appendices and the charges cited in this report and agrees with the prosecution recommendation of the above cited charges against RHB.

Special Agent
Cellular

**Approved:**

Gary Shapley

Supervisory Special Agent, Criminal Investigation

Cellular [redacted]

BY MAJORITY COUNSEL 1:

Q Okay. I'd like to talk now a little bit about the specific tax years at issue. The document being handed to you is marked as exhibit 2.

Are you familiar with this document?

A Yes, I am.

Q What is it?

A This is the special agent report.

Q And who is the subject of this report?

A Yeah. To clarify the last response, it's an excerpt from the special agent report.

Q And who is the subject of this report?

A So it says Robert Doe. That was the name that was put into our internal system to attempt to keep anyone from revealing the name, and "RHB" stands for Robert Hunter Biden.

Q And turning to the second page of the document, this excerpt includes the "Conclusions and Recommendations" section. Can you describe the conclusions and recommendations made in this report?

A Yes, I can. The report includes itemized elements of each violation for each year up above it that I couldn't provide because of grand jury (6)(e) material.

This recommended felony tax evasion charges, that's 7201, is tax evasion, and 7206(1) is a false tax return, also a felony, for the tax years 2014, 2018, and 2019. And for Title 26 7203, which is a failure to file or pay, that is a misdemeanor charge for '15, '16, '17, '18, and '19.

Also under that is a paragraph that is common when we work directly with

Department of Justice Tax Division and AUSA so closely. We usually would give a statement saying what they wanted as well at that time.

This report was reviewed extensively with Mark Daly, and also a lot with AUSA Lesley Wolf, and each of them agreed with the recommendations as posed in this report.

Q Okay. And when was this document finalized and signed?

A It was, I believe, January 27th of 2022.

BY MAJORITY COUNSEL 2:

Q And can you just walk us through the process for this document? This is an IRS document?

A It is, yeah.

Q And it is sent to who?

A Yeah. This document is a very robust document that includes everything that we do. Internally it would go to CT counsel for their review. They provide a memo, concur or nonconcur. It's just advisory. We don't have to follow what they say.

Q Did they concur?

A They nonconcurred.

Q They did not concur?

A Yeah. There was a portion in my opening statement that described that event where the line attorney concurred with all charges and then it went to the national office to review on sensitive case.

The panel at the national office agreed with the line attorney that it was concur. And when it went up to their top two people at the CT counsel, they sent it back to the line attorney and told her to change it to nonconcur.

Q Okay.

A So I'm not even sure. That could happen on occasion. What was

incredibly outside the norm here was that they usually tell us, and we ask them to tell us if anything is going to be a nonconcur.    And all along they were saying it's a concur, it's a concur -- with all charges.    It was green for 2018, yellow for other years, which is all in the concur range.

And when we got the nonconcur, I went to my special agent in charge who called the line attorney's supervisor and she said, it's always been nonconcur.

And then it was really incredible that that statement was made, and maybe only IRS CI geeks care about that.    But then we communicate in an instant message that's captured with the line attorney saying, "They are telling us that this has always been a nonconcur," and she's like, "What, no, no.    It was a concur when I sent it up."

So for some reason, that got miscommunicated.

Q     Was any feedback provided as to why?

A     There's a robust document that was created by CT counsel -- I spent time rebutting it, but there was nothing that we hadn't considered in the investigative team with the prosecution team for the 3-plus years we'd been investigating.

Yeah, and this advisory.    Yeah, it is, I would say, 90-plus percent of everything that I do in my international tax group is nonconcur by CT counsel, and we ignore what they say.

So then this report goes, after that, to the Department of Justice Tax Division. It's transmitted to them.    And that's when they take it and they review it.    And usually it's approve, discretion, or declined in a normal course.    But we sent it to them on February 25th of 2022, and I have yet to see an approval, discretion, or declination.

Q     And what's the U.S. Attorney's Office in Delaware's role with this particular document?

A     So it's just to help advise them.    After DOJ Tax, if they approve a charge,

then that's DOJ Tax saying that you have to charge it.    And if the United States

Attorney's Office, they can say, "We don't want to charge it here," but DOJ Tax then has

to go and charge it.    They have the authority to do so.

Q    So did the U.S. Attorney's Office in Delaware concur with this?

A    They would never have [to as part of the process, but] they did when it was

written, right?    They were on board with all the charges when it was written.    But there

would never be an official time where we requested their concur or nonconcur.

Q    So did they review it before you submitted it to DOJ?

A    Oh, yes, yes.

Q    Okay.

A    Yes.

Q    And they had an opportunity to make suggestions or --

A    Yes.

Q    -- tell you to tweak things?

A    Yes.

Q    And they didn't.

A    Well, we did, but --

Q    The final document though --

A    Yeah.

Q    -- they concurred.

A    The final document was a compilation of everyone's understanding of what

the evidence said and what should be charged.

Just a little bit more about this document.    I mean, this document is around – it's

incredibly robust.    So I think it was around 85 pages, just the report, and it goes through

the theory of investigation.    And then it goes, like I said, into each year and each

element.

        And it's each piece of evidence in each element, and it's cited to evidence.    So this report, in reality, crashes my computer every time it comes up because it includes all the evidence attached to it.    It's like 8-, 9-, 10,000 pages of evidence and documents. It's an incredibly robust document.

                        [Shapley Exhibit No. 3

                        Was marked for identification.]

Ex. 3

nue Service Office of Appeals may request non-binding mediation on any issue unresolved at the conclusion of—

(A) appeals procedures; or

(B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.

**(2) Arbitration**

The Secretary shall establish a pilot program under which a taxpayer and the Internal Revenue Service Office of Appeals may jointly request binding arbitration on any issue unresolved at the conclusion of—

(A) appeals procedures; or

(B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.

(Added Pub. L. 105–206, title III, §3465(a)(1), July 22, 1998, 112 Stat. 768.)

PRIOR PROVISIONS

A prior section 7123 was renumbered section 7124 of this title.

### §7124. Cross references

**For criminal penalties for concealment of property, false statement, or falsifying and destroying records, in connection with any closing agreement, compromise, or offer of compromise, see section 7206.**

(Aug. 16, 1954, ch. 736, 68A Stat. 850, §7123; Pub. L. 97–258, §3(f)(12), Sept. 13, 1982, 96 Stat. 1065; renumbered §7124, Pub. L. 105–206, title III, §3465(a)(1), July 22, 1998, 112 Stat. 767.)

AMENDMENTS

1998—Pub. L. 105–206 renumbered section 7123 of this title as this section.

1982—Subsec. (a). Pub. L. 97–258, §3(f)(12)(A), struck out heading "Criminal penalties".

Subsec. (b). Pub. L. 97–258, §3(f)(12)(B), struck out subsec. (b) which set forth cross reference to R.S. 3469 (31 U.S.C. 194) relating to compromises after judgment.

## CHAPTER 75—CRIMES, OTHER OFFENSES, AND FORFEITURES

| Subchapter | | Sec.[1] |
|---|---|---|
| A. | Crimes | 7201 |
| B. | Other offenses | 7261 |
| C. | Forfeitures | 7301 |
| D. | Miscellaneous penalty and forfeiture provisions | 7341 |

### Subchapter A—Crimes

Part

I. General provisions.

II. Penalties applicable to certain taxes.

### PART I—GENERAL PROVISIONS

Sec.

7201. Attempt to evade or defeat tax.

7202. Willful failure to collect or pay over tax.

7203. Willful failure to file return, supply information, or pay tax.

7204. Fraudulent statement or failure to make statement to employees.

7205. Fraudulent withholding exemption certificate or failure to supply information.

7206. Fraud and false statements.

7207. Fraudulent returns, statements, or other documents.

7208. Offenses relating to stamps.

7209. Unauthorized use or sale of stamps.

7210. Failure to obey summons.

7211. False statements to purchasers or lessees relating to tax.

7212. Attempts to interfere with administration of internal revenue laws.

7213. Unauthorized disclosure of information.

7213A. Unauthorized inspection of returns or return information.

7214. Offenses by officers and employees of the United States.

7215. Offenses with respect to collected taxes.

7216. Disclosure or use of information by preparers of returns.

7217. Prohibition on executive branch influence over taxpayer audits and other investigations.

[1] Section numbers editorially supplied.

AMENDMENTS

1998—Pub. L. 105–206, title I, §1105(b), July 22, 1998, 112 Stat. 711, added item 7217.

1997—Pub. L. 105–35, §2(b)(2), Aug. 5, 1997, 111 Stat. 1105, added item 7213A.

1982—Pub. L. 97–248, title III, §357(b)(2), Sept. 3, 1982, 96 Stat. 646, struck out item 7217 "Civil damages for unauthorized disclosure of returns and return information".

1976—Pub. L. 94–455, title XII, §1202(e)(2), Oct. 4, 1976, 90 Stat. 1687, added item 7217.

1971—Pub. L. 92–178, title III, §316(b), Dec. 10, 1971, 85 Stat. 529, added item 7216.

1958—Pub. L. 85–321, §3(b), Feb. 11, 1958, 72 Stat. 6, added item 7215.

### §7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, §329(a), Sept. 3, 1982, 96 Stat. 618.)

AMENDMENTS

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

EFFECTIVE DATE OF 1982 AMENDMENT

Section 329(e) of Pub. L. 97–248 provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

### §7202. Willful failure to collect or pay over tax

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851.)

EXHIBIT 3

### § 7124. Cross references

**For criminal penalties for concealment of property, false statement, or falsifying and destroying records, in connection with any closing agreement, compromise, or offer of compromise, see section 7206.**

(Aug. 16, 1954, ch. 736, 68A Stat. 850, § 7123; Pub. L. 97–258, § 3(f)(12), Sept. 13, 1982, 96 Stat. 1065; renumbered § 7124, Pub. L. 105–206, title III, § 3465(a)(1), July 22, 1998, 112 Stat. 767.)

AMENDMENTS

1998—Pub. L. 105–206 renumbered section 7123 of this title as this section.

1982—Subsec. (a). Pub. L. 97–258, § 3(f)(12)(A), struck out heading "Criminal penalties".

Subsec. (b). Pub. L. 97–258, § 3(f)(12)(B), struck out subsec. (b) which set forth cross reference to R.S. 3469 (31 U.S.C. 194) relating to compromises after judgment.

## CHAPTER 75—CRIMES, OTHER OFFENSES, AND FORFEITURES

| Subchapter | | Sec.[1] |
|---|---|---|
| A. | Crimes | 7201 |
| B. | Other offenses | 7261 |
| C. | Forfeitures | 7301 |
| D. | Miscellaneous penalty and forfeiture provisions | 7341 |

### Subchapter A—Crimes

| Part | |
|---|---|
| I. | General provisions. |
| II. | Penalties applicable to certain taxes. |

### PART I—GENERAL PROVISIONS

| Sec. | |
|---|---|
| 7201. | Attempt to evade or defeat tax. |
| 7202. | Willful failure to collect or pay over tax. |
| 7203. | Willful failure to file return, supply information, or pay tax. |
| 7204. | Fraudulent statement or failure to make statement to employees. |
| 7205. | Fraudulent withholding exemption certificate or failure to supply information. |
| 7206. | Fraud and false statements. |
| 7207. | Fraudulent returns, statements, or other documents. |
| 7208. | Offenses relating to stamps. |
| 7209. | Unauthorized use or sale of stamps. |
| 7210. | Failure to obey summons. |
| 7211. | False statements to purchasers or lessees relating to tax. |
| 7212. | Attempts to interfere with administration of internal revenue laws. |
| 7213. | Unauthorized disclosure of information. |
| 7213A. | Unauthorized inspection of returns or return information. |
| 7214. | Offenses by officers and employees of the United States. |
| 7215. | Offenses with respect to collected taxes. |
| 7216. | Disclosure or use of information by preparers of returns. |
| 7217. | Prohibition on executive branch influence over taxpayer audits and other investigations. |

AMENDMENTS

1998—Pub. L. 105–206, title I, § 1105(b), July 22, 1998, 112 Stat. 711, added item 7217.

1997—Pub. L. 105–35, § 2(b)(2), Aug. 5, 1997, 111 Stat. 1105, added item 7213A.

1982—Pub. L. 97–248, title III, § 357(b)(2), Sept. 3, 1982, 96 Stat. 646, struck out item 7217 "Civil damages for unauthorized disclosure of returns and return information".

1976—Pub. L. 94–455, title XII, § 1202(e)(2), Oct. 4, 1976, 90 Stat. 1687, added item 7217.

1971—Pub. L. 92–178, title III, § 316(b), Dec. 10, 1971, 85 Stat. 529, added item 7216.

1958—Pub. L. 85–321, § 3(b), Feb. 11, 1958, 72 Stat. 6, added item 7215.

[1] Section numbers editorially supplied.

### § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, § 329(a), Sept. 3, 1982, 96 Stat. 618.)

AMENDMENTS

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

EFFECTIVE DATE OF 1982 AMENDMENT

Pub. L. 97–248, title III, § 329(e), Sept. 3, 1982, 96 Stat. 619, provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

### § 7202. Willful failure to collect or pay over tax

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851.)

### § 7203. Willful failure to file return, supply information, or pay tax

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting

"felony" for "misdemeanor" and "5 years" for "1 year".

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 90–364, title I, § 103(e)(5), June 28, 1968, 82 Stat. 264; Pub. L. 97–248, title III, §§ 327, 329(b), Sept. 3, 1982, 96 Stat. 617, 618; Pub. L. 98–369, div. A, title IV, § 412(b)(9), July 18, 1984, 98 Stat. 792; Pub. L. 100–690, title VII, § 7601(a)(2)(B), Nov. 18, 1988, 102 Stat. 4504; Pub. L. 101–647, title XXXIII, § 3303(a), Nov. 29, 1990, 104 Stat. 4918.)

AMENDMENTS

1990—Pub. L. 101–647 substituted "substituting 'felony' for 'misdemeanor' and" for "substituting".

1988—Pub. L. 100–690 inserted at end "In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting '5 years' for '1 year'."

1984—Pub. L. 98–369 struck out "(other than a return required under the authority of section 6015)" after "to make a return".

1982—Pub. L. 97–248, § 329(b), substituted "$25,000 ($100,000 in the case of a corporation)" for "$10,000".

Pub. L. 97–248, § 327, inserted last sentence providing that, in the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure.

1968—Pub. L. 90–364 struck out reference to section 6016.

EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101–647, title XXXIII, § 3303(c), Nov. 29, 1990, 104 Stat. 4918, provided that: "The amendment made by subsection (a) [amending this section] shall apply to actions, and failures to act, occurring after the date of the enactment of this Act [Nov. 29, 1990]."

EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–690 applicable to actions after Nov. 18, 1988, see section 7601(a)(3) of Pub. L. 100–690, set out as a note under section 6050I of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–369 applicable with respect to taxable years beginning after Dec. 31, 1984, see section 414(a)(1) of Pub. L. 98–369, set out as a note under section 6654 of this title.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 329(b) of Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90–364 applicable with respect to taxable years beginning after Dec. 31, 1967, except as provided by section 104 of Pub. L. 90–364, see section 103(f) of Pub. L. 90–364, set out as a note under section 243 of this title.

### § 7204. Fraudulent statement or failure to make statement to employees

In lieu of any other penalty provided by law (except the penalty provided by section 6674) any person required under the provisions of section 6051 to furnish a statement who willfully furnishes a false or fraudulent statement or who willfully fails to furnish a statement in the manner, at the time, and showing the information required under section 6051, or regulations prescribed thereunder, shall, for each such offense, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 852.)

### § 7205. Fraudulent withholding exemption certificate or failure to supply information

**(a) Withholding on wages**

Any individual required to supply information to his employer under section 3402 who willfully supplies false or fraudulent information, or who willfully fails to supply information thereunder which would require an increase in the tax to be withheld under section 3402, shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

**(b) Backup withholding on interest and dividends**

If any individual willfully makes a false certification under paragraph (1) or (2)(C) of section 3406(d), then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 852; Pub. L. 89–368, title I, § 101(e)(5), Mar. 15, 1966, 80 Stat. 62; Pub. L. 97–34, title VII, § 721(b), Aug. 13, 1981, 95 Stat. 341; Pub. L. 97–248, title III, §§ 306(b), 308(a), Sept. 3, 1982, 96 Stat. 588, 591; Pub. L. 98–67, title I, §§ 102(a), 107(b), Aug. 5, 1983, 97 Stat. 369, 382; Pub. L. 98–369, div. A, title I, § 159(a), July 18, 1984, 98 Stat. 696; Pub. L. 101–239, title VII, § 7711(b)(2), Dec. 19, 1989, 103 Stat. 2393.)

AMENDMENTS

1989—Subsec. (b). Pub. L. 101–239 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "If any individual willfully makes—

"(1) any false certification or affirmation on any statement required by a payor in order to meet the due diligence requirements of section 6676(b), or

"(2) a false certification under paragraph (1) or (2)(C) of section 3406(d),

then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both."

1984—Pub. L. 98–369 in subsecs. (a) and (b) substituted "in addition to" for "in lieu of" and struck out reference to penalty under section 6682 after "penalty provided by law".

1983—Pub. L. 98–67 designated existing provisions as subsec. (a), added subsec. (b), and repealed amendments made by Pub. L. 97–248. See 1982 Amendment note below.

1982—Pub. L. 97–248 provided that, applicable to payments of interest, dividends, and patronage dividends paid or credited after June 30, 1983, this section is amended by designating the existing provisions as subsec. (a) with a heading of "Withholding on wages", and by adding a new subsec. (b). Section 102(a), (b) of Pub. L. 98–67, title I, Aug. 5, 1983, 97 Stat. 369, repealed subtitle A (§§ 301–308) of title III of Pub. L. 97–248 as of the close of June 30, 1983, and provided that the Internal Revenue Code of 1954 [now 1986] [this title] shall be applied and administered (subject to certain exceptions) as if such subtitle A (and the amendments made by such subtitle A) had not been enacted. Subsec. (b), referred to above, read as follows:

"**(b) Withholding of interest and dividends**

"Any person who—

then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both."

1984—Pub. L. 98–369 in subsecs. (a) and (b) substituted "in addition to" for "in lieu of" and struck out reference to penalty under section 6682 after "penalty provided by law".

1983—Pub. L. 98–67 designated existing provisions as subsec. (a), added subsec. (b), and repealed amendments made by Pub. L. 97–248. See 1982 Amendment note below.

1982—Pub. L. 97–248 provided that, applicable to payments of interest, dividends, and patronage dividends paid or credited after June 30, 1983, this section is amended by designating the existing provisions as subsec. (a) with a heading of "Withholding on wages", and by adding a new subsec. (b). Section 102(a), (b) of Pub. L. 98–67, title I, Aug. 5, 1983, 97 Stat. 369, repealed subtitle A (§§301–308) of title III of Pub. L. 97–248 as of the close of June 30, 1983, and provided that the Internal Revenue Code of 1954 [now 1986] [this title] shall be applied and administered (subject to certain exceptions) as if such subtitle A (and the amendments made by such subtitle A) had not been enacted. Subsec. (b), referred to above, read as follows:

"**(b) Withholding of interest and dividends**

"Any person who—

"(1) willfully files an exemption certificate with any payor under section 3452(f)(1)(A), which is known by him to be fraudulent or to be false as to any material matter, or

"(2) is required to furnish notice under section 3452(f)(1)(B), and willfully fails to furnish such notice in the manner and at the time required pursuant to section 3452(f)(1)(B) or the regulations prescribed thereunder,

shall, in lieu of any penalty otherwise provided, upon conviction thereof, be fined not more than $500, or imprisoned not more than 1 year, or both."

1981—Pub. L. 97–34 substituted "$1,000" for "$500".

1966—Pub. L. 89–368 substituted "section 3402" and "any other penalty provided by law (except the penalty provided by section 6682)" for "section 3402(f)" and "any penalty otherwise provided" respectively.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–239 applicable to returns and statements the due date for which (determined without regard to extensions) is after Dec. 31, 1989, see section 7711(c) of Pub. L. 101–239, set out as a note under section 6721 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Pub. L. 98–369, div. A, title I, §159(b), July 18, 1984, 98 Stat. 696, provided that: "The amendments made by this section [amending this section] shall apply to actions and failures to act occurring after the date of the enactment of this Act [July 18, 1984]."

EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by section 107(b) of Pub. L. 98–67 effective Aug. 5, 1983, see section 110(c) of Pub. L. 98–67, set out as a note under section 31 of this title.

EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–34 applicable to acts and failures to act after Dec. 31, 1981, see section 721(d) of Pub. L. 97–34, set out as a note under section 6682 of this title.

## §7206. Fraud and false statements

Any person who—

**(1) Declaration under penalties of perjury**

Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

**(2) Aid or assistance**

Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; or

**(3) Fraudulent bonds, permits, and entries**

Simulates or falsely or fraudulently executes or signs any bond, permit, entry, or other document required by the provisions of the internal revenue laws, or by any regulation made in pursuance thereof, or procures the same to be falsely or fraudulently executed, or advises, aids in, or connives at such execution thereof; or

**(4) Removal or concealment with intent to defraud**

Removes, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title; or

**(5) Compromises and closing agreements**

In connection with any compromise under section 7122, or offer of such compromise, or in connection with any closing agreement under section 7121, or offer to enter into any such agreement, willfully—

**(A) Concealment of property**

Conceals from any officer or employee of the United States any property belonging to the estate of a taxpayer or other person liable in respect of the tax, or

**(B) Withholding, falsifying, and destroying records**

Receives, withholds, destroys, mutilates, or falsifies any book, document, or record, or makes any false statement, relating to the estate or financial condition of the taxpayer or other person liable in respect of the tax;

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 852; Pub. L. 97–248, title III, §329(c), Sept. 3, 1982, 96 Stat. 618.)

**Editorial Notes**

AMENDMENTS

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$5,000".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

## § 7207. Fraudulent returns, statements, or other documents

Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both. Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 853; Pub. L. 87–792, § 7(m)(3), Oct. 10, 1962, 76 Stat. 831; Pub. L. 91–172, title I, § 101(e)(5), Dec. 30, 1969, 83 Stat. 524; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 96–603, § 1(d)(5), Dec. 28, 1980, 94 Stat. 3505; Pub. L. 97–248, title III, § 329(d), Sept. 3, 1982, 96 Stat. 619; Pub. L. 98–369, div. A, title IV, § 491(d)(51), July 18, 1984, 98 Stat. 852; Pub. L. 100–203, title X, § 10704(c), Dec. 22, 1987, 101 Stat. 1330–463; Pub. L. 105–277, div. J, title I, § 1004(b)(2)(E), Oct. 21, 1998, 112 Stat. 2681–890; Pub. L. 107–276, § 6(d), Nov. 2, 2002, 116 Stat. 1933.)

**Editorial Notes**

AMENDMENTS

2002—Pub. L. 107–276 substituted "pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527" for "pursuant to subsection (b) of section 6047 or pursuant to subsection (d) of section 6104".

1998—Pub. L. 105–277 struck out "or (e)" after "subsection (d)".

1987—Pub. L. 100–203 inserted reference to subsec. (e) of section 6104.

1984—Pub. L. 98–369 struck out "or (c)" after "subsection (b)".

1982—Pub. L. 97–248 substituted "$10,000 ($50,000 in the case of a corporation)" for "$1,000" wherever appearing.

1980—Pub. L. 96–603 substituted "subsection (b) or (c) of section 6047 or pursuant to subsection (d) of section 6104" for "sections 6047(b) or (c), 6056, or 6104(d)".

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary".

1969—Pub. L. 91–172 substituted "sections 6047(b) or (c), 6056, or 6104(d)" for "section 6047(b) or (c)".

1962—Pub. L. 87–792 inserted sentence providing that any person required pursuant to section 6047(b) or (c) to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $1,000, or imprisoned not more than 1 year, or both.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2002 AMENDMENT

Pub. L. 107–276, § 6(h)(3), Nov. 2, 2002, 116 Stat. 1934, provided that: "The amendment made by subsection (d) [amending this section] shall apply to reports and notices required to be filed on or after the date of the enactment of this Act [Nov. 2, 2002]."

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–277 applicable to requests made after the later of Dec. 31, 1998, or the 60th day after the Secretary of the Treasury first issues the regulations referred to in section 6104(d)(4) of this title, see section 1004(b)(3) of Pub. L. 105–277, set out as a note under section 6104 of this title.

EFFECTIVE DATE OF 1987 AMENDMENT

Amendment by Pub. L. 100–203 applicable to returns for years beginning after Dec. 31, 1986, and on and after Dec. 22, 1987, in case of applications submitted after July 15, 1987, or on or before July 15, 1987, if the organization has a copy of the application on July 15, 1987, see section 10704(d) of Pub. L. 100–203, set out as a note under section 6652 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–369 applicable to obligations issued after Dec. 31, 1983, see section 491(f)(1) of Pub. L. 98–369, set out as a note under section 62 of this title.

EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–603 applicable to taxable years beginning after Dec. 31, 1980, see section 1(f) of Pub. L. 96–603, set out as a note under section 6033 of this title.

EFFECTIVE DATE OF 1969 AMENDMENT

Amendment by Pub. L. 91–172 effective Jan. 1, 1970, see section 101(k)(1) of Pub. L. 91–172, set out as an Effective Date note under section 4940 of this title.

EFFECTIVE DATE OF 1962 AMENDMENT

Amendment by Pub. L. 87–792 applicable to taxable years beginning after Dec. 31, 1962, see section 8 of Pub. L. 87–792, set out as a note under section 22 of this title.

ANNUAL REPORTS

Pub. L. 110–428, § 2(e), Oct. 15, 2008, 122 Stat. 4840, provided that: "The Secretary of the Treasury shall annually submit to Congress and make publicly available a report on the filing of false and fraudulent returns by individuals incarcerated in Federal and State prisons. Such report shall include statistics on the number of false and fraudulent returns associated with each Federal and State prison."

## § 7208. Offenses relating to stamps

Any person who—

**(1) Counterfeiting**

With intent to defraud, alters, forges, makes, or counterfeits any stamp, coupon, ticket, book, or other device prescribed under authority of this title for the collection or payment of any tax imposed by this title, or sells, lends, or has in his possession any such altered, forged, or counterfeited stamp, coupon, ticket, book, or other device, or makes, uses, sells, or has in his possession any material in imitation of the material used in the manufacture of such stamp, coupon, ticket, book, or other device; or

**(2) Mutilation or removal**

Fraudulently cuts, tears, or removes from any vellum, parchment, paper, instrument,

BY MAJORITY COUNSEL 1:

Q    Okay.    The document just handed to you is being marked exhibit 3.    I'll give you a moment to look it over.

A    Oh, okay, yes.    Okay.

Q    So this document contains the relevant statutory citations included in the special agent report document you just looked at, and I'd like to walk through each of the relevant statutes briefly.

A    Okay.

Q    26 U.S.C. 7201 covers attempt to evade or defeat tax.    Is that correct?

A    That is.

Q    What are the elements of a 7201 offense?

A    So the elements are affirmative acts of evasion.    They are that there's a tax due and owing and -- I'm not used to reading it in this setting, so I'm sorry.    So it's willful attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof.    There has to be tax due and owing.    And the willfulness is a voluntary, intentional violation of a known legal duty.    And those are the elements.

Q    And what is the statute of limitations for this offense?

A    It's 6 -- this says 5 years.    Did that just change?    It was 6 years -- 6 years from the date.    Yeah.    This says 5 years.

MINORITY COUNSEL 2.    No, that's the prison sentence.

Mr. Shapley.    Oh, thank you very much.

Yeah, the statute of limitations is 6 years from when the return is filed or of an affirmative act of evasion that could occur after the filing of the tax returns.

BY MAJORITY COUNSEL 1:

Q      Okay.    And based on the conclusion in your report, the elements for that offense were met in tax years 2014, 2018, and 2019.    Is that correct?

A      That's correct.

Q      Okay.    26 U.S.C. 7203 covers willful failure to file, to supply information, or pay tax.    Is that correct?

A      It is.

Q      And what are the elements of a 7203 offense?

A      So that's that you had a requirement to file and that you had the knowledge that you did have to file, is how I know it.    I mean, would you --

Q      That's okay, you don't need to read the whole thing.

        BY MAJORITY COUNSEL 2:

Q      Yeah, we're just giving you the statute.    And this isn't a pop quiz.

A      Yeah, sorry, yeah.

Q      We're just trying to understand what the elements of these crimes are --

A      Yeah.

Q      -- what the statute of limitations is and so forth.    And since this is not a pop quiz, we just thought we would provide this as a resource.

A      Yeah.    I never see it in this format.

        BY MAJORITY COUNSEL 1:

Q      Understood.

And what's the statute of limitations for this?

A      It's 6 years.

Q      And based on this report, elements for that offense were met in 2015, 2016, 2017, 2018, and 2019.    Is that correct?

A      That's correct, yes.

Q      And same exercise, 26 U.S.C. 7206 (1) covers fraud or false statement.   Is that correct?

A      It is.

Q      And what are the elements of a 7206 (1) offense as you understand it?

A      So that there's a material misrepresentation of an item on that tax return, that they subscribe to that under penalties of perjury, and the willfulness and knowledge.

Q      Okay.   And what is the statute of limitations for that offense?

A      It's 6 years.

Q      And the elements for that offense were met in tax years 2014, 2018, and 2019.   Is that correct?

A      That's correct, yes.

Q      Is the tax liability at issue here related to just the individual taxpayer or to related companies controlled or that the taxpayer's --

A      These charges include related companies as well.

Q      Okay.   Can you tell us which companies were involved?

A      Yeah.   He was responsible for filing personal income tax returns as well as returns for Owasco P.C.

Q      And is there anything you can tell us about Owasco P.C., as far as what is the company, what does it do?

A      Oh.   So Owasco P.C., through the evidence that we obtained, was basically created with his partner Eric Schwerin.   And the crux of this, as I understand it, is that Hunter Biden had a history of noncompliance with his taxes, and he would often get large sums of money and wouldn't withhold.

So Owasco P.C. -- was initially for the -- the whole purpose was, Eric Schwerin came in to help him with his tax situation so it didn't continue to be a problem in the

future.

So all of his consulting fees and all that type of stuff would go into Owasco. There would be withholdings from it.    So then he didn't get -- when he filed his tax returns, they had withholdings to offset the taxes that he owed for that year.

Q    Okay.    Were there any other companies that you looked at in connection with this investigation?

A    Yes.

Q    A lot?

A    Yes, a lot.

Q    Okay.    The U.S. House Committee on Oversight and Accountability has publicly identified a series of companies, mostly LLCs, that are connected to this taxpayer. I'd like to walk through a list of those companies and just ask whether any of these companies were part of your investigative work.

Lion Hall Group, LLC?

A    Yes.

Q    Owasco P.C.?

A    Yes.

Q    Robinson Walker, LLC?

A    Yes.

Q    Skaneateles, LLC?

A    Yes.

Q    Seneca Global Advisers, LLC?

A    Yes.

Q    Rosemont Seneca Partners, LLC?

A    Yes.

Q      Rosemont Seneca Principal Investments, LLC?

A      Yes.

Q      Rosemont Realty, LLC?

A      Yes.

Q      Rosemont Seneca Technology Partners, LLC?

A      Not a hundred percent sure on that one.

Q      Rosemont Seneca Thornton, LLC?

A      Yes.

Q      Rosemont Seneca Advisors, LLC?

A      Yes.

Q      Rosemont Seneca Bohai, LLC?

A      Yes.

Q      JBB SR, Inc?

A      I'm not sure of that one.

Q      RSTP II Alpha Partners, LLC?

A      Yes.

Q      RSTP II Bravo Partners, LLC?

A      Yes.

Q      Owasco, LLC?

A      Yes.

Q      Hudson West III, LLC?

A      Yes.

Yes.   Sorry.

Q      Hudson West V, LLC?

A      I'm not sure about V.

Q      CEFC Infrastructure Investment U.S., LLC?

A      Yes.

Q      And in your line of work, are you familiar with what a form 1023 is?

MAJORITY COUNSEL 2.     FBI form 1023?

Mr. Shapley.    I don't know that form.

BY MAJORITY COUNSEL 1:

Q      In the course of your investigation, did any FBI agent ever make you aware of a form 1023 related to Hunter Biden or any of his family members?

A      We never discussed the form.

Q      Okay.    I think in your opening statement you discussed the jurisdiction in which the crimes we were just discussing took place, and you stated the District of Columbia.    Is that correct?

A      For 2014 and 2015, yes.

Q      Okay.    And Central District of California?    Is that correct?

A      That is correct.

Q      Any other jurisdictions?

A      The -- no, no.    I mean, there was a possibility of some, but it was always that those were the strongest, those were the ones that should be.

Q      And those are the jurisdictions related to the recommendations in the special agent report excerpt that we looked at earlier?

A      Yes, that's correct.

Q      And are you able to share details or estimates of the scope of the liability the taxpayer had to the U.S. Government or the loss to the U.S. Government in each of these tax years?

A      I probably couldn't itemize it off the top of my head, but altogether it was

around $2.2 million.

Q    Spanning 2014 through 2019 tax years?

A    Yes.   And that only includes tax liabilities that were determined on a filed tax return, because there's still unreported income in 2014 that there's no way to collect because the statute of limitations is gone.

Q    Okay.   So let's talk about that.

So you stated earlier that at the October 7th, 2022, meeting there was only 1 month remaining to collect taxes owed for tax years -- for tax year 2014.   Is that correct?

A    To charge.

Q    To charge?

A    Yes.

Q    For tax year 2014?

A    I believe it was '14 and '15.

Q    '14 and '15.   Okay.

Do you know or can you clarify whether there was a deadline for collecting those taxes?

A    I don't know if I understand your question.   Sorry.

Q    Is the deadline for collecting taxes the same as the statute of limitations period for the crime?

A    The deadline to collect, I guess, is what I'm confused about.   Like when the tax return is filed, even if it's only an extension and they're going to extend it, they have to pay the tax due and owing by the due date of the return.

And then if someone was charged and there was, say, a $2.2 million tax due and owing, it would be the courts that define when the payments are made as part of the sentencing.

Q     Okay.   Understood.

MAJORITY COUNSEL 2.    Was the statute about to run, though?    You talked about the October 7th, 2022, meeting.

Mr. Shapley.    Yeah.   The statute was about to blow in March of 2022.    And Department of Justice Tax Division and the U.S. Attorney's Office in Delaware were saying, "Get us the report, get us the report, get us the report."   They were pushing really hard to get the report to them because they wanted to go to defense counsel and say that it's been recommended, because they were hoping to initiate conversations.

Their plan was, was to go to D.C. and to charge pretty soon thereafter, which is why they requested discovery from all the agents at that time.    But what happened was the defense counsel said, "Whoa, whoa, whoa, whoa, don't charge, we'll sign statute of limitations waivers."

Mr. Lytle.    Extensions.

Mr. Shapley.    Extensions.   I'm sorry.   Statute of limitation extensions.   So I believe at least two of those were signed by defense counsel, and the prosecutors told us that they were willing to sign that, more of them, but they just didn't request it after the November limitation expired.

BY MAJORITY COUNSEL 2:

Q     Do you know when the extensions were signed and for what tax years?

A     Well, these were specific to 2014 and '15 because the statute of limitations were expiring.

Q     Okay.

A     And they -- didn't -- they just wanted to say, "Well, don't indict, my guy, like, we'll talk to you about it, we'll sign the extensions, and then you can --"

Q     And how long were the extensions good for?

A I believe it was 6 months, each extension, but I'm not a hundred percent on that. They could -- maybe they could being be defined as well. I'm not -- because I know they signed at least two, and the last one was expiring in November of 2022.

Mr. Leavitt. So they were shorter than 6 months.

Mr. Shapley. Yeah, so they might be shorter than 6 months.

MAJORITY COUNSEL 2. And ultimately the statute ran?

Mr. Shapley. It was a conscious decision by DOJ to let that run. They could've had them extend '14 and '15, but they said no.

MAJORITY COUNSEL 1. And when you say DOJ, who, in your opinion, ultimately made that decision?

Mr. Shapley. So, it had to be United States Attorney Weiss. I don't know personally, but that's how it would usually work.

BY MAJORITY COUNSEL 2:

Q It's not DOJ Tax?

A In this case no. The U.S. Attorney's Office would likely take the lead. But then again, that's just based on my experience and how it would usually work, how I've seen it work.

Q And can you give us any more information about the statute running in that particular instance?

A I mean --

Q Did you get any feedback from the U.S. Attorney's Office as to the blow-by-blow between their office and the taxpayer's lawyers?

A They weren't very transparent with the interactions with defense counsel. I just know that in March when D.C. said no we still had that belief that he had some authority, because we were doing a lot of work to try to, like, overcome whatever issues

D.C. said that they had with the report.

And we thought that he still had the authority to charge.    And then October 7th meeting comes and he said we couldn't charge it there, and he requested special counsel authority.    It was denied.    So there was really no ability to charge it there.    He had no mechanism to charge it if what he said actually happened.    So they let the statute expire.

MAJORITY COUNSEL 1.    Okay.    I'm going to talk about specific issues in specific tax years to the extent you're able.    I know you said that special agent report was a very robust document.    And if you don't know or you don't recall the answers, that's totally fine.

For tax year 2014, what evidence led to the recommendation for charges for attempt to evade and false statement?

Mr. Lytle.    Can we just have a sort of an understanding that he can't speak about grand jury materials and protected (6)(E) just so it's clear that way?

MAJORITY COUNSEL 1.    Absolutely.    And if that's an issue, we'll certainly defer to you on that, what can and can't be talked about.

Mr. Lytle.    Great.

Mr. Shapley.    So, is the question for specific evidence or more of a theme of evidence?

MAJORITY COUNSEL 1.    Let's start with a theme.

Mr. Shapley.    So concerning the Burisma income, Hunter Biden basically used a nominee organization, Rosemont Seneca Bohai -- which a convicted felon was the partner of.

MAJORITY COUNSEL 2.    That's Mr. Archer?

Mr. Shapley.    Yes.    Yes, Devon Archer.

And so the way the money worked is there's a document which is the contract between Burisma and Hunter Biden.    Those are the two parties.    It was for $1 million per year.    Of course this was 2014, and it was negotiated in April, so the payments in that year were reduced by the months.    So it was $666,000, $83,000 a month he was receiving.

What Hunter Biden did with that is he told Burisma to send that income to Rosemont Seneca Bohai.    And then when the money came back to him, he booked it as a loan.

So there's all this machinations of nonsense happening over here in this nominee structure that, "Oh, this is complex, this is complex," and, well, it's not complex, because this is -- it was a taxable event as soon as the income came from Burisma to Hunter Biden. And whatever he did with it after it was really just a scheme to evade taxes for that year.

And to add to it, is that Rosemont Seneca Bohai and Archer, when the money came back to Hunter Biden, they booked that as an expense on their books.    So even the two parties didn't treat it the same way.

And then Eric Schwerin realized this and looked into it, and he even told Hunter Biden on multiple occasions, multiple communications, you need to amend your 2014 return to include the Burisma income.    And he never did, and the statute's gone now.

[Shapley Exhibit No. 4

Was marked for identification.]





Ex 4

From: **Eric Schwerin**
Subject: **Income**
Date: January 16, 2017 at 3:11 PM
To: Hunter Biden

In 2013, your taxes reported $833,614 in income.

In 2014, your taxes reported $847,328 in income. (To be amended at $1,247,328)

In 2015, your taxes reported $2,478,208 in income.

2013 and 2014 were normal years where your income was based pretty much solely on income from Rosemont Seneca and Boies. In 2014 you joined the Burisma board and we still need to amend your 2014 returns to reflect the unreported Burisma income. That is approximately $400,000 extra so your income in 2014 was closer to $1,247,328.

The reason for the increased income in 2015 was that your income broke down as follows:

$166,666 from Burnham (for RSA)
$216,000 from Boies
$365,403 from Owasco (for RSA)
$300,000 one time payment from Eudora (for the 1/3 of CitizensRx)

The above represents all the cash you received directly.

In addition, you reported $1,000,000 of income that all went to RSB and you report $188,616 in income that also went to RSB. You didn't receive this in cash and it is in reality "phantom income".

So, of the approximately $2.5m in income you never really received almost $1.2m of it. (My numbers are approximate but you get the idea.)

Of the $1,300,000 in cash you received you had to pay $751,294 in taxes. Since you couldn't have lived on approximately $550,000 a year you "borrowed" some money from RSB in advance of payments.

FYI, in 2014 and 2015 you also had expenses beyond the norm because you renovated the house. Across 2014 and 2015 the renovation payments totaled approx. $200,000.

The numbers for 2016 haven't been finalized yet but you made at least the following:

$1,295,000 from Owasco, P.C. (representing Burisma and any Romania payments)
$216,000 from Boies Schiller

Unlike the prior years you actually received the above cash but the total income for 2016 won't be close to 2015.

Hope this makes sense.

Eric D. Schwerin

EXHIBIT
tabbies
4


Consider the environment before printing this email.

BY MAJORITY COUNSEL 1:

Q What's been handed to you has been marked as exhibit 4. I'll give you a moment to review it.

A Yep.

Q Have you seen this document before?

A I haven't seen it in this form, but I've seen excerpts of this document.

Q Is this one of the communications you were referencing just a moment ago?

A I believe so, yes.

Q And it looks like it's about the fourth paragraph down, it reads: "In 2014 you joined the Burisma board and we still need to amend your 2014 returns to reflect the unreported Burisma income."

Do you see that?

A Yes.

Q And is that consistent with your understanding of the issues in the 2014 return?

A Yeah, this is. This is accurate, yes.

Q Is there anything else on this document that stands out to you as significant?

A Well, what's important to note here as well is that Owasco was set up for this exact reason, was to take in these type of consulting fees and to withhold taxes from it. And Hunter Biden communicated with several folks that he wanted to keep this outside of the D.C. people, and we believe that to be Eric Schwerin and Owasco, and the purpose was to evade income taxes on that, in my understanding of the evidence. So, that's kind of like laid over this as well.

And then when Eric Schwerin realizes there's money coming in, Hunter Biden is

telling him, "No, this is a loan, it's a loan, it's a loan, it's a loan," and then eventually Eric Schwerin is talking with Momtazi, who is the accountant for Devon Archer and Rosemont Seneca Bohai, and they start talking.    And that's when Eric Schwerin realizes that this is actual income, and he's like, "We're going to have to book this as income." And there's multiple communications in the evidence that talk about that.

MAJORITY COUNSEL 2.   So this was an affirmative scheme by the taxpayer to avoid paying taxes?

Mr. Shapley.    This is, like, textbook, I learned at basic training nominee stuff. And in all of the defenses, it was a loan, got to have a promissory note, you got to have defined interest, and you got to have repayments, and none of those were included.

And we raised that to DOJ Tax, and in one particular instance to Jack Morgan, specifically saying this is not a loan.    We don't have these three things.    In any case, these are the things we determine if it's a loan or not, and he said that this is not a typical case.

MAJORITY COUNSEL 2.    And do you think "This is not a typical case" referred to the fact that this was the Vice President's son?

Mr. Shapley.    Yeah, yeah.    I think that there was -- every single time the process could be bogged down by deferring to some other approval level, they took full advantage of that.

[Shapley Exhibit No. 5

Was marked for identification.]

Ex. 5

GM

**Mesires, George R.**
Re: Tax Analysis - Attorney Communication
April 12, 2016 at 11:19 PM
Levinson, Kenneth S. [REDACTED]
Eric Schwerin [REDACTED], Hunter Biden [REDACTED], MacPhail, Michael R. [REDACTED], Klinefeldt, Nicholas A. [REDACTED]

I am out at those times so please proceed without me. Even if Mike or nick can't join then, I think Ken/Eric, and ideally Hunter, should connect. George.

**George R. Mesires**
*Partner*
[REDACTED]

**Direct:** [REDACTED]
**Mobile:** [REDACTED]

FaegreBD.com  Download vCard

**FAEGRE BAKER DANIELS LLP**
[REDACTED]

Sent from my iPhone

On Apr 12, 2016, at 10:16 PM, Levinson, Kenneth S. <[REDACTED]> wrote:

> Eric, All
>
> From my perspective, the 10 and 11:30 EDT time slots work for me tomorrow (Wednesday). I'm good with either of those, so when a critical mass is reached, please let us know and we'll have the call with whomever is available.
>
> Thanks, and best regards.
>
> Ken
>
> On Apr 12, 2016, at 9:44 PM, Eric Schwerin <[REDACTED]> wrote:
>
> Not sure of Hunter's availability tomorrow for this call but other than a call at 10, 11:30 and 2:30 EDT tomorrow I am free. Each of those calls should take no more than 30 minutes.
>
> Are there any times in there that work for everyone else?
>
> I can answer pretty much all of the questions in the email.
>
> Eric D. Schwerin
> [REDACTED]
>
> Sent from my iPhone
>
> On Apr 12, 2016, at 7:09 PM, Mesires, George R. <[REDACTED]> wrote:
>
>> Eric and Hunter:
>>
>> Please see Ken's comments/questions attached. Please let us know when you are available for a call tomorrow to discuss this.
>>
>> Thanks,
>>
>> George

EXHIBIT
5

**From:** Eric Schwerin [mailto:[redacted]]
**Sent:** Monday, April 11, 2016 3:50 PM
**To:** Hunter Biden
**Cc:** Mesires, George R.
**Subject:** Tax Analysis - Attorney Communication

Hunter-

See below for analysis of Burisma payments through RSB for 2015.

For the first 10 months of 2015, total pre-tax Burisma payments through RSB = $606,666

RSB Agreed to Hold Back $245,498 of the above amount to cover taxes (approx. 38%) which left you with $361,168 in "post-tax" dollars to draw down.

For the first 10 months of 2015, you drew down approximately $413,000 from RSB. Therefore you drew down $51,835 more than you should have.

If RSB counts the first 10 months of Burisma payments as income to you, they should send you the $245,498 - $51,835 or $193,663 which could be put towards your tax liabilities for 2015.

So, on $606,666 in income you'll have $193,663 to go towards taxes.

Note that for November and December of 2015, the full $83,333 for each month was sent to Owasco, PC via RSB and you withheld the appropriate taxes yourself. It is only the first 10 months of 2015 that need to be taken care of.

The only other point to keep in mind is that while Burisma paid you $83,333 a month for the first 10 months of 2015, for the first 8 months, a portion of that ($27,778 a month) went to Alex as his Board Finders Fee. RSB has taken that amount as an expense and we need to figure out a way to capture that expense so that you are only paying taxes on $55,555 a month in income through the end of August 2015 instead of the full $83,333. I am going to assume the accountants can take care of that.

Let me know if you have questions.

Best,

Eric

Eric D. Schwerin
Rosemont Seneca Advisors, LLC



Consider the environment before printing this email.

<mime-attachment>

MAJORITY COUNSEL 2.    We've just given you exhibit 5.    I think it's more email communication with Schwerin and Hunter Biden's lawyer, George Mesires, partner at the Drinker Biddle firm or whatever the firm's called now, Faegre.

Have you seen this document before?

Mr. Lytle.    Can we talk to our client just briefly.

MAJORITY COUNSEL 2.    Of course.    We can go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.    We're back on the record.

BY MAJORITY COUNSEL 2:

Q     The question is whether you've seen this document before.

A     No.    Anything from George Mesires was considered privileged --

Q     Okay.

A     -- attorney-client privilege and was not provided to us.

Q     Okay.    And so that was kept from you by the FBI?

A     No.    It would be a filter team.

Q     Okay.

A     When we get any information, and even from the laptop and hard drive, it went through filter reviews, and we only saw what came back as nonprivileged.

Q     But who ran the filter team?

A     It was different each time.    We had agents assigned, groups of noninvolved agents assigned that were --

Q     With IRS or FBI?

A     It was a little bit of both.    I think that we took turns.    I remember at least two different filter teams made up of noninvolved IRS agents.

Q     Okay.

A     And these eventually go to the prosecutors, like after the filter review.

Q     Okay.

Mr. Lytle.    I'm sorry.    Is there DOJ attorneys assigned to the filter team as well?

Mr. Shapley.    Yes, yes.

BY MAJORITY COUNSEL 2:

Q     Okay.    On page 2 -- it's an email chain, so it actually starts from the last page and works forward.    The communication here is Eric Schwerin to Hunter Biden, correct?

A    Appears so, yes.

Q    And Eric Schwerin is not Hunter Biden's lawyer, correct?

A    That's correct.

Q    Okay.    So you think they marked this attorney-client privilege just because they cc'd Mesires?

A    Absolutely.

Q    Okay.

A    That was one of the things, just a search term was the known legal counsel and just immediately went to --

Q    So if he cc's Mesires on every communication, it's all privileged?

A    That was the direction to the filter teams, and then it would go to the DOJ attorney that oversaw that, and they would make the ultimate decision.

Q    Okay.

A    But they basically claimed privilege on a huge amount of information to include the return preparers, Morgan Wingate, later on, and they said it was because they had a verbal Kovel agreement with them.

Q    Okay.

A    A Kovel agreement, do you want me to explain?    So I think it's from case law and it's basically that a defense team can bring in an accountant or CPA or return preparer into the defense team to assist them, so they become covered by the attorney-client privilege.

In this case, when we were attempting to interview the CPAs on it, Hunter Biden's legal team said there's a verbal Kovel team so you can't talk to them.

And we tried to get DOJ and U.S. Attorney's Office to pierce that, because everyone, even they said it was nonsense.    But they just wouldn't.    It took, like, 12

months to finally get to the CPAs to actually get information from them.

Q     Okay.   Looking at the content on page 2, if you and your team had access to this information, would that have been helpful, direct communication from Schwerin to Hunter Biden?   And you previously told us that one of Schwerin's main functions was to help ensure that Hunter Biden was paying his taxes correctly, right?

A     Yeah.   I'm not reading it -- I haven't read it all, but any discussions in this area, we need to know, we need to know that if it's truly a loan, then we can't include it. We need all the pieces of information that discuss income, which is why it's so important to ask about 10 percent for anybody else.

MAJORITY COUNSEL 2.   Let's go off the record for a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.   Back on the record.

BY MAJORITY COUNSEL 2:

Q     Now, was your team, were they permitted to use open-source methods for looking at the materials for this case?   Like, if materials were published on the internet related to Hunter Biden or related to Hunter Biden's business concerns, were you allowed to consult that?

A     No.   We were directed that if there's anything from the laptop from other sources to not look at it because then it's potential for it to be tainted.

Q     Okay.   So if it's posted on the internet, if it's written about in the newspaper, you were not allowed to consult that open source method?

A     Yeah.   We were directed not to.

Q     Is that customary?

A     I would say yes.   Yes.

Q     Okay.   Going back to the special agent report, after you submitted the

report recommending charges, could you just walk us through the timeline of what then happened?

A     From?

Q     You told us about what happened inside of IRS.

A     So February 25th, 2022, forward?

Q     Correct.

A     So we sent it to DOJ Tax Division, and that spurred their discussions with defense counsel.    We did not participate in that.

And I would say that I think it's not typical for the investigative team and the agents to never be in on proffers or reverse proffers with defense counsel.    We never once were allowed to do so.

And even though some communications occur with defense counsel without agents, I've never seen it where we've never been involved.

Then it went to D.C. U.S. Attorney's Office.    Department of Justice Tax Division authored a 99-page memorandum that was requested by Stuart Goldberg.    And my understanding is that it was for the purpose to support recommending that they move and be opened in D.C.    It was like a document to support opening up and charging in D.C. for 2014 and '15.

Q     Okay.    So you send what's exhibit 2, or the IRS sends it to DOJ Tax, and the result was DOJ Tax Division produced a 99-page memo to support what your memo had recommended?

A     I never saw it, but my understanding was, is that we were moving -- we were going to go to D.C., and we were going to charge, and here's the discovery.    That was the trajectory there.    So I've never seen the document, but it's been described to me as supporting those years and charging those years.

Q Do you feel like the document was kept from you and your team?

A Yeah. I don't know there's any reason not to share it with us. I don't know why. And it's also outside the norm. When a SAR goes to DOJ Tax, it usually gets -- if there's DOJ Tax attorneys working on that case, they -- those attorneys aren't the ones that get the report. It's like a third-party supposedly objective person who looks at the report and writes up whether it's approved, discretion, whatever.

This whole 99-page report was a whole separate event, and John Kane at Department of Justice Tax Division was assigned to be the objective reviewer, and I still have never seen a report from him approving, discretion, or declining.

Q Okay. So, after receiving the 99-page memo from DOJ Tax, the U.S. attorney in Delaware initiates prosecution in the District of Columbia, correct -- or he seeks permission from --

A Yeah, they send --

Q -- U.S. Attorney Graves?

A -- at least Mark Daly and I believe AUSA Wolf as well, to meet with the first assistant in D.C., and the first meeting was Mark Daly called my case agent and said, "Hey, looks good, they're going to assign AUSA."

Q That was Special Agent [redacted]?

A That's correct. And then it was 2 or 3 days later, Mark Daly calls [redacted] and says, "No, they don't support it. So we're basically dead in the water."

Q And that was the end of it?

A Yeah. At that point it became like a void. For 2 months we were working to combat the potential defenses. And I think it was all a ruse because we didn't know at the time that he requested special counsel authority and was denied. So he had no ability to charge there whatsoever, but I feel like he just sent us on a fool's errand to try

to rebut it.

Q      And when was the decision made by the U.S. attorney in the District of Columbia not to go forward?

A      It was in the March time frame.    Like I said, we requested to be a part of that, but they didn't allow us to.

Q      And when did you learn of that decision?

A      I feel like it was same day.    It was a date in March, and, unfortunately, I don't know the date.

Q      Okay.

[Discussion off the record.]

Mr. Shapley.    Yeah.    So at the time we thought that he just didn't support it. And that David Weiss would still have the ability to charge at some point.    But later on, on October 7th, David Weiss tells us straight out that he didn't allow it to be charged in his district.    And then he says he also requested special counsel authority, which why would he request special counsel authority if he had the authority to charge.

So, yeah, it's a little bit nuanced, but what I knew then was that he just didn't support it.

BY MAJORITY COUNSEL 2:

Q      I want to call your attention to some testimony, and I believe you mentioned it in your opener.    But if the decision to not bring charges in D.C. was made in March of '22 --

A      Yes.

Q      -- okay, a month later, roughly, in April of 2022, at the Senate Appropriations Committee Subcommittee on Commerce, Justice, Science, held a hearing, a review of the DOJ's funding request.    And during the hearing under questioning from Senator

Hagerty -- and, again, I think you mentioned this -- regarding the Hunter Biden investigation, the Attorney General testified -- this is a month later -- that U.S. Attorney Weiss is supervising the investigation, is in charge of that investigation.    He also testified there will not be any interference of any political or improper kind.

Did you remember hearing that at the time?

A     I did not hear that at the time.

Q     And did anyone on your team ever bring that to your attention subsequently?

A     I learned of it on and around October 7th meeting --

Q     Okay.

A     -- because that's when it became substantive to me, like, because we still were misled to believe that U.S. Attorney Weiss had the ability to charge in D.C. and that we were still talking about the '14, '15 year.

And then when he tells us in the October 7th meeting that he's not the deciding official and he doesn't have the authority to decide and that he requested special counsel authority and was denied, that's when the statements of Attorney General Garland became apparent that they were not accurate.

Q     Right.    And subsequently -- and you mentioned this in your testimony -- Senator Grassley, on March 1st of 2023, so a whole year had gone by, asked the Attorney General about this, and the Attorney General responded -- you mentioned this -- "I promised to leave the matter of Hunter Biden in the hands of the U.S. attorney for the District of Delaware…I have pledged not to interfere with that investigation, and I have carried through on my pledge."

Is that a true statement?

A     It's not accurate.    No, it's not accurate.

Q And by March of 2023, you had certainly known that the U.S. attorney in Delaware did not have special counsel authorities. Is that correct?

A By what he told us, yes.

Q And when the Attorney General made that statement, that had been almost a year after the decision was made not to move forward in the district in D.C., correct?

A Yes.

Q Senator Grassley followed up: “Without special counsel authority he could need permission of another U.S. attorney in certain circumstances to bring charges outside of the District of Delaware. I'd like clarification from you," Senator Grassley said to the Attorney General, "with respect to these concerns."

And the Attorney General responded: "The U.S. attorney in Delaware has been advised that he has full authority to make those kind[s] of referrals that you are talking about or bring cases in other jurisdictions."

Okay. I'll just say it again. The Attorney General said that he, meaning U.S. Attorney Weiss, "has full authority to make those kind[s] of referrals that you are talking about or bring cases in other jurisdictions if he feels it's necessary. And I will assure that if he does, he will be able to do that."

Are you aware that the Attorney General responded in that way?

A Yes, I am.

Q Is that true?

A No, that's not. Based on what actually happened, as well as the statements provided by U.S. Attorney Weiss, those statements are false.

Q And those statements were made in March of 2023, 1 year after the case was attempted to be brought in D.C. by the United States Attorney's Office for Delaware, correct?

A That's right.

Q And it also occurred many months after you learned in October of 2022 of this happening. Is that correct?

A Of this happening? I'm sorry.

Q Of the U.S. attorney in Delaware being denied the ability --

A Oh. Yes.

Q -- to bring the case in D.C.?

A Yes, that's correct, yes.

Q Senator Grassley followed up: "Does the Delaware U.S. attorney lack independent charging authority over certain criminal allegations against the President's son outside of the District of Delaware?"

And the Attorney General responded: "He would have to bring...if it's in another district, he'd have to bring the case in another district. But as I said, I have promised to ensure that he is able to carry out his investigation and that he be able to run it. And if he needs to bring it in another jurisdiction -- again, if he needs to bring it in another jurisdiction -- he will have full authority to do that."

Did that happen?

A No.

Q Senator Grassley then said: "Has the Delaware U.S. attorney sought permission of another United States Attorney's Office, such as the District of Columbia, or" -- presumably Senator Grassley meant the Central District of “California to bring charges? If so, was it denied?"

And what's the actual answer to that question?

A That he did bring it to both of them, and they both denied it.

Q And, just remind me again, what was the timing of the Central District of

California denying?

A We were informed that they denied it in and around January of 2023.

Q Okay. So 3 months before this testimony.

A Yes.

Q Approximately.

And the Attorney General followed up, and he said: "I don't know the answer to that, and I don't want to get into the internal elements of the decision making by the U.S. attorney. But he has been advised that he is not to be denied anything he needs. And if that were to happen, it should ascend through the Department's ranks. But I have not heard anything from that office to suggest that they're not able to do everything the U.S. attorney wants to do."

Do you think it's conceivable that the DAG's office or the head of DOJ Tax kept that information from the Attorney General?

A I feel like it's my opinion that you wouldn't make statements like that if you thought that was the case.

MAJORITY COUNSEL 2. I think our hour's up. Going to have to stop there as our hour's up.

Mr. Shapley. Sure.

[Recess.]

[11:40 a.m.]

BY MINORITY COUNSEL 2:

Q Thank you again for coming in and providing your testimony before the committee. I don't think we will take the full hour allotted. Hopefully we will be able to move things along a little bit.

I actually wanted to start by just going back, way back in your initial testimony. It is something our counterparts alluded to in the beginning of their questioning. Your initial testimony that over the course of your career you worked on teams or worked on cases that collected in the neighborhood of something along the lines of $3.2 billion of previously uncollected tax revenue. Obviously, $2 million or thereabouts, that amount at issue is relatively small, relative to the $3.2 billion over the course of your career you've collected. I am just sort of trying to get a sense of the scope and scale of this investigation relative to what would be a normal size of a criminal investigation of the type that you work on.

You have a team of 12. How many investigations does your team generally work on at one time?

A I have 75 investigations that I am [in charge of] right now of 12 agents.

Q And how many man-hours would you say that your team spent on this investigation?

A I would just have to multiply it, right? We have at least one agent working full-time on it for 4 years -- at least 4 years. So it's 2,000 hours a year.

Q And is it typical to assign an agent full-time for 4 years on an amount in issue of $2 million or thereabouts?

A It would be normal with an IRS CI, right? Like, the amount of time it takes,

we don't drive that bus.   So we have to work with our partners.   So they have an effect on the timing as well, but the case agent also had other cases as well.

Q      When you say work with your partners, do you mean work with defense counsel and work with -- who do you mean --

A      Like, FBI, DOJ.

Q      And presumably, though, in terms of how agents and your team and you allocate your time in terms of looking at these cases, does that all receive review in terms of allocation of resources?

A      Yeah, yeah.   In this particular case, we also work large cases, the initial case is a $6 billion case.   And then we also have spinoffs from these larger cases that we work, and that is the way that we do to on some other large cases we are working now. So this is an example of one of those spinoff cases that had an international nexus, so we kept it within the group.

Q      Right.   But presumably, there was a $6 billion case, and then evidence came to light and that evidence was referred to a spinoff case.   Presumably if the evidence, was an amount at issue of $1,000, the IRS wouldn't put a full-time employee on that audit for 4 years?

A      My agents would not spend time on $1,000.   And we are not auditors, we are criminal investigators.

Q      Criminal investigators.

A      Yeah, yeah, yeah, yeah.   Okay.

Q      So there is some sort of threshold and some sort of judgment applied to how many man-hours are applied on any given case, correct?

A      I don't know if there is any application of how many man-hours around each case.   I have never seen that.

Q      But somebody at some point does make a decision as to how many resources, how much in terms of CI's resources they are going to devote to any given case at any given time, right?    And presumably, that, at least in part, is dependent upon the amount at issue?

A      It is definitely not about the amount, right?    If it is a case that is approved, then if it takes 3 years or 4 years or however long it takes, they are going to let that play out.    At some point, if the charges look not viable, then we discontinue the case.    But that never occurred in this case.

Q      Right.    So the size of the tax liability is irrelevant to the resources that CI puts into the investigation?

A      Like a $2.2 million case for 95 percent of the IRS CI special agents would be a huge case for them.

Q      That is relevant information.

So this is generally considered within IRS CI to be a big case.

A      Yes.

Q      And a case of this size would typically have 12 or, for instance, 12 simultaneous interviews in terms of its investigatory step or something along those lines?

A      I mean --

Q      It wouldn't be unusual?

A      It's case-by-case.    Yeah, it is case by case, right?    We don't always do days of actions.    We do lots of days of actions, but it is based on the case because you want to do them simultaneously so that the witness pool isn't tainted by each other.    So that is why the simultaneous interviews occurred in this particular case.

Q      So, the resources that were being devoted to this case, at the end of the day, you did receive some sort of supervisory approval and up the chain, folks understood

what kind of resources were being devoted to the investigation here?

A      I guess I was confused about the resources, like, yeah, there are hours that are applied to the case.

Q      Think about hours being applied to the case as resources, so man-hours.

A      Okay.    So could you say the question again then?

Q      It was relatively understood by folks senior in CI, probably at DOJ Tax, how many man-hours were being devoted to the investigation of Hunter Biden's taxes?

A      Yeah, yeah.

Mr. Leavitt.    Did you want to talk about the supervisory approval process?

MINORITY COUNSEL 2.    If there is a supervisory approval process for the allocation of resources like that, then sure.    I am under the impression that there is not.

Mr. Leavitt.    I don't mean for the resources.    I just mean just for the case, the case being briefed up in terms of awareness of supervisors?

Mr. Shapley.    People are aware of the hours spent on the case, yes.    But it is not -- it is definitely -- DOJ would never, DOJ U.S. Attorney's Office they would never, they don't care how many hours are applied to a case, right?    And we even assigned a co-case agent to assist, try[ing] to keep the sphere small.    They would never know it.    It would really be hours applied to a case would be on our 17A CIMIS report, 17-As, and it is really like me as a supervisor or me as the ASAC, and I don't think that they go even higher than that.    I don't think that anyone -- like a special agent in charge probably wouldn't even like look at the allocation of resources on a case.    They just want to know if it is viable or if it is not viable.

Mr. Leavitt.    But you were briefing your supervisors about the case, in which case --

Mr. Shapley.    Oh, yeah, yeah.    But if we are talking about resources, that is my

answer. If we are talking about case specifics, then that is a different story.

BY MINORITY COUNSEL 2:

Q That is totally fine.

I would like to ask you a little bit about the special agent report that was discussed earlier. Your special agent report was approximately 85 pages long and it recommended charging recommendations. Could you once again, and I know you did it before, but it would be helpful for us again -- what specifically was the process by which it went to an entity that gave it a nonconcurrence?

A Sure, yes. When a special agent report is still in draft, it comes past my desk and we send it to our criminal tax attorneys, called CT counsel, and they do a review of it. They create a -- it is called a CEM, I believe it is Criminal Enforcement Memorandum. So yes, that is the process.

Then we get that and then, the management and the agent. And then we sometimes take time to answer any concerns or to provide additional evidence that maybe they didn't see to make those recommendations. But then, when it is a nonconcur from CT counsel, in order for it to go forward to the department of [Justice] Tax division, it has to be approved by the director of field operations which is -- so an IRS investigation is the chief, deputy chief, and then there is three director of field operations. So, like, the third level. So when there is a nonconcur from CT counsel, the director of field operations has to approve that to be transmitted to the Department of Justice tax division.

Q Just -- sorry. The director of op has to approve it to override the nonconcur to transmit? When you say approve, what do you mean?

A I don't think override is the correct term because CT counsel is advisory.

Q Okay.

A      But I think it is an extra step in the process to ensure that more people have reviewed it and agree with the evidence since the elements were met.

Q      Could you say a little more about who comprises the makeup of the CT counsel?

A      Just by title or names or --

Q      If you have their names or what their experience is?

A      So the head, I am not sure if it is a director or chief of criminal tax is Rick Lunger.   And the number two there is Elizabeth Hadden, I believe.   And then there is area counsel and that is like a middle layer of management.   And for me on this case it was Veena Luthra.   Then my line attorney, it was Christine Steinbrunner and she went by Christy and -- I'm sorry, did I answer your whole question?

Q      What are their backgrounds?   Why are they designated to be in this role, which appears to be something of an advisory review role?

A      The --

Q      Their professional backgrounds, what lead them to be put on this CT -- on this counsel?

A      I mean --

Q      Are they appointed?

A      Oh, no, no, no, they are internal, just internal career hires.

Mr. Lytle.   Also, could you just pause your question and give him time to answer because sometimes you guys are talking over each other.   But he needs time to just digest what you are asking him.   Are you asking -- does he know the process of how people's qualifications are determined to serve on CT counsel?

MINORITY COUNSEL 2.   That is certainly a question I could be asking, yes.   If that is the question he wants to answer --

Mr. Lytle. No, no. I just wanted to clarify.

MINORITY COUNSEL 2. He can answer it either or both ways, which is to say either do we know the specific individuals and what their qualification are, or if he does not -- what would make an individual qualified to serve on this counsel?

Mr. Leavitt. Elizabeth would know more about it, wouldn't --

Mr. Shapley. I mean, the only background I know is Elizabeth Hadden was at the Department of Justice tax division up until a year or 2 years ago maybe. Like, 2 years ago. And then she came over to be the number two in CT counsel. In terms of background, that is all I know about them.

BY MINORITY COUNSEL 2:

Q But in general, is it safe to say that they are experienced criminal tax attorneys, or criminal tax agents or having a fair amount of experience in criminal tax investigations?

A They review our reports, our enforcement actions for legal sufficiency based on the Internal Revenue manual, yeah.

Yeah, well, yes, CT counsel is not a respected organization within IRS CI. Their opinion, as I alluded to before, I bet you around 90 percent of everything that we do in the international realm are not concurred with them, and we just simply ignore them. I have heard AUSA's and prosecutors in the past when the agent will be, like, Well, you know, CT counsel nonconcurred, I have heard them say, I don't care anything of what they are saying. And then in this particular case -- it was either the August 16, 2022 meeting, or the October 7, 2022 meeting and -- Shawn Weede, who was the number two, I believe, at the U.S. Attorney's Office at Delaware actually had CT counsel's nonconcur memorandum, which, that is the first time I have ever seen a U.S. Attorney's office ever even interested in that document. And they ostensibly laughed at the legal reasonings

in that document.

Q Can you describe the legal reasonings?

A I couldn't with specificity. I really want to. So --

Mr. Lytle. If you recall.

Mr. Shapley. I don't recall. But internationally, there are things that they just in every single CEM they write, right? Like, availability of foreign witnesses, one. Admissibility of foreign evidence, two, right? There are these things, like, if a guy's 70-years-old, then they make some statement about how he could die before trial. So, I don't remember the specific items in their memorandum, but those are the types of things that I see like consistent in their reviews of the international work.

Mr. Leavitt. So you are saying it covers not just legal sufficiency but as a practical matter in success of trial for the ability to get to prosecution.

Mr. Shapley. Yeah, it could.

BY MINORITY COUNSEL 2:

Q Do charging decisions also depend on the practicality of success at trial as a general matter?

A From?

Q From the DOJ?

A Yeah.

Q If legal sufficiency is not solely the basis by which CT counsel makes its recommendations, then is that also true of the Department of Justice?

A Reasonable likelihood of prosecution is the statement, as I understand it, but I am also not an attorney.

Q Fair enough.

I want to go back to something you testified to -- you mentioned green light,

yellow light, red light on various [occasions] -- and I kind of wanted to flesh that out a little bit more.   I think you testified that the line attorney had suggested that for every tax year other than 2018, she had a yellow light, and then for 2018, it was a green light. Can you describe to me what you view as a distinction between a yellow light and a green light?

A      Sure, yeah.    And this was described to me by CT counsel Christy Steinbrunner where a yellow and green [is a] concur and red is that she did not concur. Some of the reasons to be in yellow are that, like, I said before would be admissibility of foreign evidence, and availability of foreign witnesses and things of that nature.    But to be yellow, the elements of the crimes and the minimum legal requirements have to be met.

Q      But again, just for clarity, yellow indicates that notwithstanding [that] the legality of a crime has been met, there may be other considerations regarding the likelihood of success at trial?

A      I don't know if it pertains to the likelihood of success, but it is definitely like maybe there's complexities, like, international type issues in there.

Q      Do you have any indication of what, for instance, you described 2014 and you described a payment disguised as a loan, what would cause an evaluation of that year [to] impact your chances of being yellow as opposed to green?

A      I don't recall what she said specifically.    I could opine if you wanted me to.

Q      If you had to guess, what would it be?    If you had to venture your best professional judgment as to why it might be yellow?

A      Sure.    So, as I described the income flows, that is how I would see it presented to a jury, right?    Because you have got to consider the jury might be a 20-year-old auto mechanic, right?    As soon as a contract between the two parties

identified occurs and payments from that contract begin, that is the taxable path.    For instance you can't send your paycheck to someone else, and then them send you money and tell you to say it is a loan and then you not pay taxes on it.

So if you go into the other side, this construct, this scheme to evade, of course it is incredibly complex and confusing because it is made up.    So, that is an example of how that might work for 2014 as CT counsel's opinion.

Q        Then sort of continuing along with the special agent report, we discussed before I guess the nonconcur was over[ridden] -- but it was passed on to DOJ as a result of concurrence by who exactly?

A        Director of field operations.

Q        Director of field operations.    And then that went to DOJ tax.    And then DOJ tax authored a 99-page memo?

A        I don't want to commit to a timing of that memo, but it is around that time. And that was separate and distinct from the path of the SAR.    That SAR would never be reviewed [for approval] by the DOJ tax attorneys who are working the case.    It always would go to a separate person.    And in this particular instance, it was DOJ tax John Kane is his name.    So the 99 page [memo], I am sure it was being authored or maybe it was authored or it was said to author around that time.    But it was in process because we knew since at least June of 2021, there was no venue in Delaware.    So we knew that it had to go to D.C., it had to go to California.    So, I think this document, which was outside the norm, but maybe -- I am not saying that it is wrong, right, it is just outside the norm -- maybe it was for the purpose of helping them present it to the D.C. U.S. Attorney's Office, and eventually to CDCA, the Central District of California.

Q        Okay.    So this was a memo that was I would say not written necessarily in the normal course of an investigation, and it would not normally be something that was

produced in response to an SAR?

A Yes.

Q Have you ever seen a DOJ tax memo?

A The 99-page memo?

Q The 99-page memo.

A I have not. I have seen excerpts in a presentation.

Q And did those excerpts give you a sense of whether or not DOJ tax was recommending charges?

A I don't think I could conclude from those excerpts that that happened. But I have worked with Mark Daly for 10 years and I talked to him almost daily, it was called the "daily Daly," that was extra. But you see all the action up until March, right? And you see the SAR being sent over on February 25, you see the discovery request. They anticipated it was going to go to D.C. and it was going to be opened in D.C. and it was going to be charged in D.C. So if they produced a 99-page memorandum that said something other than that, would be surprised but I have not read that document.

Q But you don't have any reason to believe that, or knowledge one way or the other of whether or not the DOJ tax memo contained information about litigation risk for instance?

A I did not see that. I wouldn't know that.

MINORITY COUNSEL 2. [redacted], that is all I have.

BY MINORITY COUNSEL 1:

Q Thank you for being here today. I appreciate it. I am going to go back over some of the things you said that I probably just missed in my notes. I just want to make sure that I have a clear record.

I think one of my colleagues had asked you when did this case begin. And you

noted that it started on another case, and then it had basically spun off of that and he was on a list of individuals. Do you have a date as to when the case started, like a year?

A So 2018, internally, the IRS CI, yes. And it went through like that PI, that primary investigation phase. And then it went through the 9131 process to go to the U.S. Attorney's Office, the DOJ tax approval to go to the U.S. Attorney's Office.

Q This was another question that I had. I think it is exhibit 2, and it is just the list of the tax years and the conclusion. On the front of it, it has a special agent and that person is redacted and the revenue agent is also redacted. Are you able to provide the names or are you one of these individuals? I just can't tell who wrote it.

A Sure. So special agent -- this report was written by [redacted]. He is the case agent on this.

Q Okay.

A The revenue agent -- he had zero input into the authoring of this document. What a revenue agent's traditional responsibilities are as a special agent we might get all these income streams and get a compilation of what we believe to be income. And we give it to these revenue agents -- and they are super educated in Tax Code and everything. And they put it into a RAR, Revenue Agent Report, and it basically spits out for each year what the additional tax due and owing, taking into account additional income, maybe additional expenses that would lower that tax income, the tax due and owing. But that is the role in it. So -- I don't know why he's on the front of --

Q Is that --

A I don't know why he's on the front of the report, but I think it is kind of to throw him a bone because --

Q Okay, okay. Do you know if that person, the revenue agent, do they review the final document, the draft before it comes across your desk?

A     No.

Q     Or it is just really you are using their numbers and that is why they --

A     It's only numbers -- appendix A to every SAR is an additional tax [due] and owing for criminal purposes, that would be the revenue agent's -- that would be the only thing that they would create exhibits that populate that document, that document says all these years, this is how much they owe for criminal purposes.    That would be the extent of their interaction with this document.

Q     Okay.    So I am going to come back to exhibit 1 in a minute, but I wanted to look at exhibit 4 and 5.    So I want to start with exhibit 4.    Did you provide this email to the committee?

A     No.

Q     Okay.    Do you know where this email came from?

A     As part of the investigation I wouldn't be able to answer that question, unless you are asking me like literally where it came from on the document.

Q     Well, I am asking two things.    I was going to get to the person.    We have never seen these two documents on my side, and so I just don't know where they came from.    And the documents that I have been provided are the ones that you gave to the committee.    So I am just wondering if this is some second set of documents that we didn't receive, or where these documents actually came from?

A     No, I'm --

Mr. Lytle.    So two questions there.

MINORITY COUNSEL 1.    Yes.

Mr. Lytle.    Does he know how they were obtained?

MINORITY COUNSEL 1.    Yes.

Mr. Lytle.    Is a question.    Do you know that?

Mr. Shapley.    No, I don't.

Mr. Lytle.    Okay.    Second question, did you deliver Exhibit 4 to the committee?

Mr. Shapley.    No, I did not.

MINORITY COUNSEL 1.    Okay.

Mr. Leavitt.    Or 5.

BY MINORITY COUNSEL 1:

Q    Did you deliver exhibit 5 to the committee?

A    I did not.

Q    Because I did actually read the documents that you provided, so I was surprised by these two documents.    Where they came from, I don't know, maybe the internet.    I don't know.

Can we talk about the individuals that are listed in exhibit 4?

A    Sure.

Q    Do you know who Eric Schwerin is?

A    Yes, I know who Eric Schwerin is, yes.

Q    And is he an attorney, a person, an accountant?    Do you know anything about his background or what is his relationship here?    I guess I am trying to understand why we have an email from Eric here.

A    Okay.    So I don't know if he's an attorney or CPA, but he is a very close friend of the family of the Bidens and a close friend of Hunter Biden.    And he is known to just be a very diligent guy.    And he was brought in and helped create OWASCO P.C. Based on the documents that I have read and understand to -- for the sole purpose of getting Hunter Biden into tax compliance.    Because in the early 2000s, he often had these large taxes due and owing, and then he couldn't pay them.    And he used to have problems and that stuff.    So he was brought in to help bring Hunter Biden into tax

compliance.

Q      Okay.    And this was back in 2017.    Okay.

And then on exhibit 5, it's the same question, George Mesires, and I think you might have mentioned him earlier, do you know his relationship?

A      Yeah.    I know him to be a personal, quote, unquote attorney to Hunter Biden.    And if I wasn't taken off the case, I would have been tainted by this document.

Q      And do you know who Eric is?    Eric is the same guy from exhibit 4, I guess.

A      Yeah, Eric Schwerin.

Q      And do you know if there is -- and maybe I missed it, do you see any response on here from Hunter Biden to these emails?

A      I don't.    This is the first time I have seen this so I don't see an email from Hunter Biden, or at least what this document shows.

Q      And then it appears in the top in the header, right after the date there a number of names.    But it also appears that there is a number of names that have been redacted.    The first one is Eric Schwerin, and then Hunter Biden, Michael McPhail and then Nicholas Klinefeldt.    But it seems some names that are missing.    Would you happen to know who those names might be?

A      I think they are there, but they are just grayed out.

Q      Oh.

A      I think it is email addresses.

Q      Oh, okay.

A      Yeah.    That is why I looked to see if it was a bleed-through, or yeah, they are just very faint.    So it looks like the email address is to those individuals.

Q      Okay.    Thank you.

Now I would like to go to exhibit 1.    This is a letter that was sent, and these are

some basic questions. I want to make sure that I have my notes clear so that I remember what I am doing when I go back to look at this. Okay.

Mr. Leavitt. What was your question before whether there was an email from Hunter Biden or whether he was the recipient?

MINORITY COUNSEL 1. Oh, no. My question was I thought that there were names that had been redacted out. But it turns out that they were actually the email addresses of those individuals?

Mr. Leavitt. But prior to that you were asking about whether Hunter Biden was on this.

MINORITY COUNSEL 1. No, whether there was a response from him.

Mr. Shapley. That's how I understood it.

MINORITY COUNSEL 1. And he said there was no response.

BY MINORITY COUNSEL 1:

Q On the first letter which is dated April 19th, and is exhibit 1, it is mentioned in here that my client has already made legally protected disclosures internally at the IRS. I wanted to ask a little bit about those disclosures, when they were made and to whom they were made, and whether you made them by letter or email -- I know you can make them by phone call as well -- and if you received any acknowledgment.

So, we can break those down, but that is essentially it. I want to know a little bit more about the line with the disclosures within the IRS.

A I don't think I will be able to be all inclusive, but I will give you examples.

Q That is fine.

A I think that the first disclosure that I made that something was far outside the norm was a June 16th of 2020 memorandum. That memorialized a meeting with the director of field operations and down, so it would be the SAC, the ASAC, me, case

agent.    I can't remember exact dates for some of these.

Q    That is okay.

A    It was something that the SCRs, these sensitive case reports, that went up to supposedly to the chief, they are authored for the chief.    And there is only a finite number of sensitive case reports produced in CI, because they are there for the purpose of informing the chief on these more sensitive cases.    And so, those were monthly on this case.    There were multiple of those where I raised various concerns to the chief.

Q    Do you know who the chief was at the time or maybe the chief changed over time, but --

A    So Don Fort was the chief through December 31st of 2020 and since then, the chief is Jim Lee.

There were briefings, there were meetings, at least, like once a year those occurred, sometimes twice a year.    And then as we got to 2022, we had those conversations more frequently, and they were surrounding bigger meetings, like a June 15th, 2022 meeting at Main DOJ, an October 7th, 2022 meeting.

Q    That is good, yeah.    Thank you.

At any time, did you make any disclosures outside of CI?    Did you make any disclosures out of the chain to, I don't know, the deputy commissioner of services and enforcement, or anyone outside of CI?

Mr. Lytle.    This is outside of CI, right?

MINORITY COUNSEL 1.    Yeah.

Mr. Lytle.    But within the IRS?

MINORITY COUNSEL 1.    Within the IRS.

Mr. Shapley.    So the chief would be, you know, that is the highest, right, like that we would usually go to unless of course I thought the chief was not doing something that

they should be doing. I raise these issues to the U.S. Attorney's Office in Delaware, and often to DOJ tax attorneys, but outside, I --

BY MINORITY COUNSEL 1:

Q But no one at Treasury?

A Oh, no.

Q No one at IRS above -- other than CI, no deputy commissioners, no commissioner?

A That is correct. And, there was a common theme that [redacted] and the co-case agent Christine Puglisi would -- after all these pros team calls we would have a follow-up call. And sometimes FBI agents would be on there as well. And it was basically talking about the strategy and it often became like, Wow, they are not letting us do this. Can you believe they said that? Like that type of thing.

And we -- in order to protect the record of the investigation basically it was me that could only document that, right? Because we wanted to make sure that the agents weren't documenting things that would eventually be turned over in discovery and could somehow affect the viability of the case.

So that is something that I documented moving forward. And each time we were, like, Wow, they didn't let us do the search warrant. Like she said -- to overcome probable cause with a search warrant is, like, that is it, right? That is really, like, okay, well, you are going to go do it, because we want evidence that is unfiltered, right? But the whole point is we were like, well, there is no way they are not going to charge us. The evidence is there. They say the evidence is there. And we just really couldn't believe that they would be doing something wrong. It was a very heavy burden to overcome from my experience and training to be, like, wow, there is something going on here.

So it got to the point where we are like, well, they are just going to charge and all the things that they didn't do were just going to go away, right, and it is not going to matter. But it just didn't happen. And then the October 7th meeting, you know, changed everything for me and I could no longer stay silent. And the case agent is also willing to come forward as well.

Q Do you know if the chief reports to anyone on, like your SCRs? Does that go anywhere up the chain at IRS, or does it just go to chief, so Mr. Fort at the time, and that is kind of the end of it. Did he ever give you an acknowledgement that he read the SCR?

A No, no. Well, the first question is I don't know if goes above the chief. The second question is, you know, there is -- they never told me they read the document. It is for the chiefs, but I don't know if they read it.

Q So no one gives you any feedback like, we need more information on this particular bullet point or something like that?

A You know, that was a common theme along the investigation as well is that we would be raising these issues, right and my senior leadership was never, like, okay explain that to me. Oh, okay, we disagree with you. So we are not going to do anything. In fact, there is multiple correspondence that basically show that they are, like, wow, yeah. And then we understand and we support you and whatever. And then even the prosecution recommendation, right? So finally, when we heard that ‘14 -- they were kind of leaning toward -- we thought they were still deciding on ‘14 and ‘15 in August, and that they were leaning toward a no to charge those. My DFO responds that he is going to go and talk to the deputy chief and tell him to call over to Stuart Goldberg and tell him that IRS CI supports 2014 and 2015. It was kind of, like, I hate to be too colloquial but it was like literally burying their heads in the sand. But

when it popped up, they even agreed, they even were able to say that they agreed with some of these charges that eventually were not charged.

Q Okay.

Mr. Leavitt. Could I just clear something up?

MINORITY COUNSEL 1. Yes.

Mr. Leavitt. When you asked about Treasury, are you just talking about Main Treasury or the inspector general there as well?

MINORITY COUNSEL 1. I was really talking about Main Treasury.

Mr. Leavitt. Okay. Thank you.

MINORITY COUNSEL 1. But if you'd like to answer about the inspector general that is fine, too, but I was asking about Main Treasury.

Mr. Lytle. Just to clarify, his attorneys have made some disclosures to all of these entities so --

MINORITY COUNSEL 1. That is fine. But I am not asking about those. I was asking more at the time --

Mr. Lytle. Got it.

MINORITY COUNSEL 1. -- whether there were any other channels or avenues for reporting up through the IRS beyond the chief, or someone else that he might have emailed. I don't know [maybe] the chief counsel, or if there is someone else that is in that chain of command that we did not ask about. My question was really just what he answered, which is did he or anyone else in that chain do anything within main Treasury.

Mr. Shapley. I was a little confused by it, but -- okay, good.

MINORITY COUNSEL 1. Okay, that is correct.

You guys have any other questions? We're done.

Thank you very much.

MAJORITY COUNSEL 1. Off the record.

[Discussion off the record.]

BY MAJORITY COUNSEL 3:

Q We were surprised to learn that prosecutors walked away from a tax assessment of hundreds of thousands of dollars. In a typical IRS audit there will be an examination of taxpayers records, either in person or via mail. If the IRS determines that additional tax is owed, IRS exam will make a formal adjustment to tax liability. Interest and penalties may apply being an underpayment of tax. And if there is no agreement between the taxpayer and the revenue agents on the amount of tax owed, there is an assessment, and the taxpayer has 30 days to consider their next course of action. Again, this is in a civil case. The taxpayer may choose to appeal the assessment administratively within the IRS, or to the Federal courts. But the taxpayer owes that tax plus any interest and penalties. If left unpaid, that can lead to criminal prosecution. It is our sense that it would be rare for the IRS to simply walk away from a six-figure tax assessment on the civil side. But based on your testimony, this case started within IRS CI. Can you confirm?

A Yeah, that is correct.

Q So your team went through the course of this investigation. You mentioned that there was $400,000 in underreported income for 2014 or 2015 or both. Can you confirm?

A 2014 was the $400,000.

Q Thank you. And that amount was reflected on an SAR?

A Yes.

Q Thank you. Then as we discussed in 2022 the U.S. Attorney allowed the statute of limitations to expire with respect to that amount. Can you confirm?

A       With respect to that tax year, which included --

Q       The 2014 tax year.

A       Yes.    That is correct.

Q       Is it typical for IRS CI to make an assessment of additional taxes owed, and then see the IRS and prosecutors simply allow the statute of limitations to run out?

A       So assessment is a civil term and assessment means that like that dollar amount goes on that taxpayer's account and then they owe that, right?    So assessment is kind of used a little bit outside of what I am used to.    So --

Q       I understand.    On an SAR, there will be a number, an assessed amount, or a deficiency in tax.    Is that correct?

A       Tax due and owing for criminal purposes, yes.

Q       Criminal purposes.    And is it typical for IRS and prosecutors to simply allow the statute of limitations to run out from the amounts shown on an SAR?    Is that a typical practice with cases that you have dealt with?

A       Letting a statute of limitations expire in an active criminal investigation is not normal.

Q       Thank you.

I would also add it seems that if Hunter Biden had been audited like any normal American, he definitely would not have received a free pass on a six-figure tax bill for 2014.    That would have been an assessment, that would have gone potentially through the courts.    It is not something that IRS on the civil side would have just walked away from.

A       I mean, based on my understanding of civil, yeah.    That is correct.

Q       Thank you.

Mr. Leavitt.    2015 is also when the statute of limitations --

Mr. Shapley. Yeah, 2015 the statute of limitations also expired. I mean, I just -- that particular year and that particular charge, I could see some issues with that that would preclude it being charged.

BY MAJORITY COUNSEL 1:

Q When you say that particular year?

A 2015.

Q 2015.

A Yeah, so, 2014 is -- the elements are met, absolutely should have been charged, any other case I ever worked with similar fact patterns, similar acts of evasion and similar tax due and owing. 2015 was a lower -- was a much lower amount. And, you know, I don't -- I am not -- I wouldn't argue that 2015 should have been -- that if they didn't charge it that was a huge problem.

BY MAJORITY COUNSEL 2:

Q And why was that? What was the number in 2015?

A It was lower it was like $23,000, $25,000. It was really low. And there were like, diamonds given, and it was like gifts and stuff -- so it was a little bit less straightforward. 2014 was just solid straightforward.

Q And what was the number in 2014, if you know?

A The tax -- again --

Q So of unassessed -- per the report was, what was that? I want to say it was $220,000 but I don't remember off the top of my head, 2014. I do know that there is still that $125,000 of unreported that cannot be collected through civil or criminal means.

BY MAJORITY COUNSEL 1:

Q And just to clarify that point, because of the way this played out on the criminal side, civil actions were suspended during the course of your investigation. Is

that correct?

A Yes, that is correct.

Q And now that the statute was allowed to run for 2014, there is no mechanism by which the IRS can force the taxpayer to pay the amounts you believe are due?

A That is correct.

Q Okay, we just talked about tax year 2015. We have talked a lot about tax year 2014. I would like to just run through the other relevant years here. For tax year 2016, what was the amount at issue, if you recall?

A You know, I don't want to say individual tax years and the tax charges, just because I am just not -- I had that chart in my head and I am not confident enough to say -- I mean, it is 2.2 over those years so --

Q Understood, understood.

BY MAJORITY COUNSEL 2:

Q Just going back to 2014 and 2015, do you know if he was paying taxes on his Burisma? He was paid $1 million or so basically for nothing. Do you know if he was paying taxes on that, the $80,000 a month coming in through the Rosemont Seneca Bohai, I believe?

A So for 2014, the $400,000 of unreported income today is the Burisma income.

Q Correct.

A It was not reported, and no taxes were paid on that.

Q Okay. And you believe it's $400,000, not $1 million?

A Well, the number was $666,000, because it was in April, right?

Q Okay.

A    So it was $1 million per year.

Q    Okay.

A    So the beginning was $666,000.    And then we gave -- in criminal investigation we are very conservative with those numbers.    So in theory, it really should be -- that number should be $666,000 of tax due and owing.    And then the tax loss associated with that.    But we gave him the benefit of the doubt on anything -- on the amount between 666 and 400.

Q    And then in 2015 is he paying his tax on the Burisma money?

A    Not at the time, but he -- it does wind up because Eric Schwerin --

MAJORITY COUNSEL 1.    Let's go off record for one second.

I'm sorry, go ahead.    Back on the record.

Mr. Shapley.    Because Eric Schwerin is now involved in that whole process so he made sure that things are --

BY MAJORITY COUNSEL 2:

Q    And is there anything about 2016 that you remember, or stands out -- because you mentioned in 2014 it was Burisma, and 2015 you said it was complicated, there were some diamonds and some other hard-to-value assets that were provided to him as income.    Do you remember anything about 2016?

A    2016 was a failure to file [and] pay year so it wasn't -- it wasn't a position of unreported income and acts of evasion, it was just that he didn't file and/or pay what he was supposed to.

Mr. Lytle.    Can I just confer briefly to refresh his recollection?

MAJORITY COUNSEL 2.    Sure.    Of course.

MAJORITY COUNSEL 2.    We can go off the record while they are conferring.

[Discussion off the record.]

BY MAJORITY COUNSEL 2:

Q So I was asking if anything about 2016 stuck out to you. And you said it was a failure to file, failure to pay case. And I think that is when we went off the record.

A Yeah, yeah. I mean, in terms of the actual conduct, I don't think I can get into it right now -- I don't want to mix up tax years. And ultimately, the case agent on those things getting into each -- I mean, it will be very dissected and very --

Q Okay. How about 2017, anything that stands out to you?

A It was a bigger dollar amount, right? It was around $500,000 taxed and owing.

Mr. Lytle. Are you asking the conduct that resulted in that income?

MAJORITY COUNSEL 2. I am asking him about both. I am asking if he's aware of roughly the dollar figure and what the dollar figure is for. Like he mentioned in 2015, it related to some diamonds. 2014 it related to Burisma. So I am just asking if he has any recollection about -- each year, now we are at 2017.

Mr. Shapley. Yeah, no. That was a failure to file pay year as well. And the tax loss was around $500,000.

BY MAJORITY COUNSEL 2:

Q And 2018?

A Yeah, 2018 was -- yeah, there is a lot of -- 2018 was like said to be -- that was at green light year from even CT, like, from a low level. There was -- even DOJ tax and U.S. Attorney's Office in Delaware was, like, this is a slam dunk case. So what occurred in 2018 was -- it wasn't a tax return that was prepared until 2020 mind you so it was, like, late and stuff. But he was expensing personal expenses, his business expenses. So, I mean, everything, there was a payment that -- there was a $25,000 to one of his girlfriends and it said, "golf membership." And then we went out and followed that

money it was for a sex club membership in LA.

And there were off-the-book employees.    So Lunden Roberts was -- she is the mother of one of his children in Arkansas.    And she was an off-the-book employee that he was giving her healthcare benefits, she wasn't working, you know.    All that was expensed.    There were multiple examples of prostitutes that were ordered basically, and we have all the communications between that where he would pay for these prostitutes, would book them a flight where even the flight ticket showed their name.    And then he expensed those.

Mr. Lytle.    First class?

Mr. Shapley.    I don't recall if it was first -- I think it was first class on some of them, but some of them was, like, Frontier, I don't think they were a first class.

So the worst part about 2018 is that Hunter Biden's accountants are sitting there with him at a table, and they have all the numbers in front of them, right?    The bank accounts in front of them and they are saying that, you know, you need to circle what are business expenses so that we know what to deduct.    So it becomes apparent to the accountants during this interaction that he's putting things on here that aren't expenses, that aren't true business expenses.    So the accountants create a representation letter that basically they said they have never done before.    And they had him sign this document, and it was basically because they didn't believe what he was saying, but they didn't -- if they were going to prepare his return, they had to listen to what he was saying. I mean, I guess they could have just chosen not to prepare his tax return would have been their only out.    But that was the type of conduct in 2018.

[12:49 p.m.]

BY MAJORITY COUNSEL 2:

Q What do you think happened between 2014 and 2018? You told us that he had utilized this Eric Schwerin fellow to try to get his taxes in order so he pays his taxes, but we get to 2018, and he's trying to expense prostitutes and whatnot.

A Yeah, and --

Q And for purposes of his tax returns, he's expensing them to what business?

A To Owasco P.C., I believe.

Q Okay.

A Yeah, I believe it was Owasco. So I don't have the date in front of me, but Eric Schwerin and Hunter Biden have a falling-out.

Q Okay.

A Yeah. And so Eric Schwerin leaves and stops working with and for Hunter Biden. And I think that's where -- it was in that timeframe where Schwerin was no longer participating.

Q Okay. Was the Owasco concern conducting any legitimate business that would need to expense anything?

A I mean, they're a company that brought in his consulting fees. So, if they were truly consulting fees and he was traveling to get his consulting fees, or some legitimate expenses can happen, like the office, and things like that.

Q Do you know if they had an office?

A Yeah. Oh, yeah, at one point it did because --

Q So Owasco had a separate office from Rosemont Seneca?

A I don't know if it was separate because -- I don't know the answer to that.

Q      And then now we're at 2019.    Is there anything that stands out about that tax year, either an amount or procedurally?

A      No.    It's a -- no, not a whole lot for me.

Q      And as I understand it, at some point, the 2014, '15 and '16, was that --

Mr. Leavitt.    Sorry, if I could confer for a second.

MAJORITY COUNSEL 2.    Of course.    Off the record.

[Discussion held off the record.]

MAJORITY COUNSEL 2.    Back on the record.

Mr. Shapley.    So, you know, these tax debts were outstanding, and there was only 1 year there was a payment plan where he paid $10,000.

BY MAJORITY COUNSEL 2:

Q      Do you remember what year that was?

A      I think it was 2016, I believe.    But he paid it a few times, and then he stopped paying it.    And, then ultimately, in late 2019-2020, a Kevin Patrick Morris comes into the picture.    And he was described as meeting Hunter Biden at a campaign finance event.    And he paid off several different tranches of tax due and owing, to include Federal and D.C. tax due and owing.

And when they prepared some of these returns, they wrote that Kevin Patrick Morris gave him a loan for these.    So that's also not taxable.    So that was one of the points of -- that was a compilation of all the tax due and owing, so --

Q      Some of these years, they tried to file in D.C., and then in the Central District of California?    Do you know where the breakdown was?

Where the U.S. Attorney's Office for Delaware tried to bring a case in D.C., and then they also tried to bring it in the Central District of California, do you know the breakdown in years?

A       Yeah.    So, the venue for 2014 and 2015 was D.C., and the venue for 2016 through 2019 was Central District of California.

Q       So D.C. was only 2014 and 2015?

A       That is correct.

Q       And when was the statute supposed to run for 2014 to 2015 after the extensions?   And we probably covered that before.    I apologize for asking again.

A       After all the extensions, it was November of 2022.

Q       So when they learned in March of 2022 that the D.C. U.S. Attorney is not bringing that case, they had April, May through November of that year to do something about that tax liability, correct?

A       Yes.

Q       And they did not do anything?

A       They did not, no.

Q       They could have tolled the statute of limitations?    They could have shifted it over to the Civil Division to pursue it civilly, correct?

A       Yes to the first question.    To the civil statute, I don't know if it would have still been open.

Q       Okay.

A       So I don't know that.    But, I mean, one thing that they did do is he did request special counsel authority in that time, right?    He was denied so -- and that's a big point that I want to make.

So it's not just -- I've worked cases for a long time and very big cases.    And yes, there -- investigators sometimes have disagreements with prosecutors.

But if you look at this, you can see -- they brought the case to D.C.    Like, they're not bringing the case to D.C. because they don't support it and they don't think it should

be charged.   And then I don't know -- it just wouldn't make any sense to me that David Weiss requested special counsel authority if he didn't also think that those years should be charged.

So that's just kind of, some of the things that were happening in that time period.

Q     And you said that the Central District of California, that case was brought out there in January of 2023, you said?

A     No, September of 2022.

Q     September of 2022 is when they brought the case in California?

A     They brought the case to California.

Q     To California.

A     It was the same week that Martin Estrada was confirmed.

Q     Okay.

A     So, after 6 months, we're kind of in limbo, and we don't know why it took 6 months to then take the next step.   And, maybe it's coincidence, but it went there at the same time that --

Q     Okay.

Mr. Lytle.   Can we go off the record for a moment?

MAJORITY COUNSEL 2.   Off the record.

[Discussion held off the record.]

MAJORITY COUNSEL 2.   Back on the record.

BY MAJORITY COUNSEL 2:

Q     I know you're not sure of when the U.S. Attorney for Delaware asked for special counsel status, but do you have a timeframe?   Sometime between March of 2022 and January of 2023?   Is that fair?

A     My understanding was that it was right in March after he was told by

Matthew Graves that they didn't support it.

Q And do you know if he asked for special counsel status at any time before he brought the case to the Central District of California?

A For California?

Q Yes.

A I don't know that. But in the October 7th meeting, he did say that if California tells him no, he has no authority to charge in California, and that he would have to request special counsel authority in order to charge it.

Q And you don't know if he did ask for special counsel authority a second time?

A I do not know.

Mr. Lytle COUNSEL 1. Can we go off the record a moment?

MAJORITY COUNSEL 2. Sure.

[Discussion held off the record.]

[Recess.]

[1:32 p.m.]

MAJORITY COUNSEL 2. Back on the record. It's 1:32.

[Shapley Exhibit No. 6

Was marked for identification.]

EXHIBIT
tabbles
6

Laptop and Hard Drive Timeline
10/22/2020 – 1000am

1. 3 laptops to the shop
2. Financial records show Sportsman was around Wilmington DE shop at a cigar shop on the same day
3. Other intelligence shows Sportsman was in the area
4. computer shop calls Sportsman to tell him to bring in an external hard drive to put recovered data on to. Sportsman returned to the shop with the external hard drive
    a. Phone records show shop called Sportsman and sportsman called the shop around this time
5. During data recovery effort (could not fix the computer so was just recovering any data he could recover)
6. At this point there was the laptop, external hard drive, and a hard drive at the computer shop (3 devices)-computer shop always kept a copy of the customers data for a period of time before purging the data off his system
7. October 16, 2019 – Richard Steven McKissack reported to the FBI office in Albequerque "his son is in possession of a sportsman computer that had not been retrieved and was not paid for…said it contains evidence of white collar crime…he did not view this data personally"
8. FBI Albuquerque generated a lead that went to Baltimore FBI.
9. FBI Baltimore received the lead on 10/17/2019.
10. Discussions began on what to do with the computer.
11. Reached out to Richard on 11/3/2019 and got John Paul's contact information
12. 11/6/2019 – Josh Wilson called John Paul
    a. Provided device number and FBI determined that device was registered to Sportsman via apple ID account/iCloud account
    b. Verification of device -
13. 11/7/2019 – FBI interviewed John Paul at his residence near Trolly Square right around the corner form the shop on Delaware Ave.
14. FBI produced a 302 and Dillon looked at the 302 to determine if there was any privileged information – produced because John Paul was providing statements about what he saw on the laptop
    a. Determined no taint items in 302 – but not being shared with prosecution team
15. 11/21/2019 – telephonic interview to clarify the steps taken to notify sportsman of completion of service request, request of payment and pick up of the item.
16. 12/9/2019
    a. Took property of laptop, external hard drive and copy of receipt signed by sportmans
    b. [redacted] provided copy of [redacted] and fbi receipt of property
17. SA [redacted] began drafting search warrant affidavit for the computer on 12/3/2019

18. 12/13/2019 – obtained T26 SW signed by SA [redacted] for laptop and external hard drive – presented a filter protocol to the magistrate with the SW
19. 12/12/2019 – OEO approval came concerning the search warrant for the laptop and hard drive
20. FBI determined in order to do a full forensic review a replacement laptop had to be purchased so the hard drive could be installed, booted and imaged.
21. Eric Overly, CART agent, imaged the external hard drive in Delaware.
22. 12/19/2019 – Image of hard drive is provided to RCFL. Went to Philadelphia so it stayed in Delaware district.
23. 1/6/2020 – forensic computer people at FBI started analysis
24. After forensics there were some initial emails about what computer analyst was seeing – many pictures with many body parts, file names, and things similar to this
25. SA [redacted] never saw a forensic report of actual hard drive or laptop – they had to actually go to the device – no cellabright report of hard drive showing the analysis in pdf format.
26. 1/15/2020 – Josh sent an email that some information was put on a shared drive with various file extensions
27. LTFC – various emails around 1/23/2020 talking about data imaging, etc.
28. 1/27/2020 - DE1 and DE2 -exported file extensions - were first pieces of evidence that were provided by computer foresnics that included some files sorted by extension – was provided on a USB drive
29. SA [redacted] asked if all information on the hard drive had been reviewed…the answer is that they did not look at all of that…SA [redacted] questions if Dillon reviewed all iMessage's that were relevant and not privileged. They would find the answer.
30. 2/27/2020 – DE3 with all messages from the hard drive were provided by computer forensics – via USB Drive
31. 2/10/2020 – Filter review completed – relevancy review began for the hard drive
32. 227 Productions
    a. DE3 – USB containing exported messages (ipad and macbook messages) No iphone messages
33. 3/31/2020 – email about quality and completeness of imaged/recovered information from the hard drive. (SA [redacted] said he had no seen it. USAO said that he would not have seen it because for a variety of reasons they thought they needed to keep it from the agents – they were going to give a redacted version at some point in time to the agents – Stephania takes what comes form Dillon …)

Laptop – iphone messages were on the hard drive but encrypted they didn't get those messages until they looked at laptop and found a business card with the password on it so they were able to get into the iphone messages

34. [redacted] and [redacted] – is related to the ipad backup
35. 3/6/2020 – FBI received the image of the laptop
36. 3/10/2020 – went to RCFL in philly to facilitate the forensic exam
37. 4/7/2020 – First evidence produced DE4 from laptop – less than what was provide in DE1,2,3
    a. Because de-duped
    b. Josh Wilson accepted this personally
38. 4/10/2020 – thumb drive to LTFC
39. 4/17/2020 – Uploaded documents to USAFx but got an error – talked about all the various types of files that were provided; voicemials, messages, videos, etc.
40. 4/20/2020 – Dillon sent to AUSA's only
    a. Zip files with Pdf and html version of cell phone reports via usafx\
    b. Redacted cellabright file but 5gb so can upload separately if you want—contain wise it is identical to other productions
    c. SA [redacted] does not believe he ever received that cellabright file – Lesley said, "OK."
41. 5/11/2020 - The cellabright file was sent on thumb drive and uploaded at some point—timing is not exact
42. SA [redacted] – For items not seen by agents shouldn't they see everything because if they have to testify to it they need to see it
    a. Lesley response is that this is a historical review and we can discuss that later
43. Someone asked if we could tell if files had been added by the computer shop
    a. The computer guy said they could do a csv list that shows when everything was created
    b. He said that the laptop was "returned to original"
    c. Lesley said (while laughing) that because a lot of people are going to be asking for the laptop
    d. Josh Wilson stated that (while laughing) so whoever they are they are going to have to buy a laptop to put the hard drive in so they can read it.
    e. Lesley stated that this team trying to determine if anything was added to the computer by a third party which are allegations being made by people who are not the defendant in this case is not a priority. We have no reason to believe there is anything fabricated nefariously on the computer and or hard drive. There are emails and other items that corroborate the items on the laptop and hard drive.

Ended around 1258

BY MAJORITY COUNSEL 2:

Q We just marked exhibit 6, and this is a document titled "Laptop and Hard Drive Timeline" dated October 22, 2020, 10 a.m.

Can you tell us about this document, who prepared it, and why?

A Yes, I prepared this document. It was to memorialize a meeting that we had with the prosecution team, plus the FBI CART team, which were the computer analysis team.

One of the things that prompted this was an email that I had sent a couple days earlier that basically asked AUSA Wolf to have a discussion about the laptop, because IRS CI was the affiant that actually allowed to get the contents of that laptop and devices. When I say laptops, there's a couple devices.

So then this occurred, and it was almost 4 hours, I think. It was a long -- no. Yeah. Three hours. It was long and it was very detailed, and I just documented it here.

Q Do you know what warrant the FBI used to obtain these devices?

A It wasn't a warrant for the FBI to physically take custody of it. They determined, because it was abandoned property, that it could be turned over via a document request.

[Witness confers with counsel.]

[Discussion held off the record.]

MAJORITY COUNSEL 2. Back on the record.

BY MAJORITY COUNSEL 2:

Q Who obtained the devices?

A FBI did.

Q Okay. And could you tell us, you know, anything else about this document

that is worth knowing about?

A So would you like me to go through the document for high points or --

Q Just the significant parts.

A Yes. So there are a couple significant parts of this. One was that, at this time, the laptop was a very big story, so we were just making sure that everything was being handled appropriately.

So we wanted to go through the timeline of what happened with the laptop and devices. I thought one of the most important first parts was that on November 6 of 2019, the FBI case agent, Josh Wilson, called up the computer shop owner, John Paul, and basically got the device numbers from him.

And then we bounced those device numbers off third-party records, and it showed that it was, in fact, Hunter Biden's device. So it was a very first important step.

And then it's a lot of minutia with what they did with the information -- or with the analysis of the computers. But what was important here was that [redacted], the IRS case agent, pointed out a couple different times how he had not seen -- he was not given a cellabright report, which is just what they call the output of the FBI CART team analysis, and was questioning whether or not the investigators were provided everything.

And when it came down to item number 33 on page 2, Special Agent [redacted] is saying like, well, I haven't seen this information. And AUSA Lesley Wolf says, well, you haven't seen it because, for a variety of reasons, they kept it from the agents. And she said that at some point they were going to give a redacted version, but we don't even think we got a full -- even a redacted version. We only got piecemeal items.

So it was an example of pertinent, relevant evidence that a prosecutor kept from an agent, and I --

Q You're supposed to be on the same team, correct?

A Yes. And it had already gone through a filter review, right? So there was no attorney-client privilege. So that couldn't be an excuse.

A prosecutor, in my experience, would never want that, right? Because they want the agents to go through the evidence and the agents to spend that time. So, you know, we don't really know what the full contents of that laptop ever had on it.

Q And was it the U.S. Attorney's Office that was withholding the documents from the investigative agents?

A AUSA Wolf was the one who communicated it. I don't know if they confer with DOJ Tax or not, but AUSA Wolf's the one that made the statement.

Q And flipping over to the last page, number 42, Special Agent [redacted], you have listed here: "For items not seen by agents, shouldn't they see everything because if they have to testify, they need to see it."

And what was the response from the U.S. Attorney's Office, Assistant U.S. Attorney Wolf?

A It was a nonsensical response. It was just something about historical review. But, you know, this 42 is an example of like -- this should have been such a mundane task, right? Like, after the analysis was complete, here you go, agents. You know, there was no attorney-client privileged information. Agents, do your analysis.

This is such a -- this is an example of Special Agent [redacted] saying like, Look, like shouldn't -- we got to see this. I don't know how, as an IRS agent, if someone is getting 10 percent of the income, when I do a tax comp for criminal purposes for Hunter Biden, I can't include the 10 percent if he's not getting that. So we need to know where all the 10 percent is going, right?

Q So if the 10 percent was going to the proverbial big guy?

A Yeah. So, I mean, this is just a very small example. This is every -- like this

happened all the time. Number 42 happened all the time where even on the smallest items, for example, like the subpoenas that I alluded to in my opening statement it was a time period in late summer 2021 where we had prioritized these interviews.

And we were to the point where we needed to go out to all these prostitutes, because these were expensed. So we had, it was probably four or five different weeks where, [redacted] would give the -- or I can't say that -- attachment for the document request and have it, you know, ready to go the next week.

So I had to call Jason Poole multiple times, because they wouldn't give those document requests without Stuart Goldberg personally approving them. And, you know, there were a couple different times he was on vacation 1 week. So he just didn't approve them. So we had to move these trips.

But that's the side story. But 42 is kind of like a microcosm of like many other events that occurred similar to that.

Q Okay. And turning to 43, item C, Ms. Wolf said, while laughing, "that because a lot of people are going to be asking for the laptop."

What did you take that to mean? Was that just a nervous laughter that she was suppressing something that needed to be addressed?

A I think -- it was in the media a lot, a lot of talk about the laptop. So I guess I didn't take from it that it was nefarious. It was really just that they were like joking about how everyone wanted the laptop.

Q Okay.

A And then it was right after that that FBI --

Q Including the IRS criminal investigators, correct?

A Yes. We would have also liked to have seen that, unfiltered and unmanipulated by the prosecutors.

Q      Item E, Ms. Wolf stated:    "This team trying to determine if anything was added to the computer by a third party which are allegations being made by people who are not the defendant in this case, is not a priority.    We have no reason to believe there is anything fabricated nefariously on the computer and/or the hard drive."

So this is Ms. Wolf, the Assistant United States Attorney, stating, according to your contemporaneous notes, that we, meaning DOJ, and the prosecution team have no reason to believe there is anything fabricated nefariously on the computer and/or hard drive.    Is that correct?

A      That is correct.

Q      There are emails and other items that corroborate the items on the laptop and the hard drive.    Is that further evidence from Ms. Wolf that the items on the laptop are authentic?

A      That is correct.

Q      And are you aware of any point in time ever that Hunter Biden or his lawyers have asserted that anything on the laptop is not accurate or not legitimate or not authentic?

A      Like news reports?    Like, you know --

Q      Has it just come to your attention?    Has anyone made an allegation that knows anything about the laptop that it's not authentic, that they would have a reason to know?

A      Anyone in --

Q      Hunter Biden, his lawyers, anyone from the Biden camp?

A      Oh, I don't know.    I don't recall who was making what statements.    I mean, I --

Mr. Lytle.    You're not aware of them?

Mr. Shapley.   Yeah, I'm not aware of it.

BY MAJORITY COUNSEL 2:

Q     If you're not aware -- I'm not either -- of anyone, Hunter Biden or his lawyers saying that anything on the laptop is fraudulent, doctored.

A     Yeah.   I don't know of that, no.

Q     Okay.   And that never came up in the prosecution team discussions?

A     No, no.

Q     And if there was a question that there was doctored material or inauthentic material on the laptop, that would be something that the prosecution team would discuss, correct?

A     They were -- we were discussing it.

Q     Okay.

A     I think that there's even another bullet point here where they're talking about looking back to see if documents have been -- or if files have been manipulated. Yeah.   So A is:   The computer guy said that they could do a CSV list that shows when everything was created, and that the laptop was returned to original when they -- yes.

So, I mean, the whole discussion was about can we rely on this information on the laptop, is it Hunter Biden's?   And their opinion was, it was, and it was not manipulated in any way.

Q     It was reliable evidence?

A     That is correct.

Q     Okay.

I want to mark another document that you produced.   It will be number 7.

[Shapley Exhibit No. 7

Was marked for identification.]

Ex. 7

DEPARTMENT OF THE TREASURY
Internal Revenue Service
Criminal Investigation

# Memorandum of Conversation

**Investigation #:** [redacted] **Location:**
**Investigation Name:** Doe, Robert
**Date:** September 3, 2020
**Time:** Approx1300-1415
**Participant(s):** See Below,

,
,
,

1. The following individuals participated on this call or were invited to this call:
   a. [redacted] – IRS-CI Special Agent
   b. Anthony Lopicolo – IRS-CI Special Agent
   c. Christine Puglisi – IRS-CI Special Agent
   d. Gary Shapley – IRS-CI Supervisory Special Agent (Author)
   e. Lesley Wolf – AUSA Delaware
   f. Carley Hudson – USAO Delaware
   g. Stefania Roca – USAO Delaware
   h. Jack Morgan – DOJ Tax
   i. Mark Daly – DOJ Tax
   j. FBI Agents with the following email addresses: [redacted] [redacted], [redacted] [redacted], [redacted]
2. AUSA Wolf stated that probable cause was not a question in determining if a physical search warrant was legally viable. She stated that there is more than enough probable cause. She stated that the decision was whether the "juice was worth the squeeze..." concerning whether the prosecution team thought that OEO and/or public integrity would approve these types of action.
3. AUSA Wolf stated that it is likely that a lot of the evidence sought in the T26 investigation would be found in the guest house of Joe Biden's residence and she stated, "...there is no way we will get that approved..." SA [redacted] interjected that there were several emails talking about the records stored at the guest house and that those communications stated that key evidence the prosecution team would seek would be sent to the subjects' California residence.
4. There was a discussion with prosecutors about removing the subjects name from several electronic search warrants, 2703-D orders and [redacted] attachments. The theme was that with the subjects name in the document it would not be approved by "...people way above them..." SA [redacted] stated that he did not agree with removing the subjects name and instead said that we should not be changing the document to fit in

with what may or may not be approved. SA [redacted] said he was not comfortable with that as it would appear that the change was made for unethical purposes. AUSA Wolf basically disregarded SA [redacted] concerns and DOJ Tax Jack Morgan interjected stating that the removal of the subjects name would still ensure we received "most" of the data the team sought. AUSA Wolf moved to the next topic.

5. AUSA Wolf discussed the Blue Star Google email search warrant they authored and sent forward for approvals. She said that public integrity had approved it but that OEO was sitting on it. It appeared that behind the scenes she received communications that indicated that warrant would not be approved.

*****Follow on call requested by AUSA Wolf on 9/4/2020 at 0945.*****

6. United States Attorney Weiss talked to Deputy Attorney General Donahue. They determined that the prosecution team can no longer issue any external requests (outside of government) whether search warrants, [redacted] 2703-D orders, preservation letters etc. Everything needs to be vetted with USA Weiss and DAG Donahue. This is because it is 60 days out of the election even though it is not technically inside any parameters. AUSA Wolf said that DOJ has zero tolerance for risk that any of these requests somehow tip off someone who would leak this to the media.
7. SA [redacted] asked if the team would still be planning to go overt in November. AUSA Wolf said that the possibility of ballots still being counted and concerning the hand over of power that she cannot determine if that would happen.
8. AUSA Wolf said that DOJ is under fire and that it was self-inflicted. She said that DOJ needs to repair their reputation. AUSA Wolf said we should assume we would continue after the election.
9. AUSA Wolf said that the DAG's office is the one who made the decision.

I prepared this memorandum on September 3, 2020 and September 4, 2020, immediately after the conversation with see list above.

[redacted]
Gary Shapley
Supervisory Special Agent

☑ Double click here to sign
Witness

110

BY MAJORITY COUNSEL 2:

Q It's a memorandum of conversation regarding the Robert Doe investigation. This is a two-page document, two pages of content -- the document is three pages, the third page doesn't have anything on it -- prepared by yourself dated September 3, 2020.

A Yes.

Q And you wrote this document?

A I did.

Q Can you describe the significance of this document?

A Yes. So this was a pros team meeting September 3rd, 2020. And we were having a discussion about being able to do the physical search warrants on Hunter Biden's residence and/or the guest house of President Biden's residence in Delaware.

And we had already established -- well, herein too this is when AUSA Wolf is stating that the probable cause had been achieved and that there was more than enough evidence and that there was likely evidence to be seized relevant to the investigation that could be found at these locations.

So she stated, "The decision was whether the juice was worth the squeeze." And also a statement made here was that she said that, well, we had to consider the optics of doing a search warrant on, you know, Hunter Biden's residence and/or the guest house of President Biden.

She further states about the guest house of Joe Biden that there was no way we'd get that approved. And here's another example of Case Agent [redacted] interjecting, talking about that there were other documents that said that there was information that would be in the guest house and in the subject's California residence in Venice Beach at the time.

And further, there was another discussion about moving forward on these external document requests.    So we did multiple electronic search warrants, D orders, you know, document requests.

And prosecutors were pushing to remove the subject's name from those.    And the reasoning behind that was that they were worried that it would -- someone would -- out there that received these documents, these document requests, would leak the information, and that if it just had the entity that it would be less -- it would be more difficult to link it to Hunter Biden.    So, I mean, of course, the issue is that she said that it would not be approved way above them, right, which -- and I could talk about that in a moment.

And then we're having a long conversation about it and every one of the investigators are like, look, like this is not normal.    There is no way we'd ever send out -- how do you do a thorough investigation of a subject without the subject's name on it?    It's just -- it was absolutely absurd.

And then even Jack Morgan from DOJ Tax said, well, we'll receive most of the information.    And in my experience with working with prosecutors who might be going toward a trial, most is never going to -- never going to be good enough for them.

Q    Was there any overt discussion at these meetings that we're dealing with the son of a Presidential candidate?    Was that ever discussed explicitly?

A    I mean, they were careful.    They tried to be careful.    You know, that's why, you know, there's not a lot of emails, there's not a lot of documents they produced, right? There were discussions that were obvious that they were talking about the issues with investigating a Presidential nominee at that time.

Q    When AUSA stated that the juice was -- whether the juice was worth the squeeze, what do you think she was referring to?    Whether the effort expended to get a

physical search warrant would be worth it?    It takes a lot of hard work and effort on the side of the investigative team to obtain a T-3 warrant, correct?

A      Well, it wasn't a T-3.

Q      Not a T-3.

A      A physical search warrant.

Q      A physical search warrant.

A      I think that she wasn't worried about that part.    She was worried about blow-back from doing a search warrant that was related to Hunter Biden.    I think all of these things that they didn't allow us to do, even back in June of 2020, was because their primary goal was to keep this investigation secret, right?

And even on December 3rd of 2020, when we're in Delaware U.S. Attorney's Office prepping for the day of action on December 8, Weiss came in and was like -- congratulations for keeping it secret.    And I was like, well, I thought that we were conducting an investigation here.    I didn't think that what we were doing was trying to keep a secret.

But there were multiple things like this that occurred -- and this wasn't specific to the upcoming election, right?    Like, we hadn't got the cease -- this was on September 3rd, 2020 -- we hadn't got a cease and desist from DOJ Public Integrity to stop.

So this was generally just that they wanted to remove the subject's name because they were so worried that some company got a document request and that they would give it to the media and that it would somehow out the investigation.

BY MAJORITY COUNSEL 1:

Q      When you said that AUSA Wolf was worried about blow-back, from who do you think she was worried about blow-back?

A      I think it was worried about, that there's going to be, suggestions of election

meddling, or that you're targeting targeting -- Hunter Biden.

I think -- all of her -- all of the reluctance to do all this I believe was related to that. Like, when she says, there's no way we'll get that approved, so at the time, right, like this is September 3rd of 2020. So Bill Barr is the Attorney General, right? So I would assume this would -- I don't know, but would this go to his level? I don't know who's not approving it, right?

But I think that this was an excuse to not even send it up. So I would -- I don't know 100 percent, but I'm almost positive that they just said, Well, we're not going to get that approved so we're not even going to send it up. And that was always kind of an excuse, to use the process to slow it down and to kind of hide behind.

BY MAJORITY COUNSEL 2:

Q And your belief, based on your experience, was they were afraid that maybe it would be approved?

A Yes, yes.

Q And so they wanted to stop it right there in Delaware, in the U.S. Attorney's Office in Delaware?

A That is correct. And even the storage unit search warrant. I mean, that was after the election. And there was no -- it was a storage unit in northern Virginia. No one would have known that was connected to Hunter Biden.

But we had information that there was -- the clean-out of the Owasco office was located in this storage unit in northern Virginia. And after the day of action, we got a little bit more information about it, so we wanted to do it.

And the night of the day of action, [redacted] sends a search warrant affidavit to Lesley Wolf saying, let's do it, right? Now, there's not even an election issue, right? And it's in a storage unit. It's not on someone's residence.

And still, AUSA Wolf and the prosecutors wouldn't allow us to do it, so much so that I set up a call with Weiss and my Special Agent in Charge at the time, and we said, Look, we got to do this. We can't just rely on a document request for them to give us whatever. We need unfettered access to this evidence. We don't know what they're going to give us eventually.

And he agreed that -- look, if it’s not -- Weiss agreed on that call that if it is not accessed, that storage unit, within 30 days that he would allow us to do a search warrant on that.

I'm feeling great, right? So hang up the phone, an hour later I find out that AUSA Wolf and the other prosecutors told defense counsel about the storage unit. So it was off the table. And that was even after the election.

So there's many things. Any other case I ever worked, if they were like there's a storage unit with documents from the business and personal documents in relation to the years under investigation -- the risk was zero, because it's on a storage unit, it's not on a residence -- there's no prosecutor I've ever worked with that wouldn't say, go get those documents.

Q Do you think these decisions were made by Ms. Wolf, the AUSA, or do you think these decisions were made by the U.S. Attorney?

A I don't know the answer to that. Based on what I was led to believe that Weiss was in charge, right? And that the prosecutors often use that as an excuse. Well, that's a great idea, we're going to go talk to Weiss about it.

Q From some of your testimony, though, in the last few minutes, it seems that the AUSA Wolf may have been curtailing parts of the investigation, but the U.S. Attorney had expressed, at least overtly, that he was interested in moving forward, at least with the search warrant for the storage unit.

A Yes. That particular item, yeah. I mean, Weiss -- I mean, I think Weiss didn't have an opportunity to talk to Wolf, right? And maybe they didn't communicate that Weiss had agreed to that.

But the whole point is, is that December 8th, there's emails where Weiss and -- or, I'm sorry, Wolf is asking for a search warrant affidavit. Like, let's go do a search warrant, right?

And then ███ gets the search warrant affidavit forward. And then all of a sudden they're like, we don't want to do that. And they knew we were talking to Weiss about the physical search warrant. So I don't know why they would call the defense counsel at the same time without speaking to Weiss about what came out of that meeting about the physical storage unit.

BY MAJORITY COUNSEL 1:

Q From an investigation process perspective, is it typical for prosecutors to notify defense counsel before executing a search warrant?

A No. No, that wouldn't happen.

BY MAJORITY COUNSEL 2:

Q Is that inappropriate?

A Absolutely. I mean, officer safety. I mean, it's just incredible. You know, there's destruction of evidence. I mean, you go into a door and they know you're coming. It's terrifying.

Q So it's not just for the integrity of the investigation, there are safety issues?

A Absolutely, yes.

Q Let's talk about the day of action, which occurred a couple months later. This memorandum of conversation we were discussing was September 3, 2020. And the day of action was going to be -- it turned out it wasn't very action-packed. Is that

correct?

      A     Yeah.   There was only one successful interview that day, but there were lots of document requests.

      Q     What other agencies were you coordinating with for the day of action?

      A     FBI.

      Q     Is that the only one?

      A     Yes.

      Q     And what was the original plan for the day of action?   I know you mentioned 12 interviews, some in Arkansas, some in California.   But maybe you can just walk us through, again, at a high level, what was planned for the day of action.

      A     So the plan on how to execute that day?

      Q     Yes.

      A     All right.   So the plan that we discussed and agreed upon on that December 3rd meeting, and it might have morphed in a couple days after just to finalize some things, was that for Hunter Biden, who now had a Secret Service detail, that we were going to have the FBI Special Agent in Charge call the Secret Service Special Agent in Charge the night before to just say, hey, I'm calling you at 8 a.m.   It's important.

      And then 8 a.m. call.   FBI SSA Joe Gordon and I were the ones tasked with interviewing Hunter Biden.

      Q     So you're in California?

      A     In California, yes.   So the night before -- so that was the plan.   I went to FBI L.A. Field Office with the FBI SSA.   We talked to their management.   That's the plan. We're going home, right?

      Now it's December 7th, the night before the day of action.   And I'm prepping for interviews, because I'm interviewing Hunter Biden and Kevin Patrick Morris, right?   So

I'm prepping.    I'm prepping.

I get a phone call from my Assistant Special Agent in Charge, George Murphy, who tells me that FBI headquarters notified Secret Service headquarters and the transition team that the day of action was occurring the next day.    And that the new plan became --

Q    Can I just stop you there?    Why did they tell the political officials?

A    I have no -- I have no idea, no idea.

Q    That certainly sounds strange to you, correct?

A    All of it is strange.

Q    It's one thing to tell the subject, but to tell the political officials introduces a whole range of topics of concern.    Isn't that correct?

A    Yeah.    All of it -- yes.    Yes to your answer, but all of it was incredible. There's also another officer safety issue, because these people close to him are going to know that we have agents out there out and about trying to do interviews and try to get information.

And then just, tampering with witnesses, right?    Now you're telling the witnesses that agents might be knocking on your door tomorrow, don't say anything.    And ultimately, we got one guy that talked.

Q    Right.    So of the 12 witnesses, do you remember who was on that list other than Hunter Biden and --

A    I generally know it was Joan Mayer, Eric Schwerin, Rob Walker.    It was Kathleen Buhle, Kevin Morris.

Q    These people are located in the United States?

A    Yes.

Q    Eric Schwerin, where is he located?

A     D.C., I think.

Q     And Rob Walker is in Arkansas?

A     That is correct, yes.    There were a few more, but I don't recall.

Q     And for the day of action, were you given any instructions -- and I think you mentioned this in your opening statement -- about what the agents could and could not ask?

A     Yes, we did.

Q     And could you tell us a little bit more about that, again?

A     Yes.    So on December 3rd, 2020, in the Delaware U.S. Attorney's Office, we were going over -- it was a very, very long day, because we had -- there were a group of like 12 or 15 people in the room.    Weiss was coming in and out.    And we were prepping for each individual witness.

So the agents that were going to conduct those interviews were Zooming into this meeting.    So we're going over each outline.    There were multiple times where Lesley Wolf said that she didn't want to ask questions about dad.    And dad was kind of how we referred to him.    We referred to Hunter Biden's father, you know, as dad.

Q     That's Joe Biden?

A     Yes.    James Biden as uncle.

Q     You were not allowed to refer to James Biden either?

A     We called him uncle.    I think it was so that we could speak more openly without, yelling, President Biden or James Biden.    I don't think that was nefarious, but -- she said, I don't want questions about dad.

So now we're in the Rob Walker, and the interview outline is eight, nine, 10 pages, and we're on page 4.    So we're not on priority items, but we're kind of gaining that rapport, getting him used to the interview, just like we do a lot of things.    Now we're

going to ask him substantive things that we really want to know.

So in there, it said: "10 held by H for the big guy." And it just said how -- what we were going to ask on that topic. And Lesley Wolf stops and says, we're not asking -- I don't want to ask about the big guy. And everyone -- basically, everyone in the room except for the prosecutors had a big problem with that. There was a large debate about it. And, she said, I don't want to talk about big guy. I don't want to -- I don't want to ask about dad. So you see in the --

Q Do you know why?

A I think that she was trying to limit where the investigation could go.

Q And do you know what her motivation was?

A I don't know what her motivation is, no.

Q And did anyone on the team give her any feedback about what are you doing, this is crazy?

A Everyone there -- the prosecutors are generally pretty silent. So Lesley Wolf was the main voice, and the other ones were very subordinate and kind of only talked when they were asked to talk.

So FBI raised concerns. [redacted] raised concerns. I raised concerns about it. She's like I don't want to talk about the big guy. Don't ask about the big guy. So you see in the Rob Walker interview --

MAJORITY COUNSEL 2. And we can mark that. It's No. 8.

[Shapley Exhibit No. 8

Was marked for identification.]

EXHIBIT
tabbies
8

JW33-1 Page 1 of 214

272D-BA-3065729
JJW:glwm
H Drive

Date of Conversation: December 8, 2020

(Transcribed from WAV file copy)

Participants:
1. SA Joshua J. Wilson, Federal Bureau of Investigation (FBI) = Wilson
2. SA Adam Soline, Internal Revenue Service (IRS), Criminal Investigations = Soline
3. John Robinson Walker, aka: Rob = Walker

Betsy (Walker?), wife of John Robinson Walker, aka: Rob = Betsy
A male voice in background (Unknown Male?) = Male
Unknown Female = Female (Wait Staff)
Unknown Male = Male (Wait Staff)

Type of Conversation: Taped Interview

---

A transcription of the above-described conversation is as follows:

Preamble by Wilson: Okay, this is Special Agent Joshua Wilson with the FBI accompanied by...

Soline: Special Agent Adam Soline, IRS, CI.

Wilson: Okay, today's date is December 8th of 2020. The local time in Little Rock, Arkansas is 10:03 a.m. Ah, the following will be an attempted interview with John Robinson Walker at his residence, [redacted] also in Little Rock.

(Background Noise. Exit vehicle and slams car door. Walking noise).

(Pause).

<u>(Counter #: 04:08:43/00:00:58):</u>

Wilson: I wonder if this..., anybody saw us coming through?

Soline: Hmph, hmph, hmph.

(Background Noise).

Soline: I'm gonna (Unintelligible).

(Background Noise).

Wilson: Um.., as far as the.., the failed joint venture that was gonna be Sinohawk which involved Tony and James and you...

Walker: Hmph hmph.

Wilson: ...and.., and Hunter...,

Walker: Hmph hmph.

Wilson: ...um.., you know, it was kind of the, um, the famous email that Tony was pointing out like the.., the equity split.

Soline: (Whispers). Uh huh.

Wilson: Um...

Walker: Sure.

Wilson: Who... Like can you tell me your opinion of that? Like ah... Ah, did you... I mean are you familiar with what I'm talking about.., that email.., when it's going through like, you know, ten b.., held by "H," you know, like...

Walker: Yeah.

Wilson: ...so you...

Walker: Yeah, I saw that on Twitter or somethin'...

Wilson: Okay. (Laughs). Right.

Walker: ...or maybe.., maybe when Tucker Carlson...

Wilson: Yeah.

Walker: ...talks about it on his show.

Wilson: So what.., w... Like can you tell me about that?

Walker: It was an email. I think that maybe James was ah.., wishful thinking that ah.., or maybe he was ah, projecting that, you know, if this was a good relationship and if this was something that was gonna happen, that ah.., ah.., and if the.., the V. P. was never gonna run...,

Soline: Hmph hmph.

Walker: ...just projecting that, you know, maybe at some point, he would be a piece of it but he was more just, you know, ah, you know, it.., it.., it looks terrible but it's not.

Wilson: Right. It was more of a "unicorns and rainbows" type email?

Walker: Yeah..., and.., and.., and fuck Tony for..., for trying to..., I mean for taking little pieces of..,

Soline: Uh huh.

Walker: ...of emails or.., or, you know, and not showing it the.., the structure of a.., of an LLC or taking pieces of conversation that he recorded of me that ah.., to try to do that. I don't know what's in it for Tony but.., but that email looks...

Soline: Hmph hmph.

Walker: ...bad and it's ah.., probably hard to explain for ah.., James. Do I remember it? No. Does it look real? Yeah. And ah.., ah.., you know, I certainly never was thinking at any time that ah.., the V. P. was a part of anything we were doin'.

Wilson: Okay. Have you met the V. P.?

Walker: Yes.

Wilson: How many times roughly?

Walker: Oh, I...my wife used to...(Unintelligible)...

Wilson: Yeah, that's right.

Walker: ...so...,

Wilson: That's right.

Walker: ...so...

Wilson: Yeah.

Walker: ...I mean I would get called and I'd.., I'd play golf with him probably eight to twelve times and...

Wilson: Okay.

Walker: ...ah.., um...

Wilson: In Delaware or...

Walker: Ah, I played with him at um.., ah.., Bully Rock in Havre de Grace with ah.., Beau and Hunter one time.

Wilson: Okay.

Walker:        That's probably the first time and then um..,

Soline:        Hmph hmph.

Walker:        ...played with 'em in D. C. probably ten times or so...

Wilson:        Okay.

Walker:        ...and it was really um.., more of ah.., hey, my dad's gonna go play golf..., you're..., you've gotta come with me.., and I'm  like at work.

Wilson:        Yeah.

Walker:        Too bad.

Wilson:        (Laughs).  Gotcha.

Walker:        Yeah.

Wilson:        Okay.

Walker:        So...

Wilson:        Um...

Walker:        And, you know, I guess and in that.., ah.., you know, if.., if Mazie was havin' a birthday party, I may be there...

Soline:        Hmph hmph.

Walker:        ...and he would stop by the Vietnam restaurant somewhere, somethin', or...

Soline:        (Sighs).

Walker:        ...if ah.., um.., you know, they're.., they're.., you know, Christmas things but even...  I mean I'm sure he knows who I am.  He knows I'm...

Wilson:        Okay.

Walker:        But he doesn't know me

Wilson:        Okay.  Did um.., did the V. P. ever show up at any CEFC meeting or anything like that.., even once he was out of office?

Walker:        Yes.

Wilson:        Okay.

Walker: It was out-of-office. Ah, we were in ah.., D. C. at the Four Seasons...

Soline: Hmph hmph.

Walker: ...and ah.., we were having lunch and he.., he stopped in...

Soline: Hmph hmph.

Walker: ...then he'd ah, leave.

Wilson: Okay.

Walker: That was it.

Wilson: Just said hello to everybody and then...

Walker: Yes.

Wilson: ...took off?

Walker: He literally sat down. I don't even think he drank water. I think Hunter said um.., I may be tryin' to start a company, ah, or tried to do something with these guys and could you.., and think he was like "if I'm around"....and he'd show up.

Wilson: Okay. So I mean you definitely got the feeling that, that was orchestrated by Hunter to.., to have like a.., an appearance by his Dad at that meeting just to kind of..,

Walker: Hmph hmph.

Wilson: ...bolster your chances at...

Walker: Hmph hmph.

Wilson: ...makin' a deal work out.

Walker: Sure.

Wilson: Okay. Um.., any other... So that was the..., ah.., Four Seasons in D. C. after he was out of office?

Walker: Yeah.

Wilson: Um, where... Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office?

Walker: Yeah.

Wilson: Okay. All right. Um.., when you started to learn about like you were going your separate ways as far as um.., splittin' off.., you and James were not gonna.., but you know that Hunter was continuing on and was...,

Walker: Hmph hmph.

Wilson: ...you know, involved with Hudson West...,

Walker: Hmph hmph.

Wilson: They... I mean first of all, did you even know that or did you read that Senate report.., the Hudson West stuff?

Walker: Um, I had ah.., I think .., specific things no. Did I think that ah..., they...

Wilson: He was still working with them?

Walker: Did I think he was still working with them and then ah.., did I think that he had ah......received the money, sure, I was questioning that.

Wilson: Uh huh.

Walker: Um.., ah.., did I... I never questioned him about it. I was ah.., happy to be out. If ah..., ah.., I read in the Senate Report where he received five or ten million dollars...

Wilson: Okay.

Walker: ...and ah..., ah..., I had ah.., always suspected it and I think ah.., Tony had suspected it also but ah.., I.., just at that point, I wasn't, you know, I didn't know anything for a fact. I wasn't gonna divulge anything to Tony who would probably try to do something about it.

Wilson: Right.

Walker: Yeah.

Wilson: And you probably heard it from Eric too 'cause Eric was still working with...

Soline: Hmph hmph.

Wilson: ...Hunter during that time.

Walker: I'll say Eric didn't say anything directly but he alluded to it...,

Wilson: Okay.

Walker: ...to me at one point.

BY MAJORITY COUNSEL 2:

Q This is a document of a December 8, 2020, interview by Special Agent Wilson of the FBI and Rob Walker.

And just as I understand this document, this is a transcript of a recording?

A Yeah. This is an excerpt of a transcript of a recording. That is correct.

Q And so was Special Agent Wilson wearing a -- or recording it on his phone, or how did it get recorded, to your knowledge?

A Yes. Mr. Walker was consensually monitored.

Q Okay. So he agreed to have the interview recorded?

A No. The agents were the consenting people to monitor.

Q Okay. So it's like a one-party State or --

A Yeah, yeah. Well, law enforcement, we have the consensual monitoring rules.

Q Okay.

A And we got approvals to do consensual monitoring for these things. So the agents are the consensual.

Q All right. Now, are they wearing a wire or are they just using an iPhone, or how does that happen?

A It's different. We have different tech. Key fobs, coffee mugs, iPhones. There's lots of different things. I haven't seen a physical like what you think of as like taped to your chest.

Q Well, I used the term "wire," but what I mean is a specific device for purposes of recording, not just an iPhone.

A That is correct. And this was to be able to be inserted into evidence at trial

transcript of that recording, excerpt of a transcript.

Q Maybe you could draw our attention to the significant parts of this document.

A Sure. So, right up to the time when Special Agent Josh Wilson or Special Agent Adam Soline, who is an IRS agent, one of my agents, was going up to this door, they were deliberating. They were basically debating about Lesley Wolf's directives.

And they were like, how can we not ask? Like, that was wrong. We got to ask. We got to ask. And so they basically decided that they would ask the question without saying the words "big guy," and that then they would somehow be doing what they were asked to do.

So, as you can see in here, page 79, it's about right in the middle of the page where it says "Wilson" and it begins "who." So this -- Wilson's question and -- do you want me to read it or --

Q I can read it.

A Okay.

Q It says: "Who...Like can you tell me your opinion of that? Like" -- I won't read the ahs and the – "I mean are you familiar with what I'm talking about..., that email.., when it's going through like, you know, ten b.., held by "H"? And Walker responds in the affirmative.

A Yeah.

Q And then Walker further says: "Yeah, I saw that on Twitter."

A Yes.

Q And so what else is significant about this back-and-forth between Special Agent Wilson --

A Sure. So this just shows the lengths at which we had to do to -- and how it

affected actually our jobs and conducting these interviews.    But then you go --

    Q    Because Walker was a business partner of Hunter Biden, correct?

    A    That is correct, yeah.

    Q    And so he was especially positioned to know what 10 for the big guy meant, right?

    A    Yes, yes.

    Q    And so by not asking directly about that, you're giving away a legitimate investigative lead, correct?

    A    Definitely could be, yes.    So, as I kind of stated about -- I'll say it a little more directly.    They were debating about this, right?    But they were struggling to come to grips.

Even, you know, what is it, 5 days later when they're headed to do that interview and they know that it's wrong but they were agents and they did the best that they could.

So if you move down into this -- this couple pages, you can see that they're saying VP, VP, page 80.

    Q    Okay.

    A    They're calling him VP, and that was because they weren't supposed to call him dad.

    Q    Okay.

    A    Not call him dad.    So that's the --

    Q    So VP wasn't on the list.    It was don't mention the big guy, don't mention dad?

    A    Yeah.

    Q    But VP wasn't on the list of barred terms?

    A    It was a little bit of a protest, I guess, to say that we're asking it, but, we'll ask

it in a way that maybe she's not mad.

Q      Do you think she would have been mad, though, because clearly she was trying to steer the investigation away from Joe Biden, correct?

A      I mean -- yeah, of course.   She would have been -- she was the type of person that did not like dissenting opinions, and what she said went.

Q      Do you think at this point in this -- maybe you don't know, but I'm going to ask it anyway -- whether she was angling for some sort of position in the administration in the Justice Department?

A      I have no idea.

Q      Was there ever any chatter among your colleagues about that, if that was her motivation?

A      No, I've never heard that.

Q      Did you or any of her colleagues have any speculation about her motives, or was it just that she was trying to keep this case from moving forward?

A      Her motives are just difficult to assess, right?   We're just thinking about the investigation and how we have prosecutors on the case that are obstructing our efforts to get all the evidence.   That's really, eventually, the reason why we went a couple years of this type of conduct was because we just -- we have to do it.   We have to suck it up. We got to work this case.

I got a prosecutor that's not great to work with.   That happens sometimes.   We just got to move forward, right?   So that's what we did for a year, 2 years, 3 years.   So she was not pleasant to work with.   She was -- I don't want to belabor that point, but it was her way, right?

And if there was big guy in the transcript, she was either going to directly berate you, or she was probably going to give you the silent treatment, which was one of her

tactics, for a couple weeks and talk behind your back.

     MAJORITY COUNSEL 2.    Okay.    Our hour is up, so pivot to our colleagues.

     Mr. Shapley.    We can come back to that, right?    There's more on that.

     MAJORITY COUNSEL 2.    Correct.

     MAJORITY COUNSEL 1.    Go off the record.

     [Recess.]

     MAJORITY COUNSEL 2.    We are back on the record.    It's 2:20.

       BY MINORITY COUNSEL 2:

     Q    Thanks again.    I think on our side, we have sort of a smattering of clarifying questions and the like.

     First, I'd like to go back to a discussion we were having before regarding the relationship between civil tax investigations and civil tax liability and criminal tax liability.

     And I think I'd like to start with questions about something that you alluded to that I have not heard before. I just wanted to get clarity on it.

     You said in the discussions of the various tax years, when we got to, I believe it was 2016, or maybe my notes are a little bit fuzzy, there was a point where you said that Hunter Biden was paying off tax debts in installments.

     Could you describe a little more about what that was, what those payments were for exactly?

     A    Yes.    So he was assessed a civil tax assessment at some point, and he entered into a payment agreement with IRS civil side to pay $10,000 a month, I believe.

     Q    Do you know for what year that liability was assessed?

     A    I don't.

     Q    But not for any of the years in question?

     A    No.    They would have been prior.

Q    Prior, okay.    And then who is responsible or what is the process at IRS CI for, let's say, hypothetically, there's a case that comes before CI, and they review it and they decide that it doesn't necessarily meet the standard for criminal prosecution, but there's, nonetheless, tax liability.

Is there a process for referral to the civil?

A    Yes.    It's called just that, civil referral.

Q    Civil referral.    And did that occur in this case at all after -- after prosecution was declined, or the statute ran, the criminal statute ran?

A    No, it didn't, because the civil statutes had run.    The statute of limitations had run.    I'm sorry.

Q    The civil statute of limitations on fraud are infinite under IRS 6501(c).    And, similarly, the statute for failure to file also does not run if you don't file a return.

Was that thought of and acknowledged by Criminal Investigation when deciding whether to refer the case?

A    Are you asking about the civil fraud penalty?

Q    No, not the civil -- if there's fraud under 6501(c) -- if the IRS can demonstrate fraud, then the statute of 6 years does not apply, correct?

A    The civil fraud penalty which you are referring to -- it can only be assessed with a criminal conviction.    That's the standard for civil to be able to make that fraud assessment.    And there are some jurisdictions where it has to even be 7201, an evasion case, in order for the civil fraud penalty to be able to be assessed.

Q    6501 is the civil fraud penalty or -- maybe I'm mixed up, because I was under the impression that that was the limitation on assessment.    So put it aside.    I don't have my Code with me.

But I was pretty sure that the limitation on assessment -- in the case of fraud,

simply did not run.    But --

    A    I think you are partly correct, but the way that the precedence for proving fraud, for the civil fraud penalty, is a criminal conviction or guilty plea.

    Q    That could -- we'll have to look.

    A    That's my understanding, and that's the way that I've seen it done in the past.

    Q    Okay.    Fair enough.

Skipping around, can we go back to AUSA Wolf for a moment?    If I recall, AUSA Wolf was among the individuals who, at the end of the day, were in favor of charging Hunter Biden in their recommendations to, for instance, the D.C. office of the DOJ?

    A    They were supportive of the charges in the SAR --

    Q    Yes.

    A    -- and moving forward to the D.C. U.S. Attorney's Office, and presumably to the California U.S. Attorney's Office, yes.

    Q    Right.    So, when all was said and done, AUSA Wolf and Mr. Weiss as well -- they didn't appear to be impartial -- to be biased in their conclusion as to whether or not to charge Hunter Biden?

    A    I don't think that's an accurate statement.    There were -- during the investigation, we have no way to know if we have all the evidence.    We were obstructed from approaching certain witnesses.    We were obstructed from asking certain questions. We limited the names that were on document requests.

So we have no idea what's out there that could have linked us to one bank account that opened up a whole other slew of evidence for us.    Just the search warrants not being allowed after they've agreed that probable cause has been achieved.

I look at it as is that there was all these obstructions, and at the end of the day,

the evidence was still strong enough to support them charging.   That's how I look at it.

Was that your question?   I'm sorry.

Q     It is my question.   But there's still a point where nonetheless they have discretion to agree or disagree with your recommendations, and they chose to agree with them.

A     Officially, and -- there's two different things you're talking about, right? There's the SAR that we give to them and they review.   And we've been working with them every single day.   They know every single piece of evidence.   They know more evidence than we do, because they withheld some from us.

So when that SAR went forward, we talked with them constantly about these are the charges that we're looking to recommend.   Is everyone on the same page, right? So we don't want to recommend something and then have some huge argument over it, right?   So everyone was on board then with the SAR.

Afterwards, with what happened at D.C., or happened at California, or if any charges have been approved officially yet or -- I don't know the answer to that.

Q     But nonetheless, they still supported your conclusion in the SAR at the end of the day?

A     That's accurate, yes.

Q     And that was despite what you perceived as obstructing various steps of evidentiary gathering along the way?

Mr. Leavitt.   Can we go off the record for a second?

MINORITY COUNSEL 2.   Of course.

[Discussion off the record.]

MAJORITY COUNSEL 1.   Back on the record.

MINORITY COUNSEL 2.   Back on the record.

BY MINORITY COUNSEL 2:

Q I was just clarifying that they agreed with your conclusions in the SAR, and I said that was despite what were your perceptions of those obstructing the obtaining of evidentiary material along the way and reaching those conclusions.

A That is correct. But I just want to go back to the fact that it could have been much more. It could have been much bigger. There could have been income streams, more income streams, to other people associated with it, to include the President.

So, that's my answer.

Q And is it your opinion, not necessarily your professional opinion, but your opinion as a citizen that the FBI in 2016 and after the 2016 election took something of a reputational hit?

A I don't really have a lot of opinion about that. I don't --

Q You're familiar with the Jim Comey memo and the like, presumably?

A Yeah. I'm not a big guy that reads a lot of news and stuff. Obviously, you hear things. And my NBC News app, I see once in a while stuff on that. But, working with the FBI, it didn't seem like there was -- I don't -- is some factions of the media saying that there's a problem, but I didn't sense it. I still -- I didn't sense it doing the work.

[2:28 p.m.]

BY MINORITY COUNSEL 2:

Q     That's fair, you're in the trenches and you're working closely with the things, but, obviously, the FBI was very much in the public eye as a result of the 2016 election and the Comey memo and the potential for interference there.

And, do you think, in general, in organizations that have sort of tiers of authority and tiers of responsibility, where, you have workers at a lower level and reporting up the chain to higher up, that those up the higher chain might have a different prudential outlook on the reputational concerns of an organization?

Mr. Shapley.   Yeah.

MINORITY COUNSEL 2.   Okay.   That's all I have.

MINORITY COUNSEL 1.   Thanks.

BY MINORITY COUNSEL 1:

Q     Okay.   I have a couple questions, and a lot of these are like my former questions.   I just want to go back and make sure that I have the record right and correct.

So earlier you had mentioned that, in 2015, there were some issues that were different.   You mentioned the diamonds, you mentioned the low amount for 2015, that maybe the case was less straightforward, I guess in the case of the loan.

Was there anything else in 2015 that made it, you think, different than 2014, other than the amount?   Were there any other issues that you can think of that maybe we haven't listed or talked about yet?

A     The conduct in 2015 and 2014 was entirely different.   So, there was a scheme to evade in 2014 by using Rosemont Seneca Bohai to divert income from Burisma under Devon Archer's entity.   In 2015, that was kind of sifted out through Eric Schwerin.

He became aware of that in 2015.    You got to think, 2015, the tax return's due in 2016, and if an extension is filed April 15th of 2016, then the return is not due until October 15, 2016.

So Eric Schwerin had become aware of the income, and that's kind of how that whole thing changed --

Q       And so maybe that's why the amount was lower in 2015, maybe he actually helped.   Okay.

A       Can I --

Q       Yeah, sure.

A       So, initially when the SAR was written, the amount of taxes owing was around $160,000 for that year.

Q       For 2015?

A       For 2015.

Q       Okay.

A       But, we were battling to get information from accountants and so on and so forth, right?    And we're trying to be as conservative as possible to give every benefit to the subject in terms of the actual tax due and owing.    So ultimately, 2015 just became something where it was -- to be conservative, it was not an issue.    I had no issue with that.

Mr. Leavitt.    And you're saying that was after the SAR had already gone forth.    Is that right?

Mr. Shapley.    Yeah.    So more information was received after that SAR went forward.

[Shapley Exhibit No. 6

Was marked for identification.]

BY MINORITY COUNSEL 1:

Q Great, thanks.

Okay. Now I want to talk about exhibit 6, which is your memo about the laptop and the hard drive. Was this memo provided to anyone?

A This memo was discussed in length with the case agent and co-case agent, but to protect the record, these I couldn't send to them.

Q Okay.

A So after each time we had calls like this, I would have conversations with them. There was even a document that I produced where they were like, well, there was this problem, this problem, this problem. So I was like, I'll record it, because we don't want this to potentially be discoverable and have any issues in the future.

So this is an example of that, where if there are at least two people that will say that we talked about this right after, and most of the conversation is to discuss what happened during that, to make sure that it was accurate.

Q But you don't provide a copy to your supervisor or Mr. Fort or anyone else in your chain of command?

A No.

Q It just stays with you?

A That's correct.

Q Okay. That's my question.

A Yeah.

Q And then in this exhibit 6, there's two items that are redacted -- it says December 9, 2019, and there's two redactions. Why are those redactions there?

A It was just a potential 6E type situation.

[Shapley Exhibit No. 7

Was marked for identification.]

Q     Okay.

Thank you.

Now I'm going to look at exhibit 7.    And the question is the same as the one

before it.    Was this memorandum provided to anyone or copied to anybody?

A     It was not.    Just to reiterate again, that this was discussed right after -- I

can't even think of a time when we didn't have a discussion immediately after these

meetings with just me, case agent, co-case agent, and sometimes with FBI agents on the

phone to discuss this.

Mr. Leavitt.    Let me just clarify, to discuss your documentation of the meeting,

which did include other parties?

Mr. Shapley.    That's correct.

MINORITY COUNSEL 1.    I thought that's what he was saying, but thank you.

BY MINORITY COUNSEL 1:

Q     Okay.    When we were talking about this exhibit 7, you mentioned that, at

the time, Bill Barr was the AG.    Why did you not take your concerns up the chain in 2020

at that time?

A     Well, as I said before, there is a healthy tension between investigators and

prosecutors, right?    And there are sometimes when I don't agree with a prosecutor, but

every time I don't agree with a prosecutor, I'm not going to run to Bill Barr or to senior

leadership to -- to blow the whistle or make a protected disclosure.    The whole focus

was to do what we had to do, even if it meant dealing with obstructions from prosecutors

to get this case across the finish line, if it was worthy of it.

And, that's what we did.    Every single time something happened wrong in this

investigation, I couldn't bring it to Bill Barr or anyone else, so --

Q     And did you think about, in 2020 at all, coming to the committee at that point in time?   Because I know that you mentioned that there were irregularities that you saw in the summer of 2020.   Did you think about coming to the committee or coming forward at that time or making a report to TIGTA in 2020?

A     Like I said, we are trained and we work with these prosecutors hours and hours, trips, and spend all this time.   We are just trained to trust them, and it was an incredibly high burden.   If I wasn't in the October 7th meeting, my red line might not have been crossed.

But the things in that meeting -- it solidified a lot of things that had happened previously and explained a lot of things that happened previously.   And it just got to the point where, okay, now all of these things that happened that might be investigator versus prosecutor-type thing, I just, I thought it got to the point where -- this is not a small thing.   I'm not coming to the House Ways and Means Committee when a prosecutor says we can't do one search warrant.   That's just not -- I'm not going to do -- I'm never going to do that, right?   This is a series of events over 3 years where every single thing was to obstruct the investigation.   Every single thing limited evidence that we were able to obtain.   And, so -- if I was in the wrong for not coming to House Ways and Means Committee, I don't know.

Q     I wasn't saying -- I wasn't implying that.

A     Okay.

Q     I was just asking, was that something that you considered in 2020, because it seems like a lot of things happened in 2020, especially at the end, and so hence my question.

A     Well, I had the exact opposite feeling right then, right, because we were going over -- we thought that the evidence we had so far -- we were going to get a bunch

of new evidence.    We thought the evidence we had so far would maybe lead to an early resolution of the case.

So there was a lot of excitement because we, for a year or so -- or a year for me, because I came on in January 2020, but longer than that from others, we couldn't do a drive-by of his residence without Stuart Goldberg approving it.

So, no -- we just wanted to move the investigation forward, and now we were finally doing that.    And so we were hoping that we'd get what we need and keep moving forward.

Q    And then, you just mentioned when you were talking, that you don't normally make it a routine to come to House Ways and Means Committee.    How many times, just generally so we get a sense, do you disagree maybe with something that a prosecutor says in a case?    Is it regularly?    Is it most cases?    Some cases?    Sometimes?    This is the first time?    Can you give us some sense as to that interaction and how often they don't agree in your cases?

A    How many times have I disagreed with a prosecutor on a case?

Q    Yeah.    Just generally.

A    I mean --

Q    Is it every case there's always something or what's a general sense?

A    It's always a professional relationship where everyone is moving forward toward the common goal.    The mission of the agency, and their agency, right?    So if every -- I challenge prosecutors all the time.    They challenge me.    It's fantastic.    And then we go and everything's great, and we come in the next day and talk about our families.    It happens but, in this particular instance, it wasn't jovial.    It was just, this is the way it is.    And then even when we try to get support to go -- for example, to get my SAC involved, to bring her to Weiss, to try to get this search warrant and this physical

stores [storage] location, we still got the end around, so -- I don't know. Did I answer your question? I'm sorry.

Q No, that answers my question. That's what I wanted to know. I just wanted to get some context. Like, if you were to tell me that most of the time we all agree a hundred percent and this is the first time that we didn't agree, that would obviously be different than, well, there's normally give and take in a case, and so this is what we're seeing here.

Okay. Moving to exhibit 8.

A Well, I don't think that's what we're seeing here. I don't think that -- that's not what I saw here. Maybe you're just speaking generally.

Q I am.

A Okay.

Q Yeah, I am.

Mr. Lytle. Well, what did you want to say?

Mr. Shapley. No. I think I've said it, that this is not the norm. This is -- I've worked with some great guys, some great prosecutors that went on to be U.S. attorneys and went on to be the deputy attorney general and, I think I have experience enough to where it means something.

And I can't even count a time -- I don't even think I can come up with a time where a prosecutor made a decision that I didn't agree with, that they didn't take the time to explain to me and I didn't walk away being like, I disagree, but that makes sense. And that just did not -- countless things did not -- that did not happen here.

BY MINORITY COUNSEL 1:

Q So do you think it was this prosecutor, is that what you're saying essentially, that's who your dealings were with?

A      I don't know what the ultimate motive was, right?    I only know what I know.    I know what the evidence said, I know what precedent is, I know what my experience is.    I know all of the things that happened in the investigation.

It just appears to me that based on taking all those factors into account, that there was some type of nefarious motive here, and I don't know what it is.    I don't know.

Q      At the beginning when you were giving your opening statement, you had mentioned that the committee was your last hope, last sort of chance.    And so, obviously, we're not a law enforcement body.    What are you hoping to get from the committee?    What is your outcome that you're looking for?    Is it a process change at IRS?    Is there something that you're hoping to get with your last hope, which was the way you described it?

A      So I'm just here to give the documents and give my testimony, and I can steer you to others that have documents and who can give testimony.    And the whole thing was that I have faith in the committee and this country, in general, to do the right thing.    And, ultimately, if you guys at the end of the day don't agree, that's not for me to say.    But, in terms of corrective actions or recommendations -- that's for you all to decide.

Q      Okay.    I was just making sure that there wasn't something that you wanted in this particular case.    That's what I was asking.

[Shapley Exhibit No. 8

Was marked for identification.]

BY MINORITY COUNSEL 1:

Q      Okay.    Looking at exhibit 8, which is the interview.

A      Yeah.

Q      As I'm reading this interview, it was held in a restaurant or some place,

because I notice here that it says "unknown female," and then it says "female, wait staff."

Where did the interview take place?

A      It was at his residence.

And I also noticed what you said, but at one point they were outside, and I couldn't tell by the transcript if they were mowing the lawn or if there was lawn maintenance -- I don't know what it was.

Q      Okay.

A      But they were in his residence.    They went to his residence.

Q      Okay.

A      And his wife was there as well.

Q      I did see the wife, and so that's why I wasn't sure.    It seemed like maybe they were in a restaurant or something.    That's why I asked the question.

A      No, no.    I don't think so, no.

Q      Okay.    And you said that the consent was given by the IRS agents for the recording of the interview.

Did he know that he was being recorded?    Do you tell the interviewee that they're being recorded?

A      We do not have to tell the interviewee that they're being recorded, and I don't know the answer as to whether we did tell him, because people can ask, right, if they're being recorded, and I don't have the answer to that side.    But we don't need to inform them that they're being recorded.

Q      Okay.    And then I was looking at the top of the transcript.    And I know that you gave us some excerpts, and we're on a couple pages, and then the total looks like 214 pages.    What else was discussed?    Was there anything else discussed in the other pages that we don't have that go to the tax, I guess, liabilities from 2014 to 2018?

I'm trying to get context on the other things that were discussed during this 214 pages that we only have a couple of these pages.

A    Sure, yeah.    So, I can't make a representation to all 214 pages, but the reason why I thought this was pertinent was because this was basically showing the outcome of the obstruction from the direction to not ask witnesses certain things.    And that's what brought this in.    So, that's why this section's included -- and I can't really remember -- if you're asking if there's dollars and cents in there for tax liabilities, I would say I don't think that there is.    But is there a different thing that you wanted me --

Q    No.    I was just wondering, in these types of interviews, and this one in particular, do you talk to him about some of the questions that you had?    I know, like 2015, you mentioned diamonds or other items.    When you're doing an interview with this person, Mr. Walker, would you talk to him about all the tax years and any issues that you might have in any of the years, or is it just limited to a single scope?    I'm trying to understand how the interview would work with him.

A    It's by witness.    So say Eric Schwerin would have been, and Joan Mayer, those are like every single year:    income, work, what's going on, expenses, in-depth type of things.    The accountant, CPA, return preparer, same thing.

This is a witness that was a business partner that was involved in a deal with CEFC, so most of the questions were kind of geared toward that and SinoHawk and some of these other things.    So this one in particular likely wouldn't even have broached the topic of how would Rob Walker know what Hunter Biden's tax situation is.    He wasn't involved in the preparation of stuff --

Q    Okay.

A    -- of it, so --

Q    Okay, that's fair.

And then the entire transcript, the whole 214 pages -- who does that go to? Would it go to AUSA Wolf?   You mentioned that she didn't want you to use the words "big guy" and other things.   So would she have seen that "VP" was used, and would she have commented on this transcript -- what happens to the transcript once you receive it?

A    So the evidence in a case should be available to everybody in the case -- prosecutors and investigators -- unless there's some type of confidential, classified type thing that could be partitioned into some SCIF or so and so forth, but everyone should have this.   And I would have to say that she read it.   I don't know directly that she read it, but it was 214 pages, so, maybe she had someone else read it.   I don't know, but --

Q    But it's available --

A    Absolutely.

Q    -- to the entire team?

A    Absolutely.

Q    Okay.   Okay.   And then I just noticed -- this is just a basic question.   I noticed through here there's a lot of these words like the "hmph," like h-m-p-h.   You see, that's kind of all throughout this interview.   What was that?   Was it like, hmph, like I'm agreeing with you, or, like, hmph, like, maybe that's a fact, or, hmph, that's not a fact, it's a question?   I don't know how to read the "hmph."   Do you recall anything from that interview that would help us with this phrase?

A    So, I wasn't in the interview, but I did chastise my agent from stop saying hmph hmph in the middle of it.   I did argue -- so I think you're absolutely right, and I think that if you listen to segments of the actual recording, you would almost have to -- when you read it in context, it makes sense, he's like, uh-huh, hmph, hmph, like, and then you can tell by the line of questioning that he responded in the affirmative.   But I

think it might require you to listen to that little section in the recording.

Q Yeah. Okay.

BY MINORITY COUNSEL 1: I think that's all that I have. Do you have anything else?

That's all that we have for now. Thank you.

MAJORITY COUNSEL 1. You're welcome.

[Discussion off the record.]

MAJORITY COUNSEL 2. Back on the record. It's 2:50.

Do you want to go first, [redacted], or do you want me to?

MAJORITY COUNSEL 1. I have just a couple quick follow-ups.

MAJORITY COUNSEL 2. Okay.

BY MAJORITY COUNSEL 1:

Q I'd like to bring your attention back to exhibit 2, what we've been referring to as the SAR, which is the special agent report. Is that correct?

A This is the excerpt from that, yes.

Q And you were discussing earlier the idea about whether U.S. Attorney Weiss and AUSA Wolf appeared impartial because they approved your recommendation in the SAR.

Only AUSA Wolf is mentioned in this document. Is that correct?

A That is correct, yes.

Q Okay. And the reference in this document that AUSA Wolf agrees with the prosecution recommendation, did you take that to include the endorsement of the U.S. Attorney Weiss or just AUSA Wolf?

A Well, I did take it to include him, but there are also other events that led me to believe that he also concurred with it. There were -- I can think of one specific time,

on that 6-15-2022 meeting at Main DOJ, Stuart Goldberg, Weiss, and everyone underneath is there, every level of everyone underneath is there.

And this was when DOJ Tax was kind of giving a presentation about potential problems with '14, '15. Now they've already tried to bring it to D.C. They already requested special counsel and got denied. So now they're kind of trying to make this evidential issue for those years.

So on the side of that, in a break, Weiss comes up and he's talking to me on the side, and [redacted] comes up, the case agent. And Weiss was like, you guys always convince me, I agree with this, and then DOJ Tax tells me something else.

So I know that Weiss agreed with these charges, and -- I don't know. At the end of the day, they should've been charged. I offered to give prosecution recommendation reports from previous cases to show precedent, to show specific examples of this loan issue and how this would follow a precedent in other cases being charged, and it just kind of fell on deaf ears.

Q Based on your knowledge, do you have an opinion of whether U.S. Attorney Weiss did everything -- took all appropriate steps to pursue charges that you just testified that you believe he concurred with?

A Like with D.C., with Main Justice, with all that stuff?

Q Yes.

A As he described it, his process was go to D.C. and try to charge there, but he needed permission from the U.S. attorney there. When that got denied, he requested special counsel authority. Then in the October 7th meeting, he's basically explaining what happens in California, right, if he -- if he recom -- he's going to recommend to California -- well, it had already gone to California, right, but there was no answer yet.

He's like, well, if they say no, then I'm going to have to request special counsel

authority from the DAG or the AG.     All I know is what he told me he did, and that's all I can say, I think, to that.

Q     Just a clarifying point on the earlier discussion about sort of your decision to make protected disclosures, right?     You testified that the October 7th, 2022, meeting was the breaking point.     Is that correct?

A     Yes, it was.

Q     Okay.     And would it be correct to say that you sought to state your opinion and impact decision making short of protected disclosures before the October 7th meeting?

A     Well, I think I reached a level of protected disclosure internally to IRS senior leadership before that.

Q     And at what point was that first protected disclosure?

A     I believe it was June of 2020.     You got to understand, at the time, I wasn't making a protected disclosure.     I was just working a case raising issues, right?     It's not until we're down the road a hundred miles that that was a protect[ed disclosure] -- you know?

Q     Yeah.     Understood.

A     But it seems like the October 7th meeting, after that, after I raised issues directly to them, I explained to them the risk of not charging '14, '15.     I explained to them how we had no mechanism to ever recoup that money, and I went like kind of like point by point how the elements were met.

And, it was that meeting where I think DOJ started to look into the discovery that I had provided back to March, because I was like, this is not right, there's a big, huge problem here.     And it switched from me raising just concerns, hoping that they'd be remedied, to now I'm like, no, this is a problem.     And I think because of that, they went

and looked at all my documents that I contemporaneously documented over the years. And then I think they started attacking me.    And I think I read a part in my opening statement, the email that I sent to my director of field operations exactly on that topic.

      Q    And who was the director of field operations that you sent that email to?

      A    Mike Batdorf.

                    [Shapley Exhibit No. 9

                    Was marked for identification.]

Ex 9

**From:** Batdorf Michael T
**To:** Shapley Gary A Jr; Waldon Darrell J
**Subject:** RE: Shapley - Manager - Discovery Update
**Date:** Tuesday, December 13, 2022 7:47:36 AM
**Attachments:** image004.png
image001.png

Gary. Good Morning.

I have not reviewed the emails that were provided to the U.S. Attorney's Office nor had conversation with the prosecuting team regarding them. I plan to do both in the coming weeks. I understand through your emails that you believe the prosecuting team may have not conducted themselves in an ethical or proper manner to include prosecutorial misconduct. I am not the reviewing official, deciding official or expert on such matters. However, there are routes that you could take if you truly believe there are violations of ethical conduct or prosecutorial misconduct. Either way you choose, Darrell, Kareem, and I (along with the Chief and Deputy Chief) will continue to work through any potential issues on this investigation.

Enjoy your use of lose annual leave and the holidays with your family and friends.

**From:** Shapley Gary A Jr <[redacted]>
**Sent:** Monday, December 12, 2022 1:32 PM
**To:** Waldon Darrell J <[redacted]>
**Cc:** Batdorf Michael T <[redacted]>
**Subject:** RE: Shapley - Manager - Discovery Update

Darrell/Mike,

I am on use or lose beginning Wednesday, 12/14, returning 1/3/2023. I am off line most of tomorrow traveling to Alexandria, VA to do my annual medical exam.

If you have questions about any emails I would ask you share it in advance so I can look at them and be prepared to put them into context. The USAO was so eager to get my emails (which they already had 95% of)…then surprise…they "might" have a problem with a few of them that memorialized their conduct. If the content of what I documented, in report or email, is the cause of their consternation I would direct them to consider their actions instead of who documented them.

EXHIBIT
tabbies
9

**I have done nothing wrong.** Instead of constant battles with the USAO/DOJ Tax, I chose to be politically savvy. I documented issues, that I would have normally addressed as they occurred, because of the USAO and DOJ Tax's continued visceral reactions to any dissenting opinions or ideas. Every single day was a battle to do our job. I continually reported these issues up to IRS-CI leadership beginning in the summer of 2020. Now, because they realized I documented their conduct they separate me out, cease all communication and are now attempting to salvage their own conduct by attacking mine. This is an attempt by the USAO to tarnish my good standing and position within IRS-CI...and I expect IRS-CI leadership to understand that. As recent as the October 7 meeting, the Delaware USAO had nothing but good things to say about me/us. Then they finally read "discovery" items (provided 6 months previous - that are not discoverable) and they are beginning to defend their own unethical actions.

Consider the below:

1. I am not a witness – therefore Jencks/Impeachment is not an issue.
2. I am not the receiver of original evidence nor engaged in any negative exculpatory language against the subject (Brady material is evidence the prosecution is required to disclose that involves any evidence favorable to the accused – evidence that goes towards negating a defendant's guilt, that would reduce a defendants potential sentence, or evidence going to the credibility of a witness) – therefore no Brady/Exculpatory information exists. My documentation only shows the USAO/DOJ Tax's preferential treatment of this subject.
3. I have called into question the conduct of the USAO and DOJ Tax on this investigation on a recurring basis and am prepared to present these issues.

For over a year I have had trouble sleeping; awake all hours of the night thinking about this. After some time, I realized it was because I subconsciously knew they were not doing the right thing. But I could not fathom concluding that the USAO/DOJ Tax were in the wrong. After I wrapped my mind around the fact that they are not infallible, I started to sleep better. My choice was to turn a blind eye to their malfeasance, and not sleep, or to put myself in the crosshairs by doing the right thing. My conscience chose the latter.

I hope IRS-CI applauds the incredibly difficult position I have been put into instead of entertaining the USAO's attacks. If they bring up something legitimate; I am sure we can address it because it was not intentional. Everything I do is with the goal of furthering IRS-CI's mission, protecting the fairness of our tax system and representing IRS-CI with honor.

I look forward to presenting these issues to you. I do have some obligations during my UorL, but will forfeit some leave if it is to protect my reputation and the agency's interests.

Thanks.

BY MAJORITY COUNSEL 1:

Q Okay. I've just marked as exhibit 9 the email you just referred to. Just to confirm, can you describe this document?

A Sure, yeah. This is the email that I sent to Mike Batdorf, the director of field operations, and cc'd -- oh, I'm sorry -- I sent to Darrell Waldon, the SAC, and cc'd Mike Batdorf, the DFO. And this was the culmination of an October 24th communication from Delaware U.S. Attorney's Office and -- well, it was really Lesley Wolf and Mark Daly who called the case agent, [redacted], on the telephone and said, hey, we need -- we need Shapley's emails and his -- these sensitive case reports that he's authored back to May.

And they didn't ask for discovery for anybody else. They didn't ask for, from the -- mind you, the agents had provided discovery March-April timeframe, so there was 6 months or so of additional discovery, and they're not asking for that, right? They're only asking for mine.

So [redacted] sends me an email with Wolf and Daly on it that says, hey, you know, they asked for this, you got to talk to Shapley. I respond, hey, yeah, I'm available 9:15, let's chat. And she sends that, she forwards my email to Shawn Weede, number [two] -- a senior level at Delaware U.S. Attorney's Office.

And then he contacts me about this discovery, and he's kind of putting a lot of pressure on me. So even Weiss called up, the deputy chief, to complain about timing of the emails that got turned over from me at that request. But, basically, I think that they understood that it was a serious issue, what they had told me on October 7th, and that I had a huge problem with it, so I think that they started looking into what I had done for 2 or 3 years. And then they specifically targeted me, because there was an SCR in my

original discovery that went to the chief that said that these people are doing the wrong thing, and this is specific, not general, specific things that they're doing that are wrong.

So they wanted to get the universe of everything that I produced -- and then they eventually started attacking me on it.   And so October 17th was the last time we had an actual call together.   And then they canc- -- then there was -- and the next call was scheduled, and then there's an awkward cancellation right before.   And then they didn't -- they wouldn't talk to us anymore, and it was because they knew that I had documented their malfeasance contemporaneously over the years.

Q     Do you know whether those prosecution team's meetings continued after October 17th?

A     If they did, we were not invited.   IRS was not invited.   This is an email that kind of toward the end where I had turned over the documents.   The documents were easy, but I'm not going to get into why the emails, we had to create PST files, and, [I] don't want to get into it.   But it was like a 25-, 30-day process.

Q     Complicated?

A     I had to get computer people on my computer to remote in to get it.   I was actually in San Diego assisting with execution of search warrants on other cases, and I have computer people chiming in to try to get my emails, because Weiss is calling my deputy chief, who knows what they're saying.   So --

Q     And at what time was that all taking place?

A     It was right around Thanksgiving time.

Q     2022?

A     Yes, thank you, 2022.   And when the request came in -- it was like the next week I was in Australia for search warrants, and then I was traveling somewhere else for a week, Los Angeles, and then it was Thanksgiving.   And then I was in San Diego for search

warrants.   I had zero time to do this.   So that's why I was like, I can't get this done right now.   And so, they were bothered by that, so they called my deputy chief and God knows what they said.   I don't know.

Q     Okay.

A     But this email was basically, I sent to these guys to say, this is just completely unacceptable.   And I laid out to them Jencks and Brady, and why a manager's information would never be discoverable.

Now, if I had had a successful interview of Hunter Biden, that changes things, right?   I might be a witness, I could be impeached, et cetera, et cetera.   But other than that, because that didn't occur, they never ask for -- they never ask for discovery from my level or above.   Never.

Q     Okay.   And I was a little inartful before about protected disclosures.   I was trying to get at the point that the October 7th, 2022, meeting, is it accurate that that would've been -- after that that is when you started to, or sometime after that, started to consider the possibility of making a protected disclosure to Congress?

A     Yes.

Q     Okay.

A     That's when I became -- looked into the process and read 6103, you guys and Senate Finance, right, that's when that occurred, and that's when I sought counsel.

Q     Okay.

A     Did you want to finish document 8?

MAJORITY COUNSEL 2.   Sorry, sir.

Mr. Shapley.   Just a reminder, document 8, there are still things that we --

MAJORITY COUNSEL 2.   We are going to come back to that, right.

We're marking exhibit 10.

[Shapley Exhibit No. 10

Was marked for identification.]

Ex 10

**From:** Waldon Darrell J
**To:** Shapley Gary A Jr; Batdorf Michael T
**Subject:** RE: Sportsman Meeting Update
**Date:** Tuesday, October 11, 2022 7:27:14 AM
**Attachments:** image001.png

Good morning, all –

Thanks, Gary. You covered it all. I am taking care of referral to TIGTA.

Mike – let me know if you have any questions.
Darrell

*Darrell J. Waldon*
*Special Agent in Charge*
*Washington, D.C. Field Office*
*(C)* [redacted]

**From:** Shapley Gary A Jr <[redacted]>
**Sent:** Friday, October 07, 2022 6:09 PM
**To:** Batdorf Michael T <[redacted]>
**Cc:** Waldon Darrell J <[redacted]>
**Subject:** Sportsman Meeting Update

Mike,

Darrell asked me to shoot an update from todays meeting. Darrell – feel free to comment if I miss something.

1. Discussion about the agent leak – requested the sphere stay as small as possible
   a. DOJ IG will be notified
   b. FBI – HQ is notified and they refer it to their Counter Intelligence squad in a field office for investigation
   c. IRS-CI – **We need to make a referral to TIGTA** – What do you need from me on this action item?
2. **Weiss stated that he is not the deciding person on whether charges are filed**
   a. I believe this to be a huge problem – inconsistent with DOJ public position and Merrick Garland testimony
   b. Process for decision:
      i. Needs DOJ Tax approval first – stated that DOJ Tax will give "discretion" (We explained what that means and why that is problematic)
      ii. No venue in Delaware has been known since at least June 2021
      iii. Went to D.C. USAO in early summer to request to charge there – Biden appointed USA said they could not charge in his district
         1. USA Weiss requested Special counsel authority when it was sent to D.C and Main DOJ denied his request and told him to follow the process

EXHIBIT
10

        iv. Mid-September they sent the case to the central district of California – coinciding with the confirmation of the new biden appointed USA – decision is still pending

v. If CA does not support charging USA Weiss has no authority to charge in CA –

1. He would have to request permission to bring charges in CA from the Deputy Attorney General/Attorney General (unclear on which he said)

vi. With DOJ Tax only giving "discretion" they are not bound to bring the charges in CA and **this case could end up without any charges**

3. They are not going to charge 2014/2015 tax years
    a. I stated, for the record, that I did not concur with that decision and put on the record that IRS will have a lot of risk associated with this decision because there is still a large amount of unreported income in that year from Burisma that we have no mechanism to recover
    b. Their reason not to charge it does not overcome the scheme and affirmative acts – in my opinion
4. FBI SAC asked the room if anyone thought the case had been politicized – we can discuss this is you prefer
5. No major investigative actions remain
6. Both us and the FBI brought up some general issues to include:
    a. Communication issues
    b. Update issues
    c. **These issues were surprisingly contentious**

Always available to discuss. Have a great weekend!

Text Description automatically generated

**WARNING:**

**LAW ENFORCEMENT SENSITIVE (LES) - FOR OFFICIAL USE ONLY (FOUO)**

The information contained in this email is considered confidential and sensitive in nature as well as sensitive but unclassified and/or legally privileged information. It is not to be released to the media, the general public, or to non-law enforcement personnel who do not have a "need-to-know". This information is not to be posted on the Internet, or disseminated through unsecured channels, and is intended for law enforcement personnel only. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

BY MAJORITY COUNSEL 2:

Q This is an email chain that starts on October 7th, 2022. Presumably this is after the meeting, correct?

A That's correct.

Q And you send this to Mr. Batdorf and Mr. Waldon. And what is the upshot of this document? Are you just giving a readout of the October 7th meeting?

A Yeah. I realized the gravity of what I just witnessed, so I didn't want it to be a memo to file that didn't go anywhere else. So I did this to ensure that my information was corroborated right then, right there.

Q Right.

A So that people couldn't --

Q Right. So this is essentially your contemporaneous notes from that business meeting, correct?

A Yeah.

Q And at the top, Mr. Waldon indicates that this is an accurate reflection of what happened in the meeting?

A That's correct.

Q And he was in the meeting?

A He was.

Q Did you have any discussions with him outside of this doc -- did you tell him you were preparing the document?

A Yes, I did. I told him that I would be the one that would summarize it for Mike, the DFO, Batdorf, and I said that I'd cc you so that you can confirm.

Q Okay. So your email says: “Mike, Darrell asked me to shoot an update from

today's meeting.”

Did Mr. Waldon ask you to prepare this?

A I put it in front of him and he said sure, that sounds great.

Q Okay.

A So --

Q And you're just trying to explain why you're sending the email, correct?

A I'm trying to play nice because I was -- I'm trying to play nice.

Q In No. 1 on this email you prepared, says: “Discussion about the agent leak -- requested the sphere stay as small as possible…DOJ IG will be notified. FBI -- HQ is notified.”

What was the specific leak?

A So there was a leak, I'm not sure what outlet, on October 6th of 2022 -- it appeared to come from the agent's level, who was critical of the prosecutors for not charging the case.

Q Okay. Talking about the Hunter Biden case?

A Yes, not charging the Hunter Biden case.

So, obviously that was part of the discussion at the beginning. And there have been multiple leaks in this case going back, and this one was handled a lot differently because I guess it was purportedly from the agent's level.

So this drastic -- you know, they used that as an excuse to kind of -- to do what they were doing to us after this meeting on the 7th, they kind of used that leak as an excuse to exclude us.

Q And then the second item in the memo -- or the document you prepared, this summary of the meeting, AUSA “Weiss stated that he is not the deciding person on whether charges are filed…I believe this to be a huge problem -- inconsistent with DOJ

public position and Merrick Garland testimony."

It's pretty remarkable that the U.S. attorney on October 7th said he is not the deciding official.   Did he say it in those words?

A    Yeah.   He said, I am not the deciding person on whether charges are filed.

Q    So there's no ambiguity, he was crystal clear in what he was saying?

A    It was how I understood it, and it was also how the special agent in charge understood it.

Q    Okay.   Is there anything else in this document that is worth bringing to our attention?

A    Yeah.   So if you go down to 2 b ii, that's kind of the acknowledgement that it's been kept in Delaware since June, even though the venue is known or was in Delaware since 2021, which not -- it is what it is.   But that describes the reason why we run into these conflicts now in the political interference here.

So he says that when he went to D.C. U.S. Attorney's Office in early summer to request charge there, Biden-appointed U.S. attorney said they could not charge in his district.   So it said they could not charge.   So up to that point, I thought that he had just said we don't support this.

Q    Right.

A    And we thought that Weiss was still deciding.   And when he said this that said he could not charge, okay.   So that's a big difference -- that's a material difference in what was occurring.

And then he further says that he requested special counsel authority when it was sent to D.C. and the Main DOJ denied his request, told him to follow the process.

Now, following the process, as they would've only have known, was to go through another -- a non-Weiss-appointed U.S. attorney -- or not Weiss.   They were going to go

through somebody else.    And when AG Garland's first defense of why everything's okay here, he immediately goes to because is Weiss a Trump appointee.    So the materiality of this being a decision outside of Weiss is pretty significant, in my opinion.

So then it goes on to page 2.    So at the bottom of page 1, that's when Weiss requested special counsel authority.    That's the first time we'd heard that, and that he was denied.

And then he said that they went to Central District of California mid-September, and it was the same week that the Biden-appointed U.S. attorney was confirmed.    And then he says, if California does not support charging, Weiss has no authority to charge in California, which is obviously contrary to what Merrick Garland said.    Then he said that he would have to request permission to bring charges in California from the DAG or AG.

Q    Right.    And earlier this morning when we were talking about Senator Grassley and the Attorney General, and maybe my notes are wrong, but I thought we had discussed that the effort to bring the case to the Central District of California was in January of 2023, and this here seems that it was -- or a little bit earlier?

A    No, it was September.

Q    It was September.

A    September 2023?

Q    Okay.    I probably have it wrong.

A    Yeah.

Mr. Shapley.    September 2022.

Oh, in January 2023, we learned from SAC Waldon that California had declined to --

MAJORITY COUNSEL 2.    Okay.

Mr. Shapley.    -- declined the case.

BY MAJORITY COUNSEL 2:

Q Oh, okay. I understand. So in September of 2022, the materials are presented to the Central District of California?

A That's correct.

Q And it wasn't until January of 2023 that a resolution on that was determined?

A It's when we learned of it. I don't know if it had already been decided.

Q Okay. And along similar lines, is it fair to say that in March of 2022, the case was brought to the U.S. attorney for D.C.?

A That's correct.

Q And then in the early summer of 2022 is when you learned that the U.S. attorney in D.C. had declined to move that forward?

A No. It was right in March, because that was when Mark Daly was calling my case agent.

Q Okay.

A The one call was, hey, things kind of look good here. Call a couple days later was, they said no.

Q Okay. So that was in March?

A That was in March.

Q And that was right away. There was no delay or there was no --

A There was very little delay. We weren't involved in the presentation in D.C., so I don't know the exact date that it went over. But it was right there at the end of March that it was declined.

Q So in your notes on page 1, 2 b iii, went to D.C. U.S. attorney in early summer, is that Weiss sort of getting the dates --

A    Yeah, I think he was just --

Q    -- incorrect?

A    -- kind of being --

Q    Okay.

A    Yeah.

Q    But it should read March of 2022, correct?

A    He would've been more accurate to say spring than early summer.

Q    Okay.    And then flipping back to the second page, No. 3, this is what you stated for the record, that if they're not going to charge 2014 and 2015, they're just letting this Burisma income go untaxed, correct?

A    Yeah.

Q    And this is just a gift to the taxpayer, right?

A    It significantly reduced the egregiousness of his conduct if that wasn't included.

Q    Right.    And I think we had established that he was getting paid about a million bucks per year in 2014, and it started in April, so it was two-thirds of the million.

A    Yeah.

Q    So that was just going completely tax-free to the taxpayer Hunter Biden, correct?

A    That's correct.

Q    Did you get any feedback when you stated that for the record?

A    There was just some general discussion.

Q    Okay.

A    It wasn't anything reportable, I guess.

Q    So nobody said, Gary, whoa, whoa, whoa, there's a mix-up here, the reason

we can't do this is because of X reason?

A    No.   No.   There's an August email that maybe I alluded to before from DFO Batdorf that says that we support 2014 and '15, and we're going to have the deputy chief call over to Stuart Goldberg at DOJ Tax to tell him we support it.    And then SAC Waldon is in this meeting, right, FBI SAC Sobocinski and FBI ASAC Holley are there as well. It was just that was their decision.

Q    Okay.

A    But the funny thing is that now that he said he requested special counsel authority in D.C. and was denied back then, him saying that he decided not to charge '14 and '15 at that point in time was moot, because he had no ability to charge it.    So maybe that's a nuance that only I think is important.

Q    Right.

A    But, he's saying that he made the decision not to charge it, but he didn't make the decision not to charge it.    The D.C. U.S. Attorney's Office made the decision not to charge it.    And then when he was denied special counsel authority, he had no ability to charge it.

Q    Okay.

A    And that's my understanding.

MAJORITY COUNSEL 2.    Off the record a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q    We'll go back to exhibit 8.    There's a discussion at the bottom of page 81, where the Special Agent Wilson asked whether the VP, meaning now President Biden, ever showed up at any CEFC meeting.

Is it fair to say that the question is whether the President, the now President, ever showed up at his son's meetings to support his son, to give it some legitimacy?    Is that a fair reading of the question?

A      Yes.

Q      And the answer was "yes" from Rob Walker, correct?

A      Yes.    And this question was specific to out of office, and his request was yes.

Q      Right.    And did they also ask whether the President, when he was the VP, appeared at any meetings on behalf of his son, when he was in office?

A      Yes.    So the bottom of 82, FBI Agent Wilson, "Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office," and Walker's response was "Yeah."

Q      And then flipping to the next page, Special Agent Wilson said:    "Okay. All right. Um.., when you started to learn about like you were going your separate ways as far as um..,splittin' off.., you and James were not gonna.., but you know that Hunter was continuing on and was…,"

Is James a reference to James Biden?

A      Yes.

Q      And do you know what's going on in that exchange right there about James going his separate ways with Rob Walker?

A      I don't know anything too specific about that.

Q      Okay.    And there's also a reference to Tony in this document.

A      Yes.

Q      A little bit further down on page 83.    And Tony I think appears on page 80 as well.    I was just wondering, for the record, who Tony is, if you know.

A That's Tony Bobulinski.

Q Okay. Tony Bobulinski.

A So if I could add -- it was page 81 or 82, right in the middle. And Walker basically describes that the VP “literally sat down. I don't even think he drank water. I think” -- and then he's basically saying Hunter told him about the company he's trying to start --

Q Right.

A -- with these guys. And basically saying, well, if you're going to be around, Dad, can you like, stop by? And, he'd show up, it said. So then Wilson asks him, “so…you definitely got the feeling that, that was orchestrated by Hunter…to have…an appearance by his Dad at that meeting, just to kind of…bolster your chances at…makin’ a deal work out.” And Walker said "sure."

Q Walker agrees, but of course he agrees. Why else would Hunter bring his dad into these meetings, correct? He's trying to trade on the family name, and if he brings his dad to the meetings, it gives him a lot more credibility, correct?

A It would make sense, yes.

Q Is there anything else on this exhibit that we have not discussed that we ought to?

A Yeah. That was 82. Yeah. So he asked a question about when he was out of office, did he ever meet with him, but then he also said, well, when he was in office, did he --

Q Right.

A -- he responded that, yes.

Q Right. Okay.

A Yeah.

Q    Next exhibit we're going to mark is the WhatsApp document.    This is number 11.

[Shapley Exhibit No. 11

Was marked for identification.]

| | |
|---|---|
| 7/30/2017 | WA message with SM and Zhao, SM says, "Z- Please have the director call me- not James or Tony or Jim- have him call me tonight. I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled. I am very concerned that the Chairman has either changed his mind and broken our deal without telling me or that he is unaware of the promises and assurances that have been made have not been kept. Tell the director that I would like to resolve this now before it gets out of hand. And now means tonight. And Z if I get a call or text from anyone involved in this other than you, Zhang or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction. All too often people mistake kindness for weakness --- and all too often I am standing over top of them saying I warned you. From this moment until whenever he reaches me. It I 9:45 AM here and i assume 9:45 PM there so his night is running out."<br>Zhao responds, "Copy. I will call you on Whatsapp."<br>SM says, "Ok my friend - I am sitting here waiting for the call with my father. I sure hope whatever it is you are doing is very very very important."<br>Zhao says, "Hi Hunter, is it good time to call now? Hi Hunter, director did not answer my call. But he got the message you just mentioned." |
| 7/31/2017 | WA message with SM and Dong, SM says, "Kevin I was told by the Director through Zhao that we were to speak tonight. If there is some extraordinary reason you can not do so please let me know. I assume that you know that this is highly confidential and time sensitive." |
| 7/31/2017 | WA message with SM and Vuk Jeremic, SM says, "Call u in a minute I'm on w/ director" |
| 7/31/2017 | WA message with SM and Zhao, Zhao sends Kevin Dong's foreign phone number. |
| 7/31/2017 | WA message with SM and Zhao, SM says, "Z – i reached out to K and he declined my call and has not returned my text. I assume he knows that our plan to speak is highly confidential. I just hope he isn't talking to Tony or J -- if he is we have a real problem. If I can reshape this partnership to what the chairman intended then James and Rob will be well taken care of but I will not have Tony dictating to me nor the director what we can and cannot do."<br>Zhao responds, "I don't think he is talking to Tony or the other guys, mostly with the director. I just sent an email to you and cc to Kevin. He has your phone number now. Hi Hunter, did you see the email from Kevin? The director would like to suggest you and Kevin have a meeting. CEFC is willing to cooperate with the family. He thinks now the priority is to solve the problem mentioned last night." |
| 7/31/2017 | WA message with SM and Zhao, Zhao sends SM an image of a message which reads, "Raymond (believed to be Zhao), many thanks for the introduction. Hunter I am based in New York and my US phone is [redacted] Let's talk tomorrow? Kevin" |
| 8/1/2017 | WA message with SM and Fran Persons, SM says, "Ok- want to talk Hong Kong and whether Bo intends to do 100 or understandable -- done his part" |
| 8/2/2017 | WA message with SM and Zhao, Zhao says, "Hi Hunter, director asked me to extend to you that Kevin has reported to him about your discussion. He supports your proposition and will act correspondingly."<br>SM responds, "That is a great relief and very welcome news my friend - let My friend know that I'm looking forward to his arrival here with great anticipation- we will do extraordinary things together and I am happy to have him as a brother in this endeavor- and my family sends their best wishes and looks forward to playing some golf when the director has time." |
| 8/3/2017 | WA message with SM and Dong, Dong says, "I received the following and thought we were finished Hi Hunter, sorry to ping you at late hours. I am texting to convey some info from director Zang:<br>1) His best regards to you, Jim and VP;<br>2) He fully supports cooperatino with you and the proposition provided by you. Chairman also agrees upon you idea;<br>3) Kevin is designated by director Zang to discuss with you on technical matters. The fund will be wired to the jointly administrated account in a timely manner.<br>Thanks!"<br>Dong asks, "From Zhao" and SM responds "Yes". |
| 8/3/2017 | WA Message with SM and Dong, SM says, "K- Very simple:<br>1. 10 M per annum budget to use to further the interst of the JV. This move to 5M is completely new to me and is not acceptable obviously.<br>2. All expenditures/ expenses salaries will be agreed to by board. My (Biden's) expenses and determination of how BIDEN (loan 5M) capital will be determined by Owasco in consultation with Hudson. The Hudson capital will be utilized for expenses beyond those Biden/Owasco has committed to Monochromes business. (K we won't break 5 and the additional 5 can roll to next year if the Chairman and CEFC review is favorable. It all has to agreed to by Board - but if the Chairman doesn't value this relationship is being worth at leas 5M then I'm just baffled.<br>3. You saw minor clarification of exclusivity.<br>4. We are all saying the same thing I hope . Please let's put this to bed tonight sign officially tomorrow (or anytime as late tonight as you want) and get to work. I am tired of this Kevin. I can make $5M in salary at any law firm in America. If you think this is about money it's not. The Biden's are the best I know at doing exactly what the Chairman wants from this partnershipn . Please let's not quibble over peanuts."<br>and Dong responds, "Do you want me to talk to Zang or you want to have a call together?" |

EXHIBIT 11

BY MAJORITY COUNSEL 2:

Q Could you tell us about this document, what is it, and how was it obtained --

A Sure. So there was an electronic search warrant for iCloud backup, and these messages were in that backup and provided --

Q Okay.

A -- from a third party, from iCloud.

Q Okay. Who was it provided to?

A The -- the investigative team from --

Q Okay.

A It would go through all the same processes of -- since it's electronic, it would go to one of the computer analysis folks, and then they would put it in a readable format, and then it would go through filter review.

Q Okay. And these aren't WhatsApp messages, these are summaries of WhatsApp messages, correct?

A Yeah, that's correct. Because it was something about the readability of the actual piece, right? It was easier to summarize in a spreadsheet.

Q Okay. And who did the summary? Who prepared this document?

A It was either the computer analysis guy or [redacted], one or the other.

Q And you referenced some of this document in your opening statement. And if you can draw our attention to the parts that you referenced in your opener.

A Oh. Do -- would you like me to --

Q Well, you can just flag it --

A Yeah. So --

Q -- by date -- or some of the dates are multiple dates, so --

A The first one, July -- the top one, July 30 of 2017, and this is Hunter Biden emailing Zhao, who is one of the executives at CEFC. He's basically saying have the director call him, and he's demanding that he doesn't call James Biden or Tony or Jim Bulger (ph). Have him call me. And it says, I'm sitting here with my father, and he would like to understand why the commitment made has not been fulfilled.

Mr. Leavitt. Sorry. You said "he." "We" would like to understand.

Mr. Shapley. Oh, sorry.

And we would like to understand why the commitment made was not fulfilled.

So I mean, I'm just looking down.

So it says, “And Z, if I get a call or text from anyone involved in this other than you, Zhang or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction.”

So then there's, a little bit going on. And then Hunter Biden responds, “Okay, my friend -- I am sitting here waiting for the call with my father. I sure hope whatever it is you are doing is very very very important.”

BY MAJORITY COUNSEL 2:

Q That seems pretty threatening, doesn't it?

A Yeah, yeah. And there are other excerpts, some that are pretty pertinent where --

Q And just for the record, SM stands for Sportsman?

A That's correct.

Q Which is Hunter Biden?

A That's correct.

Q Is it unusual to use a code name like that or code initials? If you were just

investigating somebody who didn't have national prominence, would you make up a name like Sportsman?

A    We do use code names now and again.    FBI is really heavy in them.

Q    Okay.

A    So this code name did come from FBI --

Q    Okay.

A    -- on this particular one.    We probably would've went with Robert Doe.

Q    Okay.

A    But it does happen occasionally.

Q    Okay.

A    So some of the other pertinent things in here are just talking about, CEFC is willing to cooperate with the family.

Q    And what date was that?

A    That is 7-31-20- -- well, it's one, two, three, four, the fifth message --

Q    Okay.

A    -- second line from the bottom, go all the way over.

Q    Got it.

"The director would like to suggest you and Kevin have a meeting.    CEFC is willing to cooperate with the family."

And the family is the Biden family, correct?

A    Yeah.    And he even alludes to that later on, all the way in the very bottom of No. 4, of the last part of that message where --

Q    Who is Kevin Dong?

A    So he's like the CEFC spokesperson kind of in -- he's Gon Win Dong (ph), and he goes by Kevin.

Q Okay.

A So he's just connected with CEFC. He's kind of the runner.

So that No. 4, fourth line up from the very bottom, “put this to bed tonight…I can make $5 [million] in salary at any law firm in America. If you think this is about money it's not. The Bidens are the best I know at doing exactly what the Chairman wants from this partnership…let's not quibble over peanuts.”

But, you know, he alludes to "the Bidens are the best I know at" again here.

Q And who is saying "the Bidens are the best I know"?

A Hunter Biden is saying that.

Q Okay. So Hunter Biden is referring to sort of his family here, "the Bidens are the best I know"?

A Yep.

Q So he's self-identifying that his family is good at doing this?

A At doing what the chairman wants from this partnership. Chairman Ye is who he's speaking about.

Q Okay.

A And --

[Discussion off the record.]

Mr. Shapley. Yeah. I just flagged the third message to Vuk Jeremic.

MAJORITY COUNSEL 2. Okay.

Mr. Shapley. And that's from Hunter Biden to Vuk Jeremic. And it says, “Call u in a minute I'm on w/ director.”

So Vuk Jeremic is that former Serbian politician and former -- I don't know what his title was but of the U.N. Assembly. And so because of something like that in this, let alone the rest of it, we wanted to look into this.

And the reason why this was included in here was because that when agents saw this in late August, September of 2020, we went to the prosecutors. We said, we got to ask questions about this, we got to figure this out, we got to -- like, what's going on with this? And the response was, No. No, we're not going to do it.

You want to know why? And it makes a little bit of sense, right? Well, we don't know if he was lying that his father was sitting next to him, right?

So then we said, well, let's get the location data for the messages, and if they're co-located, then we're on better ground here, right?

MAJORITY COUNSEL 2. Right.

Mr. Shapley. And they, no, we're not going to do that. And we even brought that up in a pros-team meeting because [redacted] created an agenda for every single meeting, and the agenda item number, like, 2 or 3, or whatever it was, location data, and that was specific to this, and they didn't allow us to do it.

[3:29 p.m.]

BY MAJORITY COUNSEL 2:

Q And the reason you wanted to look into this is because there could have been a lot of money coming in from CEFC that was untaxed, correct?

A Yeah. We're talking about a lot of things there. There's FARA in play. And the FBI is considering a lot of national security type issues here. And we were precluded from doing anything.

Q Is there anything else from this exhibit 11 that we haven't covered that we should?

Mr. Lytle. Can we confer for a second?

MAJORITY COUNSEL 2. Excuse me?

Mr. Lytle. Can we confer for a second?

MAJORITY COUNSEL 2. Of course.

MAJORITY COUNSEL 1. Off the record.

MAJORITY COUNSEL 2. Go off the record, please.

[Discussion off the record.]

Mr. Shapley.   I had alluded to FARA and some other things there.   But, some of these people in here, Chairman Ye, Gon Win Dong (ph), Zhao, are believed to be connected to the Chinese Communist Party.

BY MAJORITY COUNSEL 2:

Q    Okay.   So there could be national security implications with communications with those officials, correct?

A    That is correct.

Q    And was that sentiment also shared by the FBI?

A    Yes.

Q    And despite those concerns that the FBI had and that the rest of the team had, that was not looked into.   Is that correct?

A    The prosecutors said don't do it.   And then we asked for location, they said, no, we're not going to do that.   And if FBI did something at some level, I'm not privy to it.

Q    So you don't know if FBI CT went off and --

A    You would almost hope that they did, but I don't know if they did.

Q    Okay.   We're going to turn our attention to some of the retaliation you have faced.

BY MAJORITY COUNSEL 1:

Q    We talked about the email you sent up to Mr. Waldon, talking to Michael Batdorf.   And you read a portion of that in your opening statement as well.

Subsequent to that and in other material that you have shared with the committee, you referenced a failure to select situation.   Can you explain what happened with that situation?

A    Sure, yeah.   So I was selected in 2018 to help stand up the Joint Chiefs of

Global Tax Enforcement called the J5.   It's an assembly of Australia, U.K., Canada, Netherlands, and United States.   And because of my reputation working on international cases and working with other countries, and my experience, Chief Don Fort at the time selected me.   It wasn't something where it was even a job announcement.   It was all of a sudden you are a member of the J5, and I had to ask what the J5 was.

So I helped stand up the group.   My agents worked a vast majority of the operational cases that are considered J5 cases.   And ultimately there was a J5 lead.   It was an IR-1 position, like a deputy director level position at headquarters.   She was retiring.   And, everyone thought that that was the job that I was going to get, right, and I wanted that job.   And I was already an IR-1 because I was the assistant special agent in charge at the Chicago field office during that time.   And I received and outstanding rating during that rating period and everything.   So I applied for that job.

There were two people that were original members of the J5.   I was one of them. And ultimately, I didn't get that job.   The interview was one day after this email, and --

Q   That interview was on December 14th?

A   That's correct.   And this email was December 13th.   Well -- I'm sorry. The bottom one is December 12, 2022, top one is December 13, 2022.

So, being that J5 lead, they work directly with the chief, because they're basically a spokesman for the chief in J5 matters.   So -- ultimately I interviewed.   And then on January 3rd, 2023, in senior staff meeting they announced the other person, Oleg, had gotten the position.

I'm friends with a lot of people on senior staff, and they called me and said, what's going on here.   And it wasn't till the next day that Scott Goodlin, the director of IO, called me and told me that I wasn't selected for the job.   And I'm the one that had to brief Scott Goodlin when he got that job about what the J5 was.

So -- the person selected -- he hadn't been an ASAC.   I'd been an ASAC for 16 months at two different SES field offices, New York and Chicago.   I wasn't --

Q     So you believe you were qualified for the position?

A     Yes, I do.

Q     And you believe you had qualifications superior to the individual selected?

A     Yes.

Q     And why do you believe you were not selected?

A     Because I'm raising these issues.   And I think that -- Weiss calling my deputy chief, and right before this, right around this time, and who knows what he said, but I think it tainted me.   I think that they retaliated against me because of that.   There's really no other explanation for it.   Even what was explained to me by Scott Goodlin as to why Oleg got it, it almost -- it made no -- I don't even know if Scott Goodlin understands it made no sense, but it made no sense, right?   So yeah.

Q     Did you hear from colleagues after that decision was made about the fact that you hadn't gotten the position?

A     Yeah.   Several of our foreign partners, one of them is like the deputy chief of the Australian taxation office, basically was dejected and was like how -- I don't even know -- it was twofold; one, because I told them I was going to resign from my J5 duties, which I did do.   And they were like, well, number one, what are they going to do without you?   But I was in charge of a vast majority of operational stuff.   And I had the institutional knowledge since it stood up, many of the things I helped stand up.   So -- I'm sorry.

So after I resigned to the director of global ops Kareem Carter, who is actually now the SAC of Washington, D.C. field office.   It was Lola Watson ASAC, Kareem Carter SAC. He was the director of global ops.   And I sent him an email, and said, I'm resigning my J5

duties.   And they had no idea what to do.   And then I'm talking to some of the analysts

there.   Are there any discussions?   They are like, no, we don't know what's going

on -- obviously they had one chief brief -- monthly I briefed the chief and the top

executives on the J5 stuff.

So I wasn't on the first call after I resigned.   And they were like, there were no

questions answered because I wasn't there.   And -- sorry, I just lost my train of thought.

Q     It's okay.   Is it fair to say that there are others inside the agency that would

share your opinion that you were more qualified than the person selected?

A     Oh, absolutely, yes.   There were even times when the person who got

selected, he couldn't do what he needed to do, so he had to call me in to do it.   One was

a trip to Australia in February timeframe to go and represent in the intelligence group

there and the J5.   And he just simply would have added no value, so I had to go.   And

then there was a briefing to, it's called a JSEIT, it's joint strategic -- JSEIT, it's J-S-E-I-T, it's a

joint strategic emerging issues task -- I don't know what T is for.   I apologize.

So I presented on three of the J5 cases within my group at this JSEIT meeting,

which is basically a bunch of executives from all over the different business operating

divisions within IRS.   And I presented three cases that we are working on J5.   And when

they asked for someone to speak to that group, it came through Kareem Carter to Scott

Goodlin, director of IO, to Oleg.   And Oleg responds with, well, the only person that can

give this presentation is Shapley.

So then I give the briefing, and now I'm the lead of one of the working groups out

of there.   And I was just asked to be the lead of a second working group, which I asked

them, please, I don't have the time.

Q     Understood.   Okay.   Moving forward to May 15th, 2023, the committee

received the letter from your counsel noting that you and your entire investigative team

were removed from an ongoing investigation of a high-profile controversial subject, who we've been discussing is Hunter Biden. Is that correct?

A That is correct.

Q How long had you been working on this investigation when you were removed?

A Since January 2020.

Q Who informed you that you and your team were being removed from the investigation?

A SAC Kareem Carter.

Q How were you informed?

A The ASAC Lola Watson put a meeting on my calendar, and it was a telephone call, conference call. And the subject was Sportsman update. [redacted] wasn't invited, but I had him on the line anyway, and he witnessed the telephone call. We produced a memo which both of us signed, because was taken off the investigation as well, so he can see and sign all documents.

Q Okay. And remind me -- I know you covered this earlier, but just for the record, when you say the whole team was removed, how many people was that?

A Sure. Yeah. So it was me, Case Agent [redacted], Co-Case Agent Christine Puglisi, and the rest of my team, which is 12 in total, were not allowed to take the investigation. So they basically ensured that it was not under my supervision anymore.

Q Were you given a reason on that phone call as to why the team was removed?

A I specifically asked and he said, no, didn't give a reason. To which I said, how could you possibly make a decision like that in a case like this without being given a reason? So then I said, well, if you were given a reason and you can't tell me, okay, just

don't tell me, but don't tell me they didn't give you a reason -- so I challenged him on it.

Q And was the case closed at this point?

A It was not closed, no.

Q Were other IRS employees assigned to the case? Was your team replaced?

A After, yes.

Q So to the best of your knowledge, the investigation remains open and the team has been replaced by other IRS personnel?

A Yes.

MAJORITY COUNSEL 2. And did we indicate who made that decision? Was it at DOJ or --

Mr. Shapley. I don't know if it was asked, but yes, Kareem Carter told me that DOJ had requested that change.

MAJORITY COUNSEL 2. And do we know who at DOJ? Was it the Tax Division? Was it the U.S. Attorney's Office in Delaware?

Mr. Shapley. He said DOJ, is my recollection.

MAJORITY COUNSEL 2. Okay.

BY MAJORITY COUNSEL 1:

Q In your career at the IRS, have you ever been removed from an active investigation like this?

A No, no. And we even saw testimony from Don Fort, the former chief of IRS CI. And I don't remember the context or who was asking the question, but he was asked about this issue and said, in your 30 years, had you ever seen a team removed like that? And his response was, no, I've never seen that.

Q And this was recent testimony before Congress?

A It was May 16th.

Q What is your understanding about who has decision making authority about what IRS personnel work on any given investigation?

A IRS personnel should be managed by IRS, not by DOJ.

Q In this context of IRS working on cases with a different department, different agency, Department of Justice, are you aware of any formal documentation about how that relationship is managed, a memorandum of understanding, any kind of agreement about who has decision making authority on an issue like this?

A I don't think I know of a memorandum, no. No.

Q And why do you believe you and your team were removed from the case?

A I think the DOJ, because we were raising protected disclosures, that they wanted to get rid of us. And it was twofold because we were making disclosures, but also because they knew that our disclosures were valid.

Q Moving forward, only a week, May 22nd, the committee received another communication from your counsel. It included an attachment that was a letter to the IRS commissioner, Daniel Werfel, regarding additional retaliation.

Can you talk about what happened in that instance?

A Yeah. So after being removed from -- my red line was October 7, 2022. [redacted] case agent's red line was being removed from the case without cause. And he decided to make that disclosure to the IRS commissioner because he thought that the people who were retaliating were at the highest levels of IRS CI, so he went to the next two levels, which is the deputy commissioner and commissioner of IRS.

Q And how did IRS respond to that communication?

A So ASAC Lola Watson sent him an email basically threatening him that he could have violated 6(e) with the communication with someone who's not on the 6(e) list. I only could assume that that's the commissioner, because our 6(e) lists are incredibly

robust.    I mean, the commissioner is on it now.    So, I would imagine Lola Watson is not on the 6(e) list and she's an ASAC, right?    Because ASACs come in, ASACs come out, and it's really the position.

So they threatened a 6(e) violation, which there was no 6(e) in there.    And also told him that there is no -- no information should be shared at any time outside of his chain.    It was like 2 minutes later, Kareem Carter, the SAC, sends an email to all the managers in the D.C. field office saying that you are to follow the chain of command, in no instances are you to provide information outside of that chain of command without their permission.

Q    Why is that problematic?

A    It was a direct threat.    Other people, like the co-case agent that is going to make her decision on what she wants to do, that is a shot across her bow, and anyone else that ever wants to comes forward, and it's just plain and simple.

Q    And did that communication about discussions not leaving the chain of command, did that include any language acknowledging exceptions for whistleblowers?

A    It did not.    There was a follow-up email from Deputy Commissioner O'Donnell yesterday where he sent out to everyone in the IRS basically -- it seemed as though they realized that they had done something wrong and they were trying to cleanse their error.    And they sent an email that had language about how to blow the whistle of 6103 and 6(e).    I believe that -- 6103 issues or 6(e) issues.    And my understanding is that's also deficient, because it did not have language in there that you can go to Congress and that there are ways that you can go to --

Q    So it did not include any reference or any language about individuals being able to contact Congress or communicate with Congress about allegations of wrongdoing?

A That's correct. Even in their attempt to cleanse, they still fell short. It was an email from deputy commissioner of services enforcement is what is says, but that's Douglas O'Donnell. And it was yesterday, May 25th, at 4:53 p.m. And yes, there's no language of being able to make those disclosures to Congress.

Q Okay. Other than the items that we've just been discussing, have there been any other issues of potential retaliation that you would like us to know about?

A I think that there is. Can I have a second?

MAJORITY COUNSEL 1. Go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. Shapley. So this is emerging now. We have a really large case, and it's actually [redacted]'s case, just the best agent. And this huge case, nationwide, with around 30 to 40 spinoff investigations. And we required the director of field operations to buy on to the strategy. And it was in January where I presented the strategy to them, and all three DFOs agreed to the strategy. And then it was in February, I don't have the dates in front of me, DFO Mike Batdorf sends an email to all people across the country who were working this case saying that we're going to pause on it. So that was in February.

And now we're still trying to work it. We're still trying it push it forward. We have all these meetings, and they keep giving us -- they keep telling us ways that they would approve it moving forward, but we can't move forward that way because there's already grand jury material in it and because I'm not speaking about the Hunter Biden case, I can say that.

BY MAJORITY COUNSEL 1:

Q This case is different --

A       Different --

Q       Totally unrelated case?

A       Totally unrelated case.

Q       I'm sorry.    You're describing a totally unrelated case.    Is that right?

A       That is correct.    Yeah.

So even today I don't know -- what's the date?    The 26th of May, we're still on a pause.    And I think that it's directly related to coming forward and making these disclosures, because Mike Batdorf was the one that I initially called and said, with advice of counsel, to say, hey, I've retained counsel and I'm going down the road to blow the whistle, and then all this stuff starts happening.

Q       So you believe he may be retaliating by slowing down or impacting your duties and responsibilities on totally unrelated matters?

A       Absolutely.    And all three DFOs agreed to this strategy and then he paused it.    And the effect is now they can say, oh, well, you screwed this up or you didn't do something right or something happened, and it can ultimately affect me.

Q       And for the record, what does DFO stand for?

A       Director of field operations.

Q       Okay.

MAJORITY COUNSEL 1.    Our hour is up.

[Recess.]

BY MINORITY COUNSEL 2:

Q       Just really these are clarifying questions.    The letter you wrote to the committee regarding your being removed from the Hunter Biden audit was on May 15th. On what date did the Sportsman update meeting occur?

A       Sure.    So, my lawyer sent that letter.    And also, it wasn't an audit.    It's a

criminal investigation, just to clarify. But that meeting was 1:30 on May 15th.

Q Okay.

A And the letter went the same day. Yes.

Q Okay. And could you clarify or explain what the IRS' response was with the [redacted] disclosure up the chain? Who exactly is Lola Watson and what is her role, and how does she fit into that disclosure?

A Sure. Yeah. So [redacted], one of my agents; me, SSA supervisor; ASAC, assistant special agent in charge Lola Watson; then SAC Kareem Carter.

Q Okay.

A So he sent the email to ASAC and above. So ASAC, SAC, DFO, deputy chief, chief, deputy commissioner, commissioner. And she, the ASAC Lola Watson was the one who responded directly to him about following the chain of command which just a small nuance is that she didn't send it to me, which would have been the chain of command, so --

Q I see. So she was someone who was on the original email, along with the commissioner, the deputy commissioner, all the way down. In her response, did she also cc the commissioner, cc the deputy commissioner, or was that just sent directly to him?

A The only address we could see was his, so we don't know if there was bcc.

Q And presumably, since the meeting was on May 15th, that email to the commissioner was also May 15th or May 16th or sometime close thereafter?

A I think it was the 12th, May 12th. I think -- was it a Friday?

Q Well, if the meeting didn't occur until the 15th, I'm trying to figure out --

A Oh, no, no. Oh, no. Okay. I'm sorry. I wasn't following your question.

Q So when was [redacted]'s email to the commissioner, et cetera?

A Okay. Okay. I'm sorry. I totally missed your question.

Q Yeah.

A So it was -- is the 15th a Monday or a Tuesday? It was Monday or Tuesday was when that happened. And then he sent the email either Thursday or Friday of the same week.

MINORITY COUNSEL 1. 15th is Monday.

Mr. Shapley. Monday, yes. So that's when I got the call that the team was removed, and he sent that email Thursday or Friday.

Mr. Leavitt. Just to clarify, you received our letter, right, that had it as an attachment?

MINORITY COUNSEL 1. Yes, we have the May 15 letter.

MINORITY COUNSEL 2. Do we have the email with the [redacted] attachment? I can't remember.

Mr. Leavitt. May 22nd, I think, is the date we sent our letter.

MINORITY COUNSEL 1. Yeah, we have that.

MINORITY COUNSEL 2. We have it in our files.

And then I guess my only other question is, as far as personnel decisions go in terms of who assigns who to a case or who would remove someone from a case, is there any reason in the normal course of business that the commissioner of the IRS would be asked or have to approve any kind of movements at that level?

Mr. Shapley. I don't know of that occurring before, so I don't know who would approve it.

MINORITY COUNSEL 2. Okay. I'm good.

MINORITY COUNSEL 1. Thanks. And I'm going to make mine brief, so I think we're almost done here. That gives everybody hope.

BY MINORITY COUNSEL 1:

Q I want to go back to exhibit 11. That's [where] the WhatsApp messages were summarized. I had a couple of clarifying questions on that.

Who is WA? There's a WA --

A That means WhatsApp.

Q Oh, WhatsApp. Okay. That's not a person.

A No.

Q I was wondering how you guys knew it was WhatsApp.

Okay. And then you mentioned when you were providing some explanation about these WhatsApp messages that Chairman Ye was talking about a partnership. What is that partnership? And that was in connection with the July 31, 2017, message or so. I know you were talking about that.

A Sure. Yeah, yeah. I'm just --

Mr. Lytle. Which message is it? Can you direct him to it?

MINORITY COUNSEL 1. I have written down here in my notes that it's the fifth message, July 31, 2017. It talks about, "Will work with family." That one.

MINORITY COUNSEL 2. "If I can reshape this partnership to what the chairman intended."

Mr. Shapley. Oh, oh. Okay. Yes. Oh, I'm sorry.

BY MINORITY COUNSEL 1:

Q What is the partnership? Do you know what it does or what it's supposed to do?

A In all of my review of the evidence in this case, I'm not exactly sure what Hunter Biden is doing for this money. So the partnership, I'm not really sure what services he's providing as part of that partnership.

Was that your question?

Q    Yeah.    I was trying to see, if this is some sort of a real estate partnership or

a -- I have no idea.    We don't know.

A    This particular CEFC deal is not a real estate deal.    No, it's not.    There are

some dollar amounts in the last message, but I didn't really go into that too much.

Q    Okay.

MINORITY COUNSEL 1.    Okay.    We don't have anything else.

MAJORITY COUNSEL 1.    Okay.    Well, we want to thank you for --

Mr. Lytle.    Can we just have a follow-up?

MAJORITY COUNSEL 1.    Oh, sure.

Mr. Lytle.    I just have a couple of follow-up questions, if that's okay.

MAJORITY COUNSEL 2.    This is on the record?

Mr. Lytle.    Yes.

MAJORITY COUNSEL 2.    Okay.

BY MR. LYTLE:

Q    So, October 7, 2022, the meeting with Weiss where Weiss proclaimed he

didn't have the authority to make charges.    You know that meeting, right?

A    Yep.

Q    Could you just name the people that were in attendance at that meeting, to

the best of your recollection?

A    Sure.    Yeah.    So from the FBI it was SAC Tom Sobocinski, ASAC Ryeshia

Holley.    IRS SAC Darryl Waldon.    I was ASAC at the time, and I was there.    And it was

U.S. Attorney David Weiss and then Shawn Weede.    And Shannon Hanson.

So I don't know what Shawn Weede and Shannon Hanson's titles are, but they

were like David Weiss' one and two type person.    Probably crim chief, first assistant, that

area.

Q      And so if someone wanted to just check with those folks, they could tell what they heard Weiss say at the same meeting that you were at.

A      Yep.

Q      Fair to say?

A      Yep.

Mr. Lytle.    Okay.    I don't have anything else.

MAJORITY COUNSEL 2.    I'm sure they're going to be eager to come in and speak with us.

MAJORITY COUNSEL 1.    Is there anything else that you would like to mention before we conclude today that we haven't already covered?

Mr. Shapley.    No.    Just thanks for listening.    My life's on the line here, so do what you can.

MAJORITY COUNSEL 1.    Thank you very much for your time and for a long day on a Friday before a holiday weekend.    We greatly appreciate it.    Have a good afternoon.

Mr. Shapley.    Thank you.

Mr. Lytle.    Off the record.

[Whereupon, at 4:11 p.m., the interview was adjourned.]

Certificate of Deponent/Interviewee

I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

________________________________

Witness Name

________________________________

Date

# EXHIBIT 6

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF: [redacted]

Thursday, June 1, 2023

Washington, D.C.

The interview in the above matter was held in room 5480, O'Neill House Office Building, commencing at 9:41 a.m.

Present: Representative Jason Smith.

Appearances:

For the COMMITTEE ON WAYS AND MEANS:

[REDACTED], MAJORITY COUNSEL

[REDACTED], MAJORITY COUNSEL

[REDACTED], MAJORITY COUNSEL

[REDACTED], MAJORITY STAFF

[REDACTED], MAJORITY STAFF

[REDACTED], MAJORITY COUNSEL

[REDACTED], MINORITY COUNSEL

[REDACTED], MINORITY COUNSEL

[REDACTED], MINORITY COUNSEL

For [REDACTED]:

DEAN ZERBE

PARTNER

ZERBE, MILLER, FINGERET, FRANK AND JADAV, LLP

[REDACTED]

[REDACTED]

MAJORITY COUNSEL 1. Let's go on the record.

Good morning.

This is a transcribed interview of an Internal Revenue Service criminal investigator.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on May 24th, 2023, indicating your desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Could the witness please state your name for the record?

Mr. [redacted]. It's [redacted].

MAJORITY COUNSEL 1. And counsel for the witness, please state your names for the record.

Mr. Zerbe. Dean Zerbe.

MAJORITY COUNSEL 1. On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is [redacted]. I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else here from the committee introduce themselves, starting with the chairman.

Chairman Smith. Jason Smith, chairman of the Ways and Means Committee.

MAJORITY COUNSEL 2. [redacted], also with the Ways and Means Committee staff.

MAJORITY COUNSEL 3. [redacted], Ways and Means majority staff.

Ms. [redacted]. [redacted], Ways and Means majority staff.

Ms. [redacted]. [redacted], Ways and Means majority staff.

MINORITY COUNSEL 1. [redacted], Ways and Means minority staff.

Ms. [redacted]. [redacted], Ways and Means minority staff.

MAJORITY COUNSEL 1. I'd like to now go over the ground rules and guidelines that we will follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity make an opening statement.

Following your statement, the questions will proceed in rounds. The majority will ask questions first for 1 hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose. We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break, apart from that, please just let us know.

As you can see, there's an official court reporter taking down everything we say to make a written record. So we ask that you give verbal responses to all questions.

Do you understand?

Mr. [redacted]. Yes, I do.

MAJORITY COUNSEL 1. So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on the staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone down at the end of the table can hear you. It is important that we do not talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete and truthful manner

possible, so we will take our time. If you have any questions or if you do not understand one of our questions, please let us know. Our questions will cover a wide range of topics, so if you need clarification at any point, just let us know.

If you honestly don't know the answer to a question or do not remember it, it's best not to guess. Please give us your best recollection. It is okay to tell us if you learned information from someone else. Just indicate how you came to know the information.

If there are things you do not know or cannot remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with your counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that by law you're required to answer questions from Congress truthfully.

Do you understand?

Mr. [redacted]. Yes, I do.

MAJORITY COUNSEL 1. That also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. [redacted]. Yes, I do.

MAJORITY COUNSEL 1. Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements under 18 U.S.C. Section 1001.

Do you understand that?

Mr. [redacted]. Yes, I do.

MAJORITY COUNSEL 1. Is there any reason you are unable to provide truthful answers to today's questions?

Mr. [redacted]. No, there is not.

MAJORITY COUNSEL 1. I would like to note that the information discussed here today is confidential. As an IRS investigator, I know you understand the significance of our tax privacy laws. Chairman Smith takes those tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

I'm sure you know 26 U.S.C. Section 6103 makes tax returns and returns information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, the statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. [redacted]. I did.

MAJORITY COUNSEL 1. Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. [redacted]. I have.

MAJORITY COUNSEL 1. And do you wish to disclose that information to the committee today?

Mr. [redacted]. I do.

MAJORITY COUNSEL 1. In addition to Section 6103(f)(5), the chairman of the Committee on Ways and Means has the authority under Section 6103(f)(4)(A) to designate agents to receive and inspect returns or return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has designated the individuals in this room for the purposes of receiving the information you wish to share.

The chairman considers this entire interview and the resulting transcript as protected confidential information under Section 6103. That means that this interview can only proceed so long as everyone in the room is properly designated to receive the information.

The chairman has designated the court reporters and the related individuals that provide transcription services to the House of Representatives.

I would like to remind the witness and everyone in the room that 26 U.S.C. Section 7213 makes it unlawful to make any disclosure of returns or return information not authorized by Section 6103. Unauthorized disclosures of such information can be a felony punishable by fine or imprisonment.

Given the statutory protections for this type of information, we ask that you do not speak about what we discuss in this interview to individuals not designated to receive such information.

For the same reason, any marked exhibits that we use here today will remain with the court reporters so that they can go in the official transcript and any copies of those exhibits will be returned to us when we wrap up.

Your letter to the committee references the fact that you have been removed from a high-profile case and that you are concerned about possible retaliation.

Chairman Smith values whistleblowers and knows that whistleblowers take significant risks when disclosing wrongdoing.    That is why there are legal protections in place for whistleblowers making disclosures to Congress.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers.    The IRS Commissioner replied, quote:    "I can say without any hesitation there will be no retaliation for anyone making an allegation," end quote.

We understand your removal from the case team came subsequent to that testimony from the Commissioner.    This is very troubling, and we will certainly discuss that in more detail today.

That's the end of my remarks.    Is there anything that my colleagues from the minority would like to add?

MINORITY COUNSEL 1.    No.    We'd just like to thank you for coming to talk to us today, and we look forward to hearing your testimony.

MAJORITY COUNSEL 1.    And with that, I'll give you the opportunity to make an opening statement.

Mr. Zerbe.    I don't have as nearly extensive [remarks], but just a couple of points, particularly with the chairman here.

We just want note that if the committee -- we made this point but just to have it -- that if the committee were to elect or choose to release the transcripts, we would ask for strong consideration for his anonymity in terms of that.    You can identify him in terms of his role and position and release the transcript.    But in terms of his identity, his specific name, we would ask that consideration, strong consideration, be given for keeping that anonymous.

And the second is, just a blanket point, is he'll be covering an enormous amount of topics ranging over a number of years today and to the best of his ability, but, obviously, to understand he is doing his best in terms of recall and remembering what is going on and making his best efforts in that. But, obviously, folks are not infallible on that. But we'll strive to be as accurate and complete as possible.

So, ███, go ahead.

Mr. █████. So as was stated, I am a special agent with the Internal Revenue Service Criminal Investigation.

I wanted to start out by saying I'm coming here to you today after someone from your committee reached out to my counsel to come in and testify. I paid for my own flight to be here in front of you, as I do not live in the D.C. area. I have not accepted any payments from anyone in coming here, and I have legal representation through my attorney, Dean Zerbe.

I felt that it was my duty as a government employee to abide by your request, and I think that it's important that all you should know from my recollection of what happened during the Hunter Biden investigation so that we can learn from it, fix some things so justice is served, and create policy so that it doesn't happen again to us in the future.

One thing that I know, people would say about me, is that I'm passionate about my job and my career at the IRS. I always strive to be the most efficient and best agent I can possibly be, always fighting for justice, and I always try make sure that we are doing the right thing for the right reason.

But in doing the right thing, I've found that people will fight me tooth and nail and do everything in their own power to protect their own self-interests.

So if I get emotional during some of this, I apologize, but this has been 5 years of

my life.    So what's happened has been [difficult] -- yeah.    So I apologize for that.

I'm an American, and my allegiances are to my country and my government.    I'm also a gay man.    I have a husband, two dogs, a home, and a life full of family and friends. But above all else, I'm a human being.    My sexuality doesn't define me as a person.    It's just who I love.

I'd like to say one more thing regarding this topic of sexuality, especially since it's the start of Pride Month.    But people have said that I'm gay and people have said, because I'm gay and that I am working as the case agent on this investigation, that I must be a far-left liberal, perfectly placed to fit some agenda.    This was stuff that was on social media regarding me.

I can tell you that I am none of those things.    I'm a career government employee, and I have always strived to not let politics enter my frame of mind when working cases.

I've tried to stay so nonpolitical that in the last Presidential election I voted but had decided to not vote for the Presidential candidate because I didn't want to be asked that question in a court proceeding in the future and I didn't want to show any potential bias.

My political beliefs are simple.    I'm as middle of the road as they come but would consider myself to be a Democrat.    When I was younger, I grew up in a conservative household.    I also held conservative beliefs.    But over time those beliefs have changed.

At the end of the day, I will always vote for love, kindness, justice, and fairness, because that's what I believe God would want for all of us.

I heard something recently that I think is overly relevant:    The eyes are useless when the mind is blind.    Basically showing us that you can have the best investigators in the world, but if you don't have prosecutors, people willing to pursue justice, and are constantly putting up roadblocks, you'll never achieve a resolution.

I've been an agent with the IRS since 2010. In 2007, I received my undergraduate degree in accounting from [redacted] and my MBA from [redacted], so my master's in business administration. Prior to starting my career at the IRS, I worked as an external auditor for [redacted].

Throughout my career with the IRS, I have held multiple collateral positions, as well as worked a variety of criminal tax and money-laundering investigations. Over the years, I have received "outstanding" on my performance evaluations in receiving multiple performance awards and have also received a quality step increase, which is one of highest-valued performance awards.

I was [a] healthcare fraud coordinator, worked criminal tax and money-laundering investigations of physicians, pharmacists, and medical billing companies. I have authored and have been the affiant of multiple physical and electronic search warrants. I have authored and been the affiant on multiple seizure warrants, having seized millions of dollars' worth of criminal proceeds laundered through the purchase of homes, vehicles, jewelry, and the use of bank accounts.

I was a public information officer previously in which I worked as a liaison with the IRS and the U.S. Attorney's Office, our law enforcement partners, and the media partners in helping get publicity for our tax cases.

This collateral duty allowed me to get a whole different perspective of the why we do our job. If you have a successful criminal tax case and no one hears about it, was it really successful?

The mission of the IRS is clear. We are to investigate potential criminal violations of the Internal Revenue Code and related financial crimes in a manner that fosters confidence in the tax system and compliance with the law.

My agency has continually worked to show the American public this mission, it's

against the law to commit these tax offenses, and what would happen if they chose to do so.

[In] November of 2018, I transitioned out of being the public information officer and I transitioned to the International Tax and Financial Crimes group out of Washington, D.C., where we specialized in international tax crime tax cases.    We're a specialty group. We sit all over the U.S., and we primarily work international tax cases.

This was around the same time that I had initiated the criminal tax investigation into Robert Hunter Biden.    I will come back to that topic here in a few minutes.

But I wanted to give you guys an example of what I was working prior to this, something very similar that happened in that case, and kind of my perspective on that and the differences between that case and the Hunter Biden case.

While I was working as the public information officer, I took over as the case agent of an extremely complex captive insurance tax investigation.

This investigation was the first of its kind.    It had a lot of issues, to include age of the case, and I was coming in as the second assigned agent, as the previous agent was promoted.    So there's an example of why an agent might drop off [of a case].    They got promoted.

So I came in as the second agent, and I worked the case for approximately 3 years with attorneys from the Tax Division and the U.S. Attorney's Office.

One of the Tax Division attorneys assigned to that case is the same attorney that was assigned in the beginning of the Hunter Biden investigation.    His name is Jason Poole.    He was eventually promoted at DOJ Tax and oversaw the Hunter Biden investigation as [the] chief of [the] Northern [Area].    So chief of DOJ Tax Northern.

I know that Mr. Poole would say how good of an agent I was, how good my work was, and I think he would speak highly of me.

Now, why does this captive investigation matter?

Prior to joining the case, DOJ Tax had approved tax charges for the case and the case was in the process of progressing towards indictment.    Our assigned Assistant United States Attorney was promoted to judge, and DOJ Tax had made the decision to reinvestigate the case.

After working thousands of hours on that captive case, poring over evidence, interviewing witnesses all over the U.S., the decision was made by DOJ Tax to change the approval to a declination and not charge the case.

I was devastated when I found that out, but at the end of the day I understood.

We did everything we could to try to work through the issues and get the captive case ready for indictment.    I fought hard, having meetings with the leaders of my agency and DOJ Tax to try and get it charged.    But at the end of the day it was a difference in opinion, and DOJ Tax didn't want to set precedence.

I'm bringing this up to show you an example of difference in opinion between the investigators and prosecutors when it came to charging.    The captive case and the steps taken were significantly different than what happened with the Hunter Biden investigation, and hopefully I can show you that with my testimony here today.

So I have ultimately made the decision to come forward and agree to your request because I believe I made multiple attempts at blowing the whistle internally at the IRS. One of those was an email that I sent internally to the Commissioner of the IRS and was essentially intimidated and retaliated against after I sent that.

And I will bring that if you guys want.    I can bring that up later on.

Mr. Zerbe.    We can provide that email, right.

Chairman Smith.    Is it the current IRS Commissioner or the acting?

Mr. Zerbe.    Mr. Chairman, yes, it's the current.    This is the one that was in the

newspapers that was attached to the longer letter by Mr. Shapley. You've essentially got most of the context of that letter. But, yes, Mr. Chairman, it's within the last 2, 3 weeks. So yes.

Mr. [redacted]. So I'm sitting here in front of you right now terrified. In coming forward, I'm risking my career, my reputation,

and the casework that I'm working outside this investigation. I believe that the Delaware U.S. Attorney's Office and DOJ Tax have a clear target on me and my supervisor's back, and I believe that they are waiting for an opportunity pounce on us.

My own agency retaliated against me, as I just stated, even after years of essentially being left on an island from them when it came to this investigation.

I did not ask to be in this position, nor do I want to be. My supervisor, who I wholeheartedly respect, decided to blow the whistle on how this investigation was handled because his red line was crossed.

The timing of when he did that was something that we did not agree on but he felt he had to, and I wasn't going to stop him from doing what he thought was right.

I'd like to note that I wasn't present at the leadership meeting on October 7th, 2022, that Mr. Shapley and leaders from the IRS were a part of with U.S. Attorney David Weiss, the meeting where he made the statements about not being in charge.

I also wanted to continue to protect the record and my ability to testify as the case agent in the future, which is also a part of the reason I didn't come forward to you.

At the end of the day, I worked on a complex criminal tax investigation over the last 5 years, and the investigative process is 99.9 percent done, and we were in the process of bringing the case to indictment. And I have emails and stuff that I can reference that show that.

Since October of 2022, the Delaware U.S. Attorney's Office and DOJ Tax have

pretty much stopped communicating with me and my team, and we have ultimately been removed and replaced from the investigative team.    I want to make that clear.    We were removed, and they replaced us with a new agent and a new supervisor.

I'm pleased to respond to the committee's request to assist them in oversight work and to provide information through statutorily authorized provisions of 6103(f)(5). I have reason to believe that there was gross mismanagement present throughout this investigation, that there was gross waste of funds relating to the tax dollars spent on investigating this case, and that there was an abuse of authority by DOJ Tax and the Delaware U.S. Attorney's Office.

I will present some evidence now and later, if needed. I will present evidence now and at a later date, if needed.    And I will leave it to you to make your own determinations, based on my testimony and the documents, what they say about the handling of this investigation.    Obviously, we have not provided any documents to you guys so far.

In providing this testimony, I will protect sensitive and secret material, first off. And I will also strive to protect current and ongoing investigations that are spin-offs from the Hunter Biden investigation.

I would also like to mention something else that's very important.    Sometimes I think the excellent work that the investigators did regarding this investigation is being overlooked.

I have worked with some of the best investigators on this team, some of the best investigators, by far the best forensic accountant with the FBI [I have] ever worked with. Amazing, intelligent people from the IRS, an amazing co-case agent who was there for me every step of the way, who took my calls when I felt like I couldn't go on with the investigation anymore because of what was being done and the roadblocks that were

being put in front of me.

My supervisor, Gary Shapley, best supervisor I've ever worked with in my life.    He was someone I could come to whenever I needed to vent, was someone who always fought with his heart and soul to do what was right, even if we didn't agree on the path, and would try to make sure that we always were heard.    He is someone I look up to as a leader in our organization.

Now, as for the prosecutors on the case, which included AUSAs from Delaware and line attorneys from DOJ Tax.    I considered a lot of these people my friends and we spent a lot of time together over the last 5 years.

Their conduct since October of 2022 has honestly been appalling, and I do not think that they are considering the human impact of the decisions they're making.

I have respected their work but think they got lost in the type of investigation they were overseeing.    Looking back on everything, they had the best investigators in the Nation and the prosecutors were the JV squad and weren't up to the task of handling such a big case.    They would often slow-walk investigative steps, often not follow the appropriate investigative procedure, and would say that we couldn't do or had to wait on certain steps because there were too many approvals in front of us.

I recently heard from another case agent on the investigation that the Delaware U.S. Attorney's Office loves to slow-walk cases and overthink everything.    They felt that this was exaggerated tenfold because of this case.

That agent also said that they had to work with this U.S. Attorney's Office.    So they had to keep the status quo and not raise any questions or issues that could potentially hurt that relationship.

I was different.    I was coming in from the outside.    I was able to bring up real issues, challenge their arguments, and it was apparent that they didn't like it.    It was

often met with rolling eyes, dismissing my ideas, and telling me that they would, quote, "think about it."

I started this investigation in November of 2018 after -- so this is going to go through kind of a timeline chronology of the case, just so you guys are aware.

I started this investigation in November of 2018 after reviewing bank reports related to another case I was working on a social media company.    Those bank reports identified Hunter Biden as paying prostitutes related to a potential prostitution ring.

Also included in those bank reports was evidence that Hunter Biden was living lavishly through his corporate bank account.    This is a typical thing that we look for in tax cases -- criminal tax cases, I should say.

In addition, there was media reporting related to Hunter Biden's wife, ex-wife, divorce proceedings basically talking about his tax issues.    And I wanted to quote some of the things that were said in her divorce filing which was public record.

"Throughout the parties' separation, Mr. Biden" -- referring to Hunter Biden -- "has created financial concerns for the family by spending extravagantly on his own interests, including drugs, alcohol, prostitutes, strip clubs, gifts for women with whom he had sexual relationships with, while leaving the family with no funds to pay legitimate bills.

"The parties' outstanding debts are shocking and overwhelming.    The parties have maxed-out credit card debt, double mortgages on both real properties they own, and a tax debt of at least $300,000."

This is all the information that I had in my hand in November when I wanted to open this investigation.

So I began talking with colleagues in my group, and they were asking me why would I want to open up a case like this.    Big cases, big problems was the thing I was

constantly hearing.

I responded to say it shouldn't matter the name of the person on whether we work a tax case or not.   It should be the merit of the evidence, the allegation, and the clear understanding of why we are opening that investigation.   So doing the right thing for the right reason.

After discussing the case with my previous supervisor at the time, Matt Kutz, he made a decision to look into the case further before sending it -- sending the case up for referral.

So I wanted to note something here.   When we get a bank report, a lot of times we are able to take the information in that and bring it over to the U.S. Attorney's Office to say, "Hey, look at this bank report.   We need -- are you guys interested in potentially opening up an investigation?"

So that's typical.   And because we're in D.C., he lived in D.C., we would have taken it to the D.C. U.S. Attorney's Office.

My manager at the time told me, "No, you cannot do that.   That's a tax disclosure issue."   I didn't agree with him because there's been multiple instances where we do that.   That's a normal part of our job.   But he was my manager, and I wasn't going to fight him on it, and he told me that I had to open this up the normal tax administrative way that we would do [for] these cases.

At this point in 2018, I believe that I was the only agent in the U.S. looking into Hunter Biden.   So I immediately drafted a criminal tax initiation package and sent it to my manager for his review.

I wanted to provide an example of something that my SSA [at that time] told me which caused me pause and concern.   This is from what I recall.   But he said a political family like this, you have to have more than just an allegation and evidence related to

that allegation. In order for this case to move forward, you basically have to show a significant amount of evidence and similar wrongdoing that would basically illustrate a prosecution report.

So he's basically telling me that I have to show more than just non-[filed] tax returns and the information from the ex-wife in the divorce proceedings.

I did not agree with him at this time -- and I told him that we have to treat each taxpayer the same, it shouldn't matter on their name. But he was my manager and I had to do what he said.

So after three of these initiation packages, he finally allowed me to push this forward to DOJ Tax for their review.

So the way that our grand jury cases -- or the way -- I’m sorry. The way that our cases work is when the case is referred from IRS to DOJ Tax, the case has to go through our ASAC and SAC, and then it goes to DOJ Tax where they review and approve it and send it to the appropriate venue or jurisdiction.

So in [or] around March or April of 2019, the case went up to DOJ Tax. And at that time we were told that William Barr made the decision to join two investigations together. So at that point in time I had found out that Delaware had opened up an investigation related to the bank reports and that that occurred in January of 2019, so 2 months after I started mine.

So when I found out about their case and was told that we had to merge the two, I did a venue analysis. I showed them that, "Hey, the venue's in D.C. It's not in Delaware. We need to work this in D.C." But, ultimately, I was overruled, and it was determined to send the case, join the two case together, and work everything under Delaware.

So it was at that time that we had learned that the FBI in Delaware were referring

to the Hunter Biden -- were referring to Hunter Biden and the case by the name "Sportsman."

So what were the potential issues I saw with working the case in Delaware?   We were working with a small U.S. Attorney's Office who might not have ever worked a case of this caliber.   Delaware was in the State in which the subject's father lived, and the family was extremely well-known throughout the State, including people on the team. And when I say team, the investigators and prosecutors on the team.

This was later evident by President Joe Biden -- well, he was formerly Vice President at that time -- having to come into the FBI office on an unrelated matter and it being joked with the team.

There's another issue where a magistrate judge in Delaware made an inappropriate comment at the signing of the first electronic search warrant that caused her to remove herself -- that caused her to recuse herself from the investigation.   This set us back an additional 4 months as we had to draft new warrants and redo investigative steps.

I want to correct the record on that and say that that's themself, so just so that we're clear on that.

This is a few of the many issues that we encountered with working the case out of Delaware.   But at the end of the day, I constantly remember telling myself and my co-case agent and my supervisor that these are issues, we have to deal with it -- that we have to deal with -- and there's nothing we can change.

Around the same time in 2019, I had emails being sent to me and the Hunter -- and the prosecutors on the case, the Hunter Biden prosecutors, from my IRS supervisor. So this was Matt Kutz still.

From what I was told by various people in my agency, my IRS supervisor, Matt

Kutz, created memos which he put in the investigative files regarding the investigation potentially violating the subject's Sixth Amendment rights.    He also referred to Donald Trump's tweets at the time.

I recall that at one point I had to go around my supervisor and ask his boss, ASAC George Murphy, to tell him to stop sending me and the Hunter Biden prosecution team these emails and that I was searching media articles on a weekly basis and was aware of everything being written in the media regarding the case.

So one of the first disagreements I recall between the IRS investigators and the prosecutors was the idea of going overt.    When we work criminal tax investigations, there's an IRS policy in place that we need to interview the subject within 30 days of elevating the investigation.

I would like to note that there are reasons why we might wait to interview the subject of an investigation, to include potential undercover work, active crimes continuing to occur, and other covert investigative steps.    But with tax cases, the evidence is typically historical, which allows us to go overt sooner, which is why this is stated in the IRM.

I thought this to be even more true about wanting to go overt, because at the time of starting the investigation Hunter Biden had unfiled returns for 2016 and '17 and had unpaid taxes for '15.    And I wanted to put Hunter Biden on notice in the event that he filed tax returns and potentially paid his taxes.

In a normal investigation, we would typically advise the subject of the criminal investigation, try to get a statement from them, try to get an understanding of why there were unfiled returns.    And it sort of puts us on notice -- or puts them on notice that the IRS is looking into them currently and then it kind of preserves the record in an essence.

I was overruled during multiple meetings almost to the point that I couldn't bring

it up anymore to the attorneys, and they would get visually upset with me. And I was continually being told that we had to stay covert to preserve potential evidence from the FBI side of the investigation. I even offered just IRS agents going forward in interviewing the subject, just, "Hey, we have a criminal tax investigation. We want to talk to you." But it was ultimately overruled.

So I can recall being assured by the AUSAs and DOJ Tax attorneys that we would still be fine with potential Spies evasion charges because other activities would be similar to us interviewing the subject, which included the Senate investigation at the time, as well as the Arkansas case related to Lunden Roberts.

So Spies evasion. Spies evasion is essentially when you have unfiled returns. So normally unfiled returns is a misdemeanor. Spies evasion is a felony. So it's essentially stating that they willfully evaded the requirement to file and/or pay their taxes, and there were overt acts present, that essentially that's the reason why they unfiled or didn't file the tax returns.

Mr. Zerbe. Spies is spelled S-p-i-e-s.

Mr. [redacted]. Thank you.

So we did not end up going overt and conducting interviews until after the 2020 election on December 8th, 2020, after I continually pushed the issue at various meetings.

So I wanted to continue on with this, my memory of events from May 2019 to December 8th, the date we went overt with the case.

So throughout that time period we were obtaining multiple electronic search warrants, so email accounts. There were QuickBooks accounts. There was a Dropbox. There was an Apple iCloud. There was the laptop.

And with Hunter Biden being an attorney, all of this information had to go through a lengthy review. So it had to go through a filter team, a filter AUSA. So they're

filtering out any attorney-client privilege documents. And then ultimately we on the team, on the investigative team, would get the documents to review for relevancy or nonrelevancy.

Throughout this entire time, we're getting these email search warrants. We're reviewing the records. We're working as a team. We're actually bringing in people to do the filter review.

Throughout all this time we're having biweekly meetings. At these biweekly meetings, I am continually bringing up that we need to go overt.

There came a point in time to where there were some bank reports out there that were going to get released, and they were going to include potentially the names of the investigators from the IRS and the FBI who received those bank reports.

So with that being released in the public, we're like it's going to out our investigation, so we need to come out and go overt with the tax case.

And I remember there were always times to where we were always on an impending election cycle. It was always the election being brought up.

In early 2020, it was the midterms. I think that Iowa was the very first one where we weren't sure what we were allowed to do or we weren't -- it was always wait and see. And then ultimately --

Mr. Zerbe. Correct. So when you say the midterms, you mean the caucuses and the primaries for the Presidential run?

Mr. [redacted]. Yeah. No, I'm sorry. I mean the -- exactly. I'm sorry. The primaries.

So we on our side were preparing for the day of action. We were trying to establish who were the witnesses we wanted to talk to, who were -- we wanted to do search warrants. We wanted to do search warrants of physical residences.

In a failure to file case, that's typically what you want to do, is search warrants. So get inside the house and get evidence related to the unfiled returns, see if they were trying to get their returns filed and just never ended up doing it.

We were always talking about those search warrants, talking about going overt. And it was always we need [to] go through the evidence. We need to go through all [of] the search warrant records. We need to make sure that we've kind of gone through everything before we go overt.

And we didn't agree with it. We pushed this up our management chain that we didn't agree with it.

Our leadership, so leadership within my office, my S-A-C, my SAC, she agreed that we needed to go overt, but at the end of the day they outweighed us on this.

One other thing I would like to note is September 4th, 2020, we had a conference call and [DOJ Tax and Delaware USAO] told us essentially that we were on pause from any overt activities or any activities that could be overt whatsoever. So we couldn’t -- we weren't allowed to issue subpoenas.

So I have an example of this -- so October 20th, 2020, right before the election, we're getting ready to go overt the week or two after the election. The election's in early November. We're getting ready to go overt after the election.

And we needed to do a walk-by to make sure where Hunter Biden lives. That's typical of our -- we would go in general clothes, walk by the residence, see what's going on, see if there's Secret Service.

And in an email to Mark Daly, one of the DOJ Tax attorneys, he says: "Tax does not approve. This will be on hold until further notice."

I have never in my career have had Tax Division, let alone approve us doing a walk-by or anything like this.

So my response to him was:   "I'm sure I'll get asked."   So this is October 20th, 2020.   "But can you ask for the reasons why, since I think this would still be a covert action, especially since the U.S. Attorney approved this?"

He says:   "Call when free."

And, ultimately, we never were able to do the walk by the residence until after the election.   And that's ultimately when we went overt and were able to do the activities that day on December 8th.

Another devastating blow came to the investigation when we lost one of the AUSAs to the private sector in early 2020.

Former AUSA Jamie McCall, who was a judge advocate for the Marine Corps, working primarily as a prosecutor, achieving the rank of captain in the Marine Corps, was a hardworking, no-nonsense kind of AUSA.

I always thought in talking with him that he wanted to do the right thing for the right reason.   He would constantly push the envelope, and it was apparent that he was following the evidence and not working to create roadblocks.   I firmly believe that his departure had a significant impact on the future of the investigation and the investigative steps.

So I plan on providing you some more assistance -- or some more instances in which the assigned prosecutors did not follow the ordinary process, where they slow-walked and put in unnecessary approvals.

This is obviously not all of them, but is a small set of examples.   I can recall [a] meeting prior to the 2020 election in September of 2020 when we were discussing [with the prosecutors] potential additional electronic search warrants and covert subpoenas related to the case.

One of the prosecutors suggested removing the subject's name from the request.

I said on that call that I didn't feel comfortable with removing the subject's name from any documents just based on what might or might not be approved, and I told them that I thought that that was unethical.

DOJ Tax Attorney Jack Morgan said that doing it without Hunter Biden's name would essentially get us most of what we were seeking. I have never been a part of an investigation where we talked [with the prosecutors] about even removing the subject's name from a subpoena, especially a covert subpoena.

Okay. So after the day of action on December 8th, 2020, the prosecutorial team met --

Mr. Zerbe. Explain "day of action."

Mr. [redacted]. Okay. Day of action was when we went and attempted to do interviews.

All along we were preparing for doing interviews. I had a list of probably 30 people and I tiered them. So it was Tier 1, Tier 2. And I had a proposal early on that said I want to go and talk to all these people.

It got whittled down to, I think, 10 people on the day of action, some of those people who we were only allowed to serve subpoenas and weren't allowed to talk to.

So that day of action happens. We go and talk to everyone.

So that night, December 8th, 2020, the prosecutorial team met on a phone call. During that phone call we talked about a storage unit that Hunter Biden vacated when he vacated his Washington, D.C., office and stored a lot of the items in there. That was uncovered through that day of action.

On the night, at the direction of Lesley Wolf, I prepared an affidavit in support of the search warrant for the storage unit. And I thought, in looking back at this, that these were pretty telling.

Mr. Zerbe. You need to be clear. Lesley Wolf, who was Lesley Wolf?

Mr. [redacted]. Lesley Wolf was the assistant United States attorney in Delaware.

I say to her on December 8th, 2020: "Sending the draft affidavit. I guess I'm happy we drafted this before. I kept the computer language in the warrant in case there are electronic devices."

So I'm going to move on to the next paragraph.

"We will work to get this approved ASAP on our end. So please communicate your thoughts. I would like to possibly execute this sometime next week. I think that is reasonable, given the upcoming holiday."

Her response to me, December 9th, was: "We are getting to work on this, but I want to manage expectations with you regarding timing. It has to go through us, DOJ Tax, possibly OEO, and definitely [Eastern District of Virginia] (EDVA), who has never seen the case before, layer in the filter requirements in the Fourth Circuit, and it's just not clear it's going to happen next week, even with everyone making it a priority."

So that tells me two things right there. That David Weiss wasn't really in charge. And it also tells me that I have never had a case [investigation] to where, if we needed to get records and preserve them, that we didn't do everything in our power to get a search warrant approved and get moving on that expeditiously.

So I guess with the storage unit -- we asked them to keep an eye on it and tell us if anyone went to it. But it was highly unusual that I'm being told that we couldn't even do it the following week.

So let me go back to this.

So after I sent -- after we sent each other these emails, it was ultimately decided by AUSA Lesley Wolf to not do the storage unit search warrant.

On a phone call with AUSA Lesley Wolf -- and this is just from my recollection, I

didn't document this in notes -- I told her that I completely disagreed with her and that we weren't following the appropriate investigative steps to get the stuff in the storage locker and that I thought that she might be acting inappropriately.

At the time AUSA Wolf asked me if we had problems working together now and if I had issues with her moving forward. I responded at the time that I didn't and that we could move forward.

After thinking about it further, I approached them with an idea, AUSA Wolf, and I said: What if we didn't tell Hunter Biden's counsel about the storage unit? He's been given a request for records. What if at the time that he's given for those requests for records he doesn't access the unit? And if he doesn't access the unit, we know he's not complying with that request. So if at the end of that time he doesn't access it, let's do a search warrant on it then. She told me she would think about it.

So I pushed this up to my leadership. I pushed it through my SSA. They all agreed with it. They thought it was a great idea. So they called David Weiss, the U.S. attorney in Delaware.

David said to them that -- they called it "█████ Plan." "Yes, that sounds like a great idea. Let's plan on doing that." That's what he told them from what I was told after that call, on the call with -- on that call.

So I find out a couple days later that, on a phone call from them, that AUSA Wolf and DOJ Tax Mark Daly called Hunter Biden's counsel and told them about the storage location and said that the request for records includes the stuff [in] there.

So they literally went around my back, my idea, around what we [had] already talked about, and did something completely different. And I guess it was at this point -- there were a lot of things that happened before this. But it was at this point for me that I started to believe that the attorneys with the Delaware U.S. Attorney's Office

and DOJ Tax were not acting appropriately, they were not following the appropriate investigative steps, and that we were not a part of the trajectory and/or the planning of the investigation as we normally are.

I can recall another situation in which investigative activities were being held up by unnecessary approvals and constant slow-walking.    In essence, they were not letting me do my investigative job.

So this is an email regarding requesting documents.    So I say:    "Attached are these document requests for interviews I'm planning to do that are out of town."

So I'm planning to do these interviews, and I send those document requests to them.

Lesley Wolf says to me on September 9th, 2021:    "I do not think that you are going to be able to do these interviews as planned.    The document requests require approval from Tax Division.    At present, Jack and Mark are racing to get the EWC motion on Stuart's desk" -- so Stuart was the [Acting] Deputy [Assistant] Attorney General, Stuart Goldberg at Tax Division -- "Stuart's desk for approval before he leaves town for a week.

"Along with the approval for the" -- and I'm going to leave the name out of that -- "both of these items are higher priority and we can't pull time and attention away to move these subpoenas through.

"Appreciate that are you always trying to stay active and do some travel before your end, but we will be able to get these interviews and document requests done when we have a little more breathing room."

My response to her, September 10th, 2021, was:    "Okay.    I had planned stuff like this for weeks in advance to prevent this from happening.    I had brought up these interviews on multiple occasions, dating back to August 18.    And now we are being prevented from doing it 4 days before.

"This is making it difficult for me to do my job.    I don't understand why DOJ Tax senior management is needing to approve every simple document request and/or witness interview, and maybe this is a conversation that needs to be had at a higher level.

"I can push these interviews off.    Just know that I'm trying to do as much as I can to plan and get the tasks handed down to me accomplished in a timely manner in an effort to ultimately finish the pros report.

"I discussed with Mark" -- Mark Daly, DOJ Tax attorney -- "that interviews we had planned for the end of the month should be a priority as they relate to a former employee, previous business partners, and some 2018 expenditures.    I will have those subpoenas for those interviews in California to the pros team by next week so we don't have this issue again."

And so, again -- end of the month I request [to the prosecutors that] subpoenas go out -- or I request document requests to go out -- to go out and travel.    And Mark Daly, DOJ Tax attorney, says in an email to me on September 20th -- and these were document requests relating to prostitutes that Hunter was paying.

He says in this:    "Subject:    Emails sent to management with list of ten document requests to be served."

And he says:    "Ask whether they object."

And I said:    "You are the man.    I will fill you in tomorrow on my issues.    I'm almost at the end of my rope, and I am sick of fighting to do what's right.    Can you send me the final version so I can send them?"

So this is me further stating -- what I see as further stating to them that I'm sick of fighting for always doing what's right.    There were so many situations, and these are just a few, to where I'm fighting to get document requests to go do interviews.    I'm fighting to -- and it's just all:    Let me think about it.    There's too many approvals to go get that

done.

And then not only was I having issues with the prosecutors on the case, but then I had issues internally within the IRS. And I had to go around my senior leadership to my director of field operations. So that's the fourth person above me.

He told me that I can come to him any time with issues on this case -- it's the director of field operations, his name is Mike Batdorf -- that I can come to him at any time and with any issues that I'm having.

And was raising issues all along with so many various people in my management about the slow-walking, the issues that we were having with doing interviews, with doing document requests.

I said to him, Mike Batdorf, on September 20th: "Again I hate to bother you with this. I'm almost at the end of my rope, and I think I'm at the point again where I need your help. I have a ton of interviews and travel planned and scheduled for the next 3 months. Keeping on a timeline is extremely important, and I don't want this to continue to be a problem. I don't mind the questions from management, but it feels like they are not listening to me."

That is a number one -- like the fact that management was not listening to me is an overarching theme regarding this investigation. It felt like they left me on an island.

Mr. Zerbe. Could you give the date of that email?

Mr. [redacted]. Yeah, September 20th, 2021.

Mr. Zerbe. Let me just pause there for a second because I want to be mindful of the chairman.

I would say, [redacted], that he's probably going -- you've probably got about another 15 minutes to go.

Mr. [redacted]. Yeah.

Mr. Zerbe. He's probably got 15 minutes to go in his opening statement, if that's all right, but we can also pause because I think you're going to get into the prosecutorial memo referral, which is kind of important, but kind of a natural break point.

So we're happy to keep going. We're happy to pause. And if the chairman's got any questions, because I know you're a busy fellow, we can do that, too. So you tell me how you want to --

MAJORITY COUNSEL 1. I think if you have 15 minutes, let's go ahead and finish that up.

Mr. Zerbe. Okay.

MAJORITY COUNSEL 1. And then we can take a short break.

Mr. Zerbe. Okay. Perfect.

Go ahead. I'm sorry.

Mr. [redacted]. Okay. I wanted to mention one more thing. I can recall wanting to interview and getting records from Hunter Biden's children and members of the Biden family. There were expenses paid for the children, as well as potential credit card expenditures and Venmo payments, that were deducted on the tax return.

On October 21st, 2021, AUSA Lesley Wolf told us it will get us into hot water if we interview the President's grandchildren. That was completely abnormal, out of the question. And it's a part of our normal process that we go and interview people, especially people who are receiving money or receiving payments related to a case like this.

So that's just another example of issues like that.

So in October of 2021, we had what was called a tax summit to where we all met together. When I say "we all," so the prosecutors, so Jack Morgan and Mark Daly from DOJ Tax, Lesley Wolf and Carly Hudson from the U.S. Attorney's Office in Delaware.

So at that time we decided what charges we were going to push forward in the prosecution report.   So we all made the decision on that we were going to move forward with 2014, 2015, 2016, 2017, 2018, and 2019.   And it would be felony counts related to 2014 and felony counts related to 2018.   That was the decision made at that time.

So I drafted the prosecution report.   I spent all Thanksgiving, around that time, drafting this massive report.   Our reports are a lot of evidence.   There's a lot of stuff that goes into it.

So in November [I] drafted the report.   It went up to our internal counsel.   So they're called Criminal Tax counsel.   Went up to our internal counsel.

They review it for legal issues, and they actually give a recommendation to our leadership on whether to move the case forward or not.   They basically give an approval or a declination.

All along they were telling me that that -- CT counsel attorney was telling me -- her name was Christy Steinbrunner -- we're good to go on these, I'm going to give you [a] green [light].   So green being that you're good to go on those years, and yellow, yellow being caution.   She was telling me that they were going to concur to it.   I was hearing that all along.

And they took almost -- more than 60 days on their review, which is more than they're allowed.   Took more than 60 days.   And in February of 2022 -- and I'm not going to get into the details of this -- they end up sending a nonconcur, so a declination for all of the tax years at hand.

And I asked -- I messaged the CT attorney, Christy Steinbrunner, and I go:   You told me that we were concur, that we were good to go.

And she said:   I always told you it was green -- or I always told you it was green

and yellow.

I have to look at what the statement says. But basically she told me what I stated in there, that it was a concur.

So that was one of the first times where I was like, well, gosh, now we have these issues with our U.S. Attorney's Office and DOJ Tax, and now I'm also having issues with CT counsel.

So our leadership ended up pushing that forward and ended up approving it and sending it to DOJ Tax in February or March of 2022.

So let me go to my notes here.

So February 25th, 2022, the IRS sent the prosecution report forward to DOJ Tax and the U.S. Attorney's Office. So in my report proper venue for the case was in D.C. and California. We had no venue in Delaware whatsoever for the tax charges.

I recall hearing --

Mr. Zerbe. And why is that?

Mr. [redacted]. So for failure to file charges, if there are failure to file charges, it's where the subject lives.

If it's a false return or if it's an evasion charge -- so if it's false return, it's where the return is prepared or sent from. If it's an evasion charge, it can be where the overt acts occurred. So for 2014 and 2015, venue was D.C. For 2016, '17, '18, and '19, the venue was in California.

On or about March 14th, 2022, they're now able to have what's called a taxpayer conference with defense counsel. That gives an opportunity for defense counsel to come in and present: Here are our defenses. Here's why we don't think that you have a case.

All the cases I've ever been a part of, they're afforded one. In this case I know

that they've had three.    With the most recent one, they've had four.    So that's high -- I have never heard of that in my career.

So they have the taxpayer conference.    On or about April 26th, 2022, they have a second taxpayer conference.    At that conference -- at that taxpayer conference they present defenses for 2014 and 2015.    We end up reinvestigating the case relating to 2014 and 2015.

I guess -- most importantly, I need to step back a second.

March of 2022, we are told -- I get a phone call that they are bringing the case forward to start -- I need to ask you a question about how I --

MAJORITY COUNSEL 2.    We can go off the record, please.

[Discussion off the record.]

[10:41 a.m.]

Mr. █████. Okay. So in March of 2022, we know that they are going to D.C. to open a case, okay?

So I'm told -- and this is from my recollection of conversations, and I do not have notes on this. As I am the case agent, we wouldn't typically take notes on this.

I am told that it was sent to the line attorneys in the D.C. U.S. Attorney's Office. They got my prosecution report, all the information that we had, and said, hey, we want to open up this case here. The line attorneys there said, here's the process. We'll get you guys going.

Two days later, I find out another meeting was -- so meanwhile, presenting the case to D.C. was something we asked for but was denied. We were not allowed to go there to present the case to D.C. We were all to rely on the attorneys to go and do that.

So in March -- or a couple days later after that meeting, I get a phone call. And this is -- from my recollection, from Mark Daly, the DOJ Tax attorney. And I think he was a little bit too forward with his information he gave me. But he basically said that now that the U.S. Attorney looked at the case, they don't want to move forward with it.

And essentially what he told me is that not only are they not going to join the case and give us assistance -- so give us another AUSA, give us someone to help there -- they also told our prosecutors that they don't think we have -- that we can -- or they don't think that we have the charges -- or not the ability, but the evidence for the charges to charge in D.C.

So not only was it a, no, we're not going to help you, but it was a, you shouldn't bring the charges here, essentially.

Mr. Zerbe. Can we go off the record?

MAJORITY COUNSEL 1. Off the record, please.

[Discussion off the record.]

MAJORITY COUNSEL 1. On the record.

Go ahead.

Mr. [redacted]. So the first impression from the D.C. U.S. Attorney's Office was, yeah, this all looks great. Here's the process. It didn't sound like they were going to move to say no to it. It sounded like, hey, the lower-level attorneys were like, whatever we need to do to get this going. And then it changed.

So, I mean, that was frustrating for me. But at the end of the day -- they're following this normal process that they call[ed] it.

So that all happened. So we're no longer talking about D.C. anymore. Now we have -- the defense is presented 2014, 2015, and I was having a lot of issues with the DOJ Tax attorneys and the AUSA regarding 2014 to 2015, because now they're doubting it. So what we ended up doing is reinvestigating all of it.

We ended up looking at the evidence, and we found emails that actually showed that Hunter Biden [had] planned [for] what happened that caused him to essentially evade his taxes for 2014. We presented this. We dug into it. We figured this all out. And hopefully after this, I can go through some of that for you guys.

But we dug through this all. And then we were like, we finally figured it out. This is why this happened. And it felt like the line attorneys weren't listening to us. They weren't following the evidence. They were saying, well, they provided this defense, so that's the way it has to be, versus us looking at it like, well, no, let's figure out the way that the evidence shows us.

So there was a heated argument between myself and Jack Morgan, the DOJ Tax attorney, where I said, I don't think you are looking at the evidence appropriately. You

are saying something completely different than what the evidence is showing.

And he asks another time, do we have a problem here, ███? Are you questioning my ethics? Are you questioning my integrity? Another argument like that.

So we ultimately ended up asking for a meeting with David Weiss, the U.S. Attorney in Delaware. We were afforded that. And at that same time -- so this is in mid-June -- we met with David Weiss and all the leadership. Including FBI, ASAC, SAC, all the people from FBI, and Stuart Goldberg, the [Acting Assistant Attorney General] of Tax Division. We all met in D.C. We were able to present on the findings regarding 2014, 2015, the case, and moving forward related to it.

We were constantly pushing David. We were pushing our leadership with -- I'm using the wrong word. We were reciting what the evidence showed. And I'll show you what the evidence was.

Ultimately, what happened is we have a meeting. A phone call. It's in early August. And we get a phone call, all the teams on it together. So AUSA Lesley Wolf, Carly Hudson, Jack Morgan, and Mark Daly, DOJ Tax.

And they say at that meeting that we are going to approve the recommendation of charges for the -- and this is from my recollection. They are going to approve the recommendation of charges for the 2017, 2018, and 2019 tax years and that the venue for those -- the appropriate venue for those is California. They were not approving 2014, 2015. And I don't remember if it included 2016. I can't remember that off the top of my head.

But I want to say that -- in an email from Mark Daly on August 18th, 2022, after this phone call, he basically said, we have three upcoming interviews, these three interviews for weeks in September. He says, in here, the week of September 19th, we may be conducting the case in two separate districts: Delaware, Los Angeles. And they

say for Los Angeles, they're going to intro the case and possible readback.    So that shows me that they're presenting the case out to California, they've approved the charges, and they're moving forward on it.

I want to say one more thing.    We also learned that they gave what's called discretion.    This is what I was told.    This is from my memory.    But that they didn't get full on approval.    They gave discretion to charge the case.    From my understanding with Tax Division, if they were to approve the charges, according to policy, California would have to charge the case.

So we have one last meeting with David Weiss, U.S. Attorney in Delaware, in early September -- it was either end of August, early September 2022 -- to talk about the 2014, 2015 tax year.    And at that meeting, David says to us -- and this is from my recollection -- that he agrees with us regarding the 2014, 2015 tax year.    They're great. Yes, we investigated it.    We figured it out.    But he has been getting concerns from DOJ Tax regarding the tax years because they viewed that, at a trial -- that it could affect the later years.    That the information regarding the subject's brother's death, the substance abuse -- that all those things could play a huge role and cause the jury to say essentially -- to have sympathy for him and to not convict on the charges.

At that time, David is telling us, well, I'm still weighing it.    I love the 2014, 2015. Essentially, I want to charge it.    And at that meeting, he tells us -- we ask him, when are we going to charge?    And he says, well, hopefully end of September.    It was kind of up in the air.

Then October 6th happens to where there's an article in -- I apologize.    So this gets into what happened and why we were ultimately removed.    So October 6th -- I believe is the date -- The Washington Post has an article.    In that article, it talks about this difference between the investigators and the prosecutors.

And there are statements that are made in there from Hunter Biden's counsel that basically is saying that we're not getting a -- we’re getting a biased view and that -- threatening us with criminal wrongdoing if this is being leaked to the media.

So October 6th, that article comes out. October 7th was the meeting with the leadership and David Weiss. And that's where those statements were made regarding David saying, I'm not the deciding official on whether charges are filed. He has no authority to charge in California, essentially, is what is told to me about that meeting.

After that article on October 6th, we have one more interview left. We're still talking with the AUSAs. They're still meeting with us.

October 12th, 2022, was the last investigative interview that we did. I had a phone call -- I think it was around the week of October 22nd. I have it in my notes over here.

But I had a phone call with AUSA Lesley Wolf, and she asked me for the significant case reporting that my manager sent up to [IRS] leadership. She asked this as a part of discovery. She didn’t ask for -- Five months prior to this, we turned over some discovery. It's highly unusual -- or I've never had it happen to where they've asked me for my manager's either emails or discovery.

And it was at that point that I believe things changed with them, and they saw some information in -- or I don't know what it was, but -- they request[ed] discovery to include emails from the team, but it also included emails and documents from supervisors.

And just so you know, that would be super unusual because -- imagine if the chief of our agency had to provide discovery in all the cases that we work. It just would be impossible.

Anyways. So, requests discovery. And then -- I'm sorry. We essentially get

removed from the investigation. So at that point, we are essentially removed.

So I sent an email on December 7th that says, "So I was informed by my SAC that the meeting scheduled for tomorrow needed to be canceled and that he will field updates from now on. Please confirm that this is correct and send out a meeting cancellation to the team." This is December 7th, 2022, to Mark Daly, DOJ Tax.

Mark responds December 8th. David -- meaning David Weiss, U.S. Attorney -- and Darrell -- Darrell Waldon, the SAC of IRS -- had been in conversation, and that's what they have decided. I will let the team know.

So we found out through talking with our SAC that the attorneys had found -- we were always asking for updates on charging. When are we going to charge? When are we going to charge? We were told that the prosecutors had found some emails that concerned them if they could actually charge the case. That's what they said to us.

So at that point, I'm just -- I'm shocked. And I'm like, you guys told me prior to this that these years are slam dunks. We were in a whole posture to charge. And then all of a sudden, they are saying this.

Continue to move forward to end of April. The media article comes out regarding the whistleblower, and I don't think it was maybe 2 weeks later.

Mr. Zerbe. Can we go off the record?

[Discussion off the record.]

MAJORITY COUNSEL 1. We'll go on the record.

Mr. [redacted]. I wish to close with one final thought. I think about all of this, the difficult and grinding path that I and my colleagues have had to take in this matter, and how best it could be avoided.

I humbly view my role here today and response to the committee's request was to provide the facts as I best understood them, and to let Congress, the administration, and

the public consider those facts and determine the best path forward.

However, for myself, as I reflect, it is not difficult not to believe that appointing a special counsel in this matter is the best way to go forward to give everyone confidence in the fairness of our tax system.

While the impression was that the U.S. Attorney in Delaware has essentially the powers of special counsel in this case, free rein to do as needed, as is clearly shown, this was not the case.    The U.S. Attorney in Delaware in our investigation was constantly hamstrung, limited, and marginalized by DOJ officials as well as other U.S. Attorneys.    I view that a special counsel for this case would have cut through the toughest problems that continues to make problems for this case.

I would ask Congress and the administration, after reviewing the facts, to consider a special counsel for this case as well as consider the appropriateness of this special counsel taking under their authority all the related cases and spin-off investigations that have come forward from this investigation, related cases that I believe are subject to the same problems and difficulties we had.

Lastly, I would encourage Congress and the administration to consider establishing an official channel for Federal investigators to pull the emergency cord and raise the issue of the appointment of a special counsel for consideration by your senior officials.

I do not want my colleagues at the IRS, FBI, and other Federal law enforcement agencies to go through my frustrating and disheartening journey.    I believe having such a path will strengthen the public's confidence in their institutions and the fair and equal treatment of the Americans under law.

MAJORITY COUNSEL 1.    Let's go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    We'll go back on the record.

And I'll turn it over to Chairman Smith to ask a few questions.

Chairman Smith. Thank you.

Thank you for your opening statement and getting us started, and thank you for your bravery as to what you stated to do the right things for the right reasons. We appreciate that.

A couple things that I want to talk about. Earlier, you said you sent an email just a few weeks ago to the Commissioner of the IRS. What was the email address that you sent the email to?

Mr. [redacted]. So I believe it was just Douglas -- I believe it was just his email that was in our directory --

Chairman Smith. I just wanted to clarify if it was the same email that I have for him. That's why I want to know if you could tell me what his email address that you sent --

Mr. Zerbe. Sure. We'll get it --

Mr. [redacted]. I don't have it with me, but I would need to go in my computer, and I can actually see the email.

Chairman Smith. Exactly. If you could get that to us, that would be helpful. Also, could you tell if that email had been opened?

Mr. [redacted]. I didn't put [a] read receipt on it.

Chairman Smith. Okay. Did you get a response from that email?

Mr. [redacted]. No, I did not.

Chairman Smith. Okay. In that email, did it ask for him to look at it with concerns of the case? What was the basis of the email?

Mr. [redacted]. Do you care if I read it?

Chairman Smith. Sure.

Mr. ██████. I actually -- if you don't mind, like, it was something --

Mr. Zerbe. Just to be clear, we're happy to share the email with you as well. It was kind of either bring material or don't bring material. So we had not wanted to --

Chairman Smith. Read the email for the record.

Mr. Zerbe. Yeah.

Mr. ██████. Okay. So it went to Douglas O'Donnell, [Deputy] Commissioner, Daniel Werfel, Commissioner, Jim Lee, chief of IRS CI, Guy Ficco, which is deputy chief, Michael Batdorf, who was the director of field operations, Kareem Carter, who was my special agent in charge, and Lola Watson, who was my assistant special agent in charge.

It says, "My respective IRS leadership, first off, I apologize for breaking the managerial chain of command, but the reason I am doing this is because I don't think my concerns and/or words are being relayed to your respective offices. I am requesting that you consider some of the issues at hand. I'm sure you are aware I was removed this week from a highly sensitive case out of the Delaware U.S. Attorney's Office after nearly 5 years of work. I was not afforded the opportunity of a phone call directly from my special agent in charge or assistant special agent in charge, even though this had been my investigation since the start."

And outside, I still have not received a phone call from my assistant special agent in charge or anyone in my IRS CI leadership other than my supervisor.

"I can't continue to explain how disappointed I am by the actions taken on behalf of our agency. I want to echo that I love my job, I love my agency, and I am extremely appreciative of the job and position that I've had over the last 13 years. There is a human impact to the decisions being made that no one in the government seems to care about or understand. I had opened this investigation in 2018, have spent thousands of hours on the case, worked to complete 95 percent of the investigation, have sacrificed

sleep, vacations, gray hairs, et cetera.   My husband and I, in identifying me as the case

agent, were both publicly outed and ridiculed on social media due to our sexual

orientation.   And to ultimately be removed for always trying to do the right thing is

unacceptable, in my opinion.

"Again, my leadership above my direct manager, who was also removed, didn't

give me the common courtesy of a phone call, did not afford me the opportunity of

understanding why this decision was made, and did not afford me an opportunity to

explain my case.   If this is how our leadership expects our leaders to lead, without

considering the human impact -- or without considering the human component, that is

just unacceptable, and you should be ashamed of yourselves.   I am continually asking

myself, is this the kind of culture we want within the IRS and that I want to be a part of?

For the last couple years, my SSA" -- supervisor -- "and I have tried to gain the attention of

our senior leadership about certain issues prevalent regarding this investigation.   I have

asked for countless meetings with our chief and deputy chief, often to be left on an island

and not heard from.   The lack of IRS CI senior leadership involvement in this

investigation is deeply troubling and unacceptable.   Rather than recognizing the need to

ensure close engagement and full support of the investigatory team in this extraordinarily

sensitive case, the response too often had been that we were isolated, even when I said

on multiple occasions that I wasn't being heard and that I thought I wasn't able to

perform my job adequately because of the actions of the U.S. Attorney's Office and

Department of Justice.

"My concerns were ignored by senior leadership.   The ultimate decision to

remove the investigatory team from Delaware, without actually talking with the

investigatory team, in my opinion, was a decision made not to side with the investigators,

but to side with the United States Attorney's Office and the Department of Justice, who

we have been saying for some time has been acting inappropriately. I appreciate your time and courtesy in reviewing this email. Again, I can only reiterate my love for my work at CI and great appreciation for my colleagues and a strong desire for CI to learn from and be strengthened by my difficult experience. I never thought in my career I'd have to write an email like this, but here I am. Thank you, again, for your consideration with me."

And that email did receive a response.

Mr. Zerbe. We'll go off the record.

[Discussion off the record.]

Chairman Smith. Back on the record.

Mr. [redacted]. On May 19th, 2023, Lola Watson wrote to me. On the subject line, it says, "Reminder: Chain of command."

"Good afternoon, Special Agent [redacted]. We acknowledge your email received yesterday morning. You have been told several times that you need to follow your chain of command. IRS Criminal Investigation maintains a chain of command for numerous reasons to include trying to stop unauthorized disclosures. Your email yesterday may have included potential grand jury material -- grand jury, a.k.a. 6(e) material -- in the subject line in contents of the email, and you included recipients that are not on that 6(e) list. In the future, please follow previous stated directives and this written directive that no information should be sent to the director of field operations, deputy chief, chief, or any other executive without being sent through my office or the SAC's office first."

Chairman Smith. The letter your counsel sent to the committee references your removal from the case. I think you know that on May 15th, 2023, a letter was sent to me and Ranking Member Neal by another whistleblower's counsel, noting that the entire investigative team had been removed from the case.

Can you confirm that you were removed from the case?

Mr. [redacted]. I can confirm that I have been removed from the case, yes.

Chairman Smith. How long had you been working on this investigation by the time you were removed?

Mr. [redacted]. Since November of 2018. So approximately 5 years.

Chairman Smith. Who informed you that you were being removed from the investigation?

Mr. [redacted]. I learned through my supervisor, Gary Shapley.

Chairman Smith. How were you informed that you were being removed from this investigation?

Mr. [redacted]. He told me -- Gary Shapley told me that he was removed and I was removed.

Chairman Smith. So it was by phone call?

Mr. [redacted]. Yes.

Chairman Smith. Have you ever been removed from an investigation prior to the one at issue here?

Mr. [redacted]. Can we go off the record for a second?

[Discussion off the record.]

MAJORITY COUNSEL 1. We can go back on the record.

Mr. [redacted]. So I want to be clear with this. Can I explain what happened?

The assistant special agent in charge, Lola Watson, sent Gary an email -- not me, Gary Shapley -- my supervisor an email saying that they want to have a call regarding Sportsman. So a Sportsman update call. Gary, not feeling comfortable with our leadership, asked me to be on that call as a witness. I was not invited on that call, but I participated via phone on that phone call.

And it was during that call that -- I overheard it, and they said that essentially the ITFC -- so our group was removed from the investigation, and they were going to replace us with some other agents within the D.C. Field Office that they didn't know the names of yet. There was no mention of, we need you to tell ███. No mention of me whatsoever. It was just that we were removed from the case.

Chairman Smith. Do you know who it was that said that on the call?

Mr. █████. That was Special Agent in Charge Kareem Carter.

Chairman Smith. Okay.

Mr. █████. And I can tell you that Supervisor Gary Shapley really challenged him with, you're not doing the right -- you're not making the right decision here. Really challenged him with, are you sure you want to make this decision? So --

Chairman Smith. And the individual that made that statement on the call, who was he employed by?

Mr. █████. The Internal Revenue Service.

Chairman Smith. The IRS?

Mr. █████. Yes.

Chairman Smith. Not the Department of Justice?

Mr. █████. Correct.

Chairman Smith. Who are his supervisors?

Mr. █████. His supervisor would be Mike Batdorf, director of field operations, for the IRS Criminal Investigation. And then above him would be Guy Ficco, deputy chief of IRS Criminal Investigation. And then above him would be our chief, Jim Lee, IRS Criminal Investigation.

Chairman Smith. And then who is above Jim Lee?

Mr. █████. The Deputy Commissioner, Daniel Werfel, and then Commissioner

Douglas O'Donnell.

Mr. Zerbe. To clarify that, that's the Deputy -- the Commissioner is Werfel.

Mr. █████. Yes. You're right. I'm sorry.

The Commissioner is Daniel Werfel. Deputy Commissioner is Douglas O'Donnell.

Chairman Smith. Have you ever been removed from an investigation prior to the one at issue here?

Mr. █████. No, I have not.

Chairman Smith. The May 15th letter notes that you and your team were informed that the change was at the request of the Department of Justice. Is that your understanding?

Mr. █████. Yes.

Chairman Smith. But it was the IRS employee that, on the phone call, said you were removed?

Mr. █████. Correct.

MAJORITY COUNSEL 1. Why do you believe it was the Department of Justice?

Mr. █████. I have a document I could go to, but I believe it's because he said it was at the Department of Justice's request. That's just from my recollection of what I heard.

Chairman Smith. If you have a document, that would be helpful.

Who was responsible for communicating your job duties and responsibilities?

Mr. █████. It would be my supervisor. My direct supervisor. So Gary Shapley.

Chairman Smith. Who has the ability to reduce or change your job duties and responsibilities?

Mr. █████. Anyone from my supervisor all the way up to -- it could be anyone in

that chain of command.

Chairman Smith. Could Commissioner Werfel have any responsibilities and direction of any of his employees at the IRS?

Mr. [redacted]. That, I don't --

Mr. Zerbe. Let me rephrase the question.

I think, Chairman, you're asking, would the Commissioner have the authority to assign or reassign your duties if he chose to do so?

Mr. [redacted]. That was the purpose of my email, was to make him aware of what happened. And I thought that he was -- I'll give you an example.

With a chief executive officer at a company, you would think that they're in charge of everything that happens within their company. So that was where my thoughts were, is that if I'm having difficulty with my chain of command -- my leadership that I've gone to for so long on this case -- I had to go above them. That was my thought.

Chairman Smith. You've been an IRS employee how long?

Mr. [redacted]. 13 years.

Chairman Smith. 13 years.

And do you view the Commissioner of the IRS as the top of the chain of command?

Mr. [redacted]. So I think that Janet Yellen out of the Treasury, since we're under the Department of Treasury, would be above that, but --

Mr. Zerbe. Right. Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. [redacted]. Yeah. I would think that the Commissioner is in charge of the IRS.

Chairman Smith. And of all of the 80,000-plus employees of the IRS?

Mr. [redacted]. Yes.

Chairman Smith. Who do you believe is responsible for your removal from the case team?

Mr. [redacted]. This is my opinion based on my observations and everything that I've seen so far. It would be -- Department of Justice Tax would have been involved, so Mark Daly and Jack Morgan. I think that Stuart Goldberg also would have had some say in this, who is the deputy attorney general for Tax Division. And then David Weiss and the people that were part of the U.S. Attorney's Office, so Lesley Wolf and Carly Hudson. I would say that those people had some say.

Chairman Smith. Is there anyone else at the IRS that we should talk to to fully understand how this decision was made?

Mr. [redacted]. It would be the special agent in charge, Kareem Carter. And I think it's important that, on that phone call, we asked for a reason why and weren't given that.

Chairman Smith. Have you been given a reason yet to this day?

Mr. [redacted]. No, we have not. And I can tell you in my normal course of investigations I work, why an agent would be removed is for conduct. So if they did something wrong. But I've never seen it to where they would remove from a supervisor down -- anything like that ever.

Chairman Smith. How many people were removed from this team?

Mr. [redacted]. So from the way that it was phrased on the phone call, it was my supervisor and our International Tax and Financial Crimes group. So there's 12 people total in our group.

Chairman Smith. So 12 people were removed counting the supervisor?

Mr. [redacted]. It would be 13 counting the supervisor. But that's just me going off of my recollection. It's around that figure.

Chairman Smith. Okay. One other thing that I want to just touch on that's a little bit different than this, in your opening statement, you were talking about an individual that made the statement to you saying that the President's grandchildren, you should not interview? What was that?

Mr. ████. Yeah. So -- yeah. So AUSA Lesley Wolf -- and this was in quotes, so this must have been something that my -- so I also want to be clear on something else. Normally in an investigation, if we're having a meeting or whatnot, we would take notes, investigative notes, but there really isn't much that goes into those notes in a meeting. And I didn't think I would need to document things that were being said during those meetings.

But at this time, after discussions we were having internally, my supervisor felt it necessary when some of the inappropriate comments that were being made -- to start documenting them.

So, yeah, it says in quotes, "will get us into a lot of hot water if we interview the President's grandchildren." And I don't remember what ultimately happened with the grandchildren. I know I have never interviewed them, and we have not interviewed them.

Chairman Smith. And who was it that said that?

Mr. ████. AUSA Lesley Wolf.

Chairman Smith. Was it common when talking about this case to talk about how the President felt?

Mr. ████. No, not how the President felt. No, I don't think so.

Chairman Smith. Or to even refer to it as the President's son or the President's grandchildren?

Mr. ████. Yeah, I think there were times where we did refer to them as the

President's grandchildren, yes. Like, for example, for James Biden, we would call him the uncle. So that's how we referred to him, as the uncle.

Mr. Zerbe. Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. [redacted]. There were a lot of times to where they would discuss the election or discuss politics, and I had to say, on multiple occasions, that I felt that it was inappropriate that they were saying it. And there were things that would come up. For example -- even though there were smaller transaction amounts -- there were Venmo transactions that were paid to family and friends. And some of these Venmo transactions were deducted.

So I continually asked, Can I go and interview them? And can we understand what these payments were for? If they made other payments? And those were always met with no. And I think one of them was Valerie Owens that we talked about that I wasn't allowed to go and do that interview. I believe that Valerie is a relative of Joe Biden. It might be his sister. I don't -- all I know is she's a relative of his.

Yeah. So standard practice is -- for any transaction, you want to go out -- and a lot of our job is hitting the pavement, going out and talking to people. There was a lot of different investigative steps that we took, that even going and talking to the prostitutes, we found multiple people that he called his employees that were also prostitutes, and that he would have them clean his hotel room or -- there were a lot of these interviews that we ended up going and doing and talking to people that were so worth it, even though someone might -- we were always being told by the prosecutors, you guys are wasting your time going and doing that. It's not worth it. And literally, I would surprise them every time and find everyone.

Chairman Smith. Thank you.

Mr. Zerbe. Thank you.

Mr. [redacted]. Thank you.

BY MAJORITY COUNSEL 1:

Q So to follow up on some of the chairman's questions, you mentioned Kareem Carter as the person who made the statement on the phone call about the removal of the team. Is that right?

A Yes.

Q And you mentioned the chain of command up from there.

Do you know whether anyone else in that chain of command was aware of this decision?

A I do not know that. I think they are after my email.

Q Understood.

But you don't know prior to that?

A Yeah. And to be completely candid with you, I was talking with my -- I essentially wanted to have a meeting or a sit-down and explain to -- now above all my leadership -- because at the end of the day, I don't think we would be sitting here right now if us as agents -- myself and the co-case agent and Gary -- were afforded the opportunity to sit down with our chief or deputy chief to explain to them, hey, guys, here's the problems we're encountering. Here's the meeting that [we] just had. What do we do to fix this? Because we're the IRS. They're Department of Justice.

Obviously, we refer the case to them to prosecute, but if we feel that something is going wrong with it, they should be there to help us through those problems, not putting their head down and not listening to us.

Q So you mentioned Michael Batdorf and that he had told you previously that

you could go directly to him.    Is that right?

A      Yes.

Q      Did you do that at the stage where you learned that you were removed?

A      I did not.

Q      Okay.    Did you feel like you could talk to him about this issue?

A      No, because I've been having other issues with him on another case I'm working that is -- I felt like that chain of -- that that relationship was broken.

Q      When did that relationship start to break down?

A      Probably since mid-October, maybe, would be my guess.    I mean, it's -- yeah.    It's definitely --

Q      Mid-October 2022?

A      Yes.

Q      And you mentioned issues you were having with him on another case.    It's totally fine if you don't want to get into the specifics of that particular case, but can you generally describe the issues that you're referring to?

A      Yeah.    I need to stay very, very high level on this.

I had received approval with a strategy related to this case.    And they backtracked that approval a couple weeks later and said to me that we need to put this on pause and that we'll get back to you on what strategy we're going to do moving forward.    And we're still on a pause right now.

MAJORITY COUNSEL 1.    Can we go off the record real quick?

[Discussion off the record.]

MAJORITY COUNSEL 1.    We're back on the record.

BY MAJORITY COUNSEL 1:

Q      We were talking about the approval on the strategy for this other case.

And just to clarify, this is a totally unrelated matter?

A       Unrelated matter, yes.

Q       Okay.    And can you describe more about what happened to that strategy?

A       It felt like it was -- all along, we had been -- for the past probably year, we had been communicating a strategy on this case that is tackling a big problem and trying to tackle it efficiently, okay?    And it's a compliance issue in this area.

So we were briefing our [IRS] leaders and constantly having meetings about what we're planning on doing, and they were on all [of] these phone calls, and we were sending emails of our strategy.    And very recently, one of those strategies was moving forward on this compliance issue, and we were a go on it.

And a few weeks later, I receive[d] a phone call that basically says, you're being paused, and we're having to relook at what you were doing, and we will make a determination moving forward.

So now, to all my peers and the different people, I was the one pushing the strategy, and it got halted in place, and now I have to go back to [these] people and explain to them why -- it was just a mess.    It was an absolute mess.

Q       When did you get that phone call saying that you were being paused?

A       It was in February of 2023.    It was either a phone call or an email.

Q       And have you been able to proceed since then, or do you remain paused?

A       On that specific aspect of that investigation, as of right now, yes, we're still on a pause.

Q       So other than the removal from the case team, are there any other issues that have come to your attention that give you concern about possible retaliation?

A       Yeah.    So when I say there's a lot of this -- I sent an email on April 13, 2023, to Lola Watson, my assistant special agent in charge.    And I said, "So I want to put" -- [at

this point] we're still on the Hunter Biden investigation.

And I say, "So I want to put some stuff in front of you regarding updates I am hearing on the Sportsman, et al investigation, that I am not hearing through you or Kareem" -- Kareem Carter being the SAC -- "which is concerning to me. I don't think that you or Kareem have any reason to keep things from me, but I wanted to make you both aware of some of these updates."

And some of these updates were Hunter Biden's counsel meeting with DOJ Tax -- or meeting with Main DOJ at the end of the month, which I viewed as a significant update that I hadn't heard through them. Because remember that previous email, all communication was now [to go] through David Weiss and the SAC.

It also says here, "I have heard that David Weiss is currently asking for a pros memo" -- prosecution memo -- "from DOJ Tax approving the tax charges. I would consider this a significant update since indicating that David is seeking the charging authority."

And then there's other related investigative questions that I had, but I thought that this was another email in the chain that was, like, no one’s -- we were essentially removed since --

Q So this is prior to what we could call formal removal in May 2023. Is that right?

A Yes.

Q So at this time, you were still officially on the case. Is that right?

A Yes.

Q Okay. Is it your testimony that, although you hadn’t been formally removed, you felt that you had been cut out of the case prior to that?

A Yes. Absolutely.

Q Okay. And when did you first feel that you were cut out of the case?

A It most likely would have been at the end of October. When they requested my discovery so that -- the significant case reporting and the emails from my supervisor. That was when I felt that the -- or I didn't feel. I thought that the posture changed with our relationship.

[Discussion off the record.]

Mr. ████. We're back on the record?

MAJORITY COUNSEL 1. Yeah.

Mr. ████. So October 6th was the Post article. And I remember hearing from them that that touched super close to the investigation and that they felt that [it] was information that's coming [from] inside the investigation.

All along, all up until this point, we would constantly be on the forefront of, Hey, any media updates? What's going on? On our weekly calls, we would always discuss media.

Prior to this, there were other leaks. After our day of action in December of 2020, we got word that a couple of the news sources were going to release an article on the investigation. This was a couple days prior to us going public -- going overt.

So that leak happened, and nothing changed after that one. And everything indicated, even in communication in meetings from what I recall -- we thought that the leak was potentially from someone in [the] Department of Justice. So we would constantly be talking about, yeah, it's not an IRS person. It's not anyone on the team. It's always -- it appeared like it was someone from Department of Justice. So that's what kind of shocked me with this moving forward.

I was interviewed by an investigator -- I think they were with TIGTA. I told them, I didn't leak anything. I thought that the leak might have come from either defense

counsel, or from DOJ like the other ones came. But what I can tell you, and I've told this to the prosecution team, I've done everything that I can to keep my record clean and to keep my ability to testify as the case agent as clean as I possibly can.

And it honestly -- it hurt. It hurt that these are people I talked with on a daily basis. And even after the investigators came and I told them that I didn't leak the information, it was a complete shutoff of talking.

So it was end of January, early February, I am told about a meeting that is held with FBI only. There's no IRS people there. And it's regarding some of the spin-off investigations. And one of the former forensic accountants who was on the case was a part of that meeting. So they were moving on with some of our other spin-offs.

We had other tax spin-off investigations that were completely stopped. We haven't done anything on those since. But yet they were moving on those other ones. But we were not there.

BY MAJORITY COUNSEL 1:

Q And is that atypical?

A Yes. Normally, we would have been invited, especially because those other spin-off cases -- one of them has a tax component to it.

Q And the timing of that was late January, early February 2023? Is that right?

A Yes.

Q Okay.

A I did hear from FBI that they were being treated the exact same way -- that they had to communicate through their SAC to the U.S. Attorney in Delaware.

Q Can you tell us who you heard that from?

A So I could -- so her name -- I'm not meaning to be -- so it's Michelle Hoffman. I know she's a career employee there. I would ask that if her name could be redacted,

that we redact it.

Q    Understood.

A    But I don't want -- because she's not someone that would want to be brought into something like this.    She has a career.

Q    Understood.

Taking a step back on the issue of spin-offs, how would it typically work if you were working a large case and you learn of other information that leads you to think you need to investigate a spin-off in another issue?    What kind of process would normally play out?

A    So the process is a little bit different because we're with this international tax group.    We can work cases anywhere.    So the venue for the stuff we work really doesn't matter.

But typically within our agency, if we have a spin-off and there's -- there were other spin-offs in this case that we spun off the information to another IRS office.    So we actually met with them.    We sat down.    Here's the evidence.    And then they took the case on after that.

But the ones that I held closely in this case were ones that were in the area of where we were working this case, and they were -- it was information -- they were current investigations I was conducting.

Q    So the nature of these specific spin-offs would typically involve your international tax group --

A    Yes.

Q    -- on a going-forward basis?

A    Yep.

Q    Okay.    So after October 2022, any other concerns or instances that might

be considered retaliation that you have?

A None that I can think of.

[Discussion off the record.]

Mr. [redacted]. Could I say something else real quick?

MAJORITY COUNSEL 2. Of course.

Mr. [redacted]. So what's kind of the most shocking to me is that we were on the trajectory of charging the case. And we literally finished our investigative steps. The pros memo from Department of Justice Tax was written. I had worked with the -- they call it a third-party person who reviewed the case. I had discussions with him. And in all reality, we were looking towards indicting.

And to hear from the DOJ Tax people -- they weren't sure whether David was going to able to sign the indictment alone or whether it would have to be David and the U.S. Attorney in that area.

And now, I've come to learn through everything that David couldn't sign an indictment that's out of district. He had to have that U.S. Attorney there. That's what my understanding is, at least. And I've come later to hear -- through multiple people, that California also said no.

So now you have -- and that's another frustrating part was we asked to present this after we found this new information related to 2014 and 2015 to D.C. We wanted to present the case, the facts. And we were not afforded that. We wanted to do the same thing to California. And we were not afforded that. It was always, we'll handle it.

And this is very atypical. Up until October, we were very involved with -- here's the evidence. Here -- helping them out through their writing of their pros memo.

BY MAJORITY COUNSEL 2:

Q Can we just break down each of the years involved and help us understand

how much money is at stake?

    A    Yes.

    Q    Starting with 2014?

    A    Okay.    So 2014 -- it would have been false return and evasion of assessment that we were looking into.    So 7206(1) -- Title 26, [U.S.C. Section] 7206(1), and Title 26, [U.S.C. Section] 7201.    I'm going to go through the charges, and then I can go through them by year, if that's okay.

    Q    Okay.

    A    And then 2015, we proposed charges for Title 26 United States Code [Section] 7203, failure to timely pay tax.

Tax year 2016 was, again, [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2017 was [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2018 was [Title 26, U.S.C. Section] 7201, evasion of assessment and payment; [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax; and [Title 26, U.S.C. Section] 7206(1), false return.

So just to be clear, failure to timely file and pay tax -- that's a misdemeanor.    And false return -- false return and evasion are felonies.    So false return is basically that an item you report on your return is false.    So it's a little bit different than the elements for evasion, but it is essentially the same thing.

And then 2019 was failure to timely file and pay.

So Hunter Biden had had a lot of tax issues, even predating all of this stuff.    Back in 2002, he filed his Form 1040 late-filing and owing over $100,000 in taxes; 2003, owed more than $100,000 dollars in taxes; 2004, late-filed and owed more than $20,000 in taxes; and then 2005, late filed his personal return and owed over $100,000 in taxes.

[11:47 a.m.]

Mr. [redacted]. So he had a history of tax issues.

So those tax issues is why he asked for Eric Schwerin to be his finance accounting person. So that happens in 2006, 2007, because of the issues that Hunter was having with his taxes.

So Eric Schwerin actually creates an entity called Owasco P.C., which was a C Corp. And so the problem that Hunter was having was he was receiving a lot of [Form] 1099 income. So that [Form] 1099 income wasn't having any taxes withheld. So that's why he was owing a ton of money when it came to filing his returns.

So he created this C Corporation. The C Corporation would take in this 1099 income, and it would pay him a salary in W-2 wages. So Eric Schwerin sets that up.

BY MAJORITY COUNSEL 2:

Q Do you know what he was doing to earn the money?

A At that time I believe it was legal work. I don't remember off the top of my head. But I know that he worked for a law firm for a period of time. Oldaker Biden -- my memory is not the best on that. I do know it was for legal services.

Moving forward -- and the reason why this was so important is -- for 2014, so he enters into this Burisma contract. And the Burisma contract is with him and Devon Archer. So they were earning a million dollars a year, both of them, for being put on this board. And essentially Archer was put on the board one month before Hunter was. So as a part of getting on that board, Hunter sends an email to Devon Archer, stating here's my plan for how we're going to pay -- or here's our plan for what we're going to do with this million dollars.

At that time Devon Archer and Hunter Biden were also looking into this Bohai

Harvest investment. There was about a million dollars that they had to put forward. Hunter didn't have the money to put that forward. So Devon was, like, why don't I take part of the Burisma money. We can pay another part of it to you and then half of it will go into the investment in this Chinese company.

So [Hunter Biden] sets this out in this email and what ends up happening is -- so imagine this. If you are an owner of a company and your friend tells you that, I want to pay my wages to your company and you're going to loan the money back to me, that's essentially what happened here. He took loans from that corporation -- which were distributions. And he didn't pay taxes on those loans.

So what we had found is that -- can I pause for a second?

MAJORITY COUNSEL 2. Off the record.

[Discussion off the record.]

Mr. █████. Back on the record?

BY MAJORITY COUNSEL 2:

Q Yes.

A All right. So essentially for 2014, we had found that Hunter didn't report any of the money he earned from Burisma.

So the reason why this is important is because Hunter set it up this way, to not -- to essentially earn the money through his friend's corporation and then have his friend pay him back half of the money as loans, quote, unquote, loans. So --

Q How much in tax liability are we talking about here?

A Okay. So -- no, these are the -- oh, you printed it up.

Mr. Zerbe. Yeah, I --

Mr. █████. Okay. So -- the most conservative approach would have been $124,845 in tax loss. So this would have --

Mr. Zerbe. For what year?

Mr. [redacted]. For 2014.

So this would include payments that he would have received directly from Rosemont Seneca Bohai, so $315,000, payments that were made by the Rosemont Seneca Bohai entity by Archer for Sportsman or for Hunter's benefit, so $4,500 that was paid to a medical bill, and then another medical bill of $6,000. So that's the most conservative approach.

In addition to this, we had a Porsche that was purchased through Rosemont Seneca Bohai that was for Hunter's benefit. That was from Novartus holdings which is Kegnes Rakishev. Kegnes Rakishev is a Kazakhstan official or a Kazakhstan person.

And from what we were told, this was paid for Hunter to build a Tesla dealership in Kazakhstan. I took it to be that it was for future business that the two of them might have together. But the --

BY MAJORITY COUNSEL 2:

Q So none of this was taxed.

A None of it was taxed.

Q And to date none of it has been paid or prosecuted.

A So none of this has been paid or prosecuted.

And I would also like to note that the statute has run out on these tax years or on the 2014 tax year.

Q Okay.

A They were extending that statute up until December of --

Q It's a 6-year statute?

A Yes. They were extending that statute -- he was signing statute extensions. And from the best of my knowledge, he never continued to sign those. And I do not, as I

know it today, that the 2014 tax year, the statute's gone. I have brought up that --

Mr. Zerbe. Right. Go ahead.

Mr. ████. I have brought up that if we went based on an evasion theory, that he evaded these taxes -- so one more step to this is Hunter to his counsel told them about this scheme.

So basically said -- Devon Archer was handling the taxes and I was taking some of the money as loans.

So there's documentation of this and the date, everything. So we viewed that as he's lying to his attorney. He's telling his attorney exactly what happened, and he's trying to cover it up. But ultimately it gets found out, and then Eric Schwerin ends up investigating it and figures out that, hey, you didn't report this money. You need to file an amended return.

It's actually included on the marital separation agreement this tax due and owing related to this unfiled or related to this amended tax return.

So they actually were preparing and trying to file the [amended] returns. We have found out that Hunter might have received advice that if you don't have the money to pay your taxes, then you don't have to -- then I wouldn't file your tax return or that amended tax return.

BY MAJORITY COUNSEL 2:

Q Okay. Under what conceivable theory did DOJ not find that to be worthwhile to prosecute?

A They believed -- they believed the fact that the -- they believed their defense that the money was a loan and that -- so through our investigation we did find out that --

Q What did they contend it was a loan for?

A Well, that was our argument, that you can't loan yourself your own money.

It just doesn't make any sense.   So --

Q    I mean, this just seems to be a series of sham transactions, correct?

A    So, yes, I would agree that the transactions would -- you would want to sham the transactions, yes.

I do know that, there were some issues prevalent that were brought up related to Devon Archer and his credibility.   So, also having a potential witness there, was also a problem.

But I offered, well, why don't you have the agent testify to this email?   The email's pretty clear in what he's setting out here.   Why doesn't an agent testify to this?

Q    At least with respect to the Burisma income --

A    Okay.

Q    -- he's getting a million dollars a year.   It started at least part of the way through 2014.   Okay.   So maybe it's 600 and --

A    So it's $666,667.

Q    Okay.   So he received 600 -- you know, north of $660,000 for serving on the Burisma board by all accounts for doing nothing.   And that money completely escaped taxation, correct?

A    A portion of it was taxed.   The reason why a portion of it was taxed -- and I don't want to get into the details.   But the money held in the account that was going towards investments, so the half that was going for that Bohai Harvest investment, that half, because there was no offsetting expense, would have been taxed.

Q    Okay.

A    Does that make sense?

Q    Okay.   Yes.

A    Because there was no offsetting expense, he wasn't deducting the payments

he's making, so Archer wasn't deducting the payments he's making on the return, that money would have been taxed. So that money Archer would have paid some taxes over for about half of it.

Q Okay.

A That's why in our theory our most conservative approach would have been half the money.

Q Okay. Okay. What can you tell us about 2015?

A Okay. So for --

Q He's getting a million dollars from Burisma in 2015, correct?

Mr. Zerbe. Excuse me. I want to make sure.

MAJORITY COUNSEL 2. We're off the record here.

[Discussion off the record.]

MAJORITY COUNSEL 2. Okay. We're back on the record.

Mr. [redacted]. So 2014 and 2015 are interrelated because this is -- during 2014 and 2015, Hunter is having his [Burisma] payments paid to Rosemont Seneca Bohai. So essentially what happens in 2015, the amount of taxes he owes at the end of the year, which I'm going to explain in a second, is because of what happened in 2014, because of this setup.

But what he brought up that I wanted to reiterate is the 2014-2015 tax year can still be in play.

And so what ended up happening is we were assigning statute extensions. We were having these meetings on the 2014-2015 tax year. And I believe that from what happened is, because D.C. said no, they have since let that statute run. So they no longer asked for statute extensions.

I never got ahold of those statute extensions. I don't know what they look like.

But what I could say is, if we had a neutral person come in here, in explaining my theory that in an evasion case, it's your last affirmative act. If there are affirmative acts which [I believe] there are within the last 6 years, then we could potentially work that tax year.

Mr. Zerbe. And you use affirmative acts.

Mr. [redacted]. I believe that there could be but I'd have to look at -- I would argue that there could be. And then that being the meeting that he had with his attorneys where he basically tells them what happened and I view that as a lie, because what he did was actually different than what happened.

BY MAJORITY COUNSEL 2:

Q Okay.

A So 2015?

Q 2015.

A All right. So in early 2016, Hunter and Devon Archer receive a document request related to Devon Archer's Tribal bonds scheme. So that document requests from Hunter.

So Eric Schwerin says: What's this Rosemont Seneca Bohai entity? You always told me that you had it taken care of.

So Eric Schwerin starts investigating it. Starts investigating it in March and April. Eric realizes that the [Burisma] money from 2014 wasn't reported. So they need to report that, the money that Rosemont Seneca Bohai is earning, [on Hunter's] 2015 [tax extension].

So on the extension they include income from Burisma. They pay a large amount of money with the extension. And when the return is filed, Hunter owes, with this 2015 filing, so October 15, 2016, he owes $176,550 with no payment. So at the time of filing, it's that amount.

In May of 2017, Hunter starts a self-imposed $10,000-dollar-a-month payment plan, making seven payments of $10,000 over the period May of 2017 through March of 2018, and then stops.

So our theory was with our case was that the amount that he owed after that payment plan stopped would be the most conservative amount.    So it would be $100,675.

But you could argue that the actual amount that he reported when he filed his return and did not pay $176,000, that that would be the tax amount [charged].

BY MAJORITY COUNSEL 2:

Q    Okay.

A    And that amount has been paid.    That amount has since been paid.

Q    The $176,000?

A    The amount that was owed for the 2015 tax year, yes.

Q    Okay.    And what was that amount?

A    It was over $100,000.    So it was including penalties and interest.

Q    So 2015's off the table now?

A    2015, yes, 2015 would be off the table because it followed the 2014 tax year. So that was D.C.

Q    Okay.    When you sought to get this prosecuted in D.C., what year was that for?

A    2015.

Can you ask the question again.    I'm sorry.

Q    Well, if you say 2015 has been paid --

A    Oh, so --

Q    I'm just trying to reconcile.    You said 2015 has been paid.

A     Yeah, so --

Q     But 2015 was also sent to the U.S. Attorney's Office in D.C. for prosecution.

A     With a willful failure to timely file and pay [charge] --

Q     Uh-huh.

A     -- the statute is that the taxes are owed.

And even if you pay them after --

Q     Uh-huh.

A     -- the crime still --

Q     Okay.

A     -- occurred.

Q     Okay.    Fair enough.

A     Yes.    2014 and 2015 in D.C.

Q     Okay.    And then what can you tell us about 2016?

A     Okay.    For 2016, there's quite a few things.    So --

Q     Is this D.C. or California, 2016?

A     2016, he didn't file his personal return.    But he did file his C Corp return.

Q     Okay.

A     So he filed one of them but didn't file the other.

And on the personal return, he didn't report payments he received, personal payments he received from Rob Walker.

Q     Uh-huh.

A     So it was $162,179, which would have given additional tax due and owing of $69,000.

Q     Okay.

A     But those payments, there was a reliance issue with that.    He had told this

or Eric Schwerin had told his accountants about those payments -- or the receipt of that money, in the beginning of the year, the [accountants] dropped it off later.   So we knew that there was going to be an issue with that.

So the only thing on the table for that year was the failure to timely file and pay the taxes for his personal return --

Q    Okay.

A    -- which would have been $45,661 that he filed with -- when his [Form] 1040 was [filed] --

Q    Okay.   And how about 2017?

A    Could I say some other stuff regarding 2016 --

Q    Okay.

A    -- real quick?   During the fall of 2017, Eric Schwerin and his accountant, Bill Morgan -- and I have to say that Bill Morgan has since passed away.   He died in 2019. But that was his accountant.

Both made a significant effort in getting Hunter -- in getting the prepared returns to Hunter.   They sent multiple emails to Hunter and even a package with the returns, ready to go in his office.   All he had to do was sign it and mail it in.

In an email from Hunter to Eric Schwerin on November 17, 2017, he says:   "Also, I just saw last week the unmarked envelope in the office requiring signature for my taxes."

This email further confirms that Hunter received the 2016 tax returns but failed to file them timely with the IRS.

And the venue for that would have been California.

Q    Is that because he moved to California?

A    With the failure to file, it would have been where you lived.   I'd have to

look back in my notes.    But this one also could be D.C. or California.

Q    Okay.    When did he move to California?    Do you know?

A    I know he officially moved April 1st, on or about April 1st, 2018.

Q    2017?

A    Yes.

Failure to timely file and to pay taxes owed when -- so this is for both his corporate and personal returns.

Q    Uh-huh.

A    The taxes owed when he filed his Form 1120 was $13,630.    I don't believe that those taxes have since been paid but -- to the best of my knowledge I don't believe that the corporate taxes, that small amount has been paid.

Q    Okay.

A    And then for his personal return, failure to timely file and pay his taxes owed when his Form 1040 was filed, $581,713.

Q    So half a million dollars.

A    Yep.    And that has been paid and that is through, which it's in the media, is through Kevin Morris paid that.

Q    When was that paid?

A    That was paid in and around October of 2020 or October 2021 -- I apologize -- 2021.

Q    Okay.    How about 2018?

A    All right.    So 2018 was the false return year, but then you also have failure to timely file and pay because these are the returns that were filed late.

So what ended up happening is Hunter goes out to California in 2018.    In his book he's talking about substance abuse and drug use and all these different --

prostitution --prostitution use and all this different type of stuff.

So in 2019, he marries his wife, Melissa Biden, Cohen-Biden.    And he is newly sober.    At that same time, I believe there's also a Senate investigation, and he also is having the Arkansas child support payment case.    And then at that same time he also had the ex-wife that he was in breach of the marital separation agreement.    So he has all these things coming to a head.

And it's not until November of 2020 -- let me go back to the first page.    It's not until November of 2019 -- I apologize -- 2019 that he hires Edward White & Company as his new accountants.    So he hires Edward White.    They're out in California.    And the reason why is the judge in the Arkansas court case asked for tax returns.

Q    Okay.

A    We believe that that was part of the reason why.

So February of 2020, he files his 2017 and 2018 Forms 1040 and 1120.    2016's [Form 1040 was] not filed at that point.    July of 2020 --

MAJORITY COUNSEL 2.    I should note we're at our hour mark.    We want to be respectful of our time.    So we may have to push pause.

MINORITY COUNSEL 1.    Okay.    That's great.

EXAMINATION

BY MINORITY COUNSEL 1:

Q    Thank you very much for appearing before us today.

I have some questions that I wanted to go over from some of the things that you had already mentioned, and I want to make sure that I actually had them correct in my notes.    Some things should be relatively straightforward.

You talked about being on the case, and you were assigned to the case November of 2018.    This was in your opening statement.    You were talking about the fact that you

had gotten some comments from some of the AUSAs about the case itself.

You had said, quote, "After three of these filings, they said that we could go forward."

What were the three filings that you were referring to? This was in the context of, I guess, moving the case forward.

Mr. Zerbe. Can we go off the record here?

MAJORITY COUNSEL 1. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. [redacted]. My initiation packet, so sending the case forward to get -- we call it subject case. It's an SCI. It's elevating the case to actually working the investigation.

My first one showed the unfiled returns and the taxes owed for 2015 and that was it on my first package. So that was the wrongdoing that we were alleging.

And my supervisor goes: You don't have enough. You need to find more.

So I kept digging for more and more.

And even after that point, he goes: You haven't found enough.

So I ended up searching bank reports that [I] ran on the periphery of what we were looking at.

So I ran bank reports for Burisma, and in those bank reports I had found additional payments that Hunter had received. And then at that point I had found that Hunter did not report the income for 2014 related to Burisma.

So now I had a false return year. So that alone -- it was basically so much evidence that I put in there -- allowed us to elevate the case.

BY MINORITY COUNSEL 1:

Q You filed three of those initial reports? Is that what the three filings were,

or was it three times going back to him?

A Three times going back to him. That would be the correct way to state it.

Q Shortly after that, you talked about in March and April of 2018 that Attorney General Barr had made a decision to join the cases. And then you said that Delaware had opened the case. You said January of -- is that 2019 or 2018 or 2020? I didn't get the year.

A It was January of 2019 --

Q Okay.

A -- that Delaware, U.S. Attorney's Office, and FBI had opened up the investigation. They wouldn't have been able to see in our IRS system that we had a case open.

Q Okay.

Mr. Zerbe. Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 3. Back on the record.

Mr. [redacted]. Okay. So that would have been that we joined -- you're talking about one that we joined together?

BY MINORITY COUNSEL 1:

Q [Nonverbal response.]

A May of 2019.

Q Okay. You're talking about 2019. You were mentioning the fact that there was a George Murphy that was writing memos or emails and documenting some of his conclusions that were on the other side regarding this case.

Could you tell us more about him? What's his title and who is he and how does he relate to you in terms of your chain of command?

A So it was actually Matthew Kutz. He was my supervisor at the time and from the articles that he was sending me, I would say he had more of a liberal view than I had and it was pretty obvious from the things he would send me and discuss. And that's just me making an observation.

So I later found out about these memos that were put in the file regarding the issues that he saw with the investigation, the fact that we even had it opened. So I only learned about those after.

And then it came to a point to where he's sending us so many media articles about different issues that I had to tell him stop, please. And I had to go around him. And that's when I went to my ASAC at the time, George Murphy, who was above him.

MAJORITY COUNSEL 2. Off the record.

MAJORITY COUNSEL 1. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. On the record.

Mr. [redacted]. So these articles were a lot about -- were a lot of articles regarding Trump and getting a fair investigation and things related to that, Trump's tweets and stuff like that. So, that's what drew me to my conclusion.

BY MINORITY COUNSEL 1:

Q What was the purpose behind him sending you the Trump tweets? What was he trying to get at, or was he trying to give you more information for your case? Why would he send those, or do you know?

A Yeah, I think he was bringing up concerns with potentially us prosecuting the case down the road, potential issues we're going to incur. I don't remember the exact email that he sent that caused me to be -- that he had to stop sending me some of the news articles, because it wasn't even the fact that he was sending me these news articles.

It was the opinion he was providing in those emails that I did not agree or that I did not -- not agree with but did not think was appropriate. That's --

Q Okay. You mentioned -- this is a little ways later -- I believe on September the 9th of 2021 that you had an email. You were reading through it, and you had mentioned that Stuart Goldberg was leaving town.

You said there was a name that you wanted to leave out when you were reading the email. What was that name?

A So it was the name of Hunter's personal counsel, George Mesires.

Q Okay. Moving forward -- and we are into October 12th of 2022. You had mentioned, I think, at some point that you had maybe a list of 30 individuals you wanted to interview. Then they had maybe dwindled that down to, say, 10. On October 12th of 2022, you said the last interview took place.

How many interviews did you do in total?

A Of witnesses? Well over 60.

Mr. Zerbe. No, no, no.

Of the 30 that you had put in the list, take her through what happened to that list of the 30.

Mr. [redacted]. Oh, okay. So of the 30, of the 30 that were in the list, I believe we talked to or had the opportunity to talk to all of them or a majority of them.

And there were even additional ones that came after that. So I think total in the case we talked to maybe 60 witnesses, if not more.

BY MINORITY COUNSEL 1:

Q Is that typical for the amount of taxes that were owed in this case that you would talk to 60 witnesses?

A Yeah, so I would say when it's a joint investigation with FBI and

IRS -- especially for a false return to where they're deducting things that appear personal, that would be typical that you would go out and talk to people around him at the time, that these returns are around, or that the tax returns are around.

I guess this kind of has a nuance, though. So a lot of the issues that we were encountering were regarding substance abuse. So his frame of mind, was he -- like he was obviously involved in these large dollar deals. But -- how did he act? Was he in a clear frame of mind? Was he a functioning addict? All those different things were important and why we went and talked to a lot of the witnesses we talked to.

Q Okay. A little bit later on you had mentioned that he was sending Venmos to family and friends. In particular, one person was Valerie Owens, his sister.

What was the amount of these Venmo transactions? I know you wanted to reach out and talk to the individuals. What was the size of the Venmo transactions?

A I'd have to look back at them, but they were between zero and $2,000.

And I know that some of the family members were on trips and went to visit with Hunter during this time period. So that's why some of those things, if they were out there, visiting him and he's claiming that these are business deductions, they would give insight as to where, what business was he doing, stuff like that.

Q Is this typical that you would want to talk to people's grandchildren and relatives when they have amounts that are between zero and $2,000? Is that typical?

A So I can say for the kids -- there was Columbia school tuition, $30,000. That was deducted -- I believe that was for [redacted] or [redacted]. There was prep, study prep, checks that were deducted for one of the kids or one of -- and when I say the kids, one of Hunter's kids.

So it wasn't just those smaller dollar amounts. There were others that were included in there.

BY MINORITY COUNSEL 2:

Q Following up on that, the deductibility of tuition expenses and fees is sort of a matter of law. Right?

A Yeah.

Q -- its treatment is pretty clear in the Tax Code one way or the other.

What kind of information would you generally hope to gain from talking to the grandchildren about payments that were sent?

A So there were other payments or other credit card payments, so for clothing, for jewelry, for certain things. There's a ton of different expenses that were also included in there, in addition to something like Columbia or prep or the tuition.

So as a part of our cases -- you have to have a third party that comes in. And we can't just rely on that statement that, oh, it's not deductible. We have to actually call someone in, as a witness, to --

Mr. Zerbe. Confirm.

Mr. [redacted]. -- confirm what that's for. There's a legal term for it, but I can't think of it off the top of my head, for why we have to do that.

BY MINORITY COUNSEL 1:

Q Typically, and we're asking here, if the IRS goes to investigate an individual for taxes that weren't filed or weren't paid, such as the situation that we're in now, the IRS goes out and talks to all of their relatives and grandchildren and other people, 60-plus witnesses, that's typical for a case?

A What I would say to that is every case is different. You have to follow where the evidence leads you. If evidence is leading you to family members or people receiving payments on behalf of that person, then those would be leads that you would go and follow.

So in addition to some of this stuff that we've been talking about, he also had members of his family, including Lunden Roberts, on his payroll. We know that during the time period she was paid, she did not work for him. So he was deducting things for salary for employees that were his family members. A lot of those witnesses are people we would go and talk to.

Q Before you get to this point, is there any set of questions that you send out to the person that they can answer and respond back to you? Or is it at the point that it reaches your group it's like, 60 interviews? You're out, talking to every person that they know.

Is there an opportunity for the person to agree or not agree to anything that you're saying is personal and maybe not a proper business deduction?

A So when it comes to witnesses, those interviews are voluntary. They don't have to talk to us if they don't want to. So a part of what we do in our job is we go out there and we interview witnesses. So there are situations where we can let them know that we're coming but the majority of the time we go and it's a surprise visit. So they don't know that we're coming. They're not prepared for what they're going to say. That's typical of our cases.

Q Is this in a situation where the person contests what they owe, or do you just do this off the bat if it gets referred to your unit?

Mr. Zerbe. I didn't hear that que -- can you --

Mr. [redacted]. Yeah.

Mr. Zerbe. Can you say it one more time, [redacted]? I'm sorry.

BY MINORITY COUNSEL 1:

Q I'm trying to understand if, in this situation, was there some opportunity where any taxpayer -- doesn't even have to be this particular one -- does the taxpayer

have an opportunity to see the facts and decide whether they're going to contest what you're saying?    Could he have just paid this at the very beginning is my question?

        A        So -- I guess the problem with that would be the reason why -- let's take a step back, big picture.

        So there's IRS civil.    So they're coming in, and they would do audits.    They would do all different sorts of type of work related to civil issues.    So that essentially means that you made a mistake on your return.    You didn't report something.

        Where we come in, IRS criminal investigation, is that there was a willful omission or there was a willful criminal act that you took part in, in order to either evade your taxes, to file a false return, to not file timely your tax return, to not pay your taxes.

        There's a big difference and there's a big distinction between what's civil and what's criminal.

        And so with us on the criminal side, as far as your question goes, does he get an opportunity to come in and explain, so once our case is referred we offer the person an opportunity to talk to us.    We go and do an interview.    If he has an explanation, a lot of people will offer their defenses at that time.

        In this case, December 8th, 2020, we went and tried to interview Hunter.    And he declined to be interviewed.    So that's his choice.    That's his right.    But we did afford him an opportunity to explain what happened.

        And then as far as when the case is referred, when a case is referred for prosecution to Department of Justice tax, the target or the subject of that case is entitled to what's called a taxpayer conference.    And that's where they meet with their defense counsel, and their defense counsel says here are my defenses.    Here's why I don't think you should charge me.

        Q        And did he do that?

A     His account[ant] -- I was not allowed at those meetings which, to be honest with you, that -- sometimes they don't have us at these -- at those meetings.    But with a case like this, of this caliber -- we asked to be at those meetings.    They said that we couldn't be there.    I know of other agents that are at those taxpayer conference meetings.

Q     Okay.    I want to get some sense generally of your caseload and what you work.    How many cases do you currently have?    How many cases did you have back in 2018 when this case was assigned to you?

A     I was new to the group.    So this was one of two cases that I was working at the time.    And then moving forward to right now, I have one large case.    But it includes probably 80 tangential cases -- or 80 sort of spinoff cases that I'm trying to manage and work, as well.

That's abnormal.    Normally for an IRS special agent, normally it's one or two cases that they're working a year because of how much work goes into them.

Q     You mentioned that one of your other cases is paused.    How many cases do you have that are paused?    I don't know how you count the one large one with the 80 tangentials.    But how many of those are paused?

A     Probably 20-ish.    Let me rephrase that.    I would say 10 to 15.

Mr. Zerbe.    Why are they paused?    You might expand on that.

BY MINORITY COUNSEL 1:

Q     I was going ask that question.    So, yeah, go ahead.

A     They are second-guessing the strategy that we're putting forward on those.

Q     Do you have any idea of a timeline when they would get back to you on when they would lift the pause?

A     I didn't -- I was told it was going to be quick.    And it -- I know that my

supervisor is meeting with some of the leadership today to talk about it.

Q     In your cases that you've had, first starting back since November of 2018, coming forward, have you had disagreements in other cases that you've been working?

A     Yeah, yes.

Q     How did that play out?    How do your disagreements play out generally?

A     I can give you an example of in another situation I was working, we also had a person who had failed to file returns and they earned a significant amount of money and they went out into -- I need to be -- so they had that situation at hand.

I went to the prosecutors on the case.    And I said, hey, this person has these unfiled returns.    I'm thinking that specifically with what has happened -- and specifically with what has happened in news reporting related to them, I think we need to go talk to them.

And they were, like, well, no, you probably shouldn't do that.

They at the beginning onset they did not agree with me.    So me and my supervisor, we sat down with them.    And we said here's the reasons why we should go forward and interview [them].    Put [them] on notice regarding a potential tax investigation and see if [they] want to come in and talk to us.

And they were a "no" in the beginning and they changed to being a "yes" and we actually went out and did that and that is turning out to be something successful right now.

Q     Is that the same supervisor that you had on this case or --

A     Yes.

Q     -- is it a different supervisor?

A     Same supervisor, Gary Shapley.

But I want to draw your -- so remember that captive insurance case that I talked

about?    That was a huge disagreement.    I was honestly devastated by that.    And I met with top, top officials on presenting the evidence and presenting the case.    And at the end of the day it was still a "no."

And that was a huge -- I felt that the evidence was strong enough but their opinion was different than mine.    So that was something that -- that's the best example that I can give of that.

Q    You said that there are 12 people, roughly, in your group?    Is that correct? How many are in your group?

A    Twelve.

Q    Twelve.    Those twelve individuals, did they all -- oh, go ahead.

A    Approximately 12.    Let me --

Q    Okay.    Approximately 12.    Did all 12 of those individuals work on this case?

A    So in some form or fashion, they would have either helped with interviews, been a secondary on interviews.    There are a couple of newer agents who haven't had time to help in our group.

But, I think the notion that our group was removed was they weren't going to assign it to another person within my group, if that makes sense.    They wanted to go outside of that.

Q    How many groups like yours are at IRS?

A    There's only one International Tax and Financial Crimes group.    There are similar groups but they work different things.    So there's a Cybercrimes group.    They specifically work cybercrime cases.    There's an Excise Tax group.    They work alcohol, tobacco.    I forget what specific name they have.    But they only work those types of cases.

So we have specialty groups that are established around. We're unique to the international tax realm.

Q Do you have any questions?

BY MINORITY COUNSEL 2:

Q I do have a few questions. I apologize that I was late. I had a preexisting commitment this morning.

I want to also clarify some things in your statement.

Could we talk a bit about C.T.?

A Sure.

Q Who is Christy Steinbrunner exactly? What was Christy Steinbrunner's position? Do I have that name right? Christy Steinbrunner?

A Yeah, Christy Steinbrunner.

Mr. Zerbe. Can you spell it?

Mr. [redacted]. She had that correct spelling over there. So I think --

Mr. Zerbe. Okay. Good.

Mr. [redacted]. She is essentially a line attorney with the national office, and she deals directly with our international tax group.

BY MINORITY COUNSEL 2:

Q But was she a part of C.T.?

A Can you say that again?

Q I think in your testimony we said that the report went up to C.T. --

A Yep.

Q -- and that Christy Steinbrunner had been saying all along that this was good to go. This was the green light. Or a yellow light. I'm trying to figure out what the relationship between her and C.T. was.

[Discussion off the record.]

Mr. ____. So within IRS we have what's called Criminal Tax counsel. They're our advisory internal counsel for the IRS. So, when we send a case initiation package forward to DOJ tax, it has to go through their review, as well. And they provide [an] advisory [opinion].

BY MINORITY COUNSEL 2:

Q And so Christy Steinbrunner was not part of that advisory group per se.

A She is -- she's the line attorney who does the initial review --

Q Okay.

A -- of the prosecution report.

Q I see. Then it goes to some sort of review panel? I'm still trying to figure out --

Mr. Zerbe. We'll just take you through it again. Okay. So --

Mr. ____. So from my understanding -- and this is what I've learned after is she reviews the prosecution report. She reviewed our package. So let me step back even further.

So this entire case, since Christy was the one who reviewed my initiation package, she's someone I've been communicating to with issues, evidentiary issues, what's been going on in the case. So I've been keeping her apprised with everything that's been going on.

So when the case comes to her, she's not just taking this cold. When the case gets up to C.T. counsel, she reviews it and writes what's called a CEM, a Criminal Evaluation Memo. That CEM, she was telling me the entire time, was a concur and it was what she was calling a green and a yellow light, green for the later tax years, yellow for the earlier tax years.

And what I had learned is that needs to go up to a panel at [CT-Counsel], their national office, because of this case, for them to review.

And what I've heard on the back end -- this is technically hearsay -- is that they all agreed with her recommendation. But then it went to people above her and they told her that -- your writing appears like you want to give a nonconcur. So this needs to be a nonconcur to all charges.

BY MINORITY COUNSEL 2:

Q And there's no document that was produced out of C.T. memorializing that nonconcur judgment?

A So they provided a -- what, the Criminal Evaluation Memorandum? So there is a document that is, yeah, that memo.

Q That's a document that Christy Steinbrunner wrote. And the idea is that -- and I'm just sort of trying to -- she was told that -- because I assume initially when she wrote it, she concluded, this was a green or a yellow.

Was she instructed to change her evaluation or was there a subsequent other written document that evaluated the work that she's submitted and gave other reasons why there was a nonconcurrence?

A So, I mean, I don't know that. Obviously, there has to be records of what went up and then what came back down. So there is definitely -- if it's there, it's there.

But, I have an exchange with her through Messenger where I said to her: Did you know that they were always saying it's going to be a nonconcur?

Ms. Steinbrunner responded: “What? No. I sent them a yellow light.”

After discussing this, I couldn't believe, because we were doing everything in our power to show -- because normally what happens is, if they give us a nonconcur, we try to go back to them with additional evidence or additional investigative work so that they

can give us a concur.

The fact that it came back just a flat nonconcur to all years, it was one of many blows that we encountered.

Q Right.

A I had even suggested sending the report up without the subject's name, putting in just the Doe so that people couldn't see. But they said it would be too hard to take out the details related to the subject, that people would know who it was.

Q Can you describe for me to the best of your ability why Christy Steinbrunner -- you just said that she represented to you that her recommendation was a yellow. What is the difference between a yellow and a green? Why would a recommendation be yellow as opposed to green?

A So from what my understanding that she said is, yellow is we're concurring but we're giving cautionary statements of these are the legal impediments that we see. So these are the legal issues that we see. Even though we're agreeing to move it forward, we think that these issues might come up. But a red is basically, we don't think you should move forward on this.

Q Were there specifics that she mentioned as far as what legal issues might, what the hazards of litigation were in particular?

Mr. [redacted]. Can we go off the record?

MAJORITY COUNSEL 2. Off the record.

[12:46 p.m.]

MAJORITY COUNSEL 1. We can go back on the record.

Mr. [redacted]. Part of the impediments were how a jury was going to look at this.

BY MINORITY COUNSEL 2:

Q And that being because a jury might find the facts sympathetic?

A Yes.

Q You alluded to that possibility as well -- when the case went higher up -- or at least -- I'm not sure if you heard this information directly or if this was information that you testified that you heard indirectly regarding a decision that one part of the DOJ had reportedly made that suggested that facts that might have come out in 2014 or 2015 could create something of a sympathetic taint for later tax years.

Is that something that typically, in your role primarily as an investigator, you would discuss in a normal course of business with those who made the prosecuting decision?

A Yeah, because those are things that we want to counteract throughout our investigation, or those are things that we need to address as a part of our investigation.

Q And --

Mr. Zerbe. I'm sorry. Go ahead.

MINORITY COUNSEL 2. Oh, no, no, I think that you're sort of anticipating my next question.

BY MINORITY COUNSEL 2:

Q Would you be able to describe what those factors might have been that would give concern to those making a prosecuting decision?

A Yeah. So, you're referring to the meeting that we had with David Weiss,

the U.S. attorney, in September of 2022.

In that meeting he had alluded that DOJ Tax was of the mindset that the jury's sympathy -- related to the death of his brother and the drug use -- would affect the later tax years, and that David, at that time, was weighing whether to go forward based on that or not because he was getting swayed one way or the other.    And David said he felt strongly with the evidence and what we were presenting.

And another part I want to add in is, when we say that the scheme is developed in 2014 -- so 2014, Hunter is entering this million-dollar board agreement with Burisma. So, he is very well aware.    He's not apparent to be on drugs at that point.    It's not until Beau dies in May of 2015 that he kind of falls off the wagon and all these different issues start arising.

So I guess that's also important, is that during his sober -- or not his sober time, but during a clear-of-mind time, he's engaging in this agreement.    And then that caused the false return to be prepared.

But, looking back at everything, I don't know if those meetings held with us were just to make us happy, because David didn't -- we were already told no by D.C., and they told us not to bring forward a case.    I don't even know if at that time whoever at DOJ leadership told them, because I've learned later that he was told that he can't get special counsel authority to charge the case in D.C. and that he needed to follow the normal process.

Q      Okay.    Thank you.    That's a helpful clarification.

Just a few other specific follow-ups.

Going back now to the CT report and your work.    I don't know if it was a report per se.    But you learned of some judgment on this panel.    You went on to say that the leadership nonetheless, notwithstanding this recommendation, ended up pushing this

case through to the DOJ Tax.

What do you mean by "our leadership" in that decision?

A       So I don't know -- I know it has to go up to the special agent in charge, but I don't know if it went above him.    I thought it would have to go above him.    But it was either the director of field operations or the special agent in charge approves the referral that ultimately sends the case to Department of Justice Tax Division.

And so what happens at that point is DOJ Tax then reviews it.    In this case, they established a third-party reviewer, John Kane, to come in and look at the merits of the evidence.    And then, he's supposed to take an objective view of the case, which he was doing.    And that then goes to Stuart [Goldberg, Acting Deputy Assistant Attorney General] to ultimately be approved or declined.

Q       In your discussion of the various frustrations that you experienced along the way in terms of conducting your investigation, you discussed internal IRS issues and that often you went to the director of field operations, for instance, and that there was a lot of slow-walking involved in the IRS.

Do you think that the fact that they approved or pushed forward, in IRS leadership and the director of field operations, a case which had otherwise received a negative or a nonrecommended charge from this review panel is indicative of the fact that they weren't trying to slow-walk anything?    How do you reconcile, I guess is my --

A       No, I understand what you're saying.

So CT counsel is advisory.    They took the maximum amount of time to review this case that they could possibly take.    That's first off.

As far as my leadership goes, we're trying to point out that the slow-walking and the approvals for everything, a lot of that happened at the U.S. Attorney's Office in Delaware and DOJ Tax level.    So it wasn't more -- and we were just trying to make our

leadership aware of all those issues that we were encountering.

Q    So the slow-walking was not from the internal IRS per se, or maybe it was at the behest of DOJ --

A    Yeah.

Q    -- you suspect?

A    Yes.    And I would like to say that -- it appeared that our agency had their head down and didn't want to know any of the details or problems that we were having. We would communicate a lot of issues up, and they would say that they're communicating those higher than them, but we would never know if that were to happen.    We only ever met one time with the chief on this investigation, and it was towards the middle of our investigation.

I wanted to -- maybe this fits, maybe this doesn't, but -- communication issues.

So there's an FBI supervisor -- this is August 25th, 2022.    So Garrett Curley is his name.    He was an acting supervisor over the group that was working this case.

He says:    "I know we have our monthly meetings" -- and this is going to Lesley Wolf, AUSA for Delaware -- "but dissemination of information in between those meetings is being missed.    At least for me, I'm finding out about meetings, updates, and interviews well after the fact, which is causing me to send the wrong information to my headquarters.    I figured with everyone's schedules, an easiest way to correct this is through an email chain or going back to weekly meetings."

Lesley's response on August 25th, 2022, was:    "Garrett (ph), please stand down on this until we've had a chance to connect the next week."

So he was basically shut down after he was like:    You guys aren't communicating to me.

Q    Did you know if they ended up connecting?

A I believe that they did end up connecting, yes.

Q In my experience, sometimes having long email chains on things like that, sometimes things are missed. Maybe what she was suggesting was a phone call would be easier to talk about.

A Well, we were such a big team, there was a lot of this happening to where -- like, us not being included in the taxpayer conference meetings. There was a lot of information turned over at those meetings that we didn't hear about or we heard about late. So there was definitely a breakdown in communication of what we heard.

And one thing that I want to be clear on, that there was information -- and I don't know the detail of that information that was withheld from us -- but there was information withheld from the investigators.

And some of that was withheld for privilege. But there was other things -- we went out and talked to one of the potential prostitutes. And there were videos that I've seen out there on Twitter, on the internet, and information related to that person that I had never seen before.

And I brought this up as an issue. I'm like: I'm seeing things here. Why am I not seeing that from you guys? And when I say "you guys," the prosecutors. And there was a notion that some information was being held back from us, and I don't know what that information was.

Q Because we discussed this earlier, that there were leaks, there were multiple leaks throughout the course of the investigation.

Would you say that the number of leaks to the media was typical in this case compared to a normal case in CI?

A I would say, in my personal opinion, I would say it was low. With a case of this high-profile nature, I would have thought it was low.

Q But in terms of a comparably high-profile case anyway. There were leaks, and there were some -- but you think --

A So I'd go back --

Q What's an example of another high-profile case that we're comparing that to?

A So some of the information that was released -- or some of the information that was leaked related to the Trump classified documents. So that case. So there were actual pictures that were leaked from inside the search warrant. And this is what my memory of seeing things in the media. So that's something that I remember. But, I mean -- yeah.

Q I guess my follow-up is, do you think in a case where there have been leaks and there's perhaps concern about leaks through the media, it's appropriate for, in some cases on some levels, for information to be held in a tight group to sort of -- prevent further leaks?

A I do understand what you're saying. But if the investigators don't get the material to investigate the case -- typically -- we investigate the evidence, and we send that to the prosecutors to review, or here's the pertinent stuff. It's not the other way around, typically.

So I am following what you're saying, but we had, in my opinion, we had no concerns of leaks on our internal team. Prior to us going overt, prior to that December 8th day of action, up until a couple days before, there were no leaks at all. So that just shows you how tight-knit our group was.

Q I have one more question, and then I can turn to [redacted] again.

I want to skip way forward again to the removal of your team from the investigation. I guess I have a few questions.

As far as you know, is there still an active investigation in the matter?

A    Yes.

Q    Obviously, the IRS is a very large organization, 80,000-some employees.

I think you recited it for the chairman, but just to confirm -- in terms of layers of review between you and Commissioner Werfel, are we talking six, seven, roughly?

A    One, two, three, four, five, six.    So he'd be number seven.

Q    Number seven.

In the normal course, would you expect that the Commissioner of the IRS would have direct knowledge of any kind of personnel shifting or maneuvers seven levels down?

A    I would think in a case of this nature, if I were a leader of -- if I were in charge of an agency, I would want to know about stuff that's going on with inside the IRS, and here's the reason why.    It is things like this can affect the reputation of the agency. You know what I mean?    It's a big risk with something like this out there.    And, that's my opinion.

Q    But you have no reason to believe that Commissioner Werfel knew of this short of his being informed by perhaps his deputy or someone below under the normal course of events, someone in the command would have to explicitly inform Commissioner Werfel.    For instance, Commissioner Werfel would not in the normal course directly make these personnel changes.

A    So I would say that he knew that there were, prior to my email, he knew that there were whistleblowers related to this case because they specifically asked him about whistleblowers within the IRS.

Mr. Zerbe.    I want to make sure -- you made one point.    I think you need to clarify it for him.    He asked if the case is going forward.

I think for everybody here, explain though that it's not just kind of Garanimals

where they can swap you in and out. Talk about, you not being on the case, you have to put somebody in new, but kind of how that impacts. I just want you to understand that.

Mr. ████. So what's frustrating -- and I think it's obvious is he removed two of the people who have been challenging and been kind of like this is the -- we're trying to do the right thing, we're trying to do the right thing. And it was kind of like we got loud enough, and they found an avenue to remove us.

I have been told by so many people on this case that we're where we are today because of my work. It's 5 years of an investigation. You can't just pick up that and move it onto someone else.

And if they removed all the prosecutors, DOJ Tax, and had a brand-new team, I would understand that completely if that's the decision that they made. But they just removed us. Not our management -- I mean, that right there should tell you a lot.

Did I answer that?

Mr. Zerbe. Yeah. Let me go off the record.

[Discussion off the record.]

Mr. ████. On the record.

I just want to say that I made every effort to -- when we work these cases, you have to be careful of what you might say that could be used against you if you were to go to trial or if you were to go in front of a grand jury. Usually, the IRS special agent is the final witness, the summary witness. So things that you put out there in emails, they can attack you at a later date.

So I did everything that I could to possibly make the record as clean as it possibly could, investigated the case, but in doing that, here's all the things that happened because of that.

MINORITY COUNSEL 2. ?

BY MINORITY COUNSEL 1:

Q Okay. I only have one other question that I wanted to go back to.

In your cases that you have, the what I would say spin-offs and everything that you've worked since November of 2018, are there any other cases that involve sensitive individuals that you would consider to be sensitive cases?

A Not of a political nature.

Q Okay. Is this the only case that involves, say, children or family members of a politician?

A Yes.

Q Okay. Are there any cases that involve politicians themselves?

A That I've been removed from or --

Q Just that you've worked since November of 2018.

A That are spin-offs of this case?

Q Just in general. I'm trying to --

Mr. Zerbe. I don't think she's trying-- let me think about it.

Let me go off the record?

[Discussion off the record.]

Mr. [redacted]. On the record.

This is the only one that is of a nature that's politically sensitive. So the answer to your -- yes, this is the only one.

MINORITY COUNSEL 1. Those are all my questions for now. Thank you.

Mr. Zerbe. Can I suggest, if we could take a break.

MAJORITY COUNSEL 1. We'll go off the record.

[Recess.]

MAJORITY COUNSEL 1. We'll go back on the record.

We've got a series of questions we're going to jump back into.    I know you had a lot of prepared materials, and I just want you to know that when we get to the end, we'll make sure to give you an opportunity if there's anything we haven't covered.    So I don't want you to think it's your last chance to cover stuff.

BY MAJORITY COUNSEL 1:

Q    Okay.    When we last left off our questioning, we had, I think, just gotten through tax year 2018.

A    Yep.

Q    Could we go back to what we were talking about?    And can you tell us what we need to know about tax year 2019?

A    And do you guys care if I -- so I want to put this in an even bigger picture. And I'm sorry I didn't start out with this, but now that I've got some food in my belly.

Global income streams for everyone altogether, so it's for the period 2014 through 2019, our investigative years, so the total global transfers that Hunter and his associates would have received from Ukraine, Romania, and China was $17.3 million, approximately.    Okay?    So a staggering amount.

So Burisma paid to everyone involved $6.5 million.    Burisma to Blue Star, $540,000.    Burisma to Boies Schiller -- that was the law firm that Hunter was of counsel for -- $288,000.    So that's $7.3 million to those people.

Approximate total transfers from the Romania company -- I say the Romania company, I just want to keep it at that -- to everyone was $3.1 million.    The total transfers from HW III to everyone was $3.7 million.    Total transfers from State Energy HK to Rob Walker was $3 million -- or to Robinson Walker, LLC, correct that.

Total transfers from CEFC Infrastructure to Owasco P.C. was $100,000.    So that's $6.8 million.    So that gives you $17.3 million.

Of this amount, for the period 2014 through 2020, I have extended it one more year, but it pretty much ends at the end of 2019, that's when income stops coming in, it's $8.3 million. This is what Hunter would have received of that.

So total Burisma net of Devon Archer payments was $2.6 million. Total transfers from the Romania company via Rob Walker was $1 million. Total transfers from HW III net any payments to James Biden was $2.3 million. The total transfers from CEFC was $100,000. Total transfers from State Energy HK from Rob Walker was $664,000.

You also have cash that was deposited. That was $50,000. You have a chip diamond and a larger diamond. The larger diamond from various reports that I've read, it's about $80,000. We still don't know where that diamond is at to this day.

You have the Porsche, which was $142,000. You have half of an investment in a company called American Well that was $25,000. You have medical payments made by Archer, that's $10,000. So these are all approximates. Let me just reiterate that. And then you have the one-third capital contribution made into Bohai Harvest that was $325,000.

You also have other [Form] W-2 payroll that he received of $859,000. So that gives you a total of $8.3 million.

This does not also include any benefit or payments received by Kevin Morris.

Okay.

MAJORITY COUNSEL 2. When Kevin Morris paid the 2017 tax bill --

Mr. ████. He paid the 2017 tax bill, yes.

MAJORITY COUNSEL 2. That's a taxable event, correct?

Mr. ████. So can I -- since it's 6103, can I --

Mr. Zerbe. You can explain it.

Mr. ████. Okay. So on Hunter's 2020 tax return --

MAJORITY COUNSEL 2. Let me ask you this. Did he plus it up?

Mr. [redacted]. Did he?

MAJORITY COUNSEL 2. Plus it up?

Mr. Zerbe. Let him --

MAJORITY COUNSEL 2. Okay.

Mr. [redacted]. What do you mean by "plus it up"?

[Discussion off the record.]

Mr. [redacted]. Okay. Yeah. No, I apologize.

BY MAJORITY COUNSEL 2:

Q No worries.

A So on his 2020 tax return, personal tax return, Hunter stated: "See statement in 2020. The taxpayer received financial support from a personal friend totaling approximately $1.4 million. The parties agreed in 2020 to treat the support as a loan and later documented their agreement in a promissory note in the amount of $1.4 million, 5 percent interest.

"The promissory note requires periodic payments between 2025 and 2027. The promissory note was executed by both parties on October 13th, 2021.

"The taxpayer is treating this amount as a loan for tax purposes. The balance of the financial support is treated as a gift. No amount of the support is treated as a reported taxable event on this tax return."

So that's what was filed with the return.

Q And has that transaction been investigated or --

A I'm no longer a part of an investigation related to that.

Q Okay. That wasn't the question.

The question was, do you know if that has been investigated by the IRS?

A So I'm going to --

Q It's a voluntary interview. If you're not comfortable saying, you don't have to answer the question, any of our questions.

A It goes back to one of my -- if there is potentially a current investigation that's out there to --

Mr. Zerbe. Let's go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2. Go back on the record?

Mr. Zerbe. Yes.

MAJORITY COUNSEL 2. Is there anything else about the tax years of 2014 through 2019 that we haven't discussed that ought to be made clear?

Mr. [redacted]. Yeah. There's 2018 that we left off on. I went through the global payments.

So 2018 was the false tax return year.

If we don't include relevant conduct -- so relevant conduct is conduct that we didn't subpoena or that we didn't get records for that could, at sentencing, be included.

So if you don't include relevant conduct and it's just expense items that we investigated, Hunter underreported his tax return by $500,000 or -- give me one second. That's including relevant conduct.

Okay. So he underreported his total income by $267,000, if you are using the most conservative approach, and that is a tax loss of $106,000. So that includes deductions for personal wages and salaries paid, personal travel expenses paid, personal children expenses that he paid, and personal other expenses that he paid.

So let's talk about his 2018 tax year.

2018 was so significant because, at the same time he is writing his book, he is

having the returns prepared.    And the statements in his book completely contradicted what was being deducted on his tax return.    He essentially said in his book that he was in a drug-addled haze and was essentially learning how to cook crack, was some of the quotes in the book.

So some of the items that he deducted were personal no-show employees.    He deducted payments that were made to who he called his West Coast assistant, but she was essentially a prostitute.

He made payments -- there's an $18,000 wire that is made to one of these individuals, and on the wires they say $8,000 in wage and $10,000 in golf -- $10k golf club member deposit.    And we know that that $10,000 went to pay for a sex club.    He went to a sex club, and we've talked to the person that owned that sex club, and they confirmed that he was there.    And the guy has to pay $10,000, and the girl -- whoever is referring him there doesn't have to pay anything.    So that was deducted on the tax return.

The Columbia tuition was deducted on the tax return.    There were all of these sorts of things.    And the thing that showed his involvement in it is he would actually go through the bank statements and would highlight items that were -- either he was excluding from being deducted or that he was highlighting from his personal accounts to deduct on his tax return.    So it was kind of twofold.

And in addition -- because what we viewed that the accountants didn't feel comfortable with the information being provided by Hunter, they actually made him sign what's called a representation letter.    And essentially with this representation letter, he's representing that all the income is being reported and all the deductions are being -- they're for business nature, and they're being reported properly.

BY MAJORITY COUNSEL 1:

Q Why do accountants have clients sign those kind of letters?

A I've never seen that in my career.

Q Do you have an understanding of why they did that in this case?

A So the timing of it occurred after he started submitting a lot of these expenditures. So his expenditures that year were very, very high.

He also tried to -- the money that he earned from Hudson West III, he tried to say that that was a loan. Same thing we have all going along back to Burisma -- I'm loaning from my own capital in the company -- even though he didn't put any capital in the Hudson West III. It was zero. So he was trying to say that it was a loan. But the accountants were so good that they really dug into it, and they were like: No, no, no, you can't deduct this -- or you can't take this as a loan on your tax return.

He tried to -- or he deducted expenses for hotel rooms for one of his drug dealers or what we believed to be one of his drug dealers.

He deducted a hotel room for his dad, Joe Biden. There is an invoice in the dad's name -- I'm sorry. Not the dad, but Joe Biden's name. The President, President Joe Biden's.

MAJORITY COUNSEL 2. For how many nights?

Mr. [redacted]. What was that?

MAJORITY COUNSEL 2. For how many nights?

Mr. [redacted]. It was for two nights.

And let me correct the record. President Joe Biden's name. And, yeah, that was included.

There was a significant amount of expenses deducted related to his girlfriend at the time, Airbnbs related to her, hotel rooms. So he deducted a lot for the Chateau Marmont, and he actually was blacklisted and thrown out of the Chateau Marmont. We

actually have videos -- or we have photos of the rooms and the destruction that was done to the rooms.

BY MAJORITY COUNSEL 1:

Q When he deducted two nights for Joe Biden -- he deducted those as business expenses? Is that right?

A Yes.

Q Was --

A From what I believe. I apologize. I didn't mean to interrupt you. From what I believe, yes.

Q Okay. And were you aware of any business that he was involved in with Joe Biden?

A So this is a complicated issue, and we really -- there was the 10 percent for the big guy in the Sinohawk deal. We know that the Sinohawk deal never went through. And that relates to CEFC and China. So essentially, Hunter cut everyone out of that.

And we do know that there were WhatsApp -- I believe it was WhatsApp messages found that there is clear indication -- and Hunter is saying this in those WhatsApp messages, that: I'm sitting here with my dad ready to make a deal, we're waiting for the phone call. And that was one of the -- I mean, we couldn't believe that we saw that. That was more indication that the dad might have been involved.

I know that we wanted to get location data because I went to the prosecutors with this, and they, again, came back at me with: Well, how do we know that? He could just be lying and claiming that the dad -- that his dad's there, but his dad is not there.

And I said: Well, this is what we would normally do. And I have it on a meeting agenda where we talk about location data. And I don't know if the FBI ever did anything

with it, but I would think it would be a road we would want to go down or that we could

go down, and the reason being that, if President Joe Biden was getting any source of

income, whether it's through someone else's entity or for his benefit at some point, that

could be income.    So that's why it would matter to us.

Q    Anything else on tax year 2018?

A    There was the fact that he deducted some hotel and travel expenses.    So

they argued that, well, he tried to make his best effort.    And they -- and when I say

"they," that's Hunter and his counsel.    I would argue that this shows that they are

making an effort to not make it look as suspicious.    Deducting everything would be

overly suspicious in an audit, and therefore he tried making as many deductions as he

could to minimize his tax.    That's what my beliefs would be.

There is something else.    So I told you guys about the additional income.    But

you also had the unfiled returns.    So on his personal return for 2018, he owed taxes of

$620,901.    And then for 2019, for the personal return -- so that would have also been a

failure to file year -- that was $197,372.

And there were definitely some issues with the 2019 return.    He withdrew

money from a 529 plan.    It was in the ballpark -- I think I actually -- hold on one second.

Let me go into my notes and see if I -- I have the email here.

Q    Can I ask you something a little more general?

So given all these specific aspects that you're referring to of activities with regard

to tax returns that would you agree, at least, rise to the level of suspicious?

A    Yeah.

Q    What's your general view of why someone would engage in these kinds of

deductions, reporting of expenses, et cetera?

A    So from what I believe based on the evidence is his alimony and his child

support payments are based on how much income he earns. So if he reduces his income, he doesn't have to pay as much.

Q And what are you basing that opinion on?

A I would be basing that on discussions I had with prosecutors on the case and my review -- so my recollection of this isn't as clear, but I do recall that coming up in reviewing the marital separation agreement.

And the reason why I say it's complicated is because it changes as you go throughout the years. So I don't remember the specifics, but I know that that was a part of it.

Q Okay. Understood.

You mentioned CEFC. Did you look at an entity called CEFC Infrastructure Investment, LLC?

A I believe so, yes.

Q Do you know what kind of business CEFC was involved in or pursuing?

MAJORITY COUNSEL 1. Can I go off the record?

Mr. [redacted]. Yeah. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record?

Mr. [redacted]. I don't feel comfortable disclosing anything further on that issue.

BY MAJORITY COUNSEL 1:

Q Understood. Okay.

The U.S. House Committee on Oversight and Accountability has publicly identified a series of companies, mostly LLCs, that are connected to this taxpayer. We'd like to walk through the list of companies and ask simply whether or not you've come across them in the course of your investigation. A yes-or-no answer is fine.

Lion Hall Group, LLC?

A Yes.

Q Owasco P.C.?

A Yes.

Q Robinson Walker, LLC?

A Yes.

Q Skaneateles LLC?

A Skaneateles, yes.

Q Seneca Global Advisors, LLC?

A Yes.

Q Rosemont Seneca Partners, LLC?

A Yes.

Q Rosemont Seneca Principal Investments, LLC?

A Yes. Yeah, I know. It's abbreviated RSPI.

Q Rosemont Realty, LLC?

A Yes.

Q Rosemont Seneca Technology Partners, LLC?

A Yes.

Q Rosemont Seneca Thornton, LLC?

A      Yes.

Q      Rosemont Seneca Advisors, LLC?

A      Yes.

Q      Rosemont Seneca Bohai, LLC?

A      Yes.

Q      JBB SR, Inc.?

A      Yes.

Q      RSTP II Alpha Partners, LLC?

A      Yes.

Q      RSTP II Bravo Partners, LLC?

A      Yes.

Q      Owasco, LLC?

A      Yes.

Q      Hudson West III, LLC?

A      Yep.

Q      Hudson West V, LLC?

A      Yes.

Q      And CEFC Infrastructure Investment U.S., LLC?

A      Yes.

Q      Okay.    Did there come a time when you learned about testimony from

Attorney General Garland before Congress?

A      Yes.    So that was actually something I was going to get into in my closing.

So Attorney General Merrick Garland appeared before the Senate Appropriations

Committee in April -- April 22nd, 2022.    At this hearing, when he was questioned about

the Hunter Biden investigation, he said:    "Because we put the investigation in the hands

of a Trump appointee from the previous administration who is the U.S. attorney for the District of Delaware, and because you have me as the Attorney General who is committed to the independence of the Justice Department from any influence from the White House in criminal matters, the Hunter Biden investigation is being run by and supervised by the United States attorney for the District of Delaware, he is in charge of that investigation, there will no interference of political or improper kind."

Q    And in your experience with the case, did you find that to be accurate?

A    Can I say at the time and where I sit now?

Q    Sure.

A    So at the time -- I don't remember when this topic of what Merrick Garland said came up -- when exactly this came up, but I can tell you that I always viewed it as David was our advocate sometimes.    David was -- if we wanted to go with a big issue, we went to him.

Q    You're referring to David Weiss?

A    David Weiss.    I apologize.    The U.S. attorney.

So if we wanted -- and I viewed him as he's a Republican from the prior administration.    We have to have faith that he's going to do the right thing and that he's going to push this forward and that he is the person we need to get in front of to tell -- because there were times where we didn't believe that what we were stating regarding the evidence was getting to him.    Because our understanding of the evidence was different than what some of the line attorneys' understanding of the evidence, and we wanted to present on that.    It was the 2014, 2015 issue.

And I'm thankful that we ultimately were able to.    But now looking back at it, I think that -- it depends on when he asked for a special counsel, but those meetings that he had with us were for naught because we didn't end up charging 2014, 2015.

Q So looking back on it now -- what is your opinion of whether his testimony was accurate?

A I guess I would say that's not up to me to make that determination, but -- in what I know --

Mr. Zerbe. Do you want to take a break? A pause?

Mr. ████. Yeah. Off the record, please.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. ████. So in response to your question, I can't speak to what Merrick Garland thought at the time or what he might have been made aware of at that time. I was only aware of certain people within the chain that were aware of this investigation.

But looking back at it, the U.S. attorney, David Weiss, he had to follow the normal process. He had to go to Washington, D.C., the U.S. Attorney's Office, them saying no. So he really wasn't in charge. He had to follow the process.

And at the end of the day, he went to political appointees, and he's technically not a political appointee, so it's all back to square one again.

BY MAJORITY COUNSEL 1:

Q We were talking about a hearing in 2022, which we have as April 26th. I think you said 22nd, but I think it was April 26th.

A Okay.

Q The next year, moving forward to 2023, March 1st, 2023, Attorney General Garland was again testifying before Congress and was asked whether, without special counsel authority, a U.S. attorney could bring charges in other jurisdictions outside of Delaware.

Attorney General Garland said that he had been advised that he has full authority

to make those kind of referrals that you're talking about or bring cases in other jurisdictions if he feels it's necessary, and I will assure that if he does, he will be able to do that.

Based on what you testified to earlier, in your opinion, did U.S. Attorney Weiss have that authority to bring charges in other jurisdictions?

A     In what he said, I look kind of at the words from Merrick Garland, and he said he has the full authority to make the referrals.    Did I hear that correct?

Q     Correct.

A     And, yes, he's in charge of making those referrals, but whether --

Mr. Zerbe.    Read the whole quote again.

BY MAJORITY COUNSEL 2:

Q     Let's just back up here.

The Attorney General said the U.S. attorney in Delaware has been advised that he has full authority to make those kinds of referrals that you were talking about.

A     Yes.

Q     Or bring cases in other jurisdictions if he feels it's necessary.    And I will assure that if he does, he will be able to do that.

And the record reflects -- and correct us if we are wrong -- that the U.S. attorney in Delaware tried to bring a criminal case in D.C., and the U.S. attorney in D.C. said no.

A     That's correct.

Q     The U.S. attorney for Delaware, Mr. Weiss, tried to bring a case in California -- was it the Central District of California?

A     Yes.    It was wherever Los Angeles -- yes.

Q     And he was told no.

A     Yes.

Q Okay. So going back to what the Attorney General said, how do you reconcile those two? Maybe the Attorney General didn't know. Maybe they were actively keeping information from the Attorney General. But it's either that or he's lying.

A Yeah.

Q Are we missing something?

A No, I agree with you completely. And when he said that and I looked back on things, it was completely different from what I recall happening.

My understanding of a person -- so this is from my understanding from what I have heard from other cases that have happened. If you are a special counsel, you have full authority to bring it wherever.

So I do not know if this is true. And I'm sure you guys will figure this out. But DOJ Tax doesn't say: "Okay, you're approved to charge the tax charges." I believe that special counsel has authority to bring whatever charges wherever they want. And in my observations over the past 5 years, that is completely different than what happened.

Q And the Q&A continues, and it just puts a finer point on it. And this is with Senator Grassley at the March 1st, 2023, hearing.

Grassley asks as a follow-up: "Does the Delaware U.S. attorney lack independent charging authority over certain criminal allegations against the President's son outside the District of Delaware?"

And the Attorney General responded: "He would have to bring...if it's in another district, he'd have to bring the case in another district. But as I said, I have promised to ensure that he is able to carry out his investigation and that he be able to run it. And if he needs to bring it in another jurisdiction, he will have full authority to do that."

And as we have seen, he tried to bring the case to the U.S. Attorney's Office in

D.C., to the U.S. Attorney's Office in the Central District of California, and he was denied, and he did not have full authority to bring the case, and he did not have special counsel authority. Isn't that correct?

A Yes.

Q And like you testified earlier, we're not talking about $2,000. Okay? This isn't a $2,000 type of prosecution. This is -- and I believe your number was $8.3 million for Hunter Biden. And on top of that, it was $17.3 million for the group of folks and companies and concerns involved here. Isn't that correct?

A Yes.

MAJORITY COUNSEL 1. On the issue of special counsel authority, do you know whether U.S. Attorney Weiss requested special counsel authority?

Mr. [redacted]. I only know this secondhand from what my supervisor told me after that October 7th meeting, that --

MAJORITY COUNSEL 1. And this is what you know -- [who did you hear this] from secondhand?

Mr. [redacted]. I know this from Gary -- my supervisor, Gary Shapley -- telling me about what happened during that meeting. That --

Mr. Zerbe. Let's go off.

[Discussion off the record.]

Mr. [redacted]. So I heard it was a contentious meeting. My SAC and my supervisor were there. There were members from FBI there. And they had asked him about this, about bringing the case in D.C., and he explained that he was essentially told no. And then he went back and asked for special counsel authority, and they told him no. I don't think they said who he went back to, but they told him no.

BY MAJORITY COUNSEL 1:

Q      So you don't know who he requested special counsel authority from?

A      Yes, I do not know that.    But I know that they ultimately said:    No, follow the normal process.

Q      Do you know when he requested special counsel status?

A      That, I do not know.

Q      Do you know if he did it more than one time?

A      That, I do not know.

Can I add one more thing to the special counsel?    So there are multiple discussions within my agency up to our leadership.    So when I say our leadership, [up] to the DFO.    So the director of field operations saying:    This is a case where we need a special counsel brought in; because of all the problems we're having, we need a special counsel.    And he literally looked at us and was like:    I don't know what that means.    I don't know how to even do that.

And then also to that point, I recall discussions with our FBI counterparts on the case, the same issue.    And I thought that they were trying to raise the special counsel issue up through their leadership.

On that note, I just want to let you guys know that the way that FBI and their leadership -- their leadership was very, very much involved in this investigation.    I heard of multiple times that they were reporting up to their leadership, meeting with their leadership.    They had to advise them on this.

And when I say I felt like we were out on an island, we were left out on an island as it comes to this case.    And there was a clear difference between what the FBI was doing and what we were doing when it came to reporting this case and issues up to leadership.

Q      When you say FBI leadership was involved, do you know how high up at the

FBI?

A That, I do not know.

MAJORITY COUNSEL 2. You testified this morning in your opening statement that there was a very long list of incidents where the prosecutors in Delaware would not let the investigative team pursue certain matters, whether it was to go overt at a certain point of time, whether it was to conduct interviews, or whether it was with the storage unit.

And my question is, how do you reconcile that long list of efforts to shut down avenues of investigation? How do you reconcile that with, ultimately, the U.S. Attorney's Office in Delaware did try to bring charges in both D.C. and California?

Mr. █████. I don't mean to toot [my horn] -- they had me. They had me that pushed -- traveling on weekends. I know that people on the case would say that we would not have a tax case right now if it wasn't for me. If it wasn't for my investigative abilities and the evidence that we found through our investigation, if it wasn't for that, then we wouldn't be sitting here today talking about potential charges.

MAJORITY COUNSEL 2. So is it fair to say that, despite their efforts to shut down avenues of investigation, they couldn't fail to bring the case because of the evidence you and the rest of the team brought to light?

Mr. █████. To be honest with you, I think they were -- this is just me talking from my opinion and my perspective -- I think they were always afraid of: well, that's going to be too many approvals, let's not do that. They were afraid of all these different things.

That might touch the campaign, so we can't talk about that right now. That might touch this area, so we can't talk about that right now. And it was always, well, we'll sit here and we'll think about it. We might be able to do it because I'm going to

keep pressuring them to do it.

So I had a long list that I tracked all of our interviews. And I was like, this is when we're doing this. I was very organized, and I was very much, like this is what we're doing to get this case done. And I scheduled everything out. And I didn't want it to be on me that I was the reason why we didn't pursue the charges in the case.

BY MAJORITY COUNSEL 1:

Q Do you take that thorough approach to all your cases?

A Absolutely.

Q And did you have any reason to pursue this case with any more vigor than any other case?

A Yeah, I often ask myself: Am I too much in the weeds, and am I too far into the case that I really don't understand what's going on?

So what I did to combat that was we presented on the issues to neutral third parties. So our DFO, he sat in for: Here is the evidence that we had. Am I looking at this the wrong way? Am I perceiving this? And all the people within that chain of command agreed with what we -- that's why it ultimately was pushed forward.

Q So it wasn't just you pursuing this case on your own?

A No.

Q Okay. I want to go back to what you testified earlier about the day of action.

On that day -- which I understand to be the time when the investigation would go overt. Is that correct?

A Yes.

Q How many interviews were you planning to conduct on that day?

A So our planning for -- I want to say the approximate number would be 10.

Q      And how many interviews did you actually conduct on that day?

A      So we met with pretty much everyone.    Only one person ended up talking that day.

Q      And who was that?

A      Rob Walker.

Q      And was there anyone you were unable to talk to?

A      Yeah.    There were a lot of people that we were unable to get in touch with.

Q      And why were you unable to get in touch with them?

A      So one of those was the subject, Hunter Biden.    So he had a Secret Service protection detail.    So getting access to him was pretty hard.

Q      Are there ways you can get access to someone that has Secret Service protection?

A      So I didn't go and do that interview.    It was -- if we would have gone a week earlier or when we were supposed to go in the beginning of November.    We were supposed to go, I believe, November 10th, 11th, or 12th.

And it got pushed for -- I don't remember the ultimate reason, but there were a lot of different things being thrown in.    That the election wasn't finalized yet.    That we were still technically on a pause.

So I think there were a lot of different balls in the air, and we just didn't go forward at that time.

So the decision was made out of my hands to not -- and if we would have went, then he wouldn't have had a protection detail.    So we would have been able to do the interview.

Q      Did someone attempt to interview him on the day of action?

A      Yes.

Q    And who was that?

A    Gary Shapley, my supervisor, and Joe Gordon, the supervisor at the FBI.

Q    And they were unable to interview the subject?

A    Correct.

          BY MAJORITY COUNSEL 2:

Q    Do they believe they were hampered by having somebody tipped off --

A    Yeah.    I was --

Q    -- that the interviewees were coming?

A    Yeah.    I was informed of that by my supervisor after.    And I know that
that's an issue that he's brought up to me regarding letting Hunter's team -- or letting the
transition team know, I think, is the way that my boss put it to me.

Q    Letting the transition team know, the political team?

A    I don't know which.    All he ever told me was it was the transition team.
What that entailed, I don't know.

[2:30 p.m.]

BY MAJORITY COUNSEL 2:

Q Okay. This isn't the first time that we've heard about the subject, or the target, being tipped off. You mentioned this morning in context of the storage unit that you did say it was Mark Daly and Lesley Wolf --

A Yes.

Q -- contacted Hunter Biden's lawyers and tipped them off about the storage unit --

A Yes.

Q -- when you had developed a plan where you were going to not alert anyone on the Hunter Biden side of the storage unit, wait and see if they went to get responsive materials, which you knew was in the storage unit, correct?

A Yes.

Q And so by contacting Hunter Biden's lawyers, they totally blew the plan.

A Yes.

Q Is that not favoritism?

A I would hope they weren't doing that for favoritism, but yes, it does look like favoritism.

Q Was there any other, during the course of the investigation -- I know it's 5 years. So, there's a lot of time period here. Were there other instances where the Hunter Biden camp was tipped off by U.S. Attorney officials, or DOJ Tax officials?

A This might not go into that area. But, this is something that I wanted to bring that up I thought was -- so in the Washington -- was it Washington -- hold on. I think it was Washington Post.

In The Washington Post article that came out on October 6th that I referred to, Chris Clark, which is Hunter Biden's lawyer, said in a statement to the newspaper that he's had no contact whatsoever with any Federal investigative agent. Therefore, a rendition of this case from such an agent is inherently biased, one-sided, and inaccurate. It is regrettable that law enforcement agents appear to be violating the law to prejudice a case against a person who is a target simply because of his family name.

And, when he said that, it made me think back on we weren't allowed by the prosecutors at any of the taxpayer conferences. So we couldn't even meet Chris Clark to hear whatever the defense might be.

So I don't know if that was a strategy so that he could make that claim. I don't know. But, looking back at specifically what he said, that caused me pause.

Q Do you think Chris Clark or the lawyers for Hunter Biden actively procured your absence from those meetings?

A I think they could have, yes. They could have asked for the agents to not be there.

Q At these taxpayer conferences, do defense counsel have an opportunity to set the terms ordinarily for those meetings?

A So I'm usually not in charge of them, but I've never heard of them before.

Q But you've never been excluded before either, is that correct, to your knowledge?

Mr. Zerbe. Let's go off the record.

MAJORITY COUNSEL 3. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2. We'll go back on the record.

Mr. [redacted]. So I know of agents that are part of those taxpayer conferences, one

specifically with Mark Daly. There are other cases where he doesn't have communications with defense counsel without an agent there. I do know that.

BY MAJORITY COUNSEL 2:

Q Okay. So you found it unusual that you were excluded?

A Yes, especially with a case like this.

Q Okay.

A Can I make one more comment?

Q Of course.

A It was relayed to us that his counsel said something like if you charge this case, good luck with finding a job outside of here or good luck with -- it's career suicide I think is what he said.

Q And who was that related to?

A I believe that was --

Q Was that at the taxpayer conference?

A I don't know when that occurred. So I don't know which situation that would have occurred.

Q How was it related to you?

A It was just relayed to me through either one of the attorneys or through David Weiss. I don't remember who said it to us.

Q So you just don't recall who relayed that to you?

A Correct.

Q Okay.

Mr. [redacted]. Can we go off the record for a second?

[Discussion off the record.]

Mr. [redacted]. Back on?

MAJORITY COUNSEL 2. On the record.

Mr. [redacted]. Thanks. Yeah, so not being there, apparently there was information brought up during those meetings that we didn't hear until weeks after, if we heard everything. So there could have been things said there that were never relayed to us.

And it's super important for us because if there's defenses being put out there, we're going to want to know everything, because we're the investigators. We go back and -- when I say the first taxpayer conference, they presented defenses on 2014-2015. We took their defense and worked through them and tried to refute them with the evidence. And not being there gave a whole -- it wasn't efficient. It wasn't -- I don't know.

BY MAJORITY COUNSEL 1:

Q So you testified earlier that there was a time when you got the sense that investigators had not been provided all the information. You had seen public reporting. Videos, you mentioned. Were you aware of Hunter Biden's laptop?

A Yes.

Q Did the IRS have access to the material on that laptop?

A So it was obtained by the FBI, and it was an IRS search warrant. So it was a Title 26 IRS search warrant of that laptop.

Q Can you explain that for a second? So it was a Title 26 search warrant meaning --

A It was only tax charges and the initial warrant that allowed to us essentially get access to the laptop. So we had to get a search warrant of it and it wasn't --

Q And the FBI executed that search warrant?

A So it would have been done by the FBI forensic, like their forensics team.

Q And was the information on that laptop shared with IRS investigators investigating the alleged tax crimes?

A So it's quite complicated, and my memory is not the best when it comes to the laptop, because there were storage backups to it. There was also the laptop.

We had different members of our team that would -- we had one agent who looked through the laptop. We had one agent who looked through backups of it. So there were a variety of people kind of tackling it all at once. That's kind of how we tried to do everything.

So from what I do know -- and this has been -- I believe I've gone back through statements that were documented -- that there were some things that were held back from us for one reason or another. But I don't still know what that is.

Q Were you aware of any other limitations placed on investigators in this case that we haven't discussed?

Mr. [redacted]. Can we go off the record?

[Discussion off the record.]

MAJORITY COUNSEL 2. Okay. Back on the record.

Mr. [redacted]. Yeah, things related to the campaign were kind of, at least during the investigative stages, were off limits.

BY MAJORITY COUNSEL 1:

Q Do you mean the Presidential campaign?

A Yes, the Presidential campaign.

Q In 2020.

A No. This would have -- yes, but we would not have found out about it until after -- everything was done. So this would have been when we went overt.

Does that make sense?

Mr. Zerbe. Go off the record.

MAJORITY COUNSEL 3. Off.

[Discussion off the record.]

MAJORITY COUNSEL 2. Back on the record.

Mr. Zerbe. Go ahead.

Mr. [redacted]. It would occur after our day of action, after we went overt. And I recall there being a crisis management meeting. And because of attorney-client privilege issues, and potentially issues related to the campaign, I felt that some things were off limits discussing.

BY MAJORITY COUNSEL 1:

Q Why did you feel that way?

A Because during interviews there was an atmosphere that made it very difficult to ask questions because -- and I know I wasn't the only one that felt this way -- that you get eyes rolling or --

Q From whom?

A From Lesley Wolf or from Mark Daly or whoever was -- it was a very intimidating atmosphere sometimes to ask questions.

And the same thing goes from our -- we had biweekly meetings that I would run. And I didn't have a problem with bringing up challenging issues. But every single time I brought up challenging issues, they would get shot down.

And I recall having phone calls immediately after with my supervisor and my co-case agent and wanting to pull my hair out because I'm just trying get this case done.

Q And those ideas would be shot down by Lesley Wolf?

A Would be shot down by the prosecutors on the call. So it would be Lesley Wolf or Jack Morgan or Mark Daly.

Q     Anyone else?

A     It wasn't all the time, but it did happen.

Q     Other than the three people you mentioned, anyone else that would fall into the role of shooting down ideas?

A     And I want to go back for a second.    It was I'm going sit here and think about it, and then you'd have to bring it up again.    We're thinking about it.    When I say "shooting down," I want to be very loose about that question.

Q     Let me clarify my question.    So you mentioned the creation of an atmosphere that -- would it be accurate to say -- would make you second-guess raising issues?

A     Yeah, absolutely.

Q     Okay.    And other than Lesley Wolf, Jack Morgan, and Mark Daly, was there anyone else that you think created that atmosphere?

A     No.

          BY MAJORITY COUNSEL 2:

Q     Do you have any information about whether Lesley Wolf was doing this because she wanted a job in the administration?    Did she try and get a job with Main Justice?

A     I have not heard that.    This is my personal opinion that Lesley's always been -- she's a really good arguer.    I actually talked with another case agent about that she's really good at arguing and really good at talking her way out of do[ing] whatever.

          And it was a lot of things.    I'll be completely honest with you.    If we would have brought this case in SDNY, who I know was super aggressive because you see it all the time, I don't think we'd be sitting here right now.    If we were to bring this in -- maybe even D.C. U.S. Attorney's Office from the get-go, I don't think we'd be here right now.

BY MAJORITY COUNSEL 1:

Q I want to go back to something you mentioned earlier regarding a walk-by of Hunter Biden's residence. I believe you testified that Mark Daly told you that someone had denied your ability to do that walk-by.

A Yeah.

Q Who was it that denied that walk-by?

A It doesn't say. So it would have been any manager above him. So it would have been anyone in his management chain --

Q At DOJ.

A -- at DOJ Tax. And I could tell you that's never happened to where you had someone weighing in on whether you could do a covert action, walking by someone's house.

BY MAJORITY COUNSEL 2:

Q Why did you have to get approval for that?

A Because we were in a posture at that point that we couldn't do anything that appeared -- any investigative activities pretty much whatsoever.

Q But you weren't wearing an IRS windbreaker, and you weren't driving a car marked with IRS letters on it. So how would anyone possibly know? It's a free country. You're allowed to drive by any house you want.

A Yeah, I didn't want it -- because I think at that time we were trying to do surveillance of pretty much everyone we were going to potentially interview. So he was just another one of the people that we wanted to do that for. I guess I don't know --

Q But did you have to travel to do the walk-by?

A No, we would have sent an agent from that area --

Q Okay.

A      -- out to help.

Q      And was it ordinary that you would have to ask permission from the prosecutors to do something like that in any other case?

A      Not at all ordinary.

Q      So this was special to the Hunter Biden case.

A      Yes.    So it says:    Tax does not approve.

So whatever that means, tax does not approve.

          BY MAJORITY COUNSEL 1:

Q      What is that email in reference to?

A      This is in reference -- this is October 20th, 2020, walk-by of possible residence.

And Mark Daly says:    Tax does not approve.    This will be on hold until further notice.

          BY MAJORITY COUNSEL 2:

Q      And the plan was you were just going have an IRS agent out in California walk by the house?

A      Yes.

Q      Drive by the house.

A      Yes.

Q      Check it out.

A      Uh-huh.

Q      Not stop, not interview anyone, not interview neighbors.

A      Nope.

Q      Not knock on the door.    Just drive by the house.

A      Yes.

Q That was denied.

A Yes.

BY MAJORITY COUNSEL 1:

Q We talked earlier about the potential of interviewing I believe it was President Biden's grandchildren. Is that right?

A Yes.

Q So that would be Hunter Biden's children?

A Yes.

Q And the interest in conducting their interviews is because Hunter Biden made payments to those individuals? Is that right?

A Or made payments for the benefit of them.

Q And the interest in interviewing them about those payments was not because he made those payments but was because he deducted those on his taxes. Is that correct?

A Correct.

Q And what type of evidence would you need to properly evaluate whether a deduction was properly taken in an instance like this?

A So you'd want a statement from -- so there's two points to this. You'd first get the records from, let's say it's Columbia school. You get records from Columbia school, and they would show you why the person paid that $30,000. So that's step one.

Step two would also be, if it's paying for someone else, finding out why that person paid that. Was there any business purpose or reason for paying that? If it was -- she did work for me and in return for doing some work for me, I paid for this, so that could potentially be a deduction, so reasons like that.

And I want to be clear on this. I believe what happened down the road is that

there was a potential of it being stipulated, that the kids' expenses were for personal purposes, so it being stipulated from his counsel.    But I don't know if we ever officially got that or -- someone -- an attorney can say that and you can still go back on that down the road.    You know what I mean?

Q      In the absence of a stipulation like that, would it be normal to interview a third party who received a payment that was then deducted on taxes and there was a reason to question the deduction?

A      Yes.    And to be honest with you, sometimes it doesn't matter the dollar amount.    Sometimes -- I've had cases of mine to where there was a small deduction. But then they told us about this information that was completely unrelated to this.

Oh, he told me to open up this bank account for him.

And it can lead on to something that's completely different.

Q      In a typical case, would you consider the interviews of individuals like this to be a completely reasonable step in an investigation like the one you were conducting?

A      Yes.

Q      One other clarifying question on something you mentioned earlier.    You mentioned that when you opened the case at IRS, in the course of moving it forward, you learned that the U.S. Attorney's Office had opened their own case.    Is that right?

A      Yes.

Q      And those two cases were merged.    Is that right?

A      Yes.

Q      And my understanding of your testimony earlier is that the merger of those two cases created a process that would be different from if the case had just proceeded at the IRS.    Is that right?

A      Can you rephrase that question?

Q      What would happen in a typical case if the two cases had not been merged?

A      Oh, we would have opened the case -- the case would have been sent to the intake, so the tax intake, specifically the tax intake at the D.C. U.S. Attorney's Office. They would have evaluated our -- it's called a [Form] 9131, but -- basically our work product.   And they would have done the paperwork to get an investigation going.

So Delaware could have done their own, and we would have done our own thing in D.C.

Q      Under the auspices of the U.S. Attorney in the District of Columbia?

A      Yes.   Because sometimes there are cases to where you have split venue, and sometimes you do want to merge both of them.   But I do know of -- yeah, so, it just honestly depends.   There are situations where both are true.

MAJORITY COUNSEL 2.   Our hour's up.

Mr. Zerbe.   Can we take a quick break and just breathe in and out?

MAJORITY COUNSEL 3.   Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.   We'll go back on the record.

BY MINORITY COUNSEL 1:

Q      Okay.   I wanted to go back to something that you mentioned earlier.   You said that in March/April -- and I think you meant 2018, but I'm not sure -- that Bill Barr made the decision to join these cases together.

A      So that would have been 2019.

Q      2019.

And then you said that the case in Delaware was opened January of 2019?   Is that correct?

A      Yep.

Q    Okay.    And then this case was opened May of 2019?

A    So the cases were joined May of 2019.

Q    How was it communicated to you that Bill Barr joined these cases together?

A    I believe it was my manager that told me.    My manager would have been Matt Kutz.

Q    How would he have known?    Would that have come from Justice somewhere or where does that come from --

A    From his leadership, most likely, when we were told -- we were essentially told that we had go up to Delaware to meet them.    And the decision was made at his direction, from what I recall.

Q    "His" being Bill Barr?

A    Yes.

Q    Okay.    Was there any other discussion of Bill Barr taking interest in this case that you heard of beyond it being joined?

A    Not at all.

Q    Was there any reporting up the chain that you know of to Bill Barr?

A    No, not that I know of.

Q    Okay.    Who were the Justice attorneys on the case at the time that Bill Barr decided to join these cases together?

A    So you had Assistant U.S. Attorney Lesley Wolf, Assistant United States Attorney at the time, Jamie McCall.    And then from DOJ Tax it would have been Kimberly Shartar.    And I believe it was either -- I think that was Jason Poole, [DOJ Tax,] but I don't know if he was promoted at that point.    It could have been also Mark Daly[, DOJ Tax]. So it was two or three attorneys from DOJ Tax.

Q    These attorneys that were on the case, did they change when the new

administration started in 2021?

A     Could you elaborate more on that?

Q     So Lesley Wolf --

A     Okay.

Q     -- she was there in 2018, 2019 when these cases were joined.     Is she still on the case?

A     Yes.

Q     And was she --

A     From what I know, yes.

Q     Okay.    Was she on the case at the beginning of 2021?

A     Yes.

Q     January 1 of 2021?

A     Yes.

Q     The same thing with Jamie McCall.    Was he on the case at the very beginning when Bill Barr joined these cases together?

A     Yes, he was.

Q     Was he on the case January 1 of 2021?

A     No.

Q     He was gone?

A     Yes.

Q     Okay.

A     And they were --

Q     Was someone else put on the case?

A     Yes.    Carly Hudson.

Q     When did Carley join the case?

A      At some point in 2020.

Q      Do you know how attorneys are added to cases?      Do you know if that would have been a Bill Barr decision?

A      I don't know, but I don't think so.

Q      What about Kimberly Shartar?

A      Shartar.

Q      Shartar.      Was she --

A      Shartar.

Q      Was she on the case at the beginning?

A      I believe so, yes.

Q      Was she still on in 2021?

A      No.      She left for a position to become an Assistant United States Attorney in another district.

Q      Was someone else appointed, or put on the case?

A      At some point, Jack Morgan was put on [from] DOJ Tax.

Q      Do you know when he was added?

A      That I do not know.

Q      Would it have been before 2021?

A      Yes.

Q      Jason Poole and Mark Daly -- one of them was on at the beginning?

A      Yes.

Q      One of them was still on in 2021?

A      Yeah, Mark Daly was still on in 2021.

Q      Is he still on the case now?

A      I believe so, yes.

Q Okay. Now you mentioned the storage unit and the decision regarding the search. That was in 2020, correct?

A Yes.

Q At the time that the search decision was being made in 2020, were these individuals, the ones that we discussed that were there in 2020, were they the ones that would have made the decision about the storage unit?

A One of those people, yes. It would have been up to Lesley Wolf and Mark Daly and potentially Jack Morgan.

Q But that was a decision still made under the prior administration, and it was made sometime in 2020 after Bill Barr had joined the cases, correct?

A Yeah, I don't know if by that point -- I don't know when Bill Barr left Main DOJ.

MAJORITY COUNSEL 2. December 23rd --

Mr. [redacted]. Okay.

MAJORITY COUNSEL 2. -- 2020.

BY MINORITY COUNSEL 1:

Q In your experience, would you think that individuals that had been working a case would change their position because a new administration comes in in 2021?

A I have never seen that, and I would have reason to hope to believe that that wouldn't happen. And I have no indication that it was because of a change of administration.

Q It seems as if they were acting -- in my mind their actions seem consistent over the two administrations, that they had a position that they took and they continued with that position going forward when they made their decision to -- when you probably left the case or even today, since we don't know what's going on today in the case.

A Yeah, I would to like say something to that, that it wasn't always all bad as it might -- I know I'm bringing up some of the things that have happened that I thought were out of the ordinary and what, looking back, might have been improper. There was some good that we did, too.

So I don't want it to appear like it was just -- but it was definitely an atmosphere and it was -- as you can see in my emails and, looking back, it was very hard for me to do my job. I was not handheld but --

Mr. Zerbe. Handcuffed.

Mr. [redacted]. -- handcuffed.

MINORITY COUNSEL 2. How unusual, or in your experience, how frequently have you seen cases merged from the DOJ and IRS?

Mr. Zerbe. Let's go off the record.

MAJORITY COUNSEL 3. Off the record.

[Discussion off the record.]

BY MINORITY COUNSEL 2:

Q That's what I'm asking. How common is that circumstance?

Sorry. Back on the record.

A I have never had that happen in my career.

Q Would you say it was something of an unusual occurrence for the Attorney General himself to order that?

A Looking back at it, I think he was trying to utilize the resources that he had. And I recall doing venue analyses for them to determine where proper venue was, to see if -- but everything that I did said that we were -- there's no residence of Hunter other than his dad's residence, his dad, President Biden, in Delaware.

So his return preparers are in, I think it's Maryland, his -- at the time were in

Maryland.    So everything was pointing to outside of Delaware.

Q      Well, when you say utilize his resources, is it usual for the Attorney General to take a specific interest in a case that maybe conservatively would be of, you know, $1 million in value to the U.S. Government, which, although obviously is a lot of money to the folks sitting here, is pretty small, small dollars relative to the entirety of the fiscal --

A      Can ask you your question again?    I apologize.

Q      Does the Attorney General usually weigh in on cases where you're talking about $1 million?

A      I've never had that happen before.

Q      To your knowledge, did Attorney General Barr weigh in, or seek updates on the investigation after those cases were joined?

A      Not to my knowledge.

        BY MINORITY COUNSEL 1:

Q      You mentioned that the FBI leadership was involved in the case.

A      Uh-huh.

Q      And there was some reporting up the chain that you were aware of regarding the FBI leadership's being kept in the loop, I guess, for lack of a better word.

A      Yes.

Q      When did that start, that you became aware of it?    And when did it start, the reporting up the chain at the FBI?

A      I would honestly say it started in the beginning.    I was constantly hearing about them having to report up their chain regarding what was going on.    And towards the end of the case, what was kind of -- it wasn't amusing to me but, the fact they were updating their leadership on a tax investigation.    So their high-up leadership, I should say, was more caring about what we were doing in our investigation.

Q      When you say that the FBI leadership was kept in the loop from the beginning, do you mean November of 2018-ish, in 2018 when you first got involved?

A      So my knowledge of it would have started occurring in the summer of 2019.

Q      Did that continue through 2020?

A      I believe so.

Q      Are you aware of the FBI leadership at any point talking to Attorney General Barr and his leadership regarding this case?    Are you aware of any meetings like that?

A      Not that I'm aware of.

Q      I want to ask a little bit more about the grandchildren.    You said that it's not abnormal to talk to relatives and family.    How old were the grandchildren that you were seeking to interview?

A      We never got -- I honestly don't even know.    I know one of them had to have been in college, so college age, yeah.    To be honest with you -- because we were never allowed to go do it -- normally I would have pulled public reporting, or I would have pulled information that would tell me this.

But because we weren't going to go do it, I didn't need to pull any of that.    So I didn't know their age.

Q      But college age?

A      The one, yes, I believe is college or has graduated from college.

Q      When asked whether this was a reasonable step, you said that you thought that it was a reasonable step to interview someone because another person took a deduction regarding them on the tax return?    That's typical at the IRS?

A      It's not -- in my opinion, that's more of a blanket statement.

How we do our jobs is if -- when we're doing an investigation and we're looking into someone's tax returns, we find the areas that there might be fraudulent deductions.

If this is a deductions case, we look at the deductions.

So if we have a payment that's made to ABC company, and on the memo line it says for whatever their daughter's name is, then we would want to go and talk to that person.   Why was this payment made on your behalf?

And then that's kind of the reason or the line of why we do those interviews.

Q      Okay.   You mentioned that, for instance, your first step might have been to go to Columbia school and ask about the $30,000 and get their records.

Why would that have not been enough to establish what the $30,000 was for if it was for tuition?   Why the extra step of trying to talk to the grandchild?

A      So like I said, typically if -- there could be a situation where I did work for someone, and then instead of giving me actual monetary compensation, they pay for my school.   So that could be a deduction for you, a legitimate deduction.   So as a part of our investigation, we have to figure that out.

BY MINORITY COUNSEL 2:

Q      Did you, as a part of your investigation, talk to all of the hotels where payments were flagged?

A      Almost 100 percent of them.   There was a significant amount of them, yes, specifically for 2018.

Q      What were you seeking in talking to the hotels?

A      We were seeking records regarding hotel stays and the reason for the expenses.   I have the answer for you.   It's a Boulware [Greenberg] issue.   So that's what the legal term is for it: Boulware [Greenberg].   That's why you want to go to a third party to find out.   So we can't just rely on that, this looks personal.   We have to actually go and figure that out.

Q      Is that the name of a case?

A I believe so, yes.

BY MINORITY COUNSEL 1:

Q In talking to the hotels, did you establish who stayed in the hotels each of the nights that were deducted?

A Yes, we got information from the hotels about whose name was on the room. If there were any issues with the rooms, yeah, there was a lot of information that we got from the hotels.

Q You mentioned one of the nights was in the name of President Biden?

A Yes.

Q Okay. Do you know if his Secret Service was there with him that night? Is that on your hotel records?

A That I do not know.

Q Were you able to establish that he was actually in the hotel?

A No, I was not.

Mr. Zerbe. Can we go off the record?

MAJORITY COUNSEL 3. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 3. On the record.

Mr. [redacted]. Back on the record. I apologize.

I have a receipt of something that was purchased from the person, whoever stayed there, a receipt for food for room service.

BY MINORITY COUNSEL 1:

Q Oh, you have the receipt that someone was in the hotel room?

A Yes.

Q Okay. But not necessarily who it was in that hotel room?

A      Correct.

Q      Okay.    When you interviewed the hotel, did you interview the employees, as well?

A      So let me be clear on this.    We didn't interview the hotel in this situation. We would have asked for records from the hotel.

BY MINORITY COUNSEL 2:

Q      Would you submit that asking for records from a business is less intrusive than surprising an individual for an interview with the Justice Department or the IRS Criminal Investigation Unit?

A      When we do interviews, or when we do records requests, we don't -- at least in my profession, we don't consider what's least intrusive.    We consider that for search warrants.    But when it comes to going to someone's door and knocking on it to see if they want to submit to a voluntary interview, I would not consider that intrusive.

Q      Is it not that you wouldn't consider it intrusive per se?    It's just whether it's intrusive or not is something that you would not factor into in your investigative process?

A      So if it's a situation of either interviewing someone or issuing them a records request, both of them require me going to them to give it to them or to actually go there and talk to them.    So both -- in the situation with a hotel, you can mail those certified mail.

Q      Right.

A      But in terms of individuals, we can't -- there are situations where we could mail them, but typically we go to the door and we knock.

MINORITY COUNSEL 2.    Can I --

MINORITY COUNSEL 1.    Go ahead.

BY MINORITY COUNSEL 2:

Q      What is the purpose of a drive-by?

A      To establish if someone's living there, if they're present at home, their modus of -- when they are home and when they're not home.    It's to give people or to give the investigators an idea of just their normal course of what they're doing.

And it's also to establish in this case, if there was Secret Service out front, if there was a protection detail.    All those various things come into play.

Q      In order to establish, for instance, whether the person is home, whether it's lived in, what their pattern of usage of the home was, it's not merely sort of walking by casually on the street.    It's repeatedly doing so, correct?

A      It doesn't necessarily have to be repeatedly doing so.

Q      But it often can be?

A      It can be, yes.    In our job, we are trained and taught to do surveillance without being caught.    So that's part of our training, surveillance or a drive-by or a walk-by.

Q      Do we know if Mr. Biden's house was, for instance, at the end of a cul-de-sac?    On a street?    Had a sidewalk where people typically walk?

A      I think this one was in Venice Beach.    It so was just on a -- I think I have actually been there.    There was a sidewalk.    It's a normal neighborhood.

BY MINORITY COUNSEL 1:

Q      On surveillance, you had mentioned that you had roughly 60 people that you wanted to interview.    Did you put surveillance on all 60 of those individuals?

A      No.

Q      On how many of them?

A      Let me be clear on that, that it was originally, we had a larger group of people that we first wanted to interview.    That got smaller, smaller, and smaller until we

got to 10.    I believe that all 10 of those people, we did some sort of surveillance to get eyes on them before doing our day of action.

Mr. Zerbe.    Just off the record.

MAJORITY COUNSEL 3.    Off.

[Discussion off the record.]

MAJORITY COUNSEL 3.    Back on.

BY MINORITY COUNSEL 1:

Q    I think that I was talking more broadly than just the day of action.

A    Okay.

Q    Of all the people that you interviewed, which I assume it's roughly 60 or more, how many had surveillance of any sort?    A drive-by?    A walk-by?    A sit in front of their house?    How many people?

A    It would have been just in that first very instance, the people that we did that December 8th activity related to.

Q    So the 10.    And would the --

A    It would approximately be the 10.

Q    Approximately 10.

Would you have done your surveillance over a number of days?    Weeks?    Is it one day?    One hour?    How long?    How much surveillance?

A    I honestly don't know.    Some of the time we can -- they have a specialty unit within the FBI that can go and do surveillance if we need it of that particular person.

Q    Related to the day of action, which was going to be in 2020 under the prior administration, you had surveillance out on roughly 10 individuals, the ones that you were planning to do the interviews of on that day.

A    And I think it was only to establish that they lived there, to verify that the

person lived there.

    Q     Who are the 10?   Do you know who they were?

    A     I honestly do not.

    Q     Does it include his family members?   Any family members?

    A     It does, but it -- so one of the family members that we weren't able to -- they didn't allow us to interview but we were able to serve a records request was James Biden and Sara Biden -- I don't think that we did surveillance of them at all -- his ex-wife, Kathleen Buhle.   And this is all from my memory.   So it was on that day or around that day.   There was also, I believe, Hallie Biden?

    Q     Who is Hallie Biden?

    A     That is his deceased brother's wife -- widow.   I'm sorry.

        BY MINORITY COUNSEL 2:

    Q     For clarity, this was in October of 2020?   I'm sorry.   The date of action, what date are we looking at again?

    A     December 8th.

    Q     December 8th, 2020.

Do you think that, given the fact that many of these were relatives of the President-elect, there would be media presence possibly surrounding some of these individuals?

    A     Not that I was aware of.

    Q     But if there were to be media presence in some form or another, would that be of concern to either the Department of Justice or the Criminal Investigation Unit?

    A     I don't know -- what I can say from my normal process and procedure, if I saw the media out front of someone's house, maybe I might wait until the next day, or wait until that media -- it just depends on the situation.   If it's an interview that I need,

the whole purpose of that was that we were trying to somewhat take people off guard, surprise, and get information from them.

But this was their personal residences.    I wouldn't expect the media to be outside their personal residences.

Q    Can I go back to something that you said -- my colleagues were asking questions previously.    We were referring to Lesley Wolf.    Our counterparts asked whether she was potentially looking for a job in the administration and you suggested -- not that you were aware of and the like.

But then you said something to the effect of, if we had brought this case in SDNY or D.C., we wouldn't be here right now.    That surprised me a bit.    And, leaving SDNY aside, I'm curious why you have that opinion about D.C., when we've learned that D.C. declined to take this case up?

A    So it was a President Biden-appointed attorney who I believe said no to working this case in Washington, D.C.

When a lot of times when another U.S. Attorney's Office gets a case at the absolute end of that case, they don't like it very much because they didn't do the investigation.    So what I was trying to say by that was the D.C. U.S. Attorney's Office and New York, they've worked cases of this caliber.    So they know how to aggressively work these cases.

And this is just from my observations and opinion.    Let me clarify that.    But that's personally what I believe.

Q    In your experience, the Attorney General's Office in Delaware has historically not pursued either tax crimes or other financial crimes with any vigor?

A    No, I don't want to say that at all.    I would want to say that it's a smaller U.S. Attorney's Office.    So a lot of times when you have a smaller U.S. Attorney's Office,

they're a lot less -- I don't want to use the wrong word here.

It's just it's -- the problem that the agent that I spoke with that's from that U.S. Attorney's Office that said that they love to slow-walk things.   It's very common in that office.

Yeah, I said earlier that they were the JV squad, in my opinion, and weren't up to the task of tackling this.

Q     Was this your first time working with that office?

A     Yes.

Q     So safe to say, you were frustrated with working with that office.   But at the same time, as a general matter, as a condition of your job, when you have to work with different U.S. Attorney Offices around the country, oftentimes you get sort of different flavors in an office.

A     Yes.

Q     Is that safe to say?

A     Yes.

Q     At least to an extent, sort of understanding the flavor of how that office worked is part and parcel of your job.

A     Yes.

BY MINORITY COUNSEL 1:

Q     Can I go back to the $10,000 payments that were made per month?   You mentioned that he was making payments voluntarily.   Is that correct?   Or did he have --

A     Yes.

Q     -- some sort of installment agreement with the IRS?

A     He had a quasi-payment plan that he set up through his accountant, paying $10,000 a month.   But, yes, he had something set up.   It wasn't actually officially set up

with the IRS though.

Mr. Zerbe. Let's go off the record.

MAJORITY COUNSEL 2. Off.

[Discussion off the record.]

MAJORITY COUNSEL 3. On.

MINORITY COUNSEL 1. Back on.

Mr. [redacted]. Okay. So it wasn't an official monthly installment agreement, no. It was self-imposed through his accountant.

And I would also like to say that his passport was revoked. He wasn't able to get another passport because of the delinquent taxes.

They sent multiple notices. There's an actual email where he asked how long he can go without paying his taxes. And, meanwhile, let me reiterate that in the time after this, when he stopped the payment plan -- he stops making the payment plan. He earns, I think it's over -- I don't want to mistake this number. He earns $2.4 million from Hudson West III but can't make the $10,000 payment he was making on his taxes.

BY MINORITY COUNSEL 1:

Q What was the date of when he stopped making the payments?

A March 5th, 2018.

Mr. Zerbe. Is the last payment?

Mr. [redacted]. Is the last payment, yes.

BY MINORITY COUNSEL 1:

Q Do you know how much he had paid by that point on the $10,000 payments, how many months he had paid?

A Seven of them, $70,000.

Q Okay. I want to go back to the loan. You said that the way that they set it

up was that there was something attached to his return and it said that part of this was a loan and there was an interest rate of 5 percent.

A    Uh-huh.

Q    Okay.    Did you look into any paperwork regarding that loan?

A    We did attempt to obtain that note, yes.    We did attempt to obtain it, yes.

Q    Did you obtain it, or you just attempted?

A    I don't recall, and I go back to my previous statement that I don't feel comfortable going any further than.

Q    Okay.    Okay.

MINORITY COUNSEL 2.    For clarity's sake, though, because I just want to make sure something is clear on the record -- do you agree that, assuming that there is a true loan, which is to say, a promissory note with interest, and the interest is [paid]-- it's not a sham.    There's nothing untoward about that loan -- an individual making a loan for the ability of another person to satisfy his tax liability.    There's no tax fraud element to such a thing.

[3:33 p.m.]

Mr. [redacted]. It honestly depends if you're able to sham the transaction.

BY MINORITY COUNSEL 2:

Q Assume it's a true loan. It's a true honest loan. This is not a trick question. I'm not -- I'm just trying to --

A So, yes, if something is a loan, we would give them the benefit of the doubt. And our most conservative approach is that it's not income, correct.

Q Similarly, in the case of someone who provides someone with funds out of detached and disinterested generosity in order to satisfy their tax liability, that would be considered a gift and thus not subject to Federal income tax, at least by the recipient?

A There would be gift tax reporting requirements, and those would have to be upheld, but --

Q By the donor?

A Correct.

Q I want to make sure that, at least on the face of the transaction as described to us, there are certainly two avenues under which such an arrangement would not raise any flags from the perspective of the Internal Revenue Service?

A Correct.

BY MINORITY COUNSEL 1:

Q All right. I want to go back to a little bit of the discussion on the Washington Post article and the comment by Chris Clark, and then there was a question to you.

The statement was that you had heard something somewhere that someone had maybe said that, if they were to charge this, it would be career suicide. That was

hearsay, third party, that --

A    Yes.

Q    -- you just heard from a third party?

A    Yes.

Q    You have no name as to who said that?

A    I believe it came from Chris Clark, but I only know that from --

Q    But you don't know anyone inside that said this would be career suicide to charge this?

A    Inside the --

Q    The IRS.

A    Oh, yeah.   No, I -- no.   No, no, no.   No.

Q    Okay.   What about from Justice?   Did you hear anybody say that?

A    No.

Could I add one more thing?   I know this is on your time but.

There are potential other spin-offs and things that were in the process of being worked that I somewhat fear are going to get lost in the shuffle of everything that went on in that because, essentially, all I'm having to do is turn my information over to the next case agent.   So that is of a definite concern to me, and it's why I think I've been so vocal on the special counsel perspective and having that neutral person come in there and essentially review the evidence and make his decision.

BY MINORITY COUNSEL 2:

Q    Can I ask one more question?   I did have one more note that I wanted to raise.

What is the difference between making a referral or bringing a case in the case of Mr. Weiss?   I'm sort of curious.   At least from your perspective, what is the difference

between those two things, at least as spoken by Attorney General Garland?

A I would -- this is my assumption based on that. It's referring the matters from your jurisdiction to another jurisdiction. So referring the work to the other jurisdiction to where you want to charge the case. So that's bringing the case.

Q Those seem to be synonyms, as you're describing them.

Mr. Zerbe. I just want him to see the writing. I think there's a referral to the case or to bring cases.

Mr. ████. Yeah, that leads me to believe that statement right there that he has full authority to do whatever he wants with his cases.

BY MINORITY COUNSEL 2:

Q Admittedly, it's an ambiguous term or phrase because he does say make a referral or bring a case. I'm trying to understand what the difference between those two are because you pointed out that he did make a referral and he had authority to make a referral, but what would bringing a case be? What would he do differently if he were to bring a case as opposed to make a referral?

A So you have this right here where it says, "I have not heard anything from that office that suggests they are not able to do anything that the U.S. Attorney wants them to do."

And the U.S. Attorney wanted them to bring charges in the District of Columbia. And that completely contradicts that statement.

Mr. Zerbe. Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. ████. So each of these two statements showed to me that there wasn't going to be anything political involvement in this. That you had this neutral person from

the prior administration that's coming in, and that he's going to be able to do whatever he wants.    And that's what they have confidence in.

The problem I saw was that you have President-appointed U.S. Attorneys who are a part of the process now, so now it has become political again.    So you have a political appointee from a different party that was literally just nominated.    I think it was U.S. Attorney Estrada.    And this is the first thing he gets on his desk.    So the President just appoints me, and this is the first thing that I've got to deal with.

And the part that was -- I know I use this word a lot -- frustrating was that this was for the years that they told us were slam dunks.    Slam-dunk cases.    I was told that by the AUSAs and the DOJ Tax attorneys.

BY MINORITY COUNSEL 1:

Q    Could it be that, when there's a referral, the receiving AUSA -- it's at their discretion then to decide to bring the case versus just bringing the case directly?

A    Yeah.    Yes.

Q    Could it be that the AUSAs that received it have other considerations based on their jurisdiction and cases that they've seen that have been successful in their own jurisdiction?

A    Yes, that is true.    AUSAs can provide guidance based on what they know from their area.

Q    The AUSA -- Weiss -- he was Trump-appointed, correct?

A    Yes.

Q    The two -- well, at least for D.C., the AUSA was Biden-appointed, correct?

A    Yeah.    If you want, the name of him -- just so we're clear for the record.    I have it.    Matthew Graves.

Q    Matthew Graves.

But it isn't that one is more correct than the other, it's just that you have two AUSAs, and they have different opinions of the case?

A     So I go back to Merrick Garland's statement that he says.     "He is in charge of that investigation.     There will not be interference of any political or improper kind."

Q     I guess what I'm asking is, if the situation had been turned around and he had taken the case, then we wouldn't be here.

So, as long as it's a yes, then there's no political interference, but if there's a no, then there is political interference?     That can't be the way that we decide whether or not an AUSA brings a case.

A     So I guess I want to be clear here.     I was not afforded an opportunity to present to D.C. on the merits of the case, what we had found through our investigation for 2014, 2015.     I was not afforded the opportunity to present to the Los Angeles U.S. Attorney or the U.S. Attorney's Office with the evidence that we had found in this case. That was not given me the opportunity.

So that right there alone, I think, is improper on its face.     The people that know the case the best, the case agents that work the case, should be the ones that present on the material.

The thing that draws me pause is the conversations I had with Mark Daly in March 2022 to where -- they get the case.     They get the referral.     They're like, here's what we're going to do to help you guys.     And then a few days later, they meet with the U.S. Attorney, and the U.S. Attorney says, someone in that -- this is all what I heard from it. They said, not only are we not going to help you with that case, but we also don't think you should bring charges here.     So that led me to believe that there might be something else going on there.

Q     In the other cases that you have, have there not been any disagreements in

any of those cases in your career?    When cases go up to the AUSAs, they just take them all?    They take every case that IRS sends?

A       They do not, no.

        BY MINORITY COUNSEL 2:

Q       In general, in your experience -- well, I'll just say this.

In my working experience, I often would love to be the person who -- when I feel like I'm closest to the facts -- is the one presenting the information to the principal, making the [decision] -- but quite frankly, I don't always get that opportunity.    I think it's an experience that many of us in our legal careers have experienced.

Is this the only time that you haven't been able to present your case to the decision-maker and someone above -- the level above you was in charge of doing that instead?    Or even two levels above you?

A       Well, yes, there are situations like that.    But from what I know, no one from the IRS, my agency, got to present to the D.C. U.S. Attorney's Office or California.

MINORITY COUNSEL 1.    We're good.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

        BY MAJORITY COUNSEL 2:

Q       During our discussion of the 2018 tax year, you mentioned that Hunter Biden was making business expenses for prostitutes?

A       Yes, in some circumstances.

Q       Could you give us a little bit more information on that?    What was the nature of the -- was he paying for -- were they on the payroll?    Was he paying for travel?

A       In some situations, they were on payroll, and that was to get them health insurance in certain situations.    There was --

Q So he's paying for health insurance for his prostitutes?

A Not necessarily for -- so let me go back and -- so one of his girlfriends was on the payroll and --

Mr. [redacted]. Off the record, please, for a second.

[Discussion off the record.]

MAJORITY COUNSEL 2. Back on the record.

Mr. [redacted]. So Lunden Roberts, she was on his payroll. She was not working. She was actually living in Arkansas pregnant with his child, and she was on his payroll.

There were expenditures for one of -- he called it his West Coast assistant, but we knew her to also be in the prostitution world or believed to be in the prostitution world. And he deducted expenses related to her. She relates to the sex club issue.

And then there were -- and I know that my counsel brought this up earlier. There were some flying people across State lines, paying for their travel, paying for their hotels. They were what we call Mann Act violations.

Q Where he was paying for the travel of an individual to fly out to California or wherever?

A Or Boston or wherever he was at. D.C. I think one of them -- he flew someone for the night. So, yeah, there were situations like that as well.

Q And were those Mann Act violations referred to the Justice Department?

A I know that they were compiling them together. I don't know what they ended up doing with them. I know there was an effort at some point to compile them, but I don't know what ultimately happened with them.

Q And did you interview any of the prostitutes that traveled across State lines --

A I don't --

Q      -- for that purpose?

A      I don't remember.    There were -- so let me use the correct term here.    If there were prostitutes -- some ended up being his girlfriends.    So, they all kind of morphed and changed.    So I want to be accurate in how I represent them.    But there were a lot of females that I believe he was having sexual relationships with that I ended up interviewing.

Q      And he was paying money for the purpose of a sexual relationship, correct? To the best of your knowledge?

A      To the best of my knowledge, yes.

Q      Okay.    The discussion last round about the Attorney General Barr's involvement, are you aware of the Justice Department policies and procedures that relate to sensitive investigative matters and political matters?

A      I am not.

Q      And do you know if the Attorney General, under the DOJ rules and procedures, has to make some of these decisions?

A      I did not.

Q      Would it surprise you if, in fact, the Attorney General does have to sign off on certain things when it relates to the son of a Presidential candidate or an incoming President-elect?

A      It wouldn't surprise me at all.

Q      Okay.    When Joe Biden stayed at a hotel and Hunter Biden expensed that as a business expense, did you come across any other evidence that Joe Biden was involved with business dealings of Hunter Biden other than the 10 percent for the big guy that you mentioned earlier?

A      Yeah, I'd also mention the WhatsApp.    The indication in there that

regarding -- right before they entered into the CEFC deal --

Q      Okay.

A      -- that the data was there.    And then as far as the trip out to California and the hotel stay, we don't know whether that was for a business purpose -- we just know it was supposedly deducted.

Q      And that was in 2018?

A      Yes.

Q      Okay.    So Joe Biden wasn't the Vice President at that time?

A      No.

Q      Correct?    And he wasn't President?

A      No.

Q      So he didn't, to the best of your knowledge, have Secret Service detailed during 2018, correct?

A      Not that I'm aware of.

Q      It's my understanding -- I think we can stipulate that former VPs get Secret Service for, I think, 90 days or 6 months after their term of office, but then the Secret Service is no longer applicable.

You have no reason to believe that he had Secret Service during the 2018 timeframe, do you?

A      No.

Q      Okay.    Just a question about working with the U.S. Attorney's Office in Delaware.

It seems like the elephant in the room is that -- correct me if I'm wrong, but -- Joe Biden and anyone in the Biden family is royalty in Delaware.    Is that not the case?

A      It was definitely something that was overly apparent in the State, yes.

Q      So whether the President is a Republican or a Democrat, if you are in the district of Delaware, and you are in the U.S. Attorney's Office, and you are trying to bring a case against a family member of Joe Biden, that inherently has its challenges, doesn't it?

A      Yes.

Q      Because Joe Biden is, in effect, royalty in Delaware, correct?

A      I don't know if I would use the term "royalty," but I think he is someone that's a big deal within that State.

Q      Right.    And so all the nonpolitically-appointed officials in the office certainly could be affected by the fact that we're dealing with Joe Biden, correct?    In that office?

A      I went into it with the belief that I would hope that that wouldn't happen. But it being in the Delaware area, it very well could have happened that way.

Q      Okay.    And Lesley Wolf wasn't a political appointee, correct?

A      She was -- not to the best of my knowledge.

Q      Okay.    And Mark Daly wasn't a political appointee, was he?

A      Not to the best of my knowledge.

Q      And Jack Morgan wasn't a political appointee, correct?

A      Not to the best of my knowledge.

BY MAJORITY COUNSEL 1:

Q      And when the U.S. Attorney in D.C. declined, that U.S. Attorney was a political appointee, right?

A      Yes.

Q      And that person was appointed by President Joe Biden.    Is that correct?

A      From the best of my knowledge, yes.

Q      And in the Central District of California, they declined charges in that U.S. Attorney's Office.    Is that correct?

A     From what I have been told through third party, yes.

Q     And that person, that U.S. Attorney, was a political appointee appointed by President Joe Biden.    Is that correct?

A     Yes.

Q     And Attorney General Garland was appointed by President Joe Biden.    Is that correct?

A     Yes.    I would also like to add, I don't know if -- since this recent testimony or things that have happened recently -- if some of this has changed, so --

Q     Understood.

A     And they very well could change their stance, and so I want to make that clear.

Q     Sure.    Is there anything else that we haven't covered today that you would like to share with us?

A     Yeah.    So when we were going through all these issues, we actually sat down after a meeting -- when I say "we," it's me, Gary Shapley, and my co-case agent, Christine Puglisi.

And we wanted to -- at that time -- so this might have been 1 or 2 years ago.    I don't recall the time.    I'm sure if we go back, we can figure it out.    It probably was about a year ago.

But we wanted to get down on paper so that we knew at the time all the problems that we were dealing with.    And we have a list of -- what is it -- seven different areas, and they include lack of transparency, outside the normal course of an investigation, recurring unjustified delays, enforcement actions, misrepresentation of investigator's requested actions, investigator discussions related to the conduct of prosecutors.    And defense counsel bullying and threats.

This is actually in here. Prosecutors told investigators on a call on August 12th, 2022, that Defense Attorney Chris Clark threatened them, stating that their careers would be ruined if they brought various charges against Hunter.

They also said -- which I think that this is important, too -- in several other conversations, prosecutors told investigators that defense counsel requested meetings with high-ranking DOJ officials before any charging decisions were made.

Q And at the time that Chris Clark made those statements, he was representing Hunter Biden. Is that right?

A Yes.

Q And Hunter Biden's father was the President of the United States. Is that right?

A Yes.

Q And the people that he made that statement to were employees of the Justice Department. Is that correct?

A Yes. And a lot of these things, I think we've already gone over in detail. I'm going to look through here and see if there's anything that stands out that is important to you guys.

MAJORITY COUNSEL 2. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. We'll go back on the record.

Mr. [redacted]. So June 15th, 2022, the meeting with Stuart Goldberg, [Acting Deputy Assistant Attorney General]. The meeting with DOJ Tax at Main DOJ where the purpose of the meeting was misrepresented to the agents. We had no idea that they were going to bring up a huge presentation to everyone there regarding the reasons why we shouldn't charge this case.

So they presented on their stuff. I ended up presenting on my side our understanding of the evidence and the investigation. And it caught us off guard because they misrepresented that meeting to us.

BY MAJORITY COUNSEL 1:

Q Who was present at that meeting?

A So you had the SAC and ASAC at the time of FBI. You had my leadership, which included my supervisor. Gary Shapley. That included my SAC at the time. So that would have been Darrell Waldon. And I believe my DFO was also present there. I could be wrong on that. His name was Mike Batdorf. Stuart Goldberg was there. He was the DAG. David Weiss was there. Lesley Wolf, Jack Morgan, Mark Daly, and then the agents from the FBI who were part of the case team.

Q And who gave the presentation?

A Jack Morgan and Mark Daly.

Q So not David Weiss?

A Not David Weiss.

This was lack of transparency section. "Assistant U.S. Attorneys irrationally dismissed most suggestions from the investigators, creating an environment where investigators were apprehensive to bring up differing opinions."

There's one in here that -- can I do something off the record?

MAJORITY COUNSEL 1. Go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. [redacted]. "Prosecutors at one point instructed investigators not to complete any other work that was not specifically tied to the tax year 2014."

And the whole reason behind that was because we were running out of our

statute.    We had an issue with our statute that year.    So they made us focus everything in our work on 2014.

"Prosecutors instructed investigators not to ask questions in a certain area because they did not want to get DOJ PIN" -- Public Integrity -- "involved because that would result in another layer of approvals."

Yeah.    There was -- "A recurring discussion occurred between the FBI and IRS CI" -- so agents with both -- "about the unprofessional conduct engaged by the prosecutors."

And this is under investigator discussions related to conduct of prosecutors.

"FBI telephoned IRS CI in May or June of 2022 suggesting that we request a special counsel be assigned."

Q     Do you know who at the FBI made that call?

A     I do not know.    But I believe that was the supervisor at the time, Joe Gordon.

"At several times during this investigation, we were made aware that FBI leadership was confused and concerned about the path the case was taking.    Evidence of this concern was that the Baltimore FBI SAC at the time attended a meeting at Main DOJ at the Tax Division knowing that only tax charges were on the table being discussed. The FBI SAC asked several questions about the tax case and presented rebuttals to DOJ Tax attorneys, who were presenting on defenses raised by defense counsel.    The FBI SAC made comments during breaks while talking with Gary Shapley that the issues raised by DOJ Tax that might result in not charging are nonsense."

There was one more thing that I was going to bring up, but I --

Q     You've shared a lot with us.

Who was the FBI SAC -- that made the comment you just referred to regarding

"nonsense"?

A So I would have to get that. I know I have it. So we owe you the IRS Commissioner's email, and I can get you that.

Q Okay. Is there --

Mr. Zerbe. What does he want?

Mr. [redacted]. The IRS Commissioner's email.

Mr. Zerbe. I got that.

Mr. [redacted]. And then the SAC that attended the -- we called it the Tax Summit.

Mr. Zerbe. Okay.

MAJORITY COUNSEL 1. I'm going to go ahead and stop there and turn it over to my colleague.

BY MINORITY COUNSEL 1:

Q We want to follow up.

You mentioned a June 15, 2022, meeting where you say they misrepresented the purpose of the meeting, and they presented the reasons why you should not charge. What were some of the reasons that they gave at the meeting?

A More so a lot of the evidence related to the defenses that were presented. So I'll give you an example.

I had an argument with one of the DOJ Tax attorneys regarding the loan. The Burisma money loan. And he was telling me -- so the money kind of switches in 2017. Hunter starts paying Archer half of his money from Burisma starting in 2017. And they actually enter into an agreement stating that they're going to do that from that point on. Because at that point, Archer is no longer on the board because he had his pending legal issue going on.

So they kept saying that that money being sent to Archer in the later years was a

repayment of loan. And I literally held up the document. I'm like, there's this document that literally lays this out that this is for services rendered related to the Burisma board. And there's no indication at all, whatsoever, that this money is a loan.

And that was the part where it just got so frustrating with -- I'm showing you evidence, and you're just not listening to me.

BY MINORITY COUNSEL 2:

Q But they had a whole presentation prepared on their decision not to charge?

A It wasn't on their decision not to charge. It was all the reasons why we shouldn't charge for 2014, 2015.

Q How long would you say that presentation was? Was it a PowerPoint?

A I don't remember, to be honest with you.

Q But presumably, there were a litany of reasons?

A Yeah. So when they found out the defense -- that the money was a loan and that part of the taxes were paid, they threw their hands up and they were like, oh, this -- it was essentially like this is the end of the world.

And what me and the investigator did is we figured it out. We found out stuff after that that we didn't know before. And we spent so much time working through the issue and showing how it wasn't a loan at all. There's no indication of it whatsoever. Again, I go back to -- you can't loan yourself your own income.

Q Can I ask a bit about -- you mentioned just in response to [redacted]'s question -- or it was related around this information.

You said the prosecutors asked you to limit some of your [questions] -- I'm not sure exactly what you suggested they were limiting -- because they didn't want to get DOJ Public Integrity involved. Can you talk a little bit more about what DOJ Public Integrity is?

A       It's just another level of approval that, for certain issues, will come and opine and approve whether -- I believe that Public Integrity is involved if you're issuing a subpoena to an attorney.    If they're involved in that.    So there are certain things where they give their approvals for whether you can do something or not.

Q       Does Public Integrity -- I'm sort of trying to get a sense of what would you say the general purpose of that unit or that approval process is?    What is the point of it?

A       I believe when cases are of a political nature and when there's complex issues, or when you need someone outside of your team to opine on something, they're the people you go to.

Q       So --

A       That's my understanding.    So this is -- I'm not a part of DOJ.    So I only know this from what I've heard.

Q       Doesn't the fact that prosecutors were sort of trying to avoid that extra layer of review indicate -- not that they were trying to stonewall the process, but actually rather trying to expedite the process?

A       I guess I'm confused by the question.

Q       Well, presumably, another layer of review would only add time to various steps along the investigative process, right?

A       I just -- I wanted to follow the evidence.    I wanted to do the right thing. And I go back to -- if David is truly in charge and he's supposed special counsel, why are we going to these approvals?    Why can't David, who is in charge of the investigation, just allow us to do it?

Q       I guess I don't know the answer to that question.

But are these -- I don't know to what extent -- maybe you can tell me.    Does David have the authority to bypass all DOJ approval processes at his discretion?

A I don't think so. But, in my opinion, that would be something that you guys would have to figure out. What authority did he -- and, everything is pointing to me that he didn't have that authority.

Q As a matter of course, can an AUSA, bypass those kinds of procedures? Who would need to grant permission to bypass the standard DOJ procedures such as getting approval from the Public Integrity?

A Yeah -- I would look at current special counsel cases. What approvals are they having to get? What are they having to do? So that's what I would do if I were trying to figure out an answer to that.

I had no issue -- to be honest with you, I had no issue with getting the approvals. But when you're putting the approvals as a roadblock that we don't want to do it because, well, that's going to take too much time to get those approvals and when we're trying to put everything out there to follow the right path, that is frustrating.

Q I guess what I'm wondering is, is there a balance? In any organization, you know, there are processes and approvals.

It incumbent upon the prosecutors to sort of weigh the probative value of the evidence that they might potentially gather with the speed and other issues potentially related to Public Integrity and the like that could be intended in gathering that evidence?

A I understand what you're saying, but, yeah, I don't know how to appropriately answer that.

Mr. Zerbe. I just want to make sure you answer --

Mr. [redacted]. Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

MINORITY COUNSEL 2. I don't have anything else.

MINORITY COUNSEL 1. That's it. We have nothing else.

BY MAJORITY COUNSEL 1:

Q I just have a couple follow-ups or maybe just one.

If someone meets all the elements for a crime of willful evasion and are found to, in conjunction with that, owe a liability, and they pay off that liability years later when they've been caught, has a crime still been committed?

A Yes.

Q Is there anything else we haven't covered today that you would like to share with us?

A Not that I can think of.

MAJORITY COUNSEL 1. With that, I have no further questions. I'd like to thank you for making this disclosure and for coming in and for your service. Thank you very much.

[Discussion off the record.]

MAJORITY COUNSEL 1. Back on the record.

Mr. [REDACTED]. Any of the agents' names that I've said, if those could be redacted. Because, I'm coming forward as a witness. I'm asking for those protections as well, but I don't want to ruin people's careers because they're a part of this investigation, so --

MAJORITY COUNSEL 1. We understand your request, and we'll take that under advisement.

Mr. [REDACTED]. Okay.

MAJORITY COUNSEL 1. Thank you.

Off the record.

[Whereupon, at 4:21 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee

I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

________________________________

Witness Name

________________________________

Date

# EXHIBIT 7

CQ CONGRESSIONAL TRANSCRIPTS

Congressional Hearings

July 19, 2023 - Final

# House Oversight and Accountability Committee Holds Hearing on IRS Whistleblowers Investigation

## LIST OF PANEL MEMBERS

JAMES COMER:
The Committee on Oversight and Accountability will come to order. I want to welcome everyone here today. Without objection, the chair may declare a recess at any time. Without objection, chairman of the Ways and Means Committee, Mr. Jason Smith of Missouri, is waived on to the committee for the purpose of making an opening statement and questioning the witnesses at today's committee hearing.

I want to thank Chairman Smith and Chairman Jordan for their cooperation and working with the oversight committee on this investigation. This is an important joint effort that shows the American people that accountability matters regardless of your last name. For this hearing, opening statements will be limited to ten minutes for the chair and ten minutes for the ranking member.

I now recognize myself for the purpose of making an opening statement. Since assuming our Republican majority in January, the House Oversight Committee has made historically fast progress in our investigation into the Biden family's influence peddling schemes. In just six months, we have obtained thousands of pages of financial records.

This includes bank records for Biden family associates and suspicious activity reports generated by the Bidens and their associates high dollar or foreign business transactions. What these records reveal is astonishing. The Bidens created over 20 shell companies, most of which were created when Joe Biden was vice president.

Bank records so far show the Biden family, their business associates and their companies received over $10 million from foreign nationals and related companies. A lot of this money poured in while Joe Biden was vice president. Despite creating many companies after vice president took office, the Biden family used associates companies to receive millions of dollars from foreign companies in China, Ukraine and Romania.

After foreign companies sent money to business associates companies, the Bidens then received incremental payments over time to various different bank accounts. These complicated financial transactions were used deliberately to conceal the source of funds and total amounts. No normal business operates like this.

What were the Bidens selling? Nothing but influence and access to the Biden network. This is an influence peddling scheme to enrich the Bidens. We need to know whether Joe Biden is compromised by these schemes and if our national security is threatened. During our investigation, our committee became aware through whistleblower disclosures provided to Senator Chuck Grassley that the FBI had an unclassified record that details an extortion and bribery scheme involving then-Vice President Biden and a Burisma executive.

This record was generated by a trusted confidential human source that the FBI has used for over a decade. It memorializes the sources conversations with the Burisma executive who claimed that he paid Joe Biden $5 million in exchange for certain actions. The Burisma executive told the confidential human source that he didn't pay the, quote, "big guy," end quote, directly, but that he used so many bank accounts that it would take ten years to unravel.

Now that sounds an awful lot like how the Bidens conduct business, using multiple bank accounts to hide the source and total amount of the money. Today we have two brave and credible IRS whistleblowers who have risked their careers to come forward and provide important testimony. Thank you all for being here today.

I know it was not an easy decision. Their testimony about the DOJ, FBI and IRS investigation of Hunter Biden confirms the committee's findings, that there is nothing normal about the Biden family's business activity. The White House and Democrats would have. Americans believe that our investigation is based on five years of conspiracy theories.

But we have facts and new evidence continues to be uncovered by our committee revealing the first family's corruption. The Bidens have put themselves first and Americans last. We will continue to follow the money trail and provide the answers, transparency and accountability that Americans demand and deserve.

With that, I yield to the chairman of the Ways and Means Committee, Jason Smith.


JASON SMITH:
Thank you, Chairman Comer. The Ways and Means Committee is charged with ensuring that the tax code is enforced fairly. Clearly, the president only believes in making making taxpayers pay their fair share if they don't share his last name. These two courageous whistleblowers provided my committee with devastating testimony showing that the government is not treating all taxpayers equally.

And the DOJ and the IRS gave preferential treatment to the president's son during a criminal investigation into his taxes. These individuals in front of us today are credible and set for nearly 15 hours of interviews with both Republicans and Democrats. I personally took part in the interview with Mr. Ziegler.

Here's what we learned from the interviewees. The IRS recommended multiple -- the IRS recommended multiple felony charges against Hunter Biden for tax years 2014 through 2019 relating to at least $8.3 million in income from foreign companies, including one based in and -- including companies based in China, Romania and Ukraine.

And that is the only amount discovered despite the roadblocks and obstruction their investigation faced. The Department of Justice engaged in a campaign to delay, divulge and deny that investigation. They delayed investigators for years leading to the expiration of the statute of limitations for many of the crimes involved.

They divulged key investigative details to Biden's attorneys and even the president's transition team and they denied investigators the ability to authenticate evidence, serve warrants, question witnesses and bring charges. This led to Hunter Biden's sweetheart agreement announced five years after the investigation started.

But mere days before my committee voted to publicly release this testimony. Would

Americans in my Congressional district or any other Congressional district ever receive this same treatment? After raising their concerns internally at the IRS, these whistleblowers were discouraged and demoralized and turned to Congress as a last resort.

They bravely reported wrongdoing to us and what have President Biden's allies, including Hunter Biden's lawyers done? They've responded with a vicious, a vicious smear campaign to discredit these whistleblowers and discourage others from coming forward and may have even coordinated with the White House on this effort.

This is a disgrace. I urge any IRS employee watching today. If you know of misconduct, please come to the Ways and Means Committee so we can hold accountable those who are responsible and let me be clear, there will be zero tolerance for any retaliation against whistleblowers by DOJ and the IRS. The American people expect answers about whether the federal government is treating all taxpayers equally or if the wealthy and politically connected get special treatment.

Our committees are working together to get to the bottom of this abuse of power and will work tirelessly to do so and to make sure it doesn't ever happen again. Americans should not have to accept two tiers of justice in this country. One, if your last name is Biden and one for everybody else. I want to thank both whistleblowers for coming forward publicly and for your testimony today.

I yield to Mr. Jordan.


JIM JORDAN:
I thank the gentleman for yielding. The question is who are you going to believe. April 26th in front of the United States Senate the attorney general said David Weiss is in charge of the investigation. October 7th, in a meeting with Gary Shapley, one of the whistleblowers David Weiss said I'm not the deciding official.

Who are you going to believe? On February 28th, I wrote the attorney general asking him why there's no special counsel in the Hunter Biden investigation. He didn't respond, which is unusual in and of itself. They always respond to the Treasury committee when we write something to them. I wrote again on May 25th. Again, the attorney general didn't respond, but David Weiss did.

And here's what he said, June 7th, he said this, "I have been granted ultimate authority over the matter including responsibility for deciding where, when and whether to file charges." That's what the US attorney said on June 7th, three weeks later, Mr. Weiss wrote me again and he said this, "I stand by what I wrote, but I wish to expand." Wow, already changing this story 23 days later and he said this, "My charging authority is geographically limited to my home district." Well, wait a minute, you just told me 23 days before you have ultimate authority.

Now you change it. Then again on July 10th, Mr. Weiss wrote Senator Graham and he said this paragraph two, "To clarify, I have not requested special counsel designation. Rather, I had discussions with departmental officials." Mr. Weiss can't get his story straight, three different stories in a five week time frame.

On June 7th he's -- he's Tarzan, he's super, I got ultimate authority. I can do what I want, file charges where I want -- when I want and how I want. June 30th, well, actually no, I can't. And then of course on July 10th, he says to clarify, I haven't requested special counsel status, but

I've been talking to the folks at Main Justice, three different positions and a little over a month.

You know whose story hasn't changed? These two guys. Their testimony has been consistent. Throughout their testimony has been the same and guess what? Two days ago an FBI agent confirmed their testimony. Who are you going to believe? The Justice Department can't get their story straight changed three times in 33 days?

Or these two guys? The Justice Department that was found to censor Americans just two weeks ago from the federal court in Louisiana, the Justice Department that said moms and dads are terrorists, the Justice Department that said, if you're a pro-life Catholic, you're an extremist. The Justice Department that can't get his story straight or these two guys?

Ten years over a decade of experience for each of them. The go to guys in international tax evasion cases, the A-Team when it comes to investigating these matters all over the world, they've done this. And have been consistent throughout, I think I'll believe these guys, I think they're the ones telling the truth and that is -- that is fundamentally what this comes down to. So God bless you guys for the work you've done, the courage you have and for being here today stepping forward because you care about equal treatment under the law.

That's what's at stake, plain and simple. I yield back.


JAMES COMER:
I now yield to the ranking member, Mr. Raskin to Maryland, for his opening statement.


JAMIE RASKIN:
Thank you, Mr. Chairman. Good afternoon to the witnesses. I thought we might be here today on the matter that the chairman declared his top priority, the crusade to find evidence of wrongdoing by President Biden. But now the majority's long-promised star witness turns out to be a fugitive from American justice and arms trafficker indicted on eight federal criminal felony counts and an unregistered foreign agent for China who tried to trade Chinese arms for Iranian oil.

So I guess he's not going to be a witness for the majority anytime soon. Well, after the failed SARS reports, bank records, Form 1023, we can conclude that this Inspector Clouseau-style quest for something that doesn't exist has turned our committee into a theater of the absurd, an exercise in futility and embarrassment.

And now we can finally definitively say why the committee's efforts have run dry time and again. Just yesterday, Mr. Chairman, you and I got a letter from Lev Parnas, the Ukrainian-born American businessman, who was at Rudy Giuliani's side as his right-hand man for a year between November 2018 to October 2019 as Giuliani and then President Trump tried to smear Joe Biden before the 2020 election with the very same allegations we're still running through the political spin cycle every week in this committee.

I request unanimous consent to enter the Parnas letter into the record.


JAMES COMER:
Without objection, so ordered.

JAMIE RASKIN:

Now, in this extraordinary ten page letter, Parnas painstakingly describes the campaign orchestrated by Giuliani and Trump to quote, "dig up dirt on the Bidens and spread misinformation about them through various networks including government officials, journalists and Fox News personnel." After explaining this campaign to fabricate corruption charges against Biden, Parnas concludes his letter by saying, "Throughout all these months of work, the extensive campaigns and networking done by Trump allies and Giuliani associates, including the enormously thorough interviews and assignments that I undertook," quote, "There has never been any evidence that Hunter or Joe Biden committed any crimes related to Ukrainian politics.

Never during any of my communications with Ukrainian officials or connections to Burisma, did any of them confirm or provide concrete facts linking the Bidens to illegal activities." As Mr. Parnas concludes, "here has never been any factual evidence only conspiracy theories spread by people who knew exactly what they were doing." And then he calls on this committee to end its wild goose chase and offers to come and testify.

Remember, this is Mr. Giuliani's guy. This is his interpreter and right hand man who spent a year out there trying to cook the books against Joe Biden and he offers to come testify. So if anyone doubts anything he's saying let's bring him in as a witness and let's hear about that crusade that they were on to smear President Biden by promoting the same baseless conspiracy theories that this committee serves up as moldy leftovers every day.

At today's hearing, we're going to hear about wrongdoing by Hunter Biden, who's pleading guilty on two tax charges and a gun charge next week. We'll hear about the back and forth among investigators, prosecutors and a Trump-appointed US attorney, over a dozen people who spent four years investigating the president's son.

We'll hear about how they disagreed on investigative steps and what criminal charges to bring, all normal stuff in government investigations that doesn't usually lead to a Congressional hearing. But one thing you will not hear today is any evidence of wrongdoing by President Joe Biden or his administration.

Like every other try by our colleagues to concoct a scandal about President Biden this one is a complete and total bust. In fact, the ongoing case that the majority invites -- invites us to interfere with today is actually a striking illustration of the success of the American system of independent prosecutors operating under the rule of law and outside the realm of the kind of political influence my colleagues are trying to exercise today.

So, what happened? Well, the son of the sitting president of the United States, lost his brother and then lost his way badly back in 2015. As too many families around the country know, drug addiction is a dark and powerful affliction and like other addicts, Hunter Biden made foolish and criminal choices including failing to pay his taxes and owning a firearm in violation of federal law.

And he's now being held criminally accountable for it. His investigation began under the Trump administration. It was conducted by a US attorney for Delaware, David Weiss, who Donald Trump appointed to his office and who Attorney General Barr, chose for this assignment to conduct this investigation. In his final press conference in December of 2020, Attorney General Barr expressed full confidence in Weiss's work saying it was quote, "being handled responsibly and professionally within the department.

And to this point, I have seen no reason to appoint a special counsel and I have no plan to

do so before I leave." Furthermore, Joe Biden never publicly questioned or challenged this prosecution. When it began, he did not decry it as a witch hunt by Donald Trump. He placed his trust in the fairness of the American justice system.

When he became president, not only did he not use his power to halt the investigation, he kept in place Trump's handpicked US attorney Mr. Weiss overseeing it, even though incoming presidents usually replace US attorneys with their own appointees. And his attorney general Merrick, Garland, made sure that Mr. Weiss appointed by Donald Trump had full authority and resources to pursue this probe and charge it however and whenever he saw fit in any district in the country.

And in the past few weeks, as Hunter Biden accepted a guilty plea, the president and his attorney general have done nothing to interfere with the case, which is overseen by a federal judge appointed by, yes, Donald Trump. Now, can you imagine Donald Trump saying nothing about a witch hunt or not trying to quash the prosecution if it were his son being prosecuted?

Indeed, President Biden's traditional and scrupulous respect for the independence of the Justice Department stands in sharp contrast to Trump's spectacular disrespect for the rule of law and his serial efforts both in office and outside office to get prosecutors to go after and lock up his political rivals and to suspend accountability in specific criminal cases when it comes to his friends.

When Michael Flynn was investigated for lying to the FBI and later convicted for it about communicating with the Russians or when Paul Manafort was investigated and later convicted for bank and tax fraud or when Roger Stone was investigated and later convicted for lying to Congress and witness tampering an outraged President Trump repeatedly denounced the Department of Justice for prosecuting his cronies and reportedly got Attorney General William Barr to pressure prosecutors to recommend more leniency in their cases.

Trump also went to FBI Director James Comey and pushed him to pledge absolute loyalty to Trump and to find a way to let Flynn go. Ultimately, Trump used the power of the presidency to pardon all of these convicted criminals. Now, unlike President Trump's blatant abuse of the rule of law and the relationship between the president and DOJ, there's no evidence that President Biden has involved himself in any way in the investigation into his own son, an investigation that's been overseen by Trump's appointed US attorney.

No matter what my GOP colleagues say and I appreciate the testimony of our witnesses today, there is no evidence that Hunter Biden has received any kind of official favoritism in this prosecution for being Joe Biden's son. On the contrary. There are more than 10 million Americans who have filed taxes but failed to pay them, the exact crime Hunter Biden is pleading guilty to the vast majority of these cases are resolved administratively or through civil settlement.

Indeed every year the IRS and DOJ obtained convictions and sentences in fewer than 700 cases for tax crimes of any kind, a minuscule percentage. The fact that Hunter Biden faced a four-year criminal probe involving dozens of agents and prosecutors from the IRS, the FBI, the US Attorney's Office in Delaware, DOJ tax demonstrates to my mind, at the very least, that he received no special treatment but arguably selectively tougher treatment than the millions of the people who never face criminal investigation for doing the same thing.

If my GOP colleagues think that the treatment of millions of tax scofflaws or even the handful who face criminal prosecution like Hunter Biden is too lenient, I invite them to join us democrats in supporting the $80 billion in funding for the IRS that we passed in Inflation

Reduction Act last year. This money will enable the IRS to make long overdue improvements
in customer service, but will also enable the agency to restore lost capabilities and
enforcement to identify and prosecute tax cheats.

But the very first thing, House Republicans did this Congress was vote to rescind that
funding while disparaging these future IRS employees who will do the same kind of work
today's witnesses do. Senator Cruz called them Biden's shadow army. Senator Grassley said
they will be going around, ready to shoot some small business person in Iowa.

Today, we get to witness MAGA Republicans take the side of IRS -- IRS agents from the
deep state against a Trump-appointed US attorney and a rich guy exercising his Second
Amendment rights, but now facing criminal gun charges and tax charges that would call --
that they would call in any other circumstance purely technical.

We are about to hear testimony from two IRS criminal investigators. They will describe their
frustrations and disagreements with their supervisors as well as with Mr. Weiss and his team
of prosecutors who they consider junior varsity and not up to snuff during the Trump
administration generally. We will also hear about their confusion and profound
misunderstandings about Mr. Weiss and how he reviewed the evidence and made the
ultimate decision about charging Hunter Biden.

A lot of the controversy here relates to the agent's failure to distinguish between special
counsels and special lawyers, but we will clear that up today. The key point, Mr. Chairman, is
that America needs to understand is that the only political interference at play here is coming
from Donald Trump and my Republican colleagues/ We'll listen carefully to the testimony and
I thank you, Mr. Chairman.


JAMES COMER:
The ranking member yields back. I'd like to remind the members in the public that Section
6103 of the tax code makes taxpayer information confidential, except in certain
circumstances. One of those exceptions is the process the Ways and Means Committee
used to receive testimony from these whistleblowers and report transcripts of their testimony
to the full House of Representatives to make that information public.

These whistleblowers have gone above and beyond to submit information to Congress in
accordance with the law and we are grateful to them for that. The witnesses can only testify
to tax information that has already been released through proper procedures through the
Ways and Means Committee. This means that in some instances they may have to decline
to answer a question and instead submit additional information to the Ways and Means
Committee at a later date through the appropriate process.

They are each accompanied by counsel to address questions that arise on section 6103 and
are not present today to provide testimony or answer members' question. I ask members to
respect that process and requirements of section 6103 and look forward to hearing what our
courageous witnesses have to say. Further due to the complex nature of the matter at hand,
each of the witnesses shall have ten minutes for their opening testimony.

I would now like to introduce our witnesses, Mr. Joseph Ziegler is a special agent with the
Internal Revenue Service Criminal Investigation Division specifically assigned to the
International Tax and Financial Crimes Division. This is a group of 12 elite special agents
who are subject matter experts in complex international tax and other related crimes.

He started his career with the IRS in 2010 as a special agent and has developed successfully -- and has developed and successfully completed a multitude of complex financial investigations. The types of investigations include money laundering, bank fraud, wire fraud, mail, fraud, health care, fraud violations of the Bank Secrecy Act, income tax evasion and income tax related charges such as identity theft and filing false claims for income tax refunds.

Mr. Ziegler has won multiple performance awards throughout his career in recognition for his work. Mr. Gary Shapley. Mr. Shapley is the supervisory special agent of the International Tax and Financial Crimes Group. Mr. Shapley started his career with the IRS in July 2009. He was detailed to the Department of Justice's Tax Division from 2013 to 2018 investigating foreign institution -- foreign financial institutions.

He was also assigned to the Joint Terrorism Task Force working as a task force officer at both the FBI Washington field office and the FBI Baltimore field office. Mr. Shapley was promoted to supervisory special agent of the elite ITFC group in 2018. He also served as the assistant special agent in charge of both the New York field office and the Chicago field office.

I want to again thank both gentlemen for their willingness to come forward and share their testimony today for the members of this committee and for the American people. Pursuant to committee Rule 9G, the witnesses will please stand and raise the right hands. Do you solemnly swear or affirm that the testimony you are about to give is the truth, the whole truth and nothing but the truth so help you God. Yes, I.


UNKNOWN:
Yes, I do.


JAMES COMER:
Let the record show that the witnesses all answered in the affirmative. We appreciate you being here today and look forward to your testimony. Let me remind the witnesses that we have read your written statements and they will appear in full in the hearing record. Please press the button on your microphone in front of you so that it's on and the members can hear you.

I recognize Mr. Ziegler to please begin his opening statement.


JOSEPH ZIEGLER:
Thank you, Chairman Comer, Chairman Smith, Chairman Jordan, Ranking Member Raskin, and members of the committee. Today, I sit here before you not as a hero or a victim, but as a whistleblower compelled to disclose the truth. That said, in coming forward, I believe I'm risking my career, my reputation and my casework outside of the investigation we are here to discuss.

I ultimately made the decision to come forward after what I believe were multiple attempts at blowing the whistle in the Internal Revenue Service -- at the Internal Revenue Service. No one should be above the law regardless of your political affiliation. I humbly view my role here today as providing the facts as I best understood them and to let Congress and the administration and the public consider those facts and determine the best path forward.

I recognize why I was present at the start of this investigation and was closely involved with the investigation for roughly five years. I'm just a part of the story, others including my colleague and supervisor, Gary Shapley, who is here with me today, have their own views and understandings of what took place during this investigation.

I've been an agent with the IRS since 2010. In 2007, I received my undergraduate degree from Ohio University, my MBA from John Carroll University. Prior to starting my career at the IRS, I worked at Ernst & Young -- Ernst & Young as an external auditor. Throughout my career with the IRS, I have worked a variety of successful criminal tax and money laundering investigations.

In 2018, I transitioned to being to being a part of the International Tax and Financial Crimes Group out of the Washington DC field office. I was the lead IRS case agent on the Hunter Biden investigation. I've recently discovered that people are saying that I must be more credible because I'm a Democrat, who happens to be married to a man.

I'm no more credible than this man sitting next to me due to my actions -- due to my sexual orientation or my political beliefs. The truth is my credibility comes today from my job experience with the IRS and my intimate knowledge of the agency's standard and procedures. I was raised and have always strived to do what is right.

Although I do have my supporters, others have said that I am a traitor to the Democratic Party and that I am causing more division in our society. I implore you to consider that if you were in my position with the facts as I have stated them, ask yourself if you would be doing the exact same thing. I hope that I am an example to other LGBTQ people out there who are questioning doing the right thing at the potential cost of themselves and others.

We should always do the right thing no matter how painful the process might be. I kind of equate this to the experience and feelings I encountered when coming out. It was honestly one of the hardest things I ever had to go through. I contemplated scenarios that would have been highly regrettable, but I did what is right and I'm standing -- or I'm sitting here in front of you today.

I would first like to take a minute to thank some people for their unfettered help and support. First off, God, for giving me the strength and courage to get through this process. My husband who has been my rock, has put up with me, my stress and has had to deal with -- with his personal information being out there.

My attorney, Dean Zerbe, who has agreed to represent me through this matter, pro bono and someone who has provided me so much help and guidance. My colleagues from the Hunter Biden investigation. The work that was done on this case was -- is tremendous, but seems to be overshadowed by what is happening here today.

And I just want to say to the investigative team that I am thankful for having worked with you. I also want to thank my family and friends back home in northeast Ohio and Georgia. I don't live in the DC area. I had to fly here and have had to pay out of pocket for all my travel related expenses and being a whistle blower.

On that note, I would like to make another statement that I have not accepted a single payment from anyone for being a whistle blower. First -- so, Mr. Chairman, I have my written statement as well as my testimony before the Ways and Means Committee, I would like to touch on briefly seven specific matters.

First, in a recent letter to Congress, Mr. Weiss stated that he had been granted ultimate authority over this matter, but then later stated in the same letter that his charging authority is geographically limited and that he would need a President Biden-appointed US attorney to partner with him in charge.

In the case, Mr. Weiss stated that he was making all decisions necessary to preserve the integrity of the prosecution consistent with federal law, the principles of federal prosecution and departmental regulations. In the internal -- in the Criminal Tax Manual Chapter 10 found on the DOJ website, Tax Division policy states that cases involving individuals who fail to file tax returns or pay a tax, but who also commit acts of evasion or obstruction should be charged as felonies to avoid inequitable treatment.

In early August of 2022, federal prosecutors from the Department of Justice Tax Division drafted a 99-page memorandum, in -- in so, they were recommending for approval felony and misdemeanor charges for the 2017, '18 and '19 tax years. That did not happen here and I am not sure why and as to the special -- and as the special agent on this case, I thought the felony charges were well supported.

When considering the elements of felony tax case under the Criminal Code, there are two key considerations, willfulness and tax due knowing. In the criminal context, willfulness is defined as voluntary intentional violation of a known legal duty. The tax loss is the monetary loss to the government. In 2020 -- early 2020, Hunter Biden on file -- or Hunter Biden's unfilled and delinquent tax returns were being prepared, which included his 2018 tax return.

During the 2020 time period, by Hunter Biden's own account, he was sober, newly married and writing his memoir. Hunter Biden's accountants requested that he sign a representation letter stating that all the deductions were for business purposes and were being reported appropriately. Statements Hunter Biden made in his book completely contradicted what he was deducting as business deductions on his 2018 return.

While writing his memoir Hunter stated, "I holed up inside the Chateau for the first six weeks and learned how to cook crack." Hunter Biden allegedly falsely claimed business deductions for -- for payments made to the Chateau Marmont, a hotel room for a supposed drug dealer, sex club memberships, falsely referenced on the wire as a golf membership, hotels he was blacklisted from, and a Columbia University tuition payment for his adult daughter.

All of these items were used to support willfulness -- the willfulness element for felony tax evasion. These false deductions claimed by Hunter Biden caused a false return to be prepared that underreported his total income by approximately $267,000 and a loss to the US Treasury of $106,000. Second, with respect to the 2014 tax year, Hunter Biden did not report any of the money he earned from Burisma for the 2014 tax year, which would have -- which would have been a tax loss to the government of $124,000. According to my previous testimony, Hunter Biden did not report this income to the IRS or pay tax on the source of income.

There is nothing that I see in the public documents as to the Department of Justice's action against Hunter Biden that indicate that Hunter Biden will be required to pay tax on this Burisma income from 2014 or amend his 2014 tax return. I would like to note that the plea agreement when released may provide a great a greater understanding.

Third, I would like to make clear that the charging document for the District of Delaware, Hunter Biden was charged with failure to timely pay his taxes for 2017 and '18 in excess of $100,000 for each tax year. On Hunter Biden's 2017 and 18 tax returns, Hunter reported

taxes owed of of approximately $581,000 and $620,000 Respectfully.

This tax amount in 2018 would not have included the alleged additional tax due and owing from the file false return of $106,000. Thus, as I read the public documents as the Department of Justice action against Hunter Biden, there is nothing that indicates Hunter Biden will be required to amend his false tax return for 2018. A false tax return that includes proper deductions -- improper deductions for prostitutes, sex clubs, and his and his adult children's tuition.

Again, perhaps when the plea agreement is released, it may provide us with a greater understanding. Fourth, the decision to bring felony counts against Hunter Biden was agreed to by both prosecutors and investigators. In the fall of 2021, I met with prosecutors assigned to the case and we all agreed and decided which charges we are going to recommend to -- in the prosecution report, which included felony counts related to 2014 and '18. In March of 2022, the prosecutors requested discovery from the investigative team and presented the case to the DC US Attorney's Office.

In later meetings in early August of 2022, the side prosecutors, all four attorneys, agreed to recommend felony and misdemeanor charges for the 2017, '18 and '19 tax years. Insofar as the Department of Justice Tax Division attorney sent an email about the process of bringing charges to include felony and misdemeanor tax charges in two separate districts, Delaware and Los Angeles.

Less than a month later, Gary Shapley and I met with Mr. Weiss. He stated that he agreed with us regarding the 2014 and 2015 tax year misdemeanor and felony charges, but that this could somehow affect the later year misdemeanor and felony charges that he conveyed were stronger. Despite these facts, the plea deal that is being -- that is being discussed occurred.

To this day, I do not have a reason why that occurred. From my perspective, this might not have been problematic had the investigation been handled in the ordinary course. Fifth, as I had previously testified and is contained in my written testimony, I have outlined for you some instances in which assigned prosecutors did not appear to follow the normal investigative process, slow walked the investigation and put -- put in place unnecessary approvals and roadblocks from effectively and efficiently investigating the case.

A number of times we were not able to follow the facts. I'm happy to respond to questions concerning these instance. Six. I will also note that while the impression has been conveyed by the US Attorney in Delaware that he has similar powers to that of a special counsel in this case, free rein to do as needed, that was not the case.

It appeared to me based on what I experienced that the US attorney in Delaware in our investigation was constantly hamstrung, limited and marginalized by DOJ officials as well as other US attorneys. I still think that a special counsel is necessary for this investigation. To further handle ancillary investigations that are spun off and relates to Hunter Biden but may not have venue in Delaware.

I lastly, I would like to conclude again by encouraging Congress and the administration to consider establishing an official channel for federal investigators to pull the emergency cord and raise the issue of the appointment -- or of the appointment of a special counsel for consideration by senior officials.

I do not want my colleagues at the IRS, FBI and other federal law enforcement agencies to go through my frustrating journey -- to go through my frustrating journey and that of our team.

I believe such a path will strengthen the public's confidence in their institutions and their fair and equal treatment of all Americans under the law.

Thank you and I look forward to the questions.

JAMES COMER:
Thank you very much. Chair now recognizes Mr. Shapley for his opening statement.

GARY SHAPLEY:
Thank you for inviting me to testify here today. I want to thank every member and staff around both sides of the aisle who work -- for the work you do to represent your constituents and hold government accountable. My name is Gary Shapley. I worked as a special agent for IRS criminal investigation for 14 years.

I have risen to become a senior leader in the organization and currently supervise 12 lead agents in the International Tax and Financial Crimes Group. I have worked directly with the United States attorneys in multiple districts and have supervisory investigated cases in more than a dozen United States Attorney's Office across the country.

I have led, planned or executed undercover operations or search warrants in more than a dozen countries. I've investigated and managed some of the largest cases in the history of the agency, recovering more than $3.5 billion for the United States taxpayer in this country. We believe in the rule of law and that applies to everyone.

There should not be a two track justice system depending on who you are and who you're connected to. Yet. In this case, there was based on my experience, I'm here to tell you that the Delaware, US Attorney's Office and Department of Justice handling the Hunter Biden tax investigation was very different from any other case in my 14 years at the IRS. At every stage decisions were made that benefited the subject of this investigation.

For example, prosecutors concealed the contents of Hunter Biden's laptop from investigators, DOJ slow-walked steps to include interviews, serving document requests and executing search warrants. Warrants that were ready as early as April of 2020, but were delayed until after the November -- November 2020 election and never pursued.

Investigators were not allowed to follow up on WhatsApp messages from Hunter Biden's, Apple iCloud backup where he suggested he was sitting next to his fatherAssistant United States attorney, Leslie Wolf. cited the optics of executing a search warrant at President Biden's residence as a deciding factor for not allowing it even though she agreed that probable cause existed.

Prosecutors instructed investigators not to ask about the big guy or dad when conducting interviews. The Biden transition team was tipped off about interviews the night before the investigation went over. A fact my FBI counterpart confirmed to this committee in recent testimony where the result was that only one witness spoke to investigators that day.

These are just some of the examples of how our investigation was stymied. I'm not here to support partisan agendas on either side. I'm here because our tax system relies on the American people having confidence it is administered fairly and equally for everyone regardless of your last name or political connections.

If the handling of this case was inappropriate, it doesn't matter whether it happened under a

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 441 of 776 PageID #: 502
Republican or Democrat administration, whether you agree with my concerns about the unethical slow walking and preferential treatment in this case, you can be sure that my testimony is true and correct to the best of my ability.

Unfortunately, the way this has already been handled by some members and the media has done immeasurable damage to future would be whistleblowers. I have been attacked as incompetent and falsely accused of being a liar, a leaker or both, all by people who know nothing about me or the facts of this case. Some question if I should even be called a whistleblower, suggesting that my disclosures are not legally protected merely because they don't like what I'm saying.

We've seen this shoe on the other foot before and some Republicans have made the same error. So there's plenty of blame for both sides. The cycle of villainizing or canonizing government employees who report what they believe is wrongdoing has to stop. When I first started noticing deviations from a normal investigative process around June 2020, I did not run to Congress to air grievances.

Instead, I documented my concerns and made internal protected disclosures to my chain of command. I tried to give the prosecutors the benefit of the doubt for a very long time. After our investigation had largely concluded by the end of 2021, the IRS recommended charging Hunter Biden with multiple felonies and several misdemeanors for the tax years of 2014 through 2019. The Delaware Assistant United States Attorneys and tax evasion trial attorneys supported charging the felonies and misdemeanors listed in Exhibit Two of my interview transcripts on page 44 and 45, which were officially referred to the Department of Justice Tax Division in February of 2022. This case was presented to the Washington DC US Attorney's Office in around March 2022. In April 2022 and a hearing Attorney General Garland was asked how the American people could be confident that the administration was conducting a serious investigation into the president's own son.

Attorney General Garland responded by saying because we put the investigation in the hands of a Trump appointee. He led Congress to believe the case was insulated from improper political influence because all decisions were being made exclusively by Delaware United States attorney, David Weiss, but that was not true.

The Justice Department allowed the president's political appointees to weigh in on whether to charge the president's son. After United States attorney for DC, Matthew Graves, appointed by President Biden, refused to bring charges in March 2022, I watched United States Attorney Weiss tell a roomful of senior FBI and IRS senior leaders on October 7th, 2022 that he was not the deciding person on whether charges were filed.

That was my red line. I had already seen a pattern of preferential treatment and obstruction. Now, United States Weiss was admitting that what the American people believed based on the attorney general's sworn statement was false. I can no longer stay silent. In November of 2022, the statute of limitations was set to expire for the 2014 and 2015 charges in DC, which included the 2014 felonies for the attempt to evade or defeat tax and fraud or false statements regarding Burisma income earned by Hunter Biden in those years.

The statute of limitations have been extended through a tolling agreement with Hunter Biden's defense counsel and they were willing to extend it past November 2022. Weiss allowed those to expire. Prosecutors presented the 2017, 2018 and 2019 criminal tax charges to the Central District of California around September of 2022 only after President Biden's nominee Martin Estrada was confirmed.

In January of this year, I learned Estrada had declined to bring the charges. For all intents and purposes, the case was dead with the exception of one gun charge that could be brought in Delaware. And yet, when Senator Chuck Grassley asked Attorney General Garland about the case in March 2023, Garland testified, "The United States attorney has been advised he has full authority to make those referrals you're talking about or to bring cases in other districts if he needs to do that.

He has been advised that he shouldn't -- should get anything he needs." After the October 7th red line meeting, there was no way to reconcile United States Attorney Weiss's statement, his officer's actions with -- and his office's actions with Attorney General Garland's public testimony. I am 100 percent certain of what Delaware US Attorney's office did and seeking approval from political appointees in DC and California.

The New York Times reported as independently confirmed the charges being presented and declined in California. Plenty of other witnesses are familiar with these facts. In addition to those who witnessed US Attorney Weiss's private admission. I encourage them step forward and tell the truth about what happened and what they heard.

Let me be clear, although these facts contradict Attorney General Garland's testimony and raised serious questions for you to investigate, I have never claimed to have evidence that Attorney General Garland knowingly lied to Congress. Whether Attorney General Garland knew his testimony was false as for you and the inspector general's to determine, not me. The same is true for the United States Attorney Weiss's three letters of Congress since June 2023 is for others to investigate and determine whether those letters contain knowingly false statements.

However, it's clear that United States Attorney Weiss's story for the -- to the American public has evolved. He's gone from unequivocally echoing Attorney General Garland to just one month later corroborating the disclosures we made about limits on his authority. Weiss first said he can charge anywhere and then admitted he's geographically limited.

To go beyond those limits, Weiss later admitted he had to partner a get special authority. Garland said Weiss has authority. United States,Attorney Weiss said he's been assured he would get authority. If he never requested or denied special authority from Attorney General Garland as he told us on October 7th, the American public deserves to hear why he allowed 2014 and 2015 DC charges to expire.

No number of carefully worded denials or evolving half truths can overshadow this stark fact. United States Attorney Weiss and Attorney General Garland will each be sitting before these committees one day. They will have to admit that despite all their obfuscation, the absolute fact is that this case was presented to two presidentially-appointed US attorneys in DC and California.

That no charges were brought and those districts tells you everything that you need to know. I don't claim to be privy to United States Attorney Weiss or Attorney General Garland's communications, but United States Attorney Weiss told us that he was not the deciding person, that he had requested and was denied special authority after DC declined charges.

And that if California declines, you will have to request special authorities. Again, I understood the gravity of those admissions, whether full responsibility lies with United States Attorney Weiss or Attorney General Garland is for Congress, the inspector generals and ultimately the public to decide. When I decided after October 7th to come forward and began researching whistleblower attorneys, I wanted to abide by the law in every way as I

navigated the complex taxpayer privacy and grand jury secrecy statutes.

I carefully followed the whistle blower process to the letter with the advice of counsel at every step. I am fortunate to be represented by Marc Lytle, a federal prosecutor for 25 years, including five years with the Department of Justice Tax Division. I'm also grateful for Empower Oversight, a nonprofit whistleblower group whose president, Trystan Levitt, was previously nominated by President Biden to the Merit Systems Protection Board and unanimously confirmed by the United States Senate.

While some have tried to paint me with a partisan brush, because this charitable organization employs some former staffers to GOP members on Capitol Hill, their expertise developed working for the patron saint of whistleblower Senator Chuck Grassley has been invaluable. Meanwhile, the Biden family attorneys appear to be representing Hunter Biden, President Biden and the Department of Justice and they are not working for free.

It has been reported in a public sources that there is a large fund paying for legal fees for Biden family attorneys. The source of those funds is unknown. They have virtually unlimited resources to pursue their agenda while my motives are questioned simply for finding competent representation from a small nonprofit that helps whistleblowers.

Groups such as Empower Oversight and Whistleblower Aid would only path to ensure whistleblowers like me are heard and receive competent advice. My intention was not to be your sole source of information and I implore you to take the necessary steps to obtain as much evidence as possible from as many sources as possible to be able to fully inform your conclusions.

I'm confident that after you have done that, both sides will find serious issues with the Hunter Biden investigation that closely aligned with my testimony. No matter your party, I am not your opposition. I am here with information for you to examine and investigate and determine whether more action is warranted on your part.

I am on your team whether we agree on every politically sensitive issue or not. There is no benefit for me blowing the whistle on this case. Absolutely, none. I have no book deal and the only money that goes into my bank account every two weeks is from my employment for the federal government. I am still a supervisor leading a group of 12 fantastic agents working complex international investigations.

Unfortunately, to this day, my immediate supervisors are retaliating against me for making protected disclosures. Even last fall, Biden family attorneys attacked investigators in the pages of The Washington Post and threatened to prosecutors with and threaten the prosecutors with career suicide if they brought charges against the president's son.

Then one of the Biden family attorneys sends to the press a ten-page error filled letter, it attacked me with innuendo false statements and baseless speculation that had leaked -- that I had leaked information to The Washington Post. These statements by Biden family attorneys are false. In conclusion, the American people for whom this body works, I implore you to look at the facts, not agenda-laced statements from either side of the aisle.

I am the average American citizen who worries about how I will send my kids to college and if I ever have enough money to retire, just like most people watching this today. I am the person -- the first person of my family to go to college. It was not an Ivy League school and I don't have a network of rich and powerful friends to help me weather the storms of retaliation and character assassination.

I am putting myself at risk for the American people who support me and for those who do not.

At the end of the day, I'm just a small town kid from Norwich, New York who worked hard to get where I am and will never compromise my integrity. I will never forget who I am, where I come from or all the people in my life who have made me who I am today.

Thank you all for your time.


JAMES COMER:

Thank you both for those excellent opening statements. We'll now begin the questioning phase and I'll begin questioning. We'll start with Mr. Ziegler. Here on the committee we focused on following the evidence, specifically the money trail through bank records and suspicious activity reports and I want to discuss with you specific payments made to Hunter Biden and the Biden family.

Democrats and the left-wing media are also saying there's no evidence. Let's get into the evidence, Mr. Ziegler. I want to direct you to pages 99 and 100 of your transcript. How much money did Hunter Biden and his associates receive from the Romanian company you identified?


JOSEPH ZIEGLER:

So that amount would be from Romania, so the approximate total transfers from the Romania company would have been $3.1 million to everyone.


JAMES COMER:

$3.1 million. How much did Hunter Biden and his business associates receive from State Energy HK Limited through the Robinson Walker LLC?


JOSEPH ZIEGLER:

So total transfers from State Energy HK to Rob Walker was $3 million.


JAMES COMER:

$3 million. Was there a $100,000 payment from CDFC Infrastructure to a Owasco PC, Hunter Biden's professional corporation?


JOSEPH ZIEGLER:

Yes, Chairman.


JAMES COMER:

Approximately how much was transferred to Hunter Biden and his business associates through Hudson West III?


JOSEPH ZIEGLER:

So, the total transfers from Hudson West III to everyone was $3.7 million.


JAMES COMER:

$3.7 million. How much money did Hunter Biden and his business associates receive from

the Ukrainian company Burisma?

JOSEPH ZIEGLER:
Burisma paid to everyone involved $6.5 million.

JAMES COMER:
$6.5 million. Burisma also paid Blue Star Strategies and a law firm hundreds of thousands of dollars bringing the total Burisma payments to over $7 million. Is that correct?

JOSEPH ZIEGLER:
That is correct, $7.3 million.

JAMES COMER:
$7.3 million. Between 2014 and 2019, this brings the total amount of foreign income streams received to approximately $17 million, correct?

JOSEPH ZIEGLER:
That is correct.

JAMES COMER:
What was the purpose of analyzing money from foreign sources and do you have documents to support your findings?

JOSEPH ZIEGLER:
So, for the purpose of documenting the foreign sources is we -- as a part of a normal international tax investigation, we have to figure out where the money's come -- coming from. You have to follow the money trail and as a part of that process we have to follow different transactions, identify different foreign entities that might be paying a person and then we go and get those records.

JAMES COMER:
Right. And hopefully you can provide that to the -- to the committee?

JOSEPH ZIEGLER:
So, yeah -- yeah, any -- any records regarding those transactions we can --

JAMES COMER:
-- We love evidence on this side of the week in the aisle. On page 80 of your transcript, you identified other Biden family members who received relevant payments to your investigation such as the grandchildren. Can you explain why you wanted to interview them?

JOSEPH ZIEGLER:
So, as a part of the investigation, you want to interview people who might have received money, people who might have had deductions that were deducted on the tax return. So

there's -- there's a multitude of reasons why you would want to talk to family members.

JAMES COMER:

Is it common for grandchildren to receive money from foreign nationals and significant business wires?

JOSEPH ZIEGLER:

So, I don't know the reason or I don't know what's behind any of these payments that might have been made to specific family members, but I can just speak to what was paid -- what was in the -- what was in our transcript.

JAMES COMER:

Thank you. I would invite the media here today to review the committee's bank records memorandum, which closely matches the IRS figures. We will have a supplemental memorandum discussing payments from the Ukraine, Russia and other sources very soon based on bank records we've recently received, but haven't disclosed yet.

Sir, you've confirmed for me what I've been saying all along. The committee is accomplished in five months what it took the Department of Justice five years to figure out. Mr. Shapley, I want to turn to President Biden. You've stated to CBS Evening News that there were certain investigative steps you were not allowed to take that could have led to President Biden.

Can you tell us what investigative steps related to President Biden that you wanted to take, but you couldn't?

GARY SHAPLEY:

So, there are multiple instances in this investigation where there are references to -- to the father of the subject, President Biden. And in the course of any normal investigation when the subject's father is somehow related to the finances of the subject, in the normal course of any investigation, we would have to go and get that information to properly vet the financial flows of money in that investigation to determine what we end up charging.

JAMES COMER:

There was a tweet or a message in the laptop from Hunter Biden to Kevin Dunn who was with CDFC and it said, quote, "The Bidens are the best I know at doing exactly what the chairman wants from this partnership." Now, the chairman he's referring to is Chairman Ye of CDFC, Is that correct?

GARY SHAPLEY:

In that stream, I believe so, yes.

JAMES COMER:

So what -- can you tell me what the Bidens are best at? Do you understand what -- what he would have meant by that? I mean, the -- this is a Chinese company and I think the ranking member referred to it with Gal Luft. It's the same entity that paid Gal Luft the money that he got indicted for for being an unregistered foreign agent, I believe was was the charge.

But this -- this is another solicitation from Hunter Biden and he refers to the Bidens plural and they're best at doing what the chairman wants. I think that's very concerning to our committee because this is a Chinese Communist Party-owned entity. This is of concern to our national security and I didn't know in closing if you had any information with respect to that comment there.

GARY SHAPLEY:
With respect to the WhatsApp messages, it was something we clearly needed to follow up on and that was really one of the major deviations from in this case is that is that investigators asked and Special Agent Ziegler asked to follow to take some investigative steps to review that and it just simply wasn't supported by the prosecutor.

So for further delving into what that means, I just simply can't do.

JAMES COMER:
Well, I can promise you we're not going to stop on this committee until we understand what he fully meant by that message to a Chinese Communist Party official.

JOSEPH ZIEGLER:
Mr. Chairman, can I say something?

GARY SHAPLEY:
Yes, please.

JOSEPH ZIEGLER:
So, thank you for that question. What any -- that -- there was a long WhatsApp message contained in that that was only a portion of it. So, what we -- what we can do or what we can go back is we can turn that over to the House Ways and Means Committee, they can vote to release it and then that information can be available for you.

JAMES COMER:
Thank you. Thank you very much. I now yield to Ranking Member Raskin.

JAMIE RASKIN:
Thank you, Mr. Chairman. I want to thank both the witnesses for their testimony and for appearing with us today. It seems to me that a lot of your testimony has been about the problem of prosecutorial discretion and the traditional tug of war between investigators who characteristically want to charge as many offenses as they've come across and prosecutors who are more attuned to the rigors of the courtroom and the complexity of forensic evidence.

And I admit as a former state assistant attorney general, I see it more from the prosecutor's standpoint than the investigators' standpoint. But, Mr. Shapley, would you concede that there are lots of crimes that are identified by investigators that are not actually charged by prosecutors routinely? For -- I'll give you an example.

In the recent prosecution -- the recent indictment of Donald Trump for retaining government documents that he unlawfully took according to the indictment. He was charged only with

possessing those documents that were recovered after the August 2022 search warrant. But he had hundreds of documents that were recovered before that, 15 boxes that were recovered in January and then after the grand jury subpoena in June.

But the prosecutors decided not to charge any of those as offenses. They said they were going to take the most egregious offenses in charge of those. Is that unfamiliar to you that kind of decision by a prosecutor?


GARY SHAPLEY:
So, I can't speak to anything related to the Trump investigation, but, you know, the issue here with this case is that it wasn't just investigators that were agreed with these charges. In Exhibit Two in my testimony, it clearly shows a prosecution recommendation report where it says right in the document that the -- the assistant United States attorney's and Department of Justice Tax Division agreed with those recommended charges.

And -- and then again and as Special Agent Ziegler alluded to in late 2022 --


JAMIE RASKIN:
And they were recommended to whom?


GARY SHAPLEY:
To Department of Justice. So, the prosecution recommendation report is referred to the Department of Justice Tax Division for approval discretion or declination.


JAMIE RASKIN:
Right, but then it all went to the US attorney in Delaware, right?


GARY SHAPLEY:
So, that's not entirely accurate because Department of Justice tax division up through March 16th of 2023 had not yet approved, provided discretion or declined charges. So, US attorney Weiss had no authority to charge any of those charges without the Department of Justice Tax Division's approval beforehand.


JOSEPH ZIEGLER:
And I'd like to say something about this real quick --


JAMIE RASKIN:
-- Let me come back to you because I only have a limited amount of time and I've got questions for you. But we -- in fact, Mr. Ziegler, you say that Hunter Biden's unpaid taxes were around $2 million and he's now paid those back taxes, as I understand it. And he's been criminally charged for not paying taxes.

Will you just explain how people can be charged for not paying taxes even after they've made amends and gone forward to pay them?


JOSEPH ZIEGLER:
So, under the statute, the -- when someone fails to timely pay their taxes, usually due April

15th. Once that date occurs, they -- they have a known tax liability and they failed to pay it. The crime has already been committed. The fact that they paid the taxes after that's a mitigating factor that the judge can use their discretion at sentencing.

But I would like to make one reference that this does not include the -- the over $100,000 in additional tax due and owing that was not charged related.

JAMIE RASKIN:
No, you made yourself clear, you thought there were additional charges that were laid on the table and not pursued by US. Attorney Weiss, the Trump appointee. But, Mr. Shapley, you testified that the critical moment in your decision to blow the whistle in the Hunter Biden investigation was the October 7th meeting 2022 that you had with US Attorney David Weiss.

And up until that point, you say you were willing to chalk up the differences with prosecutors to the typical, quote, "investigator versus prosecutor type thing," which is what I think this is all about. But you say on page 28 of your transcript, "If I wasn't in the October 7th meeting, my red line might not have been crossed." And I think you reaffirmed that today.

Now, as I understand it, what crossed your red line is that in that meeting you understood Mr. Weiss to be saying that he did not have the authority to bring charges in DC or California without the approval of the US attorneys for those districts. Is that right?

GARY SHAPLEY:
That's correct.

JAMIE RASKIN:
OK, but in a letter that he sent to Chairman Jordan in June, US Attorney Weiss stated and I quote, "I have been granted ultimate authority over this matter including responsibility for deciding where, when and whether to file charges." He went on to explain that in considering charges in districts outside Delaware, usual DOJ practice would be, quote, "to contact the US Attorney's office for the district in question and determine whether it wants to partner on the case." Now if that office declined, he would request and be granted authority to bring the charge himself under, quote, "special attorney status from the Attorney General pursuant to 28 USC Section 515." Now, to try to clear this up, Mr. Shapley, let's go back to March 2022 when as you explained on page 153 of the transcript, the US attorney for DC declined to partner with Mr. Weiss to bring the 2014 and 2015 charges in DC. After that decision by the US Attorney for DC, Mr. Weiss continued to discuss those charges with all of you.

In fact, Mr. Ziegler, on page 39 of your transcript, you described how in September 2022 you had a meeting in which US Attorney Weiss expressed some concerns about those charges, including that in 2015 Hunter Biden was in the throes of his drug addiction after the death of his brother and in that meeting Mr. Weiss tells you and I quote, "I'm still weighing it." Now, Mr. Ziegler In September 2022, Mr. Weiss was telling you that he was the one weighing whether to bring the 2014 and 2015 charges, isn't that -- isn't that correct?

JOSEPH ZIEGLER:
That is correct.

JAMIE RASKIN:

Now, coming back to the October 7th 2022 meeting, Mr. Shapley. According to you on page 155, Mr. Weiss said that, quote, "He decided not to charge 2014 and 2015." It seems to me this October 7th, 2022 meeting which you've described as a red line is just a misunderstanding. That after the US attorney in DC declined to partner on the '14 and '15 charges, Mr. Weiss took a good hard look at those charges himself and ultimately decided not to charge them and therefore not to seek the special attorney status.

He may have been right about that. He may have been wrong, as you guys make your case for, but it was his decision, isn't that right Mr. Shapley.?

GARY SHAPLEY:
No, that's not supported by the facts.

JAMIE RASKIN:
Really. Which facts is it not supported by?

GARY SHAPLEY:
His own admissions and the October 7th, 2022 meeting that I documented contemporaneously and the only piece --

JAMIE RASKIN:
But he contradicts what you're saying. Do you agree that? He doesn't agree with what you're saying about that meeting. Now, I wasn't at that October 7th, 2022 meeting, but what was said at the meeting over two and a half years ago may be a little ambiguous or unclear today. Mr. Weiss's letter to Chairman Jordan could not be more clear.

He had, quote, "ultimate authority over this matter including responsibility for deciding where, when and whether to file the charges." So, if there's any ambiguity, it's got to go to US Attorney Weiss, Donald Trump's handpicked, US, attorney for Delaware. I yield back Mr. Chairman.

JAMES COMER:
Gentleman, yields back and now recognize Chairman Smith.

JOSEPH ZIEGLER:
Chairman Smith, can I say something real quick on that? I have two things that I wanted to bring up. So, there are a lot of different tax cases out there that include misdemeanors and felonies. And there's a lot of reasons why we charge the felony. We might charge the misdemeanor. But I want to be clear on this that when you have a felony charge with the misdemeanor that you have to charge the felony.

And in this case, they did not charge that felony. And then there's one more points of this. We had a meeting with all four --

JAMIE RASKIN:
Excuse me -- when you say when you say you have to charge the felony, that is a Department of Justice rule, you're saying?

JOSEPH ZIEGLER:

That is in their manual that you have to charge the felony in order to avoid an equitable treatment of taxpayers.


JAMIE RASKIN:

No, but you're saying whether or not the evidence supports it?


JOSEPH ZIEGLER:

That is a part of that is in that analysis is whether the evidence, but that's -- that goes back to the point of that if the certain deductions that were taken -- the certain deductions that were taken on the tax return, that's for you guys to decide whether the felony was there or not. But the point is, is that we're bringing --


JAMIE RASKIN:

-- That's for the US attorney to decide and I'm afraid we're not going to be able to investigate every tax case in America.


JAMES COMER:

Gentleman's time has expired. Now chair now recognizes Mr. Smith from Missouri.


JASON SMITH:

Thank you, Mr. Chairman. Mr. Shapley, Mr Ziegler, I want to thank you both again for your testimony and your willingness to come forward and tell the truth for the American public. And I apologize of the behavior of some of our colleagues and how the press has treated you for doing what is right, so the American people can see it. Mr. Shapley, included in the documents you provided to the Ways and Means Committee is a document labeled Exhibit Two in the transcript of your testimony, which is a portion of a special agent report.

This document is located following page 41 of the transcript, this one. What is this document and what recommendations are made in this document?


GARY SHAPLEY:

Yes, so this is the prosecution recommendation report that IRS CIA agents produce at the end of an investigation when they're going to recommend prosecution to the Department of Justice. This was authored by Special Agent Ziegler and it's an incredibly robust document. There's -- there's several thousand pages because each of these -- the facts and the elements in this, in this particular report, the elements of each violation show which piece of evidence meets that element.

So, in this report, it recommended felony charges for 2014, 2018 and 2019 and misdemeanor charges for 2015, 2016, 2017, 2018 and 2019. And it further shows that Special Agent Ziegler spoke with prosecutors and worked hand in hand with prosecutors while this was being drafted and they clearly agreed that the elements of these violations were met and they supported this document.

And when it was sent to Department of Justice Tax Division for approval on February 25th, 2022.

JASON SMITH:
Mr. Shapley, what level of confidence does the IRS need to have to recommend charges like the felony counts listed in this document?


GARY SHAPLEY:
So, I mean, each each violation has each element listed in this report and the evidence is shown underneath each of it. This report goes through internal departments, IRS criminal investigation and in addition to the prosecutors agreeing that the evidence supported charging felony counts the senior leadership up to the director of field operations.

The IRS criminal investigation also personally reviewed this report and approved it to be sent to the Department of Justice Tax Division.


JASON SMITH:
So, were you surprised that on June 20th, 2023, prosecutors announced a plea agreement with Hunter Biden under which he would only plead guilty to violations of two misdemeanor charges?


GARY SHAPLEY:
So, the guilty plea is outside of my control, but what I can say is it's not what an investigator thought. It's not what specialty Ziegler. I thought that felony charges were proven in this case, the prosecutors again and again agreed with that assessment and attorney general assisting -- I'm sorry, United States Attorney Weiss also agreed with these because he went to the DC US attorney to ask him to partner.

You don't ask someone to partner with you if you don't yourself agree with those charges and when he got denied that he requested a special authority and was declined as he said in the October 7th, 2022 meeting.


JASON SMITH:
Yeah, in the -- in the -- the report that we just highlighted as Exhibit Two it states in there that even Leslie Wolf agreed with these charges moving forward, the assistant prosecutor. Mr. Ziegler, on page 32 of the transcript of your testimony, you discussed the need to interview Hunter Biden's adult children regarding certain deductions that you listed earlier of Hunter Biden included on his tax returns.

You also testified that Assistant United States Attorney, Leslie Wolf, told you that you would get into hot water if interviewed the president's grandchildren. In other cases that you've worked over your career, have you ever had a prosecutor tell you that you couldn't interview a relevant witness?


JOSEPH ZIEGLER:
So there are -- there are certain things that come in to whether we talk to a witness or not. So, if they're an attorney, if there is some special situation that might come up that might cause caution to interviewing that witness. But I've never been told that we couldn't approach someone to interview them as a part of an investigation.

Yeah, I mean, there's -- there are certain situations to where you have to do a further

analysis of the information that you might get if like I said, if they're an attorney. But yeah, so in this case we needed to -- to -- to talk to witnesses related to things that were deducted on the tax return and in this case it was the adult children that we needed to talk to.

JASON SMITH:
Thank you, Mr. Chairman. I see my time expired.

JAMES COMER:
Gentleman, yields back. Chair now recognized Mr. Krishnamoorthi from Illinois for five minutes.

RAJA KRISHNAMOORTHI:
Thank you, Mr. Chair. Thank you, Mr. Shapley. Thank you, Mr. Ziegler, for your service to this country. Really appreciate you coming here and appearing in this capacity. First of all, Mr. Ziegler, I see at page 12 of your transcript -- deposition transcript you start laying out a series of concerns that you had with regard to various people and different issues related to this investigation.

You say quote, "I started this investigation in November 2018 after reviewing bank deposits." Then you later say career IRS staff were not initially supportive of starting the investigation. Of course in November 2018, Joe Biden was not the President, correct?

JOSEPH ZIEGLER:
Joe Biden was not the president, correct.

RAJA KRISHNAMOORTHI:
And then at page 20, you lay out another concern. You had a concern about Bill Barr, Attorney General Bill Barr, consolidating the series of cases into the US attorney's office in Delaware. At that point you said quote, "What was the potential issue I saw with working the case in Delaware? We were working with a small US attorney's office who might not have ever worked a case of this caliber." Now of course, Bill Barr was appointed by Donald Trump, correct?

JOSEPH ZIEGLER:
Yes, that is correct.

RAJA KRISHNAMOORTHI:
Now, let me turn to another concern that you lay out in your testimony. You were concerned about the quality of the prosecutors. On page 14, you say quote, "The prosecutors were the JV squad and they weren't up to the task of handling such a big case." Now sir, US Attorney Weiss was also appointed by Donald Trump.

Right?

JOSEPH ZIEGLER:
So as far as the actual nomination and what went into why --

RAJA KRISHNAMOORTHI:

I'm not asking you why. I'm just saying US DA Weiss was an attorney appointed by Donald Trump, correct?

JOSEPH ZIEGLER:

That is correct.

RAJA KRISHNAMOORTHI:

OK. Now, another concern you lay out in your deposition at page 21. You talk about your concerns about this investigation having been made overt, being publicized for the world to know. You said quote, "One of the first disagreements I recall between the IRS investigators and prosecutors was the idea of going public." Now, sir, this was in March, April 2019. Joe Biden was not the president then was he?

JOSEPH ZIEGLER:

So, I don't recall the exact date of when he announced that he was going to run for presidency, but I know that --

RAJA KRISHNAMOORTHI:

That's not my question, sir. Joe Biden was not the president in March, April 2019, correct?

JOSEPH ZIEGLER:

That is correct.

RAJA KRISHNAMOORTHI:

Now, Mr. Shapley, let me turn to you for a second here. You also raise a series of concerns in your deposition transcript. One is this, you said you were concerned about the complexities of the election cycle and potential delays that arose in connection with the election cycle. You said at page 23, "And I remember there were always times where we were always on an impending election cycle.

It was always the elections being brought up in early 2020. It was the presidential primaries. Now, Sir Joe Biden was not the president at that time, either was he?

GARY SHAPLEY:

I mean, the answer to your question is no, he was not, but I don't see where you're referenced it in my, you know --

RAJA KRISHNAMOORTHI:

Page 23. You were talking about how the election cycle is delaying decisions by the prosecution and it turns out that the delay in the election cycle was happening at a time when Joe Biden was not the president.

GARY SHAPLEY:

I'm sorry, sir. That's in Special Agent Ziegler's transcript. That's why I couldn't find it.

RAJA KRISHNAMOORTHI:

So, Mr. Ziegler, and you shared concerns about delays related to the election cycle, but at that time, Joe Biden was not the president.


JOSEPH ZIEGLER:

I believe at that time he was the nominee for president.


RAJA KRISHNAMOORTHI:

Well, he was not the president, was he? It's just a simple question, sir.


JOSEPH ZIEGLER:

Can you rephrase -- what time period?


RAJA KRISHNAMOORTHI:

Joe Biden was not the president in the presidential primaries in 2020?


JOSEPH ZIEGLER:

Correct, That is correct.


RAJA KRISHNAMOORTHI:

Sir, finally, Mr. Shapley. You said that warrants were ready as soon as April 2020 to begin searching for records, but actions weren't taken with regard to those warrants. Again, Joe Biden was not the president in April 2020, was he?


GARY SHAPLEY:

So, I'm confused by a line of questioning. We're talking about an election to which now President Biden was a part of, so he didn't have to be the president to have election meddling.


RAJA KRISHNAMOORTHI:

No, but the question is this, was he the president at that time in April 2020?


GARY SHAPLEY:

The -- that's been asked and answered.


RAJA KRISHNAMOORTHI:

And what's the answer, sir?


GARY SHAPLEY:

The election -- the election --


RAJA KRISHNAMOORTHI:

The answer is yes or no.

GARY SHAPLEY:

The answer is no.


RAJA KRISHNAMOORTHI:

Thank you. Thank you. I will yield back.


GARY SHAPLEY:

Mr. Chairman, may I finish.


JAMES COMER:

Please. You may answer the question.


GARY SHAPLEY:

So, it's clear that he was not the president, but an election is for the purpose of electing a president. And Joe Biden at the time was a nominee for president of the United States. Therefore, the election clauses with DOJ policy took place and were in effect and it wasn't until September 4th of 2020 that the Department of Justice Public Integrity said that we can no longer take any actions on that case.

And in as early as April -- and as early as April or April to June of 2020, the Department of Justice, Delaware US Attorney's office was already invoking the election as a reason not to perform those search warrants and that --


RAJA KRISHNAMOORTHI:

-- Was Donald Trump --


JAMES COMER:

Gentleman's time has expired. We've got a lot of questions here. Chair now recognizes Mr. Jordan of Ohio.


JIM JORDAN:

Thank you, Mr. Chairman. Last month, David Weiss sent me two letters. In the first letter on June 7th. He said I have been granted ultimate authority over the matter including responsibility for deciding where, when and whether to file charges. The quote that the ranking member just put up. Later that same month, he sent me the second letter where he said no, I don't know.

I don't have that charging authority. So, June 7th, he says I'm the boss, I can do whatever I darn well want follow wherever I want. And then June 30th, he says no, I can't. What happened in between those two events? Your testimony went public. He goes, oh my goodness, I got to change my story because now the truth is coming out.

And it sounds like in this investigation to me, Mr. Shapley, that the prosecutors and the investigators were in agreement for most of the investigation and then we get to October of 2022. I see Mr. Ziegler nodding his head. And that meeting is where David Weiss told you something. Is that right, Mr. Shapley?

GARY SHAPLEY:

Yes.


JIM JORDAN:

What did he say? Can you put your mic on there? What did he say?


GARY SHAPLEY:

Yes, he told me he was not the deciding person on whether or not charges were filed. He told us that DC US attorney had declined to allow charges. He told us that he had requested special counsel authority from Maine DOJ and denied --


JIM JORDAN:

-- That were denied.


GARY SHAPLEY:

That's correct.


JIM JORDAN:

Were you the only guy in that meeting?


GARY SHAPLEY:

I was not.


JIM JORDAN:

How many other people were there?


GARY SHAPLEY:

There were seven total people including me.


JIM JORDAN:

You and Mr. Weiss and five others, right?


GARY SHAPLEY:

That's correct.


JIM JORDAN:

And did any of them -- have any of them come forward and say what you just said is not true?


GARY SHAPLEY:

They have not.

JIM JORDAN:

No one has, right?


GARY SHAPLEY:

That's correct.


JIM JORDAN:

No one is -- No one is disputed refuted, no one said what you said is not true. And did you memorialize what took place in that meeting? Did you memorialize that?


GARY SHAPLEY:

Yes, I did that day when I returned home from the Delaware US Attorney's office, I put it in an email to the two senior executives at my agency.


JIM JORDAN:

You put it in an email that day.


GARY SHAPLEY:

That's correct.


JIM JORDAN:

Contemporaneous from when it happened, I got the email here. It's Exhibit 10 in your testimony when you were interviewed by the Ways and Means Committee, October 7th, Friday after -- Friday evening 6:09 p.m. That email, right?


GARY SHAPLEY:

That's correct.


JIM JORDAN:

Sent to Mr. Walden [Ph] and Mr. Bagdorf [Ph]. Who are those individuals?


GARY SHAPLEY:

Mike Bagdorf is a director of field operations for Southern Division of IRS CI and Darryl Walden was the special agent in charge of the Washington DC field office.


JIM JORDAN:

These are your bosses, right?


GARY SHAPLEY:

That's correct.


JIM JORDAN:

Did Mr. Walden get back to you?

GARY SHAPLEY:
Yes, he did.

JIM JORDAN:
Remember what he said?

GARY SHAPLEY:
He said, "Thanks, Gary, you covered it all."

JIM JORDAN:
You covered it all he didn't say. Thanks, Gary, but you're wrong. That's not what happened. He affirmed what you said. You covered it all and you laid it out, you spelled out just what you told me a few minutes ago, right?

GARY SHAPLEY:
That's correct.

JIM JORDAN:
What Mr. Weiss told you in that meeting and when that goes public on June 22nd, last month, Mr. Weiss says, oh, I got to change my story. I better send a letter to the Judiciary Committee where he says I stand by what I wrote. But I wish to expand, I wish to fix it and then he had to further go go further in July when he talked to -- when he sent a letter to Senator Graham and said to clarify again.

They've changed their story, you guys haven't. What do you think happened? What do you think Mr. Weiss was consistent with the investigators up until this October 7th meeting and then he changed. What do you think happened, Mr. Shapley?

GARY SHAPLEY:
I mean, I don't know -- I don't know what happened internal at Department of Justice, but what I can say is that -- is that the story has been changing from Department of Justice and US Attorney Weiss. And I think the only person that's really had any documents that have been corroborated in my own.

JIM JORDAN:
Exactly. I think what happened, I think it's obvious anyone with common sense can see what happened because he said it in Mr. Graham's letter, he said I had discussions with Main Justice. I had discussions with the folks, the big -- the deputy attorney general, the attorney -- whoever was, I don't know, but he had discussions with the people at Main Justice and suddenly things change.

And that all became evident on October 7th and until October 7th, the investigators, to Mr. Ruskin's point, the investigators and the prosecutors they were in agreement. Here are the facts. Here's how we do it. Here's how we've always done it. We got the two best agents in the place on the case, let's go and then, shazam, something changes.

And I think it's what Mr. Weiss conveyed to Senator Graham when he said I had discussions with folks at Main Justice. We don't know what we're in those discussions, but it looks pretty obvious what happened, looks pretty obvious. Initially everyone was pounding their chest. David Weiss has complete authority.

Now suddenly he doesn't -- he doesn't because you guys came forward and told the truth. I yield back.


JAMES COMER:
Chair now recognizes Mr. Lynch from Massachusetts.


STEPHEN LYNCH:
Thank you, Mr. Chairman. First of all, I want to thank the witnesses for their willingness to work with the committee and help us with our work. I am surprised though this seems to be a new level of hypocrisy here. As a long standing member of this committee, I think most of the members who have served a long time here know full well, what -- what political interference and what sweetheart deals look like?

And I think context is very important. In 2017, we had a situation where a former national security adviser and Trump campaign surrogate Michael Flynn was indicted. Indicted by a federal jury -- federal grand jury. He pled guilty twice and he lied to FBI agents about his communications with the Russian government prior to the inauguration of President Trump.

He was only national security adviser for 22 days. But my colleagues on the other side of the aisle had no interest, zero -- zero interest in looking into that case. And in response, the president at the time, President Trump, repeatedly and publicly attacked the case and the agents who brought it, including by claiming that Mr. Flynn was the victim of a quote -- of quote, "dirty filthy cops at the top of the FBI," close quote.

He also described the prosecution as a disgrace and claimed that those who invested investigated Mr. Flynn were guilty of treason. Those are public statements made by a sitting president attacking the FBI. And despite the fact that Mr. Flynn pleaded guilty twice to lying to the FBI, President Trump's attorney general, William Barr, personally intervened in the case.

And that led the Department of Justice to abruptly reverse course and have the case dismissed on grounds that a federal judge found dubious to say the least. And that's a quote from the judge. In the case of longtime Trump associate and adviser, Roger Stone, a federal jury found him guilty in 2019 of obstructing a Congressional investigation into Russian interference in the 2016 Presidential election by lying to Congress and witness tampering> In response, a sitting president, President Trump, immediately took to Twitter attacking the Department of Justice and accusing them of employing a, quote, "double standard" and committing a quote, "miscarriage of justice." President Trump also publicly attacked the department's sentencing recommendation for Mr. Stone leading senior officials to overrule the federal prosecutors who had investigated and brought the case.

So, this blatant political intervention not complained of at all by my Republican colleagues at the time, caused those prosecutors some of them to resign or withdraw from the case. President Trump even congratulated former Attorney General Barr for interfering. That's what political intervention looks like and we know it on this committee.

And in the case of former Trump campaign chairman, Paul Manafort, who worked to elect a

pro-Kremlin president in Ukraine and was convicted in 2018 of bank and tax fraud, ultimately ultimately pleading guilty to conspiracy against the United States and conspiracy to obstruct justice. President Trump deemed it, quote, "a very sad day for our country." And in terms of sweetheart deals, in December of 2020 at the end of his term, President Trump granted full pardons to his close allies, his pals Flynn, Stone and Manafort allowing them to escape accountability.

For the numerous crimes, now that -- that -- that is a sweetheart deal. They got away with everything. Not like Hunter Biden who's pleading guilty to the reputational damage and embarrassment to his family. The widely publicized facts of his drug addiction and this was a Trump-appointed uUS attorney that prosecuted this for four years.

And President Biden did not seek to remove him, which normally happens when a new president comes into office. He has the full right to remove them, never did so. Mr. Chairman, I yield back.

JAMES COMER:
Gentleman yields back. Chair now recognized, Mr. Timmons, from South Carolina.

WILLIAM TIMMONS:
Thank you, Mr. Chairman. I'm going to try to help simplify this for the American people. We are here today because our institutions are broken. The DOJ, the FBI, the IRS have transformed from a balanced apparatus of justice into the political weapon of the left, a process that I believe began during the Obama administration.

They actively pursue individuals based on their ideological beliefs. Specifically, targeting Donald Trump who pose a significant threat to the political left. Upon his election, the bureaucratic resistance didn't stop. Their hatred for Trump permeated throughout their work attempting to cripple his administration almost every turn and for the last 30 months, the DOJ, the FBI and the IRS have worked to not only protect the criminal actions of the Biden family, but to continue persecuting President Trump.

Some describe this as a two-tier system of justice, but what it really is, it's a system deliberately and systematically prosecuting individuals within the Trump orbit due to their hatred for President Trump simultaneously crimes of the current president and members of his family, all while issuing selectively timed and perfectly planned indictments against President Trump.

Today, we are joined by two whistleblowers from the IRS. There are also whistleblowers from within the FBI and the DOJ. All these people are stepping forward now because after the 2022 election, the American people have entrusted the House majority to Republicans granting US subpoena power. With gavels in hand With gavels in hand, we now possess crucial evidence just months into our investigations.

The American people can see plain as day the corruption, bribery and criminal actions of the Biden family. We are here to do the jobs that the DOJ, the FBI and the IRS refuse to do. They have failed to fulfill their duties and properly investigate the Biden family and their international bribery schemes which resulted in million dollar payouts.

I want to again thank you both for coming forward. I cannot imagine how difficult this has been on you and your family. I think the best use of my time is to help simplify the complex

scheme for the American people, help do the job that DOJ IRS and FBI, they just refused to do. We talk about China, we talk about Romania, Ukraine.

It all seems complicated, but this scheme was born in 2014 in Ukraine and then replicated in other countries. Ukraine is the proof of concept, if you will. This is the scheme simple foreign client has a problem, pays a Biden -- Vice President Biden travels to the country, Vice President Biden leverages US influence to force a favorable outcome for the client.

The Biden family earns their fee. That's the scheme -- that's the scheme. So, let's just start with Ukraine, so I can just show you the proof of concept. I'm going to walk you through the timeline in 2014. Burisma has a problem. They want to get their stock listed on Wall Street, but the prosecutor general is investigating corruption and they can't get the outcome they want in New York.

So, what do they do? They hire Hunter Biden pay a millions of dollars. Mr. Ziegler, my only question for you is going to be, if I can direct you to page 99 of your transcript, is it accurate to say Hunter -- Hunter Biden received millions of dollars from Burisma?

JOSEPH ZIEGLER:
Yes, that would be accurate.

WILLIAM TIMMONS:
Thank you. To the American people, I want to point out briefly that Hunter Biden has absolutely zero qualifications in this industry or in business in general. But he does have the big guy. November 2nd, 2015 in an email to Hunter, Burisma executive says that he's demanding a high-level US official visit Ukraine to force out Shokin.

This is in an email obtained from Hunter Biden's laptop. November 14th, 2015, Hunter Biden confirms the big guy's on the way, Vice President Biden's coming have no fear. December 7th through 9th, Biden has an official visit, he's using US tax dollars, threatens President Poroshenko to withhold $=1 billion loan guarantee if Shokin isn't fired.

He lied about this during the campaign. He specifically said it wasn't true. Sure enough, Shokin's fired. If you have any questions about whether he fired him, January 23rd of 2018, he brags about it years later. Ladies and gentlemen, American people, that's the scheme. That is the proof of concept. They replicated it again and again because they never dreamt Biden would be president.

No one did, but he is our president and because of his actions because of him selling policy decisions to adversaries abroad for personal gain, he is vulnerable. He is vulnerable and our national security is vulnerable because of it. We are not here to prosecute Hunter Biden. We don't care about Hunter Biden.

We care about our country's national security decisions and whether our president is compromised. That's why we're here. That is why we're here. With that, Mr. Chairman, I yield back.

JAMES COMER:
Gentleman, yields back chair. Now recognize Mr. Connolly from Virginia.

GERRY CONNOLLY:
Thank you, Mr. Chairman, and thank you both for being here today. My friend from South Carolina said he was going to simplify it for the American people. I think he succeeded, so simple as to be unrecognizable. And if we're going to talk about Ukraine and Burisma, let's remember that the president of the United States, not Joe Biden, Donald J. Trump was impeached over a phone call to the president of Ukraine wanting to get dirt on this very subject, on this very individual with this very company and -- and withheld military equipment desperately needed, as we now know, including Javelin missiles which are very useful in anti-tank warfare to get it, for which he was impeached quite correctly.

But my friends in that side of the aisle all voted against that. They had no problem with that kind of interference that directly affected national security. Mr. Shapely and Mr. Ziegler, you both testified about the fact that you've been subject to criticism, ridicule, public disclosure, perhaps menacing comments because you've come forward.

Is that correct?

GARY SHAPLEY:
A medicine comments?

GERRY CONNOLLY:
No -- no -- no.

GARY SHAPLEY:
Oh, menacing comment.

GERRY CONNOLLY:
Menacing comments.

GARY SHAPLEY:
Yes, sir.

GERRY CONNOLLY:
And you, too, Mr. Ziegler?

JOSEPH ZIEGLER:
Yes, I have.

GERRY CONNOLLY:
Right, that must be a terrible feeling and whoever does that, I think you'd probably both agree, is doing a disservice to the country and to you individually. You're simply doing your duty as you see the -- the light. Fair enough?

GARY SHAPLEY:
Yes.

GERRY CONNOLLY:

Mr. Ziegler?


JOSEPH ZIEGLER:

I am doing my duty.


GERRY CONNOLLY:

Yes, so can you imagine how the district attorney in Fulton County, Georgia must feel? Or the district attorney in Manhattan must feel? Or the special counsel of the Department of Justice, Mr. Smith must feel when the very subject of an indictment or pending indictment takes to public rallies and ridicules them by name, disparages them by name, characterizes them by name, putting them and their families at the same risk you're experiencing?

If it's wrong for these anonymous people to criticize you, it must certainly be wrong that the former president of the United States would demonize people doing their jobs just like you try to do yours, as they see the light. You can disagree with their judgment, but it's not right to disparage their character.

And what's so ironic about this hearing, is again, not one mention on the other side of the aisle about that malign behavior by the very subject of the indictment. And speaking of interference, the American people know, President Trump pressured the Justice Department, which we're talking about here today, like, wouldn't that be wrong if someone did that, to go easy on his friend, Michael Flynn.

We know when President Trump's handpicked attorney general, William Barr took the reins, he pressured officials to reduce their sentencing for Roger Stone and glossed over Robert Mueller's 2016 presidential election report saying it exonerated the president. When, in fact, Robert Mueller explicitly said no, it did not and listed ten specific items of obstruction of justice he recommended be pursued and pointed out, lest we misunderstand the pursuit part, he couldn't indict a sitting president according to DOJ guidelines.

But he said in his report, an enterprising district attorney once that president left office might want to pursue it. According to recent reporting in The New York Times, former President Trump explicitly told US Chief of Staff, John Kelly, that they, quote, "ought to investigate and get the IRS on former civil servants that Mr. Trump considered his political enemies." Explicit testimony from his own chief of staff.

But again, absolute silence on the other side of the aisle, including from the Ways and Means Committee, which purports to be so concerned about any hint of interference by any political entity or individual over the pristine work of the Department of Justice and the IRS. An agent -- an agency, I might add another piece of irony of this hearing, that has been disparaged as the hobnob, you know, boot on the neck of the American taxpayer for so long by the majority and denied resources by the majority.

As we speak, they cut $24 billion in the debt ceiling compromise agreement out of the $80 billion we provided to, in fact, give you more resources to do your job. I yield back.


JAMES COMER:

Gentleman, yields back and we're going to have two more questions and at the request of

the witnesses at the -- at every 90 minute mark, we're going to take a ten minute bathroom
recess. So, we'll recognize the next two questioners and then go to that recess. Right now,
Chair recognizes the Representative Turner from Ohio for five minutes.


MICHAEL TURNER:
Gentlemen, thank you for being here. I appreciate your courage and I sure appreciate your
dedication to the truth and your -- your sense of obligation. Surprisingly, my questions are
actually going to be about your testimony in the subject matter as to why we're here. We're
going to have a little shift to actually talk about what you're here for.

I'm going to cite specific spots of your transcript testimony for each of you, but I don't think
you'll have to read the long. I'm going to do it for the purposes of the record. If I ask a
question after having cited one and you want to refer to it and take a pause, please let me
know, but I think pretty much we'll be able to follow along.

Mr. Ziegler, you stated on page 17 of your transcript that you started this investigation in
November of 2018 after reviewing bank reports related to another case that you were
working on on a social media company. Those bank reports identified Hunter Biden as
paying prostitutes related to a potential prostitution ring.

Also included those bank reports was evidence that Hunter Biden was living lavishly through
his corporate bank account. Mr. Ziegler, when you make this statement, did you actually
review these bank statements? This is not knowledge, in other words, that you got from
someone else that someone is relating to you what they said, you've actually looked at these
documents?


JOSEPH ZIEGLER:
That is correct. I actually looked at them.


MICHAEL TURNER:
Mr. Shapley, you testified on page 57 concerning the 2014 tax report that Hunter Biden --
what Hunter Biden did is that he told Burisma to send that income to Rosemont, Seneca,
Bohai and that when the money came back to him, he booked it as a loan. You then go on to
testify that it should have been taxable as soon as it became income from Burisma to Hunter.

And whatever he did with it, after that was really just a scheme to evade taxes for that year.
You had that Rosemont, Seneca, Bohai and did not book this as a loan itself. So, Biden is
treating it differently than they did. Did you look actually at those records? Is this actually
your -- your viewing of them to make this to create this testimony?


GARY SHAPLEY:
Yeah, I looked at the evidence, with Special Agent Ziegler would be the expert that saw
every single piece, but yes, I saw that evidence.


MICHAEL TURNER:
So, Mr. Ziegler, you also looked at these -- these bank records respect to the 2014 tax
payment from Burisma.

JOSEPH ZIEGLER:

Yes.


MICHAEL TURNER:

Mr. Shapley, you went on to say this is like textbook I learned at basic training nominee stuff and in all of these defenses it was alone got. You got to have a promissory note, you've got to have defined interest and you've got to have repayments, and none of them were included, So, Biden -- Hunter Biden claims this is a loan, but the company he got it from doesn't claim it as a loan.

There's no promissory note. There's no interest. There's no repayments, is that correct?


JOSEPH ZIEGLER:

That is correct. And they actually booked it -- Rosemont, Seneca, bohai booked it as a deduction.


MICHAEL TURNER:

As a deduction, meaning it would have been a payment to him and so it would have been deductible to them?


JOSEPH ZIEGLER:

Correct.


MICHAEL TURNER:

Income to him then payable with tax, excellent. So -- but it wasn't just the bank documents that that you looked at. You also had the opportunity to look at a memo from Eric Sherwin and Eric Sherwin was actually Hunter Biden's accountant. And, Mr. Shapley, on your testimony page 57, you included Exhibit 4, a memo from Hunter's accountant saying you're going to tax on this $400,000. So, you've got the accountant even agreeing with your position that this is income and that there should have been income tax paid on it.


GARY SHAPLEY:

A correction to that is that I did not provide this document. This was provided by the committee.


MICHAEL TURNER:

OK, excellent. Well, we have it then in the public testimony public record of his accountant agreeing. So, both of you I think indicate that the taxable amount of the $400,000 would have been about $125,000 that Hunter Biden would have had to pay on the $400,000 of income. Is that correct, Mr. Shapley?


GARY SHAPLEY:

Yes, that's correct.


MICHAEL TURNER:

Mr. Ziegler?

JOSEPH ZIEGLER:

Yes, that's correct.

MICHAEL TURNER:

And you've had no evidence in all the records that you've looked at that those taxes were ever paid?

GARY SHAPLEY:

No, they were not.

JOSEPH ZIEGLER:

Yeah, no, they were not paid by Hunter Biden.

MICHAEL TURNER:

And since it was -- since the -- the statute of limitations was allowed to run, Mr. Shapley, you go on to state that in order for him to pay this, he'd have to pay it voluntarily, that the government doesn't have a way to compel him to pay it because they've allowed the statute of limitations, not just what he got out of criminal, he got out of having to pay the tax, right.

GARY SHAPLEY:

That's correct. The criminal and statute of limitations have expired for that tax year.

MICHAEL TURNER:

So, he has in his pocket $125,000 of money that should have gone to the federal government as taxes. When in the state of Ohio, you've got average family earning about $62,000 a household. That's like two full households of tax income that that he got to keep in his pocket. I think -- I wonder is, is that he could pay that today, right?

Voluntarily?

JOSEPH ZIEGLER:

Yeah.

GARY SHAPLEY:

Oh yes. If he chose to voluntarily, yes, he could.

MICHAEL TURNER:

And perhaps, Mr. President, who's supposed to be in charge of taxes coming to our nation and who so frequently tells us that the American people aren't paying enough taxes might want to wander down the hall at the White House and turn to his son and say, "Hunter Biden, why don't you pay your taxes for 2014, because I got two men who just testified there's $125,000 owed and he ought to cut the check." Thank you, Mr. Chairman.

JAMES COMER:

Gentleman, yields back. Chair now recognizes Ms. Norton from Washington DC.


ELEANOR HOLMES NORTON:

Thank you, Mr. Chairman. Mr. -- Mr. Shapley and Mr. Ziegler, thank you for being here today. We're obviously going to talk a lot in this hearing about the investigation into Hunter Biden's taxes. So, I think it's important that we set the scene and make it clear what type of investigation we're talking about.

Mr. Ziegler, what year did you open the hot Hunter Biden investigation?


JOSEPH ZIEGLER:

That was 2018, November of 2018.


ELEANOR HOLMES NORTON:

2018, thank you. The Department of Justice announced a plea agreement with Hunter Biden last month, so I estimate that you spend four or five years on this investigation, Mr. Ziegler?


JOSEPH ZIEGLER:

That would be correct.


ELEANOR HOLMES NORTON:

Mr. Ziegler, in your testimony before the Ways and Means Committee, you said that when your time working on the investigation ended, it was both and here I'm quoting, "99.9 percent done," that's end quote and that you had, here I'm quoting again, "worked to complete 95 percent of the investigation," end quote.

Given this testimony, is it fair to say, Mr. Ziegler, that in the years that you spent on the investigation, you saw it nearly to completion?


JOSEPH ZIEGLER:

So, that reference was to the tax case. So, the tax investigation as far as all the work that we had done regarding that 99 percent of that had been done to that date.


ELEANOR HOLMES NORTON:

Exactly. Mr. -- Mr. Shapley, on page 12 of your transcript -- of the transcript from your interview with the Ways and Means Committee, you describe the IRS team that worked on this investigation as consisting of, here I'm quoting, "Twelve elite agents who were selected based on their experience and performance in the area of complex, high-dollar, international tax investigations," end quote.

Mr. Shapley, how serious are the investigations undertaken by these elite agents?


GARY SHAPLEY:

I'm not sure I understand how to answer your question. How serious?

ELEANOR HOLMES NORTON:
Yes. Do they have to be very serious to be undertaken by these -- by such elite agents?


JOSEPH ZIEGLER:
Well, I think I can answer this. So, we got to treat each taxpayer the same. That's the most important part. There's -- we're kind of the agents with the international tax group that come in there and that we have the expertise to work these complex financial investigations. So whether they're more serious or we have to treat each person, each taxpayer the same.

And and that's what I try to do in my job.


ELEANOR HOLMES NORTON:
Yeah, I was referring to these particularly complex, high-dollar tax concerns. I understand you have to give equal treatment. Mr Ziegler, you called Hunter Biden investigations a, quote, "complex, criminal tax investigation," end quote and I understand that it was an interagency effort involving the IRS, the FBI, the US Attorney's office in Delaware and DOJ's Tax Division in DC. Mr. Ziegler, is it fair to say that this sort of inter-agency team is only assembled for serious and complex investigations?


JOSEPH ZIEGLER:
So, I can only speak to what happened in this particular investigation. The reason why other agencies might join an investigation, that just depends on the crimes we're investigating. Us at the IRS, we are the only agency in the federal government that is allowed to investigate tax crimes. So, that's why you have to have -- if you have a tax crime case, you have the -- you have to have the IRS on that case.


ELEANOR HOLMES NORTON:
Yeah, and you had lots of other agencies as well. Look, it sounds like Hunter Biden's taxes were subject to a great deal of scrutiny and rigorous review by a large team of expert investigators who had experienced working complex cases. This investigation occurred over several years, span multiple agencies and divisions and had an expert team.

The time, personnel and other sources devoted to this investigation make it abundantly clear that this investigation was taken seriously by both the IRS and DOJ. While our witnesses here today may disagree with the US Attorney's division -- decisions, it is undeniable that Hunter Biden was subject to a thorough and rigorous investigation.

I thank you and I yield to the ranking member.


JAMES COMER:
Gentlelady yields back and as we promised the witnesses, we're going to take a ten minute recess at which point we will reconvene in approximately ten minutes. House is now in recess. [Recess] The committee will reconvene and is now back in order, Chair recognizes Mr. Palmer from Alabama for five minutes.


GARY PALMER:
I thank the Chairman. I want to welcome the whistleblowers and thank you for your courage

but more than that, for your fidelity to your duty to faithfully enforce the laws of the United States. Mr. Shapley, the statute of limitations has run out on a number of possible felony charges for tax years 2014 and 2015 is that correct?


GARY SHAPLEY:

That's correct.


GARY PALMER:

And there were huge tax liabilities for those tax years, correct?


GARY SHAPLEY:

There were tax liabilities, yes.


GARY PALMER:

But you didn't have access to all of the evidence related to those sources of income did you?


GARY SHAPLEY:

Based on the limitations placed on us by Delaware, US Attorney's office, that's -- that's very likely.


GARY PALMER:

OK, well, the oversight committee recently reviewed a non classified document from the FBI called an FD 1023 form which is a form used by the FBI to memorialize information related to it by confidential human sources. FD 1023 form was created in June of 2020. This is not a tip sheet, it's not a hotline.

It's not a suggestion box, it's a legitimate source used by the FBI and -- and it was used here. Mr. Shapley, did you ever review the June 2020, FD 1023 form with information about Hunter Biden and President Biden?


GARY SHAPLEY:

No, I did not.


GARY PALMER:

I reviewed the form and -- and their startling allegations in it. What would you have done if presented with this piece of evidence regarding this potential stream of income? Would that have constituted an additional area of investigation?


GARY SHAPLEY:

So, since I've never seen the document, I only know what's been reported.


GARY PALMER:

Right.

GARY SHAPLEY:

So I can say that there were investigative steps that -- that involved President Biden that were not allowed to be taken. And that information like this would have been really helpful to have from investigators, by investigators when -- when we received any pushback, when we -- when we were asked to, to take names on a document requests or search warrants, it would have -- it would have been nice to have Information that that that showed why that helped prove why those names needed to be in those requests.


GARY PALMER:

Well, I think it's material to your investigation because it was after all other information that led you, you know, related to Hunter Biden's lifestyle that led you to launch the investigation to begin with. Was there other evidence in this investigation that you were denied access to?


GARY SHAPLEY:

Yes, there was.


GARY PALMER:

Do you want to elaborate on that?


GARY SHAPLEY:

So one piece was -- was the Hunter Biden laptop. There's a memorandum that I documented contemporaneously in my House Ways and Means Committee testimony that -- that states what Assistant United States Attorney, Leslie Wolf told us on that day. I think it was September 3rd of 2020. And that's that they had information from the laptop that they were not providing to the investigators.


JOSEPH ZIEGLER:

Yeah, can I add something on that?


GARY PALMER:

Yes, sir, Mr. Ziegler.


JOSEPH ZIEGLER:

So when it came to questions, I -- as a part of the investigation, we interviewed a lot of people. And as a part of that investigation, you want to feel free to ask questions. It should be an open environment. I realize that there are some attorney-client privileged information involved in this, but there was -- there was an environment when we were interviewing people -- when we were interviewing witnesses were you were afraid to ask questions.

Questions that could lead to the Presidential campaign. And this is after the campaign is over. So questions like that was restricted and I was so things like that we were limited to, to talking about.


GARY PALMER:

Well, it appears to me that you learned about the FD 1023 form through public domain sources. And I just imagine, I can only imagine how you felt about having been denied

another piece of relevant information. And I think it's important that the committee understand that -- that you guys who were trying to do due diligence, who are faithfully executing, trying to faithfully execute the laws of the United States were denied evidence relevant -- relevant to your investigation.

I think the 1023 form is a very important piece, Mr. Chairman, that -- that. I want to ask Mr. Ziegler. At one point, you wanted to move the investigation to the District of Columbia. Is that correct?

JOSEPH ZIEGLER:
When the -- from the very onset of the investigation, yes.

GARY PALMER:
Why did you want to move it to DC?

JOSEPH ZIEGLER:
So are we refer it, there are two different scenarios on where DC is involved. So when we first initiated the investigation and then when we referred prosecution. So which -- which time period? So as far as venue for the tax case, so venue for this case, we saw that when we did our analysis, that venue was either in California or DC. Well, I guess at the time in the beginning, it was DC. So we -- that was where we wanted to start our investigation was in DC

GARY PALMER:
But you were told that attorney Weiss could bring charges anywhere. Was that your understanding?

JOSEPH ZIEGLER:
OK, so that fast forward to March of 2022, I had a phone call with the prosecutors assigned to the case. They said that our prosecution report went to low level people at the DC US Attorney's office. Those low level people reviewed. It said, hey, we're going to assist you with this. Here's what we're going to do to help you work the finish the case here in DC. A few days later, I get another phone call and it's from the -- it's from the same assigned -- same assigned attorney and they tell me that now that the US attorney has reviewed it that not only is it a no, but it's a -- no, you should not work this investigation in the District of Columbia.

GARY PALMER:
Well, Mr. Chairman, it appears to me that -- that Mr. Ziegler was -- was misled and -- and that his instincts were right that it should have been moved to the District of Columbia. And again, I want to thank you for your courage and your fidelity to the law. I yield back.

JAMES COMER:
Gentleman yields back. Chair recognizes Mr. Khanna from California for five minutes.

RO KHANNA:
Thank you, Mr. Chairman. Thank you, Mr. Shapley for being here. I understand you see it as

your duty to have the strict enforcement of tax laws. Is it true that you have often disagreed with charging decisions before?

GARY SHAPLEY:

I have agreed with charging decisions before.

RO KHANNA:

I'm saying is it true that you have often disagreed? Your recommendations have often been disregarded before when it comes to charging decisions. Is that true?

GARY SHAPLEY:

I don't think disregard is accurate representation.

RO KHANNA:

They have people in your own IRS have disagreed with your decisions often before. Is that accurate?

GARY SHAPLEY:

That's not accurate.

RO KHANNA:

Is it not true that the tax counsel in the criminal department has disagreed often with your decisions in the past?

GARY SHAPLEY:

Criminal tax attorneys? Yes, and as I stated.

RO KHANNA:

So how often have they disagreed in your opinion with your recommendation decisions?

GARY SHAPLEY:

A very often criminal tax attorneys, yes.

RO KHANNA:

Can you give us a percentage of how often you've said we ought to charge someone and they've said no, that may not be a good idea.

GARY SHAPLEY:

Yeah, I would say, I mean just ballpark a vast majority of what we do and that's why they're advisory and -- and.

RO KHANNA:

Do you have respect for them?

GARY SHAPLEY:

And their advisory.


RO KHANNA:

Do you have respect for them?


GARY SHAPLEY:

Most prosecutors


RO KHANNA:

It's a simple question, sir. Do you respect those colleagues or not?


GARY SHAPLEY:

Often, their opinion is not respected me and the prosecutors.


RO KHANNA:

So do you have more respect for them or Mr. Weiss?


GARY SHAPLEY:

I don't.


RO KHANNA:

I just think because you have a history of wanting to charge people and then people pushing back by your own testimony under oath, you said about 90 percent of the time people are pushing back on what you want to do. And I'm not questioning, I mean you want a stickler for the law, you know, it reminds me of Les Mis and the famous person wanted to get the -- the person who had a sandwich.

I mean, and then all those times, you've got people pushing back on you and you say, well, they're not very well respected. I mean, do you -- do you respect Mr. Weiss?


GARY SHAPLEY:

So the criminal tax attorneys, you know, I have never had a case that they -- that they declined, that they did not concur with, that we didn't ignore their requests and move forward with them.


RO KHANNA:

But at 90 percent, they have disagreed with you correct by your own testimony.


GARY SHAPLEY:

Yeah, yes, I established that.


RO KHANNA:

But -- and let me just ask you on the media, you've given testimony under oath that you have never spoken to The Washington Post any reported on this matter, correct?

GARY SHAPLEY:
That's correct.

RO KHANNA:
Do you know, have you spoken to any media outlet on this matter?

GARY SHAPLEY:
Uh, I have spoken after the House Ways and Means Committee.

RO KHANNA:
Before that. Have you spoken to any media journalist on this matter?

GARY SHAPLEY:
Absolutely not. Do you know of any colleague of yours at the IRS who has spoken to any journalists on this matter? Absolutely not.

RO KHANNA:
Do you know of any investigation into the leaks on this matter?

GARY SHAPLEY:
Uh, yeah, so the October 6th leak, I was the person who referred it to our inspector general.

RO KHANNA:
You know, any of your colleagues are under and.

GARY SHAPLEY:
December 9th of 2020, around the day of action.

RO KHANNA:
Do you know if any of your colleagues are under investigation? [Crosstalk] Sorry if I could just finish. Do you know if any of your colleagues are under investigation for that leak?

GARY SHAPLEY:
No, I know of no colleague under investigation for that leak.

RO KHANNA:
And just for the record then it is your testimony under oath that you have never spoken to any media person before the House testimony about this matter.

GARY SHAPLEY:

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 476 of 776 PageID #: 537

It's not only my testimony under oath today, I provide an affidavit of House Ways and Means Committee stating the same. I've said -- I've said it to our inspector general's office as well.

RO KHANNA:
I appreciate that. I just want to make a final point on this one. I think what.

GARY SHAPLEY:
Mr. Chairman, we mind if I?

JAMES COMER:
Can the gentleman answer the question you asked Mr. Khann?

RO KHANNA:
I just don't want my time to be affected if.

UNKNOWN:
Granting him the time. Mr. Chairman, but that's unusual.

RO KHANNA:
I want a minute to wrap up if you want to give him.

JAMES COMER:
OK -- OK you have you have a minute?

RO KHANNA:
OK, they -- here's the point. I think this whole thing, our ranking member Raskin summarized this. I don't disrespect you, sir. I think you have a tough view on what you think the law should be and this is why we have a prosecutorial system where you don't get to decide, I don't get to decide we have a whole system.

And it turns out that often your recommendations on who should be charged differ from some of the other folks. And that's what's happened in this case.

And as your testimony here, you yourself said you think Mr. Weiss should come and explain his decision. You don't -- you don't question him and I think on the optics issue that some of my colleagues have brought up, I mean obviously Attorney General Barr is going to be concerned of the optics. When you have a Donald Trump appointed US attorney, potentially bringing charges against his rival son, that's a real legitimate thing to do. So I guess my view here is we're spending hours on a disagreement about whether to charge someone.

We have a whole democratic process that does that. You don't get to. My final question, Mr. Shapley, do you think you should decide who gets charged or do you think that should be the charging officer?

GARY SHAPLEY:
So each time you say this is the disagreement, you can say it multiple times, it doesn't make

it true. We've -- we've testified under oath here about the prosecutors agreeing with charging felony charges on multiple occasions. And just to say this is a disagreement would be a misrepresentation.

RO KHANNA:
My last question though, who do you think gets to -- do you think you should have that final decision or a prosecutor should have the final decision?

GARY SHAPLEY:
No, I am a special agent for IRS criminal investigation. I do not make the final decision on whether to charge or not.

RO KHANNA:
I appreciate that.

GARY SHAPLEY:
Mr. Chairman, may I have a second? So yes, in terms of our criminal tax point of order.

UNKNOWN:
Mr. Chairman, just are we instituting a new rule in the committee? Because I've never seen this happen before.

JAMES COMER:
OK, I didn't know if it was to answer Mr. Are you finished?

UNKNOWN:
Someone else can follow up. I see someone could see.

JAMES COMER:
You're correct. Rules. Gentleman's time has expired. Chair now recognizes Ms. Green for -- for five minutes.

MARJORIE TAYLOR GREENE:
Thank you, Mr. Chairman. Before we begin, I would like to let the committee and everyone watching at home that parental discretion is advised. I would also like to remind everyone that on our oversight committee, we provide oversight into all parts of the federal government, including their Department of Justice and their -- their willingness to prosecute and their unwillingness to prosecute and whether it's politically motivated.

I would also like to say that when evidence and proof of a crime is presented, no prosecution should be denied, no matter who the person is. To the whistleblower's today, I thank both of you for your courage to come to the committee today and your commitment to -- to truth. I have great respect for it. So thank you.

I would like to talk with you both about Hunter Biden and his tax write-offs with his law firm Owasco. I would like to ask Mr. Ziegler, when did you start your investigation and your

testimony? It was November 2018, is that correct? Yes or no?

JOSEPH ZIEGLER:
Yes, that's correct.


MARJORIE TAYLOR GREENE:
Thank you. During your testimony with the House -- with the House Ways and Means Committee, you stated that through bank records you identified Hunter Biden was paying prostitutes related to a potential prostitution ring. Is that correct? Yes or no?


JOSEPH ZIEGLER:
Yes, that's correct.


MARJORIE TAYLOR GREENE:
I've also reviewed those same bank reports commonly referred to as SARS, suspicious activity reports. And I'm very troubled by them. We read thousands of them in the Treasury. This particular excerpt from a SARS report talks about human trafficking and in regards to Hunter Biden and Owasco and payments he was making.

What's even more troubling to me is that the Department of Justice has brought no charges against Hunter Biden that will vindicate the rights of these women who are clearly victims under the law. Um, I would like to talk about in your prior testimony, you stated that the prosecutorial team was investigating violations of the Mann Act. Is that correct, Mr. Ziegler?


JOSEPH ZIEGLER:
That is correct.


MARJORIE TAYLOR GREENE:
Regarding the Mann Act, if a person is transported across state lines for sexual activity such as prostitution, that could be a violation of a federal law, is that correct?


JOSEPH ZIEGLER:
I actually recently looked at the federal law regarding Mann Act and I believe that -- that is correct, but I would refer you to the DOJ manual.


MARJORIE TAYLOR GREENE:
Thank you. I would like to present this to the committee. This is showing Hunter Biden paying for a victims United flight from LA to Dulles. This was a -- I believe this is a violation of the Mann Act. This is Hunter Biden's, this is his proof that he bought the ticket. He bought it for this woman right here.

She -- he flew her from Los Angeles to Washington on June 14th, flew her back to Los Angeles, California on June 15th of 2018. And I would like to point out that if he was purchasing her a plane ticket for sex and traveling across state lines, do you believe that to be a violation of the Mann Act? Mr. Ziegler?

JOSEPH ZIEGLER:

So I can talk to specifically what's in my transit or what's in my transcript regarding the Mann Act. So I know we were compiling the information together.

MARJORIE TAYLOR GREENE:

Yes, but Mr. Ziegler, as -- as the law states by the -- by the code of the law at states traveling, paying someone to go across state lines is -- is prostitution and it's a violation of the Mann Act. Let me just move on just one more, one more second here. So when or when Hunter Biden paid for this woman to do this with him to travel across state lines from California to Washington DC on June 15th, this is a violation of the Mann Act. This was prostitution.

Let me continue. Did Hunter Biden also use his company Owasco PC to pay prostitutes?

JOSEPH ZIEGLER:

Can you hold on one second?

MARJORIE TAYLOR GREENE:

Chairman?

JAMES COMER:

Yeah, we'll -- we'll give you this additional time back that was. [Off-Mic]

JOSEPH ZIEGLER:

So regarding Mann Act violations, what we can do is given by the statute we can turn those over to the House Ways and Means Committee and then we can -- they can decide to vote to turn them over to you. Regarding Mann Act.

MARJORIE TAYLOR GREENE:

Thank you, Mr. Ziegler. So talking about Hunter Biden using his company Owasco PC to pay prostitutes. This is also a suspicious activity report showing that victim one, the -- the woman that was paid for prostitution that traveled from California to Washington DC paid for by Hunter Biden. This is an excerpt from a SARS report that we've read in the Treasury.

And I think you all have looked at these too, showing that victim one was supposedly an employee of Owasco. But -- but I would like to point out, this is not really what most paralegals do for law firms. And it's very serious that Hunter Biden was paying this woman through his law firm and then writing it off as business tax exemptions.

Most people write off, you know, they're write off things for their taxes through their businesses like a meal or say office supplies. But can you confirm for me that Hunter Biden had written off payments to prostitutes through his law firm or Owasco?

JOSEPH ZIEGLER:

I appreciate the question given by the statute and limited in my testimony today and I respectfully would need to turn those records over to the House Ways and Means Committee.

MARJORIE TAYLOR GREENE:

OK, thank you, Mr. Ziegler. One last one, last question. You referred to one of the assistants as West Coast assistant. I believe this is the West Coast assistant. Could you agree with that?

JOSEPH ZIEGLER:

So I can tell you that there were deductions for what we believe to be escorts and then that $10,000 golf club membership, yes, that was not a golf club membership that was for a sex club payment.

MARJORIE TAYLOR GREENE:

That was for a sex club payment payments such as this through from -- from Hunter Biden to prostitutes. Also, Mr. Shapley.

UNKNOWN:

Come on Mr. Chairman, we're one minute and 53 seconds over. As long as Ms.Ocasio-Cortez can get equal time?

JAMES COMER:

I will let Ms. Green wrap up five seconds and then I'll give Mr. Mfume additional time.

MARJORIE TAYLOR GREENE:

Thank -- thank you, Mr. Chairman. Mr. Shapley you start an investigation into Hunter Biden, code named Sportsman which opened in November of 2018. It was an offshoot of an investigation the IRS was conducting into a foreign based amateur online pornography platform. This -- this is evidence [Crosstalk] of -- of Hunter Biden making sex tape -- excuse me, this is my time making pornography.

JAMIE RASKIN:

Should we be displaying this Mr. Chairman, in the committee?

JAMES COMER:

Gentlelady's time expired and went 2.5 minutes over. Mr. Mfume wants the 2.5 minutes. He can have it if he wants to yield some to Ms. Ocasio-Cortez. When she goes, she can have it. We'll make it right. 2.5 minutes. You all have an extra 2.5 minutes. Chair recognizes Mr. Mfume for --

JAMIE RASKIN:

Point of order -- point of order Mr. Chairman.

JAMES COMER:

State your point?

JAMIE RASKIN:

My understanding is that this committee was provided the suspicious activity reports on the

condition that it not publicized them for the reason that they are not actually even allegations much less evidence of anything and my colleague from Georgia has now just revealed it publicly.

JAMES COMER:
That -- that -- that is a good point. However, that suspicious activity report has been public for years. That suspicious activity report was on the Internet long before I became chairman of this committee. So that particular suspicious activity report has already been publicized.

JAMIE RASKIN:
Thank you for that clarification. She had said it was part of the thousands she reviewed, but I appreciate the clarification.

MARJORIE TAYLOR GREENE:
Public and able that we all reviewed in the Treasury.

JAMES COMER:
Reclaim time. Chair recognizes Mr. Mfume for five minutes and if you want more time, we'll -- we'll work with you.

KWEISI MFUME:
Well, thank you very much, Mr Chair. I am going to claim my five minutes and yield the two and a half additional minutes that you have given me to my colleague from New York, Ms. Ocasio-Cortez. I'm glad somebody brought up the word suspicious activity because that's just what's taking place in this room.

Make no mistake about it. And I want to congratulate my colleagues from across the aisle for gathering us here today. Almost distracting us from the biggest investigation that is going on right now in our country and in our nation's history involving the former President. Then the frontrunner for the Republican nomination who is currently facing a 37 count indictment this week and maybe two weeks from now, more it may be two weeks from then more.

But we're spending our time talking about Hunter Biden, someone who has already pleaded guilty to not filing his taxes, having a gun charge and now I hear also paying for prostitution. But let's just remember that there was a case in New York not too long ago where our former President also got into trouble regarding payments and regarding a stripper and was found guilty of a violation in civil court.

Now there seems to be a lot of hemming and hawing about special treatment and special treatments. When the President just a couple of days ago tried to delay his federal documents trial and requested the US district judge, Aileen Cannon, whom he appointed, to somehow or another consider the fact that he was a candidate and therefore maybe -- maybe -- maybe his trial should be put off until after the election.

That seems to me like special treatment if I've ever heard of it before. But I'm grateful that my colleagues on the other side of the aisle are taking at least tax evasion very seriously.

And I would welcome also, a hearing on the former President's history of tax evasion and how long it took to see his tax returns covering ten years and what was the outcome of that

decision? You know the Trump Organization was hit with $1.6 million in Manhattan state court being convicted of a tax scheme.

So let's -- let's be real when we talk about this. It's not just Hunter Biden, but as long as we're saying Hunter Biden, we forget everything else. And again, Hunter Biden did step forward and said I did not file taxes in two years. And yes, this gun charge, I will take responsibility for. Now I love the fact that we are so much in love with the IRS. In fact, Speaker McCarthy said when he was elected on the 15th vote that the first bill that he would repeal funding for was the bill that would provide for 87,000 additional IRS employees.

My don't -- we love the IRS. We're just going to cut their budget. In fact there is a member of this committee who on their own website said that they are proud to have voted to strip away the plan to empower the IRS with additional funding. So I'm going to get back to those two words again about keeping it real.

And I think we really have to do that. I just think Mr. Shapley, two quick things. Did Hunter Biden in any way, in your knowledge, not Hunter, but did any of his children receive money, yes or no?

GARY SHAPLEY:
I think Special Agent Ziegler would be better.

KWEISI MFUME:
Yes or no.

GARY SHAPLEY:
Special Agent Ziegler.

KWEISI MFUME:
Either one, yes or no.

JOSEPH ZIEGLER:
Congressman, thank you for your question given by the statute, I am limited in my testimony. I'm OK I can give here today, but I can -- we can turn over any of the records that relate to the adult children.

KWEISI MFUME:
Yes, we'd like to see the means Committee. We'd like to see those really, I would, since we are so concerned about tax evasion and we've got people at the highest levels of government doing it and we don't want to talk about that at all. Now here's what galls me. I don't like these attacks on the Department of Justice, the FBI, the IRS as if they are somehow anti US agencies.

Those agencies keep this democracy in check. It keeps them in float. They provide the checks and they provide the balances. And we could be, quite frankly, using our time to better talk about crime in America that's affecting everybody. Attacks on women's health, the economy, budgetary issues, public education, housing, the need for senior citizens to be able to pay for prescription drugs, child poverty and mental health to name a few.

And yet we are doing this all over again for the Hunter Biden Show to someone who has pleaded guilty and has taken responsibility for not filing taxes for two years. This is ludicrous. Beam me up Scotty. There is no intelligent life down here. None. I yield.


JAMES COMER:
Chairman time's expired. Chair -- chair now recognizes, Mr. Armstrong from North Dakota.


KELLY ARMSTRONG:
Well, if I could plead guilty to two years of tax evasion when I was accused of six, I might consider that to be a pretty good plea deal. And let's talk about what this is and what it's supposed to be. Mr. Shapley, I think you were going to testify that IRS criminal tax attorneys are advisory only and often DOJ prosecutors disagree with the IRS tax attorneys.

Is that probably an accurate statement?


GARY SHAPLEY:
Yes, it's an accurate statement.


KELLY ARMSTRONG:
And I think this is important because everybody continues to go after you two like you're the only two people who are involved in this. You were -- you went to work for the IRS in 2008?


GARY SHAPLEY:
2009, correct.


KELLY ARMSTRONG:
2009. Mr. Ziegler 2010?


JOSEPH ZIEGLER:
2010.


KELLY ARMSTRONG:
So you started under President Obama, continued your career under President Trump and are continuing your career under President Biden. Is that accurate?


GARY SHAPLEY:
Yes, that is correct.


KELLY ARMSTRONG:
And in your entire career excluding today, how many times have you talked about who appointed a US attorney?


GARY SHAPLEY:
No, I haven't.

KELLY ARMSTRONG:

In the course of any investigation have you talked about whether it was a Democratic appointee or a Republican appointee?


GARY SHAPLEY:

I have not. No.


KELLY ARMSTRONG:

Mr. Ziegler?


JOSEPH ZIEGLER:

I have not.


KELLY ARMSTRONG:

Because it's not supposed to matter, right? And that's why you have line US attorneys that also go across administrations and work through Republican administrations, Democratic administrations. And that's the part of your investigative team. Now that investigative team recommended that you charge Hunter Biden for every tax year from 2014 to 2019 and felonies for at least 2014 and 2018. And this included income from Burisma and a scheme to evade taxes through a partnership with a convicted felon.

Is that accurate?


GARY SHAPLEY:

Yes, that's accurate.


KELLY ARMSTRONG:

And the total amount of taxes not paid over that period or not paid timely, it was over $1.5 million. And that didn't include interest in penalties or other enhancements that are typically involved in this case, correct?


GARY SHAPLEY:

Yes, that's correct.


KELLY ARMSTRONG:

And Mr. Ziegler, you're testified identifies two separate criminal violations, which is an attempt to avoid taxes and filing false tax returns and they both carry a six year statute of limitations?


JOSEPH ZIEGLER:

That is correct.


KELLY ARMSTRONG:

And Mr. Shapley, you stated that the purposeful exclusion of the 2014 and 2015 tax years

sanitized the most substantial criminal conduct and concealed material facts. Can you expound on that a little bit?

GARY SHAPLEY:
So, so yeah, that statement and made to the House Ways and Means Committee was in reference to the -- the income from Burisma that was not reported and therefore if it wasn't reported, it wouldn't be on a statement of facts and it would be completely left off the Official record.

KELLY ARMSTRONG:
And as far as you're aware, that's not part of any plea deal, correct?

GARY SHAPLEY:
I can't speak to the plea deal, but I don't believe so.

KELLY ARMSTRONG:
I want to talk about something that is a little unique to this investigation. I want to take you back to December 7th and 8th of 2020, and you were planning your investigative team, right? This is the whole team East Coast all across the country. Numerous interviews being are going to be conducted and Hunter Biden was going to be the subject of one of those in LA, correct?

GARY SHAPLEY:
That's correct.

KELLY ARMSTRONG:
And this is unique because who Joe Biden has won the election. We're walking into this and there are some serious -- I mean, if there's Secret Service protectee as I'm assuming you have to contact the Secret Service, you're not walking up with armed FBI agents to a Secret Service protectee.

GARY SHAPLEY:
Yes, we had a plan on how to approach Hunter Biden that day.

KELLY ARMSTRONG:
Could you briefly explain that plan?

GARY SHAPLEY:
So the FBI, SSA and I were assigned with interviewing Hunter Biden that day. And the day previous we went to the LA, FBI field office and asked them to the special agent in charge of contact, the Secret Service special agent in charge from the LA Field office at 8 a.m. on the morning of December 8th and tell them that two agents were -- were going to approach Hunter Biden to and as part of an official investigation.

And the night before, all of that changed.

KELLY ARMSTRONG:

And all of that changed because FBI headquarters and Secret Service headquarters coordinated and that -- and that information had gotten out to everybody the night before and we can talk about whether it's a highly political investigation and all of those different things. But there's another group of people that was made aware of that the night before wasn't there.

GARY SHAPLEY:

Yeah, that's correct.

KELLY ARMSTRONG:

And that would be the transition team.

GARY SHAPLEY:

That's correct.

KELLY ARMSTRONG:

And the transition team is a political operation set up to help the President elect vet cabinet employees, work on inauguration, do all of those things. I mean is that your understanding?

GARY SHAPLEY:

Generally, yes.

KELLY ARMSTRONG:

They have any special investigative powers, I don't know about.

GARY SHAPLEY:

Not that I would know of.

KELLY ARMSTRONG:

Your entire history and working in history with the IRS, you ever worked with a transition team of a President to help set up an interview with a subject of a criminal investigation.

GARY SHAPLEY:

I have not.

KELLY ARMSTRONG:

Last question, did you ever get to interview Hunter Biden?

GARY SHAPLEY:

We did not interview him.

KELLY ARMSTRONG:

Thank you. I yield back.

JAMES COMER:

Gentleman, yields back chair now recognizes Ms. Ocasio-Cortez for five minutes plus the 2.5 minute that we went over.

ALEXANDRIA OCASIO-CORTEZ:

Thank you very much, Mr. Chairman. Good afternoon, Mr. Shapley and Mr. Ziegler. And I want to thank you both for appearing before us today. I understand that this is not easy and -- and it is very important that both of you are respected during the course of this hearing. Mr. Ziegler, in your deposition to the Ways and Means Committee, I believe that -- I believe you said that this -- that you began this investigation in 2018, correct?

JOSEPH ZIEGLER:

That -- that is correct.

ALEXANDRIA OCASIO-CORTEZ:

And so some of the events that you discussed in your deposition took place two, three, four years ago, correct? Over the last several years.

JOSEPH ZIEGLER:

Yeah, that would be correct.

ALEXANDRIA OCASIO-CORTEZ:

In your deposition in front of the Ways and Means Committee and in your testimony before us today, you have relayed your memory of events that occurred over the course of a nearly five year investigation. And Mr. Ziegler, when you testified before the Ways and Means Committee, you also testified that you were told that it was then Attorney General William Barr, who made the decision to merge the DC and Delaware Hunter Biden investigations, correct?

JOSEPH ZIEGLER:

I did testify to that, correct.

ALEXANDRIA OCASIO-CORTEZ:

And a few weeks after that testimony, your attorney wrote in a letter to Congress, I quote, "Mr. Ziegler is confident. He was told by his supervisor that the merging of the cases was at the direction of an official at the Department of Justice. However, on further reflection, Mr. Ziegler cannot definitively state that his then supervisor said that the Department of Justice official directing the merger of the cases was Attorney General Barr". Correct?

JOSEPH ZIEGLER:

That is correct and I can tell you that I actually refreshed my memory from looking at my emails and there was an email that I found from my supervisor at that time that stated what had happened. And I can turn that over to the House Ways and Means Committee at some

point.

ALEXANDRIA OCASIO-CORTEZ:

And -- and in that updated email, does it include Attorney General Barr or not?

JOSEPH ZIEGLER:

So I can't speak to the contents of that email, but.

ALEXANDRIA OCASIO-CORTEZ:

No problem. I think in light of the correction and truly in good faith, these things happen all the time, right? The recollection of these investigations require an extraordinary amount of detail and the charges of what is being brought forward today are extremely serious. Which require a high threshold of evidence including investigations and depositions.

But I hope you'd agree that even the best memory can be fallible at times and that is the widely understood reality in our justice system. Mr. Shapely, from your testimony today. I think you would agree that it is important that criminal investigations be conducted fairly and free from political influence.

That's why we're here today, correct?

GARY SHAPLEY:

Yes, that's correct.

ALEXANDRIA OCASIO-CORTEZ:

Now as you stated and as was kind of discussed with Mr. Comer and -- and with others, there are often disagreements. It seems as though within some of the transcribed interviews that we read, it says, yes about 90 percent of the time there is this IRS reviewing attorneys disagree with the charging decisions of the agents in the group, correct?

GARY SHAPLEY:

That was part of the testimony, not all of it.

ALEXANDRIA OCASIO-CORTEZ:

In some of your comments, you've also noted that there, you've made reference to a special counsel in this situation, but I believe what there might be a reference to here is the question of a special attorney, not a special counsel, correct?

GARY SHAPLEY:

So if you're speaking about the October 7th, 2022 email that I documented contemporaneously on that day. That's why I documented it on that day. So that nine months later, I'm not trying to recall a specific word and so it says special counsel authority, that's what he said that day, that's what a senior executive IRS corroborated when he responded to my emails.

ALEXANDRIA OCASIO-CORTEZ:

And I do think that that distinction is important because in this letter to -- to Chairman Jordan, the issue at hand seems to be a special attorney, not a special counsel which are two distinct different legal authorities. And there also may be some confusion I think with respect to that as well. And which brings me to the point of political influence.

Whether where there actually is a set of breadcrumbs however, is in a set of tweets and letters sent from former President Trump to several chairs to the chair of the House Judiciary Committee that we see here. In fact, according to New York Times article, which I'd like to present to the record, today, President Trump's attorney wrote to the Judiciary Committee chairman urging him to investigate what he called, quote, "a rogue local district attorney". And after -- after that, New York DA convened a grand jury that ultimately indicted Donald Trump.

Chairman Jordan complied with that letter shortly after President Trump's attorney sent that letter to the committee, which is highly unusual, a very highly unusual act. And in fact, after that on March 20th, Chairman Jordan, together with the Committee on House Administration Chairman, Brian Steele, as well as the chairman of this committee, wrote to District Attorney Bragg and then demanded a sweeping series of documents including communications between the DA's office and the Department of Justice, also highly unusual.

In fact, on his truth social account later on, Donald Trump claimed that the US attorney investigating Hunter Biden, a US attorney by the way that Donald Trump appointed, was quote, "a coward". And then in that he then urged that maybe the presiding judge will have the courage and intellect to break up this quote cesspool of crime.

Curiously just a few days after this tweet, the chairman of the Ways and Means Committee, Jason Smith sent a letter to US attorney David Weiss and Attorney General Merrick Garland who are implicated in this hearing. Ask -- explicitly asking them to place the whistleblower testimony from the committee's depositions into the court records which were addressed during the chairman's opening statements before Hunter Biden's plea hearing at the end of the month.

And as you can see right here, Chairman Smith explicitly said and I quote, "entering this information into the formal record". Additionally, those two chairmen waived onto this hearing today. Highly unusual.

JAMES COMER:
Will the gentleman gentlelady yield?

ALEXANDRIA OCASIO-CORTEZ:
And one moment and when we talk about political influence, we are not here today unfortunately because the facts have brought us here. We are here today because Donald Trump is exerting an influence campaign. In Congress when he is no longer President of the United States. In addition to that, if we want to talk about charges that have been dismissed and if we do want to follow the evidence, perhaps we should discuss Ivanka Trump's investigation, being charged, who was close to being charged with felony fraud after Donald Trump's personal attorney provided political contributions to the local DA. Those charges were dismissed and ultimately, we saw that that -- that that DA Vance, President Trump's attorney, provided over $50,000 in political contributions after the case was dismissed.

So when we talk about political contributions, I would hope if we are following the evidence

that -- that we are willing that this committee, if this committee is going to go there, that they be willing to open investigations into the dismissal of charges against Ivanka Trump. And by the way, if the chair, if the gentlelady from Georgia wanted to follow evidence, we should also take a look at hypothetically a case where sex trafficking charges against a 17 year old girl potentially.

JAMES COMER:
The gentleladie's time's expired.

ALEXANDRIA OCASIO-CORTEZ:
Thank you, I yield back.

JAMES COMER:
Chair now recognizes Mr. Gosar of Arizona for five minutes.

PAUL GOSAR:
Thank you, Mr. Chairman. Now Chairman Comer and his team have done an outstanding job of uncovering the millions of dollars sent to Hunter Biden from foreign sources located in places like China, Romania and Ukraine. It's pretty obvious that the Hunter Biden's only avenue for making money is the influence over his father.

Now the only thing missing is direct evidence that Joe Biden knew and participated in these bribery schemes. That is where you got brave men have come in. Their investigative efforts have the potential to uncover direct evidence in a pay to play and in some cases it did. Yet they're very hindered doing their jobs by the Department of Justice Deep State.

As Mr. Shapley said, put it, quote "At every stage, decisions were made to benefit the -- the subject of this investigation", end of quote. That's Hunter Biden and by extension Joe Biden. Now these men are not political people. They're hard working agents and the last thing they want to do is speculate. So I'm not going to stick to -- I'm going to stick to confirming the most egregious examples of the DOJ's prosecutorial misconduct abuse and favoritism detailed in their testimonies and leave it up to the American people to draw their own conclusion.

Mr. Shapley, under US tax law, taxes owed all are on all income received from legal and legal sources, right?

GARY SHAPLEY:
Yes, yeah.

PAUL GOSAR:
Hypothetically, if a person subject to US taxes receives $1 million for serving as a director for, let's say, an oil company, they would owe taxes on that $1 million perhaps as much as 38 percent, correct?

GARY SHAPLEY:
If they're a US taxpayer, yes.

PAUL GOSAR:

Failure to declare the receipt of such income violates the US tax code, correct?

GARY SHAPLEY:

Uh, yes, it would.

PAUL GOSAR:

Failing to timely pay the tax owed is what, in whatever amount, violates the tax code, correct?

GARY SHAPLEY:

Yes, it does.

PAUL GOSAR:

And the tax code has criminal and civil penalties for these violations, correct?

GARY SHAPLEY:

That is correct.

PAUL GOSAR:

So now hypothetically, if a person receives $1 million payment and then conveys 10 percent of that amount to another person, that person making that payment may have to pay a gift tax on that amount, correct?

GARY SHAPLEY:

Yeah, if they say it's a gift, yes.

PAUL GOSAR:

Or conversely the person receiving the money has to pay income tax on the money as well, correct?

GARY SHAPLEY:

If on the gift portion or on the income portion, No, on the gift, they would have to report the gift on their tax returns, but I don't believe it'd be taxable to them.

PAUL GOSAR:

And then the failure to do is subject to criminal or civil penalties, correct?

GARY SHAPLEY:

Yeah, filing a false tax return is incorrect is against the law, yes.

PAUL GOSAR:

Yeah, now is there -- is there indefinite confirmation that all evidence on the Hunter Biden laptop has been reviewed by federal agents and prosecutors.

GARY SHAPLEY:
The prosecutor stated that evidence was withheld from the investigators. We don't know how much.

PAUL GOSAR:
The DOJ prosecutors allow your team to access the laptop.

GARY SHAPLEY:
I'm sorry, could you repeat the question?

PAUL GOSAR:
Yeah. Did the DOJ prosecutors allow your team to access the laptop?

GARY SHAPLEY:
To the

PAUL GOSAR:
DOJ prosecutors.

GARY SHAPLEY:
So the -- when the laptop comes in their computer investigative specialists that review the laptop and they create reports and pull stuff from.

PAUL GOSAR:
And you were prohibited from looking at anything on the laptop, right?

GARY SHAPLEY:
We saw some but not all.

PAUL GOSAR:
OK, gotcha. Is it normal for the DOJ to deny this type of access to investigators?

GARY SHAPLEY:
No. That's the first time I've experienced being limited to investigate to evidence.

PAUL GOSAR:
Did Assistant Attorney Wolf collaborate with the data on the laptop?

GARY SHAPLEY:
Did she?

PAUL GOSAR:

Collaborate the data?

GARY SHAPLEY:
Corroborate -- corroborate, I wouldn't know.

PAUL GOSAR:
OK. Now I guess my question comes back and the reason I went down this rabbit hole is that, is it your conclusion that you were interfered with and that those that interfered with you are as guilty as those creating the problem? Are they accessories to a crime is what I'm getting to?

GARY SHAPLEY:
Well, I would agree that there were investigative steps that were definitely obstructed by DOJ that I'd never seen in my 14 years and just honestly just makes no sense. We wouldn't want to collect all of the evidence available. I can't -- I can't opine on your -- on the second part of your question.

PAUL GOSAR:
Gotcha, Mr. Ziegler, did the DOJ prosecutors deny your request to look into the famous quote, "I am sitting here with my father," text from Hunter Biden. Did they allow you to obtain location information to see where the text was sent from?

GARY SHAPLEY:
So I know it was an issue tha --t that came up whether we can get the location data and I know that that was a conversation that I would have had with the assigned prosecutors. I recall them saying to me that how do we know that he's there? How do we know that that's true? The statement that's being made there?

And then I said well, we would get the location data. So as a part of my normal investigation, that's what I would do. And what I can tell you is it, I know I didn't do it. I don't know if the FBI ever ended up doing it. It was kind of like it was kind of like a -- let's wait or I need to think about it, I guess is the proper response.

PAUL GOSAR:
Gotcha my time is up, I yield back.

JAMES COMER:
Gentleman's time has expired. Chair now recognizes Ms. Brown [Crosstalk] Ms. Brown for five minutes.

SHONTEL BROWN:
Thank you, Mr. Chairman. The American people have lost track of your supposed investigation of President Biden or is it an investigation of his son who does not and has never worked at the White House or another family member. We can't even follow which investigation we're discussing today. Is it the FBI, the IRS, ex execs or something new?

I know the American people are confused because we're all confused what we're doing here. Nothing this majority has claimed about the President or his family has merit. No wonder the folks back home are tuning out of this confused mess. My colleagues on the other side of the aisle have shredded all their credibility in this committee.

They simply grasping at straws that do not exist.

In this Congress so far, we've held more hearings on gas stoves than gun violence and culture wars than kitchen table issues. So let's talk about the real two tiered justice system. The one in which big corporations pollute the air we breathe and the big banks cause meltdowns with their negligence and not one person is held criminally liable.

They're certainly not called by the majority to sit before this committee. Or Mr. Chairman, what if we talked about the other unspoken two tiered justice system in this country. The one where people of color are subject to a deliberately harsher system at every turn from policing to prison to parole. In this country, a black person is five times more likely to be stopped without due cause than a white person and black defendants are 25 percent more likely to be held pretrial.

Meanwhile the twice indicted former President is out campaigning around the country and didn't even have to post bail. Yet hundreds of thousands of Americans sit behind bars waiting for their day in court. These are the types of lived experiences we should be addressing in this oversight committee. This is the real two tiered justice system and it's the justice system Democrats are trying to fix.

After four years of Donald Trump's misuse. Congressional Republicans however, are working to make these inequalities worse through their efforts to defund the IRS and other Democratic priorities included in the Inflation Reduction Act. So since my colleagues claim to want stricter IRS enforcement, you would think we would at least agree on giving the IRS its proper funding.

So let me conclude by asking a simple question. Mr. Shapley, yes or no. Do you know the rate at which black taxpayers are audited as compared to taxpayers who are not black? No, I don't know. Well, the answer is black taxpayers are audited at 2.9 to 4.7 times the rates of non black taxpayers. Another question for you, sir, yes or no. Will this hearing help alleviate the racial disparity in the rates of the IRS audits?


GARY SHAPLEY:
No, not the topic.


SHONTEL BROWN:
Thank you and with that [Crosstalk], I will yield the balance of my time to the ranking member.


JAMIE RASKIN:
Thank you kindly and for your excellent questioning and statement there. The chairman of the Judiciary Committee when he was here invited us to believe that the US Attorney for Delaware had changed his tune or changed his story. But when you look at the letters he actually sent, he didn't change his tune at all.

He said the exact same thing every time and even expanded the answer to be perfectly

clear. In his June 7th letter, he says, "I have been granted ultimate authority over this matter, including responsibility for deciding where, when and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution consistent with federal law, the principles of federal prosecution and departmental regulations". In other words, it's up to him, it's up to the US attorney.

Then in June 30th, the letter to the chairman, Jordan, he says, "Second, In my June 7th letter, I stated quote, 'I have been granted ultimate authority over this matter including responsibility for deciding where, when and whether to file charges ET cetera', unquote. I stand by what I wrote and wish to expand on what this means and this gets to the heart.

I think of what we're doing here today as the US attorney for the District of Delaware. My charging authority is geographically limited to my home district. If venue for a case lies elsewhere, common departmental practice is to contact the US Attorney's Office for the District and question and determine whether it wants to partner on the case.

If not, I may request special Attorney status from the Attorney General pursuant to 28 USC 515. Here I have been assured that if necessary I would be granted Section 515 authority in the District of Columbia, the Central District of California or any other district where charges could be brought in this matter".

OK, and it is the difference as Ms. Ocasio-Cortez was saying between special counsel and special attorney, which might explain the confusion or the disagreement here. In any event, the US attorney for Delaware had all of the authority he needed to bring whatever charges he wanted wherever he wanted and he is the witness for that.

Thank you, Mr. Chairman and I'll yield back to the gentleman.

UNKNOWN:
I would like to be clear that he was assured that authority, he was a --

JAMIE RASKIN:
Yes, he was. And he said he was assured the attorney.

UNKNOWN:
And he is jurist, he is limited within Delaware well.

JAMIE RASKIN:
But that's just the rules. You're just restating what the rules are. That's what he explained. That's -- you're not a lawyer, right? You don't work in the Department of Justice, correct. He's explaining what the rules are.

JAMES COMER:
Gentlemen -- gentleman's time has expired. Chair, recognizes Dr. Foxx from North Carolina for five minutes.

VIRGINIA FOXX:
Thank you, Mr. Chairman and Mr. Shapley, Mr. Ziegler. Thank you for being here today.

Blowing the whistle against a man as well connected as Hunter Biden is truly courageous, is a truly courageous act and I hope that all of my colleagues can appreciate that as well. Mr. Shapley, I'd like to start with a simple question.

When did you start your career as an investigator with the IRS?

GARY SHAPLEY:
In July of 2009.

VIRGINIA FOXX:
Thank you. In what year were you promoted to a supervisory role.

GARY SHAPLEY:
In 2018.

VIRGINIA FOXX:
So that's 14 years of service at the IRS with five of those years in a senior leadership position, correct?

GARY SHAPLEY:
Uh, that's correct.

VIRGINIA FOXX:
Did you ever in your 14 years of experience, see an investigation be handled in the same manner as the one we're here to discuss today, The one in Hunter Biden's taxes?

GARY SHAPLEY:
I have not, no.

VIRGINIA FOXX:
And when were you made Supervisor of the investigation in Mr. Biden's Operation Sportsman?

GARY SHAPLEY:
In January of 2020.

VIRGINIA FOXX:
By your estimate at that time, when did you initially believe that the evidence was sufficient to request physical search warrants in California, Arkansas, New York and Washington DC?

GARY SHAPLEY:
So Special Agent Ziegler drafted an affidavit in April or May, and that was when -- when for the search warrant.

VIRGINIA FOXX:

Of 2020?


GARY SHAPLEY:

2020, yes, I'm sorry.


VIRGINIA FOXX:

It was a short time after that you began to suspect that career officials at DOJ were quote "dragging their feet regarding the next steps in the investigation". Is that correct?


GARY SHAPLEY:

Yes, that's correct.


VIRGINIA FOXX:

And two months later in June of 2020, you came to the belief expressing as such in communications with IRS CL leadership that if normal procedures had been followed that these search warrants would have already been executed. Is that correct?


GARY SHAPLEY:

That's correct, yes.


VIRGINIA FOXX:

Was this within the typical timeframe for the self-imposed investigative pause that DOJ historically tends to implement in cases preceding elections?


GARY SHAPLEY:

It was not the official Department of Justice Public Integrity stand down came on September 4th of 2020.


VIRGINIA FOXX:

After the initial steps were in explicitly -- inexplicably denied prosecutors continued to decline to advance on promising leads. There were for example, many problematic text messages and emails on the infamous laptop in August 2020. When were you informed by Assistant US Attorney Wolf that the DOJ would not allow physical search warrant on Hunter Biden?


GARY SHAPLEY:

So I don't recall the exact date, do you?


JOSEPH ZIEGLER:

And I don't think that that's in the confines of our -- of our testimony, but we can provide that information to the House Ways and Means Committee a clarification to that and then that can clarify that -- that issue.


VIRGINIA FOXX:

My understanding is that it was October 2020, but we appreciate your clarification of that. Did Assistant US Secretary Wolf's decision not to execute a search warrant on Hunter Biden strike you as atypical? Mr. Shapley.

GARY SHAPLEY:
Uh, generally, any other investigation if we have probable cause and we believe there's evidence in that location that could prove -- help prove our violations, then we would execute that search warrant.

VIRGINIA FOXX:
So it was an unusual action.

GARY SHAPLEY:
Yes, yes, Congresswoman.

VIRGINIA FOXX:
Thank you. Is it fair to conclude that this pattern of odd atypical and sometimes bewildering actions taken by DOJ tax and the district attorney's office happened over the course of the entire investigation and not just one or two occurrences?

GARY SHAPLEY:
That's correct and it was the pattern that really drove me to one of the things that drove me to come forward of that deviation from a normal investigative processes.

VIRGINIA FOXX:
In your opinion, did these odd atypical and bewildering actions bolster or harm the investigation?

GARY SHAPLEY:
I believe they hurt the investigation.

VIRGINIA FOXX:
To our chairman. I would say that there's something rotten in the state of Delaware and that what has happened here with Hunter Biden would not have happened to other Americans. And this is totally unfair and I think it's very important that we get to the bottom of this investigation and find out who has been obstructing this sense of justice.

The American people demand justice and this committee demands justice along with the other committees involved. And I thank you for this hearing. Our witnesses.

JAMES COMER:
Gentleladies time's expired chair now recognizes Ms. Stansbury from New Mexico for five.

MELANIE STANSBURY:
Thank you. I'd like to get right into some basic vetting questions as unfortunately our

colleagues across the aisle failed to do so with some of the previous witnesses that they called. And so Mr. Ziegler and Mr. Shapley, I'm hoping that these are very simple, very straightforward questions. So I'd like to ask that you answer them with a yes or no answer.

Mr. Shapley, are you now or have you ever acted as an unregistered foreign agent for the Chinese government or for any other government?

GARY SHAPLEY:
No.

MELANIE STANSBURY:
And Mr. Ziegler, are you now or have you ever acted as an unregistered or registered foreign agent?

JOSEPH ZIEGLER:
No.

MELANIE STANSBURY:
And Mr. Shapley, have you ever participated in illegal arms trafficking?

GARY SHAPLEY:
No, I have not.

MELANIE STANSBURY:
And Mr. Ziegler, how about yourself?

JOSEPH ZIEGLER:
I have not.

MELANIE STANSBURY:
And finally Mr. Shapley, have you ever been indicted of a crime, lied to investigators while under oath or run from the law?

GARY SHAPLEY:
No, I have not.

MELANIE STANSBURY:
And Mr. Ziegler. Same question to you. Have you ever been indicted, lied to investigators or run from the law?

JOSEPH ZIEGLER:
I have not.

MELANIE STANSBURY:

Thank you for answering those questions. Obviously, it would seem strange to have to ask these clarifying questions, but given the majority's track record in calling witnesses on this matter, not to mention their own Presidential candidate, it seemed necessary to clarify for our American folks who are listening today.

So let's get into the kinds of crimes that the majority claims that they're interested in investigating here in the Oversight Committee, namely political influence, abuse of power and other alleged crimes by a President and their relations. And again, because our time is limited, I'd like to ask our witnesses to stick with very simple, straightforward yes and no answers.

Now Mr. Ziegler, you are aware that Mr. Jared Kushner received a $2 billion investment from the Saudi government after working for his father in law at the White House Correct?

JOSEPH ZIEGLER:
Congresswoman I thank you for the question. I'm here to talk about the Hunter Biden investigation.

MELANIE STANSBURY:
It is a widely known fact and I appreciate your response. Mr. Ziegler, you are aware that while serving as a senior advisor to her father, Ivanka Trump had a number of trademarks fast tracked by the Chinese government, correct?

JOSEPH ZIEGLER:
Again, I have to -- I have to stick to the confines of my transcript.

MELANIE STANSBURY:
I appreciate that. And finally, I want to remind everyone that the person who appointed US Attorney General, David Weiss to handle the matter that we're here to discuss today was Donald Trump. But this would be the same President Donald Trump, the man twice impeached for abuses of power and of course recently indicted for 37 counts of criminal activity.

Now one would think that here in the Oversight Committee, we would want to investigate such blatant acts of criminal activity and I truly could not agree more with our witness Mr. Shapley, that there should not be a two tiered system of justice for those who are powerful. And those who are wealthy and those who are not.

But that is not actually what this hearing is about here today because it's clear that this is yet another attempt by the majority to turn this committee into another in-kind donation to the Trump campaign. Now this follows on an earlier attempt this past month to undermine the FBI with a controversial markup which thankfully did not occur the very same day that Donald Trump was indicted under those 37 counts.

In fact, if you look across the aisle, we have 13 members who have already endorsed Donald Trump and now here we are trying to distract the American people once more, even though it was a political appointee appointed by Donald Trump who was at the helm of this effort when the issues we are discussing today occurred and yet we're using the committee's resources to advance this agenda.

But I think it's important that the American people actually understand that the real criminal and the actual threat to our democratic institutions is Donald Trump. The man found legally liable for sexual abuse. The man who refused to return classified documents to the government, the man who was inciting an insurrection that led to the deaths of five people and threatened the lives of people in this very room and who threaten the very foundation of our democracy.

So I find it hard to believe that members who witnessed the insurrection who have witnessed these criminal indictments continue to stand here today with Donald Trump and prop him up using committee resources. And I urge my colleagues to take a hard look in the mirror and to really reflect on what our oath of office means.

And with that I yield back.


JAMES COMER:
Gentlelady yields. Chair now recognizes Mr. Higgins from Louisiana for five minutes.


CLAY HIGGINS:
Thank you, Mr. Chairman, Mr. Shapley, Mr. Ziegler, we're going to be moving fast here. Let me make a statement to begin. Let's just clarify for America. Republicans are only interested in Hunter Biden's deceptions regarding his IRS confirmed receipt of $17.3 million from shady sources in Ukraine and Romania and China, while his father was Vice President, because Hunter Biden had nothing to sell, he had no product, no service, no skill.

All Hunter Biden had to sell was corrupted access to his father. The big guy, How dare Congressman Higgins call the President of the United States, May I say the inaugurated President of the United States, I would call him the big guy. Let's go December 30th, 2020, this investigator Shapley and Investigator Ziegler IRS criminal investigation team at a 12 hour long meeting with US attorney's office in Delaware, the prosecution team, Wolf and Weiss in attendance.

Shapley shares an IRS plan to interview Biden associate Rob Walker. Wolf objected to this plan to the dismay of those in the room. But she said we do not want to ask about the big guy and stated she did not want to ask about Dad. December 8th, 2020, Investigator Shapley and Investigator Ziegler, made in which Special Agent Joe Gordon received a call from Hunter Biden's attorneys stating that they would accept service for document requests but declined requests for the interview.

The IRS investigators were only able to conduct one meaningful interview that with Biden associate Rob Walker. That day. The investigations revealed to the Press December 9th, 2020. Wolf gets involved again to interrupt the investigation. December 14th, 2020 Assistant US Attorney Wolf tips off Biden counsel about an IRS plan that had reached a threshold of probable cause to execute a search warrant on a storage unit in Northern Virginia.

US Attorney Wolf calls on Biden's attorney and alerts him to the pending search warrant being executed. You stated investigator Shapley that at every stage during your investigation, decisions were made that benefited the subject of the investigation. Who was the subject of the investigation, good sir?


GARY SHAPLEY:

Hunter Biden.

CLAY HIGGINS:
Thank you very much and I think I clarified for America while we were interested in Hunter Biden? Because he sold access to his father, the big guy. And you Americans out there may have a compromised President in your White House. You should certainly be concerned. Mr. Ziegler, how did the IRS investigation regarding Hunter Biden begin?

Tell us briefly, sir.

JOSEPH ZIEGLER:
It was a review of bank records regarding another investigation I was working.

CLAY HIGGINS:
So was ancillary to another criminal investigation, is that correct sir?

JOSEPH ZIEGLER:
Correct.

CLAY HIGGINS:
And you are a criminal investigator, is that correct sir?

JOSEPH ZIEGLER:
That is correct.

CLAY HIGGINS:
Not civil.

JOSEPH ZIEGLER:
That is correct.

CLAY HIGGINS:
Thank you very much. Investigator Shapley, in the September 3rd, 2020 meeting with the prosecution team for the Hunter Biden case assistant US Attorney Leslie Wolf told your team there was more than enough probable cause for the physical search warrant of the guest house at then former Vice President's Delaware residence where Hunter Biden stayed for a time.

Did US Attorney Leslie Wolf confirm your investigative effort that you had sufficient probable cause for search?

GARY SHAPLEY:
Yes, she did.

CLAY HIGGINS:

Thank you very much, but you've told Congress that Assistant US Attorney Wolf also said that the question was whether the"juice was worth the squeeze", that's a quote and that optics were driving factor in the decision on whether to execute a search warrant. Optics. Have you ever run into that, Mr. Shapley?

GARY SHAPLEY:

I have not.

CLAY HIGGINS:

Have you Mr. Ziegler?

JOSEPH ZIEGLER:

I have not.

CLAY HIGGINS:

Now why do you think -- why do you think the Department of Justice might be concerned about optics in the search of the President's son's residence during the course of a criminal investigation? Mr. Shapley?

GARY SHAPLEY:

I mean just the sensitivities involved with that -- that search warrant and it would you know.

CLAY HIGGINS:

Pretty clear isn't it? There's another search warrant. I'm going to touch on a -- my remaining section. I'm going to have my time expired here. Let me just say, gentlemen, you're courageous for coming forward. And let me ask you, did your job begin with an oath?

GARY SHAPLEY:

It did.

CLAY HIGGINS:

Have you upheld that oath?

GARY SHAPLEY:

Yes, I have.

JOSEPH ZIEGLER:

Yes, I have.

CLAY HIGGINS:

And is it -- is it your core principles that have driven you to reveal the corruptions that you've witnessed in your criminal investigations coming before Congress today?

JOSEPH ZIEGLER:
Yes, it was.


GARY SHAPLEY:
Yes, it was. Thank you, Mr. Chairman, I yield.


JAMES COMER:
Very good. Chair now recognizes Mr. Gomez for five minutes -- Garcia for five minutes, sorry.


ROBERT GARCIA:
Thank you, Mr. Chairman. So let's first zero in on the bottom line. What we have is two IRS investigators who clearly worked very hard on the Hunter Biden investigation and thank you both for being here today. You both gave recommendations to prosecutors based on your work, which you've described today. And then Donald Trump's handpicked prosecutor then made recommendations to charge Hunter.

He acted independently and he himself has confirmed this. You did your job making recommendations and then the prosecutor did his job. You don't have to agree with his conclusions, but that's the bottom line of what we have today at this hearing. But today's hearing is like most of the majority's investigations and hearings.

A lot of allegations, zero proof, no receipts, but apparently some dick pics. Now at a certain point, the American people will need some actual evidence, actual evidence, but we've seen absolutely none. So let's go back and review what's gone over the course of the last seven months of this smear campaign against the White House.

First, the committee is clearly obsessed with Hunter Biden, massively obsessed with them. Now keep in mind there's been no evidence of any wrongdoing or transactions of the person that's actually in government, Joe Biden. A lot about Hunter, not a lot about Joe Biden. And Hunter Biden, I want to remind the majority, is actually not the President of the United States.

And I want to point out that no Biden, family members hold government positions of any kind. Now this is, of course, in stark contrast to the Trump crime family. The majority conveniently glazes over the Trump's family's foreign dealings. The Trump family who of course were actually appointed to White House senior jobs from Ivanka's Chinese trademarks to Jared's Qatari real estate bailout and $2 billion in Saudi private equity money.

So where's that investigation? They were actually in the White House. And I think Chris Christie, one of the Republicans running for President, said it best of course and the former governor. This is his quote, not mine. "The grift from the family is breathtaking. It's breathtaking. Jared, Kushner and Ivanka Kushner walk out of the White House and months later get $2 billion from the Saudis.

Continue you think it's because it's some kind of investigative genius or investing genius or is it because he was sitting next to the President of the United States for four years and doing favors for the Saudis. Now these are quotes from a man who's known Trump and the Kushner's for years. These people are in the White House every day formally making policy unlike Hunter Biden.

Now the Biden family attacks of course went nowhere, so they tried of course to create a new storm, a new conspiracy theory with the so-called FBI Ukraine document, another fake

scandal. This new fake scandal had a lot of hype, a lot of scary headlines from our chairman from a lot of members of this committee.

But a lot of us actually read the document and when you read the document it was pretty clear -- pretty clear this was all hype. Just a wild accusation being passed along to the FBI with zero proof. And where did this accusation actually come from Rudy Giuliani? Just another Rudy Giuliani, tinfoil hat conspiracy theory that went nowhere.

Giuliani recommended that it's Giuliani, by the way, whose law license is being recommended to actually be removed. Now Rudy Giuliani's longtime associate Lev Parnas just said that he's prepared to testify under oath that there is no evidence that the President or his son, Hunter, interfered with Ukrainian politics and there never has been.

The Republican US Attorney Scott Brady handpicked by Donald Trump determined to not have sufficient evidence to further investigate Rudy's claims. But members of this committee even today repeat this narrative over and over again. More accusations, no proof, no receipts. So what's next in this witch hunt?

This man, Gal Luft, The Republicans were so desperate just last week to find someone who could tell them what they wanted to hear that they promoted and collaborated with the Chinese spy trying to influence US policy while selling weapons to Iran and Libya. So why is this so-called whistleblower missing?

We don't know. Skipped his bail, being searched upon after being arrested. Now we're so desperate to cling to this narrative that they're defending this alleged crook. I want to know, we have questions, Was the chairman, was the committee staff in contact with Mr. Luft? He was a fugitive, do we know where he is? What vetting does the majority do to make sure that there aren't targets of foreign influence on this committee?

These are the real questions that we need to answer.

JAMES COMER:
If you're willing to yield, I'll answer that question.

ROBERT GARCIA:
Sure. I just want my time.

JAMES COMER:
I've never met Gal Luft in my life. All I know is he was getting money from the same company that the Bidens were getting money from CEFC. I yield back.

ROBERT GARCIA:
Thank you, Mr. Chairman. I'm looking forward to also if anyone from the committee or any committee members or committee staff in any contact with who is now obviously a Chinese spy which you and the committee have been hyping up for weeks.

JAMES COMER:
Well, is the President's son a Chinese spy? They took money from the -- the only difference is the President's money from hell of a lot more money than you. [Crosstalk]

ROBERT GARCIA:

Sir, sir, Mr. Chairman, you were the one hyping up a Chinese spy and arms dealer for weeks. This is just another example.


JAMES COMER:

Who cares if they had money from the same company?


ROBERT GARCIA:

So I'll, just to finish up -- just to finish up my time, let me just say that it's clear to me this majority will stop at nothing to try to impeach President Biden, the Attorney General, Secretary Mayorkas and the list goes on and on. This is just another witch hunt that the majority continues to do week after week.

The majority is trying to interfere in ongoing legal proceedings to cause chaos and to try to reelect Donald Trump. Who obviously is pulling this extremist agenda. I yield back.


JAMES COMER:

Chair recognizes Mr Sessions from Texas for five minutes.


PETE SESSIONS:

Mr. Chairman, thank you very much. Gentlemen, welcome and thank you very much for taking time. We've been sitting here listening, strongly, identify that both of you have chosen to do this as strong people who have an ethical and moral idea about your service to this country and we want to thank you. Today, we have examples of the Department of Justice and the IRS that have not just given special treatment to those who committed tax evasion and financial fraud with the President's family.

But I think there's another point that we would want to make today. And that is that I believe that a tax payer system or the agency is tasked with enforcing the laws fairly on regular citizens is also seeking the chance to shield those well connected to the President of the United States from consequences of illegal behavior in direct opposition to our nation's founding principles.

We've established that. I think that's pretty clear what you've said today. But I have a question for both of you because I believe today's hearing goes beyond that and that is that there are strong whistleblower protections under five USC Section 2302, the Whistleblower Protection Act that afford you and any other person who works in this government the protection from retaliation after making a legally protected disclosure.

In doing your job, you felt like there was something wrong, you said something about it and you filed for whistleblower status because you believe that something was being held against you. In fact, both of you had made several legally protected disclosures during this time for the record. Is that correct?


GARY SHAPLEY:

That's correct.

JOSEPH ZIEGLER:

That is correct.


PETE SESSIONS:

So after making this disclosure to the committee, did the IRS comply with the statutorily required whistleblower protections? How were you treated in this endeavor?


GARY SHAPLEY:

So I'll start. So since I made these protected disclosures that are legally protected, the IRS has chosen to retaliate against me in multiple ways. Even now there's a major case initiatives that actually Special Agent Ziegler started as well that are now being -- being put on the back burner and just being slow walked.

Again, there's the immediate, my immediate supervisor and two levels above them, haven't spoken to me since June 1st of 2023, even though I'm sending them emails and trying to conduct my business on a daily basis, they literally have not spoken to me.


PETE SESSIONS:

Would that be normal?


GARY SHAPLEY:

No, absolutely not. I mean we're running undercover operations, we're doing interviews across the world -- across the world and you know really becomes when -- when senior leadership really cuts off communication like that increases the chance of some officer safety type issue. When we can't communicate that those type of issues with senior leadership and we have no support from them.


PETE SESSIONS:

Absolutely, Mr. Ziegler. To be completely honest with you. This is going to make me a little bit emotional, but -- and I'm sorry, because I know this personally, you spoke about that in your opening statement.


JOSEPH ZIEGLER:

Never have -- I thought that it's essentially like being left out on an island and I don't know if that's done purposefully, but I -- I essentially made disclosures up to the commissioner of the IRS. I said what happened and the response I got a few days later was I may have broken the law and don't ever do this again.

Your -- your emails need to go through your leadership. So to have that come to me was chilling, it was -- I can't even put words to it. But what I can say is there are some people within my agency, some people in leadership that have been a person that I can go to for support, but the vast majority of it has just -- it's the impact on the person.

It's awful.


PETE SESSIONS:

Well, retaliation is many times seen by people who know it when they see it. And that is why

the law exists. And I want both of you to know, as chairman of Government Operations Subcommittee for this committee, Government Reform and Oversight, Government Accountability. I will be coming to the IRS and I will be going to other agencies specifically about their retaliation under the law within their agencies that we should take as a committee, a whole committee and a subcommittee very seriously.

Because this could be a number of matters that are taking place where people have chilling impact against the laws of the United States of America. Gentlemen, I've been taking notes. I want to thank you for being here today. Mr. Chairman, thank you. I yield back my time.

JAMES COMER:
Gentleman yields back. Chair now recognizes Mr. Frost from Florida.

MAXWELL FROST:
Thank you, Mr. Chairman. First off, thank you two so much for your service, working at the IRS, very important work. Let's get right into it, Mr. Shapley, you're blowing the whistle today because you feel like the Department of Justice provided preferential treatment to Hunter Biden. Is that correct? Yes or no.

GARY SHAPLEY:
That's correct.

MAXWELL FROST:
And you believe that Hunter Biden received that preferential treatment because his father is the Democratic President Joe Biden. Is that correct?

GARY SHAPLEY:
I can't conclude why hel was receiving the preferential treatment, but that is one conclusion you can come to.

MAXWELL FROST:
Yeah, I mean it's evident in your deposition that you believe that. Mr. Ziegler, did any of your supervisors explicitly tell you you're not allowed to investigate Hunter Biden because he's the President's son. Yes or no?

JOSEPH ZIEGLER:
I was never told that.

MAXWELL FROST:
You were never told that. Thank you. I mean and nowhere in your deposition, did you suggest that there are some larger conspiracy at play here, which is what my colleagues on the other side of the aisle would have us believe that there's a two tiered justice system that privileges Democrats over Republicans.

And that's what my colleagues are doing. They're using you and using your story and using your work to make this argument for themselves. And since January 6th, these Republicans

and Trump have complained about a two tiered justice system. Co-opting the language of the decades long civil rights movement for black lives and black freedom of movement that they actually are actively looking to eliminate.

There is a two tiered justice system, but it's not about Democrats versus Republican. This language, two tiered justice system has a real history. It has a real history of Emmett Till. It has a real history with Breonna Taylor. It has a real history with George Floyd, the Central Park Five. Derek Diaz, a young man who was just an unarmed young man who was just killed in central Florida, about a week ago.

And it has a real history with the Groveland four. Four black boys from central Florida who were falsely accused of kidnapping and sexually assaulting a white woman when they pulled over to help the help her when the car was broken. The fourth boy who was in pictured here Ernest Thomas wasn't apprehended initially.

He was actually shot to death in his sleep. A 100 person mob wanted to get their hands on the remaining three black boys and couldn't and so they took it out on the predominantly black town shooting residents, looting, setting fire to their homes. Charles Greenlee was sentenced to prison for life. He was 16 years old.

Now just a quick trigger warning here for black death and trauma, but it's important story to tell when we talk about the two tiered justice system. Because on the way back from the courthouse, the sheriff took it upon himself to shoot the two remaining individuals, Walter Irvin and Samuel Shepard. Walter Irvin actually ended up living because when he was shot, he played dead, but the other one was shot killed, Samuel Shepard.

They were both handcuffed as you can see in the photo and were shot to death. They all died in either prison or on parole as convicted criminals. And in 2021, 72 years later, a judge exonerated them and the trial was considered a fraud. In closing, there is a two tiered justice system. It does exist, but it's not what my Republican colleagues want to say.

It is using your story for that. It's not Republican versus Democrat, it's black, brown and poor people versus everyone else. And I won't accept when Republican politicians look to appropriate the language of the movement for black lives and civil rights to fit a political agenda to defend Donald Trump. This is the two tiered justice system.

This is the two tiered justice system. And so we have to continue to fight for a world where this doesn't happen. This case about Hunter Biden is a case closed. And I'll close with a question with the Chairman considering the quote, "falsehoods, abuses and misrepresentations of sensitive information" that you presented here when we're done with this made up investigation, are you expecting to be censured by the House?

The reason I ask is because it's in line with the logic and actions of the Republican Party here in the 118th Congress. Thank you and I yield with the gentleman, I yield to the ranking member.


JAMIE RASKIN:
Thank you very kindly. Mr. Ziegler, you referred to an FBI supervisory special agent who went with you to try to interview Hunter Biden. Is that someone that you respect?


JOSEPH ZIEGLER:
That wasn't me. That would have been my supervisor. OK. Sorry, Mr. Shapley, you went with

this SSA, Was that someone that you respect?

GARY SHAPLEY:
Yes, I respect the FBI SSA.


JAMIE RASKIN:
Because he came and did an interview with us and he said he testified that over his decade
of experience with the Delaware US Attorney's office, the FBI agent never knew the assistant
US attorneys in office or US Attorney Weiss to allow any political considerations to influence
their prosecutorial decisions in any case.

Do you accept his judgment or you disagree with his judgment about that?


GARY SHAPLEY:
So, yeah, the FBI, SSA, I respect and it's a matter of timing, he -- he retired in June of 2022.
And at that time, I haven't even overcome the burden that it took me to -- to -- to say that this
has been political and been politicized. It wasn't until October 7th, 2022. So the FBI SSA
made -- he came to his conclusions and he wasn't there for the October 7th.


JAMIE RASKIN:
Can I mention something? Let me just say I respect very much your service and I respect
very much your testimony today, but I think it's completely within the realm of prosecutorial
discretion and just subjective differences of opinion that people have. And those of us who've
been in prosecution, understand that happens all the time with prosecutors and investigators.


JAMES COMER:
Chair recognizes the gentleman from Arizona, Mr. Biggs for five minutes.


ANDY BIGGS:
Thank you. It's good to have you here. Appreciate it. Appreciate your courage and your
willingness to testify. I'm Mr. Shapley, I'm going to go to pages 18 to 20 of your testimony and
Mr. Ziegler, I'm going to go about page 104 to 105 of yours to start with. And but while you're
going there, I'm going to ask this question.

You know, we've heard a lot about this well, you know, this is 2014, 2015, 2016 tax things.
You know, Trump -- Trump, you know, we've heard a lot about Trump there, but in 2014, '15
and '16 those tax years, Donald Trump wasn't elected, but who was the Vice President of the
United States If you know?


GARY SHAPLEY:
A Joe Biden was a Vice President of United States.


ANDY BIGGS:
I think that's right. And when the statute of limitation ran on those '14 and '15 years who was
the President of the United States when the statute expired.

GARY SHAPLEY:
So that was President Biden.

ANDY BIGGS:
Under President Biden. Well, there's some indicia in their statements and testimony that you made that I want to go over. Mr. Shapley, why did you want to interview Rob Walker?

GARY SHAPLEY:
So I think Special Agent Ziegler would be better to answer that question. [Off-Mic]

ANDY BIGGS:
So I'm looking on page 18 of your -- of your -- of your testimony, Mr. Shapley.

GARY SHAPLEY:
Yeah, can you repeat the question.

ANDY BIGGS:
Yeah, I'll tell you what, I'll rephrase the question. The -- on the -- the day of action you guys were intending to interview 12 people, one of whom was Rob Walker, a business associate of Hunter Biden. And in particular you wanted to talk about, I think the quote is "ten held by H for the big guy", right.

So what, who was the big -- who did you infer that the big guy may be?

JOSEPH ZIEGLER:
So all I can do is speak to the evidence there. What I can say is I think I know what you're referring to is when we're preparing for that, we're preparing for that interview and we're referencing that email ten held by H for the big guy. And from what I understand, to be President, his dad, President Biden.

ANDY BIGGS:
OK. So I'm sorry, I just want to ask Mr. Shapley similar question because the AUSA Wolf interjected and I'm reading from your transcript now and said she did not want to ask about the big guy and stated she did not want to ask questions about 'dad' in quotes, Who did you -- who did you take dad to be when she refers to dead?

GARY SHAPLEY:
The father of the subject is President Biden.

ANDY BIGGS:
President Biden. And so even by her response, she's inferring that Joe Biden may be involved in Hunter Biden's transactions. And then you get to the FBI agent and you give some detail about his -- his, Mr. Shapley, you give some detail about what he is saying and the transcript if you will of his interview.

And in particular the FBI agent asks Mr. Walker. "So you definitely got the feeling that that

was orchestrated by Hunter Biden to have like an appearance by his dad at that meeting just
to kind of bolster your chances of making the deal work out". Walker answered, "sure." The
FBI agent continued "Any times when any time he was in the office or did you hear Hunter
Biden say that he was setting up a meeting with his dad with them while Dad was still in
office". Walker answered "Yes". That's the quote that you gave to in your transcript.

And so I guess the question there is what did you infer that the -- and then you said the FBI
agent inexplicably does ceases that line the questioning. I want to know what you thought
the FBI agent was inferring. What did you think? What do you think when you read that when
you heard that of the relationship between Joe Biden and Hunter Biden and his business
transactions when he is still in office?

GARY SHAPLEY:
Yeah, so I can't go beyond what you -- what you've quoted me as saying in my testimony, so
I'll just leave it there.

ANDY BIGGS:
OK. Thank you, Mr. Ziegler. On page one -- page 104 of yours, you mentioned that -- that --
that Mr. -- Mr. Biden, Hunter Biden attempted to obtain a business tax deduction on his return
for hotel rooms that were used by his father, Joe Biden. Tell us about that please.

JOSEPH ZIEGLER:
So, yeah, on his tax return, he deducted a hotel room for his dad. So Joe Biden. And we
actually got the invoice from the hotel that showed the dad's name on it.

ANDY BIGGS:
So -- so for that to be a valid business deduction you would -- he would have to be doing
business with Hunter Biden, is that not true?

JOSEPH ZIEGLER:
So we would typically a typical part of the process would be to interview that person to find
out what you had or what might have happened. Why did you -- why did you go to that hotel
room. And based on statements he made in his book, I mean you can correlate to what was
kind of going on around that time?

ANDY BIGGS:
But how does it become a valid business deduction if -- if Joe Biden's just there on vacation?

JOSEPH ZIEGLER:
You know, generally speaking that to be a valid business deduction, it would have to be
some type of business activity being conducted at that time.

ANDY BIGGS:
And the last one is the WhatsApp and I won't get into it because we're just about out of time.
But I would just say the WhatsApp where he says he's sitting. my dad sitting next to me and
you remember that. And then that's on, I want to say what page 105. That's where you talk

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 513 of 776 PageID #: 574
about it, Mr. Ziegler. And what page 105 of your transcript.

I guess the question there is, how would you be able to determine whether those rooms, whether he was actually next to -- to Hunter Biden? How would you be able to determine that?

JAMES COMER:
And the gentleman's time has expired, but you can please answer the question.

JOSEPH ZIEGLER:
So typically in that situation, you'd want to get location data. Contemporaneous data that would show where that person is at. So that's what we would typically look to yeah.

ANDY BIGGS:
Thank you so much.

JAMES COMER:
Very good chair now recognizes Ms. Lee from Pennsylvania.

SUMMER LEE:
Thank you, Mr. Chairman. Republicans have been invoking this term two tier system of justice a lot recently. So I want to talk about what the real two tiered justice system is where black and brown people are over criminalized and over incarcerated. On June 20th, Chairman Comer claimed in a committee press release quote "The Department of Justice's charges against President Biden's son Hunter reveal a two tier system of justice". From this, as you see or have seen from the knock off social media site, former President Trump has also used this phrase in connection with the Hunter Biden investigation.

I'd like to address the way my Republican colleagues are attempting to co-opt the phrase two tiered justice system to make it sound like Trump and his cronies are somehow the victims here when the reality is that the term two tiered system of justice is meant to refer to the very real system that exists in the United States and which affects black and brown folks.

Not powerful former Presidents and their political allies. The real two tiered system of justice is one in which in 2021, according to the DOJ's Bureau of Justice Statistics, the imprisonment rate for black men aged 18 and 19 was 11.6 times the rate for white males. The real two tiered justice system is one in which in 2021 according to those same statistics, the imprisonment rate for Native American males aged 18 and 19 was 5.1 times the rate for white males.

The two tier justice system is one in which according to a May 2018 Vera evidence brief and I quote 'black men comprise about 13 percent of the male population, but about 35 percent of those incarcerated". One in three black men born today can expect to be incarcerated in his lifetime. Compared to one in six Latino men and one and 17 white men.

The two tiered justice system is one in which an analysis of nearly 100 million traffic stops across this country found that black drivers were about 20 percent more likely to be stopped than white drivers. My Republican colleagues seem to think that using criminal law as a weapon or a political tool is objectionable only when directed against someone who should

be out of reach of the criminal system.

Someone too rich, too powerful or too white to be charged. But let's face it, that same system has been used as a weapon and a political tool against black people since the Emancipation Proclamation. These racial disparities are rooted in a two tiered view on race. The belief that black people were inferior that was created to justify the -- the enslavement of black people, which has now evolved into -- to include the belief that black people are more prone to criminality.

During the decades of lynchings that followed enslavement, white people defended the torture and murder of black people as necessary to protect property, families and a way of life from black criminals. In 1980s, Nixon's war on crime evolved into Reagan's war on drugs and we saw harsher and more frequent punishments in the start of mass incarceration.

In both cases, it was black people who were targeted and suffered under those policies. There's a reason that crack cocaine, which carries a stereotype of being used by black people, was at one point punished far more harshly than powder cocaine. Prior to 2010, that ratio was 100 to one. Meaning someone convicted in a federal court of possessing crack cocaine will receive the same sentence as someone who possesses 100 times more powder cocaine.

And I want to say that PA's extreme sentencing practices have overwhelmingly impacted people of color, but most specifically, black people who make up less than 11 percent of the population in Pennsylvania, but more than 65 percent of those serving life without parole sentences. And 58 percent of those serving non life sentences of 20 years or longer.

How many times have our elected officials and judges ran on a promise of a tough on crime approach. Even now, Republicans still tell that they are the party of law and order while in the same breath claiming that Donald Trump should not be prosecuted. Don't get it twisted. Republican efforts -- efforts to use the term two tier justice is to distract from those who are truly the victims of a disparate treatment in our criminal justice system.

And whether we say it out loud or not, we all know who those people are. I yield the remainder of my time to the ranking member.


JAMIE RASKIN:
Thank you, Ms.. Lee, for that very eloquent statement. I just -- I wonder if you remember you might be too young for this. But when there was this horrific assault, a gang rape in Central Park donald Trump ran ads in The New York Times saying that the Central Park suspects should be given the death penalty and of course they turned out to be completely innocent of the offense.

So I think that's just to reinforce your point. There's a history of profound racism in the criminal justice system and in the rhetoric around it. And there's something very disappointing about our colleagues co-opting as you say in prostituting the critique of the system as two tiered in on behalf of Donald Trump.

I yield back to you.


JAMES COMER:
Chair recognizes Mr. Grothman from Wisconsin for five minutes.

GLENN GROTHMAN:

Thank you, Mr. Chairman, for holding this important hearing. I found it interesting that the 12 witnesses, the FBI and the IRS wanted to interview on December 8th, 2020, including Hunter Biden. They only got one interview. That was Rob Walker, a friend of the Biden family and whose company, Robinson Walker LLC sent millions of dollars to the Bidens that originated in Romania and China.

President Biden said his family didn't receive money from China, but that wasn't true. Mr. Shapley, according to your testimony before Ways and Means on page 18 on December 3rd, 2020, did you have a long meeting with the prosecution team at the US Attorney's Office in Delaware?

GARY SHAPLEY:

That's correct on December 3rd, 2020.

GLENN GROTHMAN:

Is it true that US Attorney Weiss was in and out of that meeting?

GARY SHAPLEY:

Yes, that's true.

GLENN GROTHMAN:

And during the meeting, did you share your plan to interview Hunter Biden -- did you share your plan to interview Hunter Biden's associate Rob Walker?

GARY SHAPLEY:

All the interview outlines for the witnesses were discussed that day, yes.

GLENN GROTHMAN:

OK, and you wanted to question Walker about the email that said ten held by H for the big guy, is that correct?

GARY SHAPLEY:

That was included in the interview outline, yes.

GLENN GROTHMAN:

OK, but US Attorney Lesley Wolf told you she did not want you to ask questions about dad meaning Joe Biden, is that correct?

GARY SHAPLEY:

That's correct.

GLENN GROTHMAN:

OK. So assistant US Attorney General Wolf , was you felt conceding that the big guy was

Joe Biden.

GARY SHAPLEY:
I think that's accurate. I mean, I don't -- I don't -- I don't want to conclude what she was thinking.

GLENN GROTHMAN:
OK, you did have an interview with Rob Walker in Arkansas, correct?

GARY SHAPLEY:
I did not, but agents did, yes.

GLENN GROTHMAN:
OK. And did Rob Walker tell you that President Biden had ever showed up to a meeting with his son's business associates?

GARY SHAPLEY:
He told us that he had shown up at the meetings, yes.

GLENN GROTHMAN:
OK. Can you elaborate on that at all?

GARY SHAPLEY:
I can only stick to what's in the transcript and the witness described an instance where CFC executives were or people involved in CFC were meeting at the Four Seasons and that the subject's father President Biden showed up at that meeting.

GLENN GROTHMAN:
So President Biden was there physically.

GARY SHAPLEY:
That's what the witness said, Yes.

GLENN GROTHMAN:
OK, Mr. Ziegler, maybe I'm going back here a little bit further, but earlier today you wanted to elaborate on one of your questions and you were cut off by one of the Democratic Congressman. Is there anything that you want to say that you can remember that you weren't able to say?

JOSEPH ZIEGLER:
I appreciate that. So I wanted to say that one thing that was mentioned regarding the -- the -- the retired FBI supervisory special agent, I've actually recently reached out to some of my former colleagues that I worked this investigation with at the FBI, and I've asked them, was there anything I misstated In my transcript?

They said no from their best understanding of reading it. So I want to be clear on that, that they've read my transcript or they've referenced that they did and that they've said that there's -- that they didn't see any issues with what I said in my transcript.

GLENN GROTHMAN:
OK, thank you. Mr. Shapley, anything else from you?

GARY SHAPLEY:
Yeah, I want to speak briefly about our criminal tax attorneys IRS criminal investigation. So first, they're only advisory and I can't recall an instance where they not concurred with any of my actions and within the group and that we didn't send it forward anyway through our -- with our senior leadership approval.

The issue here was the manner in which it became a non concur. The line Cty attorney who took more than 50 days to review all the evidence she concurred with all of the charges in that prosecution report in this exhibit two. When she sent it forward a panel of five of lawyers at the National Office of Criminal Tax Attorneys, they concurred with the line attorney's assessment that it was concur on all of the charges that were recommended.

It then went to the senior leadership at CT Counsel and in the top said that you need to change this to a non concur. So that -- that even something like that could happen in practice. The issue here was that -- that we -- I contacted the line attorneys manager, the area counsel and I said that this was going to be -- we didn't know this is going to be a non concur.

She's been saying it's going to be a concur and she told us that it always been a non concur. Basically obfuscating the entire events that occurred at the senior levels with the panel agreeing with the law and that and recommending concurring those charges. So I don't know why CT counsel would -- would lie to us or provide false information about it being a non concur the whole time and Special Agent Ziegler had some communication with that line attorney and said, do you know that that they are saying that it's always been a non concur and she confirmed.

She -- she said what? No, I sent a yellow light, which is a concur. And so that was the issue with CT counsel that really perplexed me and that's something that I wanted to add to the Congressman back there. So thank you for the extra time.

GLENN GROTHMAN:
Thank you and just one other thing, I think with regard what happened in Central Park years ago, the mischaracterization of -- of what happened there is, I'm sure, very hurtful and harmful to the Central Park -- Park jogger. I wish you wouldn't have -- there's more of that story you know very well.

JAMES COMER:
Thank you very good, but at the request of the witnesses, we're going to take two more questioners and then we'll have another ten minute recess. So I'll just recognize Mr. Gosar and then Mr. Donalds. Right now Chair recognizes Casar from Texas for five minutes.

GREG CASAR:

It's clear from this hearing that Democrats are pro accountability, equal treatment under the law and for paying your taxes. In the Hunter Biden case, we've heard that the Trump-appointed US attorney took the extensive work of the IRS investigation and got the most severe penalty that he thought was possible and he was held accountable.

But there are so many millionaires and billionaires and big corporations that are never held accountable for tax evasion. And in fact, they are shielded by this GOP majority. Republicans are not interested in that kind of accountability. Instead, they're interested in trying their hardest to embarrass the President and prevent our government from operating as it should.

If Republicans were truly interested in holding the powerful accountable, we would be holding hearings on making sure the IRS has the resources to investigate every billionaire and every big corporation who cheats on their taxes. But instead, the first bill that I voted on, the first bill brought forward by this Republican majority was to slash funding dedicated to the IRS in order to chase down billionaire tax cheats.

That would have brought us more revenue for us. If we spend some money on the IRS to chase down tax cheats that would have brought ultimately more revenue to the United States and reduced our deficits and improved programs for the American people. A 2021 Treasury Department paper found that the wealthiest 1 percent may owe more than $160 Billion in uncollected taxes.

According to The New York Times quote, "tax compliance rates for high and low -- or sorry, or high tax compliance rates are high for low and middle income workers who have their taxes deducted automatically from their paychecks. The rich however are able to use accounting loopholes to shield their tax liabilities". So I'd like to reiterate, low and middle income Americans have high tax compliance rates.

They pay their taxes, it is the very wealthiest and the biggest corporations who refuse to pay their fair share and rig the system here in DC in their favor. So Mr. Chairman, I'm interested in whether you could commit in short order to holding a hearing about holding billionaires and big corporations accountable for evading their taxes.

I think this could be a bipartisan hearing. It could result in reductions to the deficit and if we have interest in holding folks accountable on tax evasion, I think we should be looking at the biggest fish we can across the board.


JAMES COMER:
We're starting here today.


GREG CASAR:
No, but I'm -- yeah and we -- and we can have and we -- and we're having a hearing about -- about accountability, but what I want to know is why it is we folks have voted for cutting billions of dollars in order to let folks off the hook. So I'd be interested in if we could have a hearing on the fact that the IRS has lost to attrition, thousands of employees, including those with sophisticated skills.

It used to be that 41,000 audits happened a year for millionaires. That was ten years ago. But in fiscal year 2020, the IRS only audited 11,000 millionaire returns. Only about 7100 of those returns were audited by revenue agents who are the most highly qualified auditors. So I want to know Mr. Chairman, can we have a hearing?

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 519 of 776 PageID #: 580

I think this is something we could all get behind, have a hearing about billionaires and big corporations at large scale potentially getting away with from the latest reports. We're talking about $160 Billion in uncollected taxes. I would like to see whether there might be interest from anybody on the other side of the aisle on us having that kind of a hearing.

Any interest really I have -- I have over a minute of time. Mr. Sessions, that'd be great. I think that that would be a good hearing for us to have. Yeah, we want everybody to follow the law, I agree. And with that, I yield back my time to the ranking member.

DAN GOLDMAN:
Will you yield? Yes, I mean. We'll yield to the gentleman from New York. Thank you. I appreciate the gentleman from Texas yielding. I want to bring up that October 7th meeting real quick in just a minute we have. You're familiar with an October 6th Washington Post story entitled Federal Agency Chargeable Tax Gun Purchase Case against Hunter Biden.

Is that right?

GARY SHAPLEY:
Yes, I'm familiar, yes.

DAN GOLDMAN:
And then this was -- this meeting occurred October 7th, the day after this, right/

GARY SHAPLEY:
That's correct.

DAN GOLDMAN:
Was this article discussed at that meeting?

GARY SHAPLEY:
It was.

DAN GOLDMAN:
And what was the nature of the discussion?

GARY SHAPLEY:
It's in that document that -- that email that basically says that we got to keep the sphere small.

DAN GOLDMAN:
And so it was pretty clear though, you would agree, it was pretty clear that this was a leak to The Washington Post by law enforcement agents since it describes what federal agents believe, right?

GARY SHAPLEY:

So it wasn't actually clear to me that it was because usually they'll say that it's a law enforcement source that provided it. And if you see in the bottom, it says that they corroborate it independently and they did not mention law enforcement.

DAN GOLDMAN:
And there was. You don't think it's a federal agent -- the agents who leaked this, when the headline says federal agents see chargeable tax gun purchase case against Hunter Biden.

JAMES COMER:
Gentleman's time has expired, but feel free to answer the question.

JOSEPH ZIEGLER:
So prior to that, if you go back to December of 2020, there was another leak to The Washington Post that got -- I mean, we had to get Department of Justice OIG involved TIGTA involved. So there was other leaks that happened prior to this to The Washington Post that I think are important for -- for us to understand as well in that situation.

GARY SHAPLEY:
It had similar information as the October 6th leak.

JAMES COMER:
Chair -- chair now recognizes Mr. Donalds from Florida.

BYRON DONALDS:
Thank you, Mr. Chairman. To the witnesses, thank you for being here today. I want to get right to it because we have a lot to cover. Mr. Ziegler, you're the -- you are the agent that opened up this investigation. From your transcript, page 17, what -- what it says is -- is that you were investigating a social media company and through the process of that investigation, you found out that Hunter Biden was paying prostitutes was paying potentially for prostitutes in a potential prostitution ring.

Is that correct?

JOSEPH ZIEGLER:
That is correct.

BYRON DONALDS:
OK. You also say that in -- in the beginning phases of that investigation, reviewing bank reports that there was evidence that he was living lavishly through his corporate bank account. Is that correct? And when I say him, I mean Hunter Biden, is that correct?

JOSEPH ZIEGLER:
That is correct.

BYRON DONALDS:

OK. Question for you and also for Mr. Shapely. Is it -- is it -- is it a clear line of potential investigation if somebody is charging up massive living expenses through a corporate account and not doing that through their own personal accounts and not accounting for that properly on their income tax returns?

Is that the basis of a criminal investigation?

GARY SHAPLEY:
You know, generally speaking that would definitely be factors that would spur a criminal investigation, yes.

BYRON DONALDS:
OK, let me -- let me ask this question. Let me answer this question real quick. So there was reference to the WhatsApp -- the WhatsApp text message referring to and everybody knows it now, hey, I'm sitting here on my dad tell the chairman to give me my money because I'm -- we remember and we're not going to forget because we're the Bidens and we have all these connections, yada, yada, yada?

We all -- we all know that text message now. Mr. Ziegler, on page 105 of your testimony, page 105, Gentlemen. You state, I know we wanted to get location data because I went to the prosecutors with this and they again came back at me with "well how -- how do we know that he could just be lying and claiming that dad Joe Biden, now that dad was there and dad was not there, were you allowed to get location data dealing with the WhatsApp text message?

JOSEPH ZIEGLER:
So from -- from my memory of it and from the notes that were taken, I never obtained location data regarding that message.

BYRON DONALDS:
Did -- did -- did Ms. Wolf the AUSA in Delaware, did she say, oh, wow, look at this text message, let's figure out if let's figure out the location data and see where Hunter Biden was when he sent said message. Was she like excited about this as a prosecutor?

JOSEPH ZIEGLER:
So I mean when I asked her about the location data in her response right here, it was her responding with well, how do we know that? It wasn't a -- yeah, let's try and figure that out. It was like, well, how do we know that?

BYRON DONALDS:
Well, did she read the text message? Because if I read that text message as a prosecutor, I'm saying wait a minute, Dad is sitting next to him and Dad happens to be the now President, then Vice President of the United States. Shouldn't we find out where Hunter was when he sent said text message? I mean that's -- I'm not a prosecutor, I'm a finance guy, but that just seems like common sense to me. Yeah.

JOSEPH ZIEGLER:

And I think with the previous email that was referenced, ten held by H for the big guy. Now that you have those two things kind of correlating with each other as a normal process or procedure that we would go through, you would want to figure out is that information truthful in that WhatsApp message?

BYRON DONALDS:
I totally agree with you, Mr. Ziegler, which is why I think it is the view of members on this committee. And frankly, a lot of Americans at this point that there are elements at the Department of Justice who did not want this information out, who did not want to go down the line of process of actually going through the evidence gathering process to see the depths to which this international pay for play scheme was that was actually happening around Joe Biden going through Hunter Biden and all the money that the Biden family was occurring.

That's not a question for you. That's just a statement from me. Last question. Through your investigation, how much money did you uncover was coming from Ukraine, Romania and China?

JOSEPH ZIEGLER:
If you hold on one second, let me reference the. $17.3 million approximately.

BYRON DONALDS:
OK. So $17.3 million through your investigation and you are -- you and Mr. Shapley, you are the guys that investigate criminal tax evasion on an international scale, is that correct?

JOSEPH ZIEGLER:
That is correct.

BYRON DONALDS:
OK. A question for the chairman. Mr. Chairman, through the investigation of the Oversight committee, about how much money have we seen come from Ukraine to Ukraine, Romania and China?

JAMES COMER:
Over $10 million.

BYRON DONALDS:
OK, so we have two separate investigations, one done by the investigative branch of the IRS that is charged with doing these types of investigations. These are the people you want doing them and an independent investigation by the oversight committee. And we're coming up with the same amount of money, give or take a couple million going through the same person in Hunter Biden and his investigation is slow walked.

And we're supposed to sit here and think that Joe Biden knows nothing. I think for the record, Mr. Chairman that the relevant committee needs to have questions for Lesley Wolf, the AUSA of Delaware for David Weiss, the attorney general of Delaware for Lisa Monaco, who is the deputy attorney general; and for Merrick Garland himself, the attorney general of the United States.

Because if this action is allowed to occur and investigations are slow walk with this level of detail, this ain't Donald Trump y'all. These are facts I yield back.

JAMES COMER:
Thank you. Great job and I will add, we just got bank records for Ukraine. So we'll be going through tha. At the request of the witnesses we're going to recess for ten minutes and then we'll promptly reconvene. Committee in recess. [Recess]

The oversight committee will reconvene. We're now back in order. The chair recognizes Ms. Crockett for five minutes.

JASMINE CROCKETT:
Thank you so much, Mr. Chairman. The problem with going this late in the game is there's so much that's been put out there, you're just kind of all over the place, so just rock with me for a little bit. First of all, I want to get the elephant out of the room. Just to be clear, both of you provided deposition testimony, and in your depositions, neither one of you ever stated that President Joe Biden interfered with your investigations, correct?

GARY SHAPLEY:
The transcript doesn't include that, no.

JOSEPH ZIEGLER:
Yeah, the transcript does not include that.

JASMINE CROCKETT:
Nor does it include that Merrick Garland interfered with your investigations, correct?

GARY SHAPLEY:
The transcript does not say that, no.

JASMINE CROCKETT:
Thank you. The reason that I say that is because it's the insinuation that this committee is trying to make, or at least one side of this committee is trying to make, is that for some reason there was interference, and my colleagues continue to make sure that they outline the fact that this investigation actually started under the Trump administration.

So that's the reason about who appointed who comes up. But at the end of the day, we have no evidence whatsoever that the president nor the attorney general of the United States interfered. But I also want to make sure that we outline some legal principles since we've got so many newfound prosecutors today on this committee.

Number one, just to be clear, just because you investigate something, it doesn't necessarily mean that there will be a conviction, correct?

GARY SHAPLEY:
That's correct.

JOSEPH ZIEGLER:

That is correct.


JASMINE CROCKETT:

OK. In fact, in our criminal justice system, you are cloaked in a presumption of innocence. That is what happens under the Constitution. OK? So we all have a role to play. Your role is investigative, correct?


JOSEPH ZIEGLER:

Correct.


JASMINE CROCKETT:

All right. So then you have an AUSA who usually is the one that is responsible for taking the evidence. Actually, they probably have an investigator in their office. There's usually an investigator that is directly within their office that will review any documentation that you provide, and then they will sit down and talk to the AUSA's office about recommendations, like what the charges will look like and things like that.

Is that not correct?


GARY SHAPLEY:

If that's correct, I've never seen that.


JASMINE CROCKETT:

OK. Well, let me be clear. There is a level after you get done with your investigation in which the US attorney's office then we'll look at the evidence that you've provided and they will make decisions, correct?


JOSEPH ZIEGLER:

Yes, and all four assigned attorneys agreed with recommending felony and misdemeanor tax charges.


JASMINE CROCKETT:

I heard your testimony before. I'm not going to dispute that. The difference is, I've done the defense side of this before. So as far as I'm concerned, it sounds like a sweetheart deal, because I've never played anyone to every single count of a federal indictment in the first place, unless they only had one count.

I have always negotiated and unlike on the state level, I typically do my negotiations a lot of times before there's even an indictment because a lot of times, my clients are actually turning evidence over in all kinds of things. But the thing is, those conversations have never taken place with an investigator.

They always take place with the US attorney. So the point is, you don't have the ultimate charging authority. The people that did, they decided to do what they decided to do for whatever reasons, correct?

GARY SHAPLEY:

So in my experience, I've always been a part of that, at that table, talking to the AUSA and talking about the charging decisions. So that's not accurate to say that an investigator is not involved in that process.

JASMINE CROCKETT:

So this time it was a little different for you and that's why you felt as if something was wrong. But I want to get to something else really quickly. I want to talk about what we should be prosecuting. We should be looking at the fact that in 2017, Trump's first year in office, he also made $6.5 million from China, his tax returns show.

The source of the China payments is not clear from the returns. The payments were a surprise since Trump is an outspoken critic of the $5.8 million that Hunter Biden made. The difference is Trump was our president when he made this money from China, whereas I'm sure you would agree with me, Hunter Biden has always been a private citizen.

We've got a lot of other stuff. In fact, it's clear that Trump never paid more than $750 in taxes for, I want to say, a total of two years of his taxes, which is absolutely insane. But we also know that it showed that Trump claimed large cash donations to charities, but the report said the IRS did not verify them.

The report also said that while Trump's tax filings were large and complicated, the IRS does not appear to have assigned experts to work on them. That is shameful. In addition to that, we heard testimony earlier that talked about whether or not you executed a search warrant under Section 9-13.420 of the DOJ's Justice Manual, it specifically states that when searching the premises of an attorney that is the subject of an investigation, prosecutors are expected to take the least intrusive approach consistent with vigorous and effective law enforcement.

It's kind of what they did for Trump when they gave him a number of opportunities to turn over the documents or national secrets that he kept in the toilet, but he chose not to and that's why he is facing federal charges down in Florida. And finally, I just want to make sure that we clear up something about the Central Park five, because I don't think my colleague from the other side of the aisle understands that not only were they found to be not guilty, they were paid $41 million in a 2014 settlement because their civil rights in that lawsuit were violated.

In addition to that, we do know that one of the Central Park five now serves on City council, Yusef Salam. So I asked unanimous consent that I allow this New York Times article be admitted.

JAMES COMER:

Without objection, so ordered. And the lady's time has expired, but would the lady yield to a quick question?

JASMINE CROCKETT:

To who?

JAMES COMER:

Would you yield a question?

JASMINE CROCKETT:
Yes.

JAMES COMER:
You made the argument that Trump received $6 million from China or something and Hunter Biden received the money from China. Do you know exactly what Hunter Biden did to receive the money from China because that's something we've had a hard time trying to figure out. I think I know what Trump's businesses were.

I'm not saying it's right or wrong. I just know what his businesses are. I don't know what the Biden's businesses are.

UNKNOWN:
And you don't know what it's not.

JAMES COMER:
I'm sorry?

UNKNOWN:
And you don't know what it's not either.

JASMINE CROCKETT:
But what I'll say--

UNKNOWN:
So you have no idea why or why not he received that money.

JASMINE CROCKETT:
What I will say--

UNKNOWN:
You have no evidence about it.

JASMINE CROCKETT:
Can I submit this MSNBC, or this NBC article for the record as well?

JAMES COMER:
Without objection, so ordered.

JASMINE CROCKETT:
And I will say that in this article, it specifically says that the source of a number of Trump's monies, it was unclear.

JAMES COMER:

OK.


JASMINE CROCKETT:

It just said that he did have businesses there. He did say that he had opened some bank accounts in China, but they could not find the source of the monies that were paid to him from China.


JAMES COMER:

Chair recognizes Mr. LaTurner from Kansas for five minutes.


JACOB LATURNER:

Thank you, Mr. Chairman. Thank you both for being here today. There's a lot of information. Let's try to quickly lay this out for the American people, OK? So quick answers. How long have each of you worked for the IRS. Mr. Shapley, you first.


GARY SHAPLEY:

14 years.


JOSEPH ZIEGLER:

13 years.


JACOB LATURNER:

Is it fair to say that you both have had successful careers at the IRS? You've both been recognized for your achievement there?


GARY SHAPLEY:

I believe so, yes.


JOSEPH ZIEGLER:

Yeah, absolutely.


JACOB LATURNER:

Are either of you overly partisan people?


GARY SHAPLEY:

I am not, no.


JOSEPH ZIEGLER:

Yeah, I've made an effort to not be overly--I made an effort to be partisan. I apologize.


JACOB LATURNER:

Do either of you have a burning desire or have you ever to be a spectacle at a Congressional

hearing? Are you wanting to be on TV? Are you looking for your 15 minutes of fame here?

GARY SHAPLEY:

I would prefer not to be here.

JOSEPH ZIEGLER:

Yeah, I never imagined that this would happen, but here I am.

JACOB LATURNER:

Then quickly, for the American people, why did you step forward?

GARY SHAPLEY:

Because we need the equal application of justice, and we hear all these stories about these crimes that are committed that are horrible, but without the equal application of justice, I don't understand how we move forward. And I don't understand how I meet my oath of office if I don't do what I can to ensure that occurs.

There are 300 million taxpayers out there that they think that this hearing is a big deal because they're paying their taxes and they see someone who isn't.

JACOB LATURNER:

And Mr. Ziegler.

JOSEPH ZIEGLER:

So it's a matter of accountability. So it's twofold. The matter of accountability, we need to hold those accountable who basically, for the last five years, hasn't been following proper procedure. And the second part of this is that I think we need to have some reform or something that's built in there that this doesn't happen to people again, investigators.

JACOB LATURNER:

Let's get the facts out. The Biden family and their associates received millions in global payments from companies linked to Ukraine, Romania and China funneled through various shell companies. Mr. Ziegler, is that correct?

JOSEPH ZIEGLER:

That is correct. It's $17.3 million.

JACOB LATURNER:

Quickly, Mr. Shapley, what is a special agent report?

GARY SHAPLEY:

It's the report that recommends prosecution for various charges, each of which have been proven each element.

JACOB LATURNER:

Approximately how many of these over your career have you been a part of or have you prepared? Guess.


GARY SHAPLEY:

Hundreds.


JACOB LATURNER:

Hundreds. Did you complete a special agent report for the Hunter Biden case?


GARY SHAPLEY:

Special Agent Ziegler authored that report.


JOSEPH ZIEGLER:

I completed that report.


JACOB LATURNER:

And when the special report was sent up the chain of command, just like you all have been involved with, in your case, Mr. Shapley, hundreds of times, did you notice anything outside of the normal process that you have grown used to over the years?


GARY SHAPLEY:

So the changing criminal tax attorneys was definitely inappropriate and out of the norm, but no. After that, the senior leadership quickly trumped CT counsel and they concurred with the charges, so we sent it forward to the Department of Justice Tax Division for further approval.


JACOB LATURNER:

And Mr. Ziegler?


JOSEPH ZIEGLER:

Everything that he just said was correct.


JACOB LATURNER:

Now, Mr. Shapley, you recommended felony charges in the special agent report, and we all know the answer, but was Hunter Biden ultimately charged with those felonies?


GARY SHAPLEY:

No, he was not.


JACOB LATURNER:

Mr. Ziegler, what role did Lesley Wolf play in the investigation?


JOSEPH ZIEGLER:

So she was an assistant United States attorney out of the District of Delaware assigned to

the investigation.

JACOB LATURNER:
You met with her and her team during the Hunter Biden case, correct?

JOSEPH ZIEGLER:
That is correct.

JACOB LATURNER:
In your testimony to Ways and Means you describe Assistant US Attorney, Lesley Wolf, who was once again overseeing the case out of Delaware as saying during a meeting that she did not want to ask about the big guy and stated she didn't want to ask questions about dad. Is that statement accurate? And I want to remind you that you're under oath.

Is that accurate, your testimony to Ways and Means?

JOSEPH ZIEGLER:
Can you ask that question one more time so I can--

JACOB LATURNER:
She said, Lesley Wolf said during a meeting that she did not want to ask about the big guy and stated she didn't want to ask questions about dad.

JOSEPH ZIEGLER:
So there's two fold to that. There's that line in the email that said, 10 held by H for the big guy. That was something that came up as a part of us reviewing what we were going to say during that day, and she immediately says, no, we're not going to ask that and then we essentially had to argue our stance on why we should ask it. And then it was ultimately that we didn't know.

It was unknown.

JACOB LATURNER:
I appreciate that. Mr. Shepley, you stated in public interviews that you and your team were stopped from taking certain investigative steps that you believe could have potentially connected this Hunter Biden case to President Biden. Is that correct?

GARY SHAPLEY:
That's correct.

JACOB LATURNER:
Now, I just want to summarize as quickly as I can here. We have two credible nonpartisan IRS investigators confirming that there are millions of dollars in foreign payments to shell companies to the Biden administration. We have Hunter Biden who most of us wouldn't hire to dog sit receiving these millions of dollars for services that they cannot come forward and tell us about and that potentially this is linked to President Biden, but we don't know that for a

fact because you were shut down.

You were not allowed to pursue the investigative angle that you wanted to. This is something that we have to get to the bottom of. It's shameful what's happening, and I want folks to mark my words that we will not be stifled. This committee will not be stifled by the Department of Justice or anyone in the Biden administration.

We are going to pursue this and get to the bottom of this no matter what. Thank you, Mr. Chairman, I yield back.


JAMES COMER:
Chair recognizes Mr. Gomez for five minutes.


JIMMY GOMEZ:
Thank you so much, Mr. Chairman. I just want to be clear. Whistleblower allegations should be taken seriously, period. I had a whistleblower approach my office during my first term, but one of the things I learned from that is that there's a clear, fact-based process that needs to be followed to ensure a whistleblower investigation is executed properly without political interference.

This is not what is happening here today. Where this originated, in Ways and Means, Republicans threw that process into the gutter. Here's how. One, there were more than 50 people identified in the Ways and Means committees depositions on this same topic that were not spoken to and not interviewed before the Republican majority released these allegations to the public.

They didn't take the time to check their fact and the Republicans even admitted during questioning that they never interviewed or asked questions or sought to ask questions of these individuals. Instead, Republicans cherry-picked 13 people who they knew agreed to corroborate their claims. Why wouldn't they conduct a thorough investigation and interview all people identified who might have information in this case?

There are more than 50 people who weren't given the opportunity to defend their names, respond to allegations or give this inquiry important context and facts. Two, the Whistle-Blower transcript contains unauthenticated, unverified documents from unknown searches on the internet. The exhibit used by the gentleman from Ohio in the early part of this hearing is one of those unverified documents pulled from the internet, yet they treat it as a smoking gun.

You can literally find anything on the internet. That doesn't make it true, and Republicans refuse to verify their sources. They are trying to give the appearance that these documents are from IRS files provided by the whistleblower or from some trusted source, but in fact, they are not. These documents are unauthenticated, and we don't even know their real source.

What kind of basis is this for a serious investigation? Three, the majority released this transcript with all these errors I cited to the public before verifying any of these allegations. They put the cart far before the horse, declining to speak to over dozens of valuable witnesses, refusing to verify the information they pushed to the public, throwing this whole process and its credibility out the window.

Additionally, this process has been tainted by the fact that one of these whistleblowers

attorneys has made substantial contributions to the Republican chairman of Ways and Means, as recently as February of this year and one of these whistleblowers didn't even come voluntarily. He was asked to testify by his supervisor.

None of this inspires confidence in these efforts of my colleagues across the aisle or in the process that has been taken. If my colleagues were serious about these allegations, they would have gone through the proper steps to ensure this investigation was done correctly, but they didn't. They'd rather drag this investigation and this committee into the gutter, and that was proved by the gentlewoman from Georgia.

If the gutter is where they choose to live and the only purpose of this hearing is to drag us all down there with them, I don't want any part of it. I ask for unanimous consent to submit for the record a letter from Ways and Means ranking Member Richard Neal, outlined the improper steps taken by the majority in this investigation.


JAMES COMER:
Without objection, so ordered.


JIMMY GOMEZ:
Thank you. With that, I'd like to yield my remaining time to Mr. Goldman of New York.


DAN GOLDMAN:
Thank you, Mr. Gomez. Gentlemen, I want to return to The Washington Post October 6th article, and I'd ask unanimous consent to enter it in the record. In your testimony, Mr. Sharply, before the Ways and Means Committee, you stated, quote, there was a leak. It appeared to come from the agent's level who was critical of the prosecutors for not charging the case.

What you testified earlier was a little different. Which one do you stand by today?


GARY SHAPLEY:
I'm sorry, could you repeat that?


DAN GOLDMAN:
There was a leak. It appeared to come from the agent's level who was critical of the prosecutors for not charging the case.


GARY SHAPELY:
Yeah. So yeah, it appeared because it said it came from the agent level, but the source was a source familiar with the topic, and it didn't say it was a law enforcement source.


DAN GOLDMAN:
OK. It seems to be a distinction, I think, without a difference. And then you understand that obviously leaks of grand jury information is a felony, right?


GARY SHAPLEY:
Leaking investigative information includes 6103 would be a felony, yes.

DAN GOLDMAN:

Well, that's true as well. So would you agree that there would be some skepticism from any prosecutors about which of the agents may be the source of a leak?


JAMES COMER:

And gentleman's time is expired, but feel free to answer the question.


GARY SHAPELY:

Oh, since there have been multiple leaks on this investigation and one on December 8th or December 9th, 2020, that appeared to have come from someone as Lesley Wolf stated--


DAN GOLDMAN:

I was just asking about October 6th, 2022.


GARY SHAPLEY:

So I would--


DAN GOLDMAN:

It would cause anyone suspicion, right?


GARY SHAPLEY:

If it says it comes from an agent level?


DAN GOLDMAN:

Yeah, that's what you said.


JAMES COMER:

Gentleman's time is expired. You're the next questioner after Mr. Fallon from Texas for five minutes.


PATRICK FALLON:

Thank you, Mr. Chairman. We were just talking about obfuscating and diverting and distracting and spin and a whole lot of word vomit from the other side of the aisle that makes no sense as to what we're here for today. And you hear a lot of Trump, Trump, Trump, Rudy Giuliani, Giuliani Giuliani. We're not talking about either of those gentlemen today.

I want to thank both of the witnesses for being here. I think it's been established that you're very credible, you're very experienced your subject matter experts at what you do. Mr. Shapley, you led a team of 12 elite agents in this investigation. How long were you investigating the sportsman, the Hunter Biden investigation?

How long did you lead it for?


GARY SHAPLEY:

I started in January of 2020.

PATRICK FALLON:

OK. So two to three years investigating?

GARY SHAPLEY:

That's correct.

PATRICK FALLON:

OK. You both, I'm sure, are aware that one of Hunter Biden's lawyers has accused you of having access to grind and that you're disgruntled agents. Mr. Shapley, are you a political activist?

GARY SHAPLEY:

I am not, no.

PATRICK FALLON:

You are not. Mr. Ziegler, are you a part of the MAGA movement?

JOSEPH ZIEGLER:

I am not.

PATRICK FALLON:

You are not. OK. Thank you. So I have to ask you a direct question and it's an important one. Are you two out to get Hunter Biden or are you out to get justice?

GARY SHAPLEY:

It's all about justice here and that's why a plea agreement, when people ask me to comment about the plea agreement, it is outside of my control.

PATRICK FALLON:

Justice or you want to get Hunter?

JOSEPH ZIEGLER:

It's justice.

PATRICK FALLON:

Thank you. OK. So the ranking member who was a rather skilled order, rather bombastically claimed when he was speaking earlier that this is all, and I quote, normal stuff and there's no evidence that Hunter Biden received preferential treatment. So Mr. Ziegler, do you agree with those statements? That this investigation was normal stuff, nothing out of the ordinary and that Hunter Biden didn't receive any preferential treatment.

JOSEPH ZIEGLER:

Based on my transcript, I would believe that that answer or that question would be incorrect.


PATRICK FALLON:

Would you fair to say that you vehemently disagree with those statements?


JOSEPH ZIEGLER:

I don't think it changes my perspective of it. All I can say is that we came forward with the information of slow walking, not following the investigative steps.


PATRICK FALLON:

So it was out of the ordinary?


JOSEPH ZIEGLER:

Yeah.


PATRICK FALLON:

OK. Mr. Shapley, do you agree with those statements or disagree with them?


GARY SHAPLEY:

Yes, this is out of the ordinary.


PATRICK FALLON:

OK. So when you read your transcribed interviews, which are pretty massive in and of themselves, it's clear that the levels of interference and roadblocks that the DOJ and other federal government personnel put in front of you, was astounding, if not unprecedented. In these pages, I was really shocked to see how an assistant US attorney stonewalled and scuttled your investigation.

So let's go back. It's December of 2020, the prosecutorial team is meeting to discuss next steps. Hunter Biden has received millions of dollars in foreign payments. One of his shell companies, Wasco, to this day no one can tell what the hell it ever did other than accept money. So nobody knows what services the company has ever provided.

And it's December of 2020. Hunter is vacating Wasco's DC offices and he's moving those documents to a storage unit in Northern Virginia. Mr. Shapley, were you pretty interested in what some of those documents might reveal?


GARY SHAPLEY:

Yes, we were.


PATRICK FALLON:

OK. And maybe possibly could have shedded light on criminal activity, felony criminal activity?

GARY SHAPLEY:

Unfettered access to the documents there before defense counsel can filter them and would have been very advantageous--

PATRICK FALLON:

It could have been a treasure trove. We don't know, OK, because of what happened later. So I'm going to get that in a second. So did you prepare an affidavit to search that storage unit?

JOSEPH ZIEGLER:

Yeah, I was the one that prepared that.

PATRICK FALLON:

OK. Mr. Ziegler did that. Did US Attorney Weiss agree that if the unit wasn't accessed for 30 days, then you could execute the warrant?

GARY SHAPLEY:

That's correct.

PATRICK FALLON:

OK. So now that in and of itself seems kind of weird, though, doesn't it, to wait 30 days? How are you going to know if somebody accesses it? Is it going to be under 24 hour surveillance? Is it going to be a stakeout? Are we going to have to call Emile Estevez and and Richard Dreyfuss and have them there with the binoculars checking things out?

GARY SHAPLEY:

So it wasn't in the transcript, but this was a little bit unique location where it would have been easier than what you just described, to see if it was accessed.

PATRICK FALLON:

OK. But you didn't have to wait the 30 days did you, because did assistant US Attorney Lesley Wolf, what did she do when she learned that you wanted to execute the search warrant on this storage unit?

JOSEPH ZIEGLER:

So she actually first approved and was saying that it's going to take approvals for us to get this done, but then came back a few days later and said, no, we're not going to move forward with this. And I was the one who proposed, well, let's just wait 30 days, we'll get the approvals, we will make sure that the storage unit is not accessed and then we can move forward with the warrant.

Her response was, I'm going to think about it. And then we come to find out a few days later that they had let defense counsel know that we know about the storage unit.

PATRICK FALLON:

OK. So that's key. So a US attorney tipped off the lawyers of a person who was a subject of a

years' long criminal felony investigation? Is that what you're saying? Did Lesley Wolf tip off Hunter Biden's lawyers?


JOSEPH ZIEGLER:
Regarding?


PATRICK FALLON:
The storage unit. That you guys had interest in the storage unit. Because once you know that, if you're the subject of a criminal investigation, any of those documents that could incriminate you are probably going to meet a match and some gasoline. So that's astounding to me that that is direct evidence clearly of preferential treatment and that is not normal stuff.

Is that normal?


JOSEPH ZIEGLER:
So I can tell you that that was actually my kind of red line situation, a little bit different than how Shapley refers to it, but I didn't think we had a seat at the table. It disappointed me so so badly, but I knew this was something that we were up against and that it was, like, OK, that's what they decided to do.


PATRICK FALLON:
Have either of you ever seen anything like that before in your decades of experience?


JAMES COMER:
And gentlemen's time is expired but please, feel free to answer the question.


GARY SHAPLEY:
No, I have not.


JOSEPH ZIEGLER:
I have not either.


PATRICK FALLON:
Well, I want to thank you. I think you're both excellent public servants and you're courageous and justice is the only thing I want to be blind, not our Democratic colleagues, not the legacy media and certainly not top administration officials. Mr. Chairman, I yield back.


JAMES COMER:
Chair recognizes Mr. Goldman from New York.


DAN GOLDMAN:
Thank you, Mr. Chairman. I'd love to get the extra minute that Mr. Fallon got as well. Thank you, guys, for being here today. We don't have a lot of time here. I have a lot of questions. If I cut you off, I'm not trying to be rude. I'm just trying to get through them, and I want to talk a little bit about the evidence you did have.

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 538 of 776 PageID #: 599
Mr. Ziegler, you were the case agent, so how many documents would you say you gathered during the five year investigation?

JOSEPH ZIEGLER:
So however, I do believe I may have documents, I am limited by the statute, but I would be more than welcome to turn those documents over to the--

DAN GOLDMAN:
No, no, I don't need them. How many, just the number?

JOSEPH ZIEGLER:
It was a significant amount of documents. I apologize.

DAN GOLDMAN:
Hundreds of thousands, millions?

JOSEPH ZIEGLER:
I don't want to put a number to it, but there was a lot.

DAN GOLDMAN:
Right. Bank records, right? You had a lot of bank records?

JOSEPH ZIEGLER:
Yes.

DAN GOLDMAN:
Both domestic and foreign?

JOSEPH ZIEGLER:
That is correct.

DAN GOLDMAN:
And you conducted search warrants?

JOSEPH ZIEGLER:
Yes. There was reference in our transcripts to conducting electronic search warrants.

DAN GOLDMAN:
And did you do other search warrants as well?

JOSEPH ZIEGLER:
When you say other search warrants, what do you?

DAN GOLDMAN:

Any other search warrants, electric, otherwise, physical?


JOSEPH ZIEGLER:

So I'm going to stick to what I stated in my transcript. There were multiple electronic search warrants that we executed.


DAN GOLDMAN:

And you said that you conducted more than 60 interviews as part of this investigation, is that right, in your transcript?


JOSEPH ZIEGLER:

That is correct.


DAN GOLDMAN:

That's a lot for any investigation, right, for a tax investigation?


JOSEPH ZIEGLER:

I wouldn't say that. I would say that--


DAN GOLDMAN:

All right. In my 10 years, I don't know how many investigations I did was 60 interviews. So I want to focus though for a second on the WhatsApp that we went through. And Mr. Shapley, in your testimony your opening statement, you said that the text message, the WhatsApp message that we've been talking about shows Hunter Biden discussing business with his father.

Could you show me where in the text message it says anything about discussing business with Joe Biden?


GARY SHAPLEY:

So if you'd like me to go through it, I mean, I can take time to review it, if you'd like me to.


DAN GOLDMAN:

Well, I don't have the time unfortunately, as you point out. I will tell you the only thing it says about it is that Hunter Biden was sitting with his father. It does not say anything about discussing any business. And Mr. Shapley, you also said in your testimony, and we've talked about this a bunch, that the agents were prohibited from pursuing leads related to Joe Biden and the big guy, but the agents did that anyway, right, interviewing Rob Walker?


GARY SHAPLEY:

The agents interviewed Rob Walker, did not use--


DAN GOLDMAN:

And they asked him about that, right?

GARY SHAPLEY:

--the word big--

DAN GOLDMAN:

Right. They didn't use the word big guy, but they asked about it in reference to that text. And do you recall that Rob Walker actually said in response to that, that he was not aware that Joe Biden was ever a part of anything that he and Hunter were doing?

GARY SHAPLEY:

That's what the witness said, yes.

DAN GOLDMAN:

Yes, and then you describe a lunch, what we talked about earlier, where Joe Biden came to say hello at the Four Seasons Hotel, to lunch that he was having with CFC executives, right?

GARY SHAPLEY:

That's correct.

DAN GOLDMAN:

But what you didn't talk about is what Rob Walker said the origination of that lunch was, and you testified that he said, that Hunter told his dad, according to Rob Walker, quote, I may be trying to start a company or try to do something with these guys. Now, let me ask you something. That doesn't sound much like Joe Biden was involved in whatever Hunter Biden was doing with the CEFC, if Hunter Biden is telling him that he's trying to do business with them, does it?

GARY SHAPLEY:

No, but it does show that he told his father he was trying to do business and he was talking to his father about the business.

DAN GOLDMAN:

Well, that is true. Hunter Biden does try to do business. That's correct. So you not only have no direct evidence connecting Joe Biden to any of Hunter Biden's business deal, you actually had proof that he wasn't involved. That is the proof that you had. And in the end of the day, that this was a five year criminal investigation with tens of thousands of documents, maybe hundreds of thousands-- [Audio Gap] --warrants, aggressive techniques.

You wrote a report recommending felony charges. It went to DOJ tax. They wrote a 99 page memo, approval memo, right? And neither of you saw that, did you?

GARY SHAPLEY:

That's correct.

JOSEPH ZIEGLER:

That is correct.


DAN GOLDMAN:

And what was their recommendation?


JOSEPH ZIEGLER:

So all I know is--


DAN GOLDMAN:

Approval, discretion or declination?


JOSEPH ZIEGLER:

So I have to stick to the confines of--


DAN GOLDMAN:

OK. You testified that it was discretion, which means that it wasn't an approval. It was to the discretion of the US Attorney's office which had that DOJ tax memo, which had information from the defense lawyers that they spoke with, and they are the ones who have to prove this case in court. And I will tell you, as a federal prosecutor for 10 years and I worked with many of your colleagues who do great work and I'm sure you do great work as well, but I never met an agent who didn't want to charge every possible case.

But what I noticed in five hours of testimony today is that neither one of you has ever mentioned a portion of the case that may not be so strong or may be suspect or may have a defense, and that's because that's what the prosecutor has to think about before charging a case and that is not what the special agent report does.

So in the end--


JAMES COMER:

Gentleman's time has expired. You went a minute over. Chair now recognizes Mr. Perry from Pennsylvania.


SCOTT PERRY:

I thank the chairman. Mr. Shapley, if you can turn to page 30 of your transcript and I want to say to Mr. Shapley and Mr. Ziegler, we sure appreciate you coming forward. I think, look, we've heard of alleged so-called whistleblowers in the past. They couldn't reveal themselves, and it led to an improper impeachment of a president that was unjustified and unsubstantiated.

So I really do credit you. I think this has probably been very difficult and a hard choice for you to make, but I think it was the right one and I commend you for it. Mr. Shapley, page 30 of your transcript, let me see, middle of the page, last sentence, second paragraph, starting with every single day. Every single day was a battle to do our jobs, and I understand that in Congress, but you're following the letter of the law.

You're taking in information. You're doing--prescribed, you do this, you do this, and you get

that. Why is your day--that's a chilling line. What did you mean when you said that?

GARY SHAPLEY:
So yeah. Every time we try to communicate investigative steps and get support for investigative steps, it was always slow walked. It was always pushed off that we needed a DOJ public integrity approval or DOJ OEO's approval, and it was just used as a crutch. The process was really used to stall the investigation.

And ultimately, which some people seem to be overlooking, is that these prosecutors agreed with these charges.

SCOTT PERRY:
And you finally reached your redline. You said previous in answering Mr. Fallon's question, you were seeking justice. I believe you were. I don't think you were picking winners and losers. You were just seeking to see following the rules. You finally reached your redline October 7th of 2022 at the meeting with US, Attorney Weiss.

Is that a reasonable characterization?

GARY SHAPLEY:
Yeah, that's correct.

SCOTT PERRY:
And what did you mean when you say you reached your red line?

GARY SHAPLEY:
So throughout the investigation, starting in the summer of 2020, my case agents were coming to me with certain concerns and because we were worried about the discovery process with the agents turning over documents at the end of the investigation. We wanted to protect that investigation, so I documented that amount of recurring basis issues that we were having.

And it was after discussions with my agents, I also saw these things firsthand. So we got to the point, it's a heavy burden. I have a very deep respect for the Department of Justice and AUSAs and US attorneys I've worked with in the past. And I just couldn't--to ultimately conclude that they were doing the wrong thing was just such a high burden.

SCOTT PERRY:
Yeah. You concluded that. And Mr. Ziegler your redline, I think you said, I don't want to mischaracterize, is a little later December 14th, 2020, when AUSA Wolf tips off the Biden counsel about your plan to search the storage unit. Is that right?

JOSEPH ZIEGLER:
Absolutely, because that storage unit, the method that we were planning to do was the least intrusive. It was a storage unit. We needed to get those records.

SCOTT PERRY:

And again, you were just seeking justice, right, seeking the truth?

JOSEPH ZIEGLER:

Absolutely.


SCOTT PERRY:

Truth is going to take wherever it takes you to make decisions based on what you learned. Turning back to you, Mr. Shapley. What was your agency's leadership's response when you tried to alert officials outside your chain of command?


GARY SHAPLEY:

So most recently when Special Agent Ziegler emailed the commissioner, they basically threatened and intimidated Special Agent Ziegler that he had violated some type of law.


SCOTT PERRY:

Threatened and intimidated.


GARY SHAPLEY:

And forced him, this chain of command requirement that does not meet the legal requirement.


SCOTT PERRY:

So you're trying to seek justice, you're trying to seek the truth and they're throwing an obstruction in front of you. They're obstructing you from doing it, aren't they?


GARY SHAPLEY:

So my complaints for IRS criminal investigation and senior leadership is not necessarily for blocking this investigation. I do believe that we raise things on a continual basis, and they just stuck their head in the sand and took no action. But in terms of the retaliation, that's when they first reared their head.

And there's no doubt about it, that after protected disclosures were made, that they took primitive personnel practices against me.


SCOTT PERRY:

Mr. Shapely, Mr. Ziegler, have you ever been threatened before in an investigation?


JOSEPH ZIEGLER:

I have not and I've come to learn that that this 6E grand jury threat may have happened before to other people inside the IRS.


SCOTT PERRY:

Mr. Shapely?

GARY SHAPLEY:

No, not from my own agency, not from [Inaudible].


SCOTT PERRY:

So when my friends on the other side of the aisle say that Treasury hasn't retaliated against you, it's simply not true. There's a law 5USC 2303 B13, and they placed unlawfully, you and your fellow supervisors under a gag order. Mr. Shapely and Mr. Ziegler, my time is expired, but what we're talking about here is obstruction of justice.

You were seeking justice and you were obstructed. It's against the law. Mr. Chairman, I yield the balance.


JAMES COMER:

Gentleman yields back. Chair recognizes Mr. Moskowitz from Florida.


JARED MOSKOWITZ:

Thank you, Mr. Chairman. And gentlemen, thank you for appearing today. Thank you for being a public servant and there should be no retaliation against you as whistleblowers. Unlike my colleagues that said nothing and supported President Trump when he retaliated and fired Vindman and escorted him from the building for appearing in an investigation, that shouldn't happen to you.

But of course, they said nothing when it happened to other people. We heard a lot about the Bidens, the Bidens, the Biden family, Biden associates, right, Biden's plural, the s, what does the apostrophe mean, but not Joe Biden. Didn't hear a lot about Joe Biden. Why? Because he didn't do anything. This has nothing to do with him.

You know, my colleagues talked about foreign countries, foreign entities trying to make it all scary for the American people. Of course, President Trump got $5.4 million from the Chinese while he was president because they were leasing space in Trump Tower. He goes out in air kisses. President Xi, totally perfect.

Jared Kushner gets $2 billion from the Saudis, even though he oversaw Mideast peace, totally kosher. Ivanka Trump, she's doing business with the Chinese while she's working in the White House, totally beautiful, right? Why do I bring that up? They want to say you have credibility. The problem is they have none.

They have no credibility and because you're here at their behest, their lack of their credibility questions your credibility, not because of you personally, but because of what they've done over the last several years. So the chairman says you're credible. You want to know actually what they feel about you, people like you who work in government?

I got pages of it. It goes on for years, but you know what, I'll just read a couple of adjectives. Trump has called people like you, so-called whistleblowers, fake whistleblowers, partisan people, political hack jobs, scams, frauds, traitors, cowards, spies, losers, clowns, thugs, puppets, unelected bureaucrats, the swamp and my favorite, the deep state.

By the way, are you members of the deep state? You members of the deep state. Did you stop paying--it's a rhetorical question. Did you stop paying your deep state dues? Did you do not attend the latest deep state meeting? Is that why you're not in the deep state? I can't tell when they want people like yourself to be in the deep state, not in the deep state, depending

upon what the deep state is saying.

Again, it undermines their credibility. It undermines government. It undermines the Americans trust in government. It undermines our institutions. And throughout all of this, four years, four years of it, they said nothing. And now, in an effort to own Hunter Biden, OK, they're assembling nude photos of him, right, having some intern have to sit in a room and blow up these photos and put it on poster board and figure out oh, which ones are beyond the pale?

Mr. Shapley, you said that the DOJ was slowing down the investigation, but some of that happened when President Trump was president. And I found it strange that when my colleague tried to ask both of you these questions about when your perceived slowness of this happened, you all struggled for a period of time to admit that it started under President Trump.

Was President Trump directing that DOJ to slow down the investigation? He wasn't, just like President Biden isn't now. So if there's any perceived issues with DOJ, it's with DOJ. It's not with the president. Mr. Ziegler, you said no one is above the law regardless of political affiliation. Do you think the president's son-in-law, and not as an IRS agent, as a person, do you think the president's son-in-law, Jared Kushner who worked in the White House couldn't get security clearance until the president made it happen, was put in charge of Mideast peace, and with no investment experience, got $2 billion from the Saudis?

You guys made a lot of noise today about $17 million, but what about $2 billion? Do you think as a person that should be looked at? Sounds a little strange.

JOSEPH ZIEGLER:
Congressman, thank you for that question. Given the statute, I am limited to my testimony.

JARED MOSKOWITZ:
I understand. I got it, but think about it, $2 billion from a foreign country that he was put in charge of their policy while he worked in the White House. They got no questions about that. That's totally great. Totally wonderful. Right? Joe Biden has been in Washington for almost 50 years. We didn't hear about Hunter until a couple of years ago.

Why? Because it's a pay no attention to the man behind the curtain, like the Wizard of Oz, right? Donald Trump is in so much trouble and they can't save him. But what they can do, is they can spend taxpayer money and all the time while they control these hearings to convince the American people that somehow Joe Biden has done something wrong.

But there's no evidence, none, zero zilch, nada, zippo and you know how I know that? Because they couldn't even bring up their own impeachment. They had to bury it in committee, on immigration, not on this topic, right? There are members of this committee that filed articles of impeachment, didn't bring it up for a vote.

Buried it in committee. Again, not on this topic because there's no evidence on Joe Biden. Thank you, Mr. Chairman. I yield back.

JAMES COMER:
Chair recognizes Ms. Boebert from Colorado.

LAUREN BOEBERT:
Thank you, Mr. Chairman, and thank you gentlemen for being here today. I appreciate you.
Now, Mr. Shapley, Mr. Zeigler, if you could each just quickly maybe 20 seconds or less
summarize, what did each of you find when you criminally investigated Hunter and Joe
Biden, particularly as it relates to China?


GARY SHAPLEY:
You can start.


JOSEPH ZIEGLER:
So specifically related to China, there's CEFC, Hudson West Three, State Energy HK, yeah,
those are, I believe, the three entities in my transcript.


LAUREN BOEBERT:
Mr. Shapley?


GARY SHAPLEY:
So yeah. I mean, I would just echo the same thing that's in my transcript.


LAUREN BOEBERT:
And so there's a--[Inaudible] he's a Chinese billionaire and he's tied to a CCP intelligence
gathering agency and his company is CEFC, excuse me. What is the connection between
Hunter Biden and CEFC?


JOSEPH ZIEGLER:
So I'm going to have to stick to the confines of my testimony, but what I can tell you is that
there may be some documents that are responsive to that, and then I can turn those over to
the House Ways and Means Committee and get those over.


LAUREN BOEBERT:
I welcome those. Yes.


JOSEPH ZIEGLER:
Or if they would vote to get those released.


LAUREN BOEBERT:
Yes, we would love to get those in. And I see that Hunter Biden received more than $8
million in foreign payments including $100,000 made from CEFC directly, $664,000 from
State Energy HK, as you mentioned, another Chinese company and a $325,000 capital
contribution made into Bohai harvest on Hunter's behalf, a Chinese equity investment fund.

Were you shocked to find that the then vice president's son received all of these payments,
particularly the ones from Chinese entities?


JOSEPH ZIEGLER:

Well, as I try to state earlier, in this position, you have to be nonpartisan. It isn't a matter of shock, it's just, you follow the evidence.

LAUREN BOEBERT:
Well, it's not the political position, not the party, but just the vice president's son. So I'm not accusing you of a political bias here.

JOSEPH ZIEGLER:
So it's just, follow the evidence, see where the transactions are coming from, interview witnesses and try to figure out what the purpose of those transfers of money were for.

LAUREN BOEBERT:
And Mr. Shapley, in March of 2017, Robinson Walker LLC received a $3 million wire from a Chinese company, State Energy HK Limited, which took place just two months after Joe Biden left office as vice president. And I believe it was in your testimony that you said that it seemed that this would be getting into place or was in a testimony that was said today, that this would be being assembled before he left office, and then just shortly after, it came to fruition.

So can you quickly discuss the Robinson Walker connection to the Biden family?

GARY SHAPLEY:
So, yeah, I mean, I have to refer to Special Agent Ziegler. I don't think I spoke about the $3.

JOSEPH ZIEGLER:
Yeah, so any of that information related to the $3 million, we can turn over to the House Ways and Means Committee and they can vote to release that to you.

LAUREN BOEBERT:
Thank you. And I see that Hunter Biden and [Inaudible] a CEFC associate established Hudson West Three LLC and each owned 50 percent of the company. Between August 2017 and October 2018, Hudson West Three sent over $4 million to Hunter Biden and over $75,000 to James Biden, Hunter Biden's uncle. Now, can you discuss these payments?

Because my colleagues on the other side of the aisle are wondering what the apostrophe is when we're talking about the Biden's, and it seems there are more Biden's right here who are receiving money.

JOSEPH ZIEGLER:
So in an answer to his question regarding President Biden and in an answer to this question, any documents that we believe that we may have in our possession, we can turn over to the House Ways and Means Committee. They can vote to release it to you guys.

LAUREN BOEBERT:
OK. I request that you release those to them. And then also, we have this situation with Gal Luft, that he was doing business with CEFC, and I guess that makes you a Chinese spy. So I

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 548 of 776 PageID #: 609
guess Hunter Biden is a Chinese spy according to their allegations, but do you have any information regarding Gal Luft that you could also turn over to the Ways and Means Committee?

JOSEPH ZIEGLER:
So any information that I have in my case file at the direction of my attorney, we can turn over to the House Ways and Means Committee.

LAUREN BOEBERT:
Thank you so much. I appreciate you gentlemen for being here, your bravery, your courage for standing up. You know, we saw a lot of evidence today about millions of dollars being shuffled through these shell companies. We've seen delayed warrants to impact a 2020 election, prosecutors instructed not to involve the big guy because optics.

Well, the optics are very, very clear. Hunter Biden sold access to his father with an influence peddling scheme, which in my opinion, compromises the current president of the United States. The Biden family has never sold anything in their life, but their influence in Washington DC. Every business they have is monetizing their grift of the American people.

Thank you for making that very clear today, gentlemen. I yield.

JAMES COMER:
Gentlelady yields back. Chair now recognizes Ms. McLain from Michigan.

LISA MCCLAIN:
Thank you, guys, for being here. I know it's been a long day, but we appreciate you. The American people appreciate you, to get some truth and and honesty back in the American justice system, I think is great. So thank you again. We've heard a lot of rhetoric today and I just want to talk about as much as we can, just the facts, just stick to the facts.

So Mr. Shapley, in August of 2020, your team obtained a July 2017 WhatsApp message from Hunter Biden to [Inaudible], a Chinese businessman. And I want to read a few lines from that message. I'm sure you remember it, but I'll just refresh your memory, and I quote, Z, please have the director call me, not James or Tony or Jim. Have him call me tonight.

I'm sitting here with my father, and we would like to understand why the commitment made has not been fulfilled. And Z, if I get a call or text from anyone involved in this other than you, Zang or the chairman, I will make certain that between the man sitting next to me and every person he knows and my ability, to forever hold a grudge that you will regret not following my direction.

And I am sitting here waiting for the call with my father, end quote. That's a fact. I didn't make that up. That's not my opinion. That's not rhetoric. This is a message from Hunter Biden's WhatsApp app, correct?

GARY SHAPLEY:
It's from a search warrant from an Apple iCloud backup, yes.

LISA MCCLAIN:

From where? From whose phone, my phone, your phone?

GARY SHAPLEY:

It was from Hunter Biden. Wasn't from his phone, but it from a Hunter Biden device.

LISA MCCLAIN:

Thank you, sir. I didn't mean to be disrespectful. Yes, OK. Thank you. But it was linked to Hunter Biden, correct?

GARY SHAPLEY:

Yes.

LISA MCCLAIN:

OK. Thank you. Now, Mr. Shapley, were the Bidens contemplating a deal with CEFC in July 2017 time frame?

GARY SHAPLEY:

So I would just have to stick to what was in my transcript. I don't know if I really describe that. Have you?

JOSEPH ZIEGLER:

I think that's a portion of the WhatsApp message. However, I do believe there's a full chain that if it's relevant, we can turn that over to the House Ways and Means Committee and they can decide to vote to release that to you.

LISA MCCLAIN:

That would be appreciated. I just wanted to give, in my limited time, just to set the stage. One person has come forward, Tony Bobulinski, I believe, has alleged that the Bidens were contemplating a deal with CEFC even earlier than 2017 and he's come forward and said that. Is Tony Bobulinski the Tony referenced in the WhatsApp? I'm trying to connect the dots.

JOSEPH ZIEGLER:

I think we need to stick to the transcript, and I think in my testimony, I referenced Sino Hawk, the Sino Hawk deal and we know that that deal never went through and that relates to CEFC in China.

LISA MCCLAIN:

OK. So the Tony that he's referencing, do you believe that to be Tony Bobulinski?

JOSEPH ZIEGLER:

In my transcript, I did not mention anything regarding Tony Bobulinski, but what I can do, again, is provide any information that I have related to him over to the House Ways and Means Committee.

LISA MCCLAIN:
Please. Thank you so much. And then the reference to James, is there a reference to James in there? Is that James Gilliard, another Biden associate?

JOSEPH ZIEGLER:
Again--

LISA MCCLAIN:
We might have to get that one too. That's OK. And again, I think it's just critical that we stick to the facts and not my opinion, so I appreciate the fact that you're only speaking with fact, not on a partisan basis.

JOSEPH ZIEGLER:
Absolutely.

LISA MCCLAIN:
But if you could get those, that would would help because in another message, [Inaudible] responds to the earlier message, copy, I will call you on WhatsApp. And Hunter writes back, oh my friend, OK, my friend, I am sitting here waiting for the call with my father. Again, my concern is the ability to tell the truth, right?

The cover up is always worse than the crime. How many times did we hear Joe Biden say, not involved, not involved, not involved. I have no idea, yet, his son says he's sitting right there while he's making these alleged peddle influence peddling? So Mr. Shapley, what do you these messages indicate to you?

Can you comment on that?

GARY SHAPLEY:
Yeah, I mean, they indicate that we needed to take additional investigative steps to find out what the facts and circumstances were of this WhatsApp message and we just, simply, it was not supported.

LISA MCCLAIN:
Can you explain to us what do you mean it wasn't supported?

GARY SHAPLEY:
So Special Agent Ziegler, I mean--

JOSEPH ZIEGLER:
Yeah, as a normal part of a tax investigation, you want to understand why individuals are earning money. If someone's paid a significant amount of money, in order for that to be income, not a gift, not a loan, you need to understand the substance to why that person is paying them and that's why you need to understand the four corners of that transaction.

LISA MCCLAIN:

Sure, and that's standard operating procedure that is usually held for normal members of society. I mean, that's standard operating procedure, but what you're telling me is you weren't able to pursue that. Correct?

JOSEPH ZIEGLER:

That's correct.

LISA MCCLAIN:

I am out of time. Thank you so much, Mr. Chairman, and thank you again.

JAMES COMER:

Chair recognizes Mr. Burchett from Tennessee.

TIM BURCHETT:

Thank you, Mr. Chairman. Members, thank you all for being here. When I was younger, man, the country wasn't going too well and one night it really culminated in something. And I remember my daddy praying, said Lord--at the blessing. He just said, Lord, please don't let us lose our country. That's the prayer I'll be making tonight after hearing this testimony because this just really, it sickens me and Mr. Ziegler, I know you're a man of faith.

Mr. Shapley, I guess after tonight maybe you are, or you aren't, I'm not sure where it will drive you, but I will be remembering y'all in my prayers. And I appreciate you all's incredible courage. It takes a lot of guts to get up here and put your families and your spouses through all this garbage and it's not right.

And thank you all, sincerely.

JOSEPH ZIEGLER:

I appreciate that.

TIM BURCHETT:

Yes, sir. Mr. Ziegler. It's also come to my attention that today, after this hearing was already underway, apparently Oppo Research is circulating from, quote, Hunter Biden's legal team, unquote, suggestions that you had leaked SARS and other investigative information to someone who had released that information online.

Is there a statement that you'd like to make about whether you have leaked any investigative information to someone to reveal on the internet? And I'm sure Hunter Biden's legal team who is obviously watching right now and these dirtbags are trying to smear you through the press, and it's disgusting and I'd appreciate hearing a direct answer from you, brother.

JOSEPH ZIEGLER:

So there's two parts to this. There was that release of that bank report. My name was listed in there, so my name was out in the public as one of the IRS agents working this case and that was maybe two or three years ago, so that came out. And then on top of that, me and my husband were in a report that's out on social media on Twitter by a person with the same

last name that I have, who I've never met, I've never turned over information to, we just
happen to have the same last name.

OK?

TIM BURCHETT:
Right.

JOSEPH ZIEGLER:
I was, for my sexuality, my sexual orientation, my husband was put out there, like,
information related to me. So it was in an effort to discredit me that I'm this person working
for the liberal side, and I must be a plant. And it was awful the things that they were saying
about me, but I can tell you that I've never turned over any information regarding this case to
anyone related to that Marco Polo report or someone with the same last name that I have.

TIM BURCHETT:
Thank you and I appreciate that and I'm sorry you--

JOSEPH ZIEGLER:
Thank you so much, sir.

TIM BURCHETT:
--you and your husband had to go through all that misery. Mr. Ziegler, also, how much do you
think Hunter Biden's Business Associates receive from the Burisma Board?

JOSEPH ZIEGLER:
I'm going to need to refer to my transcript, so if you give me two--

TIM BURCHETT:
How about this? How about if I just help you out, $666,667. Does that sound about right?

JOSEPH ZIEGLER:
So is that a monthly transfer?

TIM BURCHETT:
I'm not sure. Well, if it's a monthly transfer, I'm in the wrong line of work.

JOSEPH ZIEGLER:
So Burisma paid everyone involved $6.5 million.

TIM BURCHETT:
OK. OK. And when did Hunter leave the Burisma Board?

JOSEPH ZIEGLER:

Can you hold on one second?

TIM BURCHETT:

Sure.

JOSEPH ZIEGLER:

It's not in the confines of my transcript, so that would be something I'd have to turn over to the House Ways and Means.

TIM BURCHETT:

OK. I'd like to get that. Was the money you think received from Burisma sent directly to Hunter Biden in 2014 and '15?

JOSEPH ZIEGLER:

It was not. It was sent to an entity called Rosemont Seneca Bohai.

TIM BURCHETT:

OK. Why would they do that? Why would they send it to his business partner, Devon Archer, and all that?

JOSEPH ZIEGLER:

So I can talk about my normal experience, what I--hold on one second.

TIM BURCHETT:

Can you give me a couple of seconds?

JOSEPH ZIEGLER:

So I can provide this in an additional testimony to the House Ways and Means Committee to explain that.

TIM BURCHETT:

OK. I'd like to get that. Mr. Ziegler, also, Rosemont Seneca Bohai, they didn't do anything. They didn't produce anything. Skinny Atlas, they didn't obviously do anything. Owasco did not do anything. Hudson West Three didn't do anything, but are all these Hunter Biden affiliated companies, to your recollection?

JOSEPH ZIEGLER:

I believe I referenced in my testimony that I knew of those, but I didn't reference how I knew of them.

TIM BURCHETT:

OK. Well, I guess, and I should have directed that at Mr. Shapley, I believe, but my point is you're familiar with these companies, but have you been able to identify what the Bidens did here in the business of selling or what they did with these companies? Either one of y'all, Mr.

Shapley?

JOSEPH ZIEGLER:
Again, I'm going to have to--the response to that, the reason why some of these payments were received, we can turn over as a part of an additional testimony to the House Ways and Means.

TIM BURCHETT:
Well, I guess my point is they didn't sell tough steaks or crappy ties. They sold influence, in my opinion. And I'm out of time. Mr. Chairman, I apologize. I would like to close and say a buddy of mine, Rob Delozier, texted me during all this and said, I hope you all get to the bottom of this, and I hope you all do something about it. So that would be my wish for this committee.

Thank you, guys, so much. God bless you.

JAMES COMER:
That's the goal. Thank you. Chair now recognizes Mr. Fry for five minutes.

RUSSELL FRY:
Thank you, Mr. Chairman. Mr. Ziegler and Mr. Shapley, were you able to pursue this investigation in areas that may implicate the president's involvement in his family's businesses?

GARY SHAPLEY:
We were hindered from following that line of investigative steps.

RUSSELL FRY:
Would you echo that, Mr. Ziegler.

JOSEPH ZIEGLER:
Yeah, specifically in my testimony, I referenced the campaign.

RUSSELL FRY:
In 2020, President Biden, Candidate Biden at the time said during a debate, and I'm going to quote, my son has not made any money in terms of this thing about, what are you talking about, China? I have not had--the only guy who made money from China is this guy, Donald Trump. He's the only one. Nobody else has made any money from China.

Mr. Ziegler was the president telling the truth when he said that his son, Hunter Biden, had not made any money from China?

JOSEPH ZIEGLER:
So I don't know what the president at the time was thinking, but what I can tell you based on what I testified in my transcript, that he did earn money from China.

RUSSELL FRY:

Right. And in March of 2023, just a couple of months ago, the committee showed through bank records that Hunter Biden, the president's son, James Biden, Hally Biden, all received money originating from China funneled through Robinson Walker LLC, a company owned by Rob Walker, who's a well-known Biden associate.

When presented with this evidence by a reporter, the president said, that's not true. Mr. Ziegler, is it true that the President's family received money originating from China, which was funneled through the Robinson Walker account?

JOSEPH ZIEGLER:

That is correct.

RUSSELL FRY:

As it pertains to the Hunter Biden investigation, Mr. Shapley, you sat on a meeting on October 7th, 2022, with Mr. Weiss. You've testified to that. Is that correct?

GARY SHAPLEY:

Yes, that's correct.

RUSSELL FRY:

And later this year on June 7th, Mr. Wiess publicly stated in a letter to the Judiciary Committee, the following, quote, as the Attorney general has stated, I have been granted ultimate authority over this matter including responsibility for deciding where, when and whether to file charges, end quote. That statement is dramatically inconsistent with your recollection of a meeting that happened in October of 2022. Is that correct?

GARY SHAPLEY:

Yes, corroborated documentation of that meeting clearly shows that that's not accurate.

RUSSELL FRY:

How was that not accurate, from your recollection of that meeting?

GARY SHAPLEY:

Because during that meeting, United States Attorney Weiss said that he wasn't deciding person, said it right out, and he further went in, the Department of Justice Tax Division had to approve any charges first to which as of March 16th, 2023, we know that they had not approved anything yet. He further goes and says that the DC US attorney had declined to allow charges would be brought there and that he requested a special counsel authority around that time and was denied and was told to follow the process.

That process would lead him to another President Biden appointed US attorney in the Central District of California and he told us at that meeting on October 7th, 2022, that if California declined it, that he would have to request a special authority again.

RUSSELL FRY:

Right. So during that meeting and subsequent letters that Mr. Weiss produced to both Senator Graham and to the Judiciary Committee, he seems to corroborate that meeting of some of the facts from that meeting that maybe he didn't have that authority, right?

GARY SHAPLEY:

So yes. The second letter on June 30th clearly shows that he's saying that he has full authority, has ultimate authority. He immediately goes in and says, but my authority is geographically limited. I don't understand how you can conclude any way from that statement in the June 30th letter that he has full authority.

It's just simply not accurate.

RUSSELL FRY:

Correct and that was something that you saw early on, or you all saw as a potential problem. Mr. Ziegler, if the US US Attorney Weiss could not gain special counsel authority, what options remained in bringing charges against Hunter Biden in California or in the District of Columbia?

JOSEPH ZIEGLER:

So I guess it would have been the special attorney authority that I've seen recently referenced, but I mean, essentially when DC said no and we know that DC said no, we were having conversations with our FBI counterparts of, how do we bring in a special counsel into this situation? I think that once we knew that there was going to be potential problems with going to President Biden appointees with moving this case forward, we were actively trying to figure out, how as agents do we get that to happen?

And still to this day, there is not a special counsel assigned to this investigation.

RUSSELL FRY:

Right. So the approach was, and I got to go quickly here, but the approach was to go to DC with Matthew Graves, where he was not able to bring charges under a Biden appointee. He went to the Central District of California, and Mr. Estrada was not able to bring charges. So to both of you in conclusion, in relation to the US attorney's inability to obtain that special counsel authority and bring these cases in either California or DC, do you agree with Attorney General Garland's testimony that, quote, the United States Attorney Weiss has been advised that he has full authority to bring cases in other districts if he needs to do that?

GARY SHAPLEY:

I don't believe that's accurate.

JOSEPH ZIEGLER:

And I think the key word there is he has, and I don't think that that's accurate, and I think that that's refuted in the later letter by US attorney David Weiss.

RUSSELL FRY:

Thank you both. In conclusion, thank you both for being here for your bravery and testifying

today. I know it's not been easy on you or your family, but the American people and this committee appreciate the work that you do, that you continue to do, and the truth that you're shedding light on. With that, Mr. Chairman, I yield back.


JAMES COMER:

Yield back. Chair recognizes Mr. Edwards from North Carolina for five minutes.


CHUCK EDWARDS:

Thank you, Mr. Chair. Mr. Ziegler, did you ever ask for access to Hunter Biden's laptop in your investigation?


JOSEPH ZIEGLER:

I do recall asking for access, yes.


CHUCK EDWARDS:

And were you granted that access?


JOSEPH ZIEGLER:

I don't believe that that's in the confines of my transcript. So I do know--so when we're talking about--


CHUCK EDWARDS:

Did you look at the laptop?


GARY SHAPLEY:

So I can jump in there because I documented a meeting where we had this discussion, and it was included in my House Ways and Means Committee Transcript and Special Agent Ziegler asked multiple times, that he had certain pieces of certain downloads from the devices, but he did not have access to all of them.

And that's when Lesley Wolf said that, well, that's because prosecutors decided not to give it to you all.


CHUCK EDWARDS:

So you effectively were denied access. Mr. Shapley, in your interview with the Ways and Means Committee, you stated the following regarding efforts to obtain a search warrant for, at the time, former Vice President Biden's guest house. We talked about the storage unit earlier. Let's talk about the guest house now, where Hunter Biden had been staying.

And Assistant US Attorney Lesley Wolf's assessment of the situation regarding the likelihood of such a warrant being approved. There was more than enough probable cause for the physical search warrant there, but the question was whether the juice was worth the squeeze, and I find this in quotes. She continued that optics were a driving factor in the decision on whether to execute a search warrant.

She said a lot of evidence in our investigation would be found in the guest house of former Vice President Biden, but said that there's no way that we'll get it approved. I open this

question to both of you. In the course of your distinguished careers at the IRS, has a DOJ official ever attempted to argue against the execution of a search warrant while acknowledging that such a warrant being carried out would likely yield positive evidentiary results for the investigation?

Mr. Shapley?


GARY SHAPLEY:
So my response would be that argument wouldn't be required. It would be a discussion with the investigators working with the prosecutors. And if you weren't on the same page, then you just simply would move on. And with the circumstances of probable cause being achieved and knowing evidence was there, I don't know how she could have not allowed us to execute that search warrant.


JOSEPH ZIEGLER:
And I mean, it goes further and even to the storage unit, when you talk about access to something and you're relying now on them to turn the records over to you, versus you having access to those records, they're not being potentially destroyed. I mean, there's a multitude of reasons why you'd want to execute a search warrant.


CHUCK EDWARDS:
Mr. Chair, I'd just like to share some some thoughts. This hearing is much like arguing with my wife. We start out on a topic and then we go in all kinds of different directions, and it seems like that is what I'm hearing, at least from the other side, today. And I've heard over and over that President Biden has not been implicated or proven for any wrongdoing here.

And I acknowledge that for now, but I know that it is the intent of this oversight committee to continue to look at the evidence that we have here. The issue at hand, however, is that it is Joe Biden's son that is the target of this and seems to have had preferential treatment on a number of levels. The investigators were denied access to the laptop.

The Biden family was tipped off with the warrant on the storage unit and the investigators were denied access to the guest house, even knowing that or suspecting that there was evidence in that, and that is what concerns the American people. That's the real two-tiered justice system that we see here. It's not that Joe Biden has been proven to do anything wrong yet.

It's that Joe Biden's son has received preferential treatment through the Department of Justice. I think that's a shame and I appreciate these gentlemen being here to share their brave story with the American people. I yield back.


JAMES COMER:
Gentleman yields back. Chair recognizes Mr. Langworthy from North Carolina or from New York, Buffalo, New York. I've been to his place, Buffalo, New York.


NICK LANGWORTHY:
New York. Thank you, Mr. Chairman, and thank you to these two very brave whistleblowers for what's been a very grueling hearing today. And I just am very grateful for openly testifying in front of everyone. And this must be challenging despite your providing accurate and

credible testimony, but that goes directly to my point.

I think it's important to sum up a few things, so I just want to ask you a series of questions to you, Mr. Shapley and Mr. Ziegler. It is true that you provided testimony to the House Ways and Means Committee, correct?

GARY SHAPELY:

Yes.

JOSEPH ZIEGLER:

Yes, correct.

NICK LANGWORTHY:

And how long did each of your interviews last?

GARY SHAPLEY:

Say, around seven hours.

JOSEPH ZIEGLER:

Yeah, a little bit more than six, seven hours.

GARY SHAPLEY:

Six or seven hours.

NICK LANGWORTHY:

OK. And when did those interviews occur?

GARY SHAPLEY:

Mine was a late May of 2023.

JOSEPH ZIEGLER:

June 1st.

NICK LANGWORTHY:

Of this year?

JOSEPH ZIEGLER:

Yeah.

NICK LANGWORTHY:

Were Democratic staff present during your interviews, and did they question you?

GARY SHAPLEY:

Yes, they did.

JOSEPH ZIEGLER:
Democratic staff was present and actually, the Chairman Smith was present at my testimony.

NICK LANGWORTHY:
OK. Did you give your testimony knowing that you could be criminally prosecuted if you lied to Congress?

GARY SHAPLEY:
Yes, I did.

JOSEPH ZIEGLER:
Yes, I did.

NICK LANGWORTHY:
Now, how long has your testimony been public for the American people to read?

JOSEPH ZIEGLER:
For the last three plus weeks probably.

GARY SHAPLEY:
Yeah. Yeah, around, yeah, three weeks, four weeks.

NICK LANGWORTHY:
OK. And you've been questioned by both Republican and Democratic members today, correct?

GARY SHAPLEY:
That's correct.

JOSEPH ZIEGLER:
That is correct.

NICK LANGWORTHY:
OK. Now, given all that you have just told us, you gave over 15 combined hours of testimony to the Ways and Means, hours of public testimony today, and these facts have been public now for weeks and yet, not one single person has been able to contradict a single fact about your testimony. That's incredible because it's that impressive and it speaks to your credibility, your attention to detail as investigators and now as whistleblowers.

The attacks you hear today aren't actually because of your testimony, they're Democratic talking points meant to protect the Bidens, just like the DOJ and the IRS. Your testimony speaks for itself. It is powerful and I am so glad you were willing to voluntarily come in today

and that's why, Mr. Chairman, I am so pleased that you held this hearing today and show yet another example of why this committee must continue this investigation into these matters, and I'm proud to yield back.

JAMES COMER:
Gentleman yields back--

JOSEPH ZIEGLER:
Can I say something real quick regarding what he just--

JAMES COMER:
Yes.

JOSEPH ZIEGLER:
So one of the topics that was brought up over here regarding the 99 page memo, that there was discretion given in there. From what I understand discretion, there is also language that I have seen included in DOJ tax memos that references the need to charge the felony--you have to charge the felony, essentially.

So I would ask Congress when Mr. Weiss comes to testify here, at that point in time, what did that memo say? In August when he got it from his team, what did that memo say? Did it approve felony and misdemeanor charges? And then what happened to that after? That, I think, is crucial for you guys to understand.

NICK LANGWORTHY:
Thank you. Just got a little time. Mr. Shapely, do you have anything else that you'd like to add?

GARY SHAPELY:
Yeah, just to add on to that, the Department of Justice Tax division has a policy called a Major Account Policy and that basically mirrors what Special Agent Ziegler is saying. They actually teach it when they come out to speak to agents and provide training to agents. And that Major Account Policy is that they have to charge a felony.

They can't just plead away the felony just to get out of a potential trial. They can't just rely on charging a misdemeanor or giving someone a misdemeanor when there's a felony charges on the table. And as we've said all along, we've shown all along that these prosecutors agreed with multiple felonies and none of them were charged.
JOSEPH ZIEGLER:
And I have one more thing to add to that. We were always, and I go back to last spring. David Weiss is going to do the right thing. He is absolutely going to do the right thing. Let's hold off. We're moving forward. We get to August, and we get approval or recommended approval for the felony and misdemeanor charges.

So how do we end up where we're at today? I just don't know.

JAMES COMER:

Gentleman, do you yield your last 30 seconds?

NICK LANGWORTHY:
I would be glad to.

JAMES COMER:
And we were told the same thing about Mr. Weiss as well. So we share your disappointment. Mr. Ziegler, you said there were foreign documents related to this matter, related to the investigation?

JOSEPH ZIEGLER:
Yes.

JAMES COMER:
Would you provide those documents to the committee?

JOSEPH ZIEGLER:
Yeah. I can provide those documents to the Ways and Means Committee.

JAMES COMER:
Thank you.

JOSEPH ZIEGLER:
Just like a normal process for obtaining foreign documents, correspondent bank requests, so you can actually request those corresponding wires and that's a step that you can take in getting foreign money transfers.

JAMES COMER:
Would you also provide the full Rob Walker transcript?

JOSEPH ZIEGLER:
So I will consult with my attorney, and we will turn that over to the House Ways and Means Committee.

JAMES COMER:
Thank you. Thank you. Chair now recognizes Mr. Burleson from Missouri.

ERIC BURLISON:
Thank you, Mr. Chair. Good news, I'm the last one.

JAMES COMER:
Next to last.

ERIC BURLISON:
Next to last. Oh. So I want to reiterate, thank you for your bravery. Thank you for what you're doing. I think the American people should be pissed. They should be very angry about this. No one gets away with not paying hundreds of thousands of dollars in taxes and having just blown over or being turned into a misdemeanor charge, especially when you have other criminal activity involved.

And you know what's funny, this hearing, no one denied the facts that he's guilty of this stuff, right? We all know he's guilty. The question is, I think the question at hand is, to what extent was his father aware? In a way it's kind of like Schrodinger's cat, either he was aware of what's going on and he knew what his son was doing, and he was involved or he wasn't, or maybe maybe he was completely clueless, absent-minded, whatever, unaware of what his family was doing.

But one or the other is the truth. You can't come to any other conclusion other than that. And the question is, the problem is, you were not able to determine or lift that box, the Schrodinger's cat box and determine is the cat dead or not, was Joe Biden truly involved or not. So Mr. Shapley, or Mr. Ziegler, throughout the investigation, what investigative steps that would have involved Joe Biden would you have liked to have pursued but were unable to?

JOSEPH ZIEGLER:
So I guess in my testimony, I talked about the atmosphere when we're interviewing witnesses and talking about specific areas or specific, being the campaign, that we were prevented. There was rolling eyes at us. I mean, it was a very harsh environment to be in.

ERIC BURLISON:
And you were directly turned down as well?

JOSEPH ZIEGLER:
So there were situations to where I was not able to ask certain questions, yes.

ERIC BURLISON:
So you weren't able to lift the box and find out what's underneath?

JOSEPH ZIEGLER:
There were certain--in our investigation, you want to follow the facts. That's a part of our job as you follow the evidence, and you work the case.

ERIC BURLISON:
So I know that it was tipped off about the storage unit before you were able to actually search it. Can you say what you were looking for, what evidence? Because you've built up to this point and then now you know, there's strong indication that there's something there.

JOSEPH ZIEGLER:
So I believe in Gary's testimony, there was that he moved his prior office, so he being Hunter, moved his prior office into that storage unit.

ERIC BURLISON:

And so this was off computers, files?


JOSEPH ZIEGLER:

Yeah, I don't know what specifically would have been in there.


ERIC BURLISON:

OK. Besides any tax crimes or violations, what other violations were being investigated by any other agencies?


JOSEPH ZIEGLER:

So those aren't in the confines of our testimony, what other charges are being invested--any offshoots.


ERIC BURLISON:

Were there other agencies that were working with you that were working on other?


JOSEPH ZIEGLER:

Yeah, there was. FBI was working in this case with us.


ERIC BURLISON:

OK. But you can't speak to whether that was a foreign agent registration act or?


JOSEPH ZIEGLER:

I cannot speak to that.


ERIC BURLISON:

OK. My other--


JOSEPH ZIEGLER:

What I can tell you is not only do we investigate tax crimes, but we also investigate money laundering. So any instances of money laundering, us as IRS agents, we are allowed to investigate those crimes.


ERIC BURLISON:

OK.


GARY SHAPLEY:

So Mr. Congressman, if I could add. So in my transcript, I do say that there's a FARA issue at play during the investigation.


ERIC BURLISON:

OK. So there was a FARA issue, a Foreign Agent Registration Act issue has that been

pursued?

JOSEPH ZIEGLER:

We are not a part of the investigation anymore. And I mean, that's our whole point of a special counsel. If there's these offshoot investigations, we're going to just rely on the same thing to happen.

ERIC BURLISON:

In your investigations, you knew that there was foreign bank accounts or foreign money wires. Are you aware if the Biden family has or they own foreign bank accounts, and do you have the ability to get access to those?

JOSEPH ZIEGLER:

So any records that I would have related to that, I can turn over to the House Ways and Means Committee and then they could vote to release that.

ERIC BURLISON:

Thank you. Thank you. I yield back the remainder of my time.

JAMES COMER:

Were you all ever given access to the form 1023 that alleged Joe Biden and Hunter Biden were a part of a bribery scheme with Ukraine? The reason I ask that is because that allegation is consistent--the way that the oligarch claimed he gave the Bidens the bribe is consistent with what we've seen in Romania and other countries where they set up all these shell companies and then they launder the money through the shell companies back down to different Biden family members.

So I wondered if you knew about that form before it became public?

GARY SHAPLEY:

So I can speak to that. So on my original transcript, I wouldn't have been able to say that I knew anything about 1023, but I provided a supplement after I saw open source information from the former Attorney General Bill Barr, that said that he saw this document and they sent it to Delaware for further investigation and that the team, as far to the best of my knowledge, never saw that document.

JAMES COMER:

So the team that was in charge of investigating the Biden family for tax crimes never received the FBI document that alleged Joe Biden was involved in a bribery scheme?

GARY SHAPLEY:

For the IRS investigators on the case, the answer is no.

JAMES COMER:

Is that odd? I mean, everybody knew you were investigating the Bidens for at least tax

evasion. 

GARY SHAPLEY:
Generally speaking, if there was any types of money coming in and there's a criminal tax investigation ongoing, I don't see how that information could be withheld from the investigators.

JOSEPH ZIEGLER:
And I can tell you and I can provide this in my testimony, but there is things that are contained on that document that could further corroborate other information that we might be having an issue corroborating because it could be regarding a foreign official. So if we have information regarding that in a document or a witness, we can further corroborate later evidence.

And like I said, if that's something that we have, we can turn that over to the House Ways and Means Committee.

JAMES COMER:
Thank you. Thank you. Chair recognizes Ms. Luna from Florida.

ANNA PAULINA LUNA:
Mr. Shapley, did the FBI first learn of the Delaware computer shop processing a laptop that allegedly belonged to Hunter Biden and contained evidence of potential crimes in October of 2019?

GARY SHAPLEY:
Did the FBI first learn of it?

ANNA PAULINA LUNA:
Yes.

GARY SHAPLEY:
I don't know if I speak about who first learned of it.

ANNA PAULINA LUNA:
OK. The answer would be yes but thank you. And isn't it true that the FBI verified the laptop's authenticity in November of 2019 by matching the device number against Hunter Biden's iCloud account?

GARY SHAPLEY:
Yeah, I believe that's in my transcript and that's accurate.

ANNA PAULINA LUNA:
Correct. Transcript 12. The FBI analyzed the computer, correct? There was a report that the FBI [Inaudible] team analysis had taken place?

GARY SHAPLEY:

Can you point to just a page in my transcript, so that I--


ANNA PAULINA LUNA:

Page 12.


GARY SHAPLEY:

OK. Page 12.


ANNA PAULINA LUNA:

Or transcript 12.


GARY SHAPLEY:

So could you repeat the question, please?


ANNA PAULINA LUNA:

Just isn't it true that the FBI verified the laptop's authenticity in November of 2019 by matching the device number against Hunter Biden's iCloud account?


GARY SHAPLEY:

Yes, that's correct.


ANNA PAULINA LUNA:

OK. And they performed an FBI [Inaudible] team analysis?


GARY SHAPLEY:

Yes. Yes.


ANNA PAULINA LUNA:

Mr. Ziegler, did you see this report?


JOSEPH ZIEGLER:

I don't think that I talked about that in my transcript.


ANNA PAULINA LUNA:

Correct. I'm assuming that that was probably very frustrating being that you were conducting an investigation?


GARY SHAPLEY:

So I can speak to this, again, because I did contemporaneously document a long meeting about the laptop and Special Agent Ziegler confirmed in that and it was released in House Ways and Means Committee testimony, that he pointed out individual pieces of data that he was provided and then he asked why he hadn't seen other pieces of data, and that's when

Assistant United States Attorney Wolf told them that prosecutors were withholding information from the investigators.

JOSEPH ZIEGLER:

And I think what's important with withholding, they never said what they were withholding, so I think that is important.

ANNA PAULINA LUNA:

So to my understanding, the US attorney said that you haven't seen it because for a variety of reasons they kept it from the agents? So they kept this information from you, I think it's important to know, correct?

GARY SHAPLEY:

That's correct.

ANNA PAULINA LUNA:

OK. Isn't it relevant evidence for you and your team to review, Mr. Ziegler, that this type of evidence would help you to conduct your investigation?

JOSEPH ZIEGLER:

So in everyday normal investigation, you would want to know--you're the investigators. We're the ones that are supposed to process the information and provide the relevant information to the prosecutors. So we should know absolutely everything that we're looking at because we might testify to it one day.

ANNA PAULINA LUNA:

So it's safe to say that it's not a normal practice to withhold evidence from agents reviewing a case.

JOSEPH ZIEGLER:

It's not a normal practice to withhold and not tell us what you're withholding from us.

ANNA PAULINA LUNA:

Do you know who made that decision to withhold information from the agents?

JOSEPH ZIEGLER:

That, I do not know and it's not in my transcript.

ANNA PAULINA LUNA:

OK. Mr. Shapley and your team are learning about the existence of this information, and you are being denied information at the same time, this is October 2020, correct, time frame?

GARY SHAPLEY:

Yes.

ANNA PAULINA LUNA:

At that same time, did you remember Hunter Biden's laptop being discussed or rather suppressed by the media?


GARY SHAPLEY:

I generally remember the discussion of the laptop. I think everybody heard about the laptop. I don't know if I knew about the media suppressing it.


ANNA PAULINA LUNA:

So I think it's important to note that the FBI learns about the laptop in 2019. That's 2019, not 2020. And in fact, the FBI authenticated the laptop in November of 2019, then takes possession of the laptop, does analysis, but these analyzes, and information are not provided to you guys, the IRS agents conducting the case.

Mind you, the folks running the nuts and bolts of the criminal tax fraud case. They're learning about all this information and yet at the same time being denied access to it. Meanwhile, the media is actively working to suppress that. And at the same time, 51 national security officials sign on to a letter saying that, of which the FBI has authenticated, saying that it is Russian disinformation.

This is mind you, Joe Biden's son, which I think it's important to note that many of my colleagues try to make this about race and saying that there's a two-tiered justice system for Black and Brown people. And yet, we are investigating according to their terms a man of White privilege who is being aided and abetted by this administration and being criminally covered for by the Department of Justice.

And yet, somehow that's not supposed to be a topic of discussion. I have 41 seconds left. Would you guys like to say anything for the record so the American people can know what's really happening in this country?


JOSEPH ZIEGLER:

So I do have something, so there's two things. I believe that AUSA Lesley Wolf and US attorney David Weiss would say phenomenal things about my work, and I know they have said that. They have said that we did a great job in this investigation. I want to make that clear to everyone, that we're not disgruntled.

We're not out here to get people. We're here for accountability and that we learn from this. That's the most important part of why we're here.


ANNA PAULINA LUNA:

Well, you are doing great, and I know that you are not conservative. I know you're not a Republican, but I will say this, thank you for at least bringing faith back to some part of the IRS so that people understand that just because your last name is Biden does not mean that you're held above the law, so thank you.

Chairman, I yield my time.


JAMES COMER:

The gentlelady yields back and that concludes our questions. Again, I want to thank you all for being here. I'm going to yield to the much improved ranking member, Ms. Ocasio-Cortez from New York, for closing statement.

ALEXANDRIA OCASIO-CORTEZ:
I'll take the Gold Star. Thank you, Chairman, and I'd like to thank our witnesses here today. Once again, we acknowledge fully that this is not easy and that your respect, rather your service and your public service here is respected and acknowledged and valued, so thank you. Thank you for your testimony.

I think it is important for us to summarize much of what we heard and saw today and overall, what this matter is about. A US attorney handpicked by Attorney General Barr has for four years investigated together with a dozen agents and at least four prosecutors from his office and the tax division of the Department of Justice, the son of President Biden.

Hunter Biden has been charged with a felony and two misdemeanors and he is pleading guilty to several crimes and submitting to sentencing by an appointed judge, a Trump appointed judge. However, we are also seeing today is an effort to find some issue with this prosecution, this existing prosecution. This is a person who has admitted to crimes, and finding evidence of political interference, a very serious charge.

So much of what we saw today honed in on a conversation, the testimony honed in on a conversation that one of today's witnesses was involved in, in which Mr. Sharply heard Mr. Weiss to say that he was denied special counsel status. That account had been contradicted by the US attorney Weiss who has reiterated several times that he had full authority to bring any charges in any district and had received assurances from the Department of Justice that if he needed special attorney status, not counsel, but rather attorney status to bring those charges, it would be granted.

So we are left here with two possible options for this story, that either Mr. Weiss who was appointed by President Donald J. Trump and trusted by Attorney General Barr, also serving under Trump, was lying to protect the Biden administration or he respectfully disagreed with the charges that today's two witnesses wanted to bring as professionals, in their professional opinion.

Disagreement over charges is not uncommon. The IRS criminal tax counsel attorneys have disagreed in charging decisions, as we heard here today, 90 percent of the time. And in this particular case, reviewing attorneys at IRS and the tax division raised issues with the proposed charges and the witnesses described how Mr. Weiss expressed some concerns about the charges.

In fact, in some of the testimony, we saw Mr. Shapley recognized with regard to at least one of the charges which he himself recommended he could, and I am quoting from testimony, quote, see some issues with that that would preclude it from being charged. Now, I understand why the two witnesses who testified here today are disappointed after five years of investigation.

I believe you all are honorable serving professionals, truly, and that Mr. Weiss disagreed with this analysis of facts. There was absolutely frustration to not, quote, have a seat at the table, that Mr. Weiss made his decision about how to charge in this case, and he did charge. And that was a decision that he as the US attorney in charge of the case was empowered to make.

The question though, I believe that is very important to address, is why we are holding these hearings today despite what we have seen as deliberate lobbying for this hearing by a political candidate, Donald J. Trump. What we also saw today was the revival of certain conspiracy theories around Ukraine first promoted by Rudy Giuliani during Trump's first impeachment in 2019 and his reelection campaign.

We did not bring that up. That was first brought up by the Republican side that required addressing here today. Chairman Comber started this hearing by asking these witnesses about Burisma and other members of the committee again raised the specter of these debunked conspiracy theories. It has been debunked time and time again, including by Trump's own Department of Justice.

But that being said, this is the problem with bringing these conspiracy theories into this committee. They beget more. It does not stop. And today, we have gotten a new conspiracy theory, one that requires us to believe that David Weiss, a Trump appointed US attorney trusted by Trump appointed attorney General Barr has somehow been complicit in abetting and concealing a deep state conspiracy to protect Hunter Biden on behalf of the Biden administration when they were selected by Donald Trump.

This is a theory which has apparently been proven unsuccessful given that Hunter Biden is now criminally charged and facing sentencing by a Trump appointed judge. Today also marked a new low when pornographic images were paraded in this hearing room. Chairman Comber, last October, you told Time Magazine that you were not interested in the sordid details of Hunter Biden's life.

You were quoted as saying, quote, that's counter to a credible investigation and I agree. Sadly, that is a reflection of how low some individuals here have been willing to go in their efforts to attack the president and his family. And frankly, I don't care who you are in this country, no one deserves that.

It is abuse. It is abusive. If Republicans truly want to get to the facts here and they want to understand why Mr. Weiss decided to charge Hunter Biden the way he did, let's hear from Mr. Weiss. But until then, we must move on from these theories and focus on the issues that matter to the American people, like ending the scourge of gun violence that is plaguing our country, confronting and combating the climate crisis and standing up for our constitutional rights and yes, going after the enormous amount of inequity and injustice in our tax system.

And with that, I yield back to the chair.


JAMES COMER:
Gentlelady yields back. Before I close, I want to ask for unanimous consent to enter into the record three letters from myself, Judiciary Chair Jordan and Ways and Means Chair Smith to the director of Secret Service, director of the IRS and the Attorney General, requesting more information pertaining to our investigation.

Without objection, so ordered. As well as entering into the record, the two bank memorandums that we've already submitted to our friends in the media that we're trying to teach financial literacy to. I'd like to enter those two memorandums into the record. Again, I want to thank you all so much for what you've done today.

I can't imagine what you've been through. I apologize for what you have been through. This is what this committee is all about. The mission for the House Oversight Committee is to

identify and root out waste fraud, abuse and mismanagement in the federal government. To do that, we depend on whistleblowers, whistleblowers coming forward and telling their story, and that's what you all have done.

And to think that there are people on the committee who have tried to question your credibility, it's a pretty low mark for the history of the House Oversight Committee. So again, thank you. And what we've learned today, let's just go back six months when this investigation started when we became the majority.

The laptop according to many of my colleagues on the other side of the aisle and many of our friends in the media, was Russian disinformation. And what we now know is the laptop contains many of the financial records, the financial documents, the communications between both the president, as well as other members of his family with many of these associates, with many of these foreign nationals.

So there's a clear path of evidence. I say that investigating the Biden family influence peddling is like investigating a bleeding bear through a snowstorm. There's so much evidence laying around. We've confirmed today what we've been saying in this committee for several months, that the Bidens took in over $10 million, $17.3 million to be exact, from adversaries.

We have no earthly idea what they did to receive that money. I think that's concerning to every American. We have evidence that Hunter Biden spoke to his father about his businesses and that Hunter used his father's name to shake down the Chinese Communist Party backed person. We saw that in the WhatsApp message that you all released.

We've seen that in other emails and correspondence from the laptop. We learned, unfortunately, that these brave and credible whistleblowers have been retaliated against at the IRS and intimidated by the Biden's shady legal team and their lapdogs in the press. And for that, I apologize, and I hope that that does not deter other brave and credible whistleblowers from coming forward.

You know, all roads lead to Joe Biden, the big guy, the guy who was set to go in business with the Chinese Communist Party linked entity that wired money to the Biden family, as well as to Gal Luft who was mentioned earlier by one of my colleagues on the other side of the aisle. Joe Biden was even set to share office space, according to an email, with this Chinese Communist Party backed entity, and that's a concern.

That should be a concern to every American because whether you're a Republican or Democrat, whether you're rural or urban, one thing that we can agree on is that Americans detest public corruption. That's why we have an IRS. That's why we have an Irish criminal division. That's why we have an oversight committee.

That's why we have an ethics committee. That's why we're supposed to have a judicial system in America that provides equal justice for all, but we have to work together, and we have to be honest, and we have to respect our checks and balances. And what we learned today as troubling as anything is that your investigation that you spent years of your life on, that we've spent six months investigating, where you see a pattern of suspicious activity, where money flows from shady foreign companies and from shady foreign nationals through shell companies that are then laundered.

And that's according to six different banks in the suspicious activity reports, laundered down in incremental payments to the Biden family for things that we have no idea what they did to

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 573 of 776 PageID #: 634

receive the money. And as part of that years' long investigation, the FBI is sitting on the whole time a document that alleges Joe Biden and Hunter Biden took a $5 million bribe from a Ukrainian oligarch where there are bank records that show that the Bidens were receiving money from this entity.

There was already evidence there to show that. Now, I don't know whether that allegation is true or not. I know the FBI never investigated and what we know from today, they never communicated with the IRS criminal division that spent years investigating this. So there's two things that's happening here with the oversight committee with respect to the president of the United States.

There's the investigation of the Biden corruption and there's the investigation of the cover up. Again, I want to thank you all for the work that you have done over the years. We appreciate that. The American people appreciate that. The taxpayers appreciate that, and we look forward to receiving the additional information through the Ways and Means Committee through the proper process as we continue our investigation.

With that, and without objection, all members will have five legislative days within which to submit materials and to submit additional written questions for the witnesses, which will be forwarded to the witnesses for their response. If there is no further business, without objection, the committee stands adjourned.

**List of Panel Members**

PANEL MEMBERS:
REP. JAMES COMER (R-KY.), CHAIRMAN

REP. JIM JORDAN (R-OHIO)

REP. MICHAEL TURNER (R-OHIO)

REP. PAUL GOSAR (R-ARIZ.)

REP. VIRGINIA FOXX (R-N.C.)

REP. GLENN GROTHMAN (R-WIS.)

REP. GARY PALMER (R-ALA.)

REP. CLAY HIGGINS (R-LA.)

REP. PETE SESSIONS (R-TEXAS)

REP. ANDY BIGGS (R-ARIZ.)

REP. NANCY MACE (R-S.C.)

REP. JAKE LATURNER (KAN.)

REP. PATRICK FALLON (R-TEXAS)

REP. BYRON DONALDS (R-FLA.)

REP. KELLY ARMSTRONG (R-N.D.)

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 574 of 776 PageID #: 635

REP. SCOTT PERRY (R-PA.)

REP. WILLIAM TIMMONS (R-S.C.)

REP. TIM BURCHETT (R-TENN.)

REP. MARJORIE TAYLOR GREENE (R-GA.)

REP. LISA MCCLAIN (R-MICH.)

REP. LAUREN BOEBERT (R-COLO.)

REP. RUSSELL FRY (R-S.C.)

REP. ANNA PAULINA LUNA (R-FLA.)

REP. CHUCK EDWARDS (R-N.C.)

REP. NICK LANGWORTHY (R-N.Y.)

REP. ERIC BURLISON (R-MO.)

REP. JAMIE RASKIN (D-MD.), RANKING MEMBER

REP. ELEANOR HOLMES NORTON (D-D.C.)

REP. STEPHEN LYNCH (D-MASS.)

REP. GERRY CONNOLLY (D-VA.)

REP. RAJA KRISHNAMOORTHI (D-ILL.)

REP. RO KHANNA (D-CALIF.)

REP. KWEISI MFUME (D-MD.)

REP. ALEXANDRIA OCASIO-CORTEZ (D-N.Y.)

REP. KATIE PORTER (D-CALIF.)

REP. CORI BUSH (D-MO.)

REP. JIMMY GOMEZ (D-CALIF.)

REP. SHONTEL BROWN (D-OHIO)

REP. MELANIE STANSBURY (D-N.M.)

REP. ROBERT GARCIA (D-CALIF.)

REP. MAXWELL FROST (D-FLA.)

REP. SUMMER L. LEE (D-PA.)

REP. GREG CASAR (D-TEXAS)

REP. JASMINE CROCKETT (D-TEXAS)

REP. DAN GOLDMAN (D-N.Y.)

Case 1:23-cr-00061-MN Document 13-3 Filed 07/25/23 Page 575 of 776 PageID #: 636

REP. JARED MOSKOWITZ (D-FLA.)

INTERNAL REVENUE SERVICE SUPERVISORY SPECIAL AGENT GARY SHAPLEY

INTERNAL REVENUE SERVICE CRIMINAL INVESTIGATOR WHISTLEBLOWER X

---

Source: **CQ Transcripts**

# EXHIBIT 8

The New York Times https://www.nytimes.com/2023/06/27/us/politics/irs-official-justice-dept-hunter-biden.html

# *Competing Accounts of Justice Dept.'s Handling of Hunter Biden Case*

An I.R.S. investigator's testimony describing strains over the inquiry into President Biden's son is at odds with the version laid out by Attorney General Merrick Garland.

**By Glenn Thrush and Michael S. Schmidt**

June 27, 2023

At a Senate hearing in March, Senator Charles E. Grassley, Republican of Iowa, spent seven minutes grilling Attorney General Merrick B. Garland about the Hunter Biden investigation, reading a series of unusually specific queries from a paper in his hands.

Did David C. Weiss, the Trump-appointed U.S. attorney in Delaware kept on under Mr. Garland to continue overseeing the inquiry, have full authority to bring charges against President Biden's son in California and Washington if he wanted to? Had Mr. Weiss ever asked to be made a special counsel? Was the investigation truly insulated from political considerations?

That encounter has taken on new significance after House Republicans released testimony last week from a senior Internal Revenue Service investigator on the case that appeared to contradict Mr. Garland's assurances to Mr. Grassley and others that Mr. Weiss had all the freedom and authority he needed to pursue the case as he saw fit.

The I.R.S. official, Gary Shapley, oversaw the agency's role in the investigation of Mr. Biden's taxes and says his criticism of the Justice Department led to him being denied a promotion. He told the House Ways and Means Committee that Mr. Weiss had been rebuffed by top federal prosecutors in Los Angeles and Washington when he had raised the prospect of pursuing charges against the president's son in those jurisdictions.

Mr. Shapley, testifying under what Republicans say are whistle-blower protections, also said that he had witnessed Mr. Weiss saying last year that he would not be the "deciding official" regarding whether to prosecute Mr. Biden, and that Mr. Weiss had been turned down when he sought special counsel status, which would have allowed him greater flexibility in handling the case.

In providing accounts of internal discussions at odds with Mr. Garland's testimony, Mr. Shapley gave Republicans a fresh opening to raise questions about the case and to cast doubt on the Justice Department's repeated statements that Mr. Weiss had complete control of the investigation with no political interference.

David C. Weiss, the Trump-appointed U.S. attorney in Delaware, said in a letter to Congress this month that he had not been constrained in investigating Hunter Biden.
Damian Giletto/Delaware News Journal, via USA Today Network

But it remains unclear how much of the difference in the accounts reflects possible factors like miscommunication, clashing substantive judgments among agencies over how best to pursue a prosecution, or personal enmity among officials working on a high-pressure, high-profile case. Investigators like Mr. Shapley whose job it is to uncover evidence often have different perspectives from prosecutors who have to take into account how to treat defendants fairly and present cases to juries.

Republican efforts to link Hunter Biden's problems to his father have often come up short, and Mr. Garland, a former federal appeals court judge, has taken pains to distance himself from core decision-making in the politically polarizing cases that have landed on his desk. Still, Republican leaders now see Mr. Garland as a potentially vulnerable figure as they look for ways to undercut the president heading into the 2024 campaign.

"If it comes true what the I.R.S. whistle-blower is saying, we're going to start impeachment inquiries on the attorney general," Speaker Kevin McCarthy told Fox News on Monday.

Mr. Garland, addressing reporters on Friday, forcefully denied Mr. Shapley's claims. Mr. Weiss said in a letter to Congress this month that he had not been constrained in pursuing the investigation. Mr. Weiss said in the letter, dated June 7, that he had been "granted ultimate authority over this matter, including responsibility for deciding where, when and whether to file charges." He has yet to face more specific questions from House Republicans in the wake of Mr. Shapley's testimony.

White House officials dismissed Mr. McCarthy's impeachment threat as a "distraction." And Hunter Biden's lawyers have told the Justice Department that Mr. Shapley has broken federal laws that keep grand jury material secret. Mr. Shapley's lawyer, Mark D. Lytle, said his client "has legally protected rights to blow the whistle."

"There are so many unanswered questions here that I think the only solution is having Garland or Weiss, or both, testify before Congress or have a long press conference where they answer everything that's being thrown at them," said John P. Fishwick Jr., who served as U.S. attorney for the Western District of Virginia from 2015 to 2017.

"Is this just a disgruntled guy who didn't get his way, as happens in every investigation?" he added, referring to Mr. Shapley. "Or is there something else going on?"

Mr. Weiss announced this month that Mr. Biden had agreed to plead guilty to two misdemeanor charges of having failed to file his 2017 and 2018 taxes on time. Mr. Weiss also charged Mr. Biden in connection with his purchase of a handgun in 2018 but said he would not prosecute the charge under a two-year pretrial diversion program.

The Hunter Biden investigation was initiated by the Trump Justice Department in 2018 and eventually handed to Mr. Weiss, a Republican whose reputation for nonpartisanship had earned him the support of Delaware's two Democratic senators during his confirmation a few months earlier.

Mr. Weiss was, according to the committee's transcripts, determined to keep the inquiry under wraps as long as possible, thanking his team for keeping the investigation secret in a strategy session shortly after the 2020 election.

Hunter Biden and President Biden returning from Camp David to Washington on Sunday. Republican efforts to link Hunter Biden's problems to his father have often come up short. Yuri Gripas for The New York Times

After President Biden was elected, the department's interim leadership kept Mr. Weiss in place and in charge of the inquiry. Mr. Garland, after being confirmed, continued that arrangement, and was eager to avoid any suggestion of political meddling, according to people in his orbit.

But if Mr. Garland was content with how the politically explosive case was being handled, Mr. Shapley, a 14-year I.R.S. employee, was stewing in the shadows.

He recounted in his testimony that he had been arguing in meetings with Mr. Weiss and other prosecutors to aggressively pursue charges against Mr. Biden stemming from his failure to pay taxes in 2014 and 2015, two years not covered under Mr. Biden's agreement to plead guilty on the misdemeanor tax charges. During those years, Mr. Biden was earning income from work for a Ukraine-based energy company and Chinese clients that Mr. Shapley suggested was being channeled through entities that had a presence in Washington and the Los Angeles area.

**How Times reporters cover politics.** Times journalists may vote, but they are not allowed to endorse or campaign for candidates or political causes. That includes participating in rallies and donating money to a candidate or cause.

Did you find this information helpful?    Yes    No

It is not clear if Mr. Weiss was convinced those strands of the investigation should be prosecuted or was simply making sure all potential charges were pursued thoroughly. But in mid-2022, Mr. Weiss reached out to the top federal prosecutor in Washington, Matthew Graves, to ask his office to pursue charges and was rebuffed, according to Mr. Shapley's testimony.

A similar request to prosecutors in the Central District of California, which includes Los Angeles, was also rejected, Mr. Shapley testified. A second former I.R.S. official, who has not been identified, told House Republicans the same story. That episode was confirmed independently to The New York Times by a person with knowledge of the situation.

While Mr. Weiss had the authority to pursue leads that led to jurisdictions other than his own in Delaware, the department's practices dictated that he secure the approval and cooperation of the U.S. attorneys in those districts before proceeding.

If Mr. Weiss wanted to move ahead without their approval, he could have brought the issue to Mr. Garland's attention, and the attorney general could then appoint him "special attorney," which would allow him to bypass the standard chain of command. There is no indication that Mr. Weiss appealed for help from Mr. Garland or his top deputies — or that he even communicated about the case with anyone in leadership beyond the department's top career official at headquarters.

When Mr. Grassley, at the hearing in March, pressed Mr. Garland on that point — without referring explicitly to Mr. Shapley's claim, which would not become public for months, but tracking closely what Mr. Shapley would tell the Ways and Means Committee — the attorney general said he would "assure" that Mr. Weiss would be able to bring charges outside Delaware if that was his wish. At a news conference after the transcript was released, Mr. Garland repeated that message.

Attorney General Merrick B. Garland has tried to distance himself from core decision-making in the politically polarizing cases that have landed on his desk. Kenny Holston/The New York Times

As the investigation ground on, Mr. Shapley had grown disenchanted with the lack of progress in the investigation, and by his account was so upset over the conduct of the Justice Department he found it hard to sleep.

He testified that Mr. Weiss, despite his public statements to the contrary, was also unhappy, and that he complained about being handcuffed by higher-ups in the department.

Things came to a head during a meeting among investigators on Oct. 7, when Mr. Weiss made an unexpected admission to him in the presence of several other federal law enforcement officials, according to Mr. Shapley's account.

"He surprised us by telling us on the charges, quote: 'I'm not the deciding official on whether charges are filed,'" said Mr. Shapley, a longtime Republican who has said he is motivated by the evenhanded application of justice, not politics.

"To add to the surprise, U.S. Attorney Weiss stated that he subsequently asked for special counsel authority from Main D.O.J. at that time and was denied that authority," he added.

Mr. Weiss, he said, was then told "to follow D.O.J.'s process."

Mr. Shapley did not say if Mr. Weiss told him who had turned down his request to appoint a special counsel, a decision that can only be made by an attorney general under department regulations.

After Mr. Garland last week denied Mr. Shapley's account, Mr. Shapley's lawyer, Mr. Lytle, issued a statement naming six F.B.I. and I.R.S. agents who he said witnessed the exchange, which Mr. Shapley also recorded in a contemporaneous email.

Later, Mr. Shapley blamed Mr. Weiss, without evidence, for helping to kill a promotion he had hoped to get, by criticizing him to his superiors at the I.R.S.

"I think it tainted me," he told the Ways and Means Committee. "I think that they retaliated against me because of that. There's really no other explanation for it."

A spokeswoman for Mr. Weiss did not return a request for comment. In his June 7 letter to Representative Jim Jordan, chairman of the House Judiciary Committee, he wrote that he had "ultimate authority" over every aspect of the investigation, which seemed to contradict Mr. Shapley's claim that he had said he was not the deciding official in the case. (Mr. Jordan subsequently sent a letter asking Mr. Weiss to clarify what "ultimate authority" means.)

In a short news release last week setting out the terms of the deal with Mr. Biden, Mr. Weiss added without explanation: "The investigation is ongoing." It is unclear whether that phrase was just Justice Department boilerplate, a hint about the possibility of more charges arising from the inquiry or a shield against demands for documents and testimony about the Biden case from Congress.

Mr. Garland, who often sidesteps requests for comment on ongoing investigations, has been uncharacteristically blunt in refuting Mr. Shapley's testimony.

"Mr. Weiss never made that request," Mr. Garland told reporters last Friday, referring to whether Mr. Weiss had sought special counsel status.

Under the special counsel regulation, Mr. Weiss would have been required to inform Mr. Garland about any major developments in the investigation, including his request to bring charges in California and Washington. Mr. Garland, in turn, would have to inform Congress in writing if he decided to overrule any major investigative decision, like charging Mr. Biden.

"If you provided the Delaware U.S. attorney with special counsel authority, isn't it true that he would not need permission from another U.S. attorney to bring charges?" asked Mr. Grassley, a longtime chairman of the Senate Judiciary Committee, in March.

"It's a kind of a complicated question," replied Mr. Garland.

He then suggested it was also an irrelevant one, arguing that Mr. Weiss "already" possessed the same authority under both scenarios.

Mr. Grassley did not appear to be convinced.

Adam Goldman and Luke Broadwater contributed reporting.

***A correction was made on June 27, 2023****: An earlier version of this article mischaracterized a letter that Representative Jim Jordan sent to David C. Weiss. It did not address his use of the term "ultimate authority." The letter also was not sent on Monday. It was sent last week.*

---

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com. Learn more

Glenn Thrush covers the Department of Justice. He joined The Times in 2017 after working for Politico, Newsday, Bloomberg News, The New York Daily News, The Birmingham Post-Herald and City Limits. @GlennThrush

Michael S. Schmidt is a Washington correspondent covering national security and federal investigations. He was part of two teams that won Pulitzer Prizes in 2018 — one for reporting on workplace sexual harassment and the other for coverage of President Trump and his campaign's ties to Russia. @NYTMike

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Garland Facing Fresh Questions On Biden's Son

# EXHIBIT 9

U.S. GOVERNMENT INFORMATION GPO

# OVERSIGHT OF THE UNITED STATES DEPARTMENT OF JUSTICE

## HEARING

BEFORE THE

COMMITTEE ON THE JUDICIARY

U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

THURSDAY, OCTOBER 21, 2021

**Serial No. 117–42**

Printed for the use of the Committee on the Judiciary

Available via: *http://judiciary.house.gov*

OVERSIGHT OF THE UNITED STATES DEPARTMENT OF JUSTICE

bled by the Biden Administration. In a survey of more than 100 art galleries in New York's 10th Congressional District this particular art gallery received by far the largest SBA disaster loan. As an aside, Mr. Attorney General, the Member who represents the 10th Congressional District is none other than Chair Nadler.

Mr. Attorney General, who buys Hunter Biden's art? Who benefits? What benefits do they receive from the Biden Administration? The American people want to know.

I have sent a letter to the Department of Justice before your tenure asking them to appoint a special counsel to investigate Hunter Biden. I have today sent a letter to you, and I am asking you now will you appoint a special counsel to investigate Hunter Biden?

Attorney General GARLAND. For the same reason that I am not able to respond to questions about investigations of the former President or of anyone else I am not able to discuss any investigations, pending or otherwise with respect to any citizen of the United States.

Mr. BUCK. Mr. Attorney General, I worked for the Department of Justice for 15 years. You are allowed to tell us whether you will appoint a special counsel. You may not tell us whether you are investigating or not investigating a particular matter, but you are allowed to tell us whether you will appoint a special counsel. That is my question.

Attorney General GARLAND. Well, apparently, I just received the letter today from you and will be taking it under advisement, but I wasn't aware that you had sent me a letter.

Mr. BUCK. Okay. I appreciate it.

Mr. Chair, I yield back, but I would like to first place into the record two articles, one from Vox, "Why Obama's former ethics czar is highly critical of Hunter Biden's lucrative art sales," and the second from the New York Post, "Art gallery repping Hunter Biden received $500K federal COVID loan, records show."

Chair NADLER. Without objection.

[The information follows:]

Mr. MCCLINTOCK. It shocks me. Given the fact that this is now an historic high on illegal border crossings, you are the Chief Law Enforcement Officer of our country, you come here before this Committee, you devote not a word in your spoken remarks to this issue, you devote out of a 10-page written statement one paragraph simply saying we need to expedite the immigration proceedings for asylum claims. I find that astonishing.

Let me ask you this: Do you agree that an alien who has received proper notice of his or her immigration court hearing who fails to appear at that hearing absent exception circumstances and is ordered removed in absentia should be removed from this country?

Attorney General GARLAND. I am not really familiar with exactly the circumstance you are talking about. There are rules about removal and there are rules that the Department of Homeland Security has established.

Mr. MCCLINTOCK. Well, when someone is ordered deported by a court—

Attorney General GARLAND. —I am sorry.

Mr. MCCLINTOCK. If someone is ordered deported by a court, should they be removed?

Attorney General GARLAND. Yes. If they are ordered deported by a court, then we have an obligation to follow the court's order.

Mr. MCCLINTOCK. Yet, the President on his opening day in office instructed Immigration and Customs Enforcement not to conduct such deportations.

Attorney General GARLAND. I am not familiar with the specific thing you are talking about. I am sorry.

Mr. MCCLINTOCK. What circumstances would justify an independent prosecutor?

Attorney General GARLAND. So, we have had some history with independent prosecutors. Neither the Democrats nor the Republicans seem to like the result regardless of who is—

Mr. MCCLINTOCK. No, but let me—there have been multiple reports that Hunter Biden made enormous sums of money, and he has admitted that is because of his family ties. Now, that by itself might not be a crime, but there have also now been multiple reports that emails and other communications from Hunter Biden have indicated that his finances were intermingled with those of his father's, including a text to his daughter complaining that half of his earnings were going to his father.

If that doesn't call for an independent investigation of the President, what would?

Attorney General GARLAND. So, I am not going to comment about this investigation, but as everyone knows there is an investigation going on in Delaware by the U.S. Attorney who was appointed by the previous Administration. I can't comment on it any further than that.

Mr. MCCLINTOCK. That is being done under the Justice Department, not independently and the Justice Department answers to the President who is implicated in these emails.

Chair NADLER. The time of the gentleman is expired.

Ms. Jayapal?

Ms. JAYAPAL. Thank you, Mr. Chair.

# EXHIBIT 10

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
April 26, 2022 - Final

# Senate Appropriations Subcommittee on Commerce, Justice and Science and Related Agencies Holds Hearing on the Fiscal Year 2023 Justice Department Budget Request

### LIST OF PANEL MEMBERS

JEANNE SHAHEEN:
When I remember to turn on my mic. And we will take questioners -- just for everybody's information, we will take questioners in order of appearance rather than by seniority today, which I know will make all of you who arrived early very happy. And we are delighted to -- I am delighted to call the order the Subcommittee on Commerce, Justice Science and Related Agencies and welcome the Attorney General, Merrick Garland, who is today's witness for the hearing to review the President's fiscal year 2023 funding request.

It's very good to see you again. And I'm sure as you know, we will have lots of Senators coming in and out as the first real hearing day back after a two week break. There's a lot going on so I hope you will be patient. This year, the President's fiscal year 2023 budget request for the Department of Justice is $39 billion.

That's an 11 percent increase compared to the fiscal year 2022 enacted level for the department. This budget provides a renewed focus in critically important areas like protecting civil rights, including a request for increased resources for the Civil Rights Division and Community Relations Service to provide for more attorneys and mediators as well as supporting grant programs that address hate crime prevention.

Funding increases are also requested for agencies and programs that strengthen national security, including additional resources to investigate domestic terrorism, combat foreign threats, and prevent gun violence. It was also good to see the department's request for increased funding for many grant programs, including nearly double the resources for the Office on Violence Against Women Programs.

Funding requested for new Programs including those in the Office of Juvenile Justice and Delinquency Prevention seem to be much needed in order to help youth and families, especially after this pandemic. I hope we receive an allocation that allows us to fund long standing as well as newer programs at as high a level as possible.

Increased grant funding also means increased support for our police departments. This budget request does include that, particularly for community or -- oriented policing services, or COPS. But I would like to note that the subcommittee has included strong funding for law enforcement grants over the past several years and I think that is a commitment of this committee.

One area that Senator Moran and I have worked closely on is to ensure that Byrne JAG funding receives steady increases annually. For my state of New Hampshire the majority of Byrne JAG funding supports our state's drug task force which works to keep illegal narcotics including fentanyl out of our communities.

And as we know that epidemic of opioid misuse has dramatically increased during the pandemic. We've also worked together on a bipartisan basis to increase funding for programs that improve relations and strengthen trust between police and the communities they serve. Last year, we provided a total of $201 million for these programs.

This also includes overhauling the COPS development program to have dedicated funding for mobile crisis teams, police department accreditation, and officer training. I'm pleased to see that the department seems to also like the way we've restructured this COPS program and repackaged it as the just policing program in your budget request this year.

Now before I close, I want to thank the 120,000 career employees of the Department of Justice, including law enforcement personnel and attorneys for their work to keep Americans safe. I know it's been a challenging year with our country facing unprecedented threats from those that are newer and rapidly changing like cyber-crime and those that are sadly familiar like terrorism.

Your employees are meeting these challenges while continuing to work through a global pandemic and we all very much appreciate their work. I also want to thank all of those at the department who investigated and prosecuted the ISIS Beatle terrorists -- the ISIS terrorists known as the Beatles, including El Shafee Elsheikh, who murdered four Americans: James Foley, Kayla Mueller, Steven Sotloff, and Peter Kassig.

The hard work of the US Attorney's Office for this eastern district of Virginia recently resulted in a guilty verdict for Elsheikh. And I think that not only sends a message to terrorists around the world that those who commit heinous crimes against Americans are going to be prosecuted, but it provides some level of closure and justice for the families of those murdered.

So Mr. Attorney General, I look forward to our discussion today. And with that, I'd like to recognize our subcommittee Vice Chair, my colleague Senator Moran.

JERRY MORAN:
Senator Shaheen, thank you for convening this hearing. Before turning to the subject matter of the hearing, I want to express my sincere appreciation for your stewardship of our FY 2022 appropriations process and thank my colleagues who are members of this subcommittee. This subcommittee held seven hearings including a broadband hearing in January that I believe was one of the best we've had in our tenure.

JEANNE SHAHEEN:
Absolutely.

JERRY MORAN:
We produced a strong bipartisan bill in the Senate, even with complicated dynamics that were outside of our control. And in conference despite a very tough allocation, Senator Leahy, a very tough allocation, we secured a final bill that makes critical investments in scientific research, law enforcement, space exploration, economic development, and US competitiveness.

It is a bill this subcommittee can be proud of. Senator Shaheen, thank you for your leadership. I am excited to continue to work with you and my colleagues as we kick off the 2023 appropriations process. General Garland, welcome to this hearing. This budget that is being presented supports DOJ grant programs under the newly reauthorized Violence Against Women Act, which I was a proud -- which I was proud to co-sponsor, and for programs to support local police and sheriff's departments.

I want to highlight these programs as a critical tool to address the shocking increase in violent crime, including a 30 percent surge in US murder rate, the largest single year increase in 50. Unfortunately, violent crime continues to lack the attention it requires. It is absolutely critical the Department of Justice support state and local law enforcement, both through grant programs and through joint law enforcement operations.

The budget includes an increase for FY 22 enacted to -- to FY 22 en -- enacted levels for DOJ. However, rhetoric and behavior from the Administration too often send a different signal. If law enforcement officers are not respected or shown respect from our leaders they will not be respected within the community.

We've also seen an appalling increase in attack on police officers. It is no surprise that the department's police officers -- police departments and sheriff's offices are short staffed and having issues recruiting new police officers. The budget request would undermine the Board of Prison -- Board of Prison, excuse me, the Bureau of Prisons' ability to maintain suitable modern facilities that are capable of delivering educational, vocational, and fellowship programing.

In addition, request proposes new unauthorized grant programs intended to inhibit America's exercise of their Second Amendment rights. A budget request is ultimately a proposed allocation of scarce resources and it's disappointing that these messaging programs were prioritized over the budget's critical missions in fully addressing the surge in violent crime.

The budget request is a first step in the appropriations process and I look forward to working with you, Attorney General, and with Senator Shaheen as we craft the FY 2023 appropriations bill. Thank you.

JEANNE SHAHEEN:
Thank you, Senator Moran. And I realize that the Chair of the Appropriations Committee, Senator Leahy is here. And I forgot to ask if you would like to offer some opening remarks.

PATRICK LEAHY:
No, I just appreciate you and Senator Moran hol -- holding this. I am delighted that the Attorney General is here. I'm delighted the country has the Attorney General. I'll leave it to everybody else.

JEANNE SHAHEEN:

Thank you, Senator Leahy. I will now turn it over to you Attorney General Garland.

MERRICK GARLAND:
Hello. Is this working? Yeah. Good morning --

JEANNE SHAHEEN:
-- [Inaudible] pull it closer.

MERRICK GARLAND:
Yeah. Better?

JEANNE SHAHEEN:
Much.

MERRICK GARLAND:
Okay. Morning -- good morning, Chairwoman Shaheen, Ranking Member Moran, and distinguished members of the subcommittee. Thank you for the opportunity to appear before you today. Over the past 411 days that I have been Attorney General, three co-equal priorities have guided the work of the Justice Department: keeping our country safe, protecting civil rights, and upholding the rule of law.

These priorities reflect the Justice Department's mission and our mission is reflected in the President's FY 23 budget. Our first funding priority is keeping our country safe from all threats foreign and domestic, whether from hostile nation states, terrorists, or common criminals. As our country's chief law enforcement officer, I am committed to supporting members of law enforcement at all levels of government as they work to protect our country while also safeguarding civil liberties and ensuring our own accountability to the American people.

To these ends, the President's FY 23 budget requests more than $20.2 billion to support the work of the Justice Department's law enforcement components and US Attorneys' offices nationwide as they com -- carry out their complex mission sets. These resources will strengthen the Justice Department's efforts to reduce violent crime and gun violence, to counter the multitude of serious and evolving threats to our country from terrorists, cyber criminals, and hostile nation states, to combat the violent drug trafficking networks that are fueling our nation's overdose epidemic, and to protect our nation's democratic institutions, including the one we sit in today from violent attack.

In addition, the President has proposed a total of more than $30 billion in new investments over the next decade to support law enforcement by funding the police, preventing crime, and accelerating criminal justice reform. In FY 23 alone, the President's budget requests more than eight billion dollars in grants for states and localities nationwide to fund the police, including by putting more police officers on the beat and to implement community based strategies to prevent crime and gun violence.

The President's FY 23 budget also prioritizes the protection of civil rights. We are seeking a 32 percent increase in funding for the Civil Rights Division as well as additional resources for our US attorneys, the FBI, the Community Relations Service, and our office for access to justice. Our civil rights work remains vital to safeguarding voting rights, prosecuting hate crimes, ensuring constitutional policing and addressing unlawful discrimination.

Another area of environmental focus is safeguard -- economic security, fairness and opportunity, This is reflected in our request for resources to protect the American people from intellectual property crimes to reinvigorate antitrust enforcement and consumer protection, to combat corporate crime, and to bring to justice those who seek to profit unlawfully from the COVID 19 pandemic.

In particular, the department requests a total of $273 million, an increase of 41.6 percent for the antitrust division to carry out its critical mission of promoting competition in the American economy and protecting workers, consumers, and businesses alike. Finally, we are requesting $11.7 billion to ensure that just the administration of our nation's immigration courts and federal correctional systems.

This includes $1.35 billion for the Executive Office for Immigration Review, which I'll be referring to as EOIR to reduce the immigration court backlog by hiring more than 1,200 new staff, including approximately 200 immigration judge teams over the FY 22 enacted level. Our request for $8.18 billion for the Bureau of Prisons will help ensure the health, safety, and well-being of more than 150,000 individuals in federal custody, as well as the officers who protect them.

This request would allow BOP to hire 1,300 new correctional officers and first step staff and would be used to

support rehabilitative programing and improve conditions of confinement. I respectfully ask for your support for our budget as our Justice Department works to uphold the rule of law to keep our country safe and to protect civil rights for all.

Thank you for the opportunity to speak with you today.

JEANNE SHAHEEN:
Thank you very much. For those people who came in a little later, let me just point out, we will have a five minute questioning period and people will be called on an order of arrival rather than seniority because we are no longer doing any virtual hearing in this committee. So I will begin. Last month, you announced the establishment of Task Force KleptoCapture, which was described as an interagency effort dedicated to enforcing sanctions, export restrictions and economic countermeasures against Russia.

As I understand, this includes targeting the crimes committed by Russian officials, oligarchs and others who aid or conceal unlawful conduct. I know that the country is watching very closely what's happening in the war, the unprovoked war of Russia against Ukraine, and that one huge element in that is being able to reduce the amount of funding for that war that Russia has.

So can you talk a little bit about where you are in terms of the interagency effort and the kind of cooperation you're getting internationally?

MERRICK GARLAND:
Yes, and I second what you said about what we're all seeing on the news almost every day, the incredibly graphic videos of horrible atrocities that are going on in Ukraine. It's not just the war. It's the way in which the war is being prosecuted by the Russian government. The pictures of dead bodies of civilians in the streets abound with their hands behind their backs.

Intentional bombing of civilian residential apartment of -- of a theater in Mariupol. All of those pictures are just horrific and are the kind of things anybody growing up in the 20th century never expected us to see in the 21st again, a land war in Europe. So every part of this government is doing its part.

The Justice Department's role right now is to investigate and prosecute sanctions violations. So we have, as you said, the KleptoCapture task force. Its purpose is to go after the assets that the Treasury Department has sanctioned as well as to go off -- go after assets that have been laundered against the money laundering statutes for criminal behavior by the Russian oligarchs.

So in addition, we are participating in the Treasury Department's repo task force, which is the international task force where I have met with unfortunately virtually the home secretaries, attorneys, general and ttreasury secretaries of the participating countries. The cooperate -- international cooperation has been superb, really superb and heartwarming for our law enforcement officers who will often have to twist arms and beg for extraditions and other sorts of cooperation abroad.

There is no resistance at all now.

JEANNE SHAHEEN:
Can you talk about how the department is going to be dealing with the proceeds from any recovered assets?

MERRICK GARLAND:
Yes. So the money would go into the asset forfeiture fund. So first thing we have to do is freeze the assets. Second thing is we have to get a forfeiture. Third is has to go in the asset forfeiture fund. The -- we would support legislation that would allow some of that money to go directly to Ukraine. That's not the current circumstance with respect to the fund, but the current circumstances like all forfeited assets that would go into the asset forfeiture fund.

JEANNE SHAHEEN:
Well, thank you. We will take that under advisement in the committee. Let me also just editorialize a minute and say, I hope that these efforts will allow for future follow up that will take a look at how corrupt money is being laundered in the West and produce a real effort to shut that down. Not just in Russia, but wherever it's occurring.

One of the issues that you and I discussed on the Phone in advance of this hearing was my concern about the how long it's taking to get some of the nominees approved for US attorney for marshals, and I understand that there are -- there are two problems. One has been the challenge of getting the background checks done on those nominees.

And I guess I would be interested in hearing whether there are more resources that need to be put toward that. We need to take a look at that process and see if there are changes that need to be made. And then, of course, the other challenge is here in the Senate with individuals who are holding up those nominees.

So can you speak first to what -- what happens when we have US attorneys? In New Hampshire, our US attorney nominee, it's been over a year almost -- I think, over a year now that she has been forwarded to the White House and is on hold. Can you just speak to the challenge with addressing crime around the country when we have US attorneys who are taking that long to get approved?

MERRICK GARLAND:
Yes. So the United States attorneys as well as United States marshals are the tip of the spear of our effort to fight violent crime. They are the ones who convene the task forces in every one of the 94 US attorney's office districts. The task forces are combinations of all of our federal law enforcement, the four law enforcement agencies of the Justice Department, as well as the law enforcement agencies of the Department of Homeland Security and other federal agencies combined with state, local territorial and tribal law enforcement.

These cooperative task forces then also cooperate with the local communities. And that is the way in which the best attack on violent crime is possible to look at what's needed in the local area to identify the primary drivers that is particularly the repeat shooters, to get them off the streets and to get them in jail and to organize those things, we need confirmed United States attorneys.

The work of the acting is excellent, but as everyone knows in order to establish policies and programs in any office, it's important to have a permanent head. So I couldn't -- I couldn't urge more strongly for the Senate to approve as swiftly as possible the US attorney nominees and the marshals nominees.

JEANNE SHAHEEN:
Well, thank you very much. Is it fair to say that the holdup in when people are holding these individuals up for other purposes that that has a negative impact on our ability to fight crime?

MERRICK GARLAND:
Yeah. I don't want to get into the -- to the inner workings of the Senate, But -- but what I will say is that any time we're not getting confirmed law enforcement officers it -- it does have a negative effect on our ability to fight violent crime -- cyber crime, all the responsibilities that the United States, attorneys and marshals have.

JEANNE SHAHEEN:
Well, thank you. I won't quote you at that. I will say it myself, Senator Moran.

JERRY MORAN:
General Garland, thank you. You're aware and we've talked about even yet this morning, the tremendous increase in levels of violent crime. The murder rate has surged 30 percent in 2020. It's the largest increase in over 50 years in any single year. But overall, violent crime, which includes assaults, robberies, and rapes increased -- By 5 percent.

Joint operations between federal law enforcement and local and state law enforcement seem to be successful. We've had Operation Legend and Operation Triple Beam in our state. Director Wray joined me in Kansas earlier this year. We met with our local state law enforcement officials. During that conversation the Chief, Karl Oakman, of the Kansas City, Kansas Police Department expressed his desire, first of all, how valuable those joint operations were and his desire to see more of them.

JERRY MORAN:
And of course that's not unique to the Kansas City region of our state. What -- to what extent are joint law enforcement operations are part of the DOJ's plan to combat violent crimes?

MERRICK GARLAND:
Well, they are the center of our strategy. In May of 2021 after I'd been in office just a couple of months, I saw the same statistics that you're referring to now about the -- the -- the rise in violent crime, the -- the startling rise in 2020, which continued into 2021. And so I launched our first violent crime strategy for the department.

That really includes three pillars, all of which are the ones you're talking about, which is joint task forces among

federal law enforcement, joint task forces between federal and the state and local law enforcement, and involvement of the community. Because it's essential that the community let us know where the bad guys are and who the bad guys are.

So it is the core of what we do. So the money that we're asking for comes in, I would say, two buckets here. We're asking for more than $20 billion, that's an increase of 8.2 percent for our federal law enforcement in the Justice Department, all of whom participate in these task forces. So that includes the US Attorneys' offices, the FBI, the ATF, the DEA, the US Marshal Services.

Then we're asking for $8.2 billion, which is an increase in 5.48 billion for grants for state and local law enforcement. For the sheriffs you're talking about, for the police you mentioned in your opening as well. This in -- includes money for COPS hiring, for the Byrne JAG grant that the Chair spoke of which are used for these task forces, for OVW grants, some of which are also used for investigative task forces.

That's the way we are able to create these joint task forces. And so that's -- I completely agree with your assessment.

JERRY MORAN:
General, thank you. I -- you've mentioned the US Marshals. I too would mention the US Marshal Services Regional Fugitive Fugitive Task Force as another valuable combination of local and -- and federal law services. Let me turn to -- in 2021 the DOJ Office of the Inspector General released a report that revealed multiple agents at the FBI had mishandled the investigation into former USA Gymnastics physician Larry Nassar and subsequently lied about their misconduct.

I want to take this moment in your presence to again raise my strong concerns with the fact that it seems these agents have not been held fully accountable for what you described as an institutional failure. I understand that DOJ is reviewing its earlier decision. This is a -- an issue that Senator Blumenthal and I pursued in the Commerce Committee.

But you are reviewing the decision not to criminally charge these agents. Could you provide me a status update as to where this issue lies?

MERRICK GARLAND:
Yeah. So, you are right. This is a horrible institutional failure. I -- I -- it's almost unspeakable -- it is unspeakable what happened to those gymnasts and also unspeakable the way in which the investigation failed to -- to proceed. We have created institutional changes in that regard to make sure it doesn't happen again.

The FBI has revised its procedures and the deputy attorney general has issued memoranda to the field so that whenever a US Attorney's office or federal law enforcement decides not to follow up, that they immediately advise state and local law enforcement so that they can continue. Your description of -- so, the question of -- of the investigation.

So the FBI's internal disciplinary work is still in progress. The question of reopening the earlier declination is in the hands of the Assistant Attorney General for the Criminal Division, Kenneth Polite, who is continuing to review the matter.

JERRY MORAN:
Does that mean that the FBI made a report to the -- to -- to that official who is now reviewing that report?

MERRICK GARLAND:
I think it is the -- the referral came from the Inspector General's report. So it's the report that you are -- that you are aware of that was given to the criminal division to review the earlier decision to decline.

JERRY MORAN:
Thank you.

JEANNE SHAHEEN:
Thank you, Senator Moran. Senator Leahy.

PATRICK LEAHY:

Thank you, Chair. Attorney General, as I mentioned earlier I'm glad you're here this morning. But time is short, so I'll get right to the questions. I'd like to start with the VOCA Fix Act. VOCA signed into law last year. And we passed this -- excuse me -- we passed this legislation to give a much needed steady stream of deposits into the Crime Victims Fund, you know, that helps crime victims all over the country.

PATRICK LEAHY:
A major piece of the legislation requires funds collected under deferred and non-prosecution agreements to be deposited in the Crime Victims Fund. Now I understand there was a sizable deposit in the first month of implementation, but the collections from deferred and non-prosecution agreements have actually been quite low.

PATRICK LEAHY:
Across October and November, for example, the actual total deposit in the Crime Victims Fund was around a million dollars. What accounts for such starkly low deposits from what it used to be? Is the department concerned that this may end up with a zero balance in the Crime Victims Fund?

MERRICK GARLAND:
So this is going to be a complicated answer. I'm going to do the best I can. I may have to refer to Assistant Attorney General Loftus, who knows the details of the numbers far better than I. But I'll see if I can walk you through where we are here. The VOCA Fix, which we greatly supported and are greatly appreciative, allowed the money to include the deferred prosecution agreements which were not available before.

The Deputy Attorney General sent a memorandum to all United States Attorney's Offices and to the FBI and law enforcement to ensure that the money that comes from deferred prosecution agreements is tagged for the victims of crime fund. So we are making those changes. It --

PATRICK LEAHY:
-- Is it making it clear that that's a priority?

MERRICK GARLAND:
Yes. That that -- tho -- the money there must be put in and it's a priority to make sure that that happens. In -- you are right that in September -- my figure is $254 million was deposited, which was the largest monthly deposit in the last four fiscal years. That was immediately after the VOCA Fix came into effect.

In FY 22, the numbers I have for the first six months are $409 million in the fund. You know, these are cyclical. They go up and down. It depends on whether there was a deferred prosecution agreement, whether there were forfeitures and other seizures during that time. So I don't think we have enough information yet to know what --

PATRICK LEAHY:
-- I -- I would ask only the department to make it clear that it is a priority that it goes there. And because of time, let me mention another thing. The -- been a lot of bipartisan support in the Violence Against Women Reauthorization Act. But what we determined to do, we put it into this committee, the appropriations committee, put it as part of the FY 22 omnibus appropriations package.

Because we're concerned in the normal course of events it might not have gone up for a vote. But the President's FY 23 budget doesn't account for some of the new programs that were included in the Violence Against Women Act. Many of us have worked across the aisle to prove that act and large -- and I know that when I was Chair of Judiciary we added Native Americans, the LGBTQ community, sexual exploitation of minors.

So is the Department going to support the new programs enacted by VAWA? And will you make sure that your budget shows that?

MERRICK GARLAND:
The answer is yes. I'm not sure which programs, I'd like to have our staffs talk about them. Didn't make it in.

PATRICK LEAHY:
Okay, I will. Because --

PATRICK LEAHY:

It's we want -- we came together to get the -- get power through the way we did, but I also want to make sure that we have the funding and that you have what you need there. And lastly, and I would just submit this for the record because I see my time is up, You recently issued Freedom of Information Act guidelines.

I'm concerned about and I am pleased with that, but I'm concerned about the enforcement of it. So I will also submit a letter for the record on that and appreciate your answer, Attorney General.

MERRICK GARLAND:
Thank you.

JEANNE SHAHEEN:
Thank you. Senator Leahy, Senator Collins.

SUSAN COLLINS:
Thank you, Madam Chairman. Welcome Mr. Attorney General. The administration has taken conflicting positions on whether or not the COVID pandemic constitutes a public health emergency. Could you please explain to the subcommittee how the department can justify arguing in court that the pandemic has subsided enough to warrant the termination of Title 42, which will worsen the problem of tens of thousands of unvaccinated migrants illegally entering the country, while at the same time arguing in a separate case that the public health consequences are dire enough to warrant compelled mask usage by Americans on public transportation.

MERRICK GARLAND:
Yes. Thank you, senator. It's just -- and I think important for me to explain the role of the Justice Department, which is not to make judgments about the public health and really not to make judgments about policy in either of the two areas that you're -- that you're raising but rather to make determinations of whether the programs and requests of the agencies that are responsible for those are lawful.

So with respect to the mask mandate on the planes, I think this is quite transparent. The CDC announced its assessment that this was a program that was continued to be necessary in the confines of airplanes and public transportation. The only question for us is that a lawful and they asked us to appeal. The solicitor general concluded it was lawful, and so we have appealed.

With respect to Title 42, it's the same analysis from our side, from the Justice Department's side. The only question here is the CDC's program, if the -- and the CDC announcement and its assessment, and we defend that program as long as it's lawful. We don't make the public health determinations that you're speaking of.

SUSAN COLLINS:
And I understand that. I think that the CDC has put the Justice Department in an untenable position of arguing one position in one case and a completely conflicting position in another case, but I understand that you don't make the public health determination. Let me switch to another consequence of the uncontrolled southern border.

In the year between September 2020 and September 2021, more than 104,000 Americans died from drug overdoses. In Maine, we set a horrific new record. 636 people died from drug overdoses tablets, a 23 percent increase from the previous year. In 2021, the main drug enforcement agency seized more than 10,000 grams of fentanyl.

That's a 67 percent increase from the previous year. Just three months into this year, agents tell me that they have already seized half of last year's total. Law enforcement officials in Maine and elsewhere tell me that these drugs are largely entering the United States through the southern border where resources that could be targeting drug interdiction -- interdiction are instead being diverted to help with the influx of migrants illegally crossing the border.

Do you agree that the government's inability to secure the southern border has led to more drugs coming into our country?

MERRICK GARLAND:
Look, I -- the opioid epidemic and particularly the influx of fentanyl is just horrifying and extraordinarily sad for the large numbers of Americans who are becoming addicted and who have become addicted. We are -- the job of the Justice Department is to fight the large scale drug trafficking organizations that are bringing this money -- these drugs into the country.

And that's the reason we have asked for large increases for all of our anti-drug programs. The DEA has asked for

$102 million increase, which is for a total of $3.1 billion to fight the very issues that you're speaking of. The US Marshal Service has asked for $1 billion for drug trafficking fugitive capture.

The US attorney's offices, $106 million. The FBI, $161 million. The Criminal Division for $46.9 million including regional opioid task forces and the COPS grants, the money that we're giving includes the money for the anti-heroine and anti meth task forces. So we are doing -- we are asking for all the money we can get, and we are not stopping here as you don't know.

I announce the indictment and extradition of the former President of Honduras to the United States to face justice for organizing drug trafficking coming out of the Northern Triangle. We will be persistent in that effort.

SUSAN COLLINS:
Thank you.

UNIDENTIFIED:
Senator Manchin.

JOE MANCHIN:
Thank you, Mr. Chairman. Thank you, sir. Merrick Garland, I want to thank you for your continued supportive of public service. It's been wonderful and we appreciate very much your position. Sir, on voting rights, I've always believed that healthy democracy depends on the voting system that is accessible, free, fair and secure.

While history is going to tell us that we've come a long way in ensuring all individuals regardless of their race, sex, or political affiliation have the ability to cast a vote, we can all agree that we still have a lot of work to do. I'm particularly concerned about the recent opinions and rulings that seem to undercut decades of established legal precedent under the Voting Rights Act. Specifically in February, a federal district court in Arkansas ruled that only the U.S. attorney general has standing to enforce Section 2 of the Voting Rights Act. The court found that it would be inappropriate to imply a private right of action to enforce Section 2 of the Voting Rights Act. So your opinion on that sir with that interpretation or you agree or disagree?

And what impact, if any, could this ruling have on voting rights were dropped -- if this was adopted across the country?

MERRICK GARLAND:
Yes, very good question, senator. On the first question, normally I don't sort of opine. In this case, I've already opined, so I don't think it hurts any to do that. We have filed across the country in a number of these cases. We believe there is a private right of action to enforce the Voting Rights Act. It has always been assumed that that was the case since the act was passed in the mid-sixties and no one has ever questioned it I think until this year.

To the second point, the consequences of the Justice Department being the only ones who can being -- bring voting rights cases. I'm going to be blunt, You're going to have to give us a lot more money. If the Justice Department has to bring every single case to enforce voting rights, we're going to have to --

JOE MANCHIN:
You know, the argument about that, sir, I'm sorry to interrupt you, but the argument about that, you hear the pros and cons on that, They're saying, well, that'll be too much litigation, you know, and if you had everybody being able to declare that they've been infringed upon. And we don't see that going any further that we're having all these discussions in our committees, but we're trying to get a clarity on that.

But it seemed like to me that the person has that right, but it hasn't been exercised. If it's been frivolous, I haven't seen it go any further. So I don't know how it's -- it's been a strain on the court system.

MERRICK GARLAND:
So I -- you know, I haven't done an analysis of the court system, but this has been the rule that we've had all the way since the mid-sixties. I've never heard any complaints that it is taxing the court system.

JOE MANCHIN:
We haven't either way. Sir, if I could switch a little bit on that, that's very helpful. We're working on that. On the price gouging, we hear a lot about price gouging right now, and we saw that When we first had the first had COVID brought to our attention, a horrible epidemic back in May of 2020--March of 2020, we saw that with N-95 masks,

Clorox wipes, toilet paper at the beginning of the pandemic.

And now we're going to--we're seeing it again this time with fuel prices and food prices and things of that sort. Should there be a criminal price gouging statute?

MERRICK GARLAND:
Well, this is a matter of huge debate and antitrust and economics. I'd like to hold off on that, but our staff would be happy to work with you on that.

JOE MANCHIN:
Right now, what constitutes you all basically taking it under your surveillance, if you will, acceptable prices for scarce products? What constitutes acceptable price for scarce market demands, things of this sort, global pricing?

MERRICK GARLAND:
So for us, the questions are unlawful agreements to fix prices and exclusionary behavior by monopolists and near monopolists. So if we're in either of those circumstances, if they exclude competition, that falls under the antitrust laws and likewise agreements on prices between competitors.

JOE MANCHIN:
And I want to follow up also on Senator Collins concerning on the opioid epidemic. Myself, and Senator Capito, in the state of West Virginia, we've been number one as far as getting slammed with this. Can you speak to the status of DOJ's current efforts to curtail the opioid crisis, including the Appalachian Regional Prescription Opiate, or what we call the ARPO Strike Force?

MERRICK GARLAND:
Yeah, So I think that's--and I hope you agree, I think that's a very effective task force. That money is included in our request for funds. I think it--I'm not sure whether that's the one that comes under the Office of Justice Programs or under the Criminal Division, but those task forces, both the meth and heroin ones that Senator Collins was concerned about the last time we spoke and the opioid one that you're talking about--

JOE MANCHIN:
--we need your support for that, sir.

MERRICK GARLAND:
We support and we support expanding those, and if we get the money requested in the budget--

JOE MANCHIN:
--very quickly, I want to follow up with, I introduced the DEA Enforcement and Authority Act that would amend the immediate suspension order, standard of review from a substantial likelihood of an immediate threat standard to a probable cause standard. That's again, order standard of review from a substantial likelihood of an immediate threat to a probable cause standard.

So what additional authorities do you believe DOJ or FBI need in order to effectively stop the flow of prescription opiates and other illegal drugs? Because the substantial likelihood is pretty darn broad and probable cause, we know exactly what their intent are.

MERRICK GARLAND:
So I haven't been directly involved in the question of the standard here. Our Consumer Protection branch does the work on--

JOE MANCHIN:
--if you could look, we have that piece of legislation. I think all of us have been--our states have been ravaged by this horrible addiction that we have, and drugs continue to flow. It might give us a better chance to fight this opiate onslaught or drug onslaught. But if you could look into that language, if you all could support.

And that's the DEA, it's the Enforcement and Authority Act.

MERRICK GARLAND:

All right.

JERRY MORAN:

Senator Manchin, thank you.

MERRICK GARLAND:

We'll be happy to do that, Senator.

JERRY MORAN:

Senator Kennedy?

JOHN KENNEDY:

Thank you, Mr. Chairman. Thank you, General, for being here. Could you pull that mic closer to you, please, sir?

MERRICK GARLAND:

Oh, I'm sorry. Is that better? Yeah.

JOHN KENNEDY:

Yes, sir. General, I think the Justice Department is losing. I think you're losing on crime. I think you're losing on drugs. I think you're losing on immigration. I think you're losing on Chinese espionage. Let me start with crime. What percentage of cops in America do you think are bad cops?

MERRICK GARLAND:

A very small percentage.

JOHN KENNEDY:

Like how small?

MERRICK GARLAND:

I don't have a number. I think that most police--

JOHN KENNEDY:

--we'll you're the country's chief, one of the country's chief law enforcement officers. Is it less than 10 percent?

MERRICK GARLAND:

Yes, let me just be clear. We believe that most police officers follow the constitution in their practices, most police departments do. And all police officers, I believe, want to work in police departments that follow constitutional policing requirements.

JOHN KENNEDY:

Is it less than five percent?

MERRICK GARLAND:

I don't have the numbers. I think it probably is, but again, I don't have any numbers for you.

JOHN KENNEDY:

Okay. Do you think most cops are racist?

MERRICK GARLAND:

No, I do not.

JOHN KENNEDY:
What percentage of cops do you think, in your judgment, I know you can't give me an exact figure, do you think are racist?

MERRICK GARLAND:
I'm sorry. I'm not resisting because I have a number that I can't give you. I just really--I don't have any way of making that evaluation.

JOHN KENNEDY:
What's your gut tell you, less than five percent?

MERRICK GARLAND:
One thing I've learned is to not give answers from my gut.

JOHN KENNEDY:
Right. Well, you think it's less than five percent?

MERRICK GARLAND:
I don't know the answer, I'm sorry.

JOHN KENNEDY:
Okay. You don't know?

MERRICK GARLAND:
I don't know. No.

JOHN KENNEDY:
Okay. Why doesn't the Justice Department support stop, question and frisk?

MERRICK GARLAND:
I'm not sure what--you mean, stop and frisk? Is that what you mean?

JOHN KENNEDY:
Yeah. Some call it stop and frisk. [Inaudible]

MERRICK GARLAND:
Yeah, I don't know that the Justice Department has a position. This is a state and local role, normally. Look, stop--

JOHN KENNEDY:
--do you think it works?

MERRICK GARLAND:
I'm sorry?

JOHN KENNEDY:
Do you think stop, question and frisk works?

MERRICK GARLAND:
I think in some circumstances it can work, but of course, it can be abused.

JOHN KENNEDY:
Right.

MERRICK GARLAND:
Yeah.

JOHN KENNEDY:
But why doesn't the Justice Department aggressively encourage law enforcement officials to use that technique? It's been declared constitutional, as you know.

MERRICK GARLAND:
Yeah. The Supreme Court has affirmed the constitutionality of stop and frisk That's in the Terry case. That's exactly right, but we don't do that--the federal government doesn't do patrolling. This is work for patrol.

JOHN KENNEDY:
I know you don't, but you're one of the country's chief law enforcement officials, maybe the chief, and what you say matters. And suppose--here's what I'm asking. Let's take Chicago, where you haven't--we haven't made any inroads in stopping the killing. I mean, Chicago is now the world's largest outdoor shooting range.

We know that a lot of the shootings come from gangs. Why wouldn't you want to call the police chief and the mayor in Chicago and saying, look, you know who these gang members are. When you have reasonable suspicion under Terry v. Ohio, and objective standard, more than just a hunch, why don't you aggressively stop, question and frisk these gang members?

You'll get guns off the street, you'll get drugs off the street, and you'll get a lot of gang members off the street, and you'll stop people killing each other. Why won't you do that?

MERRICK GARLAND:
The best way for the federal government to stop violent crime is to work at each local level and determine and let the state and locals determine what the best use of their own--

JOHN KENNEDY:
--judge, I'm sorry to interrupt you, but I'm trying to get some answers.

MERRICK GARLAND:
You're--I'm sorry.

JOHN KENNEDY:
Why won't you do that? Just tell me why you won't do that. Your opinion matters.

MERRICK GARLAND:
Because there is no one solution fits all that the federal government can suggest to state and local law enforcement. We believe state and local law enforcement knows best as to what to do there. We provide--

JOHN KENNEDY:
--well, it's not working.

MERRICK GARLAND:
We provide our technical expertise. We put lots of resources into joint task forces. We pick up--

JOHN KENNEDY:
--well, General, I know, I've got to shut this down. I've only got 15 seconds. Is that why you're asking in the middle of a raging inflation for seven percent more money, $2.63 billion to provide technical increase--or technical advice? I mean, we're going backwards here on crime General. You're the states--or the country's chief law enforcement officer and you won't even answer my question about how you feel about stop, question, frisk.

Why should we give you more money?

MERRICK GARLAND:
I think it's a resource allocation issue for each local police department. I believe that the Justice Department does the best by putting--the money that we're asking for is increase in law enforcement that can be assisting the state and locals in the best way.

JOHN KENNEDY:
But General, is that what we're supposed to tell the mothers of those kids getting killed in Chicago? You don't understand, it's a resource allocation issue.

MERRICK GARLAND:
No. What you're supposed to tell the mothers in Chicago, and what I told them when I was there, was the Justice Department was there to provide all the resources that this subcommittee will give us to stop violent crime. The more resources you can provide--

JOHN KENNEDY:
But yet, you won't try stop, question and frisk.

MERRICK GARLAND:
That is a question for the state and the local--I'm sorry, for the state and the local law enforcement.

JOHN KENNEDY:
I didn't go over as much as Manchin did, Madam Chairman.

JERRY MORAN:
That's not the standard by which we judge behavior.

JOHN KENNEDY:
Thank you, General.

MERRICK GARLAND:
You're welcome.

JERRY MORAN:
Now, Senator Van Hollen.

CHRIS VAN HOLLEN:
Thank you, Senator Moran and welcome Mr. Attorney General.

MERRICK GARLAND:
Thank you.

CHRIS VAN HOLLEN:
I want to start with some thanks to you and President Biden and your team at the Justice Department for implementing something that many of us have pushed for, for a long time, which is a final rule with respect to ghost guns. These are, of course, are our weapons. You can buy them over the internet in pieces quickly.

-- Assemble them and they shoot and kill people just like a regular firearm. But one major difference: they do not have serial numbers. Which is why they're becoming more of the weapon of choice by criminals in my state of Maryland, places like Baltimore City, and around the country. So I want to applaud you for moving forward on that effort and also applaud the President for nominating a director of ATF, Steven Dettelbach, a good candidate.

And I hope the Senate will confirm that nomination expeditiously. The ATF has gone headless for way too long as you know. And we need a strong ATF to crack down on illegal gun trafficking among other issues. As you know, you know, Congress has brought back Congressionally directed spending so that we can try to target resources where our communities say they're needed the most.

And Senator Cardin and I worked with this committee to channel important resources to address the really serious violent crime problem in Baltimore City. And there's no one solution. But we provided a series of resources for a community based crime and violent prevention programs, community policing. So my question to you, Mr. Attorney General, Baltimore City's waiting on those funds.

How quickly can we get them? Can you give us your commitment that you can get those out the door quickly?

MERRICK GARLAND:
If you give us the money, we can get them out the door quickly. You know, an important part of of our ability to fight violent crime in Baltimore and other locations where it is a very serious problem is having more assistant US Attorneys to prosecute these cases. Federal government has stronger --

CHRIS VAN HOLLEN:
-- So, Mr. Attorney General, just one clarification here. So I'm talking about this -- in this question moneys we've -- already have appropriated. These are moneys that we have provided. They're in the custody of either the Department of Justice or Treasury. And we just --

MERRICK GARLAND:
-- I see. I see --

CHRIS VAN HOLLEN:
-- Would like to get the money out the door.

MERRICK GARLAND:
We will do -- as far as I know, our priority is to get the money out the door. It doesn't do us any good to keep it in Main Justice I assure you. So if -- if --

CHRIS VAN HOLLEN:
-- Well, we'd like to -- we'd like to en -- encourage your team to -- to get it out. Because it is a serious situation there. Now to the broader issue you're raising with respect to resources for the US Attorney in -- in Maryland, for the ATF in Maryland, for US Marshal Service in Maryland, we have seen some increases over the last couple of years.

And I -- I want to thank you and your Deputy Attorney General Monaco, who's had a series of phone calls with Senator Cardin and myself. But can you -- we -- we do need more resources. I mean, we have a very serious problem in Baltimore City and we do have good cooperation between the federal government, state, and local jurisdictions.

But can you talk about specifically how resources you're requesting here can strengthen our -- our ability to get more resources to Baltimore City?

MERRICK GARLAND:
Yeah. So through no fault of this subcommittee, we did not get the amount of money for the United States Attorneys that was in the budget request and it was in the marks of the subcommittee. It was a consequence of the omnibus. We received $120 million less than the FY 22 request. So for that reason, we're asking for increases for the US Attorneys' offices to allow us to hire 157 more Assistant US Attorneys.

Obviously the more Assistant US Attorneys we have the easier it is to allocate them around the country to the places that are in need. The same is true with respect to ATF. We're asking for an increase of 122 agents. Again, the more that we have the more we're able to expand the locations in which we can put people.

CHRIS VAN HOLLEN:
Thank you, Mr. Attorney. I look forward to supporting that -- that budget request for the reasons you've laid out. I hope the committee will as well. My -- my final -- just have a statement here, Mr. Attorney General. The Congress on a bipartisan basis has recognized that the FBI needs a new consolidated headquarters that meets its security requirements.

And before the previous Administration, three sites had been located. And in the last bill passed by the Congress appropriations bill, we directed the General Services Administration to select one of those three earlier identified

sites for the new fully consolidated FBI headquarters. So as the chief law enforcement officer, we expect you to work with us to make sure that the law is followed.

And I -- I'm confident that you will do that. Thank you. Thank you, Madam Chair.

MERRICK GARLAND:
Thank you, Senator Van Hollen. Senator Haggerty.

WILLIAM HAGERTY:
Thank you, Senator Shaheen. And thank you Ranking Member Moran for holding this hearing. Thank you, Attorney General for being back with us today. I want to touch on something that's a great concern to my constituents and I think frankly to the confidence of many people in our system that you control through the Department of Justice.

And that's the matter of the Hunter Biden investigation. It received a great deal of press, but I want to ask you a bit about how the communications have worked within your department with the White House on this. First, have you been briefed on the Hunter Biden investigation matter yourself, General Garland?

MERRICK GARLAND:
So the Hunter Biden investigation, as I said even in my own nomination confirmation hearing, is being run by and supervised by the United States Attorney for the District of Delaware.

WILLIAM HAGERTY:
I'm aware of that. But he reports to you.

MERRICK GARLAND:
He is supervising the investigation. And I'm. you know, I'm not at liberty to talk about internal Justice Department deliberations, but he is in charge of that investigation. There will not be interference of any political or improper kind.

WILLIAM HAGERTY:
And -- and are any senior officials in your department being briefed or?

MERRICK GARLAND:
Again, he is the supervisor of this investigation and, you know, the normal processes of the department occur. But he is the supervisor of this investigation.

WILLIAM HAGERTY:
Well, if -- if you won't be able to say whether there have been communications there, I'd -- I'd like for you to tell me or answer this question, if you would. Would you think it would be approp -- appropriate for the President of the United States to call you into the Oval Office and tell you that his son didn't break the law regarding this matter?

MERRICK GARLAND:
Absolutely not. And the President has not done that. And the President is committed not to interfere not only in that investigation, but any other kind of --

WILLIAM HAGERTY:
-- Well, I agree with you. But --

MERRICK GARLAND:
-- Investigation --

WILLIAM HAGERTY:
-- But I -- I do wonder this then. Why the President is resorting to TV and having his surrogates go on TV to say just that message. Earlier this month White House Chief of Staff Ron Klein stated on national television that quote, "The President is confident that his son didn't break the law."

WILLIAM HAGERTY:
And the White House communications director said that President Biden maintains his position that his son did nothing that was unethical. This is on national television. The President's already told his subordinates clearly -- these are people that he can fire will -- that he and his family did nothing wrong.

How can the American people be confident that his Administration is conducting a serious investigation?

MERRICK GARLAND:
Because we put the investigation in the hands of a Trump appointee from the previous Administration who's the United States Attorney for the District of Delaware. And because you have me as the Attorney General, who is committed to the independence of the Justice Department from any influence from the White House in criminal matters.

WILLIAM HAGERTY:
Well, I think the observation here is terribly critical because there's an obvious conflict of interest here because of those who are investigating the Biden family and their enterprise can be fired by the head of the family who's being investigated. That is, Joe Biden can fire the attor -- the Attorney General in Delaware.

He can -- he can have an impact on all of your staffing. And I want to ask you this. Un -- under what circumstances do you consider or how do you evaluate whether you would appoint a Special Counsel?

MERRICK GARLAND:
I think this is -- this is a fact and law question in each case determining it and depending upon how cases go forward and the question of whether the Justice Department with its normal processes can -- should continue. I want to be clear though. Special Counsels are also employees of the Justice Department.

We don't have an independent counsel statute anymore. Both the Democrats and the Republicans experimented with this. And I -- I think probably in the end neither side liked it. And that's why we ended up with the law not being reauthorized. But in any event, the Special Counsel is also an employee of the Justice Department.

WILLIAM HAGERTY:
Have you had any consideration about whether to do this or --

MERRICK GARLAND:
-- Again, I think our internal deliberations have to stay within the department.

WILLIAM HAGERTY:
Again, I'll just restate that -- that there's an obvious conflict there that raises concerns amongst my -- amongst my constituents. I'd like to turn to some public evidence though. There are emails and photographs that show that President Biden, while he was Vice President, met several of Hunter Biden's business associates including a Burisma executive.

WILLIAM HAGERTY:
That's the energy company that paid Hunter Biden a million dollars per year to sit on its board. And a Russian billionaire who paid Hunter's firm 3.5 million around the same time. All of this is while President Biden was running portions of the United States foreign policy including Ukraine. There's evidence that Hunter Biden paid for Joe Biden's living expenses while he was Vice President.

A Hunter Biden email from 2010 entitled JRB Bills, Joe R. Biden bills, it discusses paying for the upkeep of Joe Biden's large stake front -- lake -- lakefront home. There's another 2010 email from a Biden confidant to Hunter Biden saying, quote, "Your dad just called me. He could use some positive news about -- -- Future earnings potential.

To me this suggests that Joe Biden's $231,000 salary is -- taxpayer funded salary and lifestyle as Vice President of United States weren't enough to support his lifestyle. That same confidante of -- and also Joe Biden's business partner made nine visits to the White House between between 2009 and 2013 and met with Joe Biden in the West Wing while Joe Biden was Vice President.

And we have a text message from Hunter Biden to his daughter stating that don't worry. Unlike Pop, meaning Joe Biden, I won't make you give me half your salary. So it seems President Biden was serving as Vice President and

running US foreign policy at the same time that his son Hunter Biden was raking in money from shade -- shady foreign business deals.

And this was money that was being diverted to benefit Vice President Biden. So General Garland, do you have any reason to dispute the evidence that indicates that President Biden was involved with and using money from Hunter Biden's business deals?

MERRICK GARLAND:
Senator, following the longstanding rule of the Justice Department we don't discuss investigations or evidence that maybe -- may or may not be relevant to investigations. That's a matter for the United States Attorney's office that's investigating the case.

WILLIAM HAGERTY:
Well the --

JEANNE SHAHEEN:
-- Thank you, Senator --

WILLIAM HAGERTY:
-- That's great. Thank you.

JEANNE SHAHEEN:
Thank you. Attorney General Garland has requested a break at 11:15. So what we are going to try and do is to get Senator Schatz and Senator Capito in and then we will break -- have a 10 minute break and then we will take up the rest of the questions. Senator Schatz.

BRIAN SCHATZ:
Thank you very much, Chair He -- Chair Shaheen and Vice Chair Moran. Attorney General, thank you for being here. I have -- I'm going to try to get through five questions/ So if I can have quick answers, that'd be great. What if any are the DOJ's plans to reinstate federal prosecutorial distret -- discretion for noninterference in states, territories, and tribes where marijuana is legal?

MERRICK GARLAND:
So as I understand our -- our -- our role with respect there, it's really the same as it is with respect to states. You're talking about marijuana prosecutions right?

BRIAN SCHATZ:
Yes.

MERRICK GARLAND:
And I think I, you know, I laid this out actually also in my confirmation hearing. And my view hasn't really changed since then. And that is that the Justice Department has almost never prosecuted use of marijuana. And it's not going to be -- it's not -- that's not an efficient use of the resources given the opioid and methamphetamine epidemic that we have.

BRIAN SCHATZ:
That's good enough for me. Let's -- let's move on.

MERRICK GARLAND:
Okay.

BRIAN SCHATZ:
I want to talk a little bit about PREA oversight. There have been a number of recent sexual abuse cases at FCI Dublin and other federal prisons across the country. What's the department going to do to address these PREA violations?

MERRICK GARLAND:
Yeah. So this is a, you know, another really terrible set of events. We have prosecuted a number of the individuals responsible now at Dublin for this. We have put in place a new warden at Dublin, I think within the last three weeks. We have -- the Deputy Attorney General has set up a task force to investigate and determine what the procedural failures here were and how these kind of failures can be prevented in the future.

And the matter has been referred to the Inspector General for an internal investigation.

BRIAN SCHATZ:
Thank you. Will the DOJ at least consider -- I don't want you to commit to it now -- but consider supporting the reestablishment of an interagency law enforcement equipment working group to oversee and provide recommendations for federal programs that include the transfer or sales of controlled equipment to law enforcement?

We know this issue comes up periodically. This is a space where this can be done intelligently. I think we've seen the various progra -- 1033 and other programs where -- where equipment is -- is transferred to local departments and it can be very useful or it can be overkill. And the point of a working group like this is to sort of suss out what departments need and what seems to be over arming local police forces.

MERRICK GARLAND:
I appreciate you're not asking for a commitment. But of course any consideration of that issue requires interagency discussion because some of the -- some of the equipment you're talking about is Defense Department equipment. So certainly we'll be happy to consider that.

BRIAN SCHATZ:
This is a Hawaii specific question. We don't have a halfway house in Hawaii since October of 2019. So does the Department have an interim or an emergency set of measures to ensure that Hawaii's halfway house eligible individuals still have access to services?

MERRICK GARLAND:
Yeah. So as you know, Senator, I think we have discussed before, we've -- we've had -- the Bureau of Prisons has had problems expanding the residential reentry center in Hawaii for a number of reasons, not the least of which is the providers are very scarce. B -- BOP I understand has made progress on a day reporting center contract and hopes to make an award within the next few months.

BRIAN SCHATZ:
Great. Final question, easy one. What is your position on clemency for Leonard Peltier?

MERRICK GARLAND:
So this is a matter that goes into applications, go to the pardon attorney, pardon attorney makes recommendations to the Deputy Attorney General to the President. And so I'm not going to comment on that now.

BRIAN SCHATZ:
Can you comment on where we are in the process?

BRIAN SCHATZ:
I don't -- I assume, but don't know that an application has been made. I actually don't even know whether -- I mean, I've read about this in the press. So I don't know anything more about it than what I've read in the press.

BRIAN SCHATZ:
And this doesn't cross your desk?

MERRICK GARLAND:
Certainly not as an initial or even secondary matter. This goes to the pardon Attorney and then the Deputy Attorney General. I'm not saying I wouldn't be involved, but it certainly has not crossed my desk.

BRIAN SCHATZ:
Thank you very much.

JEANNE SHAHEEN:
Thank you, Senator Schatz. Senator Capito.

SHELLEY MOORE CAPITO:
Thank you, Madam Chair and Ranking Member. And thank you, Mr. Attorney General, for being with us today. I'm not going to ask you a question on this. I just wanted to begin with expressing my deep concern about the flow of fentanyl into the country from the southern border. Senator Manchin mentioned West Virginia is at the tip of the spear as you know.

Senator Collins brought this up as a -- as a big issue. We've had meetings over the last two weeks being at home. And fentanyl is the killer. I mean, it is what's coming up through the southern border. So I would impress upon you how absolutely critical is -- it is that the situation at the so -- at the southern border has got to get better.

I understand the demand side is what's driving this in a lot of ways. But if we can cut the supply I think we can cut a lot of tragedy out of a lot of people's lives. And I -- I know you understand that as well. Let me ask a question. According to -- over the pandemic we've seen a significant increase in first time gun owners with almost 60 percent increase in African-American gun owners, 50 percent increase in Hispanic gun owners, 43 percent in Asian American gun owners.

I guess I would ask you if you have a perception as to why this is. But the reason I'm asking the question and I'm interested in, of course I want to see our Second Amendment rights protected. But also the NICS system which runs the background checks goes through West Virginia as you know. So do you have a -- any kind of perception as to why gun ownership is up among different groups?

And during the pandemic I know it's been bigger in all groups. What would you attribute that to and what kind of strain is this having on our NICS system?

MERRICK GARLAND:
So I -- I don't know the answer, I'm sorry, to the first question. This is the kind of analysis I, you know, can't make up and I -- I can't even guess at. I don't know what the causes are. The second question I can answer. You know, the more gun sales the more difficult it is for the NICS system. But that's the job of the NICS system.

So that's why we're asking for an increase in $6.2 million for -- for the NICS system in the President's budget here to -- to take into account the increase in the number of sales.

SHELLEY MOORE CAPITO:
Right. And -- and they can certainly use it. And we know we want accurate records. We want good records. And I mean they're working 24/7 as you know. Recently FBI Director Christopher Wray stated during an interview that there is a 59 percent increase in police officer killings, that is officers being killed at a rate of almost one every five days.

This is alarming to me. We had one of these incidences in our hometown. It's -- it's occurring at ambushes and attacks. You're asking for more money in $30 billion in mandatory spending for law enforcement help. What are you looking at in this area to further -- to -- to protect? I know hiring is an issue, but protecting our force.

And this is very concerning to me.

MERRICK GARLAND:
Well, it's extraordinarily concerning to me and to all of the 120,000 members of the Justice Department, most of whom are involved in law enforcement. So these are our brothers and sisters who are sometimes being targeted directly, sometimes being killed in the line of duty, and sometimes as a consequence of suicide.

So we have a -- an overall task force involving investigating threats, which includes in particular threats against law enforcement and -- and --

SHELLEY MOORE CAPITO:
-- Are you seeing the threats go up?

MERRICK GARLAND:
Yes, extraordinarily so. And you're right about the -- I think what -- I don't know the number that Director Wray cited, but I -- it sounds exactly right to me. The number is extremely worst -- worry -- worrying.

SHELLEY MOORE CAPITO:
Well, I'd like to see the focus of some of this new funding go into -- -- this precise issue. The suicide issue obviously is something that's deeply troubling as well. I think a lot of it is the lack of respect for law enforcement in certain areas of the country around the country. We're having trouble hiring in. We tried to do -- we tried to do reform, couldn't get it across the finish line to try to help our local law enforcement recruit train.

You know Dubai's [ph] training and all kinds of things that we see are issues within -- within our police department, but I'm very, very concerned about this. Let me ask you another question. I noticed in your -- in your statement that you're going to create a division to combat climate crisis. The reason I'm asking -- I'm interested in this is I'm on the EPW Committee, I'm the Ranking Member there, there is a lot of enforcement at EPA and other places on environmental justice, you're going to create a new office for environmental justice.

I mean are these directives coming from the White House? Why now? And -- and why with all of the other efforts that are going on throughout all the different cabinet positions in the -- in -- in the government, is this something that you're putting a high priority on right now?

MERRICK GARLAND:
So I think you -- you rightly noted it's not a division, it's an office within our already existing environment division. The reason is that there is responsibilities both in the environment division and in the Civil Rights Division. And so a coordination of -- particularly on the environmental justice issue requires coordination between --

SHELLEY MOORE CAPITO:
Is that not being handled in other areas? Like for instance in the EPA [ph] enforcement in their Environmental Justice Office?

MERRICK GARLAND:
Well, I'll be honest, I don't know about their environmental justice office, but we have a civil rights division which does prosecutions for civil rights violations. We have the environment division which does the affirmative cases. And we wanted to have some coordination between the two. That's the reason for having this law.

SHELLEY MOORE CAPITO:
Well, I think I've mentioned about three things I would put in front of this. And thank you so much.

JEANNE SHAHEEN:
Thank you, Senator Capito. We will now take a break. We will reconvene at 11:30. Thank you. [Recess] [In progress]

UNIDENTIFIED:
Murkowski, who is next.

LISA MURKOWSKI:
Thank you. Madam Chairman. Mr. Attorney General, welcome. Before I begin asking my questions, I wanted to note that when Senator Leahy was asking you about the VOCA Fix, I know that that's something that we are monitoring very, very, very carefully. We worked hard to make sure that we had $5 million for the victim's service organizations in Alaska to help.

That was a real panic cry that we heard from the state, and I am concerned. Senator Leahy has emphasized making this a priority, but I want to make sure that we're not in a situation where we're looking again, realizing we're not measuring up here. There's a gap. So if there is any kind of alternative funding our line items to ensure that our victim's organizations are able to receive this, I certainly hope that the department is looking at that.

And he also raised an issue with regards to some of the new grant programs in VAWA, that for reasons known or unknown, have not been reflected in the President's budget, and you indicated--you know, you weren't sure what those might be. Some of the ones that we have looked at are those grant programs, the new grant programs,

focused on expanding access to Sains [ph] as well as to medical forensic examinations.

So my hope is that this was just a matter of timing, not a deliberate choice to overlook those very important, certainly in rural states like Alaska. So we just underscore that when we--when Senator Leahy raises these issues, I am right there with him. So to the issue of VAWA, and as you know, this was something that I've been working on for a long period of time and was very pleased that we were able to advance this, get it signed into law, contained within the VAWA reauthorization is the--and the tribal title.

We have the Alaska Public Safety Empowerment Pilot. What we're really trying to do here is to be able to provide a level of justice in areas in my state where they simply have none. We want to get to these remote, rural villages, not necessarily those on the road systems. What we want to do is empower--is supplement, basically the work that the state is doing with regards to public safety.

We're not creating Indian country. We're not taking jurisdiction away from the state. But as you know, the attorney general in consultation with the Secretary of interior is directed to establish a process to designate those Indian tribes that can participate in the pilot. So the question to you this morning is, what do you anticipate in terms of the Department of Justice plan to begin this process?

How do you see this moving forward? We also direct the creation of an Alaska tribal public safety advisory committee not later than a year. So I'm just asking this morning if you can share how the President's budget will support the Alaska Public Safety Empowerment Pilot, as well as the Public Safety Advisory Committee.

MERRICK GARLAND:
Yeah. So I'm very grateful for everything that you did with respect to getting VAWA reauthorized. Of course, the Justice Department has been full on in support of this all along. So we are in lockstep on this. We support the pilot program. We think it's an important ability of authority to bring the--to prosecute these and investigate these matters.

We can't just leave them undone. So I'm very eager to get the pilot going, to get the villages decided, likewise with the commission. So I don't see any reason why we won't be able to be on time on our marks for this.

LISA MURKOWSKI:
Well, know that we would like to be working with you to understand what those timelines are to help with the expectations of folks back home. Last question for you relates to the Bureau of Prisons. Currently, Alaska does not have any federal facilities to house our federal inmate population within this state.

We have seen considerable-- -- Growth. Over the years, the number of federal inmates has grown from just a few hundred to over a thousand. And what happens then is many of these individuals are sent to serve their sentences at facilities outside the state, sometimes two to 5,000 miles away from their homes.

I have sent you a letter. Sent it back in March of this year asking that you consider a feasibility study working with the Bureau of Prisons to -- to conduct a new feasibility study. It hasn't been done for a period of time. It was -- it was apparently about two decades ago. A lot has changed in Alaska since then.

But I would ask that you -- you look at this. We've not heard a response back. So if you can take a look at this and -- and again try to work with us on a new feasibility study, but also willing to work with the Bureau of Prisons to obtain additional halfway house bed space in Alaska. Currently, we have only 39 beds for the entire state of Alaska.

All of them are located in Anchorage. So if you could perhaps follow up with me on those two asks, it would be greatly appreciated.

MERRICK GARLAND:
I'll be happy to have our team speak to yours or the two of us speak directly. I would be very happy to.

LISA MURKOWSKI:
Very good. Thank you. Thank you, Madam Chair --

JEANNE SHAHEEN:
-- Thank you, Senator Murkowski. Senator Braun.

MIKE BRAUN:

Thank you, Madam Chair. As I was going to another committee hearing and I just talked to Madam Chair, we had three of them at the same time today. It seems like we could organize ourselves a little better. I was listening to your conversation with Senator Hagerty and I did not hear the end result. And I'm assuming he probably asked do we need a special prosecutor to look into the Hunter Biden, you know, affair.

Do you think we need to? And I would then have one follow up question to that. So do we need a special prosecutor to look into that?

MERRICK GARLAND:
So as you know, the investigation is being run and supervised by the United States Attorney in Delaware who is an appointee of the previous Administration and continues on as the United States Attorney. The question of whether to have a special counsel is one that -- it's an internal decision making in the Department.

So I -- I don't want to make any judgments one way or the other. But I'm -- I'm quite comfortable with the United States Attorney for that district continuing in the role that he's playing.

MIKE BRAUN:
So a follow up question that would be of course special prosecutor or prosecutor counsel Mueller, you know, was assigned in that whole Steele dossier issue which now has been debunked. If you had been in that capacity then, do you think a special counsel was needed there as well?

MERRICK GARLAND:
It's hard to put myself back into -- into that circumstances. Then, of course, there would be a different -- for me to be in that position there would have been a different President. So I -- I'm -- I'm not sure I can answer that hypothetical.

MIKE BRAUN:
Well, it's obvious that that would be a question that many would wonder about in terms of what that standard is, what that consistency is. And it seems like it would be the same from one Administration to the next. Got a question that -- that really is probably more pertinent in the sense that what's happening on our southern border is confusing in the sense that the Administration says we don't have enough resources.

It's done things from the beginning that is -- I was down there with 17 other Senators roughly a year ago. And to give you a description of the immensity, it had gone from record low illegal crossings. And I'm one that believes we need to secure the border and then roll our sleeves up and fix all the issues associated with it. We were -- had risen from I think 40,000 to 70,000. This last month it was 212,000. I think 60 some thousand got aways.

I mean it has exploded beyond anybody's imagination, I think, self-induced. And then there are conflicting statements that part of it's due to not having enough resources. Are we resourced at the border properly? And that would be how we address any illegal crossings. That seems to be delegated to lower levels of authority.

Isn't that confusing? And in light of the issue in terms of where it's at, do we need to do something differently? And does your office need to be outspoken about trying to fix it?

MERRICK GARLAND:
So I -- I want to be careful about explaining what our -- our role is because we are -- we do need more resources. I think most of the resources you're referring to are Department of Homeland Security resources. So I'll leave that for that Secretary to express what they need. But we have asked for $1.35 billion for our immigration courts, one billion of which is to reduce the immigration court backlog.

So the thing is that our job is to run the immigration courts after we get referrals from DHS. So we have already onboarded everyone we can as immigration judges. We asked in fiscal year 22 for 100 more. Again, no fault of this committee because you gave us the right mark, but as a consequence of the omnibus that was not funded.

So we're asking for 200 new immigration judge teams, a total of 1,200 new staff for that purpose. That's the -- we've also asked for money for a virtual court initiative so that we can run these court proceedings more efficiently and more effectively and from whatever area. If we get the additional immigration judges, we will move them to the border.

We're already going to be moving them to the border as it is.

MIKE BRAUN:

And can you describe what your request is compared to what it was in prior years? What magnitude of difference?

MERRICK GARLAND:

So yeah, it's -- it's an additional 1,200 staff for --

MIKE BRAUN:

-- In addition to how much before? So we --

MERRICK GARLAND:

-- Well it will bring us to a total of 834 IJs. The staff includes all their clerks, et cetera. So with 200 more we'll get to 834. So 834 minus 200 was 634 is what we had before.

MIKE BRAUN:

And just with the arithmetic I put out there earlier, the problem has quadrupled or quintupled. So it would beg the question are we putting enough resources to it or is it kind of lip service because we know it's become a big issue? I -- I would advise maybe that might not be adequate given the magnitude of the current problem.

It's still predicted to go up even by 50 percent more.

MERRICK GARLAND:

So that's a fair question, Senator. Of course, we didn't get what we asked for the last time so we're trying to be realistic about what we can ask for. But resources are not the only thing we're doing. We've also adopted a new asylum officer rule with DHS so that asylum decisions are made by the asylum officers not by the IJs -- IJs, immigration judges.

So they won't have to do that. And then if there are denials, there'll be a streamlined process which should reduce the amount of time from current four years to six months. We also have a dedicated dockets in order to be able to better distribute the works am -- work among our IJs. So it's a combination of things.

We want more resources and we're trying to streamline the whole process and put more of the work --

MIKE BRAUN:

-- I don't think in the --

JEANNE SHAHEEN:

-- Thank you, Senator Braun.

MIKE BRAUN:

Okay. Thank you.

MERRICK GARLAND:

I'm sorry.

JEANNE SHAHEEN:

I know that Senator Moran and I both have a second round of questions that we would like to do. It's not clear that anyone else is interested. I don't know, Senator Braun, if you also have another round. But mine are relatively brief. So I will go ahead. You were discussing with Senator Capito the horrific issue of police being targeted and also suicides.

As I'm sure you're aware, there's no comprehensive national data collection regarding police suicides. So in FY 2020 we directed the Bureau of Justice Statistics to maintain a dataset and report on police suicides for federal, state, and local law enforcement. Unfortunately, BJS has not moved forward on collecting this data.

We provided stronger directives as well as three million dollars for that data collection effort in the FY 2021 bill. But still nothing. So were you aware of the delays with this project? And -- and what we -- can we do to try and collect this data? Because it's -- as you know, it's really critical to figuring out how do we -- how we respond.

We need to have information so we can think about what we can do to address what is becoming more and more of

a challenge nationwide.

MERRICK GARLAND:

Well, I am aware. I -- I understand that BJS will be submitting its report within the next couple of months. I'm not sure exactly how many months is it? In -- in about eight weeks I'll have an -- Update for you on this--on where they are on this.

JEANNE SHAHEEN:

Good. Well, I look forward to getting that. And we've had--sadly, we've had some high-profile suicides in New Hampshire. And I also look forward to working with the department on what we can do to address the challenge of suicide within our law enforcement agencies. So thank you. I'm pleased to hear that we should expect something soon.

Unfortunately, I missed a couple of the discussions around what's happening with fentanyl, because I had to step out. But I know that on Thursday the administration released their national drug control strategy. Like so many states, New Hampshire is one that has had way too many overdose deaths because of fentanyl.

And I wondered if you could give us a little insight into how resources are being shifted within the department to respond to that strategy and how that might impact small states like New Hampshire, which are struggling with this challenge?

MERRICK GARLAND:

Yeah. So of course--we have been involved in the development of the strategy and in the most simple form, there's two sides to this. There's the enforcement against the drug trafficking organizations and there's the health challenges for those who are addicted to try to get them off of the addiction and take care of them.

So on the drug trafficking side--you know, we're asking for $9.8 billion across DOJ to counter drug trafficking. The principal agency for us of course is the DEA for $3.1 billion, which is $102 million increase for counter drugs. Fentanyl is at the very top of the list of the concerns. When I was at the border, I saw the same problems that everybody else is reporting, of--these are very tiny pills.

And as the DEA administrator makes clear, one pill can kill and the odds--you know, it's like playing Russian roulette because some of these pills are overdose pills. So that's an extraordinary part of what we're doing. We've asked for money for marshals and for the US attorneys and for the FBI. The FBI is particularly targeting fentanyl and opioid trafficking on the dark web.

And as we announced within the last two weeks, we took down the largest dark web drug marketplace to prevent the way in which some people are getting it, which is online at this point. So there's a number of different things here. Criminal Division has money in the budget for the regional opium task--opium strike forces.

And then there are COPS grants under the COPS Program for anti-heroine an anti-meth task forces. So that's on the enforcement side. On the overdose addiction side, we've asked for $418 million for the Comprehensive Addiction Recovery, the CARA Act grants. We've asked for $190 million for the COSSA program, that's Comprehensive Opioid Stimulant and Substance Abuse grants, and another $75 million for mental health and substance use grants.

Money for drug courts, $95 million for veterans' treatment courts and for our consumer protection branch, which tries to stop those who are over subscribing and improperly over dispensing opioids. So it's a--you know, it's a two-pillar issue here for us. I can't think of anything more important or anything more tragic than what fentanyl is doing to the American people.

JEANNE SHAHEEN:

Well, thank you. I certainly agree with that and hope that as this strategy is rolled out that considerable thought will be given to rural parts of the country and small states like New Hampshire, which may appear positively on lots of scales with respect to income level and resources, but in fact have been very hard hit and really need help.

Thank you very much. Senator Moran?

JERRY MORAN:

Chairwoman, thank you. General, thank you for your presence today. Just a couple more questions, perhaps a follow up to a couple of my colleagues' questions. But first of all, I'd like to start with Title 42 and your conversation

with Senator Braun. I think your answer to him was more prospectively what might transpire in the need for additional resources in the future.

I would like to highlight or focus on this year, your budget request that's in front of us now. I know there's some uncertainty with federal judge in New Orleans in a decision, but it seems to me that, my view, this is a pretty reckless decision, but the--because the estimates are about 14,000 migrants could begin crossing the border per day after Title 42 ends on May the 23rd. That has to have enormous resource consequences for the federal government.

I think Homeland Security is already talking about additional--running out of money and needing additional dollars. ICE and Border Patrol, it's estimated could be out of funds by July of this year. What about the impact on DOJ components, marshals, immigration courts, US attorney's offices, have you prepared any estimates?

Has the department prepared estimates as to what the increasing expenditures may be this year, unaccounted for in your budget request?

MERRICK GARLAND:
I don't know that we have--I don't think we have those numbers now, but we can--I think our staff can work with yours. There's no question that there will be an increase in US attorney resources needed along the southern border. We've hired, with respect to the IJs, as I was telling Senator Braun, we've hired all the way up under the current appropriation.

So without more, we won't be able to increase the numbers. We are doing everything we can to streamline the system and to move people--the IJs to the borders to assist there. But look, we're always happy for more money and I'll be happy to have our staff speak with the subcommittee staff about that.

JERRY MORAN:
Well, General, I mean, the crux of my conversation with you in--earlier in today's hearing generally revolved around violent crime. And my view is that the consequence of what the administration is determined to do with Section 42 can't be compensated for by removing resources, going to fight violent crime.

The border and violent crime are clearly related, significantly related, but you--and I remember visiting the border and what stood out to me is that when we were housing the juveniles on the border, 40 percent of the Border Patrol agents were then in the housing business, not in the Border Patrol business.

And I think there's an analogy there of something the Department of Justice must avoid, which is to take resources away from something that is a crisis already to address the crisis that is going to occur with the removal of 42. That make sense?

MERRICK GARLAND:
Yes, and I assure you, we don't want to remove the money that we need to fight violent crime, to put it anywhere else.

JERRY MORAN:
Has the Department either volunteered or been tasked with providing DOJ personnel to support DHS during this crisis?

MERRICK GARLAND:
I don't know what the--

JERRY MORAN:
--US marshals?

MERRICK GARLAND:
Yeah. Well, yes, but to be clear, we don't do border patrolling. None of our law enforcement is able to do--is trained for that or anything else. The Bureau of Prisons is going to make busses available and--for the transfers that the Border Patrol needs assistants for. And the Marshals Service is going to be providing additional deputy US marshals to assist CBP at the border.

But I don't want to overstate how much that is because our ability to make those contributions is not large.

JERRY MORAN:
Thank you. Senator Shaheen visited with you about drugs in particular, rural and and small states. You and I had a conversation probably as you were being confirmed about rural law enforcement departments. And I ask you and you agreed, and I think you've pursued making certain that rural agencies, small agencies in particular, have a fair shot at getting the federal resources.

Anything that you can do to update or anything that you would request of me to make that more--less onerousome [ph] and more likely?

MERRICK GARLAND:
I think we have been doing that. We've made it easier to make app--for small law enforcement agencies, particularly the rural ones that you're speaking of, to make the applications for the grants. I will tell you that on my recent trip to US attorney's offices to talk to law enforce--joint law enforcement task forces in Colorado and Louisiana in particular, met with rural sheriffs.

And--you know, I wanted to make sure that these task forces were not only focused on the cities but were focused on helping the rural sheriffs as well. And both of those circumstances at least we got considerable affirmation that is working well. That--you know, this is-- The -- the rural law enforcement provides the boots on the ground who know the people in the community and the federal law enforcement, DEA, FBI, ATF, Marshals are able to provide the technology and the skills sets necessary to, you know, find people who cross the border from one jurisdiction into another and to bring them back.

So, this is anecdotal, but my anecdotal work suggests very good cooperation in these joint task forces.

JERRY MORAN:
Thank you. My -- my time is more than expired. I just would mention one other thing and -- and perhaps there could be a follow up by you or your staff. I am surprised that the DOJ's only -- is only requesting -- your budget request is only an additional $68.6 million to investigate and prosecute cyber-crime, including 52 million at the FBI and 15 million at the US Attorney's Office.

The magnitude of the problem is can't -- I can't imagine be -- can be addressed with that -- with that minimal or modest amount.

MERRICK GARLAND:
Well, I -- I -- maybe my numbers are -- look a little different than yours --

JERRY MORAN:
-- All right --

MERRICK GARLAND:
-- My -- mine show up more than $1.2 billion to address cybersecurity and cyber-crime across the country. The increases are 15 million for 50 more US Attorneys to bring these cases, for another $88 million for additional 75 FBI personnel to -- to bring these cases. And then for our own cybersecurity for the Justice Department and all the law enforcement agencies, 115 million.

So I'm not sure why the numbers are --

JERRY MORAN:
-- I -- no, I may have -- I may have misspoken or certainly at -- at minimum was confusing. Those are the increases, not the total amount ex --

MERRICK GARLAND:
-- We -- we did get --

JERRY MORAN:
-- Over enacted levels.

MERRICK GARLAND:

We did get more money in -- in the -- in the recent supplemental because of Ukraine. I can promise you we expect to ask for more money. And part of the money we're going to ask for is cyber defense, because we're -- we're quite worried obviously about that. Other money in there will be for -- I'm -- I'm trying to decide whether to call it KleptoCapture or just our sanctions task force, but it's the Klepto ta -- Capture task force.

So we'll be asking for additional money, but you all -- you did give us more money in the supplemental on this as well.

JERRY MORAN:

General, thank you. Thank you for joining us. And I did agree with Senator Shaheen to -- to help her -- work together with her to see that we get the US Attorney process back under a fashion in which we get some confirmations to conclude.

MERRICK GARLAND:

That would be great. Thank you.

JEANNE SHAHEEN:

Thank you, Senator Moran, on both counts.

JERRY MORAN:

Senator Graham.

LINDSEY GRAHAM:

Thank you. Good morning. So on -- on the Russia front, we had lunch and I really appreciate what you and your team are doing. There's a lot on your plate. You know, you wanted money in the supplemental. Is there any additional authority you need from Congress to be more aggressive in terms of going after the oligarchs and kleptocracy?

Do you need any legal changes?

MERRICK GARLAND:

Yeah. So I'm -- I thank you for asking for -- about that. We have been very carefully examining that question and I expect that there will be requests for legislative changes. These could go particularly in the way in which we do the forfeitures to make it easier for us to do the forfeitures. I -- I think I mentioned earlier also the possibility of taking money out of the forfeiture fund that we collect this way and sending it to Ukraine.

So there -- the answer is yes --

LINDSEY GRAHAM:

-- Okay --

MERRICK GARLAND:

-- And we are hard at work on it. And I expect very soon, within days probably, that the Administration will be able to represent some requests.

LINDSEY GRAHAM:

Well, good, Mr. Attorney General. I think there'll be a receptive audience to give you more money if that's what it needs to go after the -- the people who've profited from destroying the Russian economy. Along that line there's articles in the paper about family members that have been used by Putin to -- to sort of launder money, and talk of a girlfriend in Sweden.

Do you know anything about an effort to bring sanctions against her?

MERRICK GARLAND:

First answer is no. And the second answer, I guess, is if I did know I wouldn't be able to discuss it --

LINDSEY GRAHAM:
-- Okay. Fair enough --

MERRICK GARLAND:
-- This is a Treasury Department issue --

LINDSEY GRAHAM:
-- Yeah. I just -- right. I just -- I would encourage you to put everything on the table. When it comes to Afghanistan, have you been briefed recently about the possibility of terrorism emanating from Afghanistan into the United States? Has that threat level gone up or down or do you know?

MERRICK GARLAND:
Yeah. The details of that I'd have to defer to a classified briefing.

LINDSEY GRAHAM:
Okay. All right. That's fair.

MERRICK GARLAND:
I think it is fair to say that we are constantly concerned about the risk that ISIS-K will try to mount something in the United States. Likewise, continuing with respect to Al-Qaeda. But the FBI is putting all its -- enormous amount of resources into preventing that as our -- as is the intelligence community outside the United States.

LINDSEY GRAHAM:
Okay. Well, let's stay in touch on that. Sort of back to the border. This idea of taking Title 42 out of the toolbox in terms of a way to deal with illegal immigrant crossings. Do you believe if Title 42 is repealed there would be a surge at the border?

MERRICK GARLAND:
I -- as I -- I think it's important for me to explain our role in this. And -- and the Justice Department's only role is when the CDC makes its assessment as it did and asks us to appeal for us to determine whether that would be lawful. And the department concluded that the CDC's --

LINDSEY GRAHAM:
-- But you -- but you're in charge -- I'm sorry. Go ahead, finish your thought.

MERRICK GARLAND:
Yeah. And so that -- that was -- so. I think to answer the other part of your question, I think all intelligence suggests that there will be a large increase in the border. Yes.

LINDSEY GRAHAM:
Now when it comes to drugs, migrants --

MERRICK GARLAND:
-- Yeah, right --

LINDSEY GRAHAM:
-- When it comes to drugs coming into the United States from the southern border, in the last year has that problem gotten better or worse?

MERRICK GARLAND:
I don't know what the numbers are. I mean, it is obviously the case that the -- the -- the transportation of fentanyl particularly has increased. Fentanyl is much easier -- it's much more compact, much smaller, goes a longer way. The smugglers, particularly in the trucks, have developed ways to hide it even from our x-rays.

LINDSEY GRAHAM:
Yeah.

MERRICK GARLAND:
So that problem of fentanyl crossing the border -- border has definitely increased in a way that makes all of us very worried.

LINDSEY GRAHAM:
Okay. So when it comes to -- to your role in all this, if Title 42 is repealed and we get a surge, there's an increase in fentanyl coming across the border and the leading cause of death for Americans from 18 to 45 they tell me is fentanyl overdose. Do you think this budget and the game plan for the Biden Administration is -- will be effective against this increase?

MERRICK GARLAND:
I think that the budget that we've asked for for drug trafficking and drug interdiction, which is $9.8 billion, is -- is -- is a huge amount and an enormous allocation of America's resources in this respect. But again, our job is different than the Department of Homeland Security's job. So I can't speak --

LINDSEY GRAHAM:
-- No, I -- I got you --

MERRICK GARLAND:
-- I can't speak to their resources.

LINDSEY GRAHAM:
And I'll try to wrap up here. But drug interdictions are dramatically less than they were in FY 2021. We had 913,000. That's how much drugs were -- were interdicted. Now we're at 340,000. It seems to be that interdiction is going down. So my basic question is do you consider the border in a state of crisis?

MERRICK GARLAND:
I think as you rightly pointed out, there's going to be a lot of -- intelligence suggests there'll be a lot of people -- a lot more people migrating at the border.

LINDSEY GRAHAM:
The reason I mention it is I believe it is. I believe that the amount of drugs coming across are unprecedented. The amount of people coming across the border illegally is unprecedented. Seems to be every trend line is getting worse. And to be honest with you, Mr. Attorney General, I think we need to go all in, all hands on deck of controlling our border.

And do you believe that what we have in place through this budget and the system as a whole that we can expect to turn this around?

MERRICK GARLAND:
I think that the money with respect to the Justice Department, which is the only thing I can speak to, I think that if you give us the increased resources that we're asking for we can do our job.

LINDSEY GRAHAM:
Okay. So six months from now we'll -- we'll see. Thank you.

JEANNE SHAHEEN:
Thank you, Senator Graham. If there are no further questions this afternoon, Senators can submit additional questions for the official hearing record. We request the Department's responses within 30 days of receiving those. And the subcommittee stands in recess until Tuesday, May 3rd when we will hold a hearing on the budget requests of NASA and the National Science Foundation.

Thank you very much, Mr. Attorney General, and to all of your staff.

MERRICK GARLAND:
And thank you.

**List of Panel Members**

PANEL MEMBERS:
SEN. JEANNE SHAHEEN (D-N.H.), CHAIRMAN

SEN. PATRICK LEAHY (D-VT.)

SEN. DIANNE FEINSTEIN (D-CALIF.)

SEN. JACK REED (D-R.I.)

SEN. CHRISTOPHER COONS (D-DEL.)

SEN. BRIAN SCHATZ (D-HAWAII)

SEN. JOE MANCHIN (D-W.VA.)

SEN. CHRIS VAN HOLLEN (D-MD.)

SEN. JEFF MERKLEY (D-ORE.)

SEN. PATRICK LEAHY (D-VT.) EX-OFFICIO

SEN. JERRY MORAN (R-KAN.), RANKING

SEN. LISA MURKOWSKI (R-ALASKA)

SEN. SUSAN COLLINS (R-MAINE)

SEN. LINDSEY GRAHAM (R-S.C.)

SEN. JOHN BOOZMAN (R-ARK.)

SEN. SHELLEY MOORE CAPITO (R-W.VA.)

SEN. JOHN KENNEDY (R-LA.)

SEN. WILLIAM HAGERTY (R-TENN.)

SEN. MIKE BRAUN (R-IND.)

SEN. RICHARD SHELBY (R-ALA.), EX OFFICIO

SEN. RICHARD SHELBY (R-ALA.) EX-OFFICIO

---

Source: **CQ Transcripts**

# EXHIBIT 11

CQ Congressional Transcripts
Mar. 1, 2023

Mar. 01, 2023 Revised Final

# Senate Committee on the Judiciary Holds Hearing on Department of Justice

## LIST OF PANEL MEMBERS AND WITNESSES

DICK DURBIN:

This meeting of the Senate Judiciary Committee will come to order. Today marks the Senate Judiciary Committee's first oversight hearing of the 118th Congress. Last Congress, we held more than a dozen oversight hearings and honored the committee's historic constitutional responsibility to provide oversight to the agencies of our government.

It is this responsibility, under Article 1 of the Constitution, that serves as a check and balance on the executive branch, whether the president happens to be a Republican or Democrat. Attorney General Garland, welcome. This is the third time you've appeared before this committee. You have many pressing responsibilities, I should say, as attorney general.

You have many pressing responsibilities, and I appreciate your taking the time to be here today. There are so many subjects under your jurisdiction worthy of close examination, which I'll turn to a few in a moment. But we shouldn't take for granted that we now have a Department of Justice with a renewed dedication.

When you were sworn into office two years ago, the department was embroiled in scandal. You committed to restoring its independence, and I believe you've kept your word. I expect that we'll hear accusations today from some of my Republican colleagues to the contrary, such as weaponization of the Justice Department.

The reality is you have recommitted the department to serving the American people and not the personal interests of any one political figure. You've taken the appropriate steps to

ensure that investigations are not overshadowed by politics. You have not interfered with the investigation of the president's son by the US attorney for the District of Delaware, a holdover who was appointed by President Trump.

You have not interfered with the special counsel investigation initiated by Attorney General Barr into the origin of the FBI investigation of the Trump campaign ties to Russia. And most recently, you've appointed two special counsels to investigate any potential mishandling of classified documents in the possession of former President Trump or President Biden.

Unfortunately, too many of my colleagues have turned a blind eye to the actual weaponization of the Justice Department during previous administrations. Take one example. President Trump and his allies attempted to co-opt the department into overturning the results of the 2020 election, a relentless campaign that this committee exhaustively documented in Subverting Justice, a 394 page report.

But your actions in the last two years should reassure the American people that the Justice Department should not and does not operate as the servant of any president. The Justice Department has important constitutional responsibilities. It must protect the civil rights of the vulnerable. It must respond to threats to our nation, both domestic and international.

It must hold accountable those who violate the laws passed by Congress. We have discussed before, and I will certainly hear again today, some issues of critical importance to the American people. More than 6,800, 6,800 Americans have died from gunfire in the first two months of this year. There have been at least 94 mass shootings, more than one every single day this year in America.

I look forward to hearing how the department is using new tools that Congress approved in the bipartisan Safer Communities Act to -- to quell this violence. In March 2021, FBI Director Wray testified under oath before this committee that the threat of domestic terrorism is metastasizing throughout this country.

I look forward to hearing your response to that extremist threat. We'll discuss the importance of full implementation of the bipartisan First Step Act, which is showing

meaningful progress in responsibly reducing recidivism and making our criminal justice fairer -- system fairer. And we'll discuss the importance of preserving America's civil rights and protecting them from attacks on their bodily autonomy, especially after the Supreme Court Dobbs Decision.

The sunset of Section 702 of the Foreign Intelligence Surveillance Act this year provides an opportunity to implement much needed reforms to keep America both safe and free. And the department must continue to hold steadfast to the principles of equity and access, despite resistance from those who are threatened by an even playing field.

As more citizens face greater impediments to exercising their constitutional right to vote and there's an increase in incidents of hate violence, the department must defend America's bedrock values. At this point, I turn to my colleague and the ranking member on the Senate Judiciary Committee, Senator Graham.


LINDSEY GRAHAM:
Thank you, Mr. Chairman. Welcome, Mr. Attorney General, appreciate you coming to the committee. And thank you, Mr. Chairman, for having the hearing. So, here's sort of the other side of the story. When you ask Americans are we on the right track as a nation, about 70 percent of them say no. Now, why? I think there's a feeling in this country that we're losing control of our streets, that crime is increasing and the world is a very dangerous people, and people don't feel safe anymore.

You talk about the number of deaths from gun violence, certainly something we should be concerned about, but let me tell you something we also should be concerned about. Rebecca Kiessling, a mother testified yesterday, who lost two sons to fentanyl overdose. They -- they were buying, I think, a Percocet pill, and it -- it was laced with fentanyl, and they died from taking one bill -- pill, both of them.

She said, as I quote, "This is a war. Act like it. Do something." So, 106,000 people died from drug overdoses, 70,000 from fentanyl last year, and it's getting worse. The leading cause of death for Americans aged 18 to 45 is death by fentanyl poisoning. What are we doing? What

is that something? So, I hope we'll recommit ourselves, Mr. Chairman of this hearing, to do something, to act like we're at war because we are.

Foreign terrorist organization designation for the Taliban, that's a good thing. Other groups; how about making drug cartels in Mexico and other places foreign terrorist organizations under US law so we can go deeper and prosecute those who help these people poison America? So, the bottom line, we're adrift as a nation.

We're not taking the crime problem as seriously as we should. The world is on fire. We say that Putin's engaged in crimes against humanity. I agree with that statement, but we're not giving jets to the Ukrainians to defend themselves against the crime. So, we've gotta up our game. And I hope out of this hearing we will have a recommitment to convince the American people that we're going to keep you safe, that we're going to have policies to deal with the poisoning of America from fentanyl, that we're going to hold Mexico and other countries accountable, that most of this stuff comes from China, and enough is enough.

We're going after those who are killing our kids from fentanyl. Gitmo; this administration let two detainees out of Gitmo. There's 30-something left. The recidivism rate is about 25, 34 percent depend -- depending on who you ask. Now is not the time, after Afghanistan, to be letting people, who've been in jail for 20 years because they're so dangerous, out of jail.

And I hope this administration will not empty Gitmo, because the worst thing we could do right now is let people go who have been involved in terrorist activities, who are still a danger or enemy combatants under international law because of the passage of time. So, Mr. Chairman, we all want to work with you on this side, but there is no strategy that I can discern about how to deal with the poisoning of American through fentanyl.

Most Americans are worried about the rise in crime, and we need to reassure them we get it, that we're going to do better. That Schedule I designation for fentanyl expires at the end of the year. Mr. Chairman, I know you don't want to -- that to happen. Senator Cotton's been ahead of this before any of us. So, if you put arsenic in a pill knowing somebody is going to take it, why aren't you charged with -- you would be charged with murder.

If you lace a pill with fentanyl, which is probably more lethal than arsenic, why aren't you charged with murder? We're going to have to deter those who are killing young people in America. We're going have to put countries on notice that you're with us or you're against us when it comes to this scourge of fentanyl.

We're going to have to control our border. We're going to have to come up with a rational immigration policy. We're gonna have to change our asylum laws because everybody in the world believes if they get one foot in America, they never leave. On many fronts, law and order has broken down here at home and the world is in chaos.

China is watching what we do in Ukraine. And the question for all of us, are we doing enough to combat the threats that we're all living with? And I would say we're woefully inadequate in dealing with the threats that exist against America at home and abroad. And maybe this committee, in a bipartisan fashion, can do something about it. Thank you.


DICK DURBIN:
Thank you, Senator Graham. Let me lay out the mechanics of today's hearing. After I swear in the attorney general, he'll have five minutes to provide an opening statement. We have his written statement for the record. There will be a first round of questions, and each senator will have seven minutes. Please try to remain within your allotted time.

Following the first round of questions, if there's an interest in the second round, senators will have an additional three minutes each. I would now ask the attorney general to please stand and raise his right hand. Do you affirm that the testimony you're about to get before this committee will be the truth, the whole truth, and nothing but the truth, so help you God?


MERRICK GARLAND:
[Off-mic]


DICK DURBIN:

The record reflects that the attorney general answered in the affirmative. And now you're invited to proceed with your opening statement.

MERRICK GARLAND:

[Off-mic] Got it. Thank you. Appreciate it. Good morning, Chair Durbin, Ranking Member Graham, and distinguished members of this committee. Every day the 115,000 employees of the Justice Department work tirelessly to fulfill our mission to uphold the rule of law, to keep our country safe, and to protect civil rights.

Every day our FBI, ATF, and DEA agents, and our deputy US Marshals put their lives on the line to disrupt threats and respond to crises. Every day department employees counter complex threats to our national security. They fiercely protect the civil rights of our citizens. They pursue accountability for environmental harms.

They prosecute crimes that victimize workers, consumers, and taxpayers. And they defend our country's democratic institutions. And every day in everything they do, the employees of the Justice Department adhere to and uphold the rule of law that is the foundation of our system of government. Thank you for an opportunity to discuss our work.

First, upholding the rule of law. When I began my tenure as attorney general, I said it would be my mission to reaffirm the norms that have guided the Justice Department for nearly 50 years. I do -- did so because those norms matter now more than ever to our democracy. The health of our democracy requires that the Justice Department treat like cases alike, and that we apply the law in a way that respects the Constitution.

It requires that, as much as possible, we speak through our work and our filings in court so that we do not jeopardize the viability of our investigations and the civil liberties of our citizens. And the survival of our democracy requires that we stand firmly against attempts to undermine the rule of law, both at home and abroad.

I am proud of the work that the department has done on each of these fronts. We are strengthening the norms that protect the department's independence and integrity. We are securing convictions for a wide range of criminal conduct related to the January 6th attack

on the Capitol. We are disrupting, investigating, and prosecuting violence and threats of violence targeting those who serve the public.

And we are working closer than ever with our Ukrainian partners in defense of democracy, justice, and the rule of law. We will continue to do so for as long as it takes. Second, keeping our country safe. The Justice Department is using every resource at our disposal to keep our country safe. We are working to counter, disrupt, and prosecute threats posed by nation states, terrorist groups, radicalized individuals, and cyber criminals.

And together with our partners across the country, we are continuing to combat the rise in violent crime that began in 2020. All 94 of our US attorneys offices are working alongside their state and local partners to pursue district specific violent crime reduction strategies. The department's grantmaking components are providing financial assistance to local law enforcement agencies.

At the tame -- same time, they are supporting community led violence intervention efforts. And our law enforcement components are working with state, local, tribal, and territorial counterparts to apprehend the most dangerous fugitives and seize illegal drugs and illegal guns. For example, last year DEA and its partners seized enough fentanyl laced pills and powder to kill every single American.

We are also aggressively prosecuting the crimes that inflict economic harm on the American people. We are prioritizing the prosecution of schemes that impact older Americans and vulnerable populations, as well as schemes involving pandemic and procurement fraud. In our corporate criminal enforcement, we are prioritizing and secure -- and securing individual accountability, and we are vigorously enforcing our antitrust laws.

Our enforcement actions have already resulted in the blocking or abandonment of mergers that would have stifled competition and harmed consumers. Third, protecting civil rights. Protecting civil rights was a founding purpose of the Justice Department, and it remains an urgent priority. The department's storied civil rights division has been at the forefront of efforts to protect the right to vote, ensure constitutional policing, and enforce federal statutes prohibiting discrimination in all of its forms.

But now, protecting civil rights is also the responsibility of every Justice Department employee every single day. We are working across components to combat hate crimes and improve hate crimes reporting. In the wake of the Supreme Court's decision to overturn Roe and Casey, the department has pulled together to protect -- protect reproductive freedom under federal law.

And the department recognizes that communities of color, indigenous communities, and low income communities often bear the brunt of harm caused by environmental crime, pollution, and climate change, so we are prioritizing cases that will have the greatest impact on the communities most burdened by those harms.

I am proud of the work of the department's employees, the work they have done to uphold the rule of law, to keep our country safe, and to protect civil rights. The department's career workforce has demonstrated extraordinary resilience after years of unprecedented challenges. They have conducted themselves with the utmost integrity without regard to any partisan or other inappropriate influences, and they have done their work with a singular commitment to the public we all serve.

The employees of the Justice Department are dedicated, skilled, and patriotic public servants. It is my honor to represent them here today. Thank you for the opportunity to testify. I look forward to your questions.


DICK DURBIN:
Thanks, Attorney General. You grew up in Lincolnwood, Illinois, if I'm not mistaken, at least part of your life.


MERRICK GARLAND:
That's true.


DICK DURBIN:
It's not far from Highland Park, is it?

MERRICK GARLAND:

That's also true.


DICK DURBIN:

And we know what happened last 4th of July when the people of Highland Park gathered for a 4th of July parade. A gunman went on -- on the roof of a business downtown and fired off 83 rounds into the crowd in 60 seconds. Even the armed good guys, the policemen who were there trying to protect the public, had trouble locating that person, and certainly, sadly, could not have the time to respond to what he had done until it was finished.

When he was finished, there was an eight year old, Cooper Roberts, who will be paralyzed for life. There was a young man, two year old Aiden McCarthy, who was -- became an orphan because both of his parents were killed. Seven total lives were lost. 50 people were injured. It is hard for me to imagine that some disciple of originalism believes that our Second Amendment envisioned what happened in Highland Park.

To think that there is a weapon out there, a military style weapon, and the rounds and clips that are available to fire off multiple rounds into innocent crowds just, to me, makes little or no sense when you read the basic language of the Second Amendment. And so Congress did something, and I want to credit Senator Cornyn for being a participant in this effort -- a leader in this effort, with Senator Murphy of Connecticut, to try to pass a bill to make it better.

The bipartisan Safer Communities Act addressed issues of straw purchasing, which we have discussed before, the terrible death of a Ella French, a Chicago policeman, because of the straw purchase made in the state of Indiana, and this situation with the shootings of innocent individuals in Highland Park. I'd like to ask you, what have you seen, if anything, that's changed for the better since we passed our law?


MERRICK GARLAND:

I think it's a very important law, and I'm grateful to the members who sponsored it and to the overall Congress that passed it. It's done several things for us. First of all, it has, as you said, established a standalone crime for straw purchasing and a standalone crime for trafficking in illegal weapons.

We have already --

DICK DURBIN:
And are these being prosecuted?

MERRICK GARLAND:
Yes. In -- in both cases, we have already brought trafficking cases. I think we already have two gun trafficking cases and several straw purchasing cases as a consequence of this law. In addition -- in addition, the law provided for enhanced background checks for people under 21, and we have largely completed the process of making those possible so that juvenile records that disclose prohibited conduct and make somebody a prohibited possessor would now be identified.

That's another thing we've done. The statute also provided funds under the burden program and additional programs for violence intervention and for helping states deal with red flag laws so that people who have been subject to a court order barring them from obtaining a gun, we would be able to get those kind of systems provided.

And we've already given out grants in both of those areas.

DICK DURBIN:
Senator Graham basically challenged me, and I accept the challenge, to show as much concern about the gun deaths -- show as much concern about fentanyl deaths in this country. And I want to do that. He noted, I believe, and correct me if I'm wrong, that the number one cause of death in people 18 to 45 is drug overdose.

I don't know if it's fentanyl specifically, but a drug overdose. And I -- I know that reality. But the number one cause of death to children under the age of 18 is gun violence in America too. We can do both. We must do both. So, let's address the fentanyl issue for a minute. We had a hearing in this committee two or three weeks ago which talked about the social media platforms and what they are peddling to Americans, particularly to our children across America.

There were mothers sitting near where you're sitting today who brought color photographs of their children who died as a result of their trafficking of information on social media. And there's little or no responsibility accepted by these platforms. Section 230 absolves them from civil liability when they broadcast things which harm children, whether it's bullying or harassment or something as basic as this choke challenge, which unfortunately claims the lives of children as well.

I think there was a general consensus on this committee, which is saying something, that we need to do something about social media platforms. And I coincidentally had a meeting just a day or two later with Anne Whigham from the Drug Enforcement Agency. She described for me the sale on the Internet and social media platforms of phony drugs.

Senator Graham made the reference to a person who thought they were buying Percocet and bought fentanyl and died as a result of it. I asked her how common this was. She said very common, and they have -- the sellers even have valet services where they will physically deliver boxes of these phony drugs to people at their homes on their porches.

This is out of hand. Do you believe that we need to do more to regulate and control the use of social media platforms that are currently exploiting families and children across America?

MERRICK GARLAND:

Senator, I agree with both you and Senator Graham with respect to how horrible this situation is. I have personally met with the families of children and teenagers and young adults and even the elderly who have taken these pills, often thinking that they're taking

Adderall or Oxycodone or Percocet, a prescription drug, but when in fact it is filled with fentanyl.

And as the DEA administrator's testimony demonstrated, six out of ten of those pills are a fatal dose. The cartels that are creating these pills and that are distributing them within the United States are the most horrid individuals you can imagine. And unfortunately, they are doing it on social media advertising as if they are prescription pills.

So, the DEA has a program of going out to the social media companies and urging them to advise DEA when they see this and advising --

DICK DURBIN:
Ms. Whigham told me that, when they approach the social media and ask for the algorithms so that they can get to the root cause of this death and destruction, these social media platforms plead Section 230 and refuse. What do we do?

MERRICK GARLAND:
Well, I think we do have to do something to force them to provide information to search their own platforms for sales of illegal drugs. This is a --

DICK DURBIN:
I -- I tell you, I mean, I don't want to put words in your mouth, but I think Section 230 has become a suicide pact. We have basically said to these companies you are absolved from liability, make money. And they're at it in overtime, and deaths result from it. And we have a responsibility. I think the committee really spoke to it. We may see it differently, but on a bipartisan basis -- and I've spoken to Senator Graham and I want to make sure that when we agree it also is publicized.

We both feel very strongly that this committee needs to be a venue to take on this issue. I hope we have your support and the support of the president when we do that.

MERRICK GARLAND:

You certainly have our support with respect to finding a better way to get the social media companies, whether it's civil or criminal, to take their -- these kind of things off their platforms, to search for them, to not use algorithms that recommend them. I totally agree with that, Senator.

DICK DURBIN:

Thank you. Senator Graham?

LINDSEY GRAHAM:

Thank you. Again, welcome, Attorney General. I'm gonna do something maybe a bit different. I want to try to find a consensus where we can, see how far we go. Do you agree that the Wagner organization associated with Russia should be a foreign terrorist organization under US law?

MERRICK GARLAND:

I think they are a organization that's committing war crimes, an organization that's damaging the United States. I think they've already been designated as a trans --

LINDSEY GRAHAM:

Yeah.

MERRICK GARLAND:

As a --

LINDSEY GRAHAM:

Criminal -- yeah, something. Yeah.

MERRICK GARLAND:

Yeah, TCO. I'm trying to get the --


LINDSEY GRAHAM:

I want to go up a notch. Are you OK with that?


MERRICK GARLAND:

I understand. This is a -- the -- the way in which determinations are made for -- with respect to terrorist organizations come through the State Department. They have to make determinations of what the consequence is for countries that are -- that have them in them.


LINDSEY GRAHAM:

Do you object to me trying to make them a foreign terrorist org?


MERRICK GARLAND:

I think -- I don't object. I think, though, that I would defer in the end to the State Department on this.


LINDSEY GRAHAM:

I gotcha. Yeah. Well, I -- I bet we'll all come together on that one. Fentanyl; fentanyl deaths are more than gun and accident deaths combined in United States. Did you know that?


MERRICK GARLAND:

Yes, sir.


LINDSEY GRAHAM:

I mean, this is -- how would you describe the fentanyl problem in America?

MERRICK GARLAND:

It's a horrible epidemic.


LINDSEY GRAHAM:

OK.


MERRICK GARLAND:

But it's an epidemic that's been unleashed on purpose by the Sinaloa and the new generation of Jalisco cartels.


LINDSEY GRAHAM:

OK. Let's just stop and absorb that for a moment. This is a horrible epidemic. It kills more people than car wrecks and gun violence combined. And the question is what are we going to do about it. Under current law, fentanyl loses its Schedule I status by the end of the year. You oppose that, I -- I assume.


MERRICK GARLAND:

I certainly do. Fentanyl -- all fentanyl related drugs should be scheduled, permanently scheduled.


LINDSEY GRAHAM:

Do you support mandatory minimums for people dealing in fentanyl?


MERRICK GARLAND:

I think we already have mandatory minimums for people dealing with --


LINDSEY GRAHAM:

Do you think they should be increased?

MERRICK GARLAND:

I think we -- we have more than enough ability now to attack this problem.

LINDSEY GRAHAM:

Well, would you agree with me, whatever we have is not working well?

MERRICK GARLAND:

Well, I --

LINDSEY GRAHAM:

Whatever we're doing is not working.

MERRICK GARLAND:

I agree with that because of the number of deaths that you pointed out.

LINDSEY GRAHAM:

Yeah. So --

MERRICK GARLAND:

So, the --

LINDSEY GRAHAM:

So, just keep an open mind that what we got on the books is not working. If somebody gave a pill to another person with arsenic or ricin, could they be charged with murder because that will kill you?

MERRICK GARLAND:

Absolutely.

LINDSEY GRAHAM:

OK. If somebody gave a candy shaped pill full of fentanyl, could they be charged with murder?

MERRICK GARLAND:

Well, they -- they can be charged with drug trafficking leading to death. I don't know -- I don't think the statute says murder --

LINDSEY GRAHAM:

OK.

MERRICK GARLAND:

But it does say --

LINDSEY GRAHAM:

Yes.

MERRICK GARLAND:

Specifically aims at that. We have brought prosecutions, I know, having discussed this with the US attorney in Colorado and the US attorney in the Southern District of New York.

LINDSEY GRAHAM:

So, Senator Cotton's got a proposal to dramatically increase the penalties associated with fentanyl. I'd like to work with you and the chairman, if we could, to find a bipartisan solution to this problem to create deterrence that doesn't exist. Mexican drug cartels, should they be designated foreign terrorist organizations under US laws?

MERRICK GARLAND:

Yeah, I think it's the -- the same answer I gave before. They're already designated in any number of ways and sanctioned by the Treasury.

LINDSEY GRAHAM:
Would you oppose some of us trying to make them foreign terrorist organizations?

MERRICK GARLAND:
I wouldn't oppose it. But again, I want to point out there are diplomatic concerns. We need the assistance of Mexico in this, and designating --

LINDSEY GRAHAM:
Is Mexico helping us effectively with our fentanyl problem?

MERRICK GARLAND:
They are helping us, but they could do much more. There's no question about that.

LINDSEY GRAHAM:
Well, if this is helping, I would hate to see what not helping looks like. So --

MERRICK GARLAND:
Well, I think --

LINDSEY GRAHAM:
The bottom line for me is they're not helping, and we need to up our game when it comes to fentanyl. Gitmo, are you familiar with -- with the Gitmo prison?

MERRICK GARLAND:
I -- I haven't been there, if that's what you're asking me.

LINDSEY GRAHAM:

No. I mean, but you know that we have foreign terrorists --

MERRICK GARLAND:

OK, yeah.

LINDSEY GRAHAM:

Housed there. Is that right?

MERRICK GARLAND:

I -- I certainly do.

LINDSEY GRAHAM:

Do you agree with me that, under the law of war, an enemy combatant properly designated can be held to the end of hostilities?

MERRICK GARLAND:

Yes. That's a -- a law both of the circuit I stood --

LINDSEY GRAHAM:

Right.

MERRICK GARLAND:

I was on before, and the Supreme Court.

LINDSEY GRAHAM:

Right. So, do you agree with me that ISIS and al-Qaida is still at war with us?

MERRICK GARLAND:

Yes, I do.


LINDSEY GRAHAM:

So, you agree that anybody associated with these organizations could be held indefinitely if they present a risk to the American people.


MERRICK GARLAND:

I think they could. I think that a determination of whether they present a risk and how they should be dealt with is a determination to be made by the Defense Department.


LINDSEY GRAHAM:

Yeah.


MERRICK GARLAND:

And the Defense Department is making that determination.


LINDSEY GRAHAM:

But legally they can be held as long as they're a risk, and that could be for the rest of their lives, correct?


MERRICK GARLAND:

I think that's right. It obviously depends on the facts of --


LINDSEY GRAHAM:

Right.


MERRICK GARLAND:

A determination of risk.

LINDSEY GRAHAM:
Totally agree. Do you believe Russia is committing crimes against humanity?

MERRICK GARLAND:
I do.

LINDSEY GRAHAM:
OK. That's a pretty bold statement. Should we create an international court to support charges of crime of aggression? Do you support that idea?

MERRICK GARLAND:
So, the United States supports what is now being developed in The Hague, sponsored by Eurojust, looking into the possibility of creating that court. There are concerns that we have to take into account with respect to how that might deal with our own service members and other circumstances. We have to be sure that the appropriate guardrails are up. But we support any number of different ways in which war crimes, crimes against humanity, and the potential for crimes against aggression are investigated.

LINDSEY GRAHAM:
I'd like to work with you in that regard. I think that's something we could do.

MERRICK GARLAND:
I would be happy to.

LINDSEY GRAHAM:
When it comes to federal prisons, are you aware that 1,200 prisoners are requesting to be sent from a male prison to a female prison?

MERRICK GARLAND:

I'm not, no.

LINDSEY GRAHAM:

OK. What is our policy when it comes to allowing a male prisoner to be transitioned into a female prison?

MERRICK GARLAND:

I think if you're generally asking the question of how trans people are dealt with in the Bureau of Prisons, my understanding is that these are -- determinations about where they're placed or where people are placed in general have to do with individualized determinations regarding the security of that individual and the management of the prison.

These are done on a case by case basis. That's my understanding.

LINDSEY GRAHAM:

Are you aware of any policy guidelines that they use to make that determination?

MERRICK GARLAND:

I think there is a policy guideline along the lines that I just said, that -- that they are --

LINDSEY GRAHAM:

I would -- I would like for the Bureau of Prisons to send it to us. Are you concerned that, if a biological male is sent to a female prison, that could be a risk to female prisoners?

MERRICK GARLAND:

I think every person in prison has to be dealt with with dignity and respect. The determinations of the safety questions you're talking about have to be made on an individualized basis and not categorically.

LINDSEY GRAHAM:

OK. Finally, let's end where we started, fentanyl. If this drug is killing more Americans than car wrecks and gun violence combined, do you believe that the policies we have today in effect are working?

MERRICK GARLAND:

I -- I've been involved in the problem of drug crime and drug trafficking for more than 40 years, including those --

LINDSEY GRAHAM:

That's not my question. It's not how long have you been involved. Are they working?

MERRICK GARLAND:

They're -- they are not stopping fentanyl from killing Americans, if that's the question you're asking.

LINDSEY GRAHAM:

Do you say they're woefully inadequate to the task?

MERRICK GARLAND:

We are putting all the resources that Congress provides to us into doing this. The DEA is doing -- we are starting at the precursor level when precursors are sent from China to Mexico. We are then working on attacking the labs.

LINDSEY GRAHAM:

No, but I -- my time is up. Mr. Attorney General, they're are not working. And we're going to help you, if you'll work with us, to give you more tools. I hope you will meet us in the middle. Thank you.

MERRICK GARLAND:

Happy to have more tools, Senator.


DICK DURBIN:

Before I recognize another colleague, I want to apologize in my reference to the DEA administrator. Her name is Anne Milgram and I mispronounced it. So, I want to, for the record, clarify that. Senator Whitehouse?


SHELDON WHITEHOUSE:

Thank you, Chairman. And thank you, Attorney General, for being here. I appreciate it. Good to see you. Methane is probably the -- one of the most dangerous greenhouse gases. We see plumes of it miles long floating across the United States. It takes multiple levels of enforcement, federal, state, local, and private, to address these massive leaks.

What can you tell me you are doing to assure that there is that coordinated multi-jurisdictional enforcement operation in place?


MERRICK GARLAND:

You are exactly right. And we now have the benefit of overhead commercial satellites, which are able to actually see methane with respect to the infrared spectrum. So, we have -- we are in the process of establishing a working group between our Environment and Natural Resources Division and the Justice Department, the EPA, the Interior Department, and affected US attorneys offices across the country to make use of the tools -- the scientific tools we have, and also some of the funding that was provided in the bipartisan Infrastructure Act.


SHELDON WHITEHOUSE:

That is good news, and I hope that that effort will include advisory participation from state law enforcement, from local law enforcement and from private litigant experts in this space.

MERRICK GARLAND:

All -- all of our work in the law enforcement field involves partnering with state and local law enforcement. Always happy to have the expertise provided, but our law enforcement working groups are confined to law enforcement as a general matter.

SHELDON WHITEHOUSE:

I just got a document from a insurance publication that says, I'm just reading here, at least 1,375 climate change related lawsuits have already been brought in the United States. These include suits filed by local municipalities and by states, Rhode Island is one of them, as well as shareholder suits. Given all of that government litigation taking place in this space, I would ask you, is there anyone looking at federal DOJ involvement in that area in the Department of Justice?

And if so, who is that person?

MERRICK GARLAND:

So, I -- I really don't, as a general matter, want to describe our internal decision making processes on these. I can assure you that the Environmental and Natural Resources Division has taken a very close look at this question. But beyond that, I really can't say.

SHELDON WHITEHOUSE:

OK. Well, you may recall that the last time the Department of Justice took a really close look at this question, they got the standard of decision wrong, applied a criminal standard of review to civil litigation. So, I hope that the seriousness of the look that's been taken, what I would like to call an honest look, is actually in fact taking place, because the record from before your time is not very convincing.

MERRICK GARLAND:

I -- I agree with you, Senator, that the criminal standard of beyond a reasonable doubt is not appropriate for fraud cases.

SHELDON WHITEHOUSE:
Yeah.

MERRICK GARLAND:
Correct.

SHELDON WHITEHOUSE:
And we're --

MERRICK GARLAND:
I'm sorry, for civil fraud cases.

SHELDON WHITEHOUSE:
Civil fraud cases, correct, criminal cases. Congress right now is on the wrong side of a bunch of OLC opinions that relate to executive privilege. And there are some specific ones that relate to so-called absolute immunity that are on the books at OLC that have been specifically rejected in quite forceful language by actual Article 3 judges, and yet those OLC opinions are still on the books.

They're still available to other agencies, who are making determinations about whether to block congressional oversight based on those OLC opinions. I would like to ask you -- let me go back a step. OLC says that they don't ordinarily review opinions of their own, even after they've been discredited by Article 3 judges, unless they've been asked.

And you're one of the people who can ask them. So, I'm asking you, will you ask them to review the OLC opinions that are now publicly on the books of the Department of Justice

that have been discredited by specific findings of Article 3 judges they relate to absolute immunity.

MERRICK GARLAND:

So, my understanding of the longstanding process at OLC is not to reevaluate old opinions unless they are now relevant for -- for a current controversy.

SHELDON WHITEHOUSE:

That's the problem.

MERRICK GARLAND:

And I also believe that their process is that, if a court of ultimate jurisdiction determines that -- that they are wrong, then they will evaluate it. My understanding of these --

SHELDON WHITEHOUSE:

So, Ketanji Brown Jackson was one of the authors of one of the opinions that said OLC opinions were wrong. She's a pretty credible judge, I think. She's now sitting on the United States Supreme Court. And those OLC opinions hang out there for review by other executive agencies even if there's no direct ask to the department that would trigger that OLC review.

MERRICK GARLAND:

So --

SHELDON WHITEHOUSE:

It's sort of like executive branch jurisprudence that sits on its own, independent from Article 3 jurisprudence. And somehow we've got to figure out how to connect those two things, because at the moment you have OLC opinions that appear to be flat out wrong by the determinations made by those whose job it is to say what the law is, the Article 3 judges.

And there's no effort to ask them in that fairly unique circumstance to go back and -- and fix it.

MERRICK GARLAND:

So, again, I think all the circumstances you're talking about are about individual judges, sometimes a single judge on a court of appeals, sometimes a judge speaking in dicta. But no decision -- if there were a decision of the United States Supreme Court that was inconsistent or of a court of appeals, I believe OLC would reevaluate.

Otherwise, there are lots of judges who criticize OLC opinions, and the Justice Department. And as a former judge, that's perfectly appropriate for Article 3 judges to do. But we have to allocate our resources to cases where -- which are active cases, and that's what OLC does.

SHELDON WHITEHOUSE:

Well, I will continue to pursue this, because I think it is wrong for OLC to insist on developing its own jurisprudence that is separate from and independent from what Article 3 judges decide. And if the only way you can change an OLC opinion, which is controlling on the entire executive branch, is to get the Supreme Court to overturn it, then you've created a really lasting obstacle to the proper separation of powers in our Constitution.

So, to be continued. Attorney General, thank you for being here today.

MERRICK GARLAND:

Thank you.

DICK DURBIN:

Thank you, Senator Whitehouse. Senator Grassley?

CHUCK GRASSLEY:

At last year's FBI oversight hearing, Wray committed to protecting whistleblowers that have approached my office about wrongdoing at the department and the FBI. Do you commit to me, this committee, and the Senate as a whole that any retaliatory conduct against whistleblowers will be disciplined?

MERRICK GARLAND:

I do, Senator. And -- and you know well, more than any other member of this committee, that I've been a staunch supporter of whistleblowers and of the False Claims Act during the entire period of my role as a judge as well.

CHUCK GRASSLEY:

I'm going to set up a hypothetical pack -- fact pattern for you and ask you to tell me how you would handle it. The Justice Department and FBI received information from over a dozen sources. That's the first one. Second, those sources provide similar information about potential criminal conduct relating to a single individual.

And third, that information was shared with the department and FBI over a period of years. According to department policy and procedures, what steps would the department take to determine the truth and accuracy of the information provided by those sources?

MERRICK GARLAND:

I'm sorry. These are whistleblower -- so, they're internal sources? Is that what you're saying? I'm not sure.

CHUCK GRASSLEY:

Doesn't matter where that comes from, just the fact that I want to know you got that information. How -- how would you go about handling it?

MERRICK GARLAND:

Yeah. So, reports of wrongdoing are normally reported to whatever the appropriate department component is. It might be US attorney's offices in the district in which it allegedly took place. It might be to the -- directly to FBI components and to FBI task forces. In cases involving whistleblowers, of course, there are specific provisions for making complaints to the inspector general's office or the Office of Professional Responsibility or the inspections division of the FBI.

CHUCK GRASSLEY:

Recent lawfully protected whistleblower disclosures to my office indicate that the Justice Department and the FBI had at one time over a dozen sources that provided potentially criminal information relating to Hunter Biden. The alleged volume and similarity of the information would demand that the Justice Department investigate the truth and accuracy of the information.

According to what -- accordingly, what steps has the Justice Department taken to determine the truth and accuracy of information provided? Congress and the American people, I think, have a right to know.

MERRICK GARLAND:

So, as the committee well knows from my confirmation hearing, I promise to leave -- I promised to leave the matter of Hunter Biden in the hands of the US attorney for the District of Delaware, who was appointed in the previous administration. So, any information like that should have gone or should -- or should have gone to that US attorney's offices and the FBI squad that's working with him.

I have pledged not to interfere with that investigation, and I have carried through on my pledge.

CHUCK GRASSLEY:

In April 2022, you testified to Senator Haggerty that the Hunter Biden investigation was insulated from political interference because it was assigned to -- as you just now told me, to

the Delaware attorney's office. However, that could be misleading because, without special counsel authority, he could need permission of -- of another US attorney in certain circumstances to bring charges outside the District of Delaware.

I'd like clarification from you with respect to these concerns.

MERRICK GARLAND:

The -- the US attorney in Delaware has been advised that he has full authority to -- to make those kind of referrals that you're talking about, or to bring cases in other jurisdictions if he feels it's necessary. And I will assure that, if he does, he will be able to do that.

CHUCK GRASSLEY:

Does the Delaware US attorney lack independent charging authority over certain criminal allegations against the president's son outside of the District of Delaware?

MERRICK GARLAND:

He would have to bring -- if it's in another district, he would have to bring the case in another district. But as I said, I promise to ensure that he's able to carry out his investigation and that he be able to run it. And if he needs to bring it in another jurisdiction, he will have full authority to do that.

CHUCK GRASSLEY:

If you provided the Delaware US attorney with special counsel authority, isn't it true that he wouldn't need permission from another US attorney to bring charges?

MERRICK GARLAND:

Well, it's a kind of a complicated question. If it -- under the regulations, that kind of act, he would have to bring to me under -- to the attorney general. Under the regulations, those kind of charging decisions would have to be brought. I would then have to, you know, authorize it and permit it to be brought in another jurisdiction.

And that is exactly what I promised to do here already, that if he needs to do -- bring a case in another jurisdiction, he will have my full authority to do that.

CHUCK GRASSLEY:

Has the Delaware US attorney sought permission from -- permission of another US attorney's office, such as in the District of Columbia or in California, to bring charges? If so, was it denied?

MERRICK GARLAND:

So, I -- I don't know the answer to that. I do -- and I don't want to get into the internal elements of decision making by the US attorney. But he has been advised that he is not to be denied anything that he needs. And if that were to happen, it should ascend through the department's ranks. And I have not heard anything from that office to suggest that they're not able to do everything that the US attorney wants to do.

CHUCK GRASSLEY:

Well, let me give you my view. If Weiss, the US attorney there in Delaware, must seek permission from a Biden appointed US attorney to bring charges, then the Hunter Biden criminal investigation isn't insulated from political interference as you've publicly proclaimed. If the Justice Department received information that foreign persons had evidence of improper or unlawful financial payment paid to elected officials or other politically exposed persons and those payments may have influenced policy decisions, would that pose a national security concern and demand a full investigation?

And when Wray was here, he seemed to answer that question in -- that it was a national security concern. I want your opinion.

MERRICK GARLAND:

In the way that you're -- if I -- if I follow the question exactly right, if it's an agent of a foreign government asking someone and paying someone to do things to support that foreign

government in secret, yes, I definitely think that would be a national security problem.

CHUCK GRASSLEY:
OK. My last question is to whistleblowers have confidentially asserted that the DOJ's public integrity unit -- I think I'm going to leave that question for another round. Thank you, Mr. Chairman.

MERRICK GARLAND:
Thank you, Senator.

DICK DURBIN:
Thanks, Senator Grassley. Senator Klobuchar?

AMY KLOBUCHAR:
Thank you very much, Attorney General Garland, for being here. I know a major goal of yours was working to build morale in the department, filling a number of the jobs. And I want to personally thank you for the work of the US attorney's office in Minnesota and our US attorney, Andy Luger, who I know you know.

And he actually, at his swearing in, announced a major strategy to address violent crime that directed federal law enforcement to prioritize cases including carjackings. We've had a rash of those cases in Minnesota, and the trafficking of firearms. Under his leadership, every federal prosecutor, as you are aware in your leadership in the office, will now take on violent crime cases.

Can you talk about how the department's approach to focusing on violent crime is centered on partnerships with local agencies and what you're doing?

MERRICK GARLAND:

Yeah, I -- I want to begin by saying that we well recognize that there is a terrible problem of violent crime. A very first -- and the reason violent crime is important to the -- to the federal government is because it -- it makes it impossible for people to go about their ordinary lives, and carry out their civic responsibilities and their family responsibilities without fear.

So, the department is very seized with this problem. One of the very first things I did after becoming attorney general, this was in -- I think in May, is to establish an anti violent crime strategy which involves the kind of partnerships that you're talking about, and -- and the kind of individual district by district determination that US Attorney Luger has made in his own district as to what is most necessary in that district to fight violent crime.

AMY KLOBUCHAR:
OK.

MERRICK GARLAND:
Our plan involves three sets of partnerships. One is among all federal law enforcement, FBI, DEA, marshals, ATF, and Homeland Security and other agencies so that there is no turf fighting, that we all work together in joint task forces, that those partnerships at the second level be expanded to state and local law enforcement, police and sheriffs.

There are not enough federal law enforcement in the world to deal with the problem of violent crime. This is largely a state and local issue and problem, and we are -- they are our force multipliers and we are their resource and expertise multipliers. So, in every jurisdiction, the US attorney is responsible for creating a task force of federal and state.

And then finally, there has to be relationships with the community. As a -- a former violent crime prosecutor myself, I know we don't get witnesses to testify in violent crime cases unless the community trusts us. The community doesn't trust us if we don't -- if law enforcement doesn't engage with them, show that we're being honest and transparent about our work, and -- and through our funding mechanisms provide grants for violence interruption and violence intervention.

AMY KLOBUCHAR:

OK. Thank you.


MERRICK GARLAND:

That -- that in a nutshell is the violent crime program.


AMY KLOBUCHAR:

Thank you for the thorough answer. I'm going to just now do a bit of a rapid round follow up on some of these.


MERRICK GARLAND:

Sure.


AMY KLOBUCHAR:

You mentioned law enforcement. You noted in your testimony that the COPS office has dedicated $224 million to help law enforcement. Senator Murkowski and I have long championed the COPS hiring program through the COPS Reauthorization Act. I assume you continue to support that and continue to support the work that needs to be done to address police officer recruitment and retention issues.


MERRICK GARLAND:

Yeah, absolutely. In the previous fiscal year, I think we had $100 million to distribute, which we did for COPS hiring, for recruitment and retention. In the next fiscal year, we expect over $200 million for the same purpose. We know how difficult police departments are -- how much difficulty they're having with respect to recruitment and retention.

And we are trying to do everything we can, both in terms of grants and in terms of expertise, to help.

AMY KLOBUCHAR:

OK, very good. Minnesota, currently a backlog of around 3,800 DNA cases awaiting testing. Senator Cornyn and I are working together on the Debbie Smith Act. And would that help law enforcement have the tools they need? This is just -- actually, these numbers just came out yesterday, so it's very timely.

MERRICK GARLAND:

Yeah. No, absolutely. I think that that needs to be re-upped, and we are very strongly supportive of providing more funds to state and locals for DNA rape kits and -- and thing -- forensic analysis of the like.

AMY KLOBUCHAR:

OK. I want to leave two minutes for antitrust, so just one quick other follow up. Senator Capito and I asked what steps the department has taken to stop the trafficking of fentanyl on the dark web. I know some of my colleagues have asked about fentanyl. Any update you want to give on that? Or you could give it in writing afterwards.

MERRICK GARLAND:

Well, I'll give you more detail in writing. As you know, we had a major takedown of two different dark web websites which were trafficking in fentanyl. And we are continuing to investigate, using our cyber tools, to take those websites down and to arrest the operators.

AMY KLOBUCHAR:

OK. Thank you. Senator Grassley and I worked together on passing, as you know, the changes to the merger fees. It was kind of a lot of drama at the end of the year. And we're very pleased that that went through. And it had, I think, 88 Senators supporting an amendment at the end of the year on the budget.

And I assume you're going to use those resources in a good way as they start coming in. And -- but I really wanted to focus on some of the legal changes we'd like to see. Senator Lee and I were pleased the venue bill passed that he led, and I know we also have a bill on the marketing side on Google. We're going to be having a hearing coming up on that topic.

And I know the department recently announced a new antitrust case against Google for its blocking competition in digital advertising. But could you talk a little bit about, beyond that, what you think legal changes, law changes would be helpful as we're seeing a changing Internet economy? And on the privacy kid's side, which Senator Durbin asked about, we haven't seen any changes to our laws.

But also on the antitrust side, on the marketing and the self preferencing of their products, whether it's Amazon or Apple, we haven't seen changes. And Senator Blackburn and Senator Blumenthal have worked together on the app store bill. Talk about what you'd like to see to give you the tools to better combat the issues that we're seeing.

MERRICK GARLAND:

So, first, gratitude for the merger fees increase. It gives us the opportunity to staff up and be able to have enough lawyers and economists to oppose private sector, which has way more than we do. And we still have fewer antitrust employees than we had in the '70s, the last time I was in the Justice Department.

With respect to --

AMY KLOBUCHAR:

You have the biggest companies the world has ever seen to try to deal with, yes.

MERRICK GARLAND:

Yeah.

AMY KLOBUCHAR:

OK.

MERRICK GARLAND:
Exactly. On the legislation side, we have supported -- I -- I think it's called the Online Choice -- American Innovation and Online -- Line Choice Act. Did I get it right?

AMY KLOBUCHAR:
Yeah.

MERRICK GARLAND:
Thank you. And the Open Apps Act, I think that's close to the correct title, has -- we've had testimony by Assistant Attorney General Cantor with respect to the Open Apps Act. We are always interested in working with Congress to modernize the antitrust laws to take account of the kind of network effects that the -- and two sided platforms that we now have in our high technology companies.

AMY KLOBUCHAR:
Well, thank you. And of course you joined a number of Republicans, as well as the NFIB has made this a huge priority in terms of passing these bills. Thank you.

DICK DURBIN:
Attorney General, of course Senator Klobuchar has a recommendation for your reading pleasure on the subject of antitrust. Senator Cornyn?

MERRICK GARLAND:
I -- I -- as Senator Klobuchar would say, channeling Taylor Swift, I know that all too well.

AMY KLOBUCHAR:

Thank you for bringing up the Ticketmaster hearing that Senator Lee and I conduct -- I'm sure we will have follow up in writing, or maybe Senator Lee could ask a question about that. Thank you.

MERRICK GARLAND:
I can't match all of Senator Lee's quips on this one, but I'm pretty familiar with Taylor Swift so I'll do my best.

DICK DURBIN:
Now you've got it started. Senator Cornyn?

JOHN CORNYN:
Attorney General Garland, you've, of course, served in the judiciary for many years and -- and before you became attorney general. Let me just ask, do you prefer to be called General Garland or Judge Garland?

MERRICK GARLAND:
The senators of this committee can call me anything that they want.

JOHN CORNYN:
Well, with -- we will with all appropriate respect.

MERRICK GARLAND:
I appreciate that part.

JOHN CORNYN:
Are you familiar with the strategy of the transnational criminal organizations that are flooding migrants across the border, overwhelming Border Patrol and other law

enforcement authorities, so that then the drug traffickers can move illicit drugs across the border? Are you familiar with that --

MERRICK GARLAND:
I --

JOHN CORNYN:
What I would call a business model?

MERRICK GARLAND:
I am, and I set up -- specifically directed the establishment of a task force on anti-smuggling and anti-human trafficking for just the reason you said. It involves our civil rights division, our criminal division, and the US Attorney's offices all along the border, as well as our offices in the Northern Triangle companies -- countries and Mexico.

JOHN CORNYN:
I think you and I had this conversation earlier, maybe at your confirmation hearing, but I think the attorney general has the toughest job in -- in government, I believe, because you have to wear two hats. You are the chief law enforcement officer of the country and you are also a political appointee and a member of President Biden's cabinet.

But I think you also told us at the hearing, your confirmation hearing, you repeatedly said that the executive branch cannot simply decide, based on policy disagreements, that it will not enforce the law. Is that still your position?

MERRICK GARLAND:
Yes, it is Senator.

JOHN CORNYN:

On September the 11th, 2001, we lost about 3,000 Americans to a terrorist attack. We declared a war on terror. The Congress issued an authorization for the use of military force. If you took the size of an average 737 or a passenger jet today, holds between 145 and 185 passengers. If you were to rack up all of the deaths that we've seen as a result of drugs coming across the southwestern border as a result of this successful business model that the cartels have employed, you would be talking about the equivalent of a passenger jet per day crashing, killing everyone on board.

I have been just astonished at the lack of sense of urgency to deal with this issue. It seems we become so desensitized to it that that sense of urgency is simply gone. But I will tell you that it's directly related to the open border policies of the Biden administration, where people continue to come across the border, turn themselves in to a broken asylum system, or simply get away from law enforcement because they're overwhelming the Border Patrol's capacity.

This is intentional. As you -- as you acknowledged, it's a business model of the cartels. And they are getting rich, and students like those parents, who I met with last week in Johnson High School in Hays County, Texas, right outside of Boston, are losing their sons and daughters to fentanyl overdoses, because of exactly this successful business model by the cartels.

I want to ask you a little bit about the prosecution policies of the -- of the Garland Attorney General's Department of Justice. Sort of the bedrock standard for prosecuting crimes has historically been that the prosecutor shall -- should pursue the most serious, readily provable offense, and that that's been the bedrock of -- of policy for -- for -- over decades.

We know that Eric Holder, when he was attorney general, changed that standard. And specifically what I want to ask you is about two different memos that you've issued to prosecutors with regard to mandatory minimum sentencing. And specifically, in the charging memo -- one of the charging memos, you said the proliferation of provisions carrying mandatory minimum sentences has often caused unwarranted -- unwarranted disproportionality in sentencing and disproportionately severe sentences.

Now, just to be clear, mandatory minimum sentences are statutory, correct? In other words, they're passed by Congress and signed into law by the president.

MERRICK GARLAND:

Yes, that's right.

JOHN CORNYN:

And here you -- you suggest that prosecutors should not enforce or charge with -- charge defendants with a crime which carries a mandatory minimum under certain circumstances, correct?

MERRICK GARLAND:

I did -- it's not exact -- if I can just have a moment to explain. I'm very familiar --

JOHN CORNYN:

Well, if you'd just answer the question. So, the memo says specifically -- I'll just read it to you, said for this reason, charges that subject a defendant to a mandatory minimum sentence should ordinarily be reserved for instances in which the remaining charges would not sufficiently reflect the seriousness of the criminal -- defendant's criminal conduct, danger of the community, harm to victims, or other considerations outlined above.

So, basically your charging memorandum says that prosecutors can exercise their discretion to charge less than the most serious offense because you don't like the mandatory minimum sentences that Congress has -- has passed, correct?

MERRICK GARLAND:

No, Senator. This is a question of allocating our resources and focusing them on violent crime. Later on in that --

JOHN CORNYN:

I thought you said -- I thought you said that your job was to enforce the law with regard -- without regard to policy differences.

MERRICK GARLAND:

It's not a question of policy differences. It's a question of the resources.

JOHN CORNYN:

You don't have enough money? You don't --

MERRICK GARLAND:

We don't --

JOHN CORNYN:

Have enough people?

MERRICK GARLAND:

Have enough people. We don't have enough money. We don't have enough jails. We don't have enough judges. But --

JOHN CORNYN:

Well, you're arrogated to yourself the -- the -- the decision to make policy by saying that, in spite of the fact that there are mandatory minimum sentences for many of these drug crimes, which are now causing untold death and destruction across America, you're telling prosecutors don't charge those if they involve a mandatory minimum sentence.

MERRICK GARLAND:

With -- with respect, Senator, the memorandum makes clear that that general analysis doesn't apply in violent crime, doesn't apply in drug trafficking, doesn't apply in cases in which there's injury.

JOHN CORNYN:

So, you're cherry picking which cases that you will charge with a mandatory minimum sentence and not applying them uniformly, and charging the most serious crime that can be proven at trial.


MERRICK GARLAND:

If we apply it to every single crime, we will not be able to focus our resources on violent crime, on significant drug trafficking, on the cartels, on the people who are killing people with fentanyl. So, the purpose here is to focus the attention of our prosecutors and agents on the things that are damaging the American people in the largest possible respect.

That's what the -- what this policy says.


JOHN CORNYN:

At 108,000, roughly, Americans who died as a result of drug overdoses last year, 71,000 roughly of fentanyl overdoses, do you consider your current policies successful?


MERRICK GARLAND:

We -- as I said an answer to another question, we have a huge epidemic, a fentanyl problem created by intentional acts by the cartels. We are doing everything we can within our resources to fight that. We have our DEA working to prevent transfer of precursors into Mexico, to capture the labs, to -- to extradite the cartel leaders, to arrest them in the United States.

We are focusing on fentanyl with enormous urgency. I have personally twice traveled to Mexico to try to get greater cooperation from the Mexicans on exactly the problem you're talking about. I have separately talked twice in person with the Mexican attorney general for exactly the problem that you're talking about.

The -- we are focusing on this with enormous urgency. This is a priority of the Justice Department, but this is a whole of government problem. The border is the responsibility of

the Department of Homeland Security. We do what we can do with respect to the jurisdictions that we have.


DICK DURBIN:

Thank you, Senator Cornyn. Senator Blumenthal?


RICHARD BLUMENTHAL:

Thanks, Mr. Chairman. Let me begin by thanking you, Mr. Attorney General, and all of the very dedicated professionals, all of the employees of the Department of Justice for the great work that they do day in and day out, a lot of it underappreciated. I say that as an alumnus of the Department of Justice, a former United States attorney, but the work that you and your team have done to restore the confidence and trust of the American public in our Department of Justice I think is one of your enduring contributions.

Let me begin with areas where I think we have a high level of bipartisan agreement. First of all, on the Wagner group, Senator Graham and I are the principal sponsors, along with Senator Whitehouse, of a measure to declare the Wagner Group a foreign terrorist organization. You would agree that, assuming that the State Department goes along with us, that it is worthwhile doing.


MERRICK GARLAND:

Yeah. Look, Mr. Prigozhin, who runs this thing, is in my view a war criminal. And maybe that's inappropriate for me to say with -- as a judge before getting all the evidence. But I think we have more than sufficient evidence at this point for me to feel that way. And I believe that that group, which is responsible for the attacks on Ukrainians in the Donbas, including by bringing in prisoners from Russian prison camps as cannon fodder, it's just -- it's unfathomable what they are doing.

And everything we can do to stop them, we should do.


RICHARD BLUMENTHAL:

Senator Whitehouse and Graham and I have been working on aiding Ukrainian prosecutors in bringing to justice those war criminals, not only Prigozhin but others who tied the hands of women and children behind their backs, shot them, buried them in mass graves, which I have visited among my three tree -- trips to Ukraine.

Can you commit the Department of Justice will support the Ukrainian prosecutor, who is hard at work right now, in trying to bring to justice those war criminals?

MERRICK GARLAND:
Not only will I commit, I'll tell you I've done that. I have met twice in person with the current prosecutor general, Prosecutor Kostin. I met in Ukraine with the previous prosecutor general. We have established a war crimes task force in the Justice Department to assist. Our -- our forensic agents are on the ground now in Ukraine to assist, to teach, to assist in the development of the forensics necessary to do those.

I have met with Eurojust and to -- and Europol to work on the -- help them develop the kind of infrastructure necessary to prosecute these cases.

RICHARD BLUMENTHAL:
Thank you.

MERRICK GARLAND:
You have our whole hearted support in your efforts here.

RICHARD BLUMENTHAL:
Thank you. Next week Senator Hawley and I are going to have a hearing on Section 230 reform, the first of a number of hearings that I hope will lead to legislation. I hope it will be bipartisan legislation. The solicitor general, in her argument on Gonzales, I think made a number of important points on differentiating third party content from platform design.

In other words, Section 230 could cover content that users post, but when YouTube or others design their products in specific ways that cause -- cause harm or take steps to amplify or change content, that goes beyond the intent and the statutory language of Section 230, one example of the ways that I think we can achieve steps toward Section 230 reform.

Another is the EARN IT Act, which Senator Graham and I have sponsored, and we will introduce it again this year. I recognize that these are general principles. I hope the Department of Justice will support this effort. I -- I hope that you will as well support efforts to take action against monopolistic endeavors like Ticketmaster.

I understand that you commented briefly on it. Can you confirm that Ticketmaster is under investigation now?

MERRICK GARLAND:
Yeah. So, the -- the department doesn't confirm or deny the existence of these kinds of investigations until they reach an overt stage, as -- as you know from your time as a US attorney. But, as I told Senator Klobuchar, we know "all too well" the importance of competition in this industry, as in all other industries.

And so, you can be confident that, in all of our work, we approach it with an understanding that highly concentrated industries are a problem for competition.

RICHARD BLUMENTHAL:
In -- in that concentrated -- concentrated situation, where power is concentrated and you have violation of consent decrees twice, wouldn't it be appropriate for the Department of Justice to investigate?

MERRICK GARLAND:
As I say, I really am happy to talk in the hypothetical, that in a case where someone violates the consent decree, of course it would be appropriate to investigate. But I just don't want to talk about individual investigations and whether they're ongoing.

RICHARD BLUMENTHAL:

Let me ask you, the -- the American public right now is hearing about investigations involving COVID, the sources of COVID in China, conclusions with low confidence, high degree of confidence. Can you, as an official in charge of intelligence and interpretations of intelligence, explain to the American people what it means for there to be low confidence or higher confidence when there are conclusions about, for example, the sources of COVID, whether it came from natural sources in China or from a lab leak, what does that designation mean?

MERRICK GARLAND:

I would have to say, to -- to my knowledge, I mean, these are -- are labels that are applied by the intelligence community. So -- so, while I read -- read the results, I'm not sure I can exactly define it, but I believe it is just as you would think, that if asked to make a decision and say yes or no, you say yes or no depending on the degree of confidence that you have that your yes or no answer is correct.

So, low confidence means you think the answer is yes, but you don't have high -- you know, you have low confidence in it. Medium is medium. You might answer we don't know at all, but that's not what -- that's not what you're asking about.

RICHARD BLUMENTHAL:

So, it's more than a hunch or a guess, but not quite --

MERRICK GARLAND:

Yeah.

RICHARD BLUMENTHAL:

Something to take to the bank.

MERRICK GARLAND:

Yeah. So, there's a lot of -- of criminal law from -- ranging from Terry stops to probable cause to convictions. There -- I don't think there is any law in the intelligence community that defines those specifically.

RICHARD BLUMENTHAL:

You -- you wouldn't sanction a search or an arrest based on low confidence.

MERRICK GARLAND:

Well, search and arrest require probable cause. That's all I can say.

DICK DURBIN:

Thank you, Senator Blumenthal.

RICHARD BLUMENTHAL:

Thank you.

DICK DURBIN:

After Senator Lee asks, we're going to take a brief intermission. Senator Lee?

MIKE LEE:

Thank you, Attorney General Garland. I want to echo briefly what Senator Klobuchar described. I hope you'll look at our letter and investigate thoroughly those issues. As you know, I -- I've long respected you and I've long respected your department. I have become concerned recently that, notwithstanding the great men and women who serve and have served for generations in the Department of Justice, there are some things that lead me to wonder whether there's -- whether some actions are being politicized within the department.

One example of this relates to 18 USC Section 1507. Ever since the leak of the Dobbs opinion and then the issuance of the Dobbs opinion by the Supreme Court last summer, we've had protesters who have been showing up at the homes of Supreme Court justices carrying signs, picketing, shouting. It's very clear that they're trying to influence, in one way or another, those serving on the United States Supreme Court, trying to influence jurisprudence.

And yet not one person, to my knowledge, has been prosecuted for such things under 18 USC Section 1507. About two weeks ago, this committee invited some officials from the Department of Justice to brief committee staff on protests at the justices' homes and ask about any arrests that have been made or might be made for people engaged in that behavior.

The briefers came to the briefing and informed staff that they hadn't read Section 1507. I assume you've read it, of course. I'm just wondering why the department would schedule such a briefing on a statute without having read it, and especially why no -- no actions have been brought under Section 1507 for these actions.

You -- I want -- I've got a lot to cover. Can you just -- can you answer that in one or two sentences?


MERRICK GARLAND:
I've tried to answer all the -- all these questions --


MIKE LEE:
Look, no. --


MERRICK GARLAND:
Together --


MIKE LEE:

Just -- just tell me, am I right in concluding that -- that you haven't brought any charges under 1507?

MERRICK GARLAND:

So, I -- I don't know the answer to that. We have -- the thing that mattered, and as soon as the Dobbs draft leaked, I ordered the marshals to do something that the United States Marshals had never in history done before, which was protect the justices' homes, residence, and lives 24/7. No attorney general had ever ordered that before, and no Justice Department had ever done that before.

We sent more --

MIKE LEE:

Which is terrific. That's -- that's fantastic. I -- I'm talking about --

MERRICK GARLAND:

So, I'm getting to why -- to the why. So, we sent more than 70 US marshals for this purpose. Those marshals' priority is protection of the lives of the justices and their families. They are on site, but their priority job is protection. That is why, when someone did come to assault Justice Kavanaugh, he had to walk -- go away from -- from where they were because there were two marshals in front of the house.

And eventually, he self-reported himself. The marshals have been advised and they know, the marshals on the ground, they have full authority to arrest people under any federal statute, including that federal statute. But they have to make the determination on the ground whether they can do that in a -- in a manner that is safe and -- and able to protect their main mission.

Now, there are also state and local entities which have similar authorities, and which I understand the Supreme Court marshal has asked them to -- to do this as well. I don't know whether they have done any of those things.

MIKE LEE:

OK. Thank you. I'd love to follow up with you more on that later. It is concerning to me. When you show up at the home of a public official, you're sending the message of implicit violence. You're sending the message we know where you sleep. We know where you and your family are most vulnerable. And it's very concerning to me. I assume you're aware of the overly aggressive arrest and prosecution of Mark Houck, who's a pro-life activist and father of seven in Philadelphia, based on the fact that he had -- had pushed a protester -- a protester who -- or a Planned Parenthood escort, rather, as -- as he was demonstrating outside of an area in the Philadelphia region.

He pushed this person after this person got in the face of his 12 year old son and was yelling vile, insulting, demeaning, implicitly threatening things, denigrating his father, denigrating his faith, and yelling vile sexually suggestive things to his 12 year old son, so he shoved him. And then, before they knew it, Mr. Houck was facing FACE Act prosecutions.

A highly militarized group of DOJ law enforcement showed up to enforce a warrant. They showed up at about 7 a.m. on a Friday morning. And as his -- as Houck's wife put it, a SWAT team of about 25 came to my house with about 15 vehicles and started pounding on the door, and then had about five guns pointed at my husband, myself, and basically my kids.

This concerns me. You know, Mr. Houck ended up facing these charges and, not surprisingly, the jury acquitted him of that. And I'm just wondering how -- it doesn't seem justifiable to me to have that overwhelming show of force for conduct like that. In the meantime, in 2022 and for the first couple of months of 2023, DOJ has announced charges against 34 individuals for blocking access to or vandalizing abortion clinics.

And there -- there have been over 81 reported attacks on pregnancy centers, 130 attacks on Catholic churches since the leak of the Dobbs decision, and only two individuals have been charged. So, how do you explain this disparity by reference to anything other than politicization of what's happening there?

MERRICK GARLAND:

The FACE Act applies equally to efforts to damage, blockade clinics whether a pregnant resource -- whether they are a pregnancy resource center or whether they are an abortion center. It applies equally in both cases, and we apply the law equally. I will say you are quite right. There are many more prosecutions with respect to the blocking of the -- of the abortion centers, but that is generally because they are -- those actions are taken with photography at the time during the daylight, and seeing the person who did it is quite easy.

The -- those who are attacking the pregnancy resources centers, which is a horde thing to do, are doing this at night in the dark. We have put full resources on this. We have asked -- put a rewards out for this. The Justice Department and the FBI have made outreach to Catholic and other organizations to ask for their help in identifying the people who are doing this.

We will prosecute every case against a pregnancy resource center that we can make, but these people who are doing this are clever and are doing it in secret. And I am convinced that the FBI is trying to find them with urgency.

MIKE LEE:

OK. I see my time's expired, Mr. Chairman. I'd like to submit for the record a copy of a letter sent by Representative Andy Biggs from Arizona regarding a case involving Philip Esformes, an individual who was granted clemency by the prior administration and who's now apparently being prosecuted. I hope to discuss this in a subsequent round.

DICK DURBIN:

Without objection, it'll be entered in the record. We're going to recess for five minutes. The committee stands in recess. [Off-mic] Resume. Senator Padilla?

ALEX PADILLA:

Thank you, Mr. Chair. Attorney General, as we've discussed on prior occasions, you know that hate crimes in many United States cities are at their highest levels since the FBI began

collecting data in the 1990s. Los Angeles alone has seen almost 700 -- or saw almost 700 hate crimes in the year 2022, its highest total ever.

Hate crimes are also known to be widely underreported, so the real numbers are very likely to be much higher. Now, hate crimes based on antisemitism in particular are rising at alarming rates. According to the Center for the Study of Hate and Extremism at California State University San Bernardino, Los Angeles faced 80 antisemitic hate crimes from January to October of last year, a nearly 10 percent increase over the previous year.

And this past month, federal prosecutors charged a 28 year old man with hate crimes after he fired at two Jewish men as they walked home from their synagogue in Los Angeles. So, my question is this. Do we have adequate resources being devoted to hate crime investigation and prosecution, and are there any solutions that you believe we should be considering to help us help you do this job?

MERRICK GARLAND:

I'm grateful for the question. And obviously, if anybody wants to give me more resources in any area of the Justice Department's responsibility, I'm happy to take them. We have been focused like a laser on hate crime since I first came into the department. I think my memorandum to department to develop a anti-hate crime task force was one of the very first memorandums I issued.

As we were making our developments in that respect, the -- the Anti-Hate Crime Act was passed by the Congress providing us with additional funding, which was very helpful. I've established a hate crimes coordinator in the department, and each of our US Attorney's offices is on the case looking into these matters.

And the FBI has elevated hate crimes and civil rights violations into their highest band of threats. So, I would say we are examining this with the highest degree of urgency that's possible, and we are putting the resources of our department into stopping these heinous acts.

ALEX PADILLA:

Well, appreciate that. And in addition to resources, if there's specific policy changes or initiatives that you would like for us to consider --

MERRICK GARLAND:

I --

ALEX PADILLA:

Please bring them forward.

MERRICK GARLAND:

I -- my staff would be happy to -- to work with yours if you have ideas in this regard. I think we're pretty -- right now, I feel like we have the statutes and techniques required. But there's always room for improvement in everything, and we would be happy to work with you in that regard.

ALEX PADILLA:

Now, a second area I wanted to raise is the issue of labor -- exploitation of children, and in particular migrant children. I'm hoping you caught a recent New York Times report of their investigation, which put a spotlight on the vast use of migrant child labor across states and across industries. I was particularly alarmed to learn that some of these children are working full adult shifts in food processing facilities, in factories after school.

Children are being placed in occupationally dangerous situations where they're putting their lives at risk and given little break from grueling work. And many of these children were formerly under the care of the Department of Health and Human Services as unaccompanied minors, but have not received adequate follow up services once released to the care of a sponsor.

I'd ask consent to enter this article into the record.

DICK DURBIN:
Without objection.

ALEX PADILLA:
Now, the Biden administration on Monday did announce that it will direct agencies to crack down on the use of child labor. And as part of the new initiative, it's the Department of Labor who will investigate and enforce penalties on these unscrupulous employers and make criminal referrals as needed. Now, the Department of Labor is also going to lead an interagency task force to combat child labor exploitation.

So, my question is, will the Department of Justice be coordinating with the Department of Labor on criminal referrals and possibly join this interagency task force?

MERRICK GARLAND:
Of course I read the same article that you're talking about. I was horrified by the reporting. Our criminal division and our civil rights division are reaching out to the Labor Department and HHS to try to be of assistance as much as possible. There's only a limited number of criminal statutes that would apply.

I would point out we do have a forced labor task force which has been very active in general, and it includes problems with respect to children, obviously. And I met with them the other -- just yesterday, and they have assured me that they would be reaching out as well.

ALEX PADILLA:
OK. Look forward to following up on that. But I also can't help but acknowledge some of the dynamics that lead to these situations, right? We know that, from the private sector, we have heard that there is a need to address the demand for workers. There's a workforce shortage in America today across a number of industries and sectors.

There's a reported 11 million unfilled jobs, many of which have historically been filled by immigrants, you know, permanent, temporary, but we've seen migration numbers drop in

recent years. So, with no migrants to fill these jobs in 20 -- since 2018, the US Department of Labor has seen a 69 percent increase in children being employed unlawfully by companies.

So, it seems like employers, particularly unscrupulous employers, they're going to find their workers somewhere. And if they're not finding them through traditional lawful means, children become the victims. Further disturbed by proposals I see from Republican legislators in states including Iowa, Ohio, Arkansas, and others, where they're proposing to loosen child labor laws.

That's not the solution here. Proposing 14 and 15 year olds work in meat coolers, industrial freezers, and other environments, this cannot be the answer to our nation's labor problems. So, I absolutely look forward to following up with you on this crackdown of unlawful child labor in the United States. My -- my time is up, but I'll have some further follow up questions in the second round, I hope.

Thank you. Thank you, Mr. Chair.


DICK DURBIN:
Thank you, Senator Padilla. We're on a roll call, to -- just to alert the members. And Senator Cruz is next.


TED CRUZ:
Thank you, Mr. Chairman. General, welcome.


MERRICK GARLAND:
Thank you.


TED CRUZ:
As you know, as I observed at your confirmation hearing, you had built a long record on the Federal Court of Appeals and a reputation of being relatively nonpartisan. And so, I had

hopes that your tenure as attorney general would continue that record. I have to say I'm deeply disappointed in what the last two years have shown.

In my judgment, the Department of Justice has been politicized to the greatest extent I've ever seen in this country. And it has done a discredit to the Department of Justice, to the FBI, and the administration of law in this country. Let me start with a simple question. General Garland, is it a federal crime to protest outside of a judge's home with the intent of influencing that judge as to a pending case?

MERRICK GARLAND:
The answer to that is yes, but I also want to at least respond to your characterization of the department --

TED CRUZ:
Sure.

MERRICK GARLAND:
Which I vigorously disagree with. I believe the men and women of the department pursue their work every single day in a nonpartisan and an appropriate way.

TED CRUZ:
General Garland, there are thousands of men and women who do that. And I'll tell you, I hear from prosecutors at the Department of Justice. I hear from agents at the FBI who are angry that it is treated as the enforcement arm for the DNC instead of upholding the law in a fair and evenhanded manner. So, you are right there are thousands of men and women that are -- that are doing the job, but it is the political leadership that you're responsible for.

So, you just said, yes, it's a crime to protest at the home of a judge. Same goes for jurors, by the way, with the intent of influencing a case. But in the wake of the leak of the Dobbs decision, when rioters descended at the homes of six Supreme Court justices night after night after night, you did nothing.

The department did nothing when extremist groups like Ruth Sent Us and Jane's Revenge openly organized campaigns of harassment at the homes of justices, you sat on your hands. When these same groups posted online information about where the justices' worship or their home addresses or where their kids went to school, you again sat on your hands and did nothing.

Your failure to act to protect the safety of the justices and their families was an obvious product of political bias. You agree with Roe vs. Wade. You disagree with the Dobbs decision. And the Department of Justice, under this president, was perfectly happy to refuse to enforce the law and allow threats of violence.

And as you know, those threats finally materialized with Nicholas Roske, a 26 year old man from California, who traveled across the country, was arrested outside the home of Justice Kavanaugh armed with a handgun, a knife, and burglary tools. And he said he came there to kill Justice Kavanaugh because he was enraged by the leaked opinion.

Now, of course you're prosecuting that individual for attempted murder. But did you bring even a single case to enforce this law, or did the Department of Justice to decide this law doesn't apply if it's harassing justices for an opinion we don't like?

MERRICK GARLAND:
When the Dobbs draft was leaked, I did something no attorney general in the history of the department had ever done before. For the first time in history, I ordered United States Marshals 24/7 to defend every residence of every justice.

TED CRUZ:
General Garland, as a judge, you're familiar with asking counsel to --

MERRICK GARLAND:
I'm --

TED CRUZ:

Answer a question.


MERRICK GARLAND:

I am answer --


TED CRUZ:

Has the Department of Justice enforced this statute? Have you brought a single case against any of these protesters threatening the judge -- justices under 18 USC Section 1507? Have you brought even one?


MERRICK GARLAND:

Senator, you asked me whether I sat on my hands, and quite of the opposite. I sent --


TED CRUZ:

OK, let me --


MERRICK GARLAND:

70 United States Marshals --


TED CRUZ:

Try again.


MERRICK GARLAND:

To defend -- and let me --


TED CRUZ:

Have you -- has the Department of Justice brought even a single case under this statute? It's a yes/no question. It's not a get -- give a speech on the other things you did.


MERRICK GARLAND:

The job of the United States Marshals is to defend the lives of the --


TED CRUZ:

So, the answer is no.


MERRICK GARLAND:

Is to defend the lives of the justices, and that's their number one priority. They have full --


TED CRUZ:

Why are you unwilling to say no? The answer's no. You know it's no. I know it's no. Everyone in this -- in this hearing room knows it's no. You're not willing to answer a question. Have you brought a case under this statute, yes or no?


MERRICK GARLAND:

As far as I know, we haven't. And what we have done is defended to the lives of the justices with over 70 US Marshals.


TED CRUZ:

So, how do you decide -- how do you decide which criminal statutes the -- the DOJ enforces and which one it doesn't?


MERRICK GARLAND:

The United States Marshals know that they have full --


TED CRUZ:

Yeah, I recognize you want to give a separate speech.

MERRICK GARLAND:

No, I don't want to give a --

TED CRUZ:

How do you decide which statute you enforce and which ones you don't?

MERRICK GARLAND:

The marshals on scene make that determination in light of the priority of --

TED CRUZ:

The marshals do not make a determination over whether to prosecute. You, the attorney general, make a determination. And you spent 20 years as a judge, and you're perfectly content with justices being afraid for their children's lives, and you did nothing to prosecute it. Let's shift to another area.

MERRICK GARLAND:

That -- that is -- can I answer the question?

TED CRUZ:

No, you cannot.

MERRICK GARLAND:

The attorney general --

TED CRUZ:

You have refused to answer the question.

MERRICK GARLAND:

I am answering your question. The attorney general --

TED CRUZ:

How did you choose --

MERRICK GARLAND:

Does not decide whether to arrest --

TED CRUZ:

How did you choose not to -- not to enforce this statute?

MERRICK GARLAND:

The marshals on scene --

TED CRUZ:

Marshals don't make that decision.

MERRICK GARLAND:

They do make the decision of whether to make an arrest.

TED CRUZ:

To prosecute someone? No, they don't.

MERRICK GARLAND:

If they make a -- if they make an --

TED CRUZ:

Marshals do not have prosecute authority.

MERRICK GARLAND:

If they make an arrest, then it goes to the marshals.

TED CRUZ:

All right. Let's -- let's change topics, because our -- our time is limited. We've also seen across the country violent attacks against pregnancy centers by similar left wing terrorist groups, including one -- one graffiti of a -- of a firebombed building said Jane was here. There have been attacks all over the country.

And yet the Department of Justice has not brought these violent criminals to justice. You contrast that. If you're a violent criminal and you attack a crisis pregnancy center, that is not a priority in the Biden Department of Justice. Contrast that to Mark Houck, who's a pro-life activist. He's a sidewalk counselor.

And he had an altercation with someone who allegedly inter -- interfered with his son's personal space and threatened him -- his son, and he pushed him. Now, in an ordinary world, pushing someone would be maybe a simple misdemeanor assault, but not under the Biden Department of Justice. If you're a pro-life activist, what can you expect?

Well, in this instance, according to Mr. Houck's wife, two dozen agents clad in body armor and ballistic helmets and shields and a battering ram showed up at his house pointing rifles at his family. Why do you send two dozen agents in body armor to arrest a sidewalk counselor who happens to be pro-life, but you don't devote resources to count to -- to prosecute people who are violently firebombing crisis pregnancy centers?

MERRICK GARLAND:

It is a priority of the department to prosecute and investigate and find the people who are doing those fire bombings. They are doing it at night and in secret, and we have found -- we have found one group which we did prosecute. We are --

TED CRUZ:

You've found one. How many of there been? How many attacks have there been?

MERRICK GARLAND:

There have been a lot. And if you have any information specifically as to who those people are, we would be glad --

TED CRUZ:

Let me ask you something. Did --

MERRICK GARLAND:

We would be glad to have that --

TED CRUZ:

Did you personally authorize 20 agents go into Mr. Houck's house?

MERRICK GARLAND:

I --

TED CRUZ:

And he offered to turn himself in through counsel, but you didn't want that. The Department of Justice wanted to make a show of it. Did you personally authorize it? And do you want to apologize to Mr. -- Mrs. Houck and her seven children for being terrorized?

MERRICK GARLAND:

To decisions about how to do that are made at the level of the FBI agents on scene. And the --

TED CRUZ:

Did you know about it?


MERRICK GARLAND:

I did not know about it until -- the way you're describing it. And my understanding is the FBI disagrees with that description.


TED CRUZ:

Was it a mistake?


DICK DURBIN:

The senator's time has expired. I'm going to allow the witness to respond to any of the questions that were asked.


TED CRUZ:

Was it a mistake?


DICK DURBIN:

I'm going to chair the committee, Senator. I'm sorry. You're not. I'm going to --


TED CRUZ:

You said you'd allow him to respond. But I repeated the question I asked, which is was it a mistake to send --


DICK DURBIN:

You --


TED CRUZ:

20 agents to arrest him at the crack of dawn?

DICK DURBIN:

You had your time and more than any --

TED CRUZ:

You just said you'd allow him to respond. You just said I'm going to allow him to respond to the question, so I repeated the question. Was it a mistake?

DICK DURBIN:

You asked the questions you want to ask --

TED CRUZ:

That was the pending question.

DICK DURBIN:

I'll ask the questions I want to.

TED CRUZ:

That's the question I had already asked.

DICK DURBIN:

Well --

TED CRUZ:

You just said you'd let him respond.

DICK DURBIN:

I'm going to let him respond right now.

TED CRUZ:

Good.


DICK DURBIN:

Please don't interrupt him. Thank you.


MERRICK GARLAND:

The decisions about how to do tactical arrests are made by the FBI agents in the field. The FBI has publicly stated that it disagrees with the description you gave of what happened in that example. I don't -- that's the best I can answer.


DICK DURBIN:

At this point, we're going to go to Senator Ossoff.


JON OSSOFF:

Thank you, Mr. Chairman. Attorney General, good morning. Last year, with Senator Grassley, I introduced and passed into law bipartisan legislation that requires DOJ and the Bureau of Prisons to strengthen and upgrade security systems at BOP facilities across the country. This includes the closed circuit camera systems, public address systems, intercom systems.

Through extensive investigation of failures at the BOP, we've identified the inadequacies of these security systems as posing a threat not just to inmates and staff, but to the broader community. This implicates public safety. And indeed, we found that at US Penitentiary Atlanta failures of systems like this one allowed widespread criminal conduct within the facility, escapes from the facility, putting the entire southeast region at risk.

And that's in the words of the BOP's own internal investigators. Our bill is now law, and the department has a deadline upcoming next month to present a plan to Congress for upgrades

to strengthen these security systems at federal prisons. So, my first question for you, Attorney General, is whether the department is on track to meet that deadline.

MERRICK GARLAND:

Senator, first, I want to say we're grateful for the work you and your committee did on this matter. And I know that you've met with the director of the Bureau of Prisons, who is adopting the recommendations that you've made. I believe we are on track to satisfy the requirements of the statute, but I'd be very happy to be sure that she or our staff meet with your staff to ensure that your expectations are being met.

JON OSSOFF:

Well, thank you, Attorney General. And I've worked diligently to develop the kind of trusting relationship with the new director. She has a task ahead of her to reform a bureaucracy that's been mismanaged, with significant human costs as a result, long predating your tenure. And I want to suggest that it's a necessary condition of demonstrating that the department is taking this seriously that this deadline be met and that we move forward expeditiously to strengthen these security systems.

Remaining on the -- on the subject of conditions in -- in prisons, the department announced in September of 2021 that it was conducting a civil investigation, a pattern of practice investigation into conditions of confinement in Georgia's state prisons. So, that was about 18 months ago. And the abysmal conditions in Georgia's state prisons which, as in the case of federal facilities, threaten public safety in the surrounding communities and are a major public safety hazard, those failures of management, in my view, in Georgia's state prison system are appalling.

They're life threatening and have, I believe, resulted in loss of life, and they undermine community safety. So, I -- I want to ensure that the department remains committed to seeing that investigation through and bringing results that can be made public and result in change.

MERRICK GARLAND:

So, the Civil Rights Division is charged with these pattern and practice investigations. They are very committed to ensuring that the conditions are changed that you're talking about. These pattern of practice investigations normally do end in a public report to -- to the state agency involved and to the public at large.

I don't know the specifics of how the -- this investigation is going, but I can assure you the Civil Rights Division is fully behind this investigation.


JON OSSOFF:

But the investigation is ongoing? It's proceeding and it's going to get a result, yes?


MERRICK GARLAND:

Yes.


JON OSSOFF:

Thank you. An additional investigation I led last year concerned the department's implementation of the Death in Custody Reporting Act. And one of the disturbing findings was that reporting under this statute, known as DCRA, had undercounted by at least -- almost a thousand deaths the deaths in state and local custody.

And in our engagements with the department, it came to my attention and I was dismayed that the department is not making DCRA data -- data available to the public. I'm going to ask unanimous consent, Mr. Chairman, that this report from the Leadership Conference and POGO titled A Matter of Life and Death, the Importance of the Death and Cost Reporting Act, be entered into the record


SHELDON WHITEHOUSE:

Without objection.

JON OSSOFF:

And I want to ask you, Attorney General, whether the department will commit to making DCRA data available to the public.

MERRICK GARLAND:

Yeah. So, first on -- on the first part of your question, we're obviously having trouble getting full reporting. This has to be voluntary on the part of the states. I believe the statute did give us some appropriations, which we're able to use as incentives for -- for more reporting. We're very charged with the importance of -- of doing that.

I have to say I don't -- I'm not familiar with the specifics of DCRA. If it provides for public reporting of the numbers we have, then we should be providing it. I don't know whether it does or not. I just -- I'm not familiar with it at that level.

JON OSSOFF:

You've got a lot on your plate, Attorney General. I recognize that. This is a serious concern for me and for the Senate. And I did not, after those investigations, come away with the impression that there was sufficient attention at a high level being committed to ensuring that this is being fixed. So, will you commit to getting up to speed and taking this matter personally into your portfolio?

MERRICK GARLAND:

I will. You now have high level attention, if you didn't have it before.

JON OSSOFF:

Well, I -- I think -- good. I -- I think we -- we should have gotten that based upon the results of investigation last year. I appreciate that commitment today. This needs to be fixed. Folks are dying in prisons and jails. The public needs to know who's dying, where they're dying.

You at the department need to know who's dying, where they're dying in order for you, for example, to bring the kinds of civil rights enforcement that you're pursuing in Georgia.

Let's talk about domestic violence for a moment. The Crime Victims Fund, as you know, is a critical resource for the funding of domestic violence shelters, child advocacy centers, and other nonprofits. And, you know, I'm hearing consistently from providers of victim services in Georgia that awards from this fund are still much lower than previous years due to some issues with VOCA reauthorization.

Will you work with my office and commit a member of your team to meet with my staff to make sure that we're identifying every opportunity to increase the resources for victims and survivors of domestic violence in Georgia and across the country, and that we are expediting the provision of those resources?

Because lives are literally on the line in my state and nationwide.


MERRICK GARLAND:
Yes, I -- I will. The VOCA fix was very helpful in allowing us to put deferred prosecution, delayed prosecution, non-prosecution agreements into the VOCA fix. We do, by the way, believe that we're on track to be fiscally responsible all the way through 2024.


JON OSSOFF:
Thank you. And with my colleague's indulgence, one final question for you. Senator Grassley and I have introduced legislation again this Congress. It passed the Senate last Congress. We need to get it through the Senate and the House this Congress to strengthen federal protections against the sexual abuse of children and to crack down on predators who use online services to target children for trafficking, for the production of child sex abuse material, and other heinous crimes.

We need to make sure that the law keeps up with technology. And we're seeing, in Georgia and across the country, children are targeted routinely and exploited online. Will you commit --

SHELDON WHITEHOUSE:

But keep it brief, because Senator Hawley and others are waiting, both you and the Attorney General.


JON OSSOFF:

Thank you, Mr. Chairman. Will you commit to ensuring that this remains a top priority for the Department of Justice?


MERRICK GARLAND:

Yes, I will.


JON OSSOFF:

Thank you, Attorney General.


SHELDON WHITEHOUSE:

Senator Hawley?


JOSH HAWLEY:

Thank you, Mr. Chairman. Attorney General Garland, let -- let me just ask you, does your department have a problem with anti-Catholic bias?


MERRICK GARLAND:

And our department is -- protects all religions and all ideologies. It does not have any bias against any religion of any kind.


JOSH HAWLEY:

Well, you could have surprised me because, given the resources that you are expending and the apparently intelligence assets that you are deploying against Catholics, it appears, and

other people of faith while simultaneously turning a blind eye while people are executed gang style on the streets of our cities, including in my home state, your answer frankly surprises me. Let's talk about the Mark Houck case, for example.

You've been asked about this already today, and frankly your answers really astound me. This is a case where a Catholic pro-life demonstrator, father, was accused of disorderly conduct in front of an abortion center. The local prosecutor, the Philadelphia district attorney, who is a Democrat, a liberal, very progressive, declined to prosecute.

There was a private suit that got dismissed. And then after all of that, your Justice Department sent between 20 and 30 armed agents in the early morning hours to the Houck's private residence to arrest this guy after he had offered to turn himself in voluntarily. Here's the photo once again. You can see the long guns.

You can see the ballistic shields. You can see that they're wearing bulletproof vests. Why did the Justice Department do this? Why did you send 20 to 30 SWAT style agents and a SWAT style team to this guy's house, when everybody else had declined to prosecute and he'd offered to turn himself in?


MERRICK GARLAND:
Determinations of how to make arrests under arrest warrants are made based by the tactical operators in the district. They are not --


JOSH HAWLEY:
But you certainly looked into it by this point, right?


MERRICK GARLAND:
They --


JOSH HAWLEY:
You -- you know the answer, surely.

MERRICK GARLAND:

They -- all I know is what the FBI has said, which is that they made the decisions on the ground as to what was safest and easiest.

JOSH HAWLEY:

So, you're --

MERRICK GARLAND:

They do not agree with your description of what happened on the scene.

JOSH HAWLEY:

If you don't agree with my description, I'm pointing out what the photo is. There are agents here who have long guns and ballistic shields. Let's take a look at the hardened criminals that your Justice Department sent these armed agents to go terrorize on that morning. Here they are. Here they are at mass.

Here's the seven children with Mr. Houck and his wife. In this early morning, they were all at home. Mrs. Houck has said repeatedly the children were screaming. They feared for their lives. You've got these agents demanding that he come out. They've got the guns, she said, pointing at the house and at them.

He has offered to turn himself in. And this is who you go to terrorize. What's really interesting to me is this seems to directly contradict your own memorandum about the use of force at the Justice Department. You say officers may use only the force that is objectively reasonable to effectively control an incident.

Are you telling me that, in your opinion as attorney general, it was objectively necessary to use 20 or 30 SWAT style agents with long guns and ballistic shields for these people?

MERRICK GARLAND:

What I'm saying is that decisions about how to go about this were made on the ground by FBI agents.


JOSH HAWLEY:

So, you're saying you don't know?


MERRICK GARLAND:

I'm -- I'm saying what I just said, that those --


JOSH HAWLEY:

Which is that you're abdicating responsibility?


MERRICK GARLAND:

I'm not abdicating responsibility.


JOSH HAWLEY:

Then give me the answer. Is -- do you think, in your opinion -- you are the attorney general of the United States. You are in charge of the Justice Department. And yes, sir, you are responsible. So, give me an answer.


MERRICK GARLAND:

The FBI does not agree with your description --


JOSH HAWLEY:

I'm not asking about the FBI. You are the attorney general. Give me your answer. Do you think that it was objectively reasonable and they followed your guidelines in sending 20 to 30 armed agents to terrorize these people, yes or no?


MERRICK GARLAND:

The facts I have, which are those presented by the FBI, are not consistent with your description.

JOSH HAWLEY:
So, you think it was reasonable?

MERRICK GARLAND:
I'm saying the facts are not as you describe.

JOSH HAWLEY:
What, that the children weren't there? That there wasn't -- that there weren't long guns there? That there weren't --

MERRICK GARLAND:
That's --

JOSH HAWLEY:
Agents? What wasn't -- what -- what do you dispute? What's the factual premise you dispute? Be specific.

MERRICK GARLAND:
FBI said they don't agree with your description of --

JOSH HAWLEY:
Be specific. They don't agree with what?

MERRICK GARLAND:
Of how many agents, of the agents who were there, and what their roles were. They don't agree. That's all I can say.

JOSH HAWLEY:

Do you know -- the jury in this case acquitted Mr. Houck, as I'm sure you're aware. Do you know how long it took them?

MERRICK GARLAND:

I -- I am aware, and we respect the decision of the jury.

JOSH HAWLEY:

Do you know how long it took them?

MERRICK GARLAND:

I don't know.

JOSH HAWLEY:

One hour, one hour. Philadelphia district attorney declines to prosecute. The private suit's dismissed. You use an unbelievable show of force with guns, that I'd just note, liberals usually decry. We're supposed to hate long -- long guns and assault style weapons. You're happy to deploy them against Catholics and innocent children, happy to. And then you haul them into court and a jury acquits him in one hour.

I'd just suggest to you that that is a disgraceful performance by your Justice Department and a disgraceful use of resources. I notice a pattern, though. The FBI field office in Richmond on the 23rd of January of this year issued a memorandum in which they advocated for, and I quote, the exploration of new avenues for tripwire and source development against traditionalist Catholics, it's their -- their own language, including those who favor the Latin mass.

Attorney general, are you cultivating sources and spies in Latin mass parishes and other Catholic parishes around the country?

MERRICK GARLAND:

No, the Justice Department does not do that. It does not do investigations based on religion. I saw the document you have.


JOSH HAWLEY:

What'd you do about it?


MERRICK GARLAND:

It's appalling. It's appalling. I am in complete agreement with you. I understand that the FBI has withdrawn it and it's now looking into how this could ever happened.


JOSH HAWLEY:

How did it happen.


MERRICK GARLAND:

That's what they're looking into. But I'm totally in agreement with you. That document is appalling.


JOSH HAWLEY:

I'll tell you how it happened. The -- this memorandum, which is supposed to be intelligence, cites extensively the Southern Poverty Law Center, which goes on to identify all of these different Catholics as being part of hate groups. Is -- is this how -- the FBI, under your direction and leadership, is this how they do their intelligence work?

They look -- they look at left wing advocacy groups to target Catholics? Is this what's going on? I mean, clearly it is. How is this happening?


MERRICK GARLAND:

The FBI is not targeting Catholics. And -- and as I've said, this is an -- an inappropriate memorandum, and it doesn't reflect the methods that the FBI is supposed to be using, should not be relying on any single organization without doing its own work.

JOSH HAWLEY:

Let me just ask you, as my time expires here, a very direct question. How -- how many informants do you have in Catholic churches across America?

MERRICK GARLAND:

I don't know, and I don't believe we have any informants aimed at Catholic churches. We have a rule against investigations based on First Amendment activity, and Catholic churches are obviously a First Amendment activity.

JOSH HAWLEY:

Well --

MERRICK GARLAND:

But I don't know a specific answer to your question.

JOSH HAWLEY:

You don't know the specifics of anything, it seems, but apparently on your watch this Justice Department is targeting Catholics, targeting people of faith specifically for their faith views. And Mr. Attorney General, I'll just say to you, it's a disgrace.

DICK DURBIN:

Senator Coons?

CHRISTOPHER COONS:

Thank you, Chairman Durbin. Thank you, Attorney General Garland, for your leadership of the department and for testifying here today. I appreciate all you're doing to restore to your order -- excuse me, to restore to your office its critical role in our constitutional order. Violent crime is a concern many members of both parties have raised today in this oversight hearing.

I just want to share with you that my home town of Wilmington, Delaware, which had had a longstanding challenge with violent crime and in particular murders, saw significant decreases over the last few years. Murders were down 58 percent in the past year to a 15 year low. Shootings were down 30 percent. Robberies were down 20 percent.

And in meeting with the mayor and chief of police recently, when I spoke with them they credited federal and local law enforcement partnerships, including in particular group violence intervention strategies as being central to their successful efforts. Congress and the Biden administration have together given $200 million to fund these programs for the first time.

Why do you think investments in things like violent intervention strategies have been so effective?

MERRICK GARLAND:

Yeah. So, I appreciate your asking that. I was just in Saint Louis and East Saint Louis to look into the way in which these violent -- violence intervention strategies have been effective. They are part of our whole of department approach to violent crime, which involves both law enforcement and support for state and local law enforcement and grants to state and local law enforcement, but also grants to communities to prevent the violence in the first place.

There are many kinds of these community violence interruption programs and intervention programs. They generally rely on having credible messengers, of people who the community trusts for any number -- a variety of reasons, who go into the community, try to -- to explain to the community that the police are on their side, that they need to be witnesses, be supportive, and to develop trust between law enforcement and the communities.

That's -- that's the bottom line of all this.

CHRISTOPHER COONS:

That's certainly what we've seen in Wilmington. And frankly, our chief of police just went to Saint Louis to be their new chief of police, and I -- I wish him well. I co-lead the law enforcement caucus with Senator Cornyn of Texas. One of the things we've recently been talking about is the NICS Denial Notification Act, which Senator Cornyn and I led last year, the president signed into law.

It requires federal law enforcement to notify state and local authorities when someone fails a background check when they lie and try to buy a gun. It's been in place since September. We've already seen 44,000 denial notifications go to local law enforcement. Can you just speak briefly to the value of this information for local law enforcement to prevent dangerous individuals from being able to acquire weapons?

MERRICK GARLAND:

Right. Well, this particular example is really the nub here. Somebody who is not lawfully allowed to get a gun who goes to try to get one anyway, I'd say there is a higher probability that person wants to do something nefarious with that gun. And now, thanks to this legislation, the state and local police will know about that and will be able to investigate to determine what it was that person was about to do with an unlawful weapon.

CHRISTOPHER COONS:

It's something that the sheriffs and the local chiefs in Delaware have been very excited about, and I look forward to working with you to make sure that it's fully and promptly implemented. I am chairing the Intellectual Property Subcommittee of this committee in this Congress. And as you know, I'm very concerned about the threat of foreign nations to our innovation and our intellectual property.

I think it's important that our response to this is coordinated across the whole government. So, I was glad to learn about your collaboration with the Department of Commerce, in

particular on the Disruptive Technology Strike Force. Could you just speak to your strategy, jointly with the secretary of Commerce, for protecting American innovation in coordination with other agencies?

MERRICK GARLAND:
Right. Well, on -- that particular task force is very focused on new technologies, AI, for example, very advanced microchips, which could be very dangerous, obviously, in the hands of an adversary, which are being exported and are evading export controls. So, what -- we're working with the -- part of the Commerce Department, which enforces export controls, and on our side on our national security division, to identify these kinds of transfers and to prevent them from happening.

You know, a very good example is what's happened on the battlefield in Ukraine. We're getting -- some of the Quadra Copters and other kinds of drones, and even some of the missiles that are landing in Ukraine turn out to have parts that came from American manufacturers. And we have to find out how they were able to evade our export controls.

CHRISTOPHER COONS:
Well, thank you. I look forward to working with you -- with you on that, and to strengthening our protections for copyright violation, patent, trademark trade secret violation. I've led, with Senator Wicker, now for some time a bipartisan bill to address the counterproductive practice of debt based driver's license suspensions.

The county Police Department I had the opportunity to supervise commented on a number of occasions in the decade I was in county government that being essentially a collections agency for the courts was the least constructive use of their time, to have traffic stops really just based on an outstanding request for a warrant or request for police action based on a failure to pay certain fines and fees.

Last year Delaware took steps to repeal these suspensions of driver's licenses, and became a national leader on access to justice for the poor. And I appreciate this administration's work

to restore the Office of Access to Justice, which previously under President Obama had issued a best practices letter on such fines and fees and how they impact those who simply cannot afford to pay low level fines.

Can you speak to your priorities for this office, the Office of Access to Justice, and the opportunity it has to help lead on fines and fees, whether by convening relevant stakeholders or reissuing a best practices letter?

MERRICK GARLAND:

Well, I'll start with the fines and fees. I think the additional, and maybe the most pernicious aspect of taking away someone's license is then they can't be employed. They can't go to their job, where they would make the money necessary to repay the fines and fees. So, I know that's an underlying basis of your concern and of the concern for these statutes.

The Office for Access to Justice has been recreated. I've appointed a director. One of the things that the office does is serve as organizing unit for the Legal Aid Roundtable, which has been reinvigorated across the government for assistance for providing pro bono work and legal assistance for the poor, who are otherwise unable to -- to -- to really do the most basic legal tasks because they just can't afford it. It's also the center of the Justice Department's own pro bono efforts.

Justice Department employees every day provide pro bono legal services to help veterans fill out the necessary forms, to help people with their wills, to help service members with respect to their debt and various other things. And that's another organization -- organizing section of this office.

CHRISTOPHER COONS:

Well, thank you, Mr. Attorney General. I look forward to working with you and with that office. We were just one vote shy of getting this bill into law at the end of last year, and I look forward to partnering with you on finding ways to reduce these driver's license suspensions and -- and debt and fee issues.

Thank you, Mr. Chairman.

DICK DURBIN:

Thanks, Senator Coons. Senator Cotton?

TOM COTTON:

Mr. Attorney General, I want to explore the dangerous crisis at our southern border and your role in causing that crisis. Asylum traditionally is reserved for people who face things like religious persecution, persecution for their political beliefs, or violence because of their race or ethnicity. In June of 2021, you changed the department's asylum rules so they could apply to individuals with significant gang violence in their home country.

Is that 2021 interpretation still in place?

MERRICK GARLAND:

It is. It reinstates a previous interpretation the department had had of the same asylum rules, yes.

TOM COTTON:

OK. Do you know the most recent murder rate in Honduras?

MERRICK GARLAND:

I'm sure it's enormously high.

TOM COTTON:

It's 36 per 100,000 people. What about Colombia?

MERRICK GARLAND:

I don't know.

TOM COTTON:

23 per 100,000. Guatemala?


MERRICK GARLAND:

Again, I don't know, but I believe it's very high.


TOM COTTON:

Seven -- 17 per 100,000. What about Mexico, right across our southern border?


MERRICK GARLAND:

I also think it's very high.


TOM COTTON:

28 per 100,000. So, as a -- since you rewrote the rules of asylum based on the perceived degree of violence in these countries, a little surprised you didn't know those. But let's look a little bit closer to home. Do you know the murder rate in New Orleans last year?


MERRICK GARLAND:

Well, I don't. But I want to be clear. This wasn't based on violence. This was based on threats, specifically to individuals on gangs where the country was unable to protect the person.


TOM COTTON:

So -- so --


MERRICK GARLAND:

That's what it was about. It wasn't about violence in general.

TOM COTTON:

Well, OK. Well, you're partly responsible for protecting Americans. So, let's say Honduras's government can protect its own people except for 36 out of every 100,000 for murders, Guatemala, 17 out of 100,000. The murder rate in New Orleans last year was 70 for every 100,000. What about Saint Louis?

MERRICK GARLAND:

Again, very high.

TOM COTTON:

68 per 100,000. What about Baltimore?

MERRICK GARLAND:

Also very high.

TOM COTTON:

58 per 100,000. Should American citizens in places like New Orleans and Baltimore and Saint Louis begin to seek asylum in countries like Honduras and Guatemala under your asylum principles?

MERRICK GARLAND:

Again, I'm saying that the principle here is protection of specific individuals who are being threatened by the gang and where the local country is unwilling or unable to protect them.

TOM COTTON:

So -- so, is the United States government and the city governments of Saint Louis and Baltimore and -- and New Orleans unwilling or unable to protect its own citizens?

MERRICK GARLAND:

I don't believe that -- I don't believe they're unwilling.

TOM COTTON:

Well --

MERRICK GARLAND:

They are doing everything that they can. We are supporting them in every way they can. The examples that you're talking about are ones where they are unwilling to protect from gangs.

TOM COTTON:

So, Mr. Attorney General, one of the reasons we have a crisis at our border, where we have illegal aliens running to our Border Patrol, not away from our Border Patrol, is this interpretation of asylum, that anyone anywhere who lives in a dangerous or poor country can come here and seek asylum as opposed to seeking it, as is traditionally the case, for things like persecution on religious belief or political practice.

MERRICK GARLAND:

That --

TOM COTTON:

But let's move on. Let's move on, Mr. Attorney General. I want to come back --

MERRICK GARLAND:

But that's not the standard. I want to be clear.

TOM COTTON:

I want to come back to a question that Senator Cornyn started, your -- your unprecedented memo in December of 2020 to direct your prosecutors not to pursue the most serious, readily provable offense. I have got numerous, numerous contacts in my office from your prosecutors who are shocked that you have overturned this decades long bipartisan standard.

You said this was about allocating resources. What -- what resources are you talking about?

MERRICK GARLAND:
No prosecutor --

TOM COTTON:
I --

MERRICK GARLAND:
No prosecutor was directed to not to bring a case again. In fact --

TOM COTTON:
Your memo specifically says if they feel that it's not warranted or only if the other offenses are not sufficient, they should not pursue what has been the standard for decades --

MERRICK GARLAND:
And, well --

TOM COTTON:
For generations of US attorneys and their assistants.

MERRICK GARLAND:
I'm well aware of the standard because I helped write the standard originally when the first principles --

TOM COTTON:

Because it was a Carter administration standard.

MERRICK GARLAND:

That's right.

TOM COTTON:

Not specifically known for being tough on crime.

MERRICK GARLAND:

Well, it was the first time the principles of prosecution were reduced to a book which explained what they were. It was included in it. Every assistant US attorney is able to use their discretion to bring these kinds of cases. No one's being directed to not do anything.

TOM COTTON:

You -- you specifically said that they should not pursue the most serious, readily provable offenses in cases where mandatory minimums are present because it's not warranted. You specifically said that.

MERRICK GARLAND:

But I said --

TOM COTTON:

That's the -- what does mandatory -- what does mandatory mean?

MERRICK GARLAND:

I'm trying to say the --

TOM COTTON:

Does it mean that prosecutors get a choice not to pursue it?


MERRICK GARLAND:

The --


TOM COTTON:

Did you write the law in that way?


MERRICK GARLAND:

The memorandum said that that -- that of cases of violent crime, which is specifically what you're asking me, are ones where in fact most likely that they should be bringing the highest and --


TOM COTTON:

Is it --


MERRICK GARLAND:

The mandatory minimum.


TOM COTTON:

Is it your assertion here that drug trafficking is not a violent crime?


MERRICK GARLAND:

No, and --


TOM COTTON:

It's build on an entire foundation and edifice of violence.

MERRICK GARLAND:

Yes, and it includes an exception, in the -- in the same memorandum we're talking about, for significant drug trafficking as well as for violent crime. That's right.

TOM COTTON:

So, let's -- let's get your specific answer. I -- I wrote it down here I was so surprised by it. You said to Senator Cornyn this is about allocating resources.

MERRICK GARLAND:

Yeah.

TOM COTTON:

What -- what resources are we allocating? If one of your assistant US attorneys had some criminal lowlife who could be charged with 12 offenses, but they don't charge the two most serious, readily provable offenses because of your memorandum, they're still charged with ten offenses. They have to go to grand jury.

They have to go to trial. They have to have a pre-sentencing report. They have to have a sentencing hearing. How is that conserving resources that you don't charge them with the most serious, readily provable offenses that would lock these lowlifes up for the longest time possible?

MERRICK GARLAND:

Well, lowlifes that you're worried about and have expressed worried about, the drug -- large drug traffickers, the violent criminals, they are to be charged to the max.

TOM COTTON:

I ask again. What resources were you talking about? You said to Senator Cornyn specifically it was about allocating resources. What resources?

MERRICK GARLAND:

These include our investigators and how much we have to investigate in order to establish the requirements for mandatory minimums, the prosecutors who have to prove those cases, the judges who have to try those cases, and the jails that have to hold those cases -- those individuals for longer terms.


TOM COTTON:

Well, if the jails are -- I don't see how jails could be a problem. You only have 158,000 prisoners now. Ten years ago was 219,000. Do you need more prisons?


MERRICK GARLAND:

Well, I think that --


TOM COTTON:

Mr. Kennedy's an appropriator. I bet he could get you more prisons.


MERRICK GARLAND:

Well, I think that many of the Senators have complained that the jails are too -- too filled, that they're overcrowded, that we're not able to provide the level of protection and security for guards and for prisoners that we would like. But that is not what this is about. Again, I want to be clear. The memorandum was crystal clear that they are to charge the most serious, provable offense in exempt cases involving violent crime and drug trafficking.


TOM COTTON:

OK. Let' -- let's turn to another example of you overriding Congress's will. Congress has repeatedly decided to impose stiffer penalties for crack cocaine than powder cocaine, done Originally at the request of members of the Congressional Black Caucus, voted for by -- by Senators like Senator Durbin, the chairman of this committee.

Ten years ago, they made a change to that. They specifically kept the ratio higher and they didn't make it retroactive. Now, you have directed your prosecutors, when they are dealing with crack cocaine, to charge it as if it was powder cocaine, something that this Congress has repeatedly refused to do, which we refused to do as recently as December when Senator Booker tried it on the floor and I blocked it. How do you explain overriding Congress's decision on this distinction between crack and powder cocaine to suit your own policy preferences?

MERRICK GARLAND:
The long standing rule is that the Department of Justice uses its discretion in which charges to bring, regardless of which ones are available, which ones are to -- to bring. Every bit of evidence we have is that there's no difference between powder and crack. Governor Hutchinson testified to that fact.

TOM COTTON:
Those are legislative -- those are legislative decisions. Those are not prosecutorial decisions. If this Congress wants to do it -- maybe it will one day and maybe I'll be outvoted. But those are legislative decisions. Those are not prosecutorial decisions. You said at your confirmation hearing that you had to follow the law as it was written, that the executive branch could not rewrite the law.

What you are doing is rewriting the law. It's not a single prosecutor out on the front lines making one decision. You are directing every federal prosecutor to override the law that has been written by Congress.

MERRICK GARLAND:
We're using our discretion as to which charges to bring in which circumstances, which ones are appropriate. That's what we're doing. That's a longstanding history of prosecutorial discretion in the United States.

DICK DURBIN:

Senator Hirono?


MAZIE HIRONO:

Thank you, Mr. Chairman. Mr. Attorney General, aloha.


MERRICK GARLAND:

Aloha.


MAZIE HIRONO:

As I have sat listening to some of the questions, the -- the phrase badgering the witness comes to mind, but I commend you for the calm way that you have comported yourself at this hearing. You have been accused of selective prosecution around the abortion issues. I want to note that, since 1977, anti-choice extremists have been responsible for 11 murders, 26 attempted murders, 42 bombings, 194 arsons, and thousands of other criminal incidents by anti-choice extremists.

And of course, we should prosecute all violence and threats of violence by those on both sides of the abortion issue. But isn't it the case that our prosecutorial focus should be on the most violent acts?


MERRICK GARLAND:

Yeah. Well, just --


MAZIE HIRONO:

Mr. Attorney General?


MERRICK GARLAND:

Let me just say, look, we prosecute without respect to ideology, but we do focus on the most violent acts, the most dangerous actors, the cases that are most likely to lead to danger to Americans. But we don't care what -- the ideology of the person who is threatening that act or who is taking that act. We will prosecute regardless.

MAZIE HIRONO:

That is what I would expect of any attorney general who observes the rule of law and -- and who abides by it, regardless of whatever the -- the -- the religion and all of that. So, that's -- that is what I expect from the attorney general. In the wake of the Supreme Court's, in my view, disastrous ruling in Dobbs, because that ruling has led to fear and chaos all across the country, and abortion is now a crime in over a dozen states, but it is not a federal crime.

What affirmative steps is the department taking to ensure that states are not infringing women's constitutional right to travel across state lines for whatever purpose?

MERRICK GARLAND:

We do not see anything in -- in the Dobbs case to suggest in any way that states can interfere with travel between states. In fact, at least one of the justices made clear that that was not within the scope of Dobbs. And so, we are looking closely. I'm not familiar with any state that has tried to criminalize interstate travel.

But if there were, we would make the appropriate filings. We have supported the Veterans Department, the Department of Defense, in their policy decisions to support people to travel out of state to receive the necessary reproductive care.

MAZIE HIRONO:

Well, Mr. Attorney General, there are people who are trying to make it ever harder for persons who get pregnant in this country to be able to access abortion services and other reproductive services. In fact, we are awaiting a decision by a federal judge in Texas whether or not he should impose a national injunction on the use of mifepristone, which is the -- the drug that is most often used for early stage abortion.

It's also a drug that is -- that is used to treat miscarriages in the early stages. So, you have a federal judge that has the power to impose a -- this kind of an injunction, and it would affect every state in the country, including all those states like Hawaii, which was among the first to decriminalize abortion.

So, I would say that the efforts do not stop there. So, whatever you can do to make sure that women in this country know that they can travel to -- to other states to get whatever services that they seek. The department awards billions of dollars in grants to state, local, and tribal law enforcement each year.

The department also operates joint task forces and provides access to forensic and surveillance resources. This sort of collaboration can be good when put to good use fighting criminals who prey on our communities, but these resources could also be used against women seeking reproductive care. How -- I -- I've just sent a -- a letter to the president expressing my concerns about the -- the use of these federal -- federal funds by local law enforcement to basically hunt down women who are seeking abortion.

So, how is the department working to ensure that states and local partners do not use federal resources to enforce state laws restricting women's access to reproductive care?


MERRICK GARLAND:
On your first question, just to be clear, we have filed in support of the FDA and the law -- mifepristone, the lawsuit that you're talking about. And we are hopeful that the result will not be the one that your concern -- that you -- that you describe.


MAZIE HIRONO:
Well, there was judge shopping to make sure that it's this particular Texas judge who would get this case.


MERRICK GARLAND:
We have -- we have filed the appropriate briefs in that -- in that.

MAZIE HIRONO:

Thank you.


MERRICK GARLAND:

On the second question, I -- I personally haven't looked into it. I don't know the answer to that. So, if we could have some people in the department get back to your staff on that, I'd be happy to do that.


MAZIE HIRONO:

Thank you very much, with the perspective that these kinds of federal resources should not be used by states to go after women who are seeking reproductive services. I hope that is the perspective that you bring to the issue. I want to get to the issue of domestic terrorism and white supremacy. Last fall, our colleagues on the Homeland Security and Government Affairs Committee released a report on the federal response to domestic terrorism.

In it, they noted that, I quote, national security agents now identify domestic terrorism as the most persistent and lethal terrorist threat to the homeland, end quote. They also explain that, quote, this increase in domestic terror attacks have been predominantly perpetuated by white supremacists and anti-government extremists individuals and groups, end quote.

This fits with a recent Department of Homeland Security assessment that the country, quote, "remains in a heightened threat environment", end quote, and that some of the potential targets include, quote, faith based institutions, the LGBTQ community, schools, and racial and religious minorities. Do you agree that white supremacist terrorists pose a significant threat to our country, and especially to racial and religious minorities and the LGBTQ+ community?


MERRICK GARLAND:

Yes. As the FBI reported in -- in that report you're talking about, racially motivated violent extremists as a group are the most dangerous of the domestic violent extremist groups. And

within that, the white supremacists are the most dangerous and most lethal, yes.

MAZIE HIRONO:

So, what -- what more can the department do to combat -- combat this rise in these kinds of domestic terrorist activities?

MERRICK GARLAND:

Well, we -- we've allocated a significant amount of resources for this purpose. Our -- the national security division has stood up a domestic violent -- violent extremist unit to further track and try and interdict these actions. The FBI is treating this with enormous seriousness of purpose, and we are going to do everything we can to deter and prosecute.

MAZIE HIRONO:

Thank you. Mr. Chairman, I think my time is up. Thank you.

DICK DURBIN:

Thank you, Senator Hirono. Senator Kennedy?

JOHN KENNEDY:

Thank you, Mr. Chairman. Thank you, General, for being here. Good afternoon.

MERRICK GARLAND:

Thank you.

JOHN KENNEDY:

I read this somewhere. I don't remember who said it, but -- or wrote it, but I remember it. It was once observed that -- that a parent who stops loving their children -- if a parent stops loving their children, the children will not stop loving the parent. The children will stop

loving themselves. I know we can agree that we should encourage parents to be involved in their kids lives.

MERRICK GARLAND:

Absolutely.

JOHN KENNEDY:

And I'm sure we can agree that we should encourage parents to make their kids do their homework.

MERRICK GARLAND:

Yes, although sometimes some resistance to that.

JOHN KENNEDY:

Right, right. And to make sure they get sleep at night so they can be ready for school.

MERRICK GARLAND:

Yes.

JOHN KENNEDY:

Here's what I'm -- I've always been confused about. Didn't you understand the chilling effect that it would have to parents when you issued your directive, when you directed your criminal divisions and your counter terrorism divisions to -- to investigate parents who were angry at school boards and administrators during COVID?

MERRICK GARLAND:

So, Senator, if you'd just give me a moment to put the full context, I did not do that. I did not issue any memorandum directing the investigation of parents who were concerned about their children. Quite to the contrary, the memorandum that you're talking about says at the

very beginning of the memorandum that vigorous public debate is protected by the First Amendment.

And the kind of concerns that you're talking about are -- as expressed by parents are of course completely protected. The memorandum was aimed at violence and threats of violence against a whole host of school personnel. It was not aimed at parents making complaints to their school board. And it -- it came in the context of a whole series of other kinds of violent threats and violence against other public officials.

JOHN KENNEDY:

Well -- well, let's walk through this. Your directive to your criminal division and your counter terror -- terrorism division came in a response to a letter from the National School Boards Association. Did it not?

MERRICK GARLAND:

In part to the letter and in part to news reports of violence and threats of violence.

JOHN KENNEDY:

And the National School Board Association said these parents ought to be investigated under the Patriot Act as potential domestic terrorists.

MERRICK GARLAND:

And you'll notice, Senator, that I said nothing like that in my --

JOHN KENNEDY:

I understand, but that's what the letter said.

MERRICK GARLAND:

There -- there was a reference to that in the letter, something I disagree with.

JOHN KENNEDY:

And your employees helped them write the letter, didn't they?


MERRICK GARLAND:

I don't know anything to suggest that that's true.


JOHN KENNEDY:

I --


MERRICK GARLAND:

No, I don't.


JOHN KENNEDY:

Thin it is true.


MERRICK GARLAND:

Well --


JOHN KENNEDY:

And the White House helped them write that letter, didn't they?


MERRICK GARLAND:

I -- I don't know. I have no knowledge about that. But certainly I don't know anything about my employees --


JOHN KENNEDY:

And so --

MERRICK GARLAND:

Helping write that letter.


JOHN KENNEDY:

And so, you get this letter from the National School Board Association asking you to investigate parents that your employees helped to write and that the White House helped to write, and you issue a directive to your criminal division and to your counterintelligence -- or counterterrorism division to start investigating parents who are angry.

What did you think was going to happen?


MERRICK GARLAND:

I'll say again, Senator, that I -- nothing in my memorandum says to investigate parents who are angry, quite the opposite. It says that the First Amendment protects that kind of vigorous debate. The only thing we wanted was for an assessment to be made out in the field about whether federal assistance was needed to prevent violence and threats of violence.


JOHN KENNEDY:

Well, one of your field -- that's not the way your -- your -- your department implemented your directive. One of your field offices actually opened an investigation. You set up a -- a Web site and a hotline to report parents. And a state --


MERRICK GARLAND:

OK. I don't think -- we didn't set up a specific hotline about this. This was a reference to the FBI's hotline.


JOHN KENNEDY:

A state Democratic Party official contacted you. They said that some Republicans were inciting violence by expressing public displeasure with school districts' vaccine mandates,

and one of your field offices opened an investigation, which is a permanent part of their record.

MERRICK GARLAND:

Senator, I don't know anything about the specific thing that you're talking about.

JOHN KENNEDY:

You're completely out of --

MERRICK GARLAND:

They used to say -- they used to say in high school this was going to be on your permanent record. I don't believe there is any such thing with respect to the -- to this.

JOHN KENNEDY:

Oh, I think there is that the FBI, General, and you and I both know there is. There -- there was a lady and -- and a mom in Michigan. She has a special needs kid. And the kid was doing pretty well, and she got upset with her local school board over its closures and -- and virtual learning policies. And she went to the meeting.

And -- and she made an intemperate comment. She -- she -- she accused them of being a bunch of Nazis. Why would the FBI open an investigation of her?

MERRICK GARLAND:

Again, I don't know anything about the specifics of the case, but accusing people of being Nazis, while I find bad, is certainly not criminal. It's totally protected by the First Amendment.

JOHN KENNEDY:

I mean, I think --

MERRICK GARLAND:

And I've said that over and over again. This is not the first time we've discussed this.


JOHN KENNEDY:

But that's not -- that's not what your department did.


MERRICK GARLAND:

Well, I -- this is about a third time I'm being asked the -- about the same memorandum, and each time I've said, and I hoped that the Senators would go ahead and advise their constituents in the same way, that this is not what we do. We are not in any way trying to interfere with parents making complaints about the education of their children.


JOHN KENNEDY:

But don't you understand, General, and -- and I -- I believe you, but don't you understand that this looks like you were just giving in to the teachers unions and politicizing the disagreement, the honest disagreements? I mean, we only as -- a result of some of our school board policies, we only experienced the largest learning loss for our kids in modern history.

Don't you think parents had a right to be upset?


MERRICK GARLAND:

Absolutely.


JOHN KENNEDY:

Instead of what is a -- I mean, you -- you implemented -- what's the threat tag?


MERRICK GARLAND:

I didn't implement the threat tag. What you're talking about there is a part of internal FBI operations.


JOHN KENNEDY:

Yeah, you --


MERRICK GARLAND:

And as far as I can --


JOHN KENNEDY:

You directed your folks, though, to open threat tags on these parents.


MERRICK GARLAND:

I -- I didn't --


JOHN KENNEDY:

And -- and -- and investigate them.


MERRICK GARLAND:

Yeah, I did not direct that. My understanding from testimony by the FBI is that, when somebody makes a complaint and it involves -- if somebody gives a tip that a -- a school official is being threatened, then there's -- in order to look at trends, they mark it as a -- as a -- in the tip involving a school Official, they make -- have the same set of threat tags with respect to a complaint that suggests somebody is making a threat against a Supreme Court justice.

These aren't complaints. These are tips that -- of violence or threats of violence.


JOHN KENNEDY:

A threat tag on a parent for being concerned at a school board meeting.

MERRICK GARLAND:

It's not on the parent. It's not on whoever. It's on -- to indicate that a threat was made against or at least alleged that a threat was made against a school board member or a school official or a teacher or a school. Some of these turned out to be bomb threats.

CORY BOOKER:

Senator -- Senator Kennedy, we're going to have a second round of questioning on behalf of Chairman Durbin, who is going to vote. I'm going to call on --

JOHN KENNEDY:

You're blaming it on Durbin. I understand. I apologize.

CORY BOOKER:

I take full responsibility.

JOHN KENNEDY:

Thank you, General.

CORY BOOKER:

Thank you, Senator Kennedy, for the grace, and thank you very much for being here. I just want to confirm because I've heard some misstatements. Fentanyl is permanently schedule -- scheduled at Schedule II, correct?

MERRICK GARLAND:

Yes, sir. The discussion is about fentanyl analogs.

CORY BOOKER:

So let's go to fentanyl analogs. Fentanyl analogs are schedule now at Schedule 1. They are not expiring this year. Fentanyl analogs are Schedule II the expiration date for which is at the end of 2024. Correct?

MERRICK GARLAND:

It might be the fiscal year. I'm not sure exactly, but --

CORY BOOKER:

I believe it's not 2023. It's at the end of the year 2024 fiscal or not.

MERRICK GARLAND:

I'm not exactly sure of the time. I know that there's a short time on this and we believe it should be re-upped.

CORY BOOKER:

OK. I want to jump into the executive order from President Biden on policing. It took really important steps to ensure that federal law enforcement agencies are engaging the best practices to make themselves and the public safer. Some of these policies, the department has adopted and is making great progress on including limitations on chokeholds, guidelines, for no knock warrants, which is extraordinarily dangerous for police officers themselves and a cleaner standard for the use of deadly force.

Even the Trump EO -- EO though included the need for us to have a database that is I guess called an accountability database to serve as a repository for officer misconduct records within the next eight months, which is now this past January. Trump's executive order which was issued In June of 2020 also directed the internal attorney general to create such a database to collect this information.

What's the status now on that?

MERRICK GARLAND:

Yeah, there's a working group run by the deputy attorney general to stand this up. As you can imagine, there are difficulties with respect to getting reporting and also difficulties with respect to defining what a determination has been made. Like we are seized with this, and we are working full speed ahead to get this done.


CORY BOOKER:

I'm grateful and hope we can continue to communicate on that. It's -- it's invaluable. And the EO directed you to encourage state and local agencies to contribute to the database. How's that going?


MERRICK GARLAND:

Yeah, we are -- we have made outreach to all the major law enforcement organizations who support this proposition. We are making outreach to state and local law enforcement. We are making progress. I can't really say more than that at this point, not because I don't want to say, but because I don't know.


CORY BOOKER:

OK. The Biden administration in cooperation with the Congress acting in a bipartisan manner has put significant amounts of money into the COPS grant program. In fact, I think under the last Congress, it was one of the higher -- highest rating -- highest amounts of money given to programs that help local police departments really Proud.

President Biden did that. I'm just curious what processes are in place to ensure that the funded funds are being used for intended purposes? Does the department audit those grants?


MERRICK GARLAND:

Yeah. When -- whenever a government agency gives out grants, there's always a risk. And so we have pretty tight, very tight auditing and review processes for these grants.

CORY BOOKER:

And do you have the resources you need to adequately audit the grants in your estimation or is that something that might -- Congress might act to give you the more resources?

MERRICK GARLAND:

I'm going to say again to you and I've said before. Whenever anybody wants to offer me more resources, I'm happy to have them. But I think we're -- we're capable of doing what the Congress wanted us to do with the resources we have right now.

CORY BOOKER:

Right, I appreciate that wise response. In December of 2021, you said the department would exercise its discretion to ensure that people released on home confinement under their CARES Act would not unnecessarily return to prison. My -- my experience, I've been visiting prisons since I was a law student and I usually go in and ask wardens who are often tough men and women who really are about the protection of their officer, their community at large.

And I always ask, are there people here that are a waste of taxpayer money? And they will often tell me stories about elderly folks, infirmed folks. But here now we had a pandemic as you know, and there was a release program with really high standards to meet for anyone being released. And I appreciate your comments on this matter in the past.

I just want to ask. can you confirm that the department will not revoke individuals released under the CARES Act for minor violations? We always know there's so-called status violations where somebody might cross a county line or do something that is a technical violation, which is often minor. They're not a threat to public safety.

Can you confirm again that the department will not revoke individuals that are released under the CARES Act for these so-called status violations once the public health emergency expires?


MERRICK GARLAND:

So just to give the full context. The CARES Act allowed us to put people in home confinement who we ordinarily would not have been able to do because of the length of time remaining on their sentence. A question was raised whether that -- whether those people would have to go back after the expiration, which is now going to be in -- in May, I believe.

The Office of Legal Counsel interpreting the statute found that they would not have to go back, that all that was necessary was that the attorney general put them into home confinement. When I say the attorney general, I mean the Justice Department and the Bureau of Prisons, and that they could remain subject to what the normal rules are having to go back.

So if somebody commits the kind of violations that would normally require somebody to go back to prison from home confinement, those would apply, but no special rules to people who came under the CARES Act. And let me also say in support of what you said, there has now been enough time to have statistical data on recidivism as found that the people out on the CARES Act, a number of -- of serious crimes committed is extremely tiny and not of -- of concern.

All right. On July 16th, my last question -- my penultimate question. On July 16th, 2022, you said that the Justice Department is examining marijuana policy and will be addressing the issue in the days ahead. And then October of 2022, President Biden urged an expeditious review of the schedule of cannabis and directed individuals federally incarcerated for cannabis possession be expunged.


CORY BOOKER:

What is the current state of the review of cannabis at the Justice Department and when can we expect policy changes on this important issue?

MERRICK GARLAND:
I think everything that you said is correct. The president commuted sentences and this is still working its way through the system to get the final certificates of commutation. But that -- that -- that is accomplished. The HHS is working on the question of scientific analysis of marijuana. And within the department, we are still working on a marijuana policy for the department.

I have to say that the crack powder thing came first in my list of things that had to be done first. That was accomplished as you already know. And I think that it's fair to expect what I said at my confirmation hearing with respect to marijuana policy that it will be very close to what was done in the Cole memorandum.

Deputy Attorney, General Cole in the Obama administration. We're not -- we're not quite done with that yet.

CORY BOOKER:
Well, I'm very eager to get to hear more about that and I'm hoping that you can do that -- review the complicated policies as more and more states red and blue are moving. It'd be good to hear that as quickly as possible. And I just would like you to respond for the record. There are some scurrilous statements out there that you're dissatisfied with your chief of staff and would like him to be replaced by his eldest son.

So if you could respond on the record for me at some point about that.

MERRICK GARLAND:
The only bad mark in his resume is that he worked for you once.

CORY BOOKER:

Thank you, sir.


DICK DURBIN:

Senator Blackburn.


MARSHA BLACKBURN:

Thank you, Mr. Chairman and Mr. Attorney General. Thank you for your time today. Listening to the questions and the answers and your responses, what is coming clear to me as I listen to this is basically in your DOJ, the Biden DOJ, there are two tiers of justice. There are one for people with conservative values for parents, for people of faith.

And then there is another tier of justice that applies to the Washington liberal elite, political elite. And what I want to do is dig down a little bit on how you and the department have applied this discretionary form of -- of justice. It's something that concerns Tennesseans. And when I'm across the state, we have 95 counties.

I visit each of them every year. And Mr. Attorney General, that comes up quite a bit. Much of it has come up in relation to the Dobbs decision and the attacks and the violence there has increased from groups on the far left. It has not increased from pro-life groups. And since the Dobbs leak, there have been 70 pro-life pregnancy centers that were targeted.

Only two of these activists have been indicted. There are 25 individuals that have been indicted under the FACE Act in just five months. So you see the disparity there. I appreciate you said that most of these attacks are carried out at night and that the protests take place during the day. So you say it's easier to identify and go after people that are carrying out a peaceful protest during the day rather than a firebombing at night.

Is that correct?


MERRICK GARLAND:

Yeah, If I -- if I could just say, I wish you would assure your constituents and all the counties that the Justice Department does not treat people in the way that they describe it. We treat

like cases alike. We do not have one view.

MARSHA BLACKBURN:
OK, then let's talk about a specific case in Tennessee, the Hope Clinic. Are you familiar with that?

MERRICK GARLAND:
I'm not familiar with it.

MARSHA BLACKBURN:
OK. So the Clinic for Women is a pregnancy resource center in Nashville. And currently you have gone out of your way to prosecute 11 individuals in Tennessee under the FACE Act. And are you aware that this clinic was the subject of an attempted firebombing with a molotov cocktail?

MERRICK GARLAND:
So we are very concerned about these kind of fire bombings, and I agree with you there are happening around the United States. The FBI has put its resources into this. We are investigating it in every way. We've offered rewards for anyone who has information.

MARSHA BLACKBURN:
Then let's talk about these groups get classified. When we talked about the way parents of children were treated and because they were concerned over what was being taught in schools, Senator Kennedy just went through that with you. You applied domestic terrorism as a term in couching that activity. Now under federal law, which you have cited, this is how you term domestic terrorism and I'm quoting; "activities that involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any state." So under that definition, would you agree that firebombing a crisis pregnancy center constitutes an act of domestic terrorism?

MERRICK GARLAND:

I would say yes, but I want to again disagree with your earlier characterizations. There was no memorandum about parents complaining and their -- to their school boards and there was --

MARSHA BLACKBURN:

Talking about bombing -- firebombing pregnancy centers.

MERRICK GARLAND:

I understand and there was no reference in that memo to using domestic terrorism.

MARSHA BLACKBURN:

Would you agree that bombing -- firebombing -- is domestic terrorism

MERRICK GARLAND:

Where it said -- yes, fire bombing -- is at least domestic violence extremism.

MARSHA BLACKBURN:

OK. Let's talk about the far-left group, Janes Revenge because they claimed responsibility for that. They went so far as to spray paint their name on the wall. So do you intend to prosecute them?

MERRICK GARLAND:

We intend if we find them to do that, there is a --

MARSHA BLACKBURN:

Oh, so you can't find them.

MERRICK GARLAND:

If you have information about those, we would be happy to.


MARSHA BLACKBURN:

That is your job.


MERRICK GARLAND:

That's right. And we are putting heavy resources into this. We have found a group that -- that's --


MARSHA BLACKBURN:

That they are a domestic terrorist organization.


MERRICK GARLAND:

I would say it depends on -- it depends on the people.


MARSHA BLACKBURN:

Who took credit for this, spray painted their name on the wall. Let me ask you a couple of questions before my time runs out. We've talked a little bit today about the targeting at the justices' homes. Have you released any type of memorandum that explicitly condemns the acts of intimidation outside of the Supreme Court justices' homes?


MERRICK GARLAND:

I have directly instructed the Marshal Service to send over 70 United States marshals to prevent acts of violence and threats of violence outside those. I don't need to do a memo because I spoke directly to the marshals about this topic.


MARSHA BLACKBURN:

All right. Have you watched any of the footage of the protesters outside the justices' homes?

MERRICK GARLAND:

Unless I caught it on the news, I haven't specifically watched it.

MARSHA BLACKBURN:

Are you investigating any of those individuals? You said, you know, you investigate protesters because they do their activity then in the light of day. And most of the fire bombings and things take place at night, but I would think the FBI knows how to investigate --

MERRICK GARLAND:

As I explained, our principal responsibility here is to protect the lives of the justices. We've put the United States

MARSHA BLACKBURN:

But you haven't watched any of that footage?

MERRICK GARLAND:

The United States marshals are on scene watching what happens on scene.

MARSHA BLACKBURN:

Any of those individuals that were protesting at the justices' homes, were there for any reason other than to try to intimidate the justices?

MERRICK GARLAND:

The marshal's job is to protect the lives of the justices and they will arrest people who they think are threatening the lives of the justices. That's their job.

MARSHA BLACKBURN:

Thank you, Mr. Attorney General. I have to say people in Tennessee talk a lot about their frustration. They want to trust the DOJ. They want to be able to trust their government. They are very concerned about what appears to be by actions two tiers of justice and this is something that they do not see as equal treatment under the law.

Thank you, Mr. --


DICK DURBIN:

Thank you. Senator Blackburn. Senator Welch.


PETER WELCH:

Thank you very much, Mr. Chairman, Mr. Attorney General. I appreciate the work you've been doing on election infrastructure and security. We have our town meeting in Vermont next week. We're pretty proud of that. You raise your hand and decide publicly how you're going to vote or you can do it privately.

And I just wanted to ask you about the Department of Justice. You have taken important steps to protect election workers and the right to vote, and that includes by establishing the election threats task force. Let me ask you. What steps to the department take in 2022 election to defend our democracy in the election workforce.

And are there any lessons learned that can help us going forward?


MERRICK GARLAND:

So we have as you note established an election threats work -- task force aimed at investigating threats against state and local election workers. The FBI has been tracking those kind of threats that come in on their tip line and making those investigations. There have been a number of prosecutions and convictions regarding those threats.

I'm not sure if that fully answers the question, but that's what we're doing.

PETER WELCH:

That's good. You know, there's -- from here time to time, there's threats to local election officials that might happen in one state and then it might be another. What things can you do to be helpful in responding to specific threats against election workers.

MERRICK GARLAND:

Yeah. So obviously the first line of defense out of state and local law enforcement, what we bring to this is a particular both resources and legal tools that can be used to track the use of the Internet to make those threats, emails to make those threats, text messages, telephone calls to make those threats.

And that's a lot of what we do is to help the state and locals identify the source of those threats and then to go out and knock on doors and investigate, you know, whether violence was actually contemplated.

PETER WELCH:

And you have the resources that you believe you need in order to make certain that our elections are safe and sound.

MERRICK GARLAND:

I think we have the resources that we need to develop -- to investigate these threats to the people who are really the foundation of our democracy, volunteers, who are, you know, running our elections. That's the way we do things in the United States. Of course, state and local elected officials are also being threatened, but so also are the volunteers who are election judges, you know, put the ballots in the boxes, etc.

PETER WELCH:

All right, Thank you. The other area I wanted to talk to you about was broadly speaking antitrust, but specifically how it's impacting our health care system. My view is that one of

the big challenges we have with affordable and accessible health care is the cost. And there's a number of factors that are driving up the cost and I think that includes some anti-competitive activities.

For example, you know, hospital consolidation is a big issue. When you go to the hospital, you get one of those bills. You just can't believe it. If you get out healthy, when you get the bill, you're going to be sick and consolidation of physician practice groups, big tech and private equity. Private equity companies bought up all of these human resource companies when we had the need for these visiting nurses and just exploded the rates and it pulverized the budgets of our small hospitals in rural America.

And just last month, the Wall Street Journal reported that CVS would purchase primary care provider, Oak Street Oak Street Health, Broadening CVS's Market domination is a parent entity of a -- is a firm pharmacy benefit manager. Now I know you can't speak specifically about any particular case, but there's a consolidation trend and market power trend that I think is escalating these prices to the detriment of the taxpayer to employers who are working hard to provide employer sponsored health care and obviously to individuals.

In the past year, the DOJ has taken steps to update its antitrust guidance. It has heard from patients and providers and advocates about how to bolster antitrust enforcement. I want to just give you an opportunity to tell us your view on this and the role you see. The -- the -- -- the antitrust division of the Department of Justice making certain that we have competitive pricing are trying to get some semblance of competitive pricing.


MERRICK GARLAND:
Yeah, I appreciate the question. We have tried since I've been attorney general to reinvigorate the antitrust division to more urgently evaluate mergers and to bring cases against exclusionary behavior by dominant firms. Thanks to the Hart-Scott-Rodino merger filings fees legislation that was passed. We now have more money that we can use to build up again the resources of the department.

As I mentioned earlier, I was stunned to learn when I came to the department that there were fewer lawyers in the unit and economists in the antitrust division than there were when I first entered the Justice Department in 1979, and you can imagine this. That's amazing and the number -- and particularly when you think of how big the companies are now.

So we're doing two things in the merger field, of course on -- on the very large mergers which are subject to Hart-Scott-Rodino. We are doing a very careful scrub and making determinations of whether we should challenge it. But I think what you're talking about is also quite important, which are smaller markets, but are still what economists call relevant markets where the price is affected regardless of whether it's a nationwide roll up. If it's -- if it's a roll up of health care providers in one entity, and really the only place that people who need health care locally can provide it. So we have brought and will continue to examine those kinds of cases as well.

You are -- you know, the bottom-line theory about antitrust is that there are multiple players in the market, they will compete with each other and we will get the best pricing, marginal cost being a -- being -- being the price where it meets the supply curve. But that's not the case where you have dominant firms where there's only a few places to go. And in those situations, price will almost always be above the competitive price.


PETER WELCH:
OK. Thank you very much, Mr. Attorney General and thank you for your service on the bench before. And Mr. Chairman, I yield back.


MERRICK GARLAND:
Thank you, Senator.


DICK DURBIN:
Thank you. Senator Welch. You're the first to do that. Senator Tillis.


THOM TILLIS:

I was actually going to thank Senator Welch for that. I think Mr. Chair, we probably ought to have four-minute rounds, so we have a reasonable chance of them getting done in seven minutes. General Garland, I guess I'm your ticket to lunch. I've just got a couple of questions to ask you. In your opening statement, I'm sorry, I had to come in and out.

I want to spend most of my time in the hearing. You have 115,000 people working in the DOJ and I think most of them are great people, purpose, service driven and I thank them for their work. But we're not all angels. We probably have some that need to be held accountable. And you made a comment about returning to some of the norms that maybe have drifted over time or focus on them.

Can you briefly describe to me a couple of those where you see positive trending?

MERRICK GARLAND:
Yeah, I think the most important is the principle that we treat like cases alike that we don't have one rule for Democrats or Republicans rich, poor powerful powerless based on ethnicity. Another important norm is that we decide our criminal investigations and affirmative civil law enforcement investigations without any interference from the White House or frankly from the Congress, that these decisions are made on the merits without any policy or political interference.

THOM TILLIS:
I think one thing that would be helpful for -- I'm a data driven person and I think one of the things would be helpful for you is to try to the extent that you can to measure, you know, some of those so that you come back equipped with data that may -- maybe refute some of the -- the misconceptions about your priorities.

I want to talk briefly about my favorite subject when I get on law enforcement. Have you seen the 3.12 March? All right, this is a subpage.

MERRICK GARLAND:

March 12th?


THOM TILLIS:

I'll shoot you a link. This is the subpage. It's been out there for a while. It's actually a sub page from ActBlue [ph], which is the largest aggregation engine for many of my colleagues on the other side of the aisle for hard dollar contributions to their campaigns, which I don't begrudge. We have an equivalent platform.

What's notable about this is this is still on the website; they're trying to raise $1.312 million. They've already received contributions. They keep it on the website. Now let me just tell you what the run's about. They say why 3.12 miles. Because 3.12 equals ACAB and ACAB equals All Cops Are Bastards. This is out there.

I wish I know that the vast majority of my Democratic colleagues did not embrace that. Some of them may -- may, but I think it's time to remove this website and remove this crap that they're trying to talk about law enforcement. In 2020 and 2021, I introduced a bill called Protect and Serve. And it was specifically focused on increasing penalties for law enforcement officers who were assaulted or murder not getting into any sort of policy recommendations.

But it seems to me at a time when we're having dramatic reductions and people willing to go into the academies where we're seeing mayors get elected out of office because of community safety and maybe a little bit too much soft on law enforcement. And when we deem it to demonize law enforcement, we are really hurting ourselves.

I know the FBI is doing relatively well with recruiting, but we're not doing well in local and state agencies. So can you see with respect to the implementation, we've talked about increasing penalties in other places. Can you talk to me about the merits or concerns you would have if we're successful with getting protect and serve pass this Congress?


MERRICK GARLAND:

Every day, I meet with Lawn -- our own law enforcement agencies. Multiple times a year, I meet with national leaders of state and local law enforcement, police, chiefs, sheriffs. And multiple times during the year, I travel all around the country to our US Attorneys offices where I meet with the state and local law enforcement agencies.

They are the ones who are on the front lines every day.

THOM TILLIS:
They're getting killed.

MERRICK GARLAND:
And I should have added -- I've been to many memorials. I've been to all the memorials happen every year. I've sat at -- stood and sat at the bedside of federal law enforcement agents who've been shot. I've been to a memorial for a federal law enforcement agent who was killed. I'm well aware of the risks that they run to protect us. We are extremely supportive of law enforcement.

THOM TILLIS:
Well, I'm sorry to interrupt. It's not my style, but what I'd like to do is really get some feedback. We are going to file the bill again. We do have interest from the Democratic side. I'm always interested in policy that makes it easier to implement. So we would like to get a commitment to take a look at this and give us advice on things that could improve it are potential unintended consequences.

I don't see anybody [inaudible].

MERRICK GARLAND:
Absolutely. We be happy to do that. I do want to say I agree with your problems about recruitment and retention. That's why we gave out $100 million for Under the Cops grant just for that purpose and we're going to do another 200 million this coming year.

THOM TILLIS:

Now I want to talk a little bit about -- I'm going to submit some questions for the record on various topics and look forward to your response. But in my remaining time, I want to talk about the implementation of the Bipartisan Safer Communities Act or what I think your department and I like the term calls BSCA. I had a discussion with ATF earlier this week and you know it has been described as a once in a generation bill.

That bill went from the initial meeting that I attended to the time that we were voting on the Senate floor in 30 days. That required a lot of hands-on involvement by the Senate members on both sides of the aisle that brought that about. What's very important to me unless we want another generation to pass before we're able to make reasonable progress is the implementation of this bill.

I'm curious, I'm not going to get into specifics because I think I'd rather do it justice by just submitting them to questions for the record. I want to know about states that have applied for and been provided. the -- the extreme risk protection orders. It was very clear that we wanted minimal standards for due process.

We don't want to reward states and incidentally the red states and blue states that I don't think have adequate due process protections for the person who may be denied their Second Amendment rights. So we want to go through the grant streams or approvals that have occurred at that time and whether or not it satisfies the letter or the spirit and the Congressional record that I'm very familiar with That was last June that we got it done.

I also want to compliment NECs with their implementation of the enhanced background checks. We need to make sure that that that there are following again the letter in the spirit of the law with respect to the length of time and having a proceed presumption if we don't have meaningful information in the first three days.

And -- and then the final proceed order and the next ten days. Trudie and the folks out at NEX have done a great job and we've found some really good outcomes from that that we need to share better with the public. The last thing I want to leave you, I'm over time I can't

believe it Mr. Chair. last thing I want to leave you with is I would like to get a -- a breakdown of the 17 cases under the straw purchase and trapping -- trafficking language in the bill.

And I'm particularly interested. I heard at least one alluded to gang organization that it was brought up on. We need to say that that bill I think is going to age well. It's why I supported it, why I'd be willing to pursue other ones as long as I can go back to the people that I worked with to vote for the bill and say that the spirit and the contours that legislation has been implemented faithfully.

Thank you.


MERRICK GARLAND:
I'll be happy to do that. I'll have our staff talk directly with yours to be sure to answer exactly the questions you're asking.


DICK DURBIN:
Thank you, Senator Tillis. We're going to take a ten-minute recess and we If there is to be a second round and that depends on the presence of members when we return and they will be recognized in the order that they appear here. I know Senator Cornyn has got an early bird rule, but let's take a 10-minute recess and come back.

[Recess] As I mentioned at the outset, there's a second round of three minutes, which will be strictly enforced. You'll hear the gavel at three minutes. I'm going to wait and save my questions to the very last. And so I begin this round of questions, the second round of questioning. Senator Whitehouse.


SHELDON WHITEHOUSE:
Thank you, Chairman, and thank you again, Attorney General. I'm going to go to a topic that was addressed earlier by Senator Blumenthal and Senator Graham, and that is the question of the freezing, seizing, and forfeiture of Russian oligarch and kleptocrat assets. One of the problems that we are running into is that for the highly valuable assets that can be seized

from the Russian oligarchs like massive yachts or Faberge eggs or other works of very expensive art, the value is well above $500,000. And right now, we have an administrative forfeiture procedure that applies for assets that are valued only up to $500,000. Above that, you have to go through a different procedure.

The nutshell way that I think about this is that the simpler administrative forfeiture procedure allows the government to proceed in rem against the asset, and people have to show up if they have a claim to the asset. It's a little bit like what the Department of Justice did with botnets. They had a proceeding in rem against the botnet, and anyone who laid claim to that botnet and asserted a right not to have it taken down, they were welcome to show up in court and present themselves.

They probably would have gone off in handcuffs, but they certainly had that right. With respect to the assets above $500,000 that are associated with the Russian oligarchs, who are associated with the really criminal war that Putin has launched into Ukraine, we would like to see the law changed. Senator Graham supports this, Senator Blumenthal and I support this.

We have legislation to support this. And I just wanted to take my moment here with you to make sure that you and I, the Marshal Service, your forfeiture offices, are all properly aligned so that we can move quickly to get this changed. At the moment, having to identify the owner of an asset, which is often hidden in Russian nesting doll layers of faraway bank accounts, shell corporations, Cyprus holding companies, really puts a major crimp in our ability to proceed fairly.

And I don't think there's any national interest or public interest in having Russian oligarchs who've supported this war treated better than American citizens, simply because their assets are more valuable. So would you please tell your team to greenlight working with us to get this bill passed quickly out of this committee and into legislation on the floor?


MERRICK GARLAND:

As you can imagine, I'm wholeheartedly in favor of the team working with you on this. As you know, we recently, thanks of the work of the Congress, were able -- I was able to certify for transfer to Ukraine money that was seized from one oligarch Malofeyev. And most recently, our Task Force KleptoCapture succeeded in forfeiting $75 million from Viktor Vekselberg.

They have done an enormous amount of work to find nesting within nesting within nesting of shell corporations. It would be easier if that weren't required. So we'd be happy to work with your team on this, yes, of course.

SHELDON WHITEHOUSE:
Thank you very much. Thank you, Chairman.

DICK DURBIN:
Thank you, Senator Whitehouse. Senator Grassley.

CHUCK GRASSLEY:
Thank you, Mr. Chairman. Thank you for -- General Garland, for being here. My first question is a follow-up to a line of questioning you had with Senator Cotton. You told this committee that, quote, "the executive branch cannot simply decide based on policy disagreements that it will not enforce a law at all," end of quote.

Then you released a December 16, '22 memo instructing prosecutors to disregard the law that establishes sentencing differences between cocaine and cocaine base. Your decision not to enforce the law ended congressional discussions at that particular point for a compromise. If DOJ claims that it will ignore the law by declining to prosecute a law that grew out of a bipartisan compromise forged in this committee, it's hard to see how members can trust the department about following any further bipartisan deals.

So I'm going to ask you, would you withdraw your memo so that a meaningful legislative discussion can resume? And if you don't have agreement with me, why wouldn't you do that?

MERRICK GARLAND:

Yeah, Senator, I want to be clear. We're not in any case saying that we won't enforce the law. In all the examples that we're talking about here, people are being prosecuted for violation of the Controlled Substances Act. It's only a question of what sentence we will seek, and this has been a matter of prosecutorial discretion.

We are not in any way limit the judge. We have to honestly tell the judge what the drug was and what the amounts was. But this is -- goes to the question of what we will charge and seek, but we will -- but we are charging these people with violations of the Controlled Substances Act.


CHUCK GRASSLEY:

On another point, the Department of Justice charged Nicolas Maduro with narcoterrorism and drug trafficking offenses, and the Office of Foreign Assets Control sanctioned him. Since then, the Biden administration has released $3 billion in foreign Venezuelan assets and authorized Chevron to drill. Does the Department of Justice still consider Nicolas Maduro a fugitive of US justice?

And if so, do you commit to diligently pursue his arrest?


MERRICK GARLAND:

I -- to be honest, Senator, I really don't have any information. I know who Maduro is, obviously, and I know that he was charged. I don't know what his current status is. I'll be happy to look into that for you, though, Senator.


CHUCK GRASSLEY:

Will you answer in writing?


MERRICK GARLAND:

Of course, of course.

CHUCK GRASSLEY:

This will have to be my last question. I have strong concerns about competition problems in different areas of the economy. Example, I've conducted oversight and drafted legislation to address abuses in pharmaceutical agriculture and high-tech industries. Can you tell us what the antitrust priorities are for the Justice Department under your leadership, and are your resources follows -- following that priority?

MERRICK GARLAND:

Yeah, so our priority are both to prevent increased concentration in industries that are already concentrated. Agriculture is a very good example. Pharmaceutical is another very good example. Therefore, to closely look at mergers and thank -- and to investigate them. And our other priority and closely related is exclusionary conduct by dominant firms.

And we are doing quite a bit of that kind of work, as referenced by some of the cases, you know, we've filed. There are also -- we're also looking at criminal violations of the price fixing statute and others. With respect to resources, this is an area where we could always use more resources. We are faced on the opposite side with companies with virtually unlimited resources.

I expressed gratitude for the Senate and the House for the Hart-Scott-Rodino Fees bill, merger fees bill, which has given us more money to even up the playing field a little bit.

DICK DURBIN:

Senator Blumenthal?

RICHARD BLUMENTHAL:

Thanks, Mr. Chairman. Thank you again, Mr. Attorney General. I want to thank you for the supportive comments you made about the Open Apps Market Act. As you know, I'm hoping that the Department of Justice will support us, because right now we have a duopoly in the

mobile apps' stores -- Apple, Google. And this measure would stop those two companies from exacting rents and boxing out competitors.

I'm hoping that the Department of Justice will support this measure.

MERRICK GARLAND:
As I said, Senator, Assistant Attorney General Cantor has already testified in support of the bill. So we hope to be able get the administration on board as well. But he has already, and that represents my views as well.

RICHARD BLUMENTHAL:
Thank you. I want to talk about the Foreign Intelligence Surveillance Act.

MERRICK GARLAND:
Yeah.

RICHARD BLUMENTHAL:
Specifically Section 702. Not exactly the topic of major inquiry here, but enormously important.

MERRICK GARLAND:
Yeah.

RICHARD BLUMENTHAL:
And without going into any classified information, that provision I believe was instrumental in preventing major catastrophic aggression against our nation. And also helping our allies like the Ukrainians with intelligence that was extremely critical to pushing back the Russians, and knowing what they needed to know on the battlefield.

Could you comment on the importance of reauthorizing Section 702?

MERRICK GARLAND:

Yes. Senator, this is a statute that I was -- you know, we didn't have the last time I was at the Justice Department. So I really didn't know what to expect when I came in this time. I will tell you that every morning I have a all-threats briefing with the FBI, with an intelligence community briefer, with our national security division.

A enormously large percentage of the threats information that we're receiving comes from 702 collection. All the examples that you're talking about, Ukraine, threats by foreign terrorist organizations, threats coming in from adversaries from China, from North Korea, from Iran from Russia. A lot of what we do in the area of cyber and particularly in ransomware investigations, of finding out who is behind the ransomware investigation, and sometimes of obtaining the keys comes from information that is at least part fed by Section 702. We would be intentionally blinding ourselves to extraordinary danger in my view, and this is not a view that I jumped on -- you know, have always held.

This is something I've learned as I've been at the department.


RICHARD BLUMENTHAL:

And blinding on our allies as well. Thank you.


MERRICK GARLAND:

Oh yeah, and our allies as well, yes.


DICK DURBIN:

Senator Cornyn.


JOHN CORNYN:

General Garland, I'm sure you will agree with me that the independence of the federal judiciary is one of the crown jewels of our form of government. And historically, federal judges have had a hard time defending themselves against attacks of various kinds. And I

just want to raise with you my concerns that we're seeing not only attacks like those from former staffers of this committee who happen to now be on the outside in special interest groups, saying that now when reporters cover the story of cases being decided by a judge, they ought to cite the partisan affiliation of that judge.

And saying it's important to say, for example, it's not just Chief Justice Roberts, or say that he's a Republican, not a conservative leaning justice. This is happening in the press. It's happening on social media. As you've already discussed with some of my colleagues, this has led to political protests at the justices' homes and even a threatened assassination of a member of the Supreme Court of the United States.

But unfortunately, it's not just limited to -- to the outside partisan rabble rousers. It includes speeches made by United States Senators on the floor of the Senate. Mr. Chairman, I'd ask unanimous consent that a copy of this speech dated February 16th be made a part of the record.

DICK DURBIN:
Without objection.

JOHN CORNYN:
This is -- this is a speech by a United States Senator trying to discredit a judge who happens to be in Texas, Matthew Kaczmarek, that Senator Cruz and I recommended and who was appointed and now serves it with lifetime tenure as a federal judge; calling him a life-long, right-wing activist, a partisan ideologue, an anti-abortion zealot.

And he goes further to say that regardless of how Judge Kaczmarek may decide this particular case, that it will inevitably be affirmed by the activist 5th Circuit Court of Appeals, and then surely rubber stamped by the United States Supreme Court. I find this sort of rhetoric, particularly by a United States Senator, to be appalling.

And I wonder if you will join me in condemning that sort of attack on the independence of the federal judiciary.

MERRICK GARLAND:

When I first got on the judiciary, I and several of my colleagues pounded our heads against the wall trying to get the reporters to stop -- and this is 20 -- more than 25 years ago -- to stop reporting the name of the president who appointed us and/or the party. Unfortunately, this is -- this is -- this is a battle that has -- has not been won.

And I don't think, obviously, given the authority of the First Amendment and its importance, is one that we're not going to be able to win. I come from a kinder and gentler era and a kinder and gentler court, even in terms of the way the members of the court treat themselves. I -- I don't know what else to say.

JOHN CORNYN:

General Garland, you are the chief law enforcement officer of the United States. Will you condemn it?

MERRICK GARLAND:

Yeah. I am against divisive rhetoric of all kinds, but I do not have authority in this matter. As you know, the speech and debate clause --

JOHN CORNYN:

You have moral authority.

MERRICK GARLAND:

My moral authority is against divisiveness from all sides and all quarters, and from all arguments to be made on the merits. That's -- that is my moral authority.

DICK DURBIN:

Senator Lee.

MIKE LEE:

That's the concern that I've got, is that you don't seem to condemn the divisiveness if it's on the left. I want to go back briefly to the text of Section 1507. Section 1507 is pretty darn clear. I personally don't see how anyone could protest outside the home of a Supreme Court justice, especially while engaging in issue advocacy related to a case that they've taken or are currently hearing.

It doesn't violate 18 USC Section 1507. So the fact that you've put US Marshal Service in charge of protecting our homes, great. The fact that not a single arrest has been made, not a single set of charges have been made, is very disconcerting. As is the fact that even if the marshals don't choose to make an arrest there, which is stunning to me that they haven't. But even if they hadn't, there's video footage, you can identify folks.

You've proven your ability to do that. And the fact that you're not bringing that is deeply disturbing -- disturbing to me, as it was when on the day of the Dobbs decision, the Department of Justice took what I believe was a pretty unprecedented step of issuing a scathing statement. Not just saying we disagree or we're disappointed with the outcome, but making arguments that I believe called into question the legitimacy of the court.

I have never seen the Department of Justice do that. It is cause for additional concern when I see people like Phillip Esformes, having received clemency is now having to face the prospect of being prosecuted again, after having received clemency by a prior president. You add all this up with the fact that by the end of this year, we're going to see the expiration of Section 702 of the Foreign Intelligence Surveillance Act. The department's already asking and chomping at the bit to be asking us to simply reauthorize that.

Notwithstanding the fact that there are all kinds of examples of how this has been politicized, how Section 702 has been misused. The current standard for a warrantless back-door search of the content of communications of Americans -- American persons is reasonably likely to return evidence of a crime. But the ODNI's recently declassified semiannual report released on December 22nd -- 21st of 2022, reports all kinds of noncompliant searches.

These are just the ones we know about, just the ones that the ODNI report was able to identify Involving US persons, including the -- the -- the searches of prospective FBI employees, members of a political party, individuals recommended to participate in the FBI Citizens Academy, journalists and even a congressman.

The politicization of the department is a problem. And you can tell your department not a chance in hell we're going to be reauthorizing that thing without some major, major reforms. Your department is not trusted because it has been politicized. I know you are a good person. You have the ability to rein it in. I ask that you do so promptly.

DICK DURBIN:
Thank you, Senator Lee. Senator Cruz.

TED CRUZ:
Thank you, Mr. Chairman. General Garland, the Department of Justice should enforce the law regardless of politics. I do not believe that has been what is happening in the last two years. Among other things, I believe you very much want to indict Donald J Trump. Toward that end, the Department of Justice has leaked that DOJ is investigating and intends to indict Hunter Biden.

The purpose of those leaks, I believe, was to set the predicate for an indictment of Trump; to say look how evenhanded we are. We're indicting a Biden; we're indicting a Trump. Those leaks are not law or enforcing the law. They are politics. Did you know about the leaks, about the Hunter Biden investigation?

MERRICK GARLAND:
I don't know about the leak that you're talking about, and I'm not -- leaks are in violation of our -- our regulations and our requirements. So the answer is --

TED CRUZ:

But the leaks are consistently on one side of the aisle advancing one political agenda. As you know, the FBI raided Donald Trump's Mar-a-Lago home. And subsequent to that raid, there have been multiple leaks about what was discovered there, including a photograph of documents that were discovered there. Did you know about the leaks from that raid?

MERRICK GARLAND:
The photo -- the photograph was a filing in court in response to a motion filed by Mr. Trump. It was not a leak.

TED CRUZ:
So you're testifying there haven't been leaks about the Trump raid and investigation?

MERRICK GARLAND:
I'm responding to the point about the --

TED CRUZ:
Do you know about the leaks that have occurred concerning the Trump --

MERRICK GARLAND:
I've read the leaks. They are inappropriate. We also don't know where they come. Witnesses on the --

TED CRUZ:
But what's interesting is when the shoe was on the other foot, I believe your intention -- and I believe it's a political intention -- to indict President Trump became infinitely harder when classified documents were discovered repeatedly at President Biden's multiple residences. According to the public record, those were first discovered on November 2nd, six days before the prior election.

Department of Justice was notified on November 4th, and yet miraculously, there was no leak about the classified documents at President Biden's home. When it politically benefited the effort to go after and charge Donald Trump, DOJ leaked. When it potentially harmed the Democrat President, DOJ did not leak.

Does that strike you as -- as at all a double -- double standard?

MERRICK GARLAND:

Leaks under all circumstances are inappropriate, and they were not directed by anyone in the Justice Department.

TED CRUZ:

Well, let me say in particular on Hunter Biden. I very much hope that an investigation of Hunter Biden is focused not just on his own personal substance abuse issues, but on connections to his father and potential corruption. That is the matter of public concern and why people are concerned. And it was striking that the leak that came out from DOJ suggested this is just going after some poor -- poor person struggling with drugs, instead of looking at the very real evidence of corruption.

Will you commit that the investigation will actually examine the public corruption aspect and not simply scapegoat Hunter Biden as an individual?

MERRICK GARLAND:

I can't comment about the investigation, other than to say that all the matters involving Mr. Hunter Biden are the purview of the US attorney in Delaware. He's not restricted in his investigation in any way.

TED CRUZ:

Well, you don't comment here, but then you leak at the same time.

DICK DURBIN:

Senator Hawley.


JOSH HAWLEY:

Thank you, Mr. Chairman. Attorney General Garland, you said in our last exchange that it's your practice to defer to FBI agents in the field when it comes to investigations, apprehensions of subjects. I was interested given your answer to read in this morning's Washington Post that the FBI is saying that you overruled them when it came to raiding ex-President Trump's personal residence.

Washington Post reports this morning, showdown before the raid, that senior FBI officials who would be in charge of leading the search resisted doing so as too combative, and proposed instead to seek Trump's permission to search his property. These field agents wanted to shutter the criminal investigation altogether in early June, the Post reports, but they were overruled by main DOJ. So I guess in light of your earlier testimony just this morning, my question is, how often do you overrule FBI field agents for political purposes?


MERRICK GARLAND:

I have skimmed that article. It is not -- that's not an accurate reflection of what the article says, and I'm not able to comment on the investigation. My comment earlier was about tactics on the ground in particular cases.


JOSH HAWLEY:

Wait, wait, wait, wait, wait, wait. You said it's not -- I'm reading to you from the article. Quote, "Senior FBI officials who would be in charge of leading the search resisted the plan as too combative, and proposed instead to seek Trump's permission to seek his property, according to four people who spoke on condition of anonymity to describe a sensitive investigation," end quote.

MERRICK GARLAND:

Again, I have to say I'm not able to describe the investigation. I will say as a general matter and at a high level of generality that, in my experience, long experience as a prosecutor, there is often a robust discussion and in -- and it's encouraged among investigators and prosecutors, and a decision is made.

JOSH HAWLEY:

Attorney General, my time is very -- yes, and you made the decision, right?

MERRICK GARLAND:

I did -- that's not --

JOSH HAWLEY:

You said you did.

MERRICK GARLAND:

No, I'm sorry, what I said was I approved the decision.

JOSH HAWLEY:

So you didn't make the decision to raid?

MERRICK GARLAND:

I approved the decision to seek a search warrant after probable cause --

JOSH HAWLEY:

Overruling the FBI agents who did not want to do so. Did you talk about this with the White House beforehand?

MERRICK GARLAND:

The memorandum does not -- that Washington Post article does not say what you're saying. I'm sorry, and I'm not able to describe this in any further detail.

JOSH HAWLEY:

Well, I think given that, Mr. Chairman, I'll just ask that this entire article be entered into the record.

DICK DURBIN:

Without objection.

JOSH HAWLEY:

And we can read for ourselves. I invite people to go and look. It says exactly that FBI field agents did not want to conduct the raid, and they were overruled by DOJ. So it doesn't seem to me, Attorney General, that the FBI has a lot of confidence in you, because what they're doing clearly is trying to distance themselves from your decisions.

They're out there leaking, left, right, and center, and saying it wasn't us. We didn't want to do it. He made us do it. What does that say about their confidence in your leadership?

MERRICK GARLAND:

No, the previous senator said that they're leaking all in favor of the left. Now, you're saying they're leaking all in favor of the right.

JOSH HAWLEY:

I'm asking you my question. Answer my question based on this evidence, Don't dissemble, Attorney General.

DICK DURBIN:

Time is expired.

JOSH HAWLEY:

Answer my question.

DICK DURBIN:

Time is expired. Senator Cotton.

TOM COTTON:

Mr. Attorney General, I want to return to the illegal protest outside of Supreme Court justices' homes last summer. It's plainly unlawful to protest outside of a judge's home to influence the outcome of a pending case. You testified earlier that as far as you know, no charges have been brought against those protesters.

But you never really explained why. Why have no charges been brought against those protesters?

MERRICK GARLAND:

The decision about making arrests is left to the marshals on scene. Their principal --

TOM COTTON:

Marshals are -- marshals are law enforcement officials. They're not prosecutors. I did not say arrests. I said charges.

MERRICK GARLAND:

There can't be --

TOM COTTON:

People were not criminal masterminds. They posted videos of themselves on their social media accounts. They advertised the protests in advance. It is possible to arrest someone for

an offense after the offense has occurred, is it not?


MERRICK GARLAND:

It is, and we're --


TOM COTTON:

Why did you not send anyone to arrest those protesters in the days after the protests?


MERRICK GARLAND:

We're allocating our resources towards protecting the lives of the justices and their -- and their families. Decisions have to be made on the ground as to what is the best way to protect those lives.


TOM COTTON:

Mr. Attorney General, do you not think that it would perhaps provide a deterrent effect if you arrested some of these criminal protestors and charged them and threw them in federal prison?


MERRICK GARLAND:

We are trying to protect the lives of the justices That is our principal priority. And I'm leaving it to the Marshal Service to make determinations on the ground. They have to make determinations about what they see on the ground.


TOM COTTON:

Look, consider the efforts your department has put into tracking down everyone who was even on the Capitol grounds on January 6, 2021. You've dedicated million of manhours to study videotape, to do forensic analysis of computers and devices, to go knock and conduct interviews. You can't allocate just a few agents to look at people's social media account to say

they were present outside of a justice's home; we're going to go arrest them and charge them?

It's a black letter violation of the law.

MERRICK GARLAND:
Our priority is violence and threats of violence, and protection of the lives of the justices, and that is what we're doing.

TOM COTTON:
Again, these are not criminal masterminds. They posted pictures and videos of themself protesting. You could probably go arrest one today from a cold start. Why can't you do that?

MERRICK GARLAND:
I'm saying again, our purpose is to protect the lives and safety of the justices. That's how we're allocating resources.

TOM COTTON:
You sent the FBI, as several senators pointed out, to do an early morning raid on Mark Houck's home in front of his children for the grave crime of singing hymns and saying prayers outside of an abortion clinic; charges of which he was acquitted by a jury of his peers within an hour. You can't send the FBI to track down anybody who was protesting outside the home of a Supreme Court justice?

MERRICK GARLAND:
And I want to be clear, our purpose here is to protect the lives and safety of the justices. That's why we're doing that.

TOM COTTON:

I think the answer is -- the answer is that you are sympathetic to the protesters, that you didn't like the decision the justices were about to issue. I think we all know what we -- you would do if a bunch of conservative protesters were outside the home of a Democratic appointed justice to the Supreme Court.

MERRICK GARLAND:
No one has ever been arrested under that statute under those circumstances.

TOM COTTON:
You're sympathetic -- it's a simple black letter violation. You will not send a single agent to conduct a single arrest and charge them on something that they have zero defense for. It's because you're sympathetic to left-wing protesters.

DICK DURBIN:
[Inaudible]

MARSHA BLACKBURN:
Thank you, Mr. Chairman. And Mr. Attorney General, I want to go back to what we discussed earlier with the two tiers of justice. And the answers you've given us, you're very subjective in how you approach decisions. You don't seem to be rules-based in how you make these decisions. As a matter of fact, you come across as being very political in the decisions that you make.

And politicizing your work is something that really offends most Tennesseans. But I want to ask you about this two tiers of justice, particularly in the way you've responded to Congressional oversight investigations. The House Judiciary Committee recently requested that you turn over documents relating to the special counsel investigation of President Biden's mishandling of classified documents.

But your DOJ so far has stonewalled the House request, claiming you can't turn over documents on an open matter. Now, let's compare that with your decision -- obviously, very

subjective -- to fully cooperate with document requests from the House January 6 committee, Your FBI had no problem at all turning over documents and information to that committee, even though they related to an open investigation.

Do you see this comparison here? Do you appreciate this? This is a prime example of two tiers of justice, your two tier system. Who you're going to cooperate with and who you are not. So why have you cooperated with the document requests that were made from Democratic-led committees, but you have refused Chairman Jordan and you have refused the House Judiciary Committee when they are requesting documents that pertain to President Biden's mishandling of classified documents?

MERRICK GARLAND:
So we greatly respect the oversight responsibilities of the committees of the Congress. And at the same time, we have to protect our ongoing investigations. I do not believe we turned over information to the January 6 committee about ongoing investigations --

MARSHA BLACKBURN:
Attorney General, your response is you give one set of responses for Republicans, another for Democrats. You have one tier of justice for people that are conservatives and another for those that are on the left. You told me earlier that you didn't know who Jane's Revenge is. They are all over Twitter. I'm going to do you a favor.

I am going to send you a letter with a whole lot of Twitter and different feeds to help you in that investigation for the Hope Clinic.

DICK DURBIN:
Thank you, Senator Blackburn. Senator Graham has told me he's on the way, so I'm going to take my three minutes now. Run the clock, please. First, there was a reference made earlier to the drug war, the war on drugs legislation of about 25 or 30 years ago. As a member of the House, I voted for it. It was an overreaction to crack cocaine, a nominally new narcotic that scared us to death.

It was cheap, it was addictive, it was lethal and heavily damaging. And we did what most people do in reaction to such a phenomena. We raised the penalty to an unimaginable height. The sentencing penalty went from 1 to 1 to 100 to 1. The net result is exactly the opposite of what we had hoped for. Price of the drug on the street went down, the usage went up, and we filled federal prisons primarily with African-American prisoners.

It backfired on us. I don't want to make that same mistake again when it comes to fentanyl. It's a deadly, dangerous situation. And I hope that just the initial reaction of getting tough and sentencing and mandatory minimums is not a sum and substance of all that we do. The second point I'd like to make is it is interesting to try to step back and follow what you face today, in terms of the resources of the government protecting elected officials when it comes to Supreme Court justices.

We hear from the other side, you just didn't do enough; you've got to do more. And I can understand that sentiment. But when it comes to school board members, the fact that you would send out a memo suggesting that they may be in danger at a school board meeting has been translated into some invidious diminution of the freedom of speech in this country.

I think you have to make a decision on a daily basis as attorney general where you're going to apply the resources of the government. I hope that you share, and I believe you do, the bottom line that violence is unacceptable from either side politically, at any circumstance. And I think if we use that standard and use it objectively that it's going to be an effective standard for the future.

The last point I'll make to you here should be said again; it was said at the outset. You have authorized special counsel to investigate the classified materials both at President Biden's home as well as former President Trump's home. Special counsels have some independence by their designation. Could you explain why you did that?

MERRICK GARLAND:
Yeah, to the extent I've already publicly explained why we appointed special counsel in those two cases, with respect to President Trump, he had announced that he was a

candidate for President, and President Biden had indicated that he would be a candidate. I thought that's an extraordinary circumstance and well-fitting within the regulations to provide a level of independence and accountability that fit within the purpose of the special counsel regulations.

DICK DURBIN:
Thank you. I think I've just used my three minutes, so I'm going to try to set an example. Senator Graham, take it away.

LINDSEY GRAHAM:
Number one, you deserve a Purple Heart for being here all day.

MERRICK GARLAND:
Thank you.

LINDSEY GRAHAM:
So really, I have enjoyed working with you and your team regarding Ukraine, oligarch seizures. And I want to compliment you. You've all have done a really good job of going after oligarchs, and hopefully we will seize some of their assets and send it to the Ukrainian people. And I want to help work with you as much as we can, create some international tribunal to let Putin and his cronies know you're going to pay a price here.

There's no forgiving him for getting in this war. You picked a fight, you picked the wrong fight, and they need to pay a price. Do you agree with that?

MERRICK GARLAND:
I do.

LINDSEY GRAHAM:

OK. Now, some areas of disagreement. There are four states -- Arkansas, Mississippi, South Dakota and Utah, and more are coming -- that have enacted legislation that regulate certain medical and surgical interventions on minor children, 21, 18, whatever the state is, regarding transgender surgeries and puberty blocking medical procedures.

You -- your office wrote a letter March 31, 2022, to states suggesting that if a state passed a law saying, you know, banning medical procedures to transition minor children, that they may be running afoul; the state may be running afoul of the equal protection or due process clause of the 14th Amendment.

Is that your position?

MERRICK GARLAND:
So the department believes that all people in the United States are entitled to be treated with dignity and respect. That the situation that you're talking about has to be evaluated by doctors, by families, by the individuals, and they have to make those determinations.

LINDSEY GRAHAM:
But states have passed laws, OK? We have 50 states here. They have passed laws and more are coming prohibiting this procedure, because the state in question believes that allowing transition medical procedures on a minor is a life-altering event and it should be not -- shouldn't be done until you're older, so you really better appreciate what you're doing.

States have taken that view, and I think more of them will take that view. Is it the position of the Department of Justice that such laws are unconstitutional?

MERRICK GARLAND:
The position is that categorical across the board, prohibitions on certain kinds of -- of surgeries and not others have to be evaluated on a case-by-case basis. And the civil rights division will do that with respect to each of the laws that you're talking about when the time comes.

LINDSEY GRAHAM:

OK. So the bottom line is the four laws in question, have you looked at the laws in Arkansas, Mississippi, South Dakota and Utah?

MERRICK GARLAND:

I haven't. I don't know whether the civil rights division has.

LINDSEY GRAHAM:

Do me a favor and just look at them and get back to me, and -- and answer my question. Are they constitutional in the eyes of the Department of Justice? Thank you. I did it in three minutes.

DICK DURBIN:

I appreciate the attorney general appearing before the committee, and the record of the hearing will remain open for a week. Questions for the record may be submitted by senators before 5 p.m. on Wednesday, March 8. Attorney General Garland, please provide these answers on a timely basis. With that, the hearing is adjourned.

**List of Panel Members and Witnesses**

PANEL MEMBERS:

SEN. DICK DURBIN (D-ILL.), CHAIRMAN

SEN. DIANNE FEINSTEIN (D-CALIF.)

SEN. SHELDON WHITEHOUSE (D-R.I.)

SEN. AMY KLOBUCHAR (D-MINN.)

SEN. CHRISTOPHER COONS (D-DEL.)

SEN. RICHARD BLUMENTHAL (D-CONN.)

SEN. MAZIE K. HIRONO (D-HAWAII)

SEN. CORY BOOKER (D-N.J.)

SEN. ALEX PADILLA (D-CALIF.)

SEN. JON OSSOFF (D-GA.)

SEN. PETER WELCH (D-VT.)

SEN. LINDSEY GRAHAM (R-S.C.), RANKING MEMBER

SEN. CHUCK GRASSLEY (R-IOWA)

SEN. JOHN CORNYN (R-TEXAS)

SEN. MIKE LEE (R-UTAH)

SEN. TED CRUZ (R-TEXAS)

SEN. JOSH HAWLEY (R-MO.)

SEN. TOM COTTON (R-ARK.)

SEN. JOHN KENNEDY (R-LA.)

SEN. THOM TILLIS (R-N.C.)

SEN. MARSHA BLACKBURN (R-TENN.)

WITNESSES:

DEPARTMENT OF JUSTICE ATTORNEY GENERAL MERRICK GARLAND

**Testimony & Transcripts**

Complete written testimony for this event March 1, 2023

## About Senate Judiciary

Staff

Hearing

Transcripts

Testimony

Committee Reports

Associated Bills

Schedules

Markup

Amendments

© 2023 · CQ - Roll Call, Inc · All Rights Reserved.

1201 Pennsylvania Ave NW, 6th floor · Washington, D.C. 20004 · 202-793-5300

About CQ Help Privacy Policy Masthead Terms & Conditions

# EXHIBIT 12



VIDEO LIVE SHOWS ELECTIONS

"I stand by my testimony," the attorney general said on Tuesday.

By Alexander Mallin, Katherine Faulders, Will Steakin, and Lucien Bruggeman
May 2, 2023, 2:56 PM

   

Former Twitter execs say removal of Hunter Biden laptop story was 'mistake'
The former Twitter employees told a House committee Wednesday that the company's decision was a "mis... Read More

Attorney General Merrick Garland on Tuesday gave his first public response to an IRS supervisor-turned-whistleblower who claimed to have information for Congress about potential mishandling of the yearslong federal investigation into President Joe Biden's son Hunter Biden.

Among the allegations laid out in a letter to lawmakers last month was that the whistleblower would contradict Garland's testimony on Capitol Hill that the Hunter Biden probe has remained free from any improper political interference, sources have told ABC News.

In an unrelated news conference Tuesday morning, Garland was asked whether he stood by those previous statements.

"Yes, it's still the case I stand by my testimony, and I refer you to the U.S. attorney for the District of Delaware who is in charge of this case and capable of making any decisions that he feels are appropriate," Garland said.

MORE: What to know about Hunter Biden investigations as congressional scrutiny increases →

Federal authorities with the U.S. attorney's office in Delaware, led by U.S. Attorney David Weiss, a Trump appointee, have been investigating the younger Biden since 2018, ABC News previously reported.

Recent Stories from ABC News

Various news outlets have reported for months that prosecutors were nearing a conclusion, but no charges have yet been filed.



Attorney General Merrick Garland announces an international law enforcement operation targeting fentanyl and opioid traffickers on the Darknet during a news conference at the Department of Justice, May 2, 2023, in Washington, D.C.
Nathan Howard/AP

The investigation spilled into public view in December 2020, shortly after Joe Biden secured the presidency, when Hunter Biden confirmed the probe into his "tax affairs." Prosecutors have examined whether he paid adequate taxes on millions of dollars of his income, including money he made from multiple overseas business ventures.

Prosecutors have also explored allegations that Hunter Biden lied about his drug use on a gun application form in 2018, despite later acknowledging that he was addicted to drugs around that time.

ABC News previously reported the younger Biden borrowed $2 million from his lawyer and confidant Kevin Morris to pay the IRS for back taxes, penalties and liens that he owed.

The president's younger son said in an interview with CBS in 2021 that he was "fully cooperating, and I'm fully confident that at the end of the day it's all gonna be fine."

In April, in a letter to lawmakers obtained by ABC News, a lawyer for the IRS whistleblower said his client is an criminal supervisory special agent "who has been overseeing the ongoing and sensitive investigation of a high-profile, controversial subject since early 2020 and would like to make protected whistleblower disclosures to Congress."

The letter did not name Hunter Biden specifically, but lawmakers have been made aware he is the "high profile, controversial" subject that the lawyer is referring to. In addition, while the letter referred to preferential treatment that Hunter Biden allegedly received, there were no specific examples provided to support the accusations.

Leading Republicans, who have campaigned in part on promises of investigating the Biden family, seized on the whistleblower letter, reacting with alarm.

"It's deeply concerning that the Biden Administration may be obstructing justice by blocking efforts to charge Hunter Biden for tax violations," House Oversight Committee Chair James Comer said in a statement.

World Food Program USA Board Chairman Hunter Biden speaks at the World Food Program USA's Annual McGovern-Dole Leadership Award Ceremony at Organization of American States, April 12, 2016, in Washington, D.C.

Paul Morigi/Getty Images

In response to the IRS agent's letter, Chris Clark, an attorney for Hunter Biden, said, "It appears this IRS agent has committed a crime" by disclosing information about his client.

"It is a felony for an IRS agent to improperly disclose information about an ongoing tax investigation," Clark said in a statement. "The IRS has incredible power, and abusing that power by targeting, embarrassing, or disclosing information about a private citizen's tax matters undermines Americans' faith in the federal government."

White House press secretary Karine Jean-Pierre declined to weigh in on the matter in April, stressing that the president was choosing to keep his distance: "I'll leave it to the Department of Justice to make their decision to move forward with this particular case. We're just not going to comment from here."

A spokesperson for the White House counsel insisted the administration had not gotten involved.

"President Biden has made clear that this matter would be handled independently by the Justice Department, under the leadership of a U.S. Attorney appointed by former President Trump, free from any political interference by the White House," Ian Sams said in an April statement. "He has upheld that commitment."

*ABC News' Molly Nagle contributed to this report.*

## Related Topics

President Biden

Promoted Links by Taboola

The Xfinity 10G Network.
Xfinity

Here's What Gutter Guards Should Cost You In 2023
LeafFilter Partner

PGA Teaching Pro Says Fixing Poor Contact Comes Down To This
Performance Golf

Judge dismisses claims against Ivanka Trump in New York AG's $250M suit against Trump Organization

DeSantis asks judge to dismiss Disney lawsuit, claims immunity

Jeffrey Epstein's suicide: New details revealed

We're Loving Made In's New Cookware Products
Food & Wine

Here's The Cost For a Tub-To Shower Conversion
BathAndShower.org

Viral: Father & Son's Amazing Speed While Training
Blazepod

ABC News Network | Privacy Policy | Your US State Privacy Rights | Children's Online Privacy Policy | Interest-Based Ads | About Nielsen Measurement | Terms of Use | Do Not Sell or Share My Personal Information | Contact Us

Copyright © 2023 ABC News Internet Ventures. All rights reserved.