# Exhibit E

| From: | Christopher Clark <clark@csvllp.com> |
|---|---|
| Sent: | Friday, May 19, 2023 8:59 AM |
| To: | Wolf, Lesley (USADE) |
| Cc: | Hudson, Carly (USADE); McCarten, Timothy (DC); Salerno, Matthew (NY); McManus, Brian (BN) |
| Subject: | Re: [EXTERNAL EMAIL] RE: In re Grand Jury Subpoenas 19-3-LFWS-V-176 - 179 - CONFIDENTIAL |

Thanks Lesley,

We will use this as a template and understand the points you raise and will address them.

Chris

Christopher Clark
Partner
Clark Smith Villazor LLP
250 West 55th Street, 30th Floor
New York, New York 10019
**O:**212-582-4400 **D:**212-377-0853

**From:** Wolf, Lesley (USADE)
**Sent:** Friday, May 19, 2023 8:52:15 AM
**To:** Christopher Clark <clark@csvllp.com>
**Cc:** Hudson, Carly (USADE)                          ; Timothy.McCarten@lw.com <Timothy.McCarten@lw.com>;
matthew.salerno@lw.com <matthew.salerno@lw.com>; Brian.McManus@lw.com <Brian.McManus@lw.com>
**Subject:** [EXTERNAL EMAIL] RE: In re Grand Jury Subpoenas 19-3-LFWS-V-176 - 179 - CONFIDENTIAL

**CONFIDENTIAL**
**SUBJECT TO FRE 408, FRE 410, AND FED. R. CRIM. P. 11(f)**

Chris,

After talking it through on this end, we thing Aegis might be the best exemplar- while it is a DPA, it seems like substituting in "Diversion" in most places for "Deferral" would be a good starting point. It sounds like you already have it- but am attaching it and copying the team as I know you are a few hours behind. A couple of things to flag in here. First, there is a whole section on cooperation here, which is not part of our discussions. Also thinking about the breach point and how to best address the concerns you raised. Instead of a thirty day back and forth, we suggest including notice from the government and if contested, then presented to the Court for determination in the same way a supervised release violation might be handled.

I am tied up much of the morning and expect to free up around noon, but can step out for a quick call if it is important to connect sooner.

-Lesley

1

**From:** Christopher Clark <clark@csvllp.com>
**Sent:** Friday, May 19, 2023 12:22 AM
**To:** Wolf, Lesley (USADE)
**Cc:** Hudson, Carly (USADE)
**Subject:** [EXTERNAL] Re: In re Grand Jury Subpoenas 19-3-LFWS-V-176 - 179 - CONFIDENTIAL

Lesley and Carly,

I've reviewed your email preliminarily with my client. We will work on a draft for discussion. If you can send an exemplar in the morning we can try to conform our draft to it to make things as easy to compare as possible.

Thanks for your continuing efforts,

Chris

Christopher Clark
Partner
Clark Smith Villazor LLP
250 West 55th Street, 30th Floor
New York, New York 10019
**O:**212-582-4400 **D:**212-377-0853

---

**From:** Wolf, Lesley (USADE)
**Sent:** Thursday, May 18, 2023 10:02:52 PM
**To:** Christopher Clark <clark@csvllp.com>
**Cc:** Hudson, Carly (USADE)
**Subject:** [EXTERNAL EMAIL] In re Grand Jury Subpoenas 19-3-LFWS-V-176 - 179 - CONFIDENTIAL

<u>**CONFIDENTIAL**</u>
<u>**SUBJECT TO FRE 408, FRE 410, AND FED. R. CRIM. P. 11(f)**</u>

Chris,

Thanks for taking the time to speak with us earlier this evening. Below please find what we would consider to be the key terms of any potential diversion agreement. A number of these were essentially included in the NPA draft you sent to us earlier today. As I said during our call, the below list is preliminary in nature and subject to change. We have not discussed or obtained approval for these terms, but are presenting them in attempt to advance our discussions about a potential non-trial resolution and accordingly this communication is subject to the protections of Fed. R. Crim. P. 11(f) and FREs 408 and 410. We understand you will work with your team to incorporate them into a draft agreement and will identify for us anything that you immediately see as problematic. I can also check in the morning to see if there is a useful form we have that will assist in drafting. Please let me know if you want me to directly copy the Latham team- otherwise, I will just send to you to forward along.

(1) Pre-trial Diversion Agreement;

(2)  Agreement to waive indictment (which requires an in-court proceeding- understand your request as to this);

(3)  Information filed charging 922(g)(3) and the tax misdemeanors;

(4)  Agree to dismiss after three years;

(5)  On non-reporting supervision by Probation Office in Delaware during that time;

(6)  Diversion agreement will be public record and filed in the criminal case;

(7)  Diversion agreement will specifically reference both prior drug use and current sobriety;

(8)  There will be some conditions of the diversion agreement, to include no drug use, drug testing, etc.;

(9)  A more comprehensive statement of facts than what was included in your initial draft;

(10)   Lifetime firearms ban (consent to NICS entry that he is prohibited);

(11)   No contradictory public statements regarding guilt;

(12)   Remedies for breaches- remove all the 30-day requirements, but omit that the US Attorney has "sole discretion" to determine whether there is a breach.  That leaves it up to the Court akin to a supervised release violation.

Other than 10-12 tomorrow (EST), we are around and available to speak.

