**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 1:23-cr-00061-MN |
| ) | |
| ROBERT HUNTER BIDEN, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |

**MR. BIDEN'S MOTION TO DISMISS FOR
SELECTIVE AND VINDICTIVE PROSECUTION AND BREACH OF SEPARATION
OF POWERS**

Abbe David Lowell
Christopher D. Man
Kyllan J. Gilmore
WINSTON & STRAWN
1901 L Street NW
Washington, DC 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

*Counsel for Robert Hunter Biden*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 4

    I.    Mr. Biden's Gun Purchase And DOJ's Initial Charging Decision.................................. 5

    II.   Mounting Political Pressure And DOJ's Second Charging Decision ............................. 6

    III.  IRS Whistleblowers And DOJ's Third Charging Decision............................................ 8

    IV.  Congressional Intervention And DOJ's Fourth Charging Decision.............................. 10

    V.   DOJ Policy Against Congressional Interference .......................................................... 17

LEGAL STANDARDS ...................................................................................................... 21

ARGUMENT ..................................................................................................................... 23

    I.    MR. BIDEN IS A VICTIM OF SELECTIVE PROSECUTION ................................... 26

        A.   DOJ's Prosecution Of Mr. Biden Is Motivated By Improper Purpose .................. 27

        B.   DOJ's Prosecution Of Mr. Biden Has Discriminatory Effects ............................... 40

    II.   MR. BIDEN IS A VICTIM OF VINDICTIVE PROSECUTION ................................. 48

    III.  THE PROSECUTION OF MR. BIDEN VIOLATES SEPARATION OF POWERS ... 54

CONCLUSION................................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ................................................................................................23

*Blackledge v. Perry*,
   417 U.S. 21 (1974) ........................................................................................................50, 51

*Bond v. United States*,
   564 U.S. 211 (2011) ..............................................................................................................57

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ..............................................................................................................56

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ..............................................................................................................25

*Collins v. Jones*,
   2015 WL 790055 (E.D. Pa. Feb. 24, 2015) ...................................................................22, 49

*Collins v. Yellin*,
   141 S. Ct. 1761 (2021) ..........................................................................................................56

*Cox v. Louisiana*,
   379 U.S. 536 (1965) ..............................................................................................................43

*D.C. Federation of Civic Ass'ns v. Volpe*,
   459 F.2d 1231 (D.C. Cir. 1971) ...........................................................................................18

*Delaney v. United States*,
   199 F.2d 107 (1d Cir. 1952) .................................................................................................58

*Dixon v. D.C.*,
   394 F.2d 966 (D.C. Cir. 1968) .......................................................................................26, 40

*Duncan v. Perez*,
   445 F.2d 557 (5th Cir. 1971) ...............................................................................................47

*INS v. Chadha*,
   462 U.S. 919 (1983) ..............................................................................................................54

*Kilbourn v. Thompson*,
   103 U.S. 168, 26 L. Ed. 377 (1880) .....................................................................................54

*Medrano v. Allee*,
    347 F. Supp. 605 (S.D. Tex. 1972) ...................................................................47

*Miracle v. Estelle*,
    592 F.2d 1269 (5th Cir. 1979) ..............................................................50, 57

*Morrison v. Olson*,
    487 U.S. 654 (1988)...........................................................................53

*New York v. United States*,
    505 U.S. 144 (1992).....................................................................55, 56

*North Carolina v. Pearce*,
    395 U.S. 711 (1969)...........................................................................51

*Oyler v. Boles*,
    368 U.S. 448 (1962)...........................................................................22

*People v. Smith*,
    203 Cal. Rptr. 196 (Cal. Ct. App. 1984) .........................................................21

*Pillsbury v. Federal Trade Comm'n*,
    354 F.2d 952 (5th Cir. 1966) ...............................................................18, 25

*Robert Hunter Biden v. United States Internal Revenue Service*,
    Case No. 23-cv-02711 (D.D.C. 2023) ............................................................12

*Sheila Law LLC v. Consumer Fin. Protec. Bureau*,
    140 S. Ct. 2182 (2020)........................................................................56

*Stamler v. Willis*,
    415 F.2d 1365 (7th Cir. 1973) .................................................................26

*United States v. Adams*,
    870 F.2d 1140 (6th Cir. 1989) .........................................................23, 27, 41, 48

*United States v. Alvarado-Sandoval*,
    557 F.2d 645 (9th Cir. 1977) ..................................................................53

*United States v. Armstrong*,
    517 U.S. 456 (1996)...................................................................1, 22, 26, 40

*United States v. Banks*,
    383 F. Supp. 389 (D.S.D. 1974) .......................................................26, 39, 47, 60

*United States v. Berrios*,
    501 F.2d 1207 (2d Cir. 1974)..........................................................21, 40, 47

*United States v. Bradley*,
   880 F. Supp. 271 (M.D. Pa. 1994) ...................................................................26, 38

*United States v. Brown*,
   381 U.S. 437 (1965)...................................................................................................57

*United States v. Crowthers*,
   456 F.2d 1074 (4th Cir. 1972) .............................................................................40, 47

*United States v. DeMarco*,
   550 F.2d 1224 (9th Cir. 1977) ...................................................................................53

*United States v. Falk*,
   479 F.2d 616 (7th Cir. 1973) ............................................................................ *passim*

*United States v. Fokker Servs. B.V.*,
   818 F.3d 733 (D.C. Cir. 2016) ...................................................................................55

*United States v. Goodwin*,
   457 U.S. 368 (1982)...................................................................................................50

*United States v. Greenlaw*,
   No. 1:21-cr-00019-MN (D. Del. Aug. 1, 2022).........................................................45

*United States v. Groves*,
   571 F.2d 450 (9th Cir. 1978) .....................................................................................53

*United States v. Haggerty*,
   528 F. Supp. 1286 (D. Colo. 1981)..........................................................26, 27, 46, 60

*United States v. Heidecke*,
   900 F.2d 1155 (7th Cir. 1990) ...................................................................................23

*United States v. Holloway*,
   29 F. Supp. 2d 435 (M.D. Tenn. 1998)......................................................................40

*United States v. Jamison*,
   505 F.2d 407 (D.C. Cir. 1974) ...................................................................................52

*United States v. Jones*,
   159 F.3d 969 (6th Cir. 1998) ................................................................................23, 40

*United States v. Judd*,
   579 F. Supp. 3d 1 (D.D.C. 2021)...............................................................................21

*United States v. Koh*,
   199 F.3d 632 (2d Cir. 1999).......................................................................................48

*United States v. Korey*,
    614 F. Supp. 2d 573 (W.D. Pa. 2009) ............................................................... 52, 53

*United States v. Mardis*,
    670 F. Supp. 2d 696 (W.D. Tenn. 2009) .................................................... *passim*

*United States v. McLeod*,
    385 F.2d 734 (5th Cir. 1967) ............................................................................. 47

*United States v. Monsoor*,
    77 F.3d 1031 (7th Cir. 1996) ...................................................................... *passim*

*United States v. Mumphrey*,
    193 F. Supp. 3d 1040 (N.D. Cal. 2016) ........................................................ 38, 46

*United States v. Napper*,
    574 F. Supp. 1521 (D.D.C. 1983) ..................................................................... 21

*United States v. Pittman*,
    642 F.3d 683 (7th Cir. 2011) ............................................................................. 49

*United States v. Ruesga-Martinez*,
    534 F.2d 1367 (9th Cir. 1976) ........................................................................... 53

*United States v. Samango*,
    607 F.2d 877 (9th Cir. 1979) ............................................................................. 26

*United States v. Steele*,
    461 F.2d 1148 (9th Cir. 1972) ..................................................................... 22, 26

*United States v. Sussmann*,
    No. 1:21-cr-00582-CR (D.D.C. 2021) ............................................................... 45

*United States v. Velsicol Chem. Corp.*,
    498 F. Supp. 1255 (D.D.C. 1980) ................................................................ *passim*

*United States v. William*s,
    2020 WL 5960689 (E.D. La. Oct. 8, 2020) ....................................................... 48

*United States v. Wood*,
    36 F.3d 945 (10th Cir. 1994) ............................................................................ 53

*Wayte v. United States*,
    470 U.S. 598 (1985) .................................................................................... *passim*

*Winsett v. McGinnes*,
    617 F.2d 996 (3d Cir. 1980) .............................................................................. 25

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ........................................................................................................21

**Statutes**

18 U.S.C. § 922(g)(3) ............................................................................................ *passim*

26 U.S.C. § 7212 ....................................................................................................34

Hatch Act, 5 U.S.C. 7323(a) and 7324(a) .............................................................59

## INTRODUCTION

This Indictment reflects a selective and vindictive prosecution of Mr. Biden and a breach of separation of powers, and it that should be dismissed in accordance with the due process and equal protection components of the Fifth Amendment.   The legal necessity of dismissing a selective and vindictive prosecution is clear, but defendants can seldom prove that such an improperly motivated prosecution has occurred because it is difficult to prove what is in the mind of prosecutors.   *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 465 (1996).   But here the prosecution has told us.   Not only does the evidence show that Mr. Biden is the victim of a selective and vindictive prosecution, but—to use a phrase—that evidence is on steroids.

After five years of a thorough (and what was and must continue to be a very expensive) investigation, U.S. Attorney David Weiss, a holdover from the Trump administration, decided to resolve the entire investigation of Mr. Biden through a Diversion Agreement concerning a firearm charge and a separate Plea Agreement to resolve tax-related misdemeanor charges.   This is the resolution Mr. Weiss suggested and wanted; his office signed the Diversion Agreement, which was effective upon execution by the parties, and the Plea Agreement, which his Office argued this Court should accept in open court.   And this is how Mr. Weiss would have resolved this case if left to exercise his own judgment.[1]

The announcement that this case would be resolved through a Diversion Agreement and a Plea Agreement drew a sharp rebuke from former President Trump (who appointed Mr. Weiss), extremist House Republicans, and the far-right media.   They made it clear that they wanted Mr.

---

[1] The extensive back-and-forth negotiation between the U.S. Attorney's Office and Mr. Biden's counsel regarding the prosecution's decision to resolve any and all investigations of Mr. Biden by the Office is discussed in detail in the accompanying declaration of Christopher Clark filed contemporaneously.

Weiss to keep this litigation alive through the presidential election (regardless of merit) and for him to bring more serious charges as a foil for the investigations and prosecutions of former President Trump.  They insisted upon this even though the evidence of more serious crimes was lacking, and the only felony charge Mr. Weiss had previously filed was part of a Diversion Agreement for a gun charge that is widely violated, yet almost never prosecuted, and that was recently found unconstitutional by the Fifth Circuit before this case was brought.

Because the facts in the case did not change and the law only became more difficult for such prosecutions, the public record supports no conclusion other than Mr. Weiss changed his decision because he buckled under political pressure to bring more severe charges.  After this Court questioned the mechanics of the Plea Agreement (not its substance) and asked for supplemental briefing on why the parties believed the Plea Agreement could work as drafted by the prosecution, Mr. Weiss chose to abandon the Plea Agreement rather than defend his prior work.  Prosecutors told defense counsel the Plea Agreement they had just advocated for was withdrawn and that they would no longer honor the Diversion Agreement that they had signed and executed, although they refused to say why or how they wanted to proceed instead.

Ultimately, as the political pressure continued to mount, Mr. Weiss brought this Indictment[2] in violation of the Diversion Agreement that he had reached, and he added two new felony charges.  The new charges do not rest upon any newly discovered evidence.  The event in question happened five years ago in October 2018.  It was investigated at that time by local law

---

[2] On December 7, 2023, after being berated by Republican Members of the House who took the unprecedented step of calling him to testify before Congress concerning an active investigation and prosecution, Mr. Weiss buckled and upped the ante yet again by converting the two misdemeanor charges for failure to timely file taxes into a nine-count indictment in California based on the same evidence he had acquired over five years before the June agreement had been made.

enforcement, and separately for months by Mr. Weiss's office, before the resolution occurred. Nothing changed since Mr. Weiss had agreed to the appropriate resolution of the case, except that the law on restricting the possession of handguns became even harder to prosecute and the pressure from his right-wing base to bring more serious charges grew louder and louder.

This is perhaps the clearest of cases of prosecutors making prosecutorial decisions for political reasons, selectively and vindictively prosecuting Mr. Biden based on his familial and political affiliation with his father, the President of the United States. The facts of Mr. Weiss's high-profile flip-flop speak for themselves, and the fact that he traded his own judgment for the judgment of President Biden's political enemies is not lost on anyone. In fact, the same Republican House Members who exerted this pressure on Mr. Weiss have claimed credit for causing Mr. Weiss's about-face.[3]

Members of Congress celebrated the end of the deal as their doing. House Oversight and Accountability Committee Chairman James Comer declared outside the Capitol: "I think that you're seeing our investigation that's shined a light on the many wrongdoings of the Biden family has picked up a lot of credibility today, because now we see that there are a lot of crimes that this family's committed and that played out in court today."[4] House Ways and Means Committee Chairman Jason Smith told Fox News that day, "justice has been served,"[5] and later Tweeted: "Announcement of a special counsel *only happened because congressional GOP exposed* the two-

---

[3] Indeed, if this case is not the one to dismiss for selective and vindictive prosecution and breach of separation of powers, it is unclear what is left of those doctrines.

[4] Kyle Morris et al., *Comer Says House Investigations Into Hunter Biden Given A 'Lot Of Credibility' After Plea Deal Crumbles*, Fox News (July 26, 2023), https://www.foxnews.com/politics/comer-says-house-investigations-hunter-biden-given-lot-credibility-plea-deal-crumbles.

[5] *Jason Smith On Hunter Biden Plea Deal Collapse: Justice Is Being Served*, Fox News (July 26, 2023), https://www.foxnews.com/video/6331889313112.

tiered judicial system by shining light onto the investigation into Hunter Biden's alleged financial crimes & the political interference that shielded both him & POTUS from scrutiny."[6]  And four days ago, after the Special Counsel decided to pile on new tax charges in California, Chairman Smith claimed credit for that too, and vowed his pressure would not end.[7]  Smith vowed "[t]his is far from over," and in an effort to politicize the matter further suggested that tax charges against the President's son somehow "confirm[s] the need for Congress to move forward with an impeachment inquiry of Joe Biden."  *Id.*

## FACTUAL BACKGROUND

In 2018, President Trump started ramping up efforts to deride his political rivals ahead of the 2020 election.  Joe Biden was high on his list, and Mr. Trump began a campaign of disparagement aimed at everything and anything associated with former Vice President Joe Biden. Hunter Biden, Joe Biden's son, became a frequent target of President Trump's attacks.  Likely not coincidentally, also in 2018, federal investigators began their investigation of Mr. Biden's tax and financial affairs, and his foreign business dealings.[8]  Without bothering with facts or evidence, President Trump started accusing Mr. Biden of corruption and calling on his Attorney General

---

[6]   @RepJasonSmith, *X* (Aug. 11, 2023), https://twitter.com/RepJasonSmith/status/ 1690065476838105088 (emphasis added).

[7] Press Release, Chairman Smith Statement On Felony Tax Charges Filed Against Hunter Biden (Dec. 7, 2023), https://waysandmeans.house.gov/chairman-smith-statement-on-felony-tax-charges-filed-against-hunter-biden/ ("Biden Administration prosecutors offered Hunter Biden a sweetheart plea deal that would have effectively forgiven these crimes, and they would have succeeded if not for two brave whistleblowers who stepped forward, at great personal risk, to expose the two-tiered system of justice.").  By "Biden Administration prosecutors," Rep. Smith seems to be alluding to Special Counsel Weiss who began this investigation during the Trump Administration, as a Trump-appointed U.S. Attorney who was held over by President Biden to avoid any appearance of meddling in the investigation.

[8] Kathryn Watson et al., *Investigation Into Hunter Biden's "Tax Affairs" Began In 2018*, Fox News (Feb. 10, 2020), https://www.cbsnews.com/news/hunter-biden-tax-investigation-began-2018/.

Barr to investigate.  *See infra* Section I.A. (discussing Trump's vindictive motive and attacks on Mr. Biden).

Mr. Barr declined President Trump's request that he appoint a Special Prosecutor, securing DOJ's position on President Trump's payback list, but he did assign U.S. Attorney David Weiss to secretly investigate Mr. Biden.  This investigation, which Mr. Biden publicly announced when he learned of it on December 10, 2020, was far-reaching and largely based on conjecture, as investigations of a single target in the Independent and Special Counsel eras tend to be. Nevertheless, the investigation may soon outlive its second presidency.  And while Mr. Trump's accusations were hollow, they set political forces in motion that DOJ was neither equipped nor motivated to resist.

