## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 23-00061-MN |
| ROBERT HUNTER BIDEN, | ) | |
| | ) | |
| *Defendant*. | ) | |

### THE UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION
### TO DISMISS FOR SELECTIVE AND VINDICTIVE PROSECUTION
### AND BREACH OF SEPARATION OF POWERS

The United States respectfully opposes defendant Robert Hunter Biden's motion to dismiss for selective and vindictive prosecution and breach of separation of powers. *See* ECF 63. His motion is meritless and should be denied for the following reasons.

***First***, the defendant contends that the indictment returned in this matter by a grand jury on September 14, 2023, is a selective prosecution by the United States Department of Justice. Without any evidentiary support, much less *clear evidence* as his burden requires, *see* Section II.A., the defendant claims the Executive Branch selectively brought charges against him "because Mr. Biden is politically affiliated with his father, the sitting President and a candidate for reelection . . . " ECF 63 at 23. Yet he produces no evidence to support his allegation that the Executive Branch, led by his father, President Biden, and its Justice Department, led by the Attorney General appointed by his father, authorized prosecution by the U.S. Attorney and Special Counsel of their choosing for an "improper political purpose." ECF 63 at 26.

The defendant must prove by clear evidence both "discriminatory effect" and "discriminatory purpose" to support his selective prosecution claim. *United States v. Armstrong,* 517 U.S. 456, 464 (1996). The defendant fails to prove *discriminatory effect* because he did not identify a similarly situated person who has not been prosecuted for the same crimes with which

he is charged in the indictment.  *See* Section II.B.  Further, he did not establish *discriminatory purpose* because none of the politicians he reads on "Truth Social" approved the indictment, and tweets by political opponents of the President did not cause current Executive Branch officials to seek an indictment against the President's son.  *See* Section II.C.  Such claims are implausible.

Missing from his motion is an earnest attempt to identify a similarly situated person, as his burden requires.  As explained below, *see* Section I.A., the strength of the evidence against him is overwhelming and distinguishable from any other person who was not prosecuted for similar crimes.  *After* the defendant's then-girlfriend discovered and discarded his gun, and *after* he became aware that local authorities had seized his gun, speed loader, and ammunition, and *after* the defendant announced his awareness of a federal investigation of him in 2020, the defendant *chose* to author and sell a book in 2021 in which he made countless incriminating statements about his years-long drug usage, including during the time period he purchased and possessed the gun.  He recounted his interaction with a drug dealer who pointed a gun at him during a drug deal before he decided to buy his own gun.  Investigators also obtained messages from his Apple iCloud account in which he discussed buying thousands of dollars' worth of crack while also taking videos of himself weighing crack and smoking it.  Furthermore, a chemist was able to confirm the presence of cocaine residue on the brown leather pouch in which defendant stored his firearm.  The evidence against him does not end there.

The charges in this case are not trumped up or because of former President Trump—they are instead a result of the defendant's own choices and were brought *in spite of*, not because of, any outside noise made by politicians.  *See* Section II.C.  The defendant cannot prevail on his selective prosecution claim because he does not identify any individual who chose to make

similar choices as him who was not prosecuted, and he cannot establish any link between statements of politicians and a discriminatory purpose by current DOJ officials.

**Second**, the defendant's *vindictive prosecution* claim argues that prosecutors acted with actual animus or were "prevailed upon to bring the charges by another with animus." ECF 63 at 48. This claim borders on the absurd and his argument can be summed up as follows: David C. Weiss, an experienced prosecutor who served as U.S. Attorney during the Obama-Biden Administration,[1] was nominated by President Trump to remain U.S. Attorney in 2018 because he was his "stalking horse," as alleged in the *Koh* case relied on by the defendant, and could be forced to bring charges at the behest of President Trump. ECF 63 at 47. Even though the defendant had not yet committed his gun crimes, somehow President Trump predicted that the defendant would, believed that Mr. Weiss was the best candidate to be his "stalking horse," and also foresaw that he would lose the election but could force Mr. Weiss to file unlawful charges later. Ignoring what the defendant refers to as telltale signs of vindictiveness during the investigation, *see* ECF 63 at 52, President Biden asked Mr. Weiss to stay on as his U.S. Attorney, according to the defendant. Further ignoring the supposedly obvious vindictiveness, the Attorney General then appointed Mr. Weiss to serve as Special Counsel. All the while, according to the defendant, Mr. Weiss, was ready to "capitulat[e]" whenever former President Trump or politicians tweeted or posted on a website called "Truth Social." ECF 63 at 50. Next, according to the defendant, Mr. Weiss convinced the Executive Branch to authorize him and his rogue prosecutors to vindictively charge the son of the sitting President of the United States.

Stripped of its bluster, the defendant's theory of vindictiveness is simply not credible.

---

[1] After Mr. Weiss served as Acting U.S. Attorney, then Attorney General Eric Holder appointed Mr. Weiss to serve as U.S. Attorney pursuant to 28 U.S.C. § 546(a). Once his term expired, this Court reappointed Mr. Weiss as U.S. Attorney pursuant to 28 U.S.C. § 546(d).

Left with the inconvenient truth of trying to explain how this could happen during the Biden Administration, the defendant suggests that evil motives are lurking deep within the Department of Justice and "[h]e is being punished for the perceived sins of his father—the sin of opposing Mr. Trump's election to the presidency." ECF 63 at 54. The defendant's conspiracy theory is not the "evidence on steroids," ECF 63 at 1, he contends it is. Contrary to his assertion, he has not established that the Special Counsel, appointed by and serving at the pleasure of President Biden and his Attorney General, is punishing the defendant "for the perceived sins of his father" in order to capitulate to a former President because of his tweets. *Id.* at 54. This theory is a fiction designed for a Hollywood script. In reality, and as discussed in Section II.D., the law requires his claim be supported by evidence of actual vindictiveness in response to a defendant exercising a legal right, or by demonstrating circumstances that reveal a *sufficient likelihood* of vindictiveness to warrant a rebuttable presumption. *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). Since the defendant fails to identify a legal right that *he* exercised that caused the DOJ to purportedly charge him vindictively, and he fails to prove animus by the actual DOJ officials involved in his indictment, his claim fails on its face.

**Third**, in his final argument, he proclaims that "the Court must not let judicial perfection be the enemy of the good," ECF 63 at 59, and demands that the Court invalidate the decision-making of the Executive Branch about who it should prosecute, a core executive function, to protect "the separation of powers." *See* Section II.E. According to the defendant's logic, the Judiciary should violate the separation of powers, just like he claims the Legislative Branch has done, to protect the Executive Branch from its own decision-making. Among the problems with this novel argument is that it has no basis in law or fact, and it should be denied.

The defendant's motion should be denied in its entirety.

4

## I.    FACTUAL BACKGROUND

In a selective prosecution claim, a defendant must establish by clear evidence that similarly situated individuals were *not* prosecuted.  As discussed *infra* at II.A, a similarly situated individual is someone who committed the same crime in substantially the same manner as the defendant and against whom the evidence was as strong or stronger than that against the defendant.  In his "Factual Background" section under the heading "Mr. Biden's Gun Purchase," the defendant devotes less than two sentences to discussing facts of the gun case, stating only that the defendant "bought a small firearm that he owned for a mere 11 days, never loaded, and never fired.  The gun was discarded and then discovered and investigated by local police . . ." ECF 63 at 5.  Because his recitation of the evidence is woefully insufficient for a comparative analysis of a similarly situated individual, the government provides the following facts.

### A.    Hunter Biden Chooses to Purchase a Gun

On October 12, 2018, the defendant entered a gun store in Wilmington, Delaware.  After surveying the inventory of guns and weapons that the store had available for purchase, the defendant chose to purchase the following items, among others:

- A Colt Cobra 38SPL revolver with serial number RA 551363 (left photo);

- An HKS Speedloader for a .38 special revolver (center photo), which, as the name suggests, is an accessory to enable the gun user to rapidly reload it by loading multiple chambers of the revolver simultaneously); and,

- 25 cartridges of Hornady "American Gunner" ammunition (right photo).

  

The gun store possessed a federal firearms license and was authorized to sell guns. ECF 40 at ¶ 1. To purchase a gun, a purchaser is required to fill out background check paperwork, including an ATF Form 4473. ECF 40 at ¶ 3. The defendant completed the form, filling out basic information such as his name, address, birthdate, and social security number. When asked whether he was an unlawful user of, or addicted to, any depressant, stimulant, or narcotic drug, or any other controlled substance, the defendant answered, "no." ECF 40 at ¶ 7.

Had he answered "yes," the gun store could not have sold him a gun. After answering additional questions, the defendant certified that his answers were true, correct, and complete, and that he understood that making any false written statement on the form was a crime punishable by a felony under federal law. ECF 40 at ¶ 4, 7. He acknowledged that he could not have received a firearm if his answer had been "yes" to the question about whether he was an addict or unlawful user of controlled substances. *Id.* He signed and dated his form, below.

I certify that my answers in Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.i and/or 12.b. through 12.c. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 12.d.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 12.d.2. and provides the documentation required in 18.c. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of Federal law. *(See Instructions for Question 14.)*

| 14. Transferee's/Buyer's Signature | 15. Certification Date |
| | 10 · 12 · 18 |

**Section B - Must Be Completed By Transferor/Seller**

| 16. Type of firearm(s) to be transferred *(check or mark all that apply)*: | 17. If transfer is at a qualifying gun show or event: |
| ☒ Handgun   ☐ Long Gun *(rifles or shotguns)*   ☐ Other Firearm *(frame, receiver, etc. See Instructions for Question 16.)* | Name of Function: _____ |
| | City State: |

After presenting his U.S. Passport to verify his identity, the defendant paid $900 in cash to cover the $886.81 purchase price, received his change, and left the gun store with a new gun, speed loader, ammunition, and other items.

**B.      Hunter Biden's Girlfriend Discovers and Discards the Gun**

Eleven days later, on October 23, 2018, the defendant's then-girlfriend discovered the defendant's gun in his open, unlocked vehicle (that had its windows down) inside his brown leather pouch along with a box of ammunition and speed loader.  She discarded these items in a trash can behind a grocery store in Wilmington, Delaware.  The defendant's gun, speed loader, 23 rounds of ammunition, and brown leather pouch were found by an elderly man who routinely collected recyclables from trash cans in the area.  The police later obtained the gun case from the defendant and obtained the defendant's gun, the ammunition contained in the ammo box, speed loader, and brown leather pouch from the older man.  These items were placed in an evidence vault by state authorities and no charges were brought at that time.

