**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 23-00061-MN |
| ROBERT HUNTER BIDEN, | ) | |
| | ) | |
| *Defendant*. | ) | |

**THE UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS FOR FAILURE TO STATE CONSTITUTIONAL CHARGES**

Defendant Robert Hunter Biden filed a pretrial motion to dismiss the indictment arguing that (1) the offense stated in Count 3 violates the Second Amendment on its face and (2) that the offenses stated in Counts 1 and 2 must necessarily be dismissed as well.  ECF 61.  These arguments are meritless and should be denied.

To succeed, the defendant's facial challenge to the constitutionality of 18 U.S.C. § 922(g)(3) requires this Court to conclude that *under no set of circumstances* may Congress prohibit the possession of firearms by a person who habitually and unlawfully abuses or is addicted to controlled substances, including when that addiction, by statutory definition, endangers public safety or causes the individual to behave compulsively with respect to his addiction.  But Anglo-American law has long recognized the government's ability to restrict access to firearms for those whose possession would present an increased risk of danger to public health and safety.  The Second Amendment, like the rest of the Constitution, "protects against invasions of individual rights; it is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).  Congress's legislative choice to prohibit individuals who are actively engaged in habitual illegal or compulsive narcotic use from possessing firearms falls firmly within longstanding historical traditions and accords with the Second Amendment.

1

## BACKGROUND

By his own admissions in his 2021 memoir, the defendant spent most of 2018 smoking crack cocaine regularly. Over many pages, he describes the intensity of his addiction in painful detail, including periods in which he was "up 24 hours a day, smoking every 15 minutes, 7 days a week." Hunter Biden, *Beautiful Things* 190-91 (2021). Though at times during 2018, the defendant entered or completed rehabilitation treatment for addiction, he himself describes those periods—including one in November 2018, following the relevant conduct here—as "bullshit attempt[s] to get well" and "insincere rehab attempts." *Id.* at 202, 207. In another place, he described the time encompassing before and after October 2018 as being "nearly four years of active addiction." *Id.* at 220. Describing one incident in spring 2018, the defendant discusses visiting "a vast homeless enclave," which he knew was "a dangerous place to visit," and opening a tent to see a gun pointed at his face. *Id.* at 190.

At trial, the government will present evidence that just months after this incident, in the midst of his persistent addiction and ongoing drug use, and after repeated efforts at rehabilitation failed, the defendant purchased a Colt revolver, a speedloader (a firearm accessory that facilitates rapid reloading), and ammunition from a federally licensed firearm dealer in Wilmington, Delaware, on October 12, 2018. To do so, the defendant completed ATF Form 4473, which is legally required with every firearm purchase.[1] Among other things, that form asks the purchaser to state whether they are an unlawful user of or addicted to any controlled substances and

---

[1] Federal law requires licensed firearm dealers to "maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business, and in such form, as the Attorney General may by regulations provide." 18 U.S.C. § 923(g)(1)(A). Among other regulations, the Attorney General has promulgated 28 C.F.R. § 478.124, which requires firearm dealers to use ATF Form 4473 and obtain required certifications of eligibility from a firearm purchaser. *See* § 478.124(c)(1).

requires the purchaser to certify that (i) their answers are "true, correct, and complete," (ii) they understand persons who are addicted to controlled substances are not permitted to purchase firearms, and (iii) they understand making a false statement on the form is a felony offense.  The defendant knowingly and falsely indicated on the form that he was not addicted to any controlled substances and made the required certifications notwithstanding that lie.

There was no interruption in the defendant's drug abuse while he possessed the firearm. On October 13, the day after he purchased the firearm, the defendant texted another person that he was waiting for a dealer.  The following evening on October 14, he texted in response to an inquiry about his location that he had been "sleeping in a car smoking crack" in Wilmington: "There's my truth." In these and other text messages, he openly confirmed that he knew he was addicted to crack cocaine.

On October 23, 2018, the defendant's girlfriend found a gun in his car, which was unlocked and had the windows lowered, along with drug remnants and paraphernalia scattered around the vehicle.  The gun was located inside the defendant's brown leather pouch, with ammunition and the Speedloader.  In a panic, she threw it away in the trashcan of a local grocery store—actions that angered the defendant, who wanted to keep the gun.  When she returned to the trash to retrieve it at the defendant's insistence, it was gone.  The relative and the grocery store manager then called the police to report the firearm was missing.  It was eventually recovered and identified, though not returned to the defendant.  In short, the defendant's possession of the firearm ended after 11 days not because he reconsidered whether he should have a gun but because a family member took the gun from him, against his wishes, and then reported the loss of the firearm to law enforcement.

Following this 11-day period, the defendant's crack addiction continued unabated. Though in late November the defendant checked into a Massachusetts rehabilitation facility, his memoir admits he was not committed to it. *See* Biden, *Beautiful Things* 202, 207. After leaving that rehab, the defendant's memoir recounts living "three or four weeks" in Connecticut motels spending "all [his] energy [on] smoking drugs and making arrangements to buy drugs. *Id.* at 207-08, 213. In text messages throughout November, the defendant referred to himself as an "addict" and to "smoking crack"; set up drug purchases; and took pictures showing apparent powder and crack cocaine and drug paraphernalia. In late December 2018, he texted another person that he will "get sober when I want to get fucking sober." His memoir described his return to California in March 2019 as a "genuine, dictionary-definition blur of complete and utter debauchery ... [n]othing but drinking and drugging." *Id.* at 217-19, 222.

On September 14, 2023, the grand jury returned an indictment charging the defendant with three offenses related to the unlawful acquisition and possession of this firearm. Count 1 charges the defendant with violating 18 U.S.C. § 922(a)(6), which makes it unlawful for a person "knowingly to make any false or fictitious oral or written statement" to a licensed firearm dealer with the intent to deceive such dealer "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition." ECF 40, at 2. Next, Count 2 charges the defendant with violating 18 U.S.C. § 924(a)(1)(A), which punishes any person who "knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter." ECF 40, at 3. Lastly, Count 3 charges the defendant with violating 18 U.S.C. § 922(g)(3), which makes it unlawful for "any person … who is an unlawful user of or addicted to any controlled substance … to … possess in or affecting commerce, any firearm or ammunition." ECF 40, at 4.

## DISCUSSION

**I.      Section 922(g)(3) does not violate the Second Amendment on its face.**

Defendant asserts that there is a "lack of any historical precedent for disarming citizens based on their status of having used a controlled substance," rendering § 922(g)(3) invalid.  ECF 61, at 3.  This argument is both factually and methodologically wrong.

