**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) Criminal Action No. 1:23-cr-00061-MN |
| | ) |
| ROBERT HUNTER BIDEN, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

_____

**MR. BIDEN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE
INDICTMENT BASED ON IMMUNITY CONFERRED BY HIS
DIVERSION AGREEMENT**

Abbe David Lowell                          Bartholomew J. Dalton (#808)
Christopher D. Man                         DALTON & ASSOCIATES, P.A.
WINSTON & STRAWN                           1106 West 10th Street
1901 L Street NW                           Wilmington, DE 19806
Washington, DC 20036                       Tel.: (302) 652-2050
Tel.: (202) 282-5000                       BDalton@dalton.law
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com

*Counsel for Robert Hunter Biden*

## INTRODUCTION

The prosecution's opposition bounces all over the place invoking contract terms, like "condition precedent," that do not exist in the Diversion Agreement and searching for contradictions in Mr. Biden's argument that are not there.  At bottom, the prosecution then actually concedes that *every party* to the Agreement—the prosecution and Mr. Biden—approved the agreement and executed it through their signatures.  That is all that matters for this agreement to be effective.  The parties never conferred a veto power upon Probation to decide what the parties could agree to do among themselves.

But even under the prosecution's view of the contract where non-party Probation's approval is a necessary condition precedent for the contract to be effective among the parties, the prosecution's claim that no contract was formed still fails.  The prosecution does not meaningfully contest the undisputed fact that Probation did approve the Diversion Agreement, so the hurdle that it seeks to erect to escape its Diversion Agreement is no hurdle at all.

## ARGUMENT

## I.   THE PROSECUTION CONFUSES APPROVAL AND EXECUTION OF A CONTRACT

The prosecution seems to deliberately try to confuse fundamental principles of contract law by distorting the relationship between "approval" of a contract and the "execution" of a contract.  All contracts must be approved by the parties and executed in a way that manifests that approval because a contract is not formed until all parties reach agreement.  *See, e.g.*, *Sturges v. Crowninshield*, 17 U.S. (4 Wheat) 122, 197 (1819) (Marshall, C.J.) ("A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing.").

The prosecution does not contest the fact that contracts typically do not have to be signed (e.g., there are oral contracts, contacts approved by conduct), rather a signature is just one way for

a party to manifest its approval or execute the contract.  (DE 60 at 19–20.)  There are, however, contracts, such as the Diversion Agreement, in which the parties had extensive negotiations in principle with the understanding that their tentative agreement was "subject to the approval of a formal contract."  1 Williston on Contracts § 1.8 (4th ed. 2023) (citing *First Nat'l Mortgage v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1065 (9th Cir. 2011) (noting some tentative agreements are made "subject to the approval of a formal contract")).  For such contracts, in other words, although the parties may reach an agreement among themselves (what would ordinarily be an oral contract), no contract is formed until that approved agreement is reduced to an executed written contract.

The written Diversion Agreement does that by specifying that the parties—defined exclusively as the prosecution and Mr. Biden (not including Probation)—must both approve and execute the agreement.  The Diversion Agreement says the Diversion Period begins following the "execution and approval of the Agreement" and it clarifies that "[t]his Agreement may be executed in counterparts.  (DE 24–1 at II(2), (18).)  The Diversion Agreement's requirement that the parties execute the contract means only that the parties must sign this formal, written agreement in the designated signature blocks to indicate their approval.  *See, e.g.*, 10 Williston on Contracts § 29.35 (4th ed. 2023) ("If [the signature] is at the end of the document, the universal custom of mankind forces the conclusion that it was appended as an execution.") (quoting *In re Manchester's Estate*, 163 P. 358 (Cal. 1917) (alterations in Williston).  A signature reflects that an agreement has been executed.  *See, e.g.*, *Resolution Trust Corp. v. Midwest Fed. Sav. Bank of Minot*, 36 F.3d 785, 796 (9th Cir. 1993) (explaining "'executed' [means] that the depository institution has 'signed' the agreement") (quoting *Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 384 (11th Cir.1991) (addressing 12 U.S.C. § 1823(e)); UCC § 1-201(37) (Am. L. Inst. & Unif. L. Comm'n 2012) ("'Signed' includes using any symbol *executed* or adopted with present intention to adopt or accept

