**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Action No. 1:23-cr-00061-MN |
| | ) |
| ROBERT HUNTER BIDEN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MR. BIDEN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS**
**FOR SELECTIVE AND VINDICTIVE PROSECUTION AND**
**BREACH OF SEPARATION OF POWERS**

Abbe David Lowell
Christopher D. Man
Kyllan J. Gilmore
WINSTON & STRAWN
1901 L Street NW
Washington, DC 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

*Counsel for Robert Hunter Biden*

## INTRODUCTION

The prosecution is correct that challenges to an indictment for selective or vindictive prosecutions are difficult to maintain, but that is due to a hurdle that is *not* present here.  Typically, it is very difficult to show what a prosecutor would have done absent some kind of improper motive because it is hard to read a prosecutor's mind.  And, typically, a defendant must make the showing that he is being treated differently by demonstrating that the prosecution treats other, similarly situated persons differently.  But here we know exactly how Mr. Weiss would have resolved this case absent outside pressure to treat Mr. Biden more harshly because Mr. Weiss did try to resolve this case through a Diversion Agreement and a Plea Agreement that called for a diverted gun charge and a recommended probation on two tax misdemeanors.  That is, until Mr. Weiss was under pressure and heavy criticism from Republican extremists arose.  In response to that outcry from former President Trump, extremist House Republicans and right-wing media looking to make Mr. Biden's fate a political issue in the next presidential election, the prosecution blew up that deal and now has brought felony charges against Mr. Biden both here in Delaware and in California and is seeking a heavy prison sentence for charges the prosecution was willing to resolve for probation just months ago.

This motion hinges upon the fact that the prosecution determined that the correct outcome concerning Mr. Biden was that he be placed on probation, but Mr. Weiss then caved to political pressure, attempted to scrap his deal with Mr. Biden, and insisted on Mr. Biden being charged with felonies.  It does not matter that the prosecution believes it has "overwhelming evidence" of guilt (Opp. at 24), that the prosecution of "prominent figures" may further deterrence (*id.* at 33) or that the prosecution believes Mr. Biden committed serious offenses (*id.* at 24).  All that was true when the prosecution agreed that probation was the appropriate outcome.  The prosecution's

understanding of the facts and its belief that it had overwhelming evidence against Mr. Biden did not change, the *only* thing that did change was that Republican criticism of the deal the prosecutors struck escalated, and the prosecution caved under political pressure.[1]

## ARGUMENT

## I.   THE PROSECUTION DISTORTS THE FACTS IN PRETENDING IT DID NOT SCRAP THE DEAL IT STRUCK UNDER POLITICAL PRESSURE

The prosecution zigs and zags through the timeline of events in an effort to sow confusion about what Mr. Biden contends the prosecution did wrong, but it devotes scant attention to the critical fact that the prosecution advocated a probationary deal for Mr. Biden to this Court and then abandoned it and ratcheted up the punishment it would seek following political pressure.  The prosecution's denial of caving to that pressure rings hollow based on the facts of what occurred— especially the fact that the extremist Republicans who pressured the prosecution now claim credit for having caused the prosecution's reversal of course.  (DE 63 at 10–11.)  The fact that multiple House Committee Chairmen claim responsibility for forcing the prosecution to reverse course is

---

[1] The prosecution contests the facts that preceded these events, noting that no charges were brought against Mr. Biden under the Trump Administration and that it was the Biden Administration that held Mr. Weiss over as U.S. Attorney and that later named him Special Counsel.  To be clear, Mr. Biden does not object to the fact that he was investigated or dispute that the prosecution considered a host of different charges.  Mr. Biden addresses these background events to show that Mr. Trump was calling for Mr. Biden's prosecution throughout and expressing public frustration that he had not been indicted.  The prosecution's investigation reportedly led it to conclude that Mr. Biden should not be indicted at all.  (DE 63 at 6.)  Mr. Clark (one of Mr. Biden's counsel) attests the prosecution began seeking a non-prosecution agreement to resolve the matter, but then continuously moved the goal posts to ask for more concessions whenever a deal was on the verge of being reached with the immediate preceding factor being not new evidence but new public and political criticism of Mr. Weiss.  (DE 60-2.)  While Mr. Biden maintains this history of ratcheting up the enforcement action the prosecution would take in response to extremist Republican pressure itself reflects a selective and vindictive prosecution, he focuses his challenge on the prosecution's decision to abandon the Plea and Diversion Agreement framework it had signed in response to ever mounting criticism and to instead bring this felony indictment.

powerful evidence that they did just that—no matter how badly the prosecution's sense of shame may now cause it to deny that happened.

The prosecution falsely pretends that it never took a definitive position on how this case should be resolved and that this is simply a routine case where the parties attempted to negotiate a plea agreement but failed to reach one. To the contrary, the parties did enter into a Diversion Agreement (*see* DE 60) and they agreed to a Plea Agreement that required approval from the Court. At the July 26, 2023 hearing, the prosecution advocated that the Plea Agreement that was signed by the parties recommending probation should accepted by the Court.

The Court did not accept the Plea Agreement that day, but the Court was clear: "I'm not saying I'm not going to reject the plea, I'm not saying I'm going to accept the Plea Agreement. I need more information." (7/26/23 Tr. at 109.) The Court expressed no concern with whether the parties had struck a fair bargain, rather the concern the Court expressed to Mr. Biden was with "making sure that your plea gets you what you think it gets." (*Id.* at 108.) The Court wanted assurances that the immunity provision in the Diversion Agreement that would have the Court decide whether Mr. Biden had breached his obligations under the Diversion and Plea Agreements before the prosecution could charge Mr. Biden with conduct that would otherwise be immunized was constitutional. (*Id.* at 105–06.) In other words, the Court's concern was with making sure that Mr. Biden received the benefit of the bargain that he struck, not with changing that bargain to be more punitive against Mr. Biden.

