**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

UNITED STATES OF AMERICA )

                                                )

           v.                             )  Criminal Action No. 1:23-cr-00061-MN

                                                )

ROBERT HUNTER BIDEN, )

                                                )

          Defendant.              )

                                                )

_____)

**MR. BIDEN'S REPLY IN SUPPORT OF HIS MOTION TO
COMPEL DISCOVERY AND SET DISCOVERY DEADLINES**

Abbe David Lowell
Christopher D. Man
WINSTON & STRAWN
1901 L Street NW
Washington, DC 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com
CMan@winston.com

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

*Counsel for Robert Hunter Biden*

## INTRODUCTION

The prosecution's response to Mr. Biden's motion to compel simultaneously seeks an unnecessary fight about tangential issues and then avoids addressing actual disputes that have been identified. As one example, the opposition focuses more on what the prosecutors have produced—rather than what it has not—and then steadfastly objects that it should *not* be required to declare that it has fulfilled its *Brady* and related discovery obligations. (Opp. at 12.) Another example is the prosecution's rhetoric accusing Mr. Biden of making a "misleading omission" and being "dishonest" (Opp. at 11, 19) for not addressing what the prosecution *has produced*, despite this being a motion to compel the prosecution to disclose what it has *not produced*. The law does not give the prosecution a participation trophy for playing in the event; they should finish the process without a defendant cheering for the partial effort. For all its bluster, there is nothing improper nor out of the ordinary for Mr. Biden to make the same request that virtually every defendant makes, asking that the prosecution give him *all* the information that he is due so that he can prepare for and receive a fair trial.

## ARGUMENT

### I.   THE PROSECUTION REFUSES TO CONFIRM ITS COMPLIANCE WITH ITS DISCOVERY OBLIGATIONS

Mr. Biden's skepticism that the prosecution has produced all that is required is compounded by the prosecution's refusal to declare that it has met its discovery obligations. Mr. Wise had no difficulty telling the Court at the July 26, 2023 hearing that the prosecution had done so. (7/26/23 Tr. at 7 ("THE COURT: Has all *Brady* material been produced?  MR. WISE: Yes, Your Honor.").) There was nothing unusual about the Court asking the prosecution whether it has fulfilled all its *Brady* obligations. Prosecutors typically welcome the opportunity to confirm they have done so, just as Mr. Wise did at the hearing. It is curious that the prosecution will not make

that commitment now and opposes an order to comply with *Brady* and other applicable requirements.

Perhaps the prosecution is gun-shy about now confirming that it has met its discovery obligations because it was so very wrong in making that same claim to the Court seven months ago. Three months after making that July 2023 representation, the prosecution made its first production in October 2023, followed by subsequent productions in November 2023 and January 2024. These productions included *Brady* material (e.g., ATF and Delaware state police investigative file; public statements by Mr. Biden; receipts and expenses related to payments made to drug and alcohol rehabilitation programs in 2018; and lab reports related to a certain leather pouch recovered with the gun in October 2018). The prosecution makes no attempt to explain Mr. Wise's misstatement to the Court in July that the prosecution had satisfied its *Brady* obligations.

Mr. Biden's concern does not rest solely upon the fact that the prosecution was wrong in mistakenly claiming *Brady* compliance previously. Those concerns have only grown as the defense has increasingly come to realize the scope of the prosecution's "curious" investigative techniques.

Take, for example, the prosecution's heavy reliance on a brown leather pouch that it claims belonged to Mr. Biden and contained cocaine residue. (Opp. at 7–8.) Mr. Biden noted in his motion to compel that law enforcement obtained that pouch in October 2018 from a garbage scavenger who pulled it from a public trash can. (Mot. at 8–9.) The prosecution treats this evidence as its smoking gun but, if that were so (despite the pouch's questionable provenance), it is dumbfounding that the prosecution waited *five years* before testing it for narcotics residue and never chose to retrieve fingerprints from it. The prosecution offers no explanation for that either.

The prosecution's latest filing amplifies why Mr. Biden and the Court cannot take the prosecution's assertions concerning its discovery production or what that discovery reveals at face value. Exhibit 1 to the prosecution's opposition states: "During November and December 2018, *the defendant took multiple photographs* of videos [*sic*] apparent *cocaine*, crack cocaine, and drug paraphernalia" (DE 86-1 at 9, citing DE 68 at 9) (emphases added), and right below it, includes a photo of three white powdery lines from "iTunes Backup (iPhone 11) - Production 1." The prosecution is flat out wrong—both that Mr. Biden "took" this photograph *and* in claiming that it depicts "cocaine." Multiple sources have pointed out, and a review of discovery confirms, this is actually a photo of *sawdust* from an expert carpenter and it was sent *to* Mr. Biden, not vice versa.[1]

More specifically, the discovery identifies this as a photo of a photo taken in the office of Mr. Biden's then-psychiatrist Dr. Keith Ablow, which Dr. Ablow initially received from an master carpenter and later texted to Mr. Biden, stating: "This one in my office is of lines of sawdust sent to me by a master carpenter who was a coke addict."[2] The message accompanying that photo was meant to convey that Mr. Biden, too, could overcome any addiction. The prosecution does not provide a date for the photo, but the message from Dr. Ablow is dated November 20, 2018.

