IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 23-61 (MN) |
| | ) | |
| ROBERT HUNTER BIDEN, | ) | |
| | ) | |
| Defendant. | ) | |

## **<u>MEMORANDUM OPINION</u>**


David C. Weiss, Special Counsel, Leo J. Wise, Principal Senior Assistant Special Counsel, Derek E. Hines, Senior Assistant Special Counsel, U.S. Department of Justice, Wilmington, DE – attorneys for Plaintiff

Bartholomew J. Dalton, DALTON & ASSOCIATES, P.A., Wilmington, DE; Abbe David Lowell, Christopher D. Man, WINSTON & STRAWN, Washington, DC – attorneys for Defendant


April 12, 2024
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE

On September 14, 2023, a federal grand jury indicted Defendant Robert Hunter Biden ("Defendant") on three charges:  knowingly making a false written statement intended to deceive in connection with acquiring a firearm in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2); knowingly making a false statement in connection with acquiring a firearm in violation of 18 U.S.C. § 924(a)(1)(A); and possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).  (D.I. 40).  Presently before the Court is Defendant's motion to dismiss the indictment based on immunity purportedly conferred by a pretrial diversion agreement.  (D.I. 60).  For the reasons set forth below, the Court DENIES Defendant's motion.

I.      **BACKGROUND**

On June 20, 2023, the government filed two Informations against Defendant.  One charged Defendant with two misdemeanor tax offenses under 26 U.S.C. § 7203 ("the Tax Case"), and the other with one count of possession of a firearm by a person who is an unlawful user of or addicted to a controlled substance in violation of 18 U.S.C. § 922(g)(3) ("the Firearm Case").  (*See* D.I. 2; *see also* Misdemeanor Information, *United States v. Biden*, Cr. A. No. 23-mj-274 (D. Del. June 20, 2023), D.I. 2).  On the same day, the government filed a letter indicating that Defendant had agreed to plead guilty to both misdemeanor tax offenses and also agreed to enter a pretrial diversion program as to the felony firearm charge.  (D.I. 1).  The Court set a hearing for July 26, 2023.

As to the misdemeanor tax charges, the parties proposed a Memorandum of Plea Agreement ("the Plea Agreement"), whereby Defendant would plead guilty to two counts of willful failure to pay tax in violation of 26 U.S.C. § 7203 and, in exchange, the government would, *inter alia*, "not oppose a two-level reduction in the Offense Level pursuant to [United States Sentencing Guidelines Manual] § 3E.1(a)" at the time of sentencing and "recommend a sentence

1

of probation." (Cr. A. No. 23-mj-274, D.I. 28 ¶¶ 1, 3, 4 & 5.a-5.c, 6).[1]  The Plea Agreement itself contained no language indicating that, in exchange for Defendant's guilty plea, the government was agreeing to dismiss or forego any charges, but it did reference a pretrial diversion agreement ("the Diversion Agreement") related to the firearm charge, the latter of which did contain an agreement not to prosecute.  (*Id.* ¶ 5.b; *see also* D.I. 24, Ex. 1 (Diversion Agreement)).

Under the proposed terms of the Diversion Agreement, Defendant would (1) not purchase or possess a firearm during the relevant diversion period, (2) consent to permanent entry into the National Instant Criminal Background Check System so that he will be denied any attempt to legally purchase a firearm, and (3) forfeit his rights and interest in all firearms and ammunition related to the charge referenced in the Information.  (D.I. 24, Ex. 1 ¶¶ 9.a-9.c).  Defendant also agreed to be subject to "pretrial diversion supervision" by the U.S. Probation and Pretrial Service Office in the District of Delaware ("Probation"), to continue to actively seek employment, to refrain from unlawfully possessing or using any controlled substance, to refrain from using alcohol, to submit to substance-abuse testing and treatment, to submit to fingerprinting by the FBI, to communicate to Probation all international travel plans, and to not violate any federal, state or local law.  (*Id.* ¶¶ 10.a-10.h).  The proposed Diversion Agreement also cross-referenced the Plea Agreement in the tax cases and stated:

> The United States agrees not to criminally prosecute Biden, outside of the terms of this Agreement, for any federal crimes encompassed by the attached Statement of Facts (Attachment A) and the Statement of Facts attached as Exhibit 1 to the Memorandum of Plea Agreement [in the Tax Case] filed this same day.  This Agreement does not provide any protection against prosecution for any future conduct by Biden or by any of his affiliated businesses.

---

[1]     The parties docketed the Plea Agreement and Diversion Agreement in their respective actions on August 2, 2023.  (*See* D.I. 24, Ex. 1 (Diversion Agreement); *see also* D.I. 28 in Cr. A. No. 23-mj-274 (Plea Agreement)).

