11:44:31

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4   UNITED STATE OF AMERICA, )
                              )
 5                            ) Criminal Action
     v.                       ) No. 23cr61(MN)
 6                            )
     ROBERT HUNTER BIDEN,     )
 7                            )
               Defendant.     )
 8

 9
                      Friday, May 24, 2024
10                    12:00 p.m.
                      Pretrial Conference
11

12                    Courtroom 4A
                      844 King Street
13                    Wilmington, Delaware

14

15
     BEFORE:  THE HONORABLE MARYELLEN NOREIKA
16            United States District Court Judge

17

18

19   APPEARANCES:

20
                      OFFICE OF THE SPECIAL COUNSEL
21                    BY:  DEREK E. HINES, ESQ.
                      BY:  LEO WISE, ESQ.
22

23
                          Counsel for the Plaintiff
24

25
```

1

**APPEARANCES CONTINUED:**

2

3

     **DALTON & ASSOCIATES, P.A.**

4      **BY:  BARTHOLOMEW J. DALTON, ESQ.**
     **BY:  CONNOR DALTON, ESQ.**

5

     **-and-**

6

     **WINSTON & STRAWN LLP**

7      **BY:  ABBE DAVID LOWELL, ESQ.**
     **BY:  DAVID KOLANSKY, ESQ.**

8

9          **Counsel for the Defendant**

10

11

12      **- - - - - - - - - - - -**

13

12:05:59 14

12:06:24 15      **THE COURT:  All right.  Good morning, everyone.**

12:06:27 16 **Please be seated.**

12:06:28 17      **All right.  So everyone is prepared to proceed?**

12:06:34 18      **Mr. Hines?**

12:06:35 19      **MR. HINES:  Yes, Your Honor.**

12:06:36 20      **THE COURT:  Mr. Lowell?**

12:06:37 21      **MR. LOWELL:  Yes, ma'am.**

12:06:38 22      **THE COURT:  All right.  Okay.**

12:06:39 23      **We're here for the pretrial conference.  We have**

12:06:43 24 **a number of Motions in Limine, nine from the government,**

12:06:47 25 **four from the Defendant.  Before turning to the trial**

12:06:50  1    logistics and discussing anything else that you all want to

12:06:55  2    discuss, I wanted to rule on at least some of the Motions in

12:06:58  3    Limine that are pending before me.

12:07:00  4            A number of them are actually I think pretty

12:07:05  5    straightforward given that there was minimal objection.  So

12:07:10  6    let me just run through those.  There are a few that I will

12:07:14  7    want to get to towards the end where I might want some

12:07:18  8    argument and may need some time to consider them.  But let's

12:07:21  9    go through the ones that I can.

12:07:25  10            Government Motion in Limine number 1 to exclude

12:07:28  11   Defendant from arguing or suggesting that the government

12:07:30  12   must show he used controlled substances on the day he

12:07:33  13   purchased the firearm.  Defendant opposes, arguing that the

12:07:38  14   government must prove his drug use on the day of purchase.

12:07:45  15   I disagree.  Defendant is charged under Section 922(g)(3),

12:07:49  16   which prohibits a person who is an unlawful user of, or

12:07:54  17   addicted to, any control substance from possessing a firearm

12:07:58  18   that traveled in interstate commerce.  And he's charged also

12:08:00  19   with making false statements regarding his drug use, thus

12:08:03  20   for each of the three counts of the indictment the

12:08:06  21   government must establish that Defendant was an unlawful

12:08:08  22   user of, or addicted to, a controlled substance.  Addicted

12:08:12  23   and user are defined in the implementing regulations for the

12:08:18  24   Gun Control Act as not limited to the use of drugs on a

12:08:21  25   particular day or within a matter of days or weeks before,

12:08:25  1    but rather that the unlawful use has occurred recently

12:08:29  2    enough to indicate that the individual is actively engaged

12:08:32  3    in such conduct.  And that is the Code of Federal

12:08:36  4    Regulations, 27 CFR Section 478.11.

12:08:41  5            In fact, in the next sentence, it says that a

12:08:44  6    person may be an unlawful user even though the substance is

12:08:49  7    not being used at the precise time the person seeks to

12:08:51  8    acquire a firearm or receives or possesses a firearm.

12:08:56  9            Now, I understand because I glanced through the

12:09:01  10   Defendant's pretrial brief that there is a concern that that

12:09:07  11   regulation doesn't apply here.  I will say that at least in

12:09:16  12   the Third Circuit from *United States v. Cheeseman*, 600 F.3d

12:09:23  13   270, the Third Circuit has cited that regulation in

12:09:27  14   connection with an offense under Section 922(g)(3), so as I

12:09:32  15   understand the current status of the Third Circuit law, it

12:09:34  16   is appropriate to look to that regulation, and thus I will

12:09:38  17   do so.

12:09:38  18           Additionally, to the extent that Defendant

12:09:41  19   relies on *Daniels*, I'll say that that reliance is misplaced.

12:09:48  20   *Daniels* addressed an as applied constitutional challenge,

12:09:53  21   not the merits of the underlying offense.  The

12:09:56  22   constitutionality of the statute as applied to this

12:09:59  23   Defendant is not an issue for this jury, and it is not as of

12:10:02  24   now an issue that has been raised before me.

12:10:05  25           To the extent that that issue is ever properly

12:10:09  1  before me, it will be for me to address and not the jury.

12:10:12  2  So therefore, I am going to grant the government's Motion in

12:10:16  3  Limine number 1.

12:10:17  4        Government's Motion in Limine number 2 seeks to

12:10:23  5  admit portions of the Defendant's memoir and exclude other

12:10:24  6  self-serving and irrelevant portions of the same book.

12:10:28  7  Defendant partially opposes.  Defendant agrees that the

12:10:31  8  government should be allowed to admit excerpts that contain

12:10:34  9  his admissions about substance use, but argues that the

12:10:37 10  government should not be allowed to redact information on

12:10:40 11  those pages that it deems irrelevant.  Rather Defendant

12:10:44 12  argues that the Rule of Completeness under Rule 106 mandates

12:10:48 13  that he be allowed to seek the admission of additional

12:10:51 14  relevant sentences or passages from that same page so long

12:10:56 15  as the statements meet the other requirements for relevance

12:11:00 16  and prejudice.

12:11:02 17        I agree.  So the motion will be granted in part.

12:11:06 18  The pages offered by the government may be admitted, but the

12:11:09 19  motion is denied to the extent that the government seeks to

12:11:12 20  admit a page from Defendant's memoir without giving him the

12:11:17 21  opportunity to seek the admission of additional relevant

12:11:20 22  sentences or passages from that same page subject to the

12:11:24 23  Rule of Completeness so long as the statements made meet

12:11:27 24  other requirements for relevance and prejudice.  The

12:11:30 25  excerpts by the way still need to come in through a witness.

12:11:33 1          Now, that being said, I will note that no one

12:11:36 2 has provided me with un-redacted pages from the book, so I

12:11:40 3 can't tell you at this point whether I view any of the

12:11:43 4 redacted portions to be properly admissible on the Rule of

12:11:50 5 Completeness or the relevance and prejudice, but I do think

12:11:53 6 it's unfair that Defendant wouldn't be given an opportunity

12:11:57 7 to establish that.

12:11:58 8          So to the extent Defendant believes those

12:12:00 9 portions should be admitted, counsel may request their

12:12:03 10 admission but must make that request outside the presence of

12:12:06 11 the jury.

12:12:07 12          Okay.  We're going to skip Motion in Limine

12:12:12 13 number 3 for a minute because I want some more argument on

12:12:15 14 that one.

12:12:17 15          Government's Motion in Limine number 4 to

12:12:19 16 exclude evidence and argument that Delaware State

12:12:22 17 authorities did not charge the Defendant.  The Defendant

12:12:25 18 states that he does not oppose the motion but argues that he

12:12:30 19 should be allowed to seek the admission of, or ask questions

12:12:33 20 concerning the Delaware State Police Incident Report as long

12:12:37 21 as there are redactions to statements regarding

12:12:39 22 non-prosecution or case closing.

12:12:41 23          So, I know I said I was skipping the other one

12:12:48 24 because I had questions, but I had more questions on that

12:12:50 25 one.

12:12:50  1      Let me ask this of the Defendant.  I don't

12:12:53  2  really understand what that means.  So --

12:12:56  3      MR. LOWELL:  Want me to -- can you hear me okay?

12:12:59  4      THE COURT:  I can.

12:13:00  5      MR. LOWELL:  What I mean is, what we mean is

12:13:03  6  that there will be a state police officer who arrives on the

12:13:09  7  scene in October of 2018, will take a statement, will have

12:13:13  8  an Incident Report and say whatever that person says on the

12:13:19  9  stand about that.  The issue is the question, for example,

12:13:25 10  is after you took the statement of so and so, when was the

12:13:29 11  next time, if any, that you sought any other information

12:13:34 12  from that witness, be it Mr. Biden, be it Mr. Biden's

12:13:39 13  brother's widow, and the answer to that might be never.

12:13:43 14      Then the other issue might be when is it that

12:13:45 15  you provided the information that you obtained that day, the

12:13:49 16  gun, the other things to the possession of the federal law

12:13:52 17  enforcement authorities, that could be three years later.

12:13:56 18  It's just part of the chain and part of understanding the

12:14:01 19  statements that were made.  It is not to say and you closed

12:14:04 20  the case without charges, it's not that.  It's just, I don't

12:14:09 21  -- without knowing what their testimony will be, it does

12:14:11 22  seem to me I should be able to complete the story as to

12:14:14 23  where things ended up and when.

12:14:16 24      THE COURT:  What is the relevance of when was it

12:14:18 25  provided to the federal authorities?

12:14:24  1            MR. LOWELL:  Well, among other reasons, for

12:14:26  2    example, one piece of evidence the government has proffered

12:14:28  3    is a leather pouch of which they have testing to which that

12:14:32  4    was obtained back in October.  It was kept in state

12:14:36  5    facilities I think for five years.  And so there is an issue

12:14:40  6    of chain of custody.  There is an issue of whether or not

12:14:42  7    the material on it had been tampered between that.  It's not

12:14:47  8    like it came into the possession of the government

12:14:50  9    immediately.  So just tracing for purposes of chain of

12:14:53 10    custody will be a legitimate relevant traditional sense of

12:14:57 11    asking about a piece of evidence.

12:14:59 12            THE COURT:  All right.  Respond.

12:15:00 13            MR. HINES:  So it seems like Mr. Lowell is

12:15:03 14    drawing a distinction between tracing dates for chain of

12:15:06 15    custody purposes and statements.  Statements in the absence

12:15:09 16    thereof are not admissible to prove any fact at issue.  With

12:15:12 17    respect to the brown leather pouch --

12:15:14 18            THE COURT:  Statements?

12:15:15 19            MR. HINES:  By the Defendant or by officers

12:15:18 20    thereafter whether or not they did anything.  The first part

12:15:21 21    of his argument was in the months and years that followed,

12:15:26 22    the officers did not do anything additional to talk to

12:15:29 23    Mr. Biden or other people involved in the incident.  That's

12:15:33 24    -- the trial involves what happened in 2018, around this

12:15:36 25    time period, not thereafter and what wasn't done.  So I

12:15:40  1    would say that is not relevant.

12:15:41  2                    With respect to this brown leather pouch, there

12:15:43  3    is no issue with chain of custody.  The history of the brown

12:15:46  4    leather pouch is it was obtained in October of 2018, put

12:15:52  5    into evidence in Delaware State Police evidence locker,

12:15:58  6    stayed in sealed evidence --

12:15:59  7                    THE COURT:  Why can't he ask about that?

12:16:02  8                    MR. HINES:  He can ask about when did the FBI

12:16:06  9    obtain the brown leather pouch.

12:16:07 10                    THE COURT:  Why can't he ask the police officer,

12:16:09 11    when did you give it to him so that we have a complete chain

12:16:13 12    from someone handed the policeman the pouch, the policeman

12:16:17 13    did X with pouch, then somebody else gave it to the federal

12:16:22 14    government, that's fine; right?

12:16:23 15                    MR. HINES:  That date is fine.  What isn't and

12:16:26 16    what we think he wants to use this for and that's to argue

12:16:29 17    that nothing was done in the history of the case between the

12:16:31 18    episode and later.

12:16:33 19                    THE COURT:  To suggest that there was no

12:16:34 20    prosecution without saying it.

12:16:36 21                    MR. HINES:  Correct.

12:16:36 22                    MR. LOWELL:  I'm not going to do that, Judge.

12:16:38 23                    THE COURT:  All right.  Thank you.

12:16:39 24                    Okay.  So with respect to that one, I am going

12:16:42 25    to grant the government's motion as to any reference that

12:16:45  1    the Delaware State Police did not charge the Defendant.  I

12:16:49  2    am also going to preclude Defendant from arguing or

12:16:52  3    mentioning anything about the fact that all relevant events

12:16:56  4    in this case took place in 2018 and prosecutors did not

12:17:00  5    bring any charges against the Defendant until five years

12:17:03  6    later.  That seems to be only relevant to a claim of

12:17:07  7    selective prosecution and I have already ruled that that is

12:17:10  8    not an issue in this case.

12:17:11  9              As to the chain of custody, it seems like the

12:17:15 10    parties are in agreement as to appropriate questions that

12:17:19 11    would be to establish the chain of custody, or in your case,

12:17:22 12    Mr. Lowell, to question whether the chain of custody is

12:17:25 13    sufficient.  So my ruling granting that motion does not

12:17:31 14    preclude you from asking questions about the chain of

12:17:32 15    custody.

12:17:33 16              Government's Motion in Limine number 5, to

12:17:37 17    exclude argument and questioning regarding any purported

12:17:39 18    defects in institution of prosecution of this case.

12:17:42 19    Defendant does not oppose, so I am going to grant the

12:17:46 20    motion.

12:17:46 21              That being said, to the extent that defense

12:17:48 22    counsel believes that a question about a witness 's

12:17:51 23    experience, competence or bias could include whether that

12:17:55 24    witness has ever investigated, worked on or testified in a

12:17:58 25    case such as the one being tried, or whether a witness has

12:18:00  1   previously made or written an extrajudicial statement that

12:18:04  2   would include reference to bringing these charges or other

12:18:07  3   gun charges, counsel must raise the issue with me outside

12:18:11  4   the hearing of the jury before asking any such questions.

12:18:14  5   Because I just don't know what they would be, so it's easier

12:18:17  6   to deal with it outside the presence of the jury.

12:18:19  7              MR. LOWELL:  And, again, one of the problems

12:18:21  8   that you and I and the government will have is we're trying

12:18:24  9   to figure out what a witness will say before they say it and

12:18:26 10   I will definitely do what you just said.

12:18:28 11              THE COURT:  Thank you.

12:18:29 12              Motion in Limine number 6, to exclude argument

12:18:32 13   and questioning related to Defendant being law abiding and

12:18:36 14   sober since 2019, as irrelevant and improper reverse

12:18:40 15   character evidence under Rule 404.  The Defendant does not

12:18:45 16   oppose, so I am going to grant this motion.

12:18:47 17              To the extent this Defendant testifies and

12:18:49 18   counsel believes that a question that would naturally come

12:18:51 19   up during the testimony regarding his sobriety and law

12:18:56 20   abiding behavior, again, I ask that counsel raise the issue

12:19:00 21   with me outside the hearing of the jury before asking any

12:19:03 22   such questions.

12:19:04 23              MR. LOWELL:  No problem with that, Judge.  Just

12:19:05 24   one little caveat on that.  Again, it's an if Mr. Biden

12:19:09 25   takes the stand, and I can't imagine there would be not a

12:19:12  1    question about that subject.  We will raise it with you

12:19:17  2    before, but I'm asking you in advance because if he does

12:19:20  3    take the stand, it should be a question about his life,

12:19:23  4    especially because the book, for example, is written in a

12:19:28  5    retrospective way after he is sober.  That's the premise of

12:19:33  6    it for him to go backwards.  I will raise that with Your

12:19:36  7    Honor when it happens.

