**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE**

UNITED STATES OF AMERICA,      )
                                      )
                v.                        )
                                      )     Criminal No. 23-00061-MN
ROBERT HUNTER BIDEN,       )
                                      )
           *Defendant.*      )

**THE UNITED STATES' OPPOSITION TO DEFENDANT'S RULE 29 MOTION FOR
ACQUITTAL UNDER THE SECOND AMENDMENT AS APPLIED AND THE FIFTH
AMENDMENT (ECF 220)**

## <u>TABLE OF CONTENTS</u>

I.    The Defendant's As-Applied Challenge to Section 922(g)(3) Under the
Second Amendment Fails. ................................................................................................ 5

    A.  Historical Analogues Confirm That § 922(g)(3) Is Constitutional As Applied to the
       Defendant. ................................................................................................................ 7

        i.   As This Court Has Held, § 922(g)(3) Is Analogous to Laws Disarming the
           Mentally Ill. .......................................................................................... 7

        ii.  Section 922(g)(3) Is Analogous to Laws Disarming Intoxicated Persons. ....... 9

        iii. Section 922(g)(3) Is Analogous to Other Laws Disarming Persons Who Are
           Otherwise Dangerous. ........................................................................... 12

    B.  The Defendant's Use of Crack Cocaine Implicates the Core Concerns Animating the
       Historical Analogues to § 922(g)(3). .......................................................... 15

    C.  The Defendant's Arguments to the Contrary Are Meritless. ..................................... 21

II.   The Defendant's Vagueness Challenge to Section 922(g)(3) Under the
Fifth Amendment Fails. ................................................................................................ 28

Conclusion. ................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*Barrett v. United States,*
  423 U.S. 212 (1976) ............................................................................... 12, 14, 16

*Bouie v. City of Columbia,*
  378 U.S. 347 (1964) ............................................................................... 30

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ............................................................................... 28

*Dailey v. City of Philadelphia,*
  417 F. Supp. 3d 597 (E.D. Pa. 2019) ............................................................ 28

*F.C.C. v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ............................................................................... 28

*Folajtar v. Att´y Gen. of the U.S.,*
  980 F.3d 897 (3d Cir. 2020) ..................................................................... 21, 28

*Fried v. Garland,*
  640 F. Supp. 3d 1252 (N.D. Fla. 2022) ........................................................ passim

*United States v. Grubb,*
  2023 WL 6960371 (N.D. Iowa Oct. 20, 2023) ............................................... 13, 23, 25

*Harmelin v. Michigan,*
  501 U.S. 957 (1991) ............................................................................... 20, 21

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................................... 8, 10, 14

*Henderson v. United States,*
  575 U.S. 622 (2015) ............................................................................... 26

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) .................................................................................. 28, 29

*Johnson v. United States,*
  576 U.S. 591 (2015) ............................................................................... 21

*Kanter v. Barr,*
  919 F.3d 437 ........................................................................................ 13, 21

*Marks v. United States,*
  430 U.S. 188 (1977) ............................................................................... 30

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ............................................................................... 8

*Muscarello v. United States,*
  524 U.S. 125 (1998) ............................................................................... 21, 25

*Nat´l Treasury Emps. Union v. Von Raab,*
  489 U.S. 656 (1989) ............................................................................... 18

*New York State Rifle & Pistol Ass´n v. Bruen,*
  597 U.S. 1 (2022) .................................................................................. passim

*Richards v. Wisconsin,*
  520 U.S. 385 (1997) ............................................................................... 21

*Rosemond v. United States,*
 572 U.S. 65 (2014) ...........................................................................................................21

*Smith v. United States,*
 508 U.S. 223, (1993) .........................................................................................................21

*State v. Shelby,*
 2 S.W. 468 (Mo. 1886) .....................................................................................................12

*United States v. Black,*
 649 F. Supp. 3d 246 (W.D. La. 2023) ..............................................................................30

*United States v. Blue Bird,*
 No. 3:22-CR-30112-RAL 2024 WL 35247 (D.S.D. Jan. 3, 2024) .............................8, 10, 25

*United States v. Carter,*
 750 F.3d 462 (4th Cir. 2014) .......................................................................................19, 21

*United States v. Cheeseman,*
 600 F.3d 270 (3d. Cir. 2010) .......................................................................................15, 23

*United States v. Clements,*
 No. 5:23-CR-01389-MIS, 2024 WL 129071 (D.N.M. Jan. 11, 2024) .........................8, 22

*United States v. Connelly,*
 ("Connelly I"), 668 F. Supp. 3d 662 (W.D. Tex. 2023) ...................................................25

*United States v. Connelly ("Connelly II"),*
 No. EP-22-CR-229(1)-KC, 2024 WL 1460762 (W.D. Tex. Apr. 2, 2024) ...................25, 26

*United States v. Cook,*
 970 F.3d 866 (7th Cir. 2020) ............................................................................................29

*United States v. Costianes,*
 673 F. Supp. 3d 756 (D. Md. 2023) ..............................................................................8, 10

*United States v. Cousar,*
 No. 23-10004-01-EFM, 2024 WL 1406898 (D. Kan. Apr. 2, 2024) ..................................9

*United States v. Danielson,*
 No. 22-00299-MJD, 2023 WL 5288049 (D. Minn. Aug. 17, 2023) .................................10

*United States v. Davey, No. 23-20006-01-D,*
 DC, 2024 WL 340763 (D. Kan. Jan. 30, 2024) .......................................................13, 23, 30

*United States v. Dugan,*
 657 F.3d 998 (9th Cir. 2011) ............................................................................................21

*United States v. Edwards,*
 540 F.3d 1156 (10th Cir. 2008) ........................................................................................29

*United States v. Endsley,*
 2023 WL 7354020 (D. Alaska June 5, 2023) ............................................................. passim

*United States v. Espinoza-Melgar,*
 687 F. Supp. 3d 1196 (D. Utah 2023) ......................................................................... passim

*United States v. Harrison,*
 654 F. Supp. 3d 1191 (W.D. Okla. 2023) .........................................................................25

*United States v. Iafelice,*
 978 F.2d 92 (3d Cir. 1992) ...............................................................................................27

*United States v. Jackson,*
 280 F.3d 403 (4th Cir. 2002) ............................................................................................29

*United States v. Lewis,*
 650 F. Supp. 3d 1235 (W.D. Okla. 2023) .......................................................................8, 10

*United States v. Lewis*,
  682 F. Supp. 3d 1038 (S.D. Ala. 2023) ...........................................................13, 19, 25
*United States v. May*,
  538 Fed. Appx. 465 (5th Cir. 2013) ...........................................................................29
*United States v. Monroe*,
  233 Fed. Appx. 879 (11th Cir. 2007) .........................................................................29
*United States v. Montoya*,
  2024 WL 1991494 & n.14 (D.N.M. May 6, 2024) ..........................................5, 16, 26
*United States v. Patterson*,
  431 F.3d 832 (5th Cir. 2005) .....................................................................................21
*United States v. Portanova*,
  961 F.3d 252 (3d Cir. 2020) ......................................................................................29
*United States v. Posey*,
  655 F. Supp. 3d 762 (N.D. Ind. 2023) ................................................................passim
*United States v. Purdy*,
  264 F.3d 809 (9th Cir. 2001) .....................................................................................29
*United States v. Randall*,
  656 F. Supp. 3d 851 (S.D. Iowa 2023) ......................................................................10
*United States v. Richard*,
  350 Fed. Appx. 252 (10th Cir. 2009) .........................................................................29
*United States v. Robinson*,
  No. 4:23-CR-40013, 2023 WL 7413088 (D.S.D. Nov. 9, 2023) ................................10
*United States v. Sanchez*,
  646 F. Supp. 3d 825 (W.D. Tex. 2022) ......................................................................30
*United States v. Seay*,
  620 F.3d 919 (8th Cir. 2010) .....................................................................................21
*United States v. Seiwert*,
  2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ....................................................5, 8, 16
*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) .....................................................................................15
*United States v. Slone*,
  No. 5:22-CR-144-KKC-MAS,2023 WL 8037044 (E.D. Ky. Nov. 20, 2023) ..............8
*United States v. Smith*,
  2024 WL 896772 (W.D. Pa. Mar. 1, 2024) ................................................................14
*United States v. Stennerson*,
  No. CR 22-139-BLG-SPW, 2023 WL 2214351 (D. Mont. Feb. 24, 2023) ...............30
*United States v. Strange*,
  2023 WL 8458225 (E.D. Ky. Dec. 6, 2023) ..............................................................25
*United States v. Striplin*,
  No. 4:21-CR-00289-RK, 2023 WL 4850753 (W.D. Mo. July 28, 2023) ...................13
*United States v. Tooley*,
  717 F. Supp. 2d 580 (S.D.W. Va. 2010) ....................................................................15
*United States v. Yancey*,
  621 F.3d 681 (7th Cir. 2010) ...................................................................9, 19, 21, 27
*Wilson v. Lynch*,
  835 F.3d 1083 (9th Cir. 2016) ...................................................................................19

