IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
        v.                          )   Criminal Action No. 1:23-cr-00061-MN
                                    )
ROBERT HUNTER BIDEN,                )
                                    )
        Defendant.                  )
                                    )
_____)


**MR. BIDEN'S REPLY IN SUPPORT OF HIS RULE 29 MOTION FOR ACQUITTAL UNDER THE SECOND AMENDMENT AS APPLIED AND THE FIFTH AMENDMENT**

Abbe David Lowell  
Christopher D. Man  
WINSTON & STRAWN  
1901 L Street NW  
Washington, DC 20036  
Tel.: (202) 282-5000  
Fax: (202) 282-5100  
AbbeLowellPublicOutreach@winston.com  

Bartholomew J. Dalton (#808)  
DALTON & ASSOCIATES, P.A.  
1106 West 10th Street  
Wilmington, DE 19806  
Tel.: (302) 652-2050  
BDalton@dalton.law  

*Counsel for Robert Hunter Biden*

## INTRODUCTION

The Supreme Court's decision last Friday in *United States v. Rahimi*, No. 22-915 (U.S. June 21, 2024), upheld 18 U.S.C. § 922(g)(8) against a Second Amendment challenge, but its analysis made equally clear that Section 922(g)(3) of the same statute is unconstitutional. The Supreme Court again emphasized that firearm possession is presumptively a constitutional right and the only valid exceptions must be analogous to a historical exception that existed when the Second Amendment was adopted.[1] *Rahimi* upheld Section 922(g)(8) because it is analogous to Founding Era surety laws—which nobody argues are analogous to Section 922(g)(3)—but more importantly, for our purposes, the Supreme Court emphatically and unanimously rejected the government's other defense of the statute that rested on the claim that Congress can disarm people who it presumes to be dangerous or not responsible. Slip op. at 17. Each of the justifications the Special Counsel raises in defense of Section 922(g)(3) fall under this rejected rubric. Each count of conviction necessarily falls.[2]

---

[1] The Special Counsel often relies on post-Founding Era purported precedents, but those come too late to inform what was intended by those who ratified the Second Amendment. As *Rahimi* explained: "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" Slip op. at 7 (quoting *N.Y. State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 29 & n.7 (2022); *see also* Slip op. at 3 (Gorsuch, J. concurring) (noting the relevant timeframe is the time of founding for interpreting the Constitution); Slip op. at 2 (Barrett, J., concurring) (explaining post-ratification practice may not reflect Founding Era views); Slip op. at 28 (Thomas, J., dissenting).

[2] Mr. Biden's initial motion to dismiss the indictment explains why all three charges fall if Section 922(g)(3) cannot be constitutionally applied to prevent him from possessing a gun. D.E.61. The first domino to fall is Count 3, the possession charge that rests upon an unconstitutional application of Section 922(g)(3). Count 1's charge for a false statement under Section 922(a)(6) would then fall because Mr. Biden's answer to the question about drug use is no longer material to the sale of a firearm and Count 2 charging a false record to be stored under Section 924(a)(1)(A) falls because the question asked is *ultra vires*. *Id*. at 6–9. The issue of whether Counts 1 and 2 fall if Section 922(g)(3) is found unconstitutional is fully briefed, but the Court declined to rule on the issue earlier because it found Section 922(g)(3) was not facially unconstitutional. D.E.114 at 10.

*Rahimi* leaves no doubt that Section 922(g)(3) is unconstitutional in most applications, and Mr. Biden's conviction cannot be sustained under the jury instructions that were given here. Even now, well after the trial, this Court has not defined where the line is that "marks where the right stops and the State's authority to regulate begins," and no narrowing construction of Section 922(g)(3) was presented to the jury through jury instructions. Slip op. at 1 (Barrett, J., concurring). That also means Mr. Biden had no advance due process warning as to where his conduct would move from a constitutional right to a felony, so that he could conform his conduct to the law. And it means the grand jury did not charge a valid indictment and the petit jury did not validly convict because the narrowing language necessary to save the statute was neither charged nor found by either jury consistent with the Fifth and Sixth Amendments. *See Erlinger v. United States*, No. 23-370, Slip op. at 7-8 (U.S. June 21, 2024) (explaining that an indictment must charge every fact necessary to a conviction and the Sixth Amendment requires "a unanimous jury to find every fact essential to an offender's punishment").

