IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | )  Criminal No. 23-00061-MN |
| ROBERT HUNTER BIDEN, | ) |
| | ) |
| *Defendant.* | ) |

## THE UNITED STATES' SUR-REPLY IN OPPOSITION TO DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL UNDER THE SECOND AMENDMENT AS APPLIED AND THE FIFTH AMENDMENT (ECF 220)

The government respectfully requests the opportunity to brief the Court in this sur-reply to address the defendant's incorrect contentions about the Supreme Court's recent decision in *United States v. Rahimi* No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024).

On June 7, 2024, the defendant filed his Rule 29 motion, ECF 220. The government filed a response in opposition on June 21, 2024, the same day that the Supreme Court issued its decision in *Rahimi*. ECF 234 ("Gov't Opp'n"). On June 24, 2024, the defendant filed his reply in support of his motion, in which he raised arguments about *Rahimi* that the government has not yet addressed. ECF 235 ("Def.'s Reply"). This sur-reply responds to the defendant's numerous misstatements about the holding, legal effect, and applicability of *Rahimi* in his reply brief. Good cause supports the filing of this sur-reply, as it will benefit the Court's review of the motion in light of new controlling law. *See St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co.*, 291 F.R.D. 75, 80 (D. Del. 2013) (additional briefing appropriate "if it responds to new evidence, facts, or arguments").

In his reply brief, the defendant principally makes three arguments about *Rahimi*, but none have merit. *First*, the defendant claims that, in *Rahimi*, the Supreme Court "emphatically and

1

unanimously rejected the government's other defense of the statute that rested on the claim that Congress can disarm people who it presumes to be dangerous or not responsible." Def.'s Reply at 1; *see also id*. at 5-8. This claim does not accurately reflect the Supreme Court's majority opinion in *Rahimi*, nor does it accurately reflect the government's position. The majority's statement that it rejected the contention that "Rahimi may be disarmed simply because he is not 'responsible,'" *Rahimi*, 2024 WL 3074728, at *11, was made in response to a separate argument that is not at issue in this case. *Rahimi* involved an argument that the Second Amendment's protections *only* applied to "responsible citizens." *See* Gov't Opening Br. at 6 (describing the Second Amendment right as one only belonging to "law-abiding, responsible citizens").[1] The government does not take the position in this case that the Second Amendment protections should not apply to the defendant simply because he is not "responsible." *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101-02 (3d Cir. 2023). Indeed, the word "responsible" was never used in the government's opposition brief. *See* Gov't Opp'n. The defendant's principal argument is therefore irrelevant to the issues before the Court in this case.

Rather, the government makes a different argument here: that laws disarming "persons who are otherwise dangerous" provide a sufficiently similar historical analogue to § 922(g)(3) as applied to the defendant. *See id.* at 12-15. The majority opinion in *Rahimi* expressly approved of this argument when it explained that it did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 2024 WL 3074728, at *9. Section 922(g)(3)—which

---

[1] Other courts have referred to this as "*Bruen* step one." *United States v. Davey*, No. 23-20006-01-DDC, 2024 WL 340763, at *2 (D. Kan. Jan. 30, 2024); *see also United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024) (referring to *Bruen*'s "step one" as asking: "does a law prohibit conduct that "the Second Amendment's plain text covers?").

was enacted to "keep guns out of the hands of presumptively risky people," *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010)—does just that. And the historical laws disarming groups of people who were deemed dangerous provide a relevantly similar analogue. *See* Gov't Opp'n at 13-15. Many district courts are in accord. *See id*. at 13 (collecting cases upholding § 922(g)(3) by relying on historical regulations disarming criminals and persons who pose a threat to the safety of others if armed). As the government explained in its opposition brief, *id*. at 12-15, Section 922(g)(3)'s temporary prohibition on firearms as applied to the defendant is "relevantly similar" to those laws in "both why and how it burdens the Second Amendment right." *Rahimi*, 2024 WL 3074728, at *9 (quoting *Bruen*, 597 U.S. at 29). Other than a citation to Justice Thomas's dissenting opinion in *Rahimi*, the defendant does not offer any authority for his argument that the Second Amendment should protect a dangerous person's possessions of a firearm. There is none.

