# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) Criminal Action No. 1:23-cr-00061-MN |
| ROBERT HUNTER BIDEN, | ) |
| Defendant. | ) |

**MR. BIDEN'S SUR-REPLY IN SUPPORT OF HIS RULE 29 MOTION FOR ACQUITTAL UNDER THE SECOND AMENDMENT AS APPLIED AND THE FIFTH AMENDMENT**

Abbe David Lowell
Christopher D. Man
WINSTON & STRAWN
1901 L Street NW
Washington, DC 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

*Counsel for Robert Hunter Biden*

The Special Counsel addressed the Supreme Court's decision in *United States v. Rahimi*, No. 22-915 (U.S. June 21, 2024), in its response to Mr. Biden's Rule 29 motion for a judgment of acquittal on all counts, but nevertheless decided to file a sur-reply to again brief the importance of *Rahimi*. Even in its sur-reply through, the Special Counsel devotes most of its attention to addressing pre-*Rahimi* lower court decisions that are now irrelevant. While the Special Counsel has good cause to be concerned by the significance of *Rahimi*, which eliminates any basis for Mr. Biden's convictions,[1] the Special Counsel adding more words on the subject in a sur-reply does not cures its problem. Accordingly, Mr. Biden is entitled to a brief response.

In its latest filing, the Special Counsel has provided the Court with a roadmap that invites reversal. *First*, the Special Counsel resorts to linguistic games when it says *Rahimi* rejected that an argument that people who are not "responsible" can be disarmed, but it allowed people who are deemed "dangerous" to be disarmed. D.E.240 at 2. Not true. At oral argument, the government argued "that when it used the term 'responsible' in its briefs, it *really* meant 'not dangerous.'" *Rahimi*, Slip op. at 28 (Thomas, J., dissenting) (quoting Tr. of Oral Arg. 10–11). This is the argument the Supreme Court rejected.

Additionally, the government's brief made clear this was not just an issue under what the Special Counsel calls *Bruen* step one of determining who are among "the people" protected by the

---

[1] The Special Counsel errs in claiming that Mr. Biden waived any challenge to Counts 1 and 2 in his Rule 29 motion because Mr. Biden moved for a judgment of acquittal on all counts, and not just Count 3. D.E.240 at 7 n.2. To the contrary, Mr. Biden sought an acquittal across the board and not for any one count in isolation. *Id.* at 1, 10. Mr. Biden's position has always been the same, that Counts 1 and 2 fall with Count 3. *See* D.E.61. The Special Counsel errs again in claiming this argument was "previously rejected." D.E.240 at 7 n.2. Rather, the Court previously upheld Count 3 against a facial challenge, so it declined to reach the fully briefed issue of whether Counts 1 and 2 would fall if Count 3 was found unconstitutional. Nevertheless, the Court invited Mr. Biden to raise a Rule 29 as-applied challenge, in which this issue would arise again. D.E.114 at 10. The issue is fully briefed and is now ripe for the Court to decide.

Second Amendment.  D.E.240 at 2 n.1.  To the contrary, the government argued: "Our Nation has a long tradition of imposing firearms restrictions even upon persons who are among 'the people'—including . . . individuals whose conduct gave reasonable cause to fear a breach of the peace." Gov't Reply, *United States v. Rahimi*, at 10-11.  It argued that "legislatures may keep firearms away from those who are apt to misuse them," had the "authority to disarm persons based on danger," and make a judgment to disarm a "category of persons [who] would pose a danger if armed." *Id.* at 10-11, 14.

According to Justices Thomas and Gorsuch: "Not a single Member of the Court adopts the Government's theory." *Rahimi*, Slip op. at 27 (Thomas, J., dissenting);. Slip op. at 6 (Gorsuch, J., concurring).  The reason for that is obvious.  The Second Amendment was enacted in response to English practices that sought to disarm politically unpopular groups (often religious groups), and that was viewed as an affront to civil liberty.  As Justice Thomas noted, the same sort of dangerousness rationale was used to improperly disarm newly freed Black slaves after the Civil War.  *Rahmini*, Slip op. at 30.  The Special Counsel dismisses the thrust of Justice Thomas' point because he was in the dissent (D.E.240 at 3), but the majority in *Rahimi* likewise explained the Second Amendment was based on the English Bill of Rights, which was enacted as part of the Glorious Revolution to limit the power previously abused by the Crown to disarm Protestants who the King deemed dangerous.  *Rahimi*, Slip op. at 9.  A constitutional right is of no good if the government has the power to simply declare you no longer have it (or can balance it away through means-end testing—a proposition rejected in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 18 (2022)).

