08:08:46

1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA, ) VOLUME 4
                               )
5                              ) CRIMINAL ACTION
     v.                        ) NO. 23cr61(MN)
6                              )
     ROBERT HUNTER BIDEN,      )
7                              )
                 Defendant.    )
8

9

10                   Thursday, June 6, 2024
                     9:00 a.m.
11                   Jury Trial

12                   Courtroom 4A
                     844 King Street
13                   Wilmington, Delaware

14

15

16   BEFORE:  THE HONORABLE MARYELLEN NOREIKA
             United States District Court Judge
17

18

19   APPEARANCES:

20

21              SPECIAL COUNSEL'S OFFICE
                BY:  DEREK E. HINES, ESQ.
22              BY:  LEO WISE, ESQ.

23                      Counsel for the
                        United States of America
24

25

1

APPEARANCES CONTINUED:

2

3

        DALTON & ASSOCIATES, P.A.
4         BY:  BARTHOLOMEW J. DALTON, ESQ.
        BY:  CONNOR DALTON, ESQ.

5

        -and-

6

        WINSTON & STRAWN LLP
7         BY:  ABBE DAVID LOWELL, ESQ.
        BY:  DAVID KOLANSKY, ESQ.
8         BY:  ISABELLA OISHI, ESQ.

9

               Counsel for the Defendant

10

11

12              - - - - - - - - - - - -

13

08:51:47 14

08:51:47 15         COURT CLERK:  All rise.

08:55:05 16         THE COURT:  All right.  Good morning, everyone.

08:55:08 17 Please be seated.

08:55:11 18         You had some issues?

08:55:13 19         MR. LOWELL:  Good morning, Your Honor.

08:55:14 20         THE COURT:  Mr. Lowell, good morning.

08:55:16 21         MR. LOWELL:  First, at the end of the day

08:55:18 22 yesterday -- first I should say that I did as I said I would

08:55:22 23 do and I've thinned this and turned it into a shorter event

08:55:26 24 so hopefully I used the time wisely.

08:55:29 25          Secondly, when we left the day I was raising the

08:55:31 1    issue that we started, on page 697 of the transcript.

08:55:54 2                    THE COURT:  Yes.

08:55:54 3                    MR. LOWELL:  Lines 7 through 14.  He was asked

08:56:00 4    "What happened next after you see Mr. Biden sign the form

08:56:03 5    and date it?

08:56:04 6                    "What happened next is Jason said, also we would

08:56:06 7    need for the passport, another form of like identification

08:56:12 8    stating his address, it could be a bill or it could be

08:56:16 9    vehicle registration.

08:56:17 10                   "What's the next thing you observed?

08:56:19 11                   "I observed Mr. Biden leave out and then come

08:56:22 12   back in."

08:56:22 13                   So on that, the questioning would be what was

08:56:24 14   the issue.  He was never asked yet what was the issue that

08:56:27 15   you went to talk to Mr. Turner about that caused you to be

08:56:31 16   asking that question.  And then he doesn't state what

08:56:34 17   happens next.  So it leaves open whether he says that there

08:56:37 18   was another form of identification because he says he went

08:56:40 19   out and he came back in, so I would ask him whether that

08:56:44 20   happened.

08:56:44 21                   THE COURT:  If he says no, what's next?

08:56:47 22                   MR. LOWELL:  If he says no, nothing.

08:56:53 23                   THE COURT:  So you say.

08:56:54 24                   MR. LOWELL:  If he says no other form of

08:56:56 25   identification was presented when Mr. Biden came back in,

08:56:58  1    no, if he says yes, then I have to ask him what it was and

08:57:01  2    then we'll see where that goes because he attaches to the

08:57:06  3    4473 form only the passport, he doesn't attach any other

08:57:09  4    form.

08:57:09  5              THE COURT:  All right.  So what is your

08:57:11  6    position?

08:57:11  7              MR. HINES:  Yeah, so on the second question, did

08:57:13  8    he see what the secondary form of identification was, if

08:57:18  9    anything, he can ask that.  I anticipate Mr. Cleveland will

08:57:22 10    say I didn't see.  But as far as like his first question,

08:57:26 11    what is the issue, what is the issue, the Court has already

08:57:29 12    ruled on that.  The gun store is not on trial for whether or

08:57:32 13    not they collected a supplemental form so that would be an

08:57:35 14    inappropriate question and not relevant in this case.

08:57:38 15              MR. LOWELL:  Not what the issue was, I could ask

08:57:40 16    that better, what did you say to Mr. Palimere and/or

08:57:43 17    Mr. Turner.

08:57:44 18              MR. HINES:  So the portion that he just cited

08:57:48 19    there, Mr. Cleveland on the stand is not saying anything,

08:57:51 20    it's Mr. Turner who says he's got to go get another form of

08:57:55 21    identification.  Mr. Cleveland has nothing to do with that

08:57:57 22    process according to what he's testified to and what

08:58:01 23    Mr. Lowell has cited to in the transcript.

08:58:03 24              MR. LOWELL:  But he's saying what happened next

08:58:08 25    is Jason said, so I want to ask him what did he say to

08:58:11  1    Jason.

08:58:15  2                MR. HINES:  That Jason said.

08:58:17  3                MR. LOWELL:  Yeah, what happened next, is Jason.

08:58:20  4                MR. HINES:  Jason Turner says.

08:58:21  5                MR. LOWELL:  But you're cutting out --

08:58:23  6                THE COURT:  Hold on.  I'm trying to get this in

08:58:25  7    context.  Did he see him sign it?  Yes.  And then we made

08:58:31  8    sure that it was the same person.  And we said there is a

08:58:36  9    date.  Who wrote the date?  Mr. Biden did.  Then Section A

08:58:42 10    is completed.  Was -- did you see Section A completely

08:58:47 11    completed by Mr. Biden.  Yes.  Has anyone else filled out

08:58:51 12    anything in that section.  No.  What happens next?  After

08:58:54 13    you saw Mr. Biden sign the form and date it?  What happened

08:58:59 14    next is Jason said.  So you want to say how did Jason get

08:59:06 15    involved?

08:59:07 16                MR. LOWELL:  Yes.

08:59:11 17                MR. HINES:  Okay.

08:59:11 18                THE COURT:  You can say you said that after you

08:59:14 19    saw Mr. Biden sign the form and date it, you said that the

08:59:18 20    thing that happened next was Jason said we would need with

08:59:23 21    the passport another form of identification.  How did Jason

08:59:27 22    get involved?  And then did you see another form of

08:59:32 23    identification?

08:59:34 24                MR. LOWELL:  And not be able to say to him what

08:59:37 25    did you say to Jason, if anything?  I mean, that's the

08:59:41  1    natural in between question.

08:59:42  2            THE COURT:  I mean, how did Jason get involved,

08:59:45  3    I guess if he says Jason was standing there, did you say

08:59:49  4    anything, no, and if he says I went into the back and talked

08:59:52  5    to Jason, I guess you can say what did you say to Jason.

08:59:56  6            MR. LOWELL:  Okay.  That was one issue.

08:59:57  7            THE COURT:  Okay.

08:59:58  8            MR. LOWELL:  The second issue is the government

09:00:00  9    said that they had six witnesses, they think they'll finish

09:00:04 10    at the end of the day or before, last night we told him who

09:00:08 11    our witnesses will be, we summoned them, they have to come,

09:00:13 12    and their lawyers have to come.  They're all coming this

09:00:15 13    afternoon, if they end up at 3 o'clock or 3:30, I don't have

09:00:20 14    them yet, they'll be here first thing in the morning, if

09:00:25 15    that happens, I ask that we break them here, we summoned

09:00:30 16    them yesterday, they're getting here as soon as they can.

09:00:33 17            THE COURT:  Let's see where we are, do you have

09:00:35 18    any problem with that, you may have a problem with

09:00:37 19    witnesses, and maybe that will give us time to deal with it

09:00:40 20    if you did.

09:00:41 21            MR. HINES:  I understand one of the witnesses

09:00:42 22    were represented, I don't know, you referenced multiple

09:00:46 23    lawyers, there will be witnesses available based on my

09:00:49 24    understanding as early as early afternoon.

09:00:52 25            MR. LOWELL:  No, I don't know that anybody is

09:00:54 1    available, they're coming this afternoon or this evening,

09:00:57 2    they're coming from different places so they're getting here

09:01:00 3    when they get here, and we did that last night based on the

09:01:05 4    government's schedule.

09:01:05 5           THE COURT:  Keep me informed.

09:01:07 6           MR. LOWELL:  On scheduling, when the government

09:01:09 7    rests, Your Honor, we have a written Rule 29 motion on three

09:01:12 8    topics.  One would be the topic that you reserved on the

09:01:15 9    issue of unconstitutional based on vagueness.  The second

09:01:20 10   will be an issue we found in 922(g), which has been amended,

09:01:26 11   so we have to address the issue that it doesn't exist at the

09:01:29 12   time of the -- of our trial.  I don't want to say more about

09:01:34 13   it because I'll say it wrong, but that's the second.  And

09:01:37 14   the third would be the issue sort of dovetails with the

09:01:40 15   first on the sufficiency of the evidence on the key issue.

09:01:44 16   But all of them are in the works and all of them have been

09:01:47 17   filed at the end of the day as soon as the government rests.

09:01:49 18   And obviously you'll want to see it and the government will

09:01:53 19   want a chance to respond, that's another good reason if we

09:01:56 20   break we would be able to do that and see what happens from

09:01:59 21   there.

09:01:59 22          THE COURT:  If you think I can read your motion,

09:02:02 23   the government will have a chance to read your motion,

09:02:05 24   respond to your motion, and I will have a chance to

09:02:08 25   carefully review that and rule by tomorrow morning, you have

09:02:12  1    an elevated view of my abilities.

09:02:15  2            So I appreciate that, but it's not going to

09:02:20  3    happen.  But I will take a look at it when it's filed.

09:02:22  4            MR. LOWELL:  What I really wanted to do is let

09:02:26  5    everybody know that, so I don't know how that effects the

09:02:30  6    scheduling, usually you argue that before you present the

09:02:33  7    case so I wanted to let you know that was in the works.

09:02:35  8            MR. HINES:  Your Honor --

09:02:36  9            THE COURT:  And I understand what you're saying,

09:02:38  10   but it's also so -- I'm not going to waste the jurors time

09:02:43  11   with making them sit around and wait for a day or two while

09:02:46  12   I figure that out.  So it may be that I just need to

09:02:50  13   reserve.

09:02:51  14           MR. LOWELL:  Right.  And that's fine.  I just

09:02:53  15   needed to give everybody notice that that was the case and I

09:02:56  16   expected that that could be one possibility.

09:02:59  17           THE COURT:  Okay.  All right.  Anything else?

09:03:02  18           MR. WISE:  Your Honor, we have an objection to

09:03:03  19   an exhibit that we got late last night that the defense

09:03:07  20   intends to use with our second witness today, Ms. Hallie

09:03:11  21   Biden.  It's Defense Exhibit 16A, I don't know if the Court

09:03:16  22   has been provided with that.

09:03:17  23           THE COURT:  Let me check.

09:03:24  24           Yes, I do have that.

09:03:26  25           MR. WISE:  The first issue is globally, we got

09:03:30 1     this at 11:07 last night that actually provided the sources

09:03:33 2     for these messages.  We have been asking for it since Monday

09:03:37 3     when they sent it to us.  We of course provided our summary

09:03:42 4     chart months ago.  The whole point of the rule, 1006 to

09:03:45 5     allow each side to check the accuracy of the statements that

09:03:48 6     are in the summary chart.  So we think the whole thing

09:03:52 7     should be kept out because we haven't had the time and they

09:03:55 8     haven't followed the rules to give us the time.  And it's

09:03:58 9     eight-pages long.  And what we did on our summary chart is

09:04:03 10    we told them page numbers in an extraction report which

09:04:08 11    makes it something you can actually find.  Here they have

09:04:10 12    given us what appears to be the same, you know, it looks

09:04:15 13    like every source is the same file path.  Which doesn't

09:04:21 14    actually tell us really thinking.  And candidly I was in a

09:04:26 15    hotel room at 11:07 last night, so wherever this was, I

09:04:29 16    wasn't in a position to go hunting for it, even assuming I

09:04:33 17    could.

09:04:34 18            The other issue it's full of inadmissible

09:04:37 19    hearsay.  Our first objection is it's late, they didn't

09:04:40 20    follow 1006, it shouldn't come in, the second is nearly

09:04:44 21    everything they wanted to do other than a couple of message

09:04:47 22    strings that are on our chart, which come in because under

09:04:51 23    801(d)(2) their opposing party statements offered against

09:04:54 24    that party --

09:04:56 25            THE COURT:  It's different if the defendant

09:04:58 1    wants to put the statements in, it's one thing if you do,

09:05:00 2    because they're admissions, but he can't put them in.

09:05:04 3            MR. HINES:  Exactly, and some of them are quite

09:05:06 4    frankly quite salacious, we can talk about them in open

09:05:10 5    court or come to side-bar so I can point those out.  I think

09:05:15 6    row number 21, for instance.

09:05:32 7            MR. WISE:  As I said, most of them, I counted

09:05:34 8    four on page 1, lines 2, 3, 4 and 5, there are strings that

09:05:40 9    contain admissions that are -- we were offering so we

09:05:44 10   obviously don't have an objection to that, and then 11, 12,

09:05:48 11   13, and 14 are also part of strings that have admissions.

09:05:52 12   And then 20 --

09:05:53 13           THE COURT:  I'm sorry, tell me again, there are

09:05:55 14   so many numbers on here.  Okay.  So first you have the

09:06:00 15   hearsay and your hearsay is the rows where it's something

09:06:06 16   that was said by the defendant, not the issue where it was

09:06:09 17   said by Ms. Biden because those aren't hearsay if she's on

09:06:15 18   the stand and they're asking her questions, right?

09:06:18 19           MR. HINES:  So it's still hearsay even if she's

09:06:22 20   on the stand because it's an out of court statement that she

09:06:25 21   made for the truth of the matter asserted, they got hearsay

09:06:29 22   problems with her and they got hearsay problems with him.

09:06:32 23   So number one, for instance, is a hearsay statement of

09:06:35 24   Ms. Biden, first row, that there is no exception for.

09:06:41 25           Same thing with it picks up, as I said, Row 2,

09:06:46  1    3, and 4 on their chart --

09:06:48  2              THE COURT:  So you're saying, they could use

09:06:51  3    this for impeachment if they asked her, for example, if they

09:06:55  4    were having problems in their relationship at that point and

09:06:57  5    she said no.

09:06:58  6              MR. HINES:  Potentially, depending on how they

09:07:02  7    set it up.

09:07:03  8              THE COURT:  Do you have a response?

09:07:04  9              MR. LOWELL:  Yes, of course.  So as to the first

09:07:07 10    one, Mr. Wise would indicate that the first time he saw

09:07:10 11    these texts was whenever he just said.  Actually, over the

09:07:14 12    last few days we have back and forth, they keep asking us

09:07:17 13    for source material and we keep trying to provide it.

09:07:20 14              THE COURT:  What are these sources that they all

09:07:22 15    have exactly the same number?

09:07:24 16              MR. LOWELL:  I would like my colleague to

09:07:26 17    address the source if I could have that happen.

09:07:29 18              MR. WISE:  I didn't say we saw the text for the

09:07:32 19    first time last night, I said we saw the source.

09:07:34 20              THE COURT:  I understand, you were trying to

09:07:36 21    check the accuracy and authenticity.

09:07:38 22              MR. LOWELL:  Again, one of the things I asked

09:07:41 23    Agent Jensen was whether or not that material, the Cloud

09:07:44 24    material, and the laptop was in the condition that they got

09:07:47 25    it and whether they provided it to us in discovery and

09:07:49  1   whether it was the same material and she said it was.  That

09:07:52  2   is the source, they have it and they sent it to us, we sent

09:07:55  3   it back to them, but I'll have Mr. Kolansky address the

09:07:58  4   source for it.

09:08:00  5            MR. WISE:  I don't think they sent it back to

09:08:02  6   us.  But again, if you look at our chart, we literally have

09:08:05  7   page 1001, I'm looking at a message 86, page 1412, so that

09:08:11  8   they could go back exactly to where this message comes from

09:08:15  9   and it was provided months ago.

09:08:17 10            MR. KOLANSKY:  Your Honor, these messages that

09:08:19 11   start on October the 11th, they're extracted from the hard

09:08:23 12   drive that we received in discovery from the government.  It

09:08:26 13   was a single hard drive with essentially, if you think about

09:08:29 14   it --

09:08:30 15            THE COURT:  So was there a way for you to say

09:08:33 16   it's on page whatever of the hard drive?

09:08:37 17            MR. KOLANSKY:  There is not, Your Honor.

09:08:38 18            THE COURT:  How did they do it?

09:08:40 19            MR. KOLANSKY:  I don't know how they do it, I

09:08:42 20   don't know what software they used.

09:08:44 21            THE COURT:  How did you give them a specific

09:08:46 22   place to go and he's saying you can't.

09:08:48 23            MR. WISE:  We gave it to them both ways, they

09:08:51 24   asked for the raw data and then we also gave them these

09:08:55 25   extraction reports that reflect all of the messages that we

09:08:59  1    are using with page numbers and all of the messages they're

09:09:01  2    using, they're just somewhere in these 18,000 pages and they

09:09:06  3    won't tell us where.

09:09:07  4              THE COURT:  You're assuming they're somewhere in

09:09:09  5    these 18,000 pages, you don't know?

09:09:11  6              MR. HINES:  They keep saying they're from the

09:09:14  7    same data, so that means they should be on the extraction

09:09:17  8    reports and the extraction reports are pages that are--

09:09:21  9              THE COURT:  Can you get them that information?

09:09:24 10              MR. KOLANSKY:  We can get them the information

09:09:26 11    based on an extraction report that we created using an

09:09:29 12    extraction software we have.  It's not going to match --

09:09:32 13              THE COURT:  Did they give you an extraction --

09:09:36 14              MR. WISE:  We gave them an extraction report,

09:09:39 15    they did not give us whatever he's referring to that has

09:09:42 16    page numbers that we can look at.

09:09:43 17              THE COURT:  So you gave them an extraction

09:09:45 18    report, the same extraction report you used to come up with

09:09:48 19    page numbers?

09:09:49 20              MR. WISE:  Exactly.

09:09:50 21              THE COURT:  Can you use that extraction report

09:09:53 22    and give them page numbers?

09:09:54 23              MR. KOLANSKY:  When I searched these messages

09:09:56 24    last night, Your Honor, for each of the 42 rows, I did not

09:10:00 25    find these messages in the extraction report that they're

09:10:04   1    referring to.

09:10:05   2                MR. WISE:  So they have discovery, an extraction

09:10:06   3    report that they're relying on that they haven't give us

09:10:09   4    which is the underlying material that supports under 1006

09:10:13   5    the summary report and they should have given it to us.

09:10:15   6                MR. KOLANSKY:  Your Honor, we're happy to

09:10:17   7    provide the extraction report that we generated.

09:10:20   8                THE COURT:  Why are you doing that today when

09:10:22   9    you expect to use the exhibit today?

09:10:25  10                MR. KOLANSKY:  It's an extraction report that we

09:10:27  11    used in order to thread the messages so that they're

09:10:29  12    readable.

09:10:31  13                THE COURT:  Yes, but -- what I'm confused about

09:10:34  14    is you're not giving them the information in the same way

09:10:36  15    that they gave it to you.  You're saying -- he's saying

09:10:40  16    look, tell us where it is, we gave you an extraction report

09:10:43  17    and you're telling me but it's not in, it's something new

09:10:47  18    that wasn't in the government's extraction report and you

09:10:49  19    can't tell us where it is?

09:10:53  20                MR. KOLANSKY:  Let me try to rephrase it, maybe

09:10:55  21    I'm mischaracterizing it.  When we --

09:10:58  22                THE COURT:  Was it in the -- so the government

09:11:00  23    gave you an extraction report, you're telling me these

09:11:04  24    messages you want to use were not in there.

09:11:06  25                MR. KOLANSKY:  Correct.  They were in something

09:11:08  1    else.

09:11:08  2              MR. LOWELL:  They were in a separate sub-data,

09:11:08  3    the extraction reports were from the iCloud, these messages

09:11:14  4    were derived not from the source file, but from Macintosh

09:11:16  5    HD, Macintosh hard drive, so there is two worlds of

09:11:20  6    discovery, iCloud, and those were the extraction reports,

09:11:23  7    and then material from the hard drive, which we extracted

09:11:28  8    ourselves based on the forensic images they provided.

09:11:32  9              THE COURT:  Did you give them an extraction from

09:11:33 10    the hard drive?

09:11:34 11              MR. WISE:  Yes, from the laptop.  There is an

09:11:37 12    extraction-- that's why if you remember when Agent Jensen

09:11:40 13    was testifying, the format changed --

09:11:42 14              THE COURT:  So these are messages that you're

09:11:44 15    using from the laptop, not from the -- not from the iCloud.

09:11:50 16              MR. KOLANSKY:  They're from the hard drive that

09:11:53 17    we received from the government.

09:11:54 18              THE COURT:  The hard drive image is from the

09:11:57 19    laptop.  You guys are talking, I got laptops and hard

09:12:00 20    drives, and I don't even know what else I got, iClouds, oh

09:12:04 21    my.

09:12:05 22              MR. KOLANSKY:  Yes, that's right.

09:12:06 23              THE COURT:  So the hard drive, though, is the

09:12:09 24    hard drive that correlates with the laptop.

09:12:13 25              MR. KOLANSKY:  Yes, Your Honor.

09:12:13  1          THE COURT:  So these are messages you want to

09:12:16  2     rely on from the laptop that are not in the iCloud?

09:12:20  3          MR. KOLANSKY:  That's correct, Your Honor.

09:12:21  4          THE COURT:  Okay.  And you're saying, Mr. Wise,

09:12:23  5     that you gave them extraction files from the hard

09:12:29  6     drive/laptop.

09:12:30  7          MR. WISE:  Exactly.

09:12:31  8          THE COURT:  And why didn't you give them from

09:12:33  9     that extraction file, the page numbers?

09:12:37 10          MR. KOLANSKY:  I have not seen that extraction

09:12:39 11     report, Your Honor.

09:12:40 12          MR. WISE:  We provided it in discovery.  It was

09:12:42 13     -- that's how we made the chart, I mean, which they've had

09:12:45 14     for months.  So if they looked at that chart and said wait a

09:12:49 15     minute this says laptop, we don't have an extraction report

09:12:52 16     from the laptop, where are you getting this from, we would

09:12:55 17     have expected to hear that months ago.  There is clearly an

09:12:58 18     extraction report, that's what the 1006 reflects and we

09:13:02 19     reattached it when we provided our expert discovery.

09:13:05 20          MR. LOWELL:  One point on that, by the way, if

09:13:08 21     we're talking about authenticity, which I think is half the

09:13:13 22     issue, we talked to the government and have the stipulation

09:13:16 23     about it being authentic.  These messages that we tried to

09:13:20 24     put together in this fashion, we could take more time and

09:13:24 25     then what we could do is printout every one individually and

09:13:27 1   ask the witness did you send it.  That will issue into the

09:13:32 2   question they raised about asking a witness on the stand did

09:13:34 3   she do something and send something.  That is not hearsay as

09:13:38 4   to the witness, she is in court to be examined.  I can ask

09:13:41 5   her, usually, did you on that moment send Mr. Biden a text.

09:13:46 6   What did the text say.  If she says she knows, fine, if she

09:13:51 7   says she doesn't, I can refresh her recollection.

09:13:53 8          THE COURT:  With the text?

09:13:54 9          MR. LOWELL:  With the text itself.  If she then

09:13:56 10  states that it is not something that refreshes her

09:13:59 11  recollection, then it is a prior recorded, you know, it fits

09:14:03 12  into the issue of something that was already in existence.

09:14:06 13  But the idea that you can't ask a witness on the stand

09:14:09 14  whether that witness said something or wrote something and

09:14:12 15  that's the hearsay, it is not hearsay at that moment.  It is

09:14:16 16  something that was existing before, but you can ask, when

09:14:20 17  and if Mr. Biden took the stand and he was testifying, he

09:14:24 18  would be able to be asked about did you receive a text from

09:14:28 19  Mrs. Biden and how did you respond and why.  So you can't

09:14:31 20  have half the story the way they have not had half the story

09:14:35 21  when they are going back and forth.

09:14:38 22         THE COURT:  Well, no, but you can't put in

09:14:40 23  evidence that is hearsay.  You can't put in statements from

09:14:43 24  the defendant when she's on the stand.

09:14:47 25         MR. LOWELL:  Not for the truth necessarily.  In

09:14:49  1    other words -- well, first of all --

09:14:52  2                    THE COURT:  Well, I mean --

09:14:53  3                    MR. LOWELL:  I don't need to seek its admission

09:14:56  4    because if she says this is what I want you to do, it's what

09:14:59  5    I want you to do necessarily, but it certainly reflects the

09:15:02  6    state of mind that they were both in at the period of time

09:15:05  7    that they were conversing, so it's that exception as well.

09:15:08  8    But if you're saying that if a witness is on the stand and

09:15:11  9    you can't ask the witness did you call Mr. Biden, what did

09:15:15 10    you say to Mr. Biden.

09:15:16 11                    THE COURT:  That's very different than what did

09:15:18 12    he say to you.

09:15:19 13                    MR. LOWELL:  I get that, I understand that.

09:15:20 14                    THE COURT:  But you have that in this --

09:15:23 15                    MR. LOWELL:  You often -- I'm sorry, often in

09:15:26 16    context, both sides will come in to put it in context, I

09:15:30 17    understand and I don't need to ask her what Mr. Biden wrote

09:15:33 18    back, I can ask her, though, I think, what did you say to

09:15:36 19    him, what did you write.  In terms of the salacious material

09:15:40 20    we provided it to them in that form but certainly there are

09:15:44 21    redactions we wanted to make, I wanted them to see the full

09:15:47 22    thing in terms of, for example, the one they said.  I

09:15:50 23    understand that Ms. Biden, from me can't be asked what did

09:15:55 24    Hunter say.  I can, though, I think, say what did you say to

09:15:59 25    him.  And especially because some of these are contextually

09:16:02 1    in state of mind.  I mean, if she wrote him and said today

09:16:06 2    it's raining, when it's not raining, I'm not putting it in

09:16:10 3    for the truth that it was raining but it does have bearing

09:16:13 4    on what she was saying to him and what his reaction would

09:16:15 5    be.

09:16:16 6            So there is -- I have never been in a situation

09:16:19 7    where you can't ask a witness did you call, you said I could

09:16:22 8    do that.  Did you say something.  You can say that.  There

09:16:25 9    is no difference in a text, did you write him, what did you

09:16:28 10   say?  And then that's where that ends in terms of not what

09:16:33 11   Mr. Biden said back.

09:16:34 12           MR. WISE:  So there is a couple of issues with

09:16:36 13   Mr. Lowell has argued.  First of all, the issue with the

09:16:39 14   summary chart is --

09:16:40 15           THE COURT:  Wait, I was actually going to ask

09:16:42 16   you that.  Let's say I say no to the summary chart because

09:16:46 17   they didn't provide you with the information that they

09:16:48 18   should have provided you in a timely way.  Mr. Lowell says,

09:16:51 19   well, okay, then I can just pull out -- you know that they

09:16:56 20   have the messages, can they just pull out a message and ask

09:17:00 21   her about it?  Not from your other objections about doing

09:17:06 22   that, but is that appropriate?

09:17:08 23           MR. WISE:  So no, it's still a text message she

09:17:11 24   wrote, is an out of court statement.

09:17:13 25           THE COURT:  No.  No.  I'm sorry, I'll let you

09:17:15  1    make that argument about the hearsay.  My point is does that

09:17:18  2    get us through the objection that they didn't give you the

09:17:23  3    information that you should have had in a timely way.

09:17:26  4             MR. WISE:  There is sort of two things with

09:17:29  5    that.  We didn't get everything that's on that laptop.  It

09:17:34  6    went through a filter review.  So we may or may not have.

09:17:38  7    They have the whole set.  So first thing --

09:17:40  8             THE COURT:  Filter review from whom?

09:17:43  9             MR. WISE:  A separate team that we have no

09:17:45 10    access, we're walled off for, it's in the search warrant,

09:17:50 11    that is the protocol that would be followed.  The first

09:17:53 12    thing is whatever they would want to show her, they should

09:17:57 13    give us, we should see it so we know, and we're not going to

09:18:00 14    be able to sitting here sort of find it on the fly.

09:18:03 15             If the question is authenticity, sure a witness

09:18:08 16    can testify that, you know, this is a text I sent or an

09:18:11 17    e-mail I sent and that gets them through the authenticity

09:18:15 18    gate, but it doesn't necessarily get them through the

09:18:18 19    admissibility gate and the admissibility gate is often

09:18:22 20    things like is it a business record, that's how it comes in,

09:18:24 21    is it some other exception --

09:18:26 22             THE COURT:  Well he's saying it goes to state of

09:18:28 23    mind.

09:18:29 24             MR. WISE:  A lot of them don't.  A lot of them

09:18:31 25    are, you know, I mean, I'll just start at the back.  "Are

09:18:37  1  you here.  I'll see you inside, I'm in the parking lot but I

09:18:41  2  feel comfortable about going in right now, I will wait here

09:18:45  3  for you.  Come in, F you, I came because it was important

09:18:49  4  for me to show dad that I could show up."

09:18:51  5          MR. LOWELL:  I'm sorry to interrupt, that's a

09:18:53  6  Hunter one.

09:18:54  7          MR. WISE:  It's the same issue with all of

09:18:56  8  these, these are out of court statements being offered for

09:18:59  9  the truth of the matter asserted that they're saying these

09:19:01 10  things, that these things reflect where they are or what

09:19:04 11  they're doing.  It's not to say, oh we want to impeach that

09:19:07 12  she said it's raining and we know it's not raining, they

09:19:09 13  want to push through, the defendant can take the stand and

09:19:13 14  say I was here or I did this or I said this, but they can't

09:19:16 15  use as proxies out of court statements he made.

09:19:19 16          MR. LOWELL:  We agree about that.

09:19:22 17          THE COURT:  We are in agreement, they cannot use

09:19:24 18  on his statements.  Okay.  Those are hearsay.

09:19:27 19          MR. LOWELL:  Right.

09:19:27 20          THE COURT:  If they want to get those in, they

09:19:29 21  have to do it a different way.

09:19:33 22          With respect to this witness, are you saying

09:19:40 23  that they would have to say -- I mean, these statements as I

09:19:46 24  read them suggest that there were issues in the relationship

09:19:52 25  at that time.

09:19:53  1              MR. WISE:  Yes, I agree.

09:19:55  2              THE COURT:  And if you're saying that they

09:20:03  3   should really be using those for impeachment, if she says,

09:20:07  4   gosh, we were happier than we have ever been, everything was

09:20:11  5   great, then you could impeach and say they weren't really.

09:20:15  6              MR. WISE:  Exactly.

09:20:16  7              THE COURT:  But if she says no, things were

09:20:18  8   really bad, then that's fine.

09:20:20  9              MR. WISE:  Exactly.

09:20:21 10              THE COURT:  If Mr. Lowell said was one of the

09:20:25 11   issues you were worried about infidelity in the relationship

09:20:29 12   and she says no, he can use those to say you did have

09:20:36 13   concerns.

09:20:36 14              MR. WISE:  Right, because then there is a prior

09:20:39 15   inconsistent statement, that gets them through the

09:20:41 16   admissibility gate.  But if she says yeah, we were fighting,

09:20:45 17   which is what they seem to be getting at that, they were

09:20:48 18   fighting, they were accusing each other of things, I don't

09:20:52 19   know how deeply we need to get into that, there is a 403

09:20:55 20   issue at some point, but if she said as Your Honor said

09:20:58 21   everything was great, then potentially, that allows for one

09:21:01 22   of these statements to come in as a prior inconsistent

09:21:03 23   statement because the rules provide for that.

09:21:05 24              THE COURT:  What if she says as Mr. Lowell says,

09:21:08 25   back around the time in October of 2018, were you guys in a

09:21:13  1    good place, and she says I don't remember.  And he says well

09:21:18  2    let me show you some things to refresh your recollection.

09:21:21  3    That's okay?

09:21:22  4              MR. WISE:  Right.  Provided one, it doesn't go

09:21:24  5    up on the screen, she looks at it herself, and the key

09:21:28  6    question is does this refresh your recollection, and if she

09:21:30  7    says yes, then he can go back to asking her okay, what was

09:21:34  8    the state of your relationship or whatever, if she says no,

09:21:36  9    the statement itself doesn't come in because it's not like a

09:21:40 10    grand jury transcript where it's under oath, it's

09:21:44 11    inadmissible, the statement itself is inadmissible other

09:21:47 12    than if its a prior inconsistent statement or if it

09:21:50 13    refreshes recollection.

09:21:51 14              THE COURT:  What about if you're putting it in

09:21:54 15    not for the truth but for her state of mind that she was

09:22:00 16    upset.

09:22:02 17              MR. WISE:  So her state of mind isn't relevant

09:22:05 18    right, it's the defendant's state of mind.  The elements are

09:22:09 19    what was he knowing, not what was in her state of mind.  So

09:22:12 20    the hearsay exception for state of mind evidence still has

09:22:15 21    to get through the relevancy test which is, is it a fact or

09:22:19 22    consequence that -- will this be a fact or consequence more

09:22:24 23    or less probable.  What she's thinking isn't, it's simply

09:22:28 24    not relevant whether she believes what he's saying or not.

09:22:31 25    You know, what their -- is she paranoid, is she saying

09:22:37  1  things because she doesn't mean them because she wants to

09:22:39  2  get back at him, whatever, none of that matters.  They can

09:22:43  3  explore a little bit in terms of bias and motive, about the

09:22:46  4  rule for state of mind for, the hearsay exception for

09:22:51  5  statements doesn't relate to a witness where the witness's

09:22:55  6  state of mind is not an element of defense.

09:22:58  7          MR. LOWELL:  I can respond in a moment.

09:23:01  8          THE COURT:  Please.

09:23:01  9          MR. LOWELL:  Okay.  I heard Mr. Wise, in my mind

09:23:05 10  he's jumbled two things.  State of mind is relevant to any

09:23:09 11  witness if that person is testifying.  It is relevant for

09:23:13 12  any number of reasons that Your Honor has asked one about,

09:23:18 13  Mr. Wise is trying to cabin this either into a refresh

09:23:23 14  recollection, or saying it's hearsay for it's the truth of

09:23:26 15  the matter.

09:23:26 16          But if Ms. Biden is writing Mr. Biden, Ms. Biden

09:23:32 17  is writing Mr. Biden and saying where are you, where are

09:23:35 18  you, where are you, that does reflect what's happening at

09:23:38 19  that moment, especially because I understand her testimony

09:23:41 20  is going to be that he was with her on a particular time

09:23:46 21  when her writing to him and saying where are you, where are

09:23:49 22  you, will reflect that that's not possible.  Or she's either

09:23:54 23  not being accurate on the stand or she's not being accurate

09:23:57 24  where she's saying --

09:23:58 25          THE COURT:  Then you can use that to impeach or

09:24:01 1   to refresh her recollection.

09:24:03 2            MR. LOWELL:  That's what I'm saying, there are

09:24:04 3   various parts of what --

09:24:06 4            THE COURT:  So I think it's a difference between

09:24:09 5   -- I'm sorry, I cut you off, I asked you not to cut me off,

09:24:13 6   so I apologize.  But I think it's a difference between

09:24:15 7   whether you use it affirmatively or whether she testifies to

09:24:18 8   something inconsistently and you then use it to impeach or

09:24:22 9   she doesn't remember what she's doing and you use it to

09:24:25 10  refresh her recollection.

09:24:26 11           MR. LOWELL:  I think that's right.  I think each

09:24:28 12  one can be for a reason and the reason could be either a

09:24:32 13  state of mind that would be relevant as to the nature of

09:24:35 14  their relationship at a moment, it would be for the

09:24:38 15  possibility of again refreshing and if she says she did say

09:24:42 16  this and she did write him six times and say where are you,

09:24:46 17  where are you, then I think that's established.  If she says

09:24:49 18  something that's inconsistent with what a text says, then

09:24:53 19  its impeachment and I think that's right.  And the reason

09:24:56 20  that we've struggled to try to get them in a very set of

09:24:59 21  data where you can find things from the reason that Mr. Wise

09:25:02 22  said, for example, that it went through a filter team, now

09:25:05 23  I'm understanding that, but I don't know why that would

09:25:09 24  eliminate these kind of texts just to save time.  We can

09:25:13 25  print each one of these separately and use them separately,

09:25:16  1    and that will be a back and forth up to the witness stand or

09:25:22  2    not, and so we thought we would try it this way.

09:25:25  3              THE COURT:  So I'm going to sustain the

09:25:27  4    objection as to the summary chart, I think that the summary

09:25:30  5    chart does include hearsay certainly as to the statements

09:25:33  6    that Mr. Biden made to Ms. Biden.  So the summary chart is

09:25:39  7    out.

09:25:40  8              As to the texts from Ms. Biden to Mr. Biden, I

09:25:48  9    think we'll have to play that one at a time.  I do think

09:25:51 10    that they are hearsay, and the question is whether they can

09:25:55 11    be used in some way to refresh her recollection, to impeach

09:26:01 12    her if she says something inconsistently.  And as to her

09:26:07 13    state of mind, I don't think her state of mind is

09:26:10 14    necessarily relevant to the issue in this case whereas her

09:26:14 15    state of mind I guess to the extent it goes to bias or

09:26:17 16    something like that, may come into play, so we're going to

09:26:21 17    have to take those issues one at a time.

09:26:24 18              MR. LOWELL:  Understand.  I will still have the

09:26:27 19    summary chart up there, for the purposes of when it gets to

09:26:31 20    refreshing, that would just be clear, or impeachment, that

09:26:35 21    would be easier for them, but we will print out the

09:26:37 22    individuals ones as well.

09:26:38 23              MR. WISE:  I seen stuff in the summary chart

09:26:41 24    where there are messages and I can recognize them where

09:26:43 25    they're not accurate.  That's the problem, if you put

09:26:46 1    something in front of her, she's not going to remember

09:26:51 2    precise wording.

09:26:51 3                THE COURT:  All right.  So you have to show her

09:26:53 4    the message and provide those messages to you.

09:26:56 5                MR. WISE:  And then we need something, whatever

09:26:59 6    they're going to show her, we need to see it too.

09:27:02 7                THE COURT:  You need to see it from their

09:27:03 8    extraction file.

09:27:07 9                MR. LOWELL:  So in the meantime when we're

09:27:08 10   starting this morning --

09:27:09 11               THE COURT:  My guess is that you're not the one

09:27:13 12   who is creating an extraction file?

09:27:14 13               MR. LOWELL:  You probably got that right.

09:27:16 14               THE COURT:  You do that in your spare time.

09:27:18 15               MR. LOWELL:  Yes.  So we will try to get that

09:27:20 16   done quickly and figure that out.  Again, not that I feel

09:27:23 17   like I need to apologize, but we have been going back and

09:27:28 18   forth.  The data is incredibly dense and we have gotten it

09:27:31 19   from the government in various ways.  And now I'm hearing

09:27:36 20   that they're saying in their extraction report or what they

09:27:39 21   did, there may be things missing, well we have them from

09:27:42 22   them, so I don't know how things we put here could be

09:27:45 23   missing because we didn't invent this, we got it from them.

09:27:50 24               THE COURT:  So anything -- maybe I should

09:27:51 25   address this to your colleague.  So anything that you have

09:27:55  1    gotten or put on this chart is something you got from the

09:27:58  2    government, not from any other source?

09:28:00  3             MR. KOLANSKY:  That's correct, Your Honor, and I

09:28:02  4    proffer that and it comes directly from the government and

09:28:05  5    that is why I endeavored to be as precise as possible to the

09:28:09  6    original source file path they can stick it on the hard

09:28:13  7    drive and get exactly to the folder where that message is

09:28:16  8    derived from on the hard drive we received.

09:28:19  9             MR. LOWELL:  Like last night I think, or

09:28:22 10    yesterday afternoon, whenever we were able to go back, we

09:28:25 11    provided them with the media that they can go and do exactly

09:28:28 12    what Mr. Kolansky just said and check it.  Now if they chose

09:28:32 13    not to, I'm sorry but we gave it to them because that's the

09:28:35 14    best you can do with the data they gave us.

09:28:37 15             THE COURT:  All right.

09:28:38 16             MR. WISE:  No, no, we didn't get any media, I

09:28:41 17    got, 11:07, I saw something on my phone that has this path

09:28:46 18    name that I don't know what it is.

09:28:48 19             MR. LOWELL:  I'm sorry, we gave them the file

09:28:51 20    path one by one of something they gave us.

09:28:54 21             MR. WISE:  Yeah.

09:28:55 22             THE COURT:  The file path one by one, but the

09:28:58 23    file path is identical.

09:29:00 24             MR. HINES:  It's filtered, we can't see that but

09:29:05 25    we can't -- and they know that from the search warrant, it's

09:29:08  1    in the search warrant.

09:29:09  2         THE COURT:  So you're limited in what you can do

09:29:14  3    because you're trying to protect rights using only the

09:29:17  4    information allowed from the search warrant.

09:29:19  5         MR. WISE:  Exactly.

09:29:20  6         MR. LOWELL:  What I'm learning for the first

09:29:22  7    time, understand this, they have provided us in discovery

09:29:27  8    things that they're saying that the investigative team does

09:29:30  9    not have.  So I didn't realize that, I thought it was a one

09:29:33 10    to one match, you would have assumed that otherwise I don't

09:29:37 11    know why they would have sent it to me, it's not

09:29:40 12    attorney/client materials we're talking about, it's

09:29:42 13    conversations between Mr. and Ms. Biden, so I don't

09:29:45 14    understand that.

09:29:46 15         MR. WISE:  It's Rule 16, it's his statement, we

09:29:49 16    have to turn it over, if it's privileged, we don't get to

09:29:52 17    see it if it goes through a filter, this is not anything

09:29:57 18    new, the search warrant says it went through a filter.

09:29:59 19         THE COURT:  He's saying this is conversation

09:30:01 20    between Mr. Biden and Ms. Biden, there is no arguable

09:30:04 21    privilege here.

09:30:05 22         MR. WISE:  Again, we don't know what we don't

09:30:08 23    know, when they say we got it, we don't have it.

09:30:11 24         THE COURT:  So there is a question as to the

09:30:14 25    authenticity accuracy of these statements, if you can

09:30:17 1   provide the extraction file whatever, so they can find that

09:30:21 2   and confirm that, then we can deal with that objection and

09:30:25 3   get through, you can use -- deal with them on a one by one

09:30:30 4   basis.  All right.  Anything else?

09:30:31 5          MR. LOWELL:  And one last piece on that so I'm

09:30:34 6   understanding, please.

09:30:35 7          So if there is a filter team, there is no basis

09:30:39 8   for them to filter out to the government a conversation

09:30:42 9   between Hallie Biden and Hunter Biden.  So how that would

09:30:46 10  not get back into their possession when it got into ours is

09:30:50 11  still something I don't understand.

09:30:52 12         THE COURT:  So it may be, and I think Mr. Wise

09:30:55 13  would say, he very well may have it, but he has no idea if

09:30:59 14  he has it based on what you gave him.  So I'm saying give

09:31:03 15  him something so that he can look at it and say oh, yeah, I

09:31:07 16  have it.  He's just saying look, I think he's trying to make

09:31:10 17  the record, I don't have everything.  Some of the stuff

09:31:13 18  that's in here, I don't remember seeing.  So I don't know if

09:31:16 19  it's right or wrong.  And so we're saying, okay, give him

09:31:21 20  the stuff to show so that he can decide if he has an

09:31:25 21  objection.

09:31:25 22         MR. LOWELL:  One other thing so that we can do

09:31:27 23  that.  On those texts which you phrased as salacious, I

09:31:32 24  wanted to make sure you saw everything, but those phrases we

09:31:35 25  can redact out and I'll show them how we do that.

09:31:40  1          MR. WISE:  We don't have a redacted set.

09:31:43  2          THE COURT:  I don't know what the point of

09:31:44  3  having that text is if you take that out because there is

09:31:47  4  nothing there other than --

09:31:49  5          MR. LOWELL:  Well, no, I'm sorry, I didn't mean

09:31:51  6  to interrupt you.

09:31:52  7          THE COURT:  21, so what do you take one word out

09:31:56  8  and then it doesn't really mean anything.

09:32:00  9          MR. LOWELL:  For that one, for example, will you

09:32:02 10  come home, then you redact so we can, blah, blah, blah

09:32:07 11  before I go.  That matters, it matters because of the date.

09:32:11 12  It matters because it indicates that he is not there.  It

09:32:17 13  matters because of that.  The relevance is her testimony of

09:32:21 14  what happened that morning and where she was and where he

09:32:23 15  was.  She's asking him to come home.  The natural inference,

09:32:29 16  not even inference, is he's not there.

09:32:32 17          MR. WISE:  But it's not that he was never there.

09:32:35 18          THE COURT:  No, no, I get it.  But that's fair

09:32:38 19  for the jury to decide.  Right?  If she says he was, he says

09:32:43 20  he wasn't, that's for the jury to decide.

09:32:46 21          MR. WISE:  Sure, and if she says he wasn't, he

09:32:49 22  left, this isn't inconsistent with that.

09:32:51 23          THE COURT:  I understand.  That's why I say

09:32:53 24  we'll take it one step at a time because I don't know what

09:32:56 25  the witness is going to say.

09:32:58  1          Okay.  Any other exhibits, anything else we need

09:33:01  2  to talk about before we let the jury come in?

09:33:05  3          MR. WISE:  Not from the United States.

09:33:06  4          MR. LOWELL:  No, we'll get working on that.

09:33:10  5          THE COURT:  All right.  Thank you.  Let's bring

09:33:11  6  in the jury.

09:34:14  7          (Jury entering the courtroom at 9:35 a.m.)

09:36:06  8          THE COURT:  All right.  Everyone, be seated.

09:36:35  9  Members of the jury, welcome back.  It's time for me to ask

09:36:39 10  my question.  Have you heard anything about this trial?

09:36:42 11          THE JURY:  No.

09:36:43 12          THE COURT:  Anyone try to talk to you about

09:36:44 13  anything in this trial?

09:36:46 14          THE JURY:  No.

09:36:47 15          THE COURT:  All right.  And you haven't done any

09:36:49 16  research or watched any TV, social media, heard any radio,

09:36:55 17  read any internet, anything kind of like that; right?

09:37:01 18          THE JURY:  No.

09:37:01 19          THE COURT:  All right.  Okay.  All right.  Let's

09:37:04 20  continue.  Let's bring in Mr. Cleveland.  Welcome back.

09:37:08 21          THE WITNESS:  Good morning.

09:37:08 22          THE COURT:  And sir, I'm just going to remind

09:37:10 23  you, you're still under oath.  Okay.

09:37:14 24          THE WITNESS:  Yes.

09:37:17 25          MR. LOWELL:  Ready, Your Honor?

09:37:25  1            THE COURT:  I am.

09:37:26  2                 CROSS-EXAMINATION

09:37:26  3  BY MR. LOWELL

09:37:27  4  Q.     Good morning, Mr. Cleveland, good morning, ladies and

09:37:29  5  gentlemen.  Mr. Cleveland, sorry I didn't get to finish last

09:37:33  6  evening.

09:37:33  7            Yesterday we were talking about a government

09:37:36  8  exhibit, which is government Exhibit A, which is the

09:37:43  9  Form 4473.  And you were asked questions about the questions

09:37:46 10  on the first page.  Do you remember doing that yesterday?

09:37:49 11  A.     Yes.

09:37:50 12  Q.     And you identified one that is letter E.  Do you

09:37:54 13  remember that?

09:37:55 14  A.     Yes.

09:37:56 15  Q.     I would like you to read through the other questions

09:37:58 16  that you said you saw Mr. Biden check the box for, okay?

09:38:02 17  A.     Okay.  So you want me to start with E?

09:38:04 18  Q.     No, I'll do it as short as I can to save you and the

09:38:09 19  jury time.

09:38:09 20  A.     Okay.

09:38:10 21  Q.     A, for example, asks the question, are you the actual

09:38:13 22  transferee; correct?

09:38:15 23  A.     Yes.

09:38:15 24  Q.     And that question uses the word "are"?

09:38:20 25  A.     Yes.

Cleveland - cross

09:38:23 1    Q.      Then B says, are you under indictment or

09:38:28 2    investigation, do you see that, for a felony?

09:38:30 3    A.      Yes.

09:38:30 4    Q.      It uses the word "are", correct?

09:38:34 5    A.      Yes.

09:38:34 6    Q.      It doesn't ask have you ever been indicted, does it?

09:38:38 7    A.      No.

09:38:38 8    Q.      Then C says, have you been convicted, do you see

09:38:42 9    that?

09:38:43 10   A.      Yes.

09:38:43 11   Q.      So that one has a "have you ever" or "have you been",

09:38:46 12   right?

09:38:49 13   A.      Yes.

09:38:49 14   Q.      D says are you a fugitive, it's another "are", do you

09:38:54 15   see that?

09:38:54 16   A.      Yes.

09:38:54 17   Q.      It doesn't ask have you ever been a fugitive,

09:38:58 18   correct?

09:38:59 19   A.      Yes.

09:38:59 20   Q.      E says, as you indicated, "are you", an unlawful user

09:39:04 21   of, or, it has the word "or" in it, right?

09:39:08 22   A.      Yes.

09:39:08 23   Q.      And then it says addicted.  That's one that is an

09:39:12 24   are, A-R-E; right?

09:39:15 25   A.      Yes, sir.

Cleveland - cross

09:39:15  1   Q.      F then says have you ever been adjudicated as a

09:39:20  2   mental defective, do you see that?

09:39:22  3   A.      Yes.

09:39:22  4   Q.      And that's a "have you", looking at the words have

09:39:26  5   you ever, do you see that?

09:39:27  6   A.      It is.

09:39:27  7   Q.      G says have you been discharged, and you see that

09:39:33  8   one?

09:39:33  9   A.      Yes.

09:39:33 10   Q.      That is also one that says "have you"; is that right?

09:39:36 11   A.      Yes.

09:39:37 12   Q.      And then H says are you subject to a court order

09:39:42 13   restraining you, do you see that?

09:39:44 14   A.      Yes.

09:39:44 15   Q.      That's an "are"?

09:39:45 16   A.      Yes.

09:39:46 17   Q.      It doesn't say "have you ever"?

09:39:48 18   A.      No.

09:39:49 19   Q.      In your experience selling weapons, would it give you

09:39:55 20   pause if somebody said "I used to have a restraining order

09:39:59 21   against me for my partner, my spouse, but I would like to

09:40:03 22   get a gun"?

09:40:04 23   A.      Yes, it would have me stop the sale.

09:40:06 24   Q.      But that's not what it asks, is it?

09:40:09 25   A.      No.

Cleveland - cross

09:40:09  1   Q.      I says, have you ever been convicted, right?

09:40:12  2   A.      Yes.

09:40:13  3   Q.      That's a "have you"?

09:40:14  4   A.      Yes, it is.

09:40:15  5   Q.      12B says, have you ever renounced, right?

09:40:19  6   A.      Yes.

09:40:20  7   Q.      It doesn't say are you presently renouncing, do you

09:40:23  8   plan to renounce, it says "have you"?

09:40:24  9   A.      Yes.

09:40:25 10   Q.      12C says, are you an illegal -- sorry, are you an

09:40:32 11   alien illegally or unlawfully in the United States, right?

09:40:36 12   A.      Yes.

09:40:37 13   Q.      That's an "are", A-R-E, right?

09:40:39 14   A.      Yes.

09:40:40 15   Q.      It doesn't say have you ever been admitted illegally

09:40:43 16   or unlawfully, it doesn't look backwards, does it?

09:40:46 17   A.      No.

09:40:46 18   Q.      But to be clear, E is one of those ones that say

09:40:51 19   "are", A-R-E?

09:40:53 20   A.      Yes.

09:40:56 21   Q.      Okay.  Then if you take that piece down.

09:41:00 22           Your testimony you said that you observed

09:41:03 23   Mr. Biden looking at the form, you told him to take his

09:41:06 24   time?

09:41:06 25   A.      Yes.

Cleveland - cross

| | | |
|---|---|---|
| 09:41:06 | 1 | Q.    You remember that, right? |
| 09:41:08 | 2 | A.    Yes. |
| 09:41:09 | 3 | Q.    Okay.  So the form has multiple pages on it, right? |
| 09:41:13 | 4 | A.    Yes. |
| 09:41:14 | 5 | Q.    And you saw him looking at each page? |
| 09:41:16 | 6 | A.    Well, he only had to go ahead and look at the first |
| 09:41:19 | 7 | -- the front of it and the back when he went to go to the |
| 09:41:22 | 8 | certified, so yes. |
| 09:41:24 | 9 | Q.    How about the instructions which explain what we just |
| 09:41:26 | 10 | went through, A, B, C, D, E, that's in the form, isn't it? |
| 09:41:31 | 11 | A.    Yes. |
| 09:41:31 | 12 | Q.    That's something that would be in the same form that |
| 09:41:33 | 13 | you handed him? |
| 09:41:34 | 14 | A.    Yes. |
| 09:41:34 | 15 | Q.    So it's a whole package? |
| 09:41:37 | 16 | A.    Yes. |
| 09:41:37 | 17 | Q.    And that's where directions, instructions, and |
| 09:41:39 | 18 | definitions apply for somebody who is filling out the form? |
| 09:41:44 | 19 | A.    Yes, sir. |
| 09:41:44 | 20 | Q.    If you'll turn to the page, put back 10A, Mr. Radic, |
| 09:41:49 | 21 | if you will turn the page.  Turn the page again.  Okay.  So |
| 09:41:55 | 22 | that's where your signature is and then it begins, the |
| 09:42:00 | 23 | series of instructions and definitions, right? |
| 09:42:03 | 24 | A.    Yes. |
| 09:42:03 | 25 | Q.    So if you look -- if you'll turn the page, Mr. Radic. |

Cleveland - cross

09:42:07  1            If you look at the -- the questions on that page

09:42:12  2   conform to the boxes, don't they?

09:42:14  3   A.     Yes.

09:42:14  4   Q.     So if you'll see, there is one for 9, there is one

09:42:19  5   for 10A, et cetera, and then there is the 11 questions

09:42:22  6   starting at the bottom of the lower page, do you see that?

09:42:24  7   A.     Yes, sir.

09:42:25  8            MR. HINES:  Objection.  Actually it starts at

09:42:27  9   the top of the page.

09:42:28 10   BY MR. LOWELL:

09:42:28 11   Q.     I'm sorry, go to the left, the bottom of the

09:42:31 12   left-hand column, letter A, "actual transferee", do you see

09:42:35 13   that.  You don't have to blow it up yet Mr. Radic.  That's

09:42:39 14   where there is a corresponding instruction for the parts of

09:42:42 15   the box you said that Mr. Biden signed?

09:42:44 16   A.     Yes.

09:42:44 17   Q.     And there is one more 11A, 11B, 11D, 11F, on the next

09:42:54 18   page, Mr. Radic?

09:42:56 19            MR. HINES:  Objection.  Sorry just to be clear,

09:43:00 20   11B-12.

09:43:04 21   BY MR. LOWELL:

09:43:04 22   Q.     Let me start again.  You see there is an instruction

09:43:08 23   for 11A to bottom?

09:43:09 24   A.     Yes.

09:43:09 25   Q.     Then there is one for 11B-12.  Do you see that?

Cleveland - cross

09:43:14 1   A.       Yes.

09:43:14 2   Q.       And then there is a lot of words right between that

09:43:17 3   one and the next one?

09:43:18 4   A.       Yes.

09:43:18 5   Q.       And then it says 11D, right?

09:43:20 6   A.       Yes.

09:43:21 7   Q.       All right.  11A was actual transferor definition of

09:43:25 8   that, right?

09:43:26 9   A.       Yes.

09:43:26 10  Q.       And 11B-12 is addressing the issue of what's

09:43:33 11  prohibited in terms of transportation, shipment as it is

09:43:37 12  explained there, right?

09:43:38 13  A.       Yes.

09:43:38 14  Q.       And then 11D is phrased fugitive from justice?

09:43:43 15  A.       Yes.

09:43:44 16  Q.       And it explains that provision, correct?

09:43:48 17  A.       Yes.

09:43:48 18  Q.       11F says adjudicated as a mental defective, and do

09:43:54 19  you see that?

09:43:55 20  A.       Yes.

09:43:55 21  Q.       And then it goes further, it says committed to, and

09:43:57 22  then there is an exception.  Can you turn to the next page,

09:44:01 23  Mr. Radic.  And then it goes more words to 11H, which says

09:44:06 24  "qualifying restraining order".

09:44:09 25  A.       Yes.

Cleveland - cross

09:44:09  1    Q.      And it's talking again, that's the one that says "are

09:44:14  2    you", not have you?

09:44:15  3    A.      Yes.

09:44:15  4    Q.      And then 11I explains what a misdemeanor crime for

09:44:21  5    domestic violence is?

09:44:23  6    A.      Yes.

09:44:23  7    Q.      And 12D explains that question of immigration status

09:44:27  8    in the present tense?

09:44:28  9    A.      Yes.

09:44:29 10    Q.      And it doesn't go and ask have you ever, does it?

09:44:32 11    A.      No.

09:44:35 12    Q.      And then 13 explains further about the U.S. issued

09:44:41 13    alien number, correct?

09:44:41 14    A.      Yes.

09:44:42 15    Q.      If you go back a page, Mr. Radic.  Do you see on the

09:44:45 16    page before where I said there is a definition for question

09:44:49 17    11D called fugitive from justice?

09:44:52 18    A.      Yes.

09:44:53 19    Q.      And then it goes to 11F, right?

09:44:55 20    A.      Yes.

09:44:55 21    Q.      There is no provision in this which defines or

09:44:59 22    instructs as to 11E, is there?

09:45:00 23              MR. HINES:  Objection.  May we approach?

09:46:25 24              (Side-bar discussion.)

09:46:25 25              MR. HINES:  So really two issues, one there is

09:46:25  1    no foundation for these questions because there is a

09:46:25  2    question that addresses 11E, it's in the section that says

09:46:25  3    question B through 12 and what Mr. Lowell just did is he

09:46:25  4    skipped the part he is an unlawful user of or addicted to

09:46:25  5    marijuana or any depressant or narcotic drug, he's

09:46:25  6    suggesting there is nothing in these instructions related to

09:46:25  7    that, the second issue it's irrelevant because it doesn't

09:46:25  8    matter what Mr. Cleveland's interpretation are regarding

09:46:25  9    what we're going through with the instruction, it's an

09:46:25 10    irrelevant basis.

09:46:25 11             MR. LOWELL:  As to the first, I don't mind going

09:46:25 12    backwards, all it does is repeat the question, it doesn't

09:46:25 13    define it.  As to the second, I'm not asking the question

09:46:25 14    that he just asked, I am pointing out that they can readily

09:46:25 15    see which is, there is nothing on 11E, that's all end of the

09:46:25 16    story.

09:46:25 17             THE COURT:  That's all your going to ask?

09:46:25 18             MR. LOWELL:  Yes.

09:46:25 19             THE COURT:  You can point out whatever you want

09:46:25 20    to point out.

09:46:25 21             MR. HINES:  Okay.

09:46:26 22    BY MR. LOWELL:

09:46:27 23    Q.    Mr. Radic, would you go back to the second column

09:46:30 24    which says questions 11B-12.  11B-12 references a statute

09:46:37 25    and it says what it prohibits, it prohibits receipt or

Cleveland - cross

09:46:41  1    possession in or affecting interstate commerce of a firearm

09:46:46  2    by one who has been convicted of a felony in a federal state

09:46:51  3    or local court, right?

09:46:52  4    A.    Yes.

09:46:52  5    Q.    And that corresponds to one of the questions, yes?

09:46:55  6    A.    Yes.

09:46:57  7    Q.    And that's a has been.  Than or any other crime

09:47:01  8    punishable by imprisonment, and then it explains it does not

09:47:04  9    include state misdemeanors, right?

09:47:06 10    A.    Yes.

09:47:07 11    Q.    Is a fugitive from justice?

09:47:09 12    A.    Yes.

09:47:10 13    Q.    It's not have you ever been.  Is an unlawful user of

09:47:13 14    or addicted to marijuana or any depressant, stimulant,

09:47:14 15    narcotic drug or any other controlled substance, do you see

09:47:17 16    that one?

09:47:17 17    A.    Yes.

09:47:17 18    Q.    That matches E right?

09:47:20 19    A.    Yes.

09:47:20 20    Q.    In that paragraph, it doesn't say more than what the

09:47:23 21    11E space on the front of the form says, the exact same

09:47:26 22    words?

09:47:27 23    A.    Yes.

09:47:27 24    Q.    It doesn't have a definition?

09:47:28 25    A.    No.

Cleveland - cross

09:47:29  1    Q.      Then it says has been adjudicated as a mental

09:47:32  2    defective, that's something that you and I went over on the

09:47:35  3    front of the form, right?

09:47:36  4    A.      Yes.

09:47:36  5    Q.      And has been, that's another has been, discharged

09:47:39  6    from the armed forces, do you see that?

09:47:41  7    A.      Yes.

09:47:42  8    Q.      And then there is that "is", is subject to certain

09:47:45  9    restraining orders, right?

09:47:46 10    A.      Yes.

09:47:46 11    Q.      That's an is, I'm sorry, that's an is, not a has

09:47:52 12    been?

09:47:52 13    A.      Yes.

09:47:52 14    Q.      And then second line down, has renounced?

09:47:55 15    A.      Yes.

09:47:56 16    Q.      Do you see that one?

09:47:57 17    A.      Yes.

09:47:57 18    Q.      That just matches the words in the front of the form,

09:48:00 19    there are no specific definitions in those?

09:48:02 20    A.      No.

09:48:02 21    Q.      And then if you'll zoom out, Mr. Radic.  And then all

09:48:05 22    I was asking you is that now we've looked at each of the

09:48:08 23    words in 11B-12, you go down the page, 11D says, "fugitive

09:48:14 24    from justice", that's where we're at, correct?

09:48:17 25    A.      Yes, sir.

Cleveland - cross

09:48:18  1    Q.      And then it skips to 11F?

09:48:20  2    A.      Yep.

09:48:20  3    Q.      So all I'm asking you, in this form in that place, is

09:48:25  4    there an 11E definition?  There is not, is there?

09:48:28  5    A.      No.

09:48:31  6    Q.      You can take that down, Mr. Radic.

09:48:33  7            Then in terms of the sequence of events, you

09:48:37  8    talked about the form being presented going into the back

09:48:42  9    room.  And yesterday you were asked this question in terms

09:48:51 10    of when Mr. Biden signed the form.  You were asked "what

09:48:57 11    happened next after you seen Mr. Biden sign the form and

09:48:59 12    date it?"  And then you answered "what happens next is

09:49:04 13    Jason", is that referring to Jason Turner, right?

09:49:07 14    A.      Yes, sir.

09:49:07 15    Q.      "Said also we would need for the passport, another

09:49:10 16    form of like identification stating his address, it could be

09:49:16 17    a bill, or it could be vehicle registration", then question,

09:49:22 18    "what's the next thing you observed?"  And the answer, "I

09:49:25 19    observed Mr. Biden leave out and then come back in."

09:49:28 20            That's what you said yesterday?

09:49:30 21    A.      Yes.

09:49:31 22    Q.      What was it that you brought to Mr. Jason Turner's

09:49:36 23    attention?

09:49:37 24    A.      What did I bring -- you said what did I bring to

09:49:41 25    Jason Turner?

Cleveland - cross

09:49:42 1   Q.      You said Jason Turner did something, what did you say

09:49:46 2   to him?

09:49:46 3   A.      I didn't say anything, I think Jason, I think he

09:49:49 4   realized that it needed to be --

09:49:52 5              MR. HINES:  Objection.

09:49:52 6              THE COURT:  Yes.  So you don't have to speculate

09:49:54 7   on what Mr. Turner thought, if you don't know.

09:49:57 8              THE WITNESS:  Yeah, I'm not a hundred percent

09:49:59 9   sure about that.

09:50:00 10  BY MR. LOWELL:

09:50:00 11  Q.      Hundred percent.  You presented Mr. Jason -- sorry,

09:50:03 12  you presented Mr. Turner with what?

09:50:05 13  A.      I presented Mr. Turner with the form so that he could

09:50:09 14  go ahead and run the background check.

09:50:12 15  Q.      Okay.  And did you also provide him the

09:50:14 16  identification that existed at the time?

09:50:16 17  A.      Yes.

09:50:17 18  Q.      Okay.  And then what did -- what did you say to him

09:50:20 19  when you did that, did you say anything?

09:50:22 20  A.      I said it's ready to go.

09:50:24 21  Q.      Okay.

09:50:25 22  A.      Ready to run the background.

09:50:27 23  Q.      Did you say anything to him about that you were

09:50:29 24  giving him a passport versus any other form?

09:50:32 25  A.      No, he already had seen it.

Cleveland - cross

09:50:35 1    Q.       Okay.  Tell me that.  What did he see what?

09:50:38 2    A.       He already knew about the passport.

09:50:40 3              MR. HINES:  Objection.  Asked and answered

09:50:42 4    yesterday.

09:50:43 5              THE COURT:  Yes.

09:50:44 6              MR. LOWELL:  I'm sorry, I know we asked it, you

09:50:48 7    asked it.

09:50:48 8    BY MR. LOWELL:

09:50:49 9    Q.       I'm sorry, can I unwind that a second please.  He had

09:50:52 10   already seen what?

09:50:53 11   A.       The passport.

09:50:54 12   Q.       When did he see that?

09:50:55 13   A.       He seen that when I went to go ask about was it fine

09:50:59 14   to use.

09:51:00 15   Q.       So you did say something to him?

09:51:02 16   A.       Yes.

09:51:04 17   Q.       And you said is it okay to use the passport?

09:51:06 18   A.       Yes.

09:51:06 19   Q.       Is that all you said?

09:51:07 20   A.       Yeah, that was it.

09:51:08 21   Q.       Why did you ask him that?

09:51:10 22   A.       Because as I stated yesterday, I have --

09:51:13 23              MR. HINES:  Objection.

09:51:22 24              THE COURT:  I'm not -- I mean, come over here.

09:55:02 25              (Side-bar discussion.)

Cleveland - cross

09:55:02  1          THE COURT:  What's the objection?

09:55:02  2          MR. HINES:  The issue is, maybe I jumped the gun

09:55:02  3  with the objection, I'll say that, but where are we going

09:55:02  4  with this and what's next, if he's just asking why did you

09:55:02  5  ask the question, but then if it is, was the reason you

09:55:02  6  asked that question was because you needed a secondary form

09:55:02  7  of identification, what is the state of mind at this point,

09:55:02  8  they're sort of packaged together, that's all irrelevant,

09:55:02  9  it's not a fact or consequence.

09:55:02 10          THE COURT:  You're going to say why did you do

09:55:02 11  it and he said because I don't know if that was enough and

09:55:02 12  then what?

09:55:02 13          MR. LOWELL:  That's the end of that question I

09:55:02 14  think.

09:55:02 15          THE COURT:  I know that's the end of that

09:55:02 16  question but what comes next in your questions.

09:55:02 17          MR. LOWELL:  Yesterday he testified that it

09:55:02 18  could be a bill, like a utility bill, he used the word bill,

09:55:02 19  it can't be a bill, he said it in testimony.

09:55:02 20          THE COURT:  Okay.

09:55:02 21          MR. LOWELL:  It can't be a bill, Your Honor.

09:55:02 22          THE COURT:  No.  No.  I mean, that's not really

09:55:02 23  relevant to whether or not this guy checked the box.  So you

09:55:02 24  can say did you ever get that, did you ever get it, you can

09:55:02 25  ask that.  But you can't ask -- and you know it was illegal

Cleveland - cross

09:55:02  1    that you used the a bill.

09:55:02  2         MR. LOWELL:  I wasn't going to say that.

09:55:02  3         THE COURT:  It wasn't allowed that you used just

09:55:02  4    a passport.

09:55:02  5         MR. LOWELL:  Okay.  The form is in evidence,

09:55:02  6    Your Honor, though, so when it comes to the definition of

09:55:02  7    what is the residence, I mean it's in evidence, I won't ask

09:55:02  8    him about it.

09:55:02  9         THE COURT:  I understand.  Look, I just put

09:55:02 10    someone in prison for a long time because he used the wrong

09:55:02 11    address and you said in your opening that he put the wrong

09:55:02 12    address on even though he doesn't live there.  So you can

09:55:02 13    you know talk about that and the address and he can put

09:55:03 14    what's there, but I'm not sure it's helpful.

09:55:03 15         MR. LOWELL:  On that point Your Honor, since you

09:55:03 16    raised it, that's where he was living when he was in

09:55:03 17    Delaware.

09:55:03 18         THE COURT:  Okay.  I'm just going by-- it

09:55:03 19    surprised me when you said it in your opening, I said holy

09:55:03 20    cow.

09:55:03 21         MR. LOWELL:  It wasn't his permanent address,

09:55:03 22    but the relevance so that the record is as you and I are

09:55:03 23    doing it, if somebody said he went and got a car

09:55:03 24    registration at that address in the black Cadillac, it's his

09:55:03 25    father's car.

09:55:03 1          THE COURT:  He already said it wasn't his car.

09:55:03 2   I think -- or maybe you said it.

09:55:03 3          MR. LOWELL:  I said in opening.

09:55:03 4          THE COURT:  You said it wasn't his car.  He knew

09:55:03 5   it wasn't his car.

09:55:03 6          MR. LOWELL:  If they're going to profess that

09:55:03 7   the man came back with a car registration as maybe he or

09:55:03 8   somebody else.

09:55:03 9          MR. WISE:  He didn't say that, he didn't say

09:55:03 10  that, he never said he came back with a registration.

09:55:03 11         MR. LOWELL:  I'm sorry, because somebody said

09:55:03 12  something wrong once one way in an interview.

09:55:03 13         MR. WISE:  He didn't say it on direct.

09:55:03 14         THE COURT:  You can ask him did he ever see a

09:55:03 15  car, a registration.

09:55:03 16         MR. LOWELL:  Yes.

09:55:03 17         THE COURT:  That's it.

09:55:03 18         MR. LOWELL:  Right, and then Mr. Turner will be

09:55:03 19  asked the same question.

09:55:03 20         MR. HINES:  But our case-in-chief is ending, we

09:55:03 21  have proved it you can't dull Turner.

09:55:03 22         THE COURT:  Just to impeach him.

09:55:03 23         MR. LOWELL:  Not to impeach Mr. Cleveland.

09:55:03 24         THE COURT:  Or you can't call him just to

09:55:03 25  impeach Mr. Turner, either ask him to say something if you

09:55:03 1    think he's going to lie on the stand.  You can't put him up

09:55:03 2    there to lie because.  You're not allowed the put someone up

09:55:03 3    there to lie and if they do, you can't put them up there

09:55:03 4    just to cross-examine him.

09:55:03 5                If you're going to call Mr. Turner and you

09:55:03 6    object, we can get a proffer.  We don't need to find that

09:55:03 7    right now.  That seems pointless.

09:55:08 8                (End of side-bar.)

09:55:08 9    BY MR. LOWELL:

09:55:11 10   Q.    I'm trying to remember my last question, which was

09:55:13 11   did I ask you yet what did you say to Mr. Turner?

09:55:16 12   A.    Yes.

09:55:17 13   Q.    What did you say?

09:55:17 14   A.    I said that the background check was ready.

09:55:20 15   Q.    Before that you were, were you presenting the first

09:55:22 16   time with the passport what did you say?

09:55:24 17   A.    I asked him was the passport fine to use.

09:55:26 18   Q.    And then coming back he then did something you said

09:55:30 19   yesterday, you don't have to tell me what he said, but he

09:55:32 20   did something?

09:55:33 21   A.    Yes.

09:55:33 22   Q.    But yesterday you did say you got the okay?

09:55:36 23   A.    Yeah.

09:55:36 24   Q.    And who else was in the room when that happened?

09:55:39 25   A.    Jason and Ronald Palimere.

09:55:41  1   Q.      And was Mr. Palimere and Mr. Turner together when

09:55:45  2   this exchange was going on?

09:55:47  3   A.      Yes.

09:55:48  4   Q.      They both heard your -- sorry, Mr. Palimere was close

09:55:51  5   enough to Mr. Turner to hear what you were saying and what

09:55:54  6   Mr. Turner was saying?

09:55:56  7   A.      Yes.

09:56:00  8   Q.      When you were in the room with Mr. Palimere, did you

09:56:03  9   get an impression in your exchange of what Mr. Palimere was

09:56:07 10   seeking to get the sale done quickly?

09:56:11 11   A.      He wanted the sale done quickly because he didn't

09:56:14 12   want him --

09:56:15 13               MR. HINES:  Objection.

09:56:16 14               THE COURT:  Yeah.  Hearsay is when you're

09:56:20 15   talking about what someone else said out of court.  So we

09:56:23 16   don't let in hearsay, and I sustain the objection.

09:56:27 17               MR. LOWELL:  All he was asking, and I didn't ask

09:56:29 18   you for what he said, I said did you get the impression that

09:56:32 19   he wanted the sale to go quickly.

09:56:34 20               THE WITNESS:  Yes.

09:56:34 21   BY MR. LOWELL:

09:56:34 22   Q.      Now, after you said yesterday that Jason said that we

09:56:40 23   should need for the passport another form of identification

09:56:43 24   stating his address, it could be a bill, or it could be a

09:56:46 25   vehicle registration, then you said what's next, I observed

09:56:50  1   Mr. Biden leave out and then come back in?

09:56:52  2   A.     Yes.

09:56:53  3   Q.     Right, did he come back in with anything?

09:56:56  4   A.     I believe so.

09:56:58  5   Q.     When you say you believe so, what's that belief based

09:57:02  6   on?

09:57:02  7   A.     I believe so because Jason was the one that was

09:57:05  8   handling the rest of that, taking over to run the background

09:57:08  9   check.

09:57:08 10   Q.     So is it your testimony that you don't know and are

09:57:14 11   assuming that Mr. Turner did or got something or you saw

09:57:17 12   that, or what did you see Mr. Biden do and come back with,

09:57:21 13   if anything?

09:57:22 14   A.     He just came back in, that's all I can say, he came

09:57:25 15   back in.

09:57:25 16   Q.     Did you see him have a piece of paper in his hand?

09:57:28 17   A.     No.

09:57:29 18   Q.     Did you see him talk to Mr. Turner at that point?

09:57:32 19   A.     Yes.

09:57:33 20   Q.     So he comes back in and has a conversation with

09:57:37 21   Mr. Turner?

09:57:38 22   A.     Yes.

09:57:38 23   Q.     Did you see Mr. Biden give Mr. Turner anything?

09:57:41 24   A.     No.

09:57:41 25   Q.     And then what happened next in terms of the sequence,

Cleveland - cross

09:57:46  1    did Mr. Turner go back into the back room?

09:57:48  2    A.    Yes, to run a background.

09:57:50  3    Q.    So that's when he ran the background?

09:57:52  4    A.    Yes, we don't do it on the sales floor.

09:57:55  5    Q.    Okay.  Going back to the form, go to the first -- to

09:58:07  6    the second page, Mr. Radic.

09:58:10  7          In the form, you said that it was Mr. Turner who

09:58:15  8    filled out line 18(a)?

09:58:17  9    A.    Yes.

09:58:17 10    Q.    And that's where the passport is referred to?

09:58:20 11    A.    Yes.

09:58:20 12    Q.    And then 18(b) says supplement, do you see that?

09:58:24 13    A.    Yes.

09:58:24 14    Q.    Is there anything on the form about a supplement that

09:58:27 15    day?

09:58:28 16    A.    No.

09:58:37 17    Q.    Yesterday you said that you're the one who copied the

09:58:40 18    form and attached the form of identification to it?

09:58:45 19    A.    Yes.

09:58:47 20    Q.    Okay.  Can we get back to government Exhibit 10A

09:58:52 21    again?  So if we flip to the next page.  And the next page.

09:58:58 22    And the next page.  Sorry, keep going, please.  And the next

09:59:03 23    page.  Next page.  Okay.

09:59:06 24          So it is the practice to take what it is a

09:59:10 25    person presents as their I.D., and then put it on the form?

Cleveland - cross

09:59:14  1    A.      Yes.

09:59:14  2    Q.      And there was a passport, you talked about the

09:59:16  3    passport.  Whose handwriting is on the left?

09:59:19  4    A.      Mine.

09:59:20  5    Q.      So you did that and attached that; is that right?

09:59:25  6    A.      Yes.

09:59:26  7    Q.      And I notice that was in red?

09:59:29  8    A.      Yes.

09:59:29  9    Q.      Yesterday I think your -- and we saw your handwriting

09:59:34 10    was in blue?

09:59:35 11    A.      Yes.

09:59:35 12    Q.      Except for that date next to your signature which was

09:59:38 13    in red?

09:59:38 14    A.      Yes.

09:59:39 15    Q.      How did this become red?

09:59:40 16    A.      Because with this form I don't have to fill out any

09:59:43 17    specific color, I can use whatever pen that I grab out of

09:59:47 18    the pen holder.

09:59:48 19    Q.      I got it.  I'm just trying to figure out like when

09:59:50 20    the blue came to red on this.  So you had both or did you

09:59:54 21    take Jason's pen?

09:59:55 22    A.      No, multiple different color pens in the pen holder.

10:00:01 23    Q.      Okay.  So you can -- that handwriting is yours?

10:00:04 24    A.      Yes.

10:00:05 25    Q.      And that's what you attached?

Cleveland - cross

10:00:06 1   A.      Yes.

10:00:07 2   Q.      There is nothing after this passport, you didn't

10:00:10 3   attach any other form of I.D. that day?

10:00:13 4   A.      No.

10:00:14 5   Q.      In terms of your interchange with Mr. Biden that day

10:00:19 6   -- now you can take it down.

10:00:20 7          Did you go through the checklist with him and

10:00:22 8   ask him if he was a fugitive or ask him whether or not he

10:00:26 9   was under a restraining order, or ask if he had ever been an

10:00:30 10  improper person in the country, did you go through and ask

10:00:33 11  him any of those orally?

10:00:34 12  A.      No, he's supposed to read that and answer those

10:00:37 13  questions himself.

10:00:39 14  Q.      Did you ask him any questions about whether or not he

10:00:41 15  ever drank or was presently drinking alcohol?

10:00:44 16  A.      No.

10:00:45 17  Q.      But I understand that that would be of concern to

10:00:48 18  you?

10:00:48 19  A.      Yes.

10:00:49 20  Q.      Even though it's not asked for on the form?

10:00:51 21  A.      Yes.

10:00:54 22  Q.      So are you -- am I right that there is no other form

10:00:58 23  that he was given that day that asked him about his use of

10:01:01 24  alcohol?

10:01:01 25  A.      No.

Cleveland - cross

10:01:03  1    Q.      And you don't want to sell a gun, I imagine, to

10:01:06  2    somebody who you know to be either high or drunk or using a

10:01:12  3    drug or using alcohol, right?

10:01:14  4    A.      No.

10:01:15  5    Q.      Is it your practice to try to understand or glean or

10:01:20  6    observe a person?

10:01:20  7    A.      Yes.

10:01:22  8    Q.      And as I understand it, your practice would be that

10:01:26  9    you would try to see whether somebody is glassy eyed, right?

10:01:30 10    A.      Yes.

10:01:30 11    Q.      Or smells of alcohol?

10:01:32 12    A.      Yes.

10:01:32 13    Q.      Or smells of marijuana such that it gives a smell?

10:01:36 14    A.      Yes.

10:01:36 15    Q.      Or any other indication of a person?

10:01:39 16    A.      Yeah.

10:01:39 17    Q.      Not being in their normal sober condition?

10:01:42 18    A.      Yes.

10:01:43 19    Q.      And that day Mr. Biden didn't exhibit any of those

10:01:48 20    things that you try to observe?

10:01:50 21    A.      Not at all.

10:01:53 22    Q.      Then you indicated that Mr. Turner was the one to run

10:01:58 23    the background check, I'm not going to belabor that.  I do

10:02:02 24    want to figure out just as best as I can the sequence.

10:02:05 25    Okay?

Cleveland - cross

10:02:05  1    A.        Okay.

10:02:06  2    Q.        I promise I won't take a long time.  If you'll put up

10:02:09  3    government Exhibit 12.  So I'm referring to government

10:02:26  4    Exhibit 12A, which is in evidence.  Do you recognize what

10:02:30  5    this is?

10:02:31  6    A.        Yes.

10:02:31  7    Q.        What is it?

10:02:32  8    A.        That is the paperwork for when you run a NICS

10:02:37  9    background check.

10:02:38 10    Q.        This would have been something Mr. Turner was

10:02:40 11    responsible for?

10:02:41 12    A.        Yes.

10:02:41 13    Q.        And Mr. Turner runs the check, and it indicates when

10:02:46 14    it was done on the top; right?

10:02:49 15    A.        Yes.

10:02:50 16    Q.        And that says on the 12th of October and the time is

10:02:54 17    6:36 p.m., do you see that?

10:02:56 18    A.        Yes.

10:02:56 19    Q.        And then it also indicates when the response came,

10:03:00 20    doesn't it?

10:03:01 21    A.        Yes.

10:03:01 22    Q.        And that would be three lines from the bottom of

10:03:05 23    6:37 p.m., right?

10:03:06 24    A.        Yes.

10:03:07 25    Q.        So it took a minute for this to happen, right?

Cleveland - cross

10:03:10  1    A.      Yes.

10:03:10  2    Q.      And would you put up government Exhibit 13A, which is

10:03:20  3    the sales receipt.

10:03:22  4            And the sales receipt has a time on the top,

10:03:28  5    doesn't it?

10:03:29  6    A.      Yes.

10:03:29  7    Q.      What's that time?

10:03:31  8    A.      6:53.

10:03:33  9    Q.      So the first time stamp of the check is 6:36, right?

10:03:40 10    A.      Yes.

10:03:40 11    Q.      Or 37 when it comes back?

10:03:42 12    A.      Yes.

10:03:42 13    Q.      And then this is all paid for on a cash -- on a cash

10:03:48 14    basis, a receipt that is 6:53?

10:03:51 15    A.      Yes.

10:03:51 16    Q.      So I'm just trying to make sure I have this right.

10:03:54 17    In the sequence of events, the following things happened

10:03:58 18    after you got the go ahead from Mr. Turner.  You came back,

10:04:05 19    only the gun was there, and then the other events occurred?

10:04:08 20    A.      Yes.

10:04:08 21    Q.      That's when you spoke to Mr. Biden about bullets?

10:04:12 22    A.      Yes.

10:04:12 23    Q.      That's when you spoke the to him about speed loader?

10:04:16 24    A.      Yes.

10:04:17 25    Q.      That's when he, according to you, went and looked and

Cleveland - cross

10:04:22  1  got the NEBO thing?

10:04:24  2  A.      Yes.

10:04:24  3  Q.      And then went over to the case where a BB gun was?

10:04:29  4  A.      Yes.

10:04:30  5  Q.      And then came back?

10:04:31  6  A.      Yes.

10:04:31  7  Q.      And then discussed with you all those purchases, put

10:04:36  8  it on the table, you had to ring it up?

10:04:38  9  A.      Yes.

10:04:38 10  Q.      And you said yesterday that, his looking at the BB

10:04:44 11  gun, his seeking the NEBO utility knife and the flash light

10:04:49 12  all happened after the gun was picked out, not before?

10:04:52 13  A.      Yes.

10:04:52 14  Q.      And therefore in your sequence, all the events I just

10:04:56 15  said, going in the back room, getting it, coming back,

10:05:00 16  saying it was okay, all the things I just said happened in

10:05:04 17  those 16 minutes?

10:05:05 18          MR. HINES:   Objection.   The form, he did it

10:05:11 19  before the background check.

10:05:12 20  BY MR. LOWELL:

10:05:13 21  Q.      I'm sorry, all the events that I just went through

10:05:15 22  with you, all the ones that I detailed about whatever you

10:05:18 23  did after you got the okay, and you're saying it all happens

10:05:22 24  in terms of the utility knife, the flashlight, you said it

10:05:25 25  was after?

Cleveland - cross

10:05:26  1    A.      Yes.

10:05:26  2    Q.      That happened in those 16 minutes?

10:05:29  3    A.      Yes.

10:05:31  4    Q.      So you ended up with that cash receipt and the sale

10:05:34  5    at that hour.  And Mr. Biden purchased all of those events.

10:05:41  6    But the gun itself didn't go out of the store with the way

10:05:47  7    it was presented to the jury as just a handgun that he puts

10:05:51  8    in a bag and goes out, right?

10:05:53  9    A.      No.  It's leaving out in the case that it comes in

10:05:57  10   from the manufacturer.

10:05:57  11   Q.      Which has a lock on it?

10:06:00  12   A.      No.  It doesn't have a lock.

10:06:01  13   Q.      At the time it didn't?

10:06:03  14   A.      No, when the guns go out, this they don't have a

10:06:07  15   lock, they have a lock inside to render them useless, you

10:06:11  16   usually put it through the barrel and put the slide back or

10:06:14  17   you open the cylinder on a revolver and you put the lock

10:06:17  18   through and lock it with a key.

10:06:19  19            MR. LOWELL:  May I approach, Your Honor?

10:06:21  20            THE COURT:  All right.

10:06:22  21   BY MR. LOWELL:

10:06:23  22   Q.      Let me show you what's been marked as government

10:06:25  23   Exhibit 5A.  Do you recognize that?

10:06:28  24   A.      Yes.

10:06:29  25   Q.      What does it depict?

10:06:32  1    A.        I didn't hear you.

10:06:33  2    Q.        What does it depict, what does it show?

10:06:35  3    A.        It depicts the Colt case for the revolver and it has

10:06:39  4    a lock on it, which that lock would have been put on after

10:06:42  5    the fact, leaving the store.

10:06:44  6    Q.        And you see that the lock that you were just talking

10:06:47  7    about has the name Colt on it?

10:06:49  8    A.        Yes.

10:06:49  9    Q.        It comes with the box?

10:06:52  10   A.        Yes.

10:06:52  11   Q.        Inside?

10:06:53  12   A.        Yes.

10:06:53  13   Q.        And then it gets put on the outside?

10:06:55  14   A.        Yes.

10:06:56  15   Q.        Is this an accurate depiction of the box that was

10:07:00  16   given to Mr. Biden or that he asked about?  He asked about

10:07:03  17   the box, didn't he?

10:07:05  18   A.        No, he didn't have to ask about the box, when you

10:07:08  19   present the firearm -- so, once the person picks out what

10:07:11  20   they want, I retrieve the box for it so the box is already

10:07:16  21   there with the firearm sitting in it.

10:07:18  22   Q.        He didn't leave with the firearm outside of the box?

10:07:20  23   A.        No.

10:07:21  24   Q.        He left with it in this?

10:07:22  25   A.        Yes.

10:07:23  1            MR. LOWELL:  Your Honor we move into evidence

10:07:25  2    government Exhibit 5 and 5A.

10:07:27  3            MR. HINES:  No objection.

10:07:28  4            THE COURT:  Thank you.  Admitted.

10:07:30  5            MR. LOWELL:  May I bring this to the attention

10:07:32  6    of the witness and the jury?

10:07:34  7            THE COURT:  You may.

10:07:35  8            MR. LOWELL:  Thank you.

10:07:35  9            (Government Exhibits No. 5 and 5A were admitted

10:07:40 10    into evidence.)

10:07:40 11    BY MR. LOWELL:

10:07:41 12    Q.    Mr. Cleveland, I'm looking at what is admitted as

10:07:43 13    Exhibit 5.  Is this what you were talking about a moment

10:07:46 14    ago?

10:07:47 15    A.    Yes.

10:07:47 16    Q.    This is the lock on it that says Colt, just as in the

10:07:50 17    photo?

10:07:51 18    A.    Yes.

10:08:13 19    Q.    After Mr. Biden left the store with the material he

10:08:17 20    had purchased and the gun was in the lock box, correct?

10:08:20 21    A.    Yes.

10:08:21 22    Q.    Put in a lock box.  Do you know what happened next,

10:08:24 23    where he went, what he did with it?

10:08:26 24    A.    No.

10:08:26 25    Q.    Did it ever come to your attention where he went

Cleveland - redirect

10:08:29  1  after that?

10:08:29  2  A.      No.

10:08:30  3  Q.      Or what happened to the gun?

10:08:31  4  A.      No.

10:08:33  5  Q.      I'm sorry, that I had you stay over.  I have no other

10:08:37  6  questions?

10:08:37  7               THE COURT:  Redirect.

10:08:41  8               MR. HINES:  Yes, Your Honor.

10:08:42  9                    REDIRECT EXAMINATION

10:08:43 10  BY MR. HINES:

10:08:43 11  Q.      Picking up where we left off, Government's Exhibit 5,

10:08:46 12  Mr. Cleveland, you see how today in court it has a lock on

10:08:50 13  top?

10:08:50 14  A.      Yes.

10:08:50 15  Q.      Was this lock on the box when you presented this to

10:08:54 16  Mr. Biden?

10:08:55 17  A.      No.

10:08:55 18  Q.      It was inside the box?

10:08:56 19  A.      Yes.

10:08:57 20  Q.      And when he left the store, was the lock on it?

10:09:00 21  A.      No.

10:09:00 22  Q.      Do you know whether law enforcement or someone else

10:09:03 23  put the lock on this box or Mr. Biden, do you have any idea?

10:09:07 24  A.      No.

10:09:08 25  Q.      Do you know whether Mr. Biden actually put his

Cleveland - redirect

10:09:10  1    revolver in this lock box when he had it in his possession?

10:09:16  2    A.     No.

10:09:19  3    Q.     Now, if we could have Exhibit 13A on the screen,

10:09:24  4    please.  Mr. Lowell asked you a series of questions about

10:09:29  5    the events that occurred prior to 6:53, when this receipt

10:09:33  6    was generated.  Do you recall those questions he was just

10:09:36  7    asking you?

10:09:36  8    A.     Yes.

10:09:37  9    Q.     And the background check was completed 16 minutes

10:09:40 10    earlier?

10:09:41 11    A.     Yes.

10:09:41 12    Q.     Was Mr. Biden out on the floor while the background

10:09:45 13    check was occurring?

10:09:47 14    A.     Yes.

10:09:47 15    Q.     And so he would have been on the floor for longer

10:09:52 16    than 16 minutes looking at items?

10:09:55 17    A.     Yes.

10:09:55 18    Q.     Now, if you look at the number of items after the

10:09:59 19    revolver, just 1, 2, 3, 4, 5 items on that receipt in

10:10:03 20    addition to the revolver, correct?

10:10:05 21    A.     Yes.

10:10:08 22    Q.     And then yesterday Mr. Lowell asked you some

10:10:12 23    questions, and actually again today, about Government's

10:10:17 24    Exhibit 10A, and your signature on that on page 3.  And

10:10:28 25    above your signature at the end of the certification it

Cleveland - redirect

10:10:30  1   says, "it is my belief that it is not unlawful for me to

10:10:34  2   sell, deliver, transport, or otherwise dispose of the

10:10:37  3   firearms listed on the form to the person identified in

10:10:40  4   section A."  Is that what it says there at the bottom of the

10:10:42  5   certification?

10:10:43  6   A.    Yes.

10:10:43  7   Q.    Does that mean that you're responsible, too, and that

10:10:47  8   you're not able to sell someone a firearm if you knew that

10:10:50  9   they were an unlawful user or an addict?

10:10:53 10   A.    Yes.

10:10:53 11   Q.    Is that why that question 11E matters?

10:10:56 12   A.    Yes.

10:10:56 13   Q.    Mr. Lowell asked you about that question, why does it

10:11:00 14   matter?

10:11:01 15   A.    It matters because on the form, you're not supposed

10:11:06 16   to be purchasing firearms using drugs, even with a medical

10:11:09 17   marijuana card, it's just the rules.

10:11:12 18   Q.    Do you care?

10:11:13 19   A.    Yes.

10:11:13 20   Q.    Why do you care?

10:11:15 21   A.    I mean, you have somebody under the influence,

10:11:18 22   anything could happen.

10:11:20 23            MR. HINES:  No further questions, Your Honor.

10:11:21 24            THE COURT:  Thank you.  All right.  Thank you so

10:11:24 25   much for coming back, Mr. Cleveland.  You're excused.

Hallie Biden - direct

| | | |
|---|---|---|
| 10:11:27 | 1 | THE WITNESS:  All right. |
| 10:11:28 | 2 | THE COURT:  What's next? |
| 10:11:29 | 3 | MR. WISE:  Your Honor, the United States calls |
| 10:11:31 | 4 | Hallie Biden. |
| 10:11:48 | 5 | COURTROOM DEPUTY:  Please raise your right hand. |
| 10:12:10 | 6 | Please state and spell your full name for the record. |
| 10:12:17 | 7 | THE WITNESS:  Hallie Biden, H-A-L-L-I-E, |
| 10:12:34 | 8 | B-I-D-E-N. |
| 10:12:36 | 9 | HALLIE BIDEN, having been duly sworn was |
| 10:12:42 | 10 | examined and testified as follows: |
| 10:12:51 | 11 | THE COURT:  All right.  Go ahead, Mr. Wise. |
| 10:12:53 | 12 | MR. WISE:  Thank you, Your Honor. |
| 10:12:53 | 13 | DIRECT EXAMINATION |
| 10:12:53 | 14 | BY MR. WISE: |
| 10:12:54 | 15 | Q.    Good morning, Ms. Biden. |
| 10:12:55 | 16 | A.    Good morning. |
| 10:12:56 | 17 | Q.    Do you know the about defendant? |
| 10:12:58 | 18 | A.    Yes. |
| 10:12:59 | 19 | Q.    And how do you know him? |
| 10:13:00 | 20 | A.    He's my brother-in-law. |
| 10:13:05 | 21 | Q.    How long have you known him? |
| 10:13:06 | 22 | A.    Since I was young, actually, probably middle school. |
| 10:13:09 | 23 | Q.    You testified he is your brother-in-law.  Were you |
| 10:13:13 | 24 | married to his brother? |
| 10:13:14 | 25 | A.    Yes. |

Hallie Biden - direct

10:13:14  1    Q.      Did your husband die in 2015?

10:13:17  2    A.      Yes.  He did.

10:13:18  3    Q.      At some point after the death of your husband, did

10:13:21  4    you and the defendant begin a romantic relationship?

10:13:24  5    A.      Yes.

10:13:24  6    Q.      And approximately when was that?

10:13:26  7    A.      Late 2015 or 2016, it was gradual.

10:13:32  8    Q.      At some point after that, did you learn that the

10:13:35  9    defendant was using drugs?

10:13:36 10    A.      Yes, I did.

10:13:38 11    Q.      And approximately when did you learn that?

10:13:41 12    A.      During the time that I was in a romantic relationship

10:13:45 13    with him, but I'm not sure exactly.

10:13:48 14    Q.      And what kind of drugs was it that you learned he was

10:13:51 15    using?

10:13:52 16    A.      Crack cocaine.

10:13:54 17    Q.      And how did you first learn that?

10:13:56 18    A.      I found it and I Googled it because I didn't know

10:14:03 19    what it was.

10:14:04 20    Q.      Once you found it and you Googled it, did you talk to

10:14:09 21    the defendant about it?

10:14:11 22    A.      Yes, I did.

10:14:14 23    Q.      And what did he tell you, I'm not looking for a

10:14:17 24    quote, but what did he tell you?

10:14:19 25    A.      He told me what it was.

Hallie Biden - direct

| | | |
|---|---|---|
| 10:14:20 | 1 | Q.    And what did he say it was? |
| 10:14:22 | 2 | A.    Crack cocaine. |
| 10:14:25 | 3 | Q.    Had you ever seen that before? |
| 10:14:26 | 4 | A.    I had not. |
| 10:14:35 | 5 | Q.    Did he deny it was his? |
| 10:14:37 | 6 | A.    No. |
| 10:14:40 | 7 | Q.    And where were you when you first found it? |
| 10:14:44 | 8 | A.    I think it was -- I'm not sure exactly but I believe |
| 10:14:47 | 9 | it was my house. |
| 10:14:48 | 10 | Q.    And where was your house at the time? |
| 10:14:50 | 11 | A.    In Wilmington, Delaware. |
| 10:14:53 | 12 | Q.    And would the defendant stay at your house in |
| 10:14:59 | 13 | Wilmington, Delaware, from time to time? |
| 10:15:01 | 14 | A.    Yes. |
| 10:15:01 | 15 | Q.    After you first found it, did there come a time when |
| 10:15:04 | 16 | you actually saw him smoking crack? |
| 10:15:06 | 17 | A.    Yes. |
| 10:15:07 | 18 | Q.    And where was that? |
| 10:15:08 | 19 | A.    I don't remember where -- it might have been in the |
| 10:15:15 | 20 | house or on the patio, I'm not sure exactly when I saw that. |
| 10:15:20 | 21 | Q.    How frequently did you see him doing that once you |
| 10:15:24 | 22 | started seeing him do that? |
| 10:15:26 | 23 | A.    Occasionally. |
| 10:15:29 | 24 | Q.    In between the times you saw him using it, were you |
| 10:15:33 | 25 | also seeing him? |

Hallie Biden - direct

10:15:36  1   A.      In between the times -- I'm confused.

10:15:38  2   Q.      In between the times he was smoking crack, were you

10:15:42  3   also with him or seeing him?

10:15:44  4   A.      Yes.

10:15:44  5   Q.      And at those times was he interacting with other

10:15:50  6   people?

10:15:50  7   A.      Yes.

10:15:50  8   Q.      Including members of your family?

10:15:52  9   A.      Yes.

10:15:52 10   Q.      And other acquaintances and family friends?

10:15:56 11   A.      Yes.

10:15:56 12   Q.      Was he also working?

10:15:58 13   A.      Yes.

10:15:59 14   Q.      All right.  And did you see him smoking crack

10:16:07 15   anywhere other than in Wilmington somewhere in or around

10:16:11 16   your home?

10:16:13 17   A.      In D.C., he had an apartment in D.C.

10:16:16 18   Q.      Did you sometimes go there with him?

10:16:20 19   A.      Yes.

10:16:21 20   Q.      Where did he get the drugs from?

10:16:26 21   A.      Various dealers.

10:16:27 22   Q.      Did you sometimes see that?

10:16:29 23   A.      Yes.

10:16:29 24   Q.      Do you remember where you were when you saw that?

10:16:32 25   A.      In D.C.

Hallie Biden - direct

10:16:36  1    Q.      And were you ever with him when he bought drugs from

10:16:39  2    the various dealers?

10:16:41  3    A.      I was.

10:16:44  4    Q.      When he used drugs, did you notice a change or did

10:16:47  5    you observe a change in his demeanor or his behavior?

10:16:51  6    A.      Yes.

10:16:52  7    Q.      And describe what that was?

10:16:55  8    A.      It varied, so it wasn't always consistent, but he

10:17:04  9    would be agitated and high strung.  But then other times,

10:17:12 10    you know, functioning as well.

10:17:15 11    Q.      Okay.  And were there times when you were with him

10:17:18 12    out or interacting with other people where you knew he had

10:17:22 13    used drugs close in time to that?

10:17:26 14    A.      Yes.

10:17:26 15    Q.      And did he appear to be under the influence in those

10:17:29 16    settings or was he showing those signs you saw?

10:17:33 17    A.      Sometimes yes, and sometimes no.

10:17:37 18    Q.      Now in 2017 and 2018, did you and the defendant rent

10:17:46 19    a house together in Annapolis, Maryland?

10:17:51 20    A.      Yes, we did.

10:17:52 21    Q.      And approximately from when to when?

10:17:55 22    A.      The school year basically.

10:17:57 23    Q.      So sort of late, I guess fall '17 through?

10:18:00 24    A.      Right.

10:18:01 25    Q.      Through fall of '18?

Hallie Biden - direct

10:18:03 1    A.      Correct.  We ended -- or I ended it early in July.

10:18:09 2    Q.      And did the defendant stay at the house with you in

10:18:13 3    Annapolis in '17 and into '18?

10:18:16 4    A.      Yes.

10:18:18 5    Q.      And you testified that you saw him using drugs in the

10:18:23 6    house in Wilmington.  The same question for the house in

10:18:26 7    Annapolis, did you see him using drugs there in '17 and '18?

10:18:31 8    A.      Yes.

10:18:32 9    Q.      And where in the house in Annapolis, if you recall?

10:18:35 10   A.      It varied.

10:18:39 11   Q.      Do you know where he kept the drugs?

10:18:42 12   A.      Backpack or a car.

10:18:49 13   Q.      And what kind of quantities did you see him with?

10:18:53 14   A.      That varied as well.

10:18:55 15   Q.      And so if you had to put it on a spectrum, what was

10:19:01 16   sort of the smallest to the largest I guess, because it

10:19:04 17   varied?

10:19:05 18   A.      I don't really know how the quantities, whether it

10:19:09 19   goes by weight or size, I don't know what you mean.

10:19:12 20   Q.      So is the smallest smaller than a marble?

10:19:17 21   A.      Sure, yeah.

10:19:18 22   Q.      And would the biggest be, the size of a ping pong

10:19:23 23   ball, bigger than that, smaller than that?

10:19:27 24   A.      Maybe a ping pong ball, maybe a little bigger

10:19:31 25   sometimes.

Hallie Biden - direct

10:19:31 1   Q.      Were there times when you saw him with multiple ping

10:19:36 2   pong ball size rocks at a time?

10:19:39 3   A.      Occasionally, maybe.

10:19:40 4   Q.      Did you discuss his drug use with him at the house in

10:19:44 5   Annapolis in '17 and '18?

10:19:46 6   A.      I did.

10:19:47 7   Q.      What did you discuss, I'm not looking for exact

10:19:49 8   quotes, but what did you discuss?

10:19:52 9   A.      That this can't go on, we can't do this, a lot of,

10:19:58 10  you know, back and forth with that.

10:20:03 11  Q.      And what did he say about his drug use?

10:20:07 12  A.      It kind of would go back and forth, sometimes, you

10:20:12 13  know, leave me alone, I'm fine, I don't have a problem, and

10:20:16 14  other times, yes, I do, and I, you know, I'll figure it out

10:20:22 15  my way.

10:20:23 16  Q.      Did he talk about it in terms of an addiction or

10:20:28 17  words to that effect or like that?

10:20:30 18  A.      Sometimes, yes.

10:20:36 19  Q.      During the time you were aware of him using drugs,

10:20:39 20  was he also drinking?

10:20:40 21  A.      Yes.

10:20:40 22  Q.      And did the two go hand in hand?

10:20:47 23  A.      Not always hand in hand, but they were both issues.

10:20:52 24  Q.      Was he frequently using both substances at the same

10:21:00 25  time?

Hallie Biden - direct

10:21:00  1    A.      Yes.

10:21:07  2    Q.      So the same question for the house in Annapolis, how

10:21:11  3    frequently was he using when he was with you at the house in

10:21:15  4    Annapolis?

10:21:16  5    A.      It became more and more frequently.

10:21:19  6    Q.      And so, what did that -- what did that look like?

10:21:25  7    A.      Well, he didn't -- he probably stayed there maybe

10:21:31  8    less than 50 percent of the time.  So --

10:21:36  9    Q.      So when he was there, how frequently was it?

10:21:38 10    A.      When he was there, I think it was frequent.  Daily,

10:21:44 11    if that's how you're asking, yes.

10:21:47 12    Q.      Okay.  And when he was using I guess daily, how long

10:21:51 13    would it go between I guess uses, if that's the right word?

10:21:56 14    A.      Generally you know, I don't know, eight hours.

10:22:02 15    Q.      So there were stretches of time in between when he

10:22:05 16    was using, when you observed when he wasn't using?

10:22:08 17    A.      Yes.

10:22:10 18           THE COURT:  Can you just speak clear, you were

10:22:13 19    talking about using alcohol.

10:22:14 20           MR. WISE:  I'm sorry, I'll be clear.

10:22:16 21    BY MR. LOWELL:

10:22:16 22    Q.      I'm focused on using, smoking crack at that time?

10:22:20 23    A.      Okay.

10:22:20 24    Q.      What were-- what were the intervals, if that's the

10:22:25 25    right word, in between when you saw him using crack?

Hallie Biden - direct

10:22:29  1    A.        You mean what were the breaks?

10:22:31  2    Q.        What were the breaks.

10:22:33  3    A.        Sleeping or when there was some obligation.

10:22:38  4    Q.        Okay.  So similar question as I asked from the

10:22:41  5    Wilmington house, when you were with him in Annapolis, in

10:22:45  6    these breaks when he wasn't using, was he interacting with

10:22:49  7    other people?

10:22:51  8    A.        Not when I -- he was really only there at the house

10:22:59  9    when he was there.  So I didn't --

10:23:01 10    Q.        Was there ever anyone at the house besides the two of

10:23:05 11    you?

10:23:06 12    A.        Not often.

10:23:09 13    Q.        But were there occasions where there were?

10:23:12 14    A.        Yes.

10:23:12 15    Q.        Like other family members?

10:23:14 16    A.        Yes.

10:23:15 17    Q.        And your children?

10:23:17 18    A.        Yes.

10:23:17 19    Q.        And were his children sometimes there as well?

10:23:21 20    A.        No.

10:23:22 21    Q.        Friends or acquaintances?

10:23:24 22    A.        Occasionally.

10:23:26 23    Q.        And when other people were at the house, was he able

10:23:32 24    to use the word you used, "function" with them?

10:23:35 25    A.        Yes.

Hallie Biden - direct

| | |
|---|---|
| 10:23:35 | 1 |
| 10:23:40 | 2 |
| 10:23:45 | 3 |
| 10:23:48 | 4 |

Q.      And were there times when you knew he had used drugs but the signs you described weren't apparent, I guess, when he was interacting with other people?

A.      Yes.

Q.      And you said also for, I think you said events or something, did you understand he was going out to do other things as well?

A.      Right.  Yes.

Q.      Did he ever try and hide his drug use from you in this period in '17 and '18?

A.      I don't recall.

Q.      Did he ever try and hide it, to your knowledge, from other people like members of your family?

A.      Yes.

Q.      At some point did he start going to California?

A.      I didn't know where he was going.

Q.      Okay.  At some point did you go to California to visit him?

A.      I did.

Q.      And approximately when was that?

A.      I believe it was around June of 2018.

Q.      Okay.  And what was the first place you remember staying when you went to California to visit him?

A.      The Roosevelt Hotel.

Q.      And when you went to visit him in the Roosevelt

Hallie Biden - direct

10:24:53 1    Hotel, was he using drugs?  Was he smoking crack then?

10:24:57 2    A.    Yes.

10:24:58 3    Q.    And how frequently was it then?

10:25:11 4    A.    Frequently.

10:25:12 5    Q.    How long did you stay at that time?

10:25:16 6    A.    A couple of days, I believe, I'm not sure exactly.

10:25:22 7    Q.    At that point were you also using drugs?

10:25:26 8    A.    Yes.

10:25:27 9    Q.    And who had introduced you to it?

10:25:32 10   A.    Hunter did.

10:25:34 11   Q.    And was it also crack?

10:25:36 12   A.    Yes.  It was a terrible experience that I went

10:25:42 13   through, and I'm embarrassed and I'm ashamed, and I regret

10:25:47 14   that period of my life.

10:25:54 15   Q.    And at some point did you stop, were you able to

10:25:57 16   stop?

10:25:58 17   A.    Yes.

10:25:58 18   Q.    And when was that?

10:25:59 19   A.    August of 2018.

10:26:02 20   Q.    During the time you were with him in June, did you go

10:26:09 21   out, did you do other things with him while you were in Los

10:26:14 22   Angeles?

10:26:14 23   A.    It was -- no, not really because it was a bit

10:26:19 24   volatile, you know, like arguing.

10:26:24 25   Q.    You testified at the beginning that you were in a

Hallie Biden - direct

10:26:28  1  romantic relationship.  By the, I guess by the summer, what

10:26:31  2  was the state of the relationship?

10:26:33  3  A.      Off and on, and so we wouldn't talk often and then we

10:26:44  4  would and be together and then not again.

10:26:48  5  Q.      You testified you left after a couple of days?

10:26:52  6  A.      Yeah.

10:26:53  7  Q.      And then did you ever go back to LA when he was

10:26:57  8  there?

10:26:58  9  A.      In August I did.

10:27:00 10  Q.      Where did you stay when you went in August?

10:27:02 11  A.      I was staying with a friend.

10:27:04 12  Q.      And how long did you see the defendant for when you

10:27:07 13  went back in August?

10:27:09 14  A.      Just a few hours.

10:27:11 15  Q.      Where was he at that time?

10:27:13 16  A.      He was at a treatment center.

10:27:15 17  Q.      And you said you just stayed for a few hours?

10:27:17 18  A.      Yeah, I was visiting him at the treatment center.

10:27:21 19  Q.      Okay.  All right.  After you saw him for a few hours

10:27:34 20  in August, moving forward in time, did you see him again in

10:27:38 21  October of 2018?

10:27:41 22  A.      I did.

10:27:42 23  Q.      And did he come to stay with you either late at night

10:27:48 24  on October 22nd or early in the morning on October 23rd?

10:27:51 25  A.      Yes.

Hallie Biden - direct

10:27:52    1    Q.    Do you remember which it was, whether it was late the

10:27:54    2    night before or early the following morning?

10:27:57    3    A.    I believe it was in the morning, but I don't recall

10:28:01    4    -- it was kind of a typical pattern, so I don't recall

10:28:04    5    exactly when he got there.

10:28:06    6    Q.    And what was the typical pattern?

10:28:09    7    A.    Where I didn't know where he was and I had been

10:28:12    8    trying to reach him for, it could be weeks.  And then

10:28:16    9    talking and then him coming and spending the night.

10:28:22   10    Q.    So you were awake when he got there, whether it was

10:28:27   11    the night before or the morning of?

10:28:29   12    A.    Yes.  Likely morning.

10:28:32   13    Q.    Likely morning.  What did you observe about him early

10:28:35   14    in the morning on the 23rd?

10:28:38   15    A.    He was tired, exhausted, looked like he hadn't slept.

10:28:46   16    Q.    Did you observe anything else about him?

10:28:52   17    A.    I don't know.

10:28:53   18    Q.    Did it look like he had been using drugs?

10:28:56   19    A.    Could have been.

10:28:57   20    Q.    Is that something you observed?

10:29:00   21    A.    Yes.

10:29:01   22    Q.    And what did he do after he got there?

10:29:07   23    A.    He went to bed.

10:29:10   24    Q.    And what did you do after he went to bed?

10:29:13   25    A.    I went to clean out his car and his stuff hoping that

Hallie Biden - direct

10:29:20 1    you know, after a certain amount of hours when he woke back

10:29:25 2    up we could, you know, help him start a new and deal with

10:29:30 3    stuff.

10:29:30 4    Q.    When you say help him start a new and deal with

10:29:34 5    stuff, what do you mean?

10:29:35 6    A.    Get sober if he wasn't.

10:29:38 7    Q.    And when you say sober, do you mean drugs or alcohol

10:29:42 8    or both?

10:29:43 9    A.    Both.

10:29:44 10   Q.    Based on what --

10:29:45 11   A.    All.

10:29:46 12   Q.    Based on what you had observed?

10:29:48 13   A.    Yeah.

10:29:48 14   Q.    And when you said you cleaned out his car; is that

10:29:52 15   right?

10:29:52 16   A.    Yes.  Or truck.

10:29:54 17   Q.    Or truck.  Right.

10:29:55 18         Did he drive a truck to your house early that

10:29:59 19   morning?

10:30:00 20   A.    Yes.

10:30:00 21   Q.    And where was the truck parked?

10:30:03 22   A.    On the lawn on the side of the house.

10:30:09 23   Q.    Is there a lot somewhere near your house?

10:30:13 24   A.    I don't -- a lot?  A parking lot?

10:30:18 25   Q.    Something that would be referred to as a lot?

Hallie Biden - direct

| | | |
|---|---|---|
| 10:30:21 | 1 | A.    I don't -- not, there is a couple of properties in my |
| 10:30:25 | 2 | area. |
| 10:30:25 | 3 | Q.    You said he parked on the lawn at your house? |
| 10:30:27 | 4 | A.    Right. |
| 10:30:27 | 5 | Q.    And while he was asleep, you went in the car? |
| 10:30:30 | 6 | A.    To clean it out. |
| 10:30:31 | 7 | Q.    What were you looking for? |
| 10:30:33 | 8 | A.    I was looking to clean it out, I wasn't necessarily |
| 10:30:36 | 9 | looking for anything.  So... |
| 10:30:42 | 10 | Q.    Was that the first time you had gone through a car he |
| 10:30:45 | 11 | had been driving? |
| 10:30:46 | 12 | A.    No, that was kind of a pattern as well. |
| 10:30:48 | 13 | Q.    What was the purpose of cleaning out the car, what |
| 10:30:52 | 14 | was looked for? |
| 10:30:53 | 15 | A.    To clean out if there was any drugs or alcohol in the |
| 10:30:56 | 16 | car. |
| 10:30:56 | 17 | Q.    And you said this was a pattern.  Had you done this |
| 10:31:00 | 18 | on more than one occasion? |
| 10:31:01 | 19 | A.    Yes. |
| 10:31:02 | 20 | Q.    And why did you do that? |
| 10:31:04 | 21 | A.    In an effort to help him get or stay sober. |
| 10:31:10 | 22 | Q.    And that was including early in the morning on the |
| 10:31:13 | 23 | 23rd? |
| 10:31:13 | 24 | A.    Yes. |
| 10:31:13 | 25 | Q.    Were there times also when your children cleaned out |

Hallie Biden - direct

10:31:16  1    his car looking for drugs?

10:31:18  2    A.      Yes.

10:31:19  3    Q.      Or other things?

10:31:21  4    A.      Yes.

10:31:21  5    Q.      When you searched his car, what did you find?  Or

10:31:37  6    when you cleaned out his car, to use your words, when you

10:31:41  7    went through the car?

10:31:42  8    A.      Aside from trash and clothes.

10:31:45  9    Q.      Full of trash and clothes?

10:31:47 10    A.      Yeah.  I did find some remnants of crack cocaine and

10:31:52 11    some paraphernalia.

10:31:56 12    Q.      And just to be clear, this is the morning of the

10:31:59 13    23rd?

10:32:00 14    A.      Yes.  Oh, and the gun, obviously.

10:32:06 15    Q.      Understood.  I'll ask you about that.  I'm going to

10:32:11 16    ask you about each of the things you mentioned, the remnants

10:32:14 17    of crack cocaine and paraphernalia and the gun, before I do

10:32:19 18    that, about at some point did you have to take your kids to

10:32:23 19    school that morning?

10:32:24 20    A.      I don't remember if it was a school day, of course I

10:32:27 21    would have, I always took my kids to school.

10:32:30 22    Q.      Now you testified that you found remnants of crack

10:32:33 23    cocaine, paraphernalia, and a gun, correct?

10:32:35 24    A.      Yes.

10:32:36 25    Q.      What does remnants of crack cocaine mean, what does

Hallie Biden - direct

10:32:38  1  that look like?

10:32:39  2  A.    A dusting of powder, I guess.

10:32:43  3  Q.    And how did that come about, how did the remnants get

10:32:47  4  left behind?

10:32:48  5  A.    As you're using it, it breaks into pieces and a lot

10:32:51  6  of it gets lost and dropped.

10:32:54  7  Q.    And then you said you found paraphernalia?

10:32:58  8  A.    Yeah.  I don't remember exactly what that was, you

10:33:03  9  know, like because I had seen that and cleaned that out

10:33:09 10  previously, so I don't recall exactly what.

10:33:11 11  Q.    Generally speaking, what kind of paraphernalia would

10:33:14 12  you find when you did go through the car?

10:33:16 13  A.    It would be crack pipes or broken pipes.

10:33:21 14  Q.    And then you testified you found a gun, right?

10:33:25 15  A.    Yes.

10:33:25 16  Q.    Is that the first time you ever found a gun?

10:33:29 17  A.    Yes.

10:33:29 18  Q.    Had you ever seen a gun up close like that before?

10:33:33 19  A.    No.

10:33:33 20  Q.    Where did you find the gun in the truck?

10:33:36 21  A.    In the console, the arm console, it was like a box.

10:33:43 22  Q.    Was the box part of the truck like in the --

10:33:46 23  A.    Yes.

10:33:47 24  Q.    Was that box locked?

10:33:48 25  A.    It had a lock, but the lock had been broken.  So it

Hallie Biden - direct

10:33:53  1    was like two inches ajar, you couldn't like click it.

10:33:59  2    Q.    I see.  And how had you gotten in the car?  Was the

10:34:06  3    car locked?

10:34:08  4    A.    I think it was open.

10:34:10  5    Q.    Did you have keys to the truck in any event?

10:34:13  6    A.    I don't know, I don't have my own keys.

10:34:17  7    Q.    I'm sorry, I didn't hear you?

10:34:19  8    A.    I don't have my own keys, I don't have a set of keys,

10:34:23  9    I don't remember if it was open or the keys were in the car

10:34:25 10    or the keys were sitting out when he went to sleep.

10:34:28 11    Q.    But the console you said was unlocked and actually

10:34:33 12    the lock was broken and it was actually up a couple of

10:34:36 13    inches, you said?

10:34:38 14    A.    Yes.

10:34:40 15              MR. WISE:  Can I have government Exhibit 1?

10:34:46 16    Your Honor, this is the same, in the same condition we

10:34:49 17    showed yesterday.  Can I approach the witness with it?

10:34:53 18              THE COURT:  Yes.

10:34:55 19    BY MR. WISE:

10:34:57 20    Q.    Ms. Biden, do you see government Exhibit 1?

10:34:59 21    A.    Yes.

10:35:00 22    Q.    Is that the gun you found?

10:35:01 23    A.    I mean, I can't know if that's the one, but it looks

10:35:05 24    like it.

10:35:05 25    Q.    Have you ever seen another pistol?

Hallie Biden - direct

| | |
|---|---|
| 10:35:08 | 1 |
| 10:35:09 | 2 |
| 10:35:12 | 3 |
| 10:35:19 | 4 |
| 10:35:26 | 5 |
| 10:35:30 | 6 |
| 10:35:35 | 7 |
| 10:35:35 | 8 |
| 10:35:38 | 9 |
| 10:35:39 | 10 |
| 10:35:41 | 11 |
| 10:35:43 | 12 |
| 10:35:46 | 13 |
| 10:35:47 | 14 |
| 10:35:54 | 15 |
| 10:35:57 | 16 |
| 10:36:03 | 17 |
| 10:36:09 | 18 |
| 10:36:12 | 19 |
| 10:36:14 | 20 |
| 10:36:18 | 21 |
| 10:36:23 | 22 |
| 10:36:27 | 23 |
| 10:36:33 | 24 |
| 10:36:37 | 25 |

A.      No.

Q.      Does this look like the pistol you found?

A.      Yes.

Q.      And just so it's clear, I think the jurors saw this, but can I have government Exhibit 1A on the screen.  So this is the pistol, this looks like the pistol you found?

A.      Yes.

Q.      Did you find any ammunition with the gun, any bullets?

A.      Yes.

Q.      You can take that down.

        When you found the gun and the bullets, what did you do?

A.      I panicked and I wanted to get rid of them.

Q.      Why did you panic?

A.      Because I didn't want him to hurt himself or I didn't want my kids to find it and hurt themselves, and I just panicked and wanted to get rid of it.

Q.      What did you do then?

A.      I was looking around for like what to do, I wasn't sure.  I considered hiding it somewhere but then I was afraid one of my children would find it.  So then I wanted -- I thought about throwing it away.  So I remember going back into the house and finding like something to put it in.

Q.      What was it that you found?

Hallie Biden - direct

10:36:38  1   A.     Like a -- like just like a little gift shopping bag.

10:36:43  2   Q.     What color was it, do you remember?

10:36:46  3   A.     I don't remember, dark.

10:36:48  4   Q.     Okay.

10:36:48  5   A.     And then I went back out, like I didn't even -- like

10:36:53  6   I'm not -- I was afraid to touch it, I didn't know if it was

10:36:56  7   loaded, so I was trying to kind of put it in the bag and

10:37:01  8   then I realized that it was so visible, so then I was

10:37:04  9   looking around for something to put it in, which was the

10:37:08 10   pouch, and then I --

10:37:10 11   Q.     So you were looking around the car for something?

10:37:12 12   A.     I was looking around the car while sitting there like

10:37:15 13   what could I wrap this, what could I put this in and then

10:37:18 14   put it back in the bag so I could take it and get it off my

10:37:23 15   property and throw it away.

10:37:24 16   Q.     I think you said you found a pouch in the car?

10:37:27 17   A.     I did.

10:37:29 18   Q.     I'm going to show you what's been marked -- I'm going

10:37:32 19   to show you what's been marked as government Exhibit 4.

10:37:40 20   A.     Yes.

10:37:40 21   Q.     Is that the pouch?

10:37:41 22   A.     Yes.

10:37:42 23           MR. WISE:  Your Honor, I move in admission

10:37:44 24   government Exhibit 4.

10:37:45 25           MR. LOWELL:  No objection.

Hallie Biden - direct

10:37:46  1              THE COURT:  Thank you.  It's admitted.

10:37:48  2              (Exhibit No. 4 was admitted into evidence.)

10:37:49  3              MR. WISE:  I would like to have government

10:37:52  4    Exhibit 4A.  I also move this in admission.  The next one.

10:38:00  5    Next one.

10:38:02  6    BY MR. WISE:

10:38:02  7    Q.      Is this the pouch that I just showed you?

10:38:04  8    A.      Yes.

10:38:05  9    Q.      Opened up?

10:38:07 10              THE COURT:  So you offered the 4(a) into

10:38:09 11    evidence?

10:38:11 12              MR. WISE:  Yes, I'm sorry.

10:38:11 13              THE COURT:  Was there an objection?

10:38:12 14              MR. LOWELL:  No objection, Your Honor.

10:38:13 15              THE COURT:  Thank you.  I just want to make sure

10:38:15 16    we have it clear so we can post the right things so it's

10:38:18 17    admitted.

10:38:19 18              MR. WISE:  Thank you, Your Honor.  My apologies.

10:38:22 19              (Exhibit No. 4A was admitted into evidence.)

10:38:22 20    BY MR. WISE:

10:38:23 21    Q.      Had you seen the defendant with pouches before?

10:38:26 22    A.      Yes, but not for a while.

10:38:29 23    Q.      And what did he keep in the pouches?

10:38:31 24    A.      Sometimes business cards, sometimes drugs, sometimes,

10:38:38 25    you know, any little things.

Hallie Biden - direct

10:38:43  1    Q.      So you said you found the pouch in the car and you

10:38:45  2    put the gun inside?

10:38:46  3    A.      I did.

10:38:47  4    Q.      Did you put anything else in it, if you remember?

10:38:49  5    A.      The bullets.

10:38:50  6    Q.      And then what did you do with the pouch that now had

10:38:53  7    the gun and the bullets in it?

10:38:55  8    A.      I put it into the little shopping bag that kind of

10:38:58  9    had a handle so that I could not touch it when I was

10:39:03 10    walking.

10:39:04 11    Q.      Okay.  And then after you did that, what did you do

10:39:13 12    next?

10:39:13 13    A.      I took it to the grocery store up the road and I

10:39:23 14    threw it away.

10:39:24 15    Q.      And you took it to the grocery store up the road and

10:39:27 16    threw it away?

10:39:28 17    A.      Threw it in the outside trash can.

10:39:30 18    Q.      And which grocery store was that?

10:39:33 19    A.      Janssen's Market.

10:39:39 20            MR. WISE:  Your Honor, we have a video, the

10:39:42 21    video from Janssen's Market.  If there is no objection, I

10:39:46 22    would enter that into evidence and play it.

10:39:48 23            MR. LOWELL:  There is no objection.

10:39:49 24            THE COURT:  It's admitted.

10:39:52 25            MR. WISE:  This is 39A, Ms. Vo.

Hallie Biden - direct

10:39:54  1                    (Exhibit No. 39A was admitted into evidence.)

10:39:54  2    BY MR. WISE:

10:39:55  3    Q.       Do you see that on the screen, Ms. Biden?

10:39:57  4    A.       Yes.

10:39:58  5    Q.       What's that, just generally speaking the set up where

10:40:02  6    we are?

10:40:02  7    A.       The parking lot at Janssen's.

10:40:04  8    Q.       The parking lot at Janssen's.  Can we play the video?

10:40:13  9                    (Video played.)

10:40:25 10             Is that your car?

10:40:26 11    A.       Yes.  I mean, I believe so.

10:40:58 12    Q.       Is that you, Mrs. Biden?

10:41:03 13    A.       Yes.

10:41:04 14    Q.       What you got out of the back, or getting out, we'll

10:41:08 15    see in a second.  Is that the bag?

10:41:11 16    A.       Yes.

10:41:22 17    Q.       And is that you putting it in the trash can?

10:41:25 18    A.       Yes.

10:41:25 19    Q.       And then what did you do after that, did you go

10:41:29 20    inside the store?

10:41:30 21    A.       I forget.  Probably, but I mean, I was so flustered

10:41:35 22    from the whole thing, so, I mean, if I see myself going in,

10:41:41 23    then yes.  It was a stupid idea now, but I was panicking, so

10:41:50 24    I threw it in the trash.

10:41:51 25                    MR. WISE:  I would move in evidence 39B, which

Hallie Biden - direct

10:41:54  1  is a clip from inside the store, unless there is an

10:41:57  2  objection.

10:41:57  3            MR. LOWELL:  There is no objection.

10:41:58  4            THE COURT:  Thank you.  It's admitted.

10:42:01  5            MR. WISE:  If we could have 39B.

10:42:03  6            (Exhibit No. 39B was admitted into evidence.)

10:42:04  7  BY MR. WISE:

10:42:04  8  Q.     Is that the inside of the store?

10:42:06  9  A.     Yes.

10:42:07 10  Q.     If you could play it.

10:42:10 11            (Video played.)

10:42:13 12            Is that you coming in?

10:42:15 13  A.     Yes.

10:43:17 14  Q.     After this, did you go back to your car and leave the

10:43:20 15  store?

10:43:21 16  A.     I don't -- I mean, I -- did I shop, I don't recall.

10:43:27 17  Q.     I'm asking, at some point did you leave the store?

10:43:30 18  A.     Yes.

10:43:30 19  Q.     Did you go back home?

10:43:31 20  A.     I did.

10:43:31 21  Q.     When you went home, did you discover that the

10:43:35 22  defendant had left?

10:43:36 23  A.     I can't remember the order of that.  I can't remember

10:43:40 24  if I saw him back at home or if he called me at that point.

10:43:45 25  Q.     So at some point, though, did he leave your home

Hallie Biden - direct

10:43:48  1    either when you were there or when you weren't there?

10:43:51  2    A.    I -- I don't know.

10:43:56  3    Q.    When you got home, was he still there?

10:44:02  4    A.    I -- that's where I'm not sure if I talked to him on

10:44:06  5    the phone or he was back at my house and he had already

10:44:10  6    left.

10:44:10  7    Q.    So, and we're going to look at some messages.  At

10:44:14  8    some point you did communicate with him, I guess later?

10:44:18  9    A.    Correct.

10:44:18 10    Q.    But do you have a memory of when you got back to the

10:44:21 11    house, you discovered he had left or was he still there?

10:44:25 12    A.    That's what I'm not sure.

10:44:29 13    Q.    Do you recall telling when you were interviewed by

10:44:31 14    the police and we'll talk about this later, that at some

10:44:35 15    point he had left your residence that morning?

10:44:37 16    A.    I don't recall the -- him leaving or not leaving.  I

10:44:43 17    remember him telling me to go back and file the police

10:44:47 18    report, so that -- what I'm saying, I can't remember if that

10:44:50 19    was on the phone or if that was in person.

10:44:52 20    Q.    Okay.  But you're clear that he was at your house

10:44:57 21    that morning?

10:44:58 22    A.    Yes.

10:45:00 23    Q.    Now you said either in person or over the phone --

10:45:05 24    well, I guess at some point, did he learn what you had --

10:45:09 25    that you had thrown the gun away?

Hallie Biden - direct

10:45:11  1   A.      Correct.  Yes.

10:45:12  2   Q.      And either in person or over the phone, what did he

10:45:17  3   tell you to do?

10:45:18  4   A.      To go back to the store and -- first go look for it,

10:45:23  5   and then when I went back to look for it and didn't find it,

10:45:26  6   he told me to file a police report for it because it was

10:45:30  7   registered in his name.

10:45:32  8   Q.      Okay.  And did you do that, did you go back to the

10:45:35  9   store to try to get it?

10:45:36 10   A.      I did, yes.

10:45:38 11             MR. WISE:  Your Honor, I would offer government

10:45:40 12   Exhibit 39D, which is a recording back at the store of

10:45:44 13   Ms. Biden coming back, unless there is an objection.

10:45:47 14             MR. LOWELL:  One second, judge.  What's the

10:45:50 15   number?

10:45:52 16             MR. WISE:  39D.

10:45:55 17             MR. LOWELL:  No objection.

10:45:56 18             THE COURT:  Thank you.  It's admitted.

10:45:58 19             ( Exhibit No. 39D was admitted into evidence.)

10:46:06 20             MR. WISE:  You can play the clip.

10:46:24 21             (Video played. )

10:46:29 22   BY MR. WISE:

10:46:30 23   Q.      Is that you coming back, Ms. Biden?

10:46:32 24   A.      Yes.

10:46:38 25   Q.      Is that you in the shop?

Hallie Biden - direct

10:46:42  1    A.    Yes, outside of the shop.

10:46:43  2    Q.    And are you looking for it?

10:46:45  3    A.    Yes.

10:47:32  4    Q.    Were you able to find it?

10:47:34  5    A.    No.

10:47:34  6    Q.    And you had nothing in your hand when you got back in

10:47:37  7    the car, right?

10:47:38  8    A.    Right.

10:47:42  9    Q.    What did you do after you couldn't find it?

10:47:49 10    A.    I think I went in and talked to them at Janssen's and

10:47:55 11    asked if they had any -- you know did they take the trash

10:47:58 12    out or was there a security camera, tried to kind of figure

10:48:02 13    that out.

10:48:04 14    Q.    Okay.

10:48:05 15    A.    And then eventually I filed a police report while I

10:48:09 16    was at Janssen's with the manager that worked there.

10:48:15 17    Q.    I think you testified that you communicated with the

10:48:19 18    defendant --

10:48:19 19    A.    Throughout that.

10:48:20 20    Q.    Throughout that.

10:48:23 21          In that time period, how did you communicate --

10:48:25 22    in October of 2018 and then moving forward in time, how did

10:48:29 23    you communicate with the defendant?

10:48:31 24    A.    Cell phone.

10:48:31 25    Q.    Including messages on the cell phone?

10:48:35  1    A.      Texting, correct.

10:48:37  2    Q.      Texting.

10:48:37  3            MR. WISE:  I'm going to ask if we could have

10:48:42  4    government Exhibit 18.

10:48:46  5    BY MR. WISE:

10:48:47  6    Q.      And this should be in front of you, Ms. Biden, that

10:48:53  7    binder.  This is already in evidence, and on the monitor, so

10:48:58  8    whatever is more convenient or comfortable for you, you can

10:49:01  9    look at it on the monitor or on the book, I'm going to be

10:49:05 10    enlarging some things so if you can't see it clearly, I can

10:49:10 11    do that.

10:49:11 12    A.      Okay.

10:49:11 13    Q.      If we could go to page 29.  Just to orient us, if we

10:49:20 14    look across the top, you'll see it's got row, date, time,

10:49:25 15    from, to, and message.  Do you see that?

10:49:30 16    A.      Yes.

10:49:30 17    Q.      And I'm not -- the next three columns I'm not going

10:49:34 18    to be asking you about.

10:49:36 19            And at that time, were you using a cell phone

10:49:40 20    that's at that number that ends in 3774?

10:49:44 21    A.      Yes.

10:49:44 22    Q.      Now, the first message is from October the 13th of

10:49:55 23    2018, so before the events that we just saw, right?

10:49:58 24    A.      Yes.

10:49:58 25    Q.      And the next message, or the message is, "I'm using

Hallie Biden - direct

10:50:03 1  this until my other phone arrives by mail."  Do you see

10:50:06 2  that?

10:50:06 3  A.      Yes.

10:50:07 4  Q.      And that's with the number ending 2473?

10:50:11 5  A.      Yes.

10:50:11 6  Q.      At this time when you were communicating with the

10:50:14 7  defendant, was he using a phone number that had actually

10:50:17 8  been associated with his former spouse?

10:50:19 9  A.      That number, yes.

10:50:20 10 Q.      That number.  And if we go to the next page, at the

10:50:27 11 top, did you say "that freaked me out"?

10:50:29 12 A.      Yes.

10:50:29 13 Q.      And then he said "this is Kathleen, and I'm going to

10:50:34 14 beat you up.  If you come out of that."  And you say,

10:50:37 15 "hello."  So there is a gap.  So just to be clear, this

10:50:42 16 number, you knew you were talking to the defendant even

10:50:45 17 though it had been a number you had previously known his

10:50:48 18 wife to use, ex-wife to use?

10:50:50 19 A.      Correct.

10:50:51 20 Q.      And then later in that same day, it looks like you

10:50:56 21 text him "hello" then "hi, are you on your way home?  Call

10:51:01 22 me please."  Right?

10:51:03 23 A.      Yes.

10:51:04 24 Q.      If we go to the next page, he responds "five."

10:51:10 25 Five."  You can leave them.  I think we can see it okay.

Hallie Biden - direct

10:51:15 1    You say "you okay?  Where are you?  Truthfully."  This is

10:51:20 2    all around 8:14, 8:15 on the 13th, right?

10:51:24 3    A.      Yes.

10:51:25 4    Q.      If we go to the next page.  He says "buy.  I

10:51:32 5    guessing."  So buying with an I guess in the middle, do you

10:51:36 6    see that?

10:51:36 7    A.      Yes.

10:51:37 8    Q.      And then he tells you "hold", we're now at 8:18 on

10:51:41 9    that day, on the 13th.  Did you know what he was buying?

10:51:45 10   A.      I mean, I -- I would guess, but I mean I didn't know

10:51:50 11   for sure.

10:51:51 12   Q.      Okay.  And if we go to the next page.  You asked him

10:51:56 13   "where are you?"  Or he asked you, "where are you?"  He's

10:52:00 14   green, right, you're blue.  And then you say "where?  I'm

10:52:05 15   home."  And then you say to him "in DE or D.C.," right?

10:52:12 16   A.      Yes,

10:52:14 17   Q.      And he responds "New Castle.", right.

10:52:19 18           Go to the next page.  And then you tell him,

10:52:22 19   "Please be safe.  I just want you safe."

10:52:28 20           Now that's at 8:23, 8:24.  Now after 9 o'clock,

10:52:33 21   he asked, "Do you want to go to the latio?"  And then says

10:52:33 22   "Patio."

10:52:37 23           What is that?  Do you know what that is?

10:52:40 24   A.      I don't know if that was --

10:52:43 25   Q.      Is it like a bar or restaurant or something?

Hallie Biden - direct

10:52:46  1    A.      Not that I know of.

10:52:47  2    Q.      If we go to the next page.  And then he says "yes or

10:52:51  3    no?"  You asked, "sure, what time?"  Sort of later it looks

10:52:57  4    like.  And then he says "trying to find out how long they

10:53:01  5    will be there."  And then you say, "what do you think?"

10:53:04  6    Again, this is all still on the 13th.

10:53:06  7            If we go to the next page.  You say, "do you

10:53:11  8    want to go?  I'll do whatever you want.  Love you."  And

10:53:14  9    then there is a question mark now a little before 10:00,

10:53:18  10   right?

10:53:18  11   A.      Uh-huh.

10:53:19  12   Q.      And then he responds, "I'll be home in an hour."

10:53:22  13   Right?  Do you see that?

10:53:23  14   A.      Yes.

10:53:24  15   Q.      And then a few minutes later, "you okay?  We staying

10:53:30  16   home?"  That's what you said, right?

10:53:32  17   A.      Yes.

10:53:32  18   Q.      We go to the next page.  Now at 10:25, you ask "why

10:53:38  19   won't you answer my calls?  Where are you?  Are you with

10:53:41  20   someone?"  And then if we could, the next, in the next one

10:53:44  21   is kind of small, if you could enlarge the next three.  Does

10:53:50  22   he respond "yes."  It's in response to your question are you

10:53:55  23   with someone.  "Yes, Bernard hangs at 7/11 on Greenhill and

10:54:02  24   Lancaster, I'm now off Maryland Avenue behind Blue Rocks

10:54:07  25   Stadium, waiting for a dealer named Mookie", do you see

Hallie Biden - direct

10:54:10  1  that?

10:54:10  2  A.    Yes.

10:54:10  3  Q.    When he said dealer, what did you understand him to

10:54:14  4  mean?

10:54:14  5  A.    That he was buying crack cocaine.

10:54:17  6  Q.    And then he said "his brother L is getting in car

10:54:21  7  now, I'm -- he has my money and I'm getting pissed."  Do you

10:54:30  8  see that?

10:54:30  9  A.    Yes.

10:54:33 10  Q.    And that was at about 10:30 on the 13th, right?

10:54:40 11  A.    Yes.

10:54:41 12  Q.    Now if we move -- we can come out of that and go to

10:54:45 13  the next page.  We move forward in time to the next day,

10:54:48 14  10:14 in the evening, do you see that at the top?

10:54:52 15  A.    Yes.

10:54:52 16  Q.    And did you text him "I called you 500 times in the

10:54:56 17  past 24 hours and you no answer.  Practice what you preach."

10:55:01 18  Do you see those messages?

10:55:02 19  A.    Yes.

10:55:02 20  Q.    And then if you can enlarge the one on the bottom,

10:55:06 21  his response at 5:37, is his response "I was sleeping on a

10:55:11 22  car smoking crack on 4th Street and Rodney."  Is that his

10:55:15 23  response?

10:55:15 24  A.    Yes.

10:55:20 25  Q.    And then if we go to the next page, he asked "where

Hallie Biden - direct

10:55:26 1  were you?" And then he says "there's my truth." And then

10:55:31 2  repeats "where were you?" Do you see that?

10:55:36 3  A.    Yes.

10:55:36 4  Q.    If we go to the next day, 10:15, at the bottom if you

10:55:42 5  could enlarge that, please?

10:55:44 6        You text, "I just want to help you get sober,

10:55:48 7  nothing that I do or you do is working. I'm sorry." Do you

10:55:52 8  see that?

10:55:52 9  A.    Yes.

10:55:52 10  Q.    And then if we go to the next page. You text, "I'm

10:55:59 11  afraid you are going to die." Do you see that?

10:56:02 12  A.    Yes.

10:56:03 13  Q.    Was that a fear you had at this time?

10:56:07 14  A.    Yes.

10:56:09 15  Q.    Were you afraid of him overdosing?

10:56:16 16  A.    Maybe, or you know, suicide, you know, I didn't know.

10:56:22 17  Q.    And then he responds on the 15th, a little bit later,

10:56:27 18  "what one thing have you done to help me get sober, Hallie?"

10:56:34 19        Had you tried to help him get sober?

10:56:37 20  A.    Yeah.

10:56:37 21  Q.    And when you tried to get -- help him get sober, was

10:56:42 22  it both to get off of crack and to stop drinking?

10:56:46 23  A.    Yes.

10:56:47 24  Q.    And then he says, "I'm almost there." And then he

10:56:51 25  says "I'm here can't get in." And then if we go to the next

Hallie Biden - direct

10:56:56  1    page.  I think that's it.

10:57:00  2                Now, if we move to the next page, 42.  So that

10:57:03  3    was 10:15, if we go to the next page, 42.  And if you could

10:57:08  4    enlarge.  This is now 10:23, this is the, just to remind us,

10:57:14  5    this is the morning where you found the gun in the unlocked

10:57:17  6    console, right?

10:57:18  7    A.      Okay, yes.

10:57:19  8    Q.      After he had come to your home, right?

10:57:21  9    A.      Yes.

10:57:22 10    Q.      And you said you don't remember if you talked to him

10:57:28 11    or if he -- or I guess if he texted you, right?

10:57:34 12    A.      Right.

10:57:35 13    Q.      So I guess -- if you remember, did he find that the

10:57:46 14    gun was missing and ask you about it or do you remember

10:57:50 15    telling him?

10:57:50 16    A.      I did not tell him.

10:57:52 17    Q.      You didn't tell him?

10:57:53 18    A.      No.  I wasn't-- I wasn't planning, I was just going

10:57:58 19    to pretend like it wasn't me.

10:58:00 20    Q.      Okay.  So you didn't tell him what you had done with

10:58:02 21    the gun?

10:58:03 22    A.      No.

10:58:03 23    Q.      He discovered it?

10:58:05 24    A.      Correct.

10:58:05 25    Q.      And you don't remember if the initial discussion was

Hallie Biden - direct

10:58:07  1    -- when he discovered it if he was still there or if it was

10:58:11  2    over the phone or something?

10:58:12  3    A.      Correct.

10:58:12  4            MR. LOWELL:  It's been asked and answered.

10:58:15  5            MR. WISE:  I don't think I have, Your Honor.

10:58:19  6            THE COURT:  Don't ask it again.

10:58:21  7            MR. WISE:  Thank you, Your Honor.

10:58:23  8    BY MR. WISE:

10:58:24  9    Q.      And so he texts you, and this is at 11:45 on the

10:58:28 10    morning of 10/23, "did you take that from me, Hallie?"  What

10:58:34 11    did you understand him to be referring to when he said "did

10:58:37 12    you take that from me?"

10:58:39 13    A.      The gun.

10:58:40 14    Q.      "Are you insane.  Tell me now.  This is no game.  And

10:58:44 15    you're being totally irresponsible and unhinged."  And then

10:58:48 16    it looks like a few seconds later, tell me now, Hallie.  And

10:58:53 17    then I guess a few minutes after that, he says, "you really

10:58:59 18    need to help me think right now, Hallie, this is very, very

10:59:03 19    serious."

10:59:06 20            Right?

10:59:07 21    A.      Yes.

10:59:08 22    Q.      And then if we move to the next page, page 43, the

10:59:16 23    last message was at 11:58, now at 12:17, you say "call me."

10:59:23 24    Right?

10:59:23 25    A.      Right.

Hallie Biden - direct

10:59:24  1    Q.    So I guess by this point you weren't with him, that's

10:59:33  2    clear, right, because you asked him to call you.  And then

10:59:39  3    at 1:06, do you remember talking to him after this text?

10:59:45  4    A.    Yes.

10:59:46  5    Q.    Okay.  What do you remember about that?

10:59:48  6    A.    That he was angry with me.

10:59:51  7    Q.    Okay.  And then you respond, "I can't believe this,

10:59:55  8    you can blame me all you want.  I know it was stupid, but

10:59:59  9    your part is dangerous and negligent.  And because of this

11:00:04 10    and my stupidity for being worried about you, I'm dealing

11:00:07 11    with insanity and possibly I'm the one going to get in

11:00:11 12    trouble.  Check yourself into a local rehab Hunter, this has

11:00:15 13    all got to stop.  Don't run away again.  Please don't

11:00:19 14    leave."

11:00:24 15          And then about 20 minutes later.  You text

11:00:27 16    "police coming to talk to me now, I'll take full blame.  I

11:00:31 17    don't want to live like this anymore.  This too much for me

11:00:34 18    to handle."  Are these messages being sent when you're still

11:00:38 19    at Janssen's?

11:00:40 20    A.    I believe so, probably when we're waiting for the

11:00:43 21    police to arrive.

11:00:44 22    Q.    Okay.  And then the next message is several hours

11:00:51 23    later.  If you can bring that out a little bit just to see

11:00:56 24    the time.  It's 6:47, and he text you back, "the fucking FBI

11:01:01 25    Hallie, it's hard to believe anyone is that stupid.  So

Hallie Biden - direct

11:01:04  1   what's my fault here Hallie that you speak of.  Owning a gun

11:01:08  2   that's in a locked car hidden on another property?  You say

11:01:12  3   I invade your privacy.  What more can I do than come back to

11:01:15  4   you to try again and you do this???  Who in their right mind

11:01:20  5   would trust you to help me get sober?  Was it a locked car

11:01:28  6   on another property?"

11:01:31  7   A.      "It was on my property, it was on the back side

11:01:36  8   yard."

11:01:38  9   Q.      If we go to the next page, still on the 23rd, a

11:01:44 10   minute later, he says "do you want me dead."  And then you

11:01:48 11   respond, "I'm sorry."  If we could bring out her messages

11:01:52 12   because the text gets small at the bottom.  "I'm sorry.  I

11:01:55 13   just want you safe.  That was not safe.  And it was open,

11:01:59 14   unlocked and windows down, and the kids search your car."

11:02:02 15           Do you see that?

11:02:03 16   A.      Yes.

11:02:04 17   Q.      Do you remember the windows being down?

11:02:06 18   A.      I mean, if I wrote that, then they were.

11:02:11 19   Q.      And then you write "you have lost your mind, Hunter,

11:02:14 20   I'm sorry I handled it poorly today, but you are in a huge

11:02:17 21   denial about yourself and about that reality that I just

11:02:20 22   want you safe.  You run away like a child and blame me for

11:02:24 23   your shit, it's to be expected that you go, you prove

11:02:27 24   repeatedly that you can't stay and really do work on

11:02:30 25   yourself, it's easier for you to avoid looking within and

11:02:34  1    cowardly to constantly point the blame on me."  All right.

11:02:39  2    You can take that down.

11:02:40  3              Moving forward in time if we go to the next

11:02:43  4    page, that was 10:23, page 45.  The next message I wanted to

11:02:47  5    ask you about is on November the 3rd, so now we're less than

11:02:52  6    a week later, a little more than a week later.  If you could

11:02:56  7    enlarge those three messages.  The one at the top is from

11:03:00  8    him, right?

11:03:02  9    A.    Yes.

11:03:03 10    Q.    And it he says to you, "I'm a liar and a thief and a

11:03:07 11    blamer and a user, and I'm delusional and an addict unlike

11:03:12 12    beyond and above all other addicts that you know, and I've

11:03:15 13    ruined every relationship that I have ever cherished."  Is

11:03:18 14    that what he wrote?

11:03:20 15    A.    Yes.

11:03:20 16    Q.    And then you respond, "let's do this right, come home

11:03:23 17    and talk with the kids, let's tell your family and your kids

11:03:26 18    the plan and let's stick to it.  Everyone adores you and

11:03:29 19    wants to feel like you are safe and working on sobriety.  We

11:03:33 20    can do this."  When you talk on working on sobriety, are you

11:03:38 21    referring to drugs and alcohol?

11:03:40 22    A.    Well, if you're sober, it's all of the above.

11:03:43 23    Q.    "We can do this.  Then I'll do therapy with you while

11:03:47 24    you are there.  We can talk about everything you want once

11:03:50 25    you are there."  And then the next message, "you are blaming

Hallie Biden - direct

11:03:54  1    me again and for what?  Do you know how much and what you

11:03:57  2    and your addiction has done to us all?  When you humbly

11:04:02  3    realize how much damage you caused, then I'll know you are

11:04:05  4    ready to get sober.  Blaming me, this is an excuse to avoid

11:04:10  5    sobriety, if you want us, our love, our support, my help,

11:04:16  6    than shut up and come home and we can get you there."  If we

11:04:20  7    go to the next page, did he respond within the same minute,

11:04:25  8    "no blame regarding sobriety."  Is that what he said?

11:04:28  9    A.     Yes.  That's what it looks like.

11:04:31 10    Q.     And then you write, "you are the one not sober and

11:04:34 11    brutally effecting all of us."  And then did he write, "I'm

11:04:38 12    a drunk, an addict."  And then if we go to the next page.

11:04:44 13    Did he say, "don't you want your crack back, Hallie?"  And

11:04:49 14    did you respond "I can't take it anymore."  And then did you

11:04:54 15    say "you want me to relapse?"  Do you see that?

11:05:01 16    A.     Yes.

11:05:01 17    Q.     And then he said "for a long time."  Right.  Is that

11:05:05 18    what he said back?

11:05:06 19    A.     That's what it looks like, yes.

11:05:10 20    Q.     And then if we go to the next page, page 48, did you

11:05:14 21    respond, "focus on yourself and getting sober, not on me."?

11:05:19 22    A.     Yes.

11:05:21 23    Q.     Now, that was early November.  I have one more --

11:05:32 24    well, before I do that, I have one message I want to ask you

11:05:39 25    about that's not in that chart.  It should be in your

Hallie Biden - direct

11:05:45  1    binder.  This is 18G.  Do you see 18G on the side, in the

11:06:19  2    binder?

11:06:20  3    A.      You want me to look?

11:06:21  4    Q.      If you could, otherwise I could hand you a copy.

11:06:29  5    A.      Yes.

11:06:30  6    Q.      All right.  And is this another series of text

11:06:33  7    messages between you and the defendant from October, so a

11:06:37  8    little bit before, October the 31st, a little bit before the

11:06:41  9    last message we just looked at?

11:06:44 10    A.      Yes.

11:06:47 11            MR. WISE:  And I would offer 18G into evidence.

11:06:49 12            MR. LOWELL:  We need to approach.

11:11:38 13            (Side-bar discussion:)

11:11:38 14            MR. LOWELL:  I'm being, trying to be generous,

11:11:38 15    that's not reciprocal.  The e-mail account, EDH that's up

11:11:38 16    here is not one that has been previously identified and it

11:11:38 17    is not part of what I believe was put in in the exhibit in

11:11:38 18    which the underlying data was presented.  So I don't know

11:11:38 19    what this account is and it hasn't been provided.

11:11:38 20            MR. WISE:  It has been provided in discovery.

11:11:38 21            MR. LOWELL:  It may every --

11:11:38 22            MR. WISE:  This is part of the exhibits that we

11:11:38 23    disclosed some time ago and they didn't raise any questions

11:11:38 24    about it or ask us to show where it is, but this was

11:11:38 25    provided in discovery.  And it has the page number from the

Hallie Biden - direct

11:11:38  1    discovery at the bottom.

11:11:38  2              MR. LOWELL:  But the agent didn't authenticate

11:11:38  3    this account, what she wrote, what she talked about.

11:11:38  4              MR. WISE:  She can.  She just said this is a

11:11:38  5    text exchanged she had with him, she's already authenticated

11:11:38  6    it.

11:11:38  7              MR. LOWELL:  Okay.  So she'll be able to

11:11:39  8    identify this account and say this is something that she

11:11:39  9    received from him in this account?

11:11:39 10              MR. WISE:  So this iCloud account was already on

11:11:39 11    the summary chart but she just said this was a text exchange

11:11:39 12    she had with him.  This is what I'm going to ask her about,

11:11:39 13    she text him I just went into the library and sitting next

11:11:39 14    to Hunter, that's her son, is your brown leather pouch with

11:11:39 15    a stem in it laying on the chair next to him.  That's the

11:11:39 16    one I'm going to ask her about.

11:11:39 17              MR. LOWELL:  How does she know this is Hunter

11:11:39 18    operating this account?

11:11:39 19              MR. WISE:  Well, first of all, the account is

11:11:39 20    already in evidence, it is on the summary chart but she just

11:11:39 21    testified the texts she had with him including this account

11:11:39 22    and this is another one.

11:11:39 23              THE COURT:  Just so I understand, is this the

11:11:39 24    same brown pouch?

11:11:39 25              MR. WISE:  A different one, he had more than

Hallie Biden - direct

11:11:39  1    one.  Ms. Kestan testified to that as well.

11:11:39  2              MR. LOWELL:  All I can say is that the iCloud

11:11:39  3    extraction that the agent offered is not this one.  It's not

11:11:39  4    this one.  So -- look, what I'm trying to do is, this is not

11:11:39  5    quite a goose and gander, but if they are going to say I'm

11:11:39  6    supposed to be looking at data to find this text to prove

11:11:39  7    that it's okay, not being able to do this, or she can say it

11:11:39  8    I can ask her the same question did you send a text, and she

11:11:39  9    can authenticate it and did it, that's fine, but they can't

11:11:39 10    say I need to find where it is ahead of time when they

11:11:39 11    haven't shown me.

11:11:39 12              MR. WISE:  This has already been authenticated

11:11:39 13    this is part of the authentication motion in limine we filed

11:11:39 14    with this account, it's already been authenticated, the

11:11:39 15    problem with summary chart we couldn't tell what was on the

11:11:39 16    chart was accurate, this isn't a typed up summary, this is

11:11:39 17    the raw messages.

11:11:39 18              THE COURT:  This is what I actually asked you to

11:11:39 19    use instead of the summary chart, is the raw messages.

11:11:39 20              MR. LOWELL:  Right.

11:11:39 21              THE COURT:  And you're saying this document with

11:11:39 22    the raw messages written like this was produced in

11:11:39 23    discovery?

11:11:39 24              MR. WISE:  Yes.

11:11:39 25              THE COURT:  Under this production number 1605?

Hallie Biden - direct

11:11:39  1              MR. WISE:  Yes.

11:11:39  2              MR. LOWELL:  Authentication was not the issue

11:11:39  3    before, they agreed that what we were seeking was authentic,

11:11:39  4    they said they couldn't fined it and, therefore, they

11:11:39  5    couldn't check its accuracy.

11:11:39  6              THE COURT:  In the summary document?

11:11:39  7              MR. LOWELL:  Right.

11:11:39  8              MR. WISE:  Because we had to compare the raw to

11:11:39  9    the summary document, we couldn't find the raw, this is the

11:11:39 10    raw, it's authenticating because the 902.11 search that was

11:11:39 11    parts of that motion in limine for this account, this

11:11:39 12    account was covered by that.

11:11:39 13              MR. LOWELL:  I understand that both of us have

11:11:39 14    gotten stipulations of the authenticity of the material but

11:11:40 15    that wasn't your objection before, your objection before is

11:11:40 16    notwithstanding that it's authentic, you couldn't find it in

11:11:40 17    the extraction report.  The account did not identify this

11:11:40 18    one as being in the extraction report so I want it on the

11:11:40 19    record that that did not happen.  If you're asking her if

11:11:40 20    she can looking at this text and indicate that it's

11:11:40 21    something that she remembers and that it's something she

11:11:40 22    said --

11:11:40 23              THE COURT:  How about if I let them take their

11:11:40 24    morning break.  Okay.

11:11:40 25              Ladies and gentlemen how about you take your

Hallie Biden - direct

11:11:40  1    morning break, fifteen minutes and then we'll come back.

11:11:43  2                    (Jury exiting the courtroom at 11:11 a.m.)

11:11:59  3            THE COURT:  Okay.  Everyone can be seated.

11:12:05  4            So --

11:12:07  5            MR. LOWELL:  Your Honor.

11:12:09  6            THE COURT:  I'm sorry, yes, actually, you should

11:12:12  7    go out in the hall since we're going to talk about this.

11:12:16  8    Your breaks are usually about 10 or 15 minutes.

11:12:20  9            THE WITNESS:  Okay.

11:12:21 10            THE COURT:  Thank you.  Hold on.  Let me just

11:12:47 11    look at the testimony that came up beforehand.  By the way,

11:12:50 12    Mr. Wise, I can do it or you can do it, but ask the witness

11:12:53 13    to lean into the microphone, some of the jurors are having a

11:12:57 14    hard time hearing her.

11:12:59 15            MR. WISE:  Sure.

11:12:59 16            THE COURT:  Okay.  Let me just look at this

11:13:01 17    question.  So she said this is a series of text messages

11:13:12 18    between her and the defendant from October.  A little bit

11:13:17 19    before October, 31st, a little bit before the November

11:13:20 20    messages that had just been on the screen.

11:13:24 21            MR. WISE:  Right, our paralegal handed me the

11:13:28 22    extraction report that was produced in discovery where this

11:13:32 23    message appears on page --

11:13:36 24            THE COURT:  1605.

11:13:38 25            MR. WISE:  1605, this report is what was

Hallie Biden - direct

11:13:41 1    produced to the defense and it's self authenticating.

11:13:46 2                THE COURT:  You're complaint about them was he

11:13:47 3    didn't have the equivalent?

11:13:49 4                MR. HINES:  We had a chart that purported to be

11:13:52 5    typed up messages and we couldn't compare to see if they

11:13:56 6    were accurate, and for instance I looked at one that I did

11:13:59 7    recognize and it wasn't accurate.  It's not that they

11:14:02 8    deliberately mistyped it, but that's the whole point why we

11:14:06 9    give them to each other.  That's frankly why in our summary

11:14:09 10   chart we used the raw pictures to kind of cut down on,

11:14:12 11   somebody leaves out a word or leaves out a not or whatever,

11:14:16 12   that was my issue with the summary chart.

11:14:18 13               I just need to be able to know that something

11:14:21 14   they're putting in evidence in place of the underlying

11:14:24 15   evidence is accurate.  That's the fairness we're looking

11:14:29 16   for.

11:14:29 17               But this is a series of exchanges that already

11:14:32 18   has been authenticated between her and the defendant.  And

11:14:38 19   they had this -- they've had the report, they have had the

11:14:40 20   exhibit, they raised no objection, I'm going to ask about

11:14:43 21   the one I pointed to at side-bar and that's my question.

11:14:49 22               THE COURT:  Mr. Lowell?

11:14:50 23               MR. LOWELL:  Before the issue was not phrased as

11:14:54 24   authentication.  The government doesn't contest that our

11:14:58 25   texts, Mr. Wise said there is one that he recognized had a

Hallie Biden - direct

11:15:03  1   mistake in it, I don't know if it did or not, we have the

11:15:05  2   original text.

11:15:06  3        THE COURT:  We can deal with mistakes.

11:15:08  4        MR. LOWELL:  It's not an issue, before it wasn't

11:15:10  5   an issue of authentication, it was an issue of whether or

11:15:13  6   not I had provided, we had provided in a way that they can

11:15:16  7   verify.  And they indicated they hadn't.  This is provided

11:15:21  8   in discovery is what Mr. Wise just said, it's the same way

11:15:25  9   that we got what we got and they sent it to us.  So now it's

11:15:29 10   okay if it's just provided in discovery, it's up to us to go

11:15:33 11   find it.  When we were given what they gave us and they're

11:15:35 12   saying they can't find it, that's not okay.

11:15:38 13        What I'm suggesting is, that they are now saying

11:15:41 14   something that should allow us to do what we did but we're

11:15:45 15   doing it your way when we get there, individual texts one by

11:15:48 16   one.  I'm pointing out that the argument they're making

11:15:52 17   contradiction about what they said that we did.  I'm

11:15:56 18   pointing out that the account said we are there too

11:15:58 19   authenticate their account and this is how we got it.  In

11:16:01 20   her extraction testimony this wasn't there.

11:16:03 21        I can work out with Mr. Wise.  At the end of the

11:16:06 22   day, this text is not the end of the day and if she can

11:16:10 23   identify it and say she received it, that's fine I'll work

11:16:13 24   it out with him, but I'm just pointing out that they are

11:16:16 25   making an argument to support what they want to do that's

Hallie Biden - direct

11:16:20 1   different from what they're trying to object to what we are

11:16:23 2   asking to do, that's what I'll work out with him.

11:16:25 3            MR. WISE:  That's just not true.  We gave them

11:16:28 4   the report, it has page numbers on it, that's all we asked

11:16:31 5   for from them and they would not do it.

11:16:34 6            MR. LOWELL:  It's not that we would not do it,

11:16:35 7   Your Honor, we are doing our best, understanding if we told

11:16:38 8   him -- I don't want to belabor that point again.  We

11:16:42 9   discussed that.  I apologize.

11:16:44 10           I will explain to Mr. Wise at the break what we

11:16:48 11  can do about this one, and we do have now what we said we

11:16:51 12  can, I might need to check at the break, it might be fifteen

11:16:55 13  in order to get the individual text to ask her about.  Okay.

11:16:58 14           THE COURT:  Okay.  Just to be clear on the

11:16:59 15  summary chart, part of the problem was that you had the

11:17:02 16  clearly hearsay other texts on there.

11:17:05 17           MR. LOWELL:  And we understood that and I am

11:17:07 18  correcting that as well.

11:17:08 19           THE COURT:  Okay.  All right.  We'll take

11:17:12 20  fifteen minutes and come back around 11:30.

11:17:15 21           MR. WISE:  Thank you, Your Honor.

11:18:26 22           COURTROOM DEPUTY:  All rise.

11:18:29 23           (A brief recess was taken.)

11:35:58 24           COURTROOM DEPUTY:  All rise.

11:37:52 25           (Jury entering the courtroom at 11:37 a.m.)

Hallie Biden - direct

11:38:15   1           THE COURT:  All right, everyone.  Welcome back.

11:38:21   2   Everyone, please be seated.

11:38:26   3           Mr. Wise.

11:38:35   4           MR. WISE:  Thank you, Your Honor.

11:38:36   5   BY MR. WISE:

11:38:37   6   Q.    When we broke, Ms. Biden, I had asked you if the text

11:38:42   7   exchange in government Exhibit 18G was one you had with the

11:38:45   8   defendant.  Do you remember me asking you that?

11:38:49   9   A.    This right here?

11:38:51  10   Q.    Yes.

11:38:51  11   A.    Yes.

11:38:52  12   Q.    I think you testified that it was?

11:38:53  13   A.    Yes.

11:38:55  14           MR. WISE:  I move for the admission now of 18G

11:38:57  15   in evidence.

11:38:59  16           MR. LOWELL:  With no objection.

11:39:02  17           THE COURT:  Thank you.  It's admitted.

11:39:05  18           ( Exhibit No. 18G was admitted into evidence.)

11:39:06  19   BY MR. WISE:

11:39:08  20   Q.    Ms. Vo, if you could enlarge the third bubble up from

11:39:13  21   the bottom, and in this message to the defendant, this is

11:39:19  22   from October 31st, you text, or write "I just went into

11:39:24  23   library and sitting next to Hunter was your brown leather

11:39:28  24   pouch with a stem in it laying in the chair next to him."

11:39:33  25   A.    Yes.

Hallie Biden - direct

11:39:33  1    Q.      Did you have a room in your house at the time that

11:39:35  2    was referred to as the library?

11:39:37  3    A.      Yes.

11:39:37  4    Q.      Is that Hunter, is that the defendant or is that

11:39:39  5    someone else?

11:39:40  6    A.      That's my son.

11:39:41  7    Q.      And you write, "was your brown leather pouch with a

11:39:46  8    stem in it."  What does a stem refer to?

11:39:48  9    A.      A crack pipe.

11:39:50 10    Q.      So you obviously testified that the government

11:39:54 11    Exhibit 4, was the brown leather pouch that you had found in

11:39:57 12    the defendant's truck on the 23rd that you put the gun in,

11:40:02 13    right?

11:40:02 14    A.      Yes.

11:40:04 15    Q.      Now at the end of October, is this another brown

11:40:07 16    leather pouch that you had found in your home?

11:40:09 17    A.      Yes.

11:40:09 18    Q.      And that you're asking the defendant about?

11:40:13 19    A.      Yes.

11:40:13 20    Q.      That apparently had drug paraphernalia in it,

11:40:16 21    correct?

11:40:18 22    A.      Correct.

11:40:20 23    Q.      Do you remember him having multiple leather pouches

11:40:25 24    over a period of time?

11:40:27 25    A.      Yes.

Hallie Biden - cross

11:40:27 1    Q.      And then if we could go back to 18, I think there was

11:40:33 2    one last message I was going to ask you about, and that's at

11:40:41 3    page, Ms. Vo, 61.  And this is from January of 28, 2019.  If

11:40:56 4    you could enlarge that message, Ms. Vo, at the bottom, it's

11:41:00 5    partially redacted.  This is a message from the defendant to

11:41:02 6    you and it reads "that's a line brighter than throwing my

11:41:07 7    gun in a full trash can in a busy grocery store and then

11:41:10 8    some kid blows his sisters head off and you go to prison for

11:41:15 9    the rest of your life."  Do you see that?

11:41:17 10    A.      I do.

11:41:17 11    Q.      Is that a reference to what happened on October 23rd,

11:41:21 12    that is the throwing gun in a trash can?

11:41:24 13    A.      Yes.

11:41:34 14            MR. WISE:  Your Honor, I have nothing further.

11:41:35 15            THE COURT:  All right.  Thank you.

11:41:38 16            Cross-exam.

11:41:40 17            MR. LOWELL:  Thank you, Your Honor.

11:41:58 18            Your Honor, may I approach?

11:42:01 19            THE COURT:  You may.

11:42:02 20                    CROSS-EXAMINATION

11:42:03 21    BY MR. LOWELL:

11:42:13 22    Q.      Still good morning.

11:42:13 23            Good morning, Ms. Biden.

11:42:15 24    A.      Good morning.

11:42:16 25    Q.      I'm Abbe Lowell, one of Hunter's lawyers.  We never

Hallie Biden - cross

11:42:20  1   met.

11:42:20  2   A.      We never met.

11:42:22  3   Q.      We have never talked to each other.  I'm sorry that

11:42:27  4   you need to be here.

11:42:29  5           I want to go backwards a bit.  And you were

11:42:33  6   explaining to the jury, various times in the life of you and

11:42:39  7   Hunter in which drugs were involved.  And you talked about

11:42:43  8   his use going backwards from the time that I think you and

11:42:48  9   he started dating, I'm using the word dating, becoming

11:42:53  10  involved at the end of '15, right?

11:42:55  11  A.      Yes.

11:42:55  12  Q.      And then you described his various uses and that was

11:43:00  13  in 2016 as well?

11:43:03  14  A.      Yes.

11:43:04  15  Q.      And then that carried into 2017?

11:43:07  16  A.      Yes.

11:43:08  17  Q.      But there were times when neither he nor you were

11:43:13  18  using drugs, right?  There were various times?

11:43:17  19  A.      Yes.

11:43:17  20  Q.      And those could last for some period, correct?

11:43:20  21  A.      Yes.

11:43:20  22  Q.      And then in the beginning of 2018, I think you said

11:43:26  23  there came a point where you visited him in LA, but in the

11:43:30  24  first part of 2018, he wasn't living with you?

11:43:35  25  A.      Like January, February --

Hallie Biden - cross

11:43:38  1    Q.       No, I'm sorry, living or visiting, sometimes staying

11:43:41  2    with you in January?

11:43:43  3    A.       In the month of January.

11:43:44  4    Q.       Of 18?

11:43:45  5    A.       I don't recall.

11:43:46  6    Q.       But you do know later in 2018, in the spring, he then

11:43:50  7    moved to -- took a trip to Los Angeles or California?

11:43:54  8    A.       Yes.

11:43:55  9    Q.       And at some point you visited him there?

11:43:58 10    A.       Yes.

11:44:02 11    Q.       I'll come back to 2018.  In the period of time I

11:44:07 12    think that you had testified prior to our break, I think you

11:44:11 13    said there were instances, or many instances where he would

11:44:15 14    not be truthful with himself about what he was using and how

11:44:19 15    bad his problem was?

11:44:21 16    A.       Yes.

11:44:21 17    Q.       And that would be both as to alcohol and when he

11:44:26 18    started to use cocaine, crack cocaine?

11:44:28 19    A.       Yes.

11:44:28 20    Q.       And he would deny that, right?

11:44:30 21    A.       Yes.

11:44:30 22    Q.       Deny it to you?

11:44:32 23    A.       Sometimes, yes.

11:44:33 24    Q.       And deny it to himself?

11:44:35 25    A.       Yes.

Hallie Biden - cross

11:44:36  1          MR. WISE:  Your Honor, I object, she can't say

11:44:40  2   what he's doing to himself.  I would object.

11:44:43  3   BY MR. LOWELL:

11:44:43  4   Q.     When he would speak out loud and say he would deny

11:44:47  5   it, he's the one who is speaking, correct?

11:44:50  6   A.     Yes.

11:44:52  7          THE COURT:  So we'll strike her speculation as

11:44:56  8   to what he was -- believed in his own mind.

11:45:02  9   BY MR. LOWELL:

11:45:02 10   Q.     And I think in the events that you said in terms of

11:45:05 11   your back and forth with him, there came a point that you

11:45:09 12   also started using drugs?

11:45:11 13   A.     Yes.

11:45:12 14   Q.     And in that period of time, there were times where

11:45:16 15   both he and you were working together towards sobriety and

11:45:23 16   recovery and rehabilitation; correct?

11:45:25 17   A.     Correct.

11:45:25 18   Q.     And in fact, sometimes you did that together?

11:45:28 19   A.     Yes.

11:45:28 20   Q.     And in those occasions, he was also urging you to try

11:45:33 21   to become sober?

11:45:36 22   A.     Yes.

11:45:36 23   Q.     And you to him?

11:45:38 24   A.     Yes.

11:45:39 25   Q.     And on those occasions in which you were doing this,

Hallie Biden - cross

11:45:42  1  either alone or apart, he was paying for all that, wasn't

11:45:47  2  he?

11:45:47  3  A.      For his or mine?

11:45:49  4  Q.      Sometimes yours and always his.

11:45:53  5  A.      Uh --

11:45:54  6  Q.      He paid for periods of time where you, for example --

11:45:57  7  A.      Maybe -- maybe some things he paid for of mine, yeah.

11:46:02  8  Q.      Sitting here today, I notice this morning that

11:46:05  9  sometimes you said maybe, sometimes you said you guess.  I

11:46:08 10  have to assume that the events of October 2018, were fairly

11:46:14 11  upsetting?

11:46:15 12  A.      Yes.

11:46:16 13  Q.      And being here is not a picnic, either?

11:46:18 14  A.      Yes.

11:46:19 15  Q.      So in general, speaking about putting together the

11:46:23 16  sequence of time, is that a difficult thing for you to do to

11:46:28 17  remember blow by blow?  I mean, I saw that they played a

11:46:32 18  video, and I think you said in one of them, I think that's

11:46:35 19  what I did, I'm not sure.

11:46:37 20  A.      Yes.

11:46:37 21  Q.      So reconstructing this is not easy?

11:46:40 22  A.      Right.

11:46:45 23  Q.      In the periods of time that you spoke with

11:46:52 24  prosecutors and investigators and recounted what you were

11:46:56 25  doing, whatever it was, whether it involved your use of

Hallie Biden - cross

11:47:01  1   drugs or the events of October 22nd, you did tell them about

11:47:06  2   all that?

11:47:06  3   A.      Yes.

11:47:06  4   Q.      And you and they have an agreement that nothing that

11:47:10  5   you say to them can be used against you?

11:47:12  6   A.      Correct.

11:47:14  7   Q.      I want to turn to the beginning of October of 2018.

11:47:20  8   And see if we can -- will you help me construct the sequence

11:47:25  9   of events?

11:47:27 10   A.      Yes.

11:47:27 11   Q.      You talked about what happened later in October.   I

11:47:31 12   would like to start backwards a bit.

11:47:33 13           Hunter came back from Los Angeles on or about

11:47:38 14   October 6th of 2018, do you recall that?

11:47:40 15   A.      I believe so, I don't recall the dates.

11:47:42 16   Q.      I'm sorry, to ask you to do this, would you speak a

11:47:45 17   little bit into the microphone?

11:47:47 18   A.      Sure.

11:47:47 19   Q.      So it was around then, do you know that that's when

11:47:50 20   it was?

11:47:51 21   A.      I don't know the date, but if that's what it said,

11:47:56 22   then...

11:47:59 23           MR. LOWELL:  May I approach to point out

11:48:00 24   something to the witness?

11:48:02 25           THE COURT:  You may.

Hallie Biden - cross

11:48:03  1            MR. LOWELL:  Thank you, judge.

11:48:30  2            MR. WISE:  Your Honor, I don't know what's going

11:48:32  3  on.

11:48:32  4            MR. LOWELL:  I gave him the same thing as you

11:48:34  5  for the refreshing and other things.

11:48:36  6            MR. WISE:  All she said is she doesn't remember.

11:48:38  7            MR. LOWELL:  I'm asking to request if something

11:48:41  8  refreshes her recollection.

11:48:43  9            THE COURT:  As to when he came back to the East

11:48:47 10  Coast?

11:48:47 11            MR. LOWELL:  Yes.

11:48:47 12            THE COURT:  You can ask her to look at it, but

11:48:49 13  don't --

11:48:50 14            MR. LOWELL:  Yeah, I'll approach this a

11:48:52 15  different way.

11:48:52 16  BY MR. LOWELL:

11:48:53 17  Q.     Do you recall in the beginning of October, that

11:48:55 18  Hunter came back to be with you for something that you were

11:49:01 19  doing in the beginning of October, having to do with your

11:49:05 20  sobriety?

11:49:07 21  A.     I don't recall exactly.

11:49:10 22  Q.     Okay.  In the beginning of October, around the sixth,

11:49:14 23  were you familiar with a place called Caron, C-A-R-O-N?

11:49:19 24  A.     Yes.

11:49:19 25  Q.     What is Caron?

Hallie Biden - cross

11:49:21  1    A.    Caron is a rehab that I went to.

11:49:23  2    Q.    Do you recall a specific incident in which in that

11:49:27  3    period of time he came back so that he could attend one of

11:49:31  4    those sessions with you on October 6th?

11:49:34  5    A.    I think I know what you're referring to, but it's all

11:49:39  6    kind of vague.

11:49:41  7    Q.    Okay.  So generally speaking, you have a memory in

11:49:43  8    the beginning of October of Hunter coming back from Los

11:49:47  9    Angeles, that's true, right?

11:49:48 10    A.    Yes.

11:49:48 11    Q.    And I'm asking you whether, when he did that on the

11:49:51 12    beginning, do you recall in that same period, whether it's

11:49:54 13    the 5th or 6th or 4th, that he attended with you one of

11:49:59 14    those check-ins at Caron?

11:50:03 15    A.    Yes.

11:50:04 16    Q.    And that was right after he came back in that period?

11:50:08 17    A.    Okay.  Yes.

11:50:10 18    Q.    And where is that facility?

11:50:13 19    A.    Like an hour-and-a-half from Wilmington in

11:50:16 20    Pennsylvania.

11:50:16 21    Q.    It's in Pennsylvania.  And do you know that day

11:50:20 22    whether he came back on that day he flew into Philadelphia

11:50:26 23    so he could join you?

11:50:28 24    A.    I do not recall.

11:50:29 25    Q.    Do you know where he flew into?

Hallie Biden - cross

11:50:31  1    A.      I do not.

11:50:31  2    Q.      You had said and described incidents, occasions is a

11:50:36  3    better word, where you would go into his car or you would be

11:50:40  4    in his car, maybe you were traveling with his car and I

11:50:44  5    think you said that there were times when you saw remnants

11:50:47  6    and paraphernalia?

11:50:48  7    A.      Yes.

11:50:48  8    Q.      Now, that would be as early as when you and he were

11:50:53  9    starting to become involved at the end of 2015 into 2016 and

11:50:59 10    into '17, correct?

11:51:01 11    A.      Correct.

11:51:01 12    Q.      I'm not asking you, but I imagine given what you said

11:51:04 13    about putting all this together, can you be sure at any of

11:51:08 14    those times when your discoveries occurred at any time in

11:51:11 15    2016 or just generally?

11:51:13 16    A.      In 2016?

11:51:14 17    Q.      Like, for example, 2016?

11:51:17 18    A.      No.

11:51:18 19    Q.      Yes, sorry.

11:51:19 20    A.      Not if it wasn't a significant day or event.

11:51:22 21    Q.      And when you said you would go into the car or you

11:51:26 22    would see in the car, and you would find those things, if I

11:51:29 23    asked you, for example, to help me construct when in 2016 or

11:51:34 24    '17 or even in the beginning of 2018 before he went to Los

11:51:39 25    Angeles, could you do that?

Hallie Biden - cross

11:51:41  1    A.      No.

11:51:49  2    Q.      And then after he came back and you have this memory

11:51:52  3    that he attended with you a session that you were at Caron,

11:51:57  4    on that day when you were at Caron, you didn't see him using

11:52:01  5    drugs, did you?

11:52:02  6    A.      No.

11:52:02  7    Q.      In fact, from the time he came back to the time of

11:52:05  8    the incident with you finding the gun, you didn't use any

11:52:09  9    drugs in that period of time, right?

11:52:11 10    A.      I did not, no.

11:52:12 11    Q.      And did you see him?

11:52:13 12    A.      I did not see him.  I didn't see him for --

11:52:17 13    Q.      I understand you're not with him every time, correct,

11:52:19 14    is that what you were saying?

11:52:20 15    A.      Yes.

11:52:20 16    Q.      But there were times where you did?

11:52:23 17    A.      Right.

11:52:23 18    Q.      And you can see between the time he came back and

11:52:26 19    came to see you at Caron, and then later when you were on

11:52:29 20    the 22nd, for example, and in that period of time, you never

11:52:34 21    saw him using drugs?

11:52:35 22    A.      Correct.

11:52:35 23    Q.      You had seen him using drugs when he was at your

11:52:39 24    house before?

11:52:39 25    A.      Correct.

11:52:40 1    Q.    He had been at your house in that window of time, but

11:52:42 2    you didn't see him using drugs then?

11:52:44 3                MR. WISE:  I'm going to object, I don't know

11:52:46 4    what window of time we're talking about.

11:52:48 5                MR. LOWELL:  October 6th through October 22nd.

11:52:50 6                THE WITNESS:  I honestly don't know if he was at

11:52:52 7    my house between that time.

11:52:54 8    BY MR. LOWELL:

11:52:54 9    Q.    Okay.  So then you would not have seen him if he

11:52:57 10   wasn't there?

11:52:57 11   A.    Correct.

11:52:57 12   Q.    We'll come back to whether he was there with some

11:53:00 13   documents, okay?

11:53:01 14   A.    Okay.

11:53:03 15   Q.    All right.  So now on the day that you said you went

11:53:06 16   into his truck, we'll come back to later in terms of the

11:53:09 17   remnants, I just wanted to clarify that in his return, there

11:53:12 18   was never an occasion where you found, for example, in your

11:53:16 19   house or even in his car a rock, a marble, a ping pong ball

11:53:21 20   size piece of crack, you used the words remnants?

11:53:25 21   A.    Correct.

11:53:25 22   Q.    I take it if they were where you say they were, you

11:53:30 23   would have no idea when they were, I mean when they were put

11:53:32 24   there --

11:53:32 25   A.    Correct.

Hallie Biden - cross

11:53:34  1    Q.      Sorry?

11:53:34  2    A.      Correct.

11:53:34  3    Q.      It could have been that day, it could have been a

11:53:37  4    week before, it could have been a month before, it could

11:53:40  5    have still been there, but you don't know?

11:53:42  6    A.      Correct.

11:53:48  7    Q.      You, I think, described your relationship over

11:53:51  8    whatever year, but I want to turn particularly to 2018.  And

11:53:55  9    in 2018 after he's back in that period of time, I think you

11:54:01 10    used generally the phrase "on and off."  Is that right?

11:54:05 11    A.      Yes.

11:54:05 12    Q.      Sometimes it was good and sometimes it was not as

11:54:08 13    good?

11:54:08 14    A.      Correct.

11:54:10 15    Q.      And sometimes it was intense, would that be a fair

11:54:14 16    statement?

11:54:15 17    A.      Yes.

11:54:15 18    Q.      And it was always complicated?

11:54:17 19    A.      Yes.

11:54:20 20    Q.      Is it a generally true statement that throughout your

11:54:23 21    relationship with him, he would say things to you or tell

11:54:26 22    you things or write you things that you knew were not true?

11:54:29 23    A.      Yes.

11:54:31 24    Q.      And in some occasions did he not want you to know

11:54:37 25    where he was and what he was doing?

Hallie Biden - cross

11:54:39 1   A.      Yes.

11:54:39 2              MR. WISE:  I'm going to object, I don't think

11:54:42 3   she can testify to what he wanted.

11:54:44 4   BY MR. LOWELL:

11:54:44 5   Q.      Sorry.  There were times that you --

11:54:46 6              THE COURT:  So hold on.

11:54:48 7              MR. LOWELL:  I'll withdraw the question.

11:54:49 8              THE COURT:  And that's sustained and stricken

11:54:52 9   because she did answer it.

11:54:53 10  BY MR. LOWELL:

11:54:54 11  Q.      There were periods of time that he did not tell you

11:54:56 12  where he was?

11:54:57 13  A.      Correct.

11:54:58 14  Q.      There were periods of time where he told you where he

11:55:00 15  was, and then you later found out yourself that that was not

11:55:04 16  true?

11:55:04 17  A.      Correct.

11:55:13 18  Q.      Before the 22nd, I think he was back, between that

11:55:20 19  time you were saying you're not sure or you are sure that

11:55:25 20  you saw him between the 6th and the 22nd?

11:55:28 21  A.      I'm not sure if there was the text messages then.

11:55:35 22             MR. LOWELL:  One moment.

11:55:41 23  BY MR. LOWELL:

11:55:41 24  Q.      If you'll look -- I'm sorry, if there was a text

11:55:46 25  exchange between you and Mr. Biden on a date, would that

Hallie Biden - cross

11:55:53  1    help refresh your recollection of whether or not he was with

11:55:56  2    you?

11:55:57  3    A.        Yes.

11:55:58  4    Q.        With that in mind, let me make sure I'm at the right

11:56:03  5    page, please.  If you'll look at the first entry on the

11:56:17  6    page, just look at it to yourself.  Tell me when you're done

11:56:24  7    looking up.

11:56:24  8    A.        You mean read it?

11:56:26  9    Q.        No, not out loud, just look at it to yourself.  If

11:56:31 10    you look at that document and I'm looking at the date of it

11:56:35 11    being October the 11th to start off with?

11:56:37 12              MR. WISE:  Your Honor, it shouldn't be read into

11:56:39 13    the record.

11:56:40 14              MR. LOWELL:  I'm not reading it, I'm just asking

11:56:40 15    her to read.

11:56:46 16              All right there is a row number.  Row one does

11:56:49 17    that work for you.  Reading that to yourself, does that

11:56:52 18    refresh your recollection that you were trying to see him

11:56:55 19    during that period of time.

11:56:56 20              MR. WISE:  I'm objecting, he asked whether he

11:56:59 21    stayed with her, not whether she was trying to see him.

11:57:02 22    BY MR. LOWELL:

11:57:03 23    Q.        Let me change that, does that refresh your

11:57:06 24    recollection as to whether or not, you and he saw each other

11:57:10 25    before the 22nd?

Hallie Biden - cross

11:57:20  1    A.        I believe that means he wasn't.

11:57:24  2    Q.        Okay.

11:57:24  3              THE COURT:   The question is does it make you

11:57:27  4    remember, refreshing your recollection is look at it and

11:57:30  5    think, gosh, I remember.

11:57:31  6              THE WITNESS:   Yes.   No, I think it's confusing

11:57:34  7    so I'm not sure, it confuses it further.

11:57:36  8    BY MR. LOWELL:

11:57:37  9    Q.        Let me change the question then.   In this period of

11:57:40 10    time, were you asking to see him?

11:57:42 11    A.        Yes.

11:57:42 12    Q.        And you're sitting here today not aware of whether

11:57:46 13    that happened or not?

11:57:46 14    A.        On that day, correct.

11:57:48 15    Q.        Until a later time in October where you testified?

11:57:50 16    A.        Yes.

11:57:51 17    Q.        And were there times where you would call him or text

11:57:55 18    him and ask him in that period of time where are you, will

11:57:58 19    you come home?

11:57:59 20    A.        Yes.

11:57:59 21    Q.        And he didn't respond?

11:58:02 22    A.        Correct.

11:58:02 23    Q.        And then he did respond after -- on one of the

11:58:09 24    occasions, you asked him, I think, maybe the government

11:58:12 25    heard you, you said you called him repeatedly and

Hallie Biden - cross

11:58:15  1    repeatedly, do you remember that you did that?

11:58:17  2    A.      Yes.

11:58:18  3    Q.      And if you will put up, Mr. Radic, the government

11:58:21  4    Exhibit 18, Row 119.  I'm going to bring your attention to

11:58:32  5    that date of October 13th, which is a week after he got --

11:58:37  6    and Row 119.

11:58:40  7            So you see on the above, can we go to 118, you

11:58:45  8    don't have to blow it up yet.  This is that occasion on the

11:58:48  9    13th, "why won't you answer my calls?  Where are you?  Are

11:58:53 10    you with someone?"  Correct?

11:58:54 11    A.      Correct.

11:58:54 12    Q.      When you said someone, were you thinking that he was

11:58:57 13    with a drug dealer or another woman?

11:59:00 14    A.      A woman.

11:59:00 15    Q.      And then he wrote, "yes, Bernard who hangs at 7-11 et

11:59:05 16    cetera" has been read to you, do you see that's his

11:59:08 17    response?

11:59:08 18    A.      Yes.

11:59:08 19    Q.      You mentioned that you can't trust what he says when

11:59:11 20    he writes you because you find out sometimes he's lying,

11:59:14 21    correct?

11:59:15 22    A.      Correct.

11:59:15 23    Q.      Do you know whether he was at the 7-11 on Greenhill

11:59:22 24    Maryland avenue, et cetera?

11:59:22 25    A.      I do not.

Hallie Biden - cross

| | |
|---|---|
| 11:59:24 1 | Q.      And later I think there is government exhibit, the |
| 11:59:33 2 | next day, Row 14.  I'm sorry, no, I take that back, it's |
| 11:59:38 3 | Row 125.  And there on the date of the 14th, you say, "I |
| 11:59:46 4 | called you 500 times in the past 24 hours.  And you no |
| 11:59:50 5 | answer.  Practice what you preach."  Those were yours to |
| 11:59:53 6 | him, right? |
| 11:59:54 7 | A.      Correct. |
| 11:59:54 8 | Q.      And then he writes, a minute, not even a minute, |
| 12:00:01 9 | 17 seconds after the last one, "I was sleeping on a car |
| 12:00:03 10 | smoking crack on 4th and Rodney", right? |
| 12:00:06 11 | A.      Yes. |
| 12:00:06 12 | Q.      And you have no idea whether he was just saying that |
| 12:00:09 13 | or whether he was actually there? |
| 12:00:10 14 | A.      Correct. |
| 12:00:30 15 | Q.      You can take that down. |
| 12:00:33 16 |         So I would like to get to the time period of |
| 12:00:36 17 | what you testified to as being your discovery of the gun and |
| 12:00:40 18 | then the recovery of it, recovery by you.  And this is where |
| 12:00:45 19 | I'm going to ask your help to put together the sequence. |
| 12:00:50 20 | Okay?  You said that you found the gun sometime in the |
| 12:00:53 21 | morning of the 23rd of October. |
| 12:00:57 22 | A.      Yes. |
| 12:00:58 23 | Q.      The day before on October 22nd, you were not with |
| 12:01:03 24 | Hunter during the day; is that right? |
| 12:01:06 25 | A.      Not that I recall. |

Hallie Biden - cross

12:01:08  1    Q.    And during that day, you were reaching out to see

12:01:11  2    whether you could see him?

12:01:14  3    A.    Is that the text messages that you have?

12:01:17  4    Q.    It is in a text message that I'll ask you about if

12:01:20  5    you need to have your memory refreshed about that.

12:01:25  6            If you'll turn to what I gave you and look at

12:01:30  7    Row 15.

12:01:31  8    A.    I'm sorry, under what?

12:01:33  9    Q.    And read that to yourself.

12:01:35 10            That same place that I showed you.

12:01:54 11            So if you'll look at -- on what I have just

12:02:01 12    given you on the 22nd, is it Row 15?  Tell me if Row 15 has

12:02:19 13    a date on it so you can acclimate yourself, is that on the

12:02:24 14    22nd I'm showing you something?

12:02:25 15    A.    On the 22nd.

12:02:26 16    Q.    Would you look at that?

12:02:28 17    A.    Yes.

12:02:29 18    Q.    Looking at it yourself?

12:02:30 19    A.    Uh-huh.

12:02:31 20    Q.    Were you seeking to see him that day?

12:02:33 21            MR. WISE:  I think the question has to be does

12:02:35 22    it refresh your recollection.

12:02:36 23    BY MR. LOWELL:

12:02:36 24    Q.    Does it refresh your recollection as to whether you

12:02:38 25    were trying to see him that day?

Hallie Biden - cross

| | | |
|---|---|---|
| 12:02:40 | 1 | A.      I don't recall that, but that sounds like -- |
| 12:02:43 | 2 | Q.      It does, you were trying? |
| 12:02:45 | 3 | A.      That I was trying yes. |
| 12:02:47 | 4 |          MR. WISE:  I think she said I don't recall that. |
| 12:02:51 | 5 | By MR. LOWELL: |
| 12:02:51 | 6 | Q.      Go slower for me, look down and read that, and when |
| 12:02:55 | 7 | you're done, look up? |
| 12:02:56 | 8 |          THE COURT:  And the question was does it refresh |
| 12:02:58 | 9 | your recollection, which is to start answering yes or no |
| 12:03:01 | 10 | before we get further, we can take it in steps. |
| 12:03:04 | 11 |          THE WITNESS:  Vaguely, but not times. |
| 12:03:05 | 12 | BY MR. LOWELL: |
| 12:03:06 | 13 | Q.      Not by the exact time? |
| 12:03:07 | 14 | A.      Correct. |
| 12:03:08 | 15 | Q.      But that day? |
| 12:03:09 | 16 | A.      Like that doesn't bring me back to that day. |
| 12:03:12 | 17 | Q.      In that period of time, as before texts when I asked |
| 12:03:16 | 18 | whether or not you were wondering with whom he was, were you |
| 12:03:19 | 19 | still wondering when whom he was spending time during this |
| 12:03:23 | 20 | period of time? |
| 12:03:23 | 21 | A.      Yes. |
| 12:03:24 | 22 | Q.      Did you sometimes write him and ask are you with |
| 12:03:26 | 23 | somebody, another woman? |
| 12:03:28 | 24 | A.      Yes. |
| 12:03:28 | 25 | Q.      And in that October 22nd period of time, in the day |

Hallie Biden - cross

12:03:34   1    of the 22nd, does looking down at that refresh your

12:03:38   2    recollection of whether you were with him at that moment?

12:03:42   3                    MR. WISE:  Objection, she already said it

12:03:45   4    doesn't.

12:03:45   5                    THE WITNESS:  I was just asking "are you in New

12:03:47   6    York?"

12:03:47   7                    MR. LOWELL:  No, don't answer.  I'm sorry.

12:03:48   8                    THE COURT:  Again.  It's not your fault, it's

12:03:51   9    the way the rules of evidence work, you need to take these

12:03:55  10    when he's asking you to refresh your recollection, one step

12:03:58  11    at a time.

12:03:58  12                    THE WITNESS:  Okay.

12:03:59  13                    THE COURT:  Okay.  So you're looking at it and

12:04:02  14    basically what's in there doesn't come into evidence unless

12:04:05  15    it refreshes your recollection, we have to take it a step at

12:04:10  16    a time.

12:04:10  17                    If you start saying what you're reading, it kind

12:04:14  18    of defeats the purpose.  So we start with does it, and oh

12:04:17  19    gosh, now I remember, it could have been something where

12:04:20  20    someone said I saw you at the birthday party, you could be

12:04:24  21    like oh yeah, now I remember the birthday party.  You don't

12:04:28  22    need to know what the rules of evidence are.

12:04:30  23    BY MR. LOWELL:

12:04:31  24    Q.     So my question was on the 22nd, do you first and

12:04:33  25    foremost know whether you were with him?

Hallie Biden - cross

12:04:38  1   A.      I am not sure.

12:04:41  2   Q.      Okay.  And did you on that day send him a text asking

12:04:44  3   him where he was?

12:04:47  4   A.      Yes.

12:04:48  5   Q.      You did.  And did --

12:04:50  6   A.      Now -- are you not now doing what --

12:04:54  7   Q.      So far so good?

12:04:55  8           MR. WISE:  Well, no.

12:04:59  9           THE COURT:  You could be a lawyer.

12:05:01 10           MR. WISE:  Your Honor, you know, she asked if

12:05:04 11   you sent him a text, she looked at the exhibit, which is in

12:05:07 12   evidence, and said yes I did, that's not refreshing.

12:05:10 13           MR. LOWELL:  Now maybe go to side-bar.

12:11:28 14           (Side-bar discussion.)

12:11:28 15           MR. LOWELL:  We have provided the government at

12:11:28 16   the break what they asked for and put into individual texts

12:11:28 17   and individual sources and individual places to find them.

12:11:28 18   And then the government said okay, so where we're at is the

12:11:28 19   hearsay objections and that's where we're at.  Now it could

12:11:28 20   be a text from her that she does or does not remember.  If

12:11:28 21   she does, fine, if she doesn't then it's past recollection

12:11:28 22   recorded.  It's something that she did, it's something that

12:11:28 23   she said, that's what I asked you before, can you ask

12:11:28 24   somebody did you do something.  Her state of mind as to why

12:11:28 25   she was going into his car looking for drugs is what she

12:11:28  1   said, she told the Delaware State Police she went into the

12:11:28  2   car because she was looking for evidence of him being with

12:11:28  3   another woman, I think her state of mind is an issue because

12:11:28  4   it was impeachment as to why he she went into his car is one

12:11:28  5   of the reasons.

12:11:28  6           MR. WISE:  There is a lot there.  He can't ask

12:11:28  7   us her to read-he can't ask her to use this to say what he

12:11:28  8   can't introduce.  So the question has to be, were you with

12:11:28  9   him on the 22nd, she said I don't remember, as you tried to

12:11:28 10   say, does that refresh your memory, if she says yes, then

12:11:28 11   she says I was with him on the 22nd, not anything about a

12:11:28 12   text, if she says no, he's got to move on.  Whatever she

12:11:28 13   says to the Delaware State Police he may be able to impeach

12:11:28 14   by calling somebody from the Delaware State Police but he

12:11:29 15   can't do with these text messages.

12:11:29 16           THE COURT:  It should be clearer to her that

12:11:29 17   she's not to testify from these text messages, she needs to

12:11:29 18   close it unless he gets somewhere where he needs to ask her

12:11:29 19   a question, she can look at it and do the same drill, does

12:11:29 20   this refresh your memory, fine, if she says no, she move on

12:11:29 21   to the next question.

12:11:29 22           MR. LOWELL:  I'm at the point now I will move

12:11:29 23   this line now that we have established the first obstacle of

12:11:29 24   getting this into evidence for the reasons I said.

12:11:29 25           THE COURT:  He said it's not hearsay, it's a

Hallie Biden - cross

12:11:29  1  recorded recollection, it's a past or recorded recollection.

12:11:29  2          MR. WISE:  I can bring the rule up, this is not

12:11:29  3  a recorded recollection.

12:11:29  4          MR. LOWELL:  But --

12:11:29  5          MR. WISE:  A recorded recollection is write down

12:11:29  6  what you remember.  These are contemporaneous text messages.

12:11:29  7          THE COURT:  In a matter the ones knew about but

12:11:29  8  cannot recall well enough to testify fully and accurately,

12:11:29  9  this is a recorded recollection is a record on a matter the

12:11:29 10  witness once knew about but now cannot recall well enough to

12:11:29 11  testify fully and accurately was made or adopted by the

12:11:29 12  witness when the matter was fresh in the witness's memory,

12:11:29 13  and accurately refreshes the witness's knowledge.  If

12:11:29 14  admitted the record may be read into evidence but may be

12:11:29 15  received only if offered by an adverse party.

12:11:29 16          MR. WISE:  So it doesn't -- the last part, the

12:11:29 17  accurately refreshes.

12:11:29 18          THE COURT:  Accurately reflects the witness's

12:11:29 19  knowledge.

12:11:29 20          MR. WISE:  So this is not, you know, on this --

12:11:29 21  for instance, this day I did the following things, this is a

12:11:29 22  text message that says I'm asking if he's there.  It's not

12:11:29 23  that if she remembers, she's written something down saying I

12:11:29 24  remember, I asked him if he was there.

12:11:29 25          THE COURT:  Well what I am -- so let's say you

Hallie Biden - cross

12:11:29  1    can get it in, you can't then ask her, so that means you

12:11:29  2    weren't -- because if her recollection is she was looking

12:11:29  3    for him, then -- and she says no, it doesn't refresh my

12:11:29  4    recollection and let's say you get the text in, you can't

12:11:29  5    then say so you -- you knew you weren't with him because

12:11:29  6    that's not her recollection.

12:11:29  7              MR. LOWELL:  No, that's right, that's right.

12:11:29  8              THE COURT:  You just want to argue it.

12:11:29  9              MR. LOWELL:  At some point I have the ability to

12:11:29 10    make an argument of whatever is in evidence, but it fits in

12:11:29 11    the exact definition that you just read into there, if she

12:11:29 12    identifies it as a text that she wrote at the time,

12:11:29 13    contemporaneously.

12:11:29 14              THE COURT:  So let me see this text, what is the

12:11:29 15    one we're talking about?

12:11:29 16              MR. WISE:  So it's --

12:11:29 17              MR. LOWELL:  Which one is it.

12:11:29 18              MR. WISE:  I think he said line 15, are you in

12:11:29 19    New York with Zoe.

12:11:29 20              THE COURT:  And you're going to say did you

12:11:29 21    wonder if he was with someone and then you show her that and

12:11:30 22    say does that refresh your recollection and let's say she

12:11:30 23    says no.

12:11:30 24              MR. LOWELL:  Then I'll move it into evidence,

12:11:30 25    I'll read it into the record, I mean, whatever the rules

Hallie Biden - cross

12:11:30 1   say.

12:11:30 2                Sorry, what was that part?

12:11:30 3                THE COURT:  A record that is on a matter the

12:11:30 4   witness once knew, and you're not going to say so you sent

12:11:30 5   this text -- I mean, what do you do when you get it in

12:11:30 6   evidence?  You just move on?

12:11:30 7                MR. LOWELL:  Yeah.  Well I move on and say did

12:11:30 8   you inquire where he was on that day and ask him whether he

12:11:30 9   was in New York?  And then she answers and then we find out.

12:11:30 10                MR. WISE:  I mean, you can ask that without

12:11:30 11   showing her the text.  At that point she's just testifying

12:11:30 12   about stuff she says she doesn't remember based on a text.

12:11:30 13                MR. LOWELL:  But based on past recollection

12:11:30 14   recorded.

12:11:30 15                MR. WISE:  All I can do even if you can get it

12:11:30 16   in, which I don't think you can, you can't say okay now that

12:11:30 17   you got this text in front of you.

12:11:30 18                THE COURT:  You know you did.

12:11:30 19                MR. WISE:  Right, let's talk about this.

12:11:30 20                THE COURT:  And he's saying he's not going to do

12:11:30 21   that, he's just going to say in argument she had no idea

12:11:30 22   where he was.

12:11:30 23                MR. LOWELL:  Right.  Okay.  Thank you, Judge.

12:11:30 24           (End of side-bar.)

12:11:30 25   BY MR. LOWELL:

Hallie Biden - cross

12:11:37 1    Q.      On October 22nd is where we were at and I was

12:11:40 2    asking --

12:11:41 3              THE COURT:  Can you hold on one second.  Let me

12:11:43 4    just look at one thing.  I apologize.  Okay.  Go ahead.

12:13:26 5              MR. LOWELL:  Thank you, judge.

12:13:27 6    BY MR. LOWELL:

12:13:28 7    Q.      Ms. Biden, on the 22nd is where we were place marking

12:13:31 8    the date, and I was trying to figure out whether on that

12:13:34 9    day, since you say you're not sure when Mr. Biden and you

12:13:38 10   saw each other.  So do you understand the context?

12:13:41 11   A.      Yeah.  Uh-huh.

12:13:42 12   Q.      On that date in the middle of the afternoon, if

12:13:45 13   you'll just look at me to begin with, don't read that yet,

12:13:49 14   please.  I'm sorry.  Did you inquire where he was?

12:13:52 15   A.      Yes.

12:13:52 16   Q.      And if you were inquiring where he was, it meant he

12:13:56 17   wasn't with you?

12:13:57 18   A.      Yes.

12:13:57 19   Q.      And in the middle of the afternoon, did you make a

12:14:00 20   specific inquiry if he was in New York?

12:14:02 21   A.      Yes.

12:14:03 22   Q.      And did you text him that way?

12:14:05 23   A.      Yes.

12:14:07 24   Q.      And do you remember what you said?

12:14:09 25   A.      Can I look --

Hallie Biden - cross

12:14:10 1    Q.      Do you remember as you're looking at me what you

12:14:13 2    said?

12:14:13 3    A.      No.

12:14:14 4    Q.      At the time, though, did you send a text, you do know

12:14:18 5    that?

12:14:18 6    A.      Yes.

12:14:19 7    Q.      And at the time that reflected what you said at the

12:14:23 8    time?

12:14:23 9    A.      Yes.

12:14:23 10   Q.      It is something you would do, you would text him?

12:14:26 11   A.      Yes.

12:14:26 12   Q.      And on that day you recall having texts with him?

12:14:29 13   A.      Yes.

12:14:29 14   Q.      Including in the middle of the afternoon?

12:14:31 15   A.      Yes.

12:14:31 16   Q.      In the middle of the afternoon?

12:14:33 17          MR. LOWELL:   Your Honor, pursuant to your bench

12:14:35 18   conference, I would like to read into the record the exhibit

12:14:38 19   -- the text we're talking about.

12:14:40 20          THE COURT:   Okay.

12:14:42 21   BY MR. LOWELL:

12:14:43 22   Q.      Now you can look down and I am going to ask you if I

12:14:46 23   read this correctly.   October 22nd, 2018, at 2:55 in the

12:14:51 24   afternoon.   Did you write him, "are you in NY with Zoe?"

12:14:57 25   A.      Yes.

12:14:58  1   Q.      You did do that?

12:14:59  2   A.      From this paper, correct.

12:15:00  3   Q.      Yes.  You don't have to remember it now because your

12:15:03  4   text is something that you recognize as a text you sent?

12:15:06  5   A.      Yes.

12:15:06  6   Q.      And that's what you said, meaning you weren't with

12:15:09  7   him at that moment?

12:15:10  8   A.      Correct.

12:15:11  9   Q.      And then later that afternoon, did you inquire where

12:15:16 10   he was again?

12:15:17 11   A.      Yes.

12:15:18 12   Q.      And if you look up at me --

12:15:21 13           THE COURT:  Just to be clear, are you saying yes

12:15:23 14   because you remember that or because you're reading

12:15:25 15   something?

12:15:26 16           MR. LOWELL:  Let me take the book away for a

12:15:29 17   moment.  I'm just going to put this over here, don't look at

12:15:35 18   it until there is a moment.  Hopefully that works better.

12:15:35 19   BY MR. LOWELL:

12:15:41 20   Q.      Later in the afternoon, did you inquire again where

12:15:44 21   he was, do you recall?

12:15:47 22   A.      Not just from recalling without text messages.

12:15:51 23   Q.      Okay.  I understand.

12:15:52 24           Now, you can -- sorry.  I'll do this better if I

12:15:59 25   can.  Now, I'm just going to ask you to look at that just

Hallie Biden - cross

12:16:04  1   first for the purposes of seeing if it refreshes your

12:16:06  2   recollection about that.  So if you'll look at Row 17.

12:16:14  3   A.      Yes.

12:16:15  4   Q.      Look down and then read it to yourself.

12:16:18  5   A.      Wait a second.  Yes.

12:16:22  6   Q.      Now look up?

12:16:24  7   A.      Wait, 17?

12:16:26  8   Q.      Row 17, there are row numbers on the left side?

12:16:28  9   A.      Mine goes from 16 to 18.

12:16:31 10   Q.      I'm sorry, hold on.  No, no, no.  Look at Row 17.

12:16:44 11   Not 17, I got that wrong, I'm so sorry.  Look first at

12:16:51 12   Row 16.  And when you have read it to yourself, look up so

12:16:55 13   I'll know.

12:16:56 14           Looking at that, does it refresh your

12:16:58 15   recollection of sending him another text in the afternoon

12:17:01 16   seeking where he is?

12:17:02 17   A.      Yes.

12:17:03 18   Q.      And you did that then, and looking up, what were you

12:17:07 19   asking him at that point?

12:17:10 20   A.      Another way of saying I don't know where you are.

12:17:13 21   Q.      And that you recall the date, the time would be

12:17:18 22   4:32 in the afternoon, not that you recall it, but would it

12:17:20 23   be later than the first one?

12:17:22 24   A.      Yes.

12:17:23 25   Q.      And then proceeding, did you continue to text him?

Hallie Biden - cross

| 12:17:28 | 1 | A.        Yes.

| 12:17:30 | 2 | Q.        And --

| 12:17:31 | 3 | A.        Can I look?

| 12:17:32 | 4 | Q.        And later being after the time of the first two, so

| 12:17:37 | 5 | do you remember it then getting to be later in the afternoon

| 12:17:41 | 6 | around 5:30?  Do you remember?

| 12:17:44 | 7 | A.        I don't remember that from like --

| 12:17:47 | 8 | Q.        Now, can I --

| 12:17:48 | 9 |                THE COURT:  Time marches on.

| 12:17:52 | 10 | BY MR. LOWELL:

| 12:17:52 | 11 | Q.        Except when I'm asking questions?

| 12:17:53 | 12 | A.        Right.  And if I could look at these, this refreshes

| 12:17:58 | 13 | -- there is obviously a time stamp of my conversation.

| 12:18:01 | 14 | Q.        If you could look at that and see that was later in

| 12:18:04 | 15 | the afternoon around 5:30, would that refresh your

| 12:18:06 | 16 | recollection around the time?

| 12:18:07 | 17 | A.        Yes.

| 12:18:08 | 18 |                THE COURT:  So again.  Refreshing your

| 12:18:10 | 19 | recollection is I read it, I don't remember it, but it says

| 12:18:13 | 20 | it, so I'll believe it, that's not refreshing your

| 12:18:16 | 21 | recollection.  Refreshing your recollection is if someone

| 12:18:21 | 22 | says remember we met in 2024, or you say no but yes to be

| 12:18:25 | 23 | polite, but you don't really, and then they say remember it

| 12:18:29 | 24 | was Bob's birthday party and we talked about the pizza that

| 12:18:33 | 25 | was great and you say oh my gosh, I remember that, so this

Hallie Biden - cross

12:18:37  1    is a little bit different.  This is if you read a message

12:18:40  2    and you say oh my God, I do remember sending that message,

12:18:44  3    then it refreshes your recollection.  If not, the answer

12:18:49  4    does it refresh your recollection is no, and then he just

12:18:52  5    has to go through a few more steps to make sure we have the

12:18:56  6    evidence.

12:18:56  7              THE WITNESS:  It's a process.

12:18:57  8              THE COURT:  It's a legal process.

12:18:59  9              THE WITNESS:  Okay.

12:18:59 10    BY MR. LOWELL:

12:19:00 11    Q.    Let's try that again, okay.  All right.  So going

12:19:02 12    back to Row 16, right, look down and see whether it

12:19:07 13    refreshes your recollection of what time you sent a text to

12:19:11 14    Hunter and what it said.  And if you look up.  It does?

12:19:14 15    A.    Yes.

12:19:14 16    Q.    What time does that refresh your recollection.  Don't

12:19:17 17    look down, just look up at me.  What time does it refresh

12:19:21 18    your recollection that you sent that?

12:19:23 19    A.    4:30ish.

12:19:25 20    Q.    And in that, what is it that you recall asking him,

12:19:28 21    you were asking him-- what was it you recall you saying?

12:19:32 22    A.    Again, where are you, or --

12:19:35 23    Q.    Or what are you doing?

12:19:37 24    A.    What are you doing?

12:19:38 25    Q.    And then later in that same day, because we're trying

Hallie Biden - cross

12:19:42  1    to get the time sequence, okay?

12:19:44  2    A.    Okay.

12:19:44  3    Q.    Later than that, do you recall continuing to have a

12:19:47  4    text exchange with him?

12:19:49  5    A.    Likely.

12:19:50  6    Q.    Likely.  Well, to start, look down and see if you see

12:19:54  7    additional text that could refresh your recollection that it

12:19:57  8    continued to happen?

12:19:58  9    A.    Yes.

12:19:58 10    Q.    And did you then write to him, or do you recall

12:20:03 11    having another exchange where you are asking him further

12:20:08 12    either in words or to the effect where are you and what

12:20:11 13    you're doing?

12:20:12 14    A.    Yes.

12:20:12 15    Q.    And looking up, do you know that that was later than

12:20:15 16    that last one, this one now being at about 5:30?

12:20:19 17    A.    Yes.

12:20:19 18    Q.    And in that, do you recall telling him that you

12:20:22 19    thought you knew where he was?

12:20:25 20    A.    Yes.

12:20:27 21    Q.    And what is it that you recall you said?

12:20:32 22    A.    Like, I know where you are.

12:20:35 23    Q.    Okay.  And where did you think he was when you said

12:20:39 24    that?

12:20:39 25    A.    I don't know.

Hallie Biden - cross

12:20:40  1    Q.      But you said to him, "I know where you are"?

12:20:43  2    A.      I know, but I don't know if I really knew where he

12:20:46  3    was.

12:20:46  4    Q.      But that's what you wrote, why did you write it that

12:20:49  5    way?

12:20:49  6    A.      I don't recall.

12:20:52  7    Q.      Okay.   And then into the evening, in terms of where

12:20:59  8    you were and whether he was there, do you recall continuing

12:21:04  9    another text in which you are exchanging and sending to him

12:21:10 10    something reflecting whether you were with him at the time

12:21:13 11    that evening or not?

12:21:15 12    A.      Yes.

12:21:15 13    Q.      And was that in the evening?

12:21:18 14    A.      Yes.

12:21:18 15    Q.      Do you know what, without looking down, do you know

12:21:22 16    off hand what time in the evening?

12:21:24 17    A.      8ish.

12:21:25 18    Q.      Or later?

12:21:26 19    A.      Or later.

12:21:27 20    Q.      And in that period of time, did you reach out to him

12:21:29 21    and say come over or words to that effect?

12:21:34 22    A.      Yes.

12:21:34 23    Q.      Or if you asked -- offered for you to go wherever he

12:21:38 24    was?

12:21:38 25    A.      Right, correct.

12:21:39  1    Q.       Okay.  So at 8:49 or later, eight something as far as

12:21:44  2    you can remember, you're still not with him?

12:21:46  3    A.       Correct.

12:21:47  4    Q.       And you're reaching out to him and asking him to

12:21:50  5    either come or for you to go wherever he is?

12:21:53  6    A.       Yes.

12:21:54  7    Q.       And then after that, did you text him again and

12:21:58  8    indicate how he could get there?

12:22:00  9    A.       Can I --

12:22:03 10    Q.       I'm sorry, I take that back.  Sorry, full day, never

12:22:07 11    mind, I'm in a different day.

12:22:11 12             MR. LOWELL:  Judge should I keep going or if I'm

12:22:13 13    in the next day should we take a lunch break, it's up to

12:22:16 14    you?

12:22:17 15             THE COURT:  Keep going.

12:22:18 16             MR. LOWELL:  Okay.  Thank you.

12:22:19 17    BY MR. LOWELL:

12:22:20 18    Q.       Then you testified that October 22nd, now having gone

12:22:23 19    through those texts, or at least refreshing on those that

12:22:28 20    you did, does that help you remember whether at any point on

12:22:33 21    the evening of the 22nd you ever went to wherever Hunter was

12:22:38 22    as you were asking him or he ever came to your house?

12:22:41 23    A.       I did not see him, no.

12:22:45 24    Q.       So we can pretty well establish you didn't see him

12:22:48 25    that night?

Hallie Biden - cross

12:22:49  1    A.       Correct.

12:22:49  2    Q.       Now, let's turn to the next day.  I get the sequence

12:23:01  3    the next morning, it was a weekday, I think on the 23rd of

12:23:05  4    October, yes?

12:23:06  5    A.       Yes.

12:23:06  6    Q.       And you were, your two children were school aged?

12:23:10  7    A.       Yes.

12:23:10  8    Q.       One is named Hunter?

12:23:12  9    A.       Yes.

12:23:12  10   Q.       And the other one's name is Natalie?

12:23:15  11   A.       Natalie, yes.

12:23:16  12   Q.       And you would normally in your routine get up and get

12:23:22  13   them ready for school?

12:23:23  14   A.       Yes.

12:23:23  15   Q.       And you would drive them?

12:23:25  16   A.       Correct.

12:23:25  17   Q.       And if it was a weekday, even though you don't have a

12:23:29  18   specific memory, it would be likely that that's what

12:23:31  19   happened that morning?

12:23:32  20   A.       Yes.

12:23:32  21   Q.       What time is it that they needed to get to school?

12:23:35  22   A.       By 8:00.

12:23:38  23   Q.       And then you would leave how early in the morning to

12:23:41  24   get them there, eight or when?

12:23:43  25   A.       It's like a mile away.

Hallie Biden - cross

12:23:45 1    Q.    So you did that as far as we can reconstruct in the

12:23:48 2    morning of that morning?

12:23:49 3    A.    Yes.

12:23:49 4    Q.    And when you left, given that we have established

12:23:51 5    that Hunter wasn't there the night before, do you have any

12:23:55 6    recall that at that moment he was there?

12:23:57 7    A.    I do not.

12:23:59 8    Q.    Still don't know where he was.  So now you leave and

12:24:03 9    you bring your kids to school?

12:24:05 10   A.    Yes.

12:24:05 11   Q.    Did you stop after dropping them off at school before

12:24:09 12   you came back to the house?

12:24:10 13   A.    Not that I recall.

12:24:11 14   Q.    How long would it be between the time that you went,

12:24:14 15   left the house, dropped them off at school, and then would

12:24:17 16   have come back?

12:24:18 17   A.    15 minutes.

12:24:19 18   Q.    You were back at the house then perhaps by 8:30?

12:24:23 19   A.    Correct.

12:24:24 20   Q.    Now, in the sequence of events, you pull into your

12:24:28 21   driveway?

12:24:29 22   A.    Yes.

12:24:29 23   Q.    Is that right?  And is that when you see the truck?

12:24:33 24   A.    I don't recall when I first saw the truck.

12:24:37 25   Q.    Okay.  But somewhere you did?

Hallie Biden - cross

12:24:40  1    A.    Yes.

12:24:40  2    Q.    Sometime you did?

12:24:41  3    A.    Yes.

12:24:42  4    Q.    You don't know whether it was before you took them to

12:24:45  5    school, but certainly you saw it after you came back?

12:24:48  6    A.    Right.  I guess what I'm unclear about is if he came

12:24:54  7    in the middle of the night and that -- got into bed and then

12:24:57  8    I -- after I took the kids to school, cleaned it out, or if

12:25:02  9    he arrived at like the 10:00 a.m., I don't recall.

12:25:06 10    Q.    You just said something about got into bed.  I

12:25:09 11    thought a few moments ago we said that on the night of the

12:25:13 12    22nd he wasn't with you, you were asking where he is?

12:25:15 13    A.    It could have been at 2 in the morning.

12:25:18 14    Q.    It could have been, but what I'm asking is do you

12:25:21 15    recall?

12:25:21 16    A.    I do not recall.

12:25:22 17    Q.    You don't know when the truck was put there, whether

12:25:25 18    it was early morning hours of the 23rd, right?

12:25:28 19    A.    Right.

12:25:28 20    Q.    But certainly you know it's not before, and you're

12:25:31 21    asking him later in the evening around 9 o'clock where are

12:25:34 22    you?

12:25:34 23    A.    Yes.

12:25:35 24    Q.    And then you cannot tell whether at the point that

12:25:38 25    you saw the truck it was before or after you dropped your

Hallie Biden - cross

12:25:42  1    kids off?

12:25:44  2    A.      Correct.

12:25:44  3    Q.      But certainly you didn't go into the truck until

12:25:47  4    afterwards?

12:25:48  5    A.      Right.

12:25:48  6    Q.      So you come back from dropping them off from school

12:25:52  7    as I get it, and do you go into the house, do you

12:25:55  8    immediately go to the truck, do you go inside to get the

12:25:58  9    keys, what are you doing?

12:26:01 10    A.      That's where I'm still unclear if he had even arrived

12:26:05 11    yet.  If he had already been there, because like I said it

12:26:08 12    was kind of a pattern.  So I don't -- I can do --

12:26:14 13    Q.      Sorry, go ahead?

12:26:15 14    A.      I can go from cleaning out the truck that day, does

12:26:19 15    that make sense?

12:26:20 16    Q.      It does.  But we do have two benchmarks right, we

12:26:24 17    know you're going to drop your kids of at around 8:30, and

12:26:28 18    we know of the time stamp of when you get to Janssen's?

12:26:31 19    A.      Which is what time?

12:26:32 20    Q.      11:20.

12:26:33 21    A.      Okay.  We have that.

12:26:35 22    Q.      We have that.

12:26:36 23    A.      We have that as your--

12:26:38 24    Q.      You are back at the house, but you don't remember

12:26:41 25    specifically, did you have a pattern, let's say the truck

Hallie Biden - cross

12:26:43  1   was there, it was wherever it was on the grass, is that

12:26:46  2   where you're saying, it was on the grass?

12:26:48  3   A.      Yes.

12:26:48  4   Q.      Can you tell whether it was on the grass at your

12:26:51  5   house or behind or whether there was another lot, do you

12:26:54  6   remember that specifically at this point?

12:26:55  7   A.      Yeah, on the yard, on my --

12:26:58  8   Q.      On the grass and behind your house, is there another

12:27:01  9   property I think you said, I think the question was is there

12:27:03  10  a lot, but not a parking lot, there is another house?

12:27:08  11  A.      There is a house, there could be a half a mile

12:27:14  12  between us, not a mile, sorry, half an acre.

12:27:17  13  Q.      Sorry, half an acre?

12:27:19  14  A.      Yes.

12:27:19  15  Q.      Is that a property you know to be a house or a

12:27:22  16  property owned by a family named Hobbs?

12:27:25  17  A.      Yes.

12:27:25  18  Q.      Do you know whether the truck was on your part of

12:27:29  19  that, their parts of it, or do you have any specific memory

12:27:32  20  of that piece?

12:27:33  21  A.      I believe it was on my property.

12:27:35  22  Q.      But nevertheless it was on the grass?

12:27:37  23  A.      Correct.

12:27:37  24  Q.      Not on the driveway?

12:27:39  25  A.      Right.

Hallie Biden - cross

12:27:39  1    Q.    Given the normal way of dropping your kids off and

12:27:42  2    coming back, what I'm asking is do you recall today whether

12:27:45  3    when you came back, that's immediately when you went to the

12:27:48  4    truck, did you go inside, did you get keys, what can you

12:27:51  5    recall about the time you came back and the time you went

12:27:53  6    inside the truck?

12:27:54  7    A.    I don't recall if the car was there, the truck was

12:27:59  8    there, when I got back or if he drove it in at 9:00.  I

12:28:04  9    don't recall.

12:28:06 10    Q.    Okay.

12:28:06 11    A.    Sorry.

12:28:07 12    Q.    No, don't be sorry, that's why I asked if you'll help

12:28:12 13    me do the sequence.  In the sequence, I think in your

12:28:15 14    testimony prior to the break, you said at some point you do

12:28:17 15    have a memory of seeing him, but I don't know that you can

12:28:20 16    place that hour or a moment on the 23rd?

12:28:23 17    A.    Correct.

12:28:24 18    Q.    Is that right.  If you can't do that, can you tell me

12:28:27 19    then when he looked exhausted, when was it that he looked

12:28:30 20    like he hadn't slept, do you know where in the sequence that

12:28:34 21    would be?

12:28:36 22    A.    Either in 2:00 in the morning, those hours, if it was

12:28:42 23    then, or if it was from that 8:30 to 10 or 11:00 when I

12:28:52 24    threw it away.

12:28:54 25    Q.    Okay.  But what your memory, whenever you saw him,

Hallie Biden - cross

12:28:59  1    was tired and exhausted, right?

12:29:01  2    A.      Yes.

12:29:01  3    Q.      And I think you were asked whether or not then you

12:29:07  4    would suppose, guess, wonder, whether that was because he

12:29:12  5    was either using drugs or alcohol?

12:29:14  6              MR. WISE:  Objection, I didn't say "wonder" in

12:29:20  7    the question.

12:29:20  8    BY MR. LOWELL:

12:29:20  9    Q.      You didn't see him doing any alcohol or drugs,

12:29:22 10    correct?

12:29:23 11    A.      Correct.

12:29:23 12    Q.      Whether you saw him exhausted or whatever the phrase

12:29:26 13    you used, you don't know whether he was just exhausted and

12:29:31 14    didn't have any sleep?

12:29:33 15    A.      Correct.

12:29:35 16    Q.      Next step along the time sequence.

12:30:02 17              On the morning of the 23rd, I want to see if we

12:30:04 18    can construct when you saw him, okay?

12:30:06 19    A.      Okay.

12:30:07 20    Q.      Now, again on that morning, do you recall writing him

12:30:14 21    any texts or calling him and asking him where he was?

12:30:20 22    A.      Can I look at this?

12:30:22 23    Q.      Well first tell me if you can recall?

12:30:25 24    A.      I don't recall.

12:30:26 25    Q.      Now, if you'll look at Row 19.

Hallie Biden - cross

12:30:37  1    A.      Okay.

12:30:38  2    Q.      When you have done that, look up.

12:30:41  3            Does that refresh your recollection as to

12:30:43  4    whether or not in the morning you reached out to him?

12:30:47  5    A.      I have on the 19th, that was the evening before.

12:30:51  6    Q.      I'm sorry, I did that wrong, didn't I?  Look at

12:31:05  7    Row 20.  And now look up after you have done that?

12:31:12  8    A.      Okay.

12:31:13  9    Q.      Okay.  So looking at Row 20, does that refresh your

12:31:17 10    recollection if you reached out to him in the morning of the

12:31:20 11    23rd mid-morning, in some fashion to find out where he was?

12:31:28 12    A.      I don't really understand that because of the

12:31:32 13    context, so I don't recall.

12:31:34 14    Q.      If he was with you at that time, and if he was, as

12:31:40 15    you pointed it out, may have been there, would you ask him

12:31:45 16    anything about an Uber?

12:31:47 17    A.      No.

12:31:48 18    Q.      So if you were asking him anything about an Uber,

12:31:52 19    would that be for him to come with an Uber to where you

12:31:56 20    were, or where?

12:32:01 21    A.      I don't know.

12:32:02 22    Q.      Okay.

12:32:03 23    A.      Because why wouldn't I drive?

12:32:06 24    Q.      I can't answer that.  But do you recall at the time

12:32:10 25    being in a text exchange with Hunter?  We've said on the

Hallie Biden - cross

12:32:15  1   22nd and clearly we're on the 23rd, right?

12:32:19  2   A.      Right.

12:32:20  3   Q.      And you remember that you were sending texts in the

12:32:22  4   morning of the 23rd as well?

12:32:24  5   A.      Correct.

12:32:24  6   Q.      And when you sent him a text, you knew how to text

12:32:28  7   him, what number it was going to?

12:32:30  8   A.      Yes.

12:32:30  9   Q.      And with the texts that you have seen that the

12:32:35 10   government has shown you, and one that I have entered into

12:32:38 11   evidence by reading, would that be an accurate depiction of

12:32:42 12   what you would have sent him?

12:32:44 13   A.      Yes.

12:32:44 14           MR. LOWELL:  Your Honor, we move in, so that I

12:32:46 15   can read the text at ten, on October 23rd at 10:23.

12:32:53 16           THE COURT:  10/24?

12:32:57 17           MR. LOWELL:  10/23 at Row 20.

12:33:03 18           THE COURT:  You can read it in.

12:33:07 19           MR. LOWELL:  Thank you.

12:33:08 20   BY MR. LOWELL:

12:33:08 21   Q.      So on 10/23, October 23rd, 10:23 in the morning, did

12:33:14 22   you say to him "call Uber"?

12:33:17 23   A.      Yes.

12:33:17 24   Q.      And then following that, did you remember texting him

12:33:22 25   again.  Can you look up and tell me, was there an exchange

Hallie Biden - cross

12:33:27 1    with him, you texted him "call Uber."  Did you text him

12:33:31 2    again?

12:33:31 3    A.     I don't recall off the top of my head.

12:33:34 4    Q.     Now, would you please look down on Row 21, and look

12:33:37 5    up when you have done it?

12:33:40 6    A.     Yes.

12:33:40 7    Q.     Okay.  Having done that, does it refresh your

12:33:44 8    recollection that you were asking him to come home?

12:33:46 9    A.     Yes.

12:33:47 10   Q.     And that's a minute later than the one I read into

12:33:49 11   the record?

12:33:50 12   A.     Yes.

12:33:50 13   Q.     So if you're asking him to come home at 10:24, that

12:33:56 14   would obviously mean he wasn't there then?

12:33:58 15   A.     Correct.

12:34:07 16   Q.     Did you understand at that time in the morning or in

12:34:10 17   the night before, that he was staying at a hotel?

12:34:16 18   A.     I don't think I knew where he was.

12:34:18 19   Q.     Okay.  You do remember being in an exchange, will you

12:34:24 20   now look at Row 22?  And doing so, look up after you've read

12:34:29 21   it.  Do you remember having an exchange with him as the

12:34:35 22   morning progressed?  The last one I read in where the time

12:34:39 23   was 10:24.  Do you remember that you continued to text

12:34:43 24   exchange with him that morning?

12:34:45 25   A.     I see that.

Hallie Biden - cross

12:34:46 1   Q.      I'm asking if you remember?

12:34:47 2   A.      I don't remember, no.

12:34:48 3   Q.      And my question was do you remember whether he was

12:34:51 4   staying at a hotel?

12:34:52 5   A.      I don't remember.

12:34:53 6   Q.      Now looking down, does that refresh your recollection

12:34:56 7   that you did in fact know that he was staying at a hotel?

12:35:00 8               MR. WISE:  I'll object, that's not what the --

12:35:03 9   we're looking at the text, that's not what that said.

12:35:06 10              MR. LOWELL:  Row 22.

12:35:08 11              MR. WISE:  That doesn't mean she knows he was

12:35:11 12  staying at a hotel.

12:35:12 13              MR. LOWELL:  I asked whether it refreshed her

12:35:14 14  recollection whether or not she knew that he was at a hotel.

12:35:17 15              THE COURT:  She can say yes or no as to whether

12:35:19 16  that reminds her, refreshed her recollection that she knew

12:35:23 17  he was.

12:35:23 18              THE WITNESS:  Yes.

12:35:25 19              MR. LOWELL:  That's what I hoped I did, so if I

12:35:28 20  didn't, let me do it again.  Does that refresh your

12:35:31 21  recollection as to whether or not you knew he was at a

12:35:33 22  hotel?

12:35:34 23              THE WITNESS:  Yes.

12:35:34 24  BY MR. LOWELL:

12:35:34 25  Q.      So having looked at that, as of the mid-morning, you

Hallie Biden - cross

12:35:40  1   now are refreshed that he was not at your house, that he was

12:35:43  2   at a hotel?

12:35:47  3   A.      Yes.

12:35:50  4            MR. WISE:  Well which, that's a compound

12:35:52  5   question.

12:35:52  6            THE COURT:  I know.  It's very confusing because

12:35:56  7   I don't know if that means he left, he came back.

12:35:58  8            THE WITNESS:  Right, I don't remember either.

12:35:59  9            THE COURT:  So if -- it's just better if you

12:36:04 10   don't remember, you -- we want the record to be clear what

12:36:07 11   you remember and what you don't remember.  If you don't

12:36:09 12   remember, it's okay, nobody is going to think, as long as

12:36:13 13   it's truthfully you don't remember, that's okay.

12:36:16 14            THE WITNESS:  Okay.

12:36:16 15            THE COURT:  When he says does it refresh your

12:36:18 16   recollection, you can say yes or no.

12:36:21 17            THE WITNESS:  Okay.

12:36:21 18            THE COURT:  It does, I still don't remember it,

12:36:24 19   I see there is text, we all get e-mails and texts every day

12:36:27 20   that you don't remember.

12:36:29 21            THE WITNESS:  Okay, I don't remember.

12:36:30 22            THE COURT:  But then he can follow up and try

12:36:32 23   and say well, would you have recorded this at the time,

12:36:36 24   whatever, and he can try and deal with it differently.

12:36:38 25            THE WITNESS:  Okay.  I don't remember.

Hallie Biden - cross

12:36:39  1    BY MR. LOWELL:

12:36:40  2    Q.    So now you don't remember?

12:36:41  3    A.    I don't remember.

12:36:42  4    Q.    As I asked you before, you understand and you agree

12:36:45  5    that you're sending a text?

12:36:46  6    A.    Yes.

12:36:46  7    Q.    And the ones you identified are among those?

12:36:49  8    A.    Yes.

12:36:49  9    Q.    And that text exchange continued and it reflects what

12:36:53 10    you would have sent him that day?

12:36:55 11    A.    Yes.

12:36:55 12    Q.    It was the same day that you were identifying other

12:36:58 13    texts?

12:36:58 14    A.    Yes.

12:36:59 15    Q.    You knew where to send it to?

12:37:01 16    A.    Yes.

12:37:01 17    Q.    Having done that, I am now going to read into the

12:37:04 18    record what you in fact said in that text exchange.  And on

12:37:12 19    October 23rd, 2018, at 10:46, you wrote, if I say it right

12:37:19 20    "where is hotel and room number??"  Two question marks.

12:37:25 21    Right, I read that correctly?

12:37:26 22    A.    Yes.

12:37:27 23    Q.    And you sent that to him then?

12:37:30 24    A.    Yes.

12:37:30 25    Q.    That reflects that at that moment you had an

Hallie Biden - cross

12:37:33  1   understanding --

12:37:33  2              THE COURT:  Wait, wait, wait, no, we decided

12:37:35  3   that --

12:37:36  4              MR. LOWELL:  Okay, I stand corrected.  Judge, I

12:37:38  5   am trying to do this carefully.

12:37:40  6              THE COURT:  I know, you're trying to do it

12:37:42  7   carefully and it's difficult, but we had an agreement on

12:37:45  8   that.

12:37:46  9              MR. LOWELL:  Okay.  So you did send that text

12:37:48 10   and it does use the word "hotel"?

12:37:50 11              THE WITNESS:  Yes.

12:37:50 12   BY MR. LOWELL:

12:37:51 13   Q.    And then I want you to look at what I just read in

12:37:56 14   and the time.  Right?  And it says 10:46.  That's the time

12:38:01 15   of that one?

12:38:02 16   A.    Okay.

12:38:03 17   Q.    You dropped your kids off at 8:30, I'm sorry, before,

12:38:07 18   and you came back.  Had you yet gone into his truck at this

12:38:11 19   point?  It's two hours and change later?

12:38:19 20   A.    Then no, if he's not at my house.

12:38:22 21   Q.    Well, but you said you're not sure that the truck

12:38:25 22   wasn't there at that time.  The truck could be there and he

12:38:28 23   not be there, right?

12:38:29 24   A.    Well, how?

12:38:31 25   Q.    Okay.  I mean, he could drop the truck off--

12:38:35 1          MR. WISE:  She can't ask him questions.

12:38:37 2          THE WITNESS:  Sorry.

12:38:38 3          THE COURT:  And what he says is not evidence.

12:38:42 4          THE WITNESS:  Okay.

12:38:43 5   BY MR. LOWELL:

12:38:43 6   Q.     Okay.  Somebody could have -- be in their car and

12:38:48 7   somebody else be in the car next to them and drop a truck

12:38:51 8   off and then go in that person's car and leave, could that

12:38:54 9   happen?

12:38:55 10  A.     That could.

12:38:55 11  Q.     Somebody could call an Uber, you saw a reference to

12:38:59 12  an Uber?

12:39:00 13  A.     Yes.

12:39:00 14  Q.     What I'm asking, again going backwards in time,

12:39:04 15  you're not sure when the truck was on the property you

12:39:07 16  identified?

12:39:08 17  A.     Correct.

12:39:08 18  Q.     But now that I'm looking at 10:46 as a time stamp,

12:39:13 19  you're not sure whether you did or did not find the gun

12:39:17 20  before then?

12:39:21 21  A.     If we're not talking about the gun, I don't think I

12:39:24 22  found it yet.

12:39:25 23  Q.     Okay.  That was going to be my next question to you.

12:39:29 24  If you had found the gun by any particular time in the

12:39:34 25  morning, you have testified about what you did when you did

Hallie Biden - cross

12:39:39  1    it, and we know from some time stamp that at 11:20 you're at

12:39:44  2    Janssen's, is there anything you recall, calling him

12:39:48  3    immediately and telling him?

12:39:50  4    A.    No, I did not call him and tell him.

12:39:54  5    Q.    Okay.  Then the next sequence is I think you were

12:40:06  6    asked whether or not you know when, if the truck left the

12:40:13  7    property you identified, do you remember?

12:40:18  8    A.    When it left?

12:40:19  9    Q.    The grass, the property?  You obviously found

12:40:24  10   something in it; right?

12:40:25  11   A.    Right.

12:40:26  12   Q.    And then at some point later when you came back, it

12:40:30  13   wasn't there, later in the day?

12:40:33  14   A.    Well, he drove it to Janssen's --

12:40:37  15   Q.    Do you know if he drove it directly to Janssen's.  Do

12:40:41  16   you know where he was before the incident when you and he

12:40:46  17   were at Janssen's?

12:40:47  18   A.    I'm not sure.

12:40:48  19   Q.    Do you know whether or not on that day he had an

12:40:50  20   indication that he was going to Washington D.C. on the 23rd?

12:40:54  21   A.    I don't recall.

12:40:55  22   Q.    Do you recall anything about one of his daughters

12:41:00  23   living in D.C. at the time?

12:41:01  24   A.    Yes.

12:41:02  25   Q.    Was there a daughter named Maisy that he had?

Hallie Biden - cross

12:41:05  1    A.      Yes.

12:41:05  2    Q.      Was Maisy in school in Washington at that period of

12:41:09  3    time?

12:41:09  4    A.      Yes.

12:41:10  5    Q.      And she was in high school?

12:41:12  6    A.      Yes.

12:41:13  7    Q.      Do you recall Mr. Biden, Hunter, telling you he was

12:41:18  8    going to see Maisy at Washington for a game?

12:41:23  9    A.      Via text message or in person?

12:41:25 10    Q.      I'm asking you, do you recall any conversation about

12:41:28 11    where he was intending to go on the 23rd?

12:41:30 12    A.      No, because I can only see it from the text messages.

12:41:35 13    Q.      I want you to look, see if this refreshes your

12:41:39 14    recollection, if you will look at Row 24?

12:41:42 15    A.      Mine says --

12:41:43 16    Q.      Don't say what it says?

12:41:44 17    A.      No, I meant I don't have Row 24.

12:41:47 18          THE COURT:  You're asking for hearsay, right,

12:41:49 19    are you asking what he said or what she said?

12:41:52 20          MR. LOWELL:  I'm asking whether looking at

12:41:53 21    anything refreshes her recollection, not whether it's in the

12:41:57 22    record, not whether it can be admissible, but anything can

12:42:00 23    refresh the witness so I'm asking.

12:42:03 24          MR. WISE:  I think there is no Row 24.

12:42:07 25          MR. LOWELL:  I'm sorry.  May I approach?

Hallie Biden - cross

12:42:13   1   BY MR. LOWELL:

12:42:13   2   Q.      What I want you to do is what we have done before,

12:42:16   3   take a look at this page and look at Row 24, just Row 24,

12:42:20   4   and read it to yourself.

12:42:22   5           THE COURT:  And then does it refresh your

12:42:23   6   recollection, not what you're reading.

12:42:28   7   BY MR. LOWELL:

12:42:28   8   Q.      Do you see it?  Does reading that refresh your

12:42:31   9   recollection of whether or not you understood he was on his

12:42:35  10   way to Washington D.C. to see his daughter Maisy?

12:42:39  11   A.      That that was the intention?

12:42:40  12   Q.      Yes.

12:42:41  13   A.      Yes.

12:42:44  14           MR. LOWELL:  Your Honor, keep going, I mean, I

12:42:47  15   just don't want to keep people.

12:42:49  16           THE COURT:  It's 12:42.  We'll take our lunch

12:42:53  17   break.

12:42:53  18           COURTROOM DEPUTY:  All rise.

12:42:56  19           (Jury exiting the courtroom at 12:42 p.m.)

12:43:18  20           THE COURT:  All right.  We usually take about an

12:43:26  21   hour.  Is that all right?

12:43:27  22           THE WITNESS:  Sure.

12:43:29  23           MR. LOWELL:  May we approach before you leave

12:43:30  24   the bench?

12:43:31  25           THE COURT:  You can go.

Hallie Biden - cross

12:43:34  1                    (A luncheon recess was taken.)

13:14:28  2                    (Side-bar discussion:)

13:14:28  3              THE COURT:  So one of the jurors said to Mark

13:14:28  4     when she was leaving that when we were over here at

13:14:28  5     side-bar, that they noticed that she was communicating with

13:14:28  6     someone in the back.  Now, I don't know if she has a lawyer

13:14:28  7     here.

13:14:28  8              MR. HINES:  She does.

13:14:28  9              MR. WISE:  Well, it's her husband.  She got

13:14:28 10     married this weekend and I can see him in back.

13:14:28 11              THE COURT:  So she was communicating with

13:14:28 12     someone.  They were like mouthing something to her.  My

13:14:28 13     guess is it was something on the order of, you know --

13:14:28 14              MR. LOWELL:  What a jerk I am.

13:14:28 15              THE COURT:  My guess.

13:14:28 16              MR. LOWELL:  Could you clean that one up.  What

13:14:28 17     a jerk I am.  Thank you.

13:14:28 18              MR. HINES:  No objection.

13:14:28 19              THE COURT:  Okay.  So they noticed -- so one

13:14:28 20     juror, it's the second alternate, so we know we have the two

13:14:28 21     younger women, so it's one of them.  And then she said to

13:14:28 22     him -- and you can ask Mark questions, too, she said to him

13:14:28 23     and other jurors noticed, too.

13:14:28 24              MR. LOWELL:  So I'm sorry to get this right,

13:14:28 25     Mark, Mr. Buckson, the first -- second alternate says it to

13:14:28  1    you?

13:14:28  2              COURTROOM DEPUTY:  She stays behind and says, "I

13:14:28  3    have to talk to you a minute."

13:14:28  4              MR. LOWELL:  When she did, she said other jurors

13:14:28  5    saw it, too?

13:14:28  6              COURTROOM DEPUTY:  She told me what happened and

13:14:28  7    said other jurors saw it, too.

13:14:28  8              MR. LOWELL:  Meaning that they talked about it.

13:14:28  9              THE COURT:  That's what I said to Mark, that's

13:14:28 10    why I want to tell you guys everything that they said.

13:14:28 11              Now what I don't know -- my guess is, it was on

13:14:29 12    the way out the door, so it wasn't like they had talked

13:14:29 13    about it in the jury room.  It was probably one of those

13:14:29 14    things where they were like this, you know, but I don't know

13:14:29 15    that.

13:14:29 16              MR. LOWELL:  I understand.

13:14:29 17              THE COURT:  So if you guys want to ask, you can.

13:14:29 18    So what I thought I would do is tell you now, even though I

13:14:29 19    interrupted your lunch, so you can go back, you can figure

13:14:29 20    out who the person was.

13:14:29 21              MR. WISE:  I saw him.

13:14:29 22              MR. LOWELL:  She also has her lawyer.

13:14:29 23              MR. WISE:  I mean, if someone is mouthing like

13:14:29 24    hang in there, doing, whatever it is, I'm guessing it's the

13:14:29 25    husband, I don't think a lawyer is mouthing something.

Hallie Biden - cross

13:14:29  1          THE COURT:  I don't know who she was doing it

13:14:29  2  with.  Maybe you can go figure out.  Maybe you can find out

13:14:29  3  what they are saying and you guys can figure out what you

13:14:29  4  want to do if you want to talk to the jury or you want me to

13:14:29  5  talk to the jury.

13:14:29  6          MR. LOWELL:  Or maybe we let it be.

13:14:29  7          THE COURT:  Let it be with a reminder that don't

13:14:29  8  talk to each other.

13:14:29  9          MR. WISE:  My only concern if she think she's

13:14:29 10  being coached or something.

13:14:29 11          THE COURT:  If she's doing something improper.

13:14:29 12          MR. WISE:  I don't want that impression to be

13:14:29 13  left on them.

13:14:29 14          MR. LOWELL:  Unfortunately, to figure that out,

13:14:29 15  you would have to start inquiring who were you talking to,

13:14:29 16  what were you mouthing, what was he mouthing back, and that

13:14:29 17  concerns me as much as, you know, as anything because why --

13:14:29 18  how is that helpful, right.

13:14:29 19          Let's figure out before we bring them back what

13:14:29 20  is the least that is necessary, if anything, because if you

13:14:29 21  start inquiring, how is that helpful, right, I don't think

13:14:29 22  that's helpful.  I understand you don't want the jury to

13:14:29 23  think she's being coached, certainly not by my party.

13:14:29 24          MR. WISE:  Right.

13:14:29 25          MR. LOWELL:  But I wonder how do you do that

Hallie Biden - cross

13:14:29  1    with finesse.  Nothing comes to my mind at the moment, but

13:14:29  2    I'll try to put my mind to it.

13:14:29  3             Thank you for telling us.  And right now I don't

13:14:29  4    have anything I would suggest, but I'll talk to you all

13:14:29  5    about it.

13:14:29  6             THE COURT:  Maybe you guys, somebody can just

13:14:29  7    check with her lawyer and husband and find out what that

13:14:29  8    was.

13:14:29  9             MR. LOWELL:  Thanks, Your Honor, for bringing it

13:14:29 10    to our attention.

13:43:51 11             (End of side-bar.)

13:43:51 12             COURTROOM DEPUTY:  All rise.

13:48:37 13             THE COURT:  All right.  So can I just see

13:48:44 14    counsel for one second.

13:53:43 15             (Side-bar discussion.)

13:53:43 16             THE COURT:  So you want me to do what?

13:53:43 17             MR. LOWELL:  I thought the, we talked, I think

13:53:43 18    what we agreed was you don't have to do it right away or

13:53:43 19    whenever you would, it would just be the normal instructions

13:53:43 20    to the jury just a reminder that you shouldn't be talking to

13:53:43 21    each other about the case, among yourselves of anything

13:53:43 22    that's happening, you have that, I don't know exactly the

13:53:43 23    words.

13:53:43 24             THE COURT:  And then with respect to the

13:53:43 25    discussions, are you okay if they just want to ask her, do

Hallie Biden - cross

13:53:43  1    you have someone here supporting you or something so the

13:53:43  2    jury understands?

13:53:43  3                    MR. LOWELL:   I would object to that as somebody

13:53:43  4    here supporting you.

13:53:43  5                    THE COURT:   Someone here --

13:53:43  6                    MR. LOWELL:   I mean, if you want to say do you

13:53:43  7    have a relative -- I mean, I don't know.  My view is do the

13:53:43  8    least.  But if you feel like something needs to be said.

13:53:43  9    But I don't know how that doesn't make it worse.

13:53:43 10                    MR. WISE:   Was your impression that they thought

13:53:43 11    it was something wrong going on?

13:53:43 12                    COURTROOM DEPUTY:   Kind of.

13:53:43 13                    MR. WISE:   Okay.

13:53:43 14                    COURTROOM DEPUTY:   It was a suspicious.

13:53:43 15                    MR. LOWELL:   Let's say she has a relative, the

13:53:43 16    problem, it still opens the door, what was your relative

13:53:43 17    saying to you, were they just giving you a high five.

13:53:43 18                    MR. WISE:   The question would be Ms. Biden were

13:53:43 19    you recently married, yes, just this week, is your husband

13:53:43 20    here in audience to support you, yes.

13:53:43 21                    MR. LOWELL:   Not support you.

13:53:43 22                    MR. WISE:   Yeah, that's what spouses do.

13:53:43 23                    THE COURT:   Is your husband here with you.

13:53:43 24                    MR. WISE:   At the breaks, have you been looking

13:53:43 25    at him and exchanging supportive words, has anyone been

Hallie Biden - cross

13:53:43  1   telling you what to testify about.

13:53:44  2           MR. LOWELL:  I object to all those questions.

13:53:44  3           THE COURT:  Well, I don't object to has anyone

13:53:44  4   told you what to testify.

13:53:44  5           MR. LOWELL:  I mean in general, yeah.

13:53:44  6           MR. WISE:  I don't know what the prejudice is

13:53:44  7   for her to say my husband is in the audience, I have been

13:53:44  8   looking at him and he's been looking at me for support.

13:53:44  9           MR. LOWELL:  For support, how about I have been

13:53:44 10   looking at him and he's been looking at me.

13:53:44 11           THE COURT:  And anything in that, was he telling

13:53:44 12   you what to say, or something like that?

13:53:44 13           MR. WISE:  Okay.

13:53:44 14           THE COURT:  People are telling you what your

13:53:44 15   testimony should be, something like that.

13:53:44 16           MR. WISE:  Yeah.

13:53:44 17           THE COURT:  Because I -- look, I'm just

13:53:44 18   concerned that the jury, there was nothing -- I don't think

13:53:44 19   there is anything that she did wrong.

13:53:44 20           MR. WISE:  We confirmed with the lawyer, we said

13:53:44 21   is she talking to you, no, no, the husband is here.

13:53:44 22           He's not going to obviously tell her anything

13:53:44 23   about her testimony, but I am concerned that we're leaving

13:53:44 24   an impression with the jury that she's doing something

13:53:44 25   wrong, so if you just want to say, were you recently

Hallie Biden - cross

13:53:44  1    married, is your husband here with you, and then have you

13:53:44  2    during breaks looked to him, and did anything that you do --

13:53:44  3    any of your interactions about your testimony or something

13:53:44  4    like that.

13:53:44  5              MR. WISE:  Okay.

13:53:44  6              MR. LOWELL:  Say that, were any of your

13:53:44  7    interactions, sorry, were any of your interactions about

13:53:44  8    your testimony.

13:53:44  9              THE COURT:  Yes.

13:53:44 10              MR. LOWELL:  Is that the phrase?

13:53:44 11              THE COURT:  Yes.  I was just trying to get at

13:53:44 12    that it's not influencing her testimony, but if there is a

13:53:44 13    better word for that.

13:53:44 14              MR. WISE:  I think maybe while you are on the

13:53:44 15    stand.

13:53:44 16              THE COURT:  Yes.  While you were on the stand

13:53:44 17    did you occasionally look to him, was any of that about your

13:53:44 18    testimony?

13:53:44 19              MR. LOWELL:  I mean --

13:53:44 20              THE COURT:  I know, and you can object and if

13:53:44 21    you have to object now.

13:53:44 22              MR. LOWELL:  Why don't, we could that now, let

13:53:44 23    me do it now.  Yeah, I just think the more we inquire, the

13:53:44 24    worse it gets, so I object to anything other than the

13:53:44 25    instruction to the jury, telling them that you're not

Hallie Biden - cross

13:53:44  1    supposed to be talking about the case before you deliberate.

13:53:44  2           THE COURT:  I understand.  The problem is that

13:53:44  3    horse is out of the barn and I can instruct them on that

13:53:44  4    going forward, but for this particular horse and barn, I

13:53:44  5    don't want the jury left with the impression that something

13:53:44  6    nefarious was going on.  I have enough issues with her

13:53:44  7    testimony let alone something wrong.

13:53:44  8           MR. LOWELL:  Let's put this horse back in the

13:53:44  9    barn, but can we do it with the fewest number of kicks to

13:53:44 10    the side, to use the analogy.

13:53:44 11           THE COURT:  Yes.  I think that's what it is, if

13:53:44 12    you think there is a way that we can kick less, I took out

13:53:44 13    support.

13:53:44 14           MR. LOWELL:  Right.

13:53:44 15           THE COURT:  I took out support and all I wanted

13:53:45 16    to clarify is it didn't have anything to do with -- he

13:53:45 17    doesn't know anything about her testimony.

13:53:45 18           MR. LOWELL:  But we don't have to explain that.

13:53:45 19           THE COURT:  Exactly.

13:53:45 20           MR. LOWELL:  Okay.

13:53:53 21           (End of side-bar. )

13:53:57 22           THE COURT:  All right.  We can bring in the

13:54:00 23    jury.

13:54:17 24           (Jury entering the courtroom at 1:54 p.m.)

13:55:43 25           THE COURT:  All right, everyone, welcome back.

Hallie Biden - cross

13:55:50 1    You can be seated.  Members of the jury.  Welcome back.  And

13:55:53 2    I hope if you went outside, you're able to enjoy the less

13:55:58 3    humid weather in here if it's a little chilly.  Mr. Lowell

13:56:04 4    please continue.

13:56:05 5              MR. LOWELL:  Thank you, Your Honor.  Good

13:56:06 6    afternoon, ladies and gentlemen, good afternoon, Ms. Biden.

13:56:08 7    And thank you for helping put together the sequence and I

13:56:11 8    don't have a lot more.

13:56:12 9    BY MR. LOWELL:

13:56:13 10   Q.    Where we left off before lunch was still trying to

13:56:15 11   figure out the time sequence on the morning of the 23rd.  Do

13:56:19 12   you remember that that's where we left off?

13:56:21 13   A.    Yes.

13:56:22 14   Q.    So with that in mind, I want to turn first to

13:56:28 15   figuring out as best as you can you at some point we know go

13:56:34 16   into the truck, we know that.

13:56:36 17   A.    Yes.

13:56:36 18   Q.    And you're searching around, we know that?

13:56:39 19   A.    Yes.

13:56:39 20   Q.    We know that's when you found the gun?

13:56:42 21   A.    Correct.

13:56:42 22   Q.    And you said in your testimony this morning that you

13:56:44 23   believed you also had seen, I think what you called,

13:56:47 24   remnants or also paraphernalia?

13:56:51 25   A.    Yes.

Hallie Biden - cross

13:56:51  1    Q.      Okay.  You had done that many times in the past I
13:56:55  2    think you said in the earlier years when you and Mr. Biden
13:56:58  3    were using?
13:56:59  4    A.      Yes.
13:57:00  5    Q.      And I imagine there was more than one of those?
13:57:03  6    A.      Yes.
13:57:03  7    Q.      So on that day, I don't know if you said this and if
13:57:11  8    so I'll skip it again, remnants meaning, what did you think
13:57:15  9    you saw?
13:57:16 10    A.      Like dusting.
13:57:18 11    Q.      Dusting.  Okay.  Not a piece?
13:57:21 12    A.      No.
13:57:22 13    Q.      But a dust?
13:57:23 14    A.      Correct.
13:57:23 15    Q.      And search your memory, on the car seat, on the
13:57:29 16    steering wheel, on the outside of the console, on the mat?
13:57:35 17    A.      I don't recall.
13:57:37 18    Q.      And paraphernalia, not like the thing you said you
13:57:41 19    found in the pouch at the end of October, what do you
13:57:46 20    recall, if anything, about what that was that day?
13:57:49 21    A.      I don't recall exactly what it was.
13:57:53 22    Q.      And on that day as we've established, you don't have
13:57:57 23    a specific memory about where he was or when he was there,
13:58:03 24    and other of the details, and in here, too, you just have
13:58:07 25    this general memory of that?

13:58:10 1          MR. WISE:  Your Honor, I'll object, her

13:58:11 2   testimony was he was at the house, he didn't --

13:58:15 3          MR. LOWELL:  I'll withdraw and restate, okay.

13:58:17 4          THE COURT:  Okay.  So you're withdrawing your

13:58:21 5   question?

13:58:21 6          MR. LOWELL:  I withdraw the question.

13:58:23 7   BY MR. LOWELL:

13:58:24 8   Q.     So on that morning you're not certain when you went

13:58:26 9   in the car?

13:58:27 10  A.     Correct.

13:58:27 11  Q.     You're not certain when you saw him?

13:58:33 12  A.     Correct.

13:58:33 13  Q.     You're not certain as to the sequence of whether it

13:58:37 14  happened when after you came back from dropping your kids?

13:58:40 15  A.     Correct.

13:58:41 16  Q.     And similarly, you have this general impression that

13:58:43 17  there was, to use your phrase, some powder and some

13:58:48 18  paraphernalia and you don't know what that was?

13:58:50 19         MR. WISE:  Again, object, it wasn't a general

13:58:53 20  impression, she testified that's what she found.

13:58:56 21         THE COURT:  Okay.  So the jury can, both the

13:59:00 22  lawyers stuff is not evidence, you can remember what she

13:59:03 23  said.  And but Mr. Lowell, if you'll just ask her, take out

13:59:11 24  your generalizations and if you'll make an objection without

13:59:14 25  giving so many specifics.

Hallie Biden - cross

13:59:17  1                    MR. WISE:  Thank you, Your Honor.

13:59:18  2                    MR. LOWELL:  Okay.

13:59:20  3        BY MR. LOWELL:

13:59:20  4        Q.    I'm just trying to compare the specificity of what

13:59:24  5        you remember versus some general.  Okay?  And if I didn't do

13:59:29  6        it right, I'll try it again.

13:59:30  7                    Powder I understand, remnants, you're not having

13:59:34  8        a memory of what, if anything, that was; is that right?

13:59:39  9        A.    Correct.

13:59:40 10        Q.    So we do know that at some point you're doing what

13:59:47 11        you described your morning events to be, and now I would

13:59:51 12        like to turn to in your book, if you'll turn to Exhibit 17.

14:00:09 13        In that morning you also -- I think you testified that you

14:00:13 14        had phone conversations with Hunter, as well.  On the

14:00:18 15        morning of the --

14:00:19 16        A.    Do I look at the book?

14:00:21 17        Q.    Sorry, no, first --

14:00:23 18        A.    Okay.

14:00:24 19        Q.    Before looking at anything.

14:00:26 20        A.    Okay.

14:00:27 21        Q.    In the morning, you had telephone conversations with

14:00:31 22        Hunter, as well as texts; is that a fair statement?

14:00:34 23        A.    I don't recall them.

14:00:36 24        Q.    Okay.  But I'm generally speaking, do you recall that

14:00:40 25        you guys talked by phone on the day that you recovered the

Hallie Biden - cross

14:00:44   1    gun?

14:00:45   2    A.      Yes.

14:00:45   3    Q.      And my question, then, is if you don't remember the

14:00:50   4    specifics, if you'll -- hold on.

14:01:02   5            So if you will turn, please, to page -- to

14:01:07   6    DX-17, it should be in the book and if you can't find it,

14:01:11   7    let me know.  It should have a tab.  Tell me when you're

14:01:21   8    there.

14:01:21   9    A.      I'm there.

14:01:21  10    Q.      Okay.  So for the purposes of my questioning of you,

14:01:25  11    I'm going to only read to you for the morning of

14:01:30  12    October 23rd, times of calls from you to him or him to you.

14:01:36  13    A.      Okay.

14:01:36  14    Q.      Okay.  So I would like you to look at that.  Am I

14:01:40  15    correct that on October 23rd of 2018 at 9:51 a.m., you

14:01:45  16    called him?

14:01:47  17    A.      I'm on the wrong --

14:01:49  18    Q.      I'm sorry.

14:01:50  19            MR. LOWELL:  Can I approach?

14:01:53  20            THE WITNESS:  Page 2 of that.

14:01:55  21    BY MR. LOWELL:

14:01:55  22    Q.      I think it's page -- 10/23.  I'm sorry.  Page 3.  And

14:02:04  23    I'll tell you which, look at the time stamp, please.  So if

14:02:12  24    you look at Row 68?

14:02:19  25    A.      Yes.

Hallie Biden - cross

14:02:20  1    Q.      I'm sorry, so yes, and at 9:51, you're calling him?

14:02:25  2    A.      Yes.  That's what this says.

14:02:28  3    Q.      And there is an indication in the columns that there

14:02:30  4    was no answer?

14:02:32  5    A.      Yes.

14:02:32  6    Q.      At 9:51, when you tried to call him, were you calling

14:02:39  7    him because by that point in the sequence of events you had

14:02:43  8    found the gun?

14:02:44  9    A.      I don't recall.

14:02:45 10    Q.      Then a few minutes later on the same morning, if

14:02:53 11    you'll look at Row 69 at 9:56, he calls you.  Yes?

14:03:00 12    A.      Yes.

14:03:01 13    Q.      Okay.  And that one was a call for a minute and

14:03:05 14    20 seconds?

14:03:06 15    A.      Yes.

14:03:06 16    Q.      Now, if you're calling him in the morning at those

14:03:09 17    two places, is it right that you wouldn't be calling him if

14:03:15 18    he was either in your house, or right in the driveway?

14:03:19 19    A.      Correct.

14:03:19 20    Q.      So he's someplace else?

14:03:21 21    A.      Yes.

14:03:21 22    Q.      In the morning?

14:03:23 23    A.      Yes.

14:03:23 24    Q.      And then if you'll look again, and that's a minute

14:03:26 25    and 20, yes?

Hallie Biden - cross

14:03:29  1   A.     Yes.

14:03:30  2   Q.     Okay.  And I'm sure that would be the case that five

14:03:34  3   years later, you don't know what was spoken in that minute

14:03:38  4   and 20?

14:03:38  5   A.     Correct.

14:03:39  6   Q.     Is it your memory, though, that at that point, you

14:03:44  7   had found the gun?  You just don't know?

14:03:45  8   A.     I don't recall.

14:03:46  9   Q.     And then six minutes later, if you look at Row 70,

14:03:50 10   it's now 10:02, right?

14:03:53 11   A.     Yes.

14:03:53 12   Q.     And he calls you, correct?

14:03:57 13   A.     Yes.

14:03:57 14   Q.     And that call is 1 minute and 33?

14:04:03 15   A.     Yes.

14:04:03 16   Q.     Now at 10:02 in the morning, I'm imaging from your

14:04:07 17   testimony and what we saw in the video that you're still

14:04:14 18   home?

14:04:14 19   A.     Yes.

14:04:15 20   Q.     So he's not there either?

14:04:17 21   A.     Yes.

14:04:18 22   Q.     And then 28 minutes later on the same morning, you

14:04:23 23   call him.  And that's at 10:30; right?

14:04:29 24   A.     Yes.

14:04:30 25   Q.     And that one lasts a little bit more than a minute?

Hallie Biden - cross

14:04:35  1   A.      Yes.

14:04:36  2   Q.      And so far at that point at 10:30, if you're calling

14:04:41  3   him, we can establish that at 10:30, he's not there?

14:04:47  4   A.      Yes.

14:04:58  5   Q.      In your testimony before lunch, you had talked about

14:05:04  6   finding the gun, looking for someplace to put it, and at

14:05:10  7   some point, you went in your house to get a bag.  Is that

14:05:17  8   right?

14:05:17  9   A.      Correct.

14:05:18 10   Q.      Now, I want to establish in the sequence whether you

14:05:22 11   went in the house to get a bag, and then you said you

14:05:27 12   retrieved a leather pouch, or it's the other way around?

14:05:31 13   A.      I don't recall.

14:05:33 14   Q.      But you went into the house and you got a bag and the

14:05:37 15   first bag was like -- how did you describe it, a gift bag?

14:05:41 16   A.      Like a little gift shopping bag.

14:05:44 17   Q.      Show me the size.

14:05:45 18   A.      Like that.

14:05:45 19   Q.      Is that where you ended up putting what you found?

14:05:48 20   A.      Yes.

14:05:49 21   Q.      Is that what you ended up bringing to Janssen's?

14:05:52 22   A.      Yes.

14:05:53 23   Q.      If you saw in the video that the government's

14:05:56 24   attorneys played, you see it and it was like a purple bag?

14:06:00 25   A.      Yes.

Hallie Biden - cross

14:06:02  1    Q.      And after you put it in the bag, and again, you can't

14:06:07  2    tell us today whether the gift bag or the pouch came first;

14:06:12  3    right?

14:06:13  4    A.      Correct.

14:06:13  5    Q.      But nevertheless, at some point they came together.

14:06:18  6    A.      Yes.

14:06:18  7    Q.      And I heard you say that you got the leather pouch

14:06:21  8    from the car as opposed to the library of your house or any

14:06:25  9    other place in the house or do you know?

14:06:27 10    A.      From the car.

14:06:28 11    Q.      Where in the truck, front seat, back seat, what would

14:06:34 12    you call that, truck bed?

14:06:35 13    A.      Like, just around, it was a lot of stuff.  I don't

14:06:40 14    recall exactly where I pulled it from.

14:06:44 15    Q.      Was it sitting on top of the stuff, was it underneath

14:06:48 16    the stuff, where was it?

14:06:51 17    A.      I don't recall.

14:06:52 18    Q.      And so the next thing that I understand is you, I

14:06:57 19    think the phrase that either Mr. Wise used or you used, "you

14:07:04 20    panicked" about finding the gun, certainly understandable?

14:07:07 21    A.      Yes.

14:07:07 22    Q.      But your reaction was to go put it in a bag, a gift

14:07:11 23    bag, is that right, not a gift bag, but to put it in a bag?

14:07:15 24    A.      I didn't want to hold it like a gun.

14:07:17 25    Q.      And you had no idea if it was loaded at the time?

Hallie Biden - cross

14:07:19  1    A.       Correct.

14:07:20  2    Q.       But you did see a box of bullets that were next to

14:07:23  3    it?

14:07:23  4    A.       Yes.

14:07:24  5    Q.       And it had bullets in it?

14:07:25  6    A.       I don't know.

14:07:26  7    Q.       You didn't shake it, open it up?

14:07:28  8    A.       The bullets?

14:07:29  9    Q.       The box.

14:07:30 10    A.       Some were out and I think it had some weight to it

14:07:33 11    too.

14:07:33 12    Q.       It had some weight.  But did you open it to see

14:07:36 13    whether they were all there, not all there, how did you

14:07:39 14    know?

14:07:39 15    A.       Some were loose out of the box.

14:07:42 16    Q.       Did you scoop those up?

14:07:44 17    A.       I did, I put those in there, as well.

14:07:46 18    Q.       You put those in where, as well?

14:07:48 19    A.       In the pouch.

14:07:49 20    Q.       So there were some in the box and you thought there

14:07:51 21    were some that were in the same steel underneath the console

14:07:56 22    part?

14:07:56 23    A.       In the console, there were some loose bullets that

14:08:00 24    were just sitting there, and then next to it was the box

14:08:04 25    that they came from.

Hallie Biden - cross

14:08:05  1    Q.      So they had fallen out of the box?

14:08:07  2    A.      Correct.  But all of that, all of that, all into the

14:08:12  3    pouch.

14:08:12  4    Q.      They weren't in the gun, they were next to the box?

14:08:15  5    A.      Correct.

14:08:16  6    Q.      Now I understand.  So now you take -- and the speed

14:08:19  7    loader was there?  I'm sorry, speed loader, there was a

14:08:23  8    thing other than the box and the gun, right?

14:08:25  9    A.      I don't know what that is.

14:08:26 10    Q.      Was there another device, another object that you

14:08:33 11    scooped out?

14:08:33 12    A.      I--

14:08:33 13    Q.      Whatever was there, you scooped out.

14:08:36 14    A.      Whatever looked like it was gun related I put in the

14:08:39 15    pouch.

14:08:39 16    Q.      Okay.  There was whatever -- strike that.

14:08:43 17            So in the sequence you take it out and put it

14:08:47 18    either in the pouch in the bag, or the bag in the pouch, you

14:08:50 19    can't figure out which came first?

14:08:52 20    A.      Correct.

14:08:52 21    Q.      But either way it gets into the bag?

14:08:55 22    A.      Correct.

14:09:00 23    Q.      And then you were asked whether or not, and you saw a

14:09:02 24    text that there is a different pouch later at the very end

14:09:05 25    of the month?

Hallie Biden - cross

14:09:06  1    A.      Correct.

14:09:06  2    Q.      You saw a text that says the pouch with Hunter in the

14:09:11  3    library?

14:09:12  4    A.      Right.

14:09:12  5    Q.      In that pouch, lot of leather pouches?

14:09:16  6    A.      Yes.

14:09:16  7    Q.      There are a lot of leather pouches, you said you had

14:09:20  8    leather pouches, sometimes in cars or sometimes where he

14:09:23  9    would put his drugs?

14:09:24 10    A.      Right.

14:09:24 11    Q.      In that particular one, that you are texting him

14:09:28 12    about on October 31st, we established that's not the pouch

14:09:31 13    you threw away on October 23rd, when did that pouch get into

14:09:35 14    your house?

14:09:36 15    A.      I don't recall.

14:09:36 16    Q.      Could it have been there for a while?

14:09:39 17    A.      I mean --

14:09:40 18    Q.      You just don't know when?

14:09:42 19    A.      I don't know.

14:09:42 20    Q.      And when you said inside of it was a -- I forget what

14:09:53 21    you called it, a stem, a pipe or something?

14:09:55 22    A.      Yes.

14:09:56 23    Q.      Do you know when that was put into that pouch that

14:09:58 24    you found in your house on the 31st?

14:10:00 25    A.      I don't know.

Hallie Biden - cross

14:10:02  1    Q.      Was it your intention to go to Janssen's that morning

14:10:07  2    anyway?

14:10:07  3    A.      Yes.

14:10:08  4    Q.      And so when you first discovered the gun, in the time

14:10:14  5    sequence that I'm trying to recreate with you given the

14:10:17  6    phone calls and the texts, what we can establish is that you

14:10:20  7    find it and immediately you call him on the phone, that

14:10:23  8    didn't happen?

14:10:23  9    A.      That didn't happen.

14:10:24 10    Q.      You decided on your own to put it into the gift bag?

14:10:29 11    He didn't tell you to do that?

14:10:30 12    A.      No, he did not tell me to do that, he didn't know I

14:10:34 13    was doing that.

14:10:34 14    Q.      And so you decided on your own to put it in the

14:10:38 15    pouch?

14:10:38 16    A.      Correct.

14:10:39 17    Q.      And then you decided on your own that you were going

14:10:41 18    to take all that?

14:10:43 19    A.      Correct.

14:10:43 20    Q.      And drive it to the grocery store?

14:10:45 21    A.      Yes.

14:10:46 22    Q.      And so can I put up, please -- oh, wait.

14:10:55 23            MR. LOWELL:  I move into evidence Defense

14:11:01 24    Exhibit 22.

14:11:01 25            MR. WISE:  No objection.

Hallie Biden - cross

14:11:02  1             THE COURT:  Thank you.  It's admitted.

14:11:04  2             (DTX Exhibit No. 22 was admitted into evidence.)

14:11:05  3   BY MR. LOWELL:

14:11:06  4   Q.      Would you put it up on there?  I'm showing you on the

14:11:09  5   screen, a picture of a store called Janssen's Market.  Does

14:11:15  6   that fairly depict?

14:11:16  7   A.      Yes.

14:11:17  8   Q.      The Janssen's that you went to?

14:11:19  9   A.      Yes.

14:11:19 10   Q.      And I see in front there are -- there is at least one

14:11:23 11   trash can.  Do you see that one?

14:11:25 12   A.      Yes.

14:11:25 13   Q.      And I take it there were others just like that down

14:11:27 14   the row?

14:11:28 15   A.      Yes.

14:11:29 16   Q.      Were they behind -- I'm sorry, in between each of

14:11:33 17   those columns?

14:11:34 18   A.      Yes.

14:11:35 19   Q.      Okay.  But that's the kind of thing that you could

14:11:38 20   recall?

14:11:38 21   A.      Yes.

14:11:39 22   Q.      So we saw you pull up, and if you remember the

14:11:52 23   screen, I want to go backwards because colleagues with

14:11:55 24   better memories remind me of something.  When you gathered

14:11:59 25   the things, was there also an iPhone box?

Hallie Biden - cross

14:12:02  1    A.      I don't recall.

14:12:04  2    Q.      Okay.  Do you recall how many things fit into the

14:12:08  3    pouch that has been put into evidence, which was like this

14:12:11  4    big by that big?  You don't?

14:12:14  5    A.      I don't know.  I mean, the pouch wasn't that big.

14:12:16  6    Q.      I'm sorry, it wasn't that big?

14:12:18  7    A.      But you have the pouch, so I don't know what would

14:12:21  8    actually --

14:12:22  9    Q.      Do you have the pouch?

14:12:27 10    A.      They showed it to me.

14:12:29 11    Q.      Yeah I know they showed it to you, but sometimes with

14:12:33 12    a picture it's hard to get the dimensions.

14:12:44 13              MR. LOWELL:  May I approach?

14:12:45 14              THE COURT:  You may.

14:12:46 15    BY MR. LOWELL:

14:12:46 16    Q.      So this has been entered into evidence as exhibit,

14:12:49 17    government Exhibit 4.  And you have identified this as the

14:12:53 18    pouch?

14:12:53 19    A.      Yes.

14:12:53 20    Q.      So as you're looking at this, you're saying that in

14:12:58 21    this, you put a gun?

14:13:00 22    A.      Correct.

14:13:01 23    Q.      A box of bullets?

14:13:02 24    A.      Correct.

14:13:02 25    Q.      Whatever else you found?

Hallie Biden - cross

14:13:05  1    A.        Right.

14:13:05  2    Q.        And you can't remember what else?

14:13:10  3    A.        Correct.

14:13:12  4    Q.        So if an iPhone box was recovered in the bag, that

14:13:19  5    was thrown out by you and recovered by somebody else, do you

14:13:22  6    have any memory of that box?

14:13:24  7    A.        I don't recall the iPhone box.

14:13:27  8    Q.        All right.  So we -- you pulled up at 11:20 and you

14:13:31  9    saw that.  And by now, you definitely have found this.  The

14:13:36 10    video showed you throwing it out.  And then leaving.  I'm

14:13:42 11    sorry, then going into the store.  I think you were standing

14:13:45 12    at, it might have been an ATM machine, that is what that

14:13:49 13    was?

14:13:50 14    A.        That's what it looked like.

14:13:51 15    Q.        And then you got cash, I take it you got cash?

14:13:55 16    A.        Uh-huh.

14:13:55 17    Q.        And then you did or did not remember whether you went

14:13:59 18    shopping?

14:13:59 19    A.        I don't know if I did.

14:14:03 20    Q.        At that point still you hadn't called Hunter, right?

14:14:07 21    A.        Correct.

14:14:07 22    Q.        And what we do know, is that later than when you

14:14:11 23    arrived, that you arrived at 11:20, and then some minutes

14:14:15 24    later, Hunter texts you.  Can you put up the government

14:14:24 25    Exhibit 18, and turn to Row 139.  Row 139, please.

Hallie Biden - cross

14:14:40  1            And this is at 11:45, right?

14:14:44  2   A.     Correct.

14:14:44  3   Q.     So it's after you dropped it off before you return at

14:14:48  4   11:52?

14:14:50  5   A.     Correct.

14:14:50  6   Q.     And he writes you, "did you take that from me,

14:14:54  7   Hallie?"  Is that how you say your name, Hallie?

14:14:57  8   A.     Hallie.

14:14:58  9   Q.     I'm sorry, I knew that.  I listened to them and I got

14:15:02 10   it wrong.

14:15:03 11            "Are you insane.  Tell me now.  This is no game.

14:15:07 12   And you're being totally irresponsible", that's when he

14:15:12 13   first contacts you, is that right?

14:15:14 14   A.     Yes.

14:15:14 15   Q.     And then eight seconds or so later, he writes, "tell

14:15:19 16   me now Hallie."

14:15:26 17   A.     Yes.

14:15:26 18   Q.     And then about 13 minutes later, he text you again?

14:15:31 19   A.     Yes.

14:15:32 20   Q.     Okay.  But in between there was a phone call; right?

14:15:35 21   A.     I don't recall.

14:15:36 22   Q.     Okay.  So if you'll look back to what was in front of

14:15:41 23   you, and I had you stop at Row 71 at 10:30, will you look at

14:15:48 24   Row 72 in the book, Exhibit 17.  So it would be Row 72, it's

14:15:58 25   page 3.

941
Hallie Biden - cross

14:16:07  1   A.      Yes.

14:16:08  2   Q.      When he calls you at 11:46, a minute after the text

14:16:14  3   that we ended up at 11:45, right, so to do the sequence

14:16:19  4   right, that's what happens next, he calls you?

14:16:21  5   A.      Correct.

14:16:22  6   Q.      You didn't call him, he calls you?

14:16:24  7   A.      Correct.

14:16:25  8   Q.      You speak for 1 minute and 56 seconds, almost two?

14:16:28  9   A.      Correct.

14:16:28 10   Q.      That's the conversation in which you do tell him that

14:16:31 11   you found the gun; is that right?

14:16:34 12   A.      Correct.

14:16:34 13   Q.      And by now, you have left the store?

14:16:39 14   A.      Yes.

14:16:40 15   Q.      And gone back --

14:16:41 16   A.      I don't recall.

14:16:42 17   Q.      Okay.  But you know you come back at 11:52, we know

14:16:47 18   that you've dropped it off at 11:20, you certainly weren't

14:16:52 19   there for the 32 minutes in between, right?  You dropped it

14:16:56 20   off and threw it out at 11:20, we have the video?

14:17:00 21   A.      Correct.

14:17:00 22   Q.      And then you left?

14:17:01 23   A.      Right, but I don't know where I went.

14:17:03 24   Q.      I know you don't -- I said home, I'm sorry.  You left

14:17:06 25   the store?

Hallie Biden - cross

14:17:07  1   A.       Correct.

14:17:07  2   Q.       And you came back later at 11:52, that's what the

14:17:11  3   video showed?  It's okay, it's in evidence.

14:17:15  4   A.       Okay.

14:17:15  5   Q.       What I'm trying to do is establish a timeline?

14:17:18  6   A.       Okay.

14:17:18  7   Q.       We know about, those are two bookmarks.  We left, and

14:17:22  8   that's when he text you and you told him for 1 minute 56

14:17:26  9   what happened, right?

14:17:27 10   A.       Yes.

14:17:28 11   Q.       I think you testified that in that conversation he

14:17:30 12   spoke to you and your understanding was he said among other

14:17:33 13   things I'm sure, "go back and get it"?

14:17:37 14   A.       Yes.

14:17:37 15   Q.       You had already left, okay.  Yes?

14:17:40 16   A.       Yes.

14:17:41 17   Q.       And then you go back; right?

14:17:44 18   A.       Yes.

14:17:45 19   Q.       And we saw the video.  You can take that down for

14:17:48 20   now, Mr. Radic.  And you went back and you looked and we saw

14:17:51 21   you looking and you didn't find it?

14:17:53 22   A.       Yes.

14:17:53 23   Q.       And then we saw you come back into your car and then

14:17:56 24   you called him to tell him I didn't find it?

14:18:01 25   A.       Yes.

Hallie Biden - cross

14:18:02  1   Q.      If you look at Row 73.  You see it says Row 73 at

14:18:11  2   11:53, you call him?

14:18:12  3   A.      Yes.

14:18:13  4   Q.      And it says 1:47?

14:18:16  5   A.      Yes.

14:18:16  6   Q.      So you spoke to him for 1 minute and 47 seconds after

14:18:20  7   it is that you found that the gun was gone?

14:18:23  8   A.      Right.

14:18:23  9   Q.      That the bag was gone?

14:18:25 10   A.      Yes.

14:18:25 11   Q.      And I think you said in that conversation, he said to

14:18:29 12   you, "go tell somebody", go tell or make, I think to use

14:18:33 13   your phrase, a police report; right?

14:18:37 14   A.      Right.

14:18:38 15   Q.      So he asked you to do that?

14:18:39 16   A.      Correct.

14:18:40 17   Q.      Okay.  So he wanted you to see what could be done to

14:18:44 18   recover the gun?

14:18:45 19   A.      Correct.

14:18:45 20   Q.      That's when -- what happens next, do you go back into

14:18:49 21   Janssen's?

14:18:50 22   A.      Yes.

14:18:51 23   Q.      Whom did you speak with there?

14:18:53 24   A.      I forget her name.

14:18:55 25   Q.      Somebody in the store?

14:18:57 1   A.      Yeah, in the back office I went.  I think it's the

14:19:01 2   owner's daughter.

14:19:02 3   Q.      An office person?

14:19:03 4   A.      Yes.

14:19:03 5   Q.      And you told them what had happened?

14:19:06 6   A.      Yes.

14:19:06 7   Q.      Do you remember what you told them?

14:19:08 8   A.      I told her what happened, because at first I think I

14:19:12 9   was trying to see if they had any -- if you know, like did

14:19:16 10  you guys take the trash out that quickly, and do you have

14:19:20 11  some cameras that we could look at and then she was looking

14:19:24 12  for that, and then we saw we couldn't figure it out, I said

14:19:29 13  that Hunter told me to file a police report, and you know,

14:19:35 14  she said let's -- do you want me -- you know, we did it

14:19:38 15  together in her office.

14:19:39 16  Q.      Meaning you called the police?

14:19:40 17  A.      We called the police and had them come out and we

14:19:43 18  filed a report on the missing gun.

14:19:45 19  Q.      In terms of a minute by minute time sequence, you

14:19:48 20  went in the office and you spoke to the person you just

14:19:51 21  described?

14:19:51 22  A.      Correct.

14:19:52 23  Q.      Explained to her what happened, and then the two of

14:19:55 24  you, as you recall it, I don't know if both of you can dial.

14:19:58 25  A.      Yeah, she called on speaker, I was upset.

Hallie Biden - cross

14:20:01  1  Q.      I'm sure.   Who wouldn't be?

14:20:03  2  A.      Right.

14:20:03  3  Q.      So then you called the police, but she called on the

14:20:06  4  speaker phone?

14:20:07  5  A.      Correct.

14:20:07  6  Q.      Did you talk to the police at that point or just she

14:20:10  7  summoned them to come because there was an issue?

14:20:13  8  A.      Yeah, can you come here, we want to file a police

14:20:16  9  report, and yes.

14:20:16 10  Q.      On that phone call do you recall her or you saying

14:20:20 11  because I threw a gun out in a bag in the trash, or that

14:20:23 12  didn't happen until they came?

14:20:25 13  A.      I don't recall.

14:20:25 14  Q.      So do you remember how much later that happened that

14:20:29 15  they came?

14:20:30 16  A.      I don't recall.

14:20:32 17  Q.      But they did come?

14:20:33 18  A.      Yes.   I mean I sat there and waited.

14:20:36 19  Q.      And then in that period of time, that would be, if

14:20:40 20  you came back at 11:52, and he told you to please go in, and

14:20:45 21  maybe he didn't use the word please, to go have this report

14:20:49 22  done, then you have additional phone calls in this next

14:20:52 23  period of time.   You call him back at 11:59, if you'll look

14:20:59 24  at Row 74?

14:21:00 25  A.      Yes.

Hallie Biden - cross

14:21:01  1   Q.      And that one is 3 minutes and -- 3 minutes and

14:21:06  2   37 seconds.  Do you got that?

14:21:08  3   A.      Yes.

14:21:08  4   Q.      Now, in the sequence, were the police there yet?

14:21:15  5   A.      I don't know.

14:21:16  6   Q.      And then the next one -- by the way, when you were

14:21:19  7   calling him, you don't know where he is, I take it, or you

14:21:23  8   do at this point?

14:21:23  9   A.      He was at my house.

14:21:25 10   Q.      At this hour, are you sure?

14:21:28 11   A.      No, I don't, I don't know.

14:21:30 12   Q.      Before lunch you indicated that you did know his

14:21:33 13   intention was to drive to Washington D.C.?

14:21:35 14   A.      Well, that's what the text said.

14:21:37 15   Q.      Right.

14:21:38 16   A.      Right.

14:21:39 17   Q.      Okay.  Was it your understanding when he texted that

14:21:43 18   that could be a lie?

14:21:45 19   A.      I don't recall.

14:21:46 20   Q.      If you're at the store and you're calling him all

14:21:48 21   these times, you don't know where he is, do you, he's not at

14:21:52 22   your house at this period of time?

14:21:54 23   A.      At one point he was at my house, because when I

14:21:57 24   called -- when the police were there and I called and said

14:22:00 25   they want you to come over, he came over.

14:22:03   1    Q.      20 minutes later?

14:22:04   2    A.      I don't know.

14:22:05   3    Q.      Well, the report of the police will indicate how

14:22:09   4    long?

14:22:09   5    A.      Yeah.

14:22:09   6    Q.      How far is your house from Janssen's?

14:22:12   7    A.      Two minutes.

14:22:14   8    Q.      So if when you called him and said that you need to

14:22:17   9    come back, if he was at your house, unless he decided to

14:22:22  10    delay for some period of time, that would have been two

14:22:26  11    minutes?

14:22:26  12    A.      If he left right away, yes.

14:22:29  13    Q.      But again, you're not at the house to know where he

14:22:32  14    was?

14:22:32  15    A.      Correct.

14:22:33  16    Q.      So now at the next period of time, 4 minutes later,

14:22:38  17    at 10/23/18 at 12:06, you call him again?

14:22:43  18    A.      Correct.

14:22:44  19    Q.      That's 1 minute and 12, do you see that?

14:22:47  20    A.      Yes.

14:22:47  21    Q.      And then without going through it laboriously, the

14:22:52  22    next four lines down the page are 12:14, 12:14, 12:15,

14:22:58  23    12:18, 12:23, correct?

14:23:01  24    A.      Correct.

14:23:01  25    Q.      And you're calling him each of those occasions and on

Hallie Biden - cross

14:23:06  1    12:27, if you look at Row 82, now you're talking to him for

14:23:12  2    four-and-a-half minutes; right?

14:23:14  3    A.      Yes.

14:23:16  4    Q.      And 15 minutes later, you call him and it's a 4

14:23:22  5    minute phone call; right?

14:23:24  6    A.      Correct.

14:23:25  7    Q.      So if you had already told him that the police were

14:23:29  8    there, or they want to speak to him, from the time that

14:23:32  9    happened, we're now, I don't know, at least 30 minutes from

14:23:38 10    that, if not more, and you keep calling him; right?

14:23:42 11    A.      Right.

14:23:43 12    Q.      Meaning he's not there yet?

14:23:45 13    A.      Right.  He didn't -- I didn't -- the police didn't

14:23:48 14    ask him to until like three quarters of the way for him to

14:23:52 15    come out there, so there was a lot of process.

14:23:55 16    Q.      Okay.  So what are these calls to him if you're still

14:23:59 17    in the process, that is lasting as many minutes as they're

14:24:03 18    lasting?

14:24:05 19    A.      I don't recall.

14:24:05 20    Q.      And then nevertheless, at some point he shows up and

14:24:09 21    your memory is is it's some time after you were talking to

14:24:14 22    the woman in the store and then the police came, sometime

14:24:17 23    after that?

14:24:17 24    A.      Correct.

14:24:17 25    Q.      And you can't place that from these calls?

Hallie Biden - cross

14:24:20  1    A.    Correct.

14:24:20  2    Q.    And so the next thing that happens, the police show

14:24:23  3    up, do you remember the names of the officers?

14:24:25  4    A.    I don't.

14:24:26  5    Q.    And did they talk to you?

14:24:29  6    A.    Yes.

14:24:29  7    Q.    Was the person from the store with you when you were

14:24:32  8    being talked to?

14:24:32  9    A.    Yes.

14:24:33 10    Q.    Was it in the office?

14:24:34 11    A.    In the office.

14:24:35 12    Q.    Okay.  So they asked you the questions they asked

14:24:37 13    you?

14:24:38 14    A.    Correct.

14:24:38 15    Q.    In the office?

14:24:39 16    A.    Correct.

14:24:40 17    Q.    With that person?  Okay.  That's right so far, I have

14:24:44 18    it right?

14:24:44 19    A.    Yes.

14:24:44 20    Q.    And then how long did that take?

14:24:47 21    A.    A long time, well it felt long.

14:24:49 22    Q.    Probably felt like an eternity.

14:24:52 23    A.    Yeah.

14:24:52 24    Q.    Just speaking here, you don't know --

14:24:54 25    A.    I don't know.

Hallie Biden - cross

14:24:55  1   Q.      Okay.  And was it one officer, or two, or do you

14:24:59  2   know?

14:24:59  3   A.      Two.

14:25:00  4   Q.      Was it two from the beginning, or one and then

14:25:03  5   another person came?

14:25:04  6   A.      I don't recall.

14:25:04  7   Q.      But by the time it was done, there were two?

14:25:07  8   A.      Yeah.

14:25:07  9   Q.      Were both of them taking notes or just one?

14:25:10 10   A.      I don't know who was taking notes.

14:25:11 11   Q.      Or if either of them were?

14:25:14 12   A.      Excuse me?

14:25:15 13   Q.      Or if either of them were?

14:25:17 14   A.      No, I don't recall note taking.

14:25:22 15   Q.      In that period of time, we saw a text, and that text

14:25:27 16   I think was the one where -- can you put up government

14:25:33 17   Exhibit 18.  Would you put up government Exhibit 18 and go

14:25:50 18   to Row 145, please.  If you look at 145, that is Row 145.

14:25:54 19   No, not that one.  I'm sorry.  Sorry.  You can pull that

14:26:00 20   down.

14:26:01 21           Would you put up government Exhibit 18 and go to

14:26:19 22   Row 144.  And you have read this before.  This is at 1:23

14:26:24 23   and you're texting him.

14:26:27 24   A.      Okay.

14:26:27 25   Q.      So if you remember the call exchanges that I asked

14:26:31  1    you about, they were 11:00, 11 and change, 12:00, all the

14:26:35  2    way until I asked you whether or not there is one on page 3

14:26:44  3    of the phone calls at 1:15.  Do you see Row 58?  Back on

14:26:55  4    Exhibit 17, page 3, Row 58.

14:27:09  5              MR. WISE:  Is that from the preceding day?

14:27:12  6              MR. LOWELL:  I'm sorry, I screwed that up again,

14:27:14  7    I'm back there.  Thank you for pointing that out.

14:27:18  8    BY MR. LOWELL:

14:27:18  9    Q.    Would you go to page 4, and look at Rows 84 and 85.

14:27:23 10    A.    Yes.

14:27:24 11    Q.    Do you see there is one at 12:55; correct?

14:27:28 12    A.    Correct.

14:27:29 13    Q.    And then one at 1:11.

14:27:32 14    A.    Correct.

14:27:33 15    Q.    The first one you call him, the second one he calls

14:27:36 16    you; right?

14:27:38 17    A.    Correct.

14:27:42 18    Q.    In Row 84, you're calling him.

14:27:46 19    A.    Yes.

14:27:46 20    Q.    And in 85, he's calling you.

14:27:48 21    A.    Yes.

14:27:49 22    Q.    And that's 15 minutes apart?

14:27:53 23    A.    Yes.

14:27:54 24    Q.    Okay.  But that last call is at 1:11 in the

14:27:57 25    afternoon, right?

Hallie Biden - cross

14:27:58 1  A.      Yes.

14:27:58 2  Q.      And then this text, is your sending it to him ten

14:28:04 3  minutes later, 11-12 minutes later, do you see that one?

14:28:08 4  A.      Yes.

14:28:08 5  Q.      "Police coming to talk to me now, I'll take full

14:28:12 6  blame, I don't want to live like this anymore, this is too

14:28:15 7  much for me to handle."  You read that one before lunch.

14:28:19 8  You said you will a take full blame, because "blame" as I

14:28:21 9  understand it, you're the one who took the gun, put it in

14:28:25 10 the pouch, put it in the bag, put it in the trash, threw it

14:28:30 11 out, the gun is now missing, that's what you meant?

14:28:33 12 A.      Yes.

14:28:34 13 Q.      So we can at least know the police haven't arrived

14:28:37 14 yet because they say they're coming?

14:28:39 15 A.      Right.

14:28:47 16 Q.      I'm sorry, I said that, now can you please go back to

14:28:51 17 GX-18, and go to the right thereafter.  And that's the one

14:28:56 18 that you read in which Hunter says "the fucking FBI, it's

14:29:02 19 hard to believe" et cetera, and then it says at the end,

14:29:05 20 "who in their right mind would trust you to help them get

14:29:12 21 sober", do you see that?

14:29:13 22 A.      Yes.

14:29:15 23 Q.      "Me get sober", sorry, starting to wear glasses, it's

14:29:19 24 not working very well.  It says help me get sober, correct?

14:29:23 25 A.      Correct.

Hallie Biden - cross

14:29:24  1    Q.       When he, in prior text, you sometimes use the word

14:29:28  2    clean and sometimes the word sober, right?

14:29:30  3    A.       Correct.

14:29:31  4    Q.       And you testify that he's using alcohol in this

14:29:34  5    period of time?

14:29:35  6    A.       Yes.  Yes.

14:29:36  7    Q.       And so when he is saying to help me get sober, you

14:29:41  8    have no way of knowing whether when he uses that word he's

14:29:44  9    talking about alcohol, drugs, both, or whatever?

14:29:49 10    A.       Correct.

14:29:50 11    Q.       So now we've established that you got visited by the

14:29:53 12    police, you have given a statement or you have talked to

14:29:57 13    them and then Hunter shows up.  Were you there when he

14:30:01 14    showed up?

14:30:02 15    A.       Yes.

14:30:02 16    Q.       Did he come over to you and see how you were?  Were

14:30:07 17    you outside the office yet?

14:30:08 18    A.       No, I was still in the office with the -- but the

14:30:12 19    door, the back door was open, so he came up through the

14:30:15 20    back.

14:30:16 21    Q.       So he came through the back and he saw you?

14:30:18 22    A.       Yes.

14:30:19 23    Q.       Asked you how you were?

14:30:20 24    A.       I don't recall if he asked.

14:30:21 25    Q.       You don't know anything about what that exchange was?

Hallie Biden - cross

14:30:24  1  A.      Yeah, I don't recall.

14:30:25  2  Q.      And do you know then what happened next?  Did then

14:30:29  3  the police talk to him?

14:30:30  4  A.      The police talked to him, they went back out.

14:30:32  5  Q.      Together?

14:30:33  6  A.      Together, he walked with the police and I stayed in

14:30:36  7  there.

14:30:36  8  Q.      And how long was he with the police, do you remember?

14:30:39  9  A.      I don't recall.

14:30:41 10  Q.      But eventually he was done talking to them?

14:30:44 11  A.      Correct.

14:30:44 12  Q.      And at that point, both of you left after that all

14:30:49 13  occurred?

14:30:50 14  A.      Yeah.

14:30:51 15  Q.      Do you know how long that was between the time the

14:30:54 16  police came and spoke to you and spoke to him and then you

14:30:57 17  both left?

14:30:58 18  A.      I don't recall.

14:30:58 19  Q.      I know again it must feel like a week, but was it an

14:31:03 20  hour, two hours?

14:31:05 21  A.      I don't know.

14:31:05 22  Q.      I understand.  So then you went home?

14:31:08 23  A.      I believe so.

14:31:09 24  Q.      You don't remember where you went?  I'm sorry, I

14:31:12 25  didn't hear you?

Hallie Biden - cross

14:31:13  1    A.      I believe so.

14:31:14  2    Q.      No memory, this is a traumatic day and I'm not trying

14:31:19  3    to test your blow by blow unless I could give you something

14:31:23  4    that would help?

14:31:23  5    A.      Right.

14:31:24  6    Q.      Do you think you went home or do you think you went

14:31:26  7    someplace else?

14:31:27  8    A.      I mean, I would probably go home, but I just don't

14:31:32  9    recall driving and getting home.

14:31:34  10   Q.      Hunter didn't come back with you then?

14:31:36  11   A.      I don't recall.

14:31:37  12   Q.      So you don't know where he went?  All right.  So

14:31:41  13   that's on the 23rd.  And thereafter you guys started, poorly

14:31:48  14   phrased, Hunter and you started to continue to talk or text

14:31:54  15   or be communicating.  Yes?

14:31:57  16   A.      Yes.

14:31:57  17   Q.      And when you talked to the police, did you explain to

14:32:03  18   them, or did they ask you why it is that you were going into

14:32:08  19   his vehicle, his truck?

14:32:11  20   A.      I believe so, but I don't totally remember.

14:32:17  21   Q.      Okay.  And you would therefore not remember what you

14:32:21  22   told them at the time?

14:32:22  23   A.      I don't recall.

14:32:22  24   Q.      Did you tell them that you went in looking for drugs?

14:32:26  25   A.      I wouldn't have said that.

Hallie Biden - cross

14:32:27  1    Q.      I'm refreshing your recollection.  Did you tell them

14:32:30  2    you were looking for any evidence that he was with another

14:32:33  3    woman?

14:32:33  4    A.      Maybe, but I don't recall.

14:32:34  5    Q.      Again, ma'am, I'm sorry, I just need to make sure I

14:32:38  6    do know what you recall and what you don't.  On this issue,

14:32:41  7    you don't recall?

14:32:42  8    A.      I don't recall.

14:32:43  9    Q.      I can show you if you'll look at the exhibit in front

14:32:51 10    of you on the front of the book that's now put in front of

14:32:56 11    the book, it was 16, that should be right in front.  Let me

14:33:00 12    make sure it's where I want it to be.  Do you remember that

14:33:04 13    text back and forth?

14:33:06 14    A.      Yes.

14:33:07 15    Q.      Take a look at that.  Do you remember that then after

14:33:10 16    the incident with the gun on the 23rd --

14:33:12 17    A.      This is back to the 13th.

14:33:14 18    Q.      I know, but I'm going to a different page.

14:33:17 19    A.      What page?

14:33:19 20    Q.      I'll get there, I'm going to try to do this the right

14:33:23 21    way.  I'm asking you if you remember after the 23rd you're

14:33:26 22    in touch with him, by text or phone?

14:33:28 23    A.      Likely, yes.

14:33:29 24    Q.      But you don't know where he is on those days

14:33:32 25    necessarily?

Hallie Biden - cross

14:33:32   1    A.        I did not.

14:33:33   2    Q.        Did you reach out for him to come back to your house,

14:33:36   3    do you recall?

14:33:36   4    A.        I don't recall.

14:33:37   5    Q.        If you'll turn to Row 31 on that exhibit, just look

14:33:43   6    down.

14:33:50   7    A.        Yes.

14:33:54   8    Q.        I think I'm right about the row, let me check.  Yes,

14:34:02   9    if you look at Row 31?

14:34:04  10    A.        Yes.

14:34:04  11    Q.        Look at that.  And after you have read it to

14:34:08  12    yourself, would you look up and tell me whether it refreshes

14:34:11  13    your recollection as to whether or not you were reaching out

14:34:14  14    to come back?

14:34:14  15    A.        It doesn't recall a recollection.

14:34:16  16    Q.        But again, in this period of time, you're texting

14:34:19  17    him, right?

14:34:20  18    A.        Correct.

14:34:20  19    Q.        And you were texting him to the same place that this

14:34:24  20    morning I asked you about?

14:34:25  21    A.        Yes.

14:34:26  22    Q.        I mean his phone from your phone?

14:34:28  23    A.        Yes.

14:34:28  24    Q.        And you knew that at the time you were writing what

14:34:32  25    you were writing contemporaneously by texting him, this is

14:34:36  1   not afterwards, this is at the time?

14:34:38  2   A.      Correct.

14:34:41  3              MR. LOWELL:  So with that I am going to ask to

14:34:43  4   read that line as I earlier did on other texts.

14:34:48  5              MR. WISE:  No objection, Your Honor.

14:34:49  6              THE COURT:  Excuse me?

14:34:51  7              MR. WISE:  No objection, Your Honor.

14:34:53  8   BY MR. LOWELL:

14:34:53  9   Q.      On October 27th of 2018 at 10:27, you write, "don't

14:34:58 10   come back to the house, obviously you have something in New

14:35:01 11   York more important to you than me."  Right?  That's what

14:35:06 12   that said?

14:35:07 13   A.      That's what that said.

14:35:08 14   Q.      So you were concerned that he was with somebody else?

14:35:12 15   A.      That's what that says, yes.

14:35:13 16   Q.      And that's on the 27th?  How would you characterize

14:35:18 17   at that point after the gun incident the nature of your

14:35:21 18   relationship with him, more tense, less tense, back to

14:35:25 19   normal?

14:35:26 20   A.      More tense.

14:35:28 21   Q.      Nevertheless, right after that, remember I asked you

14:35:32 22   before lunch whether Hunter came back from California, and

14:35:36 23   on that first day went with you to that facility that I

14:35:39 24   called, or I think it's named Caron?

14:35:42 25   A.      Yes.

Hallie Biden - cross

14:35:43  1    Q.      I think that's C-A-R-O-N?

14:35:45  2    A.      Correct.

14:35:46  3    Q.      At that period of time when you were still, or he was

14:35:49  4    doing check-ins or any rehabilitation, he went with you

14:35:53  5    again?

14:35:53  6    A.      I don't recall.

14:35:54  7    Q.      Do you recall going to either an AA, AA means

14:36:02  8    Alcoholics Anonymous, meeting later in the month right after

14:36:04  9    this event?

14:36:04 10    A.      I mean, I don't recall, but I was going every day.

14:36:09 11    Q.      And do you remember at the end of the month, he went

14:36:11 12    with you to one of them?

14:36:14 13    A.      I don't recall exactly.

14:36:16 14    Q.      Okay.  Again, to see if it refreshes your

14:36:23 15    recollection, if you'll look at Rows 39, 40, and 41.  Take a

14:36:34 16    look at that and tell me when you're done?

14:36:36 17            MR. WISE:  There is no 41.

14:36:38 18            THE WITNESS:  There is just 42.

14:36:39 19    BY MR. LOWELL:

14:36:40 20    Q.      Oh, I'm sorry, yes, I'm sorry.  I'm sorry, I did that

14:36:44 21    wrong, I just thought they were sequential.  39, 40 and 42.

14:36:50 22    Take a look and tell me when you have read that?

14:36:53 23    A.      Yes.

14:36:53 24    Q.      Does that refresh your recollection that you were at

14:36:55 25    a facility, facility is a bad word, doing what you said you

Hallie Biden - cross

14:37:00  1    were going every day?

14:37:01  2    A.      Yes.

14:37:01  3    Q.      Does that refresh your recollection that he joined

14:37:03  4    you there?

14:37:04  5    A.      I mean, I don't recall all this, but that's what that

14:37:07  6    says.

14:37:07  7    Q.      If you don't recall it, that's fine, again, I'm just

14:37:10  8    going to go through.

14:37:11  9    A.      Yes.

14:37:11 10    Q.      I'm sorry, this is the text you sent?

14:37:13 11            MR. WISE:   I'm going to object, Your Honor, this

14:37:16 12    doesn't actually reflect an AA meeting.

14:37:20 13    BY MR. LOWELL:

14:37:20 14    Q.      Did he at the end of the month -- I?

14:37:23 15            MR. LOWELL:   I withdraw the question and I'll do

14:37:24 16    it again.

14:37:25 17    BY MR. LOWELL:

14:37:26 18    Q.      You're not disputing with me that he would go with

14:37:29 19    you to such a meeting at the end of the month?

14:37:30 20    A.      I don't recall.

14:37:31 21    Q.      One way or the other, no recall at all?

14:37:35 22    A.      Right.

14:37:35 23    Q.      There are some things you remember and many things

14:37:37 24    you don't?

14:37:38 25    A.      I don't recall him coming to an AA meeting with me.

Hallie Biden - cross

14:37:41  1   Q.     And looking at this set of texts doesn't refresh your

14:37:45  2   recollection about that?

14:37:45  3   A.     It does not.

14:37:46  4   Q.     Later in November, this is at the end of the month,

14:37:49  5   you were shown some other texts, one of which he is telling

14:37:53  6   you on the 3rd, looking at himself, he says "I'm a drunk,

14:37:57  7   I'm an addict, I've ruined every relationship I have ever

14:38:02  8   been in", you were asked questions about that, right?

14:38:04  9   A.     Yes.

14:38:04 10   Q.     When you go to an Alcoholics Anonymous meeting, is it

14:38:08 11   typical for the meeting to start with saying "hi, I'm Hunter

14:38:12 12   Biden, and I'm an alcoholic" or "I'm an addict"?

14:38:16 13   A.     Yes.

14:38:17 14   Q.     You understand, have you ever had to say that, not

14:38:20 15   had to, do you ever say that?

14:38:21 16   A.     Yes, I do.

14:38:22 17   Q.     At the time you say that, that doesn't mean you're an

14:38:25 18   addict other than in the sense that you're always an addict?

14:38:28 19   A.     Correct.

14:38:29 20   Q.     And then at some point at the beginning of November,

14:38:32 21   you had a text where he said that and then you know that he

14:38:35 22   then in November, after the gun incident, went to a

14:38:38 23   different kind of treatment; correct?

14:38:41 24   A.     Correct.

14:38:41 25   Q.     In Massachusetts?

Hallie Biden - cross

14:38:42 1    A.    Yes.

14:38:42 2    Q.    And that was in November?

14:38:46 3    A.    Yes.

14:38:47 4    Q.    That was a month after the gun sale?

14:38:49 5    A.    Yes.

14:38:49 6    Q.    Weeks after the event with the police investigating

14:38:54 7    and talking to him?

14:38:55 8    A.    I don't know that.

14:38:57 9    Q.    In November, you know it was in November?

14:39:00 10   A.    What was in November?

14:39:01 11   Q.    That he went to Massachusetts?

14:39:03 12   A.    No, I thought you meant the police, and you said --

14:39:05 13   Q.    The police talking to you on October 23rd?

14:39:08 14   A.    Yeah, I'm sorry.

14:39:09 15   Q.    I'm sorry, again, bad question.  October 23rd and

14:39:12 16   then weeks later he's up going to Massachusetts?

14:39:15 17   A.    Yes.

14:39:15 18   Q.    And indeed you drove him?

14:39:18 19   A.    Yes.

14:39:18 20   Q.    That you remember; right?

14:39:21 21   A.    I do remember the drive.

14:39:23 22   Q.    Okay.  So he and you were still working together at

14:39:27 23   least in terms of trying to help him?

14:39:28 24   A.    Yes.

14:39:28 25   Q.    And you do remember he was attending some meetings

Hallie Biden - cross

14:39:32 1  with you even if you can't say that's one of them?

14:39:34 2  A.      Correct.

14:39:35 3  Q.      You drove him up, right?

14:39:36 4  A.      Yes.

14:39:36 5  Q.      And then you didn't see him for a bit I take it after

14:39:40 6  that?

14:39:41 7  A.      Correct.

14:39:41 8  Q.      So lastly, between October the 6th and October

14:39:48 9  the 12th, you don't know that you ever saw him in that

14:39:51 10 six-day period; right?

14:39:52 11 A.      Correct.

14:39:52 12 Q.      You don't know if he was drinking, using, or either

14:39:56 13 of the above?

14:39:57 14 A.      I don't know.

14:39:58 15 Q.      And between the 12th and the 23rd, when the gun

14:40:02 16 incident occurred, you did not see him do drugs or even

14:40:05 17 alcohol in that period of time, did you?

14:40:07 18 A.      Correct.

14:40:07 19 Q.      And then afterward back in November is when he's

14:40:11 20 checking himself back in to rehab in Massachusetts?

14:40:14 21 A.      Yes.

14:40:15 22         MR. LOWELL:  Sorry I took so long.  That's all

14:40:17 23 the questions I have.

14:40:19 24         THE COURT:  Thank you.

14:40:19 25         Mr. Wise, redirect.

Hallie Biden - redirect

14:40:22  1          MR. WISE:  Thank you, Your Honor.

14:40:23  2                    REDIRECT EXAMINATION

14:40:25  3   BY MR. WISE:

14:40:35  4   Q.    I just have a few questions, Ms. Biden.  The first is

14:40:39  5   were you married just this past weekend, recently?

14:40:42  6   A.    Yes.

14:40:43  7   Q.    And is your husband in the audience?

14:40:45  8   A.    Yes.

14:40:46  9   Q.    And at the breaks have you been looking at him and

14:40:49 10   him looking at you?

14:40:50 11   A.    Yes.

14:40:50 12   Q.    Has any of that had anything to do with your -- the

14:40:54 13   substance of your testimony?

14:40:55 14   A.    No, just support.

14:40:57 15   Q.    Now, Mr. Lowell asked you, he asked you about some

14:41:01 16   phone records, I want to briefly touch on that.  He asked

14:41:04 17   you whether you had a call on the morning of the 23rd at

14:41:08 18   9:51 with Mr. Biden, that he didn't answer, the defendant,

14:41:13 19   that he didn't answer.  Do you remember that, do you

14:41:15 20   remember him asking that?

14:41:16 21   A.    I'm getting awfully confused now with the phone calls

14:41:20 22   and I don't have a picture in front of me.

14:41:22 23          THE COURT:  Slow down.

14:41:24 24   BY MR. WISE:

14:41:24 25   Q.    I think Mr. Lowell asked you, he had you look at some

14:41:27  1    phone records, which was Defense Exhibit 17, which I think

14:41:30  2    is still -- in his book?

14:41:33  3              Yeah, it should be still up there.

14:41:35  4    A.      Uh-huh.   And the --

14:41:37  5    Q.      Go to the first one in a second, but just to be

14:41:41  6    clear, you saw the defendant, as you testified on direct,

14:41:45  7    either late in the evening on the 22nd or in the middle of

14:41:48  8    the night or that morning on the 23rd, right?

14:41:51  9    A.      Yeah.

14:41:52 10    Q.      And I think you used the phrase, if he came in in the

14:41:55 11    middle of the night, came into bed in the middle of the

14:41:59 12    night or the next morning, you put eyes on him?

14:42:02 13    A.      Yes.

14:42:02 14    Q.      That's when you testified that he looked exhausted,

14:42:05 15    you weren't sure if he had been using drugs, right?

14:42:08 16    A.      Correct.

14:42:08 17    Q.      And that's why you went and searched the car; right?

14:42:11 18    A.      Correct.

14:42:12 19    Q.      Based on your observations of him?

14:42:14 20    A.      Yes.

14:42:16 21    Q.      At some point that morning, he left your house;

14:42:20 22    right?

14:42:21 23    A.      Yes.

14:42:21 24    Q.      And you don't remember when?

14:42:23 25    A.      Correct.

Hallie Biden - redirect

14:42:23  1    Q.      And if you look at 17, defense 17 on page 3,

14:42:29  2    Mr. Lowell asked you about a phone call.  This is line 68.

14:42:35  3    The earliest phone call in this string is 9:51 a.m., right?

14:42:40  4    A.      Yes.

14:42:40  5    Q.      So if you come in the middle of the night or early in

14:42:43  6    the morning, this call would have been long after that,

14:42:46  7    right?

14:42:47  8            MR. LOWELL:  It depends on when in the early

14:42:49  9    morning you're talking about, judge, right?  Object to the

14:42:51 10    way he characterizes it, he's leading her.

14:42:55 11            MR. WISE:  I'm sorry, let me do that again.

14:42:57 12            MR. LOWELL:  Objection, leading.

14:42:58 13            THE COURT:  Okay.  Do you want to ask it in an

14:43:01 14    un-leading way?

14:43:02 15            MR. WISE:  Sure.

14:43:03 16    BY MR. WISE:

14:43:03 17    Q.      Did he come to your house?

14:43:05 18    A.      Yes.

14:43:05 19    Q.      Do you remember when?

14:43:08 20    A.      I don't.

14:43:10 21    Q.      Was it the middle of the night?

14:43:13 22    A.      I don't know.

14:43:15 23    Q.      Or the early morning?

14:43:16 24    A.      Could have been the early morning.

14:43:18 25    Q.      But you saw him at some point either middle of the

Hallie Biden - redirect

14:43:23  1    night or early morning?

14:43:24  2    A.      Yeah.

14:43:25  3                  MR. LOWELL:  Objection, four times.

14:43:26  4                  THE COURT:  Did you -- ask it in an open ended

14:43:30  5    way.

14:43:31  6                  MR. LOWELL:  That's the fourth time he's asked

14:43:33  7    the same question.

14:43:33  8                  THE COURT:  I think he's trying.

14:43:35  9                  MR. LOWELL:  I understand, all right, just

14:43:37 10    leading.

14:43:37 11    BY MR. WISE:

14:43:38 12    Q.      Did you see him that morning?

14:43:39 13    A.      Yes.

14:43:39 14    Q.      At some point, you left, right?

14:43:42 15    A.      Correct.

14:43:43 16    Q.      And at some point he left?

14:43:45 17    A.      Correct.

14:43:45 18    Q.      And at some point you talked on the phone?

14:43:48 19    A.      Correct.

14:43:49 20    Q.      And the earliest phone call that Mr. Lowell asked you

14:43:54 21    about was defense 17, line 68, was 9:51 a.m.; right?

14:44:01 22    A.      Correct.

14:44:03 23    Q.      That's not in the middle of the night, right?

14:44:06 24    A.      Correct.

14:44:06 25    Q.      And that's not early in the morning?

14:44:08  1   A.       Correct.

14:44:08  2   Q.       And then he asked you about some text messages, the

14:44:11  3   first one was the one that referenced Uber, and this is

14:44:17  4   defense 16.  And the time, do you have that, 16?  Defense

14:44:29  5   16, it should be the one right before it.

14:44:41  6   A.       At what time now?

14:44:43  7   Q.       Line 20?

14:44:44  8   A.       Yes.

14:44:44  9   Q.       And that text he read into the record was even later,

14:44:49 10   that's 10:23 a.m.; right?

14:44:51 11   A.       Right.

14:44:52 12   Q.       Again, not the middle of the night; right?

14:44:55 13   A.       Right.

14:44:55 14   Q.       Not early in the morning?

14:44:57 15   A.       Correct.

14:44:58 16   Q.       Now he asked you about AA meetings, right?

14:45:08 17   A.       Yes.

14:45:08 18   Q.       And he said when people go to these meetings, they

14:45:12 19   introduce themselves and they say their name and they say

14:45:15 20   I'm an addict; right?

14:45:18 21   A.       Or an alcoholic, yes.

14:45:19 22   Q.       Or an alcoholic.  In your experience, why would they

14:45:23 23   say that?

14:45:25 24   A.       Because that's what you say -- I mean, because you

14:45:32 25   believe that's what you are.  But -- but I go to AA, which

Marley - direct

14:45:38 1 is alcoholics anonymous, even though, you know, my addiction

14:45:43 2 was drugs.  So I just like it better.  So you can, you know,

14:45:48 3 use it in all different ways.

14:45:50 4 Q.     Sure.  But you say it because you mean it, right?

14:45:55 5 A.     Correct.

14:45:55 6         MR. WISE:  Thank you.  Nothing further.

14:45:57 7         THE COURT:  All right.  Thank you.

14:46:27 8         THE COURT:  All right.  What's next?

14:46:29 9         MR. HINES:  Your Honor, the United States calls

14:46:33 10 Joshua Marley.

14:46:36 11        COURTROOM DEPUTY:  Please raise your right hand.

14:46:41 12 Please state and spell your full name for the record.

14:46:45 13        THE WITNESS:  Joshua Marley.  J-O-S-H-U-A,

14:46:55 14 M-A-R-L-E-Y.

14:46:56 15        JOSHUA MARLEY, having been duly sworn was

14:47:00 16 examined and testified as follows:

14:47:04 17                DIRECT EXAMINATION

14:47:05 18 BY MR. HINES:

14:47:13 19 Q.     Good afternoon, sir.

14:47:14 20 A.     Good afternoon.

14:47:14 21 Q.     What do you do for a living?

14:47:16 22 A.     I'm a State Trooper for State of Delaware.

14:47:19 23 Q.     How long have you been a State Trooper for the

14:47:22 24 Delaware State Police?

14:47:23 25 A.     Approximately 15 years.

Marley - direct

14:47:24 1    Q.    And what is your current title?

14:47:26 2    A.    I am a master corporal with uniformed patrol division

14:47:31 3    troop 9.

14:47:32 4    Q.    Can you describe for us your training and experience

14:47:36 5    over the years?

14:47:36 6    A.    Sure.  The academy lasts six months, it's a live-in

14:47:40 7    academy, it's three months to the road with a seasoned

14:47:42 8    officer, and then ongoing education throughout the life span

14:47:47 9    of the career.

14:47:48 10   Q.    Are you familiar with Janssen's Market in the suburbs

14:47:53 11   of Wilmington here?

14:47:54 12   A.    Yes.

14:47:54 13   Q.    Where is Janssen's Market located?

14:47:57 14   A.    It's on Route 52 in Greenville.

14:48:00 15   Q.    Do you get many calls to that location?

14:48:02 16   A.    Rarely, Greenville is a pretty quiet neighborhood.

14:48:06 17   Q.    Did you respond to an incident at Janssen's Market on

14:48:09 18   October 23rd, 2018?

14:48:11 19   A.    I did.

14:48:11 20   Q.    Were you on patrol that day?

14:48:14 21   A.    Correct.

14:48:14 22   Q.    What was the incident you responded to on

14:48:17 23   October 23rd, 2018?

14:48:18 24   A.    A stolen handgun.

14:48:20 25   Q.    Did you go to the Janssen's Market?

Marley - direct

14:48:22  1    A.      Yes.

14:48:23  2    Q.      What did do you when you arrived?

14:48:25  3    A.      I viewed video in reference to the handgun being

14:48:30  4    disposed of in a trash can on the east side of the exterior

14:48:33  5    and then searched the trash cans.

14:48:37  6    Q.      So had you been advised that a handgun was missing

14:48:41  7    and was in a trash can?

14:48:42  8    A.      Yes.

14:48:43  9    Q.      Is that why you began looking at the video

14:48:45 10    surveillance?

14:48:46 11    A.      Yes.

14:48:46 12    Q.      Ultimately, were you able -- did you take any steps

14:48:50 13    to look for the handgun?

14:48:51 14    A.      Yes, we emptied the trash cans.

14:48:53 15    Q.      Around the exterior?

14:48:54 16    A.      Yes, on the -- yeah.

14:48:56 17    Q.      How long did that take?

14:48:58 18    A.      Maybe 10 or 15 minutes.

14:49:01 19    Q.      Were there any other officers there with you that

14:49:05 20    day?

14:49:05 21    A.      Yes, Sergeant Clemons.

14:49:06 22    Q.      Did Hunter Biden arrive at the Janssen's Market at

14:49:11 23    some point in time later that day?

14:49:13 24    A.      Yes.

14:49:13 25    Q.      Was he interviewed in your presence, and did you

Marley - direct

14:49:16  1  participate in an interview with him?

14:49:18  2  A.    He was interviewed in my presence, I don't know if I

14:49:21  3  participated much.

14:49:22  4  Q.    How far away were you standing from him during the

14:49:25  5  course of this interview?

14:49:26  6  A.    If I recall correctly, just a couple of feet.

14:49:29  7  Q.    Who else was with you?

14:49:30  8  A.    Sergeant Clemons.

14:49:31  9  Q.    Was Sergeant Clemons asking the questions and you

14:49:34 10  were sort of recording the answers?

14:49:36 11  A.    Correct.

14:49:36 12  Q.    When you interviewed Hunter Biden, were you looking

14:49:39 13  for the missing gun?

14:49:41 14  A.    Yes, I think at that point, the gun, we couldn't find

14:49:45 15  the gun in the trash can.

14:49:47 16  Q.    Was it a voluntary interview in the sense that Hunter

14:49:51 17  Biden was not under arrest, he was there, he was free to

14:49:53 18  leave if he wanted to?

14:49:54 19  A.    Correct, I believed he was the victim the entire

14:49:57 20  time.

14:49:57 21  Q.    Do you believe he was the victim because his handgun

14:50:00 22  had been stolen, or was that at least the investigation at

14:50:03 23  that time?

14:50:03 24  A.    Yes.

14:50:04 25  Q.    And is that how it was reported at least?

Marley - direct

14:50:06  1    A.       Yes, that the gun was removed from his vehicle.

14:50:10  2    Q.       Did Hunter Biden say anything about who owned the gun

14:50:13  3    that was missing?

14:50:14  4    A.       Yeah, he said he had purchased the gun on either the

14:50:17  5    12th or the 13th from StarQuest Shooter.

14:50:20  6    Q.       Hunter Biden had said he himself had purchased the

14:50:23  7    gun?

14:50:24  8    A.       Yes.

14:50:24  9    Q.       Did he say anything about how he discovered the gun

14:50:27 10    was missing?

14:50:28 11    A.       I believe he just went into his vehicle and found it

14:50:32 12    was missing from the center console.

14:50:34 13    Q.       Did he say that?

14:50:34 14    A.       I think so.

14:50:35 15    Q.       Did you prepare a report?

14:50:36 16    A.       Yes.

14:50:37 17    Q.       Would that be reflected in your report, if he had

14:50:42 18    said it?

14:50:42 19    A.       Yes.

14:50:43 20    Q.       Would it refresh your recollection to see that

14:50:45 21    report?

14:50:45 22    A.       Sure, yeah.

14:50:54 23             MR. HINES:  May I approach, Your Honor?

14:50:56 24             THE COURT:  You may.

14:51:03 25    BY MR. HINES:

Marley - direct

14:51:04  1    Q.      Could you read that second sentence there, starting

14:51:07  2    with that word?

14:51:10  3    A.      To be advised --

14:51:12  4    Q.      No, just read it to yourself?

14:51:14  5    A.      I'm sorry, okay.

14:51:16  6    Q.      Does that refresh your recollection as to whether or

14:51:20  7    not Hunter Biden said where he had -- his gun had been?

14:51:25  8    A.      Yes.

14:51:25  9    Q.      What did he say?

14:51:26 10    A.      That it was missing from the center console of the

14:51:28 11    vehicle.

14:51:32 12    Q.      He indicated where he had purchased the gun?

14:51:37 13    A.      Yes.

14:51:37 14    Q.      What was the location where he had purchased it?

14:51:39 15    A.      The StarQuest Shooters gun shop on Concord Pike.

14:51:43 16    Q.      What did you do next in the course of your

14:51:46 17    investigation?

14:51:46 18    A.      I responded there to recover the serial number,

14:51:48 19    because Mr. Biden was not sure of what that was.

14:51:51 20    Q.      Before you had left, had you asked Mr. Biden what the

14:51:55 21    serial number was?

14:51:55 22    A.      I think Sergeant Clemons did.

14:51:57 23    Q.      Did he answer that he didn't know?

14:51:59 24    A.      That he didn't know.

14:52:00 25    Q.      Did he say anything about a case for the weapon?

Marley - cross

14:52:03  1    A.       That I think in my report it says that he wasn't

14:52:08  2    quite sure where the case was, and it wasn't with him at the

14:52:10  3    time, it was important that we got that serial number and

14:52:13  4    entered the gun as stolen in the NCIC in a timely fashion.

14:52:18  5    Q.       Ultimately, did you go to StarQuest and confirm what

14:52:21  6    that serial number was?

14:52:23  7    A.       No.

14:52:23  8    Q.       Did you write a report that day reflecting the events

14:52:27  9    of that day?

14:52:27 10    A.       Yes.

14:52:28 11    Q.       And then is it your understanding that Lieutenant

14:52:32 12    Millard Greer was assigned to follow-up on your report after

14:52:35 13    October 23rd, 2018?

14:52:36 14    A.       Correct.

14:52:41 15           MR. HINES:  No further questions.

14:52:43 16           THE COURT:  Mr. Lowell.

14:52:44 17           MR. LOWELL:  Yes, ma'am.

14:52:46 18                 CROSS-EXAMINATION

14:52:46 19    BY MR. LOWELL:

14:52:47 20    Q.       Good afternoon.

14:52:48 21    A.       Sir.

14:52:49 22    Q.       My name is Abbe Lowell, I'm one of Mr. Biden's

14:52:53 23    attorneys.

14:52:53 24           In the sequence of events, did you arrive at

14:52:58 25    Janssen's first or did Sergeant Clemons?

Marley - cross

14:53:02  1   A.      Sergeant Clemons.

14:53:03  2   Q.      How soon after he arrived did you arrive?

14:53:06  3   A.      I'm not sure.

14:53:08  4   Q.      Momentarily or could it have been some minutes?

14:53:11  5   A.      Probably some minutes.

14:53:12  6   Q.      Was he already in the office of the store talking to

14:53:17  7   Ms. Biden when you arrived?

14:53:18  8   A.      I'm not sure.

14:53:20  9   Q.      Okay.  But at some point did you also go into that

14:53:23 10   office?  You said that you saw him, him being Mr. Clemons?

14:53:28 11   A.      I spoke with Mr. Clemons, or Sergeant Clemons

14:53:32 12   outside, and I know I viewed the video, but I'm not sure if

14:53:35 13   I was ever in the office with anyone else at the same time.

14:53:38 14   Q.      So if there is any part of the police report about

14:53:44 15   the questions asked, like the ones that Mr. Hines just asked

14:53:48 16   you about what Mr. Biden said, that's not in your earshot

14:53:53 17   because you're outside and it's Mr. Clemons doing this, is

14:53:58 18   that right?

14:53:58 19   A.      Correct.  I was outside by the loading docks.

14:54:01 20   Q.      Right.

14:54:02 21   A.      But if there was --

14:54:04 22   Q.      Sorry go ahead?

14:54:05 23   A.      If there was something inside, I probably wasn't

14:54:08 24   there.

14:54:08 25   Q.      So anything that Ms. Biden said, you weren't there to

Marley - cross

14:54:13  1  hear?

14:54:13  2  A.      Correct.  I never -- I don't think I ever even saw

14:54:16  3  Ms. Biden.

14:54:17  4  Q.      And your arrival, did that come before, at the same

14:54:21  5  time or after Hunter arrived?

14:54:23  6  A.      I think I was there before.

14:54:25  7  Q.      You're not sure?

14:54:26  8  A.      I'm not sure.

14:54:28  9  Q.      And you have no idea where he came from?

14:54:30 10  A.      Like previous to the market?

14:54:32 11  Q.      Right.  Before the moment he arrives at Janssen's, do

14:54:36 12  you know where he was?

14:54:37 13  A.      No.

14:54:37 14  Q.      Do you know how long it took to get him there?

14:54:40 15  A.      No.

14:54:41 16  Q.      At some point you said that I think you were seeking,

14:54:44 17  of course, to get the serial number, to see if it was in the

14:54:48 18  system?

14:54:48 19  A.      Getting the serial number so we could enter it into

14:54:52 20  the system as stolen.

14:54:53 21  Q.      To enter it as stolen?

14:54:55 22  A.      Correct, with it being stolen by, we didn't know who

14:54:58 23  at that time, it was important to get it in as stolen before

14:55:02 24  it could be used in a crime.

14:55:04 25  Q.      Did you collaborate with Sergeant Clemons to write

Marley - cross

14:55:07  1   the police report that you were shown to refresh your

14:55:11  2   recollection?

14:55:11  3   A.      Collaborate as far as, I did my report and he also

14:55:17  4   wrote his report on his own.

14:55:18  5   Q.      Say that last part?

14:55:19  6   A.      He also did a report.

14:55:20  7   Q.      So if in the police report of that day at the bottom

14:55:24  8   of the page it has the name Sergeant Clemons, does that mean

14:55:27  9   what's on the page was his or it's something that you both

14:55:32 10   would have collaborated about, but he wrote it?

14:55:35 11   A.      I'm not --

14:55:37 12   Q.      Do you still have -- did you give him that?

14:55:42 13               MR. LOWELL:  May I approach?

14:55:43 14               THE COURT:  You may.

14:55:44 15               MR. LOWELL:  Thank you.

14:55:45 16   BY MR. LOWELL:

14:55:46 17   Q.      You were shown this to refresh your recollection.

14:55:48 18   Can you do that again for me?  Just take a look at that,

14:55:51 19   look down, I want you to see the bottom, I want you to see

14:55:55 20   where there are names, and tell us whether or not that

14:55:57 21   refreshes your recollection as to who is responsible for the

14:55:59 22   words on a page?

14:56:00 23   A.      So this one would be myself.

14:56:02 24   Q.      This one, meaning the front page?

14:56:05 25   A.      Correct.

Marley - cross

14:56:05  1  Q.      Now if you'll turn to the second page.

14:56:09  2  A.      Also myself.

14:56:11  3  Q.      Okay.  Third page?

14:56:12  4  A.      Still myself.

14:56:13  5  Q.      Now on the fourth page, if your report has again, as

14:56:17  6  I was asking, a name at the bottom, does that reflect what?

14:56:21  7  A.      That would be Sergeant Clemons.

14:56:23  8  Q.      That's not your writing, if he asked questions,

14:56:25  9  that's what is reflected in the report?

14:56:28 10  A.      Right.  So that would be his report.

14:56:31 11  Q.      Okay.  I understand.  Did you review what he wrote?

14:56:35 12  A.      No.

14:56:36 13  Q.      And whether he wrote this, it's all typed up in a

14:56:39 14  nice form.  That's not what was done on the scene, right?

14:56:43 15  A.      No, this would be later.

14:56:44 16  Q.      Later the day, later the next day, do you know when?

14:56:47 17  A.      We have three days to complete a report.  So I'm not

14:56:52 18  exactly sure.

14:56:53 19  Q.      Okay.  Before it becomes finalized, whatever that

14:56:57 20  means, do you read it?  The report?

14:57:01 21  A.      Before I submit it in for approval?

14:57:04 22  Q.      Yes.

14:57:05 23  A.      Yes, I read it.

14:57:06 24  Q.      At the point at which you did that for this form, had

14:57:09 25  Mr. Clemons already put his part in?

14:57:12  1    A.      I don't know.

14:57:13  2    Q.      But you see it in the report that it's a number of

14:57:16  3    pages, some his and some yours?

14:57:18  4    A.      Correct.  So it would be two separate reports under

14:57:22  5    the same number, so like a supplement.

14:57:24  6    Q.      So part could happen one time, and then the next part

14:57:28  7    happens another time, and at the end of the process it's one

14:57:31  8    report which has all the parts in it?

14:57:33  9    A.      Yes, if it's the same report number, yes, you could

14:57:36 10    do supplements at any given time, you know, a day later, a

14:57:40 11    month later if new evidence comes up or whatever.

14:57:43 12    Q.      Got it.  If there is something about what Ms. Biden

14:57:46 13    said, you weren't in her earshot, but it would be in the

14:57:50 14    report if Mr. Clemons took that interview?

14:57:52 15    A.      I would imagine.

14:57:53 16    Q.      Did you know, did you review what it was he wrote

14:57:57 17    down that she said?

14:57:58 18    A.      No.

14:57:58 19    Q.      And you have never looked at that?

14:58:00 20    A.      Not that I remember.

14:58:01 21    Q.      And the next thing that happened is after you were

14:58:05 22    there, Mr. Clemons was also the one, I'm going to use the

14:58:09 23    word interview, but asked questions of Mr. Biden?

14:58:12 24    A.      Yes.

14:58:13 25    Q.      And I think you were outside, but were you in

Marley - cross

14:58:16  1    earshot, did you say?

14:58:17  2    A.    Right, I think all three of us were outside.

14:58:20  3    Q.    Mr. Biden, Mr. Clemons and yourself?

14:58:23  4    A.    Yes.

14:58:24  5    Q.    And Ms. Biden was not there?

14:58:25  6    A.    Correct.  I don't really ever recall even seeing

14:58:29  7    here.

14:58:29  8    Q.    So he's interviewing Mr. Biden, you're not doing

14:58:34  9    that?

14:58:34 10    A.    Yes.

14:58:34 11    Q.    He would be responsible for putting down what you

14:58:38 12    were refreshed as to what Mr. Biden said?

14:58:39 13    A.    Yes.

14:58:40 14    Q.    When you were doing that, you were refreshed that he

14:58:43 15    admitted right away that he had been the one to buy the gun?

14:58:46 16    A.    Yes.

14:58:46 17    Q.    He told you where?

14:58:47 18    A.    Correct.

14:58:48 19    Q.    And he told you where he thought it was?

14:58:51 20    A.    Yes.

14:58:51 21    Q.    And then after that you were seeking the serial

14:58:55 22    number?

14:58:55 23    A.    Yes.

14:58:55 24    Q.    He didn't know that by heart I take it, right?

14:58:59 25    A.    Right.

Marley - cross

14:59:00 1  Q.      At some point, was it you or Mr. Clemons asked him if

14:59:04 2  he could go find the seal serial number for the box in which

14:59:08 3  it came, did you do that?

14:59:09 4  A.      I did not.

14:59:09 5  Q.      That would have been Mr. Clemons?

14:59:11 6  A.      Yes.

14:59:12 7  Q.      Were you there when he left to do that, or do you

14:59:14 8  know if he went to do that?

14:59:15 9  A.      I don't know.  I think I had left pretty quickly to

14:59:19 10 go try and attempt to get it on my own.

14:59:21 11 Q.      So you went to StarQuest and you don't know whether,

14:59:25 12 or when Mr. Biden went wherever he went?

14:59:27 13 A.      Right, I don't think I returned back to Janssen's.

14:59:31 14 Q.      That was what I wanted to know if you went back, you

14:59:34 15 didn't?

14:59:34 16 A.      No.

14:59:35 17 Q.      You went to StarQuest?

14:59:36 18 A.      Uh-huh.

14:59:36 19 Q.      And when you went to StarQuest, you asked them if

14:59:39 20 they had a record for the sale?

14:59:40 21 A.      Yes.

14:59:40 22 Q.      And did you -- did they or did they just give you the

14:59:44 23 serial number which is what you were looking for?

14:59:47 24 A.      I'm not sure if they gave me a register receipt or

14:59:50 25 they read it off the computer terminal and I copied it and

Marley - cross

14:59:54  1   made the phone call and put it in NCIC.

14:59:57  2   Q.    Oh the report you made, there is no copy on of what

15:00:01  3   StarQuest gave you that day if they gave you anything?

15:00:03  4   A.    Okay.

15:00:04  5   Q.    I'm asking?

15:00:05  6   A.    Oh, yeah, if it's not.

15:00:06  7   Q.    If it's not there, it's not part of the report?

15:00:09  8   A.    Right.

15:00:09  9   Q.    You might have just asked for the serial number?

15:00:12 10   A.    Yes.

15:00:12 11   Q.    You didn't ask for an ATF Form 4473 on that day?

15:00:17 12   A.    No.

15:00:17 13   Q.    You just wanted the serial number?

15:00:19 14   A.    Exactly.

15:00:19 15   Q.    Were you involved after that, in getting the people

15:00:22 16   at StarQuest to send you the actual form that was filled out

15:00:25 17   by the gun buyer?

15:00:26 18   A.    No.

15:00:27 19   Q.    And then after you did that, after you went to

15:00:31 20   StarQuest you didn't go back, then your role in this would

15:00:35 21   then after, to then write your report?

15:00:36 22   A.    That was it.

15:00:37 23   Q.    And in that report, and in your dealings with

15:00:41 24   Mr. Biden, I think you said that he was listed as the victim

15:00:44 25   of a crime?

15:00:45 1    A.        Yes.

15:00:45 2    Q.        When you were there, did you hear him express

15:00:48 3    concerns about whether you were going to charge Ms. Biden?

15:00:51 4    A.        I don't remember.

15:00:52 5    Q.        But you called him a victim?

15:00:54 6    A.        Right.

15:00:55 7              MR. LOWELL:  That's all the questions I have.

15:00:57 8              THE COURT:  All right.  Redirect.

15:01:01 9              MR. HINES:  Just briefly

15:01:02 10                       REDIRECT EXAMINATION

15:01:02 11   BY MR. HINES:

15:01:03 12   Q.        There were a lot of questions about the reports and

15:01:05 13   who wrote them.  Corporal, just to be clear, the bottom of

15:01:10 14   the report clearly reflects who wrote the report, right?

15:01:13 15   A.        Yes.

15:01:13 16   Q.        And you wrote the first report in the sequence and

15:01:17 17   had nothing to do with the second report that Sergeant

15:01:20 18   Clemons wrote, right?

15:01:21 19   A.        Correct.

15:01:21 20              MR. HINES:  No further questions.

15:01:22 21              THE COURT:  Thank you.  Thank you, sir.  You're

15:01:25 22   excused.

15:01:26 23              Okay.  Should we take our afternoon break?

15:01:29 24              MR. HINES:  That would be fine, Your Honor.

15:01:31 25   Thank you.

Greer - direct

| | | |
|---|---|---|
| 15:01:31 | 1 | THE COURT:  Let's take our afternoon break. |
| 15:01:32 | 2 | We'll come back in fifteen minutes. |
| 15:01:34 | 3 | COURTROOM DEPUTY:  All rise. |
| 15:01:36 | 4 | (Jury exiting the courtroom at 3:01 p.m.) |
| 15:02:06 | 5 | THE COURT:  All right.  Anything we need to talk |
| 15:02:10 | 6 | about? |
| 15:02:11 | 7 | MR. HINES:  No, Your Honor. |
| 15:14:12 | 8 | (A brief recess was taken.) |
| 15:23:19 | 9 | COURTROOM DEPUTY:  All rise. |
| 15:23:20 | 10 | THE COURT:  All right.  Bring in the jury. |
| 15:23:28 | 11 | (Jury entering the courtroom at 3:23 p.m.) |
| 15:23:36 | 12 | THE COURT:  All right.  Everyone, welcome back. |
| 15:23:57 | 13 | Everyone else may be seated.  Mr. Hines, what's next? |
| 15:23:59 | 14 | MR. HINES:  The United States calls Millard |
| 15:24:02 | 15 | Greer. |
| 15:24:04 | 16 | COURTROOM DEPUTY:  Please raise your right hand. |
| 15:24:07 | 17 | Please state and spell your full name for the record. |
| 15:24:11 | 18 | THE WITNESS:  Millard, M-I-L-L-A-R-D, middle |
| 15:24:23 | 19 | initial A, Greer, G-R-E-E-R. |
| 15:24:26 | 20 | MILLARD GREER, having been duly sworn, was |
| 15:24:31 | 21 | examined and testified as follows: |
| 15:24:33 | 22 | DIRECT EXAMINATION |
| 15:24:34 | 23 | BY MR. HINES: |
| 15:24:38 | 24 | Q.     Good afternoon, sir. |
| 15:24:39 | 25 | A.     Good afternoon. |

Greer - direct

15:24:40  1    Q.      Are you currently employed?

15:24:42  2    A.      Yes.

15:24:42  3    Q.      How are you currently employed?

15:24:44  4    A.      I'm a special investigator for the Delaware

15:24:48  5    Department of Justice.

15:24:48  6    Q.      How long have been a special investigator for the

15:24:51  7    Delaware Department of Justice?

15:24:53  8    A.      Just shy of three years.

15:24:55  9    Q.      What did you do prior to that?

15:24:56 10    A.      I worked for the Delaware State Police.

15:24:58 11    Q.      In what capacity?

15:25:00 12    A.      At retirement, I was a Lieutenant in the criminal

15:25:03 13    investigation unit for New Castle County.

15:25:04 14    Q.      How long were you a Delaware State Police Officer?

15:25:07 15    A.      Just shy of 25 years.

15:25:09 16    Q.      So Lieutenant was your last rank?

15:25:12 17    A.      Yes.

15:25:12 18    Q.      And what was your rank in 2018?

15:25:15 19    A.      Lieutenant.

15:25:16 20    Q.      I would like to direct your attention to October of

15:25:19 21    2018.  Were a signed to do follow-up investigative work

15:25:23 22    regarding an incident at Janssen's Market?

15:25:26 23    A.      Yes.

15:25:26 24    Q.      Who assigned you to that incident?

15:25:28 25    A.      My lead supervisor at the time was Captain Pete

Greer - direct

1    Sawyer.

2    Q.      When were you assigned to do investigative work?

3    A.      I believe that was the afternoon, evening of October

4    the 25th, 2018.

5    Q.      In connection with that follow-up investigation --

6    A.      24th, I believe that was the 24th.

7    Q.      So October 24th is your recollection?

8    A.      I believe -- is that a Thursday?

9    Q.      October 24th, 2018, is that what you believe the day

10   was?

11   A.      Yeah.  Yes.

12   Q.      Did you review video footage in connection with your

13   follow-up investigation?

14   A.      The following day, yes, the 25th I believe.  Friday.

15   I was assigned on a Thursday, on Friday I looked at the

16   video.

17   Q.      Tell us what steps you took to get that video footage

18   and what it showed and what you did with it?

19   A.      I responded up to Janssen's Market, initially I met

20   with Paul Janssen and reviewed the interior video footage.

21   I then met with the owner of the security company,

22   Addlestone Security, and went to a security room, and viewed

23   the video footage on their system.

24           Mr. -- the owner of that company then gave me a

25   U.S. B that contained all the video footage as did Ms.

Greer - direct

15:26:59  1    Janssen.  I went back to my office and reviewed it

15:27:03  2    extensively over the next few days.

15:27:05  3    Q.     Did some of those video show Hallie Biden arriving at

15:27:10  4    Janssen's Market, walking through Janssen's Market and

15:27:12  5    leaving Janssen's Market?

15:27:13  6    A.     It did.

15:27:14  7    Q.     The jury has already seen those.  Was there an

15:27:18  8    additional video that was of significance to the

15:27:20  9    investigation?

15:27:22 10    A.     Yes.

15:27:23 11    Q.     And what did that additional video show?

15:27:26 12    A.     There is exterior video that shows the -- an elderly

15:27:36 13    gentleman park a vehicle at the far end of the parking lot

15:27:40 14    and then begin to look through trash cans at the market.

15:27:47 15    Q.     And is that -- I'm going to show you in a moment, in

15:27:51 16    advance of your testimony today, did you look at

15:27:53 17    Government's Exhibit 39C, and review that video footage?

15:27:57 18    A.     I did.

15:27:58 19               MR. HINES:  With the Court's permission, I would

15:28:00 20    like to admit that exhibit and play it.

15:28:02 21               MR. LOWELL:  Without objection.

15:28:03 22               THE COURT:  All right.  Thank you.  It's

15:28:04 23    admitted.

15:28:05 24               (Exhibit No. 39C was admitted into evidence.)

15:28:07 25               MR. HINES:  Would you please play 39C, Ms. Vo.

15:28:13  1          (Video played.)

15:28:16  2    BY MR. HINES:

15:28:16  3    Q.      Does the video show the man that is approaching the

15:28:20  4    exterior trash can that you described a moment ago?

15:28:22  5    A.      It does.

15:28:22  6    Q.      Does it get cut off because there is sort of an

15:28:26  7    awning?

15:28:26  8    A.      It does.

15:28:27  9    Q.      Right here.  So the angle only shows kind of the

15:28:30 10    right side of the trash can?

15:28:32 11    A.      Correct.  He's currently at a trash can that's not

15:28:35 12    related to why we're here.  But he eventually makes his way

15:28:41 13    down.

15:28:41 14    Q.      All right.  So now at this time in the video, are we

15:28:46 15    seeing the man walk down to the trash can that is related to

15:28:49 16    this investigation?

15:28:50 17    A.      Yes.

15:28:50 18    Q.      Or in the vicinity of it?

15:28:53 19    A.      Yes.

15:28:54 20    Q.      Do you see him kind of bending over a head right

15:28:57 21    there, is that right?

15:28:58 22              MR. LOWELL:  I'm sorry, can you say that again?

15:29:01 23    BY MR. HINES:

15:29:01 24    Q.      Do you see a head right above the trash can that was

15:29:04 25    just bent over there a moment ago?

Greer - direct

15:29:06  1   A.      Yes.  To be honest I can't tell that it's a head, I

15:29:10  2   can tell that there is movement at that trash can.

15:29:13  3   Q.      All right.  So did you take any steps to try and

15:29:17  4   ascertain the identity of that man, that individual that

15:29:21  5   just walked toward that trash can?

15:29:23  6   A.      I did.

15:29:23  7   Q.      What steps did you try to take to ascertain his

15:29:27  8   identity?

15:29:27  9   A.      Interviewed a number of people at Janssen's Market

15:29:30 10   and at the Greenville Shopping Center and Greenville Center

15:29:35 11   Shopping Center next door, I think it's called.  There were

15:29:37 12   a lot of people familiar with, there was an elderly

15:29:41 13   gentleman that would routinely come and rummage the trash

15:29:44 14   cans for recyclables.  I eventually spoke to a maintenance

15:29:49 15   worker who had a first name of Ed for this subject.

15:29:53 16   However, that's all he could provide, he couldn't provide

15:29:56 17   any further name information or vehicle or anything of that

15:30:00 18   nature.

15:30:01 19          He did point me toward the Fidelity Investments

15:30:09 20   Office.

15:30:09 21   Q.      I didn't mean to cut you off, at some point in time

15:30:13 22   based on that information it was someone named Ed and the

15:30:16 23   location he was frequenting, did you begin to do some

15:30:19 24   surveillance to try to see this man looking for recyclables?

15:30:23 25   A.      I did, I did multiple days of surveillance.

Greer - direct

15:30:28  1    Eventually I did see him rummaging through trash cans.  I

15:30:35  2    actually received a phone call and was told that he was in

15:30:38  3    the area while I was there, so I was able to locate him.

15:30:43  4            I then watched him over the period of the next

15:30:47  5    15 minutes, I believe.  And then he approached a car, I

15:30:50  6    believe it was a Chevy Equinox, that was parked over near

15:30:54  7    Janssen's Market.  At that time I approached him.  I

15:30:57  8    identified myself as a Delaware State Trooper, and advised

15:31:02  9    him that I was there because somebody had placed something

15:31:05 10    in a trash can that shouldn't have been there.  His

15:31:08 11    immediate response was yes, they did.

15:31:10 12            I then asked him what might that be, he said a

15:31:15 13    .38 Special.  I then advised him that I immediately needed

15:31:19 14    that weapon, he says it's at my house.  I then took his ID

15:31:25 15    to make sure he didn't have any active warrants.  He

15:31:29 16    explained that he was a Navy veteran.  He was retired from

15:31:33 17    --

15:31:33 18            MR. LOWELL:  Objection, I was allowing the

15:31:35 19    context, now it's getting --

15:31:38 20            MR. HINES:  I'll move you forward a little bit,

15:31:41 21    Lieutenant Greer.  So after he indicated that he did have a

15:31:47 22    .38 Special, did he ultimately take you, with his consent,

15:31:50 23    to his residence to locate that firearm.

15:31:54 24            THE WITNESS:  He did.  Yes.

15:31:56 25    BY MR. HINES:

Greer - direct

15:31:56  1    Q.        And you went there and did you retrieve any items?

15:32:01  2    A.        Yes.  We responded to ████████████  in

15:32:06  3    Wilmington, Delaware, and he retrieved a black box from an

15:32:12  4    upstairs room, brought it down the steps, and presented it

15:32:17  5    to me.  He didn't present the box to me, he was holding it,

15:32:21  6    it had a number of socks in it.  He pulled a gun out of one

15:32:24  7    of the socks and handed it to me and it was a .38 Special.

15:32:29  8    Ultimately I was able to confirm the serial number of that

15:32:32  9    gun matched the serial number on the stolen -- theft of

15:32:36 10    firearm report taken by Trooper Marley.

15:32:39 11    Q.        And in that box, you said there was a .38 Special

15:32:44 12    revolver.  In advance of your testimony today, did you have

15:32:46 13    a chance to look at Government's Exhibit 1?

15:32:50 14    A.        Yes.

15:32:50 15    Q.        And is this -- is Government's Exhibit 1 the .38

15:32:54 16    Special revolver that Mr. Banner turned over to you?

15:32:57 17    A.        Yes.

15:32:57 18    Q.        Did you identify that based on the serial number

15:33:00 19    there?

15:33:00 20    A.        Yes.

15:33:00 21    Q.        How did he present the revolver to you, it was in the

15:33:04 22    sock you said?

15:33:04 23    A.        It was in a sock, yes.

15:33:06 24    Q.        And then in like a larger box?

15:33:08 25    A.        Yeah, a larger black box that I would describe as a

Greer - direct

15:33:13 1    shoe, it was a larger shoebox as maybe some high top

15:33:17 2    sneakers or boots came in it.

15:33:19 3    Q.    Is there anything else that he indicated that he

15:33:21 4    retrieved from the trash receptacle that day that he turned

15:33:25 5    over to you?

15:33:26 6    A.    Yes, he then handed me a leather pouch that contained

15:33:30 7    a number of other items, I believe some -- a tube of chap

15:33:38 8    stick, a speed loader, that holds bullets so you can load a

15:33:44 9    revolver at one time.  And a box of I believe it was Hornady

15:33:54 10   38-caliber ammunition.

15:33:59 11             MR. HINES:  May I approach, Your Honor?

15:34:00 12             THE COURT:  You may.

15:34:01 13   BY MR. HINES:

15:34:02 14   Q.    I'm showing you Government's Exhibit 4.  Is this the

15:34:05 15   leather pouch that you described?

15:34:07 16   A.    Yes.

15:34:07 17   Q.    And what is government Exhibit 3?

15:34:10 18   A.    That's the speed loader.

15:34:12 19   Q.    And I'm showing you Government's Exhibit 2, what is

15:34:16 20   2?

15:34:16 21   A.    That's the box of ammunition.

15:34:18 22   Q.    How were these items presented to you?

15:34:21 23   A.    As I recall, it was just kind of all cupped in his

15:34:25 24   hand and kind of handed it all over, these items were kind

15:34:29 25   of laying in the, cupped in the pouch.

Greer - direct

15:34:32  1   Q.      So this pouch was like sort of folded open?

15:34:36  2   A.      Yes.   Yes.   If I remember it's like a flap that goes

15:34:40  3   over and has a pocket inside of it, I believe.   And I think

15:34:44  4   everything was just laying in the center and it was just

15:34:46  5   opened.

15:34:47  6   Q.      So kind, he kind of presented it to you like this,

15:34:51  7   like altogether?

15:34:52  8   A.      Yes.

15:34:53  9   Q.      How many cartridges of ammunition were in the box

15:34:59 10   when he presented it to you?

15:35:02 11   A.      23.

15:35:03 12   Q.      So there were two missing from the 25 cartridge box?

15:35:07 13   A.      Yes.

15:35:07 14   Q.      Now, when you received those items, what did you do

15:35:14 15   with them?

15:35:16 16   A.      Well before I took it, I put latex gloves on, and I

15:35:24 17   placed them in an evidence bag that I put in my -- it wasn't

15:35:31 18   a patrol car, it was an administration car, put in my police

15:35:36 19   car and drove back to Troop 2, where it was later packaged

15:35:40 20   for storage for evidence.

15:35:42 21   Q.      When you say packaged and stored as evidence, did it

15:35:45 22   get placed in a Delaware State Police evidence vault?

15:35:48 23   A.      It did.

15:35:49 24   Q.      Is that where it remained for some period of time

15:35:52 25   thereafter?

Greer - direct

15:35:53 1    A.    Yes.  I turned it all over to the evidence Sergeant,

15:35:57 2    who placed it in the evidence area.  All that took place at

15:36:01 3    my office.

15:36:02 4    Q.    Before putting these items in, did you do anything to

15:36:06 5    examine the brown leather pouch closely, did you look at it

15:36:13 6    very closely?

15:36:14 7    A.    No.

15:36:15 8    Q.    At that time, what was the report you were

15:36:18 9    investigating?

15:36:19 10   A.    Theft of a firearm.

15:36:22 11   Q.    Did Mr. Banner indicate that all of these items, 1,

15:36:27 12   2, 3, and 4 had all come from that exterior trash can?

15:36:32 13   A.    He did.

15:36:35 14   Q.    Now, at that point of your investigation having

15:36:38 15   retrieved the missing items, did you reach out to the

15:36:41 16   defendant, Robert Hunter Biden?

15:36:44 17   A.    I did.

15:36:46 18   Q.    And did you end up communicating with Mr. Biden by

15:36:50 19   phone?

15:36:50 20   A.    I did.

15:36:51 21   Q.    Did Mr. Biden express anything about whether he

15:36:54 22   wanted to participate further in any investigation?

15:36:58 23   A.    He was the victim of a theft of a firearm, I advised

15:37:04 24   him that I was calling to see if he sought any prosecution

15:37:08 25   of the person who took that firearm and he did not.

Greer - direct

15:37:12  1    Q.      Because Mr. Biden had declined further prosecution,

15:37:17  2    did you take any additional investigative steps at that

15:37:23  3    time?

15:37:23  4    A.      Investigative steps, no.

15:37:26  5    Q.      So did these items just get logged into evidence and

15:37:32  6    remain there until a federal investigation was underway and

15:37:37  7    agents retrieved these items for this case?

15:37:40  8    A.      Yes.  But I believe the firearm was probably sent

15:37:43  9    down to the forensic firearms services unit lab for a test

15:37:48 10    fire to -- for comparison to see if it came back for a match

15:37:54 11    in anything, what's known as the NIBIN system, a system that

15:37:59 12    identifies shell casings that has special markings so we

15:38:03 13    test fire all guns that we recover.

15:38:06 14    Q.      Was there any match in this case?

15:38:07 15    A.      I was not advised of any matches.

15:38:10 16    Q.      And there were two pieces of ammunition missing,

15:38:13 17    there was nothing in the system that suggested that those

15:38:16 18    had been linked to a known crime?

15:38:19 19    A.      No, if they were, that unit would have composed a

15:38:24 20    report and sent back to me and it would have been attached

15:38:27 21    to my report, and to the best of my knowledge, I never heard

15:38:31 22    anything back from them which indicates that it was not.

15:38:33 23    Q.      Did Mr. Banner also turnover an additional firearm to

15:38:37 24    you?

15:38:37 25    A.      He did.

Greer - direct

15:38:38  1  Q.      And what were the circumstances regarding that

15:38:41  2  additional firearm?

15:38:42  3  A.      Out of that same box he took out another sock and he

15:38:46  4  says you may want this as well, or something to that effect,

15:38:51  5  going on almost six years ago now.  But he handed over a

15:38:56  6  Sundance 25-caliber semiautomatic handgun, he advised that

15:39:02  7  it had been given to him by a coworker when he worked at

15:39:06  8  General Motors.

15:39:07  9          MR. LOWELL:  I'm sorry, objection to the hearsay

15:39:10 10  part of this, finish the sentence, finish that, but let's

15:39:13 11  not --

15:39:16 12          THE COURT:  So you can finish your sentence he

15:39:18 13  said, it's just talking about what someone told you is

15:39:23 14  different than saying what someone gave you or what you said

15:39:26 15  to someone, or what you understood, that's okay, it's what

15:39:31 16  they said.

15:39:31 17          MR. LOWELL:  He should finish the thought

15:39:33 18  because I interrupted him.

15:39:36 19          THE WITNESS:  I thought he did finish it.

15:39:39 20  BY MR. HINES:

15:39:40 21  Q.      Did you take that additional firearm?

15:39:42 22  A.      I did.

15:39:44 23  Q.      And why did you take it?

15:39:46 24  A.      For the same reason, I mean those are some very

15:39:49 25  suspicious circumstances there that we wanted to test fire

15:39:53  1    that gun and make sure it wasn't related to another crime.

15:39:57  2    Q.    You said at this time you were investigating a theft

15:40:00  3    of a firearm, in this case, did investigators like you have

15:40:05  4    any iCloud messages or anything like that of the defendants

15:40:09  5    at that time?

15:40:09  6    A.    No.

15:40:10  7    Q.    This was in 2018, so had the defendant written a book

15:40:16  8    at that time indicating any drug activity to your knowledge?

15:40:19  9    A.    No.  I'm not sure when he wrote the book.  I wasn't

15:40:23 10    aware of a book in 2018, I'm pretty sure.

15:40:27 11    Q.    So based on the information known then, a separate

15:40:30 12    investigation of the defendant was not opened at that time

15:40:33 13    and at the state level, is that right?

15:40:36 14    A.    No.

15:40:38 15              MR. HINES:  No further questions, Your Honor.

15:40:39 16              THE COURT:  All right.  Thank you.  Cross-exam.

15:40:43 17                   CROSS-EXAMINATION

15:40:43 18    BY MR. LOWELL:

15:40:45 19    Q.    Good afternoon, Lieutenant Greer.  Is that in your

15:40:48 20    Delaware DOJ, what is your rank?

15:40:51 21    A.    I'm just an investigator there.

15:40:53 22    Q.    So I'll call you detective if that's okay?

15:40:57 23    A.    Millard would be just fine.

15:41:00 24    Q.    My name is Abbe Lowell, I'm one of the attorneys that

15:41:04 25    represents Hunter, okay?

Greer - cross

15:41:05 1    A.        Good afternoon, sir.

15:41:06 2    Q.        Good afternoon to you.  You were asked some questions

15:41:09 3    at the end, a few moments ago.  At the time of this incident

15:41:13 4    in 2018, I think you mentioned that it was being

15:41:15 5    investigated because Hunter was deemed to be the victim of a

15:41:20 6    gun theft; right?

15:41:21 7    A.        Yes, sir.

15:41:22 8    Q.        And that's what the report states, victim?

15:41:25 9    A.        Yes.

15:41:25 10   Q.        As I understand the sequence, when did you get

15:41:31 11   assigned to try to do what was needed in your investigation,

15:41:37 12   what day of October, can you recall that?

15:41:41 13   A.        The day after Marley took his report.

15:41:45 14   Q.        So if Marley took his report on the 23rd, that would

15:41:48 15   make it the 24th?

15:41:49 16   A.        Thank you, yes, the 24th.

15:41:50 17   Q.        You're welcome.

15:41:51 18            And so you're assigned and then the point is to

15:41:55 19   try to find the gun as I understand it?

15:41:57 20   A.        Yes.

15:41:57 21   Q.        And I think you said what you did, you went and

15:42:01 22   looked at the -- to find if there was surveillance video,

15:42:06 23   correct?

15:42:06 24   A.        Yes.  I was aware that there was surveillance video.

15:42:09 25   Q.        So you were looking to get it to review it?

15:42:12  1    A.      Yes.

15:42:12  2    Q.      And I think you said the first time you did that was

15:42:15  3    where?  Was it at the store or at the security place?

15:42:18  4    A.      The first video I looked at was at the store, but

15:42:22  5    that was only interior.  There is two different systems, the

15:42:26  6    interior and the exterior.

15:42:27  7    Q.      Okay.  So which one did you see first, the interior

15:42:30  8    or the --

15:42:31  9    A.      Interior.

15:42:32  10   Q.      And anything of relevance did you see on the

15:42:36  11   interior?

15:42:37  12   A.      The reason I looked at the interior first is because

15:42:44  13   -- I was told that there was a person of interest who had

15:42:47  14   been seen carrying out something.  I don't know if I'm

15:42:52  15   getting into hearsay here or not.

15:42:54  16   Q.      No, you're not saying -- oh, you were told.  Were you

15:42:57  17   looking to see if it was evidence of who either put it in

15:43:00  18   the trash or took it out of the trash?

15:43:03  19   A.      Yeah, I was looking to see someone walking out with

15:43:06  20   something that was surrounded in some type of purple bag or

15:43:10  21   paper or tissue or something.  I can clear that up now if

15:43:14  22   you let me.

15:43:14  23   Q.      You can clear it up.  You obviously knew something

15:43:18  24   about a color being purple?

15:43:19  25   A.      Yes, the owners of the security company thought that

Greer - cross

15:43:22  1    the bag that it was placed into the trash can looked purple

15:43:26  2    to them.

15:43:27  3    Q.      Okay.  So you went -- you were looking at the

15:43:30  4    interior to see if you could find such a thing?

15:43:34  5    A.      Yes.

15:43:34  6    Q.      And you didn't see that in the interior?

15:43:36  7    A.      I saw the purple tissue that he was talking about.

15:43:40  8    Q.      Oh, that turned out not to be --

15:43:42  9    A.      Had nothing to do with this.

15:43:44 10    Q.      Understand.  The wrapping flowers?

15:43:47 11    A.      Yes.  They wrap every floral arrangement in purple

15:43:52 12    tissue paper.

15:43:52 13    Q.      Got it.  So you looked at that, and then the exterior

15:43:56 14    video was not there at that point or is it was?

15:43:59 15    A.      Janssen's does not have access to the exterior video,

15:44:04 16    only the security company does.  So I moved from inside

15:44:08 17    Janssen's Market, to an office that is in the rear of the

15:44:11 18    shopping center down underneath kind of like, in a basement

15:44:15 19    area where they had their Multiplex system set up for kind

15:44:21 20    of a command center for the security video.

15:44:23 21    Q.      And that's where you went?

15:44:24 22    A.      That's where I went, yes.

15:44:26 23    Q.      And that's where you saw the video?

15:44:28 24    A.      The first time, yes.

15:44:29 25    Q.      And then you got a USB?

Greer - cross

15:44:31  1    A.      Yes.

15:44:31  2    Q.      A thumb drive, right?

15:44:33  3    A.      Yes.

15:44:33  4    Q.      And you went back to your office to look at it and

15:44:36  5    review it again?

15:44:37  6    A.      Yes.

15:44:38  7    Q.      And I think that's where you were shown the actual

15:44:41  8    video.  I would like to put that back -- a moment ago you

15:44:46  9    were looking at it and identifying a video?

15:44:48 10    A.      Yes.

15:44:49 11    Q.      And that's government Exhibit 39C?

15:44:51 12    A.      Yes.

15:44:52 13    Q.      Would you put, Mr. Radic, 39C back up, please.

15:44:58 14            I want to run this again because of what

15:45:01 15    Mr. Hines and you discussed.  So in this video as it starts

15:45:05 16    you'll see a man wearing a purple shirt.  Stop there,

15:45:10 17    Mr. Radic.

15:45:11 18    A.      I think it's actually a blue jacket.

15:45:13 19    Q.      Blue purple, okay.  In that clip, that guy wasn't

15:45:18 20    carrying a bag, at this point you saw him walking with

15:45:21 21    nothing in his hand?

15:45:22 22    A.      Yes.

15:45:23 23    Q.      And then he goes into the interior, right?

15:45:26 24    A.      Yes.

15:45:26 25    Q.      And there is no camera of that?

Greer - cross

15:45:28  1   A.     Unfortunately there is not.

15:45:30  2   Q.     It would have made your job a lot easier than it was?

15:45:33  3   A.     Yes.

15:45:34  4   Q.     Keep going, Mr. Radic.  Then I think you were asked,

15:45:38  5   and this same person seems to be the person who comes out.

15:45:41  6   And when that happens, Mr. Radic, will you freeze it.

15:45:45  7           Stop there.  He's not carrying a bag in that

15:45:58  8   picture, is he?

15:46:00  9   A.     He does not appear to be.

15:46:04 10   Q.     Keep playing Mr. Radic.  He'll put his arm down.

15:46:08 11   Right there, stop, so he's not carrying a bag?

15:46:10 12   A.     No.

15:46:11 13   Q.     Now you'll see him go to that interior again?

15:46:14 14   A.     Yes.

15:46:15 15   Q.     Keep playing it.  And now he's gone.  Stop there.  So

15:46:18 16   you can't tell what he's doing there?

15:46:20 17   A.     No.

15:46:20 18   Q.     Keep going.  And then right there.  That's where

15:46:28 19   Mr. Hines asked you if that's -- do you see his head.  But

15:46:33 20   you can't identify that as a head, can you?

15:46:36 21   A.     I can't say it's a head.  I seen motion in the area.

15:46:42 22   Q.     You can see motion.  It's not a picture of him, it's

15:46:45 23   not a shirt that you saw the color of.  I just wanted to

15:46:49 24   identify what that was if you could and it doesn't look to

15:46:51 25   me --

Greer - cross

15:46:52  1    A.      I think we're a little bit out of sequence here if

15:46:55  2    you'll allow me to clarify, maybe.

15:46:57  3    Q.      Yeah, I just said --

15:46:59  4    A.      I viewed this video countless times.  It wasn't until

15:47:05  5    after I had encountered Mr. Banner and had the gun back and

15:47:10  6    went back and reviewed it more, because at that point, I

15:47:13  7    knew where he parked, how he walked up, and so prior to

15:47:17  8    recovering the gun, I had no idea that the person in that

15:47:22  9    blue jacket had anything, and I didn't notice that motion

15:47:28 10    over the trash can at that time because I had a 32-minute

15:47:34 11    window that I was looking at, not just -- I didn't notice

15:47:41 12    that motion at the trash can until after.

15:47:43 13    Q.      Right.

15:47:43 14    A.      I had recovered the gun.

15:47:45 15    Q.      I get it.  I'm just trying to figure out whether that

15:47:48 16    helps you determine that it was him at that moment with the

15:47:51 17    motion because all you I see is a little round thing and you

15:47:54 18    were asked whether or not that was the person's head and I

15:47:56 19    think you said you can't identify it as a head?

15:47:59 20    A.      I cannot.

15:47:59 21    Q.      Can you finish the video.  That was it?  Okay.  So in

15:48:08 22    that video, you don't see him putting his hand in the trash?

15:48:13 23    A.      No.

15:48:13 24    Q.      And you didn't see him taking a bag out?

15:48:16 25    A.      No.

Greer - cross

15:48:16  1    Q.      And you don't see in what condition any bag came out;

15:48:20  2    correct?

15:48:21  3    A.      No.

15:48:21  4    Q.      And you didn't see whether the bag was right side up

15:48:24  5    or upside down?

15:48:25  6    A.      No.

15:48:26  7    Q.      And you don't know at that point what's in either the

15:48:28  8    bag or anything in the bag?

15:48:30  9    A.      No.

15:48:30 10    Q.      And that was the end of your ability to identify what

15:48:33 11    happened on the video?

15:48:36 12    A.      Yes.

15:48:36 13    Q.      As I understood it then you were doing your job and

15:48:39 14    trying to figure out if anybody knew what had happened?

15:48:42 15    A.      Yes.

15:48:42 16    Q.      And somebody told you that there was a person who

15:48:44 17    from time to time came and looked through the trash, did

15:48:49 18    that person tell you what that person's understanding was of

15:48:53 19    why the person went through trash?

15:48:56 20    A.      There were -- it was -- it seemed to be common

15:49:00 21    knowledge among the businesses there that this gentleman

15:49:06 22    rummaged for recyclables.

15:49:08 23    Q.      Okay.  So somebody who picks up things and then tries

15:49:11 24    to sell them --

15:49:14 25    A.      Yes, it's unusual for the area.  Greenville,

15:49:18  1    Centerville, it's a very fluent area that's not a lot of

15:49:24  2    people rummaging.

15:49:24  3    Q.    You were told something about that and that was your

15:49:27  4    lead?

15:49:27  5    A.    Yes.

15:49:27  6    Q.    After that you then tried to track down people who

15:49:31  7    might identify the person who did this?

15:49:33  8    A.    Yes.

15:49:33  9    Q.    And you got a name, Ed, right?

15:49:35 10    A.    Yes.

15:49:35 11    Q.    And then at some point as I got the sequence, later,

15:49:41 12    a couple of days later, somebody called you and told you

15:49:44 13    that that person who was identified was back in the parking

15:49:47 14    lot looking through trash, is that kind of right?

15:49:50 15    A.    He was actually in an office when they called me.

15:49:54 16    Q.    He, being the person who grabbed the material?

15:50:00 17    A.    Ed was inside the Fidelity Investment Office at the

15:50:04 18    time.

15:50:04 19    Q.    He was inside.  Now I get it, he was inside the

15:50:07 20    offices of Fidelity doing something, not going through trash

15:50:11 21    at that point?

15:50:12 22    A.    Correct.

15:50:12 23    Q.    That's when you confronted him in the office?

15:50:16 24    A.    No.

15:50:17 25    Q.    You waited for him to come out?

Greer - cross

15:50:18  1    A.      I waited for him to come outside.

15:50:20  2    Q.      And that's when you interviewed him?

15:50:22  3    A.      No, I observed him for, close to an hour.

15:50:25  4    Q.      In that hour after Fidelity, to the hour, was it

15:50:29  5    after that amount of time that you saw him going through

15:50:32  6    trash again?

15:50:33  7    A.      Yes.

15:50:33  8    Q.      So in that hour after Fidelity, before the trash,

15:50:36  9    what was he doing, it's an hour, 60 minutes, what was

15:50:41 10    happening in that 60 minutes?

15:50:42 11    A.      So, I'm up there doing surveillance, I'm across the

15:50:46 12    street, I get a call from somebody at Fidelity Investments

15:50:51 13    saying hi, the subject you were looking for is here, I said

15:50:54 14    thank you, and that was because they had refused to identify

15:50:58 15    him, they knew who he was, but they wouldn't tell me his

15:51:03 16    name before because he was a client, they agreed to call if

15:51:05 17    he came back to the area and let me know he was in the area.

15:51:08 18    As luck would have it, they did call and I was there, so I

15:51:11 19    was able to see, they described his clothing, I was able to

15:51:14 20    see him come out of the office.  I then watched him for, I

15:51:19 21    would have to look at my report to be sure, I think it was

15:51:22 22    50 minutes, I think it was from 10:50 to 11 o'clock, I

15:51:26 23    believe.  Or 10:10 until 11 o'clock, 50 minutes.  During

15:51:32 24    that time, he went by each trash can in the two shopping

15:51:39 25    centers and would literally lean over and dig through and I

Greer - cross

15:51:42  1   saw him pull out plastic and aluminum.

15:51:46  2   Q.      I'm just trying to suggest, not suggest, I'm trying

15:51:49  3   to ask, you said there was a period of time, 50, I'm just

15:51:52  4   asking if you're observing him going through trash for that

15:51:56  5   period of time?

15:51:57  6   A.      Yes.

15:51:57  7   Q.      Just in front of Janssen's?

15:51:59  8   A.      No, no, he was doing both shopping centers.

15:52:01  9   Q.      That's what I wanted to find out, it didn't seem like

15:52:05 10   he could be looking at three trash cans at Janssen's for 50

15:52:08 11   minutes.

15:52:09 12   A.      No, I didn't count the number of trash cans that he

15:52:11 13   went through, it was quite a few, it was two shopping

15:52:14 14   centers.

15:52:14 15   Q.      And then you saw him taking things out?

15:52:16 16   A.      Yes.

15:52:16 17   Q.      And that's when you went up to him?

15:52:18 18   A.      I waited until he went to his car.

15:52:21 19   Q.      Okay.  So now he's at his car and then you asked him

15:52:24 20   questions?

15:52:25 21   A.      Yes.

15:52:25 22   Q.      Did you introduce yourself?

15:52:27 23   A.      Yes, his car was parked at Janssen's, pretty much

15:52:31 24   where it was parked on that video.

15:52:32 25   Q.      So you identified yourself?

Greer - cross

15:52:34  1    A.       I did.

15:52:34  2    Q.       And I think you explained what you said that you were

15:52:37  3    looking for something that somebody threw out in the trash

15:52:40  4    and should not have, or something like that?

15:52:42  5    A.       Yes.

15:52:42  6    Q.       And he agreed that that's what the case was; is that

15:52:46  7    right?

15:52:46  8    A.       Yes.

15:52:46  9    Q.       At that point, did you ask or did he tell you what he

15:52:50 10    was doing to have obtained that, did he tell you that's what

15:52:54 11    I do, I go through trash cans?

15:52:56 12    A.       Yes.

15:52:56 13    Q.       And you asked him whether he found something and

15:53:00 14    that's when he told you he had?

15:53:03 15    A.       No, I didn't ask him if he found something, I said

15:53:05 16    the reason I'm contacting you, the reason I'm here in the

15:53:08 17    area and contacting you is because somebody placed something

15:53:12 18    in a trash can here that they should not have placed here.

15:53:16 19    Q.       And he said?

15:53:17 20    A.       And he immediately said oh, yes, they did.

15:53:19 21    Q.       When did you the discover that yes they did meant the

15:53:23 22    gun, right then than or later?

15:53:25 23    A.       Right then, I said what may that be.

15:53:27 24    Q.       And then he identified that may be, to be a gun?

15:53:30 25    A.       He said a .38 Special.

Greer - cross

15:53:33  1   Q.      And at that point is when you ran, a check, a

15:53:36  2   background on-- a check of any kind on him, you got his

15:53:40  3   name?

15:53:40  4   A.      I asked him for his license.  And the typical police

15:53:44  5   stuff, who are you, what's your date of birth, do you do

15:53:48  6   business abroad, blah, blah, blah, and he was very

15:53:52  7   cooperative.

15:53:52  8   Q.      And then at that point, you ran the check and seen

15:53:56  9   that he didn't have a criminal record or any outstanding

15:53:59 10   warrants, is that what you were looking for?

15:54:01 11   A.      Correct.

15:54:01 12   Q.      At that point, did you tell him in words or in effect

15:54:04 13   that it was not normal for law abiding citizens to place

15:54:09 14   guns in trash cans and that such items were critical pieces

15:54:12 15   of evidence related to the potential of serious crimes?

15:54:15 16   A.      Yes, something of that nature.

15:54:17 17   Q.      In words, I'm not quoting you directly.  At that

15:54:20 18   point his response was to apologize, right?

15:54:23 19   A.      Yes.

15:54:24 20   Q.      Now, at that point, did he indicate to you after you

15:54:27 21   told him that, and apologized, and by the way, I have

15:54:31 22   another gun in my house, did he say anything about that?

15:54:34 23   A.      He didn't say anything about that.

15:54:35 24   Q.      Then the two of you then, you asked him where he

15:54:39 25   lived or you had his license and he said, he told you where

Greer - cross

15:54:42  1    it was?

15:54:42  2    A.    Yeah --

15:54:43  3    Q.    I'm sorry, I asked a bad question.  He told you that

15:54:47  4    the gun he had identified was at his house?

15:54:49  5    A.    Yes, he did.

15:54:51  6    Q.    And then the two of you went there?

15:54:53  7    A.    We did, I held on to his license, he drove his car, I

15:54:57  8    followed him over.

15:54:58  9    Q.    And you get to the house, when you got to the house,

15:55:02 10    he opened the door, and was there anybody else there at the

15:55:09 11    time?

15:55:09 12    A.    Well, he got to the house, he didn't have his key, he

15:55:12 13    had locked himself out of the house.

15:55:15 14    Q.    He knew how to find a gun but not necessarily a key.

15:55:20 15    Okay.  Keep going?

15:55:20 16    A.    Yes.  So we tried calling, his wife was home he said.

15:55:27 17    There was no answer.  So we ended up pounding on -- he was

15:55:32 18    pounding on the door and side window, he was kind of

15:55:35 19    panicking a little bit, but eventually she woke up and

15:55:39 20    answered the door, yes.

15:55:40 21    Q.    Okay.  By the time you said you were there, and an

15:55:43 22    hour had went by, that started at 11ish in the morning, you

15:55:48 23    said --

15:55:48 24    A.    Those times are all on my supplement.

15:55:51 25    Q.    But you said that she eventually woke up, she had

Greer - cross

15:55:54  1  been sleeping?

15:55:54  2  A.      Yes.

15:55:55  3  Q.      In the middle of the day?

15:55:56  4  A.      Yes.

15:55:57  5  Q.      And she gets up and opens the door?

15:55:59  6  A.      Yes.

15:55:59  7  Q.      You did you talk to her?

15:56:03  8  A.      At that moment, at that moment, no.

15:56:09  9  Q.      Okay.

15:56:10 10  A.      Things got a little weird at that moment.

15:56:13 11  Q.      I would say so.

15:56:14 12  A.      So weird in that he is now pounding on the door, his

15:56:18 13  wife wakes up, opens the door, you both go in.  It's a split

15:56:25 14  level -- well there is a living room to the right, there is

15:56:28 15  steps that go up as soon as you go in, and as soon as she

15:56:32 16  finally opens, again he was kind of panicking that she

15:56:35 17  wasn't opening the door.  As soon as she opened the door, he

15:56:39 18  goes running up the steps.

15:56:40 19  Q.      He's started running up the steps?

15:56:42 20  A.      Yes.

15:56:44 21  Q.      You were still down --

15:56:45 22  A.      At that point I was like whoa, whoa, whoa, we're

15:56:48 23  dealing with guns here, hold on.

15:56:50 24  Q.      Well no gun here at the moment, right?

15:56:52 25  A.      No, I had a gun, too.

Greer - cross

15:56:54  1    Q.    But not in a sock in his drawer?

15:56:57  2    A.    No, no, I'm sorry.

15:56:59  3    Q.    So he runs up and his spouse is still with you?

15:57:03  4    A.    Yes.

15:57:04  5    Q.    Do you run up after him at that point?

15:57:07  6    A.    No.  He stopped, I asked him to stop.

15:57:11  7    Q.    You asked him to stop?  Okay.  He stopped?

15:57:13  8    A.    Yes.  And I stood a couple of steps up, and he says

15:57:17  9    the box is right here, he's pointing towards what I assume

15:57:20 10    is a closet area and I said okay, well, bring it down here,

15:57:24 11    and he calmed down and slowly retrieved the box and walked

15:57:29 12    it down.

15:57:30 13    Q.    The box was upstairs, you're on stairs, he goes and

15:57:34 14    gets them in your eyesight and brings the box down is that,

15:57:37 15    is that right or tell me why it's wrong?

15:57:39 16    A.    I didn't see where the box was exactly staying.

15:57:42 17    Q.    Upstairs?

15:57:43 18    A.    It was upstairs.

15:57:44 19    Q.    And you're on the stairs or downstairs?

15:57:46 20    A.    I am probably standing 1 or 2 stairs up, because I

15:57:50 21    was beginning to chase him down.

15:57:52 22    Q.    I get it.  I get it.

15:57:54 23          So you're watching him, he goes and retrieves a

15:57:58 24    box?

15:57:58 25    A.    Yes.

15:57:59  1    Q.       Shoebox, did you say?

15:58:01  2    A.       Similar to a shoebox.  I believe it was probably the

15:58:06  3    bottom part of a shoebox that had a lid, I didn't see the

15:58:10  4    lid if there was a lid.

15:58:11  5    Q.       At this point you're with his spouse, on the steps

15:58:16  6    going up, are you conversing with her?

15:58:18  7    A.       I may have had some small talk with her, said, I'm

15:58:23  8    Lieutenant Greer with the state police, please be calm,

15:58:26  9    we're okay here, I'm just conducting an investigation.

15:58:29 10    Q.       And did she say anything about a gun or anything like

15:58:33 11    that at the time?

15:58:34 12    A.       No.

15:58:34 13    Q.       So he comes back with the box, and is the box open or

15:58:38 14    closed at the point at which that happened?  I'm asking if

15:58:43 15    it has a cover or not?

15:58:45 16    A.       I describe it as a shoebox that didn't have the top.

15:58:49 17    Q.       Okay.  So in the box was whatever was in the box

15:58:51 18    without a cover?

15:58:52 19    A.       Yes.

15:58:53 20    Q.       And if I understand what you said, in the box were

15:58:59 21    socks?

15:58:59 22    A.       Socks, like if you're familiar when you take a pair

15:59:05 23    of socks and role them up in a ball and stick them in your

15:59:08 24    drawer, that's what I would describe that as.

15:59:10 25    Q.       But if they were rolled up in a ball, did you say the

Greer - cross

15:59:14  1    gun was in a sock?

15:59:15  2    A.      The gun was in a sock, yes.

15:59:17  3    Q.      But not -- that sock couldn't have been rolled up

15:59:20  4    with a gun in it?

15:59:21  5    A.      If I recall right, the rolled up socks were all on

15:59:24  6    top and these stocks that contained guns were under them.

15:59:27  7    Q.      There were multiple socks in this box, but the ones

15:59:30  8    that you are talking about --

15:59:31  9    A.      He had this pouch and all this other stuff were in

15:59:34 10    that box too.

15:59:35 11    Q.      What was on top, the socks or the pouch or the guns?

15:59:38 12    A.      The rolled up socks.

15:59:40 13    Q.      Sorry?

15:59:40 14    A.      The rolled up socks.   What I remember seeing is a

15:59:43 15    bunch of socks.

15:59:44 16    Q.      And under were the other things?

15:59:46 17    A.      Yes.

15:59:46 18    Q.      And the exhibit that you identified as the Colt gun,

15:59:51 19    it was inside a sock?

15:59:52 20    A.      A sock, yes.

15:59:53 21    Q.      See did you have the box, did he give it you to you

15:59:57 22    to look at it, or is he giving it to you himself?

16:00:01 23    A.      From what I recall, he's holding the box and he pulls

16:00:05 24    out -- he reaches down and he says I think this is what

16:00:09 25    you're looking for and he pulled out a sock that has the gun

Greer - cross

16:00:13  1    in it.  I put on latex gloves and pulled the gun out.

16:00:17  2    Q.      I'm going to come back to the latex gloves in a

16:00:20  3    second.  He gives you the sock and you pull the gun out of

16:00:22  4    the sock?

16:00:23  5    A.      Yes.

16:00:23  6    Q.      Now you have the gun out of the sock, right?  And you

16:00:27  7    indicated that there was also other things in that box,

16:00:31  8    right?

16:00:32  9    A.      Yes.

16:00:32  10   Q.      There was, for example, I think you mentioned a

16:00:37  11   leather pouch?

16:00:38  12   A.      Yes.

16:00:39  13   Q.      Now, at the point of there being a leather pouch, the

16:00:43  14   gun was not in that pouch at this point because you just

16:00:46  15   said it was in a sock?

16:00:48  16   A.      Yes.

16:00:48  17   Q.      So in the pouch was there-- was at that point, would

16:00:52  18   you call it a speed loader, was that inside the pouch, or

16:00:56  19   was that lying next to it?

16:00:58  20   A.      Again, we're almost six years out.

16:01:01  21   Q.      And if you don't remember, that's fine, I just want

16:01:03  22   to understand.

16:01:04  23   A.      What I remember is he just kind of handed me, this is

16:01:08  24   with it too, or something, I don't know the exact words.

16:01:10  25   Q.      Okay.

16:01:11  1    A.      But he handed me this pouch and I believe it was kind

16:01:15  2    of like cupped with all this stuff laying inside.

16:01:18  3    Q.      And did it all fit in the pouch, so the gun is not

16:01:21  4    there, was the box of bullets inside or outside?

16:01:24  5    A.      I don't think it was -- by inside you mean --

16:01:27  6    Q.      Inside the pouch?

16:01:28  7    A.      It was laying -- I think the pouch was open and all

16:01:31  8    this stuff was kind of laying.

16:01:33  9    Q.      All the stuff, not the gun, bullets, speed loader you

16:01:36  10   mean, right?

16:01:37  11   A.      Everything but the gun.

16:01:38  12   Q.      Chap stick?

16:01:39  13   A.      Chap stick, yeah.

16:01:40  14   Q.      Was there a cell phone box in the box?

16:01:44  15   A.      I would have to look at my report.

16:01:47  16   Q.      You don't remember sitting here --

16:01:49  17   A.      If you bring one up, there probably was.

16:01:52  18   Q.      But that would have been in the pouch, or was it?

16:01:56  19   A.      It was with all the stuff.

16:01:59  20   Q.      The cell phone box?

16:02:03  21   A.      From what -- I don't think all this stuff would fit

16:02:04  22   inside the pocket of the pouch.

16:02:05  23   Q.      Exactly, that's what I'm asking.  So it was in the

16:02:08  24   shoebox but where in the shoebox, some of it was in the

16:02:11  25   pouch, some not, is that correct?

Greer - cross

16:02:14 1    A.      I'll agree with you on that, yeah.

16:02:18 2    Q.      All right.  So now you have the box and you have

16:02:20 3    among other things the bullets and you have the speed

16:02:24 4    loader.  There were no bullets in the gun when it was

16:02:26 5    retrieved were there?

16:02:27 6    A.      No.

16:02:28 7    Q.      And you have a box and you said there were 23 of the

16:02:31 8    bullets that there were holes for 25, correct?

16:02:35 9    A.      Correct.

16:02:35 10   Q.      And two loose bullets weren't in the box, right?

16:02:40 11   A.      No.

16:02:40 12   Q.      But they weren't in the gun?

16:02:42 13   A.      No.

16:02:43 14   Q.      As you looked at the gun, given your experience,

16:02:46 15   could you even see whether it had ever been fired?

16:02:51 16   A.      I didn't check to see if it had been fired.

16:02:54 17   Q.      You said earlier, too, that there was, you think,

16:02:59 18   maybe you're sure that there was some investigation to bring

16:03:01 19   the gun somewhere and fire it.  Are you sure about that?

16:03:05 20   A.      Am I sure about what?

16:03:06 21   Q.      That somebody after you got the gun, brought it to

16:03:10 22   someplace and put a bullet in it and fired it?

16:03:12 23   A.      I'm not sure, I never got a report back from them.

16:03:15 24   Q.      You're not sure that that happened, you assume, but

16:03:18 25   you don't know that that happened?

Greer - cross

16:03:19  1    A.      I would be very surprised if it didn't.

16:03:21  2    Q.      I understand what you're saying about being

16:03:24  3    surprised, but I'm looking through the material and I'm

16:03:26  4    asking whether there is any report of that happening, did

16:03:29  5    you see one?

16:03:30  6    A.      I don't have one, no.

16:03:31  7    Q.      So you would be surprised but you don't know if

16:03:34  8    somebody did that?

16:03:35  9    A.      I do not, no.

16:03:36  10   Q.      Now we're back to the box and you get the material

16:03:39  11   and you put the latex gloves on, I'll come back to that,

16:03:43  12   too.

16:03:43  13          Did you find out that day when he got the

16:03:48  14   material that he was giving you?

16:03:52  15   A.      Did I --

16:03:54  16   Q.      Right.  Did you find out on October 29th when you are

16:03:57  17   in his house when it was that he -- did he tell you when he

16:04:04  18   had retrieved that material?

16:04:05  19   A.      Not that I recall.

16:04:06  20   Q.      Did he tell you anything about the specifics about

16:04:10  21   when he went into the trash, the pouch was upside down or it

16:04:13  22   was right side up or whether or not the bullets were full or

16:04:16  23   whether the bullets weren't full or anything like that that

16:04:19  24   day?

16:04:20  25   A.      No, I was just concerned with recovering a stolen

16:04:25  1    firearm.

16:04:25  2    Q.      At any point did he tell you or did you come to learn

16:04:29  3    whether anybody went into the trash looking for the two

16:04:32  4    stray bullets?

16:04:33  5    A.      No.

16:04:34  6    Q.      So you get this material and if I understand it

16:04:37  7    correctly, you're now getting it and is he that volunteers

16:04:44  8    and by the way, you might want this, too?

16:04:50  9    A.      He did.

16:04:51 10    Q.      And that was another gun, right?

16:04:52 11    A.      It was.

16:04:53 12    Q.      And it was in a different sock in the same box?

16:04:57 13    A.      Yes.

16:04:57 14    Q.      And underneath where the other folded socks were?

16:05:00 15    A.      Yes.

16:05:01 16    Q.      When you got the gun from him, the first gun or

16:05:05 17    confronted him, did you ask him when you fished out this gun

16:05:10 18    from the trash, Mr. So and so, I don't know if he said his

16:05:14 19    name yet?

16:05:15 20    A.      Banner.

16:05:15 21    Q.      Banner, did you report it to the police, did you ask

16:05:18 22    him that?

16:05:21 23    A.      I did.

16:05:22 24    Q.      Did you ask Mr. Banner if he's the one who fished it

16:05:25 25    out, why did he not call the police when he fished out a

Greer - cross

16:05:29  1    gun, did you ask him that?

16:05:30  2    A.      Yes, I did.

16:05:31  3    Q.      And his response?

16:05:32  4    A.      He didn't have a response.

16:05:34  5    Q.      So now you've got him saying to you, and by the way,

16:05:38  6    you may want this too, right?

16:05:40  7    A.      Yes.

16:05:41  8    Q.      I think you identified he said that he had another

16:05:43  9    gun, right?

16:05:44 10    A.      Yes.

16:05:44 11    Q.      And you identified what it was, it was some sort of

16:05:47 12    semiautomatic?

16:05:48 13    A.      It was a Sundance 25-caliber semiautomatic.

16:05:52 14    Q.      So the Colt is a revolver with five chambers, right?

16:05:55 15    A.      Correct.

16:05:56 16    Q.      What's a semiautomatic?

16:05:59 17    A.      I wasn't allowed to bring a gun in here.

16:06:04 18    Q.      You don't have to, you can describe it, there are too

16:06:07 19    many guns in here right now.

16:06:09 20    A.      If you're holding a gun in your hand, the handle

16:06:11 21    comes down in your hand right here, from the bottom, there

16:06:15 22    is an item referred to as a magazine that slides up into the

16:06:19 23    handle.  It has bullets stacked in it, there is a spring at

16:06:25 24    the bottom, so there is, up at the top there is a thing

16:06:29 25    called a firing chamber and you pull the trigger there is a

16:06:33  1    hammer that comes forward, hits the back of that bullet

16:06:36  2    that's in the firing chamber, there is a primer, when it

16:06:39  3    strikes the primer it creates an explosion, and sends the

16:06:44  4    bullet out of the gun.

16:06:45  5    Q.       Thank you, that was way too much information than I

16:06:49  6    wanted.

16:06:50  7    A.       That's why it's a semiautomatic.

16:06:52  8    Q.       A different kind of a handgun than one that has a

16:06:56  9    revolving chamber?

16:06:56 10    A.       Yes.

16:06:57 11    Q.       So he gave you that one, too?

16:06:59 12    A.       Yes.

16:06:59 13    Q.       Was that one loaded at the time?

16:07:01 14              MR. HINES:  Objection, Your Honor may we

16:07:03 15    approach?

16:08:47 16              (Side-bar discussion.)

16:08:47 17              MR. HINES:  So we've obviously given Mr. Lowell

16:08:47 18    some leeway.  The crosses have been consistently lengthy,

16:08:47 19    two times our directs.  He's asked thirty questions about

16:08:47 20    Mr. Banners' socks.

16:08:47 21              THE COURT:  I was wondering if it was outside

16:08:47 22    the scope.

16:08:47 23              MR. HINES:  We're giving some leeway, I don't

16:08:47 24    know if we're running out the clock here, but we have two

16:08:47 25    witnesses waiting who are 80 years old and we're trying too

Greer - cross

16:08:47  1    move forward, I think it's irrelevant all these questions

16:08:47  2    about this other firearm.

16:08:47  3            MR. LOWELL:  As to outside the scope, he talked

16:08:47  4    about the man giving him another gun, he already talked

16:08:47  5    about the fact that the guy explained about that gun, I have

16:08:47  6    maybe three questions about that, I don't see how that's

16:08:47  7    outside the door since you open the door about where the gun

16:08:47  8    was, I didn't --

16:08:47  9            THE COURT:  This is going on a little long.

16:08:47 10            MR. LOWELL:  I will cut him off.

16:08:47 11            THE COURT:  I got jurors over there nodding off,

16:08:47 12    do that at your peril, but they are half sleeping.

16:08:47 13            MR. HINES:  The other thing I'm up here, I would

16:08:47 14    like to request, I did not intend to elicit this, and he

16:08:47 15    indicated the address of the Banners and I would like to

16:08:47 16    request that we strike that from the transcript.

16:08:47 17            MR. LOWELL:  I see that.

16:08:47 18            THE COURT:  I actually heard that and I was

16:08:47 19    wondering that so we'll strike that from the transcripts.

16:08:47 20            (End of side-bar.)

16:08:47 21    BY MR. LOWELL:

16:08:47 22    Q.    So we're at the part of the story where there is a

16:08:49 23    semiautomatic gun acquired, too.  Did you ask him how he got

16:08:52 24    that?

16:08:52 25    A.    I did.

Greer - cross

16:08:53  1    Q.      Did you indicate that the friend gave it to him

16:08:57  2    because the friends's brother was in some form of trouble?

16:08:59  3    A.      Coworker.

16:09:00  4    Q.      Coworker's brother was in some form of trouble?

16:09:03  5    A.      Yes.

16:09:03  6    Q.      At that point you said you did run a check of that

16:09:07  7    gun, right?

16:09:08  8    A.      Yes.

16:09:08  9    Q.      Did you ask him anything about what was the name of

16:09:11 10    the coworker?

16:09:11 11    A.      Yes.

16:09:12 12    Q.      And did he tell you?

16:09:13 13    A.      He couldn't recall.

16:09:14 14    Q.      And did he ask you the name ---so he couldn't answer

16:09:19 15    that question, he didn't know the name of the brother who

16:09:21 16    was quote in trouble, is that correct?

16:09:24 17    A.      Correct.

16:09:24 18    Q.      So then he gave you both guns.  Then did you ask him

16:09:28 19    what was he going to do with the Colt if you had not come

16:09:31 20    and gotten it from him?

16:09:32 21    A.      I did.

16:09:33 22    Q.      What did he say?

16:09:34 23    A.      He said it would probably sit in that box for years

16:09:38 24    just like the other one did.

16:09:39 25    Q.      Did he say that the first one had been there for

Greer - cross

16:09:42  1    years?

16:09:42  2    A.      Yes.

16:09:42  3    Q.      So now you have both and you leave.  And you said

16:09:45  4    that you put latex gloves on?

16:09:47  5    A.      Yes.

16:09:47  6    Q.      Why did you do that?

16:09:49  7    A.      So that to protect the evidentiary value of the item.

16:09:54  8    Q.      At the point at which you were acquiring it, right?

16:09:58  9    A.      Yes.

16:09:58 10    Q.      But by then he had actually had the items in his

16:10:02 11    possession, right?

16:10:03 12    A.      Yes.

16:10:03 13    Q.      Without having latex gloves on as far as you could

16:10:06 14    tell?

16:10:07 15    A.      Correct.

16:10:07 16    Q.      And he, at that point, confirmed he had taken it from

16:10:10 17    the trash, right?

16:10:11 18    A.      Correct.

16:10:11 19    Q.      And you don't know if anybody touched it in that

16:10:14 20    period of time?

16:10:15 21    A.      I do not.

16:10:16 22    Q.      Right.  So at that point you're just making sure that

16:10:19 23    when you get it it's in the form that you got it?

16:10:21 24    A.      Yes, just trying not to contaminate it any further

16:10:25 25    than it's already been.

Greer - cross

16:10:26  1    Q.      Okay.  And so the next thing that happens is I hear

16:10:30  2    you took all the material.  Did you ask him as to that

16:10:34  3    second gun when he got it, did he call the police when he

16:10:40  4    got the first gun, whenever that first gun, the

16:10:43  5    semiautomatic, did you ask him why he didn't call the police

16:10:46  6    about that one?

16:10:47  7    A.      I don't recall.  I already knew he didn't call the

16:10:52  8    police about the first one.

16:10:53  9    Q.      You didn't have to ask him.  You put it in the box

16:10:55 10    and you take it to Delaware State Police headquarters and

16:10:58 11    put it in a vault?

16:10:59 12    A.      Troop 2.

16:11:00 13    Q.      Sorry?

16:11:01 14    A.      Troop 2, not headquarters.

16:11:04 15    Q.      I'm sorry, some Delaware State Police facility,

16:11:08 16    right?

16:11:08 17    A.      Yes.

16:11:08 18    Q.      After you did that, I hear you said that you

16:11:11 19    contacted Mr. Biden who was in the police report a victim of

16:11:14 20    a stolen gun?

16:11:16 21    A.      Yes.

16:11:16 22    Q.      And you told him you had recovered it?

16:11:18 23    A.      Yes.

16:11:18 24    Q.      And I think you were asked some questions, Mr. Biden

16:11:23 25    indicated he didn't want to press charges against anybody,

16:11:26  1    either the person who threw it out or the person who

16:11:28  2    retrieved it, right?

16:11:29  3    A.        Correct.

16:11:30  4    Q.        And at that point, he said he didn't want the gun

16:11:32  5    back, right?

16:11:34  6    A.        I don't recall him saying he didn't want the gun

16:11:36  7    back.

16:11:36  8    Q.        But you didn't give it back?

16:11:38  9    A.        I explained that there were some procedural things

16:11:40 10    that we needed to do before it could be returned.

16:11:43 11    Q.        But you said it could be returned?

16:11:45 12    A.        I said before it could be returned, yes.

16:11:47 13    Q.        And then what happened is I think Mr. Hines asked you

16:11:50 14    that that was in 2018 and then years later some new

16:11:54 15    investigation occurred, right?

16:11:55 16    A.        Correct.

16:11:56 17    Q.        And the gun stayed in the possession of the Delaware

16:12:00 18    State Police for all that time?

16:12:01 19    A.        Correct.

16:12:01 20    Q.        Meaning it was never returned to Mr. Biden?

16:12:03 21    A.        It was not.

16:12:04 22    Q.        And then when you say that it happened over a number

16:12:08 23    of years, these events are October of 2018, right?

16:12:11 24    A.        Yes.

16:12:12 25    Q.        And the number of years in which this investigation

16:12:15  1    that you understand occurred were how many years later?

16:12:18  2    A.    We're almost six years later now.

16:12:21  3    Q.    Now, but when the investigation began, a couple of

16:12:23  4    years, three years?

16:12:24  5    A.    I'm not certain.

16:12:26  6    Q.    Did you know what happened to the material that you

16:12:28  7    got from Mr. Banner that day that you put into the Delaware

16:12:32  8    State Police facility between the time it was retrieved and

16:12:35  9    the time that any other investigation occurred?

16:12:37 10    A.    I assume it stayed in the evidence lock.

16:12:40 11    Q.    I said you assumed.  Do you know?

16:12:44 12    A.    I never saw it again after I turned it over to

16:12:48 13    Sergeant Smith.

16:12:48 14    Q.    So you wouldn't know what happened in those

16:12:50 15    intervening years?

16:12:51 16    A.    No.

16:12:52 17             MR. LOWELL:  Thank you for the time.  I have no

16:12:54 18    other questions.

16:12:55 19             MR. HINES:  No questions.

16:12:56 20             THE COURT:  All right.  Thank you.  Thank you,

16:12:57 21    sir.  You're excused.  What's next.

16:12:59 22             MR. HINES:  The United States calls Edward

16:13:03 23    Thomas Banner.

16:13:18 24             COURTROOM DEPUTY:  Please raise your right hand.

16:13:31 25    Please state and spell your name for the record.

Banner - direct

16:13:41  1            THE WITNESS:  Edward T Banner.  E-D-W-A-R-D.  T

16:13:54  2    for Thomas.  B-A-N-N-E-R.

16:13:57  3            EDWARD THOMAS BANNER, having been duly sworn was

16:14:03  4    examined and testified as follows:

16:14:06  5                    DIRECT EXAMINATION

16:14:08  6            THE COURT:  All right.  You can sit down, sir.

16:14:10  7    Thank you.  Thank you, sir.  You can sit down.  You probably

16:14:18  8    want to get in the chair before it.

16:14:26  9            THE WITNESS:  Thank you.

16:14:30 10    BY MR. HINES:

16:14:31 11    Q.    Good afternoon, Mr. Banner.  Can you hear me okay

16:14:35 12    from there?  Mr. Banner, can you hear me?  Good afternoon,

16:14:51 13    Mr. Banner, can you hear me?  Testing, testing?

16:15:01 14            THE COURT:  Do you want to stand up a little

16:15:05 15    closer.

16:15:05 16            MR. HINES:  May I, Your Honor?  May I stand

16:15:17 17    here, Your Honor.

16:15:18 18            THE COURT:  Yes.

16:15:20 19    BY MR. HINES:

16:15:20 20    Q.    Good afternoon, Mr. Banner?

16:15:22 21    A.    Good afternoon.

16:15:23 22    Q.    If you could speak towards this microphone, I'm going

16:15:25 23    to position it right here for you.  Can you hear me okay

16:15:29 24    right now?

16:15:29 25    A.    Yes.

Banner - direct

16:15:30  1    Q.    Is it better if we speak when we're closer together

16:15:34  2    so you can see my lips moving when we talk?

16:15:37  3    A.    Yes.

16:15:37  4    Q.    How old are you, sir?

16:15:39  5    A.    80.

16:15:41  6    Q.    Are you retired?

16:15:42  7    A.    Yes.

16:15:43  8    Q.    How long have you been retired?

16:15:45  9    A.    Since '06.

16:15:47 10    Q.    What did you previously do for a living?

16:15:49 11    A.    I worked at General Motors for 43 -- well over

16:15:53 12    40 years.

16:15:53 13    Q.    What did you do while you were working at General

16:15:56 14    Motors for over 40 years?

16:15:58 15    A.    I did production, and they shipped me out and I was

16:16:02 16    the janitor, or environmental one, and they would sometimes

16:16:13 17    they would send me to the body shop when I was working in

16:16:18 18    production.

16:16:20 19    Q.    Prior to working at General Motors, did you serve in

16:16:23 20    the military?

16:16:24 21    A.    I served four years while I was working at General

16:16:30 22    Motors, so I went in -- I worked about a year at General

16:16:33 23    Motors, then I went in the Navy for four years.

16:16:36 24    Q.    Now, after you retired, did you acquire a hobby where

16:16:42 25    you would collect recyclables from trash cans and then

Banner - direct

16:16:45 1    recycle them?

16:16:46 2    A.      Yes, I actually started doing that before I retired

16:16:50 3    from General Motors, mostly with the aluminum cans and

16:16:54 4    plastic bottles and I would take them to New York a lot of

16:16:59 5    times, and got a nickel a piece then.  But now you only get

16:17:06 6    so much a pound.  Anywheres, I was getting anywhere from

16:17:09 7    $0.25 a pound to $0.75 a pound.  And they take them to a

16:17:15 8    recycle place because in New York, it's too dangerous for me

16:17:22 9    to go up there and too far, but I would get like a $120 when

16:17:27 10   I took them to New York for plastic and cans.  Now I only do

16:17:31 11   cans because plastic is not -- I don't know nothing about

16:17:35 12   plastic now.

16:17:36 13   Q.      So you're both saving the environment and making a

16:17:39 14   little money on the side?

16:17:40 15   A.      Yes, especially now with the gas prices.

16:17:43 16   Q.      And did you have a family member in New York that you

16:17:46 17   would go visit and use that money --

16:17:48 18   A.      Oh, absolutely, yes, I had family up there.  And they

16:17:51 19   had two restaurants, I think they're sort of getting out of

16:17:56 20   it now, I don't know for sure.

16:17:57 21   Q.      Well, let's -- I would like to direct your attention

16:18:01 22   to a particular date, October 23rd, 2018.  Do you recall

16:18:07 23   finding something special at the Janssen's Market that day?

16:18:12 24   A.      Yes.  I don't remember the date specifically but I

16:18:17 25   definitely remember finding that, yes.

Banner - direct

16:18:22  1    Q.      And we'll go over that in a moment.  In advance of

16:18:23  2    your testimony today, were you shown a video of exterior

16:18:27  3    footage from the Janssen's Market?  In advance of your

16:18:31  4    testimony today, were you shown a video of the exterior of

16:18:36  5    Janssen's Market?

16:18:36  6    A.      Oh, yes, yes.

16:18:37  7    Q.      Did that video show you in it?

16:18:40  8    A.      Yes.  Yes it did.

16:18:42  9    Q.      Play what's been in evidence of video 39C,

16:18:46 10    Exhibit 39C, please.  And if you look at the screen before

16:18:51 11    you, Mr. Banner, it should come up in a moment.  All right.

16:19:10 12    If we can pause it right there, Ms. Vo.  Is that you,

16:19:15 13    Mr. Banner, in the video?

16:19:16 14    A.      It sure looks like me.

16:19:18 15    Q.      And now if we keep playing the video a little

16:19:23 16    further.  What are you doing as you dip out of the frame

16:19:26 17    here in this first part of the video?

16:19:28 18    A.      Apparently I'm looking in the trash can bin.

16:19:31 19    Q.      Does Janssen's have a couple of exterior trash cans?

16:19:34 20    A.      They have two right there by where you enter, one at

16:19:38 21    the entrance and one just down a little bit.

16:19:41 22    Q.      We'll wait a moment.  And is that you now continuing

16:19:47 23    to walk to the next trash can?

16:19:50 24    A.      Uh-huh.

16:19:53 25    Q.      And now when you dip out of frame again, is there a

16:19:56  1   trash can right near where that white box is on the screen?

16:19:59  2   A.      Right.

16:20:00  3   Q.      Do you see a little object here above the trash can?

16:20:03  4   A.      Yeah.

16:20:04  5   Q.      Were you looking in that trash can?

16:20:06  6   A.      Absolutely.

16:20:08  7   Q.      What did you find in that trash can on that day?

16:20:11  8   A.      Apparently I found a 38.

16:20:13  9   Q.      A 38 what?

16:20:14 10   A.      Pistol, or handgun.

16:20:18 11   Q.      Now, I remember --

16:20:20 12   A.      And there was a lot of other stuff with it, like a

16:20:24 13   black cylinder type thing that you load the gun with or

16:20:29 14   whatever, and it was within a floss or parchment, the gun

16:20:38 15   was, there was other stuff along with it.  That pertained to

16:20:42 16   the gun.

16:20:43 17   Q.      Okay.  You found several items in that trash can?

16:20:47 18   A.      Yes.

16:20:47 19   Q.      We're going to go through each of them.  In advance

16:20:50 20   of your testimony today, did you have an opportunity to look

16:20:52 21   at some of those items again?

16:20:55 22   A.      Yes, I did.

16:21:03 23   Q.      Let me first show you what's in evidence of, and

16:21:09 24   still in the same condition as yesterday, Government's

16:21:11 25   Exhibit 1.  Do you recognize this, sir, Government's

Banner - direct

16:21:16  1  Exhibit 1?

16:21:16  2  A.    More than likely, yes.

16:21:18  3  Q.    How do you recognize it?

16:21:19  4  A.    It's a .38.  And the ammo was with it.  And it was

16:21:25  5  two cartridges missing.

16:21:28  6  Q.    Now, Government's Exhibit 2, is this the ammunition?

16:21:34  7  A.    I assume that it is, if there is two missing, it's

16:21:38  8  more than likely the one.

16:21:39  9  Q.    Would you please put up Exhibit 2A.  And if you go to

16:21:45 10  the second page, the third page.

16:21:51 11  A.    Yeah, that's it.

16:21:52 12  Q.    Do you see how there is two missing there?

16:21:54 13  A.    Yeah, that's it.

16:21:55 14  Q.    And was there two missing when you found it out of

16:21:59 15  the trash can?

16:22:00 16  A.    Yes, there was.

16:22:01 17  Q.    Is this the other item that you were describing?

16:22:03 18  A.    Yeah, that's a black thing I was just referring to.

16:22:06 19  Q.    Do you know what this is?

16:22:08 20  A.    You put the shells in it to load the gun, fast load

16:22:11 21  or something.

16:22:14 22  Q.    Okay.  For the record that was Government's Exhibit 3

16:22:19 23  that I was just showing Mr. Banner.

16:22:21 24        Now, was this the parchment that you were just

16:22:27 25  describing, Government's Exhibit 4?

Banner - direct

16:22:32  1    A.      Is this the what?

16:22:33  2    Q.      You mentioned there was a parchment, I think your

16:22:37  3    word was parchment or words to that effect, was there an

16:22:43  4    item that had the items inside of it when you found it?

16:22:46  5    A.      The parchment, the gun was in that.

16:22:52  6    Q.      This was in a sealed envelope.  Can I show him 4A,

16:22:54  7    please.  I'm going to show you a photograph.

16:22:57  8    A.      Yeah, that looks like it.

16:22:59  9    Q.      If you scroll down a little bit.

16:23:01 10    A.      Because it was brown leather.

16:23:03 11    Q.      There on page 3?

16:23:04 12    A.      Yeah.  No, I would say that was it.

16:23:10 13    Q.      So when you got these items out of the trash can,

16:23:14 14    what did you do with them?

16:23:17 15    A.      Well, I had a lunch thing that I got at General

16:23:26 16    Motors, and I put the items in that.  And I didn't -- I

16:23:30 17    never looked at it again until the police officer come and

16:23:35 18    wanted to know about this particular situation.

16:23:39 19    Q.      All right.  So you took the items home after you

16:23:41 20    found them in the trash can?

16:23:42 21    A.      Right.

16:23:43 22    Q.      Did they stay in that object that you were

16:23:46 23    describing, did you put them in that object and did they

16:23:49 24    stay there until the police came?

16:23:51 25    A.      Yes, they did.

Banner - direct

16:23:52 1    Q.    Did you do anything with the gun, did you shoot it,

16:23:54 2    did you play with it?

16:23:55 3    A.    No, no, I put it up on the top shelf in the closet,

16:24:01 4    actually it was, I can't think of the name, but it was the

16:24:07 5    lunch box that we got from General Motors, and I put it in

16:24:11 6    there.

16:24:11 7    Q.    Did you have other items in there as well, like

16:24:14 8    clothing or other things like that?

16:24:16 9    A.    Oh, in the closet.  It was on a shelf like and that

16:24:21 10   was on the top shelf.

16:24:23 11   Q.    And then --

16:24:24 12   A.    Or definitely near the top, you know.

16:24:28 13   Q.    Is your next memory that the police came and asked

16:24:32 14   you about the firearm?

16:24:34 15   A.    Yes.  Yes.  I don't know whether it was weeks or

16:24:37 16   months or how long it was, but yeah, it was after that.

16:24:40 17   Q.    But between the time that the police -- between the

16:24:44 18   time that you found the firearm and the police came, you

16:24:47 19   didn't touch the firearm after putting it away?

16:24:50 20   A.    No, I didn't look at the items until I sort of got a

16:24:54 21   little hazy about them because I never looked at them again

16:24:58 22   until they -- until I gave him the gun.

16:25:00 23   Q.    Now, did the police officer come to your home and ask

16:25:03 24   you to provide him with the gun?

16:25:06 25   A.    They came to my home and they started asking me

Banner - direct

16:25:09  1    questions and they got to that subject, yes.

16:25:12  2    Q.      And had the police officer first approached you in a

16:25:15  3    parking lot before he came to your home and talked to you?

16:25:18  4    A.      In the parking lot, possibly, I don't remember

16:25:21  5    exactly how that all came about.  But I was amazed, I'm glad

16:25:28  6    that he took all this stuff down because I didn't record

16:25:32  7    anything, you know, I didn't write down when I got it, I

16:25:35  8    didn't, you know.

16:25:36  9    Q.      So did you just turn everything over to the police

16:25:39 10    that you had gotten out of that trash can?

16:25:41 11    A.      Yes, I did, as a matter of fact, I had another gun

16:25:44 12    that somebody at General Motors gave me years before this,

16:25:49 13    and I retired in '06 so it was years before that, and I gave

16:25:54 14    him that one, too, because I had that, either in that one or

16:25:58 15    in another lunch box just like it because somebody at work

16:26:02 16    had given me another one.  I got one from the plant and then

16:26:06 17    they give me another one, so I had it either in the same one

16:26:10 18    or in a different one, you know another one.

16:26:12 19    Q.      Did you ever fire or use that second gun from the

16:26:16 20    plant?

16:26:16 21    A.      No, no, all fifty ammunition was with that one, but

16:26:20 22    my nephew got rid of it when I lived there because he didn't

16:26:24 23    want to take any chance on anybody getting-- start using it

16:26:29 24    for something you know, because it was in the garage then.

16:26:32 25    Q.      I see like someone breaking in and taking it?

Banner - direct

16:26:35  1    A.      Yeah.

16:26:36  2    Q.      So you had no ammunition for that firearm in this

16:26:39  3    house?

16:26:39  4    A.      No, I gave him that gun, too.

16:26:41  5    Q.      The police officer, you gave him both guns?

16:26:44  6    A.      Yes, I did.

16:26:44  7    Q.      Turned it over.  Was your wife home that day?

16:26:47  8    A.      I think she was.

16:26:48  9    Q.      And your wife's first name is?

16:26:50 10    A.      Joanne.

16:26:51 11    Q.      And how long have you guys been married?

16:26:55 12    A.      I think eleven years.

16:26:58 13    Q.      Eleven years?

16:26:59 14    A.      Yeah, I think so.  She'll know better than I do.

16:27:05 15    Q.      All right.  Mr. Banner, this may sound like an

16:27:09 16    unusual question, but does anyone in your household use

16:27:13 17    cocaine?

16:27:14 18    A.      No.  No.

16:27:16 19    Q.      And in your closet or your dresser or your bedroom,

16:27:21 20    have you ever seen cocaine or residue or anything like that?

16:27:24 21    A.      Not that I know of.

16:27:27 22    Q.      All right.

16:27:27 23            MR. HINES:  I have no further questions.  Thank

16:27:29 24    you.

16:27:30 25            THE COURT:  Mr. Lowell.

16:27:31  1          MR. LOWELL:  Thank you.

16:27:32  2          Is it okay if I do the same thing?

16:27:35  3          THE COURT:  You may come on down.

16:27:37  4          MR. LOWELL:  Thank you

16:27:38  5                  CROSS-EXAMINATION

16:27:39  6   BY MR. LOWELL:

16:27:39  7   Q.      Good afternoon, Mr. Banner.  Can you hear me okay?

16:27:41  8   A.      I hear you better the closer you get.

16:27:43  9          MR. LOWELL:  Can I be this close?

16:27:45 10          THE WITNESS:  Yeah, that's all right.

16:27:47 11   BY MR. LOWELL:

16:27:47 12   Q.      I'll tell you as a word of wisdom, one is best

16:27:51 13   knowing how many years you have been married to a spouse, I

16:27:54 14   can tell you.

16:27:54 15   A.      What.

16:27:55 16   Q.      You best know how many years you have been married to

16:27:58 17   a spouse, you said eleven years?

16:27:59 18   A.      Yeah, absolutely.

16:28:00 19   Q.      I just have a few questions.  You said you were at

16:28:03 20   Janssen's --

16:28:04 21   A.      No, I don't work there.

16:28:05 22   Q.      No, not work there, I'm sorry, that's where you found

16:28:08 23   the gun, is that right?

16:28:10 24   A.      Yeah, that's where I found the gun.

16:28:11 25   Q.      And do you that because you were looking for

Banner - cross

16:28:14  1    recyclable material?

16:28:16  2    A.    Right.

16:28:16  3    Q.    When you found the gun in the trash, was it in a bag

16:28:19  4    or not in the bag?

16:28:21  5    A.    Was it what?

16:28:23  6    Q.    Was it in a bag?

16:28:24  7    A.    Well, that piece of brown material, whatever it is.

16:28:27  8    Q.    That's where it was, but was it in a shopping bag or

16:28:30  9    a gift bag?

16:28:32 10    A.    I don't recall that.

16:28:33 11    Q.    Okay.

16:28:34 12    A.    But all the parts were there, whatever I found, they

16:28:36 13    were all in the trash can.  I don't think they were in a

16:28:39 14    bag, they could have been in a bag, I don't recall that.

16:28:42 15    Q.    Okay.  And do you recall or other than today, whether

16:28:47 16    or not at the time you remember getting a leather pouch?

16:28:54 17    A.    The gun was apparently in that.

16:28:56 18    Q.    I know apparently.  But were you interviewed prior to

16:29:00 19    today by anybody in the prosecution in which you said you do

16:29:03 20    not recall the leather pouch?

16:29:05 21    A.    I recall it to a large degree, but exactly whether it

16:29:10 22    was wrapped in it real tight or if it was loose or what, but

16:29:15 23    it was all in there in the trash can with it.

16:29:18 24    Q.    So in your understanding, whether it was in a bag,

16:29:22 25    there is the gun, yes, the gun, the gun?

Banner - cross

16:29:25 1    A.    As far as I know it wasn't in a bag, it might have

16:29:28 2    been in that parchment but it wasn't in a bag, as far as I

16:29:32 3    know.

16:29:32 4    Q.    And the bullets, a box of bullets?

16:29:34 5    A.    Yes, there was.

16:29:35 6    Q.    When you retrieved the gun, it wasn't loaded, was it?

16:29:39 7    A.    I don't think so, unless it's loaded now.  If it was

16:29:42 8    loaded, it should be still loaded.  I didn't --

16:29:46 9    Q.    You didn't look?

16:29:47 10   A.    Well, not that I recall, because I certainly didn't

16:29:50 11   take any out and I didn't put any in.

16:29:53 12   Q.    Did you look in the trash to see if there were any

16:29:57 13   bullets that had fallen out of the box?

16:29:59 14   A.    No, no, because if they -- I only processed the top,

16:30:04 15   I don't dig down to the bottom.  Especially if they're full.

16:30:09 16   Q.    Okay.  So you took it out of the trash?

16:30:12 17   A.    Yes, sir.

16:30:12 18   Q.    And then did you put it or was it in a bag or was it

16:30:16 19   all just in the parchment?

16:30:18 20   A.    I might have put it in a bag with the cans, or

16:30:22 21   whatever, plastic bottles, whatever I was doing at the time.

16:30:25 22   Q.    And then you brought it home to your house?

16:30:28 23   A.    Yes.  I don't know if I brought it directly home, I

16:30:31 24   might have been around somewhere else in town there.

16:30:34 25   Q.    At some point?

Banner - cross

16:30:35  1    A.      Greenville.

16:30:36  2    Q.      At some point you did bring it home?

16:30:38  3    A.      Absolutely.

16:30:40  4    Q.      Okay.  And you said when you did, you put it in a

16:30:44  5    lunch box kind of thing?

16:30:47  6    A.      Yeah.

16:30:47  7    Q.      Like a lunch box?

16:30:48  8    A.      Not a lunch box.

16:30:50  9    Q.      Tell me.

16:30:51 10    A.      It's sort of like a bag, it's about that big, and I

16:30:55 11    can't think of the name of it, but suggestion plan, a

16:31:01 12    suggestion plan lunch box from General Motors and I put the

16:31:05 13    stuff in there.

16:31:06 14    Q.      Now I understand like a suggestion box where people

16:31:09 15    put suggestions in?

16:31:10 16    A.      Sort of like a cloth thing that you would put a lunch

16:31:13 17    in, but I never put lunches in them, I apparently used it

16:31:17 18    for that.

16:31:18 19    Q.      Okay.  Do you have any recall about taking the gun

16:31:21 20    you found and putting it in a sock, a sock, you know, a

16:31:26 21    sock, did you put it in a sock?

16:31:28 22    A.      I didn't put it in no sock, no.

16:31:31 23    Q.      Okay.  So as far as you remember, no sock?

16:31:34 24    A.      No sock, I don't remember no sock.

16:31:36 25    Q.      And you said this box was put on the top shelf, is

Banner - cross

16:31:39  1    that right?

16:31:40  2    A.      Either the top or at near the top, you know, there

16:31:44  3    might have been something else above it, I don't know.

16:31:46  4    Q.      And then when the officer came and asked you

16:31:50  5    questions and you gave it to them?

16:31:52  6    A.      I went up and got it, yeah.

16:31:54  7    Q.      And then did you then tell him you had another gun?

16:31:59  8    A.      Yeah, I might have had it right in the same one, I'm

16:32:02  9    not sure, that's a box.

16:32:06  10   Q.      And when you have that other gun in the same or

16:32:09  11   another box, was that also in a sock?

16:32:13  12   A.      Was what?

16:32:14  13   Q.      Was that in a sock, the second one?

16:32:16  14   A.      In a sock?

16:32:17  15   Q.      In a sock.

16:32:19  16   A.      I know nothing about a sock, that parchment or

16:32:23  17   whatever was shown there, it was in that.  The other gun was

16:32:26  18   never in that.

16:32:26  19   Q.      Where was the other gun?

16:32:28  20   A.      It was in a -- in a suggestion plan box, the same one

16:32:34  21   or another one just like it because somebody at work had

16:32:37  22   given me a second one that was theirs, and I had two of them

16:32:42  23   as far as I know.  And it might have been in a separate one

16:32:45  24   or whatever, but I didn't need either gun, I mean, I wasn't

16:32:50  25   --

Banner - cross

16:32:50  1    Q.       But you had two guns in the boxes, two?

16:32:53  2    A.       Yeah, I had two guns up there together, one might

16:32:57  3    have been in one suggestion plan lunch box and the other one

16:33:01  4    could have been in the other one or they both could have

16:33:04  5    been in the same one, but I don't know if they would fit, so

16:33:07  6    I didn't want to try to differentiate that, but they were

16:33:12  7    definitely separate guns.

16:33:13  8    Q.       I understand, but I want to follow-up on just one

16:33:16  9    thing.  When you got that first gun, the one from your

16:33:19 10    co-worker, I think you said there were bullets when you got

16:33:22 11    it?

16:33:22 12    A.       No, they were not bullets in the gun, there were

16:33:25 13    fifty bullets in a box just like the other box, there was

16:33:29 14    two black men, the one that gave me the gun was the brother

16:33:33 15    and he said it was his brother's gun and he didn't want his

16:33:37 16    brother to get in trouble with it, that's why he gave it to

16:33:40 17    me, so I had that one several years longer than the other

16:33:43 18    one.

16:33:43 19    Q.       And it had a box of ammunition?

16:33:46 20    A.       Yes.

16:33:47 21    Q.       Your nephew took it away early, after that?

16:33:50 22    A.       The ammunition was gone when I put the other gun in

16:33:53 23    the other.

16:33:54 24    Q.       Right.

16:33:55 25    A.       Because my nephew at the time I was living at my

16:33:59 1    nephews and, or where he lives, and he didn't want the

16:34:05 2    ammunition because he had two little, they were little, but

16:34:10 3    he was worried about the ammunition, somebody getting the

16:34:14 4    gun and using it, the same as I was about the other gun.

16:34:17 5    Q.    When you took the material out of the trash, you held

16:34:19 6    it in your hands, you held the gun, you held the pouch?

16:34:23 7    A.    I imagine I held it one way or the other when it was

16:34:27 8    in the pouch or whether it was out of the pouch, but I took

16:34:32 9    it out and looked at it at some point or I wouldn't have

16:34:35 10   known what it was.

16:34:36 11   Q.    And then on October 29th when Detective Greer came to

16:34:40 12   your house, you gave it all to him?

16:34:42 13   A.    That's right.

16:34:43 14            MR. LOWELL:  I have no other questions.

16:34:44 15            THE COURT:  Thank you.  Any redirect?

16:34:47 16            MR. HINES:  No, Your Honor.  Thank you.

16:34:48 17            THE COURT:  Thank you, sir.  Thank you very

16:34:50 18   much.

16:34:51 19            THE WITNESS:  You're welcome.

16:34:52 20            THE COURT:  You're excused.  Be careful stepping

16:34:55 21   down there.

16:34:57 22            THE WITNESS:  All right.

16:35:01 23            THE COURT:  Mr. Hines, what's next?

16:35:03 24            MR. HINES:  We're going to move on to --

16:35:08 25            THE COURT:  You're not going to call her.

16:35:11  1            MR. HINES:  No.

16:35:12  2            THE COURT:  So then we can finish.  All right.

16:35:18  3  So at this point we're going to take our evening break and

16:35:21  4  I'll just ask you not to talk to anybody, listen to anybody,

16:35:24  5  do any internet search or listen to any reports anywhere of

16:35:28  6  any kind.  And I'll see you here tomorrow at 9 o'clock.

16:35:33  7            Thank you.

16:35:34  8            COURTROOM DEPUTY:  All rise.

16:35:36  9            (Jury exiting the courtroom at 4:35 p.m.)

16:36:03 10            THE COURT:  Mr. Lowell, like the movies, you get

16:36:10 11  to get right in their face when you cross-examine, it's not

16:36:13 12  like it's made out to be like it's in movies.

16:36:17 13            MR. LOWELL:  No, it's not like Perry Mason did.

16:36:20 14            THE COURT:  All right.  I forgot to ask the

16:36:25 15  jurors not to talk to each other, but I will do that

16:36:28 16  tomorrow, I promise, before we do anything, and they're

16:36:31 17  going to leave right now anyway.

16:36:33 18            The government, so defendant put in a

16:36:40 19  supplemental jury instruction document last week, a couple

16:36:48 20  weeks ago.  For the most part I think I understand what

16:36:53 21  their positions are and what yours are from our prior

16:36:56 22  discussions and from their written part.  There is a good

16:37:00 23  faith instruction.  I don't know what the government's

16:37:02 24  position is on that.  If you guys can -- you don't have to

16:37:05 25  tell me right now, but you can either submit something or

16:37:08 1    tell me in the morning so I can understand where we are.

16:37:11 2                    MR. HINES:  Yes, Your Honor.  Will do.

16:37:13 3                    THE COURT:  Anything else we need to talk about?

16:37:15 4                    MR. LOWELL:  I'm sorry, Judge.

16:37:16 5                    MR. HINES:  We have two witnesses in the

16:37:20 6    morning, it's the chemist and then the drug expert.  We

16:37:23 7    anticipate we will rest in the morning.

16:37:28 8                    THE COURT:  The drug expert?

16:37:29 9                    MR. HINES:  Yeah, Joshua Romig from the DEA,

16:37:33 10   both we will qualify as experts in the case, the chemist is

16:37:37 11   Dr. Jason Brewer of the FBI, he's a very short witness and

16:37:40 12   the drug expert, Joshua Romig from the DEA, he is in our

16:37:45 13   view not a long witness, we think we will rest in the

16:37:48 14   morning.

16:37:48 15                   THE COURT:  Okay.

16:37:48 16                   MR. LOWELL:  On that, Judge, one holdover item.

16:37:52 17   So if you remember on our last --

16:37:55 18                   THE COURT:  Everybody else can be seated.  I

16:37:57 19   apologize.

16:37:59 20                   MR. LOWELL:  On our lab expert, you wanted to

16:38:02 21   hear from them, we're not deciding whether we're going to

16:38:04 22   call him until I hear Agent Brewer, but he'll be here if we

16:38:08 23   decide to do that so you can voir dire him if that's what

16:38:11 24   you want to do.

16:38:12 25                   THE COURT:  Yes.

16:38:13  1          MR. LOWELL:  Okay.  Thank you.

16:38:15  2          THE COURT:  And so yeah, actually why don't we

16:38:18  3  do this, if they rest, then maybe we can take a little bit

16:38:21  4  longer of a break if you want before you put on your case,

16:38:25  5  if you want to do that, or you can -- we can do it at

16:38:28  6  lunchtime, take a little bit longer lunch and you can think

16:38:32  7  about whether you want to put him on.

16:38:34  8          MR. LOWELL:  That would be helpful, also in

16:38:37  9  terms of timing, this is not going to delay the game because

16:38:40 10  no matter what we would have on this point depending on that

16:38:44 11  witness, very few, two or three, maybe not even witnesses,

16:38:47 12  we told the government who they are, and then we would make

16:38:50 13  the decision as to whether Mr. Biden is going to testify.

16:38:53 14  Even if that happened, Judge, the whole thing can be done by

16:38:57 15  Monday at the end of the day, so if we took a longer break,

16:39:01 16  that may be good because we also want to present to you,

16:39:03 17  which we'll file whatever way you want it, the Rule 29.

16:39:07 18          THE COURT:  Got it.  Okay.

16:39:08 19          MR. LOWELL:  Thank you.

16:39:09 20          THE COURT:  Anything you all have?

16:39:10 21          MR. HINES:  No, Your Honor, thank you.

16:39:12 22          THE COURT:  All right.  Then we'll see you in

16:39:13 23  the morning.

16:39:14 24          COURTROOM DEPUTY:  All rise.  Court is

16:39:26 25  adjourned.

16:39:26   1                    **(Court adjourned at 4:39 p.m.)**

         2

         3

         4              **I hereby certify the foregoing is a true and**
            **accurate transcript from my stenographic notes in the proceeding.**

         5

         6                             **/s/ Dale C. Hawkins**
                                     **Official Court Reporter**
         7                            **U.S. District Court**

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25