-Lesley

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    Criminal Action No. 11 - $17$ - UNA
                                    )
AEGIS ELECTRONIC GROUP, INC.        )
                                    )
            Defendant.              )

## DEFERRED PROSECUTION AGREEMENT

### I.    PARTIES

This Deferred Prosecution Agreement (the "Agreement") is entered into between the United States of America, by and through the United States Attorney's Office for the District of Delaware (collectively, the "United States"), and Aegis Electronic Group, Inc. ("Aegis"), collectively referred to herein as "Parties," by and through their authorized representatives.

### II.   TERMS AND CONDITIONS OF DEFERRED PROSECUTION AGREEMENT

Criminal Charges

1.    Aegis shall waive indictment and agrees that the United States will file a one count information (hereinafter "the Information") in the United States District Court for the District of Delaware, charging Aegis with one count of failing to comply with the International Emergency Economic Powers Act, Title 50, United States Code, Section 1701, et seq., and the Iranian Transaction Regulations, 31 Code of Federal Regulations, Part 560.

2.    Aegis agrees to pay the United States Department of Treasury, Office of Foreign Assets Control (OFAC) $20,000 (the "Settlement Amount"), no later than twenty months from the date

1

FILED

MAR   1 2011

of this Agreement by electronic funds transfer pursuant to written instructions to be provided by OFAC. The parties incorporate by reference the settlement agreement between Aegis and OFAC, and agree that a breach by Aegis of the OFAC settlement agreement constitutes a breach of this agreement. The twenty month period following the execution of this Agreement shall be known as the "Deferral Period."

Deferred Prosecution

3. In light of the fact that Aegis has accepted responsibility for the actions referenced in the Statement of Facts as set forth in the attached Appendix A (hereinafter "Statement of Facts"), and because Aegis has agreed to undertake the Remedial Action Plan, and in consideration for the other terms recited herein, the United States will recommend that prosecution of Aegis on the Information shall be deferred pursuant to the terms and conditions set forth herein.

4. Aegis agrees that the United States has probable cause to bring the charge in the Information, and that the charge is not frivolous, vexatious or made in bad faith. Aegis also agrees that if at a future time the government should move to dismiss the Information pursuant to this Agreement, Aegis is not a "prevailing party" with regard to the Information. Aegis further waives any possible claim for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this case.

5. The United States agrees that if Aegis complies with all of its obligations under this Agreement, the United States, within thirty (30) days after the expiration of the Deferral Period, will file a motion with the Court seeking the dismissal of the Information.

6. The United States agrees to conduct a review of Aegis' progress in implementing the Remedial Action Plan prior to the conclusion of the Deferral Period. If, in the sole discretion of the United States, the United States concludes from its review that: (1) Aegis has successfully

2

implemented the Remedial Action Plan, (2) Aegis is in full compliance with all of its obligations under this Agreement and (3) no further monitoring under this Agreement is necessary, the United States shall file a motion to dismiss the Information.  Aegis and the United States agree that a dismissal of the Information prior to the expiration of the full twenty   month Deferral Period will be considered a closing of the Deferral Period and a termination of any further obligations under this Agreement unless otherwise required by applicable law.

7.      Aegis agrees to waive its right to raise any defense relating to the statute of limitations with regard to the charge set forth in the Information, and agrees that the applicable statute of limitations period for any charges arising out of the conduct described in the Appendix A shall be tolled during the term of this Agreement.  Aegis further agrees not to assert any right to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, or Title 18, United States Code, Section 3161, or Federal Rule of Criminal Procedure 48(b), or any local rule of the District of Delaware, with respect to the Information.

Remedial Actions & Non-Prosecution

8.      Aegis agrees to implement the Remedial Action Plan and such other remedial actions that might be necessary to ensure that Aegis is in compliance with the export laws of the United States of America.  Aegis further agrees not to willfully commit any violation of the export laws of the United States of America.

9.      As outlined in the Remedial Action Plan, Aegis agrees to continue its independent internal investigation of its possible violations of the export laws of the United States.   Nothing in this Agreement shall preclude or limit the United States from bringing a criminal prosecution for any criminal violation of the Arms Export Control Act or its implementing regulations, or the International Emergency Economic Powers Act, that Aegis fails to inform the United States

3

about prior to the date of this Agreement. Nothing in this Agreement shall preclude or limit the United States from bringing a criminal prosecution against Aegis under any criminal statute for any criminal act that takes place after the date of this Agreement.

Statement of Facts

10.     Aegis agrees that the Statement of Facts attached as Appendix A is true and accurate to the best of its knowledge and belief. In respect to those facts to which it has no independent knowledge, Aegis agrees that they are true and accurate for the limited and sole purpose of this Agreement.

11.     Aegis acknowledges responsibility, as set forth in the Statement of Facts, for the (1) criminal and illegal conduct of Jim Larrison, a former Aegis employee, and (2) the acts of those individuals and entities who acted on behalf of Aegis.

12.     Aegis agrees that it will not, through its present or future attorneys, board of directors, agents, affiliates, officers or employees, make any public statement, including statements or positions in litigation in which any United States department or agency is a party, contradicting any statement of fact set forth in the attached Statement of Facts. Any contradictory public statement by Aegis, its present or future attorneys, board of directors, agents, affiliates, officers or employees, shall constitute a breach of this Agreement. The decision as to whether any public statement by an Aegis representative will be imputed to Aegis for the purpose of determining whether Aegis has breached this Agreement shall be at the sole discretion of the United States. If and when the United States determines that a contradictory statement was made by Aegis, the United States shall so notify Aegis and discuss, in good faith, whether the statement is contrary to the intent of this paragraph 12. If a contradictory statement was made, Aegis may avoid a breach of this Agreement by publicly repudiating such statement within three

4

business days after the conclusion of the good faith discussions between the Parties.