## I.    Mr. Biden's Gun Purchase And DOJ's Initial Charging Decision

The same year President Trump started spinning his yarn, Mr. Biden bought a small firearm that he owned for a mere 11 days, never loaded, and never fired.  The gun was discarded and then discovered and investigated by local police, who decided no charges were warranted.

Federal law enforcement was aware of the gun purchase and Mr. Biden's past drug use, which had been widely reported.  Although there is a criminal offense for possession of a firearm by a user of a controlled substance (18 U.S.C. § 922(g)(3)), DOJ almost never brings charges under that statute absent some aggravating factor, such as the use of the firearm in a violent crime, none of which are present here.  *See infra* Section I.B. (discussing DOJ enforcement polices and charging practices and statistics).

In fact, the year before, Attorney General Jeff Sessions had specifically directed DOJ to reserve the statute for prosecuting "criminals responsible for significant violent crime" to conserve limited Department resources.  *Id*.  Mr. Biden has no history of violence and has never posed a

risk to public safety.  Indeed, the New York Times reported that "Mr. Weiss told an associate that he preferred not to bring any charges, even misdemeanors, against Mr. Biden because the average American would not be prosecuted for similar offenses."[9]  Thus—consistent with its practices and directives, and the way it treats everyone else—DOJ exercised its prosecutorial discretion and declined to pursue gun charges.

## II.     Mounting Political Pressure And DOJ's Second Charging Decision

Having determined that gun charges were not warranted, DOJ continued to "investigate" Mr. Biden while weathering increasing political pressure by President Trump and other prominent Republicans eager to find something they could use against Mr. Biden's father (even though there is no evidence that Mr. Biden's father had engaged in any wrongdoing with his son).  But DOJ's investigation was not producing evidence of corruption, so Mr. Trump and his supporters resorted to Mr. Biden's personal history as both a means of demeaning the Bidens and leveraging DOJ.

President Trump, for example, whose campaign started selling "Where's Hunter?" T-shirts referencing his baseless accusations in 2019 that Mr. Biden should be charged with a litany of corruption offenses, and President Trump used Mr. Biden's struggle with addiction to attack President Biden in a presidential debate in 2020.[10]  Rep. Matt Gaetz argued on live television that Mr. Biden's history with drugs must mean he was corruptly appointed his position on the board of

---

[9] Michael Schmidt et al., *Inside The Collapse Of Hunter Biden's Plea Deal*, N.Y. Times (Aug. 19, 2023), https://www.nytimes.com/2023/08/19/us/politics/inside-hunter-biden-plea-deal.html.  The article does not disclose the source.  The account is most likely true considering the charging statistics, DOJ enforcement policies described below, and Mr. Weiss's initial reluctance in prosecuting Mr. Biden on this charge.  If it is true, it is extremely damning evidence of discriminatory prosecution.  Thus, to the extent there is any doubt, the Court should grant Mr. Biden's request for discovery and an evidentiary hearing.  *See* Mr. Biden's Discovery Mot. (filed concurrently).

[10] Michael Collins, *Hunter Biden's Drug Use Back In Public Eye As Criminal Charges Could Be Around The Corner*, USA Today (June 12, 2023), https://www.usatoday.com/ story/news/politics/2023/06/12/hunter-biden-addiction-american-families-opioid/70222851007/.

Ukrainian company, Burisma Holdings.[11]  After President Biden assumed office, Senators Chuck

Grassley and Ron Johnson publicly announced that they sent letters to the Secret Service, the FBI,

and the ATF demanding all records related to the firearm purchase by Mr. Biden and accusing the

investigative agencies of political favoritism.[12]  And in 2022, Fox News aired a leaked, private

voicemail allegedly from President Biden to Mr. Biden expressing the President's love and support

for his son, which the network claimed reflected Mr. Biden's drug use at the time he purchased

the firearm—a direct challenge to DOJ's refusal to charge Mr. Biden under Section 922 that

Republican opponents of the Biden Administration were quick to jump on.[13]  Setting a new low

for the standards of decency in Congress, Rep. Marjorie Taylor Greene used an official Oversight

Committee proceeding to gratuitously display blown-up sexually explicit and lewd photos—albeit

unlawfully obtained—of Mr. Biden under a guise that fooled no one that her actions had something

to do with "legislating."[14]

Suffice it to say, these opponents of President Biden are not bashful about exploiting Mr.

Biden and his personal life to advance political agendas, even though many of these critics had

---

[11] Reis Thebault, *Rep. Matt Gaetz Criticized Hunter Biden For His Addiction. Then He Got Called Out For His Own DUI Arrest.*, Wash. Post (Dec. 12, 2019), https://www.washingtonpost.com/politics/2019/12/12/rep-matt-gaetz-criticized-hunter-biden-his-addiction-then-he-got-called-out-his-own-dui/.

[12] Press Release, Chuck Grassley, *Grassley, Johnson Seek Information About Feds' Involvement In Hunter Biden Firearm Incident* (Mar. 26, 2021), https://www.grassley.senate.gov/news/news-releases/grassley-johnson-seek-information-about-secret-service-involvement-in-hunter-biden-firearm-incident.

[13] Kyler Alvord, *Hannity Sparks Backlash After Airing Biden's Private Voicemail Amid Son Hunter's Addiction Battle*, People (Oct. 11, 2022), https://people.com/politics/sean-hannity-airs-loving-joe-biden-voicemail-to-son/.

[14] Mariana Alfaro, *Marjorie Taylor Greene's Explicit Visuals At Hunter Biden Hearing Draw Rebuke*, Wash. Post (July 19, 2023), https://www.washingtonpost.com/politics/2023/07/19/marjorie-taylor-greene-hunter-biden-photos/.

objected that criticism of President Trump's children should be off-limits.[15]  DOJ has been in an uncomfortable position ever since President Trump first bullied the agency into opening an investigation.  *See also infra* Section I.A. (describing further targeting of Mr. Biden for political purposes).  Regrettably, DOJ finally buckled under the political pressure and, rather than closing the investigation based on the lack of aggravating factors, contacted Mr. Biden's counsel on May 15, 2023 to propose a non-prosecution agreement (NPA) for the gun charges (and then later, to further require a guilty plea by Mr. Biden to two misdemeanor tax charges that IRS agents cobbled together in its own self-defense against compounding political aggression), even though the agency had already exercised its prosecutorial discretion and determined that these charges should not be brought.[16]

## III.   IRS Whistleblowers And DOJ's Third Charging Decision

DOJ was once again satisfied with its determination that prosecution was unnecessary, and even sent Mr. Biden's counsel a framework for the resolution (a DPA) used in another recent case (involving Aegis Electronic Group, Inc.) where DOJ also agreed to defer charges.[17]  But politics again intervened when the IRS agents actually investigating Mr. Biden, Gary Shapley and Joseph

---

[15] Traditionally, it has been viewed as unseemly, and appropriately so, to target children of the President or other public officials with negative publicity that members of the general public would not receive.  Presidents have opened family members up to political attacks by putting them in political position, as President Kennedy did with his brother and President Trump did with his daughter and son-in-law.  Nevertheless, many Republicans objected to the scrutiny given to President Trump's daughter Ivanka Trump as an unfair personal attack on the child of a president. *See, e.g.*, Rachel Bade et al., *House Democrats Torn Over How Aggressively To Scrutinize Ivanka Trump, President's Other Children*, Wash. Post (Mar. 7, 2019), https://www.washingtonpost.com/politics/house-democrats-torn-over-how-aggressively-to-scrutinize-ivanka-trump-presidents-other-children/2019/03/07/bfd51192-4023-11e9-a0d3-1210e58a94cf_story.html.

[16] *See* Clark Decl. ¶¶6, 10.

[17] Clark Decl. ¶¶13–14 (discussing AUSA Wolf's May 19, 2023, email and attachment to Chris Clark).

Ziegler, championed by House Republicans,[18] went public (including making numerous media appearances) with claims that DOJ and the Biden Administration were interfering with the investigation of Mr. Biden's taxes.[19]   A few weeks later, Republicans in the House Ways and Means Committee voted to release *hundreds* of pages of confidential grand jury material and taxpayer information, in violation of numerous federal laws, and in so doing dumped into the public IRS's investigative case files of Mr. Biden for all to read.   This unprecedented disclosure of case materials for an active investigation, followed by the purported "whistleblowers" public media campaign, prompted further congressional investigation, and Mr. Weiss seemingly decided an agreement deferring the tax charges was no longer politically palatable.   Despite having already decided the tax charges should be deferred, Mr. Weiss reneged on the deal and demanded Mr. Biden plead guilty to two misdemeanor tax charges as part of the agreement to defer the gun charges.[20]   As The New York Times explained, "Weiss was willing to conclude the investigation without even as much as a plea deal before the [IRS] agents accused the Justice Department of

---

[18] The same Republicans who applaud the acts of these IRS agents as purported "whistleblowers" who unlawfully publicly disclosed Mr. Biden's confidential tax information have hypocritically attacked the Biden Administration for not insisting on more severe punishment of an IRS agent who unlawfully leaked Mr. Trump's confidential tax information.   *See* Ways and Means Republicans Demand DOJ Answer For Inadequate Charging Decisions For ProPublica Leaker (Nov. 8, 2023), https://waysandmeans.house.gov/ways-and-means-republicans-demand-doj-answers-for-inadequate-charging-decisions-for-propublica-leaker/.   That leaker actually was prosecuted, however, while the leakers praised by Republicans have not been.

[19] *See, e.g.*, *IRS Whistleblower In Hunter Biden Case Says He 'Felt Handcuffed' During 5-Year Investigation*, CBS (July 19, 2023), https://www.cbsnews.com/news/hunter-biden-irs-whistleblower-felt-handcuffed-case-hearing-investigation/; *IRS Whistleblower Joseph Ziegler Joins The Lead In His First Televised Interview Since Testifying Before Congress*, CNN (July 20, 2023), https://www.cnn.com/videos/tv/2023/07/20/the-lead-irs-whistleblower-joseph-ziegler-jake-tapper-live.cnn.

[20] Clark Decl. ¶12 (discussing AUSA Wolf's May 18, 2023, email to Chris Clark listing 12 "key terms" for a resolution).

interfering."[21]  Then, just four days ago, responding to the continued roars from his political party, Mr. Weiss filed nine counts (felonies and misdemeanors) against Mr. Biden in Los Angeles based on the same tax issues that had initially been passed over by DOJ and then made only into two late tax payment filing misdemeanor charges.

## IV.    Congressional Intervention And DOJ's Fourth Charging Decision

Even though Mr. Weiss initially did not believe that charges were warranted at all, Mr. Biden agreed to plead guilty to the tax misdemeanors as part of a Plea Agreement and a separate Diversion Agreement for the firearms charges subject to a 24-month probationary period.  Yet, after prosecutors sent the Plea Agreement and Diversion Agreement to the Court on June 8, 2023[22] and filed a letter describing the deal's structure on the docket in Delaware on June 20, 2023 (D.E. 1) the political backlash was forceful and immediate.  As discussed in depth below, *see infra* Section I.A., even before the Court raised questions about the mechanics of the agreement on July 26, politicians and Mr. Trump were denouncing it as a "sweetheart deal," a "slap on the wrist," and a "traffic ticket," accusing DOJ of favoritism and misconduct, and using the excuse to interfere with and further coopt its investigation.[23]

Critics of the deal did not stop at condemnation—they immediately deployed their social and political influence to poison the deal and bring DOJ to heel.  Leaders of the House Judiciary, Oversight and Accountability and Ways and Means Committees opened a joint investigation into the case and DOJ's plea negotiations.  On June 23, Ways and Means Committee Republicans voted

---

[21] Schmidt et al., *supra* note 9.

[22] Clark Decl. ¶31.

[23] Phillip Bailey, *'Slap On The Wrist': Donald Trump, Congressional Republicans Call Out Hunter Biden Plea Deal*, USA Today (June 20, 2023), https://www.usatoday.com/ story/news/politics/2023/06/20/donald-trump-republicans-react-hunter-biden-plea-deal/70337635007/.

to publicly release closed-door testimony from the two IRS "whistleblowers," who, in the words of Chairman Smith, "describe how the Biden Justice Department intervened and overstepped in a campaign to protect the son of Joe Biden by delaying, divulging and denying an ongoing investigation into Hunter Biden's alleged tax crimes."[24]

Separately, Congress kept up the ad hominem attacks. *See infra* Section I.A. It was at a hearing of the House Oversight and Accountability Committee in July 2023, for example, that Rep. Marjorie Taylor Greene made her display of what is colloquially called "revenge porn" for no other reason than to denigrate Mr. Biden and his family. *Id.*

Then on July 25, just one day before Mr. Biden's scheduled plea hearing, Chairman Smith actually tried to intervene in this case to file an amicus curiae brief "in Aid of Plea Hearing" (*United States v. Biden*, D.E. 7, No. 23-mj-00274-MN), in which, with no shame about doing real political interference while complaining about non-existent involvement by others, he encouraged the Court to "consider" the unfounded allegations by the IRS agent whistleblowers that the probe into Mr. Biden was tainted by political interference and attaching transcripts of their testimony (*which contained confidential taxpayer and grand jury information*) on the public docket. (D.E. 7-3 (Smith Memo) ("[T]he Defendant appears to have benefited from political interference which calls into question the propriety of the investigation of the U.S. Attorney's Office . . . it is critical that the Court consider the Whistleblower Materials before determining whether to accept the Plea Agreement.").)[25]  The two "whistleblowers" (who were the case agents on the investigation that was being pursued) then publicly testified before Congress about their work on the investigation

---

[24] Farnoush Amiri, *GOP Releases Testimony Alleging DOJ Interference In Hunter Biden Tax Case*, PBS (June 23, 2023), https://www.pbs.org/newshour/politics/gop-releases-testimony-alleging-doj-interference-in-hunter-biden-tax-case.

[25] *United States v. Biden*, D.E. 7-3, No. 23-mj-00274-MN.

as agents, disclosing further confidential grand jury testimony and taxpayer information about Mr. Biden in the process.[26]   It is not unusual that agents may disagree with the charging decisions ultimately made by prosecutors, but that does not give those agents a right to disclose confidential tax information publicly and to become part of a right-wing effort to turn this prosecution into a political game.   Instead, it is clear that these agents had a political axe to grind with Mr. Weiss and his team and were prepared to weaponize their power no matter the cost to Mr. Biden and his right to a fair process.   As noted above, non-prosecution was consistent with DOJ policy and even prosecutors under President Trump's own Attorney General Barr had declined to indict Mr. Biden.

The "whistleblower" accounts contradicted testimony to Congress by Attorney General Merrick Garland that Mr. Weiss had complete authority to make all charging decisions related to the investigation.   Their testimony was in turn contradicted by ten officials from DOJ, FBI, and IRS who were in meetings and conversations in which Mr. Weiss's authority was confirmed (no one corroborated the IRS agents' claims).   Mr. Weiss tried to do damage control, writing to House Judiciary Chairman Jim Jordan on June 7, 2023 that he had "ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges."[27]   But after the Court raised questions about the Plea Agreement on July 26, Mr. Weiss—feeling the weight of the Republican criticism—jumped at the chance to escape the deal he had struck and that had subjected him to public condemnation.   The Court, while raising questions concerning some of the

---

[26] *See Robert Hunter Biden v. United States Internal Revenue Service*, Complaint, No. 23-cv-02711 (D.D.C. 2023) (discussing public testimony of whistleblowers Shapley and Ziegler).

[27] Betsy Woodruff Swan, *In Talks With Prosecutors, Hunter Biden's Lawyers Vowed To Put The President On The Stand*, Politico (Aug. 19, 2023), https://www.politico.com/news/2023/08/19/hunter-biden-plea-deal-collapse-00111974.

procedures in the agreement for alleging breach, never stated or insinuated that the deal would be unfair without more serious charges being levied against Mr. Biden.[28]

Republican Members of Congress were quick to take credit for sabotaging Mr. Weiss's proposed Plea Agreement, celebrating the end of the deal as their doing.  House Oversight Committee Chairman Comer declared outside the Capitol: "I think that you're seeing our investigation that's shined a light on the many wrongdoings of the Biden family has picked up a lot of credibility today, because now we see that there are a lot of crimes that this family's committed and that played out in court today."[29]  Chairman Smith told Fox News that afternoon "justice has been served,"[30] and later said: "Announcement of a special counsel *only happened because congressional GOP exposed* the two-tiered judicial system by shining light onto the investigation into Hunter Biden's alleged financial crimes & the political interference that shielded both him & POTUS from scrutiny."[31]  *See infra* Section I.A. (discussing congressional admissions of interference with DOJ).  And now these same Republican leaders are praising the new tax charges that were just piled on in California (years after DOJ had the relevant facts and after it

---

[28] (July 26, 2023 Tr. 104: 24-16 ("These agreements are not straightforward and they contain some atypical provisions. I am not criticizing you for coming up with those, I think that you have worked hard to come up with creative ways to deal with this."); *id.* at 105: 6-15 (I would like some briefing, additional briefing. . . on what it is that makes this plea acceptable, because I'm not saying that it is not, but nobody seems to really have given me [] what I would need. . . to determine that. . . .").)