**C.      While Investigating the Defendant for Tax Violations, Investigators Obtained Evidence Showing His Prior Gun Purchase Was Illegal Because He Was Addicted to Controlled Substances**

In August 2019, IRS and FBI investigators obtained a search warrant for tax violations for the defendant's Apple iCloud account.[2]  In response to that warrant, in September 2019, Apple produced backups of data from various of the defendant's electronic devices that he had backed up to his iCloud account.[3]  Investigators also later came into possession of the defendant's Apple MacBook Pro, which he had left at a computer store.  A search warrant was also obtained for his laptop and the results of the search were largely duplicative of information investigators had already obtained from Apple.[4]  Law enforcement also later obtained a search

---

[2] District of Delaware Case No. 19-234M and a follow up search warrant, District of Delaware Case Number 20-165M.

[3] The electronic evidence referenced in this section was produced to the defendant in discovery in advance of the deadline to file motions.

[4] District of Delaware Case No. 19-309M.

warrant to search the defendant's electronic evidence for evidence of federal firearms violations and to seize such data.[5]  The searches revealed incriminating evidence, including evidence of the defendant's addiction to controlled substances and his possession of the firearm, such as:

- Prior to October 12, 2018 (the date of the gun purchase), the defendant took photos of crack cocaine and drug paraphernalia on his phone.

- Also prior to his gun purchase, the defendant routinely sent messages about purchasing drugs.

- On October 13, 2018, and October 14, 2018 (the day after and two days after he purchased the firearm), the defendant messaged his girlfriend about meeting a drug dealer and smoking crack.  For example, on October 13, 2018, the defendant messaged her and stated, ". . . I'm now off MD Av behind blue rocks stadium waiting for a dealer named Mookie." The next day, the defendant messaged her and stated, "I was sleeping on a car smoking crack on 4th street and Rodney."

- On October 23, 2018 (the day his then-girlfriend discarded his firearm), the defendant messaged his girlfriend and asked, "Did you take that from me [girlfriend]?"  Later that evening, after his interactions with law enforcement, he messaged her about the "[t]he fucking FBI" and asked her, "so what's my fault here [girlfriend] that you speak of.  Owning a gun that's in a locked car hidden on another property?  You say I invade your privacy.  What more can I do than come back to you to try again.  And you do this????  Who in their right mind would trust you would help me get sober."  In response, the girlfriend stated "I'm sorry, I just want you safe.  That was not safe.  And it was open unlocked and windows down and the kids search your car.  You have lost your mind hunter.  I'm sorry I handled it poorly today but you are in huge denial about yourself and about that reality that I just want you safe.  You run away like a child and blame me for your shit . . ."

- After the firearm was taken from him and recovered by police, the defendant continued to send messages to various people about his use of drugs, including telling his girlfriend that he is an "addict" on November 8, 2018, and on November 21, 2018, telling Person 1, ". . . I'm a fucking better man than any man you know whether I'm smoking crack or not."  He also continued to send messages about purchasing drugs.  He sent a message to his girlfriend on November 29, 2018, stating, in relevant part, "I DONT BLAME MY ADDICTION ON YOU . . ." and another message to Person 2 on December 18, 2018, acknowledging that he is "an addict."  On December 28, 2018, he

---

[5] District of Delaware Case No. 23-507M.

                messaged Person 2 stating, "I'll fuxking [sic] get sober when I want to get fucking sober."

-    During November and December 2018, the defendant took multiple photographs of videos apparent cocaine, crack cocaine, and drug paraphernalia.

These episodes of persistent drug usage, documented by the defendant, in the immediate time frame before, during, and after his possession of the gun were evidence that he lied during the background check and unlawfully possessed the gun in October 2018.

### D.    The Defendant Released a Book in 2021 in which the Defendant Made Incriminating Statements that Implicate Him Further in Prior Gun Crimes

After the defendant publicly announced his awareness of a federal investigation of him in late 2020, *see* ECF 63 at 5, the following year (2021) he chose to author, sell and promote his memoir, *Beautiful Things*, and to release an audiobook in a lucrative book deal. Relevant to the charges in this matter, the defendant made expansive admissions about his extensive and persistent drug use, including throughout the year 2018 when he purchased the gun.

For example, the defendant admitted that he was experiencing "full blown addiction" to crack cocaine and by the fall of 2018 he had gotten to the point that:

> It was me and a crack pipe in a Super 8, not knowing which the fuck way was up. All my energy revolved around smoking drugs and making arrangements to buy drugs—feeding the beast. To facilitate it, I resurrected the same sleep schedule I'd kept in L.A.: never. There was hardly any mistaking me now for a so-called respectable citizen. Crack is a great leveler.

Hunter Biden, *Beautiful Things* (2021) at 203, 208.

The defendant described that his "superpower" was "finding crack anytime, anywhere." *Id.* at 187. The defendant further recounted his "five-month self-exile in Los-Angeles" beginning in the Spring of 2018 and wrote, "the amount of alcohol I consumed and crack I smoked was astounding – even death defying." *Id.* at 189-91. He smoked "every crumb of crack [he'd] brought." *Id.* 187. In 2018, he went through periods where he was "up 24 hours a day,

smoking every 15 minutes, 7 days a week." *Id.* 190.  He wrote in Chapter 10 of his memoir, "I returned [to the East Coast] that fall of 2018, after my most recent relapse in California, with the hope of getting clean through a new therapy . . .   Neither happened." *Id.* at 203.

The defendant admitted that he had "nearly four years of active addiction," *id.* at 220, that spans the time in October 2018 in which he is charged with illegally possessing the Colt .38 Special described in the indictment, all the while - as described in his book-he engaged in a wildly reckless, drug-fueled lifestyle.

In addition to his admissions about persistent drug usage, the defendant trivialized the dangerous encounters he faced while "buying and using without getting caught or hurt or killed during some random drug-buy mix-up. Walking into a park in a high-crime neighborhood to buy crack at 4 a.m. was no different than playing Russian roulette with two shells in the chamber. In some places, it was like playing with five shells—and still, I was willing to spin the chamber again and again." *Id.* at 158. The defendant explained how he would sometimes drive to "a vast homeless enclave" of pop-up tents and cardboard boxes that "was a dangerous place to visit" to buy crack. *Id.* at 187-89. One night, while looking for crack and stepping around people curled up on cardboard, the defendant pulled back the flap on a tent and, from the pitch black, saw a gun pointed at his face. *Id.* at 190.

Only a few months after this happened, on October 12, 2018, the defendant chose to buy his own gun, and during this period he continued to be addicted to crack.  Guns and drugs, of course, are a dangerous combination.

The defendant admitted to his callous disregard for human life when he described how, in "October 2016, [he] set out on a crack-fueled, cross-country odyssey." *Id.* at 155. After experiencing a "six-day bacchanal" with crack in Los Angeles during which time the defendant

10

"never slept," *id.* at 169, the defendant rented a car and headed out on I-10 for a 500-mile trip to a rehab center in Arizona. *Id.* at 170. While "speeding east" along the highway, the defendant nodded off and suddenly found himself "in midair, the car having jumped off a soft curb on the passing lane and soaring at eighty miles an hour, heading into a gulch that divided I-10." *Id.* at 171. After the car landed in the gulch, the defendant hit the gas and the "car spun into the westbound lanes—the same direction as the oncoming traffic." *Id.* at 171. "Miraculously, there was a gap in the traffic," and the car stopped in the emergency lane with four flat tires, "hissing and coughing." *Id.*

Accepting no responsibility for his criminal behavior, the defendant called the rental company and lied by telling them that someone had run him off the road. *Id.* at 172. The defendant then "climbed behind the wheel of another rental," *id.,* and continued his trip to Arizona. "To stay awake, [the defendant] chain-smoked crack and cigarettes," and "leaned into the bracing air whenever [he] felt himself nodding off. At some point, the crack lost its oomph, but [he] kept lighting up anyway, out of force of habit." *Id.* at 173. Then, not knowing "if it was real or a hallucination" the defendant began driving after an enormous barn owl in the "inky night" "through a series of tight, bounding switchbacks." *Id.* at 173-74. As the owl made "hairpin turns at full speed" the defendant tried to follow close behind the owl. *Id.* at 174. The defendant somehow made it to his destination alive, left to wonder how he had not "killed myself or anyone else after sailing over the highway" or how he had not spun off the mountainside while following a giant bird that he acknowledged was a possible "figment of [his] addled imagination." *Id.*[6]

---

[6] The defendant also explained how a Hertz employee cleaning out the car he drove found some paraphernalia and white-powder residue on an armrest. *Beautiful Things*, at 175.

The defendant's choice to sell a book containing these admissions not only made the government's case against him stronger, but also increased a potential prosecution's general deterrence value.

### E.     Cocaine Was Found on the Defendant's Brown Leather Gun Pouch

In 2023, FBI investigators pulled sealed evidence from the state police vault to take photographs of the defendant's firearm.  After opening the evidence, FBI investigators observed a white powdery substance on the defendant's brown leather pouch that had held the defendant's firearm in October 2018.  Based on their training and experience, investigators believed that this substance was likely cocaine and that this evidence would corroborate the messages that investigators had obtained which showed the defendant buying and using drugs in October 2018.  An FBI chemist subsequently analyzed the residue and determined that it was cocaine.  To be clear, investigators literally found drugs on the pouch where the defendant had kept his gun.

### F.     The Government Considered Pursuing All Charges in the Indictment prior to March 2022, and after the Hearing on July 23, 2023, the Government Continued to Negotiate a Pre-Indictment Resolution but, Oddly, the Defendant Insisted the Unapproved Diversion Agreement was Binding

The defendant's motion makes allegations of prosecutorial vindictiveness, personally attacking and ascribing illegal motives to the prosecutors who handled this matter and concluding by claiming that the prosecution was "not conducted in a spirit of fairness or good faith."  ECF 63 at 60.  Glaringly missing from his motion to the court are facts known to the defendant that directly refute his own claim, namely, written statements his counsel made to the government—both *before* and *after* the hearing on July 23, 2023.

During the course of discussions between counsel for the defendant and counsel for the government, in a letter dated **October 31, 2022**, from Mr. Biden's prior counsel to government counsel, the defense wrote:

12

Since December 2020, nearly all of our meetings, phone calls, and correspondence with your Office have related to the Government's investigation of Mr. Biden for possible *tax offenses*. It was not until a phone call in **March 2022**—over a year into our cooperative dialogue—that your Office disclosed a potential investigation of Mr. Biden for possible firearms offenses (the "Firearm Investigation"). (footnote)

Exhibit 1 (redacted and includes only relevant pages).

The footnote in the letter stated, "**Your Office informed us that the implicated Title 18 provisions are Sections 922(g)(3), 922(a)(6), and 924(a)(1)(A).**" *Id.* (emphasis added). The defense later released their letter to selected media outlets,[7] but the defendant did not include it in his materials filed with the Court in support of his motion to enforce the diversion agreement. The letter the defense sent in October 2022 shows that the defense was aware that the government was considering all of the charges later returned in the indictment*, see* Section I.G., as of March 2022. This directly refutes that the charges returned by the grand jury were the product of various statements by out-of-office politicians in 2023, as the defendant claims.