In making his argument, the defendant relies on one mistaken, nonbinding Fifth Circuit case—without mentioning that the Supreme Court has already granted certiorari, received merits briefing, and heard oral argument on it.  *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) (holding federal statute that prohibits firearm possession by those subject to domestic violence protective order violates Second Amendment), *cert. granted*, 143 S. Ct. 2688 (2023) (argued Nov. 7, 2023).  He likewise relies on another Fifth Circuit case, *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), for which the Solicitor General has filed a petition for a writ of certiorari and asked the Supreme Court to hold for its decision in *Rahimi*.  *See* Pet. for Writ of Certiorari, *United States v. Daniels*, No. 23-376 (U.S. filed Oct. 5, 2023).  The Supreme Court scheduled the petition in *Daniels* for its conference on January 5, 2024, and did not deny certiorari. The defendant also briefly references the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), while acknowledging that it addresses the markedly different context of an as-applied challenge to the particular felony circumstances of the plaintiff in that case.  *See* ECF 61, at 5 n.3.  Here too, the Solicitor General has filed a petition for a writ of certiorari from the en banc court's decision, which was distributed for the Supreme Court conference on Nov. 17, 2023, and has not been denied.  *See* Pet. for Writ of Certiorari, *Garland v. Range*, No. 23-374 (U.S. filed Oct. 5, 2023).

As explained below, the defendant's arguments, and the Fifth Circuit decisions on which he relies, are wrong.

### A.     Defendant has elected to challenge § 922(g)(3) on its face, which substantially raises his burden to establish unconstitutionality.

The distinction between a facial and an as-applied constitutional challenge has significant implications for the universe of circumstances a court considers when assessing the statute.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  The Supreme Court has unequivocally held that "[t]he fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Ibid.*  "An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citing *Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410, 411-12 (2006) (per curiam)).

Here, not only does the defendant not press an as-applied challenge, but instead he affirmatively disclaims one.  In just over four pages, he makes the crux of his argument: the assertion that there is "no historical precedent" for a prohibition on regular unlawful drug abusers or those addicted to controlled substances as a general category, not that in his particular circumstances the application of § 922(g)(3) violates the Second Amendment.  *E.g.*, ECF 61, at 6.  But more than that, in footnote 4 of his motion, the defendant expressly recognizes the distinction between facial and as-applied challenges and then goes on to argue that as-applied determinations under § 922(g)(1) or (3) would just create a vagueness problem.  *See* ECF 61, at 5

n.4.  In short, the defendant has intentionally hitched his arguments to "the most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745.[2]

Because the defendant has chosen to mount only a facial attack, to successfully invalidate § 922(g)(3), he must demonstrate that under no set of circumstances could Congress constitutionally prohibit individuals who regularly and unlawfully use controlled substances or who are addicted to them from possessing firearms.  *See* Oral Arg. Tr. 42:23-43:1, *United States v. Rahimi*, No. 22-915 (U.S. argued Nov. 7, 2023) (Justice Gorsuch: "[N]ormally, we ask on a facial challenge, is there any set of circumstances in which the dispossession would be lawful?").

**B.     The statute has a narrow, specific scope and does not prohibit anyone who has used drugs from possessing firearms.**

First, contrary to the defendant's characterization, the statute does not disarm everyone who has used a controlled substance.  The defendant repeatedly relies on this straw man to overstate the scope of the law.  *See also, e.g.*, ECF 61, at 3 (suggesting the law applies to "anyone who had at one time used a controlled substance"); *id.* at 3 n.2 (suggesting the law might apply to anyone who had "tried marijuana").  Yet the defendant is forced to concede (albeit buried in a footnote) that the Third Circuit—like every other federal court of appeals to address the issue—has properly understood Congress's intent to cover only unlawful "regular use over a period of time proximate to or contemporaneous with the possession of the firearm." ECF 61, at 3 n.1 (quoting *United States v. Augustin*, 376 F.3d 135, 138 (3d Cir. 2004)); *see also United*

---

[2] Nor may the defendant attempt to raise an as-applied challenge later, given that such an argument would now be untimely. *See United States v. James*, 955 F.3d 336, 345 (3d Cir. 2020) ("The rule that federal courts do not consider waived arguments is premised on the adversarial nature of our system of justice: that litigants, not the courts, choose the facts and arguments to present. Thus, when a party clearly chooses a particular path, it will be respected and generally not further reviewed." (citations omitted)).  Moreover, the defendant has not offered the relevant facts for analyzing an as-applied challenge and should not be permitted to seek to remedy that belatedly.

*States v. Yancey*, 621 F.3d 681, 687 (7th Cir. 2010) ("Every circuit to have considered the question has demanded that the habitual abuse be contemporaneous with the gun possession." (citing cases)).  In other words, courts have uniformly determined that the relevant unlawful drug use must be both (a) regular and (b) temporally linked to the gun possession.  *See, e.g.*, *United States v. Claybrooks*, — F.4th — , 2024 WL 44928, at *3 (4th Cir. Jan. 4, 2024) (recognizing that § 922(g)(3) "requires that the government prove 'that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm.'" (quoting *United States v. Purdy*, 264 F.3d 809, 813 (9th Cir. 2001))).  That conclusion flows from the plain text of the statute, which applies only to a person who "*is* an unlawful user of or addicted to any controlled substance." § 922(g)(3) (emphasis added); *see also Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 116 (1983) (noting that § 922(g)(3)'s present tense "is significant and demonstrates that Congress carefully distinguished between present status and a past event").

Moreover, the defendant's argument focuses exclusively on his characterization of the words "unlawful user" and ignores the parallel defined term, "addicted to".[3] On a facial challenge, the defendant must contend with whether the statute is constitutionally applicable to *any* set of circumstances, and the statute equally covers individuals who are "addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act)." § 922(g)(3). That statute defines an "addict" as "any individual who habitually uses any narcotic drug so as to

---

[3] Here, the indictment charges the defendant under both categories, permitting the jury to find him guilty under either theory. *See* ECF 40, at 4 (charging "the defendant, Robert Hunter Biden, knowing that he was an unlawful user of and addicted to any stimulant, narcotic drug, and any other controlled substance…."); *cf. United States v. Niederberger*, 580 F.2d 63, 68 (3d Cir. 1978) ("[I]t is settled law that where a statute denounces an offense disjunctively, the offense may be charged conjunctively in the indictment. Moreover, guilt may be established by proof of any one act named disjunctively in the statute." (citations omitted)).

endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." 21 U.S.C. § 802(1).  The first clause of this definition not only incorporates the requirement of regular or habitual use but also requires that the use endanger the public in some way.  The second clause requires that the addiction contain a specific characteristic: the loss of self-control over the drug usage.  The scope of this separate definition is neither ambiguous nor broad.

Lastly, the mental state required for the criminal offense further limits its scope and blunts any vagueness concern.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 412 (2010); *United States v. James*, 952 F.3d 429, 435 (3d Cir. 2020).  As the Supreme Court recently clarified, a criminal § 922(g) offense occurs only when the government can prove "both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019); *see* 18 U.S.C. § 924(a)(8) (imposing criminal penalties only on someone who "knowingly violates" § 922(g)).  In other words, to be convicted under § 922(g)(3), a defendant would have to know that that they were a regular, unlawful user or that they were addicted to the controlled substance.  The defendant's protestations that "[r]oughly half of American adults" could be turned into felons is a transparently paper tiger.  *Cf.* ECF 61, at 3 n.2.