a writing.") (emphasis added); 12 U.S.C. § 1832(e)(2); 15 U.S.C. § 7006(5) ("The term 'electronic signature' means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and *executed* or adopted by a person with the intent to sign the record.") (emphasis added).  Obviously, a party will agree to and approve a contract before it affixes a signature executing it.  *See, e.g.*, *Bailey v. Hannibal & St. J.R. Co.*, 84 U.S. 96, 108 (1872) (noting contract was "approved and signed by all the bondholders"); *see also Goldberg v. United States*, 425 U.S. 94, 98 (1976) (holding the Jencks Act applies to witness statements that are "signed or otherwise adopted or approved" by them); *Gardner v. Collector of Customs*, 73 U.S. 499, 505 (1867) (noting that the Constitution applies the same process to the enactment of legislation passed by Congress, it requires "the approval of the President, and his signature attesting that approval").

The prosecution feigns confusion in Mr. Biden's position because his motion states in various places that the Diversion Agreement became effective when the parties "executed" the agreement, it was "approved and executed by the parties," or when Mr. Biden "accepted" the Diversion Agreement sent to him by the prosecution.  Opp. at 7.  The prosecution claims these are "conflicting theories" and that it cannot discern which of these "competing versions" Mr. Biden is advancing (Opp. at 7), but it surely knows better.  The executing of the agreement reflects the parties' prior approval of the agreement and their acceptance of the agreement.  Someone cannot execute a contract without approving it, and the contract here required execution through a signature of the parties to manifest that approval (as opposed to an oral answer or a nod of the head).  Consistent with the language of the Diversion Agreement itself, Mr. Biden's position is that it became effective once "approved and executed" by the parties.

## II.    THE PROSECUTION HAS FAILED TO ESTABLISH THAT PROBATION'S APPROVAL WAS A CONDITION PRECEDENT

The same is not true for the role of Probation.  The prosecution acknowledges that Mr. Biden and the prosecution are the only parties to the Diversion Agreement and agrees that the Diversion Agreement was executed by all parties.  The prosecution even attaches a photograph of those signatures to its brief.  Opp. at 11.  From Mr. Biden's perspective, that should be the end of the matter.  The contract is complete once all parties have approved and executed it.

Ignoring the straight-forward fact that the contract is binding because every party to the Agreement has approved and executed it, the prosecution now faces political pressure to find some way to squirm out of the Agreement that it has signed.  Accordingly, the prosecution now claims that approval by Probation—a non-party to the Agreement—is a "condition precedent" to the Agreement becoming effective among the parties and that it has gone unfulfilled.  Opp. at 14. There is no such condition precedent, however.

### A. The Prosecution Fails To Meet Its Heavy Burden In Establishing A Condition Precedent

In advancing its argument that the Diversion Agreement's "approved by" signature block of a non-party—rather than any contract provision in the document itself—creates a condition precedent that negates the actual parties' approval and execution, the prosecution runs into three strong headwinds.  First, it is the prosecution's burden to prove the existence of a condition precedent.  *See, e.g.*, *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1007 (3d Cir. 1980) ("The generally accepted rule is that the burden of proof in regard to a condition precedent is on the party alleging the breach of the conditional promise."); *Shareholder Rep. Servs. LLC v. Shire Holdings, Inc.*, 2020 WL 6018738, at *17 (Del. Ch. Oct. 12, 2020) (same).