Although the prosecution defended the validity of the Diversion Agreement at the hearing (*id.* at 102–03) and requested time to brief the validity of that Agreement for the Court (*id.* at 106), the prosecution did not brief the issue. Instead of making a submission to defend the validity of the Diversion Agreement, the prosecution filed a motion with the Court to vacate the briefing

3

schedule because so-called "additional negotiations" had failed and there would be no Plea Agreement. (DE 25 at 2.)

The prosecution's position was remarkable because the prosecution had previously defended the validity of the breach-testing mechanism that it had drafted, and Mr. Biden has since explained why it was valid, could easily have been tweaked, and was severable even if it was invalid. (DE 60 at 5 n.3 and 13 & n.6.) The prosecution *never* has expressed any concern that the mechanism was invalid nor contested Mr. Biden's arguments for why it was valid, could easily have been tweaked, and was severable. There was no reason for the prosecution not to stand by the Plea Agreement that it had drafted and signed.

To be clear, there was nothing to negotiate. The Plea Agreement had been negotiated and all that was left to do was to brief the Court as to why the *procedural mechanism* in the Diversion Agreement was valid. Mr. Biden protested the prosecution's decision to "renege on the previously agreed-upon Plea Agreement" and made clear that he would abide by the valid Diversion Agreement that was in effect. (DE 27 at 1.)

Following all the criticism that extremist Republicans had showered on the prosecution once the Plea Agreement was announced, the prosecution simply reversed course and sought to scrap the Plea Agreement altogether. Even after the prosecution's filing, the prosecution could not even tell the defense what it wanted. It would just say the prior proposal was off the table. There were *no negotiations* over how to make the Plea Agreement that was negotiated work better procedurally in the event of a breach. Contrary to the numerous assertions it made in its Opposition that it was negotiating in "good faith," the opposite was true. Rather than address the issues raised by the Court, and instead of finding a different procedural mechanism for assessing a breach, the prosecution immediately insisted that a more punitive agreement be stuck, quickly demanding

4

felony convictions and a prison sentence.  And even after the felony gun charges were filed, extremist Republicans cried that was still insufficient, and the prosecution bowed again and brought additional felony tax charges in California.

In short, Mr. Biden has produced a long list of publicly available evidence showing that the prosecution was being criticized and even threatened by extremist Republicans for agreeing to a Plea Agreement that they maintained was too soft, and the prosecution caved.  The prosecution has offered *no explanation* for why resolving the matter through probation was what it believed was appropriate on July 26, 2023, but not days later.  The only thing that had changed between the time the Plea Agreement was announced and the time that the prosecution withdrew the Plea Agreement was the amount of pressure being placed on the prosecution.[2]

---

[2] The prosecution claims its charging decision rested on "overwhelming evidence" (Opp. at 24), but it gained no new evidence during this short timeframe.  For example, the prosecution devotes extensive attention to Mr. Biden's description of his struggle with addiction in *Beautiful Things*, but that memoir was published in 2021—roughly two-years before the prosecution agreed that the Plea Agreement with a probationary sentence was the appropriate resolution of the case.  Opp. at 9–12.  Frankly, it is despicable that the prosecution treats the memoir as though it is Mr. Biden gloating over breaking the law in his "for-profit memoir," enhancing the need to punish him for "general deterrence." Opp. at 12, 24.  Perhaps the prosecution should visit an Alcoholics or Narcotics Anonymous meeting, where they will find that the sort of stories Mr. Biden recounts in his memoir are common.  These stories are not told to gloat.  Acknowledging the depraved actions that they have taken while in the throes of addiction and acknowledging responsibility for them is part of the healing process.  It shows others who are coming to terms with their addiction that they are not alone, that there are others who understand them, and that there is a path forward.  Mr. Biden wrote his memoir as a cautionary tale to show that even a child born into great privilege can succumb to addiction and, perhaps more importantly, to show people that no matter how far you may have fallen, you can still pick yourself back up.  Mr. Biden has been proudly sober four years now—a fact the prosecution conveniently omits when it revels in discussing the more salacious details of his history of drug use.  Prosecutors and courts throughout the country typically recognize that drug and alcohol rehabilitation programs work better than incarceration and encourage the very sort of Diversion Agreement this prosecution previously wrote, endorsed and spoke for in this case as the appropriate solution for the same reason.  The prosecution backtracking on those principles is what is shameful; not Mr. Biden's effort to help others struggling to overcome addiction.

The prosecution's explanation that it was essentially oblivious to this pressure is not credible, as there is no other explanation.  Rather than providing one, the prosecution derides this motion as "a fiction designed for a Hollywood script."  Opp. at 4.  The record demonstrates it is non-fiction drafted by the prosecution in Wilmington:

**Fact:**  There was a five-plus-year investigation (starting in 2018) involving numerous federal prosecutors and agents from multiple agencies included interviews, search warrants, and grand jury subpoenas and testimony.

**Fact:**  Whether Mr. Weiss had "considered" bringing some gun charge before June 2023, he and his colleagues decided *not* to bring such a charge and then determined that the proper resolution of the investigation was the Diversion Agreement.

**Fact:**  A non-prosecution outcome was completely in keeping with DOJ policy and the decisions of the U.S. Attorney's Office in Delaware, which had never brought these charges against a similarly situated individual.

**Fact:**  After the parties filed a letter on the docket describing the deal's structure on June 20, 2023, and even before the July 26 hearing, two of the IRS agents investigating Mr. Biden (while they were still government officials) began and continued an unprecedented publicity campaign criticizing Mr. Weiss and the agreed-upon resolution, and disclosing confidential investigation information and case files; various Republican congressional leaders began their own public campaign to criticize Mr. Weiss and the agreed-upon resolution; and former President Trump made a number of public statements criticizing Mr. Weiss and the agreed-upon resolution, calling it a "sweetheart deal" and a "traffic ticket."