---

[1] *Exp[o]rt Reports: When David Weiss Claimed Keith Ablow's Sawdust Was Hunter Biden's Cocaine*, EmptyWheel (Feb. 14, 2024), https://www.emptywheel.net/2024/02/14/export-reports-when-david-weiss-claimed-keith-ablows-sawdust-was-hunter-bidens-cocaine/.

[2] The message excerpt on the following page is found on the data image provided to Mr. Biden by the prosecution (iPhoneXS_Chat_00000132). There is no Bates stamp for this material as discussed in Mr. Biden's opening motion. (*See* Mot. at 18.)



The prosecution was reckless in making such a hyperbolic and sensational claim in a public filing, which it surely realized would prejudice Mr. Biden in the public eye. Mistaking sawdust for cocaine sounds more like a storyline from one of the 1980s Police Academy comedies than what should be expected in a high-profile prosecution by the U.S. Department of Justice.

Another development, just last week, further informs Mr. Biden's request for and now motion to compel discovery. On February 15, 2024, Special Counsel David Weiss unsealed the remarkable indictment of former FBI informant Alexander Smirnov. *United States v. Smirnov*, 2:24-cr-00091-ODW (C.D. Cal.). The Special Counsel's Indictment notes that Mr. Smirnov expressed his "bias" against President Biden and was telling a farcical tale that Burisma, a Ukrainian company, enlisted Mr. Biden as an unregistered foreign agent and paid bribes to him

and then-Vice President Biden that proved to be so outlandish and unsubstantiated that the FBI

field team recommended its investigation be closed and the then-FBI Deputy Director and then-

Principal Associate Deputy Attorney General (Richard Donoghue) agreed in August 2020.[3]  (*Id.*

DE1 at ¶ 40 ("Smirnov Indict.").)   Nevertheless, with prodding from extremist Republican

Members of Congress (who initiated an impeachment inquiry of President Biden based on the

same baseless allegations) and the right-wing media, the prosecution team that was already

pursuing Mr. Biden resuscitated the baseless investigation of Mr. Smirnov's ridiculous claims

against Mr. Biden *thirty-four months later*.  (*Id.* ¶ 41.)  It now seems clear that the Smirnov

allegations infected this case, and why, on July 26, 2023, the Special Counsel answered as it did

the Court's question about whether the Diversion Agreement's immunity provision would bar

charges under the Foreign Agents Registration Act (7/26/23 Tr. at 55).[4]

 Lo and behold, some seven months later, the Special Counsel finally figured out that Mr.

Smirnov was lying—which should have been obvious to everyone, certainly by August 2020 when

---

[3] Mr. Biden's DOJ requests (*see infra* at 18–19), as well as his Rule 17 subpoena requests (DE 58) seeking communications and records from, among others, Principal Associate Deputy Attorney General Richard Donoghue and former U.S. Attorney for the Western District of Pennsylvania Scott Brady, bear directly on and are probative of the allegations in the Smirnov Indictment.  The fact that Special Counsel Weiss handled the Smirnov investigation and is prosecuting the case makes Mr. Biden's requests all the more important.

[4] The discussion about the scope of the immunity agreement appears shaped by the prosecution's investigation of the Smirnov allegations, which it began looking into just days before the July 26, 2023 hearing.  (Smirnov Indict. ¶ 41 (noting the prosecution team began investigating Smirnov's claims in July 2023).)  While a host of possible crimes had been investigated, the defense understood that the FARA/bribery investigation had been closed and that the only pending issues concerned gun and tax charges.  The Diversion Agreement resolved the gun and tax charges, which is why defense counsel believed the immunity agreement covered everything and would conclude the investigation.  The push back from the prosecution and its discussion of an "ongoing" investigation—apparently tied to the Smirnov allegations—came as a surprise to defense counsel. (7/26/23 Tr. at 50, 54.)  Having taken Mr. Smirnov's bait of grand, sensational charges, the Diversion Agreement that had just been entered into and Plea Agreement that was on the verge of being finalized suddenly became inconvenient for the prosecution, and it reversed course and repudiated those Agreements.

DOJ closed the investigation.   The Special Counsel charged Mr. Smirnov with lying and obstruction, but the more interesting part of this story is not that Mr. Smirnov lied.   It is more remarkable that beginning in July 2023, the Special Counsel's team would follow Mr. Smirnov down his rabbit hole of lies as long as it did.  (Smirnov Indict. ¶¶ 41–46.)  Disclosure about why the Special Counsel abandoned its June/July 2023 agreements with Mr. Biden and the role played by the Smirnov allegations may reveal flaws worse than mistaking sawdust for cocaine.[5]  Despite the prosecution's strong words in its opposition to this motion, its actions demonstrate that the prosecution has gotten much wrong and provides good cause for Mr. Biden to question whether it has gotten its discovery obligations right.[6]