(D.I. 24, Ex. 1 ¶ 15).  The Diversion Agreement defined the "Diversion Period" as "twenty-four (24) months, beginning on the date of approval of this Agreement, unless there is a breach as set forth in paragraphs 13 and 14."  (*Id.* ¶ 1; *see also id.* ¶ 2).

Defendant made his initial appearance in both criminal actions on July 26, 2023.  (*See* D.I. 16).  During that appearance, the Court conducted a plea colloquy under Federal Rule of Criminal Procedure 11 for the tax charges before turning to a substantive discussion of the Plea Agreement and then the Diversion Agreement.  (D.I. 16 at 11:8-17:5).  Although the parties represented that the Plea Agreement was presented under Rule 11(c)(1)(B), it became apparent at the hearing that, in exchange for his guilty plea on the tax charges, Defendant had been relying on promises of immunity from outside the Plea Agreement:

> THE COURT:  . . . . Mr. Biden, does the written [Plea A]greement as summarized by Mr. Wise accurately reflect the agreement you have reached with the government?
>
> THE DEFENDANT:  Yes, Your Honor.
>
> THE COURT:  Has anyone threatened you or forced you into entering this written agreement?
>
> THE DEFENDANT:  No, Your Honor.
>
> THE COURT:  Has anyone made you any promises that are not contained in the written agreement?
>
> [DEFENDANT'S COUNSEL]:  Your Honor, with the exception of the Diversion Agreement –
>
> THE COURT:  We're not making an exception.  I want to know, has anyone made you any promises that are not contained in the written Memorandum of Plea Agreement?
>
> [DEFENDANT'S COUNSEL]:  Yes, there are promises from the government in the Diversion Agreement, Your Honor.

THE COURT:  And sir, are you relying on the promises made in the Diversion Agreement in connection with your agreement to plead guilty?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And if the Diversion Agreement were not valid or unenforceable for any reason, would you enter into the Memorandum of Plea Agreement?

THE DEFENDANT:  No, Your Honor.

THE COURT:  . . . .Paragraph 15 of the Diversion Agreement states the United States agrees not to criminally prosecute Biden outside of the terms of this agreement for any federal crimes encompassed by the attached statement of facts, Attachment A to the Diversion Agreement, and the statement of facts attached as Exhibit 1 to the Memorandum of Plea Agreement filed this same day.  This agreement does not provide any protection against prosecution for any future conduct by Biden or by any of his affiliated businesses.

And just so we're clear I think you already answered this, sir, but are you relying on that promise in connection with your agreement to accept the Memorandum of Plea Agreement and plead guilty?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  If that provision were not valid or not enforceable, would you accept the Memorandum of Plea Agreement?

THE DEFENDANT:  No, Your Honor.

THE COURT:  If you had no immunity from the government, perhaps even a different prosecutor and the government could bring a felony tax evasion charge or drug charges against you, would you still enter the plea agreement and plead guilty to these tax charges?

THE DEFENDANT:  No, Your Honor.

(D.I. 16 at 39:2-41:5; *see also id.* at 17:6-21 (both parties stating that the Plea Agreement was being offered under Rule 11(c)(1)(B))).  Under oath, Defendant repeatedly told the Court that his guilty plea in the Tax Case was conditional on the immunity conferred by the Diversion Agreement in the Firearm Case – *i.e.*, the government's promise not to prosecute Defendant "for any federal

crimes encompassed by" the statement of facts attached to both the Diversion Agreement and Plea Agreement. (D.I. 24, Ex. 1 ¶ 15). Concerned by the interrelatedness of the two agreements and the implications of the Plea Agreement instead being one under Rule 11(c)(1)(A),[2] the Court pressed the parties on their respective understandings as to the government's promises in exchange for Defendant's guilty plea on the tax charges. (D.I. 16 at 41:6-42:23). The Court briefly recessed the hearing so that the parties could discuss. (*Id.* at 42:24-43:8).

After the hearing resumed, Defendant's attorney changed course, insisting that Defendant was "ready to enter a plea to that plea agreement without contingency, without reservation, and without connection" – and seemingly without any of the immunity conferred by the Diversion Agreement. (D.I. 16 at 43:17-19; *see id.* at 44:21-23 ("Yes, my client would resolve this case on these terms in the hypothetical situation that exist without that Diversion Agreement.")). Defendant himself, again under oath, similarly reversed his position. (*Id.* at 45:3-18).