12:19:37  8            THE COURT:  You can raise that with me when it

12:19:38  9    happens.

12:19:38 10            Government Motion in Limine number 7, to exclude

12:19:41 11    argument, evidence, and questioning relating to the

12:19:44 12    constitutionality of the firearm statute the Defendant is

12:19:47 13    charged under.  The Defendant did not respond to the motion,

12:19:49 14    so I am going to grant the motion as unopposed.  There

12:19:53 15    should be no questioning, argument, reference to or

12:19:56 16    statements of any kind questioning the constitutionality of

12:20:00 17    the statute.  I have ruled on the facial challenge that was

12:20:03 18    raised and if there is later an as applied challenge with

12:20:07 19    respect to this Defendant, that will be for me to address

12:20:09 20    and not the jury.

12:20:10 21            Government's motion in --

12:20:12 22            MR. LOWELL:  Before you get to that, I think you

12:20:15 23    said it was not a response.  I think the Government's motion

12:20:17 24    indicated that we had no response, I hope it didn't, I don't

12:20:20 25    remember now, we didn't disagree.

12:20:22 1        THE COURT:  It may have.  I'm sorry, I was

12:20:24 2  looking at opening paper/responsive paper and there was

12:20:28 3  none.

12:20:29 4        MR. LOWELL:  All right.

12:20:29 5        THE COURT:  There were lots of motions that said

12:20:31 6  there was no objection, but then there was this short

12:20:35 7  response filed, so that's what I was looking for.

12:20:36 8        Government's Motion in Limine number 8, to

12:20:39 9  exclude argument and questioning regarding Defendant's

12:20:42 10  potential punishment, plea negotiations and diversion

12:20:46 11  agreement, or the July 26, 2023 hearing.  Defendant does not

12:20:49 12  oppose, and I am going to grant the motion.

12:20:52 13        To the extent Defendant believes the government

12:20:54 14  has opened the door to questioning on this issue, again, I

12:20:57 15  ask that counsel raise the issue with me outside the hearing

12:21:01 16  of the jury before asking any such questions.

12:21:03 17        All right.  I am going to skip government's

12:21:06 18  Motion in Limine number 9 for the moment because I have some

12:21:11 19  additional questions on that, and move to Defendant's Motion

12:21:14 20  in Limine number 1, which is to exclude argument,

12:21:18 21  questioning and reference to the pending tax charges against

12:21:24 22  the Defendant in California or the proceedings in that case.

12:21:27 23  The government disagrees that use of the phrase "tax

12:21:34 24  investigation" would be prejudicial to Defendant, but is

12:21:36 25  willing to use the phrase "criminal investigation" instead.

12:21:40 1    The government also argues that it should be allowed to

12:21:43 2    cross-examine the Defendant about his taxes if he testifies.

12:21:47 3         Okay.  What I didn't understand, Mr. Hines, I

12:21:50 4    did have one question on this.  The government's paper said

12:21:54 5    something like well, we need it in order to explain where

12:21:58 6    documents came from.  I don't know what you're talking about

12:22:01 7    or what types of documents that would be, so what's an

12:22:05 8    example so that I can evaluate the statement, or the

12:22:10 9    argument that you made?

12:22:11 10        MR. HINES:  So, for example, I know we'll get to

12:22:14 11   this argument later, the 1006 summary chart, and the

12:22:17 12   information law enforcement received for that was during the

12:22:21 13   course of the tax investigation in response to search

12:22:23 14   warrants that authorized searches for tax-related crimes

12:22:27 15   which law enforcement then obtained pursuant to those

12:22:31 16   warrants.

12:22:32 17        We would want to specify for the jury that this

12:22:34 18   came from a criminal investigation.  We don't need to say

12:22:37 19   tax, but the jury has to understand like how law enforcement

12:22:41 20   legally got these documents into their possession, mainly

12:22:46 21   the stuff that was produced from AppleLink, as well as other

12:22:51 22   information from the Defendant's laptop.

12:22:53 23        THE COURT:  Thoughts?

12:22:54 24        MR. LOWELL:  If it is because they want to show

12:22:56 25   that there is a basis for it to come in their possession,

12:23:00  1   they don't have to refer to anything in California, tax or

12:23:03  2   anything.  We're not contesting, so we can find a way if

12:23:06  3   that becomes an issue, we're not challenging the way

12:23:10  4   Mr. Hines just said to not be prejudiced to say there is

12:23:13  5   another criminal investigation, a tax investigation, we got

12:23:15  6   this in some other way, we just need to deal with the fact

12:23:18  7   that law enforcement obtained this pursuant to proper

12:23:23  8   authorization, period.

12:23:24  9           THE COURT:  So as long as there is no question

12:23:26 10   that you can say law enforcement got this through

12:23:29 11   appropriate procedures and defense counsel is not going to

12:23:34 12   say anything contrary to that, isn't that enough for you?

12:23:37 13           MR. HINES:  Yes, Your Honor.

12:23:38 14           THE COURT:  Okay.  So with that I am going to

12:23:40 15   grant the motion.  I don't think there is a need for the

12:23:42 16   government to refer to the tax case or investigation in

12:23:45 17   explaining where documents came from in this case.  So there

12:23:49 18   should be no reference to the tax charges or criminal

12:23:52 19   proceedings pending out in California.

12:23:53 20           And the parties can work on language that makes

12:23:59 21   clear that whatever evidence was obtained through warrants

12:24:02 22   or otherwise was done through proper chains so there is no

12:24:06 23   question what the jury has as to whether it was somehow done

12:24:09 24   improperly.

12:24:10 25           To the extent, however, that the Defendant

12:24:12 1    testifies and the government believes that it should be

12:24:15 2    allowed to use evidence relating to the tax matters to probe

12:24:18 3    his credibility, or other issues that may come up, counsel

12:24:22 4    should seek permission from me outside the presence of the

12:24:25 5    jury before asking those questions.

12:24:27 6            Okay.  Defendant's Motion in Limine number 2, to

12:24:30 7    exclude argument, questions and references relating to child

12:24:37 8    support proceedings in Arkansas, or Mr. Biden's discharge

12:24:40 9    from the Navy in 2014.  The government partially opposes

12:24:45 10   this motion, agreeing not to reference either of these

12:24:48 11   topics unless the Defendant opens the door through his own

12:24:51 12   testimony.

12:24:51 13           So with that, I am going to grant the motion as

12:24:55 14   essentially unopposed.  But again, to the extent the

12:24:58 15   Defendant testifies and the government believes it should be

12:25:00 16   allowed to use evidence related to the child support

12:25:03 17   proceedings or the Navy discharge, counsel should seek

12:25:07 18   permission from me outside the presence of the jury before

12:25:10 19   doing so.

12:25:11 20           Defendant's Motion in Limine number 3, to

12:25:15 21   exclude argument, questions and references relating to any

12:25:18 22   statement Mr. Biden made at the July 26, 2023 hearing in

12:25:23 23   this matter.  So this one seems to overlap with the

12:25:27 24   government's eighth Motion in Limine, which was largely

12:25:31 25   unopposed, but the government says it does not intend to

12:25:34  1    introduce Defendant's statements from the July 26, 2023

12:25:38  2    hearing, "outside the limits of Federal Rule of Criminal

12:25:43  3    Procedure 11(f) and Federal Rule of Evidence 410."  So it

12:25:48  4    seemed like everyone was on the same page about keeping out

12:25:52  5    statements from that hearing, but this proviso, I can't tell

12:25:56  6    if you're taking that back or what.  So is there some

12:26:01  7    scenario that you think you might use those statements?

12:26:05  8              MR. HINES:  Yes.  So 410, I believe it's (b)(1),

12:26:08  9    either (b)(1) or (b)(2), provides if the defense brings it

12:26:12 10    up, essentially opens the door, we would be able to rebut

12:26:16 11    that and address it through his statements.  That's the

12:26:18 12    scenario we're envisioning.  If he were --

12:26:21 13              THE COURT:  So just for example, during that

12:26:24 14    hearing there was a diversion agreement and I know that's

12:26:27 15    the subject of motions, but there was a statement of facts,

12:26:30 16    and to the extent that in that statement of facts the

12:26:33 17    Defendant admitted things like that he falsified, you know,

12:26:37 18    he made a statement on the form and he knew it wasn't true,

12:26:42 19    that kind of thing, you are not planning to put that in

12:26:45 20    unless the Defendant gets up and testifies somehow contrary

12:26:49 21    to that?

12:26:50 22              MR. HINES:  That, or if defense counsel argues

12:26:54 23    in a manner that's inconsistent with respect to him making a

12:26:57 24    statement at that hearing in that manner, that limited

12:26:59 25    subset.  So we don't envision this happening at trial, we

12:27:03 1    just want to make it very clear that we aren't agreeing

12:27:06 2    there is no scenario under which that could come up.

12:27:08 3              THE COURT:  Just to make it clear, you are not

12:27:11 4    saying that if they argue that there is a question as to

12:27:13 5    whether he did so, that's not bringing it in, you're saying

12:27:16 6    if Mr. Lowell got up and said he has never said -- he said

12:27:20 7    that he never signed that form, he never even saw that form,

12:27:23 8    then you might seek to add it?

12:27:25 9              MR. HINES:  Correct, Your Honor.

12:27:26 10             THE COURT:  Anything you want to add?

12:27:30 11             MR. LOWELL:  Yes.  The exception to the Rule 410

12:27:39 12   talks about there being a false statement charge, not any

12:27:42 13   charge that's in 18 United States Code.

12:27:44 14             THE COURT:  Right.

12:27:45 15             MR. LOWELL:  So I think to get the protection

12:27:46 16   that's supposed to happen in Rule 11 and 410, it is not

12:27:50 17   supposed to invade even that.  If Mr. Biden were to testify

12:27:56 18   and I don't know what he would say, but it's not what

12:27:59 19   Mr. Hines said because of what I just told you about the

12:28:01 20   parameters of a false statement case, then we probably would

12:28:04 21   have to come and see you, Judge, because at that point

12:28:08 22   Mr. Biden would explain what happened on July 26th.  We

12:28:12 23   don't necessarily want that to happen, but they can't have a

12:28:15 24   one-way lane on that is what I'm saying.

12:28:17 25             THE COURT:  Right.  It seems to me that there

12:28:18 1    are a number of issues that may become more contested should

12:28:22 2    Mr. Biden decide to testify, and we're going to have to

12:28:25 3    address those.  I do think -- I mean, I understand that you

12:28:28 4    might want to know in advance, but some of it depends on

12:28:32 5    what people can tell me that they're going to see from what

12:28:37 6    other witnesses testify to and what you would expect you

12:28:40 7    would ask him.

12:28:41 8            What I will do with this motion is similar to

12:28:45 9    what I have done previously, and also with the government's

12:28:49 10   motion on the July hearing which is I am going to grant it.

12:28:57 11           MR. LOWELL:  I'm sorry, Judge, I needed to check

12:28:59 12   to make sure I didn't say something.

12:29:01 13           THE COURT:  I appreciate that.

12:29:03 14           I am going to grant it and say that to the

12:29:06 15   extent either side believes that a door has been opened that

12:29:09 16   would allow anything from the July 26, 2023, hearing to come

12:29:13 17   in, counsel shall raise the issue with me outside the

12:29:16 18   hearing of the jury before asking any questions.

12:29:18 19           Defendant's Motion in Limine number 4 to exclude

12:29:23 20   argument, questions and references to spending on an

12:29:26 21   extravagant lifestyle during the time period where he was

12:29:30 22   struggling with addiction.  The government opposes this one,

12:29:33 23   first noting that the focus of its case-in-chief will not be

12:29:37 24   on any such extravagant lifestyle.  Instead the government

12:29:40 25   anticipates offering evidence that the Defendant was

12:29:42 1  spending large sums of cash on drugs and drug paraphernalia,

12:29:46 2  withdrawing large sums of cash from locations consistent

12:29:50 3  with descriptions in his book, withdrawing cash prior to

12:29:55 4  purchasing a firearm with $900 in cash.  On this motion I am

12:29:57 5  going to grant it in part and deny it in part.  I am

12:30:00 6  granting the motion to extent the Defendant seeks to

12:30:02 7  preclude the government from phrasing the evidence as having

12:30:05 8  an extravagant lifestyle or introducing evidence to solely

12:30:09 9  establish the Defendant was spending lots of money on

12:30:12 10 hotels, et cetera.  But I am denying the motion as it

12:30:15 11 relates to the government introducing argument and evidence

12:30:18 12 regarding the Defendant obtaining and spending large amounts

12:30:20 13 of cash on drugs, drug paraphernalia, and otherwise

12:30:26 14 consistent with drug-related activity that may be relevant

12:30:28 15 in this case to showing that he was addicted to or an

12:30:32 16 unlawful user of drugs.

12:30:34 17          MR. LOWELL:  On that one may I say one sentence?

12:30:36 18          THE COURT:  You may.

12:30:37 19          MR. LOWELL:  I don't even disagree that's what I

12:30:40 20 understand they're now doing in terms of cash, but we will

12:30:42 21 raise with you at the appropriate time the time period in

12:30:45 22 which, for example, large sums of cash were withdrawn as

12:30:48 23 opposed to it being 2014 or '15 as opposed to 2018 when this

12:30:54 24 event occurred, number one.

12:30:55 25          Number two, as you will recognize, there is not

12:30:57 1    going to be an indication on a debit card or an ATM that the

12:31:01 2    cash is being withdrawn for drugs.  It will be a debit card

12:31:06 3    for whatever and there will be other explanations, so that's

12:31:09 4    what they're asking.  If they were going to seek evidence

12:31:11 5    that such and such day, X amount of cash was withdrawn,

12:31:16 6    there is no objection to that.  As to them characterizing it

12:31:20 7    unless they have evidence to link it up, then that's where

12:31:22 8    --

12:31:22 9            THE COURT:  We all know that circumstantial

12:31:24 10   evidence is powerful evidence in cases and to the extent

12:31:27 11   that they have other circumstantial evidence that would

12:31:31 12   suggest that any type of large cash withdraw was related to

12:31:35 13   drug activity, then I suppose they can raise it and you can

12:31:39 14   object.

12:31:39 15           MR. LOWELL:  Right.  And again, of course what

12:31:41 16   will be in context to Your Honor and to the jury that he

12:31:45 17   didn't have a credit card at the time, so yes, I understand.

12:31:48 18           THE COURT:  Okay.  Next we have the government's

12:31:54 19   motion to exclude proposed defense experts.  Government

12:31:57 20   seeks to exclude the testimony of four proposed expert

12:32:00 21   witnesses likely to be called by Defendant on three grounds.

12:32:03 22   The first ground is the expert notices were untimely.  I

12:32:06 23   suppose that that may have been that they were untimely, but

12:32:10 24   given the history of this case and our discussion at the

12:32:12 25   last hearing, I am not going to find these expert notices

12:32:16 1   were untimely.

12:32:17 2          Next, the government argues that the notices

12:32:20 3   failed to comply with the requirements of Rule 16.  So let

12:32:25 4   me ask the defense counsel, Rule 16 says that the contents

12:32:31 5   of the disclosure must include a complete statement of all

12:32:38 6   opinions that the Defendant will elicit from the witness in

12:32:42 7   the Defendant's case-in-chief and the bases and reasons for

12:32:46 8   them.  I don't see how the disclosures that I have seen meet

12:32:53 9   that requirement.  So what's your position?

12:32:57 10          MR. LOWELL:  I thought that the government's

12:33:00 11  point was that we had not found yet where any of our experts

12:33:04 12  had provided testimony, not that it was not clear from our

12:33:09 13  disclosure what it was they were going to testify about.  I

12:33:13 14  don't know what specifically Your Honor is pointing to, but

12:33:16 15  for example, I'll start with -- I don't know, I'll start

12:33:20 16  with the lab person, the government identified DEA or some

12:33:24 17  other government agent to do lab analysis of residue.  We

12:33:28 18  have provided them with our expert that would indicate what

12:33:31 19  wasn't done on that sample.  And we have an issue of whether

12:33:38 20  or not we can even date the residue.  And I thought that was

12:33:40 21  pretty clear, Judge.