iv

**Statutes**

18 U.S.C. § 922(a)(6) ........................................................................................................2

18 U.S.C. § 922(g)(3) ............................................................................................1, 2, 23

18 U.S.C. § 924(a)(1)(A) ....................................................................................................2

Mo. Rev. Stat. § 1274 (1879) .........................................................................................12

**Rules**

Federal Rule of Criminal Procedure 29 ..........................................................................1

## INTRODUCTION

Defendant Robert Hunter Biden moves pursuant to Federal Rule of Criminal Procedure 29 for judgment of acquittal, arguing that the charge against him brought under 18 U.S.C. § 922(g)(3) violates both the Second Amendment as applied to him and the Fifth Amendment. Def.'s R. 29 Mot. for Acquittal Under the 2nd Amend. As Applied & the 5th Amend. ("Def.'s Mot."), ECF 220. This Court has already rejected the defendant's facial challenge to § 922(g)(3) under the Second Amendment. May 9, 2024 Mem. Order ("Order"), ECF 114. At trial, the government proved that the defendant was a heavy crack cocaine user who frequently posed a danger to himself and others. Section 922(g)(3), as applied to the defendant, falls squarely within "this Nation's historical tradition of firearm regulation" and comports with the Second Amendment. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The Supreme Court's decision today in *United States v. Rahimi*, No. 22-915 (U.S. June 21, 2024) clarified that *Bruen* only requires the government to show "the challenged regulation is consistent with the principles that underpin our regulatory tradition," not that it is "identical" to a regulation at the founding. Slip op at 7. This significantly undermines the defendant's reliance on *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), which cites repeatedly to the now-reversed Fifth Circuit decision in *Rahimi*. As to the Fifth Amendment challenge, because § 922(g)(3) provides fair notice of the conduct it prohibits, it is not unconstitutionally vague. The Court should therefore deny the defendant's motion.

## BACKGROUND

The defendant in this case was charged by indictment with three counts: Count One charges that the defendant knowingly made a false statement in the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6); Count Two charges that the defendant made a false statement related to information required to be kept by law by a federal firearms licensed dealer, in violation of 18 U.S.C. § 924(a)(1)(A); and Count Three charges that the defendant, knowing that he was an

unlawful user of a controlled substance or addicted to a controlled substance, did knowingly possess a firearm, in violation of 18 U.S.C. § 922(g)(3). ECF 40. On December 11, 2023, the defendant moved to dismiss the indictment, arguing in part that Section 922(g)(3)—which prohibits someone who is "an unlawful user of or addicted to any controlled substance" from "possess[ing]" a firearm—was unconstitutional under the Second Amendment. ECF 61. On May 9, 2024, the Court denied that motion. *See* Order. Trial began on June 3, 2024.

At trial, the government proved the following facts. *See also* Gov't Opp'n to Def.'s R. 29 Mot. for Acquittal for Insufficiency of the Evidence ("Gov't Opp'n to Def.'s Sufficiency Mot."), ECF 230. From 2015 to 2019, the defendant was a chronic user of and addicted to crack cocaine. *See, e.g.*, Ex. 18 (Summary Chart); Ex. 19 (*Beautiful Things* Excerpts); Tr. 576-80, 600-51, 664-66, 816-28. In his memoir, the defendant described himself as someone who was "up twenty-four hours a day, smoking every fifteen minutes, seven days a week." Ex. 19 at 190. He stated that he had a "superpower" of "finding crack anytime, anywhere." *Id*. at 159. By March 2019, he claimed he had "no plan beyond the moment-to-moment demands of the crack pipe" and that this period followed "four years of active addiction." *Id*. at 219-20.

Zoe Kestan, with whom the defendant was in a romantic relationship from 2017 to 2018, testified about the defendant's extensive use of crack cocaine from December 2017 through November 2018. Tr. 597-98, 600-02, 604, 606-15, 619-48, 664-65. During this time period, including in September and November 2018, she witnessed him using crack as frequently as every twenty minutes. Tr. 614-15, 643-44, 646-48. Kathleen Buhle, who was married to the defendant until 2017, testified that the defendant used crack cocaine during their marriage, Tr. 576-79, and that as recently as 2019, she found drugs or paraphernalia in his car. Tr. 579-80, 594. And Hallie Biden, who was also romantically involved with the defendant, testified that she saw the defendant

using drugs throughout the course of their relationship. Tr. 816-20. According to Hallie Biden, in 2017 and 2018, he was using drugs "daily," Tr. 822. The defendant also discussed purchasing drugs in text messages with several individuals, showing a pattern of consistent drug use from spring 2018 to spring 2019. *See, e.g.*, Ex. 18 at Row 1-22 (April 2018); *id*. at Row 23-65 (May 2018); *id*. at Row 66-72 (June 2018); *id*. at Row 73-85 (July 2018); *id*. at Row 86-87 (August 2018); *id*. at Row 169-80 (November 2018); *id*. at Row 195-206 (December 2018); *id*. at Row 217-49 (February 2019). FBI Agent Erika Jensen testified that the defendant's bank statements showed that he was withdrawing large sums of cash from ATMs, consistent with the practice of illegal drug users, who pay their dealers in cash. Exs. 28A, 29E, 30A, 36A, 37A; *see also* Tr. 425-31.

Amidst the defendant's "four years of active addiction," Ex. 19 at 220, on October 12, 2018, the defendant entered StarQuest Shooters & Survival Supply, a firearms dealer in Wilmington, Delaware. Tr. 675-76. To purchase the firearm, the defendant was required to fill out an ATF Form 4473, which asked, "Are you an unlawful user of, or addicted to . . . any . . . stimulant, narcotic drug, or any other controlled substance?" Ex. 10A, Question 11(e). The Form 4437 also required the defendant to certify that his answers were true, correct and complete. Ex. 10A at 2. The defendant falsely stated on the Form 4473 that he was not an unlawful user of, or addicted to, any stimulant, narcotic drug, or any other controlled substance, *id*. at 1, and purchased the Colt Cobra, Tr. 704-07.

On October 12, 2018, the same day that he purchased the Colt Cobra, the defendant withdrew $5,000 in cash from an ATM. Ex. 29E. One day later, on October 13, 2018, the defendant sent a text message stating that he was with "Bernard who hangs at the 7/11!on [sic] Greenhill and Lancaster I'm now off MD Av behind blue rocks stadium waiting for a dealer named Mookie." Ex. 18 at Row 119. He followed up by sending another text message to Hallie Biden stating that that an

unidentified male "has my money mad [sic] I'm getting pissed." *Id.* at Row 121. On October 14, 2018, two days after he purchased the firearm, the defendant sent a text message to Hallie Biden stating that he was "sleeping on a car smoking crack on 4th Street and Rodney," which is an intersection in Wilmington, Delaware. *Id.* at Row 125.