The Special Counsel devotes much of his brief to arguing the facts, but he is directing his repeated closing argument to the wrong forum. This Court properly told the jury that "you are the sole judges of the facts," and this jury was not asked to find the constitutionally relevant facts. It was only told to find whether the statutes as written were violated—without any further finding necessary to satisfy the Second Amendment. 6/10/24 Tr. at 1298. In fact, the Special Counsel sought, and this Court granted, a motion *in limine* to prevent reference to a Second Amendment defense. D.E.189 at 3 (Order granting government's motion (D.E.124) to exclude argument, evidence and questioning relating to the constitutionality of the firearm statute). The Sixth Amendment prevents Mr. Biden's conviction from resting upon any judge found facts, those facts must be found by a jury beyond a reasonable doubt, and—over Mr. Biden's objection—the jury

was not even asked to find the facts necessary for his conduct to be a crime consistent with the Second Amendment. *Erlinger*, Slip op. at 11 ("Judges may not assume the jury's factfinding function for themselves, let alone purport to perform it using a mere preponderance-of-the-evidence standard.").

## ARGUMENT

I.  *RAHIMI* RESTS ON DISTINCT HISTORICAL PRECEDENT

The prohibitions in Sections 922(g)(8) and 922(g)(3) are very different and have very different historical pedigrees. Section 922(g)(8) applies only to persons who are "subject to a court order" that "was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate," and that order finds that the person poses "a credible threat to the physical safety of such intimate partner or child" and restrains that person from "harassing, stalking, or threatening" that intimate partner or child. By contrast, Section 922(g)(3) applies to an addict or unlawful drug user without any court order finding them dangerous in any respect. That distinction is critical to the Second Amendment analysis.

The Supreme Court explained its holding, writing "we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, Slip op. at 17. That decision rested on an analogy to similar Founding Era surety and affray ("going armed") laws. The Court found Section 922(g)(8) "matches the surety and going armed laws, which involved *judicial determinations* of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 14 (emphasis added).

The Court explained the surety system and how, as with Section 922(g)(8), it often applied to prevent domestic violence. An abused spouse or other abused person could go to court and

3

obtain an order finding that their specific abuser posed a threat to them and requiring the abuser to post a bond that would be forfeited if they violated the terms of the surety by harming the victim again. *Id.* at 10.

The Court also found Section 922(g)(8) analogous to affray statutes, which prevented armed persons from going out in public to terrorize people. *Id.* at 12. "An affray could occur only in 'some public place' and "generally, required 'actual violence.'" Slip op. at 23 (Thomas, J., dissenting). The historical "offense was not about mere possession, or even openly carrying a firearm. It required more, the 'offensive[]' *use* of a firearm in a way that terrorized others." *United States v. Veasley*, 98 F.4th 906, 917 (8th Cir. 2024).

## II. *RAHIMI* DEMONSTRATES SECTION 922(g)(3) IS UNCONSTITUTIONAL AS APPLIED TO MR. BIDEN

### A. The Historical Analogs That Supported Section 922(g)(8) Do Not Support Mr. Biden's Conviction Under Section 922(g)(3)

The surety and affray laws do not support Mr. Biden's conviction under Section 922(g)(3). The surety laws, with their requirement of an advance judicial finding of dangerousness and a judicial order for a specific individual to refrain from certain conduct, have nothing to do with Section 922(g)(3), which has none of those features. The Special Counsel does not argue otherwise in his response.

The analogy to the affray laws would substantially narrow Section 922(g)(3). *Veasley* found Section 922(g)(3) was not facially unconstitutional because some people who are armed and on drugs will terrify people in the same manner targeted by the affray laws. But the Eighth Circuit explained: "To be sure, not every drug user or addict will terrify others, even with a firearm. . . . But those are details relevant to an as-applied challenge, not a facial one." 98 F.4th at 917–18.