In terms of *why* the challenged provisions restrict the Second Amendment right, like the historical laws, these provisions limit firearm use by groups of people considered dangerous. "While these laws targeted different categories of people, the justification was the same: the legislatures identified these groups as dangerous to public safety, untrustworthy, or otherwise unfit to bear arms." *United States v. Montoya*, No. 1:21-CR-0997-KWR, 2024 WL 1991494, at *11 (D.N.M. May 6, 2024). Congress likewise enacted § 922(g)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). "[T]he very real risk to public safety posed by the combination of unlawful drug use and firearms was evidently a primary motivation behind Congress's enactment of § 922(g)(3). This motivation aligns with this Nation's historical tradition of banning dangerous people from possessing guns." *United States v. Endsley*, No. 3:21-CR-00058-TMB-MMS-1, 2023 WL 6476389, at *5 (D. Alaska Oct. 5, 2023).

The record in this case is replete with evidence demonstrating that the defendant's extensive crack cocaine use made his possession of a firearm dangerous. *See* Gov't Opp'n at 15-21. "[U]nlawful drug use . . . causes significant mental and physical impairments that make it dangerous for a person to possess firearms." *Fried v. Garland,* 640 F. Supp. 3d 1252, 1262-63 (N.D. Fla. 2022) (citation omitted). The defendant exhibited those qualities when, for example, he stored his firearm in his unlocked truck that he parked on the lawn of Hallie Biden's house where she lived with her young children, *see* Gov't Opp'n at 26-27, or when he purchased a speed loader and more damaging hollow point bullets along with his firearm, *id*. at 19-20. The defendant also embodies the concern that drug users are "more likely than the general population to engage in crime (including robbery and other crimes of violence to feed their habit, as well as trafficking)." *United States v. Espinoza-Melgar*, 687 F. Supp. 3d 1196, 1204 (D. Utah 2023) (citation omitted). For example, the defendant admitted in his memoir that his frequent use of crack cocaine led him to "darkest corners of every community," and he "bec[a]me dependent not only on a criminal subculture to access what [he] need[ed] but the lowest rung of that subculture—the one with the highest probability of violence and depravity." Ex. 19 at 159-60. He recounted participating in numerous drug deals, including one during which a gun was pointed in his face. *See* Gov't Opp'n at 19-20. This conduct makes him "analogous to other groups the government has historically found too dangerous to have guns." *Fried*, 640 F. Supp. 3d at 1263.

In terms of *how* the challenged provisions burden Second Amendment rights, like historical intoxication laws, they impose a *temporary* restriction on possession or receipt that lasts only during the period an individual is an unlawful user or addict. This "relatively lenient" burden "only endures for as long as the individual is an unlawful user or addict, leaving them free to regain their full Second Amendment rights at any time." *United States v. Posey*, 655 F. Supp. 3d 762, 776 (N.D.

Ind. 2023). By contrast, the "burden imposed on the right to bear arms by colonial legislatures was substantial and sometimes absolute." *Montoya*, 2024 WL 1991494, at *11. In upholding § 922(g)(8), *Rahimi* rested on similar logic. The majority noted that § 922(g)(8)'s restriction "was temporary" because it "only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Rahimi*, 2024 WL 3074728, at *10. It also explained that, since the historical laws provided for imprisonment, the "lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id*. Like in *Rahimi*, § 922(g)(3)'s temporary deprivation of firearms is a "lesser restriction" than analogous laws at the Founding—a "relevant aspect of the burden" that "fits within the regulatory tradition." *Id*.

*Second*, after claiming that *Rahimi* somehow helps his arguments, the defendant tries to distinguish *Rahimi* by arguing that the historical analogues that the Supreme Court relied on in upholding § 922(g)(8) do not apply here. Def.'s Reply at 3-5. But that is beside the point— § 922(g)(3), which prohibits someone who is "an unlawful user of or addicted to any controlled substance" from possessing a firearm, encompasses a different set of conduct than § 922(g)(8), which prohibits a subject to a domestic violence restraining order from possessing a firearm. It is only logical that the reasons for "how and why the regulations burden a law-abiding citizen's right to armed self defense" could involve different historical analogues. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 29 (2022). And as the government explained, historical laws disarming persons who were mentally ill, intoxicated, or otherwise dangerous all provide relevantly similar analogues to justify § 922(g)(3) as applied to the defendant. *See* Gov't Opp'n at 7-15.