The Special Counsel quotes *Rahimi* in explaining the Court does "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories

2

of persons thought by a legislature to present a special danger of misuse," but it omits the language the follows. D.E.240 at 2 (quoting Slip. op. at 14). The Court found that 18 U.S.C. § 922(g)(8) "matches the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." Slip op. at 14. Section 922(g)(8) "presumes, like the surety laws before it, that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Id.* at 15. Thus, what the Special Counsel misses in the Supreme Court's remark is that whatever category of people sought to be disarmed because of a special danger must be rooted in an analogous Founding Era exception that permitted disarmament.

*Second*, the Special Counsel loses sight of the need to look for a historical analog. It is not enough to say that a legislature can deem a group of people dangerous, as explained above. All gun restrictions are designed to prevent the danger of firearms being misused, but such mitigation of danger rationales have repeatedly been rejected in striking laws down under the Second Amendment. *See, e.g.*, *Bruen*, 597 U.S. 1; *McDonald v. Chicago*, 561 U.S. 742 2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). Rather the point of *Rahimi* is that where a historical analog permitted persons to be disarmed in the Founding Era, those same type of restrictions can be imposed today. *Rahimi* took great pains to show that Section 922(g)(8) is comparable to Founding Era surety laws that required a judicial assessment that a particular individual was dangerous and needed to be restrained. Slip op. at 17. In doing so, the Supreme Court highlighted the narrowness of its holding, writing "we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.*

3

The whole point of looking for a historical analog is to determine how a modern problem would have been handled in the Founding Era. Here, there is no reason to guess. As Mr. Biden has shown, the Founding Era was very familiar with the disorienting effects of powerful drugs, including opium. And we do not need to guess at whether people who actively used drugs like opium were disarmed in the Founding Era. They were not, and not even the Special Counsel argues otherwise.

Looking at how the Founding Era dealt with those who were mentally ill or abused alcohol tells us nothing about how the Founding Era handled situations with those who used drugs. Even if it did, those authorities show that neither group was categorically disarmed. They had to do something more like fire a gun or brandish it in some sort of threatening way. At a minimum, that required someone to be actively intoxicated or mentally ill, physically armed, and to at least threaten someone with a gun. But Mr. Biden did none of that. For all the Special Counsel's effort to chronicle just how seriously and persistently Mr. Biden used drugs, it could not identify a single incident—not one—where he ever became violent or threatened anyone with a gun. It failed to even show that he was in actual physical possession of the gun at the same time he was actively using drugs. The jury was not even asked to make such findings. Thus, to whatever extent the Special Counsel seeks to analogize Mr. Biden's conduct to the sort of permissible regulations of the Founding Era, the analogy quickly breaks down.

The Special Counsel recognizes this, but he treats the Second Amendment like a game of horseshoes where close enough counts for something. But that simply resurrects the dangerousness argument that the Supreme Court unanimously rejected. The analogy does not have to be an exact historical twin, but they must be more closely related than that. We can look to how opium was regulated in considering a modern drug, like crack cocaine, just as we can look to how

4

muskets were regulated when looking to modern firearms, like the Colt pistol that Mr. Biden briefly owned. The Special Counsel invents its unsupported argument that the criminal violations that it seeks to impose on Mr. Biden are in any way analogous to how he would have been treated in the Founding Era because there was no Founding Era precedent that made his conduct a felony.

*Third*, the Special Counsel ignores the fact that Mr. Biden has received no fair notice—consistent with the Second Amendment—as to the crime charged and the jury was never instructed as to the scope of Mr. Biden's Second Amendment rights. There was no time in this case where a line was drawn separating Mr. Biden's exercise of a constitutional right from a felony.[2] Thus, Mr. Biden had no advance notice as to where that line would be drawn, and the jury certainly did not find that line crossed. Accordingly, the Fifth and Sixth Amendments require his acquittal on all charges.

Dated: July 2, 2024

Bartholomew J. Dalton (#808)
DALTON & ASSOCIATES, P.A.
1106 West 10th Street
Wilmington, DE 19806
Tel.: (302) 652-2050
BDalton@dalton.law

Respectfully submitted,

/s/ *Abbe David Lowell*
Abbe David Lowell
Christopher D. Man
WINSTON & STRAWN
1901 L Street NW
Washington, D.C. 20036
Tel.: (202) 282-5000
Fax: (202) 282-5100
AbbeLowellPublicOutreach@winston.com
CMan@winston.com

*Counsel for Robert Hunter Biden*

---

[2] In responding to a separate supplemental notice of authority, the Special Counsel suggests that Mr. Biden waived any objection to the lack of fair notice arguments (D.E.239 at 2), but Mr. Biden repeatedly challenged the jury instructions on this basis and the lack of fair notice in his Rule 29 motion (D.E.220 at 9-10).

## CERTIFICATE OF SERVICE

      I hereby certify that on July 2, 2024, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

                                                          /s/ *Abbe David Lowell*
                                                          Abbe David Lowell

                                                          *Counsel for Robert Hunter Biden*