Cooperation

13.     Aegis agrees to cooperate during the Deferral Period with the United States, and, as directed by the United States, with any other governmental department or agency regarding any matters related to this Agreement.

14.     Aegis agrees that with respect to this Agreement, Aegis' cooperation shall include, but is not limited to, the following:

a.     Truthfully disclosing information within Aegis' possession, custody or control with respect to the activities of Aegis, its affiliates and its present and former officers, agents, and employees, concerning the subject matters inquired into by the United States regarding possible violations of the laws, regulations and programs listed in Section I.A. of the Remedial Action Plan.   This obligation of truthful disclosure includes an obligation to provide the United States access to Aegis' documents and employees, whether or not located in the United States, and reasonable access to Aegis' facilities for that purpose.

b.     Assembling, organizing and providing on request from the United States, documents, records or other tangible evidence in Aegis' possession, custody, or control in such format as the United States reasonably requests. Where appropriate, Aegis will continue to use the services of expert technical consultants to assist in the identification and retrieval of relevant information and data.

c.     Using its reasonable best efforts to make available its present or former officers, directors and employees, whether or not located in the United States, to provide information and/or testimony as requested by the United States, including sworn

5

testimony before a federal grand jury or in federal trials, as well as interviews with federal authorities. Cooperation under this paragraph will include identification of witnesses who, to Aegis' knowledge, may have relevant information regarding possible violations of the laws, regulations and programs listed in Section I.A. of the Remedial Action Plan.

    d.    Providing testimony and other information deemed necessary by the United States or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents or other exhibits in any criminal or other proceeding as requested by the United States.

15.    Aegis agrees that the United States, in its sole discretion, may disclose to any government department or agency any information, testimony, document, record or other tangible evidence provided to the United States pursuant to this Agreement.

Breach of Agreement

16.    Aegis agrees that a knowing failure to abide by or fully perform any of the terms, promises or agreements set forth in this Agreement shall constitute a breach of the Agreement.

17.    If the United States determines that Aegis has committed a knowing material breach of this Agreement, the United States shall provide Aegis with written notice of this preliminary breach determination. Within thirty (30) calendar days from the date of the government's written notice, Aegis shall have the right to make a presentation to the United States or its designees to demonstrate that no breach has occurred, or to the extent applicable, that the breach was not a knowing or material breach or that the breach has been cured. If Aegis elects to make a presentation, the United States shall thereafter provide written notice to Aegis of the United States final determination regarding whether a breach occurred within thirty (30) days of the

presentation. If Aegis fails to make a presentation within the thirty (30) day time period, the initial notification will become the United States' final determination.

18. If the United States makes a final determination that Aegis has made a knowing and material breach of this Agreement, the United States may elect from the following remedies depending on the nature and seriousness of the breach:

**Remedy 1** - The United States may give Aegis a specific time period in which to remedy the breach. If the United States determines that Aegis has failed to remedy the breach during the specified time period, the United States may elect Remedy 2 below.

**Remedy 2** - The United States may prosecute Aegis with regard to the Information and any other criminal conduct. Aegis shall be deemed to have stipulated to the admissibility into evidence of the Statement of Facts. Aegis shall also be precluded from offering any evidence or arguments that the statements in Appendix A are untrue. Aegis agrees that all statements made by and on behalf of Aegis, including testimony given by Aegis or any employee (current or former) at Aegis' direction before a grand jury, or elsewhere, shall be admissible in evidence when offered by the United States in any and all criminal proceedings brought by the United States against Aegis. Aegis further agrees that it shall not assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, or any other rule, that statements made by, on behalf, and at the direction of Aegis prior to or subsequent to this Agreement should be inadmissible or suppressed. Aegis also agrees to waive any right to be indicted by a grand jury and stipulates that the United States may proceed by Information.

III. GENERAL TERMS AND CONDITIONS

19. It is expressly understood that this Agreement has no bearing on the rights and

7

obligations of either Party with respect to potential administrative suspension and debarment issues. However, the United States agrees to notify administrative agencies that may initiate any civil proceedings involving Aegis related to acts referenced in the Statement of Facts of this Agreement, the Remedial Action Plan, and Aegis' cooperation in the government's investigation.

20.     Upon completion of the Deferment Period and dismissal of the Information, Aegis fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Aegis has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the United States' investigation and prosecution of the transactions described in Appendix A.

21.     This Agreement, together with all the obligations and terms hereof, shall inure to the benefit of and shall bind assigns, successors-in-interest, or transferees of the Parties thereto within the Deferral Period.

22.     Each of the signatories of this Agreement represents that he or she has the full power and authority to enter into this Agreement.

23.     This writing constitutes the entire agreement of the signatories with respect to the subject matter of this Agreement and may not be modified, amended or terminated except by a written agreement signed by the Parties specifically referring to this Agreement.

24.     Aegis agrees that, if Aegis' business operations are sold, whether by sale of stock, merger, consolidation, sale of a significant portion of its assets, or other form of business combination, or otherwise undergo a direct or indirect change of control within the Deferral Period under this Agreement, Aegis shall include in any contract for the sale or merger a provision binding the purchaser/successor to the obligations of this Agreement, including Appendix B.