[29] Kyle Morris et al., *Comer Says House Investigations Into Hunter Biden Given A 'Lot Of Credibility' After Plea Deal Crumbles*, Fox News (July 26, 2023), https://www.foxnews.com/politics/comer-says-house-investigations-hunter-biden-given-lot-credibility-plea-deal-crumbles.

[30] *Jason Smith On Hunter Biden Plea Deal Collapse: Justice Is Being Served*, Fox News (July 26, 2023), https://www.foxnews.com/video/6331889313112.

[31] @RepJasonSmith, *X* (Aug. 11, 2023), https://twitter.com/RepJasonSmith/status/1690065476838105088 (emphasis added).

agreed to resolve them with a plea to misdemeanor offenses), while simultaneously criticizing them as an effort to "protect" Mr. Biden and demanding even more charges.[32]

In other words, these officials have (1) accused DOJ of trying to protect Mr. Biden by resisting calls to investigate him based on baseless accusations in the first place, (2) criticized DOJ for declining to charge him with a crime for which no similarly situated person would be charged, (3) claimed credit for Mr. Weiss caving to their pressure and forcing Mr. Biden to enter a Plea Agreement he should never have had to consider, (4) claiming credit for Mr. Weiss subsequently yielding to their pressure and scrapping that plea deal, (5) boasting that the appointment of a Special Counsel (which those officials had demanded for years) was their doing , and (6) declaring they were the cause for Mr. Weiss now bringing misdemeanor and felony tax charges DOJ had not believed were warranted until they intervened.  This ludicrous and shameless behavior would be comical if it were not so deeply unfair to Mr. Biden, embarrassing to the country, and offensive to the concept of justice.  It is overwhelmingly clear that nothing the Justice Department could charge Mr. Biden with, no matter how unjustified, would satisfy these officials, which is no surprise given that their real objective is to attack the President and the Democratic Party before an election.[33]

---

[32] Tara Suter, *Tapper Mocks Comer For Claim About Hunter Biden Indictment*, The Hill (Dec. 8, 2023), https://thehill.com/homenews/house/4350926-tapper-mocks-comer-for-claim-about-hunter-biden-indictment/.

[33] As if the over-the-top and excessive nature of these charges was not apparent from the face of the document and in light of the two misdemeanors previously agreed to, on an appearance on CNN that evening, former Attorney General Eric Holder even stated that both Republican and Democratic former U.S. Attorneys who he has spoken to indicated that based on these facts, "this was not a case we would have brought." Mr. Holder went on to say that he believes Mr. Biden is "being treated perhaps a little differently because of who he is.  There's a political component to this case . . .  I think there is certainly political pressure that exists in this case that you would not see with regard to other matters."  *Eric Holder: Hunter Biden Charges Wouldn't Have Been Brought In Normal Scenario*, CNN (Dec. 8, 2023), https://www.cnn.com/videos/politics/2023/12/08/hunter-biden-eric-holder-reaction-sot-lcl-vpx.cnn?cid=ios_app.

In sum, politicians and public officials at war with their political rivals are flouting separation of powers to intentionally interfere with the Executive Branch's handling of this case, and the casualties are Mr. Biden's constitutional rights, any objective appearance of fairness, and public confidence in the justice system.  DOJ is responsible for preventing this, but the agency was bullied into investigating Mr. Biden in the first place and now everything the agency does (or does not to) earns it condemnation and reprisal.

As bad as this already is, it will only get worse.  Former President Trump, for example, has vowed, if elected, to "appoint a real special prosecutor to go after" the "Biden crime family," "defund DOJ" until the Department "comes to its senses," and revive an executive order that allows him to fire Executive Branch employees without cause.[34]  *See infra* Section I.A. (discussing Mr. Trump's vows of retribution).  Indeed, in response to direct questioning on live television about whether he would abuse the powers of the Presidency to get even with his political rivals, the most he was willing to offer was to only act as a dictator on "day one" of his presidency (although history does not show that dictators peacefully give up that power once assumed).[35]  And there is no doubt his hit list includes Mr. Biden and Mr. Weiss—if Mr. Weiss fails to aggressively prosecute Mr. Biden.  In his own motion to dismiss for discriminatory prosecution, Mr. Trump insists he is only being prosecuted because he targeted Mr. Biden in the first place.[36]  This no doubt

---

[34] *See, e.g.,* Kristen Holmes, *Trump's Radical Second-Term Agenda Would Wield Executive Power In Unprecedented Ways*, CNN (Nov. 16, 2023), https://www.cnn.com/2023/11/16/politics/trump-agenda-second-term/index.html; Alexander Bolton, *Trump's Call To Defund DOJ, FBI Puts Senate, House GOP At Odds*, The Hill (Apr. 6, 2023), https://thehill.com/homenews/senate/3936557-trumps-call-to-defund-doj-fbi-puts-senate-house-gop-at-odds/.

[35] Maria Alfaro, *Trump Says He Wouldn't Be A Dictator 'Except For Day One'*, Wash. Post (Dec. 6, 2023), https://www.washingtonpost.com/politics/2023/12/06/trump-dictator-day-one-hannity/.

[36] *See United States v. Trump*, Motion to Dismiss for Selective and Vindictive Prosecution, No. 1:23-cr-00257-TSC-1 (D.D.C. Oct. 23, 2023). Even Mr. Trump cannot fail to see the hypocrisy in championing the constitutional principle that no one should be subject to a selective or vindictive

exerts considerable pressure on Mr. Weiss to curry favor, and avoid the wrath, of a potential future president by complying with his demands.

Congress is way ahead of him.  Chairmen Jordan, Chairman Comer, and Chairman Smith have made it their personal and political missions to come up with or, if necessary, manufacture evidence that Mr. Biden committed a crime, and they are using the power of three congressional committees to discipline Mr. Weiss for not punishing Mr. Biden more severely.  They even pressured Mr. Weiss (and two other U.S. Attorneys) to provide testimony regarding the decision not to bring charges, a nearly unprecedented abuse of power and intrusion on a pending investigation by the Department of Justice.[37]  And now, those same Congressmen are trying to force Assistant U.S. Attorney Lesley Wolf, who negotiated the Diversion Agreement and Plea Agreement, to provide further testimony about the investigation.  Notably, capitulating to this pressure is contrary to longstanding and sensible DOJ policy against congressional interference.

## V.    DOJ Policy Against Congressional Interference

DOJ has a long history of condemning this interference by Congress.  In a November 30, 1982 letter to Rep. John Conyers, for example, Attorney General William French Smith, with the "knowledge and concurrence" of President Reagan, expressed the "longstanding position of the

---

prosecution while threatening to pressure DOJ into doing that very thing to get back at those he feels have wronged him.

[37] There have been only a few occasions involving high-level public officials where the supervisor of an investigation appeared before a congressional committee while the investigation was pending.  One instance was the investigation prompted by the Watergate break-in and cover up implicating the President of the United States, and the other was under the Independent Counsel statute and the proceedings of cabinet officer Michael Espy.  On Watergate, only after the criminal events in question had already been exposed to the public and there was minimal risk of additional pre-trial publicity and prejudice, did the special prosecutors testify.  Likewise, the Independent Counsel's testimony in 1997 about Mr. Espy's alleged wrongdoing came *only after* the government's successful prosecution of Espy's chief of staff, Ronald H. Blackley, on three federal counts.  Here, Mr. Biden is a private citizen, and Mr. Weiss testified only a few weeks after Mr. Biden was charged in Delaware.

16

Executive Branch" that DOJ generally "decline[s] to provide committees of Congress with access to or copies of law enforcement files except in the most extraordinary circumstances."  H. Rep. 99-435 at 1168-69.   The letter quotes Attorney General Robert Jackson stating that "all investigative reports are confidential documents of the Executive department" and "Disclosure of the reports could not do otherwise than seriously prejudice law enforcement." *Id.*  The letter also quotes former Deputy Attorney General Thomas Kauper: "the Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation.  If a congressional committee is fully apprised of details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressure will influence the course of the investigation." *Id.* at 1170; *id.* (noting the "well-founded fears that the perception of the integrity, impartiality and fairness of the law enforcement process as a whole will be damaged if sensitive materials are distributed beyond those persons necessarily involved in the investigation and prosecution process"); *see also* 40 U.S. Opp. Atty. Gen. 45. 1941 WL 1875 (Apr. 30, 1941 AG Robert Jackson) ("Disclosure of information contained in [investigative] reports might [] be the grossest kind of injustice to individuals," as they "include leads and suspicions, and sometimes even the statements of malicious or misinformed people," and "[e]ven though later and more complete reports exonerate the individuals, . . .we know that a correction never catches up with an accusation.").

As Deputy Assistant Attorney General Robert Shanks explained in 1984:

Pretrial publicity originating in Congress [] can be attributed to the Government as a whole and can require postponement or other modification of the prosecution on due process grounds.  The discretion of prosecutive officials to conduct their investigations and trials in the manner they deem to be the most efficient and constructive can be infringed by precipitous disclosures which prompt a court to impose remedial procedural obligations upon the Government.

The Department of Justice also has an obligation to ensure that the fairness of the decisionmaking with respect to its prosecutorial function is not compromised by excessive congressional pressures, and that the due process rights of those under

investigation are not violated. *See Pillsbury v. Federal Trade Comm'n*, 354 F.2d 952 (5th Cir. 1966). Just as an agency's ability to fulfill its statutory obligation may be impermissibly strained by pressure from the Legislative Branch during the administrative decision making process, *D.C. Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246-1247 (D.C. Cir.), cert. denied, 405 U.S. 1030 (1972), excessive interference with the exercise of prosecutorial discretion can substantially prejudice the rights of persons under investigation. Persons who ultimately are not prosecuted may be subjected to prejudicial publicity without being given an opportunity to cleanse themselves of the stain of unfounded allegations. Moreover, the injection of impermissible factors in the decision whether to initiate prosecution offends not only the rights of the accused, but also the professional obligation of government attorneys to the integrity of the judicial process and, ultimately, the obligation of the Executive faithfully to execute the laws.

8 U.S. Op. Off. Legal Counsel 252 (O.L.C.), 1984 WL 178369, *Congressional Subpoenas of Department of Justice Investigative Files* (Oct. 17, 1984 Deputy Assistant AG Robert Shanks).

Attorney General John Ashcroft elaborated on this policy and the reasons behind it in 2012:

The need for confidentiality is particularly compelling in regard to the highly sensitive prosecutorial decision of whether to bring criminal charges. The Department's attorneys are asked to render unbiased, professional advice about the merits of potential criminal cases. The formal mechanism by which this process occurs is the preparation of prosecution and declination memoranda. In short, these documents review the strength of the evidence, substantive legal issues, policy considerations, and overall likelihood of success if the case were to proceed. If these deliberative documents are subject to congressional scrutiny, we will face the grave danger that prosecutors will be chilled from providing the candid and independent analysis essential to the sound exercise of prosecutorial discretion and to the fairness and integrity of federal law enforcement.

. . . Just as troubling, the prospect of congressional review might force prosecutors to err on the side of investigation or prosecution simply to avoid public second guessing. This would undermine public and judicial confidence in our law enforcement processes. . . We have significant concerns, . . .about oversight requests for prosecution and declination memoranda. The nexus between such inquiries and the purpose of oversight is questionable, and this kind of demand threatens to politicize the criminal justice process. Legislative Branch pressure on prosecutorial decisionmaking is inconsistent with the separation of powers and thereby threatens individual liberty. . .

Congress cannot justify a demand for a decisionmaking document based on its disagreement with a prosecutorial decision. . . In any event, even if the Committee has a legitimate oversight interest in these documents, its oversight needs cannot outweigh the Executive Branch's interest in the confidentiality of prosecutorial decisionmaking and our concerns about congressional influence on such decisionmaking in individual cases.

DOJ, 25 Opinions of the office of Legal Counsel at 2 (Jan. 10, 2012 AG Ashcroft); *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 245, 2357-58 (2001) ("Resolution of prosecutorial questions usually is conceived as lying at the heart of the executive power vested in the President. But it is in this area, because so focused on particular individuals and firms, that the crassest forms of politics (involving, at the extreme, personal favors and vendettas) pose the greatest danger of displacing professionalism and thereby undermining confidence in legal decisionmaking.").

Similarly, former Attorney General Benjamin Civiletti warned that it could be impossible for an accused to persuade DOJ not to indict

> to be heard by the prosecutor, [if he] has to shout over loud protestations by Members of Congress urging indictment of this very individual; or that Members of Congress are standing ready to chastise the prosecutor if no indictment is brought.  To imagine such a scenario is to understand why congressional involvement is so prosecutorial decisions can be perilous to civil liberty. . . .  The Attorney General cannot effectively and fairly enforce the laws when career prosecutors are receiving pressure from Congress.

Benjamin Civiletti, Justice Unbalanced: Congress and Prosecutorial Discretion (Nov. 12, 1993) (Heritage Foundation Lecture), https://www.heritage.org/political-process/report/justice-unbalanced-congress-and-prosecutorial-discretion.  That is precisely the situation here with Mr. Biden.

Failure to adhere to these policies is a recent trend, and this is not the first time it has happened in response to pressure from Mr. Trump.  Deputy Attorney General Rod Rosenstein failed to follow these policies with respect to the investigation of Russian interference with the 2016 presidential election, drawing criticism from DOJ and Congress alike.  As former Deputy Assistant Attorney General Harry Litman, now a professor of constitutional law at the University of California at San Diego, explained:

Deputy Attorney General Rod Rosenstein has capitulated to political pressure from the president and his allies in Congress. He has yielded to demands from the most rabid opponents of special counsel Robert Mueller's probe in a way that harms the long-term interests of the Justice Department and likely does little to protect the probe or Rosenstein's own job.

While requests from Congress are always subject to some ad hoc back-and-forth, it is about as hard and fast a rule as there is that the Justice Department will not hand over documents relating to a still-active investigation. And for good reason: It could compromise the investigation, unfairly expose uncharged individuals and provide a road map for defendants to sculpt their stories. It is precisely that the practice is inflexible and long-established that provides department officials the wherewithal to resist the often urgent saber-rattling calls from the Hill to provide documents in pending investigations.[38]

Former Senator Carl Levin (D-Mich.) agreed:

Only the executive branch has the constitutional authority to prosecute. Congress can, when it comes across what it thinks is criminal activity, refer a matter to the Justice Department for possible prosecution, but its role and authority stops there. Should it seek to try to influence the discretionary authority of the executive branch in a prosecutorial matter, the third branch of government, the judiciary, could throw out the prosecution based on political influence.

But Congress has always avoided seeking documents from ongoing criminal investigations. That was my experience, and that's the way it should be. That is a bright red line that should not be crossed.[39]

*See also infra* Section III. (discussing current DOJ policy related to separation of powers).

There is no doubt that DOJ is in an unenviable political position with respect to this case.

But as DOJ itself has long believed, Mr. Biden's rights must come first and efforts by members of

Congress and the former President to interfere have tainted this prosecution beyond purification.

As a result, there is no constitutional option but to dismiss this case.[40]

---

[38] Harry Litman, *Rod Rosenstein Has Made Two Critical Missteps*, Wash. Post (Apr. 23, 2018), https://www.washingtonpost.com/opinions/rod-rosenstein-has-made-two-critical-missteps/2018/04/23/4bd9c740-4689-11e8-9072-f6d4bc32f223_story.html.

[39] Former Sen. Carl Levin (D-Mich), *Congress Dangerously Wields Its Oversight Power In Russia Probe*, The Hill (May 15, 2018), https://thehill.com/opinion/judiciary/387648-congress-dangerously-wields-its-oversight-power-in-russia-probe/.

[40] If the Court has any doubt that the material set out in this motion is sufficient to warrant outright dismissal of these charges, it should permit discovery and conduct an evidentiary hearing. Mr.