As is often the case in a pre-indictment negotiation, the parties negotiated a resolution that did not include all the potential charges that were being considered by the government. With respect to the defendant's gun purchase, the parties' negotiations resulted in a proposed diversion agreement (hereafter the "Diversion Agreement"), which is the subject of another motion and is discussed in the government's response.[8] That proposed agreement included a provision that the

---

[7] *See e.g.,* https://www.politico.com/news/2023/08/19/hunter-biden-plea-deal-collapse-00111974.

[8] Because the proposed Diversion Agreement is unambiguous, as conceded by the defendant in his motion (ECF 60 at p.9), the government did not attach additional communications to its response because parol evidence in that context is irrelevant and should not be considered under contract law. As it relates to this motion, the government simply notes that an examination of the selected materials included by the defendant in his motion show that the line prosecutor who engaged with defense counsel repeatedly indicated that her discussions were just that—discussions—and that the terms she discussed had not been approved by supervisors within the

defendant would waive indictment to a criminal information that charged the defendant with a violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(2).  ECF 24 at ¶ 3.

At the hearing on July 26, 2023, the United States in good faith tried to move forward with the resolutions, both the proposed Diversion Agreement and a separate proposed plea agreement in the tax case.  The Court deferred a decision on the two proposed agreements at the hearing, ordering further briefing if the parties intended to try to proceed with those draft agreements.  In ordering briefing, the Court stated, "I would like to understand why [Paragraph 15 of the proposed Diversion Agreement], *if you want to go forward*, is appropriate, and why I am not doing something that gets me outside of my lane in terms of my branch of government if I were to do what is being requested."  ECF 16 at 104-105.

Following the hearing, the government continued to negotiate in good-faith and sought to make changes to the agreements that addressed only specific issues identified during the hearing.  After the hearing on July 26, 2023, defense counsel asked to meet with the government and proposed changes to both documents on that same day.  *See* ECF 32 at p. 1-2.  The government

---

DOJ.  For example, in an email to defense counsel dated May 18, 2023, about "a *potential* non-trial resolution," Document 60-6 at p. 2, the AUSA stated, "As I said during our call, **the below list is preliminary in nature and subject to change.  We have not discussed or obtained approval for these terms**, but are presenting them in an attempt to advance our discussions about a **potential** non-trial resolution . . ."  The following week, in an email to defense counsel dated May 23, 2023, Document 60-9 at p. 3, the AUSA stated, "**As we indicated in our emails and discussions we did not have approval for a pre-trial diversion agreement.  As you know, that authority rests with the US Attorney who ultimately did not approve continued discussions for diversion related to the tax charges**."  In response to this email, defense counsel wrote, "Ok.  My client has asked that I speak to you further.  Are you able to speak?  I may have some slight flexibility."  Far from an agreement or an agency determination that these charges should not be brought, as the defense suggests in their briefing, these discussions merely indicate the parties were engaged in plea discussions at the line prosecutor level and the AUSA repeatedly disclosed that such discussions were subject to review and approval by the U.S. Attorney.  This is not "ludicrous and shameful behavior," ECF 63 at 14, as the defendant claims.

considered the Defendant's proposals but did not believe they were in the best interests of the United States and offered counterproposals on July 31, 2023.  *Id.*  The defendant rejected these counterproposals on August 7, 2023.  *Id.*  Instead, the defendant now insisted that the proposed Diversion Agreement bound both parties, thus effectively shutting down any further plea negotiations.  *See* ECF 27 at p.2.

Because no agreement was reached between the parties, and because the proposed Diversion Agreement had not entered into effect, the government prepared for an indictment as it would in any other case and considered the exact same charges it had previously considered in 2022 prior to plea negotiations, as confirmed by defendant's letter, Exhibit 1.

### G.    The Timing of the Indictment Was Not Based on Political Commentary, as the Defendant Suggests

Hunter Biden purchased the firearm on October 12, 2018, and possessed it until it was taken from him on October 23, 2018.  Accordingly, the statute of limitations related to firearms charges expired in October 2023.  Moreover, as the government stated to the Court previously*, see* ECF 37, the Speedy Trial Act required the Government to obtain the return of an indictment by September 29, 2023.  ECF 65.  After the defendant rejected the government's counterproposal on August 7, 2023, the government filed a status report on September 6, 2023, notifying the court and defense counsel of its intention to seek the return of an indictment by a grand jury before the end of the month.  ECF 37.

### H.    The Indictment Does Not Increase the Defendant's Sentencing Guidelines

A grand jury returned an indictment on September 14, 2023, which included charges for the offenses that the government had considered prior to the plea negotiations, *see* Exhibit 1, including:

| OFFENSE(S) & CITATION(S): | MAXIMUM PENALTY: |
|---|---|
| Count 1: False Statement in Purchase of a Firearm, Title 18, United States Code, Sections 922(a)(6) and 924(a)(2). | 10 years of imprisonment; a fine of $250,000; 3 years of supervised release; a special assessment of $100 |
| Count 2:  False Statement Related to Information Required to be Kept By Federal Firearms Licensed Dealer, Title 18, United States Code, Section 924(a)(1)(A). | 5 years of imprisonment; a fine of $250,000; 3 years of supervised release; a special assessment of $100 |
| Count 3: Possession of a Firearm by a Person who is an Unlawful User of or Addicted to a Controlled Substance, Title 18, United States Code, Sections 922(g)(3) and 924(a)(2) (2018). | 10 years of imprisonment; a fine of $250,000; 3 years of supervised release; a special assessment of $100 |

While the total maximum penalties for all counts increased from 10 to 25 years of imprisonment, no single charge in the indictment includes a greater maximum penalty than was included in the charge listed in the information.  Moreover, the government preliminarily estimates that the defendant's post-trial guidelines as determined under the United States Sentencing Guidelines are 15-21 months' imprisonment (offense level 14, criminal history I) under U.S.S.G. § 2K2.1 and will group together under U.S.S.G. § 3D1.2(d).  These guidelines are *the exact same* guidelines he faced if convicted after a trial on the single charge listed in the information.[9]

## II.    ARGUMENT

After claiming in the first paragraph of his motion that he has developed "evidence" from tweets, "Truth Social," and anonymous sources that "is on steroids," the defendant's motion is stunningly weak and wholly unsupported by facts and law.

---

[9] In the event the defendant is convicted and there is a sentencing hearing, the government reserves the right to consider additional facts, circumstances, issues, the calculation by the United States Probation Office, and other factors under 18 U.S.C.§ 3553(a) when considering the appropriate calculation of the United States Sentencing Guidelines and any recommendation.

In his primary argument regarding "selective prosecution," which consumes most of his filing, *see* ECF 63 at p. 26-47, the defendant simply ignores his burden of producing "clear evidence," which the government addresses below.  *See* Section II.A.  With respect to his "discriminatory effect" argument, he fails to identify any similarly situated individual as required by law, *see* Section II.B.1., and his reliance on statistical arguments is misplaced, *see* Section II.B.2.  In arguing that the DOJ had a "discriminatory purpose" in prosecuting him, *see* Section II.C., the defendant fails to prove by clear evidence that former President Trump, *see* Section II.C.1., or various politicians, *see* Section II.C.2., caused decisionmakers in the Executive Branch in this Administration to act unlawfully.  He also fails to prove that the DOJ exhibited a discriminatory purpose when it charged him with the charges it had been considering long before plea negotiations began.  S*ee* Section II.C.3.

In his second argument, "vindictive prosecution," *see* ECF 63 at 48-54, the defendant again fails to meet his burden of proof, *see* Section II.D.1.  He fails to articulate a valid legal right that was violated, *see* Section II.D.2., but even if he had stated a valid legal right, he fails to prove *actual vindictiveness*, Section II.D.3, or make a case that warrants presumption based on a *reasonable and realistic* likelihood of vindictiveness, Section II.D.4.  Had he done so, the burden would shift to the government to proffer objective reasons for its conduct, *see* Section II.D.5.

Finally, the defendant asserts an unrecognizable, novel and imprudent separation of powers claim, openly asking the Court to ignore "judicial perfection" (i.e., the law) to invalidate the actions of the Executive Branch.  He cites no precedent where a court has done so previously. This argument should also be denied.  *See* Section II.E.

### A. The Defendant Bears the Burden of Proving Selective Prosecution by Providing *Clear Evidence* of Discriminatory Effect & Discriminatory Purpose

A defendant claiming selective prosecution bears the burden of proof and must establish two elements by "clear evidence" in order to "overcome the presumption of regularity that attaches to decisions to prosecute." *United States v. Taylor,* 686 F.3d 182, 197 (3d Cir. 2012) (citing *United States v. Armstrong,* 517 U.S. 456, 464 (1996)). The claim draws on "ordinary equal protection standards" and the defendant must prove that the federal action "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong* at 465.

As to the first element, "discriminatory effect," the defendant must prove by *clear evidence* that "persons similarly situated have not been prosecuted." *Taylor* at 197.

For the second element, "discriminatory purpose," the defendant must prove by *clear evidence* that "the decision to prosecute him was made on the basis of an unjustifiable legal standard, such as race, religion, or some other arbitrary factor." *Id.*

He has not satisfied either element and falls far short of producing "clear evidence."

Because selective prosecution claims are "rare birds" and "invade a special province of the Executive,"[10] the Supreme Court has repeatedly emphasized that the standard for proving them is "particularly demanding" requiring a defendant to present "clear evidence" that

---

[10] "Article II of the Constitution assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed.'" *United States v. Texas,* 599 U.S. 670, 678 (2023) (quoting U.S. Const. art. II, § 1, cl. 1, and § 3). Under the Constitution, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *Id.* at 679 (quoting *United States v. Nixon,* 418 U.S. 683, 693 (1974)). The Executive Branch decides "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *Id.* at 678 (quoting *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2207 (2021)). In short, "decisions about enforcement of 'the Nation's criminal laws' lie within the 'special province of the Executive.'" *Id.* at 679 (quoting *United States v. Armstrong,* 517 U.S. 456, 464 (1996)).

establishes that a prosecutor did not act lawfully. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999); *United States v. Armstrong,* 517 U.S. 456, 463–465 (1996).  This demanding standard of proof is necessary because the Executive branch has 'broad discretion' as to whom to prosecute.  As such, "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607–08 (1985).

As a practical matter, "courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area," and necessarily, "the Executive Branch must prioritize its enforcement efforts." *Id*. at 679 (citing *Wayte* at 607–08 (1985)). "In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies." *Id*. at 680. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis that courts are competent to undertake." *Armstrong*, 517 U.S. at 465.

As this court has previously confirmed, "clear evidence" does not include "speculative" or "tenuous" evidence.  *United States v. Stevenson,* 540 F. Supp. 93, 98 (D. Del. 1982) (declining to dismiss an indictment "based on such unsupported allegations").

The defendant's claims are not even speculative and tenuous, they are utterly unfounded.