C. **Bruen expressly rejected a requirement for a precise historical match to sustain a modern firearm regulation.**

Like the Fifth Circuit's erroneous decision in *Daniels*, the defendant myopically focuses on whether the Founders prohibited firearms specifically for those who habitually abused or were addicted to controlled substances, a fundamental misapplication of the Supreme Court's precedent.  The Supreme Court instead held in *Bruen* that a statute does not violate the Second Amendment if the government demonstrates "the regulation is consistent with this Nation's

historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022).  However, the Court expressly emphasized that "[a]lthough its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28.  For that reason, the Court opted for the methodological approach of "reasoning by analogy" and concluded that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar'" according to a specified metric.  *Id.* at 29.  From its prior precedents, the Court then identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Ibid.*

Reiterating the flexibility of its mode of analysis, the Court unambiguously held that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30.  To sustain a legislative restriction on firearms, therefore, the Second Amendment "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Ibid.* (emphasis in original).  The Court then gave a specific example: Recognizing even "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," the Court observed that it was "aware of no disputes regarding the lawfulness of such prohibitions." *Id.* at 30 (citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  Thus, the Court found it "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment" and affirmed the ability of modern courts "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Ibid.* (emphasis in original).

Thus, the relevant inquiry is not whether, at the time of the Founding, there existed regulations restricting firearm access for those habitually abusing or addicted to controlled substances.  The inquiry is whether the government can identify historically analogous regulations that are "relevantly similar" in, at least, their impact on "a law-abiding citizen's right to armed self-defense" or other appropriate metrics.

### D. Ample historical precedent supports a prohibition on firearm possession by individuals presenting a heightened risk of danger to public safety.

Anglo-American law has long recognized that the government may disarm those who, by their conduct or characteristics, present an increased risk to public safety if they possess firearms.[4]

In 1662, the English Parliament enacted the Militia Act, which authorized designated representatives of the Crown (called lieutenants) "to search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or any two or more of their deputies shall judge dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662).  Subsequently, the Crown repeatedly directed its lieutenants to disarm such individuals.  *See, e.g.*, Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); *Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers,*

---

[4] If it would assist the Court, the United States will provide copies of the historical sources cited in this response upon request.

*Domestic Series, May 1,1684–February 5, 1685,* at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

Subsequently, after monarchical abuses caused the Glorious Revolution, Parliament first codified a right to bear arms in its enactment of the English Bill of Rights, which condemned James II's disarming of "good subjects" and declared that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.); *see also Bruen*, 597 U.S. at 44 (discussing this provision of the English Bill of Rights as "the predecessor to our Second Amendment"); *Heller*, 554 U.S. at 593 (same).  Notably, however, English law did not treat the Bill of Rights as overruling or abrogating the Militia Act, which continued to be used as a matter of regular practice after 1689.  See, *e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702,* at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).  In fact, the power to disarm those deemed dangerous under the Militia Act continued to be recorded in numerous justices-of-the-peace manuals between 1689 and the drafting of the Second Amendment.  *See* Robert Gardiner, *The Compleat Constable 68 (3d ed. 1708); Giles Jacob, The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of*

*Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

Likewise, the Statute of Northampton—a 1328 law that prohibited Englishmen from "rid[ing]" or "go[ing] armed by night nor by day … upon pain to forfeit their Armor to the King," 2 Edw. 3 c. 3 (1328)—continued to be applied following the English Bill of Rights, though commentators and manuals noted that its plain meaning had been limited to a prohibition on carrying arms "accompanied with such Circumstances as are apt to terrify the People." 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135-136 (1716); *see also* Barlow, *supra*, at 12; 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); *cf. Bruen*, 597 U.S. at 45 (concluding that the Statute did not support a prohibition on "the mere public carrying of a handgun" but noting this remaining scope). Following rioting in London in 1780, officials confiscated the rioters' arms, and the House of Lords ultimately rejected a motion declaring that the confiscation violated the Bill of Rights. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-132 (1994). In doing so, some Lords observed that there was a difference between the confiscation of arms from "sober citizens" and "citizens of character" and confiscation of arms from a "disorderly" "mob." *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780); *id.* at 730-31 (June 21, 1780) (speech of Lord Stormont). Thus, the power to disarm individuals deemed to present a risk of danger to public safety continued in harmony with the general right of the law-abiding, responsible public to keep and bear arms.

13

In America, popular understanding contemporaneous to the Second Amendment proceeded on the assumption that the right covered those who were peaceful, law-abiding, and not dangerous to public safety. Numerous Founding-era American justice-of-the-peace manuals repeated the Statute of Northampton's directive to confiscate the arms of those who carried them in a manner that spread fear or terror. *See*, *e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.). Several states expressly recodified the rule. See Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

In addition, the revolutionary Continental Congress recommended disarming loyalists and those who refused to take a loyalty oath, and most states enacted such laws accordingly.[5]

---

[5] See 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia,*

For example, in 1780, the town of Williamsburg, Massachusetts proposed amending the new state constitution with an individual, but qualified, right to keep and bear arms, noting: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Lawfull Subjects of Government* we Ought Never to be deprived of them." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966) (emphasis added). Nor was that principle limited to the Revolution: in 1787, Massachusetts passed a law outlining pardon procedures for individuals participating in Shays' Rebellion (an internal rebellion concerning taxation) the previous year. *See* Act of Feb. 16, 1787, ch. VI, 1787 Mass. Acts 555. To obtain a pardon, rebels had to take a loyalty oath and forfeit their arms for three years. *Id.* at 556. As one scholar notes, "[t]he law demonstrates that in a well regulated society, the state could disarm those it deemed likely to disrupt society." Saul Cornell & Nathan DeNino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 508 (2004). Other common statutes disarmed individuals who committed offenses related to firearm safety, like unsafe storage laws. See Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

---

*from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

The Second Amendment's own pedigree demonstrates this understanding.  At Pennsylvania's ratifying convention for the new Constitution, the Anti-Federalists proposed a bill of rights—which *Heller* described as "the highly influential minority proposal," 554 U.S. at 604—that prohibited "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals.*" 2 *The Documentary History of the Ratification of the Constitution* (*Documentary History*) 598 (Merrill Jensen ed., 1976) (emphasis added); *see also Nicholas Collin, Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788) (discussing the Pennsylvania proposal and agreeing that Congress should have the power to disarm individuals who posed a "real danger of public injury"), *in Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights* 40 (Stanton D. Krauss ed., 2019).  At the Massachusetts ratifying convention, Samuel Adams proposed a bill of rights that prohibited Congress from preventing "the people of the United States, who are peaceable citizens, from keeping their own arms." 6 *Documentary History*, *supra*, at 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000); *see also* Letter from Jeremy Belknap to Ebenezer Hazard ("Belknap Letter") (Feb. 10, 1788) (describing the proposal as an effort to protect "the right of peaceable citizens to bear arms")*, in* 7 *Documentary History*, *id.*, at 1583.  Although this proposal was rejected by the convention, it was not for substantive disagreement with restriction of the right to "peaceable citizens" but for a procedural failure to propose it early enough.  Belknap Letter, *supra*.  These proposals, though defeated in their state ratifying conventions, created the impetus that became the Second Amendment.  *See, e.g.*, *Heller*, 554 U.S. at 604 (noting that the "Federalist-dominated first Congress … adopted primarily the popular and uncontroversial (though in the Federalists' view, unnecessary) individual-rights amendments"); *McDonald v. City of Chicago, IL*, 561 U.S. 742, 769 (2010)

(noting that "those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution").