Second, "conditions precedent are not readily assumed" and "conditions precedent must be 'expressed in unmistakable language,'" *Sohm v. Scholastic, Inc.*, 959 F.3d 39, 46 (2d Cir. 2020) (quoting *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016)); *see Young Women's Christian Home v. French*, 187 U.S. 401, 417 (1903) (requiring "unmistakable language" to create a "condition precedent"); *Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 298 F. Supp. 2d 1, 4 (D.D.C. 2002) ("language in a contract not clearly identified as a condition precedent is presumed not to be one") (quoting in *Shook of West Virginia, Inc. v. York City Sewer Auth.*, 756 F. Supp. 848, 851 (M.D. Pa. 1991)).  The current Attorney General, writing as Chief Judge of the D.C. Circuit, for example, found the government breached a plea agreement and rejected a similar claim by the government to find an unmet condition precedent in the agreement because the law "demands that conditions precedent be expressed in unmistakable language."  *United States v. Murray*, 897 F.3d 298, 306 (D.C. Cir. 2018) (Garland, C.J.).

Third, as the prosecution concedes, this particular kind of contract—a diversion agreement—must be construed like a plea agreement, where any ambiguity is construed against the prosecution.  Opp. at 9 n.5; *see also* DE 60 at 10–13 (explaining that any ambiguity must be construed against the prosecution[1]).  Thus, to the extent there is any question about whether, as makes sense given the roles of all those involved, Probation would only be approving the authority being given to it under the Agreement or is instead approving whether Mr. Biden and the

---

[1] Later, the prosecution claims that the meaning of the contract should be understood from the perspective of an objective third-party (Opp. at 12), but that is the general rule of contract interpretation.  As the prosecution acknowledges, the Diversion Agreement should be construed like a plea agreement where, because of the constitutional rights at issue and the power imbalance favoring the government, any ambiguity must be construed against the prosecution.  Opp. at 9.  Consequently, a Diversion Agreement is construed bases upon what a defendant could reasonably believe.  (DE 60 at 11 (citing cases).)

prosecution (the actual parties) can contract among themselves through this Agreement, the prosecution has failed to meet its burden in proving a condition precedent exists.

### B. The Prosecution Fails To Meet Its Burden Of Proving "Unmistakable Language" Created A Condition Precedent

The Diversion Agreement never uses the words "condition precedent" or any language—unmistakable or not—that would create one. There is no mystery as to what sort of "unmistakable language" is necessary to overcome the presumption that a contract does not contain a condition precedent. The prosecution itself quotes case law answering that question, noting "such words as 'on condition that, 'provided that' and 'if' are often used for this purpose." Opp. at 14 (quoting Restatement (Second) of Contracts § 226 & cmt. A (1981)). There are others. "[L]inguistic conventions of condition—such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to[]'—can 'make plain' a condition precedent." *Sohm*, 959 F.3d at 46 (quoting *Bank of N.Y. Mellon*, 821 F.3d at 305–06).

There is no such language anywhere in the Diversion Agreement and the prosecution points to none for that reason. The Diversion Agreement's actual language cuts against it. The first paragraph of the Agreement identified the prosecution and Mr. Biden as the parties. (DE 24–1 at I.) They are the *only* persons mentioned when the subsequent two paragraphs address the need for the Agreement to be "approv[ed]" and "execut[e] and approv[ed]." (DE 24–1 at II(1), (2).) To avoid any confusion, Probation is never mentioned in any of these paragraphs or anywhere in the document that precedes them. Thus, if anyone reading the document would ask themselves who must "approve" and "execute" the Diversion Agreement, the only answer would be the parties. Nobody else has been mentioned. At that point in reading the Agreement, no one could imagine that the references to approval in Paragraphs 2 and 3 of Section II could mean approval by

6

Probation because the word Probation has not yet been used.  The Agreement is discussing only the parties—the prosecution and Mr. Biden.  Probation was never a party.