**Fact:**  The day before a scheduled court hearing in Delaware on the Plea Agreement reached, Republican House Ways and Means Chairman Jason Smith filed a brief asking this Court to consider the testimony of the two "whistleblowers" in his attempt to have the Court reject the Plea Agreement.

**Fact:**  At the July 26, 2023 hearing, the prosecution stated that it and Mr. Biden had a stand-alone Diversion Agreement between the parties that would prevent any additional charges or actions on guns, drugs and taxes.

**Fact:**  Following the July 26, 2023 hearing when Republican congressional leaders crowed that their investigations, inquiries, and pressure had successfully killed the deal, the prosecution did just that by immediately demanding that Mr. Biden plead to a number of felonies, with jail time, to resolve the investigation without charges.

**Fact:**  When Mr. Biden rejected that severe and unexplained reversal on August 29, 2023, the prosecution filed three felony gun charges in this case on September 14, 2023, and filed nine tax charges (six misdemeanors, three felonies) on December 7, 2023 in California.

6

**Fact:** The prosecution's claim that it was not political pressure but "overwhelming evidence" that supported its reversal is totally belied because it claimed when making the June agreements that it had overwhelming evidence were a resolution not achieved. The prosecution did not accept diversion as the right outcome because it doubted the strength of its case, but because the remedy of encouraging rehabilitation for drug abuse was appropriate for a nonviolent defendant who had successfully attained sobriety.

**Fact:** And the prosecution's description of its "overwhelming evidence" reveals the fallacy of its argument: (a) a brown pouch (obtained by a scavenger from a public trash can) with cocaine residue was in law enforcement's possession for over *five* years, but was not tested until *after the charges* were brought; (b) even then no test was done for fingerprints or to date how long the residue had been there; and (c) most disturbing and contrary to its pointing to texts and photos as part of the "overwhelming evidence" claim, the prosecution did not even obtain a search warrant for firearms offenses to obtain those texts and photos until *three months after* it brought the charges.

This is the "clear evidence" of selective prosecution that the prosecution emphasizes is needed thirty times in its opposition brief. The prosecution does not dispute the voluminous evidence of the criticism and pressure that was placed on it to renounce the Plea Agreement and has not offered a viable explanation to the contrary or to rebut the admission of multiple House Republican Committee Chairmen that they succeeded in getting the prosecution to change its mind.

If the prosecution can support its newly made-up explanations (e.g. "overwhelming evidence," the realization that Mr. Biden's "prominence" was a factor, or that insistence on felonies and jail instead of the previously agreed up sentence of probation is "good faith" negotiating), it would not hide from scrutiny by opposing discovery and an evidentiary hearing.[3]

---

[3] Mr. Weiss should welcome such a hearing. Mr. Biden notes that the *New York Times* reported that Mr. Weiss told an associate he opposed charging Mr. Biden because no one else would be charged under the circumstances. (DE 63 at 6.) In its opposition, the prosecution writes that the *New York Times* also noted that an unnamed "senior law enforcement official" denied the account. Opp. at 40. It is odd that Mr. Weiss has not squarely and personally addressed whether he made the statement that was reportedly said by him. If Mr. Weiss wants to refute the statement attributed to him, the hearing requested would give him the opportunity to do so.

Mr. Biden is entitled to transparency. *See United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972) ("The government offered no explanation for its selection of defendants, other than prosecutorial discretion . . . Since Steele had presented evidence which created a strong inference of discriminatory prosecution, the government was required to explain it away, if possible, by showing the selection process actually rested upon some valid ground."). The prosecution has not satisfied its burden to "show[] the selection process actually rested upon some valid ground." *Steele*, 461 F.2d at 1152; *United States v. Haggerty*, 528 F. Supp. 1286, 1292 (D. Colo. 1981) (finding selective prosecution based on political affiliations).[4]

## II.   THE SELECTIVE AND VINDICTIVE PROSECUTION OF MR. BIDEN VIOLATED HIS CONSTITUTIONAL RIGHTS

The prosecution's claim that Mr. Biden is not part of a protected class and could not have been retaliated against for exercising a constitutional right is wrong. Mr. Biden is being targeted because he is the son of a sitting Democratic President and a political rival of former President Trump, who seeks to defeat President Biden in the upcoming presidential election. The Republicans so vocal against Mr. Weiss have unabashedly expressed their support for Mr. Trump and even that the actions they are taking against Mr. Biden are to "move the needle" against the President.[5] If Mr. Weiss treated President Biden differently because of this party affiliation or

---

[4] Perhaps the prosecution's assertion of having "overwhelming evidence" is its recognition that a claim of *newly discovered* overwhelming evidence can rebut a presumption of vindictiveness, *see United States v. Goodwin*, 457 U.S. 368, 381 (1982); *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993), but here that claim fails because the prosecution had its so-called "overwhelming evidence" before it signed the Diversion and Plea Agreements. The evidence that the prosecution described at length comes from Mr. Biden's memoir that was published in 2021 and other evidence in its possession *before* it made the June 2023 Agreements. The only subsequent evidence it claims to have discovered—the leather pouch's residue and newly discovered text messages—was obtained *after* the charges were filed, so that evidence could not have informed the prosecution's charging decision.

[5] Aaron Blake, *House GOP Chairman Links His Investigation To Biden's Poll Numbers*, Wash. Post (May 22, 2023), https://www.washingtonpost.com/politics/2023/05/22/james-comer-biden-

because he is running against the man who initially appointed him, no one would doubt that would entail improper prosecution.  It is no different if the disparate treatment is being directed at the son of President Biden for the same reason.  Does anyone really think that the IRS agents, Mr. Trump, Republican Houe Chairmen, and right-wing media would be criticizing a typical diversion agreement of a former drug addict and tax misdemeanors for a person who paid their full taxes years ago, if his name was John Smith?  Just as children of Presidents are in need of Secret Service protection because they are subject to physical harm by people targeting them as surrogates for their parent, so should they have protection from the harm that can rob them of their freedom as a result of the similarly dangerous weapon of improper criminal charges.