---

[5] The prosecution's outrage over criminal activity by those associated with its investigation remains rather selective.  Last month, a former government contractor working at the IRS, who unlawfully leaked private taxpayer information concerning former President Trump, was sentenced to five years in prison—a significant sentence for a serious crime.  *United States v. Charles E. Littlejohn*, No. 23-cr-00343-ACR (D.D.C. 2023).  Nevertheless, two IRS agents on the prosecution's team investigating Mr. Biden blatantly and publicly did the same thing, on television no less, and yet they have not been prosecuted or even fired by the IRS.  Mr. Biden raised the agents' misconduct several times with the Inspector General and Mr. Weiss.  Neither have yet acknowledged the complaint.  Thus, Mr. Biden brought a civil action based on these agents' misconduct and their agency's failure to act.  *Biden v. IRS*, No. 23-cv-02711-TJK (D.D.C. 2023).  Still, however, neither the IRS nor the prosecution has taken action against them.  Ironically, the same extremist Republican voices who now angrily complain that Mr. Trump's leaker got off too easy simultaneously claim the two IRS agents who leaked confidential tax information concerning Mr. Biden should be hailed as courageous "whistleblowers."  *Chairman Jordan Opens Inquiry into DOJ's Sweetheart Deal for Trump Tax Return Leaker*, H. Judiciary Comm. (Feb. 8, 2024), https://judiciary.house.gov/media/press-releases/chairman-jordan-opens-inquiry-dojs-sweetheart-deal-trump-tax-return-leaker; Arjun Singh, *Top GOP Rep Calls On More Whistleblowers To Come Forward, Pledges 'Zero Tolerance' For Retaliation*, Daily Caller (July 19, 2023), https://dailycaller.com/2023/07/19/jason-smith-irs-whistleblower-retaliation/.   The prosecution's various actions and inactions send the very message that Mr. Biden's motions to dismiss allege—misbehave when dealing with former President Trump and there will be consequences; do the same in the unprecedented charges against Mr. Biden and you will be praised.

[6] Among other things, the prosecution's recent productions identified a new December 4, 2023 warrant, which Mr. Biden intends to challenge.  Although Mr. Biden will address the deficiencies with that warrant then, the prosecution makes a few points that are worthy of a brief response now.  First, the prosecution tries to head off claims about its unlawful seizure and then unlawful search of Mr. Biden's computer and electronic documents by saying this subsequent December 4, 2023

The prosecution does not contest that Mr. Biden made a request for the discovery, and that is sufficient to preserve a *Brady* claim on appeal whether or not he ever moved to compel. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 682–83 (1985). The prosecution should appreciate that Mr. Biden has made specific requests because the onus is not on him to guess at what evidence the prosecution may have but has not shared; only the "prosecution [] alone can know what is undisclosed." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Here, when new evidence suggests that Mr. Biden has not received all that he is entitled, he has raised that first with the prosecution and only later with the Court.

The prosecution also fundamentally misunderstands the nature of *Brady*, which is a "retrospective test" that is applied "only in the context of appellate review." *United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020) (citations omitted). That is because a *Brady* violation will be found only if the prosecution's suppression was material to the question of guilt or

warrant "moots" its prior Fourth Amendment violations. (Opp. at 6.) That is flat out not the law; even a valid new warrant cannot cure a prior Fourth Amendment violation. *See, e.g.*, *United States v. Payton*: 573 F.3d 859, 863 (9th Cir. 2009) ("A seizure of a computer to await a second warrant is nevertheless a Fourth Amendment seizure . . . .") (reversing the denial of a suppression motion). Second, the prosecution advances a position of startling breadth in claiming that if it has a warrant to search for *anything* on a computer or electronic database, it can search and seize *everything* under the plain view doctrine. (Opp. at 4–5.) If accepted—and it should not be—that view would transform every warrant to search a computer or electronic database into a general warrant, which is the very thing the Fourth Amendment was designed to prevent. *See, e.g.*, *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1167–72 (9th Cir. 2010) (en banc). Third, the prosecution challenges the basis for a future motion to suppress by Mr. Biden, and suggests— without authority or foundation—that Mr. Biden must "seek leave to file a belated motion to suppress the December 2023 warrant." (Opp. at 18.) Mr. Biden does not require leave to challenge a newly discovered evidentiary issue that he did not become aware of until mid-January 2024. *See United States v. Neal*, 2019 U.S. Dist. LEXIS 166526, at *1 (M.D. Pa. Sept. 27, 2019) (granting motion for reconsideration of denial of defendant's motion to suppress where, since the court's initial denial, "new evidence from [an Officer]'s personnel file bearing on his credibility has come to light"); *see also United States v. Wrensford*, 866 F.3d 76, 88 n.6 (3d Cir. 2017) (on motion to reopen suppression hearing, among the factors to weigh, "courts may consider how the new evidence came to light" and when).

punishment, and that materiality analysis is difficult before a trial is complete. Consequently, the task for the prosecution and a trial court at the discovery stage is to avoid a situation that may result in reversal. *See, e.g.*, *id.* ("[T]he government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed . . . as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence . . . might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed.") (quoting *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005)). The Court should decline the prosecution's suggestion that it ignore a *Brady* violation, hold a lengthy trial, and just wait for any conviction that may be obtained to be vacated on appeal. The Court is certainly empowered to compel the prosecution to provide Mr. Biden a fair trial before Your Honor.