Having received contradictory sworn statements about Defendant's reliance on immunity, the Court proceeded to inquire about the scope of any immunity. At this point, it became apparent that the parties had different views as to the scope of the immunity provision in the Diversion Agreement. In the government's view, it could not bring tax evasion charges based on the conduct set forth in the Plea Agreement, nor could it bring firearm charges based on the particular firearm identified in the Diversion Agreement, but unrelated charges – *e.g.*, under the Foreign Agents Registration Act – were permissible. (D.I. 16 at 54:13-55:9). Defendant disagreed. (*Id.* at 55:17-18). At that point, the government appeared to revoke the deal (*id.* at 55:22) and proceedings were again recessed to allow the parties to confer in light of their fundamental misunderstanding as to

---

[2]     The government admitted that an agreement not to prosecute recited in the Plea Agreement itself would bring that agreement within Rule 11(c)(1)(A). (D.I. 16 at 46:23-47:4).

the scope of immunity conferred by the Diversion Agreement (*id.* at 57:1-7).  The hearing resumed, with Defendant's attorney again reversing position and explaining to the Court that the immunity provision covered only federal crimes related to "gun possession, tax issues, and drug use."  (*Id.* at 57:23-24).

Before deciding how to proceed, the Court turned to further discussion of the Diversion Agreement.  The government recited a summary of the terms of the agreement (D.I. 16 at 83:4-90:12), and the Court asked about the unusual procedure regarding a potential breach found in Paragraph 14:

> If the United States believes that a knowing material breach of this Agreement has occurred, it may seek a determination by the United States District Judge for the District of Delaware with responsibility for the supervision of this Agreement.  Upon notice to Biden, the United States may seek a determination on a preponderance of the evidence presented to such District Judge.  Biden shall have the right to present evidence to rebut any such claim in such proceeding.  If after that process the judge overseeing such process makes a final determination that Biden committed a knowing material breach of this Agreement, then the United States may elect from [one of the two] following remedies depending on the nature and seriousness of the breach . . . .

(D.I. 24, Ex. 1 ¶ 14).  The Court pressed the government on the propriety of requiring the Court to first determine whether Defendant had breached the Diversion Agreement before the government could bring charges – effectively making the Court a gatekeeper of prosecutorial discretion.  (D.I. 16 at 92:22-95:17).  Acknowledging that such a requirement was without precedent, the government offered little defense for such a limitation on its power to charge.  (*Id.* at 95:3-10).  After raising the possibility that such a limitation might be unconstitutional or that the Court might refuse to undertake the tasks the parties assigned to it, the Court questioned the validity of the entire Diversion Agreement given the absence of a severability provision.  (*Id.* at 98:5-19).  The parties attempted to analogize the breach procedure to a violation of supervised release, but the

Court was left with unanswered questions about the constitutionality of the breach provision, leaving open the possibility that the parties could modify the provision to address the Court's concerns. (*Id.* at 102:5-106:2).

At the conclusion of the hearing, the Court explained that it could not accept or reject the Plea Agreement as offered. The Court remained unconvinced that the Plea Agreement was properly offered under Rule 11(c)(1)(B) and concerned that, if not, Defendant's contradictory sworn testimony as to whether he believed the Diversion Agreement's immunity was part of his plea bargain left issues unresolved – as did the confusion surrounding the scope of immunity. (D.I. 16 at 104:19-105:2; *see also id.* at 107:2-108:7). The Court asked for further briefing on these issues, as well as on the constitutionality and severability of the Diversion Agreement's breach provision. (*Id.* at 105:23-106:2). The Court also suggested that the parties clarify the scope of any immunity conferred by the immunity provision of the Diversion Agreement. (*Id.* at 105:16-22). Defendant then entered a plea of not guilty. (*Id.* at 109:6-10).

On August 11, 2023, the government filed a motion to vacate the Court's briefing schedule in both criminal actions, as well a motion to dismiss the Information in the Tax Case so that charges could be brought in another venue, because the parties were at an impasse on both the Plea Agreement and Diversion Agreement. (*See* D.I. 25, *see also* D.I. 30 & 31 in Cr. A No. 23-mj-274). That same day, United States Attorney David Weiss was appointed as special counsel to conduct the ongoing investigations relating to these two criminal matters, as well as to conduct investigations into matters arising from the ongoing ones. *See* Off. of the Att'y Gen., Order No. 5730-2023, Appointment of David C. Weiss as Special Counsel (2023); *see also id.* (also authorizing David Weiss to prosecute federal crimes arising from the investigations).

On September 14, 2023, a federal grand jury returned an indictment against Defendant charging him with three firearm offenses: knowingly making a false written statement intended to deceive in connection with acquiring a firearm in violation of §§ 922(a)(6) and 924(a)(2); knowingly making a false statement in connection with acquiring a firearm in violation of § 924(a)(1)(A); and possession of a firearm by a prohibited person in violation of §§ 922(g)(3) and 924(a)(2). (D.I. 40). The indictment contained the same unlawful possession charge that was present in the original Information (D.I. 1), along with two additional charges for making a false statement in connection with acquiring a firearm. On October 3, 2023, Defendant made his initial appearance and was arraigned on the indictment. (D.I. 49). On October 4, 2023, the government moved to dismiss the earlier filed firearm Information (D.I. 51 & 52) and the Court granted that motion on October 19, 2023 (D.I. 57).