12:33:42 22          THE COURT:  Right.  But it's supposed to give

12:33:44 23  what opinions he will give and the bases and reasons for

12:33:50 24  them.  This is an analysis of I suppose the government's

12:33:58 25  expert's examination, an analysis of the accuracy and

12:34:04 1  reliability of it, a description of the jury of the possible

12:34:09 2  samples.  Okay.  None of this is very specific, a

12:34:12 3  description of the jury about how materials would be

12:34:14 4  affected by age.  Well, what is his opinion?

12:34:18 5           MR. LOWELL:  Judge, on that, I should have

12:34:19 6  started with the fact that the government made that motion

12:34:22 7  two days ago, it's twenty-six pages long.  I know the

12:34:31 8  government preferred to have all these motions heard, but we

12:34:31 9  have not had a chance to respond to that.  We have done what

12:34:34 10  we could do as I indicated and promised you I would do last

12:34:37 11  time I was standing here and I have caught up pretty well.

12:34:40 12  I might be able to respond to that.  We had made a

12:34:43 13  supplement to the government yesterday on the issue of the

12:34:45 14  testimony or trials or events in which we would like to be

12:34:48 15  able to respond to them and do that, and we would do that

12:34:52 16  very promptly.  But you said as we left, you know, you guys

12:34:56 17  work it out and try to make sure that you're getting things

12:34:59 18  done.  We have done a pretty good job of catching up, but we

12:35:02 19  have not had that for more than thirty-six hours and have

12:35:06 20  not had a chance to respond.

12:35:07 21           THE COURT:  I will give you that opportunity to

12:35:09 22  respond.  Let me give you some guidance, which is, this does

12:35:14 23  not meet the requirements of the rules.  Okay?  So perhaps

12:35:21 24  it makes sense that you respond and I can address it after I

12:35:32 25  get your response and any reply the government has.  When do

12:35:37 1   you think you will be responding?

12:35:38 2              MR. LOWELL:  I think we can get that in on the

12:35:41 3   28th, the day right after Memorial Day, Tuesday.  We might

12:35:45 4   be able to get it to you, or the Court, or the government on

12:35:48 5   Memorial Day, but I'm sure we can get it to you on Tuesday.

12:35:52 6   And I'm pretty sure we can do that.

12:35:55 7              THE COURT:  Well, I will not rule on that one at

12:36:00 8   this moment because I agree that you should have an

12:36:03 9   opportunity to respond.  I don't know what was in any

12:36:07 10  supplemental disclosures and whether that would suffice to

12:36:12 11  address the government's concerns, so I will let the

12:36:14 12  briefing play out on that and then after I get the briefing,

12:36:18 13  I will decide it as expeditiously as I can.

12:36:21 14             MR. LOWELL:  One question on that, Judge, is

12:36:22 15  that the government's motion is twenty-six pages, I believe.

12:36:25 16  We have been on motions on limine using your rule of four

12:36:28 17  pages.  I don't know that I need twenty-six pages to respond

12:36:31 18  to our supplement, but I wanted to ask the Court permission

12:36:35 19  to go beyond your four page rule?

12:36:39 20             THE COURT:  You have that.  And any motion, any

12:36:44 21  response, in one of your responses, I need to have any

12:36:50 22  supplemental disclosures that you would be proposing,

12:36:55 23  because if I only have what I have right now, it's going to

12:36:59 24  be a waste of my time to look at it if the government agrees

12:37:02 25  that other information is more complete.

12:37:09  1          Okay.  I think that's everything -- oh, no, it's

12:37:20  2   not.  We still have two motions in limine, Motion in Limine

12:37:24  3   number 3, and Motion in Limine number 9.

12:37:27  4          Okay.  So with respect to Motion in Limine

12:37:31  5   number 3, that is the chart, government's Motion in Limine

12:37:38  6   number 3, to admit a Rule 1006 summary chart and for a

12:37:42  7   determination that the underlying evidence being summarized

12:37:46  8   is authentic.  The chart is a summary of over 18,000 pages

12:37:51  9   of evidence obtained from Defendant's iCloud account, laptop

12:37:55 10   and hard drive pursuant to several search warrants.

12:37:58 11   Defendant does not appear to oppose the motion as to the

12:38:01 12   admission of the chart as a summary of the voluminous

12:38:05 13   information.  Do I have that correct?

12:38:07 14          MR. LOWELL:  You do.

12:38:07 15          THE COURT:  The Defendant also does not appear

12:38:09 16   to challenge the authenticity of the data collected as being

12:38:13 17   what law enforcement received on December 9th, 2019, from

12:38:17 18   John Paul Mac Isaac and from Apple; correct?

12:38:20 19          MR. LOWELL:  Also true.

12:38:22 20          THE COURT:  Defendant disputes, however, that

12:38:25 21   the data is authentic as to being Defendant's data as he

12:38:29 22   used and stored it prior to Mr. Mac Isaac having possession

12:38:34 23   of it.

12:38:35 24          Okay.  So from the government, is your motion

12:38:38 25   seeking to have me say that the underlying data is authentic

12:38:44  1    as of the date law enforcement collected it, or when

12:38:49  2    Defendant possessed it?  And I couldn't really tell because

12:38:52  3    in your papers -- I mean, certainly there is some that I

12:38:57  4    think you argue with the Apple 3, Apple 4 is independently

12:39:02  5    corroborated as of some time, and there is other data that

12:39:06  6    you say will be corroborated based on other witness

12:39:10  7    testimony.  But I couldn't -- what is it that you're asking

12:39:14  8    for in your motion?

12:39:16  9            MR. HINES:  So we are asking, Your Honor, for an

12:39:18 10    authentication ruling from the date law enforcement received

12:39:22 11    it.

12:39:22 12            THE COURT:  And they don't oppose that?

12:39:23 13            MR. HINES:  Correct.

12:39:24 14            THE COURT:  Okay.

12:39:25 15            MR. LOWELL:  No, Judge, I don't want to waste

12:39:27 16    the Court's time, but I wanted to just make clear that

12:39:33 17    Mr. Mac Isaac states he received data on April 12th, I

12:39:37 18    think, of 2019.  The government didn't come into its

12:39:39 19    possession until December of that same year.  Mr. Mac Isaac

12:39:44 20    has stated on numerous occasions that he accessed the data,

12:39:47 21    copied it, opened files, et cetera.

12:39:49 22            THE COURT:  How would you put that into

12:39:51 23    evidence?

12:39:52 24            MR. LOWELL:  I'm not going to be the one to put

12:39:56 25    that into evidence.  I am going to say that the

12:39:57 1  government -- we might be able to agree on a particular text

12:40:00 2  or a particular communication.  The government wanted a

12:40:04 3  ruling, as I understood it, that said everything in their

12:40:07 4  possession was created or obtained by Mr. Biden prior to it

12:40:12 5  coming into their possession and that's not true.  So it may

12:40:16 6  have to be either on a communication-by-communication basis,

12:40:20 7  which we can do with them, but it's not up to me, Judge, to

12:40:23 8  say what they got on December 19th is something that I have

12:40:26 9  to prove was not what Mr. Biden put there three years

12:40:30 10 earlier.

12:40:31 11         THE COURT:  No, no, and I don't mean to suggest

12:40:33 12 that.  What I was looking at was in your papers, and you

12:40:37 13 have like a quote from The Washington Post who quotes from

12:40:40 14 some other expert.  That all seemed like hearsay upon

12:40:46 15 hearsay upon hearsay, so I didn't really understand what you

12:40:50 16 were suggesting that -- I mean, everybody seems to agree now

12:40:54 17 that it's okay to summarize voluminous information in the

12:40:59 18 chart and the information in the chart is accurate and

12:41:02 19 authentic as of the date that the government received it.

12:41:07 20 The Defendant may want to question whether some of the

12:41:13 21 information in the chart is actually things that the

12:41:17 22 Defendant texted or said or whatever, right?

12:41:23 23         MR. LOWELL:  Correct.

12:41:24 24         THE COURT:  But what I'm trying to figure out,

12:41:26 25 and maybe this is something we'll just have to deal with

12:41:29  1    piece by piece at the trial, is you're not suggesting that

12:41:32  2    you're going to be like someone is going to be on the stand

12:41:35  3    and you're like well, you read The Washington Post article;

12:41:38  4    right?

12:41:38  5         MR. LOWELL:  No, Your Honor.  Again, just to be

12:41:41  6    as clear as I can be, and it probably wasn't four sentences

12:41:44  7    ago, I'm not doing that.  But as I said, there could be a

12:41:49  8    particular communication which as -- not hearsay upon

12:41:54  9    hearsay upon hearsay, but even in the litigation that

12:41:58 10    occurred in which Mr. Mac Isaac is involved.  There have

12:42:03 11    been issues that there were changes to the data prior to it

12:42:07 12    getting in the hands of the government, that's all I can

12:42:09 13    say, when the government got what they got in December, then

12:42:13 14    they have a summary chart based on that, and we don't

12:42:16 15    disagree about that.

12:42:17 16         THE COURT:  I understand.  And all I'm saying is

12:42:20 17    I would just suggest that if you were going to say that

12:42:23 18    there were changes to the document based on admissions that

12:42:26 19    were given in a different case that the government doesn't

12:42:28 20    have access to, that you cannot suggest that changes that

12:42:33 21    were not the subject of admissions were made, right?  As

12:42:37 22    long as there is a foundation to what the changes were.

12:42:40 23         MR. HINES:  Your Honor, one point of

12:42:42 24    clarification I would like to add, too, if I may.  So the

12:42:45 25    summary chart, as Your Honor has read, summarizes stuff from

12:42:49 1    Apple.  John Paul Mac Isaac, has nothing to do with that

12:42:53 2    data for that production.

12:42:54 3              THE COURT:  I understood that.  And as I

12:42:56 4    understood, that's where the real contest comes in, not from

12:43:01 5    the iCloud, I guess unless the iCloud was backed up at some

12:43:05 6    time during April.

12:43:06 7              MR. HINES:  So it comes from two devices that

12:43:08 8    Hunter Biden had, his phone and his iPad, that were backed

12:43:12 9    up to Apple.  John Paul Mac Isaac never had custody of that

12:43:16 10   phone or the iPad at this store.  He had the laptop.  That

12:43:21 11   stuff that is on the summary chart has nothing to do with

12:43:25 12   what Mr. Lowell is alleging from The Washington Post.  What

12:43:29 13   we're using on the laptop are messages that will be

12:43:32 14   corroborated by a witness in this case who will testify that

12:43:36 15   she sent those messages and received those messages and then

12:43:39 16   a couple of other messages which we have noted on page 3 of

12:43:44 17   our reply.  Where there was other corroboration, for

12:43:48 18   example, a message that shows that he's in Wilmington,

12:43:50 19   Delaware and made an ATM withdraw, that shows that as well.

12:43:55 20   This isn't some vast array of messages from John Paul Mac

12:44:01 21   Isaac that the Defendant alleges without evidence that he

12:44:03 22   planted into his laptop.  To be clear, we've asked for

12:44:08 23   reciprocal discovery over and over again.  They made this

12:44:11 24   claim in the media that the laptop wasn't true.  We haven't

12:44:14 25   seen one scintilla, not one message that that isn't true

12:44:18  1    from the data that law enforcement turned over.  And they

12:44:21  2    can't raise that issue in any meaningful way at trial

12:44:25  3    because there is no evidence of it.  We want to make that

12:44:28  4    clear in our reply, the data coming in, and we don't believe

12:44:30  5    there is any basis for Mr. Lowell to make these kinds of--

12:44:34  6              THE COURT:  I understand, but do you disagree if

12:44:36  7    he wants to ask, look, he dropped off the laptop in April,

12:44:39  8    you got it in December, that he can ask that?

12:44:42  9              MR. HINES:  He can ask that timing question,

12:44:44 10    absolutely, Your Honor.

12:44:45 11              THE COURT:  All right.

12:44:45 12              MR. LOWELL:  And one more thing, Judge.  I think

12:44:47 13    there may be -- I have no quarrel with the point if they

12:44:51 14    have a witness that said I sent this or received this

12:44:54 15    message, of course that's fine.  It's just that it seems to

12:44:57 16    me their point was they wanted a broad stroke agreement or

12:45:01 17    stipulation that the data is all authentic as opposed to --

12:45:06 18              THE COURT:  And can be tied to Mr. Biden?

12:45:09 19              MR. LOWELL:  Yes.  And so I can't make that

12:45:11 20    because we know to the contrary.  I think your point about

12:45:14 21    there might be individual things to raise, if we find that,

12:45:17 22    we will, but I don't have a disagreement with what you and

12:45:20 23    Mr. Hines just said.

12:45:21 24              THE COURT:  Okay.  And I guess we can address

12:45:23 25    that to the extent it comes up in trial.  So as I understand

12:45:30  1  it, the government is asking for a ruling that the summary

12:45:35  2  of voluminous messages is appropriate under the Federal Rule

12:45:39  3  of Evidence 1006.  Defendant doesn't object to that.  So I

12:45:45  4  will allow this as a summary chart.  The government is

12:45:47  5  seeking to have this chart authenticated as of the date that

12:45:51  6  the government received the laptop into federal -- some

12:45:58  7  federal agent's custody.  The Defendant does not disagree

12:46:01  8  with that.  So I will grant the motion to the extent that is

12:46:04  9  what the motion is seeking.

12:46:06  10       With respect to whether particular messages on

12:46:11  11  there can be challenged, we will have to take that on a

12:46:14  12  case-by-case basis at the trial.

12:46:16  13       MR. HINES:  Your Honor, on point two that you

12:46:18  14  just read for your ruling, it's the laptop and the Apple

12:46:21  15  iCloud because the Apple iCloud came into the custody of law

12:46:25  16  enforcement independently of the laptop.  I wanted to make

12:46:29  17  sure that was our request as well.

12:46:31  18       THE COURT:  Thank you for that clarification.

12:46:32  19       MR. LOWELL:  One other thing as to what you

12:46:34  20  pointed out in terms of the book.  We raised the issue of

12:46:37  21  completeness for their 1006 chart, which we will also talk

12:46:41  22  to them about.

12:46:42  23       THE COURT:  If there is stuff that you want to

12:46:44  24  add.

12:46:44  25       MR. LOWELL:  If not, we will proffer our own

12:46:46  1    1006 if we can't agree.

12:46:48  2                THE COURT:  Okay.  All right.  Then we get to

12:46:59  3    Motion in Limine number 9 to admit certified ATF Form 4473,

12:47:04  4    and exclude evidence of the annotated version of Form 4473.

12:47:11  5                So, there are apparently two versions of the ATF

12:47:17  6    Form 4473, and that is the -- that's the form that anyone

12:47:22  7    who wants to buy a gun has to fill out, right?

12:47:26  8                MR. HINES:  There is a certified form, and then

12:47:28  9    there is a form that was turned in years later that was

12:47:30 10    annotated.

12:47:32 11                THE COURT:  Right.  I'm just saying ATF Form

12:47:36 12    4473 is something someone has to fill out if they want to

12:47:39 13    purchase a gun?

12:47:40 14                MR. HINES:  Correct.

12:47:41 15                THE COURT:  The original version of Form 4473

12:47:44 16    was e-mailed to the ATF on October 26, 2018, and the

12:47:49 17    annotated or, the Defendant would say, altered, annotated,

12:47:54 18    I'm not choosing a word here to favor anybody, I'm just

12:47:57 19    trying to distinguish the two forms, the second version of

12:48:01 20    the form is a physical copy of the form that was apparently

12:48:04 21    in the gun shop owner's files, and obtained from the gun

12:48:09 22    shop owner in September of 2021 when it was requested by ATF

12:48:14 23    in connection with an investigation.  Correct?

12:48:16 24                MR. HINES:  Correct.