Late on October 22 or early on October 23, the defendant arrived at Hallie Biden's house in Delaware, looking "like he hadn't slept" and as though he could have been using drugs. Tr. 826-827. After the defendant went to sleep, Hallie Biden searched the truck he arrived in for drugs and alcohol, something she had done on prior occasions as part of a "pattern." Tr. 829-30. She testified that she found remnants of crack cocaine and drug paraphernalia along with a firearm. Tr. 830-31. Hallie Biden put the firearm in the defendant's brown pouch she found in his truck, which she knew he used to store drugs and drug paraphernalia. Tr. 833-35. She then went to Janssen's Market, a supermarket, and disposed of the revolver by putting it in a trashcan outside of the store. Tr. 836-37; Ex. 39A.

Later that day, the revolver was found by Edward Banner, a man who was looking for recyclables in the trash can. Ex. 39C; Tr. 1033. After Hallie Biden notified the Delaware State Police to report the gun missing, Lieutenant Millard Greer recovered the firearm from Banner's house. Tr. 991-92; Ex. 1, 1A. FBI forensic chemist Jason Brewer analyzed a white powdery substance found on the brown pouch and determined it was cocaine. Tr. 1056-63; *see also* Ex. 4; Ex. 4C. Hallie Biden also sent the defendant a message on October 31, one week after she found the firearm, telling him that she found another similar brown leather pouch of the defendant's in her house with his crack pipe in it. Tr. 862-63; Ex. 18G.

The government rested its case-in-chief on June 7. That day, the defense filed the instant motion for judgment of acquittal under Rule 29, arguing that § 922(g)(3) violates the Second

Amendment, as applied to him, and the Fifth Amendment. ECF 220. For the reasons stated below, the Court should deny this motion.

**DISCUSSION**

I.    **The Defendant's As-Applied Challenge to Section 922(g)(3) Under the Second Amendment Fails.**

The Court has already held that § 922(g)(3) is facially constitutional under the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, joining the overwhelming majority of federal courts to do so. *See* Order at 3-9. As applied to the defendant, § 922(g)(3) is likewise "relevantly similar" to historical regulations aimed at preventing dangerous persons from possessing firearms. *See* Order at 2, 4-9. The evidence at trial demonstrates that the defendant regularly used and was addicted to crack cocaine—in his own words, he was an "addict" who smoked crack "every fifteen minutes, seven days a week," Ex. 19 at 5, 190—when he possessed a firearm.

No court has found § 922(g)(3) unconstitutional as applied to use of or addiction to crack cocaine, and several district courts have upheld § 922(g)(3) as applied to heavy drug users similar to the defendant. *See United States v. Seiwert*, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022) (holding § 922(g)(3) constitutional as applied to defendant who admitted to "years of addiction to heroin and crack cocaine"); *United States v. Montoya*, 2024 WL 1991494, at *12 & n.14 (D.N.M. May 6, 2024) (holding § 922(g)(3) constitutional as applied to defendant who was found with suboxone, heroin, and cocaine); *United States v. Endsley*, 2023 WL 7354020, at *11-12 (D. Alaska June 5, 2023), *report and recommendation adopted*, 2023 WL 6476389 (D. Alaska Oct. 5, 2023) (holding § 922(g)(3) constitutional as applied to heroin and methamphetamine user who was found with cocaine); *see also Fried v. Garland*, 640 F. Supp. 3d 1252, 1260-64 (N.D. Fla. 2022) (upholding § 922(g)(3) as applied); *United States v. Espinoza-Melgar*, 687 F. Supp. 3d 1196, 1201

(D. Utah 2023) (upholding § 922(g)(3) as applied). Therefore, Section 922(g)(3) as applied to the defendant is constitutional.

*Bruen* requires a showing that § 922(g)(3), as applied to the defendant, "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 19; *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (discussing *Bruen* in the context of an as-applied challenge to § 922(g)(1)).[1] In *Bruen*, the Court emphasized that "[a]lthough its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 597 U.S. at 28. For that reason, the Court opted for the methodological approach of "reasoning by analogy" and concluded that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar" according to a specified metric. *Id.* at 28-29. From its prior precedents, the Court then identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29.

The Court unambiguously held that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. In *Rahimi*, the Supreme Court reaffirmed the flexibility of this mode of analysis, stating that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, slip op. at 7. "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id*.

---

[1] The defendant suggests that two recent appellate court decisions—*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) and *United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024)—provide two different "tests" to apply to Second Amendment challenges. *See* Def.'s Mot. at 3, 8. That is an incorrect reading of those cases. Both applied the *Bruen* framework set forth in this brief, albeit to two different sets of facts.

(quoting *Bruen*, 597 U.S. at 28). Historical precedents are "not meant to suggest a law trapped in amber." *Id*. at 7. Thus, the relevant inquiry is not whether, at the time of the Founding, there existed regulations restricting firearm access for those habitually abusing or addicted to crack cocaine. The inquiry is whether the government can identify historically analogous regulations that are "relevantly similar" to § 922(g)(3) in "both why and how [they] burden the Second Amendment right." *Id*. at 14.

A.   **Historical Analogues Confirm That § 922(g)(3) Is Constitutional As Applied to the Defendant.**

Like this Court previously held, laws prohibiting the mentally ill from possessing firearms provide a sufficient historical analogue to § 922(g)(3) under *Bruen*. *See* Order at 6-9. The reasoning set forth in the Court's prior ruling applies with equal force to defendant's as-applied challenge here. Moreover, as applied to the defendant, § 922(g)(3) also finds relevantly similar analogues in historical laws that restricted firearm access for two other categories of people: the intoxicated and otherwise dangerous persons.

i.   **As This Court Has Held, § 922(g)(3) Is Analogous to Laws Disarming the Mentally Ill.**

In upholding § 922(g)(3) as facially constitutional, the Court relied on the reasoning in *United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024), which "undertook a careful analysis of the history of regulating firearm possession by mentally ill and dangerous persons, ultimately concluding that § 922(g)(3) is consistent with that historical tradition." Order at 7 (citing *Veasley*, 98 F.4th at 910-16); *see also District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008) (warning that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions

on the possession of firearms," including by "the mentally ill").[2] The Court explained that in the 18th century, mental illness was viewed as "a transitory condition" and those deemed dangerous were confined and restrained without "access to guns." Order at 7 (citing *Veasley*, 98 F.4th at 915). It noted that by "the late 1800s, states started to permit prosecution of individuals who provided firearms to mentally ill people." *Id*. The Court adopted *Veasley*'s analysis, explaining that "[a]lthough drug addiction and mental illness may have distinct pathologies, sufficient similarities exist between the two such that a historical analogue under *Bruen* is appropriate." *Id*. at 8. The Court also cited to numerous district court cases holding that the country's history of disarming the mentally ill provide a "relevant historical analogue" under *Bruen*. *Id*. at 8 (citing *United States v. Blue Bird*, No. 3:22-CR-30112-RAL, 2024 WL 35247 at *2 (D.S.D. Jan. 3, 2024); *United States v. Slone*, No. 5:22-CR-144-KKC-MAS, 2023 WL 8037044 at *4 (E.D. Ky. Nov. 20, 2023); *United States v. Costianes*, 673 F. Supp. 3d 756, 762 (D. Md. 2023); *Fried*, 640 F. Supp. 3d at 1263; *Seiwert*, 2022 WL 4534605, at *2).[3]

Further, as the Court observed, the "burden" imposed by § 922(g)(3) is, in fact, "less heavy-handed than" the Founding-era laws governing the mentally ill. *Id*. at 7-8 (citing *Veasley*, 98 F.4th at 915-16); *see also Rahimi*, slip op. at 14 (in upholding § 922(g)(8) as constitutional, noting that the "restriction [is] temporary" because it "only prohibits firearm possession so long as the

---

[2] A plurality of the Court "repeat[ed]" *Heller*'s "assurances" in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), and in *Bruen*, several Justices reiterated those assurances yet again. *See Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626)); *id*. at 72 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)).