4

Here, the jury did not find Mr. Biden ever terrorized anyone with a gun in public, or anywhere else, or used it dangerously in any way. Indeed, there is no evidence he ever even took the gun out of its case in public, loaded or used it, showed anyone the gun, told anyone he had bought a gun until after it left his possession, and there certainly is no evidence he terrorized anyone with the gun. Whatever room the affray laws leave for Section 922(g)(3) to constitutionally survive, there was no evidence from which a jury could have found that Mr. Biden used the gun to publicly terrorize anyone and—most importantly—the jury made no such finding. That requires Mr. Biden's acquittal.

### B. Mr. Biden's Conviction Cannot Be Upheld Because The Special Counsel Claims He Was Dangerous

The Special Counsel devotes much of its opposition to claiming that Mr. Biden's drug use made him dangerous (D.E.234 at Sec. I.B.), but *Rahimi* clearly rejected the government's argument that this is a basis for disarmament. A more particularized historical analogy is required.

As the Supreme Court explained in *Rahimi*, while "holding that Section 922(g)(8) is constitutional as applied to Rahimi," the Court "reject[ed] the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'" Slip op. at 17; *see* Slip op. at 6 (Gorsuch, J., concurring) ("Nor do we purport to approve in advance *other laws* denying firearms on a categorical basis to any group of persons a legislature happens to deem, as the government puts it, not 'responsible.'") (emphasis added). At oral argument, the government explained that "when it used the term 'responsible' in its briefs, it *really* meant 'not dangerous.'" Slip op. at 28 (Thomas, J. dissenting) (emphasis in original). With respect to this argument "that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding,'" Justice Thomas emphasized: "Not a single Member of the Court adopts the Government's theory." *Id.* at 27. To highlight this fact, Justice Gorsuch requoted Justice Thomas' point in his concurrence.

5

Slip op. at 6 (Gorsuch, J., concurring) ("Not a single Member of the Court adopts the Government's theory").

The reason for that is self-evident.

> The Government's proposed justification is also far too general. Nearly all firearm regulations can be cast as preventing 'irresponsible' or 'unfit' persons from accessing firearms. In addition, to argue that a law limiting access to firearms is justified by the fact that the regulated groups should not have access to firearms is a logical merry-go-round. As the Court has made clear, such overly broad judgments cannot suffice.

Slip op. at 15 (Thomas, J., dissenting).

Beyond advancing this erroneous legal theory (or "invented" theory, according to Justice Thomas, Slip op. at 28 (Thomas, J., dissenting)), the Special Counsel is simply wrong in claiming that Mr. Biden posed any risk of violence. We do not quarrel with the Special Counsel's claims and statistics that many users of crack are violent and have misused guns, but—while the Special Counsel has extensively chronicled Mr. Biden's conduct over several years of crack use—the Special Counsel has not identified a *single* time in which Mr. Biden became violent. Not one. And there is no evidence whatsoever that Mr. Biden ever loaded, fired, brandished, or threatened anyone with a gun, or that it was ever even in his actual physical possession at any time in which he was allegedly using any drug.

Mr. Hines conceded this point in his opening:

> To be clear, Mr. Biden is not charged with a violent offense, the gun was taken from him just after 11 days *before anything like that could occur*. But it's important to note that *whether the defendant is dangerous is not an issue that's relevant for your determinations in this case*. He's just charged with possession of a gun.

6/4/24 Tr. at 341 (emphasis added). Not only is this an acknowledgment that no violent offense did "occur," Mr. Hines told the jury it would not be making any finding as to "whether the defendant is dangerous." *Id*. And he was right about that—nothing in the jury instructions asked the jury to find whether Mr. Biden was dangerous. Thus, even if this is an element of the offense

6

that must be read into the statute to make it constitutional, the jury was not asked to find this element met as is required by the Sixth Amendment.