Regardless, the affray laws cited approvingly in *Rahimi*—along with other historical laws disarming groups of people deemed a threat to public safety—are relevant to the defendant's conduct. *See id*. at 12-15. As the government has described, the defendant's crack cocaine use made

5

him someone whose possession of a firearm would pose a threat to himself and others. *See id*. at 15-21. Indeed, the defendant sent a text message discussing his participation in drug deal *while he possessed the gun*. *See* Ex. 18 at Row 119 (October 13, 2018 text message saying that the defendant was "waiting for a dealer named Mookie."); *see also* Ex. 19 at 160 (defendant writing in his memoir that he had to "learn little things to protect" himself during drug deals). That is analogous to the conduct the affray laws were intended to prevent: "going armed" with "dangerous or unusual weapons" for the purpose of terrifying people. *Rahimi*, 2024 WL 3074728, at *9; *see also United States v. Veasley*, 98 F.4th 906, 916-17 (8th Cir. 2024).

The defendant counters that the affray laws do not supply an adequate historical analogue to § 922(g)(3) as applied because his firearm was taken from him before he could "publicly terrorize" anyone with it. Def.'s Reply at 5. That argument is akin to requiring a "dead ringer" or a "historical twin"—something *Rahimi* repeatedly rebukes. *See Rahimi* 2024 WL 3074728, at *6 (citing *Bruen*, 597 U.S. at 30); *id*. ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber."); *id*. ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."); *id*. at *9 ("Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be."); *id*. at *11 ("[T]he Fifth Circuit made [an] error" by reading "*Bruen* to require a 'historical twin' rather than a 'historical analogue.'"). As the government explained, this aspect of *Rahimi* also undermines the reasoning in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), which the defendant continues to rely on. Notably, the defendant's reply brief fails to engage with that argument or the government's additional arguments demonstrating why *Daniels* does not apply here. *See* Gov't Opp'n at 22-23.

6

*Third*, defendant also incorrectly claims that the majority opinion in *Rahimi* rejected the argument that § 922(g)(3) is a prophylactic statute intended to disarm "presumptively risky people." Def.'s Reply at 7. To the contrary—as noted, the majority expressly stated that it does "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 2024 WL 3074728, at *9. Moreover, all provisions of § 922(g) prevent firearm possession based on an individual's conduct or status and do not, as the defendant suggests, require a finding that the individual committed a violent act with the firearm. Indeed, such a contorted theory would eviscerate federal criminal laws that prohibit gun possession by certain individuals. And contrary to the defendant's characterization, the government does not advocate for the application of "means-ends scrutiny." Def.'s Reply at 7. Adhering to the law of both *Rahimi* and *Bruen*, the government has overwhelmingly shown that § 922(g)(3), as applied to the defendant, is consistent "with the principles that underpin our regulatory tradition." *Rahimi*, 2024 WL 3074728, at *6. The defendant's unsupported arguments about why he should have been permitted to possess his firearm fail to overcome these historic principles.[2]

                                                                Respectfully submitted,

                                                                DAVID C. WEISS
                                                                SPECIAL COUNSEL

---

[2] In a footnote of his reply brief, the defendant attempts to revive an argument previously rejected by this Court in its order denying his motion to dismiss, *see* ECF 114 at 10—that the false statements charges in Counts One and Two are also unconstitutional under the Second Amendment. *See* Def.'s Reply at 1 & n.2. But the defendant did not include this argument in his Rule 29 motion, so it is waived. *See Perrigo Co. v. Intl. Vitamin Co.*, 2019 WL 359991, at *2 (D. Del. Jan. 29, 2019) ("Because this argument was raised for the first time in a reply brief, this Court may consider it waived."). In any event, as the government explained in its opposition to the defendant's motion to dismiss, this argument is meritless. *See* ECF 71 at 35-39.

July 1, 2024                                      By: /s/ Derek Hines
                                                  _____
                                                  Derek E. Hines
                                                  Senior Assistant Special Counsel

                                                  Leo J. Wise
                                                  Principal Senior Assistant Special Counsel

                                                  U.S. Department of Justice