8

25. It is further understood that this Agreement does not relate to or cover any criminal conduct by Aegis other than the conduct or transactions within the scope of the Investigation, as described in this Agreement.

26. All parties consent to the public disclosure of this Agreement. The parties agree that this Agreement and any order related thereto shall be publicly filed in the United States District Court for the District of Delaware.

27. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

In Witness Whereof, the Parties, through their duly authorized representatives, hereunder set their hands.

ON BEHALF OF THE UNITED STATES OF AMERICA

DAVID C. WEISS
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515

Keith Rosen
Assistant United States Attorney
Chief, Criminal Division


Dated: FEBRUARY 23, 2011

David L. Hall
Assistant United States Attorney

ON BEHALF OF AEGIS ELECTRONIC GROUP, INC.

I, Carolynn Larson-Garcia, the duly authorized representative of Aegis, hereby expressly acknowledges the following: (1) that I have read this entire Agreement; (2) that I have had an opportunity to discuss this Agreement fully and freely with Aegis' outside attorneys; (3) that Aegis fully and completely understands each and every one of its terms; (4) that Aegis is fully satisfied with the advise and representation provided to them by its attorneys; and (5) that Aegis has signed this Agreement voluntarily.

Aegis Electronic Group, Inc.

_____
DATE: 2/15/11

Carolynn Larson-Garcia

Counsel for Aegis

The undersigned are outside counsel for Aegis. In connection with such representation, we acknowledge that: (1) we have discussed this Agreement with our clients; (2) that we have fully explained each one of its terms to our clients; (3) that we have fully answered each and every question put to us by our clients regarding the Agreement; and (4) we believe our clients completely understand all of the Agreement's terms.

_____
DATE: 2/18/11

Gregory A. Brower, Esq.
Brett W. Johnson, Esq.
Snell & Wilmer LLP
Attorneys for Aegis Electronic Group, Inc.

10

STATEMENT OF FACTS
APPENDIX A

The United States and Aegis agree to the following statement of facts.

On September 5, 2007, Amir Ahkami, purportedly a General Purchase employee for SBC Technology Groups, sent an e-mail to Aegis seeking a quote for certain products to be sent to Dubai. Aegis communicated with Mr. Ahkami until September 18, 2007, about a possible purchase. During this communication, Mr. Ahkami did not make any reference in regard to a re-export to Iran. A purchase and export never occurred at this time.

In October, 2007, the government obtained a search warrant for the laptop computer of Iranian procurement agent Amir Ardebili. Pursuant to the warranted search, Immigration Customs Enforcement ("ICE") agents found communication between Ardebili and Aegis Electronic Group, Inc.

On June 26, 2008, Aegis management specifically advised its employees who had involvement with international purchases about export controls and that transactions in violation of such sanctions were strictly prohibited. Aegis' senior management sent a memorandum to its employees listing the government websites associated with prohibited export transactions.

An ICE Special Agent, acting in an undercover capacity and herein after referred to as the UCA, purported to be two different businessmen in communicating with Aegis, one by the name of "Amir Dave" (an alias of Ardebili) and the other as "Harry." On August 15, 2008, "Amir Dave" contacted Aegis via electronic mail and advised he wanted to purchase a Hitachi-brand JU-Z2 camera controller from Aegis for export to Iran, by transshipping the merchandise to Vienna, Austria:

> I am hope that you are remember me from last year. My customer have request for the camera control box, P/N: JU-Z2, $1900. Can you kindley provide the total amount to include shipping to Vienna. I can make arrangements from there to have it shipped to my customer in Iran,
>
> I await your prompt reply,
>
> Regards,
>
> Amir

The JU-Z2 is a level converter to enable the remote control of multiple compatible color cameras (such as the HV-C20A, HV-D15, HV-D25, HV-D27, and HV-D37) from a single personal computer. Multiple cameras can be controlled by the computer; centralized control can be performed in studio surveillance and other types of systems.

On August 18, 2008, the UCA received an email from Jim Larrison, now a former employee of Aegis, using the email account jim@aegiselect.com. Larrison emailed the UCA the following:

> Amir,
>
> Good Morning. Last week you sent a request to [M, an Aegis employee] with our company for a quote on the JU-Z2 control box. My name is Jim Larrison and I am now the International Sales Rep for Aegis Electronic Group, Inc. [M, an Aegis employee] has forwarded me your request. Your cost on the control box is $1235.00/usd. In order to provide you with a shipping cost I would need your complete ship to address. Please provide me with that info. If you have any questions or if I can provide any additional assistance please let me know.
>
> Best Regards,
>
> Jim
>
> Jim Larrison
> Aegis Electronic Group

On August 25, 2008, the UCA received an email from Larrison, using the email account jim@aegiselect.com. Larrison emailed the UCA the following:

> Amir,
>
> Good Morning. Last week I quoted you on the Hitachi Control Box Ju-Z2. I am following up today to make sure you received the quote an to answer any questions you may have. Did you receive the info? When will you be needing this box? When will a decision be made? Please provide me with an update when you have a chance. If you have any questions or if I can assist you in any way please let me know.
>
> Best Regards,
>
> Jim.

On September 1, 2008, the UCA responded to Larrison with the following email:

> I am apologize for lengthy time to return email. I speak with my

12

customer in Iran and he wish the product be sent to the following
address:

Vabguard International
Nussdorfe, Stasse 1-140
Vienna, Austria A -1090

I will handle the subsequent shipping from Vienna.

I am look forward to your reply .