## LEGAL STANDARDS

"For almost one hundred years, the federal courts have recognized that it is unconstitutional to administer the law 'with an evil eye and an unequal hand so as practically to make unjust and illegal discrimination between persons in similar circumstances.'" *United States v. Napper*, 574 F. Supp. 1521, 1523 (D.D.C. 1983) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)). Thus, "although prosecutorial discretion is broad, it is not unfettered. . .  In particular, the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citations omitted).  Indeed, "[n]othing can corrode respect for a rule of law more than the knowledge that the government looks beyond the law itself to arbitrary considerations. . .  Selective prosecution then can become a weapon used to discipline political foe[s]." *United States v. Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974); *see, e.g.*, *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) ("[T]he Government cannot base its decision to prosecute on. . . a defendant's political beliefs."); *People v. Smith*, 203 Cal. Rptr. 196, 213 (Cal. Ct. App. 1984) ("A criminal prosecution should not, of course, be initiated because the defendant belongs to a particular political party. . . ."). Relatedly, when the prosecution "ups the ante" by bringing more severe charges in response to "animus," the prosecution is "vindictive." *United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996).

Importantly, while many selective prosecution cases involve an "unjustifiable standard such *as* race, religion, or other arbitrary classification, . . .*including* the exercise of protected statutory and constitutional rights, *Wayte*, 470 U.S. at 608 (emphasis added), improper or

---

Biden has already sought discovery from DOJ and information from third-parties with knowledge of former President Trump's influence, and DOJ has not responded to the requests and filed an opposition for this information to be disclosed.

vindictive purpose exists whenever a charging decision is made for reasons other than legitimate prosecutorial considerations (i.e., prosecutors may target conduct, not individuals).  *See United States v Velsicol Chem. Corp.*, 498 F. Supp. 1255, 1265 (D.D.C. 1980) (dismissing a vindictive prosecution based on government's "institutional stake" in discouraging third-party conduct and avoiding "contempt for federal law enforcement"); *Collins v. Jones*, 2015 WL 790055, at *11 (E.D. Pa. Feb. 24, 2015) (vindictive prosecution includes charges "motivated by the prosecutor's personal stake in the outcome of a case. . ."); *United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972) (prosecution must rest "upon some valid ground. Mere random selection would suffice, since the government is not obligated to prosecute all offenders, but no effort was made to justify these prosecutions as the result of random selection and Steele's evidence was inconsistent with such a theory"); *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (prosecutors may not bring charges to target "specific persons").

When prosecutors bring charges for an improper purpose—one that targets an individual for who he is, rather than his allegedly criminal conduct—they violate a defendant's due-process and equal-protection rights.  *Armstrong*, 517 U.S. at 465; *United States v. Mardis*, 670 F. Supp. 2d 696, 701 (W.D. Tenn. 2009), *aff'd,* 600 F.3d 693 (6th Cir. 2010) (discussing cases); *Wayte*, 470 U.S. at 608, n.10.[41]  It does not matter whether the improper purpose belongs to the prosecution or a third party with influence, as any external interference in the independent judgment of prosecutors is problematic.  *See Monsoor*, 77 F.3d at 1035 (where outside party "in some way prevail[s] upon the prosecutor in making the decision to seek an indictment," the "ill will, whoever its bearer," may be "imputed to federal prosecutors"); *United States v. Adams*, 870 F.2d 1140,

---

[41] "It is appropriate to judge selective prosecution claims according to ordinary equal protection standards."  *Wayte*, 470 U.S. at 608.

1146 (6th Cir. 1989) (evidence that a party had "instigated and pushed" the prosecution justified discovery into whether that party "was able to prevail upon the Department of Justice to institute a prosecution that [otherwise] would not have been undertaken").  Moreover, when prosecutors bring charges because of political pressure, it not only violates due process and equal protection, but separation of powers as well.  *Mardis*, 670 F. Supp. 2d at 701 (discussing "whether a decision to prosecute was tainted by a violation of the separation of powers").

When a prosecution is selective, vindictive, or violates separation of powers, the tainted charges must be dismissed.  *See id*. at 700 ("Preservation of this system of checks and balances requires the courts to invalidate actions that. . . undermine the authority and independence of one or another coordinate Branch.") (citations omitted); *In re Aiken Cnty.*, 725 F.3d 255, 264 n.7 (D.C. Cir. 2013) ("If the Executive selectively prosecutes someone based on impermissible considerations, the equal protection remedy is to dismiss the prosecution . . . .").[42]

## ARGUMENT

This case exists because Mr. Biden is politically affiliated with his father, the sitting President and a candidate for reelection, at a time when a historically divided nation prepares for a contentious presidential election.  From its inception, the investigation of Mr. Biden has been polluted with politics.  President Trump, without any evidence, started accusing Mr. Biden of corruption in 2018, claims that featured prominently in his presidential campaign.  Since then, the investigation has been a hot-button topic for Republicans who have made it a centerpiece of their campaign to discredit the Biden Administration and challenged President Biden's reelection

---

[42] Where a defendant has not carried his burden, but has demonstrated a "colorable claim," discovery and an evidentiary hearing should be permitted.  *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990); *United States v. Jones*, 159 F.3d 969, 978, n.8 (6th Cir. 1998) (granting discovery to give the defendant "the opportunity to move to dismiss the indictment" for selective prosecution).  *See* Mr. Biden's Discovery Mot (filed concurrently).

campaign;[43] indeed, now it has even become the basis for an expected vote on impeachment in the next few days.  As a holdover from the Trump Administration, Mr. Weiss faces political pressure from his own party to pursue Mr. Biden more aggressively than similarly situated individuals and to do so for vindictive reasons.  His political future within this constituency may depend upon it.

This case was the inevitable result of the devolution into crass politics.  Under mounting pressure, yet unable to find evidence of Biden-family wrongdoing, DOJ reached for an unconstitutional statute that its official enforcement policy expressly reserves for cases impacting public safety (*see infra* Section I.B.) and charged Mr. Biden with a crime based on facts DOJ has known and chose not to act upon for years.  DOJ then leveraged Mr. Biden into a plea deal he should never have had to consider, hoping to shoot for some middle ground between Democrats poised to condemn this vindictive prosecution and Republicans eager to decry favoritism (ironically by treating Mr. Biden as it would anybody else).  When that backfired, DOJ found itself facing down a Republican congressional inquiry into its charging decisions and plea negotiations, so the agency abandoned the deal, forcing Mr. Biden to defend himself against felony charges DOJ was happy to defer when it believed that was the most politically advantageous strategy.

This record should raise more than judicial misgivings.  Politicians are not just wooing and wheedling, but openly interfering with this case, poisoning the potential jury pool, and shaking public confidence in the judicial system.  And Republican House Members are boasting about their success in torpedoing the deal struck by Mr. Weiss.  To be clear, no new facts had emerged after the prosecution proposed the Plea Agreement (after five years of a thorough investigation) and the prosecution's choice to abandon the Plea Agreement framework and insist on charging multiple

---

[43]  In fact, one of the primary congressmen pressuring the DOJ and U.S. Attorney in this case, Oversight Chairman James Comer, is actually using his attacks as a fundraising vehicle for his campaign. *See* Suter, *supra* note 32.

felonies (despite the executed Diversion Agreement that confers immunity).  The only thing that changed (other than that the law underlying the gun charge was successfully challenged in several federal courts, including the Fifth Circuit) is that the prosecution's Republican benefactors turned on them and exerted pressure on them to take a more aggressive line against Mr. Biden in time for the election.

Just as the numerous statements from former Attorneys General (Republican and Democrat appointees) attested, it is no secret that "excessive interference with the exercise of prosecutorial discretion can substantially prejudice the rights of persons under investigation."  *Wayte*, 470 U.S. at 607; *Bowsher v. Synar*, 478 U.S. 714, 722 (1986) (finding congressional interference with the executive function unconstitutional because "[t]he Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of law it enacts."); *Winsett v. McGinnes*, 617 F.2d 996 (3d Cir. 1980) (due process violated where officials acted based on fear of negative public reaction and legislative reprisals); *Mardis*, 670 F. Supp. 2d at 702 ("In some circumstances, . . . pressure from congressmen and senators violates the due process rights of the parties involved.").  That is why "the Department of Justice [] has an obligation to ensure that the fairness of the decision making with respect to its prosecutorial function is not compromised by excessive congressional pressures, and that the due process rights of those under investigation are not violated."  8 U.S. Op. Off. Legal Counsel 252 (O.L.C.), 1984 WL 178369, *Congressional Subpoenas of Department of Justice Investigative Files* (Oct. 17, 1984 Deputy Assistant AG Robert Shanks) (citing *Pillsbury v. Federal Trade Comm'n*, 354 F.2d 952 (5th Cir. 1966)).  Here, DOJ has done the opposite, and it is incumbent on the Court to intercede.  *United States v. Falk*, 479 F.2d 616, 624 (7th Cir. 1973) ("[T]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all

branches of the Government.") (quoting *Stamler v. Willis*, 415 F.2d 1365, 1369-1370 (7th Cir. 1973)).[44]  *See supra* Section V. and *infra* Section I.A. (discussing DOJ's policies regarding freedom from political interference and appearance of bias).

## I.   MR. BIDEN IS A VICTIM OF SELECTIVE PROSECUTION

Mr. Biden has been selectively charged for an improper political purpose.  "In deciding if a defendant has established selective prosecution, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *United States v. Bradley*, 880 F. Supp. 271, 280–81 (M.D. Pa. 1994) (citations omitted).  To prove selective prosecution, Mr. Biden must show the prosecution exercised its discretion with "discriminatory purpose" and a "discriminatory effect."  *Armstrong*, 517 U.S. at 465.  When a defendant has alleged a *prima facie* case of selective prosecution, the burden shifts to the prosecution to "show[] the selection process actually rested upon some valid ground."  *Steele*, 461 F.2d at 1152; *United States v. Haggerty*, 528 F. Supp. 1286, 1292 (D. Colo. 1981) (finding selective prosecution based on *political affiliations*).

---

[44] The Court's supervisory powers provide an alternate basis to dismiss the indictment.  *Dixon v. D.C.*, 394 F.2d 966, 970 (D.C. Cir. 1968) (Bazelon, J.) ("I conclude that in this case our supervisory power must be used to protect the purity of the government and its processes.  Accordingly, I would vacate both judgments below and remand to the trial court with instructions to dismiss the information."); *United States v. Banks*, 383 F. Supp. 389, 397 (D.S.D. 1974) ("Although it hurts me deeply, I am forced to the conclusion that the prosecution in this trial had something other than attaining justice foremost in its mind. . .  The waters of justice have been polluted, and dismissal, I believe, is the appropriate cure for the pollution in this case.").  Importantly, the prosecution's "conduct need not be so unfair or imprudent as to offend due process before exercise of this supervisory power is appropriate."  *Id.* at 392.  "Instead the supervisory power can be utilized whenever the administration of justice is tainted."  *Id.*; *United States v. Samango*, 607 F.2d 877, 885 (9th Cir. 1979) ("We conclude and hold that the manner in which the prosecution obtained the indictment represented a serious threat to the integrity of the judicial process.  The District Court's dismissal, therefore, was a proper exercise of its supervisory power.").

### A.    DOJ's Prosecution Of Mr. Biden Is Motivated By Improper Purpose

Proving discriminatory intent in the minds of prosecutors typically is exceedingly difficult and dooms most claims, but the fingerprints of discriminatory intent are all over this case, complete with boasting by Republican House Members claiming credit for coercing Mr. Weiss into changing his charging decision.    Top GOP government officials admittedly are openly weaponizing this case to influence voters and the next presidential election.    Whole Republican-led House committees are publicly accusing the Administration of interfering in the case while gloating about their own efforts to do just that.    *See Monsoor*, 77 F.3d at 1035 (where an outside party "in some way prevail[s] upon the prosecutor in making the decision to seek an indictment," the "ill will, whoever its bearer," may be "imputed to federal prosecutors").    The original investigation and prosecution team that negotiated the June/July non-prosecution and misdemeanor resolution of this case has been silenced and sidelined.    A new team chosen to replace them with an agenda of reaching a different charging decision than the first team is now in charge. That the very prosecutors who investigated and negotiated the resolution of this case said nothing at the July 26, 2023 is both very odd and suspicious (even at the time).    The fact that DOJ has flip-flopped and brought on a new team to give a different answer undermined the legitimacy of the prosecution.    *See Adams*, 870 F.2d at 1146 (finding criticism of a charging decision by prosecution team members relevant to a determination of bad faith).[45]

---

[45] As noted, selective prosecution claims include any cases where prosecutors bring charges to target an individual for reasons unrelated to legitimate prosecutorial concerns, which is clearly the case here.    But even if such claims were limited to cases where prosecutors bring charges based on membership in a constitutionally protected class or in retaliation for exercise of legal rights, this case would qualify.    Mr. Biden is being targeted based on his political affiliations and as a proxy for the political affiliations of his father—constitutionally protected activity.

**Donald J. Trump.**  Mr. Trump is ground zero for improper motive.  During his term in office, President Trump incessantly called in demagogue-like fashion on DOJ, the media, the public, and even foreign governments to target and investigate Mr. Biden.  At 2020 election rallies, for example, President Trump encouraged his audience to chant "Lock him up!" in reference to Mr. Biden.[46]  After he lost the 2020 election, Mr. Trump tweeted that "10% of voters would have changed their vote if they knew about Hunter Biden."[47]  And in his speech inciting the same crowd that went on to break into the Capitol on January 6, 2021, President Trump egged them on with the refrain, "Where's Hunter?"[48]  Other Tweets during his time as President include:

- Tweets of Oct. 6, 2019 ("The Biden family was PAID OFF, pure and simple!  The fake news must stop making excuses for something that is totally inexcusable.  Sleepy Joe said he never spoke to the Ukrainian company, and then the picture came out where he was playing golf with the company boss and Hunter….");[49]

- Tweets of Oct. 10, 2019 ("Where is Hunter Biden?  He has disappeared while the Fake News protects his Crooked daddy!");[50]

- Tweets of Oct. 12, 2019 ("WHERE'S HUNTER?");[51]

---

[46] Brooke Seipel, *Rally Crowd Chants 'Lock Him Up' As Trump Calls Biden Family 'A Criminal Enterprise'*, The Hill (Oct. 18, 2020), https://thehill.com/homenews/administration/521626-rally-crowd-chants-lock-him-up-after-trump-calls-biden-family-a/; John T. Bennett, *'Lock Him Up': Trump Chuckles As Florida Rally Crowd Calls For Hunter Biden's Imprisonment*, The Independent (Oct. 16, 2020), ), https://www.independent.co.uk/news/world/americas/us-election-2020/trump-florida-rally-hunter-biden-lock-him-up-us-election-2020-b1082298.html.

[47] @realDonaldTrump, *X* (Dec. 10, 2019).  A complete searchable index of Donald Trump's Twitter from 2015-2021 is available via The American Presidency Project: https://www.presidency.ucsb.edu/.

[48] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[49] @realDonaldTrump, *X* (Oct. 6, 2019); *see also* supra note 4.

[50] @realDonaldTrump, *X* (Oct. 10, 2019); *see also* supra note 4.

[51] @realDonaldTrump, *X* (Oct. 12, 2019); *see also* supra note 4.

- Tweets of Oct. 13, 2019 ("Where's Hunter?  He has totally disappeared!  Now looks like he has raided and scammed even more countries!  Media is AWOL.");[52]

- Tweets of Nov. 15, 2019 ("Democrats must apologize to USA: Ukrainian Foreign Minister Vadym Prystaiko said that 'United States Ambassador Gordon Sondland did NOT link financial military assistance to a request for Ukraine to open up an investigation into former V.P. Joe Biden & his son, Hunter Biden. . . .'");[53]

- Tweets of Sept. 24, 2020 ("Russian Billionaire wired Hunter Biden 3 1/2 Million Dollars.  This on top of all of the other money he received while Joe was V.P.  Crooked as can be, but Fake Mainstream Media wants it to just go away!");[54]

- Tweets of Dec. 12, 2020 ("Why didn't Bill Barr reveal the truth to the public, before the Election, about Hunter Biden.") and ("IF Biden gets in, nothing will happen to Hunter or Joe.  Barr will do nothing, and the new group of partisan killers coming in will quickly kill it all.  Same thing with Durham.  We caught them cold, spying, treason & more (the hard part), but 'Justice' took too long.  Will be DOA!");[55] and

- Tweets of Dec. 17, 2020 ("I have NOTHING to do with the potential prosecution of Hunter Biden, or the Biden family.  It is just more Fake News.  Actually, I find it very sad to watch!").[56]

      Out of public view, Mr. Trump also improperly pressured DOJ to target and investigate

Mr. Biden based on his false and baseless accusations.  Examples include:

- On December 27, 2020, then Acting Deputy Attorney General Richard Donoghue took handwritten notes of a call with President Trump and then Acting Attorney General Jeffrey Rosen, showing that Mr. Trump had instructed Mr. Rosen and Mr. Donoghue to "figure out what to do with H[unter] Biden" and indicating that Mr. Trump insisted "people will criticize the DOJ if he's not investigated for real."[57]

---

[52] @realDonaldTrump, *X* (Oct. 13, 2019); *see also* supra note 4.