### B.      The Defendant Fails to Establish a *Discriminatory Effect* Because He Did Not Identify a Similarly Situated Person Who Was Not Prosecuted

How a defendant defines his selective prosecution claim impacts the analysis of "discriminatory effect" because it is the defendant's burden to establish with clear evidence that "persons similarly situated have not been prosecuted." *United States v. Taylor,* 686 F.3d 182, 197 (3d Cir. 2012) (citing *United States v. Armstrong,* 517 U.S. 456, 464 (1996)).  When a defendant

alleges he is part of a protected class that was discriminated against on the basis of race, a defendant can, for example, put forth clear evidence showing that individuals of a different race who engaged in the same criminal conduct as the defendant were not prosecuted. *Armstrong* at 456. The defendant does not make an allegation based on race or religion.

Instead, he alleges he is being prosecuted for "an improper political purpose" because he "is politically affiliated with his father, the sitting President and a candidate for reelection." ECF 63 at 23, 26. The essential facts he is relying on to establish his political affiliation are not clear from the defendant's claim. Based on the quote above, it appears that he is relying on his father's political affiliation with the Democratic Party, and asks for a derivative extension of political affiliation to him as his son. The defendant failed to provide the court with any facts in his motion that suggest the defendant's own political activity (party-affiliation, speeches, statements, rallies, etc.) is the basis for his claim. Rather, he only appears to fasten his claim to his father's political office. The government has not located any case in which a court has recognized that a defendant who is *a family member* of a politician is in a protected class due to the *politician's* political affiliation. While the Third Circuit has recognized that "membership in a political party is protected by the First Amendment," *United States v. Torquato*, 602 F.2d 564, 569 (3d Cir. 1979), the defendant does not cite any case where a defendant was purportedly prosecuted selectively due to the political affiliation of a family member. Many criminal defendants have family with political affiliations, but no court has ever recognized a selective prosecution claim based on such an attenuated theory. This court should not be the first.

Nonetheless, even if the defendant were in a protected class based on his father's political affiliation, to succeed in his claim, the defendant must show by clear evidence that a similarly

situated individual to him (i.e., a son of a Republican politician who had an addiction and lied during a gun background check) was not prosecuted. He did not attempt to do so in his motion.

      **1.**      **The defendant fails to identify a single person who was not prosecuted but committed the same gun crimes in substantially the same manner and against whom the evidence was at least as strong or stronger.**

A "similarly situated person" is "one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000); *United States v. Lewis*, 517 F.3d 20, 27–28 (1st Cir. 2008) ("[a] similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced"); *United States v. White*, 928 F.3d 734, 743 (8th Cir. 2019) (citing *Smith*); *United States v. Houck*, 2023 WL 144117, at *3 (E.D. Pa. Jan. 10, 2023) (citing *Smith* and *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)). The defendant fails on this first element because he does not even try to identify someone who is similarly situated but was not prosecuted. An examination of three cases squarely addressing a political affiliation selective prosecution claim—*Torquato*, *Slawick*, and *Hastings*—do not support his argument.[11]

In *United States v. Torquato*, the defendant, a Democratic official, unsuccessfully alleged a selective prosecution claim. Specifically, he claimed that certain uncharged Republican Party officials had committed some of the *same* conduct as him and were therefore similarly situated to

---

[11] The defendant did not cite these cases in his motion.

the defendant.  *United States v. Torquato*, 602 F.2d 564, 570-72 (3d Cir. 1979).  *Torquato*

recognized that "membership in a political party is protected by the First Amendment." *Torquato*,

602 F.2d at 569 n. 9.  In analyzing his selective prosecution claim, the court found that *Torquato*

failed to show that the identified Republican Party officials had engaged in the extortion scheme

that *Torquato* was charged with engaging in.  *Id.* at 571.  The court also explained that *Torquato*

was not charged with spraying PennDOT employees with mace, which state authorities found

had occurred under both Republican and Democratic administrations and which Torquato

pointed to as evidence of selective prosecution.  *Id.*  While the defendant had alleged that the

Republican Party County Chairman was similarly situated to him and had not been prosecuted,

the court disagreed, finding instead there was a "complete absence of evidence that Republican

Party officials engaged in the type of activity with which Torquato was charged." *Id.* at 572.

Here, the defendant fails to point to any similarly situated individual who was addicted to

drugs and engaged in the illegal firearm possession and false statement crimes he is charged

with, but was not prosecuted by the government.  In other words, the defendant could have

attempted to establish the necessary discriminatory effect for his claim based on "improper

political purpose" by providing clear evidence (i.e., a name) of someone, such as the son or

daughter of a Republican politician, who was not prosecuted for illegally purchasing and

possessing a firearm under similar facts and circumstances as him.  He did not.[12]

---

[12] The defendant's clear failure to meet his burden of establishing a similarly situated
individual who was not prosecuted makes it unnecessary for this Court to decide whether
*Torquato*'s analysis of political affiliation survives under current equal protection standards.  A
defendant must allege an "unjustifiable standard such as race, religion, or other arbitrary
classification" was "underlying his prosecution."  *United States v. Rivera*, 62 F.4th 778, 788 (3d
Cir. 2023).  In the years since *Torquato* "assume[d] for this case that prosecutorial decision
based on the defendant's membership in one political party or another" would violate the Equal
Protection Clause, and endorsed a "claim of selective prosecution based on individual

In *United States v. Slawick*, the defendant was indicted after a federal investigation into the zoning process in New Castle County, Delaware, showed the defendant accepting cash in exchange for influencing state and local politicians in order to obtain favorable treatment from state and county agencies. *United States v. Slawick*, 1993 U.S. Dist. LEXIS 11020, *3 (Dist. of Del. 1993). Specifically, the charges against the defendant related to a conspiracy to obtain two $10,000 payments to influence a zoning vote of a New Castle County Councilman. *Id.* at *5. The defendant was a Democrat and was charged in connection with delivering one of the two payments, while Robert O'Hara, a former Superior Court Judge and a Republican, was not charged even though he delivered the second payment. *Id.* The defendant alleged selective prosecution based on his political affiliation. *Id.* United States District Judge Sue L. Robinson denied the claim without an evidentiary hearing, even after the defendant identified a specific individual who was not prosecuted after accepting cash bribes. Judge Robinson held that O'Hara was not similarly situated to the defendant because the state of the evidence against him was weaker. *Id.* at *6-7 (discussing lack of evidence establishing O'Hara's awareness of the contents of the money envelope or its purpose). Moreover, Judge Robinson expressed "skepticism of finding selective prosecution where a defendant asserts the Government has failed to prosecute only one other person who is similarly situated to the defendant." *Id.* at *8.

---

discrimination," 602 F.2d at 569 n.9, the Supreme Court limited equal protection claims based on personal animus. *See Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 603 (2008). The Third Circuit has in turn recognized that *Engquist* limits equal-protection claims, *Stradford v. Sec. Penn. Dept. of Corrections*, 53 F.4th 67, 76 (3d Cir. 2022), and has rejected that political affiliation is a cognizable class under the equal-protection standard under 42 U.S.C. § 1985(3). *See Farber v. City of Paterson*, 440 F.3d 131 (3d Cir. 2006); *see also Perez-Sanchez v. Public Building Auth.*, 531 F.3d 104, 108-09 (1st Cir. 2008) (collecting cases). *Cf. Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (partisan gerrymandering claim under Equal Protection Clause presented political question beyond reach of federal courts).

Even more broadly, here the defendant failed to identify *any* individual, let alone a family member of a Republican politician, who committed the same crimes as him under similar circumstances and where the government amassed as much evidence against the individual but chose not to prosecute. Here, the defendant purchased and used crack cocaine—a serious drug. The defendant frequently used crack over a several-year period, often smoking crack every 15 minutes, by his own admission. The defendant purchased a revolver with an accessory that enhanced the ability to use it in a shootout. He didn't just borrow or buy it from a friend, he walked into a federally licensed gun store and *lied* on background check paperwork. And, unlike in many other investigations, the evidence of the defendant's possession of the gun is overwhelming—he produced his U.S. Passport and sent messages admitting possession of the gun after purchasing it, and then turned over the gun case to law enforcement when they asked for it. Moreover, the evidence of his multi-year addiction to crack cocaine, including at the time he purchased the gun and possessed it, is equally as strong. Even his brown leather pouch that he stored his gun in had cocaine residue on it. The current of evidence against him includes admissions he made in his for-profit memoir. This overwhelming evidence suggests why the defendant failed to even attempt to direct the court to any other uncharged individual.

In *United States v. Hastings*, the defendant was a leader of the Republican Party in Boone, North Carolina and failed to timely file income tax returns and owed substantial taxes over a four-year period. *United States v. Hastings*, 126 F.3d 310, 312 (4th Cir. 1997). After becoming aware of an IRS investigation, Hastings filed his delinquent tax returns. *Id.* at 313. In IRS memoranda, agents mentioned Hastings' political prominence and recommended him for criminal prosecution. *Id.* After a grand jury indicted him for failing to file his tax returns, Hastings sought to have the indictment dismissed on grounds of selective prosecution, arguing

24

that his case was motivated by unconstitutional animus because he was a Republican. *Id.* at 315. The district court ordered discovery on his claims, and when the government refused to comply, dismissed the indictment. *Id.*

On appeal, the Fourth Circuit reversed the dismissal and found that the discussion of Hasting's political affiliation by agents did not demonstrate political animus, but even if it had, there was no evidence that the person who made the decision to prosecute was motivated by impermissible considerations. *Id.* With respect to the discriminatory effect element, Hastings had submitted an affidavit of a former law enforcement official stating that the case "is not the sort that is generally subject to prosecution" and that he "knew of no similar cases which had been criminally prosecuted." *Id.* at 315. He also submitted an affidavit from an experienced tax attorney, who made similar statements. *Id.* The Fourth Circuit held that Hastings did not meet his burden of producing clear evidence because he was "unable to show that there were other persons with similar characteristics who were spared prosecution because of their political affiliation." *Id.* The court found that Hastings was "unable to show that any other person not prosecuted has any of the characteristics" he had. *Id.*

Like in *Hastings*, here the defendant fails to submit clear evidence that shows "there were other persons with similar characteristics who were spared prosecution because of their political affiliation." Unlike in *Hastings*, here the defendant failed to even submit any declaration or affidavit of a person with knowledge of such prosecutions and knowledge of the extensive evidence in this case. Instead, the defendant cites a news article which the defendant contends shows "several experienced legal experts and law enforcement officials have agreed with Special Counsel Weiss's initial conclusion that prosecution is not warranted." ECF 63 at 41. Notwithstanding the defendant's inaccurate premise about Mr. Weiss's "initial conclusion," a

review of the article shows that no one said the "prosecution is not warranted" and none of the commentators had knowledge of the evidence in this case.  Moreover, as in *Hastings*, the submission of a sworn declaration was insufficient to establish the existence of a similarly situated individual.  Unsworn media commentary fares no better.