As with the English Bill of Rights, post-Founding practice with respect to the Second Amendment confirmed that the right was not violated when the government disarmed those who presented threats to public peace and safety.  Government officials, writing or speaking about the scope of the Second Amendment and state counterparts, observed that the right prohibited "taking from peaceable citizens their arms." *State Convention of the Suffrage Men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1; *see also* Joseph Gales, *Prevention of Crime*, in *O.H. Smith, Early Indiana Trials and Sketches* 466-67 (1858) (reporting the mayor of Washington, D.C.'s statements that a "peaceable citizen " could bear arms but asking rhetorically "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?").  In discussing the Second Amendment and Maine's equivalent constitutional provision, the legal commentator John Holmes noted that the right was qualified such that "a free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840).  Holmes observed that "the rights of self defence" are "guarded and secured to every one who entitles himself by his demeanor to the protection of his country." *Ibid.*

In line with these restrictions, beginning in the 1830s and carrying through the 1870s, states began to pass surety laws, which required an individual "who was reasonably likely to 'breach the peace,'" and "could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Bruen*, 597 U.S. at 55-56 & n.23 (collecting state statutes).  While *Bruen* held that these statutes did not support a general regulation on the ability of ordinary, law-

17

abiding citizens to carry arms in public, it did so expressly *because* these statutes applied on their terms only to those who presented a threat to public safety. *See id.* at 60 (noting that the surety statutes did not "operate[] to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose").

In the Civil War-prelude slavery conflicts in Kansas Territory between 1851 and 1864, public reaction to the conflict—and government disarmament actions—varied dramatically based on whether the individuals disarmed were peaceful or threats to public safety. Anti-slavery Senators called for Congress to pass legislation disarming "armed" groups that were "violating law, order, and peace" or "enter[ing] the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856) (statement of Sen. Henry Wilson); *see also id.* at 1091 (statement of Sen. Benjamin Wade) (similar). Yet anti-slavery newspapers and petitions also decried federal and territorial authorities when they disarmed "peaceable citizens," then specifically invoking the Second Amendment. *See, e.g.,* New-York Daily Tribune, Oct. 2, 1856, at 4; *High-Handed Outrage in Kansas,* Holmes County Republican, Oct. 30, 1856, at 1; *see also* A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1, 1856), *in* The Liberator, Aug. 22, 1856, at 140 (calling for President Pierce's impeachment for disarming "peaceable citizens").

Following the Civil War, Southern states routinely attempted to disarm Black citizens solely because of their race, prompting rebukes by the federal government because the freed citizens had not engaged in any conduct that would permit their disarmament. *See, e.g.*, *Heller*, 554 U.S. at 614. The congressionally established Freedman's Bureau responded to Georgian attempts to disarm Black citizens with a circular emphasizing that "[a]ll men, without distinction of color, have the right to keep arms" unless "convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866). A joint congressional

report excoriated attempts by South Carolinians to take firearms away from freed Black citizens, observing "[t]he freedmen of South Carolina have shown by their peaceful and orderly conduct that they can safely be trusted with fire-arms." *Heller*, 554 U.S. at 615 (quoting Joint Comm. on Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866)).  A Reconstruction order in 1866 thus guaranteed the right to keep and bear firearms to "all loyal and well-disposed inhabitants" in South Carolina but noted that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-09.

In fact, throughout the 19th century, states began to enact more regulations on firearms, as technology advanced and made them more dangerous than their single-shot predecessors.  By 1895, at least 29 jurisdictions had age restrictions on purchasing or possessing firearms.[6]  States

---

[6] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

enacted laws prohibiting firearms to persons of unsound mind[7] or to vagrants.[8]  Several states

prohibited intoxicated persons from carrying firearms.[9]  Kansas prohibited anyone "who has ever

borne arms against the government of the United States" from carrying firearms.  *See* Act of Feb.

23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.  State supreme courts upheld these statutes as

consistent with the right to keep and bear arms.  *See, e.g.*, *State v. Hogan*, 58 N.E. 572, 575

(Ohio 1900); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Beginning in the 1930s, Congress began enacting a series of statutes that restricted

firearm access to those deemed potential threats to public safety.  Congress initially disqualified

violent criminals, fugitives, and persons under felony indictment and then added, in the 1960s,

all other felons, habitual drug users and addicts, and persons with mental illnesses.  *See* Federal

Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251; Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2,

75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220.  Subsequent

legislation in the 1980s and 1990s added unlawfully present noncitizens, people dishonorably

discharged from the Armed Forces, persons subject to domestic-violence protective orders, and

---

[7] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[8] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[9] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

domestic-violence misdemeanants.  *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452 (May 19, 1986); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014; Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372.

Describing Congress's enactments in this area, the Supreme Court observed in 1983 that it had given "weight to the Act's broad prophylactic purpose," which it had described as motivated by Congress's concern "with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest" with a purpose "'to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"  *Dickerson*, 460 U.S. at 118-19 (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).  As a result, the Court noted Congress's determination that "firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them." *Ibid.*

In short, the prohibitions contained in § 922(g) are simply the latest step in a lengthy history of firearm regulation aimed at addressing the threat to public safety by individuals whose conduct or characteristics present an increased risk of danger when possessing a firearm.  As discussed below, the regular unlawful drug abuse and addiction covered by § 922(g)(3) is "relevantly similar" to these historical analogues and falls well within our constitutional tradition.

**E.      Habitual illegal drug use and addiction presents significant public health and safety risks when coupled with firearms.**

The Supreme Court and federal appellate case law recognizing that "drugs and guns" are a "dangerous combination"—and that unlawful drug users are more likely than the average law-abiding citizen to misuse firearms—is extensive, to put it mildly. *E.g.*, *Rosemond v. United States*, 572 U.S. 65, 75 (2014); *see also United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014) (citing studies showing drug users "were much more likely to engage in violence, even controlling for multiple demographic and behavioral variables"); *cf. Muscarello v. United States*, 524 U.S. 125, 132 (1998); *Smith*, 508 U.S. at 240; *Johnson v. United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting); *Harmelin v. Michigan*, 501 U.S. 957, 1003 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *Richards v. Wisconsin*, 520 U.S. 385, 391 n.2 (1997); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005); *Yancey*, 621 F.3d at 685; *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011).  In fact, in 1989, the Supreme Court upheld suspicionless drug testing as a condition of promotion to federal jobs requiring individuals to carry firearms expressly because of "the extraordinary safety … hazards that would attend the promotion of drug users to [those] positions." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 674 (1989).  The Court noted that "[e]ven a momentary lapse in attention can have disastrous consequences" and that "[t]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.* at 670-71.