Not only is there no reason for a non-party to have to sign the Agreement for it to become effective among the parties who do sign the Agreement, Paragraph 19 of the Agreement clarifies that no such requirement exists.  Mr. Biden highlighted that Paragraph 19 (DE 60 at 14–16), which addresses modifications to the Diversion Agreement, states that such changes must be "in writing and *signed by the United States, Biden, and Biden's counsel*."  (DE 24–1 at II(19) (emphasis added).)  There is no role for Probation whatsoever.  The prosecutions wishful reading to make Probation a party as its way of weaseling out of an agreement it now finds hard to defend to its critics is plainly belied by this provision.

This provision disproves any notion that Probation's approval of the Agreement was necessary to make the Agreement effective among the parties because it is illogical to assume that the Agreement gives Probation the power to approve the terms of the Agreement, but also gives the parties the ability to re-write the terms of the Agreement and cut Probation entirely out of the process.  Nothing prevents the parties from adding to Probation's authority or stripping it away entirely, no matter how forcefully Probation may object.  Unable to meaningfully respond to this point, the prosecution says nothing—and that silence is deafening.

Without any "unmistakable language" creating a condition precedent in the body of the Agreement—language necessary to overcome the heavy presumption that a contract does not have conditions precedent—the prosecution rests its argument on two words in a signature block for Probation: "approved by."  But that is a slender reed for the prosecution to place so much weight upon, as that language is in the signature block and not the body of the document and it fails to use any of the traditional language noted above to designate a condition precedent.  It does not even

contain a noun to specify what it is that Probation is being asked to approve. Surely, Probation would not have the role to agree what charges would be in the agreement or what immunity the agreement would bestow. Its only role would be its traditional, discretionary role in deciding whether or not to supervise someone. Acceptance of that authority is what its approval on the agreement or document would signify.

The prosecution is wrong to claim those two words give Probation a veto power over the authority of the prosecution and Mr. Biden to bind themselves through the Agreement. Rather than convey a veto power, the "approved by" language is simply an acknowledgment by Probation that it has been given the authority to supervise Mr. Biden—authority Probation is not required to exercise.[2] If Probation refuses to give its approval, that does not alter the validity of the Agreement between the parties. Mr. Biden has done all that is required of him by agreeing to submit to Probation's supervision, whether or not Probation chooses to exercise that discretion.

The prosecution has only itself to blame if it wishes the Diversion Agreement more clearly stated the position it now advocated. As the drafter of the Agreement, the prosecution is responsible for any inartful draftsmanship and that, along with its disproportionate power over defendants, is why any ambiguity must be construed against it. (DE 60 at 10–13.) That burden is all the harder for the prosecution in the context of proving a condition precedent exists, given the need for "unmistakable language" to overcome the heavy presumption that no conditions precedent exist in a contract. As noted above, there are any number of time-tested ways the

---

[2] Paragraph 10 of Section II states that Mr. "Biden shall," among other things, "[b]e subject to pretrial supervision as directed by the U.S. Probation and Pretrial Service Office in this District." (DE 24–1.) Again, this is not a direction that Probation do anything. It is a requirement that Mr. Biden submit to being supervised by Probation and follow whatever directions Probation, in its discretion asks of him. If Probation never were to exercise that discretion that would not alter the fact that Mr. Biden agreed to be subject to Probation's supervision.

prosecution could have drafted a condition precedent, but it chose none of them.  Mr. Biden and any reasonable person would naturally have understood the absence of such "unmistakable language" to the contrary to mean the Agreement tracks the presumption that no condition precedent exists.

## III.   THE PROSECUTION CANNOT DENY THAT PROBATION GAVE ITS APPROVAL

As with the prosecution's purported confusion over whether Mr. Biden was arguing conflicting theories about what was necessary for the Agreement to be effective, the prosecution also pretends to be confounded that Mr. Biden argues both that Probation's approval of the agreement was unnecessary to make the Agreement effective and that Probation gave its approval. Having made the first argument, the prosecution suggests that Mr. Biden then "reverse[d] course" and "abandon[ed] it."  Opp. at 13.  Mr. Biden did no such thing.  There is no inconsistency in arguing that Probation's approval was unnecessary, but it was given.