In addition to the political freedom protected by the First Amendment, the First Amendment also protects the freedom of association among family members—particularly as the parent-child relationship is an immutable characteristic.  One of the few rights expressly protected in the body of the Constitution itself prevents the government from inflicting harm on children for the conduct of their parents.  U.S. Const., art III, § 3 (1789) (prohibiting the common law "Corruption of Blood" penalty that would destroy inheritance rights of children based on their parent's crimes).  The Supreme Court has repeatedly extended this principle in the Due Process and Equal Protection contexts in preventing the government from inflicting harm on the children of people in disfavored classes.  *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 219–20 (1987) (holding the constitutional rights of children are denied under a law that would deny them public education based on whether their parents are in the country legally); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) (addressing cases where the Supreme Court has invalidated laws

---

investigation-polls/ (quoting Chairman Comer telling the press that his investigation of Mr. Biden is benefitting Mr. Trump's campaign against President Biden).

that denied benefits to children where their parents caused them to be born out of wedlock); *Weber v. Aetna Cas. And Surety Co.*, 406 U.S. 164, 175 (1972) ("[I]mposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.  Obviously, no child is responsible for his birth and penalizing the . . . child is an ineffectual—as well as unjust—way of deterring the parent."); *see also Korematsu v. United States*, 323 U.S. 214, 243 (1944) (Jackson, J., dissenting) (viewing the notorious, wrongly decided Japanese internment case as "an attempt to make an otherwise innocent act a crime merely because this prisoner is the son of parents as to whom he had no choice, and belongs to a race from which there is no way to resign").

To be sure, children of politically powerful individuals enjoy great privilege, but they often become the targets of animus for that very reason.  History is replete with children of political figures being abducted and assassinated literally (e.g., murder of Romanov children by Russian revolutionaries) or figuratively (e.g., Odysseus murdering the son of Crown Prince Hector when sacking Troy).  Regrettably, political attacks on the children of politicians to harm or influence their parents are not uncommon in America either.[6]  While courts are powerless to police decency in the political process, they do have the authority to dismiss indictments resulting from improper

---

[6] Among the most disturbing and now widely condemned examples of this involved Senator Lestor Hunt.  Senator Joseph McCarthy and his confederates persuaded him not to seek reelection by threatening to make the fact of his son's homosexuality a political issue.  Senator Hunt agreed because he "feared a vicious contest that would add to his son's torments," and the Senator later committed suicide by shooting himself in his Senate office.  *See* Unted States Senate, Historical Highlight, https://www.senate.gov/artandhistory/history/minute/Senator_Lester_Hunts_Decision. htm; *see also* Marie Brenner, *How Donald Trump and Roy Cohn's Ruthless Symbiosis Changed America*, Vanity Fair (June 28 2017), https://www.vanityfair.com/news/2017/06/donald-trump-roy-cohn-relationship (explaining how Mr. Trump hired Roy Cohn, Sen. McCarthy's counsel and strategist, as his own attorney and embraced Mr. Cohn's underhanded tactics).

weaponization by political opponents of a President pressuring prosecutors to selectively and vindictively charge that President's son.

## III. MR. BIDEN HAS DEMONSTRATED SELECTVE PROSECUTION

### A. The Prosecution Misstates Mr. Biden's Burden

The prosecution views Mr. Biden's selective prosecution argument through the wrong lens. It argues Mr. Biden has not shown discriminatory effect because he has not identified a single "similarly situated person," which the prosecution describes as "a son of a Republican politician who had an addiction and lied during a gun background check,"[7] who has not been prosecuted. Opp. at 20–21. Why not limit it further to those who have the first name, "Robert?"  The burden for proving selective prosecution is not so high that it can never be met.

The prosecution conflates the similarly situated analysis with the discriminatory purpose analysis.  Mr. Biden does not claim that he is being treated differently from the sons of Republican politicians, but that he is being treated differently from similarly situated nonviolent offenders that DOJ, per formal policy and practice, declines to prosecute.  Consistent with those policies, the prosecution even sought to follow that consistent practice of avoiding criminal charges in this very case through a Diversion Agreement, which would seek to ensure that Mr. Biden remain clean and sober as he has for the past four years.  Under political pressure though, the prosecution reneged on the Agreement it signed so that Mr. Biden could be charged with felonies carrying the threat of serious jail time.  The prosecution abandoned DOJ's policies and historic practices to charge him criminally—something that is not done to similarly situated persons, particularly those who have been sober for the past four years (or those who paid their taxes in full after being sober).  The

---

[7] Background check is a pretty misleading way to describe checking a series of small boxes on a federal gun form, one of which denied being a drug addict.

prosecution does not dispute that Mr. Biden has identified tens of millions of drug users and addicts who purchase firearms that DOJ does not charge.[8]

Mr. Biden explained the proper way to define those who are "similarly situated." (DE 63 at 40–43.) Persons "are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) (citations omitted). Mr. Biden provided uncontroverted evidence of the prosecutorial factors DOJ considers when deciding whether to bring these charges. This evidence includes:

1) Examples of knowledgeable sources stating that these charges would not normally be brought under these circumstances, including former Attorney General Holder and (according to a *New York Times* source) Mr. Weiss himself. (DE 63 at 40–41.)

2) Statistics showing that even by conservative estimates "*at least 16 million Americans* could be subject to criminal prosecution under 922(g)(3) for the exact conduct of which Mr. Biden is accused." (*Id.* at 42 n.91 (emphasis in original).)[9]

3) DOJ policies and binding directives consistent with these statistics that expressly reserve prosecution for this offense for cases impacting public safety and/or exacerbating circumstances that are not present here. (*Id.* at 44–47.)