## II.    MR. BIDEN'S SPECIFIC DISCOVERY REQUESTS

### A.    Request For Rule 16 Materials

All the prosecution had to do to respond to Mr. Biden's October 8, 2023 or November 15, 2023 Rule 16 material requests was to state that it had fulfilled its Rule 16 obligations. Instead, the prosecution ignored Mr. Biden's outreach. Then, after the prosecution told Mr. Biden's counsel on a phone call on December 1, 2023, that the prosecution believed it had satisfied its discovery obligations, it proceeded to produce an additional 502,000 pages of new discovery in January 2024. But, without receiving further communication from the prosecution that it had fulfilled its Rule 16 obligations, it was more than appropriate for Mr. Biden to seek confirmation via the Court that no further responsive Rule 16 material exists in the prosecution's possession. A

criminal defendant is rightfully entitled to ask for all that he is lawfully entitled to receive—a practice routinely done in nearly every prosecution.[7]

### B. Request For *Brady* Materials

Mr. Biden's skepticism that the prosecution has completed its obligations rests upon more than just the prosecution inaccurately claiming in July 2023 to have met its *Brady* obligations then. Those concerns are compounded by the prosecution's failure to even describe its *Brady* obligations accurately, and acknowledge that its ethical duties to produce discovery are even broader than *Brady*.[8] It frames those requirements exclusively in terms of evidence of the question of guilt, but *Brady* itself makes clear that it applies to "evidence [that] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Indeed, the defendant in *Brady* conceded guilt and the case solely concerned evidence relevant to sentencing. *Id.* at 84. The prosecution cannot substantially limit the scope of *Brady* by excluding evidence relevant to punishment (e.g., evidence that the prosecution does not typically prosecute similar cases would show a lack of need for deterrence and raise a sentencing disparity concern, *see* 18 U.S.C. § 3553).

---

[7] The prosecution describes Mr. Biden as being "incorrect" about its failure to produce expert materials, noting it provided two reports (of which Mr. Biden was aware) prepared by an FBI chemist examiner and an ATF Special Agent. (Opp. at 7–8.) The prosecution, however, has not yet designated its experts and did not identify these materials as expert reports as required under Rule 16 when it made the production. That they were among more than 700,000 pages of material produced to Mr. Biden on November 2, 2023, without more, is not what the rule envisions.

[8] Ethically, prosecutors are required to make disclosures without regard to materiality. *See* ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3–3.11(a) (3d ed. 1993) ("A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused"); ABA Model Rule of Professional Conduct 3.8(d) (1984) ("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense").

Additionally, for the reasons discussed *infra* at Section II.H, obtaining limited discovery of "the internal deliberative process and work product" of DOJ (Opp. at 9) is relevant to the evidence of selective and vindictive prosecution and, if Mr. Biden satisfies his threshold showing, would necessarily be discoverable (even *Brady*, as potential impeachment and sentencing-related evidence). For instance, internal memoranda, agents' reports, or deliberative communications indicating that this prosecution is motivated by improper bias may implicate the bias by government witnesses and their manner of collecting evidence. Similarly, evidence that others are not typically charged in similar circumstances is *Brady* mitigation evidence offered at sentencing.

If the prosecution believes it has now fully satisfied its *Brady* obligations, rather than deny Mr. Biden's motion, the prosecution should just affirmatively confirm as much to defense counsel and the Court rather than bemoan Mr. Biden's filing.

### C. Request For Jencks Materials

The prosecution's response acknowledges that, while not mandated under 18 U.S.C. § 3500 and Federal Rule of Criminal Procedure 26.2, the provision of Jencks Act material to the defense well before trial is both routine in this Circuit (and elsewhere) and warranted in the instant case. Yet, they argue that just one week prior would be enough (if, despite the various motions to dismiss, there would be a trial in this case). (Opp. at 12.) There is no good reason for their limited offer here. *See United States v. Blackwell*, 954 F. Supp. 944, 970 (D.N.J. 1997) (noting that while courts in this Circuit "cannot compel disclosure of Jencks material . . . the [Third] Circuit encourages early disclosure") (citations omitted); *see also United States v. Bianchi*, 2007 WL 1521123, at *3 (E.D. Pa. May 22, 2007) (ordering production of all Jencks materials, in addition to any other discovery, months in advance of trial). The prosecution is familiar with this practice as Judge Scarsi advised these same prosecutors at Mr. Biden's initial appearance in California last

month: "[I] just suggest that the Government provide Jencks material well in advance of trial, just so we don't have unnecessary continuances and things during trial. . . .  I know it's not required, but it certainly helps when the Government makes early Jencks material disclosures."  *United States v. Biden*, No. 23-599-MCS (C.D. Cal.) (1/15/2024 Tr. at 25.)  If, as the prosecution claims, only "a small volume of unproduced Jencks materials [exists] in this case" (Opp. at 13), there is no reason to delay proceedings due to late Jencks disclosures that the prosecution could make well ahead of trial, and give the defense time to review and brief in a timely manner any evidentiary issues those statements would raise.