Pretrial motions were due on December 11, 2023. To date, Defendant has filed one motion for issuance of subpoenas *duces tecum* pursuant to Federal Rule of Criminal Procedure 17(c) (D.I. 58), four pretrial motions to dismiss the indictment based on various grounds (D.I. 60, 61, 62, 63), one motion for discovery and an evidentiary hearing relating to his selective and vindictive prosecution motion (D.I. 64) and one motion to compel discovery (D.I. 83). This opinion addresses Defendant's motion to dismiss the indictment on the grounds that the government is barred from bringing these charges by the existence of the Diversion Agreement. (D.I. 60).

## II.   <u>DISCUSSION</u>

Both sides agree that diversion agreements are contracts to be interpreted in accordance with the principles of contract law. (*Compare* D.I. 60 at 8-10 (Defendant asserting that the Diversion Agreement "is a binding and enforceable contract" and citing contract cases); *with* D.I. 69 at 8-9 (the government noting that plea agreements are analyzed under contract law standards and analogizing plea agreements to diversion agreements)). And both sides agree that

the Diversion Agreement here is a contract to be interpreted under Delaware law.  (*Compare* D.I. 60 (Defendant citing Delaware contract law), *with* D.I. 69 at 8-9 (government citing Delaware contract law)).  Any mutual understanding as to the Diversion Agreement stops here.  What remains is a contentious fight over whether the agreement is a valid contract that binds the parties today.  Defendant argues that it is and that the "broad immunity" conferred by the Diversion Agreement requires dismissal of the indictment in this case.  (D.I. 60 at 21-23).  The government argues that the Diversion Agreement is not in effect – and never was.  (D.I. 69 at 7).  For the reasons discussed below, the Court finds that the Diversion Agreement is not an effective agreement and therefore its immunity provision does not require dismissal of the indictment.

### A.    The Diversion Agreement Required Probation's Approval

The issue before the Court is whether the Diversion Agreement is in effect – if it is, then the firearm charges against Defendant in this case would appear to be prohibited by Paragraph 15 of the agreement (unless Defendant is in breach).  The crux of the dispute between the parties about whether the Diversion Agreement is in effect is whether Probation's signature, evidencing approval, was required.  In short, the government maintains that Probation had to approve the agreement for it to become effective, whereas Defendant contends that no such approval was required.  The source of this disagreement is the language found in the first two numbered paragraphs of the Diversion Agreement:

> 1.  The term of this Agreement shall be twenty-four (24) months, beginning on the date of approval of this Agreement, unless there is a breach as set forth in paragraphs 13 and 14.  Obligations hereunder survive the term of this Agreement only where this Agreement expressly so provides.

> 2.  The twenty-four (24) month period following the execution and approval of this Agreement shall be known as the "Diversion Period."

(D.I. 24, Ex. 1 ¶¶ 1-2).  In Defendant's view, "approval" only means approval by two parties – the government and Defendant.  (D.I. 60 at 8-10 & 16-18).  That is, if and when those two parties execute the signature page, the term of the Diversion Agreement (*i.e.*, the Diversion Period) begins to run.  The government maintains that "approval" refers to approval by Probation and that the Diversion Agreement never becomes effective (and the Diversion Period never begins to run) if Probation fails to execute the signature page.  (D.I. 69 at 10-14).  Although both sides apparently agree that "approval" is used unambiguously in the Diversion Agreement, they dispute what that "approval" means.  (*Compare* D.I. 60 at 8, *with* D.I. 69 at 8-9 & n.5).  To resolve the parties' dispute over the meaning of "approval," the Court turns to basic principles of contract interpretation.

"Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, No. 650-N, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).  "The true test is not what the parties to the contract intended [a term] to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).  "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."  *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").  "The determination of ambiguity lies within the sole province of the court."  *Osborn*, 991 A.2d at 1160.

Although the parties dispute the meaning of "approval" and whose approval is required by the Diversion Agreement, the relevant language unambiguously requires Probation to approve the agreement. *See Osborn*, 991 A.2d at 1160 ("The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."). There are just three references to the word "approval" or any variation thereof in the Diversion Agreement. Paragraphs 1 and 2 each recite "approval" when describing and defining the term of the agreement (*i.e.*, the Diversion Period). (D.I. 24, Ex. 1 ¶¶ 1-2). As set forth above, Paragraph 1 of the Diversion Agreement explicitly provides that the term shall be twenty-four months "beginning on the date of approval," and Paragraph 2 defines the "Diversion Period" as the twenty-four months "following the execution and approval" of the agreement. The only other place that any variant of the word "approve" appears is on the last page of the Diversion Agreement – above a line intended for the Chief of Probation's signature. (*Id.* at 9). And Probation's signature line is the only one accompanied by the phrase "APPROVED BY." (*Id.*). Neither the government nor Defendant's signature line carry the same words; instead, they are preceded only by the phrase "ON BEHALF OF." (*Id.*). There are no other references to the concept of or the word approval in the Diversion Agreement. Simply put, the only place where any person or entity is to indicate approval is reserved for Probation – no one else. A reasonable person viewing the plain language of the agreement would understand that it was parties' intent to require Probation's explicit approval before the agreement becomes effective and the Diversion Period begins to run.