12:48:17 25                THE COURT:  Okay.  So that second form

essentially was in the files, but nothing was done with it

or would have been done with it except for this

investigation?

MR. HINES:  Correct.

THE COURT:  Okay.  Now, the second version of

the form contained two markings not present on the original

certified version, one was the seller's transactional serial

number had been added to the top right-hand corner; and two,

and I think this is the one that's more contended in this

case, two, the words "DE Vehicle Registration" in all caps

were added to line 18B in the section which was to be filled

out by the sender.

The government seeks to admit the original

certified version of the form and exclude the second

version.  Specifically as to the second version, the

government argues the actions taken by employees of

StarQuest after the form was filled out by the Defendant do

not make any element of the charged offenses more or less

likely and are therefore not relevant and should be

excluded.

The government also argues that even if the

suggestion that the gun should never have been sold to the

Defendant because he did not present correct ID were

relevant, the probative value of that fact is substantially

outweighed by a danger of confusing the jury, and should be

12:49:43  1    excluded under Federal Rule of Evidence 403.

12:49:46  2            Now, Defendant does not dispute the

12:49:48  3    admissibility of the original form that was e-mailed to ATF,

12:49:52  4    so I will grant the motion that the original is admissible.

12:49:55  5            Now, as to the remainder of the motion,

12:49:58  6    Defendant argues that the second version of the form goes to

12:50:01  7    the credibility of gun shop employees who saw Defendant fill

12:50:05  8    out and sign the form.

12:50:07  9            So from the government, let me ask you, how are

12:50:11 10    you planning to prove that the Defendant filled out and

12:50:14 11    signed the form with the false statement that is at issue

12:50:18 12    here?  Are you calling witnesses from the gun shop?  Are you

12:50:21 13    calling someone to look at the handwriting?  What is it that

12:50:24 14    you're going to do?

12:50:26 15            MR. HINES:  There are a number of ways we will

12:50:28 16    prove it was him.  The witness we are calling will primarily

12:50:32 17    prove -- this is Gordon Cleveland.  He is the gun shop

12:50:36 18    salesman who showed Mr. Biden the firearm at his request

12:50:40 19    when he surveyed the store, picked out what he wanted, sold

12:50:43 20    him some other items, sat with him, or stood with him I

12:50:47 21    should say, in the store as he went through Section A,

12:50:50 22    writing his name, his address, all the other information

12:50:54 23    there, his height, weight, his date of birth, and then

12:50:57 24    watched him as he went through and checked the boxes on the

12:51:01 25    form, including the box that says, you know, are you an

12:51:05 1    unlawful user of, or addicted to any controlled substance,

12:51:08 2    and Mr. Biden checked no.

12:51:10 3            So Mr. Cleveland is the one that saw him in the

12:51:14 4    store that day and will testify to him filling out this

12:51:17 5    form.  The crime that's charged in Counts One and Two

12:51:21 6    related to this false statement --

12:51:22 7            THE COURT:  Don't get into the rest of the

12:51:24 8    argument, let's stick with my questions for now.

12:51:28 9            So you are planning to call Mr. Cleveland.  And

12:51:33 10   he is going to say I watched the Defendant fill out the

12:51:38 11   form.  I wrote down -- did he write down -- I noticed that

12:51:45 12   with Mr. Lowell's motion, he gave me a color copy of the

12:51:51 13   form, which was nice.  So is he going to be able to testify

12:51:58 14   who wrote stuff in red, blue, black, whatever?

12:52:01 15           MR. HINES:  Yes, he will.  He will testify that

12:52:03 16   Mr. Biden filled out Section A, which is the section that

12:52:06 17   can only be completed by the buyer.  And he will testify

12:52:09 18   that he signed the form.  You can see his signature on the

12:52:13 19   third page of the form.  And then he will testify that Jason

12:52:17 20   Turner filled out Section B of the form.  Jason Turner is

12:52:26 21   another employee of StarQuest.

12:52:28 22           THE COURT:  And who filled out -- oh, Section B.

12:52:34 23           MR. HINES:  Correct, Section B.

12:52:36 24           THE COURT:  It looks like the same person who

12:52:38 25   makes their zeros like that, but some are in black and some

12:52:41  1   are in red.

12:52:44  2            MR. HINES:  Correct.  Based on the information

12:52:46  3   the government has, he will testify that Mr. Turner

12:52:49  4   completed Section B of the form.

12:52:51  5            THE COURT:  Okay.  So are you calling anyone

12:52:56  6   else from the gun store?

12:52:58  7            MR. HINES:  No, Your Honor.

12:52:58  8            THE COURT:  And so the argument that I

12:53:03  9   understand from the Defendant is does the fact that you are

12:53:12 10   calling a witness from the gun shop who says I saw him check

12:53:20 11   the box and yet there was another subsequent form that had

12:53:29 12   changes made to it.  Does that put into question, well,

12:53:32 13   gosh, were other changes made such as, you know, I don't

12:53:37 14   know, adding his signature, adding his checks, doing

12:53:41 15   something like that?  Does that put his credibility into

12:53:44 16   play?

12:53:45 17            MR. HINES:  So two responses to that.  For one,

12:53:48 18   we have the benefit of the certified form sent in an e-mail

12:53:50 19   in October of 2018 knowing that there could have been no

12:53:54 20   changes after that date beyond the Delaware vehicle

12:53:58 21   registration that was annotated years later.  And nothing

12:54:00 22   was known at that time period.  Mr. Cleveland will testify

12:54:04 23   in this case that as to what was completed by Mr. Biden.

12:54:11 24   It's our understanding he has no knowledge what Mr. Palimere

12:54:14 25   did years later, and that's why we went and interviewed

12:54:18  1   Mr. Palimere and provided the Court with the 302 and defense

12:54:22  2   counsel with 302, because Mr. Palimere's account is it was

12:54:25  3   done at his direction by another employee.  Again, another

12:54:29  4   employee who is not testifying in this case.  And

12:54:32  5   Mr. Cleveland did not do that, and he explicitly said that.

12:54:36  6            THE COURT:  So then let me ask you, sir, respond

12:54:40  7   to that.  And then I have some other questions for how this

12:54:44  8   is going to work, because you have subpoenaed these other

12:54:47  9   folks?

12:54:48 10            MR. LOWELL:  Correct.

12:54:48 11            THE COURT:  Okay.  What I'm trying to understand

12:54:51 12   is if the government says Mr. Cleveland is the one who saw

12:54:55 13   this and the gun shop owner, Mr. Palimere.

12:55:01 14            MR. HINES:  Correct.

12:55:02 15            THE COURT:  The gun shop owner says I never saw

12:55:07 16   Mr. Biden do that, but I did write in that we had a

12:55:15 17   different form of ID than we did, and that was a lie, let's

12:55:19 18   assume he says that, but I don't know, we did write that in,

12:55:24 19   what is the relevance of that to the question as to whether

12:55:31 20   -- so Palimere had nothing to do with the form until --

12:55:35 21   assuming, until after -- you can tell me I'm wrong, until

12:55:39 22   after -- like let's say we have the form and Cleveland gets

12:55:44 23   up and he says this is all Mr. Biden.  This is all

12:55:50 24   Mr. Turner.  This is all me.  Then Palimere isn't -- he

12:55:57 25   didn't do anything with the form.  So what is the

12:55:59 1 relevance -- let's assume that he's the one who had the

12:56:03 2 other stuff added, what's the relevance of that to the

12:56:05 3 question of whether Mr. Biden checked the box and made a

12:56:08 4 false statement?

12:56:09 5       MR. LOWELL:  To start off with, Judge, Palimere

12:56:13 6 did have access and involvement with the form on the very

12:56:16 7 date in question, and the government didn't just say that.

12:56:18 8 Mr. Cleveland sees what Mr. Biden has in a form of ID.  He

12:56:24 9 walks -- and knows it's not a valid form of identification.

12:56:27 10 He includes Mr. Palimere right then.  He goes into the back

12:56:32 11 room and has a conversation with him.

12:56:34 12       THE COURT:  Wait, I get it, I get it --

12:56:34 13       MR. LOWELL:  And he brings the form in as well,

12:56:37 14 and the passport.  Mr. Palimere is involved on the day in

12:56:40 15 question.

12:56:41 16       THE COURT:  Right.  But here is my question.  So

12:56:45 17 you say in your reply that the second version is relevant to

12:56:49 18 the Count Two false statement.  And I apologize, I'm just

12:56:56 19 going to shortcut because I understand there is a difference

12:56:58 20 in factual -- like who was involved in the form.  You're

12:57:02 21 saying we think Mr. Palimere was involved in the form and

12:57:05 22 the government is saying no, Mr. Cleveland is going to say

12:57:09 23 he's not and you want to test that.  Okay.

12:57:11 24       So just so I understand the dispute here, it

12:57:14 25 doesn't seem like the question is whether Mr. Biden was at

12:57:17 1    the shop and bought the gun, it's the form that you're

12:57:20 2    concerned about, right?

12:57:21 3            MR. LOWELL:  Yes, which is for two reasons, one

12:57:24 4    of which we've already said.

12:57:26 5            THE COURT:  Is what you're suggesting that he

12:57:29 6    did not fill out the original form with his personal

12:57:31 7    information like his Social Security number, check the boxes

12:57:35 8    and sign it?

12:57:36 9            MR. LOWELL:  It's our view that we are allowed

12:57:38 10   to question Mr. Cleveland and Mr. Palimere as to whether or

12:57:41 11   not they are the ones who did something on the form,

12:57:44 12   including on the issue of the boxes.  I can't sit here and

12:57:47 13   tell you what Mr. Biden will say if he takes the stand.  I

12:57:51 14   can tell you that given what the documents have provided us

12:57:53 15   in discovery raises the question as you asked initially, who

12:57:58 16   wrote what on the form and when.

12:58:00 17           THE COURT:  So is there evidence that could

12:58:01 18   properly be in the record that suggests that Mr. Biden

12:58:05 19   didn't check the box, sign the form, fill it out, or is it a

12:58:12 20   credibility issue where you are questioning whether the

12:58:15 21   person who saw him do it is credible?

12:58:19 22           MR. LOWELL:  It is a little of both, but it's

12:58:22 23   mostly the second.  By that I mean, for example, you asked

12:58:26 24   about Count Two, Judge.  It is not the faxing of the form

12:58:30 25   that Mr. Biden is accused of in Count Two.  The Count Two

12:58:35 1    requirement is that a record -- a false statement is put on

12:58:39 2    a record which has to be kept by the gun store.  Has to be.

12:58:44 3    If there had not been the event on October 23rd, nothing of

12:58:48 4    that form would have ever been sent to the ATF.  It was only

12:58:51 5    when the gun was thrown out and it was recovered that that

12:58:54 6    was done.  The crime is to have a false statement on a form

12:58:57 7    that's kept by the store.

12:58:59 8          THE COURT:  For Count Two?

12:59:00 9          MR. LOWELL:  For Count Two, and so that makes,

12:59:03 10   for example, what happened to that form when law enforcement

12:59:06 11   gets it in 2021 at the core of that count to begin with,

12:59:09 12   because if it had been any other piece of evidence, had it

12:59:13 13   been you're supposed to keep the drugs, you're supposed to

12:59:15 14   keep the gun, you're supposed to keep something, and we now

12:59:19 15   know that they tampered with it in between, that's a very

12:59:22 16   germane and relevant area of inquiry.

12:59:25 17          As to the issue of credibility, because

12:59:28 18   Mr. Cleveland confers with Mr. Palimere on the day as to

12:59:33 19   what should be on the form and what shouldn't and whether

12:59:36 20   they can accept this or accept that, what they should tell

12:59:38 21   Mr. Biden, what they shouldn't tell Mr. Biden, that makes

12:59:42 22   Mr. Palimere a relevant witness and because he's a relevant

12:59:45 23   witness in talking to Mr. Cleveland.  What Mr. Palimere says

12:59:49 24   not just goes to what he was allowing to happen on the form,

12:59:53 25   which may or may not have been properly filled out that day,

12:59:56  1    but then Mr. Palimere's credibility.

12:59:58  2            And now that we know that neither the gun store,

13:00:01  3    Mr. Cleveland who accepted an ID that he shouldn't have

13:00:05  4    accepted, Mr. Palimere who alters the form years later, it

13:00:08  5    doesn't seem to have anything happen to them and they're

13:00:10  6    witnesses, that goes to bias.  The government is giving them

13:00:13  7    a break.

13:00:14  8            THE COURT:  Right.  But what is the bias?  Is

13:00:17  9    the bias that they -- I mean, what I'm trying to figure out

13:00:24 10    is are you saying that all this stuff with Social Security

13:00:30 11    numbers, height and weight, addresses, birth dates, and the

13:00:34 12    checks, was done by someone else?

13:00:38 13            MR. LOWELL:  The evidence will likely be that

13:00:42 14    handwriting in the top part is Mr. Biden's.  And then after

13:00:45 15    that, you won't be able to tell who puts a checkmark in a

13:00:50 16    box and who does the DE registration thereafter, unless they

13:00:55 17    testify and they say they do.  But Judge, you're

13:00:57 18    predetermining the ability -- I don't mean you're doing it,

13:01:01 19    you're asking it, and I'm saying I have the right to

13:01:04 20    question Mr. Cleveland and Mr. Palimere who is now in the

13:01:07 21    activity on what is going on in that form on the day it

13:01:10 22    happened.

13:01:10 23            THE COURT:  The reason I'm asking is because the

13:01:12 24    government's assertion that what matters is what was on --

13:01:20 25    what your client put on the form.  And that's what I'm

13:01:23  1  trying to understand so that I can -- let me just read

13:01:27  2  exactly what the government's position was because I'm

13:01:29  3  trying to evaluate that.

13:01:31  4       So the government's position was that actions

13:01:55  5  taken by employees after the form was filled out by the

13:02:01  6  Defendant do not make any element of the charged offenses

13:02:06  7  more or less likely, and are therefore not relevant.  And

13:02:11  8  I'm trying to understand, so you are saying, one, we don't

13:02:15  9  know if the actions that you're talking -- we don't know --

13:02:20 10  I mean, are you disputing that the actions were taken --

13:02:24 11  that took place, I mean, clearly the additions to the form

13:02:27 12  were done later because it wasn't on the e-mailed version,

13:02:31 13  right?

13:02:31 14       MR. LOWELL:  Yes.  And on the e-mail version,

13:02:33 15  the e-mail version doesn't get completed and sent to the

13:02:37 16  ATF.

13:02:37 17       THE COURT:  Normally.

13:02:38 18       MR. LOWELL:  And not that day, days later.  And

13:02:42 19  days later.  And so as I'm suggesting to Your Honor, the

13:02:46 20  fact that the government says that however many days later

13:02:50 21  when it was asked of the gun shop, they then faxed, and I

13:02:55 22  think it's fourteen days later, fourteen days later, it's

13:02:59 23  not contemporaneous, so raising what happens in those

13:03:04 24  fourteen days is part of the issue here because we now know

13:03:08 25  that Mr. Cleveland and Mr. Palimere had conversations on

13:03:11 1    that day.  They didn't send the form that day.  There is a

13:03:15 2    fourteen-day gap at the very least.  And now we know what

13:03:18 3    they have done later and it might reflect what they have

13:03:21 4    done in that fourteen days.  And the point is they're going

13:03:24 5    to take the stand and talk about it.  It seems to me that

13:03:26 6    that is the issue that is normally in any way that I can

13:03:30 7    imagine germane to both the subsequent count, their

13:03:33 8    credibility as to what happened on that day, their

13:03:36 9    credibility as to when and if they did what they did to the

13:03:39 10   form, and as I said, if they violated the rules, which

13:03:41 11   apparently they have done, whether or not they are or are

13:03:44 12   not subject when they take the stand, including

13:03:47 13   Mr. Cleveland, is something that goes to their bias.  If the

13:03:51 14   government authorities that regulate gun sales such as

13:03:55 15   Mr. Biden is charged with having violated with 922, the gun

13:03:59 16   shop owner violated 922, so consequently, that's subject for

13:04:05 17   examination.