[3] Other courts have held the same. *See, e.g., United States v. Clements*, No. 5:23-CR-01389-MIS, 2024 WL 129071, at *5-6 (D.N.M. Jan. 11, 2024); *United States v. Posey*, 655 F. Supp. 3d 762, 774-76 (N.D. Ind. 2023); *United States v. Lewis*, 650 F. Supp. 3d 1235, 1241 (W.D. Okla. 2023); *United States v. Espinoza-Melgar*, 687 F. Supp. 3d 1196, 1203-05 (D. Utah 2023).

defendant 'is' subject to a restraining order."). By definition, § 922(g)(3) applies solely to those who are either habitual unlawful users of controlled substances or whose addiction presents a public safety risk or is defined by a loss of self-control over the addiction. A user can "regain his right to possess a firearm simply by ending his drug abuse." *United States v. Yancey*, 621 F.3d 681, 686-87 (7th Cir. 2010); *see also Veasley*, 98 F.4th at 915. By contrast, "the mentally ill had less of a chance to regain their rights than drug users and addicts do today," as "confinement with straitjackets and chains carries with it a greater loss of liberty than a temporary loss of gun rights." *Id*.

As this Court understood, "laws keeping guns from the mentally ill . . . flow from the historical tradition of keeping guns from those in whose hands they could be dangerous." *Fried*, 640 F. Supp. 3d at 1263. And the defendant's conduct as a crack cocaine user and addict easily fits within this historical tradition, as explained more fully below, *see infra* Section I.B.

### ii. Section 922(g)(3) Is Analogous to Laws Disarming Intoxicated Persons.

Other laws that inhibited the ability of certain categories of people to possess firearms offer additional historical analogues to § 922(g)(3) as applied to this case. Laws regulating firearm possession and use by those under the influence of alcohol provide a particularly apt analogy to the application of § 922(g)(3) to the defendant, a habitual cocaine user. Numerous courts have upheld § 922(g)(3) on these grounds. *See, e.g.*, *United States v. Cousar*, No. 23-10004-01-EFM, 2024 WL 1406898, at *11 (D. Kan. Apr. 2, 2024); *United States v. Posey*, 655 F. Supp. 3d 762, 773-74 (N.D. Ind. 2023); *Fried*, 640 F. Supp. 3d at 1262; *Costianes*, 673 F. Supp. 3d at 762; *United States v. Randall*, 656 F. Supp. 3d 851, 854-56 (S.D. Iowa 2023); *United States v. Lewis*, 650 F. Supp. 3d 1235, 1241 (W.D. Okla. 2023); *Blue Bird*, 2024 WL 35247, at *6; *United States v. Robinson*, No. 4:23-CR-40013, 2023 WL 7413088, at *4 (D.S.D. Nov. 9, 2023); *Espinoza-Melgar*, 687 F. Supp.

3d at 1204 n.7; *United States v. Danielson*, No. 22-00299-MJD, 2023 WL 5288049, at *5 (D. Minn. Aug. 17, 2023).

The founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness").[4] A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Colonial and founding-era legislatures also adopted specific measures to separate firearms and alcohol, including laws regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns in drinkeing [events]," regardless of whether attendees actually became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767).

Also instructive are 18th-century militia laws, which reflect legislatures' significant authority to separate firearms and alcohol. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective

---

[4] If it would assist the Court, the government will provide copies of the historical sources cited in this response upon request.

Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms di[s]gui[s]ed in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). Similar laws persisted into the 19th century, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

Despite the pervasiveness of alcohol at the founding, early laws understandably focused on the militia because social norms "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism." Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987). The community "held drinking excesses largely in bounds." *Id.* at 15. And the cumbersome nature of 18th-century firearms also mitigated the general risk created by intoxicated individuals. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019).

As those circumstances changed during the 19th century, *see*, *e.g.*, Lender, *supra*, at 45-46, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms or pistols. *See* 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290, § 3 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers

may not "carry[] . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); 1909 Idaho Sess. Laws 6, § 1 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms," even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

As set forth more fully below, *see infra* Section I.B., § 922(g)(3) as applied to the defendant also imposes "a comparable burden" that is "comparably justified" by historical intoxication statutes. *Bruen*, 597 U.S. at 29. Like the intoxication statutes, § 922(g)(3) limits the firearm use of individuals when they are deemed unlikely to use them responsibly.  Intoxication-related statutes were enacted to prevent the "mischief" threatened by intoxicated persons "going abroad with fire-arms," *Shelby*, 2 S.W. at 469, and Congress likewise enacted § 922(g)(3) to "keep firearms away from" a crack cocaine user and addict like the defendant, who it reasonably "classified as potentially irresponsible and dangerous," *Barrett v. United States*, 423 U.S. 212, 218 (1976). And like § 922(g)(3), historical intoxication statutes restricted access to firearms "for the duration of the period individuals are using intoxicating substances, but "[b]oth groups are then able to regain their Second Amendment rights by simply ending their substance use." *Posey*, 655 F. Supp. 3d, at 773-74.

### iii.   Section 922(g)(3) Is Analogous to Other Laws Disarming Persons Who Are Otherwise Dangerous.

The full scope of § 922(g)(3) as applied to the defendant is further justified by historical regulations disarming criminals and those would pose a threat to the safety of others if armed. *See*

ECF 61 at 11-21 (describing history of laws permitting disarming of groups that presented increased risk to public safety). Courts have also relied on these grounds in upholding § 922(g)(3). *See, e.g.*, *United States v. Davey*, No. 23-20006-01-DDC, 2024 WL 340763, at *5-6 (D. Kan. Jan. 30, 2024); *Fried*, 640 F. Supp. 3d at 1263; *United States v. Grubb*, No. 23-CR-1014-CJW-MAR, 2023 WL 6960371 at *4 (N.D. Iowa Oct. 20, 2023); *Endsley*, 2023 WL 6476389, at *5; *United States v. Striplin*, No. 4:21-CR-00289-RK, 2023 WL 4850753, at *1 (W.D. Mo. July 28, 2023); *United States v. Lewis*, 682 F. Supp. 3d 1038, 1053-55 (S.D. Ala. 2023); *Posey*, 655 F. Supp. 3d at 774.

"[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir.) (Barrett, J., dissenting) (abrogated by *Bruen*, 597 U.S. 1 (2022)). Some laws disarmed those who carried arms in a manner that spread fear or terror. *See Rahimi*, slip op. at 9 ("From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others."); *Veasley*, 98 F.4th at 916-17 (describing the "historical pedigree" of the "Terror of the People" offense). Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance[5] to the colony or the Revolution's cause[6]; enslaved persons[7]; and Native Americans.[8] And although historical laws disarming people based on religion or race

---

[5] Records of Governor & Company of the Massachusetts Bay in New England 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[6] *See, e.g.*, 4 Journals of the Continental Congress 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia 281-83 (1821) (1777 law); 15 The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive 193 (Charles J. Hoadly ed., 1890) (1775 law).

[7] *See, e.g.*, 1700-1797 Del. Laws 104; 1692-1720 Md. Laws 117-18; 1715-1760 N.Y. Laws 162; 1715-1755 N.C. Sess. Laws 64; 1731-1743 S.C. Acts 168.