When a statute has been narrowed by a judicial construction, courts must instruct juries that the narrowing condition must be satisfied to obtain a conviction. *See, e.g.*, *Osborne v. Ohio*, 495 U.S. 103, 124 (1990); *United States v. Simmons*, 96 U.S. 360, 363 (1877); *United States v. Riley*, 621 F.3d 312, 323 (3d Cir. 2010) (finding error in honest services fraud jury instructions that did not comport with the Supreme Court's narrowing of the offense in *Skilling v. United States*, 561 U.S. 358 (2010)). If the jury is never told it must apply a narrowing construction to a statute to convict, the narrowing construction necessary to save a statute from being found unconstitutional serves no purpose whatsoever. Charging the jury under a constitutionally overbroad statute without the necessary narrowing construction allows a jury to convict on an unconstitutional basis.

The Special Counsel argues that even though Mr. Biden was not violent that does not matter because Section 922(g)(3) is a "prophylactic statute" meant to disarm "presumptively risky people," but that is not good enough under the Second Amendment. D.E.234 at 26. That is the very argument the Supreme Court unanimously rejected in *Rahimi* and that the Supreme Court has rejected when overturning every law under the Second Amendment. All gun control laws have a prophylactic intent and aim to prevent the misuse of a firearm, but this sort of means-end scrutiny was rejected in *Bruen*. 597 U.S. at 19.

Moreover, the Special Counsel's claim that Congress could declare a group of persons "presumptively risky people" and disarm them is exactly the fear that led to the adoption of the Second Amendment. In elaborating upon why the Supreme Court unanimously rejected the government's dangerousness argument in *Rahimi*, Justice Thomas explained: "The Second

7

Amendment stems from English resistance against 'dangerous' person laws." Slip op. at 8 (Thomas, J, dissenting). The impetus for the Second Amendment was that England had disarmed groups of people deemed dangerous to the crown, and the Founders sought to deny that power to Congress. Our country witnessed similar abuses in the efforts to disarm newly freed Black slaves on the grounds that they were deemed "dangerous" too. *Id.* at 30. "In short, laws targeting 'dangerous' persons led to the Second Amendment. It would be passing strange to permit the Government to resurrect those self-same 'dangerous' person laws to chip away at that Amendment's guarantee." *Id.* at 8–9.

## II. THE SPECIAL COUNSEL'S ANALOGIES TO THE MENTALLY ILL AND INTOXICATED PERSONS DO NOT SUPPORT MR. BIDEN'S CONVICTION

The Special Counsel invokes Founding Era prohibitions on gun possession by the mentally ill and intoxicated persons, but he grossly distorts those Founding Era Second Amendment exceptions. Neither group was categorically disarmed. As *Veasley* explained: "Just like the intoxicated kept their civil liberties, including the right to possess firearms, the mentally ill frequently did too. Those who posed no danger stayed at home with their families, and their civil liberties remained intact." 98 F.4th at 913. Thus, even applying the exceptions invoked by the Special Counsel now, none would warrant disarming Mr. Biden.

### A. Mr. Biden Is Charged With A Drug Offense, So Founding Era Drug Laws Are The Relevant Analogy

The Special Counsel begins with a curious argument that despite Mr. Biden's use of cocaine being the purported basis of his crimes 'the relevant inquiry is not whether, at the time of the Founding, there existed regulations restricting firearm access for those habitually abusing or addicted to crack cocaine." D.E.234 at 7. Although crack cocaine was not widely used, if used at all during the Founding Era, numerous other drugs were, so drug use should be the most relevant

8

analogy. People of the Founding Era were well aware of the impact of the powerful, widely used drug opium, as well as hemp, ayahuasca, peyote, and hallucinogenic mushrooms. *Veasley*, 98 F.4th at 911. Thus, "lawmakers were certainly aware of the problem." *Id.*

The problem for the Special Counsel with making an apples-to-apples comparison of modern drug laws concerning guns to Founding Era drug laws concerning guns is that the Founding Era had none. The Special Counsel cites none and *Veasley* explained: "Despite the widespread use of opium in particular, the government concedes that its 'review of early colonial laws has not revealed any statutes that prohibited [firearm] possession' by drug users." 98 F.4th at 912 (alteration in *Veasley*); *see also* D.E.234 at 7 (Special Counsel acknowledging even laws regarding alcoholism were sparse in the Founding Era).