Regards,

Amir

On September 2, 2008, the UCA received an email from Larrison using email account
jim@aegiselect.com with the following information:

> Thanks for the email. In order to set up this account and place the
> order I will need your billing address. When you forward me that
> information I will set up your account and send you a performa
> Invoice. The standard terms for International Orders is bank wire
> transfer. I will forward my bank details along with the proforma
> invoice so you can make payment. Once the payment is received
> I will send out the product. Please send me the billing address as
> soon as possible.
>
> Best Regards,
>
> Jim.

On September 9, 2008, the UCA received an email from Larrison using email account
jim@aegiselect.com with the following information:

> Good Morning. Last week you advised me that you wanted to
> order the JU-Z2 Control Box. You provided me with the ship to
> address but I advised you I would need the bill to information so
> that I could set up your account and send you a proforma invoice
> for payment. I have not heard back fro you. Could you please
> provide me with the information as soon as possible so that I may
> process your order. If you have any questions or if I can assist
> you in any way please let me know.
>
> Best Regards,

13

Jim.

On September 23, 2008, the UCA received an email from Larrison using email account jim@aegiselect.com with the following information:

> Amir,
>
> Hello. Several weeks ago you sent me an email that you wanted to purchase the JU-Z2 Control Box. You gave me the ship to address but I advised you I would need the bill to information so that I could set up your account and send you a proforma invoice for payment. I have not heard from you and have been unable to proceed with the order. Please provide me with the necessary information so I can process your order. If I don't hear from you by Friday I will assume that you have decided to cancel the order. Please let me know if you have any questions or if I can assist you in any way.
>
> Best Regards,
>
> Jim.

On October 6, 2008, the UCA responded to Larrison at the following email address jim@aegiselect.com, with the following:

> Mr. Larrison,
>
> I am sorry there seems to be a lot of confusion, I know my english is not very good.
>
> Kan you please use the below address for shipping and billing. I will need the box very soon. How much will it cost just to ship to Vienna, do not worry anout iran.
>
> I think you had more questions that you need answer from me, so I am addressing all questions now if I can. If there is anything else, please let me know,
>
> Best Regards
>
> Amir

On October 8, 2008, the UCA responded to Larrison at the following email address

14

jim@aegiselect.com, with the following:

> Mr. Larrison,
>
> I apologize again for the lengthy delay in response. Please use the Vienna address for billing needs as well as shipping address. My customer in Iran is worried that I can not ship to him because of export law, but I am ensure to him that I can handle that after you ship to me in Vienna. If you need further information for billing purposes, please contact Harry (the last name of UCA has been intentionally omitted from this search warrant) a business partner in London. He can provide you with means of billing, and he will make arrangement to pay you.
>
> Harry
> Vanguard International
> English telephone number
> UCA email address
>
> Best regards,
>
> Amir

On October 9, 2008, the UCA received an email from Larrison using email account jim@aegiselect.com with the following information:

> Harry,
>
> Good Morning, I have been working with a business partner of yours, Amir Dave. He has placed an order for a JU-Z2 Control Box. He has advise me that I should contact you for payment. Our terms for payment are bank wire transfer. I am forwarding you a copy of the proforma invoice and our bank details for payment. If you have any questions or if I can assist you in any way please let me know.
>
> Best Regards,
>
> Jim.

On October 20, 2008, the UCA received an email from Larrison using email account jim@aegiselect.com, with the following information:

> Good Morning. About a week ago I sent you an Invoice and our

15

bank details regarding an order for the Hitachi JU-Z2. This order was placed by a business partner of yours Amir Dave. I am following up today to make sure you received my email and to answer any questions you may have. Did you receive my email? Have you sent the payment? When are you going to send it? Please provide me with an update when you have a chance. If you have any questions or if I can assist you in any way please let me know.

Thanks.

Jim.

On October 21, 2008, the UCA responded to Larrison at the following email address jim@aegiselect.com, with the following:

Mr. Larrison,

I just called your office regarding Invoice number #72344. I must apologize for taking so long to return you email. As I simply overlooked your last email.

I am currently awaiting Amirs payment to me. As you can imagine, it is rather difficult for Amir to get money to me in London. Once I get the money it wont take long to wire it to you. Also I need to change the order and have it shipped to the address in Vienna, and I will take care of shipping the Control Box to Amir.

Please call me at your earliest convenience. Again, I apologize for the lengthy time in my response.

Regards,

Harry

As the UCA sent the above-mentioned e-mail, Larrison contacted the UCA on his telephone. The UCA asked Larrison if he had the information in front of him in reference to invoice number # 72344 and the e-mail that referenced Amir, who is trying to buy a part that the UCA was not familiar with and referred to a control box. The UCA asked Larrison what the JU-Z2 Control Box was for. Larrison stated that it was to control up to four cameras with one personal computer. The UCA asked if he could order two cameras instead of one, Larrison agreed to change the order. The UCA asked Larrison if he saw the e-mail from him [Amir] on October 8th. Larrison asked if that was the one with UCA'S information on it. The UCA said, "maybe." After a brief moment, Larrison advised he had the email, as referenced above, pulled

16

up.