[53] @realDonaldTrump, *X* (Nov. 15, 2019); *see also* supra note 4.

[54] @realDonaldTrump, *X* (Sept. 24, 2020); *see also* supra note 4.

[55] @realDonaldTrump, *X* (Dec. 12, 2020); *see also* supra note 4.

[56] @realDonaldTrump, *X* (Dec. 17, 2020); *see also* supra note 4.

[57] Dec. 27, 2020 Handwritten Notes of Richard Donoghue Released by H. Oversight Comm. at 4 (emphasis added), www.washingtonpost.com/context/read-richard-donoghue-s-handwritten-notes-on-trump-rosen-calls/cdc5a621-dfd1-440d-8dea-33a06ad753c8; *see also* Transcribed Interview of Richard Donoghue at 56 (Oct. 1, 2021), H. Oversight Comm., https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000034600/pdf/GPO-J6-TRANSCRIPT-CTRL0000034600.pdf.

- Former Attorney General William Barr's book recalled an earlier vignette in mid-October 2020 in which President Trump called Mr. Barr and inquired about the investigation of Mr. Biden, which Mr. Barr says ended with Mr. Barr yelling at Mr. Trump, "Dammit, Mr. President, I am not going to talk to you about Hunter Biden.  Period!"[58]

- Case files provided by and testimony from IRS "whistleblower" Mr. Shapley reveal that around the 2020 election, all aspects of the investigation into Mr. Biden "need[ed] to be vetted with USA Weiss and DAG Don[og]hue"[59] and that "no proactive interviews have occurred as a result of guidance provided to the investigative team"[60] by the Deputy Attorney General's office, among others.

- IRS "whistleblower" Mr. Ziegler testified that then Attorney General Barr ultimately made the decision to put Delaware in charge of the investigation and "to join two investigations together" in 2019 (at a time when President Trump's personal attorney, Rudy Giuliani, was already seeking dirt on Hunter Biden in the Ukraine).[61]

- AUSA Wolf told the investigative team, in or around September 3, 2020, that "United States Attorney Weiss talked to Deputy Attorney General Don[og]hue and the DAG's office, under President Trump (not President Biden), "is the one who made the decision" not to take further overt investigative steps around the 2020 election.[62]

Separately, also in an unprecedented interference in a criminal prosecution (which as a former U.S. Attorney he should have known was improper), President Trump's personal attorney Rudy Giuliani traveled the globe in search of "dirt" on Mr. Biden and convinced DOJ to open dedicated channels to receive this information.  He did this to then-U.S. Attorneys Richard Donoghue (E.D.N.Y.) and Scott Brady (W.D.P.A.), and he made presentations to multiple U.S. Attorney's Offices regarding Mr. Biden.[63]  Since then, Mr. Barr has confirmed, on the record,

---

[58] Matt Zapotosky & Josh Dawsey, *Barr Calls Prospect of Trump Running For President Again 'Dismaying,' Says GOP Should 'Look Forward' to Others*, Wash. Post (Feb. 27, 2022), https://www.washingtonpost.com/national-security/2022/02/27/barr-trump-2024/.

[59] Gary Shapley Interview Tr. at 129, Ex. 7 at 2, Comm. on H. Ways and Means (May 26, 2023).

[60] Gary Shapley Aff. 3, attach. 9 (Sportsman Investigation, IRS-CI-WDCFO) at 1, https://gop-waysandmeans.house.gov/wp-content/uploads/2023/09/T90-Shapley-3_Attachment-9.pdf.

[61] Joseph Ziegler Interview Tr. at 19, 132–33, Comm. on H. Ways and Means (June 1, 2023).

[62] Gary Shapley Interview Tr. at 129, Ex. 7 at 2, Comm. on H. Ways and Means (May 26, 2023).

[63] *See, e.g.*, Letter from Asst. Att'y Gen. Stephen E. Boyd to Hon. Jerrold Nadler (Feb. 18, 2020), https://www.justice.gov/ ("[T]he Deputy Attorney General has also assigned Scott Brady, the U.S. Attorney for the Western District of Pennsylvania, to assist in the receipt, processing, and

knowledge of how information was shared by Mr. Brady's team to Mr. Weiss's team.[64]  And just weeks before the 2020 presidential election, Mr. Giuliani obtained stolen electronic data from Mr. Biden and disseminated its purported contents (as well as manipulating some of it) in an attempt to create a media spectacle and undermine his President Biden's political campaign.

Since leaving office in January 2021, Mr. Trump has continued to flex his considerable influence over government officials to drive the case against Mr. Biden and criticize the plea agreement between him and DOJ.  For example (emphases added):

- On March 31, 2023, when Mr. Trump was notified charges had been filed against him in Manhattan criminal court, his response was to post on the inaptly-named *Truth Social*, "WHERE'S HUNTER?"[65]  The following week, during an evening address at Mar-a-Lago, after 34 charges against Mr. Trump were unsealed and he surrendered and was arraigned, Trump's response was again to make wild allegations against RHB and his family.[66]

- On June 20, 2023, Mr. Trump posted repeatedly on *Truth Social* about the agreements that the DOJ had made with Mr. Biden and announced that day:

---

preliminary analysis of new information provided by the public that may be relevant to matters relating to Ukraine.").

[64] Margot Cleveland, *EXCLUSIVE: Bill Barr Confirms Rep. Jamie Raskin Lied About Biden Family Corruption Investigation*, The Federalist (June 7, 2023), https://thefederalist.com/2023/06/07/exclusive-bill-barr-confirms-rep-jamie-raskin-lied-about-biden-family-corruption-investigation/ (confirming that a confidential human source's allegations about Joe Biden "was sent to Delaware for further investigation.").

[65] *Highlights And Analysis: Donald Trump Indicted In Hush Money Probe*, NBC News (Mar. 31, 2023), https://www.nbcnews.com/politics/donald-trump-live-blog/live-updates-manhattan-grand-jury-indicted-donald-trump-rcna75172.

[66] Donald J. Trump, *Trump Statements On Indictment From Mar-a-Lago* (Apr. 4, 2023), https://www.youtube.com/watch?v=LLxS8OnvSrU ("And just recently, the FBI and DOJ in collusion with Twitter and Facebook in order not to say anything bad about the Hunter Biden laptop from hell, which exposes the Biden family as criminals in which, according to the pollsters, would have made a 17 point difference in the election result. . . .  Just got $10 million from China. Where did that come from?  *I guess they were banking on Hunter's expertise*.") (emphasis added).

- o "Wow!  The corrupt Biden DOJ just cleared up hundreds of years of criminal liability by giving Hunter Biden a mere 'traffic ticket.'  Our system is BROKEN!"[67]

- o "A 'SWEETHEART' DEAL FOR HUNTER (AND JOE), AS THEY CONTINUE THEIR QUEST TO 'GET' TRUMP, JOE'S POLITICAL OPPONENT.  WE ARE NOW A THIRD WORLD COUNTRY!"[68]

- o "The Hunter/Joe Biden settlement is a massive COVERUP & FULL SCALE ELECTION INTERFERENCE 'SCAM' THE LIKES OF WHICH HAS NEVER BEEN SEEN IN OUR COUNTRY BEFORE.  A 'TRAFFIC TICKET,' & JOE IS ALL CLEANED UP & READY TO GO INTO THE 2024 PRESIDENTIAL ELECTION. . . ."[69]

- On June 24, 2023, Mr. Trump posted repeated false charges on *Truth Social*:

  - o "When Hunter Biden harshly threatened the Chinese businessman, he and his father, Joe, were together in Joe's house (even the ownership of the house, and rent paid, are questionable and now forgotten about by the Fake News Media!) where classified documents having to do with CHINA were stored . . .  They took in millions of dollars from China – How much information was given. BIG STUFF!  Joe is totally corrupt!!!"

  - o "Biden will do about Russia whatever President Xi of China wants him to do. Remember, Hunter & Joe illegally took large amounts of money from both countries, but China right now is the bigger threat."[70]

- Mr. Trump has also re-posted on his *Truth Social* channel libelous comments about Mr. Biden, including one on June 26, 2023 that said, "AMERICAN JUSTICE: 69-Year-Old Grandma with Cancer Given More Prison Time for Walking Inside US Capitol than Hunter Biden for Sharing Classified Documents with Foreign Regimes

---

[67] Brett Samuels, *Trump Compares Hunter Biden Charges To 'Traffic Ticket'*, The Hill (June 20, 2023), https://thehill.com/homenews/campaign/4058241-trump-compares-hunter-biden-charges-to-traffic-ticket/.

[68] Alexandra Stone, *The Donald Claims Hunter's Plea Deal Is Part of a Biden Family Conspiracy to 'Get Trump'*, OK! Mag. (June 20, 2023), https://okmagazine.com/p/donald-trump-claims-hunter-biden-plea-deal-quest-get-him/.

[69] Nikki Schwab, *Trump Compares Hunter Biden Deal To A 'Traffic Ticket' And Says The System Is 'Broken' - Three Weeks After Predicting President's Scandal-Ridden Son Would Be Charged With 'Something Small'*, Daily Mail (June 20, 2023), https://www.dailymail.co.uk/news/article-12215017/Trump-compares-Hunter-Biden-deal-traffic-ticket-says-broken.html.

[70] Fatma Khalet, *Donald Trump Reacts To Wagner Mutiny In Russia*, Newsweek (June 24, 2023), https://www.newsweek.com/donald-trump-reacts-wagner-mutiny-russia-1808848.

and Multi-Million Dollar Bribery Scheme."  Mr. Trump curtly captioned above the post: "HORRIBLE!"[71]

- And regarding Mr. Biden's deal reached with the Trump-appointed USAO in Delaware, on July 11, 2023, Mr. Trump wrote on *Truth Social*: "Weiss is a COWARD, a smaller version of Bill Barr, who never had the courage to do what everyone knows should have been done.  He gave out a traffic ticket instead of a death sentence. . . . "[72]

- On November 23, 2023, Mr. Trump posted on *Truth Social*: "Why would anybody be surprised that the Supreme Court has ruled against me, they always do!  It is unprecedented to be handing over Tax Returns, & it creates terrible precedent for future Presidents.  Has Joe Biden paid taxes on all of the money he made illegally from Hunter & beyond."[73]

DOJ kept Mr. Trump and his yes-men at bay for years by continuing to investigate Mr. Biden, even as the investigation failed to reveal any serious offense, but the Department's future if Mr. Trump wins the next presidency looks bleak.  Mr. Trump's outrage at DOJ's failure to follow his demands has dangerously compounded as he fends off his own criminal and fraud charges (which *do* relate to national interests and presidential competency).  At a recent political rally, he swore "retribution" on his political rivals and the agencies he blames for helping them.[74]  He

---

[71] Josephine Harvey, *Convicted Jan. 6 Rioter Tells Trump: Stop 'Using' Me*, Yahoo! News (June 27, 2023), https://sg.news.yahoo.com/convicted-jan-6-rioter-tells-153630583.html.  Trump, for course, was indicted for a grievous leak of classified information.

[72] Ryan Bort, *Trump Blasts Prosecutor He Appointed for Not Giving Hunter Biden 'Death Sentence'*, Rolling Stone (July 11, 2023), https://www.rollingstone.com/politics/politics-news/trump-suggests-hunter-biden-death-penalty-1234786435/.  It is ironic that Trump boasts that he only hired the "best people," but now derides so many of his former Administration officials because of their criticism of him  *See* Samantha Grindell, *Donald Trump, Who Said He Only Hired The Best People, Was Thoroughly Asked Why So Many Key Players Of His Administration Do Not Want Him To Be President Again*, Business Insider (June 20, 2023), https://www.businessinsider.in/politics/world/news/donald-trump-who-claimed-to-only-hire-the-best-people-was-thoroughly-asked-why-so-many-key-players-of-his-administration-do-not-want-him-to-be-president-again-/articleshow/101120142.cms

[73] Zach Schonfeld, *Trump Rips Supreme Court After Ruling He Hand Over Tax Records*, The Hill (Nov. 23, 2022), https://thehill.com/regulation/court-battles/3747749-trump-rips-supreme-court-after-ruling-he-hand-over-tax-records/.

[74] Maggie Haberman & Shane Goldmacher, *Trump, Vowing 'Retribution,' Foretells A Second Term Of Spite*, N.Y. Times (Mar. 7, 2023),

promises he will "defund the DOJ and FBI" until "they come to their senses," appoint a "real special 'prosecutor'" to "go after" the Bidens, and revive an executive order that allows him to fire executive branch employees without cause.[75]  These are not abstract promises of vengeance—Mr. Trump is literally describing how he intends to misuse his authority to punish and cripple DOJ for not "locking up" Mr. Biden.  In fact, even when directly asked on live television in a recent interview whether he would seek to use the powers of the Presidency to get even with his political enemies, he could not even manage a denial—instead, Mr. Trump claims he only plans to abuse his power on "day one" of his presidency.[76]  And no one familiar with Mr. Trump would lightly call his bluff.

The prospect that Mr. Trump may be elected and turn his vengeance on the prosecutors, if they fail to take a hard line against Mr. Biden and aid Mr. Trump's election hopes, is surely not lost on them.  Moreover, the fact that Mr. Trump now emphasizes his desire to seek retribution on Mr. Biden and others on his blacklist in the future undermines any contention that he was above abusing the powers of DOJ to target Mr. Biden in the past.[77]

---

https://www.nytimes.com/2023/03/07/us/politics/trump-2024-president.html (at a recent rally, Mr. Trump stated: "I am your warrior.  I am your justice.  And for those who have been wronged and betrayed, I am your retribution.").

[75] Rami Ayyub, *Trump, Newly Charged, Urges Defunding Justice Department And FBI*, Reuters (Apr. 6, 2023), https://www.reuters.com/world/us/trump-facing-criminal-charges-calls-defunding-fbi-2023-04-05/; Brett Samuels, *Trump Vows To Appoint Special Prosecutor To 'Go After' Biden If Former President Wins In 2024*, The Hill (June 12, 2023), https://thehill.com/homenews/campaign/4045934-trump-vows-to-appoint-special-prosecutor-to-go-after-biden-if-former-president-wins-in-2024/; Tal Axelrod, *Trump's Unprecedented Campaign Pitch: Elect Me To Get Revenge On The Government*, ABC News (July 14, 2023), https://abcnews.go.com/Politics/trumps-unprecedented-2024-campaign-pitch-elect-revenge-government/story?id=100778347.

[76] Alfaro, *supra* note 35.

[77] President Trump initiated the investigation of Mr. Biden illegally.  26 U.S.C. § 7217 provides: "It shall be unlawful for any applicable person [including the President] to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such

**Republicans In Congress.**  After President Biden assumed office—more than two years after President Trump started calling on DOJ to investigate Mr. Biden—Senators Chuck Grassley and Ron Johnson sent letters to the Secret Service, the FBI, and the ATF requesting all records related to the firearm purchase by Mr. Biden—a private citizen—and publicly announced their actions.[78]

Since then, congressional Republicans have used every excuse to criticize DOJ, publicly question its integrity, and threaten the agency with everything from subpoenas for documents and testimony to defunding and increased congressional "oversight."  In April 2021, twenty-four members of Congress, all staunch opponents of President Biden, wrote a letter to President Biden's nominee for Director of the ATF, calling on him to commit to investigating Mr. Biden if

---

taxpayer."  After unlawfully requesting that Mr. Biden be investigated, President Trump violated 26 U.S.C. § 7212 of the Internal Revenue Code by interfering with that investigation.  The section has two substantive provisions.  The "Officer Clause" forbids "corruptly or by force or threats of force (including any threatening letter or communication) endeavor[ing] to intimidate or impede *any officer or employee of the United States* acting in an official capacity under [the Internal Revenue Code]." (emphasis added).  The second clause, the "Omnibus Clause," forbids "corruptly or by force or threats of force (including any threatening letter or communication) obstruct[ing] or imped[ing], or endeavor[ing] to obstruct or impede, *the due administration of [the Internal Revenue Code].*"  (emphasis added).  Mr. Trump has done both.