In his motion, the defendant next mentions a media appearance by former Attorney General Eric Holder who commented on the tax indictment returned in the Central District of California, stating that some unnamed former prosecutors with whom he spoke would have tried to resolve the case in a plea agreement, that Mr. Weiss was not doing anything inappropriate, and that "[t]his isn't some kind of ordinary run-of-the-mill tax case, this was an abuse of the tax system."[13]  The former Attorney General's comments underscoring the severity of the defendant's tax crimes do not establish that a similarly situated person was not prosecuted for the gun crimes involved in this case and do not support "an inference of discriminatory effect," as the defendant claims.  ECF 63 at 41, 46.  Commentary by persons without first-hand knowledge of the evidence in his gun case do not support an inference, and in any event, an *inference* is not "clear evidence."  Because he failed to identify any similarly situated individual, the court should deny his selective prosecution claim.

> **2.     The defendant's statistical claims are not sufficient to establish a selective prosecution claim by clear evidence, and in any event, do not actually support his allegation.**

The Supreme Court has held that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.*"  *United States v. Bass*, 536 U.S. 862, 864 (2002) (emphasis in original).  In *Hastings*, the defendant also offered statistical evidence in support of his claim of discriminatory impact, much like the defendant has attempted

---

[13] https://transcripts.cnn.com/show/lcl/date/2023-12-07/segment/01

to do in this case.  *United States v. Hastings*, 126 F.3d 310, 312 (4th Cir. 1997).  The Fourth

Circuit found those statistics did not sustain Hastings' burden of proof by clear evidence.  While

the statistics showed the IRS referred only 12 of 37,000 delinquent filers for prosecution, and

only one other similar case had been prosecuted in that federal district, the court found:

> Hastings does not show that *any* of the thousands of persons not prosecuted had the same characteristics militating in favor of prosecution as Hastings. He also does not show that most, or even any, of the few persons who were pursued for criminal investigations were Republicans.

*United States v. Hastings*, 126 F.3d 310, 316 (4th Cir. 1997) (emphasis added).

Here, the defendant needed to support his claim with specific examples of individuals

who were *not* prosecuted but committed the same crime, and where the government had amassed

at least the same amount of evidence against those individuals.  But he failed to do so.  He also

does not show that the people who were prosecuted under these charges were Democrats, as

opposed to Republicans, or even had a political affiliation, as opposed to no political affiliation.

The statistics that the defendant cites is not a workaround for this lack of evidence.

Nonetheless, the statistical claims the defendant makes are misleading and without

context.  For example, citing certain data, the defendant states, in years 2008-2017, "only 1.8%

were brought under Section 922(g)(3)."  ECF 63 at 42.  However, what he ignores is that felon-

in-possession charges under 18 U.S.C. § 922(g)(1) overwhelmingly account for more than 70%

of the gun prosecutions cited in that same data.  He also fails to mention that of the 86 different

types of federal gun charges listed in that study, the gun charges filed against the defendant are

brought more frequently than over 90% of the other available firearm offenses, and are the 6th,

7th and 8th most frequently brought charges, respectively:

| Frequency Ranking of Federal Firearm Charges | Statute (and Corresponding Count in Indictment) |
|---|---|
| 6th out of 86 | Count 1: False Statement in Purchase of a Firearm, Title 18, United States Code, Sections 922(a)(6) and 924(a)(2). |
| 7th out of 86 | Count 2:  False Statement Related to Information Required to be Kept By Federal Firearms Licensed Dealer, Title 18, United States Code, Section 924(a)(1)(A). |
| 8th out of 86 | Count 3: Possession of a Firearm by a Person who is an Unlawful User of or Addicted to a Controlled Substance, Title 18, United States Code, Sections 922(g)(3) and 924(a)(2) (2018). |

In the most recent reporting of the United States Sentencing Commission, the Commission analyzed the number of sentencings involving § 922(g), and found that for Fiscal Year 2021, the _second_ most utilized charge was § 922(g)(3) for those prohibited from possessing a firearm because they were illegal drug users or addicted to controlled substances.[14]



Figure 17. NATURE OF §2K2.1 PROHIBITED PERSON OFFENSES
_Fiscal Year 2021_

Indeed, it makes sense that the § 922(g)(3) charge is the second-most-frequently used gun charge against prohibited persons because "[D]rugs and guns are a dangerous combination." _Smith v. United States_, 508 U.S. 223, 240 (1993).  Handling a firearm requires great care, caution, safety, and self-control.  These characteristics are compromised by the psychological

---

[14] _See_ https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220714_Firearms.pdf at p. 30.

and physiological effects of illegal drug use.  Drug users also frequently use firearms to commit other crimes such as funding their drug habit, protecting their drugs, and preventing apprehension.  Drugs and guns can be a deadly combination and the effects of gun violence plague our communities.  The fact that the defendant's girlfriend disposed of his firearm against his will before he could use it in another crime does not make his crimes any less serious.

The defendant selectively cites DOJ press releases and claims that DOJ only charges § 922(g)(3) "when there are aggravating factors creating a risk of public safety, such as violent crime, association with criminals or hate groups, drug or weapon trafficking, etc."  ECF 63 at 44.[15]  In doing so, he trivializes his own conduct—the defendant *lied* on a federal form to get a gun.  That fact alone is considered aggravating conduct by the Commission, as shown in the chart below which shows false statements falls into one of five aggravating categories.  *Id.* at 31.

---

[15] To state the obvious, a press release is done when an office deems there to be a press-worthy event, accordingly, those cases generally involve more serious conduct that media are more likely to report on.  Citing to cases where charges *were* brought does not satisfy the defendant's burden of showing a similarly situated individual who was *not* charged.  But, ironically, most of these press releases relied on by the defendant discuss convicted drug users where the evidence against them was less serious and less significant than in this case.

The defendant cites the case of a man far younger than himself, Jakerrius Gill, 23, who was sentenced to 36 months imprisonment under § 922(g)(3). *See* Doc. 63 at 45, n. 99 (citation to Dec. 28, 2022, DOJ Press Release). Gill was prosecuted after police smelled burnt marijuana in a car Gill had been riding in, and then discovered prescription pills (that turned out to be counterfeit) which Gill admitted having bought, and a gun. This case apparently did not involve evidence of the kind of years-long illegal conduct that the defendant engaged in while using drugs, nor did it apparently involve lying on a federal background check.

The defendant also cites the case of another young man, Said Muhammad Almustaqiim, 20, who was sentenced to 30 months imprisonment under § 922(g)(3). *See* Doc. 63 at 45, n. 99 (citation to Aug.18, 2023, DOJ Press Release). Almustaqiim was pulled over for driving a car without a license plate, after which the officer smelled burnt marijuana. The officer searched the car and found 22 grams of marijuana, a digital scale, $40 in a backpack, and a handgun. *Id.* Almustaqiim told officers that he was a user of marijuana. *Id.* There apparently appears to be significantly less evidence of drug usage against Almustaqiim than the defendant and no evidence of lying on a background check, and the defendant's case involves a more serious drug.



Figure 18. AGGRAVATING CONDUCT OF §2K2.1 PROHIBITED PERSONS
*Fiscal Year 2021*

Furthermore, even if there were no aggravators at issue in his case, the chart above still shows that half of the offenders prosecuted as prohibited persons did not engage in aggravating conduct.  The defendant's claim that "powerful statistics" show "selective enforcement" against him is powerfully belied by the statistics themselves.

Missing from the defendant's selected press releases is the § 922(g)(3) case of *United States v. Erik Harris,* No. 21-3031 that is currently on appeal before the Third Circuit from the Western District of Pennsylvania. Harris entered a conditional plea of guilty to three counts of § 922(g)(3) as a marijuana user in possession of a firearm, and three counts of making false statements in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6). *United States v. Harris*, 2022 WL 217927 *2 (Answering Brief for the United States). Harris was sentenced to 6 months imprisonment. *Id.*

The facts underlying Harris's conviction are that, by April 2019, Harris admittedly had been using marijuana on a frequent basis for several years. *Id.* at *4. Harris had twice bought a pistol from a federally licensed firearms dealer, and during each transaction, Harris represented that he was not an "unlawful user" of marijuana on the ATF Form 4473. *Id.* at *5. On April 18, 2019, Harris was interviewed by investigators. *Id.* Harris was a junior in college at the time of the interview, and he explained that he had used marijuana since his freshman year of high school. *Id.*  In Harris's appellate brief, he states that at the time of his interview he was a 21-year-

old who, in addition to being on track to be the first in his family to graduate from college, worked for a non-profit organization. *Harris*, 2022 WL 1080925 at *4 and *19. (Appellant's Opening Brief). Harris had zero criminal history points. *Harris*, 2022 WL 1080925 at *6.

The evidence of the defendant's drug usage in this case is not limited to a single post-arrest statement. The defendant used crack cocaine, a more serious drug than marijuana that has a more dangerous potential to cause the user of a firearm to use it irresponsibly. The defendant is far older and has enjoyed far greater privileges in terms of his education, opulent lifestyle and economic opportunities than other defendants who were prosecuted.

Finally, the defendant contends that he has set forth enough facts to support "an *inference* of discriminatory effect." ECF 63 at 46. That is the wrong standard. He must support his claims with *clear evidence*.[16] The defendant fails to meet his burden because he failed to identify a similarly situated individual who was not prosecuted, and his efforts to cobble together statistics and press releases of those who were charged do not cure his failure. Instead, the comparisons the defendant draws only underscore that the law applies equally to all, including the defendant.

### C.     The Defendant Fails to Provide Clear Evidence of *Discriminatory Purpose* by Decisionmakers in His Case

Under well-established equal protection principles, a defendant must show "that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292-93, 298 (1987); *accord Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021); *Broadnax v. Lumpkin*, 987 F.3d 400, 413-14 (5th Cir. 2021); *United States v. Lawrence*, 735 F.3d

---

[16] The case he relies on was a selective enforcement case as opposed to a selective prosecution case. *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1063 (N.D. Cal. 2016) (questioning whether the "similarly situated requirement" even applies in a "selective enforcement case"). For this same reason, the defendant's reliance on programmatic analysis in *Mumphrey* is also misplaced.