Strong evidence supports Congress's determination that regular unlawful drug use or addiction presents an increased public safety threat when coupled with firearm possession.  Drugs can induce changes in "physiological functions, cognitive ability, and mood *Harmelin*,

501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment), including by "emboldening [individuals] in aggression" (*Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 332 (2012)).  Taking cocaine as an example, the National Institute on Drug Abuse has concluded that "studies suggest that a wide range of cognitive functions are impaired with long-term cocaine use—such as sustaining attention, impulse inhibition, memory, making decisions involving rewards or punishments, and performing motor tasks." Nat'l Inst. on Drug Abuse, Nat'l Inst. of Health, *What Are the Long-Term Effects of Cocaine Use?* (May 2016), *available at* https://nida.nih.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use. Short-term effects of large doses, which habitual or addicted users are more likely to take (*see id.*), "can also lead to bizarre, erratic, and violent behavior" as well as "feelings of restlessness, irritability, anxiety, panic, and paranoia" and "tremors, vertigo, and muscle twitches." Nat'l Inst. on Drug Abuse, Nat'l Inst. of Health, *What Are the Short-Term Effects of Cocaine Use?* (May 2016), *available at* https://nida.nih.gov/publications/research-reports/cocaine/what-are-short-term-effects-cocaine-use.

Similarly, a meta-analysis of studies found "significant impairment across multiple cognitive domains in cocaine abusers" that continues even up to 5 months into abstinence, with the "most impaired domains" including "attention" and "impulsivity," with smaller effects on functions like "speed of processing." Stéphane Potvin et al., *Cocaine and Cognition: A Systematic Quantitative Review*, 8 J. Addiction Medicine 368 (2014); *see also* Priscila P. Almeida et al., *Attention and Memory Deficits in Crack Cocaine Users Persist over Four Weeks of Abstinence*, 2017 J. Subst. Abuse Treatment 73 (Oct. 2017); Helen Fox et al., *Difficulties in Emotion Regulation and Impulse Control During Cocaine Abstinence*, 89 Drug & Alcohol Dependence 298 (July 2007).  Another review of literature concluded that "[c]ocaine abusers

have significant cognitive impairments that encompass all aspects of executive function"—defined as updating relevant information, shifting between multiple tasks, the ability to inhibit automatic or impulsive responses, and general decision-making—with the data "strongly support[ing] the idea that cocaine is an important contribution to the significant impairments of cognitive performance experienced by drug users."  Thomas J.R. Beveridge et al, *Parallel Studies of Cocaine-Related Neural and Cognitive Impairment in Humans and Monkeys*, 363 Philos. Trans. R. Soc. B 3257, 3257-69, 3262-63 (2008).  The review noted data indicating cognitive deficits in areas like "poor inhibitory control or an inability to gate inappropriate responses to external influences" and a decreased ability "to process future negative consequences in the presence of an opportunity for immediate gratification." *Id.* at 3259.[10]

It is practically beyond reasonable dispute that firearm possession while operating under significant cognitive impairment in critical areas like attention, speed of processing, emotional regulation, inhibition control, and the ability to prioritize negative long-term consequences—not to mention psychological and physiological effects like panic, paranoia, tremors, or muscle twitches—presents a significant public safety risk. *See Von Raab*, 489 U.S. at 670-71, 674. As discussed above, states throughout the 18th and 19th century disarmed those whose possession of firearms was determined to present an increased threat to public safety: those who refused to take loyalty oaths, minors, those who used arms and ammunition unsafely, the mentally ill, vagrants,

---

[10] Such effects are perhaps no more vividly demonstrated by the defendant's own portrayal of his crack cocaine addiction during the relevant period, in which the loss of inhibition, emotional regulation, and self-control was central.  *See supra* (discussing the defendant's memoir recounting his addiction); *see also* Biden, *Beautiful Things* 169-74 (discussing an episode in which the defendant drove a 500-mile road trip on which he damaged a rental car when he hit the curb and spun into oncoming traffic, chain-smoked crack cocaine while driving, and chased a possibly hallucinatory barn owl at high speeds "through a series of tight, bounding switchbacks").

and intoxicated persons. *See supra* nn.4-8 & accompanying texts; *see also Heller*, 554 U.S. at 626 & n.26 (noting historical regulations on felons and the mentally ill are "presumptively lawful regulatory measures"); *McDonald*, 561 U.S. at 786 (plurality opinion) (same).

Notably, at that time, firearms tended to be single-shot and often misfired, could not be stored loaded for long periods, and then took a lengthy time to load. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). Today, firearms are significantly more lethal and immediately usable because of technological developments like metallic cartridges, mass-produced revolvers, and multi-round magazines. *See id.* at 123-27. At the same time, drugs like cocaine have an availability today that did not exist in the Founding Era. *See, e.g.*, Drug Enforcement Admin., *2019 National Drug Threat Assessment* 60 & fig.56 (December 2019) (showing a rising cocaine-purity trend alongside falling price trend between 2013 and 2017). As much as the Second Amendment continues to protect commonly used "arms" even when their technological capabilities far outstrip those extant at the Founding (*e.g.*, *Bruen*, 597 U.S. at 47), it certainly does not restrain Congress from considering that distinctly increased lethality when determining what presents a "relevantly similar" risk to public safety for purposes of lawful firearm possession.

Second, the nexus between violence and habitual illegal drug use or addiction is well documented. In the years preceding § 922(g)(3)'s enactment in 1968, the President and both Houses of Congress recognized that habitual or compulsive drug use often motivated criminal behavior. *See* H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) (presidential message) ("Drug addiction … drives its victims to commit untold crimes to secure the means to support their addiction."); H.R. Rep. No. 1486, 89th Cong., 2d Sess. 8 (1966) ("Narcotic addicts in their

desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs"). The Supreme Court reporter is replete with cases documenting crimes motivated by drug habits, particularly robberies.[11] *See, e.g.*, *Stokeling v. United States*, 139 S. Ct. 544, 551 (2019) (characterizing robbery as the "quintessential" violent felony predicate under the Armed Career Criminal Act); *cf.* FBI, *Violent Crime*, Uniform Crime Reporting Program (2019) (reporting that robberies constituted 22.3% of violent crime in the United States, the second-highest incidence). Robberies are an inviting crime in the drug world because participants often complete transactions with cash and "are less likely to report robberies to the police." *Taylor v. United States*, 579 U.S. 301, 303 (2016).  According to a Bureau of Justice Statistics study, around 20% of state inmates (and almost 40% of those incarcerated for property crimes) reported committing their crimes to obtain drugs or money for drugs.  *See* Jennifer Bronson et al., Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009*, at 6 (rev. Aug. 10, 2020).  These cases are not merely anecdotal: as the Seventh Circuit has observed, "[a]mple academic evidence confirms the connection between drug use and violent crime." *Yancey*, 621 F.3d at 686 (citing studies).