### A.   Probation Approved Of The Agreement

It is curious that the prosecution devotes so much of its opposition to arguing that Probation's approval was necessary when it does not seriously dispute that Probation's approval was given.  There should be no argument over the fact that it was given.  As Mr. Biden explained, Probation sent the Court and the parties a copy of Mr. Biden's Pretrial Diversion Report on July 19, 2023, along with a copy of the proposed Diversion Agreement, conveying the Recommendation: "The United States Probation Office *recommends* the defendant as a candidate for a 24-month term of Pretrial Diversion."  (DE 60 at 18 (citation omitted).)  He also explained that, on July 20, 2023, the prosecution emailed the Court to report that "[t]he parties *and Probation have agreed* to revisions to the diversion agreement to more closely match the conditions of pretrial release that Probation recommended in the pretrial services report issued yesterday."  (*Id.* at 19

9

(citation omitted).)  Additionally, Probation assigned Mr. Biden a probation officer and has been supervising him since the Diversion Agreement went into effect.

Remarkably, the prosecution responds claiming that "recommending the defendant for pretrial diversion to the Court is not the same thing as Ms. Bray approving the diversion agreement."  Opp. at 13.  That makes no sense.  Probation could not recommend "pretrial diversion" in the absence of a pretrial diversion agreement.  That fact is made all the clearer by the fact that Probation circulated a copy of the Diversion Agreement with its Pretrial Diversion Report and recommendation, and the follow up email from the prosecution to the Court stating that Probation "agreed" with the parties on revisions to the Diversion Agreement based on suggestions from Probation.  Having *recommended* Mr. Biden for pretrial diversion pursuant to a Diversion Agreement that included Probation's suggested edits, it is difficult to follow the prosecution's claim that Probation was somehow recommending something that it disapproved of.  That argument is particularly incredulous given the prosecution's email to the Court stating that Probation had "agreed" to revisions in the Diversion Agreement.  Given that Probation "agreed" with the language in the Diversion Agreement and was "recommending" diversion pursuant to that Agreement, the prosecution is playing the most bizarre of linguistic games in pretending Probation did not approve of the Diversion Agreement.[3]

### B.    Probation Can Manifest Its Approval Without A Signature

What the prosecution really seems to be saying is that Probation just did not sign the Agreement, but it was not required to do so.  The prosecution does not deny that a signature on a

---

[3] Here, again, the prosecution plays at being confused, claiming it does not know what Mr. Biden's motion meant when it said, "not only did Probation passively agree with the Diversion Agreement, Probation went further and *recommended* the Diversion Agreement."  (DE 60 at 18); *see also* Opp. at 13 (questioning "whatever that means").  The point is that Probation did not just indifferently approve what the parties were trying to accomplish, it went further and actually recommended it.

contract is not required where approval is given some other way.  (DE 60 at 19–20.)  Sending a copy of the Diversion Agreement to the parties and the Court while recommending that Mr. Biden be placed on pretrial supervision based on the attached Diversion Agreement certainly conveys approval.  The prosecution advising the Court that Probation "agreed" with the language in the Diversion Agreement would be an admission that is true (assuming the prosecution does not want to argue that there is some difference between "agree" and "approve").

Knowing the facts are decisively against it, the prosecution asks the Court to close its eyes to them by invoking the parol evidence rule.  Opp. at 9.  To be sure, Mr. Biden agrees the parol evidence rule bars consideration of the terms of an unambiguous contract, but they do not bar parol evidence of the parties' assent to a contract or its approval by a non-party.  That is not a question involving any ambiguity in a contract's language, it is a separate question of whether a party has approved a contract.  *See, e.g.*, *Bekhor v. Josephthal Grp. Inc.*, 2000 WL 1521198, at *4–5 (S.D.N.Y. Oct. 13, 2000) (explaining the parol evidence rule would bar evidence of a condition precedent to a contract but not invalidate a contract that was not signed).