4) An example of DOJ moving to dismiss its indictment in a case where it was satisfied that the public safety threat that initially warranted charges no longer existed. (*Id* at 45 n.100.)

5) DOJ's own record reflecting non-prosecution of these offenses, and that no cases like Mr. Biden's has been charged by this U.S. Attorney's Office since the district began keeping searchable electronic records more than three decades ago.

---

[8] The prosecution argues that Mr. Biden must show he is in a "protected class" and that he was charged when others in that class were not. Opp. at 19–20. The prosecution again confuses the discriminatory effect requirement, that Mr. Biden show he was charged when others were not for the same conduct, with the requirement that he show he was charged for an improper purpose. Nevertheless, children of politicians who are targeted by the government because of who their parents are a protected class, as shown above.

[9] These statistics are supported by a lengthy string cite of DOJ press releases under the statute, in each of which DOJ expressly states that the prosecution was part of its public safety initiatives. (DE 63 at 44–45 n.99.) Presumably DOJ would not describe this prosecution as part of its Project Safe Neighborhood program, which highlights how much of an outlier it really is.

Mr. Biden is alleged to be a nonviolent offender who has been sober for *four years* and none of the relevant aggravating factors are present, which makes him similarly situated to the tens of millions of offenders DOJ, as a matter of policy and practice, does not prosecute—a conclusion further supported by DOJ's decision *not* to bring these charges for years after learning in 2018 the relevant facts and the timing and circumstances of its subsequent decisions to up the ante. (*See* DE 63 at 44 (discussing aggravating factors considered by DOJ).)

The prosecution's scramble to redefine the "similarly situated" pool is not aided by its caselaw. First, the prosecution relies on *United States v. Torquato*, where a Democrat argued he was prosecuted for an extortion scheme when Republican officials were not for the same conduct. Opp. at 22 (citing 602 F.2d 564 (3d Cir. 1979)). The court found that the officials the defendant accused had not engaged in the bribery scheme, so he had no evidence he was being treated differently than anyone else. Here, Mr. Biden has identified millions of individuals, including specific examples, of similarly situated, nonviolent offenders who could be prosecuted, but are not, pursuant to formal DOJ policy and standard practice. Indeed, no similarly situated offenders have ever been charged in Delaware.

The prosecution points to *United States v. Slawick*, where the court determined that a Republican was not similarly situated to a Democrat accused of the same conduct because "the state of the evidence against him was weaker." Opp. at 23 (citing 1993 U.S. Dist. LEXIS 11020, at *3 (D. Del. 1993)). As explained, while the strength of the evidence may explain disparate treatment in some cases,[10] it does not here because it is not the factor that distinguishes between who DOJ charges with these crimes and who it does not under the unique DOJ charging policies

---

[10] In fact, those policies and directives say DOJ should focus on meaningful reduction in crime, *not* simply obtaining convictions. (DE 63 at 44 & n.97 (citing DOJ policies).)

in the gun context, and the record overwhelmingly refutes the suggestion that it was DOJ's reason for bringing charges here.[11]

Even if this *was* the relevant consideration, it would still be obvious that similarly situated, nonviolent offenders are not charged.  DOJ does not go around charging everyone with a medical marijuana license who purchases a firearm with these offenses, even though that would seem to be a pretty cut and dry violation.

Finally, the prosecution argues that *United States v. Hastings* rejected a selective prosecution claim because the defendant was "unable to show that there were other persons with similar characteristics who were spared prosecution because of their political affiliation."  Opp. at 25 (citing 126 F.3d 310, 315 (4th Cir. 1997)).  Again, Mr. Biden is not claiming similarly situated offenders were spared because of their political affiliations, but that they were spared because they, like Mr. Biden, do not meet DOJ's criteria for prosecution.  But because Mr. Biden is the surrogate target for his father's political enemies, Mr. Biden was not spared for partisan political reasons.

In sum, each of DOJ's cases involve a defendant alleging he was being charged unfairly *because of* his political affiliation, and each recognizes that this is an improper purpose to prosecute.  But the defendants in those cases alleged the similarly situated individuals who were *not* charged for the same conduct were members of another political party.  Here, Mr. Biden also claims that he was unconstitutionally charged for partisan political reasons because his father is a sitting President seeking reelection and the prosecution succumbed to the Republicans trying to

---

[11] The prosecution notes that the judge in *Slawick* expressed "skepticism of finding selective prosecution where a defendant asserts the Government has failed to prosecute only one other person who is similarly situated to the defendant."  1993 U.S. Dist. LEXIS 11020, at *8.  Mr. Biden alleges clear evidence that DOJ, per policy and practice, fails to prosecute millions of similarly situated offenders.

defeat that President, but the similarly situated individuals who were not charged are the millions of Americans DOJ could prosecute for these offenses, but does not.

**B.  The Prosecution Fails To Counter Mr. Biden's Charging Data**

The prosecution seeks to place an impossible burden on Mr. Biden to prove a negative by objecting to his reliance upon statistics to show that DOJ does not charge the millions of people it could prosecute under similar circumstances, but has not.  Opp. at 17.  It is not clear how else Mr. Biden could be expected to prove why there is an absence of charges in similarly situated situations.  Courts do not fault the use of statistical evidence, but as with any kind of evidence they do somehow question whether the relevant statistics have been presented.  The strength of the evidence is what matters and, here, Mr. Biden has shown that the charges against him are a statistical anomaly.  (DE 63 at 42–43.)

The prosecution makes the right kind of argument in attacking Mr. Biden's charging data as misleading (Opp. at 26–31), but the prosecution lacks the fact to support it.  The prosecution ironically refers to Mr. Biden's statistical claims as "misleading" before proceeding to spend pages setting forth incredibly misleading statistical claims.