For example, in its response to Mr. Biden's motions to dismiss the indictment (DE 68 at 7, 12, 24), the prosecution repeatedly referenced "defendant's brown leather pouch" that, after recovered by a scavenger from a public trash can, purportedly contained trace amounts of cocaine residue (among whatever else as it traded hands before and after passing through the trash). Understanding what various eyewitnesses to that pouch said or did not say about it, who handled the pouch, where it was found, and the chain of custody in the days leading up to and after October 12, 2018 will all be critical issues at any trial and require advance preparation.

There is no question these statements are discoverable Jencks, if not *Brady*, materials.  *See United States v. Gonzalez-Melendez*, 570 F.3d 1, 4 (1st Cir. 2009) (witness statements in FBI 302 Forms and other interview reports and summaries are discoverable Jencks).  Moreover, discovery produced to date (notably, the ATF case file) indicates the individual who retrieved the firearm from the trash can possessed a second firearm that was not registered to him and belonged to someone else.  Understanding what this individual did with the items he collected from the trash, and what he told law enforcement about the various firearms he had, will be another critical issue

11

for defense counsel at any trial.  Should this case proceed, having Jencks Act disclosure no later than four weeks before any trial is reasonable.[9]

### D.  Request For Rule 404 Materials

Mr. Biden agrees with the prosecution in seeking a deadline for disclosure of Rule 404(b) materials in advance of trial.  "What constitutes 'reasonable notice in advance of trial' [pursuant to Rule 404(b)] is determined by the circumstances and complexity of the prosecution."  *United States v. Johnson*, 218 F. Supp. 3d 454, 462 (W.D. Pa. 2016).  To give the defense an adequate opportunity to consider such evidence, Mr. Biden respectfully requests the Court order the prosecution to disclose any 404(b) evidence it intends to use by the same four weeks suggested above for Jencks Act disclosures.  Finally, if the prosecution intends to use any evidence of past acts or crimes that it believes are not subject to Rule 404, the prosecution should be required to identify those materials and its reasoning so that Mr. Biden has an opportunity to respond.

### E.  Request For Grand Jury Materials

The prosecution seeks to transform Rule 6(e) protection of the internal deliberations of grand juries into a shield that loses any relationship to that purpose.  Grand jury deliberations are not compromised by addressing how the grand jury is structured and reviewing the ground rules for how it will operate (e.g., empanelment records, efforts to screen grand jurors for bias, and the legal instructions they receive).  There is a strong need to examine these materials to determine whether the grand jury proceedings were flawed.  Mr. Biden does not need to prove the flaw first to obtain discovery, as the prosecution suggests, because there would be no need for discovery if grand jury abuse could be proven without it.

---

[9] Should the Court schedule an evidentiary hearing, Mr. Biden requests the disclosure of Jencks Act materials two weeks before then.

None of these requests implicate Rule 6(e) in the first place.  Grand jury secrecy protections simply "do[] not govern matters such as the court's charge to a grand jury." Susan Brenner & Lori Shaw, *Federal Grand Jury: A Guide to Law and Practice* §16:11 (2d ed. 2021).  "The legal instructions given to the grand jury regarding the charges on which they are deliberating are a part of the 'ground rules' by which the grand jury conducts its proceedings.  The instructions do not reveal the substance of a grand jury's deliberative process or other information that would compromise the secrecy that Rule 6 seeks to protect." *United States v. Belton*, 2015 WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015); *see In re Cudahy*, 294 F.3d 947, 951 (7th Cir. 2002) (Posner, J.) ("[M]inisterial grand jury records, such as records reflecting the empaneling and extension of the grand jury, are not within the reach of Rule 6(e) because they reveal nothing of substance about the grand jury's investigation." (quoting 1 S. Beale et al., *Grand Jury Law and Practice* §5:6 (2d ed. 2001))); *United States v. Alter*, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("Alter was entitled to know the content of the court's charges to the grand jury.  The proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not."); *United States v. Diaz*, 236 F.R.D. 470, 477–78 (N.D. Cal. 2006).

In addition, the Jury Selection and Services Act of 1968 (JSSA) acknowledges that defendants "have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  To determine compliance with JSSA, Mr. Biden requested access to certain records from the prosecution with respect to grand jury proceedings, including (i) "Dates on which each such grand jury sat, the number of grand jurors present on those dates, and the dates on which each grand juror was in attendance," and (ii) the record of any grand jurors who were summoned but excused from

13

service.  (*See* Mr. Biden's October 8, 2023 letter).  The prosecution has not yet provided any such material to Mr. Biden.

Without inspection of this data, Mr. Biden is unable to assess *whether* the grand jury that returned the three-count indictment against him was selected, and treated, in accordance with the provisions of JSSA, and whether he has a potentially meritorious jury challenge.  *See Test v. United States*, 420 U.S. 28, 30 (1975) (under JSSA § 1867(f), "a litigant has essentially an unqualified right" to such inspection, and "without inspection, a party almost invariably would be unable to determine whether he has a potentially meritorious jury challenge."); *United States v. Beaty*, 465 F.2d 1376, 1382 (9th Cir. 1972) (holding defendant "had a right to make the inspection before he made a motion to challenge the jury under § 1867(a)").  The attendance record and reasons for absence are also necessary to ensure that, even assuming the grand jury represented a fair cross-section of the community, enough of the same jurors heard the key evidence of this case. Moreover, courts have rejected the notion that only information regarding the creation of the Master Jury Wheel—and not information regarding subsequent selection procedures—is subject to disclosure under Section 1867(f), particularly where, as here, evidence suggests that the grand jury was empaneled during the Covid-19 pandemic which may have distorted the grand jury selection process. *United States v. Holmes*, 2020 WL 5408163, at *4 (N.D. Cal. Sept. 9, 2020).