In light of this plain language, the Court is unpersuaded by Defendant's suggestion that the recited "approval" merely means approval by the parties – *i.e.*, by the government and Defendant. (D.I. 60 at 16). Delaware courts must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Const., Inc. v.*

*Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010); *see also NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).  In Paragraph 2 of the Diversion Agreement, there is a distinction made between execution and approval:  "[t]he twenty-four (24) month period following the execution and approval of this Agreement shall be known as the 'Diversion Period.'"  (D.I. 24, Ex. 1 ¶ 2).  That is, the agreement calls for execution ***and*** approval before the agreement goes into effect and the Diversion Period begins to run.  Presumably, neither the government nor Defendant (or any other reasonable party) would execute the Diversion Agreement without having approved it first, so the phrase "execution and approval" must require approval separate and apart from execution by the parties.  And the only additional approval ever sought by the Diversion Agreement is found on the signature page – where Probation signs to indicate approval.  Thus, the "approval" recited in the phrase "execution and approval" means Probation's approval.  This conclusion is bolstered by the fact that, if Defendant were correct that only the parties' approval is required to satisfy this "approval" language, then the signature section for Probation accompanied by the words "APPROVED BY" would be superfluous.  An interpretation that leaves surplusage in a contract is rarely the correct answer.  In the Court's view, the Diversion Agreement unambiguously requires Probation's approval for the agreement to become effective.[3]

---

[3]     Defendant also argues that the signature line for Probation's approval was merely to indicate that it approved supervisory responsibility for Defendant.  The Court is unpersuaded, particularly because the Diversion Agreement clearly states that the Diversion Period begins to run upon approval – and the only entity whose approval is called for anywhere is that of Probation.

Having determined that the Diversion Agreement required Probation's approval to enter into effect, the Court now turns to whether such approval was, in fact, given. Probation did not sign on the line provided to indicate approval of the Diversion Agreement. (D.I. 24, Ex. 1 at 9). Thus, as evidenced by the document itself, Probation did not approve. Defendant nevertheless suggests that Probation's approval may be implied from the fact that Probation recommended pretrial diversion and suggested revisions to the proposed agreement before the July 2023 hearing. (D.I. 60 at 18-19). The Court disagrees. That Defendant was recommended as a candidate for a pretrial diversion program does not evidence Probation's approval of the particular Diversion Agreement the parties ultimately proposed. Probation recommended that Defendant was of the type of criminal defendant who may be offered pretrial diversion and also recommended several conditions that Probation thought appropriate. (D.I. 60, Ex. S at Pages 8-9 of 9). That is fundamentally different than Probation approving the Diversion Agreement currently in dispute before the Court. And as to Probation's purported assent to revisions to the Diversion Agreement (D.I. 60, Ex. T at Page 2 of 28), Defendant has failed to convince the Court that the actions described can or should take the place of a signature required by the final version of an agreement, particularly when the parties execute the signature page. Ultimately, the Court finds that Probation did not approve the Diversion Agreement.

By its terms, the Diversion Agreement required Probation's approval – and that approval was not given.[4] Without Probation's approval, the proper trigger for the Diversion Period to start running never occurred and, as such, the Diversion Agreement never went into effect. The

---

[4]   Although not part of the Court's decision, the Court finds it noteworthy that the government clearly stated at the hearing that "approval" meant "when the probation officer . . . signs it" and Defendant offered no objection or correction to this. (D.I. 16 at 83:13-17 & 90:13-15).

Diversion Agreement therefore provides no immunity to Defendant and no basis for dismissal of the indictment.[5]

### B.    The Scope of Defendant's Immunity from the Diversion Agreement Is Unclear

Even if the Diversion Agreement had been approved by Probation as required, the Court would nevertheless be unable to find it an enforceable agreement in existence today. "[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn*, 991 A.2d at 1158. Although the parties may have manifested an intent to be bound by signing the agreement, the Court is not convinced that all essential terms of the contract are sufficiently definite.[6] "A contract is sufficiently definite and certain to be enforceable if the court can – based upon the agreement's terms and applying proper rules of construction and principles of equity – ascertain what the parties have agreed to do." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018). Terms are sufficiently definite if they permit a court to determine if a breach has occurred and to fashion an appropriate remedy. *Id.* (citing Restatement (Second) of Contracts § 33(2)); *see also Indep. Cellular Tele., Inc. v. Barker*, No. 15171, 1997 WL 153816, at *4 (Del. Ch. Mar. 21, 1997) ("The material terms of a contract will be deemed fatally vague or