13:04:05 18           MR. HINES:  That's a selective argument I'm

13:04:07 19   hearing there --

13:04:08 20           THE COURT:  I'm little concerned about selective

13:04:10 21   prosecution, but I understand it goes to bias.

13:04:13 22           MR. LOWELL:  I didn't mean selective, I'm sorry,

13:04:15 23   Judge, I am not suggesting that it's selective, that's not

13:04:19 24   the point, the point is, just the way they have given people

13:04:22 25   immunity, which they have, they gave Mr. Palimere a proffer

13:04:26  1    agreement last week after we were in your court on the

13:04:29  2    status conference.  And Mr. Hines said all these things

13:04:32  3    about why this is such a great piece of evidence because it

13:04:35  4    shows Mr. Biden gave two forms of identification.

13:04:38  5                    MR. HINES:  I didn't say that --

13:04:39  6                    MR. LOWELL:  I'm talking about the fact that if

13:04:41  7    the government gives a benefit to a witness that is subject

13:04:44  8    to examination.

13:04:45  9                    THE COURT:  Okay.  Let me ask you this.  You

13:04:47 10    mentioned two folks from the gun shop.  You have subpoenaed

13:04:52 11    them.  Presumably Mr. Cleveland if he comes to the stand,

13:04:56 12    you would just cross-examine him, right, and not call him

13:04:59 13    pursuant to subpoena?

13:05:00 14                    MR. LOWELL:  Yes, ma'am, if he's coming.

13:05:02 15                    THE COURT:  And then Mr. Palimere, if he didn't

13:05:04 16    show up, your plan would be to subpoena him?

13:05:07 17                    MR. LOWELL:  Yes.  We have had the Court issue a

13:05:10 18    subpoena for him at our request.  I don't know if he's been

13:05:13 19    served yet or not.

13:05:14 20                    THE COURT:  Okay.  You also -- there is like --

13:05:17 21    I didn't even look at them because the clerk's office deals

13:05:21 22    with subpoenas.  There are like four others.  Are any of

13:05:25 23    those other folks gun store people you're going to call?

13:05:28 24                    MR. LOWELL:  No, Your Honor.  There is

13:05:30 25    Mr. Palimere for the reason I said.  And Mr. Palimere has

13:05:34  1   implicated Mr. Turner who did Mr. Palimere's bidding on that

13:05:38  2   day and thereafter, those are the three gun shop employees.

13:05:43  3            MR. HINES:  Your Honor, while we're talking

13:05:44  4   about defense witnesses, because I think it highlights

13:05:47  5   exactly the nullification the defense is trying to inject in

13:05:51  6   this case.  We turned over in discovery messages that

13:05:54  7   Mr. Palimere had with other individuals, one person who is a

13:05:57  8   resident in Florida, another person is another gun owner

13:06:01  9   related type person, nothing to do with this case, and the

13:06:04 10   messages occurred in 2020 and thereafter when Mr. Palimere

13:06:10 11   was -- messages will speak for themselves, but my summary

13:06:14 12   is, you know, he was suggesting that nothing was done with

13:06:18 13   this event and otherwise should have, and that Mr. Biden was

13:06:21 14   receiving protection.

13:06:23 15            THE COURT:  You're saying they're going to

13:06:24 16   improperly try to say oh, this guy was, I don't know,

13:06:30 17   influenced by Russia or Republicans or somebody to say all

13:06:34 18   this?

13:06:34 19            MR. HINES:  Exactly.  They want to turn this

13:06:38 20   into a side show.  One is Michael Elward, and the other is

13:06:41 21   Michael Furia, literally not a percipient witness in this

13:06:47 22   case, it's from events in 2018.

13:06:48 23            THE COURT:  Are you going to move to quash those

13:06:50 24   subpoenas?  How does that work?

13:06:52 25            MR. HINES:  We just got them, and I saw in their

13:06:54 1    trial brief and what they said in response to our Motion in

13:06:57 2    Limine yesterday what I believe they're intending to call

13:07:00 3    these people for.  So I think all this underscores our

13:07:03 4    request is to keep it to the facts that matter --

13:07:07 5            THE COURT:  Right.  And I sort of understand

13:07:09 6    what you're saying with respect to some of these other

13:07:12 7    issues, and if you want to move to quash, and you have that

13:07:16 8    brief and let them respond, that's fine, I will address

13:07:19 9    that.

13:07:20 10           What I'm concerned about is, and so if we're

13:07:23 11   going to get out there with like -- with things that go far

13:07:27 12   afield and do fall into the prejudice, I can address those

13:07:31 13   and make a determination.

13:07:33 14           The issue that Mr. Lowell, though, is focused on

13:07:38 15   here is not -- is not, you know, crazy conspiracy theory,

13:07:43 16   it's you made a change.  The whole idea is did this man, who

13:07:48 17   you want to charge with a crime, X a box and make a false

13:07:53 18   statement.  And he's saying look, you have one guy who comes

13:07:57 19   in and says I saw him do it.  But why can't I question his

13:08:02 20   -- why can't I question his credibility and say well, did

13:08:07 21   you really see him do it?  And you knew that the passport

13:08:13 22   wasn't really going to cut it, and you asked about that.

13:08:17 23   Like, I don't know that any of that is really, you know -- I

13:08:28 24   don't know what a jury would think of any of that, but why

13:08:33 25   can't he just try and impeach the guy?

13:08:36  1          MR. HINES:  So he can certainly ask

13:08:38  2  Mr. Cleveland, the witness who sold him the gun and watched

13:08:42  3  him fill out Section A of the form, questions to see if

13:08:45  4  Mr. Cleveland is making it up that Mr. Biden actually filled

13:08:48  5  out that section of the form and making it up that somehow

13:08:51  6  --

13:08:51  7          THE COURT:  But also that goes more to Count

13:08:53  8  One.  What Mr. Lowell is talking about, though, is Count

13:08:57  9  Two, which is you lied on a form that someone was required

13:08:59 10  to keep.  And he's saying well, let's say -- I mean, you're

13:09:06 11  saying he lied on a form that someone else had no

13:09:09 12  compunction about making changes to without his knowledge,

13:09:13 13  and does that sort of undercut the claim?  I don't know.

13:09:17 14          MR. HINES:  Not at all.  Mr. Cleveland is the

13:09:20 15  salesperson who saw him fill out Section A.  What

13:09:23 16  Mr. Palimere, a person who was not involved in the actual

13:09:26 17  sale, did years later with respect to another section that's

13:09:29 18  supposed to be completed by firearms licensees only has no

13:09:34 19  relevance to whether Mr. Biden completed the crime in this

13:09:38 20  case in October of 2018, the crime was complete at the

13:09:42 21  moment he signed that certification.

13:09:44 22          THE COURT:  But the question is, what did that

13:09:45 23  certification say at that moment.  And I guess is it fair to

13:09:53 24  let him ask some questions about that?

13:09:59 25          MR. LOWELL:  Whenever it's appropriate, Judge.

13:10:02  1          MR. HINES:  I would just say that whether or not

13:10:04  2  Mr. Biden showed up with a Delaware vehicle registration for

13:10:08  3  the car that he showed up in has no bearing on the falsity

13:10:12  4  of his statement whether or not he was an unlawful user or

13:10:18  5  addict, there is no correlation whatsoever.

13:10:20  6          With respect to Mr. Cleveland when he testifies,

13:10:23  7  you can ask the types of questions, did Mr. Biden in fact

13:10:27  8  fill this out, did someone else do it, did you see it filled

13:10:31  9  out.  But to bring in evidence of a form that's created two

13:10:34 10  years later, annotated by someone unrelated, is not even in

13:10:38 11  the witness stand and ask Mr. Cleveland if that had some

13:10:42 12  bearing on what he saw that day is just hearsay and it's

13:10:45 13  irrelevant, it has nothing to do with what the charges are

13:10:49 14  in this case.

13:10:49 15          THE COURT:  Let me hear from you, Mr. Lowell.

13:10:52 16          MR. LOWELL:  I want to clear the brush.  There

13:10:55 17  is no attempt in any of this to create a claim of some vast

13:11:02 18  conspiracy that includes Russia, et cetera, no.

13:11:05 19          THE COURT:  I was trying not to -- I was

13:11:08 20  thinking of things you said in your papers when you said

13:11:11 21  this laptop was compromised in Russia or something, and so I

13:11:17 22  was trying not to make stuff up, I was trying to do

13:11:20 23  something that you had suggested, but not saying you were

13:11:23 24  going to put it in at trial.

13:11:25 25          MR. LOWELL:  All I want to add to whatever I

13:11:26  1    just said, I don't understand when special counsel says

13:11:33  2    something about it's hearsay, it's not hearsay depending on

13:11:36  3    whether or not Mr. Cleveland will say he said it or

13:11:39  4    Mr. Palimere will say he said it.  I can't address that.

13:11:42  5    What I can address, again, is Mr. Palimere was involved in

13:11:45  6    the issues on the day of the sale.  Mr. Palimere had the

13:11:48  7    form between the time of the sale and the time the events

13:11:51  8    occurred in which the form was sent on to the ATF.  That is

13:11:55  9    something that is not contested.

13:11:58 10         In addition to which, I understand the special

13:12:02 11    counsel's office can try to sanitize by, for example,

13:12:05 12    calling it annotated, but also sanitize by just calling

13:12:09 13    Mr. Cleveland knowing full well that Mr. Palimere had a very

13:12:13 14    important conversation with Mr. Cleveland on the day the gun

13:12:16 15    was bought that puts Mr. Palimere in the events of that day

13:12:19 16    concerning the elements of the crime, number one.

13:12:21 17         But also, Judge, they then go interview him, and

13:12:25 18    when they interview him after I raised this with Your Honor

13:12:29 19    and said this form is much more complicated than special

13:12:34 20    counsel indicates it is, two days later they interview him

13:12:37 21    and he gave them misinformation that day according to the

13:12:43 22    Form 302.  He says he was involved in 2021 because the press

13:12:47 23    was after him.  It turns out Mr. Palimere invited the press

13:12:51 24    to become involved in this case --

13:12:52 25         THE COURT:  I get it, you said some of that

13:12:54 1   stuff in your papers.  What I am going to do on this one is

13:12:57 2   I am going to withhold ruling and take this under

13:13:01 3   advisement.  I need to understand how this whole thing is

13:13:05 4   going to play out including with witnesses.  Are you calling

13:13:08 5   these people from Florida?

13:13:09 6           MR. LOWELL:  No, if Mr. Palimere -- I didn't

13:13:11 7   know that I was going to call -- well, I was thinking we

13:13:14 8   were going to call Mr. Palimere, I wasn't sure.  Now given

13:13:17 9   what he told the government, the witnesses will be the gun

13:13:20 10  shop owners, the gun shop seller, and none of the other

13:13:24 11  witnesses, and we will withdraw those two subpoenas based on

13:13:28 12  Mr. Palimere testifying so I can clear that up.  I didn't

13:13:33 13  know, Judge, until three days ago or whatever it was what

13:13:36 14  Mr. Palimere said, and Mr. Palimere directed the falsity to

13:13:40 15  be put on the form, I had no idea.

13:13:42 16          THE COURT:  Okay.  So I am going to take this

13:13:44 17  one under advertisement.  So he's withdrawn two of his

13:13:48 18  subpoenas.  If you have issues with any of the other

13:13:51 19  subpoenas that you want me to address before trial, file a

13:13:53 20  motion.

13:13:54 21          MR. HINES:  Thank you, Your Honor.

13:13:55 22          THE COURT:  Okay.  So those are the motions.

13:14:02 23  There is still a motion for an injunction outstanding.  I

13:14:05 24  know it's out there and briefing is underway and when I get

13:14:08 25  that briefing, I will address it.

13:14:10 1        MR. LOWELL:  I'm sorry, something else on the

13:14:12 2    MIL's before we pass them when you're ready.

13:14:15 3        THE COURT:  Sure.  I was just going to ask --

13:14:18 4        MR. LOWELL:  One the government said, two things

13:14:21 5    you said.  I want to be clear, your reference to the CFR, I

13:14:25 6    assume it will be for the full CFR you see in your papers

13:14:28 7    and the trial brief response?  There is language in there

13:14:31 8    what an addict is and what a user is.  The Court is going to

13:14:35 9    use the reg.  We ask that you use the entire reg, that's

13:14:38 10   one.

13:14:38 11       THE COURT:  Any objection?

13:14:39 12       MR. HINES:  Yes, Your Honor.  We wanted to

13:14:40 13   request that we use an instruction that's been blessed by

13:14:43 14   the Court, and specifically we're asking for the Eighth

13:14:46 15   Circuit model jury instruction.  We're not proceeding on the

13:14:49 16   theory of that first part, the person who uses a controlled

13:14:53 17   substance has lost the power of self control with reference

13:14:57 18   to the use of the controlled substance, someone grabbed a

13:15:00 19   gun and went and done something violent.  There is multiple

13:15:03 20   theories under that regulation under which the Defendant

13:15:05 21   could be considered --

13:15:07 22       THE COURT:  Is this a jury instruction fight?

13:15:08 23       MR. HINES:  Yes, this is a jury instruction

13:15:10 24   fight.

13:15:10 25       THE COURT:  Do I have to deal with a jury

13:15:12  1    instruction fight at the pretrial conference, or you're

13:15:15  2    saying I do because of all the evidence that they're going

13:15:18  3    to try to put in?

13:15:20  4         MR. HINES:  I think what -- why I think

13:15:22  5    Mr. Lowell is raising this now is because in opening, he may

13:15:25  6    address -- not citing instructions, I'm sure he won't do

13:15:31  7    that, but suggest that someone has lost the power of self

13:15:34  8    control, which is not in the Eighth Circuit model jury

13:15:38  9    instructions.  It's not accepted in *Turnbull* or all the

13:15:40 10    other cases that we've cited.  What they have honed in on

13:15:44 11    are portions of that regulation that are applicable here to

13:15:47 12    the Defendant, so we merely ask the Court use the exact

13:15:51 13    Eighth Circuit model jury instruction.

13:15:53 14         MR. LOWELL:  Judge, my response so far is just

13:15:56 15    this, I don't always agree with they say I am going to do

13:15:59 16    before I do it, I am not using that in opening statement.

13:16:03 17    But Your Honor basically said you were looking at the law,

13:16:06 18    you looked at the Third Circuit, you looked at the Third

13:16:09 19    Circuit made reference to the regulation.  The regulation is

13:16:11 20    the regulation in its entirety.  The Eighth Circuit is not

13:16:15 21    this circuit.  They want to pick part of that regulation

13:16:18 22    that suits them and exclude part of that regulation that

13:16:21 23    doesn't.  It will then be -- I don't know what evidence will

13:16:23 24    come in through them and their witnesses, but I'm just

13:16:26 25    asking the Court, if you are going to rely on the --

13:16:29  1          THE COURT:  You're asking me when I ruled, did I

13:16:33  2  mean to say the entire regulation is coming in.  I did not

13:16:36  3  address that issue.  I did not consider that issue, so I

13:16:39  4  cannot say yes to that issue, but I will take a look at that

13:16:42  5  issue.

13:16:42  6          MR. LOWELL:  So all we're asking is if that is

13:16:45  7  informing the Court or will inform the jury, the government

13:16:48  8  shouldn't be allowed to pick and choose what part of the

13:16:51  9  regulation they think works.

13:16:52 10          THE COURT:  Right.  I will take a look at it.

13:16:54 11  As I understand the government's position they want to pick

13:16:57 12  and choose the portions of the regulations that they're

13:16:59 13  actually relying on in order to prove guilt.  There is

13:17:03 14  probably lots of things that are in regulations that your

13:17:06 15  client didn't do and aren't relevant, because it doesn't

13:17:10 16  apply to what's actually being -- he's being accused of.