[8] *See, e.g.*, 1723-1730 Conn. Acts. 292; Charter & General Laws of Massachusetts Bay 133 (1814) (1633 law); 6 Statutes at Large of Pennsylvania from 1682 to 1801 319-20 (WM Stanley Ray ed., 1898) (1763 law); 1 Hening, supra, at 219 (1633 Virginia law).

are repugnant and would be unconstitutional today, some courts have relied on the past existence of such laws to "demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving people posing a threat to society (as they viewed it) from possessing arms." *United States v. Smith*, No. 2:23-CR-129-22, 2024 WL 896772, at *5 (W.D. Pa. Mar. 1, 2024); *see also United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) ("While some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms."), *reh'g and reh'g en banc denied*, 85 F. 4th 468 (8th Cir 2023).

Second Amendment precursors proposed in state ratifying conventions likewise confirmed that legislatures could disarm certain categories of individuals, including for "crimes committed, or real danger of public injury." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (discussing Pennsylvania proposal); *Heller*, 554 U.S. at 603-04 (describing Pennsylvania proposal as being a "highly influential" "precursor" to the Second Amendment). Accordingly, as one early scholar wrote, the government could restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, A View of the Constitution of the United States of America 123 (2d ed. 1829). This understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866). Further, many states, "whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). "Criminals in England

could also be, and often were, disarmed." *United States v. Tooley*, 717 F. Supp. 2d 580, 589 (S.D.W. Va. 2010), *aff'd*, 468 F. App'x 357 (4th Cir. 2012).

In sum, this Nation's "historical tradition of firearm regulation" permits legislatures to disarm those who were deemed to be dangerous with firearms, including the mentally ill and intoxicated. "Congress believed that unlawful drug users could be dangerous," and it acted "within the historical tradition when it enacted § 922(g)(3)." *Espinoza-Melgar*, 687 F. Supp. 3d at 1206; *see also United States v. Cheeseman*, 600 F.3d 270, 280 (3d. Cir. 2010) (Section 922(g)(3) codified "Congress' intent to keep firearms out of the possession of drug abusers, a dangerous class of individuals.").

**B.      The Defendant's Use of Crack Cocaine Implicates the Core Concerns Animating the Historical Analogues to § 922(g)(3).**

The government proved that the defendant was a chronic crack cocaine user and addict. His memoir recounts scenarios when he put his own life and the lives of others in danger. He described how he recklessly drove his vehicle at excessive speeds while under the influence of crack before crashing it, showing total disregard for human life. He frequently purchased drugs and participated in the drug trade to fuel his addiction. He recalled instances where he had guns pointed in his face during drug deals and explained how he learned to protect himself. Then, he chose to buy a gun. When he bought the revolver, he also purchased a speed loader and hollow-point ammunition, a type of bullet that expands upon impact and causes significant lethal damage. And he left the firearm, loader and ammunition in an unlocked car with the windows down parked on someone else's property where young children lived. The same historical traditions that justify § 922(g)(3)— traditions restricting firearms rights for the mentally ill, intoxicated, and dangerous—justify applying the statute to the defendant. *See Fried*, 640 F. Supp. 3d at 1258-63; *see also Montoya*,

2024 WL 1991494 at *10-12; *Endsley*, 2023 WL 7354020, at *12; *Seiwert*, 2022 WL 4534605, at *2. Accordingly, Section 922(g)(3) is constitutional as applied to him.

The evidence at trial demonstrated the defendant's extensive use of crack cocaine from 2015 to 2019, spanning the period in which he possessed the firearm. For example, in his memoir, the defendant admitted the extent of his crack addiction and his mental state while on crack. The defendant stated that he was often "up twenty-four hours a day, smoking every fifteen minutes, seven days a week." Ex. 19 at 190. He described this time period as a "genuine, dictionary-definition blur of complete and utter debauchery" when he was "doing nothing but drinking and drugging." *Id*. at 222. The defendant characterized his daily experience in November 2018 as "me and a crack pipe in a Super 8 [motel], not knowing which the fuck way was up," explaining that "[a]ll my energy revolved around smoking drugs and making arrangements to buy drugs." *Id*. at 208. According to the defendant, by March 2019, he had "no plan beyond the moment-to-moment demands of the crack pipe." *Id*. at 219-20. The witnesses who testified at trial corroborated these accounts and described him as a "daily" user of crack cocaine, Tr. 822, who was smoking crack as often as every twenty minutes, Tr. 613-15, 641-44, 646-48. *See also* Tr. 597-98, 600-02, 604, 606-10, 613-15, 619-48, 664-65 (Kestan testifying about the defendant's extensive crack use from 2017 to 2018); Tr. 576-79 (Buhle testifying about the defendant's use of crack cocaine during their marriage and finding drugs or paraphernalia in his car through 2019); Tr. 816-20 (Hallie Biden testifying about the defendant's drug use throughout the course of their relationship, from 2015 through 2018).

The behavioral effects of crack cocaine use resemble the same behaviors justifying the restrictions preventing the mentally impaired, intoxicated, or dangerous from possessing firearms. *See Veasley*, 98 F.4th at 912 (describing the "overlap[ping]" behavioral effects between drug use

and mental illness); *Endsley*, 2023 WL 7354020, at *12 (concluding that the effects of "mind-altering substances" like heroin and methamphetamine "are comparable to founding-era definitions of a temporary loss of 'reason'" and the "temporal 'insanity' of a lunatic."). The National Institute on Drug Abuse has concluded that "studies suggest that a wide range of cognitive functions are impaired with long-term cocaine use—such as sustaining attention, impulse inhibition, memory, making decisions involving rewards or punishments, and performing motor tasks." Nat'l Inst. on Drug Abuse, Nat'l Inst. of Health, What Are the Long-Term Effects of Cocaine Use? (May 2016), available at https://nida.nih.gov/research-topics/cocaine#long-term. Short-term effects of large doses, which habitual or addicted users are more likely to take, *see id.*, "can also lead to bizarre, erratic, and violent behavior" as well as "feelings of restlessness, irritability, anxiety, panic, and paranoia" and "tremors, vertigo, and muscle twitches." Nat'l Inst. on Drug Abuse, Nat'l Inst. of Health, What Are the Short-Term Effects of Cocaine Use? (May 2016), available at https://nida.nih.gov/research-topics/cocaine#short-term.

Similarly, a meta-analysis of studies found "significant impairment across multiple cognitive domains in cocaine abusers" that continues even up to 5 months into abstinence, with the "most impaired domains" including "attention" and "impulsivity," with smaller effects on functions like "speed of processing." Stéphane Potvin et al., *Cocaine and Cognition: A Systematic Quantitative Review*, 8 J. Addiction Medicine 368 (2014); *see also* Priscila P. Almeida et al., *Attention and Memory Deficits in Crack Cocaine Users Persist over Four Weeks of Abstinence*, 2017 J. Subst. Abuse Treatment 73 (Oct. 2017); Helen Fox et al., *Difficulties in Emotion Regulation and Impulse Control During Cocaine Abstinence*, 89 Drug & Alcohol Dependence 298 (July 2007). Another review of literature concluded that "[c]ocaine abusers have significant cognitive impairments that encompass all aspects of executive function"—defined as updating relevant

information, shifting between multiple tasks, the ability to inhibit automatic or impulsive responses, and general decision-making—with the data "strongly support[ing] the idea that cocaine is an important contribution to the significant impairments of cognitive performance experienced by drug users." Thomas J.R. Beveridge et al, *Parallel Studies of Cocaine-Related Neural and Cognitive Impairment in Humans and Monkeys*, 363 Philos. Trans. R. Soc. B 3257, 3257-69, 3262-63 (2008). The review noted data indicating cognitive deficits in areas like "poor inhibitory control or an inability to gate inappropriate responses to external influences" and a decreased ability "to process future negative consequences in the presence of an opportunity for immediate gratification." *Id.* at 3259.