The Special Counsel attempts to skip past the lack of an analogous Founding Era *drug* law for this modern *drug* prosecution, and instead seeks to compare modern drug users to those who were drunk or mentally ill in the Founding Era. But because the Founders were well aware of the problems posed by drugs, the relevant inquiry is how drug use was addressed in the Founding Era.

The Supreme Court in *Rahimi* explains that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." Slip op. at 7. *Rahimi* adds: "Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* That is because "history is our reference point and anchor. If we stray too far from it by eliding material differences between historical and modern laws, we 'risk endorsing outliers that our ancestors would never have accepted.'" Slip op. at 15 (Thomas, J., dissenting) (quoting *Bruen*, 597 U.S. at 30).

9

Thus, the fact is that Founding Era lawmakers were aware of the impact of powerful drugs but did not enact any laws to disarm those who used such drugs is dispositive. "The lesson here is that disarmament is a modern solution to a centuries-old problem. The fact that 'earlier generations addressed the societal problem . . . through materially different means . . . [is] evidence that' disarming all drug users, simply because of who they are, is inconsistent with the Second Amendment." *Veasley*, 98 F.4th at 912 (quoting *Bruen*, 597 U.S. at 26).

The Special Counsel repeatedly emphasizes that the historical precedent need not be identical to a modern law, which is no doubt true, but the Supreme Court has not tolerated the sort of expansion beyond Founding Era precedent that the Special Counsel seeks here. Founding Era lawmakers knew about opium and muskets, not modern drugs like crack or modern weapons like the AR-15, but we can draw analogies to Founding Era laws on the same subject. We know how the Framers would have regulated an AR-15 because we see how they regulated guns of that era. The same is true of drugs. We know how the Founders would have viewed those who use crack cocaine because we know how they treated those who used opium and other drugs.

We do not have to imagine what the Founders would do about drugs by looking at how they regulated drunkards and the mentally ill because we can examine how they regulated—or here, did not regulate—drugs because drugs and the problems they posed existed in the Founding Era. Drugs are not a modern day discovery requiring us to guess at how they would have regulated drug users by searching for analogous situations, such as the regulation of drunkards and the mentally ill, because we can see how they actually regulated drug users then. The answer is they did not (and not everything has to be regulated). No matter how harshly Founding Era laws may have restricted gun possession for the mentally ill or for drunkards, that does not change the fact that no Founding Era restrictions existed for drug users.

The Special Counsel loses sight of the purpose of looking for a historical analog, which is to assess how lawmakers of the Founding Era would have dealt with a modern problem. New technology can make those determinations tricky in some contexts, like deciding whether GPS tracking or satellite surveillance violates the Fourth Amendment because the Founders were unfamiliar with such technology. But there is no such problem here. The Founders were aware of the disorienting effect of drugs and we can look at how the Founders actually handled that problem. We do not have to guess at how they would have handled that problem by looking to how they handled different problems, such as those posed by the mentally ill and alcohol.

Again, the question here is whether there was a Founding Era law for disarming people who used drugs and there was none, so by necessity imposing any such restriction of that kind now unconstitutionally "exten[ds] beyond what was done at the founding." *Rahimi*, Slip op. at 7. Whatever Founding Era laws may have said about the mentally ill or those who were drunk tells us nothing about whether Mr. Biden's *drug* use would have caused his disarmament at the Founding.