      The UCA then said, "you understand where this stuff is going, so that's the problem right now, there just waiting to get the money from Amir….", Larrison said "OK", "…..which is taking a little while to obviously get the money out of Iran to get to me in London so, there is….." Larrison said "OK", "…..obviously a little bit of…. you know a little bit of lag time there, em….", Larrison responded, "Sure".   The UCA said, "….and that's another thing I don't know why? This guy [Amir] continues to mention where it's going [Iran], which you know obviously we don't want eh, I'd rather just not even, just avoid talking about that [Iran] all together". Larrison said "exactly, exactly, I'm pretending I don't….I know nothing", as he laughed.   The UCA said, "Exactly and that's what I want to do as well, so let's try not to mention that [Iran] any more, you know obviously with the Embargo, we've got an Embargo in my country [the United States] and you've got Embargo's in your country [England] with Iran, so there's no reason to….."   Larrison said "it was going to Vienna for all I know", the UCA said "Exactly, so…" and Larrison laughed again.   The UCA concluded the conversation, by advising soon as he got the money from Amir, he would have the money wired to Larrison by a contact in the United States, it would raise less flags if they did it that way.   This call ended at approximately 1:35 P.M., (Eastern Standard Time).

      Approximately thirty minutes after the telephone conversation Larrison emailed the UCA with the following emails which stated:

      Tuesday, October 21, 2008 5:49 PM (Greenwich Mean Time)

      Harry,

      Here is the updated proforma invoice you requested.   If you have any questions or if I can assist you further please let me know.

      Thanks,

      Jim

      Tuesday, October 21, 2008 5:50 PM (Greenwich Mean Time)

      Harry,

      I forgot to attach the invoice before I sent you the last email. Here it is.

      Thanks,

      Jim

Proforma invoice (971-4-2259535) to the UCA with the following information:

JU-Z2 Hitachi Control Boxes quantity of two: $2470.00

| | |
|---|---|
| Freight and Handling: | $175.00 |
| Wire fee | $40.00 |
| Invoice total | $2685.00 |

On October 28, 2008, the UCA, acting as "Harry Umbrage," wired US $ 2,685.00 from his account at WSFS Bank in Wilmington, Delaware, to Aegis' Bank Account for the camera controllers at issue.

On October 29, 2008, the UCA emailed Larrison at the following email address jim@aegiselect.com, with the following:

> Jim,
>
> On 10/27/08, $2685.00 was wired to the [BANK INFORMATION].
>
> I noticed on the performa invoice there is a new address for your company....Should I use this address for my records or the address listed below?
>
> Can you confirm when you received the money and advise when the two JU-Z2 Control Boxes will be shipped to Vienna, Austria.
>
> I look forward to completing more business with you, upon successful delivery of this order to my customer.
>
> Thanks,
>
> Harry.

On October 29, 2008, the UCA received an email from Larrison using email account jim@aegiselect.com, with the following:

> Hello, I received your wire transfer this morning. I will advise when we ship out the control boxes. You may also use the address listed in my signature. If you have any questions let me know.

18

Thanks,

Jim

On October 31, 2008, SAC/PH sent an initial license request to ICE Exodus Accountability Referral System (EARS), in reference to the two JU-Z2 Hitachi Control Boxes purchased by the UCA from Aegis on October 27, 2008. An initial request for a license determination was submitted by an ICE Special Agent through the Exodus Command Center. The Exodus Command Center is the point of contact for ICE special agents which provide operational support from export licensing authorities.

On November 5, 2008, the Department of Treasury, Office of Foreign Assets Control (OFAC) License Determination, referral number 2008-11-3-ICE-01494, indicated that the JU-Z2 Hitachi Control Box did not have a general authorization or exemption for exportation of camera conversion equipment to Iran. Therefore, a specific license is required for such export to Iran. OFAC Enforcement searched their central database, which contains records data from 2002 to the present. No license applications or licenses were found for Aegis.

In a reply dated November 15, 2008, Exodus Command Center replied that the JU-Z2 Control Box part is not a US Munitions List item under category XII(d) and therefore does not require a State Department license for export.

On November 18, 2008, the UCA received an email from Larrison using email account jim@aegiselect.com, with the following:

> Good afternoon. I was just notified by Hitachi today that the JU-Z2 controllers that you have ordered are back ordered and won't be in till Mid December. I will keep you informed and let you know when we receive them. If you have any questions please let me know.
>
> Thanks.
>
> Jim.

On December 2, 2008, Aegis shipped two (2) Hitachi-brand JU-Z2 camera controller devices to Vienna, Austria under Aegis Invoice Number 72344. As stated, the total value of the attempted transaction for these camera controllers was US $ 2,685.00 (including freight and wire transfer fee).

On December 5, 2008, the item arrived in Vienna, Austria via UPS.

On December 8, 2008, Aegis' senior management first learned of the details of this

attempted transaction. UPS contacted Aegis' senior management and stated that the address in Vienna, Austria was incorrect. Aegis' senior management accessed Larrison's e-mail and learned for the first time that a possible re-export to Iran could occur.

Aegis' senior management took immediate action to stop the transaction, divert the products back to the United States, cancel the transaction, and refund any monies received.

On January 1, 2009, the UCA emailed Larrison at jim@aegiselect.com and wrote the following:

> Jim,
>
> I wanted to check on the progress of the JU-Z2. Last I heard, they were supposed to be ready in Mid-December, but I never heard back from you.
>
> Thank you in advance,
>
> Harry.

On January 5, 2009, Aegis advised the purported purchaser that it could not ship a product whose ultimate destination was Iran. On January 5, 2009, the UCA received an email from Larrison using email account jim@aegiselect.com, with the following:

> Harry,
>
> Good Morning and Happy New Year. I have been on Vacation since December 23 and have not been able to check on the package. I have been notified by UPS that the address we were given to ship the product to Austria is invalid and they have been shipping product to Iran. Due to Embargo's on Iran and Legal issues I will not be able to supply you with this product. If you could please supply me with the bank name, Swift Code and account number you would like me to send the money back to I will do that for you.
>
> Best Regards,
>
> Jim.