[78] Press Release, Sen. Chuck Grassley, *Grassley, Johnson Seek Information About Feds' Involvement In Hunter Biden Firearm Incident* (Mar. 26, 2021), https://www.grassley.senate.gov/news/news-releases/grassley-johnson-seek-information-about-secret-service-involvement-in-hunter-biden-firearm-incident.

confirmed.[79]   In June 2022, when asked by reporters about gun legislation and recent mass shootings, Senator Johnson used the opportunity to publicly call for prosecution of Mr. Biden.[80]

The House Oversight and Accountability Committee's "mission statement is to ensure the efficiency, effectiveness, and accountability of the federal government and all its agencies," not to investigate a private citizen for crimes it has a political motivation to uncover.[81]   Yet it has teamed up with the House Judiciary Committee to malign DOJ and subject the agency to burdensome enquiries while incrementally second-guessing its investigative and prosecutorial role.   Rep. Comer regularly goes on media outlets to condemn what he (mis)characterizes as the "Biden Crime Family" and brag about (mis)using congressional authority to conduct its own criminal investigation of a private citizen.   In a recent committee press release titled "Justice Department Attempting a Biden Family Coverup," Rep. Comer vows:

> The House Oversight Committee will continue to follow the Biden family's money trail and interview witnesses to determine whether foreign actors targeted the Bidens, President Biden is compromised and corrupt, and our national security is threatened.   We will also continue to work with the House Committees on Judiciary and Ways and Means

---

[79] Days later, Mr. Giuliani, now under criminal prosecution himself, further pushed for the prosecution of Mr. Biden for possession of a firearm on Fox News.   *See, e.g.*, *Tucker Carlson Tonight*, Fox News Channel (Apr. 29, 2021) (Rudy Giuliani: "*The reality is the hard drive . . . spells out, as we know, a clear violation of the Gun Act*, the application is a straight out fraud.   He says, 'I'm not an addict.'   We have a picture of him five days before smoking a crack pipe behind the wheel of a car, and then saying under oath that he's not an addict.") (emphasis added); Letter from U.S. House of Representatives to David Chipman (Apr. 26, 2021), https://good.house.gov/. This conduct is particularly troubling given that such an investigation is well outside ATF's normal course of practice when addressing similar conduct.

[80] Steve Benen, *Asked About Gun Violence, Ron Johnson Talks About Hunter Biden*, MSNBC (June 8, 2022), https://www.msnbc.com/rachel-maddow-show/maddowblog/asked-gun-violence-ron-johnson-talks-hunter-biden-rcna32569.

[81] H. Comm. on Oversight and Accountability, *About – Mission* (last accessed Dec. 7, 2023), https://oversight.house.gov/#:~:text=United%20States%20House%20Committee%20on%20Oversight%20and%20Accountability%20%2D&text=Our%20mission%20statement%20is%20to,to%20the%20people%20it%20serves.

to root out misconduct at the Justice Department and hold bad actors accountable for weaponizing law enforcement powers.[82]

In other words, multiple Republican-led House committees have taken it upon themselves to investigate Mr. Biden for criminal activity, while criticizing DOJ's exercise of prosecutorial discretion in not bringing more serious charges against him, stoking public and political outrage at and distrust of the agency, and directly interfering with DOJ's investigation by subjecting it to a burdensome congressional inquiry.  And unlike DOJ, Congress does not even pretend to offer Mr. Biden the presumption of innocence.  Now Rep. Greene claims Rep. Comer is "leading the best investigation into the Bidens, far better than anything the FBI has done, far better than anything the DOJ has done."[83]  In Rep. Jordan's own words, "the fix is in," but Republican-led House Committees are doing the fixing and Mr. Biden is the victim.[84]

**The Department of Justice.**  DOJ confirmed its own improper motive when, under fire from Congress and the public, it resorted to a rarely used gun charge that reports indicate Special Counsel Weiss himself admitted would not have been brought against the average American.[85]

---

[82] Press Release, H. Comm. on Oversight and Accountability, *Comer: Justice Department Attempting A Biden Family Coverup* (Aug. 11, 2023), https://oversight.house.gov/release/comer-justice-department-attempting-a-biden-family-coverup/.

[83] Scott Wong, *James Comer, Leading The GOP Biden Probe, Insists He's 'Bipartisan' As He Flirts With Higher Office*, NBC News (Aug. 31, 2023), https://www.nbcnews.com/politics/congress/james-comer-hunter-joe-biden-investigation-senate-governor-rcna102212.

[84] Steve Benen, *Jim Jordan Declares What He Thinks 'Everyone Knows'*, MSNBC (Sept. 21, 2023), https://www.msnbc.com/rachel-maddow-show/maddowblog/jim-jordan-declares-thinks-everyone-knows-rcna111360.

[85] Michael S. Schmidt et al., *Inside The Collapse Of Hunter Biden's Plea Deal,* N.Y. Times (Aug. 19, 2023), https://www.nytimes.com/2023/08/19/us/politics/inside-hunter-biden-plea-deal.html. As noted above, the article does not disclose the source, and to the extent there is any doubt about the veracity of the claim, the Court should grant Mr. Biden's request for discovery and an evidentiary hearing.  *See* Mr. Biden's Motion for Discovery and an Evidentiary Hearing (filed concurrently).

That is an admission of improper motive.  *See United States v. Bradley*, 880 F. Supp. 271, 280–81 (M.D. Pa. 1994) ("Circumstantial evidence of invidious intent may include proof of disproportionate impact."); *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1046, n.6 (N.D. Cal. 2016) ("[E]vidence of differential treatment is also probative of discriminatory intent.").[86]

Appropriate factors considered by prosecutors in making charging decisions include "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan. . . ."  *Wayte*, 470 U.S. at 607.  If DOJ had wanted to bring the gun charge based on any of these legitimate considerations, it would have done so years ago when it first became aware of the relevant facts (and before the statute was held unconstitutional).  *See Falk*, 479 F.2d at 622 (prima facie case of selective prosecution where government "had notice of [the defendant's] violations . . . [y]et the indictment charging violations . . . was not returned until almost three years had passed. . . .").  But DOJ did not, which makes sense because DOJ's enforcement plan and priorities expressly state that agency resources and federal gun statutes should be reserved for prosecuting violent crime.  *See id.* at 621 ("[I]n view of its admitted policy. . . it was incumbent upon the government to come forward with evidence that it had in fact changed its policy generally or otherwise to explain why Falk was being singled out for prosecution in contravention of the government's own procedures."); *see infra* Section I.B.

Instead, even when DOJ did cave to political pressure and decided to do something about the gun charge, prosecutors were willing to resolve the whole matter through a non-prosecution

---

[86] "Indeed, under some circumstances proof of discriminatory impact 'may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on [nondiscriminatory] grounds.'" *Bradley*, 880 F. Supp. at 280–81 (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

(later a diversion) agreement, without a guilty plea, before IRS whistleblowers went public and the pressure they generated caused the agreement to became politically unsavory for the Republican prosecutors.   Only then did Mr. Weiss demand that Mr. Biden plead guilty to misdemeanors.  *See Banks*, 383 F. Supp. at 393 (dismissing charges because the court was "forced to conclude that the prosecution . . . was seeking convictions at the expense of justice").

And if there were any remaining doubt about DOJ's improper motive, DOJ's efforts to torpedo even that plea deal in response to political blowback puts the matter to rest.  Even if DOJ could claim with a straight face to have brought charges and agreed to a deal based on legitimate considerations, nothing about the Court asking the parties to address certain concerns with incidental mechanics of the plea agreement's structure should have impacted that analysis.  No issue was raised by the Court as to the fairness of the Plea Agreement, only as to whether the mechanics would secure Mr. Biden the benefit of his bargain in the event that the prosecution alleged a breach of the agreement and the role of the Court in the Diversion Agreement (a demonstration of this Court's respect for separation of powers that the other branches of government lack).  What changed were the political consequences for the prosecution following Republican criticism in Congress, and this led DOJ to abandon a deal it had emphatically recommended that the Court accept as a fair and appropriate resolution of the case hours earlier.  Indeed, rather than respond to the Court's questions in writing, as the Court requested, the prosecution simply withdrew the plea agreement, which easily could have been tweaked to address the Court's concern.[87]

When the prosecution purports to act in accordance with its legitimate enforcement priorities and then does a 180-degree about-face in response to congressional ire and criticism—

---

[87] *See* Biden Motion to Dismiss for Diversion Agreement, filed concurrently (Dec. 11, 2023).

particularly absent any change in the prosecution's understanding of the facts of the case or a change in the law (here, of course, there was a change in the law, but one that cut *against* prosecution)—improper motive is evident. *See Dixon*, 394 F.2d at 968 (prosecution improper if "the Government had legitimately determined not to prosecute appellant and had then reversed its position solely because he filed a complaint"); *id.* at 970 ("The Government did not change its view of the merits; it merely sought to avert the risk of rebuke.").  And whether DOJ did so at the urging of public officials, in pursuit of the prosecutors' own political agenda, or to fend off criticism and avoid scrutiny, discriminatory purpose is at the heart of this case, and it must be dismissed. *See Wayte*, 470 U.S. at 610 (holding that government acts with "discriminatory purpose" when it "select[s] or reaffirm[s] a particular course of action at least in part because of, not merely in spite of, its adverse effects upon" the accused) (citations omitted); *United States v. Crowthers*, 456 F.2d 1074, 1079 (4th Cir. 1972) ("What the government has done here is to undertake to suppress a viewpoint it does not wish to hear under the guise of enforcing [the law]."); *Falk*, 479 F.2d at 620 (concluding equal protection violated when prosecution based on "the exercise of protected First Amendment activities," such as political affiliations "unpopular with the government"); *Berrios*, 501 F.2d at 1209 ("Nothing can corrode respect for a rule of law more than the knowledge that the government looks beyond the law itself to arbitrary considerations [such as desire] . . . to discipline political foe and the dissident.").

### B.    DOJ's Prosecution Of Mr. Biden Has Discriminatory Effects

"[T]o establish discriminatory effect, a defendant must show that similarly situated individuals . . . were not similarly prosecuted." *Jones*, 159 F.3d at 977 (citing *Armstrong*, 517 U.S. at 465); *United States v. Holloway*, 29 F. Supp. 2d 435, 439 (M.D. Tenn. 1998) ("To establish the discriminatory effect element, a defendant must 'produce some evidence that similarly situated defendants . . . could have been prosecuted, but were not.' " (quoting *Armstong*, 517 U.S. at 469)).

40

It is hard to imagine better evidence than the report of Special Prosecutor Weiss's express admission that he did not want to bring these charges against Mr. Biden because DOJ would not bring them against the average American based on the same facts.[88]

Several experienced legal experts and law enforcement officials have agreed with Special Counsel Weiss's initial conclusion that prosecution is not warranted.[89]  Even with respect to the tax charges that were just brought in California, former Attorney General Eric Holder stated on live television that he had spoken to both Republican and Democratic U.S. attorneys and all agreed that the charges would not have been brought but for political pressure.[90]  This supports an inference of discriminatory effect.  *See Adams*, 870 F.2d at 1146 ("Mr. Gipson, drawing on his lengthy experience as an employee of the IRS, states in his affidavit that he does not believe that criminal proceedings would 'ordinarily' be instituted in tax cases of the sort presented here," which "raises a significant question as to why this particular prosecution was undertaken."); *Falk*, 479 F.2d at 623 ("The unrebutted evidence before the court, including the admission of the Assistant United States Attorney and the two published statements by the Selective Service officials that contradict the propriety of the action taken in this case, made out at least a prima facie case of improper discrimination in enforcing the law.").

---

[88] *See supra* n.7.

[89] *See, e.g.*, Glenn Thrush, *The Gun Charges Against Hunter Biden Are Unusual. Here's Why*, N.Y. Times (Sept. 15, 2023), https://www.nytimes.com/2023/09/15/us/politics/hunter-biden-gun-charges.html ("When officials with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives reviewed Hunter Biden's gun application several years ago, they believed the case most likely would have been dropped if the target were a lesser-known person—because the gun had not been used in a crime and Mr. Biden had taken steps to get and stay sober, according to a former law enforcement official familiar with the situation.").

[90] *Eric Holder: Hunter Biden Charges Wouldn't Have Been Brought In Normal Scenario*, CNN (Dec. 8, 2023), https://www.cnn.com/videos/politics/2023/12/08/hunter-biden-eric-holder-reaction-sot-lcl-vpx.cnn.

The accuracy of Special Counsel Weiss's alleged acknowledgment that an ordinary citizen would not be prosecuted for this offense is borne out by DOJ's policy and statistical evidence. Sections 922(g)(3) is very broad (unconstitutionally so), covering millions (if not tens of millions) of gun owners who use substances controlled under federal law, including marijuana, even if those drugs are legal at the state level.[91]   Yet they are almost never used.   In years 2008–2017, for example, of the 132,464 criminal prosecutions under federal gun statutes, only 1.8% were brought under Section 922(g)(3).[92]   Similarly, with respect to Sections 922(a)(6) and 924(a)(1)(A), the Government Accountability Office has reported that DOJ rarely even *investigates*—let alone criminally charges—individuals who falsely denied drug use or addiction when purchasing a firearm.   Fewer than 1,000 such cases each year are *referred for investigation*.[93]   And even when they are charged, it typically is done in conjunction with a more serious crime, such as the use of the unlawfully-obtained firearm in a violent crime, purchasing firearms for others who cannot

---

[91] There are an estimated 81 million Americans ages 18 and over who own a firearm, and *more than 20 percent of gun owners have admitted to using drugs*, even on surveys relying on self-reporting.   Ewan Palmer, *1 in 5 U.S. Gun Owners Use Drugs, Report Mental Health Condition: Survey*, Newsweek (Apr. 16, 2018), https://www.newsweek.com/1-5-us-gun-owners-are-drug-users-mental-health-problems-survey-874688.   That means that by conservative estimates, *at least 16 million Americans* could be subject to criminal prosecution under 922(g)(3) for the exact conduct of which Mr. Biden is accused.   National Drug Control Strategy, Executive Office of the President (Apr. 2022), https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf (recent Government estimates indicate nearly 60 million people in the United States use illicit drugs each year, and around 25 million struggled with a substance use disorder in the past year).

[92] *Federal Weapons Prosecutions Rise For Third Consecutive Year*, Transactional Records Access Clearinghouse (TRAC) (Nov. 29, 2017), https://trac.syr.edu/tracreports/crim/492/.

[93] U.S. Gov't Accountability Off., GAO-18-440, *Report To The Ranking Member, Subcommittee On Commerce, Justice, Science, And Related Agencies, Committee On Appropriations, House Of Representatives, Law Enforcement – Few Individuals Denied Firearms Purchases Are Prosecuted And ATF Should Assess Use Of Warning Notices In Lieu Of Prosecutions* (Sept. 2018) ("2018 GAO Report") at 30 (noting between 2011 and 2017, fewer than 4,000 delayed denials were even referred for investigation because the owner was an unlawful user or addict); *see also id.* at 21 ("[C]ases involving falsifying information when attempting to purchase a firearm generally are only a small fraction of USAO efforts.").

legally purchase them, possession of firearms with extended clips or obliterated serial numbers, drug trafficking, etc.[94]

DOJ's selective enforcement would of course be arbitrary and capricious unless it is choosing who to charge based on legitimate enforcement objectives. *See Cox v. Louisiana*, 379 U.S. 536, 557-558 (1965) ("It is clearly unconstitutional to enable a public official to . . . engage in invidious discrimination among persons or groups . . . by selective enforcement of an extremely broad prohibitory statute."). Criminal charges are meant to punish disfavored conduct, not people who may be disfavored by prosecutors. There are, however, "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to" Mr. Biden and the millions of other nonviolent offenders whom DOJ does not prosecute. *Lewis*, 517 F.3d at 27–28.[95]

We can say this with confidence because, beyond the powerful statistics reflecting enforcement decisions, DOJ has defended its reluctance to bring these charges in articulating what it believes those legitimate prosecutorial factors are as part of its enforcement policy and practices. Those policies expressly reserve agency resources and federal gun statutes, including the one at issue, to cases involving violence and public safety. In 2017 (right before the time President Trump began bullying DOJ to investigate Mr. Biden), Attorney General Jeff Sessions directed DOJ to use

---

[94] *Id.* at 33 ("The denial cases ATF field divisions refer to USAOs for prosecution generally include aggravating circumstances . . . these aggravating circumstances could include violent felonies or multiple serious offenses in a short period of time, especially if these occurred in close proximity to the timing of the attempted firearms purchase."); *see also infra* note 99 (citing DOJ press releases).