385, 439 (6th Cir. 2013); *Freeman v. Attorney General*, 536 F.3d 1225, 1232-33 (11th Cir. 2008); *United States v. Olvis*, 97 F.3d 739, 745-46 (4th Cir. 1996).  "[D]iscriminatory purpose implies more than intent as awareness of consequence"; instead, "it implies that the decisionmaker selected or reaffirmed a particular course of action at least in part '*because of*,' not merely '*in spite of*,' its adverse effects on an identifiable group." *Wayte*, 470 U.S. at 610 (emphasis added). When a defendant merely asserts "some selectivity in enforcement," and cannot show that the enforcement decision was "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification," the "selectivity in enforcement is not itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

In the *Hastings* case, discussed in the previous section, the prosecution considered the defendant's "prominence in the community" as a factor that supported its decision to charge. *United States v. Hastings*, 126 F.3d 310, 314–15 (4th Cir. 1997).  As the court noted, "Hastings points us to no authority that supports the proposition that prominence itself is not a valid factor to weigh in favor of a criminal prosecution."  Hastings argued that he was prosecuted because he was a Republican and that agents had discussed his political affiliation in the discovery.  The court denied this claim, finding that the defendant failed to support his contention with clear evidence that "the government official who actually made the decision to prosecute the case was motivated by impermissible political considerations."  The court held that it would not impute the biases of others who were not prosecutors to the persons ultimately responsible for the prosecution.  *Id.*  The court denied Hastings' claim because he failed to offer clear evidence and instead relied on his "own interpretation" of statements by those who were not involved in the charging decisions.  *Id.*  In denying the motion, the court stated that defendant's theory and claims were "simply inadequate to satisfy the burden of proof on this issue."  *Id.*

Like *Hastings*, other courts have routinely found that a person's prominence may be properly considered among other factors when deciding whether to pursue criminal sanctions for a violation of the law.  In *United States v. Saade,* 652 F.2d 1126, 1136 n. 14 (1st Cir.1981), the First Circuit stated that the increased deterrent effect inherent in the prosecution of prominent figures is a legitimate consideration in favor of prosecution. *See United States v. Catlett,* 584 F.2d 864, 868 (8th Cir.1978) ("Since the government lacks the means to investigate and prosecute every suspected violation of the tax laws, it makes good sense to prosecute those who will receive, or are likely to receive, the attention of the media."); *United States v. Ojala,* 544 F.2d 940, 944–45 (8th Cir.1976) (holding that the potential deterrent effect of prosecuting a well-known person is a valid prosecutorial consideration); *United States v. Peskin,* 527 F.2d 71, 86 (7th Cir.1975) ("Assuming that the decision to indict Peskin and press for trial was based in part on considerations of his political prominence, this is not an impermissible basis for selection.")

Likewise in the *Slawick* case discussed previously, the court found that the defendant failed to make his threshold showing that the Government acted with a discriminatory purpose. In that case, *Slawick*, a Democrat, argued that his prosecution, and the failure to prosecute a rival Republican, was clear evidence of selective prosecution.  *Slawick* made the following claim:

> This decision comes down to pure politics, plain and simple. The defendant is a deposed democrat who still wields some influence with democratic politicians. Unfortunately for him, the United States Attorney is not a democrat. O'Hara is affiliated with the Republican party and has been for years. In addition, he is a former judge and the prosecution of a former Republican judge by a Republican United States Attorney would bring cries of recrimination within his political party.

*United States v. Slawick*, 1993 U.S. Dist. LEXIS 11020, *9-12 (D. Del. 1993).  The court found this claim to be "conjecture" and was "not persuaded by defendant's argument that the evidence offered is sufficient to grant an evidentiary hearing on the selective prosecution claim."  *Id.*

Here, the defendant provides no evidence of disparate treatment of similarly situated members of the opposing political party.  He also fails to acknowledge that his prominence in the community is a factor that can be considered by the government.  The defendant's argument for "discriminatory purpose" is focused entirely on "Donald J. Trump," ECF 63 at 28-34, "Republicans in Congress, *id*. at 35-37, and "The Department of Justice," *id*. at 37-40, as noted by the bold headings in his motion.  The government will respond to each, in turn.  Like in *Slawek* and *Hastings*, the defendant's claims are based on "conjecture" and are "simply inadequate to satisfy the burden of proof on this issue" because it is the defendant's burden show that the Executive Branch made a decision to prosecute him *because of*, not *in spite of*, the defendant's father's political affiliation.  *Wayte*, 470 U.S. at 610 (emphasis added).

### 1. Former President Trump is Not the President of the United States and Is Not Controlling the Executive Branch led by President Biden.

The defendant's claims related to former President Trump's statements fall into two categories: (1) statements he made during the Trump administration when no charges were brought, and (2) statements he made during the Biden administration when former President Trump was not able to direct charges because he was not the President.  ECF 63 at 28-34.

As it relates to the first category, the defendant alleges that in 2018, then-President Trump began attacking Hunter Biden and "[l]ikely not coincidentally, also in 2018, federal investigators began their investigation of Mr. Biden . . ."  ECF 63 at 4.  The timing of this allegation, of course, is critical for the defendant's claim that the investigation of him was supposedly started in response to Trump's alleged vindictive purposes.  The defendant's motion then states that his support for this claim can be found in Section I.A. of his motion, which is on page 27.  The first facts alleged in that section include a series of four tweets beginning in October and November 2019.  ECF 63 at 28.  But the defendant fails to explain how the government initiated an

investigation into Hunter Biden in 2018 in response to President Trump's "WHERE'S HUNTER?" tweet on October 12, 2019. The defendant fails to explain how the defendant's incriminating iCloud messages obtained in September 2019 were caused by President Trump's tweets the following month. Clearly, the investigation was not initiated in response to tweets.

Instead, the defendant appears to suggest that once a politician speaks publicly about an individual already under investigation, the government cannot prosecute him lest it be vindictive. That is not the law. Indeed, the DOJ is currently prosecuting former President Trump in two federal cases while politicians throughout the country have commented on his conduct relevant to those cases. Those comments do not render a prosecution "selective."

Even the contents of most of the tweets cited by the defendant contradict his claim that he is being selectively and vindictively prosecuted. For example, according to the defendant, on December 12, 2020, former President Trump *complained* that then-Attorney General Barr did not "reveal the truth" to the public before the election about Hunter Biden. ECF 63 at 29. If the DOJ was acting to pursue a political agenda, wouldn't DOJ have done the opposite? The defendant says President Trump tweeted, "I have NOTHING to do with the potential prosecution of Hunter Biden, or the Biden family. . . " *Id.* That claim of non-involvement does not support his claim. According to the defendant, in his book, Attorney General Barr stated he was asked by President Trump about the investigation of Hunter Biden, and Attorney General Barr refused to tell him about it. *Id.* at 30. This withholding of information does not support his argument.

In this same section of his brief, the defendant cites testimony of an IRS employee who stated that DOJ made the decision not to take overt investigative steps that could influence the 2020 election. *Id.* The problematic conduct that the defendant complains of is that the Deputy Attorney General's office during the Trump Administration was aware of and involved in some

specific investigatory decisions in the most banal fashion possible—by *waiting* to take specific investigative steps at certain times out of caution so that that investigation would not influence a Presidential election.  If the defendant's vindictiveness allegations were true, wouldn't DOJ prosecutors have done the opposite and permitted investigators to take overt steps that could have influenced the election?  These claims show only that career DOJ prosecutors and DOJ leadership acted appropriately when investigating the son of a candidate for President. Moreover, against this backdrop, U.S. Attorney Weiss was then asked to remain U.S. Attorney during the Biden Administration, which further underscores the lack of discriminatory intent.

The next statements by Trump cited by the defendant in support of his argument (ECF 63 at 31) occurred in 2023, now on a website called "Truth Social."  After the defendant filed his motion, undersigned counsel have tried to gain access to the website to verify the authenticity of the "Truth Social" messages cited by the defendant, but the site apparently is not functional:



Accordingly, while the government has not verified the accuracy of the messages or been able to assess any surrounding context that the defendant may have omitted, it is still clear that these supposed messages do not advance the defendant's claim.

At the outset, the defendant fails to provide clear evidence that any of the prosecutors ever read these messages, much less understood them as some sort of edict that had to be obeyed.

According to the defendant's motion, apart from one "WHERE'S HUNTER?" message in March of 2023 and one message in November 2023 (after the indictment was returned), all of

the remaining messages relevant to his claims occurred between June 20, 2023, and July 11, 2023.  ECF 63 at 31-33.  The messages included in his motion appear to have criticized the resolution of the case (even though the agreements were not yet public) and made other claims about President Biden that are unrelated to the gun case against the defendant.  The defendant claims these messages show discriminatory intent by the prosecution because "Mr. Trump has continued to flex his considerable influence over government officials to drive the case against Mr. Biden and criticize the plea agreement between him and DOJ."  ECF 63 at 31.  This claim is frivolous, and the court need only consider two undisputable facts about these statements:

*First*, after this criticism about the resolution by politicians (again, before any agreements had been made public), U.S. Attorney Weiss, and the undersigned counsel acting on his behalf, signed the plea on July 26, 2023, and showed up in court in good faith and in an attempt to move forward with the resolutions.  If these "Truth Social" messages really were "driving the case against Mr. Biden," why did the government sign the agreements on July 26, 2023—weeks after former President Trump had apparently railed against them?  Moreover, after the hearing and for the next several weeks, why would the DOJ continue to negotiate with the defendant to resolve these two cases if in fact the DOJ was acting "at the urging of public officials, in pursuit of the prosecutors' own political agenda, or to fend off criticism and avoid scrutiny"?  ECF 63 at 40.  The defendant's claims do not withstand scrutiny.

*Second*, to state the obvious, former President Trump is not the President.  The defendant's father is the President.  The defendant fails to establish how President Biden or the President's Attorney General, to whom the Special Counsel reports, or the Special Counsel himself, or his team of prosecutors, are being "improperly pressured" by former President Trump, such that the Executive Branch approved allegedly selective and vindictive charges to be

brought against the President's son in violation of the law.  The defendant ignores the fact that the President's current Attorney General personally exercised his discretion to direct "a full and thorough investigation" of these matters and conferred on the Special Counsel statutory and regulatory authority to prosecute this case. *See* Order No. 5730-2023 (Aug. 11, 2023) (citing 28 U.S.C. §§ 509, 510, 515, 533 and 28 C.F.R. pt. 600).[17] Thus, the defendant's claim of selective prosecution must contend with the presumption of regularity not only for the Special Counsel's decision to prosecute but also for both the Attorney General's decision to direct a full and thorough investigation *and* the Attorney General's determination that the prosecution warrants the greater authority and independence of the Special Counsel's Office.  The defendant ignores these facts. He submits no evidence that the Special Counsel had any animus against the defendant, and he offers no evidence that the current Attorney General acted out of any improper motive when empowering the Special Counsel to pursue prosecution of the defendant.[18]

## 2.  Republicans in Congress Do Not Control the Executive Branch.

The defendant's next claim is that "multiple Republican-led House committees have taken it upon themselves to investigate Mr. Biden for criminal activity, while criticizing DOJ's exercise of prosecutorial discretion in not bringing more serious charges against him . . ."  ECF 63 at 37.  Republicans in Congress do not control prosecutorial decision-making in the Executive

---

[17] https://www.justice.gov/d9/2023-08/order.appointment_of_david_c._weiss_as_special _counsel.pdf.