In addition, specifically because of its unlawfulness, violence is prevalent within the illegal narcotics trade, not only between drug dealers and customers but also between drug users

---

[11] *See, e.g.*, *Ramirez v. Collier*, 142 S. Ct. 1264, 1296 (2022) (Thomas, J., dissenting); *Andrus v. Texas*, 140 S. Ct. 1875, 1877 (2020) (per curiam); *Wong v. Belmontes*, 558 U.S. 15, 15-16 (2009) (per curiam); *Smith v. Texas*, 543 U.S. 37, 41 (2004) (per curiam); *Bell v. Cone*, 535 U.S. 685, 703 (2002); *Buford v. United States*, 532 U.S. 59, 62 (2001).

and law enforcement.  *See, e.g.*, *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment) (observing that "violent crime may occur as part of the drug business or culture"); *Michigan* v. *Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence."); *Carter*, 750 F.3d at 469 ("[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," and such encounters "threaten the safety" of the officers "when guns are involved."); *see also* Carrie B. Oser et al., *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1288 (Aug. 2009); Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* 3 (Sept. 1994).  The defendant's own memoir characterizes "[w]alking into a park in a high-crime neighborhood to buy crack at 4 a.m." as being "no different than playing Russian roulette with two shells in the chamber" and "[i]n some places, it was like playing with five shells." Biden, *Beautiful Things* 158.

Lastly, the intersection of firearm possession and habitual drug abuse or addiction presents a significant risk to the user themselves. *See Bruen*, 142 S. Ct. at 2164 (Breyer, J., dissenting) (citing statistics showing 61% of firearm deaths in 2015 were by suicide). As one article noted, "[a]lmost all substance abuse disorders are associated with an increase in suicide risk." Michael Esang & Saeed Ahmed, *A Closer Look at Substance Use and Suicide*, Am. J. of Psych. Residents' J. 7 (June 2018); *see also* Guilherme Borges et al., *Associations of Substance Use, Abuse, and Dependence with Subsequent Suicidal Behavior*, 151 Am. J. Epidemiology 781 (2000) (noting increased risk of suicide accompanying drug abuse and dependence over use without abuse or dependence).  One recent meta-analysis of the literature concluded that a

substance use disorder "is strongly associated with an increased risk of suicide ideation, suicide attempt and suicide death." Jalal Poorolajal et al., *Substance Use Disorder and a Risk of Suicidal Ideation, Suicide Attempt, and Suicide Death: A Meta-Analysis*, 38 J. Pub. Health e282, e289 (Oct. 2015).  Given the physiological and psychiatric effects of habitual drug abuse or addiction discussed above, like lowered inhibition control, lowered emotional regulation, and feelings like panic or paranoia, these results again confirm that firearm possession by habitual drug abusers or addicts presents a serious risk of harm to themselves, not merely the general public.

**F.      Section 922(g)(3)'s prohibition is relevantly similar to historical regulations.**

As the history discussed above demonstrates, "[t]hat *some* categorical limits are proper is part of the original meaning [of the Second Amendment], leaving to the people's elected representatives the filling in of details." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (Easterbrook, J.).  *Heller* itself declared "longstanding prohibitions on the possession of firearms by felons and the mentally ill," which are unquestionably categorical determinations, as "presumptively lawful regulatory measures." 554 U.S. at 626-27 & n.26.  The Court then reiterated the permissibility of such disqualifications in its holding, which concluded that "[a]*ssuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Id.* at 635 (emphasis added).  Moreover, such "[c]ategorical limits on the possession of firearms would not be a constitutional anomaly," considering the limits applicable to other individual rights like free speech.  *Skoien*, 614 F.3d at 641.  Thus, as with a sensitive-places determination, Congress is entitled to extend the reasoning of historical regulations restricting firearm access for public safety "to *new* and analogous" contexts. *Bruen*, 597 U.S. at 30.

Congress's decision to prohibit firearm possession for individuals falling within § 922(g)(3)'s narrow scope is fully consistent with *Bruen* and with the nation's historical

tradition of disarming persons whose possession of firearms presents a public safety threat.[12]
*Bruen* emphasized that the relevant metrics identified in *Heller* and *McDonald* were, "at least," "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29.  *Bruen* then disclaimed any effect on "'shall-issue' licensing regimes," including those "which often require applicants to undergo a background check … to ensure only those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  What's more, three of the six Justices in the *Bruen* majority— along with the three *Bruen* dissenters—expressly emphasized that *Bruen* did not modify *Heller*'s and *McDonald*'s discussions of permissible firearm restrictions or "who may lawfully possess a firearm." *Id.* at 72 (Alito, J., concurring); *see also id.* at 80-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 129 (Breyer, J., dissenting, joined by Sotomayor & Kagan, JJ.).  Habitual unlawful drug users and addicts, and the risk their possession of firearms poses to public safety, fall well outside the heartland of what the Second Amendment protects.

First, the statute applies minimal, if any, burden to "a law-abiding citizen's right to armed self-defense." *Ibid.*  By definition, the statute applies solely to those who are either habitual *unlawful* users of controlled substances or whose addiction presents a public safety risk or is defined by a loss of self-control over the addiction.  *See supra,* Part I.B.  The unlawfulness inherent in the abuse of controlled substances thus presents even less of a threat to the core Second Amendment right than historical analogues like age and mental illness or incompetence, which carry with them no inherent culpability or civic misconduct.  With § 922(g)(3), moreover,

---

[12] Notably, even in the context of the as-applied felon-in-possession analysis in *Range*, three members of the en banc majority—a determinative number—separately concurred to note that § 922(g)(1) remained "presumptively lawful … because it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society." *Range*, 69 F.4th at 109-10 (Ambro, J., concurring).

criminal penalties attach only to those who know that they fall into this category and then knowingly possess a firearm anyway. *See Rehaif*, 139 S. Ct. at 2200. Notably, because of the Attorney General's requirement that all federally licensed firearms dealers collect a certification from a purchaser on ATF Form 4473, individuals are expressly informed that their habitual, unlawful drug abuse or addiction makes firearm ownership unlawful. *See* 28 C.F.R. § 478.124(c)(1). Any subsequent choice to lie on the form and obtain a firearm anyway goes beyond mere knowledge and becomes an intentional, willful violation of the law. *Cf. Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (observing that willfulness is present when the "defendant acted with knowledge that his conduct was unlawful").

Moreover, unlike *Heller*'s presumptively lawful disarmament of felons or those who have been civilly committed for mental illness in the past, for example, the disqualification has a temporal limitation to present circumstances: it applies "only so long as [a person] abuses drugs"; a user can "regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-87; *cf. Dickerson*, 460 U.S. at 116 (distinguishing between § 922(g)(3)'s "present status" and § 922(g)(1) and (4)'s "past event[s]"). Put differently: a habitual, unlawful drug user or addict "controls his right to possess a gun; the Second Amendment, however, does not require Congress to allow him to simultaneously choose both gun possession and drug abuse." *Yancey*, 621 F.3d at 687.[13]

Defendant invokes the Fifth Circuit's analysis of historical regulations involving intoxication (*see* ECF 61, at 3), but that analysis is erroneous on both facts and law. As an initial

---

[13] In similar fashion, the Supreme Court has recognized that the constitutional principle prohibiting a state from criminalizing a "mere status" does not prevent a state from imposing "a criminal sanction for public behavior which may create substantial health and safety hazards, both for appellant and for members of the general public." *Powell v. Texas*, 392 U.S. 514, 532 (1968).