The Third Circuit has explicitly affirmed reliance on parol evidence to find a written contract binding despite being unsigned.  *United States v. Clementon Sewage Auth.*, 365 F.2d 609, 612 (3d Cir. 1966).  Likewise, in *Hanna v. Motiva Enterprises, LLC*, the court rejected at contention that

> the Court should not consider parol evidence to "fill in" the missing signature.  However, "[i]n any given case it is the intent of the parties that will determine the time of contract formation.  To discern that intent a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'  These circumstances may be shown by 'oral testimony or by correspondence or other preliminary or partially complete writings.'"

839 F. Supp. 2d 654, 667 (S.D.N.Y. 2012) (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 81 (2d Cir. 1985) (citing Restatement (Second) of Contracts § 27); *see Nat'l Sur. Co. of N.Y.*

*v. Jackson Cty. Bank*, 20 F.2d 644, 647 (4th Cir. 1927) (relying upon parol evidence to find acceptance of an unsigned contract). Because acceptance of a written contract can rest upon assent given without a signature (e.g., oral acceptance, acceptance by conduct), by necessity a court must look beyond the face of the contract itself to parol evidence in such cases. *See, e.g.*, *Grunstein v. Silva*, 2014 WL 4473641, at *18 n.177 (Del Ch. Sept. 5. 2014); *Schwartz v. Chase*, 2010 WL 2601608, at *8 n.66 (Del. Ch. June 29, 2010); *Tel. and Data Sys., Inc. v. Eastex Cellular LP*, 1993 WL 344770, at *11 (Del. Ch. July 23, 1993).

The prosecution has offered no evidence to refute that Probation has given its approval. To the contrary, it has not just forfeited but deliberately waived its right to do so. The prosecution relies solely on its misplaced parol evidence rule argument in responding to the evidence that Mr. Biden put forward, claiming only that "because [these materials] are irrelevant, the Government will not address them. This does not mean, however, that the Government agrees with the version of events former defense counsel offers in his declaration. It does not." Opp. at 10. The prosecution's naked statement that it does not agree with Mr. Biden's statement of facts, without identifying which facts it believes are wrong, explaining why, or offering any supporting documents constitutes a waiver. "Perfunctory and undeveloped arguments . . . are waived." *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 618 (7th Cir. 2014) (quoting *Judge v. Quinn,* 612 F.3d 537, 557 (7th Cir. 2010); *see Rufo v. Fox*, 2022 WL 16646689, at *2 (3d Cir. Nov. 3, 2002) (finding waiver because passing and conclusory statements are inadequately briefed); *see also Hamer v. Neighborhood Hous. Servs. Of Chicago*, 583 U.S. 17, 20 n.1 (2017)

(explaining a forfeiture results from not timely asserting a right and waive occurs when a right is intentionally not asserted).[4]

## IV.     Judicial Estoppel Precludes The Prosecution From Denying The Validity Of The Diversion Agreement Or Probation's Approval Of It Now

The prosecution's sole objection to Mr. Biden's judicial estoppel argument is purely factual, resting on its denial of what it is transcribed as saying in open court. Opp. at 4 n.2. But the truth is that the prosecution came to court to encourage the Court to accept a Plea Agreement, and it sought to comfort the Court that Mr. Biden's rights would adequately be protected because there already was a Diversion Agreement in place with a broad grant of immunity. *Never* did the