First, in response to Mr. Biden providing statistics showing that Section 922(g)(3) is used incredibly rarely, DOJ repeatedly points to the fact that "the § 922(g)(3) charge is the second-most-frequently used gun charge against prohibited persons."  Opp. at 28.  But just because a given occurrence is the second most frequent does not mean that occurrence is *actually* frequent.  After all, the second most frequent outcome of playing the lottery is winning the lottery.  DOJ's own statistics show that Section 922(g)(3) was used in a meager 5.3% of the cases in which Section 922(g) charges were brought against a defendant.  Opp. at 28.  Again, that is of the people charged, when the more relevant inquiry is a comparison to the people who could have been charged.  The

report cited by DOJ shows that there were 6,549 defendants charged with Section 922(g) offenses in FY 2021.[12]  5.3% of those cases means that out of the approximately 16 million Americans (DE 63 at 42 n.91) who own guns and admit to illegal drug use, DOJ brought charges against only 347 of them.  This figure also does not account for the number of those cases in which the offense included risk to public safety or other dangerous aggravating circumstance.  (DE 63 at 43 n.94 ("The denial cases ATF field divisions refer to USAOs for prosecution generally include aggravating circumstances . . . these aggravating circumstances could include violent felonies or multiple serious offenses in a short period of time, especially if these occurred in close proximity to the timing of the attempted firearms purchase.").)

Further, the prosecution claims that the three charges brought against Mr. Biden are the "6th, 7th, and 8th most frequently brought [federal gun] charges," however, they offer absolutely no raw numbers to show that these charges are actually brought frequently, against whom, why, and who DOJ decided not to charge under these statutes.  Opp. at 27.  Mr. Biden's point is that the statistics reflect DOJ's policy to rarely charge these crimes at all, so the focus is on how many people who could be charged are charged, not on what charges are brought in the rare occurrence that someone is charged.  By the same token, the fact that most people struck by lightning are struck on the head does not mean that such lightning strikes are common.

Finally, the prosecution attempts to argue that a false statement during a firearm purchase is an aggravating circumstance that would make enforcement of a federal gun charge more likely.  Opp. at 29–30.  However, the prosecution then points to a graph showing that in only 0.7% of Section 922(g) cases was a defendant's false statement considered to be an aggravating

---

[12]   *See*   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220714_Firearms.pdf at 30.

circumstance.  Opp. at 30.[13]  If the prosecution is looking for statistical support to show that Mr. Biden's alleged conduct is in line with their routine prosecution policy, they have not found it in the cited data.

Moreover, where DOJ does bring these kinds of charges in some kinds of cases, as a matter of policy it does not bring them in a nonviolent case where no one was hurt, which is sufficient evidence that Mr. Biden is being treated differently.  *See United States v. McLeod*, 385 F.2d 734, 744 (5th Cir. 1967) (where it is "common knowledge" that enforcement officials "often overlook violations" of a law, enforcement without valid explanation supports inference of discrimination); *Duncan v. Perez*, 445 F.2d 557, 560 (5th Cir. 1971) ("[I]t is clear beyond dispute that any violation that may have occurred was so slight and technical as to be generally reserved for law school hypotheticals rather than criminal prosecutions. . . [no one was] hurt and. . . [d]e minimus [violations] of this kind occur repeatedly  .  .  .  and do not become the subject of criminal proceedings."); *Medrano v. Allee*, 347 F. Supp. 605, 614 (S.D. Tex. 1972) ("The activity was peaceful and did not endanger public safety. . . [yet defendant's violation] was treated differently from other [violations] which were more [serious] in nature," which "can only be characterized as 'biased' or 'selective.'").  Moreover, Mr. Biden has been sober for four years, and the prosecution has not and cannot allege that he has engaged in any of the sort of conduct that he engaged in while using drugs since he became sober.  Perhaps that is why their Opposition takes so much time to recount his conduct when he was an addict in years *before* the gun purchase.[14]  There is no need

---

[13] In fact, the number is less than 0.7%.  The 0.7% figure is the total when combining (1) cases with a false statement made in the purchase of a firearm with (2) cases in which the defendant was making a straw purchase for someone else.  Opp. at 30.

[14] This is just one other way that the Opposition plays loose with its claim of "overwhelming evidence." When they quote Mr. Biden calling himself an "addict," they should again attend any recovery program where that is how people refer to themselves forever, even when sober for decades.

to get him off the street, as there may be with other defendants. This factor makes him even less likely to be prosecuted under the policy.

And, as the prosecution emphasizes throughout its response, the burden is on Mr. Biden to show he was targeted by identifying one or more similarly situated individuals DOJ declined to prosecute, not to prove no one has ever been prosecuted on similar facts. *See* Opp. at 18. Mr. Biden is similarly situated with the nonviolent offenders DOJ declines to prosecute, raising the inference noted by former Attorney General Holder that, were he the average American, this case would not exist.

### C. Mr. Biden Provided Clear Evidence Of Discriminatory Purpose

The prosecution claims Mr. Biden must show he was charged for exercising a constitutional right or being in a protected class, but Mr. Biden has done so (*see supra* Section II) and even that is not required. Mr. Biden's caselaw confirms that any purpose other than the pursuit of legitimate prosecutorial objectives that "may have played an impermissible role" in the prosecution's charging decisions violates due process and equal protection. (*Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997); *see also* DE 63 at 22.)[15] The fact that this prosecution also punishes Mr. Biden for exercising other constitutional and legal rights just makes it worse. This is consistent with "ordinary equal protection standards," Opp. at 18 (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)), which (regardless of the level of scrutiny applied) involve balancing individual interests against the legitimate governmental interests that are furthered, and the government has no legitimate interest in prosecuting Mr. Biden because they

---

[15] *C.f.*, *United States v. Schmucker*, 721 F.2d 1046, 1049 (6th Cir. 1983), cert. granted, judgment vacated, 471 U.S. 1001 (1985) ("[I]t is obvious that the government cannot selectively enforce a law prosecuting only Republicans . . . *or only Southerners* who violate the law") (emphasis added). Just as the prosecution would have no constitutional basis to charge someone because he is a Southerner, the same is true of prosecuting Mr. Biden because he is the son of a politician.

felt pressure to change their decisions as a result of the animus directed at him or his father—for whatever reason.