Finally, disclosure of voir dire questions presented to potential grand jurors is  warranted here to avoid possible injustice in this prosecution.  The Supreme Court has repeatedly declared that a defendant has a constitutional right to have an indictment "returned by a legally constituted and nonbiased grand jury."  *See, e.g.*, *Lawn v. United States*, 355 U.S. 339, 349–50 (1958).  How else can a grand jury be screened for bias except to ask them about their biases, just as courts screen petit jurors for bias in the same way?  "Trust us, we are from the government," is no way

to ensure that a constitutional guarantee is fulfilled; rather, defendants are entitled to look at the precautions actually taken to exclude grand jurors with improper biases or to know if no such precautions were taken.

More than in most cases, this is undoubtedly a high-profile, politically charged case involving the President's son that garners significant media attention and evokes strong feelings of hate or adoration. Some effort is required to screen jurors for bias in these circumstances. To eliminate those grand jurors who would indict Mr. Biden based upon prejudice, rather than the merits of the prosecution's case, it would not have been difficult to voir dire all potential grand jurors. Specific questions should have and could easily have been asked to elicit conscious and unconscious prejudices of the jurors concerning political affiliation, politics, and foreign influences. Such screening is routine in selecting trial juries, *see, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *Gov't of Virgin Islands v. Dowling*, 814 F.2d 134, 139 (3d Cir. 1987); *United States v. Dansker*, 537 F.2d 40, 55 (3d Cir. 1976). If the grand jury is going to fulfill its function to sort out and bring only charges based on the facts and law, then these same protections should apply to prohibiting biased individuals from serving on this body as well. Actual bias cannot be discerned absent answers on voir dire.

Not only does production of the requested materials not implicate Rule 6(e), that rule would not preclude production if it were applicable because Mr. Biden has demonstrated a "particularized need" for such items that outweighs the public interest in secrecy. *See Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 223 (1979) (disclosure of grand jury proceedings is appropriate "where the need for it outweighs the public interest in secrecy"); *see also United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (recognizing the "secrecy of grand jury proceedings" may be broken "where there is a compelling necessity" that is "shown with particularity"). Here,

Mr. Biden has demonstrated a particularized need given the conduct and behavior of the investigating agents and prosecutors, particularly as it relates to his motion to dismiss for selective and vindictive prosecution and breach of separation of powers. *See United States v. Abounnajah*, 1991 WL 42895, at *2 (E.D.N.Y. Mar. 26, 1991) (defendant demonstrated a particularized need sufficient to warrant disclosure of instructions given to a grand jury, finding the instructions "are potentially relevant [] to the defendant's motion").

The prosecution complains that Mr. Biden did not offer sufficient legal authority "for most of his requests" (Opp. at 14), more so than about the requests themselves. Mr. Biden will clarify that authority as follows. On the issue of instructions provided to the grand jury, due to the inherently prejudicial impact of mis-instructing a grand jury, numerous courts have ordered dismissal of indictments based, at least in part, on erroneous legal instructions:

- *United States v. Bowling*, 108 F. Supp. 3d 343, 352–53 (E.D.N.C. 2015) (dismissing multiple counts where "the government's erroneous legal instruction to the grand jury concerning the Procurement Integrity Act played a significant and impermissible role in the grand jury's decision to indict");

- *United States v. Stevens*, 771 F. Supp. 2d 556, 564, 567–68 (D. Md. 2011) (dismissing indictment where prosecutor gave erroneous advice to grand jury on advice-of-counsel defense that negated wrongful intent);

- *United States v. Cerullo*, 2007 WL 2683799, at *3 (S.D. Cal. Sept. 7, 2007) (dismissing indictment where prosecutor's failure to explain an important legal issue accurately and fairly "misled the grand jury" and "prejudiced the Defendant");

- *United States v. Breslin*, 916 F. Supp. 438, 442–46 (E.D. Pa. 1996) (dismissing indictment on several grounds, but labeling "most disturbing" the prosecutor's erroneous legal instruction as to the grand jury's deliberation on a conspiracy charge);

- *United States v. Peralta*, 763 F. Supp. 14, 19–21 (S.D.N.Y. 1991) (dismissing indictment where there was "grave doubt that the decision to indict was free from the substantial influence" of the prosecutor's "misleading statements of the law" regarding constructive possession of a firearm); and

- *United States v. Vetere*, 663 F. Supp. 381, 386–87 (S.D.N.Y. 1987) (dismissing indictment, *even after a guilty verdict at trial*, on grounds that the independent role of the grand jury was impaired based on the prosecutor's misleading "presentation both with respect to the facts and the law").