---

[5]    This Court recognizes that, relying largely on California and Ninth Circuit law, the judge overseeing tax charges brought against Defendant in the Central District of California decided that Probation's approval is "a condition precedent to performance, not to formation," and that the absence of Probation's approval means that "performance of the Government's agreement not to prosecute Defendant is not yet due." *United States v. Biden*, No. 2:23-cr-00599-MCS-1, 2024 WL 1432468, at *8 & *10 (C.D. Cal. Apr. 1, 2024). Neither of those issues nor that law was raised by the parties before this Court.

[6]    Although related and sometimes conflated, there is a difference between the first two prongs of the *Osborn* test. *See Eagle Force*, 187 A.3d 1209 at 1242 (Strine, J. concurring-in-part and dissenting-in-part). The first prong is concerned with whether there has been a meeting of the minds on all material terms of an agreement. The second prong is focused on whether the material terms are sufficiently definite so as to be enforced.

indefinite if they fail to provide a reasonable standard for determining whether a breach has occurred and the appropriate remedy."). Here, the Court is unable to find that the parties reached agreement on at least one essential term – Defendant's immunity from prosecution.[7]

Initially, the immunity provision of the Diversion Agreement recited:

> 15.  The United States agrees not to criminally prosecute Biden, outside of the terms of this Agreement, for any federal crimes encompassed by the attached Statement of Facts (Attachment A) and the Statement of Facts attached as Exhibit 1 to the Memorandum of Plea Agreement filed this same day.  This Agreement does not provide any protection against prosecution for any future conduct by Biden or by any of his affiliated businesses.

(D.I. 24, Ex. 1 ¶ 15).  As evidenced by the Court's questions at the July 2023 hearing, the scope of immunity provided by this language was not readily apparent.  The Diversion Agreement was offered in the Firearm Case only, but it contained a government promise not to prosecute any federal crimes encompassed by the Statement of Facts attached to the Plea Agreement in the Tax Case.  And the Statement of Facts in the Tax Case was expansive in its reach.  Those facts covered a time period ranging from at least 2015 to 2021.  (*See* Cr. A. No. 23-mj-274, D.I. 28, Ex. 1).  And those facts describe conduct at least on behalf of Defendant, other domestic individuals, domestic corporations and foreign business entities.  (*Id.*).  The Court struggled to understand from the terms of the agreement what charges would be prohibited by the words of this provision versus those that would be permissible – a critical issue for any later determination of whether the government may be in breach of its promise not to prosecute.  Pressing the parties on their respective understandings of what conduct was protected by the immunity from prosecution led to a collapse of the agreement in court.  (D.I. 16 at 54:10-55:22).

---

[7]    The Court assumes that it is beyond dispute that the immunity conferred by the "Agreement Not to Prosecute" in Paragraph 15 is an essential term of the Diversion Agreement.

Apparently acknowledging that the immunity provision as initially drafted was not sufficiently definite, the parties attempted to revise the scope of the immunity conferred by the Division Agreement orally at the July 2023 hearing.  (*See* D.I. 16 at 57:19-24 ("I think there was some space between us and at this point, we are prepared to agree with the government that the scope of paragraph 15 relates to the specific areas of federal crimes that are discussed in the statement of facts which in general and broadly relate to gun possession, tax issues, and drug use.")).  The Court recognizes that Delaware law permits oral modifications to contracts even where the contract explicitly provides that modifications must be in signed writings, as the Diversion Agreement did here.  (*See* D.I. 24, Ex. 1 ¶ 19 ("No future modifications of or additions to this Agreement, in whole or in part, shall be valid unless they are set forth in writing and signed by the United States, Biden and Biden's counsel.")).  That being said, although the government asserted that that oral modification was binding (D.I. 16 at 89:9-14), the Court has never been presented with modified language to replace the immunity provision found in Paragraph 15.  The Court therefore cannot determine whether the parties agreed to a sufficiently definite immunity term – an essential term of the Diversion Agreement.

## C.    The Parties Never Addressed the Court's Concerns about the Constitutionality of the Breach Provision in Paragraph 14

Contractual provisions that are against public policy are void.  *See Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) ("[C]ontracts that offend public policy or harm the public are deemed void, as opposed to voidable.").  "[P]ublic policy may be determined from consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration." *Sann v. Renal Care Centers Corp.*, No. 94A-10-001, 1995 WL 161458, at *5 (Del. Super. Ct. Mar. 28, 1995).  Embedded in the Diversion Agreement's breach procedure is a judicial restriction of prosecutorial discretion that may run afoul of the

separation of powers ensured by the Constitution.  *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case . . . ."); *United States v. Wright*, 913 F.3d 364, 374 (3d Cir. 2019) ("[A] court's power to preclude a prosecution is limited by the separation of powers and, specifically, the Executive's law-enforcement and prosecutorial prerogative.").