13:17:14 17          MR. LOWELL:  One more point on that is only

13:17:16 18  this, of course the government, we agree that's what's at

13:17:19 19  issue here, Defendant, Mr. Biden's knowingly and

13:17:22 20  intelligently state of mind when he says and does things,

13:17:25 21  and so if a regulation informs that, it could, I don't know

13:17:29 22  what all the evidence will be, but part of the evidence will

13:17:32 23  be that if you're going to hold him responsible to what part

13:17:35 24  of the regulation says, I don't mean you, but I don't know

13:17:39 25  what it's going to end up.  It seems to me there is a part

13:17:42  1    of that regulation that will conform to the evidence as to

13:17:46  2    what was happening to him, that becomes germane.  I

13:17:49  3    understand we're at a pretrial conference --

13:17:51  4              THE COURT:  I understand, but what I'm also

13:17:53  5    concerned about is instruction to the jury about what

13:17:55  6    regulations mean or what the law means which seems like it's

13:17:59  7    outside of the bounds of what lawyer argument addresses.  So

13:18:02  8    I will go back and look at the papers that I already have on

13:18:05  9    that issue because I was not appreciating that aspect of it,

13:18:09 10    and if I have more questions, I will let you know.

13:18:12 11              MR. LOWELL:  Thank you.

13:18:12 12              And the other thing I just wanted to point out

13:18:14 13    on Motion in Limine number 1 is what you had said in your

13:18:19 14    ruling on your constitutional challenge on the as applied

13:18:22 15    part, and you said when it becomes relevant, we can make

13:18:25 16    that.  And of course we don't know that until the evidence

13:18:28 17    comes in.  I didn't think you were saying I need to make the

13:18:31 18    motion before we get to a Rule 29 on the issue because as

13:18:35 19    applied, as Your Honor pinpointed out, can't occur until we

13:18:39 20    know the facts and this is a good example as to when use

13:18:41 21    occurred.  When in the law is it developing?  Is it

13:18:46 22    contemporaneous for somebody to be buying a gun and using?

13:18:50 23    Those are issues that you're grappling with, I know, in the

13:18:53 24    jury instruction as we have submitted them, and you are

13:18:55 25    looking at them, but that is -- I guess I'm trying to make

13:18:58  1    sure --

13:18:59  2             THE COURT:  You're making sure you didn't waive

13:19:01  3    an as applied challenge.

13:19:02  4             MR. LOWELL:  You said we had that right.

13:19:03  5             THE COURT:  A few words, I got it, that's what

13:19:06  6    you wanted.  And I have not made that determination that you

13:19:11  7    have waived it and, in fact, I think as we said in our

13:19:13  8    brief, in our opinion that --

13:19:17  9             MR. LOWELL:  You would entertain it --

13:19:20 10             THE COURT:  From what we saw it's usually fact

13:19:23 11    based.  But that doesn't mean you should be trying to elicit

13:19:26 12    facts to support that in front of the jury if they are not

13:19:28 13    relevant to other issues in front of the jury.

13:19:30 14             MR. LOWELL:  Right.  And I can say yes to that

13:19:33 15    easily.  But, for example, there is testimony that's going

13:19:36 16    to come in from their witnesses as to when, for example,

13:19:39 17    Mr. Biden was theoretically using what.  By definition that

13:19:44 18    will go to an issue of whether it was contemporaneous in

13:19:47 19    some fashion or not.

13:19:49 20             THE COURT:  I'm just saying if it's not relevant

13:19:51 21    to the issues that are here, then it doesn't come in.

13:19:55 22             MR. LOWELL:  I understand that.

13:19:56 23             THE COURT:  In front of the jury.  If it is

13:19:58 24    relevant to their issues, then --

13:20:00 25             MR. LOWELL:  Okay.  You'll have no problem with

13:20:03  1    me about that issue.

13:20:04  2              THE COURT:  Okay.  Anything else on motions in

13:20:06  3    limine?

13:20:07  4              MR. HINES:  No, Your Honor.  Thank you.

13:20:08  5              THE COURT:  Okay.  So some miscellaneous issues

13:20:11  6    and trial logistics.  So let me get an idea of the scope of

13:20:16  7    the trial.  The government list nine witnesses and

13:20:20  8    anticipates calling several other witnesses on its witness

13:20:23  9    list and may call those in case-in-chief or rebuttal.  Is

13:20:27 10    that still the plan?

13:20:28 11              MR. HINES:  Yes, Your Honor.  Per the Court's

13:20:30 12    order we brought a witness list today for the defense and

13:20:33 13    for Your Honor.  We have twelve witnesses listed on that

13:20:36 14    list, and it's possible, given that the parties have agreed

13:20:41 15    to stipulate that one issue, it might end up being eleven

13:20:45 16    witnesses or so.

13:20:46 17              THE COURT:  Okay.  Can we see that?  And these

13:20:48 18    are all live, we don't have depositions like I do in civil

13:20:52 19    trials?

13:20:53 20              MR. HINES:  Correct.

13:20:57 21              THE COURT:  We call them bedtime stories.

13:21:08 22              Okay.  And Defendant, Mr. Lowell, I understand

13:21:15 23    your case will -- what you do in your case may change

13:21:21 24    throughout trial.  Currently are you just thinking the gun

13:21:27 25    shop owner?

13:21:29  1          MR. LOWELL:  Judge, first of all, I just got

13:21:31  2   this and that's when we're supposed to get it, so I didn't

13:21:34  3   know.

13:21:35  4          THE COURT:  Okay.

13:21:36  5          MR. LOWELL:  I will say to you that our

13:21:37  6   witnesses -- I have no concept of if we're going to have a

13:21:42  7   case-in-chief, and I wouldn't.  As often the case the

13:21:46  8   Defendant doesn't have to have one.  So seeing this will

13:21:49  9   help me decide that.  If we have a case-in-chief, depending

13:21:54 10   on this list, and putting aside the possibility of Mr. Biden

13:21:57 11   testifying, we will have witnesses in that regard.

13:22:00 12   Partially it will depend on the decision you make on

13:22:03 13   experts, that will be two, given that Mr. Palimere has

13:22:07 14   admitted when I was trying to figure out when I was trying

13:22:10 15   to figure out what he has done, I don't need a handwriting

13:22:13 16   expert.

13:22:13 17          THE COURT:  That's helpful, one less thing for

13:22:15 18   me to decide.

13:22:16 19          MR. LOWELL:  But it kind of depends on what

13:22:19 20   happens with Mr. Palimere.

13:22:20 21          THE COURT:  I got it.  So Mr. Detweiler is the

13:22:23 22   one who may or may not be testifying?

13:22:28 23          MR. LOWELL:  And likely not.

13:22:29 24          THE COURT:  And then with respect to the

13:22:30 25   clinicians, you would only be calling one of those?

13:22:33  1        MR. LOWELL:  Correct.  It was a question of who

13:22:35  2  was available, so there would be one.

13:22:39  3        THE COURT:  And then you have the chemical

13:22:40  4  residue guy?

13:22:41  5        MR. LOWELL:  Yes.  And even that, Judge,

13:22:44  6  depending on whether or not --

13:22:45  7        THE COURT:  What happens in cross and stuff like

13:22:47  8  that.

13:22:47  9        MR. LOWELL:  Correct, that may or may not be

13:22:49 10  necessary.  And then in addition the other possible witness

13:22:53 11  is depending on what the list is, for example, from some on

13:22:56 12  the government's list could be people who had contact with

13:22:59 13  Mr. Biden in the period of time of what's going on in this

13:23:02 14  case, say from sometime in 2018 through the time of the

13:23:08 15  deposition as to what happened and what his state was and

13:23:11 16  what his state of mind was, but I can't say that yet.

13:23:14 17        THE COURT:  Okay.  So --

13:23:18 18        MR. LOWELL:  And I don't think that would be

13:23:21 19  more than two or three witnesses for that period of time.

13:23:24 20        THE COURT:  So what I'm trying to figure out,

13:23:26 21  and the reason I asked that is not because I want to pin you

13:23:30 22  down, but because we originally talked about this being a

13:23:32 23  three- to five-day trial, and when I ask questions from the

13:23:40 24  voir dire, I tell folks how long they are going to be here.

13:23:45 25  So --

13:23:52  1              MR. LOWELL:  Just on that, Judge, I wanted to

13:23:53  2  remind the Court and counsel for the government that I

13:23:56  3  didn't say -- I said the opposite, I said I don't know that

13:23:59  4  it will take, depending on how long voir dire is going to

13:24:02  5  be, whether the government's estimate is correct.

13:24:05  6              THE COURT:  I'm not holding you to it, I get it,

13:24:08  7  but I want to tell the jury something.  Right?  Because I

13:24:11  8  can't say you're going to be here for a month, that seems

13:24:15  9  unfair if nobody thinks they're going to be here for a

13:24:20 10  month, but I don't want to say they're going to be here for

13:24:23 11  two days if then there are going to be scheduling conflicts.

13:24:25 12  My question is what do you want me to tell them?

13:24:28 13              MR. LOWELL:  Can I consult with counsel for a

13:24:31 14  second?

13:24:32 15              THE COURT:  You may.

13:24:43 16              MR. LOWELL:  I think either way, Judge, I think

13:24:45 17  if you said to them without regard to selection, it will go

13:24:50 18  possibly two weeks, the first week and the second week.

13:24:53 19              THE COURT:  Without regard to --

13:24:55 20              MR. LOWELL:  From the moment testimony begins, I

13:24:57 21  believe there could be one, two, three, four, five, six,

13:25:00 22  seven or eight trial days.

13:25:02 23              THE COURT:  Okay.  I'm sorry about the math

13:25:06 24  here.  It's confusing me.  So let's assume the worst and

13:25:15 25  that the jury selection finishes on Wednesday, June 5th, you

13:25:20  1  want me to tell them they would need to be available until

13:25:24  2  June 19th, or you want me to tell them they would need to be

13:25:28  3  available until June 14th?

13:25:30  4          MR. LOWELL:  I have to do the math on that.  I

13:25:31  5  have to do the calendar.  3rd, 10th, 10, 11, 12, 13, 14.  I

13:25:38  6  can't predict.  I think you could for the purposes of jury

13:25:42  7  selection say this case should take between two and three

13:25:46  8  trial weeks, no later than the third week, so it would be

13:25:49  9  more like the 19th, not the 14th.

13:25:51 10          MR. HINES:  So if their case is three times as

13:25:53 11  long as ours, then it could take that long, but we have

13:25:57 12  twelve witnesses.  If we start on Wednesday, it is possible

13:26:00 13  we could go into Monday.  We think it's approximately three

13:26:03 14  days of case-in-chief for us.

13:26:05 15          THE COURT:  I get it.  And I understand.  I

13:26:08 16  think he's being conservative.  What I don't want to happen

13:26:14 17  is we lose jurors after they spend time dealing with this

13:26:19 18  issue and then they say you only told me two weeks and I'm

13:26:22 19  going on vacation next week.

13:26:24 20          MR. LOWELL:  I think the 14th is a very

13:26:26 21  reasonable projection, but that can --

13:26:29 22          THE COURT:  14th.  So we can say something like

13:26:32 23  through the 14th, but there is some chance it may go into

13:26:35 24  the following week, that you may be here the following week?

13:26:38 25          MR. LOWELL:  I think that's fair.  I don't think

13:26:40 1  our case will take twice or three times as long.  Again, you

13:26:43 2  have done this a long time, I have done this a bit of time,

13:26:47 3  people's projections about how long witness questioning

13:26:51 4  sometimes is wrong, but yes, I think you said it correct.

13:26:53 5          THE COURT:  Okay.  That is helpful.  Okay.

13:26:58 6          MR. HINES:  Your Honor, can I just ask, you're

13:27:01 7  sitting on Friday, correct, the Fridays of each week?

13:27:04 8          THE COURT:  We're a five day a week kind of

13:27:07 9  court.

13:27:07 10         MR. HINES:  Thanks, Your Honor.

13:27:09 11         THE COURT:  So in my civil trials, and in the

13:27:19 12 criminal trials that I have had to date, we have had the

13:27:25 13 parties provide to us electronic versions of all trial

13:27:30 14 exhibits that they know as of now that they intend to offer.

13:27:37 15         Is that something that you could get to us by

13:27:40 16 noon on Friday, May 31st?

13:27:43 17         MR. HINES:  I can get it to you today because

13:27:45 18 your order says that the parties shall exchange exhibit

13:27:48 19 lists and bring exhibits, so I have that for the Court

13:27:51 20 today.

13:27:51 21         THE COURT:  Even electronically?

13:27:53 22         MR. HINES:  Electronically, I have a USB drive

13:27:56 23 that our support team has put together.

13:27:58 24         THE COURT:  Mr. Lowell, are there exhibits that

13:28:00 25 you know -- I don't know, do you --

13:28:02  1            MR. HINES:  May I pass this up?

13:28:04  2            THE COURT:  You may.  Do you guys exchange

13:28:07  3    exhibits or not?  I don't know how it works.

13:28:09  4            MR. HINES:  Yes, your order said we should do

13:28:11  5    that today.

13:28:12  6            MR. LOWELL:  Yes, so the answer to Your Honor's

13:28:14  7    question is we will provide the government with our best

13:28:19  8    guess of what our case-in-chief exhibits might be and it's

13:28:22  9    not many, but of course we have no obligation to provide the

13:28:25 10    government with our cross-exam, so we will do that.  And we

13:28:28 11    can give the government that at the end of the day today and

13:28:32 12    provide it to the Court as well.  I don't know --

13:28:35 13            THE COURT:  That's fine, I only need it by next

13:28:37 14    Friday.

13:28:37 15            MR. LOWELL:  Well, you'll have it in plenty of

13:28:40 16    time.

13:28:40 17            THE COURT:  What I would ask, to the extent it's

13:28:42 18    feasible for the cross-examination stuff, we don't accept

13:28:46 19    paper copies of binders because I just wind up here behind a

13:28:50 20    mountain of binders.  Okay?  So what I typically do is I

13:28:54 21    just keep them, I have all of the exhibits, they're labeled

13:28:58 22    electronically, you know, PTX 1 through whatever, DTX 1

13:29:03 23    through whatever, if there is joint exhibits, JTX 1 through

13:29:07 24    whatever, however you want to call them, government's

13:29:09 25    exhibit, I don't care, but if I hit sort on my list they

13:29:15 1    come up in the way they do.

13:29:16 2              If you are going to have documents that you use

13:29:19 3    for cross, is there a way that you can submit possible

13:29:25 4    documents to us that you would use?  You don't have to give

13:29:28 5    them to the other side in advance, but could you give them

13:29:31 6    to us so that I have them, and then when a dispute comes up,

13:29:35 7    it just makes it more efficient for me to look at.

13:29:39 8              MR. LOWELL:  Just one minute.  Let me speak to

13:29:42 9    somebody who understands documents.

13:29:44 10             THE COURT:  I understand if there is something

13:29:45 11   random that comes up.

13:29:47 12             MR. LOWELL:  I'm sure we can do that, Your

13:29:50 13   Honor.  It may end up being that we can't give it to you all

13:29:54 14   in advance, but we would give it to you in advance of the

13:29:57 15   witness --

13:29:58 16             THE COURT:  That's what I was thinking, if we

13:30:00 17   know someone is going to be called on Monday, if you could

13:30:03 18   by Monday morning at 7:00 a.m. or something get them to us.

13:30:06 19             MR. LOWELL:  Or the night before.

13:30:08 20             THE COURT:  Or the night before get them to us

13:30:10 21   so we can have them loaded and it tends to make things go

13:30:14 22   more smoothly.

13:30:15 23             MR. LOWELL:  That I'm sure we can get it to the

13:30:17 24   Court with your understanding that we are giving them to

13:30:19 25   you.

13:30:20 1          MR. HINES:  Your Honor, on one exhibit with

13:30:21 2  respect to the audio book and the book, I want the Court to

13:30:25 3  know that our paralegal has snipped the audio portions to be

13:30:29 4  the portions we highlighted in the book for efficiency, we

13:30:34 5  can move, we don't have to spend a lot of time locating them

13:30:38 6  in large segments.  Your Honor left open the possibility

13:30:42 7  that the Defendant might raise completeness type questions.