It is beyond dispute that firearm possession while operating under significant cognitive impairment in critical areas like attention, speed of processing, emotional regulation, inhibition control, and the ability to prioritize negative long-term consequences—not to mention psychological and physiological effects like panic, paranoia, tremors, or muscle twitches—presents a significant public safety risk. *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670-71, 674 (1989). The dangerousness of the defendant's cocaine use is vividly shown by the evidence presented at trial, in which the loss of inhibition, emotional regulation, and self-control was demonstrated. *See, e.g.*, Ex. 19 at 170-74 (discussing an episode in which the defendant drove a 500-mile road trip on which he wrecked a rental car when he hit the curb and spun into oncoming traffic, chain-smoked crack cocaine while driving, and chased a possibly hallucinatory barn owl at high speeds "through a series of tight, bounding switchbacks").

As the *Fried* court noted, "unlawful drug use . . . causes significant mental and physical impairments that make it dangerous for a person to possess firearms." 640 F. Supp. 3d at 1262-63. People who habitually use a substance like crack cocaine that impairs the ability to think, judge,

and reason "are analogous to other groups the government has historically found too dangerous to have guns." *Id*. at 1263; *see also Wilson v. Lynch*, 835 F.3d 1083, 1094 (9th Cir. 2016) ("It is beyond dispute that illegal drug users . . . are likely as a consequence of that use to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior."); *United States v. Carter*, 750 F.3d 462, 469-70 (4th Cir. 2014) (finding "convincing" the government's argument "that drugs 'impair [users'] mental function . . . and thus subject others (and themselves) to irrational and unpredictable behavior'"); *Yancey*, 621 F.3d at 685 ("habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms").

The defendant's crack cocaine use also frequently put him in situations in which access to a firearm would pose a serious risk of harm to both himself and others. Indeed, "[d]rug addicts and unlawful users of controlled substances . . . may reasonably be viewed as more likely than the general population to engage in crime (including robbery and other crimes of violence to feed their habit, as well as trafficking) and as less likely than the general population (due at least to altered mental states both while under the influence and while in withdrawal) to handle a firearm responsibly." *Lewis*, 682 F.Supp.3d at 1038 & n.34 (citing cases that have upheld § 922(g)(3) post-*Bruen* on similar grounds). In his memoir, the defendant acknowledged as much, stating that crack "takes you into the . . . darkest corners of every community," and "you become dependent not only on a criminal subculture to access what you need but the lowest rung of that subculture—the one with the highest probability of violence and depravity." Ex. 19 at 159-60. He recounted an episode during which he entered a "downtown tent city" to buy crack and found a "gun pointed at my face." *Id*. at 190. He also noted that he had to "learn little things to protect" himself during drug deals. *Id*. at 160; *see also id*. at 158 (stating that he became "hyperfocused" on his "successes in buying and

using without getting caught or hurt or killed during some random drug-buy mix-up."). The defendant's own actions when purchasing the Colt Cobra underscored his potential for dangerousness:  he also bought a speed loader, which allows a gun user to "reload a revolver a little bit faster," Tr. 703, and hollow point bullets, which expand upon impact and take out a larger portion of the target, Tr. 702. The fact that he kept his gun in his vehicle also shows his dangerousness, as the defendant described in his book that he frequently arranged drug deals at places like 7-Eleven stores and drove his vehicle to those locations to buy drugs. Ex. 19 at 144, 208.

Further, the defendant was regularly participating in illicit drug deals, and it is common sense that "violent crime may occur as part of the drug business or culture." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment). The defendant's memoir repeatedly references buying drugs in the middle of the night in high-crime areas. *See, e.g.*, Ex. 19 at 158 (characterizing "[w]alking into a park in a high-crime neighborhood to buy crack at 4 a.m." as being "no different than playing Russian roulette with two shells in the chamber" and "[i]n some places, it was like playing with five shells."); *id*. at 160 (stating that the "diciest time to buy" was "in the predawn morning, stepping into a place where it's inadvisable to be at 4 a.m. with a pocketful of cash and no weapon."); *id*. at 163 (stating that he would "wait, like an idiot, at 2 a.m., in the most dangerous part of town."). Texts with drug dealers demonstrated the frequency and extent of the defendant's drug purchases. *See, e.g.*, Ex. 18 at Row 1-29, 50-72 (April through June 2018); *id*. at Row 30-49 (May 2018); *id*. at Row 73-85 (July 2018); *id*. at Row 86-87 (August 2018); *id*. at Row 169-80 (November 2018); *id*. at Row 195-206 (December 2018); *id*. at Row 217-49 (February 2019). And the defendant's bank statements showed that he was withdrawing large sums of cash from ATMs to purchase the illegal drugs. Exs. 28A, 29E, 30A, 36A, 37A; *see also* Tr. 427-28.

Court and federal appellate case law recognizing that "drugs and guns" are a "dangerous combination"—and that unlawful drug users are more likely than the average law-abiding citizen to misuse firearms—is extensive, to put it mildly. *E.g.*, *Rosemond v. United States*, 572 U.S. 65, 75 (2014); *see also Carter*, 750 F.3d at 469-70 (citing studies showing drug users "were much more likely to engage in violence, even controlling for multiple demographic and behavioral variables"); *cf. Muscarello v. United States*, 524 U.S. 125, 132 (1998); *Smith v. United States*, 508 U.S. 223, 240, (1993); *Johnson v. United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting); *Richards v. Wisconsin*, 520 U.S. 385, 391 n.2 (1997); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005); *Yancey*, 621 F.3d at 685; *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011). Individual judges have suggested that the drug trade is "dangerous because [it] often lead[s] to violence," *Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting), and that § 922(g)(3) aligns with a historically justified interest in "keeping guns out of the hands of those who are likely to misuse them," *Kanter*, 919 F.3d at 465-66 (Barrett, J., dissenting).

In sum, as applied to the defendant, "the historical restrictions and Section 922(g)(3) comparably burden the Second Amendment right by categorically prohibiting certain persons from possessing firearms, and comparably justify the regulation as promoting public safety by keeping guns out of the hands of presumptively dangerous persons," including "intoxicated persons, and the mentally ill." *Clements*, 2024 WL 129071, at *5; *see also id.* at *6 (collecting the "overwhelming majority" of cases upholding § 922(g)(3) post-*Bruen*).

## C.   The Defendant's Arguments to the Contrary Are Meritless.

The defendant refuses to engage with any of the historical analogues identified here, as *Bruen* requires. Instead, he principally contends that (1) the Fifth Circuit's opinion in *Daniels* compels a finding that § 922(g)(3) is unconstitutional as applied to the defendant, Def.'s Mot. at 3-

8; (2) the government has failed to present evidence that the defendant was using crack in October 2018, when he possessed the firearm, so he cannot be considered dangerous, *id*. at 5-7; and (3) the defendant's conduct does not closely resemble the "Founding-era prohibition on taking up arms to terrify the people" discussed in *Veasley*, *id*. at 8. Each argument fails.