      **B.**      **Founding Era Intoxication Laws Do Not Support Mr. Biden's Conviction**

People who were mere users of alcohol were not disarmed, rather the prohibition concerned "the misuse of weapons while intoxicated." *United States v. Daniels*, 77 F.4th 337, 345 (5th Cir. 2023). Even the examples cited by the Special Counsel note that the offenses were for "shoot[ing]" or "firing" guns while intoxicated. D.E.234 at 10. These laws "only prevented . . . misusing the guns they did have during bouts of drinking" and they "applied only to those under the influence, not habitual drinkers." *Daniels*, 77 F.4th at 345–46. Thus, the Fifth Circuit explained: "Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing.

11

The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol." *Id.* at 346.

The Fifth Circuit found that, "[d]espite the prevalence of alcohol and alcohol abuse, neither the government nor *amici* identify any restrictions at the Founding that approximate § 922(g)(3)." *Id.* at 345. Section 922(g)(3) extends much further than any Founding Era law concerning alcohol in two respects. First, those laws did not ban gun possession—especially under the loose constructive possession instruction given to the jury where mere ownership could establish possession even if the owned gun was miles away from the owner. *See* 6/4/24 Tr. at 342 (Hines opening) (repeatedly arguing ownership as the basis for liability: "He is charged with owning a gun."). They required the gun actually be misused in some manner, which required actual physical possession of the gun when firing the weapon or using it to terrorize someone. Again, there is no evidence Mr. Biden even ever loaded the gun, fired it, brandished it in public, or misused the firearm in any way at all.

Second, that restriction on actual physical possession applied only to someone who was actively intoxicated at the very same time they had physical possession of a gun—not someone who was drinking alcohol, but was not drunk, and certainly nothing comparable to the instructions to this jury that allowed Mr. Biden to be deemed a drug user even if he last used "days or weeks before." 6/10/24 Tr. at 1305; *see also id.* at 1321 (Wise closing) ("So again, the United States is not required to prove drug use on a particular day, whether it's October 12th, or any day between October 12th and October 23rd, or within a matter of days or weeks before that period. In other words, there is no requirement that the United States prove use in the month of October.").

Mr. Biden is entitled to an acquittal because there is no evidence that his conduct fit into this historical exception or, at a minimum, he is entitled to a new trial because the jury was never

instructed and made no factual findings concerning the applicability of this instruction as required by the Sixth Amendment.[3]

### C. Founding Era Laws Concerning The Mentally Ill Do Not Support Mr. Biden's Conviction

The Special Counsel moves farther afield in looking to whether moder day drug users could have been disarmed based on laws then-existing at Founding concerning the mentally ill, rather than looking to whether drug users could be disarmed in the Founding Era. Mental illness and drug use are very different. Nevertheless, in the Founding Era mental illness was viewed as a transitory condition where people would flow in and out of periods of lucidity, and intoxication was viewed as a sort of "temporary insanity." *Veasley*, 98 F.4th at 913 (citation omitted). Even so, as described above, those who were viewed as temporarily insane because of drunkenness were not disarmed. Thus, the Founding Era precedents do not establish that people who used drugs or even those who were actively intoxicated on alcohol were treated like the mentally ill.

Nor were the mentally ill disarmed—"only those who were both mentally ill and dangerous." *Id*. Again though, the Special Counsel has offered no evidence that—at the time Mr. Biden owned a gun (that was never even loaded) for 11 days—Mr. Biden would have been treated like the mentally ill during the Founding Era or was dangerous at the same time. Rather, the Special Counsel conceded that Mr. Biden did not commit any violent crime during this period and

---

[3] The Special Counsel raises in passing that militia laws would disarm actively intoxicated militia members, but that is irrelevant. D.E.234 at 10-11. Those restrictions applied only to those *in* the militia—not members of the general public—and concerned issues of preserving military readiness and preventing abuses by the militia. The Fifth Circuit found this analogy particularly weak because those militia laws "exist[ed] to ensure a competent military—a service-member cannot perform his duties if he is impaired." *Daniels*, 77 F.4th at 346. In any event, Mr. Biden was not a member of the military or any militia in the relevant timeframe that he owned a gun.

could not identify any incident in which Mr. Biden ever was violent while using drugs or otherwise. 6/4/24 Tr. at 341.