On January 6, 2009, the UCA responded to Larrison at the following email address jim@aegiselect.com, with the following:

> Jim,

20

Thank you for your prompt response. I will forward you our bank information later. Can you please provide me the tracking number and the contact number at UPS, I am concerned that they have provided you with that information as that will interfere with future business for us. I know it comes as no surprise to who the end user of this product was. However, I do not know how UPS knows and now we will have to obtain a new address.

Thank you for your assistance in this matter,

Harry.

On January 7, 2009, the UCA received an email from Larrison using email account jim@aegiselect.com, with the following:

Harry,

Please send me your Swift and Bank account info so that I can send your money back. The tracking number was 1Z9V0F026796501037.

Thanks,

Jim.

At approximately 1:26 P.M., Larrison responded to the UCA with the following:

Thanks. I will be sending the money back to you shortly. All of the shipping info is the same as whats on the invoice. Due to the issues of this being sold to Iran I have been directed to no longer discuss any issues with you except the return of the money. Please keep all further conversations on this topic.

Thanks,

Jim.

On January 7, 2009, the UCA contacted Larrison telephonically, the following is a synopsis of the conversation between the UCA and Larrison, and is not verbatim of the recorded conversation. The UCA asked Larrison if the shipment went to Vienna, Austria. Larrison advised that the product went to Vienna, Austria. However, UPS said the address was undeliverable. Subsequently, UPS returned the package to AEGIS. Larrison advised that after UPS had returned the product his company reviewed the paperwork and advised they could not send the product, because the UCA wanted to send it to Iran. The UCA asked Larrison if he

21

could ship the product to another address. Larrison said, "unfortunately not". The UCA asked for the UPS tracking number, Larrison advised he would e-mail the UPS tracking number to the UCA. Larrison asked the UCA for his Swift and Bank account information so he could return the money to the UCA.

On January 8, 2009, the UCA received an email from Larrison using email account jim@aegiselect.com. Larrison requested to know the name on the bank account in order to wire the money to the UCA. Larrison advised he had all of the bank account information.

On January 9, 2009, Aegis returned $2,470.00 United States Dollars into the undercover bank account of ICE SAC/PH.

Aegis initiated an informal investigation into the transaction and the conduct of Larrison. Larrison claimed ignorance of understanding or comprehending the impact of the transaction, despite Aegis' senior management e-mail memorandum dated June 26, 2008. As a result, Aegis enrolled Larrison in export control training through the U.S. Department of Commerce, Bureau of Industry & Security (BIS). Larrison attended a BIS sponsored training course on January 27-28, 2009, in Scottsdale, Arizona. The transaction was not reported to law enforcement authorities.

On August 26, 2009, ICE agents visited Aegis' corporate offices. Aegis' senior management was completely cooperative with the agents and answered all of their questions concerning the cancelled transaction to Austria and Larrison's illegal conduct. By this time, Larrison was no longer an Aegis employee.

At the time of the offense, Aegis did not have written export compliance policies and procedures, export compliance controls, or an export compliance training program. However, Larrison has admitted that he would have attempted to complete the transaction subject to the offense regardless of whether or not Aegis had a written export compliance program in place. Further, Larrison has admitted that he was not forced or coerced into committing his offense and that Aegis' senior management was not aware of the transaction before it was cancelled on December 8, 2008.

B.    Compliance Management Structure

Aegis shall restructure its management of all Aegis employees charged with the responsibility of implementing the compliance laws, regulations and programs listed in Section I. A. above within three (3) months of the date of this Agreement. In particular, all Aegis export compliance managers and/or security managers with the responsibility of safeguarding export controlled materials, including all "Empowered Officials" (hereinafter "EO") pursuant to the ITAR or "Facility Security Officers" (hereinafter "FSO") shall be supervised, evaluated and report directly to the EMC or other export/security compliance managers who report directly to the EMC.   All other Aegis export compliance employees or security employees with responsibility for safeguarding export controlled materials shall be supervised, evaluated and report directly to an export/security compliance manager who is directly or indirectly supervised by the EMC.   The purpose of this provision is to ensure that all Aegis export compliance and security personnel with responsibility for safeguarding export controlled materials can act to ensure full compliance with the laws, regulations and programs listed in Section I. A. above without fear of adverse action.

II.   Compliance Education &Training

A.    Annual Training

The Parties acknowledge that Aegis has already instituted a comprehensive export compliance program for its employees.   All Aegis employees who have access to or who manage Aegis employees who have access to export controlled materials shall receive annual training which at a minimum shall include the purpose of, their responsibilities under, and the potential consequences of violating the compliance laws, regulations and programs listed in Section I. A. above.   Aegis shall submit to the United States an outline of the training to be given along with any materials to be provided during the training at least one (1) month prior to the training.   If the United States does not object or provide comment as to the training outline and material prior to the actual training session, such training will be deemed approved by the United States.   The first annual training pursuant to this Remedial Action Plan shall take place within six (6) months of the date of this Agreement.