[95] For example, surveys found that around 12 million gun-owning Americans admitted to using drugs within the past month, yet fewer than 150 Americans are prosecuted each year under the statute. Jacob Sullum, *The Arbitrary Ban On Gun Possession By Drug Users Invites Wildly Uneven Enforcement*, Reason (Aug. 16, 2023), https://reason.com/2023/08/16/the-arbitrary-ban-on-gun-possession-by-drug-users-invites-wildly-uneven-enforcement/.

the statute to prosecute "criminals responsible for significant violent crime" as part of DOJ's Project Safe Neighborhood (PSN) program.[96]

Later in 2021, a similar memorandum from the Deputy Attorney General's Office further explained that "[t]he Department is most effective when we focus our limited enforcement resources on identifying, investigating, and prosecuting the most significant drivers of violent crime. . . ." [97]  To that end, DOJ must "focus[] more on ensuring the law enforcement intervention is aimed at the most significant drivers of violence, and *not* aimed at enforcing particular statutes or bringing specific criminal charges."  *Id.* at 4 (emphasis added) ("[T]he fundamental goal of this work is to reduce the level of violence in our communities, not to increase the number of arrests or prosecutions as if they were ends in themselves."); *see also* DOJ Strategic Plan ("[T]he Department will focus enforcement efforts on reducing the incidence of guns used to commit violent crime as well as solving more gun-related violent crimes.").[98]

To its credit, apart from this case, DOJ does appear to exercise its enforcement authority consistent with its PSN program.  A review of DOJ Section 922(g)(3) press releases for prosecutions under the statute show it is used when there are aggravating factors creating risk to public safety, such as violent crime, association with dangerous criminals or hate groups, drug or weapon trafficking, etc.[99]  Indeed, DOJ notes in every press release that the prosecution under

---

[96] Memorandum from Att'y Gen. Jeff Sessions on Commitment to Targeting Violent Crime to All Federal Prosecutors (Mar. 8, 2017), https://www.justice.gov/opa/press-release/file/946771/download.

[97] Memorandum from Deputy Att'y Gen. Lisa Monaco on a Comprehensive Strategy for Reducing Violent Crime to Department of Justice Employees (May 26, 2021), https://www.justice.gov/dag/page/file/1397921/download.

[98] DOJ, *DOJ Strategic Plan FYs 2022-2026: Strategic Goal 2: Keep Our Country Safe*, https://www.justice.gov/doj/doj-strategic-plan/strategic-goal-2.

[99] *See, e.g.*, Press Release, DOJ, *Waterloo Man Sentenced For Possessing A Firearm As A Drug User* (Mar. 10, 2023), https://www.justice.gov/usao-ndia/pr/waterloo-man-sentenced-possessing-firearm-drug-user (gun trafficker who purchased 38 guns for other people who could not, including

Section 922(g)(3) was part of the PSN program "to reduce violent crime and gun violence," consistent with the Department's "violent crime reduction strategy."[100]

---

a man out on bond for murder charges, pleads guilty in 2022); Press Release, DOJ, *Waterloo Man Sentenced To Federal Prison For Possessing Gun Following A Shooting* (Sep. 28, 2020), https://www.justice.gov/usao-ndia/pr/waterloo-man-sentenced-federal-prison-possessing-gun-following-shooting (man with burglary conviction who was present at a shooting and then took the gun pleads guilty in 2020 and is sentenced to 27 months); Ryan J. Reilly & Jessica Schulberg, *D.C.'S Neo-Nazi Brothers Were Hiding In Plain Sight*, HuffPost (Nov. 16, 2018), https://www.huffpost.com/entry/white-supremacist-brothers-jeffrey-clark-edward-clark_n_5bef3b57e4b0b84243e25b83 (neo-Nazi who stock-piled weapons with high-capacity magazines, celebrated and promoted violence and hate crimes online, and associated with violent criminals sentenced to time served in 2018. Both federal public defender and the magistrate note at hearing that they had never seen prosecutors use the unusual federal charge.); Dennis Romero, *Mother Of 6-Year-Old Who Shot Virginia Teacher Charged With Federal Gun Crimes*, NBC News (Jun. 5, 2023), https://www.nbcnews.com/news/us-news/mother-6-year-old-shot-virginia-teacher-charged-federal-gun-crimes-rcna87825 (woman indicted on felony child neglect and child endangerment charges whose son shot his elementary school teacher offered plea for 18-24 months in 2023); Press Release, DOJ, *Drug User Sentenced For Illegally Possessing A Firearm* (Mar. 20, 2023), https://www.justice.gov/usao-vt/pr/drug-user-sentenced-illegally-possessing-firearm (man pleads guilty and sentenced to time served after being caught committing burglary, concealing a handgun from police, and admitting he used heroin and fentanyl, among other substances, on a daily basis); Press Release, DOJ, *Lincoln Man Sentenced To 3 Years As A Drug User In Possession Of A Firearm* (Dec. 28, 2022), https://www.justice.gov/usao-ne/pr/lincoln-man-sentenced-3-years-drug-user-possession-firearm (man sentenced to 36 months in 2022 after police found him driving under the influence with prescription pills and guns, including an AR-style rifle); Press Release, DOJ, *Lincoln Man Sentenced To 24 Months For Possession Of A Firearm* (Oct. 2, 2023), https://www.justice.gov/usao-ne/pr/lincoln-man-sentenced-24-months-possession-firearm (man who had another person illegally purchase weapon that he then brandished publicly on social media sentenced to 24 months in 2023); Press Release, DOJ, *Lincoln Man Sentenced To 30 Months For Possession Of A Firearm* (Aug. 18, 2023), https://www.justice.gov/usao-ne/pr/lincoln-man-sentenced-30-months-possession-firearm (man accused of drug trafficking sentenced to 30 months after driving under the influence with drug distribution paraphernalia in his car in 2023).

[100] Press Release, DOJ, *Waterloo Man Sentenced For Possessing A Firearm As A Drug User* (Mar. 10, 2023), https://www.justice.gov/usao-ndia/pr/waterloo-man-sentenced-possessing-firearm-drug-user. In fact, of approximately 139,431 suspects investigated for violations of 922(g)(3) between 2000 and 2016, nearly all such investigations (91%) involved possession with a felony conviction. Emily Tiry et al., *Prosecution Of Federal Firearms Offenses, 2000-16* at 5, Table 2, Urban Inst. (Oct. 2021), https://www.ojp.gov/pdffiles1/bjs/grants/254520.pdf. And even after charges are brought based on aggravating factors, DOJ recognizes that its interest in prosecuting and expending resources evaporates. *See, e.g.*, *United States v. Greenlaw*, No. 1:21-cr-00019-MN, D.E. 27 (D. Del. Aug. 1, 2022); *id.*, D.E. 1 at 3 n.1 (D. Del. Mar. 1, 2021) (DOJ moved to dismiss its indictment for false statement on a gun purchase form because the Court was confident that he would be unable to purchase another firearm). *C.f.*, *United States v. Sussmann*, No. 1:21-

45

But then there is Mr. Biden.  The unfortunate truth is that DOJ lacks the resources to prosecute even a fraction of *dangerous* acts of gun violence.  Yet, DOJ devotes its limited resources to charging Mr. Biden, who (1) purchased a single, small revolver that he never loaded or fired and owned for just eleven days, (2) has no criminal record or history of violence, and (3) has never posed any risk to public safety.  DOJ is supposed to be "evaluat[ing] the best way to build or maintain trust and legitimacy, to set strategic enforcement priorities, and to measure success by the actual reduction in violent crime. . . ."  May 26, 2021 Memorandum To DOJ Employees, *supra* note 97 at 5.  Prosecuting Mr. Biden *undermines* DOJ trust and legitimacy, and it certainly does nothing to reduce violent crime, which is undoubtably why DOJ declined to bring charges for years and, even when it did so under political duress, it was willing to avoid prosecution through a non-prosecution agreement and then, only after political pressure, a diversion agreement.  *See Falk*, 479 F.2d at 621 ("[I]n view of its admitted policy. . . it was incumbent upon the government to come forward with evidence that it had in fact changed its policy generally or otherwise to explain why Falk was being singled out for prosecution in contravention of the government's own procedures."); *Haggerty*, 528 F. Supp. at 1293 ("[T]he government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution.").  These facts support an inference of discriminatory effect.  *See Mumphrey*, 193 F. Supp. 3d at 1061 (assessment of discriminatory effect "should include consideration of the goals of the [prosecution] program," and "even under the government's purported criteria for prosecution. . . (*e.g.*, history of drug dealing, strength of the evidence), Defendants have demonstrated there were similarly situated [defendants] who were not arrested and subject to prosecution . . . . )"; *id.* at 1064 ("Evidence of

---

cr-00582-CR (D.D.C. 2021) (prosecution by Special Counsel John Durham of Michael Sussmann—a former attorney charged with a false statement made years earlier—was discriminatory where there were no aggravating factors).

[] knowledge [of other offenders] combined with the failure to arrest any [of those offenders] gives rise to an inference of discrimination."); *Duncan v. Perez,* 445 F.2d 557, 560 (5th Cir. 1971) ("[I]t is clear beyond dispute that any violation that may have occurred was so slight and technical as to be generally reserved for law school hypotheticals rather than criminal prosecutions. . . [no one was] hurt and. . . [d]e minimus [violations] of this kind occur repeatedly. . . and do not become the subject of criminal proceedings."); *Medrano v. Allee,* 347 F. Supp. 605, 614 (S.D. Tex. 1972) ("The activity was peaceful and did not endanger public safety. . . [yet defendant's violation] was treated differently from other [violations] which were more [serious] in nature," which "can only be characterized as 'biased' or 'selective.'"); *United States v. McLeod,* 385 F.2d 734, 744 (5th Cir. 1967) (where it is "common knowledge" that enforcement officials "often overlook violations" of a law, enforcement without valid explanation supports inference of discrimination); *Crowthers,* 456 F.2d at 1079 ("Suffice it to say that the record establishes that the level of [wrongdoing] attributed to these defendants could not possibly have exceeded the level [] previously permitted by the government on numerous prior [] occasions.").

Mr. Biden is not being singled out for prosecution for his conduct—the same conduct that implicates millions of other Americans who go uncharged—rather he is being singled out for his political affiliations and used as a means for Republicans to go after the President and promote their own political campaigns.  He has established a prima facie case for selective prosecution, and the Court need look no further than the record before it to see that DOJ cannot rebut this by "proving that the decision to prosecute was free of discriminatory taint." *Berrios,* 501 F.2d at 1212 n.4.  "The waters of justice have been polluted, and dismissal. . . is the appropriate cure for the pollution in this case." *Banks,* 383 F. Supp. at 397.

47

## II.    MR. BIDEN IS A VICTIM OF VINDICTIVE PROSECUTION

Vindictive prosecution is a species of selective prosecution where an accused must prove by a preponderance of the evidence that "(1) the prosecutor harbored genuine animus; and (2) absent this motive, defendant would not have been prosecuted."  *Monsoor*, 77 F.3d at 1034 (citations omitted).  This can be done "in one of two ways: (1) present objective evidence that a prosecutor's actions were designed to punish him or her for asserting his or her legal rights, which is proof of actual vindictiveness; or (2) show sufficient facts to give rise to a presumption of vindictiveness, which may be overcome by objective evidence justifying the prosecutor's actions." *United States v. William*s, 2020 WL 5960689, at *10 (E.D. La. Oct. 8, 2020).  An important difference between this claim and one for selective prosecution is that "a presumption of vindictiveness may apply even absent proof of improper motive . . .where there exists a realistic likelihood of vindictiveness." *Id.* (citations omitted); *United States v. Velsicol Chem. Corp.*, 498 F. Supp. 1255, 1263–64 (D.D.C. 1980) ("The vindictive prosecution doctrine reaches all prosecutions that pose a realistic likelihood of vindictiveness, whether or not the prosecutor acted out of vindictiveness in fact.") (citations omitted).

Prosecution is vindictive when the prosecutor acts on his own animus or "was prevailed upon to bring the charges by another with animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999); *Monsoor*, 77 F.3d at 1035 (where an outside party "in some way prevail[s] upon the prosecutor in making the decision to seek an indictment," the "ill will, whoever its bearer," may be "imputed to federal prosecutors"); *Adams,* 870 F.2d at 1140 (evidence that party had "instigated and pushed" the prosecution-supported claim that outside forces were "able to prevail upon the Department of Justice to institute a prosecution that [otherwise] would not have been undertaken"). Perhaps the prototypical example of vindictive prosecution is based on a desire to punish the defendant when a prosecution is based on a personal stake or interest. *Velsicol*, 498 F. Supp. at

1265 (dismissing a vindictive prosecution based on government's "institutional stake" in discouraging third-party conduct and avoiding "contempt for federal law enforcement"); *Collins v. Jones*, 2015 WL 790055, at *11 (E.D. Pa. Feb. 24, 2015) (vindictive prosecution includes charges "motivated by the prosecutor's personal stake in the outcome of a case" (quoting *United States v. Pittman*, 642 F.3d 583, 586 (7th Cir. 2011)).

The record is laden with evidence that Mr. Biden is defending himself against these charges because of self-serving and vindictive motives ranging from a desire to punish him and others for engaging in constitutionally protected speech and political activity to influencing elections, avoiding scrutiny and criticism, and other interests unrelated to the fair administration of justice. Mr. Trump's animus, for example, is beyond question, and he is happy to substitute it for due process. Indeed, while Mr. Trump rails against his own treatment at the hands of justice, he promises to use the same methods to exact his revenge if he ever returns to office.[101] Such threats clearly evince vindictive motive. *Velsicol*, 498 F. Supp. at 1266 ("[I]n addition to mere appearances, this proceeding involves an explicit threat, the gravamen of which is an intent to retaliate . . . .").

Mr. Trump's supporters and other opponents of the Bidens have their own animus and influence over DOJ, and they are actively targeting Mr. Biden based on his familial and political affiliations and to seek retribution for actions taken by the Administration and democratic party. These officials are not doing so in secret—they are publicly calling on DOJ to target Mr. Biden, remonstrating DOJ for reaching a plea deal and claiming credit for derailing it, and pressuring DOJ

---

[101] Isaac Arnsdorf et al., *Trump And Allies Plot Revenge, Justice Department Control In A Second Term*, Wash. Post (Nov. 6, 2023), https://www.washingtonpost.com/politics/2023/11/05/trump-revenge-second-term/ ("In public, Trump has vowed to appoint a special prosecutor to 'go after' President Biden and his family. The former president has frequently made corruption accusations against them that are not supported by available evidence.").

into prosecuting charges it initially found unwarranted.  And Mr. Weiss is capitulating.  Cases where a defendant can show actual vindictiveness without discovery may be few and far between, but this is surely one.

Even if there were no evidence of actual vindictiveness, a presumption of vindictiveness clearly rises from the facts of this case.  Often, such a presumption arises after a defendant successfully challenges a conviction and the prosecution responds by bringing additional or more severe charges.  *United States v. Goodwin*, 457 U.S. 368, 381 (1982).  But a presumption of vindictiveness may also exist in the pretrial context where, as here, the prosecution's actions create "the apprehension or appearance of prosecutorial vindictiveness," *Velsicol*, 498 F. Supp. at 1264, such as when the prosecution "ups the ante" without legitimate purpose.  *Id.* at 1263 ("[T]he [] prosecutorial vindictiveness doctrine prohibits the prosecutor from acting out of an actual retaliatory motivation or acting in a manner which instills in defendant an 'apprehension' of retaliatory motivation." (quoting *Blackledge v. Perry*, 417 U.S. 21, 28 (1974)).

DOJ obtained the facts underlying this case years ago and was satisfied the case did not warrant prosecution.  It was then planning to avoid charges altogether until IRS whistleblowers went public, generating Republican fervor, and Mr. Weiss suddenly demanded that Mr. Biden plead guilty to misdemeanor tax charges and a diversion agreement on the gun charge.  Then, after agreeing to defer the gun charge as part of the Diversion Agreement, DOJ upped the ante again when that Agreement and the Plea Agreement were criticized by bringing additional felony gun charges for the same conduct immunized by the Diversion Agreement.  *See id.* at 1265 (vindictive prosecution where charges brought to avoid a "problem" the government feared would "breed contempt for federal law enforcement").  And just last week, DOJ upped that ante one more time

by turning a two-page, two count late filing/paying information into a *fifty-six page, nine count* tax indictment (which members of Congress again admit they pressured the agency into bringing).[102]

These facts fit comfortably in the mold identified by the courts as supporting an appearance of vindictiveness that violates due process.  The cases that have found this have relied on two key factors present here: (1) suspicious timing of charging decisions (e.g., delay in bringing charges and proximity to event that appears to have triggered decision) and (2) absence of any obvious legitimate explanation for the action.  In *North Carolina v. Pearce*, for example, the Supreme Court explained that imposing a sentence to punish the exercise of legal rights is unconstitutional, and "since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right, . . . due process also requires that a defendant be freed of apprehension of such a retaliatory motivation . . . . "  395 U.S. 711, 725 (1969).  The Court extended the "prophylactic rule of *Pearce*" to prosecutorial charging decisions in *Blackledge v. Perry*, noting that it "would clearly be a different case if the State had shown that it was impossible to proceed on the more serious charge at the outset . . . ."  417 U.S. 21, 29 n.7 (1974).  Here, no new facts came to light after the prosecution executed the diversion agreement and proposed the plea agreement, it was simply political pressure that drove the prosecution's decision to renounce the Diversion Agreement and add charges.