[18] Finally, the defendant turns to talking about future hypotheticals, devoting two pages of his motion to claims about what he believes may happen if former President Trump wins the presidency.  Future hypotheticals are not "clear evidence" that supports a claim of past discrimination, they are conjecture and speculation.  Undersigned counsel have over four decades of combined experience within the Department of Justice, serving under multiple administrations.  If the defendant believes that members of the Special Counsel's Office are concerned about "vengeance" and "retribution," whatever that might be, he is mistaken.

Branch.  The defendant appears to suggest that statements of politicians criticizing the resolution and then "tak[ing] credit for sabotaging" it are evidence that the DOJ was directed to file these charges by Congress.  ECF 63 at 13.  The Special Counsel is accountable to the Attorney General, and remains subject to the Attorney General's direction and supervision.  The Special Counsel does not answer to Congress.  There is no evidence, much less clear evidence, that the actions of non-prosecuting officials who are members of an entirely different branch of government caused the Special Counsel to bring unwarranted charges.

Throughout the defendant's entirely imagined narrative, he barely refers to the actions or motives of the then-U.S. Attorney, now-Special Counsel, much less makes *Armstrong*'s "credible showing" of discriminatory intent on his part.  Defendant's real argument is that if political actors uninvolved in the prosecution claim credit for the prosecution for their own political ends, those statements must have necessarily influenced the Special Counsel's decisions. These conclusory assertions are fundamentally at odds with the presumption of regularity accorded to the actions of the Special Counsel, who is also a Presidentially appointed, Senate-confirmed constitutional officer who swore an oath to apply the law faithfully and discharge his duties impartially.  This Court should find that the defendant has failed to meet his burden of clear evidence based on such peripheral atmospherics by uninvolved elected officials—or those seeking office—trying to make political hay.

### 3.    The Department of Justice's Motives Were Not Improper.

Lastly, the defendant contends "the DOJ confirmed its own improper motive when, under fire from Congress and the public, it resorted to a rarely used gun charge that reports indicate Special Counsel Weiss admitted would not have been brought against the average American," citing a news article in support of this outlandish claim.  ECF 63 at 37.  The defendant

conveniently omits the next sentence from the article[19] in which a senior law enforcement

official forcefully denies the anonymized account:

> Mr. Weiss told an associate that he preferred not to bring any
> charges, even misdemeanors, against Mr. Biden because the
> average American would not be prosecuted for similar offenses. (A
> senior law enforcement official forcefully denied the account.)

Indeed, the average American does face these same charges, as demonstrated by the data

and the press releases cited by the defendant. The charges the defendant is facing are not rarely

used – they are more common than over 75 other firearms charges that are used by the DOJ and

are only less common than five firearms charges. The defendant's claim that the Special Counsel

only considered these charges "when, under fire from Congress" is false. As his counsel states in

correspondence with the government in October 2022, then-U.S. Attorney Weiss had been

considering bringing the charges in this indictment in March 2022 prior to any plea negotiations.

This was well before the statements cited by the defendant in his motion.

Moreover, defendant points to nothing about the actual circumstances of his case itself

that would weigh against his prosecution. As *Amstrong* made clear, prosecutorial charging

decisions can factor in considerations like "the strength of the case, the prosecution's general

deterrence value, the Government's enforcement priorities, and the case's relationship to the

Government's overall enforcement plan are not readily susceptible to the kind of analysis that

courts are competent to undertake." *Armstrong*, 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at

607). The defendant has acknowledged committing the factual conduct at issue: that during the

relevant time, he was addicted to and an unlawful user of crack cocaine and purchased a gun

while lying about his addiction. *See* ECF 24-1, at 10. Defendant later authored a book admitting

---

[19] *See* https://www.nytimes.com/2023/08/19/us/politics/inside-hunter-biden-plea-deal.html

that he was addicted to crack cocaine in 2018, the year in which he illegally purchased a gun. The sampling of messages discussed in this response are highly incriminating. And through his counsel's comments in recent media appearances, the defendant has conceded facts that must be proved in the case, including the defendant's possession of the gun.[20] As discussed in *Armstrong* and *Wayte*, factors like the strength of the case and its general deterrent value are quintessentially permissible considerations for a prosecution to proceed. *See Armstrong*, 517 U.S. at 465. It is unremarkable therefore that a prosecutor would choose to pursue charges on such discretionary factors. Accordingly, the defendant's motion should be denied.

> **D.   The Defendant's Vindictive Claim Fails Because He Cannot Show a Realistic Likelihood of Vindictiveness for His Exercise of a Legal Right.**
>
> > **1.   The Defendant Bears the Burden of Producing Evidence of Actual Vindictiveness or Demonstrating Circumstances that Reveal a *Reasonable* and *Realistic* Likelihood of Vindictiveness.**

With respect to a vindictive prosecution claim, a defendant bears the initial burden of proof and is required to establish the appearance of vindictiveness. *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). A defendant must do this by either (1) producing evidence of actual vindictiveness, or (2) demonstrating sufficient facts that reveal a *realistic* likelihood of vindictiveness to warrant a rebuttable presumption of vindictiveness. *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). A rebuttable presumption of vindictiveness arises only when the facts presented establish a "*reasonable* likelihood of a danger" that the government "might be

---

[20] For example, defendant admitted through his counsel that "Hunter owned an unloaded gun for 11 days" which is relevant to the government's burden of proving that the defendant possessed the firearm. *See e.g.,* https://transcripts.cnn.com/show/ebo/date/2023-09-14/segment/01 (Sept. 14, 2023); *see also* https://www.cbsnews.com/news/abbe-lowell-hunter-biden-attorney-transcript-face-the-nation-08-13-2023/ (August 13, 2023).

retaliating against the defendant *for* lawfully exercising a right." *United States v. Esposito,* 968 F.2d 300, 303 (3d Cir. 1992) (emphasis added) (citing *United States v. Goodwin,* 457 U.S. 368, 381 (1982)).  Courts will only apply a presumption where there exists a "*realistic* likelihood of 'vindictiveness.'" *Blackledge v. Perry,* 417 U.S. 21, 27 (1974) (emphasis added).[21]  However, "[w]here the government's conduct is attributable to legitimate reasons, [courts] will not apply a presumption of vindictiveness." *Paramo* at 998 F.2d at 1220 citing *Esposito,* 968 F.2d at 305.

If, and only if, the defendant meets this burden and a court finds that he has established a realistic likelihood of vindictiveness, then the prosecution has "an opportunity to proffer legitimate, objective reasons for its conduct."  *Paramo* at 998 F.2d at 1220*; Esposito,* 968 F.2d at 305; *Goodwin,* 457 U.S. at 374.  To succeed in such a claim, the defendant must establish that the punitive prosecutorial action "was 'brought *solely* to 'penalize' [him] and could not be justified as a proper exercise of prosecutorial discretion."  *Goodwin* at 457 U.S. at 380 n.12.

As discussed below, because the defendant fails to establish actual vindictiveness and because he does not meet his threshold showing of a *reasonable* and *realistic* likelihood of retaliation for his exercise of a lawful right, his claim should be rejected.

## 2.   Defendant Fails to Identify and Explain What Valid Legal Right *He* Exercised that Caused the Prosecution to Seek the Indictment

The defendant does not attempt to show causal linkage between a legal right exercised by him and his prosecution.  In his motion, the defendant appears generally to identify one legal right that he claims he exercised which he alleges caused his indictment: "engaging in

---

[21] The Fifth Circuit explains the burden as "[t]he defendant has the burden of proving, by a preponderance of the evidence, prosecutorial vindictiveness." *United States v. Saltzman,* 537 F.3d 353, 359 (5th Cir. 2008).

constitutionally protected speech and political activity." ECF 63 at 49. But he fails to identify with any specificity what *his* constitutionally protected speech or *his* political activity was. For example, he does not contend that *he* made a public political statement, nor does he identify which statement caused prosecutors to have animus. His failure to identify facts that support any actual legal right that *he* exercised should prevent this court from moving forward to even analyze his vindictive prosecution claim because no court has recognized a derivative vindictive prosecution claim based on a family member's exercise of rights.

Even if he had specified some legal right that *he* exercised, he must show causation between the prosecutorial decision and his exercise of that legal right. Because "[t]he imposition of punishment is the very purpose of virtually all criminal proceedings," a defendant cannot simply point to "[t]he presence of a punitive motivation," since that "does not provide an adequate basis for distinguishing governmental action that is fully justified as a legitimate response to perceived criminal conduct from governmental action that is an impermissible response to noncriminal, protected activity." *Goodwin*, 457 U.S. at 372-73.

### 3. The Defendant's Claim that the Special Counsel is Former President Trump's "Stalking Horse" is Unsupported by Any Evidence.

Relying on *Koh,* the defendant claims that the Special Counsel is "capitulating" to former President Trump because he was "prevailed upon to bring the charges by another with animus," ECF 63 at 48, "such that the prosecutor could be considered a 'stalking horse'" *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999). To make this claim, the defendant must show "he would not have been prosecuted except for the animus." *Id*. On this theory, "the defendant must affirmatively prove actual vindictiveness." *Wasman v. United States*, 468 U.S. 559, 569 (1984).

The Attorney General's decision to appoint Mr. Weiss as Special Counsel and approve the prosecution in this matter entirely rebuts the defendant's claim because the defendant makes no

allegation about vindictiveness by the Attorney General or President Biden.  The defendant ignores the fact that after a change in administrations, and after the events he claims show actual vindictiveness by former President Trump, on August 11, 2023, the Attorney General authorized the Special Counsel to prosecute the defendant for federal crimes.  To succeed in his claim, he would have to establish that the Attorney General and President Biden were likewise acting as President Trump's stalking horses by authorizing this prosecution.  This claim is frivolous.

The government's response to the selective prosecution argument about former President Trump is equally applicable here, *see* Section II.C.1.  In short, there is no evidence that the DOJ is acting as President Trump's stalking horse because it is not true.  The defendant fails to show actual vindictiveness and his claim should be denied.

> **4.      The Defendant's Presumption of Vindictiveness Claim Is Based on Legitimate Pretrial Prosecutorial Conduct, which the Supreme Court has Rejected.**

Due process is violated when one is punished out of vindictiveness for doing "what the law plainly allows" in "exercising a protected statutory or constitutional right." *United States v. Goodwin,* 457 U.S. at 372.  "The Supreme Court has determined that certain prosecutorial conduct raises a presumption of vindictiveness...." *United States v. Spears,* 159 F.3d 1081, 1086 (7th Cir. 1998). That presumption generally does not apply, however, to "pre-trial prosecutorial conduct." *Id.* ("the Supreme Court has refused to extend the presumption of vindictiveness to pre-trial prosecutorial conduct")*; see Goodwin,* 457 U.S. at 384 ("The possibility that a prosecutor would respond to a defendant's pretrial demand for a jury trial by bringing charges not in the public interest that could be explained only as a penalty imposed on the defendant is so *unlikely* that a presumption of vindictiveness certainly is not warranted.").  The fact that a prosecutor files additional charges after a failed plea negotiation does not establish a presumption of vindictiveness. *Goodwin*, 457 U.S. at 380 ("For just as a prosecutor may forgo

legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.").