matter, alcohol was a lawful substance in the United States at the Founding, unlike controlled substances now, rendering laws governing alcohol and firearms a presumptively different regulatory balancing.  But even setting aside the defendant's continued disanalogy of § 922(g)(3)'s scope to "any history of ingesting intoxicating substances" (*ibid.*), there is in fact ample historical precedent.  A plethora of 19th-century state statutes permitted "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as those deemed "lunatics" and those who lacked mental competence to conduct their own affairs.[14] *E.g.*, *Kendall v. Ewert*, 259 U.S. 139, 146 (1922).  Such restrictions or commitments were certainly accompanied by a loss of the right to keep and carry their own firearms.  *See Yancey*, 621 F.3d at 685 (discussing lack of specific firearm disarmament statutes for the mentally ill because justices of the peace could perform the greater restriction of civil commitment); *cf. supra* note 6 & accompanying text (discussing statutory disarmaments of those deemed of unsound mind).  The defendant's assertion that the Second Amendment allows restrictions only on persons "actively" intoxicated or under the influence of controlled substances is likewise cut from whole cloth.

---

[14] *See*, *e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

Those historically deemed "lunatics" at common law included those who "hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765); *see also* Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* § 405, at 247 (1628) (defining a "[l]unatique" as a person "that hath sometime his understanding, and sometime not"). Again, *Heller*'s characterization of "longstanding prohibitions on the possession of firearms by … the mentally ill" as "presumptively lawful" carried with it no limitation that the individual be experiencing a present, acute manifestation of mental illness for the disarmament to be constitutional. 554 U.S. at 626-27 & n.26.

As discussed above, habitual drug use and addiction carry with them persistent cognitive, psychological, and physiological impacts that present a risk to public safety when coupled with firearm possession. *See supra,* Part I.E. A limitation to "active" intoxication or substance influence does not address the full scope of that danger to public safety. But even if the Court assumes the Second Amendment permits Congress to consider only the risk from "active" (*i.e.*, immediate intoxication or drug effects), the statute's limitation to those engaged in habitual unlawful drug abuse or compulsive addiction remains valid. The Second Amendment does not require Congress to assume the incredible proposition that such individuals will remove a firearm from their possession before ingesting controlled substances and only retake possession once the substance has been metabolized past all immediate effects.

In short, both the defendant and the Fifth Circuit in *Daniels* commit the methodological error expressly repudiated by *Bruen*: that of requiring the government to establish a historical "twin" instead of identifying historical "analogue[s]" that are "relevantly similar" in, at least, "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597

U.S. at 29.  The Founding-era historical record and subsequent practice are replete with examples of uncontroversial disarmaments of those whose conduct or characteristics made the possession of firearms an increased danger to public health, safety, or order.  Here, § 922(g)(3)'s application only to regular unlawful users and those addicted to controlled substances under the statutory definition presents minimal, if any, burden on the core right of law-abiding citizens.  Likewise, the data showing the significant and severe risks presented when regular unlawful drug users or addicts possess firearms are extensive and well documented.  Section 922(g)(3) is thus amply "relevantly similar" to historical regulations of firearms as to both the "how and why" inquiries and fully consistent with the original understanding of the Second Amendment.

*　*　*

To conclude, the defendant's choice to mount a facial challenge to § 922(g)(3) requires him to demonstrate that under no set of circumstances can Congress prohibit firearm possession by anyone who falls within the statutorily defined category.  *See Salerno*, 481 U.S. at 745.  Thus, the defendant's argument requires this Court to conclude that Congress is constitutionally required to permit *all* habitual drug abusers and addicts to possess a firearm—no matter the intensity of the habitual drug abuse or addiction, no matter the temporal proximity or immediacy between the drug use and the firearm possession, no matter the symptoms experienced, and no matter the absence of any legitimate need for or purpose of self-defense a particular defendant may have.  That extraordinary position collapses on the mere statement of it, even more quickly when the historical tradition is examined in detail.  Defendant's cursory assertion that § 922(g)(3) lacks historical precedent does not come close to meeting his burden.  The historical record firmly rebuts his contentions and more than satisfies the standard outlined in *Bruen*.

33

Lastly, the government notes that the defendant appears to concede that "Congress could criminalize gun possession from someone who was actively intoxicated, or perhaps someone who at least actively had a controlled substance in their body." ECF 61, at 3.  As just briefly summarized above, the government's evidence would certainly permit a jury to conclude, directly or circumstantially, that the defendant possessed the gun while actively using crack cocaine and under its immediate effects.  *See supra,* Background.  Thus, even on a narrowed construction of § 922(g)(1) to the defendant's own terms about what the Second Amendment permits, the government's evidence about his crack cocaine use contemporaneously with the gun possession would require submission of the charge to the jury.  *See, e.g.*, *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011) (describing review under Fed. R. Crim. P. 12(b)(3) as "a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury").

Defendant's concession thus necessarily dooms his facial challenge (by identifying at least one circumstance in which § 922(g)(3) is permissible) and any chance of dismissal in this case.[15]  The Supreme Court has repeatedly emphasized "the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973); *see also United States v. Raines*, 362 U.S. 17, 21 (1960) (same).  Because the defendant's conduct here is constitutionally punishable even on his own theory, his arguments grounded on the unconstitutionality of § 922(g)(3) as

---

[15] In fact, the defendant's methodological error is revealed by the end of his sentence, which claims that "a prohibition on gun ownership by anyone who had at some time used a controlled substance is constitutionally overbroad under *Bruen*." ECF 61, at 3. But as discussed above, the Supreme Court has never permitted an "overbreadth" facial challenge "outside the limited context of the First Amendment." *Salerno*, 481 U.S. at 745.

hypothetically applied to others must be rejected.  The Court should deny the defendant's constitutional challenge to Count 3.

## II.      The law uniformly recognizes that false-statement charges are valid, even if the predicate conduct to which they were related cannot be constitutionally prosecuted.

The defendant contends that the false-statement charges against him in Counts 1 and 2 must also be dismissed if the § 922(g)(3) charge against him in Count 3 violates the Second Amendment.  In making this argument, he relies principally on an inapposite dissent in *Abramski v. United States*, 573 U.S. 169 (2014), ignoring more than 80 years of consistent, directly applicable Supreme Court decisions.

The Supreme Court has concluded in many cases, across many decades, and in many different contexts that a defendant cannot make a false statement to evade a statute the defendant believes is unconstitutional and escape criminal liability for the false statement by arguing the unconstitutionality voids his knowingly false statement: "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them.  A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." *LaChance v. Erikson*, 522 U.S. 262, 265 (1998) (quoting *Bryson v. United States*, 396 U.S. 64, 72 (1969)).  In 1937, for example, the Supreme Court held that defendants charged with defrauding the United States by misrepresenting the identity of hog producers could not escape criminal liability by arguing that the statute and regulations requiring the information to be furnished were unconstitutional.  *See United States v. Kapp*, 302 U.S. 214, 215, 218 (1937).  In a prosecution based on fraudulent affidavits certifying non-membership in the Communist Party, the Supreme Court reiterated that "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of deceit.  One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be

excused because the statute he sought to evade is unconstitutional." *Dennis v. United States*, 384 U.S. 855, 867 (1966).