---

[4] Among other things, the prosecution also waived any response to Mr. Biden's claim that the Diversion Agreement is constitutionally valid (DE 60 at 5 n.3) and that, if the Diversion Agreement is valid, the indictment must be dismissed because it is within the scope of the Diversion Agreement's immunity provision. (DE 60 at 21–23.) In making the unremarkable point that it can withdraw a Diversion Agreement before it becomes effective (a proposition Mr. Biden does not contest, but maintains did not happen here), the prosecution also claims that Mr. Biden has not been prejudiced by its purported withdrawal of the Agreement. Obviously, Mr. Biden has been harmed if, as he claims, the Diversion Agreement did go into effect and it conferred upon him a right of immunity from prosecution that he now lacks. There can be no disagreement after the parties' statements in court that the Agreement barred other charges for guns, drugs, and taxes. Based on its breach of contract, the prosecution now seeks to have Mr. Biden convicted of multiple felonies in two jurisdictions to face jail time for the charges the parties indicated could not be brought. That is about as serious a form as prejudice as it comes. Additionally, the prosecution makes light of the fact that Mr. Biden was subject to supervision by Probation and the loss of his Second Amendment rights. The prosecution notes these are standard conditions of pretrial release (Opp. at 20), but those conditions would end for Mr. Biden with a successful trial outcome. The Diversion Agreement would be in effect for 24-months, even absent a finding of guilt. Moreover, Mr. Biden's admission to the statement of facts in the Agreement does work to his detriment, even if those statements cannot be used directly in a future trial. Mr. Biden's confirmation of facts alleged by the prosecution helps the prosecution conduct its investigation, pursue investigative leads (it does not confer derivative-use immunity), and prepare for trial—all to Mr. Biden's detriment. Demonstrating that prejudice, the prosecution now invokes the fact that Mr. Biden admitted to the statement of facts in the Diversion Agreement in opposing his motion to dismiss for selective prosecution. (DE 68 at 40 (arguing that Mr. Biden "acknowledged committing the factual conduct" and citing Mr. Biden's submission of the executed Diversion Agreement to the Court in (DE 24–1)).) The prosecution's claim that Mr. Biden is not prejudiced by the statements that he made while the prosecution is actively using those statements against him is astounding.

13

prosecution tell the Court to accept the Plea Agreement conditionally, based on a condition that Probation may choose to later sign the Diversion Agreement. Consistent with Article III's "cases or controversies" requirement, the prosecution knows the Court will not issue hypothetical orders that would apply only in the event that a third-party—Probation—chooses to do something. The parties had obtained Probation's approval in advance, and they approached the Court expressing the view that the Diversion Agreement was in effect and the only thing left to be done was for the Court to approve the Plea Agreement. Now that the position the prosecution advocated to this Court no longer serves its purposes, the prosecution wants to advocate the opposite. The doctrine of judicial estoppel prevents it from doing so. (DE 60 at 20–21.)

The prosecution engages in revisionist history in claiming that Mr. Biden conceded that Probation's approval was necessary to make the Diversion Agreement effective among the parties, when just the opposite happened—the prosecution acknowledged that the Diversion Agreement is in effect even without Probation's signature. The prosecution acknowledges that it told the Court: "Your Honor, the Diversion Agreement is a contract between the parties so it's in effect until it's either breached or a determination [of breach has been made], period." (7/26/23 Tr. at 91 ¶¶ 6–8 (Mr. Wise).) Nevertheless, the prosecution seeks to walk away from this concession, including its definite use of the word "period."

The prosecution correctly notes that this answer was given in response to a question about what would happen to the Diversion Agreement in the future in the event that the underlying criminal charge was found unconstitutional (Opp. at 4 n.2), but that context does not qualify the prosecution's answer. The prosecution's answer that the Agreement is "in effect until" some breach has been shown is stated in the present tense. The prosecution could have prefaced its answer with a phrase like "if the Agreement goes into effect and the statute is later found

unconstitutional," but that was not said because there was no need to speculate on whether a Diversion Agreement could be in effect in the future.  The parties had just signed the Diversion Agreement and knew it was in effect and agreed to do so without regard to a constitutional challenge in the future.