The prosecution next disputes that Mr. Biden has shown discriminatory purpose "by decisionmakers in his case." Opp. at 31. It is sufficient to show, as Mr. Biden has, that the decisionmakers in his case decided to scrap the Plea and Diversion Agreements they thought were appropriate and take a more aggressive approach to charging felonies based on the animus that others have against Mr. Biden. It does not matter whether the animus against Mr. Biden lies in the hearts of the prosecution team or not, it bowed to the political pressure of those who held such animus, so the result is the same. The victim of a murder-for-hire count is just as dead whether or not the hired gun shared the animus of the person who hired him, and the same is true here.

The prosecution again appeals to *Hastings*, where the court found that, despite animus attributed to others, the defendant had not shown that "the government official who actually made the decision to prosecute the case was motivated by impermissible political considerations." Opp. at 32 (citing 126 F.3d at 314–15). The court in *Hastings* declined to automatically impute animus attributed to individual investigators to the prosecutors when there was no evidence to support doing so, noting that "'the animus of a referring agency is not, without more, imputed to federal prosecutors.'" 126 F.3d at 314 (citing *United States v. Monsoor,* 77 F.3d 1031, 1035 (7th Cir. 1996)).

*Hastings* is of help to the prosecution only if it can show that, despite the animus of others who improperly sought to influence the prosecution, the prosecution made its charging decision independent of that influence. But as explained above, the prosecution cannot do so. The prosecution team decided to sign and advocate to this Court for the agreements it made as the proper resolution of the case. The now-argued reasons contained in the opposition fall apart with

any scrutiny, and the only plausible explanation for the prosecution's reversal of course was the pressure put upon it to reverse course by outsiders with animus—the very outsiders with animus who touted being able to change the prosecution team's decision.

## IV.   MR. BIDEN HAS DEMONSTRATED VINDICTIVE PROSECUTION

The prosecution argues Mr. Biden must demonstrate vindictive prosecution "by either (1) producing evidence of actual vindictiveness, or (2) demonstrating sufficient facts that reveal a *realistic* likelihood of vindictiveness to warrant a rebuttable presumption of vindictiveness," and he has done so.  Opp. at 41 (emphasis in original).  Mr. Biden presented evidence of both, including facts showing that:

1) The prosecution made a deal it believed appropriate after five years of investigation that did not include felony gun or tax charges.

2) The prosecution either had the evidence it claims to be overwhelming already or did not acquire until after it brought the charges.

3) In between the agreement and its decision to charge, Mr. Trump and other prominent officials criticized and pressured DOJ.

4) The prosecution then changed its mind and, rather than negotiating in "good faith," insisted on felony charges and jail.

The prosecution mistakes this claim as "absurd" because it would mean President Trump put the investigation in motion because he "predicted that the defendant would [commit his gun crimes], believed that Mr. Weiss was the best candidate to be his 'stalking horse,' and also foresaw that he would lose the election but could force Mr. Weiss to file unlawful charges later."  Opp. at 3.  None of this is true.

Mr. Biden's argument hinges on the fact that Mr. Weiss determined that the appropriate resolution of this matter were Plea and Diversion Agreements with a recommendation of probation, and reversed course after being pressured by extremist Republicans to do so.  Again, it is relevant that then-President Trump was calling for Mr. Biden to be indicted during his

Administration and expressed frustration that he was not.  If anything, the fact that Mr. Weiss did not charge Mr. Biden during the Trump Administration reflects that Mr. Weiss did not think that was the right thing to do.  That is consistent with Mr. Clark's Declaration noting that Mr. Weiss's office, under ever-increasing pressure, started by asking for a non-prosecution agreement and incrementally asked for more and more as that political criticism of him and pressure grew.  (DE 60-2.)  That culminated in Plea and Diversion Agreements that Mr. Weiss thought would be fair enough—despite initially seeking less from Mr. Biden.  Mr. Weiss's reversal of course occurred only when the extremist Republican backlash showed him that their bloodlust would not be satisfied by the agreements he signed, so Mr. Weiss reneged on those agreements and decided to bring multiple felony charges instead (followed by still more backlash and a decision to indict on even more charges in California).

This is evidence of actual vindictiveness and that gives rise to an objective appearance and apprehension of vindictiveness sufficient to require dismissal.[16]  If nothing else, it provides evidence of a realistic likelihood of vindictiveness to warrant a rebuttable presumption of vindictiveness.

Next, the prosecution argues Mr. Biden fails to establish an objective appearance or apprehension of vindictiveness because he has not demonstrated "circumstances that reveal a *sufficient likelihood* of vindictiveness to warrant a rebuttable presumption."  Opp. at 4 (emphasis in original).  Mr. Biden cited numerous cases where courts applied the presumption when the prosecution (1) delays bringing charges despite learning the facts upon which they are based, and

---

[16] As noted, the fact that Mr. Biden is also a surrogate target for the political activity of his father makes no difference—animus is driving the case against him rather than legitimate prosecutorial considerations, and that is what violates Mr. Biden's rights.  It would be nonsensical to suggest due process and equal protection are violated when a defendant is prosecuted because of animus towards him, but not when he is prosecuted because of animus towards his father.

then (2) brings charges or otherwise ups the ante without a relevant change in circumstances or other adequate explanation.  (*See* DE 63 at 50–51.)  The inference here is even stronger because the delay was a matter of years and the prosecution continually upped the ante right after facing political consequences; the only relevant change in circumstances were rulings that the gun charges here are unconstitutional and this prosecution runs counter to DOJ's formal enforcement policies and objectives and standard practices.  Thus, even if Mr. Biden's evidence of actual vindictiveness were not sufficient, this evidence is more than enough to raise a presumption that the prosecution fails to rebut.