### F.  Request For DOJ Materials

Mr. Biden does not "misunderstand[] *Brady*" (Opp. at 16) in arguing that he is entitled to material responsive to his November 15, 2023 discovery requests for DOJ materials.  Documents in DOJ's possession that, for example, would discredit or undermine the credibility of government witnesses (e.g., agents) may indeed "be determinative of a defendant's guilt or innocence" and are squarely *Brady*.  (Opp. at 17 (citing *Giglio v. United States*, 405 U.S. 150, 154, (1972), and *United States v. Gengler*, 574 F.2d 730, 735 (3d Cir. 1978)).)  As explained in Mr. Biden's opening motion and his motion requesting Rule 17 subpoenas (DE 58), certain communications, memoranda, or notes in DOJ's possession, from the prior administration, may reflect the potential actions and motivations behind the investigation of Mr. Biden, and later the charges—an issue for which witnesses may be called during an evidentiary hearing.  Accordingly, such records are probative of bias and needed for impeachment of government witnesses.  If the prosecution is stating that those most responsible for any misconduct (e.g., the IRS agents who were on the case for years) will not be called as witnesses (hardly a surprise now), that does not end the issue.  What they said to others and what others said to them very well can be or lead to impeachment or other exculpatory evidence.  Mr. Biden may even choose to call those witnesses themselves.

Nor are Mr. Biden's requests "far-reaching" (Opp. at 17); in fact, they are narrowly tailored to focus on documents and records from five former DOJ officials specifically connected to this investigation in one way or another, plus the former President.  (*See* DE 63 at 29–31.)  To the extent communications exist concerning prosecuting or investigating Mr. Biden (or a request from one DOJ official to another to do so), such documents would be exculpatory in demonstrating

DOJ's lack of independent investigatory and prosecutorial decision-making concerning Mr. Biden. This information would be directly pertinent to Mr. Biden's pending motion to dismiss, and as of now, the prosecution has identified no basis to withhold such material.

Moreover, the Special Counsel's recent Indictment of Mr. Smirnov, discussed *supra* at 4–5, bears directly on the significance of Mr. Biden's DOJ requests. The requests seek, among other things, documents and records reflecting communications from January 20, 2017 to the present by or among Scott Brady (then-U.S. Attorney for W.D.P.A.) or Richard Donoghue (then-Principal Associate Deputy Attorney General) relating to or discussing any investigation or prosecution of Mr. Biden. (Mot. at 15.) As it turns out, the involvement of these two individuals was central to vetting the claims raised by this former FBI informant, and who concluded in August 2020 that "all reasonable steps had been completed regarding [Mr. Smirnov]'s allegations and that their assessment . . . should be closed." (Smirnov Indict. ¶ 40.) The fact that Special Counsel Weiss, beginning in July 2023, then elected to chase the goose making these unsubstantiated claims— after several DOJ and FBI officials agreed the matter should be closed—is all the more justification for granting Mr. Biden's request for these DOJ materials. Not only is this relevant to the evidence of selective and vindictive prosecution addressed below in Section II.H, it also would constitute *Brady* requiring its disclosure as potential impeachment and sentencing-related evidence.

### G. Laptop

The prosecution mixes apples with oranges in charging that Mr. Biden is being "dishonest and misleading" in objecting to what the prosecution contends was a laptop it obtained being produced in the native format that he requested (Opp. at 19), but that is disingenuous. To be sure, Mr. Biden asked for an exact copy of the laptop so it could be examined in the same way in which it was originally found, which is helpful in making a forensic examination of the laptop. That will

be needed, for example, to challenge the chain of custody, provenance, or likely tampering with the data before it came into the possession of the government.

However, this motion seeks something more—something traditionally provided in discovery. The crux of Mr. Biden's complaint here is that the prosecution has not supplemented that production with an index or some other means that would identify which of the vast materials on the laptop the prosecution believes are relevant to this case. The request for the forensic copy is not the same. If the prosecution is claiming that it has not indexed the 220 gigabytes of data (which would be an odd statement), then it needs to say that, and, as with other requests, the dispute will end. If it does have what it normally has with vast amounts of e-data, without providing more, the defense is in a needle in a haystack situation.

This amount of mixed media data in this tech age is difficult to navigate. The text messages and photos cited by the prosecution in its motions, for example, are difficult to locate. They are "buried" in a convoluted collection of different backup folders and files and are not stored in one streamlined digital backup or application. The messages and photos cited come from "Apple iCloud Backup 01"; "Apple iTunes Backup"; "Apple iCloud Backup 04"; and "iTunes Backup (iPhone 11)," titles that are not even remotely descriptive of what they contain. (*See* DE 86-1.) For this reason, Mr. Biden requested an index of material (which the prosecution has now clarified it does not have), or Bates stamps for that which it had cited. (Opp. at 19.)

In his opening motion, Mr. Biden merely requested, following the prosecution's citation to myriad text messages and photos in its responses, that the prosecution indicate *where* on the image it provided Mr. Biden could find those referenced materials. (Mot. at 18.) The reason for this request was straightforward at the time: defense counsel could not locate certain of the messages and photos given the broad date ranges used by the prosecution to describe them (e.g., photos taken

"Prior to October 12, 2018"; messages sent "prior to his gun purchase"; and photos taken "During November and December 2018"). (DE 86-1.) Mr. Biden appreciates that with the Exhibit filed with its opposition, the prosecution has now fulfilled this part of his request.