At the hearing in July 2023, the Court expressed concern over the breach provision of the Diversion Agreement and the role the parties were attempting to force onto the Court.[8]  (*See* D.I. 16 at 92:12-98:19).  In the Court's view, the parties were attempting to contractually place upon the Judicial Branch a threshold question that would constrain the prosecutorial discretion of the Executive Branch as to the current Defendant.  As the government admitted, even if there were a breach, no charges could be pursued against Defendant without the Court first holding a hearing and making a determination that a breach had occurred.  (*Id.* at 94:10-15).  If the Court did not agree to follow the procedure, no charges could be pursued against Defendant.  (*Id.* at 94:16-20).  Mindful of the clear directive that prosecutorial discretion is exclusively the province of the Executive Branch, the Court was (and still is) troubled by this provision and its restraint of prosecutorial decisions.  Although the parties suggested that they could modify this provision to address the Court's concerns (*id.* at 103:18-22), no language was offered at the hearing or at any time later.  And no legal defense of the Diversion Agreement's breach provision has been provided to the Court – the deals fell apart before any supplemental briefing was received.

Even if the Court were to find the Diversion Agreement was approved by Probation as required and the scope of immunity granted sufficiently definite, the Court would still have

---

[8]     It is an odd situation indeed where contracting parties attempt to obligate a federal trial court to perform in some way but never seek that court's consent to be bound.

questions as to the validity of this contract in light of the breach provision in Paragraph 14.  To be clear, the Court is not deciding that the proposed breach provision of Paragraph 14 is (or is not) constitutional.  Doing so is unnecessary given that the Diversion Agreement never went into effect.  The Court simply notes that, if the Diversion Agreement had become effective, the concerns about the constitutionality of making this trial court a gatekeeper of prosecutorial discretion remain unanswered.  And because there is no severability provision recited in the contract, more would be needed for the Court to be able to determine whether this provision could properly remain in the Diversion Agreement and whether the contract could survive should the Court find it unconstitutional or refuse to agree to serve as gatekeeper.

### D.  Judicial Estoppel Does Not Apply Against the Government Here

Defendant also argues that judicial estoppel prevents the government from repudiating the Diversion Agreement or arguing that Probation did not agree to the Diversion Agreement.  (D.I. 60 at 20-21).  According to Defendant, the government represented to the Court that the Diversion Agreement was approved by Probation and in effect and, as such, the government is judicially estopped from arguing there is no Diversion Agreement in effect.  (*Id.* at 20).  Defendant, however, cites no law to support his argument that judicial estoppel should apply here; in fact, Defendant does not even present the relevant test for judicial estoppel.[9]  Nor does the government – whose response is almost nonexistent.  (D.I. 69 at 4 n.2).  Yet even if both sides had adequately addressed this theory, the Court would nevertheless find judicial estoppel inapplicable here.

"The doctrine of judicial estoppel prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Carlyle*

---

[9]     Defendant dedicated little effort to this argument in his opening brief, only adding sparse details and identifying particular statements (but still no law) in his reply brief.  (*Compare* D.I. 60 at 20-21, *with* D.I. 78 at 13-16).

*Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 221 (3d Cir. 2015).  Judicial estoppel is concerned with judicial integrity and serves to prevent litigants from "playing fast and loose with the courts."  *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121 (3d Cir. 1992) (quoting *Scarano v. Cent. R. Co. of N. J.*, 203 F.2d 510, 513 (3d Cir. 1953)).  It is thus a doctrine "intended to protect the courts rather than the litigants."  *Fleck*, 981 F.2d at 121-22; *see also Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir. 1990) ("Unlike the concept of equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between the litigant and the judicial system, and seeks to preserve the integrity of the system.").  "The application of judicial estoppel constitutes an exercise of a court's inherent power to sanction misconduct."  *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 784 (3d Cir. 2001).