13:30:46 8  If we were to accommodate that in our trial exhibit, that

13:30:51 9  takes some time so we would need to know that soon --

13:30:51 10         MR. LOWELL:  I think we can tell the government

13:30:53 11 what we think by the middle of next week for sure.

13:30:56 12         THE COURT:  If there is a dispute, it may be

13:30:58 13 that the completeness aspect is they can use it on cross,

13:31:02 14 but you guys can see if you can work that out.

13:31:04 15         MR. HINES:  Okay, Your Honor.

13:31:05 16         MR. LOWELL:  One other point that we put in our

13:31:07 17 paper, and I'll also explain whether the Motion in Limine

13:31:10 18 was talked about, I think irrelevant or self serving, we

13:31:15 19 will not be seeking statements of Mr. Biden unless it's out

13:31:18 20 of his own mouth if he were to take the stand for the truth

13:31:21 21 of the matter, but of course state of mind is relevant,

13:31:24 22 they're using it for both.  I think we will work with the

13:31:28 23 government to have completeness, but I wanted to point out

13:31:31 24 that there are other admissibility issues in terms of

13:31:35 25 whether or not an out-of-court statement by the Defendant is

13:31:38  1  admissible for another reason.

13:31:39  2          MR. HINES:  We have addressed that rule in our

13:31:40  3  reply.  It doesn't apply here because it's not then existing

13:31:45  4  --

13:31:45  5          THE COURT:  I would say that those types of

13:31:48  6  statements are not going to come in subject to my proviso

13:31:54  7  that if you think there is a reason that they should come

13:31:56  8  in, you should ask before you do it.

13:31:58  9          MR. LOWELL:  Yes, Judge, but again, just so

13:32:00 10  they're clear, I'm not suggesting that for what he wrote in

13:32:04 11  2021, I'm asking that there are statements he makes in 2018

13:32:09 12  right in the midst of the one they're using, so it's not an

13:32:14 13  after the fact, it's in the fact, that's the question.  I

13:32:17 14  think I understood him to say wait, you can't use his book

13:32:20 15  excerpts because it doesn't go to his state of mind at the

13:32:24 16  time.  Statements he made in the very same text that they're

13:32:27 17  raising could go to that issue.

13:32:29 18          THE COURT:  I don't know what you're talking

13:32:30 19  about and I don't rule on evidentiary exhibits in generic

13:32:34 20  general terms, so if there is something to that effect and

13:32:37 21  you want to use it, then I guess you should tell the

13:32:39 22  government and you guys can decide.  It might come up in

13:32:43 23  what they ask you to add to the chart, I don't know.

13:32:48 24          MR. LOWELL:  Exactly.

13:32:49 25          THE COURT:  And if there is a dispute on that --

13:32:51  1          MR. HINES:  We're happy to work with defense if

13:32:53  2     there is that completeness issue.  I don't think that rule

13:32:56  3     -- I'll talk with Mr. Lowell offline, but that rule doesn't

13:32:59  4     apply here, but we're happy to work with the defense.

13:33:02  5          THE COURT:  If you can't agree, then you can

13:33:05  6     raise it.

13:33:06  7          Okay.  Witness binders.  We do not accept

13:33:08  8     witness binders for my court reporter, my clerk, or me.  If

13:33:11  9     you want to give them to the witnesses, that's probably a

13:33:17 10     good idea.  If you do, I will tell you that like on

13:33:20 11     cross-examinations when people keep going up and back with

13:33:23 12     exhibits, juries despise that, especially with Covid.  They

13:33:26 13     feel like people are breathing on them unnecessarily.  So

13:33:30 14     you can do it however you're comfortable doing, but with

13:33:33 15     respect to like walking up and back with exhibits, juries

13:33:39 16     hate it.

13:33:39 17          MR. LOWELL:  I have a question.  I have not

13:33:41 18     appeared in this court before.  Usually these days exhibits

13:33:45 19     are presented electronically on the screen, et cetera.

13:33:49 20          THE COURT:  So the way I do it is the witness

13:33:53 21     has a book, and if you're trying to put an exhibit into

13:33:59 22     evidence, you need to get -- you need to offer the exhibit

13:34:03 23     into evidence before you can show it on the screen to the

13:34:07 24     jury.  So that's why I'm saying the witness has a book

13:34:10 25     because otherwise there is no way you can say to the

13:34:13  1    witness, what's DTX-25.

13:34:15  2                MR. LOWELL:  In other words, in this courtroom,

13:34:16  3    there is not the device by which the Court, counsel and a

13:34:20  4    witness will look at an exhibit to identify it before it's

13:34:24  5    published to the jury?

13:34:28  6                THE COURT:  No.

13:34:29  7                MR. LOWELL:  There is not that?  On

13:34:31  8    cross-examination, that's a challenge because I can't tell

13:34:34  9    in advance.  I don't want to give a witness, especially an

13:34:37 10    adverse witness a book of what he or she or they are going

13:34:41 11    to be cross-examined about before that happens so I can --

13:34:44 12                THE COURT:  Most of the time -- look, if you

13:34:47 13    want, just keep walking back and forth, but what usually

13:34:51 14    happens is right as the witness is about to be crossed, they

13:34:55 15    get a binder and it's not like they're going to be sitting

13:34:59 16    up there reading through everything because you're going to

13:35:02 17    start asking questions.  And then you ask them a question,

13:35:05 18    you say, do you recognize that, yes, I do, you know, that's

13:35:09 19    a form that you signed or whatever you're going to ask, and

13:35:12 20    then you say I offer that into evidence and then you put it

13:35:15 21    on the screen.  It's not --

13:35:17 22                MR. LOWELL:  I understand.  I am used to the

13:35:19 23    other way of doing it, but I have been in many courtrooms

13:35:22 24    that are different.  I will figure out a way to work within

13:35:24 25    this Court's ability and what you just said.

13:35:31  1          THE COURT:  I appreciate that.

13:35:33  2          If you know ahead of time that you have

13:35:35  3  objections to a witness or an exhibit that's going to be

13:35:37  4  offered, try to bring those to our attention in the morning

13:35:41  5  before the witness will testify.  Typically what I do is I

13:35:44  6  say like, if, for example, the government is going to call a

13:35:49  7  particular witness and you say we know they're going to use

13:35:52  8  an exhibit that we object to with that witness, I would try

13:35:56  9  to bring that to my attention in the morning.  Just, again,

13:35:59 10  to make the time that the jurors -- we are compelling

13:36:03 11  citizens of our state to come in here.  I try to make things

13:36:05 12  as efficient as possible so we use time when they're not

13:36:09 13  here to deal with objections.

13:36:11 14          MR. HINES:  Yes, Your Honor.

13:36:12 15          MR. LOWELL:  Yes, Your Honor.

13:36:13 16          THE COURT:  Okay.  So I ask if you can you do

13:36:16 17  that so we don't have to just have them sitting over there

13:36:20 18  doing nothing while we fight about -- you guys fight about

13:36:23 19  what is going to come in or not.

13:36:26 20          We already talked about the days for trial.

13:36:31 21  Trial will start on Monday, June 3rd.  Jury selection will

13:36:36 22  take place that morning and will proceed as discussed during

13:36:41 23  the May 14th status conference.  Recall we are bringing up

13:36:44 24  to 250 citizens in five waves of fifty starting the morning

13:36:49 25  of June 3rd.  The second wave -- so the first wave I think

13:36:52  1    is supposed to report at 7:30 with the idea that we would

13:36:58  2    start the process around 8:30, to the extent that we can.

13:37:02  3            The second one will come that day at noon.  And

13:37:08  4    then Tuesday at 8:30, Wednesday at noon -- I'm sorry,

13:37:14  5    Tuesday at 8:30 and 12:00, and Wednesday at 8:30.  And I am

13:37:21  6    anticipating presentation of evidence to begin right after

13:37:22  7    the jury is seated unless we finish jury selection at the

13:37:25  8    end of the day.

13:37:26  9            Any issue with that?

13:37:28 10            MR. HINES:  No, Your Honor.

13:37:29 11            MR. LOWELL:  No, Your Honor.

13:37:29 12            THE COURT:  All right.  We will plan then on

13:37:32 13    subsequent trial days we start at 9:00 a.m., and you should

13:37:36 14    be prepared to present evidence to the jury until at least

13:37:39 15    4:30.  Sometimes juries like to go a little bit longer.

13:37:42 16    We'll go at least to 4:30, or if you can finish up a witness

13:37:46 17    in the next fifteen minutes, we can go to 4:45, that's

13:37:51 18    flexible, but at least 4:30.  We do a fifteen-minute break

13:37:55 19    in the morning and one in the afternoon.

13:37:56 20            All right.  Voir dire --

13:37:58 21            MR. LOWELL:  Before you get there, Judge, again,

13:38:01 22    I don't know, how long do you give the jurors and personnel

13:38:04 23    for lunch?

13:38:04 24            THE COURT:  That was actually a good question.

13:38:07 25    Lunch, we typically give them about an hour.  And we tend to

13:38:11 1   bring in lunch because if we let them go out for lunch, then

13:38:14 2   it takes extra time because they have to get back in through

13:38:18 3   security.  We will do an hour.  If it turns out that we need

13:38:21 4   to give them more time because there are issues, we can

13:38:24 5   address that, but that's my plan.

13:38:26 6          Voir dire.  I described some of this at the

13:38:30 7   May 14th status conference and I will explain the process in

13:38:33 8   more detail now.

13:38:34 9          Prospective jurors when they come in, they would

13:38:38 10  be randomized when they arrive and assigned a number 1

13:38:42 11  through 50 for each wave.  25 will sit in the back over

13:38:46 12  here, and 25 will sit in the back on the other side.  Each

13:38:50 13  juror will wear a number.  And each juror will be provided

13:38:53 14  with a sheet that includes the voir dire questions and a pen

13:38:57 15  or pencil so that each may keep track of any yes answers on

13:39:01 16  their own when I read the questions aloud.

13:39:04 17         The jury will then move to Courtroom 4B next

13:39:08 18  door, and we will bring in one juror at a time through this

13:39:13 19  door over here if they have answered yes to any questions so

13:39:17 20  that we can conduct further questioning.

13:39:19 21         If the juror did not answer yes to any question,

13:39:22 22  they will automatically be in the pool of thirty-two and

13:39:25 23  subject to preemptory strikes.  Those people will remain in

13:39:29 24  4B until we're ready for preemptories, or they are told to

13:39:32 25  come back because we need more time to finish selecting the

13:39:36  1    jury.

13:39:37  2         So with respect to the voir dire, we're going to

13:39:42  3    give you our thoughts on the proposed voir dire.  In

13:39:46  4    general, I think I'm going to ask the questions that you

13:39:48  5    asked me to do so, but what I am planning to do is you have

13:39:53  6    questions on there that are not yes/no questions, and

13:39:57  7    they're sort of subquestions.  If you answered yes to a

13:40:00  8    question, there is a subquestion.

13:40:01  9         My plan would be to just ask the yes or no

13:40:05 10    question with those other questions being asked in follow-up

13:40:08 11    when the jurors come in.  So I don't even -- let me see if I

13:40:17 12    have an example.

13:40:18 13         Okay.  Proposed question.  "Have any of you

13:40:24 14    heard or read anything about this case or the underlying

13:40:27 15    investigation from the news, social media, or any other

13:40:30 16    source?"  That would be my question.  To the extent that

13:40:32 17    someone answered yes to that question when they came in, we

13:40:37 18    would ask them about what they heard.  We would ask what

13:40:40 19    news outlet, internet site, or social media source generally

13:40:48 20    speaking, where do you get your news, those would be

13:40:50 21    questions that you all could appropriately ask if you all

13:40:54 22    wanted to, but I wouldn't ask them in the general voir dire.

13:40:58 23         Thoughts?

13:40:59 24         MR. HINES:  That's fine with us.

13:41:01 25         MR. LOWELL:  I think that's fine, also, Your

13:41:03 1   Honor.

13:41:03 2            THE COURT:  Okay.  And then as I just said,

13:41:07 3   those are questions you could ask.  If you want me, I can

13:41:10 4   ask those subsets and you can follow-up.  My plan would be

13:41:14 5   to allow -- I usually welcome the jury in and ask them what

13:41:20 6   they answered yes to and ask them some standard, some

13:41:24 7   introductory questions and then allow the attorneys to ask

13:41:28 8   any further follow-up.

13:41:29 9            I am planning to do that here, but as I tell

13:41:32 10  people in all my cases, if it's abused and it starts

13:41:36 11  dragging on too long and things, questions become prying,

13:41:41 12  then I will stop that and the Third Circuit allows me to

13:41:45 13  just ask the questions subject to the Federal Rules.  So I

13:41:50 14  don't think that's going to be an issue, but I always tell

13:41:52 15  people that so that they're not surprised if I were to take

13:41:56 16  off the ability.

13:42:02 17           Prospective jurors who are questioned but not

13:42:07 18  excused for cause, we're going to bring them in.  We have

13:42:10 19  Juror Number 1 comes in, ask questions, there is no motion

13:42:13 20  to strike for cause, that person would go back into the

13:42:16 21  courtroom and stay.  And we will keep doing that until we

13:42:20 22  have thirty-two prospective jurors upon which to exercise

13:42:24 23  preemptories.

13:42:25 24           Now, if it turns out that we get, you know,

13:42:31 25  twenty-five jurors from the morning fifty, I'll probably

13:42:36 1   have them stick around or maybe tell them -- anyone who

13:42:40 2   hasn't been stricken to come back Tuesday morning.  But if

13:42:45 3   we are able to get thirty-two on Monday, that would be

13:42:51 4   great, they could just -- we would just start immediately.

13:42:53 5   If we can't get thirty-two until Tuesday or Wednesday, then

13:42:57 6   we'll just have anyone who hasn't been stricken told to

13:43:02 7   report back at some time.

13:43:03 8          MR. LOWELL:  May I ask one question on that,

13:43:05 9   Judge?  Maybe I didn't understand.  I don't know that you

13:43:07 10  have ever said, there will be four alternates?

13:43:10 11         THE COURT:  So we were thinking two.  I was

13:43:15 12  thinking fourteen jurors, but if you want --

13:43:20 13         MR. HINES:  We would agree that four alternates,

13:43:22 14  if they can fit would be appropriate in this case just in

13:43:25 15  the event there is an issue.

13:43:27 16         MR. LOWELL:  I just didn't know.  And depending

13:43:29 17  on the number, the question then becomes the number of

13:43:32 18  preemptories, I guess generally it would be ten and six?

13:43:35 19         THE COURT:  So it's ten and six.

13:43:37 20         MR. LOWELL:  And I assume two?

13:43:38 21         THE COURT:  And each get one for the alternates,

13:43:41 22  so when I have a jury of fourteen, I do ten and six and one

13:43:44 23  for the alternates.  I guess here, what would we do, ten and

13:43:49 24  six?

13:43:49 25         MR. LOWELL:  Two and two --

13:43:50  1          THE COURT:  And then two and two.  So then we

13:43:53  2   would need more than thirty-two.

13:43:56  3          MR. LOWELL:  Which is why I asked.  I wasn't

13:43:59  4   sure.

13:43:59  5          THE COURT:  We would need thirty-six?  Okay.  So

13:44:03  6   we keep going until we get to thirty-six.

13:44:07  7          And Mark, will you figure out what we're going

13:44:10  8   to do with the jurors?

13:44:11  9          MR. LOWELL:  Also, I'm sorry to keep asking

13:44:13 10   questions, but may I ask one more?

13:44:15 11          THE COURT:  The reason you're here is to ask the

13:44:17 12   questions.

13:44:17 13          MR. LOWELL:  Does the Court inform the

13:44:19 14   alternates of who they are or don't?

13:44:22 15          THE COURT:  Yes.

13:44:23 16          MR. LOWELL:  Thank you.

13:44:24 17          THE COURT:  Do you have a preference?