*First*, the Supreme Court's recent decision reversing the Fifth Circuit in *Rahimi* substantially weakens the reasoning in *Daniels*. In upholding § 922(g)(8) as constitutional, the Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases," which were "not meant to suggest a law trapped in amber." *Id*. at 7. It noted that the Second Amendment "permits more than just those regulations identical to ones" at the Founding. *Id*. The Fifth Circuit in *Daniels* relied heavily on its now-reversed *Rahimi* decision. *See, e.g.*, *Daniels*, 77 F.4th at 350-353. *Daniels* conducted a similarly narrow analysis that improperly required a "law trapped in amber." *See Rahimi*, slip op. at 7; *see also id*. at 3-4 (Barrett, J., concurring) (identifying the Fifth Circuit as a court that has adopted the incorrect "narrow approach" rather than the correct "wider lens" for analogical reasoning); *Espinoza-Melgar*, 687 F. Supp. 3d at 1209 ("This court is not persuaded by the *Daniels* court's decision because that court sought to find in the historical record not a 'well-established and representative historical analogue' to § 922(g)(3), but rather a 'historical twin'—thereby imposing a 'regulatory straightjacket [sic]' on Congress that vastly exceeds what the Supreme Court requires.") (quoting *Bruen*, 597 U.S. at 30); *Grubb*, 2023 WL 6960371, at *5 & n.1 (disagreeing with the "reasoning and treatment of analogues" in *Daniels* because its "narrow reading and demand for near perfect analogues . . . is

too severe and places too great an emphasis on the specific controlled substance Daniels used—marijuana.")[9]

Daniels was also mistaken in finding that history and tradition do not, by analogy, support § 922(g)(3)'s validity. The Fifth Circuit suggested that the historical tradition of prohibiting gun possession by persons intoxicated with alcohol and by persons with mental illnesses would support modern laws disarming drug users who are "currently under an impairing influence." Daniels, 77 F.4th at 349. But Daniels erred in arguing that the lack of Founding-era laws disarming intoxicated individuals generally, even during intermittent periods of sobriety, undermines the constitutionality of § 922(g)(3). Id. at 347-48. The danger to society posed by an armed drug user extends beyond the risk that he will mishandle firearms while under the influence of drugs; as explained, drug users are also more likely to use firearms to commit crimes to fund their drug habit, engage in violence as part of the drug business or culture, attack police officers who are investigating their drug crimes, and commit suicide. Those risks justify disarming habitual drug users even "between periods" of drug intoxication. Daniels, 77 F.4th at 349. And while Daniels contended that historical limitations on the militia were of limited relevance in assessing "the limits acceptable for the general public," 77 F.4th at 346, early laws understandably focused on the militia because social norms at the time restrained intemperance, there was little public outcry against alcoholism, and the cumbersome nature of firearms mitigated risks posed by intoxicated individuals who were not members of the militia.

In any event, the facts of Daniels are distinguishable. In Daniels, the court largely focused on the fact that the defendant was not "dangerous" because he only "smoke[d] marihuana multiple

---

[9] United States petitioned for certiorari in Daniels and asked the Supreme Court to hold the petition pending the Supreme Court's resolution of Rahimi. See Petition for Writ of Certiorari 5, United States v. Daniels, No. 23-376 (U.S. Oct. 5, 2023). That petition remains pending.

times a month." *Daniels*, 77 F.4th at 354. That hardly resembles this case, in which the defendant admitted to being "up twenty-four hours a day, smoking [crack cocaine] every fifteen minutes, seven days a week." Ex. 19 at 190; *see also* Tr. 613-15, 641-44, 646-48; (Kestan testifying that she witnessed the defendant smoked crack every twenty minutes); Tr. 882 (Hallie Biden testifying that the defendant used crack "daily"). The government has shown that the defendant's drug use was "so regular and so heavy that he was continually impaired." *Daniels*, 77 F.4th at 354. And unlike in *Daniels*, the government has presented evidence that the defendant was smoking crack while he possessed the firearm, as explained below.

Moreover, the effects of casual marijuana use are far different than those stemming from heavy cocaine use like the defendant's. As explained, *see supra* at 17-19, cocaine use can cause severe cognitive impairment and a loss of control that can easily lead to dangerous outcomes. *See Endsley*, 2023 WL 7354020, at *11 ("Suffice it to say that [the defendant] is no casual consumer of marijuana."). And unlike in *Daniels*, the record is replete with evidence showing how the defendant's crack use predisposes him to violence, *see supra* at 16-22—the defendant regularly participated in drug deals and recounted numerous situations where he became involved in a "criminal subculture . . . with the highest probability of violence and depravity." *Id*. at 159-60.[10]

---

[10] For similar reasons, this case is also unlike *United States v. Connelly ("Connelly I")*, 668 F. Supp. 3d 662 (W.D. Tex. 2023) and *United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023), two outlier district court decisions that have held § 922(g)(3) unconstitutional as applied to marijuana users. *See Connelly I*, 668 F. Supp. 3d at 666 (defendant used marijuana "to sleep at night and to help with her anxiety"); *Harrison*, 654 F. Supp. 3d at 1194 (offers found defendant with marijuana). Significantly, the same judge who found § 922(g)(3) unconstitutional as applied to a marijuana user refused to find it unconstitutional as applied to a crack cocaine user. *See United States v. Connelly ("Connelly II")*, No. EP-22-CR-229(1)-KC, 2024 WL 1460762, at *3 (W.D. Tex. Apr. 2, 2024). Courts have also criticized both *Connelly I* and *Harrison. See, e.g., Posey*, 655 F. Supp. 3d at 775 n.9; *Blue Bird*, 2024 WL 35247, at *2; *United States v. Strange*, 2023 WL 8458225, at *5 (E.D. Ky. Dec. 6, 2023); *Grubb*, 2023 WL 6960371, at *5; *Lewis*, 682 F. Supp. 3d at 1055-59 (S.D. Ala. 2023); *Endsley*, 2023 WL 7354020, at *11.

Indeed, the evidence showed the defendant was buying thousands of dollars' worth of crack cocaine from drug dealers. *See, e.g.*, Exs. 18, 28A, 29E, 30A, 36A, 37A. *Daniels* therefore does not support the conclusion that the defendant in this case was entitled to possess a deadly weapon. *See United States v. Connelly ("Connelly II")*, No. EP-22-CR-229(1)-KC, 2024 WL 1460762, at *3 (W.D. Tex. Apr. 2, 2024) (distinguishing *Daniels* as "strongly intimat[ing] that not only those who are actively intoxicated, but also those who are rendered dangerous or violent by their drug use, may be prohibited from possessing firearms without running afoul of the Second Amendment.").

*Second*, the defendant continues to incorrectly claim that no evidence shows that he was using crack cocaine or was addicted to crack cocaine when he possessed the firearm in October 2018. Def.'s Mot. at 4-5. To the contrary, the government has provided ample evidence that the defendant was both using and addicted to crack throughout 2018, including during October 2018. *See* Gov't Opp'n to Def.'s Sufficiency Mot. at 4-10. The defendant's bank statements showed that he withdrew $5,000 in cash from the ATM on October 12, 2018, the same day that he purchased the Colt Cobra. Ex. 29E. On October 13, 2018, one day after he purchased the firearm, the defendant sent a text message stating that he was with "Bernard who hangs at the 7/11!on [sic] Greenhill and Lancaster I'm now off MD Av behind blue rocks stadium waiting for a dealer named Mookie." Ex. 18 at Row 119. On October 14, 2018, two days after he purchased the firearm, the defendant sent a text message to Hallie Biden stating that he was "sleeping on a car smoking crack on 4th Street and Rodney," which is an intersection in Wilmington, Delaware. *Id*. at Row 125.[11] Hallie Biden also testified that late on October 22 or early on October 23, the defendant arrived at her house in

---

[11] The defendant again insists that he "lied" in these texts to Hallie Biden. Def.'s Mot. at 4. This argument is entirely unsupported and should be rejected for the reasons stated in the government's brief in opposition to the defendant's Rule 29 motion challenging the sufficiency of the evidence. *See* Gov't Opp'n to Def.'s Sufficiency Mot. at 13.

Delaware, looking "like he hadn't slept" and as though he could have been using drugs. Tr. 827. She testified that after he went to sleep, she searched the truck he arrived in for drugs and alcohol and found remnants of crack cocaine[12] and drug paraphernalia along with a firearm. Tr. 830-31. This evidence bolsters the conclusion that the defendant was using crack at the time he possessed the firearm, making him precisely the type of "risky" person contemplated by the historical regulations restricting access to firearms. Order at 8 (citing *Veasley*, at 915-16); *see also Montoya*, 2024 WL 1991494, at *6 (Section 922(g)(3) was enacted to disarm "presumptively risky people" who could "endanger public safety" by "prohibiting the possession of firearms by habitual users or addicts of a controlled substance so long as they are using the controlled substance contemporaneously with the firearm possession.").