### III. THE INDICTMENT IS UNCONSTITUTIONAL UNDER THE DUE PROCESS CLAUSE FOR FAILURE TO PROVIDE FAIR NOTICE OF A CRIME

The Special Counsel flubs his response to Mr. Biden's due process concerns under the Second Amendment. Although Mr. Biden certainly contests that Section 922(g)(3) is clear,[4] the central problem here is that the line that "marks where the [Second Amendment] right stops and the State's authority to regulate begins," has not been drawn. Slip op. at 1 (Barrett, J., concurring). If Section 922(g)(3) is clear and there is no application of Section 922(g)(3) that would violate the Second Amendment, then this is not a concern. But this Court has not said that Section 922(g)(3) is constitutional in *every* application and, to the contrary, the Court relied heavily on the *Veasley* and *Daniels* decisions that made clear that Section 922(g)(3) cannot be constitutionally applied in a vast number of situations. D.E.114 at 4.

That begs the question: where is this line that separates not only what is legal from what is illegal, but where the exercise of a constitutionally protected right becomes a felony? How does a person have fair notice of when he or she is allowed to possess a firearm if they used a prohibited substance a day, a week, a month or, as the Special Counsel argued, years before? This Court has not said, and the jury that would have to find a constitutionally permissible charge to convict was

---

[4] For example, the Special Counsel repeatedly claims, "[a] user can 'regain his right to possess a firearm simply by ending his drug abuse.'" D.E.234 at 9; *see also id.* at 12. But it is not quite so simple if someone is still considered a drug user if they have quit, but last used drugs "days or weeks before." 6/10/24 Tr. at 1321. Defense counsel has repeatedly asked and still is left to wonder how long after someone who has quit using drugs must wait before they can possess a gun without violating Section 922(g)(3). Neither the Special Counsel nor this Court have provided an answer, and the fact that defense counsel could not even advise a client of how long someone who quit using drugs would have to wait to legally posses a gun is powerful evidence that Section 922(g)(3) is too unconstitutionally vague for an average citizen to determine that answer either.

14

not told either.  In other words, whatever more facts must be proven beyond Section 922(g)(3)'s statutory language for a conviction to be proven—such as active intoxication while physically armed and terrorizing people—remains an unknown and were never found by the jury.

Moreover, once the Court does announce where this line exists, that guidance is only of value to the people of Delaware prospectively.  It comes too late for people like Mr. Biden to be able to conform their conduct within the constitutional bounds of the law previously.  Thus, while courts may impose limiting constructions on a statute to resolve constitutional problems with them in some circumstances, principles of due process notice prevent those new standards from being applied retroactively.  *See, e.g.*, *Marks v. United States*, 430 U.S. 188, 194–95 (1977); *Bouie v. City of Columbia*, 378 U.S. 347, 362 (1964).  Additionally, when courts add a judicial gloss on a statute, that gloss must be charged in an indictment like any other element.  *See, e.g.*, *Simmons*, 96 U.S. at 363.  There is no point in saving a statute from being found unconstitutional through a limiting construction if the grand jury that makes a charging decision and the jury that is asked to convict are never told what is required by a court's limiting construction.  Consequently, if the Court finds that the Second Amendment places a gloss on Section 922(g)(3) that narrows the constitutionally permissible scope of the statute, Mr. Biden must be acquitted on that ground alone.

## CONCLUSION

The Court should order an acquittal of Mr. Biden because the charges against him are unconstitutional.

Dated: June 24, 2024

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050

Respectfully submitted,

/s/ *Abbe David Lowell*
Abbe David Lowell
Christopher D. Man
WINSTON & STRAWN
1901 L Street NW
Washington, D.C. 20036

15

BDalton@dalton.law                          Tel.: (202) 282-5000
                                                                Fax: (202) 282-5100
                                                                AbbeLowellPublicOutreach@winston.com
                                                                CMan@winston.com

*Counsel for Robert Hunter Biden*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ *Abbe David Lowell*
Abbe David Lowell

*Counsel for Robert Hunter Biden*