B.    Additional Manager Training

Aegis shall ensure that all export compliance managers and security managers, including all EOs, FSOs and their immediate assistants shall have sufficient

REMEDIAL ACTION PLAN
APPENDIX B

As part of its obligations pursuant to the Agreement, Aegis agrees to implement the Remedial Action Plan set forth below. The United States acknowledges that Aegis has already implemented the majority of the Remedial Action Plan. Aegis understands that the remedial actions set forth below impose obligations that are in addition to those imposed by existing laws, regulations and contractual obligations. Nothing in the Agreement shall be construed to, or shall have the effect of, excusing any failure of Aegis to comply with the provisions of existing laws, regulations and contractual obligations.

I.     Compliance Management

A.     Executive Manager of Compliance

Aegis shall retain an outside consultant to be integrated within its corporate structure dedicated to the mission of ensuring that Aegis is in full compliance with all U.S. export laws and regulations and all U.S. programs directed at the protection of technology, including, but not limited to the following:

1.     The Arms Export Control Act (hereinafter "AECA") and its implementing regulations contained in the International Traffic in Arms Regulations (hereinafter "ITAR"); and

3.     The Export Administration Act/International Emergency Economic Powers Act (hereinafter "IEEPA") and its implementing regulations contained in the Export Administration Regulations (hereinafter "EAR") and the Office of Foreign Assets Control Regulations;

Aegis shall submit to the government for approval the name and background of the outside consultant who will fill the position of executive manager of compliance (hereinafter "EMC") within thirty (30) days of the date of this Agreement. The EMC shall be retained within three (3) months of the date of this Agreement. The EMC shall have significant background, training and experience with the compliance laws, regulations and programs listed above. The EMC will report directly to the Chief Executive Officer of Aegis (hereinafter "CEO") and shall have access to Aegis's Board of Directors. The EMC shall have the authority and the resources necessary to ensure that Aegis is in full compliance with the laws, regulations and programs listed above. If the United States does not object or provide comment as to the EMC nominee before the retention date of the EMC, such EMC nominee will be deemed approved by the United States.

23

training and experience to ensure full compliance with the compliance laws, regulations and programs listed in Section I. A. above. The EMC, on behalf of Aegis, shall submit to the United States within six (6) months from the date of this Agreement, a written certification stating that Aegis has reviewed the background and training of all Aegis EOs, FSOs, and their immediate assistants, and that all Aegis EOs, FSOs, and their immediate assistants have sufficient training and experience to ensure full compliance with the compliance laws, regulations and programs listed in Section I. A. above. Aegis shall ensure that all export compliance and security managers and their immediate assistants regularly obtain additional training to improve and update their knowledge of the export compliance laws, regulations and programs listed in Section I. A. above.

C. Record Keeping

Aegis shall keep a record of the training provided and the names and positions of the individuals who received training for a period of at least five (5) years. Each employee who received training shall sign a document verifying that he/she has received the required annual training and understands the purpose of, their responsibilities under, and the consequences of violating the export compliance laws, regulations and programs listed in Section I. A. above. Aegis shall also keep a record of all training received by all export compliance managers and security managers, including all EOs, FSOs and their immediate assistants for a period of at least ten (10) years.

III. Mandatory Reporting of Violations

A. AECA/ITAR Violations

During the Deferral Period, Aegis shall make an initial written report of all violations of the AECA/ITAR to the U.S. Department of State, Office of Defense Trade Controls Compliance, and the United States within two (2) weeks of the discovery of the violation. Aegis shall make written interim and/or final reports of all violations of the AECA/ITAR as directed by the U.S. Department of State, Office of Defense Trade Controls Compliance. During the Deferral Period, a copy of any interim or final reports shall also be provided to the United States.

B. IEEPA/EAR Violations

During the Deferral Period, Aegis shall make an initial written report of all violations of the IEEPA/EAR to the U.S. Department of Commerce, Office of Export Enforcement, and the United States within two (2) weeks of the discovery of the violation. Aegis shall make written interim and final reports of all

violations of IEEPA/EAR as directed by the U.S. Department of Commerce, Office of Export Enforcement. During the Deferral Period, a copy of any interim or final reports shall also be provided to the United States.

IV.    Compliance Investigation

    A.    Export Compliance

During the Deferral Period, Aegis shall conduct an export compliance audit of each Aegis business unit that has access to export controlled materials. The primary purpose of these audits will be to identify past and present violations of the compliance laws, regulations and programs listed in Section I. A. above. The audits shall also determine whether each Aegis business unit has a sufficient program and resources to ensure full compliance with the export laws of the United States. The audits shall also determine whether proper export licenses are in place and whether the terms, conditions, and provisos of Aegis' export licenses are being fully complied with. Upon completion of the audit, a copy of the audit shall be provided to the United States. Within three (3) months of the completion of each audit, the Chief Executive Officer of the Aegis business unit audited shall sign and submit to the United States a certification stating that a comprehensive audit has been completed. All export compliance audits shall be completed within six (6) years of the date of this Agreement. All export compliance deficiencies shall be corrected within the Deferral Period.

V.    Compliance Certification

The Chief Executive Officer of Aegis shall sign a compliance certification stating the following:

"I, (Name)_____ _____, (Title) _____ _____, on behalf of Aegis Electronic Group, Inc. ___ _____ ___, do hereby certify that to the best of my knowledge and belief, Aegis Electronic Group, Inc. is in full compliance with the export laws of the United States. I further certify that all violations of the export laws of the United States have been reported to the appropriate official(s) of the United States government."

The executed compliance certification shall be dated and notarized by a notary public. The executed compliance certification shall be forwarded to the United States no later than the last day of the Deferral Period.