Here, DOJ did over what it believed it had already done correctly, simply because Republicans pressured the agency into being more hostile to Mr. Biden before the election.  Mr. Weiss was subject to blistering political criticism and, there is no avoiding the appearance that he

---

[102] *United States v. Biden*, No. 2:23-cr-00599-MCS, Dkt. 1 (C.D Cal. Dec. 7, 2023); Chris Stein, *Top House Republican Takes Credit For New Charges Against Hunter Biden*, The Guardian (Dec. 8, 2023), https://www.theguardian.com/us-news/live/2023/dec/08/hunter-biden-indictment-new-charges-republicans-trump-politics-latest-updates?page=with:block-657350a48f08c64a67374406.

caved to this improper pressure.  This fits the definition of vindictiveness.  He upped the ante now

three times in response to those directing animus at Mr. Biden and a desire to punish him and his

family for lawful and constitutionally protected political activity.  The timing of these acts and the

fact that they were not based on new facts or circumstances create an objective appearance of

vindictiveness.  As the court explained in *Velsicol*:

> When, as in this case, the government chooses not to lodge charges for a period of time
> and then makes the decision to prosecute so close after a defendant elects to exercise his
> rights in the face of prosecution opposition, apparent vindictiveness is clearly established.
> Indeed, the question of the delay and the timing of the present indictment is crucial.
>
> . . . The present *Velsicol* indictment alleges criminal conduct completed by 1976 . . . [and
> the] basis of proof and evidence were materials in the government's possession since
> February 1978, at the latest . . . .  On the basis of these facts the Court finds that defendants
> have made a strong prima facie showing of prosecutorial vindictiveness, or 'apparent
> vindictiveness,' based on the delay prior to the return of this indictment . . . .  The Court
> must conclude that the government had the necessary evidence several months before
> filing new charges, but it chose to purse the charges only when Velsicol pled nolo to the
> misdemeanor information.

498 F. Supp. at 1264–65; *see also United States v. Jamison* 505 F.2d 407, 413, 417 (D.C. Cir.

1974) ("[A] charge increase might in some circumstances be justified by intervening events or by

new evidence of which the government was excusably unaware at the time of the first indictment.

. . . [But] [s]ince this record is devoid of any illumination of the reasons why the first degree murder

charge was brought, we can only conclude that the reindictment of appellants for first degree

murder denied them due process and that their convictions of that charge cannot stand.").  This

Court's sister court has done the same.  *See United States v. Korey*, 614 F. Supp. 2d 573, 584–86

(W.D. Pa. 2009) ("The government has identified no new evidence, no new witnesses, and no

change in the law to support this charge . . . The government's failure to provide an explanation for "upping the ante" only lends support to defendant's claim of vindictiveness.").[103]

As discussed, while many vindictive prosecution cases involve retaliation for specific actions by the defendant, the crux of the doctrine is that prosecutors upped the ante after having exercised their prosecutorial discretion in response to improper motive. In all of these cases, that inference arose because (1) the timing of the charging decision was suspect and (2) there was no change in circumstances or other reasonable explanation to explain the change in position. The same is true here, and this supports applying a presumption of vindictiveness in this case. DOJ did not bring charges based on newly discovered evidence; it had the information for years (far longer than the delay of months that created the appearance of vindictiveness in several of the cases). DOJ then upped the ante from deferred prosecution to a guilty plea, and then again by withdrawing the deal entirely—both in direct response to political blowback. This is also not a case where "the government is 'excusably unaware' of new evidence supporting the subsequent charge[s]," *Velsicol*, 498 F. Supp. at 1265, or a "change in the law to support this charge." *Korey*, 614 F. Supp. 2d 573, 584–86. To the contrary, the only relevant change in circumstances between DOJ's assessment that prosecution was not warranted and its decision to bring charges was a ruling by the Fifth Circuit that found the statute *unconstitutional*. That should have further dampened the prosecution's appetite to charge this case.

---

[103] As have the Ninth, Fifth, and Tenth Circuits. *United States v. Ruesga-Martinez*, 534 F.2d 1367, 1369 n.2, 1370 (9th Cir. 1976); *United States v. Ruesga-Martinez*, 534 F.2d 1367, 1369 n.2, 1370 (9th Cir. 1976); *United States v. Groves*, 571 F.2d 450, 453 (9th Cir. 1978); *United States v. DeMarco*, 550 F.2d 1224, 1226–27 (9th Cir. 1977); *United States v. Alvarado-Sandoval*, 557 F.2d 645, 646 (9th Cir. 1977); *Miracle v. Estelle*, 592 F.2d 1269, 1277 (5th Cir. 1979); *United States v. Wood*, 36 F.3d 945, 947 (10th Cir. 1994).

The prosecution cannot rebut the clear presumption that this Indictment is the product of a changes in action caused by extraneous considerations that include who Mr. Biden is, who he is related to, and his political affiliations.  These charges would not otherwise be brought against him, just as they are not brought against millions of other similarly situated Americans and just as DOJ implicitly acknowledged when it chose not to prosecute him sooner.  Mr. Biden is not being prosecuted for any sin that DOJ believes he has committed.  He is being punished for the perceived sins of his father—the sin of opposing Mr. Trump's election to the presidency.

## III.  THE PROSECUTION OF MR. BIDEN VIOLATES SEPARATION OF POWERS

On July 26, 2023, this Court, noting that "the executive branch has the discretion to bring charges," asked the parties to address the "constitutionality" of the role the proposed agreement contemplated for the Court.  (July 26, 2023 Tr. 98: 9-14.)  While the agreement did not contemplate an improper judicial role (which the parties would have explained if DOJ had not succumbed to political pressure and scraped the deal), the Court was right to respect separation of powers and the integrity of the Executive Branch.  The Legislative Branch, however, has failed to do so.[104]

"[T]he separation of powers has long been recognized as part of the federal constitutional system." *Mardis*, 670 F. Supp. 2d at 699.  As the Supreme Court explained, "the persons intrusted with power in any one [branch of government] shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn v. Thompson,* 103 U.S. 168, 190–91, 26 L. Ed. 377 (1880).  "[T]he doctrine of separation of powers remains a vital and important limitation on government—a limitation the courts have readily enforced." *Mardis*, 670 F. Supp. 2d at 700; *see INS v. Chadha,* 462 U.S. 919, 951 (1983) ("The hydraulic pressure inherent

---

[104] *See supra* Section I.V. (discussing DOJ's longstanding policy regarding separation of powers).

within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."); *Morrison v. Olson,* 487 U.S. 654, 693 (1988) ("We have not hesitated to invalidate provisions of law which violate this principle."); *New York v. United States,* 505 U.S. 144, 181 (1992) ("[T]he separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch . . . .").

"The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York*, 505 U.S. at 182. That has occurred here. Prosecutorial discretion "stems from the Constitution's delegation of 'take Care' duties, U.S. Const. art. II, § 3, . . . to the Executive Branch." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (citations omitted). Yet, Congress is interfering with the executive function and DOJ is capitulating rather than fulfilling its obligation to maintain independence when exercising its prosecutorial discretion.

In fact, this exact situation was predicted by the Supreme Court in the context of congressional interference with State government. The Court observed that "it is likely to be in the political interest of each individual official to avoid being held accountable to the voters," and so "[i]f a federal official is faced with the alternatives of" making a choice with potential political consequences, "or directing [another branch] to do it, the official may well prefer the latter, as a means of shifting responsibility for the eventual decision." *New York*, 505 U.S. at 182–83. "The interests of public officials thus may not coincide with the Constitution's intergovernmental allocation of authority." *Id.* at 183. The Court explained why the judiciary must guard against this outcome:

> Some truths are so basic that, like the air around us, they are easily overlooked.  Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form.  The result may appear "formalistic" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity.  But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.  The shortage of disposal sites for radioactive waste is a pressing national problem, but a judiciary that licensed extraconstitutional government with each issue of comparable gravity would, in the long run, be far worse.

*Id.* at 187–88.

And it does not matter that DOJ has acquiesced—"The constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States."  *Id.* 505 U.S. at 182; *see also Boumediene v. Bush,* 553 U.S. 723, 742 (2008) ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches."); *see also* Sara Sun Beale, Rethinking the Identity and Role of United States Attorneys, 6 Ohio St. J. Crim. L. 369, 416, 435-38 (2009) (advocating for regulation of contact between DOJ and "political actors"); *see generally* James Eisenstein, The U.S. Attorney Firings of 2006: Main Justice's Centralization Efforts in Historical Context, 31 Seattle U. L. Rev. 219 (2008) (providing historical commentary on the role of politics in the appointment process of U.S. Attorneys and noting a broad consensus that DOJ prosecutors should conduct their work in a manner divorced from partisanship and ideology).  A violation of separation of powers warrants the dismissal of the Indictment.  *See, e.g.*, *Collins v. Yellin*, 141 S. Ct. 1761, 1780 (2021) ("As we have explained on many prior occasions, the separation of powers is designed to preserve the liberty of all the people. So whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge"); *Sheila Law LLC v. Consumer Fin. Protec. Bureau*, 140 S. Ct. 2183,

2196 (2020) (defendant could challenge enforcement action where agency lacked authority under the Appointments Clause); *Bond v. United States*, 564 U.S. 211, 220 (2011) (defendant could challenge indictment on federalism grounds).

"In considering whether the doctrine of separation of powers has been violated, the courts are called upon to apply a sophisticated system of checks and balances designed to safeguard the structural integrity of a tripartite government." *Mardis*, 670 F. Supp. 2d at 700. In *Mardis*, the Sixth Circuit affirmed, on the facts of that case, a ruling by the Western District of Tennessee that efforts by a member of Congress to influence DOJ's charging decisions did not breach separation of powers. The Court explained that "[b]ecause the object of the doctrine is nothing less than the preservation of political liberty, courts must not easily dismiss concerns that one branch of government has impermissibly encroached upon or diminished the powers of another." *Id.* However, the Court explained that "[g]enerally, informal legislative pressuring of the executive for certain action—particularly from a lone legislator—does not itself result in any assumption of executive power or in legislative domination of the executive." *Id.* at 702; ("[L]imitations on contact by members of Congress typically arise from the Administrative Procedure Act or the requirements of due process rather than from concerns specific to the Constitution's separation of powers."). But while the court agreed that public officials "may cajole, and exhort with respect to the administration of a federal statute," separation of powers are violated when those efforts "result in an[] assumption of executive power or in legislative domination of the executive." *Id.* As an example, the court noted that the Supreme Court considers bills of attainder, where Congress seeks "to compel a certain result or seeking to directly impose a punishment or penalty" "implicates separation of powers." *Id.* at 705, n.6 (citing *United States v. Brown*, 381 U.S. 437, 442-47 (1965)). However, the court determined that, in that case, "[t]he allegations against Congressman Cohen

57

amount to nothing more than contentions that he 'cajoled' or 'exhorted' the executive to seek federal charges against Defendant."  *Id.* at 704.

Here, however, the scale tips the other way.  A lone congressman is not just cajoling and exhorting.  Many members of Congress, including the last Speaker of the House, Chairman of the House Oversight Committee, Chairman of the House Judiciary Committee, and the Chairman of the Ways & Means Committee are actively interfering with DOJ's investigation, using their authority to pressure and malign DOJ, and using congressional committees limited to investigating government agencies to conduct a criminal investigation of private conduct by a private citizen— one they are conducting based on a publicly stated presumption of guilt.  They have gone as far as releasing agents' entire investigative file during the investigation.  Their actions have overcome Special Counsel Weiss's independent judgment, causing him to abandon the very resolution of this case that he proposed prior to their pressure.  As noted above, these Republican House Members have publicly claimed credit for causing Special Counsel Weiss to cave under their pressure.  S*ee supra* Section IV (discussing congressional interference).[105]  There was no such evidence in *Mardis.*

Finally, it is notable that by succumbing to congressional influence, DOJ is violating its own policies as well as being party to a Hatch Act violation.  *See supra* Section V (discussing longstanding DOJ policy against congressional interference).  As DOJ explains on its website:

---

[105] Because the Congress and DOJ are both part of the United States Government which prosecutes a criminal defendant, there is "no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm." *Delaney v. United States*, 199 F.2d 107, 114 (1st Cir. 1952). "Pretrial publicity originating in Congress, therefore, can be attributed to the Government as a whole and can require postponement or other modification of the prosecution on due process grounds." 10 *Opinions Of The Office Of Legal Counsel Of The United States Department Of Justice* 77 (1993) (April 28, 1986, Statement of Charles J. Cooper, Deputy Asst. Att'y Gen., Off. of Legal Counsel).

All Department of Justice employees are subject to the Hatch Act, 5 U.S.C. 7323(a) and 7324(a), which generally prohibits Department employees from engaging in partisan political activity while on duty, in a federal facility or using federal property.  Political activity is activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group.

"Further restricted" employees are held to stricter rules [and] . . . may not campaign for or against candidates or otherwise engage in political activity in concert with a political party, a candidate for partisan political office, or a partisan political group.  Considering the Department's mission, it has been determined that, as a matter of Department policy, all political appointees will be subject to the rules that govern "further restricted" employees under the Hatch Act *to ensure there is not an appearance that politics plays any part in the Department's day to day operations*.[106]

*See also* Aug. 30, 2022 Memorandum For All Department of Justice Career Employees[107] ("The public trusts that we will enforce the laws of the United States in a neutral and impartial manner, without the actual or apparent influence of political agendas."); Aug. 30, 2022 Memorandum For All Department of Justice Non-career Employees[108] ("In fulfilling this responsibility, we must do all we can to maintain public trust and ensure that politics—both in fact and appearance—does not compromise or affect the integrity of our work. . . I know you agree it is critical that we hold ourselves to the highest ethical standards to avoid even the appearance of political influence as we carry out the Department's mission.").

This Court was careful in considering the plea agreement to respect DOJ's autonomy and discretion, but the Court must not let judicial perfection be the enemy of the good.  The prosecution's conduct here "render[s] the interest in noninterference with prosecutorial discretion

---

[106] DOJ, Departmental Ethics Off., *Political Activities: Permitted and Prohibited Activities* (Apr. 28, 2023), https://www.justice.gov/jmd/political-activities# (emphasis added).

[107] Memorandum from Assistant Att'y Gen. for Admin. Jolene Ann Lauria on Restrictions on Political Activities to All Dep't. of Just. Career Employees (Aug. 30, 2022), https://www.justice.gov/jmd/file/834486/dl.

[108] Memorandum from Assistant Att'y Gen. for Admin. Jolene Ann Lauria on Restrictions on Political Activities to All Dep't. of Just. Non-Career Employees (Aug. 30, 2022), https://www.justice.gov/media/1100636/dl?inline.

minimal and subordinate to [Mr. Biden's] right to noninterference with his" constitutional liberties. *Estelle*, 592 F.2d at 1277; *see also Haggerty*, 528 F. Supp. at 1293 ("[T]he government's failure to follow its normal prosecutorial procedures mandates stricter judicial scrutiny of the prosecution."); *Falk*, 479 F.2d at 624 ("[T]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government."). Congress has intruded on the executive function to an extent that only dismissal of these charges can cure, and DOJ has abdicated its responsibility and pledge to prevent it from doing so. The Court should not hesitate to step in and safeguard Mr. Biden's rights, the independence of purity of government, and the integrity of the justice system.

## CONCLUSION

"[O]ur society is not bettered by law enforcement that. . . is not conducted in a spirit of fairness or good faith." *Banks*, 383 F. Supp. at 397. This prosecution falls in that category, and the Court should dismiss the indictment.[109]

Dated: December 11, 2023

/s/ *Abbe David Lowell*
Abbe David Lowell
Christopher D. Man
Kyllan J. Gilmore
WINSTON & STRAWN
1901 L Street NW
Washington, DC 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street

---

[109] As stated through this and the other motions to dismiss, the record available to the Court supporting dismissal is extraordinary. Were there to be any doubt at all, the basis for discovery and an evidentiary hearing has well been established.

Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

*Counsel for Robert Hunter Biden*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of December, 2023, I filed the foregoing Motion to Dismiss the Indictment with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ *Abbe David Lowell*
Abbe David Lowell

*Counsel for Robert Hunter Biden*