In providing a framework for determining which prosecutorial decisions are vindictive and which are not, the Supreme Court has distinguished between a prosecutor's decision to add charges in the pretrial context and such a decision after trial.  In the pretrial context, the Supreme Court recognized that, "by tolerating and encouraging the negotiation of pleas, this Court ha[s] accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his constitutional right to stand trial." *Id*. at 378.  Moreover, the addition of charges in the pretrial context does not give rise to a presumption that the prosecutor is acting vindictively.  "An initial indictment—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the legitimate interest in prosecution."  *Id.* at 380.  "In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance.  At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *Id*. at 381.  In short, "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Id*. at 382.

Moreover, "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or other constitutionally protected interest." *Mabry v. Johnson*, 467 U.S. 504, 507 (1984), *disapproved on other grounds by Puckett v. United States*, 556 U.S. 129

(2009). Plea negotiations in such circumstances may continue, or a prosecutor may choose to add charges, cease negotiations, and go to trial. "A charging decision does not levy an improper 'penalty' unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." *Goodwin*, 457 U.S. at 380 n.11; *see also Paramo*, 998 F.2d 1212, 1221 (3d Cir. 1993).

For these reasons, for "a defendant to prove vindictiveness on the part of the government for its decision to seek an indictment, he must present objective evidence showing genuine prosecutorial vindictiveness," *Spears,* 159 F.3d at 1086, that is, that the prosecutor was actually vindictive, *Esposito,* 968 F.2d at 305; *see id.* ("[W]here the government's conduct is attributable to legitimate reasons, we will not apply a presumption of vindictiveness (though [the] defendant may still show actual vindictiveness)."). Courts look for evidence of "hostility or punitive animus toward the defendant *because* [he] exercised [a] specific legal right." *United States v. Battles*, 745 F.3d 436, 459 (10th Cir. 2014).

Without any proof of actual animus by the Special Counsel, the defendant argues for "a presumption of vindictiveness" by claiming "the prosecution's actions create the apprehension or appearance of prosecutorial vindictiveness." ECF 63 at 50. At the outset, this court should not permit the defendant to present a claim that may warrant a presumption because the nature of his complaint relates to pretrial plea negotiations and pre-indictment prosecutorial decision-making. *See Esposito,* 968 F.2d at 305 (declining to extend the presumption of vindictiveness where new charges are brought against the defendant after an acquittal); *Goodwin*, 457 U.S. at 384 (declining to extend the presumption of vindictiveness to pretrial claim where prosecution increased punishment the defendant faced).

46

Relying on an out-of-circuit district court case, *United States v. Velisicol Chemical Corp*, 498 F. Supp. 1255 (D.D.C. 1980), the defendant contends that a presumption of vindictiveness should extend to the pretrial context.  ECF 63 at 50.  Even if this court were to consider permitting a presumption based on a distinguishable District of Columbia case and contrary to Third Circuit precedent in *Goodwin* and *Esposito*, the grounds on which the defendant claims such a presumption is warranted are false and contradicted by the record.

First, the defendant claims, "DOJ obtained the facts underlying this case years ago and was satisfied the case did not warrant prosecution."  ECF 63 at 50.  This is inaccurate.  Many of the incriminating facts were discovered years after the conduct when prosecutors had received the defendant's Apple messages and when the defendant released his incriminating book.  There is no evidence that the DOJ decided that this case did not warrant prosecution "years ago."

Second, the defendant claims, "[DOJ] was then planning to avoid charges altogether until IRS whistleblowers went public."  ECF 63 at 50.  There is no evidence of that whatsoever.  Indeed, this claim is contradicted by the defendant's own letter dated October 31, 2022 (months before "IRS whistleblowers went public") that acknowledged the government was investigating him for the very same gun charges brought in this indictment.

Finally, the defendant argues that the government "upped the ante now three times in response to those directing animus at Mr. Biden . . ."  ECF 63 at 52.  This is not true.  The first "ante" is the false premise that the government never considered charging the defendant, which is again belied by his own counsel's statements in October 2022.

The second "ante" purportedly is the plea discussions in May of 2023 which were always subject to supervisory approval, as confirmed in the emails that were exchanged between the parties.  Indeed, the line AUSA stated "[w]e have not discussed or obtained approval for these

terms" and cautioned "that authority rests with the U.S. Attorney." Experienced criminal defense lawyers know that a plea offer is not final until it is approved by DOJ supervisors, received in writing, signed by the defendant and government, and accepted in court during a hearing. Notwithstanding the experience of defense counsel in this case, the line AUSA also caveated her discussions with defense counsel to make her lack of authority indisputable. An unapproved statement during a plea negotiation that does not culminate in an offer cannot fairly be described as an "ante up" by the DOJ that supports a finding of animus.

The third "ante" is apparently the Special Counsel's decision to seek the return of an indictment after the defendant stopped negotiating towards an agreement that addressed the court's concerns and instead insisted, contrary to contract law, that the prior unapproved Diversion Agreement was binding. With the statute of limitations approaching in October and the Speedy Trial Act deadline approaching in September, the government sought the return of an indictment. There is no "ante" here where the government merely presented the charges that it had been considering before negotiations failed to resolve the case, as confirmed by counsel's own letter of October 2022. The defendant does not dispute that all three counts in the indictment are supported by the evidence. Moreover, the indictment did not increase the defendant's sentencing guidelines and no charge carried a greater maximum penalty than 10 years imprisonment, which was the maximum penalty of the § 922(g)(3) charge in the information. Again, the defendant's claim rings hollow.

The defendant can say "ante up" all he wants but his cards speak for themselves. This court should call him on his bluff and deny his vindictive prosecution claim.

**5.    The Defendant Failed to Prove He Is Entitled to the Presumption and Therefore This Court Need Not Make a Finding Requiring the Government to Proffer Reasons**

If this Court declines to follow the Third Circuit's decisions in *Esposito* and *Goodwin* and instead finds that the defendant's speculative claims warrant a presumption, unless and until there is an adjudication that results in a finding by this court that there is "reasonable likelihood of danger" that the Executive Branch "might be retaliating against the defendant for lawfully exercising a right," the government is not in a position to disclose its deliberative processes and waive any privileges.  If the Court does make such a finding, then the government should have an opportunity to proffer legitimate, objective reasons for its conduct. *Paramo*, 998 F.2d at 1220 citing *Esposito,* 968 F.2d at 305.  These reasons may include, but will not be limited to, the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan.  *Armstrong*, 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at 607).   In addressing the defendant's selective prosecution claim and the need to identify a similarly situated individual, the government has already proffered some, but not all, of the facts related to the strength of the case.  *See* Section I.A. through H.  Indeed, these facts alone as well as the general deterrence value of a prosecution of this defendant would suffice to rebut a presumption, which should not apply here.

**E.    The Defendant's Novel Separation of Powers Claim Is Not Legally or Factually Supported**

In his final argument, the defendant asks this Court to do something that no court has ever done.  He asks this Court to find that elected members of Congress have acted unlawfully in violation of the Constitution by virtue of their speech about a pending criminal matter.  While providing no evidence that members of Congress have "actively interfer[ed]" with the DOJ's criminal investigation of the defendant, he asks this Court to dismiss an indictment to correct

what the defendant believes is an "encroachment" on the powers of the Executive Branch by the Legislative Branch.  Ironically, he demands that the Judicial Branch encroach on the Executive Branch's decision-making authority to seek this indictment pleading with the Court to "not let judicial perfection be the enemy of the good." ECF 63 at 59.

The defendant's rhetoric and invitation to act improperly to grant his claim should be dismissed outright. "It is well established that the exercise of prosecutorial discretion is at the very core of the executive function." *In re Grand Jury Subpoena, Judith Miller,* 438 F.3d 1141, 1153 (D.C. Cir. 2006).  The power to prosecute itself, as opposed to decide what to prosecute, is also a core executive function. *United States v. Armstrong,* 517 U.S. 456, 467 (1996).  The Executive Branch's decisions with respect to its exercise of prosecutorial discretion "are not subject to judicial review absent a showing of actual vindictiveness or an equal protection violation." *United States v. Molina,* 530 F.3d 326, 332 (5th Cir. 2008).

In support of his novel claim, he relies on only one out-of-district criminal case in which the court *denied* the defendant's supposed breach of separation of powers claim.  In *Mardis*, the defendant murdered a code enforcement officer who wrote him a traffic ticket in Memphis, Tennessee.  *United States v. Mardis*, 670 F. Supp. 2d 696, 697-98 (W.D. Tenn. 2009), *aff'd,* 600 F.3d 693 (6th Cir. 2010).  The defendant pled guilty to second degree murder in state court, agreed to a sentence of 15 years, and in doing so resolved a contemplated federal firearms charge.  *Id.*  Thereafter, U.S. Representative Steve Cohen of Tennessee actively pushed for a federal indictment of the defendant, including by promising at a press conference that he would help obtain a federal prosecution of the defendant, and later took credit for the prosecution as one of his accomplishments during a political debate.  *Id.*  The defendant filed a motion to dismiss

for a violation of separation of powers, arguing that the congressman "used his political stature to coerce federal prosecutors into pursuing charges against the defendant." *Id.*

The court explained that the separation of powers jurisprudence shows that "one branch of the federal government need not exercise its power totally uninfluenced by others." *Id.* at 699 (citing *Morrison v. Olson*, 487 U.S. 654, 693-94 (1988)). The court recognized that there was "no precedent squarely on point" to support the defendant's claim, and instead relied on general jurisprudence regarding the separation of powers. *Id.* at 701. The court distinguished the facts in *Mardis* from the primary case the defendant relied upon, *Bowsher* (also cited by the defendant), which involved a statute by which an officer of Congress could command the President himself to take action. The court found that "there is no statute in this case, nor does this case involve any other official action by Congress." *Id.* at 701.

Similar to *Mardis*, here the defendant's allegations about statements by politicians do not demonstrate that the Legislative Branch has assumed any duties of the Executive Branch. Specifically, the defendant's motion includes his various complaints about statements and conduct of Chairman Smith, Chairman Comer, Chairman Jordan, and U.S. Representative Greene. However, Chairman Smith did not present the indictment to the grand jury. Chairman Comer did not draft this response. Chairman Jordan will not be giving the government's opening at trial. And U.S. Representative Greene will not be determining the government's exhibit list. The defendant fails to show how any of these Members of Congress made any prosecutorial act or decision. His request for the Court to invade the province of the Executive Branch should be denied.

### III.    CONCLUSION

The defendant's motion is meritless and should be denied without an evidentiary hearing.

Respectfully submitted,

DAVID C. WEISS
SPECIAL COUNSEL

By:    _____
Derek E. Hines
Senior Assistant Special Counsel

Leo J. Wise
Principal Senior Assistant Special Counsel

U.S. Department of Justice