These standards govern even when Congress includes materiality as an element of the false-statement offense.[16]  In *Kapp*, for example, the district court had dismissed the indictment on the theory that "the facts alleged … had ceased to be material because of the unconstitutionality of the provisions," but the Supreme Court reversed and explained that "Congress was entitled to protect the government against those who would swindle it regardless of questions of constitutional authority." *Kapp*, 302 U.S. at 217, 218.  The Court has continued to adhere to this rule. *See, e.g.*, *Bryson*, 396 U.S. at 65 & n.1, 68-69 (upholding conviction under 18 U.S.C. § 1001 for defendant who lied about Communist party membership, without deciding constitutionality of provision that required answer to question and even though § 1001 requires false statement to be material).

Recently, the Seventh Circuit applied this principle to a defendant who purchased a firearm by falsely denying that he was under felony indictment.  *See United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023).  The defendant argued that the law prohibiting indicted persons from purchasing firearms (18 U.S.C. § 922(n)) violated the Second Amendment and claimed that his Second Amendment challenge insulated him from a false-statement prosecution.  *See id.* at 1017. The Seventh Circuit correctly rejected this argument: "Many decisions of the Supreme Court hold that false statements may be punished even when the government is not entitled to demand answers—when, for example, compelling a truthful answer would incriminate the speaker." *Ibid.*

---

[16] The plain text of § 922(a)(6) incorporates a materiality requirement by addressing "any fact material to the lawfulness of the sale," but § 924(a)(1)(A) "is broader than § 922(a)(6) in one respect: It does not require that the false statement at issue be 'material' in any way." *Abramski*, 573 U.S. at 191.

(citing *Kapp*, 302 U.S. at 218; *Dennis*, 384 U.S. at 866-67; *United States v. Knox*, 396 U.S. 77, 79 (1969)).  Moreover, as the Seventh Circuit explained, "[t]he word 'material' in § 922(a)(6) does not create a privilege to lie, when the answer is material to a statute, whether or not that statute has an independent constitutional problem." *Ibid.*

In sum, the Supreme Court has adamantly policed the "distinction between appropriate and inappropriate ways to challenge acts of government thought to be unconstitutional." *Dennis*, 384 U.S. at 867.  It has therefore refused to permit individuals to circumvent statutory requirements "by a course of fraud and falsehood, with the constitutional attack being held for use only if the conspirators are discovered." *Ibid.*  Instead, the Court has made clear that someone like the defendant has access to many "methods for challenging the Government's right to ask questions," such as seeking a declaratory judgment that a statutory requirement is impermissible. *LaChance*, 522 U.S. at 265 (quoting *Bryson*, 396 U.S. at 265).  But "lying is not one of them." *Ibid.*

Against this unbroken line of Supreme Court precedent, the defendant's citation to a nonbinding dissent in *Abramski* is not just legally untenable but also factually distinguishable.  In *Abramski*, the defendant falsely stated that he was the actual buyer of a firearm, when in fact his uncle was the buyer, and made the false statement to obtain a discount on the purchase. *See* 573 U.S. at 175.  The Court held that the defendant's misstatement about the actual buyer was a material misrepresentation even if the defendant's uncle could lawfully have purchased the gun. *See id.* at 189.  The defendant now invokes a statement by the dissent in *Abramski* that 18 U.S.C. § 924(a)(1)(A) does not "criminalize a false answer to an ultra vires question." 573 U.S. at 206. The dissent reasoned that neither § 924(a)(1)(A) "nor any regulation requires a dealer to keep a record of whether a customer is purchasing the gun for himself or for an eligible third party" and

37

that § 924(a)(1)(A) "no more criminalizes a false answer to an ultra vires question on Form 4473 than it criminalizes the purchaser's volunteering of a false e-mail address on that form." 573 U.S. at 206.  On its own facts, therefore, the *Abramski* dissent is inapplicable, given its focus on whether the ATF form's questions accurately captured what the governing statutes and regulations required.  Here, by contrast, the form's question about the defendant's drug addiction was plainly consistent with the applicable statute and compelled by the regulations, and the defendant has no argument otherwise.  Of course, more to the point, a Supreme Court dissent did not—and could not—abrogate the Court's directly applicable precedent on the independent validity of false-statement charges even when a defendant asserts a constitutional deficiency with the regulatory scheme.  Conspicuously, in relying on the inapposite dissent in *Abramski*, the defendant fails to acknowledge *any* of the Supreme Court precedent within the 80-plus years since *Kapp*—which includes *LaChance*, *Bryson*, *Knox*, and *Dennis*—or the Seventh Circuit's recent application of those principles to this specific context in *Holden*.

Again, as the Supreme Court has explained, a person "who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defendant against prosecution for his fraud by challenging the validity of the requirement itself." *Knox*, 396 U.S. at 79.  "[I]t cannot be thought that as a general principle of law a citizen has a privilege to answer fraudulently a question that the Government should not have asked." *Bryson*, 396 U.S. at 72. Courts have "without exception allowed sanctions for false statements or perjury" even when the defendant alleges "that the Government exceeded its constitutional powers in making the inquiry." *United States v. Mandujano*, 425 U.S. 564, 577 (1976) (plurality opinion) (affirming perjury conviction for false statement to grand jury made in an alleged Fifth Amendment violation).  Self-help of lying will not "be excused because the statute which [the defendant]

sought to evade is unconstitutional." *Dennis*, 384 U.S. at 867; *see also Kay v. United States*, 303 U.S. 1, 6 (1938) (refusing to review constitutionality of the Home Owners' Loan Act of 1933 when defendants made false statements that violated Act).

In sum, even if § 922(g)(3) were unconstitutional—and the statute passes constitutional muster for the reasons described above—the defendant was not entitled to avoid using lawful processes to resolve that question and instead simply to lie about his drug abuse in purchasing a firearm, "with the constitutional attack being held for use only if [he was] discovered." *Dennis*, 384 U.S. at 867. The Court should deny his motion to dismiss Counts 1 and 2.

## CONCLUSION

The defendant's motion does not come close to showing the facial unconstitutionality of Congress's prohibition on the possession of firearms by individuals who habitually abuse or are addicted to controlled substances. That prohibition falls firmly within the Anglo-American tradition of regulating access to firearms by individuals whose possession of them would present risks to public health and safety. It therefore satisfies the standards of *Bruen* requiring a relevantly similar historical analogue. Independently, under uniform and directly applicable Supreme Court precedent, the defendant cannot now seek to escape his false and fraudulent misrepresentations on a background check form by making a collateral constitutional attack on § 922(g)(3). The Court should deny the defendant's motion to dismiss each count on all asserted grounds.

Respectfully submitted,

DAVID C. WEISS
SPECIAL COUNSEL

By:

Derek E. Hines
Senior Assistant Special Counsel

Leo J. Wise
Principal Senior Assistant Special Counsel

U.S. Department of Justice