Putting the prosecution's answer in context only undercuts the prosecution's argument.  Its answer followed Mr. Biden's counsel directly telling the Court: "I want to be clear that it is the parties' position that there is a Diversion Agreement between the parties which is binding." (7/26/23 Tr. at 44 (Mr. Clark).)  He added that "our understanding of the Diversion Agreement, which is a bilateral agreement between the Defendant and the government which the government has reaffirmed to me it will stand by." (*Id.* (Mr. Clark).)  Mr. Biden's counsel was not speaking in the context of some future, hypothetical world, he was clearly stating both what he understood the existing reality to be *and* that he understood the prosecution agreed.  He was purporting to speak for the prosecution as well, discussing the view of the parties.  If the prosecution did not agree, it was incumbent on the prosecution to say so.

Ignoring these discussions, the prosecution turns to another portion of the transcript that is admittedly a bit sloppy.  The prosecution was summarizing the various provisions of the Diversion Agreement at length, and one of his comments was that the Agreement would run upon approval from Probation.  Opp. at 15–16.  The Court did ask Mr. Biden's counsel if he had any corrections to make, and he said he did not.  Opp. at 16.

To be sure, Mr. Biden's counsel could have corrected the prosecution on this one technical point, but it did not seem particularly important at the time.  As noted above, Probation *had* approved the Agreement, so the Agreement was in effect and Mr. Biden's counsel had told the Court so.  Moreover, because the Diversion Agreement was negotiated among the parties with

15

input from Probation, they all had approved of the Agreement around the same time. That is reflected in the prosecution's email to the Court prior to the hearing reporting that "[t]he parties *and Probation have agreed* to revisions to the diversion agreement to more closely match the conditions of pretrial release that Probation recommended in the pretrial services report issued yesterday." (7/20/23 Email from B. Wallace to M. Buckson (DE 60–2 ¶ 42 (emphasis added).)) Thus, the clarification seemed immaterial, as the Diversion Agreement was in effect and went into effect around the same time whether that is measured from its approval by the parties or Probation.

Additionally, on the next page of the transcript, Mr. Biden's counsel answered the same question from the Court concerning a possible Second Amendment challenge to the indictment by saying: "I can tell you our intention would be to abide by the agreement and only raise such constitutional determining at such time that somebody tried to bring any charges on this, otherwise it's an agreement between the parties. We are going to honor the agreement." (DE 60 at 7.)

The prosecution's effort to pretend that it was not representing to the Court that the Diversion Agreement was in effect and would protect Mr. Biden's rights if the Court accepted the Plea Agreement—as the prosecution was undoubtedly asking the Court to do—simply cannot be squared with the prosecutions 180-degree turn to now argue that the Diversion Agreement was not in effect. The judicial estoppel doctrine prevents the prosecution from playing so fast and loose with the Court and the defense. The prosecution is bound by its prior representation.

## CONCLUSION

The prosecution is bound by the agreements that it makes, approves, and signs with a defendant, just as it often seeks to hold defendants to the terms of the agreements that defendants make and sign. No matter how fervently the prosecution's decision to enter into the Diversion Agreement is criticized by extremist Republican politicians and the right-wing press, the

prosecution remains bound by the agreement it struck.  The Court must not allow the prosecution to renege on its agreement.

Dated: January 30, 2024                           Respectfully submitted,

                                                  /s/ *Abbe David Lowell*
                                                  Abbe David Lowell
                                                  Christopher D. Man
                                                  WINSTON & STRAWN
                                                  1901 L Street NW
                                                  Washington, DC 20036
                                                  Tel.: (202) 282-5000
                                                  Fax: (202) 282-5100
                                                  AbbeLowellPublicOutreach@winston.com

                                                  Bartholomew J. Dalton (#808)
                                                  DALTON & ASSOCIATES, P.A.
                                                  1106 West 10th Street
                                                  Wilmington, DE 19806
                                                  Tel.: (302) 652-2050
                                                  BDalton@dalton.law

                                                  *Counsel for Robert Hunter Biden*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of January, 2024, I filed the foregoing Reply in Support of Mr. Biden's Motion to Dismiss the Indictment with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ *Abbe David Lowell*
Abbe David Lowell

*Counsel for Robert Hunter Biden*