## V.   MR. BIDEN HAS DEMONSTRATED A BREACH OF SEPARATION OF POWERS

The prosecution disparages Mr. Biden's separation of powers argument as "novel" and some sort of "invitation to act improperly" (Opp. at 49–50), but the position Mr. Biden advocates has emphatically been the position of the U.S. Department of Justice since Attorney General Jackson and it has been echoed by virtually every subsequent Attorney General (DE 63 at 16–20). Time after time, DOJ has warned Congress not to interfere with active criminal investigations— and DOJ typically has refused to comply with subpoenas and demands for testimony concerning active criminal investigations—precisely because such interference is improper and would give rise to the very sort of motion to dismiss that Mr. Biden brings here.  (*Id.*)  Mr. Weiss's effort to rebuke DOJ's long-standing policy is misguided and it would seem to be an argument beyond his authority to make.  *See* 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice.").

A federal court applying the law to review prosecutorial decisions—whether in charging, the presentation of evidence, the submission of jury instructions, and all other aspects of criminal law and procedure—is not a "violation" of the separation of powers, it is what courts are required

to do under the Constitution.  *Marbury v. Madison*, 5 U.S. 137, 180 (1803) ("a law repugnant to the constitution is void; and [] *courts*, as well as other departments, are bound by that instrument") (emphasis in original).  The prosecution questions Mr. Biden's reliance on *Mardis*,[17] where the court ultimately declined to dismiss based on breach of separation of powers, but Mr. Biden also cites a number of cases that were dismissed on that basis.  (DE 63 at 56–57.)  Moreover, the relevance of *Mardis* is the court's recognition that when other branches of government, including Congress, influence a prosecutor's charging decisions, it breaches separation of powers and, in turn, a defendant's constitutional rights.  (*Id.*)  The prosecution does not dispute this premise,[18] it simply denies that it was actually influenced.  That is not what the record shows.

The fact that House Republican leadership has confessed that they used (and continue to use) their authority in Congress to interfere with the prosecution's charging decision establishes that a separation of powers violation has occurred.  (*See* DE 63 at 3–4 (quoting statements from House Oversight and Accountability Committee Chairman James Comer and the Chairman of the House and House Ways and Means Committee Chairman Jason Smith).)  They even took the unprecedented step of subpoenaing Special Counsel Weiss to testify about his investigation of Mr. Biden in November 2023 (and a month later Mr. Weiss indicted Mr. Biden for a second time in California).  And despite the prosecution's empty protestations to the contrary, the facts support Chairman Comer and Chairman Smith.  Mr. Weiss had blessed the Plea and Diversion Agreements providing and recommending for an explicit term of probation to resolve any gun or tax charges

---

[17] *United States v. Mardis*, 670 F. Supp. 2d 696, 697-98 (W.D. Tenn. 2009), *aff'd*, 600 F.3d 693 (6th Cir. 2010).

[18] In fact, as Mr. Biden explained in his motion to dismiss, DOJ has a long history of agreeing that even the slightest appearance of political influence on DOJ must be avoided and that, like the judiciary, DOJ is responsible for ensuring separation of powers to protect defendant rights.  (*See* DE 63 at 58–59.)

that could be brought against him.  On July 26, 2023, Mr. Weiss sat right behind his prosecution team when they urged this Court to accept those agreements.  Chairmen Comer and Smith (among other Republicans) heavily criticized Mr. Weiss's decision, and Mr. Weiss abruptly reversed course by withdrawing or reneging on the agreements and charging multiple felonies carrying a lengthy potential term in prison—just as Chairman Comer and Chairman Smith demanded.[19]  Nothing else happened in the window between when Mr. Weiss's team advocated for the Plea Agreement to this Court on July 26th and Mr. Weiss's 180-degree about-face only days later.  Mr. Weiss has not offered any other credible explanation for his change of position.

## CONCLUSION

The Court should dismiss the indictment as a selective and vindictive prosecution in violation of separation of powers or, at the very least, grant discovery and an evidentiary hearing before ruling on the motion.

Dated: January 30, 2024                    Respectfully submitted,

                                           /s/ *Abbe David Lowell*
                                           Abbe David Lowell
                                           Christopher D. Man
                                           Kyllan J. Gilmore
                                           WINSTON & STRAWN
                                           1901 L Street NW
                                           Washington, DC 20036

---

[19] The prosecution makes a baffling argument that Mr. Biden is not exposed to more jail time under the current multiple felony count indictment than he would have faced under the one-count information that it fled, although it acknowledges the "total maximum penalties for all counts increased from 10 to 25 years of imprisonment," because the Sentencing Guideline calculation would be the same.  Opp. at 16.  The prosecution is comparing apples-to-oranges though because Mr. Biden would not be sentenced under the information it filed if the prosecution had honored its Diversion Agreement (which Mr. Biden maintains is still in effect, *see* DE 60).   Under the Diversion Agreement, the charge would be dismissed and no imprisonment could result.  Moreover, increasing the statutory maximum from 10 years to 25 years is significant (otherwise, why would the prosecution bother?).  The Court is not bound by the Sentencing Guidelines and could theoretically, at least, impose a sentence as high as 25 years upon conviction.

Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

*Counsel for Robert Hunter Biden*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of January, 2024, I filed the foregoing Reply in Support of Mr. Biden's Motion to Dismiss the Indictment with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

<u>/s/ *Abbe David Lowell*</u>
Abbe David Lowell

*Counsel for Robert Hunter Biden*