As to the meeting between Mr. Biden's counsel and prosecutors in Wilmington on August 29, 2023 (Opp. at 19), Mr. Biden notes that prosecutors indicated, during that meeting, that they possess "independent sources" for any material on the laptop device that would be helpful to the prosecution's case, presumably referring to material subpoenaed from third parties, such as Apple, Inc. or various cellphone carriers. For this reason, it was curious to Mr. Biden's counsel when reviewing the prosecution's response that it elected to cite to and quote from messages and photos contained on the device it possessed (lacking any Bates stamps) rather than from those "independent sources" included in the discovery produced to the defense. That is precisely why Mr. Biden requested the prosecution indicate *where* on the device he could find the quoted messages and referenced photos, and why he suggested these files were "left buried" among a set of voluminous files that, as made clear now, span multiple iPhone, iTunes, and iCloud backups. (Opp. at 19 (quoting Mot. at 17).) Nevertheless, Mr. Biden appreciates the prosecution providing the folder locations of the messages and photos it referenced.

### H. Evidence of Selective and Vindictive Prosecution

The prosecution erroneously claims that it can withhold evidence that it has engaged in selective or vindictive prosecution because it is not *Brady*. (Opp. at 11 n.5.) The prosecution is overly fixated on labels, when what matters is whether discovery can be compelled. The Due Process Clause is the source of both the prosecution's *Brady* obligation to produce evidence and its obligation to produce discovery of a selective or vindictive prosecution. There is no question that the Supreme Court has held that discovery pursuant to the Due Process Clause is appropriate

concerning selective or vindictive prosecution. *See United States v. Armstrong*, 517 U.S. 456, 463 (1996). Mr. Biden's Motion for Discovery and an Evidentiary Hearing addresses that case law at length. (DE 64 at 3–4.)

As to some discovery materials, there may be a distinction between a defendant's right to *Brady* materials and its right to certain materials relevant to a selective or vindictive prosecution claim under the broader provisions of the Due Process Clause. The prosecution's obligation to produce *Brady* materials always exists, while a defendant must establish a basis for seeking evidence of selective or vindictive prosecution. That extra burden, however, is a low bar. To obtain discovery on a selective or vindictive prosecution claim, a defendant need only "make out a colorable entitlement to the defense of discriminatory prosecutions, . . . or come forward with some evidence tending to show the existence of the essential elements of the defense." *United States v. Bradley*, 880 F. Supp. 271, 279 (M.D. Pa. 1994) (citations omitted). As Justice Marshall remarked, the low standard for discovery on a selective or vindictive prosecution claim "is consistent with our exhortation that the need to develop all relevant facts in the adversary system is both fundamental and comprehensive" and that "most of the relevant proof in selective prosecution cases will normally be in the Government's hands." *Wayte v. United States*, 470 U.S. 598, 624 (1985) (Marshall, J., dissenting) (citations omitted). Mr. Biden has explained why he has made that showing. (DE 64 at 3–4.)

Additionally, much of the evidence sought by Mr. Biden would fit comfortably under *Brady* as well. Evidence that a prosecution is motivated by improper bias may implicate the bias

by government witnesses and their manner of collecting evidence. Similarly, evidence that others are not typically charged in similar circumstances is *Brady* mitigation evidence at sentencing.[10]

The bottom-line is that the prosecution is obligated to produce the discovery that Mr. Biden has requested, regardless of whether his due process-based right to it is grounded in *Brady* or *Armstrong*.

## CONCLUSION

Mr. Biden respectfully requests that the prosecution be required to produce the discovery requested herein, pursuant to any deadlines set by the Court for doing so.

Dated: February 20, 2024         Respectfully submitted,

        /s/ *Abbe David Lowell*

Bartholomew J. Dalton (#808)      Abbe David Lowell
DALTON & ASSOCIATES, P.A.      Christopher D. Man
1106 West 10th Street      WINSTON & STRAWN
Wilmington, DE 19806      1901 L Street NW
Tel.: (302) 652-2050      Washington, DC 20036
BDalton@dalton.law      Tel.: (202) 282-5000
     Fax: (202) 282-5100
     AbbeLowellPublicOutreach@winston.com
     CMan@winston.com

*Counsel for Robert Hunter Biden*

---

[10] Sentencing courts are required to consider both the need for the sentence proposed and the need to avoid sentencing disparities. 18 U.S.C. § 3553. There is no compelling need for "deterrence" or "to promote respect for the law," when prosecutors typically charge no one under similar circumstances, and imposing a punishment here when others are not typically charged at all is the worst kind of sentencing disparity. *Id.* § 3553(a)(2).

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of February, 2024, I filed the foregoing Reply in Support of Mr. Biden's Motion to Compel Discovery and Set Discovery Deadlines with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ *Abbe David Lowell*
Abbe David Lowell

*Counsel for Robert Hunter Biden*