In the Third Circuit, judicial estoppel does not apply unless (1) the party to be estopped has taken two positions that are irreconcilably inconsistent, (2) the party's change in position was "in bad faith – *i.e.*, with intent to play fast and loose with the court" and (3) no sanction short of judicial estoppel "would adequately remedy the damage done by the litigant's misconduct."  *Montrose*, 243 F.3d at 779-80.  The party to be estopped need not have benefitted from the prior inconsistent position for judicial estoppel to be available.  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003) ("[A]pplication of judicial estoppel does not turn on whether the estopped party actually benefitted from its attempt to play fast and loose with the court.").  "[J]udicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position."  *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009), *as amended* (Dec. 4, 2009).  Whether to apply judicial estoppel

is a question committed to the Court's discretion.  *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

As an initial matter, the Court is not convinced the government has taken "irreconcilably inconsistent" positions as to the Diversion Agreement.  During the summary of the terms of the Diversion Agreement at the July hearing, the government clearly stated:

> Roman two describes the terms and conditions of the agreement. Paragraph 1 provides that it's for a two-year period, twenty-four months ***beginning on the date of approval of this agreement, and that would be when the chief probation officer, Ms. Brey [sic] signs it***, unless there is a breach as set forth in paragraphs 13 and 14.

(D.I. 16 at 83:13-17 (emphasis added); *see also* D.I. 24, Ex. 1 ¶ 1).  As the Court understood that statement at the time, the government's position was that the diversion period did not begin to run until Probation's approval was given – approval to be indicated by a signature on the Diversion Agreement itself.  That is, the Diversion Agreement would not become effective until approval through signature was given.  That continues to be the Court's understanding today.  Defendant concedes that he took no issue with this recitation of the terms despite being given the opportunity to correct.  (D.I. 78 at 15).  He attempts to defend that silence by arguing that "it did not seem particularly important" to object to the government's statement about approval because he purportedly believed Probation had approved the Diversion Agreement.  (*Id.*).  The Court is unpersuaded, particularly because the government did not merely say the Diversion Agreement "would run on upon approval."  (*Id.*).  The government went further – clearly stating that "approval of this agreement . . . would be when the chief probation officer . . . signs it."  (D.I. 16 at 83:15-16).[10]  In any event, Defendant's understanding of the government's position is irrelevant here because the doctrine of judicial estoppel is focused on protecting the Court from a litigant's

---

[10]     Defendant has never taken the position that Probation signed the agreement.  Nor could he. (*See* D.I. 24, Ex. 1 at 9 (Diversion Agreement signed by the parties but not by Probation)).

inconsistent positions.  And the Court never understood the government's position to be that the Diversion Agreement was in effect with the diversion period running at the time of the hearing.

Contrary to Defendant's suggestion (D.I. 78 at 13-15), the Court can find no instance where the government asserted that the Diversion Agreement was already binding on the parties at the time of the plea hearing and regardless of the outcome of the plea hearing.  The Court rejects Defendant's suggestion that statements by defense counsel can trigger judicial estoppel against the government.  (*See* D.I. 78 at 15 ("Mr. Biden's counsel was not speaking in the context of some future, hypothetical world, he was clearly stating both what he understood the existing reality to be *and* that he understood the prosecution agreed.  He was purporting to speak for the prosecution as well, discussing the view of the parties." (emphasis in original))).  Judicial estoppel is a rarely applied doctrine that functions as a sanction against a litigant who is attempting to play fast and loose with the Court.  Allowing one party to make statements on behalf of an adversary only to then turn around and allege those statements judicially estop the adversary would be a strange result – and one subject to abuse.  That Defendant cites nothing in support of his argument suggests that there is no precedent for applying judicial estoppel in this way.  Ultimately, the Court remains unpersuaded that the government took the position that the Diversion Agreement was a binding agreement in effect without Probation's approval as manifested by signature.  In now asserting that the Diversion Agreement never became effective, the government is not taking a position that is "irreconcilably inconsistent" with any position it has previously taken with the Court.

Even if the Court were to find that the positions taken by the government were irreconcilably inconsistent, the Court would nevertheless decline to apply judicial estoppel because there is no evidence that any change in position was done in bad faith or with an intent to play fast and loose with the Court.  *See Montrose*, 243 F.3d at 779.  Judicial estoppel is not available as a sanction unless the inconsistent positions were assumed in bad faith.  And bad faith for purposes

of judicial estoppel requires that the litigant "behaved in a manner that is somehow culpable" and that that "culpable conduct has assaulted the dignity or authority of the court."   *Id.* at 781. Defendant makes no showing as to either element, seemingly suggesting that the purported inconsistencies alone are sufficient to show the government was attempting to play fast and loose with the Court.   More is clearly required in this Circuit.   *See Klein v. Stahl GmbH & Co. Maschinefabrik*, 185 F.3d 98, 111 (3d Cir. 1999) (bad faith in the context of judicial estoppel "must be based on more than inconsistency in factual positions").   The Court on its own can discern no bad faith or intent to play fast and loose with the Court on the part of the government.

As it is unnecessary to do so, the Court declines to reach the last prong of the inquiry – *i.e.*, whether any lesser sanction would remedy the damage done.  Judicial estoppel is inapplicable here.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss the indictment based on the Diversion Agreement (D.I. 60) is DENIED.