13:44:26 18          MR. LOWELL:  That is my preference for obvious

13:44:29 19   reasons.

13:44:29 20          THE COURT:  Okay.  So once we have thirty-six

13:44:37 21   jurors, we'll do preemptory strikes.  And usually what we do

13:44:42 22   is we have the jurors sit in the back when you're doing the

13:44:45 23   strikes.  But they will have their numbers on so you can see

13:44:48 24   them.  We generally set them up in numbered order, so if you

13:44:52 25   want to look at, oh, wait, who is number 6, you can see who

13:44:57  1    number 6 is.

13:44:57  2            MR. LOWELL:  And then on the preemptory strikes,

13:45:01  3    I take it alternating?

13:45:02  4            THE COURT:  Yes.  Typically what we do is there

13:45:04  5    is a clipboard that will list thirty-six jurors, my deputy

13:45:10  6    will have a clipboard and he'll walk it back and forth

13:45:13  7    between the counsel tables.  The first twelve jurors on the

13:45:16  8    list after preemptories will be the deliberating, and the

13:45:19  9    final four will be the alternates.

13:45:23 10            I think usually, am I right, Mark, does the

13:45:28 11    Defendant, you do two strikes, one strike?

13:45:31 12            MR. LOWELL:  I think, we figure out the math,

13:45:33 13    because it's ten/six, it would be two, and then whatever,

13:45:37 14    but then at some point it's one and one.

13:45:39 15            THE COURT:  Exactly.  Exactly.  A lot of math.

13:45:46 16            All right.  As I said, we're reviewing the

13:45:49 17    proposed voir dire and preliminary jury instructions.  We'll

13:45:53 18    get you edits next week.  I already talked to you about the

13:45:57 19    open-ended questions.

13:45:58 20            MR. HINES:  I'm sorry to interrupt.  Just before

13:46:00 21    we leave jury selection, is it the Court's practice that the

13:46:03 22    parties will receive juror lists in advance and if so,

13:46:07 23    approximately when would we receive those?

13:46:09 24            THE COURT:  I think it's Thursday.  Is that

13:46:11 25    right, Mark?  Thursday.

13:46:13  1          MR. LOWELL:  Thank you.  And I think what I read

13:46:15  2   is that that gives you some basic information about their

13:46:19  3   name and where they are and their occupation?

13:46:22  4          THE COURT:  I think it's their name, maybe the

13:46:24  5   town they live in or their Zip code, their profession, and

13:46:29  6   their level of education.

13:46:32  7          MR. LOWELL:  I think that's right.  And the

13:46:34  8   reason I'm asking, among other reasons is given the close

13:46:37  9   community of Delaware knowing where they worked or even

13:46:40 10   where they were educated would be a follow-up question if

13:46:43 11   they know the Defendant or his family as an example.  So we

13:46:47 12   can get that you said in the middle of the week, that's

13:46:49 13   helpful.

13:46:50 14          THE COURT:  You're not getting their education

13:46:51 15   in the middle of the week, because I don't have that.

13:46:55 16          MR. LOWELL:  I mean where they went to school.

13:46:57 17          THE COURT:  I don't have that.  So I don't have

13:46:58 18   it, that means you're not going to get it until the jurors

13:47:01 19   are here.

13:47:02 20          MR. LOWELL:  Okay.

13:47:02 21          THE COURT:  When I said education, I meant

13:47:04 22   level.  So it will say like high school, two years of

13:47:07 23   college, college, post college.

13:47:15 24          MR. LOWELL:  I understand.

13:47:16 25          THE COURT:  Okay.  Government, you are

13:47:18  1  responsible for bringing enough pens or pencils and enough

13:47:21  2  copies of the voir dire for the prospective jurors, about

13:47:24  3  250 people.  If possible have those delivered to the clerk's

13:47:28  4  office by noon on Friday the 31st.

13:47:31  5       Side-bars.  So I don't know if anyone has any

13:47:36  6  preference on this.  We can do -- we can do a side-bar over

13:47:42  7  here.  Sometimes -- it doesn't look like there is that many

13:47:47  8  people here, but sometimes when it gets really crowded over

13:47:50  9  here, we just walk out into the hall.  I don't know how that

13:47:53 10  works with like security details and stuff like that, but

13:47:56 11  does anyone have any thoughts on side-bars?  How many people

13:48:00 12  do you think would be coming up to argue things?

13:48:04 13       MR. HINES:  For the government, just Mr. Wise

13:48:06 14  and I will be going up to side-bar.  And I take it in this

13:48:11 15  Court there is not a lavaliere mic or something that the

13:48:14 16  Defendant listens to what's going on at side-bar, we would

13:48:17 17  have concern if he came up to side-bar if that is a practice

13:48:20 18  as well as two counsel of their choosing.

13:48:25 19       MR. LOWELL:  I think if we had a side-bar, it

13:48:27 20  would be myself, possibly another counsel and, of course,

13:48:29 21  Mr. Biden has a right to be there.  Depending on what it is,

13:48:34 22  he might or might not.  It wouldn't be more than those

13:48:38 23  three.  We don't have a husher or something that makes a

13:48:41 24  background noise so no one can hear?

13:48:43 25       THE COURT:  We have that.  We can make the

13:48:45  1    noise.

13:48:45  2                MR. LOWELL:  So it's not a question of the

13:48:47  3    noise.

13:48:47  4                THE COURT:  It was a question of sometimes when

13:48:49  5    we have defendants that we don't want wandering around the

13:48:53  6    courtroom, or that are not free to wander around the

13:48:59  7    courtroom, we don't want to make that obvious, so we have a

13:49:02  8    headset for them.

13:49:04  9                MR. LOWELL:  I see what you're saying.

13:49:05 10    Obviously it's not an issue here.  It would be no more than

13:49:09 11    three of us and two of them.  That should be accommodated

13:49:12 12    over there.  If there is a reason for going into the

13:49:15 13    hallway, we'll work that out.

13:49:18 14                THE COURT:  Okay.  Court closing.  Closing the

13:49:20 15    court.  I am disinclined to close the courtroom.  And the

13:49:24 16    Third Circuit has a high standard to meet for sealing the

13:49:26 17    courtroom.  Anyone anticipate asking to close the courtroom?

13:49:30 18                MR. HINES:  No, Your Honor.

13:49:31 19                MR. LOWELL:  No, Your Honor.

13:49:31 20                THE COURT:  Good.  If anyone ask or that

13:49:33 21    changes, you have to ask in advance so we can get a ruling

13:49:36 22    on it.  But as I said, the Third Circuit standard is pretty

13:49:41 23    high.  It's kind of -- it's very difficult to meet.

13:49:45 24                Okay.  I know, a question, so it looks like --

13:49:52 25    we're probably going to have room in the courtroom, but I

13:49:55  1  was asked whether you or your team wants us to reserve the

13:49:59  2  front row for you, the front row in the back, so you can put

13:50:07  3  documents and stuff there.  Do you want the front row?

13:50:09  4        MR. LOWELL:  I'm sorry, I'm just confused.  We

13:50:13  5  can put our documents to the extent in front of the bar, I

13:50:17  6  think, if that's what you're asking.  You're not asking

13:50:20  7  whether there should be reserved seats for the defense team?

13:50:23  8        THE COURT:  Yes, that's what I'm asking.  Would

13:50:25  9  you like me to do that?

13:50:28 10        MR. LOWELL:  We would like part of a row and we

13:50:30 11  have to talk to our security folks as well.

13:50:32 12        THE COURT:  Do you guys care?

13:50:35 13        MR. HINES:  If they have a row?  No.  We would

13:50:37 14  like a row as well.

13:50:38 15        THE COURT:  To put documents and stuff.  Usually

13:50:40 16  what happens is folks hide their documents back there and

13:50:43 17  they have people hand them to them, because that row is

13:50:47 18  wider.

13:50:47 19        MR. LOWELL:  That works fine.

13:50:48 20        THE COURT:  So we will reserve the front row for

13:50:51 21  each side.  If you need access to the courtroom --

13:51:01 22        MR. LOWELL:  To the extent that we're going to

13:51:03 23  display documents, publish them after, I was trying to

13:51:06 24  figure out, we would set our person who will do that at our

13:51:12 25  table and plug it in that way, is that how it works?

13:51:15  1          THE COURT:  Sure.  However you want to do it.  I

13:51:17  2     don't actually know.  I always had people who did it when I

13:51:20  3     was a lawyer and now I don't even see the people who do it.

13:51:24  4     Sure.  Whoever you want.  Usually what happens is there is

13:51:28  5     some kind of trial setup and they either get into our system

13:51:31  6     and they can show it up there and it shows on the TVs in

13:51:35  7     front of you and the TV up here, and I have a TV down here,

13:51:38  8     or you can just put it on the Elmo and it goes to all those

13:51:42  9     places as well.

13:51:44 10          MR. LOWELL:  I think ours is not an Elmo, in

13:51:46 11     case somebody came up, it would be prepared in advance.  And

13:51:50 12     the jury doesn't have any monitors in the box, they only

13:51:52 13     have that?

13:51:53 14          THE COURT:  Yes.

13:51:54 15          MR. LOWELL:  All right.

13:51:55 16          THE COURT:  Any questions from you on that?

13:51:56 17          MR. HINES:  No, Your Honor.

13:52:02 18          MR. LOWELL:  I have some other questions when

13:52:03 19     you're done.

13:52:04 20          THE COURT:  All right.  If you all need access

13:52:06 21     to the courtroom to set up for trial, you may do so on

13:52:10 22     Friday, May 31st, starting at 3:00 p.m. Coordinate with my

13:52:14 23     staff, either Ms. Smith or Mr. Buckson.  And that is all

13:52:18 24     that I had.

13:52:21 25          MR. LOWELL:  One last question.  I don't know if

13:52:27  1   counsel, special counsel has their offices here or near by.

13:52:32  2   Could we have access to someplace as well in the courthouse

13:52:36  3   for the things like breaks and lunch, is that something we

13:52:40  4   can have?

13:52:40  5           THE COURT:  Sure.  The clerk's office, there are

13:52:43  6   attorney conference rooms.  If you walk out the door, there

13:52:46  7   is one on that side and one on that side.  You can go in the

13:52:50  8   clerk's office there and reserve them.  I don't know that --

13:52:53  9   I mean, sometimes when there is lots of trials going on, we

13:52:57 10   often have many, many trials going on and it's hard to get

13:53:00 11   those, but my guess is that you can get them and if you have

13:53:04 12   a problem with that, then why don't you ask the clerk's

13:53:09 13   office to make some arrangements because I understand you

13:53:14 14   wouldn't want to just be sitting out in the hall.

13:53:16 15           MR. LOWELL:  Right, I will do that.  I assume we

13:53:19 16   hopefully will get that one.

13:53:20 17           THE COURT:  If you can't get that one, just ask

13:53:22 18   the clerk's office what they can do.

13:53:24 19           MR. LOWELL:  And then the question, I'll ask

13:53:27 20   whether we can keep materials there, you wouldn't be doing

13:53:31 21   other things so we can keep materials in the courtroom over

13:53:34 22   night?

13:53:34 23           THE COURT:  We lock the courtroom overnight as

13:53:36 24   soon as everyone leaves.  Mr. Buckson will lock the

13:53:40 25   courtroom and it will remain untouched overnight, so that's

13:53:43  1    fine.  I don't know about the attorney conference rooms.

13:53:46  2    You would have to ask the clerk's office.  So usually what

13:53:49  3    happens, you get the key in the morning and you give the key

13:53:52  4    back in the afternoon, but I don't really know how that

13:53:56  5    works.

13:53:57  6              Anything else?

13:53:57  7              MR. HINES:  No, Your Honor.

13:53:59  8              MR. LOWELL:  One issue, Judge, that -- two more,

13:54:02  9    maybe I have to deal with it or somebody else, in terms of

13:54:05 10    the jury when it is picked, it was our preference that like

13:54:10 11    we do it the way they do it, they show up and they come into

13:54:13 12    the courthouse the way they have.  There is some issue as to

13:54:18 13    whether they should be transported from another location.  I

13:54:21 14    would prefer that their lives stay as normal as possible.

13:54:23 15              MR. HINES:  So on Wednesday, I asked for

13:54:26 16    counsel's position on this, and they hadn't given it back to

13:54:29 17    me so I didn't raise this.  But we requested what's referred

13:54:33 18    to as a Jury Transportation and Management order.  I

13:54:36 19    proposed it to counsel and wanted to get their position

13:54:39 20    before I proposed it to the Court.  It is sort of a standard

13:54:41 21    order that the marshals use in certain cases that allows

13:54:45 22    them to provide essentially transportation from the

13:54:48 23    courthouse to an offsite parking lot so the jurors can park

13:54:53 24    there.  The location is not disclosed and then they can get

13:54:57 25    into the courthouse without sort of people, you know,

13:55:03  1    inundating them on the courthouse steps.  That was a

13:55:05  2    consideration that we were going to ask the Court to

13:55:08  3    consider in this case.  It's a standard order that the

13:55:12  4    marshals use.  I'm happy to provide it, but I was first

13:55:14  5    waiting to see if defense counsel had a position on it.

13:55:17  6            THE COURT:  If you want to make that motion,

13:55:19  7    I'll certainly take a look at it.  The one thing that you

13:55:23  8    said about making their lives, or changing their lives less,

13:55:29  9    as little as you possibly can is parking is a real problem

13:55:33 10    around here, so when you said they could park someplace

13:55:37 11    else, my guess is the jurors would be thrilled with that.

13:55:40 12    But anyway's, what is your position on that?

13:55:42 13            MR. LOWELL:  My position is I trust to follow

13:55:44 14    your instructions not to talk to anybody and I trust Your

13:55:47 15    Honor is going to tell the media to leave them alone and I

13:55:50 16    think that's what we need to do.

13:55:52 17            MR. HINES:  Our primary concern is people

13:55:54 18    following the jurors as they leave the building, and I'll

13:55:57 19    leave it at that.  But one way to mitigate against any

13:56:02 20    concerns there is that they are dropped at an offsite

13:56:07 21    location that no one knows about and they don't get followed

13:56:12 22    home directly from the courthouse.

13:56:13 23            MR. LOWELL:  We live in a strange and sometimes

13:56:16 24    not a particularly good world, but I don't know how real

13:56:18 25    that threat is.  But I would say that anything that makes

13:56:22  1    them feel that there is something more going on in their

13:56:26  2    lives than is necessary can affect them in ways that we

13:56:30  3    don't even know about in a case and I would prefer that not

13:56:33  4    to happen if at all possible.

13:56:35  5              THE COURT:  Why don't you submit whatever you

13:56:38  6    want to submit to me and I'll think about it.  I don't think

13:56:43  7    we need to deal with anything until we -- we certainly don't

13:56:50  8    need to deal with it today, though I understand the marshals

13:56:54  9    will probably need some time to prepare.

13:56:56 10              MR. HINES:  Yes, Your Honor.  As far as the

13:56:58 11    submission, I intend to provide it in the e-mail to the

13:57:01 12    Court, copy in the counsel.  I notice in the J 6 case in the

13:57:05 13    District of Columbia, those orders were docketed on the

13:57:08 14    docket and they were directed to the marshal.  I'll submit

13:57:11 15    it in an e-mail to Your Honor with copies to the defense

13:57:16 16    counsel.

13:57:16 17              THE COURT:  That would be fine.

13:57:17 18              Anything else we need to address?

13:57:19 19              MR. LOWELL:  I don't think so, Judge.

13:57:20 20              MR. HINES:  No, Your Honor.  Thank you very

13:57:21 21    much.

13:57:22 22              THE COURT:  Thank you very much.

13:59:05 23              COURT CLERK:  All rise.  Court is adjourned.

24              (Court adjourned at 1:59 p.m.)

25

1          I hereby certify the foregoing is a true and
   accurate transcript from my stenographic notes in the proceeding.

2

3                              /s/ Dale C. Hawkins
                              Official Court Reporter
4                              U.S. District Court