The defendant also appears to argue that the concerns about dangerousness do not apply to him because there is no evidence that he loaded or used the firearm. Def.'s Mot. at 7.[13] But § 922(g)(3) is a prophylactic statute enacted to "keep guns out of the hands of presumptively risky people." *Yancey*, 621 F.3d at 683. The dangers inherent in firearm possession by a crack user like the defendant is evident from Hallie Biden's testimony that she found the gun in the defendant's unlocked truck that he parked on her lawn in the middle of the night. Tr. 828-29, 832. As Hallie Biden testified, her children often searched the defendant's car, so she was cleaning out his car that morning when she found the gun in a console had a "broken" lock and was ajar. Tr. 831-32. The

---

[12] The defendant's assertion, without any citation, that Hallie Biden "found no drugs" in the truck is plainly inaccurate. *See* Def.'s Mot. at 6.

[13] The defendant also seems to contend that while he may have "owned" the gun, he did not "possess" it. Def.'s Mot. at 5-6. It is unclear how this argument factors into the *Bruen* analysis. In any event, constructive possession is sufficient to satisfy § 922(g)(3). *See Henderson v. United States*, 575 U.S. 622, 626 (2015) (constructive possession involves someone "though lacking such physical custody, still has the power and intent to exercise control over the object"); *United States v. Iafelice,* 978 F.2d 92, 96 (3d Cir. 1992). Defendant has pointed to no support for suggestion that he lacked either actual possession of the gun or control over it from October 12 to October 23.

defendant's impaired judgment from his crack use led him to store his firearm in an unlocked car near children, who could have easily found the gun instead of Hallie Biden. It is beside the point that the defendant's careless possession of a deadly weapon did not result in even graver consequences.

*Third*, the defendant's argument that the reasoning in *Veasley* does not apply to him simply because he did not "brandish the weapon in any threatening or offensive manner" fails. *See* Def.'s Mot. at 8. *Bruen*'s analysis does not require the government to find a historical case or regulation that is a "historical twin" or "a dead ringer for historical precursors." *Bruen*, 597 U.S. at 30; *see also Rahimi*, slip op. at 7. The defendant's argument would put the government in a "regulatory straightjacket," something both *Bruen* and *Rahimi* expressly cautions against. *Bruen*, 597 U.S. at 30; *Rahimi*, slip op. at 7; *see also Fried*, 640 F. Supp. 3d at 1261 ("Requiring an analogue with the specificity Plaintiffs demand would arguably prevent the government from restricting any illegal drug users from possessing guns."). *Bruen* only involves determining that a modern firearms regulation is "relevantly similar" to historical practice. *Id.* at 28-29. And for the reasons set forth above, *see supra* Section I.B., the government has thoroughly explained why the defendant's crack cocaine use can be analogized to "terrifying and dangerous behavior," *Veasley*, 98 F.4th at 917. Regardless, while *Veasley* identified the offense of "Terror of the People" as one historical analogue to § 922(g)(3), the opinion primarily relied on the history of regulations disarming the mentally ill. *See id*. at 913-16. This Court, in turn, largely relied on *those* grounds in upholding § 922(g)(3) as facially constitutional. *See* Order at 4-9. For the reasons explained above, the analogy to the mentally ill readily applies to the defendant's as-applied challenge, *see supra* Section I.B.

## II.   The Defendant's Vagueness Challenge to Section 922(g)(3) Under the Fifth Amendment Fails.

The defendant also argues that § 922(g)(3) is unconstitutional under the Fifth Amendment because it is unconstitutionally vague.[14] "The 'void for vagueness' doctrine addresses two due process concerns: 'first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Dailey v. City of Philadelphia*, 417 F. Supp. 3d 597, 616 (E.D. Pa. 2019), *aff'd*, 819 F. App'x 71 (3d Cir. 2020) (citing *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 at 253 (2012)). The doctrine prevents the government from enforcing a criminal law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *United States v. Portanova*, 961 F.3d 252, 263 (3d Cir. 2020) (citation omitted).

Section 922(g)(3) provides fair notice about the conduct it prohibits. Numerous courts of appeals have rejected vagueness challenges to the provision, and the Court should do the same here. *See, e.g.*, *United States v. Morales-Lopez*, 92 F.4th 936, 944 (10th Cir. 2024); *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020); *United States v. May*, 538 Fed. Appx. 465, 465-66 (5th Cir. 2013); *United States v. Richard*, 350 Fed. Appx. 252, 261 (10th Cir. 2009); *United States v. Edwards*, 540 F.3d 1156, 1162 (10th Cir. 2008); *United States v. Monroe*, 233 Fed. Appx. 879, 881 (11th Cir. 2007); *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002); *United States v.*

---

[14] The defendant does not specify whether he is bringing a facial or as-applied vagueness challenge. However, he is foreclosed from bringing a facial challenge—outside the First Amendment context, the Supreme Court has not typically permitted "[a] plaintiff who engages in some conduct that is clearly proscribed" to challenge the law's vagueness "as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (quotations omitted); *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973) (collecting cases). Accordingly, the government construes his challenge as an as-applied one.

*Purdy*, 264 F.3d 809, 812 (9th Cir. 2001). As the government has explained, the evidence overwhelmingly demonstrated that the defendant was a habitual user of and addicted to crack cocaine when he possessed a firearm in 2018. *See supra* Section I.C.; *see also* Gov't Opp'n to Def.'s Sufficiency Mot. at 4-10. As the evidence at trial established, the defendant continued to use crack cocaine during his possession of the firearm from October 12, 2018 to October 23, 2018. *See id*. The evidence also demonstrates that he knew he was a drug user or addict. *See id*. at 10-13. Under those facts, "there is no question that a person of ordinary intelligence" would understand that regularly using crack cocaine—particularly as extensively as the defendant has done here— prohibits him from possessing a firearm under § 922(g)(3). *See Portanova*, 961 F.3d at 263.  As the defendant admitted in his book, an addict's desire for more crack cocaine "most certainly can" induce "violent behavior."  Exh. 19 at p. 162.

The defendant entirely fails to specify what aspect of § 922(g)(3) he believes has not given him "notice that certain conduct is a crime." Def.'s Mot. at 9. To the extent the defendant contends that *Bruen* changes the vagueness analysis, his argument fails. The court in *Posey* explained that "*Bruen* did not utter a word about how courts determine whether statutes are unconstitutionally vague." 655 F. Supp. 3d at 772. Other district court decisions post-*Bruen* have rejected similar vagueness challenges. *See, e.g.*, *Espinoza-Melgar*, 687 F. Supp. 3d at 1214-15; *Davey*, 2024 WL 340763, at *10; *United States v. Black*, 649 F. Supp. 3d 246, 253 (W.D. La. 2023); *United States v. Sanchez*, 646 F. Supp. 3d 825, 830 (W.D. Tex. 2022); *United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351, at *2-3 (D. Mont. Feb. 24, 2023). The defendant's citations to cases concerning retroactivity thus have no application here. *See* Def.'s Mot. at 10 (citing *Marks v. United States*, 430 U.S. 188, 194-95 (1977); *Bouie v. City of Columbia*, 378 U.S. 347, 362 (1964)).

## CONCLUSION

For all of these reasons, the Court should deny the defendant's motion for judgment of acquittal under Rule 29.

Respectfully submitted,

DAVID C. WEISS
SPECIAL COUNSEL

By:

_____

Derek E. Hines
Senior Assistant Special Counsel

Leo J. Wise
Principal Senior Assistant Special Counsel

U.S. Department of Justice