08:20:04

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA, ) VOLUME 5
                              )
5                             ) CRIMINAL ACTION
     v.                       ) NO. 23cr61(MN)
6                             )
     ROBERT HUNTER BIDEN,     )
7                             )
              Defendant.      )
8

9

10                  Friday, June 7, 2024
                    9:00 a.m.
                    Jury Trial
11

12                  Courtroom 4A
                    844 King Street
13                  Wilmington, Delaware

14

15

     BEFORE:  THE HONORABLE MARYELLEN NOREIKA
16           United States District Court Judge

17

18

19   APPEARANCES:

20

                    SPECIAL COUNSEL'S OFFICE
21                  BY:  DEREK E. HINES, ESQ.
                    BY:  LEO WISE, ESQ.
22

23                       Counsel for the
                         United States of America
24

25

1     APPEARANCES CONTINUED:

2

3

        DALTON & ASSOCIATES, P.A.
4         BY:  BARTHOLOMEW J. DALTON, ESQ.
        BY:  CONNOR DALTON, ESQ.

5
        -and-
6
        WINSTON & STRAWN LLP
7         BY:  ABBE DAVID LOWELL, ESQ.
        BY:  DAVID KOLANSKY, ESQ.
8         BY:  ISABELLA OISHI, ESQ.

9
                Counsel for the Defendant
10

11

12             - - - - - - - - - - -

13

08:26:24 14

08:45:38 15         COURTROOM DEPUTY:  All rise.

08:58:46 16         THE COURT:  All right.  Good morning, everyone.

08:58:50 17 Does someone want to talk?

08:58:51 18         MR. LOWELL:  Yes, ma'am.

09:10:04 19         (Discussion off the record.)

09:10:23 20         THE COURT:  Mr. Lowell, have you given us your

09:11:10 21 direct exhibits?

09:11:11 22         MR. LOWELL:  We did, yes, we sent it to the

09:11:14 23 Court when we sent it to the government.

09:11:16 24         THE COURT:  I don't have it.

09:11:18 25         MR. LOWELL:  Would you let me know, and we can

09:11:20  1    do it again?

09:11:27  2                    (Jury entering the courtroom at 9:12 a.m.)

09:12:57  3                    THE COURT:  All right.  Members of the jury,

09:13:15  4    welcome back.  Everyone else, please be seated.

09:13:18  5                    Members of the jury, it's time for me to ask my

09:13:23  6    daily question.  Have you spoken to anyone, has anyone

09:13:27  7    spoken to you or tried to speak to you or even had a

09:13:30  8    conversation about this case in your presence that you were

09:13:35  9    listening to?

09:13:37 10                    THE JURY:  No.

09:13:37 11                    THE COURT:  All right.  Anyone do any research,

09:13:41 12    listen to any news reports, or even accidentally listen to,

09:13:45 13    read, hear anything about this case?

09:13:47 14                    THE JURY:  No.

09:13:48 15                    THE COURT:  All right.  Thank you.

09:13:49 16                    And then it's been about a week, so I'll just

09:13:52 17    remind you also again, don't talk to anybody, and when I say

09:13:57 18    don't talk to anybody, that includes each other about the

09:13:59 19    case, now that you guys have got to know each other

09:14:03 20    sometimes I like to remind you because it gets easier as you

09:14:06 21    know each other better.

09:14:07 22                    THE COURT:  Okay, alright, who do we have next?

09:14:09 23                    MR. WISE:  Thank you, Your Honor.  The United

09:14:19 24    States calls Dr. Jason Brewer.

09:14:23 25                    COURTROOM DEPUTY:  Please raise your right hand.

09:14:27  1    Please state and spell your full name for the record.

09:14:36  2            THE WITNESS:  Jason Brewer, J-A-S-O-N,

09:14:41  3    B-R-E-W-E-R.

09:14:43  4            JASON BREWER, having been duly sworn, was

09:14:48  5    examined and testified as follows:

09:14:51  6                DIRECT EXAMINATION.

09:15:05  7            MR. WISE:  Thank you, Your Honor.

09:15:06  8    BY MR. WISE:

09:15:07  9    Q.    Good morning, Dr. Brewer.

09:15:09 10    A.    Good morning.

09:15:09 11    Q.    Where do you work?

09:15:10 12    A.    I work at the FBI Laboratory in Quantico, Virginia.

09:15:15 13    Q.    How long have you been with the FBI?

09:15:16 14    A.    A little over twenty years.

09:15:18 15    Q.    Can you describe briefly the positions you have held

09:15:21 16    in your twenty years with the FBI?

09:15:23 17    A.    I was first hired as a research chemist through a

09:15:27 18    contract post-doctoral program, I did that for approximately

09:15:33 19    11 months.  Then I was hired on permanently as a forensic

09:15:36 20    chemist in the chemistry unit.  I spent approximately two

09:15:40 21    years in that position, and then was promoted to my current

09:15:43 22    position of chemist forensic examiner.

09:15:46 23    Q.    Have you been there ever since?

09:15:49 24    A.    Yes, approximately seventeen-and-a-half years.

09:15:51 25    Q.    And can you describe what your duties and

Brewer - direct

09:15:54 1  responsibilities are as a chemist and forensic examiner in

09:15:57 2  the chemistry unit?

09:15:58 3  A.      So when evidence is submitted to the FBI Laboratory,

09:16:02 4  when there is a question about the chemical nature of the

09:16:05 5  item, I will analyze that item of evidence, and write an FBI

09:16:10 6  Laboratory report stating my conclusions.  And then testify

09:16:13 7  in court when requested.

09:16:15 8  Q.      And tell us about your educational background?

09:16:18 9  A.      I have a bachelor of science degree in chemistry from

09:16:22 10 James Madison University.  And a Ph.D. in chemistry from the

09:16:26 11 University of North Carolina, Chapel Hill.

09:16:29 12 Q.      Are you a member of are any professional

09:16:31 13 organizations?

09:16:32 14 A.      Yes, I am a member of SWGDRUG, which is the

09:16:36 15 scientific working group for the analysis of seized drugs.

09:16:39 16 Q.      And what does that group do?

09:16:43 17 A.      It's a group of international forensic chemists that

09:16:48 18 help write guidelines and best practices for analyzing

09:16:52 19 controlled substances.

09:16:52 20 Q.      Have you ever had previous experience testifying as

09:16:55 21 an expert?

09:16:56 22 A.      Yes, I have.

09:16:57 23 Q.      Approximately how many times?

09:16:59 24 A.      Approximately 25 times.

09:17:01 25 Q.      And have you had any specialized training that

Brewer - direct

09:17:05  1    qualified you as a forensic chemist with the FBI lab at

09:17:09  2    Quantico?

09:17:10  3    A.      Yes.   The first permanent position I described as a

09:17:13  4    forensic chemist, that required an approximately one year

09:17:17  5    training program to be qualified and authorized in that

09:17:20  6    position.   And then the current position I hold of chemist

09:17:24  7    forensic examiner, also required approximately one year of

09:17:27  8    training to become qualified and authorized.

09:17:35  9    Q.      Can you tell us, and again, it's only an

09:17:35 10    approximation, but can you tell us the number of suspected

09:17:39 11    controlled substances you have examined in your career?

09:17:42 12    A.      Probably thousands of items.

09:17:45 13            MR. WISE:  Your Honor, at this time I would move

09:17:47 14    to qualify Dr. Jason Brewer as an expert in the field of

09:17:50 15    forensic chemistry.

09:17:52 16            THE COURT:  Any objection?

09:17:53 17            MR. KOLANSKY:  No objection.

09:17:54 18            THE COURT:  Thank you.  He'll be recognized as

09:17:55 19    such.  So what that means, members of the jury, fact

09:17:58 20    witnesses can testify to facts, what they know, what they

09:18:02 21    experience.  An expert witness is qualified, so the expert

09:18:06 22    can give opinions, so that's why we had to do that, and he

09:18:10 23    can only give opinions in what he's been qualified as an

09:18:13 24    expert.

09:18:15 25            MR. WISE:  May I approach, Your Honor?

                                  Brewer - direct

09:18:23  1                THE COURT:  You may.

09:18:29  2     BY MR. WISE:

09:18:31  3     Q.      Dr. Brewer, I have just handed you what's been

09:18:34  4     already admitted in evidence as government Exhibit 4.  Do

09:18:37  5     you recognize that?

09:18:39  6     A.      Yes, I do.  Within the interior package I can see my

09:18:44  7     name and initials where I sealed the evidence.

09:18:46  8     Q.      And is this an exhibit, a piece of evidence you were

09:18:49  9     asked to analyze?

09:18:50 10     A.      Yes, it is.

09:18:52 11     Q.      And if I can have government Exhibit 4C, which I also

09:18:56 12     believe is in evidence?

09:18:57 13                MR. WISE:  I would offer 4C in evidence, Your

09:18:59 14     Honor, it's a photo of the pouch, if there is no objection.

09:19:03 15                MR. KOLANSKY:  No objection.

09:19:04 16                THE COURT:  Thank you.  It's admitted.

09:19:06 17                (Exhibit No. 4C was admitted into evidence.)

09:19:07 18     BY MR. WISE:

09:19:07 19     Q.      Do you see 4C on your screen or on the big screen,

09:19:11 20     Dr. Brewer?

09:19:12 21     A.      Yes.

09:19:12 22     Q.      Generally speaking, what is this?

09:19:14 23     A.      Those are the photographs I took of what we called

09:19:18 24     Item 1 at the FBI Laboratory, which is a brown pouch.

09:19:22 25     Q.      And that's the brown pouch in government Exhibit 4

Brewer - direct

09:19:24 1    that I have just handed you?

09:19:26 2    A.    Yes, sir.

09:19:26 3    Q.    Now, I'm going to ask you what you did to analyze any

09:19:30 4    substances found in this pouch, but before I do, I just want

09:19:34 5    to ask a couple of questions about what you didn't do.

09:19:37 6    Okay?

09:19:37 7         Now, were you asked to analyze this pouch for

09:19:41 8    fingerprints or DNA?

09:19:44 9    A.    No, I was not.  And those are not areas of my

09:19:48 10   expertise.

09:19:49 11   Q.    So those aren't tests you conduct?

09:19:51 12   A.    No.

09:19:51 13   Q.    Is there a test that can determine when a drug or

09:19:55 14   controlled substance is put on a physical item like this

09:19:58 15   pouch, is there such a test?

09:20:01 16   A.    No.

09:20:01 17   Q.    So that wasn't a test you conducted; correct?

09:20:04 18   A.    Correct.

09:20:04 19   Q.    Is there a forensic test that can determine who put

09:20:13 20   drugs on a physical item?

09:20:13 21   A.    No.

09:20:13 22   Q.    So that wasn't a test you were asked to conduct,

09:20:17 23   correct?

09:20:18 24   A.    Correct.

09:20:18 25   Q.    And to be clear, you received the pouch in the

Brewer - direct

09:20:22  1  condition it's in, right?

09:20:23  2  A.     Yes.

09:20:24  3  Q.     Your analysis does not address what might have

09:20:29  4  happened with the pouch before you received it; right?

09:20:32  5  A.     Correct.

09:20:33  6  Q.     And I think this probably goes without saying, but

09:20:41  7  you weren't asked to test, or do a test to determine who put

09:20:45  8  the drugs, if drugs were found on the object, correct?

09:20:48  9  A.     That's correct.

09:20:49 10  Q.     Now I want to ask you about what you did, the tests

09:20:52 11  you did.

09:20:53 12         Can you tell the members of the jury what

09:20:55 13  qualitative tests you performed to determine whether or not

09:20:59 14  the exhibit contained controlled substances?

09:21:02 15  A.     So the first thing I do in any exam is a visual

09:21:07 16  examination.  In this type of case I am looking for any

09:21:10 17  solid material that I can directly remove from the item to

09:21:15 18  then test for controlled substances.

09:21:17 19  Q.     Did you find any?

09:21:18 20  A.     Yes.  In this instance I found a minimal amount of

09:21:22 21  white powder, or off-white powder, on the inside of the

09:21:26 22  flap, and then another small amount within the bottom

09:21:30 23  interior of the pouch.

09:21:31 24  Q.     Ms. Vo, if you could enlarge the bottom half of

09:21:35 25  government Exhibit 4C.

Brewer - direct

09:21:36  1          Whose handwriting is that Dr. Brewer?

09:21:42  2   A.    That's my handwriting, and I took this photo.

09:21:44  3   Q.    What are you pointing at?

09:21:46  4   A.    As you can see, there is a small amount of white

09:21:49  5   material or off-white material that the arrow is pointing

09:21:52  6   to.

09:21:52  7   Q.    And that's what you saw from your visual examination?

09:21:55  8   A.    Yes.

09:21:57  9   Q.    And did you see anything else in your visual

09:22:02 10   examination of the pouch?

09:22:04 11   A.    Yes.  So this picture shows the interior flap, but

09:22:09 12   also in the bottom, the bottom interior, I also saw similar

09:22:13 13   looking material.

09:22:14 14   Q.    Could we go to the next page in Exhibit 4C?

09:22:19 15          So is the top another larger image of what we

09:22:23 16   saw, the material from the inside flap?

09:22:26 17   A.    Yes, the top is an enlarged image of the previous

09:22:29 18   page.

09:22:29 19   Q.    And if we could -- if you could enlarge, Ms. Vo, the

09:22:33 20   bottom half of 4C.

09:22:34 21          What's that?

09:22:36 22   A.    So this is inside of the pouch in the bottom, you can

09:22:39 23   see a small amount of white or off-white solid material.

09:22:43 24   Q.    Okay.  So after visually identifying these two places

09:22:47 25   on the brown leather pouch where there was a small amount of

Brewer - direct

09:22:50  1  white material, what did you do?

09:22:52  2  A.      So I used a metal spatula to remove a few particles

09:22:57  3  from both areas and I combined those particles into a test

09:23:01  4  tube for further testing.

09:23:03  5  Q.      And then what did you do?

09:23:04  6  A.      So I then dissolved these solid particles in a liquid

09:23:09  7  chemical known as methyl alcohol.  Methyl alcohol would

09:23:13  8  dissolve most controlled substances that we would be

09:23:16  9  analyzing for.

09:23:17 10  Q.      Once you dissolved it, what did you do?

09:23:19 11  A.      The first instrumental exam I did was called direct

09:23:23 12  analysis, in real time, time of flight, mass spectrometry,

09:23:28 13  or DART for short.

09:23:30 14  Q.      And can you explain how DART works?

09:23:36 15  A.      DART is what's known as a mass spectrometer.  So the

09:23:38 16  liquid sample will be volatilized into a gas state, formed

09:23:45 17  into an ion, or a charged particle, and traveled through the

09:23:48 18  mass spectrometer, where we would get what is known as a

09:23:52 19  mass discharge ratio.  This mass discharge ratio can be used

09:23:57 20  to determine the chemical formulas of any compounds that

09:24:00 21  were present in the liquid, and became ionized and went

09:24:04 22  through the instruments.

09:24:05 23  Q.      Do you know what that is, that mass discharge ratio

09:24:09 24  for instance, for cocaine?

09:24:10 25  A.      So for instance, cocaine has a chemical formula that

09:24:14 1  consists of 17 carbons, 21 hydrogens, one nitrogen, and four

09:24:19 2  oxygen's.  So when passed through this instrument, it should

09:24:23 3  give a peak of 304.154 for its mass discharge.

09:24:30 4  Q.    So if the substance you're examining shows that mass

09:24:32 5  discharge, is that an indication of cocaine?

09:24:34 6  A.    That's a presumptive indication that it could be

09:24:37 7  cocaine.  The building blocks that I described that make up

09:24:40 8  cocaine also make up other compounds that are not cocaine.

09:24:43 9  Q.    What did you do next?

09:24:44 10  A.    So the next technique I did on that methyl alcohol

09:24:48 11  solution is called gas chromatography mass spectrometry, or

09:24:55 12  GCMS.

09:24:55 13  Q.    And how did GCMS work?

09:24:58 14  A.    The GCMS is basically two instruments coupled

09:25:03 15  together, the first instrument is the gas chromatograph, or

09:25:08 16  the GC, the solution that I talked about may contain a

09:25:11 17  mixture of the compounds, they're injected in the GC where

09:25:15 18  they're instantly converted to the gas phase and then they

09:25:18 19  travel through a 30-meter long column.  This column has

09:25:22 20  what's known as a stationary phase on it and different

09:25:25 21  compounds will interact differently with that stationary

09:25:28 22  phase, so they will travel through the instrument in

09:25:30 23  different times.

09:25:31 24       So essentially, we get a, what's called a

09:25:37 25  chromatogram which shows various compounds coming through

Brewer - direct

09:25:39  1  the instrument at different times, so that piece of data is

09:25:42  2  called the chemicals retention time.  And a particular

09:25:46  3  chemical will demonstrate a similar retention time each time

09:25:51  4  it goes through the instrument.

09:25:52  5  Q.    And would a chemical that demonstrates a similar

09:25:55  6  time, for example, be cocaine?

09:25:56  7  A.    Yes, time is one of the pieces of data, we will

09:26:00  8  compare our unknown material to a reference material of a

09:26:04  9  known substance, for example, cocaine.

09:26:05 10  Q.    So based on these two tests, the DART and the GCMS,

09:26:10 11  after your visional examination, did you reach a conclusion

09:26:13 12  about the substance you were testing?

09:26:15 13  A.    Yes.  But I do have something to add for that

09:26:18 14  particular instrument.

09:26:19 15  Q.    Sure.  Go ahead.

09:26:20 16  A.    So for the GCMS, what I described in the first part

09:26:24 17  is the GC.  Once the compounds pass through the GC, they go

09:26:29 18  into the mass spectrometer, which is somewhat similar to the

09:26:33 19  DART that I described earlier, except that it's a higher

09:26:36 20  energy ion station, so the compound gets broken into its

09:26:40 21  building blocks in a repeatable manner, and they can use

09:26:44 22  that spectrum of how it's broke into its pieces to help

09:26:48 23  identify the material.

09:26:49 24  Q.    Thank you for that clarification.  Once you had done

09:26:51 25  all that, did you reach a conclusion?

Brewer - direct

09:26:53  1  A.      Yes, I did.

09:26:54  2  Q.      And what was your conclusion?

09:26:56  3  A.      Cocaine was identified within the residual white

09:27:00  4  particles that I had sampled.

09:27:02  5  Q.      Are there multiple forms of cocaine?

09:27:04  6  A.      Yes, there are.

09:27:05  7  Q.      And what are they?

09:27:07  8  A.      Cocaine can exist as many drugs, in either its base

09:27:12  9  form or a salt form.

09:27:14 10  Q.      And does what is commonly known as crack cocaine

09:27:17 11  present in one of those two forms?

09:27:18 12  A.      Crack cocaine is a -- the base form of cocaine.

09:27:22 13  Q.      Was the form of cocaine, whether cocaine base or

09:27:28 14  cocaine salt or hydrochloride, I think you said, determined

09:27:32 15  scientifically in this case?

09:27:34 16  A.      No, it's not.

09:27:34 17  Q.      Why is that?

09:27:35 18  A.      Because I had such little material, I went straight

09:27:39 19  to extracting it in solution, and once I had that material

09:27:42 20  in solution, if it was a salt it would disassociate, so the

09:27:46 21  base of the salt can't be differentiated.

09:27:51 22  Q.      Was the conclusion that cocaine was present in the

09:27:53 23  sample taken from the brown leather pouch memorialized in a

09:27:56 24  laboratory report?

09:27:58 25  A.      Yes, it was.

Brewer - direct

09:27:59  1  Q.      Did you prepare the report at or around the time near

09:28:02  2  your analysis?

09:28:03  3  A.      Yes.

09:28:03  4  Q.      Do you routinely prepare reports in the course of

09:28:07  5  regularly conducted examinations in controlled substances?

09:28:10  6  A.      Yes I do.

09:28:11  7  Q.      Is that a regular practice of yours required by the

09:28:17  8  FBI lab at Quantico?

09:28:17  9  A.      Yes.

09:28:17 10           MR. WISE:  At this time Your Honor, I would move

09:28:18 11  in admission government Exhibit 108.

09:28:22 12           MR. KOLANSKY:  No objection.

09:28:23 13           THE COURT:  Thank you.  It's admitted.

09:28:25 14           (Exhibit No. 108 was admitted into evidence.)

09:28:26 15  BY MR. WISE:

09:28:27 16  Q.      Do you see government Exhibit 108, Dr. Brewer?

09:28:30 17  A.      Yes.

09:28:31 18  Q.      And what's that?

09:28:32 19  A.      That's the first page of the laboratory report.

09:28:34 20  Q.      And is this the laboratory report you prepared?

09:28:38 21  A.      Yes, it appears to be based on the item description,

09:28:41 22  the second page would have my name on it.

09:28:44 23  Q.      Now, if we go to the, I believe it's the second page

09:28:50 24  under the title results of examination, what were the

09:28:55 25  results of the examination as reflected in this report?

Brewer - cross

09:28:59 1   A.      So this summarizes the fact that cocaine was

09:29:02 2   identified within the Item 1 residue.

09:29:05 3   Q.      And you said at the very beginning that Item 1 is the

09:29:08 4   brown leather pouch that has been marked, at least for

09:29:10 5   court, as government Exhibit 4; right?

09:29:13 6   A.      Yes.

09:29:17 7   Q.      Is cocaine a controlled substance?

09:29:22 8   A.      Yes, it is.

09:29:23 9            MR. WISE:  No further questions, Your Honor.

09:29:25 10           THE COURT:  Thank you.

09:29:26 11           Cross-exam.

09:29:29 12                    CROSS-EXAMINATION

09:29:34 13  BY MR. KOLANSKY:

09:29:44 14  Q.      Good morning, Dr. Brewer.

09:29:45 15  A.      Good morning.

09:29:46 16  Q.      My name is David Kolansky, I am one of the counsel

09:29:49 17  for Hunter Biden.  Good morning, ladies and gentlemen.

09:29:51 18           Dr. Brewer, you testified about residue that was

09:29:56 19  positive for trace amounts of cocaine, I believe your report

09:30:00 20  described it as a minimal amount; is that right?

09:30:02 21  A.      I believe the term was residue, but yes.

09:30:05 22  Q.      Residue, so a minimal amount of residue?

09:30:08 23  A.      Yes.

09:30:09 24  Q.      And that residue you said was combined when you did

09:30:13 25  your tests based on what was extracted from the pouch?

Brewer - cross

09:30:16  1    A.      Yes, I combined the two areas that were shown in the

09:30:19  2    photo, I combined those into one sample.

09:30:23  3    Q.      That residue that you collected, though, it was not a

09:30:26  4    lot of residue, it was minimal?

09:30:29  5    A.      Correct.

09:30:29  6    Q.      And that came from the pouch -- if I may, do you have

09:30:35  7    the pouch?

09:30:37  8                MR. KOLANSKY:  May I approach, Your Honor?

09:30:39  9                THE COURT:  You may.

09:30:41 10    BY MR. KOLANSKY:

09:30:41 11    Q.      So this is the pouch that you tested?

09:30:53 12    A.      Yes.

09:30:53 13    Q.      This was the pouch and it was collected in October,

09:30:56 14    from your investigation, it was collected in October of

09:31:00 15    2018, is that right?

09:31:00 16    A.      I am not aware of those details, I can speak to when

09:31:04 17    I received it.

09:31:04 18    Q.      And you received it in October of 2023?

09:31:06 19    A.      Yes, sir.

09:31:07 20    Q.      So if this investigation began in October of 2018,

09:31:13 21    and you received this pouch in October of 2023, that would

09:31:18 22    be five years between the time that it was first collected

09:31:23 23    and when you received it; is that right?

09:31:24 24    A.      Yes, based on those dates, that would be five years.

09:31:27 25    Q.      When you received the pouch in October of 2023, to

Brewer - cross

09:31:33  1  put that in sequence, that's after the charges were filed in

09:31:37  2  this case; is that right?

09:31:38  3  A.      I am not aware of those timelines.

09:31:41  4  Q.      Do you know when the charges were filed in this case?

09:31:44  5  A.      No.

09:31:45  6  Q.      But you know that after you received the pouch, it

09:31:49  7  had been requested by investigators in the course of this

09:31:52  8  investigation?

09:31:53  9  A.      Yes.  Generally we don't receive items until there is

09:31:56 10  a case that has been opened.

09:31:58 11  Q.      So you don't know, for example, if this case was

09:32:01 12  charged in September or August or October?

09:32:04 13  A.      No, sir.

09:32:08 14  Q.      When you received this pouch and you took the

09:32:11 15  evidence from it, you took the residue from it, excuse me,

09:32:15 16  there were no tests done on that residue prior to you having

09:32:18 17  received it?

09:32:19 18  A.      None that I'm aware of.

09:32:20 19  Q.      And no tests were done on the pouch itself prior to

09:32:23 20  when you had received it, there was nothing to go off of, is

09:32:27 21  that right?

09:32:27 22  A.      Can you rephrase that, please?

09:32:29 23  Q.      Yes, sure.  So when you received the pouch and you

09:32:32 24  collected the residue, from your investigation, your test

09:32:36 25  was the first test that was done on that residue sample, is

Brewer - cross

09:32:41 1    that correct?

09:32:41 2    A.    To my awareness, yes.

09:32:44 3    Q.    When you collected the residue, tested the sample,

09:32:49 4    tested positive for trace amounts, I think minimal amounts

09:32:55 5    of cocaine, is that right?

09:32:55 6    A.    Yes, residue.

09:32:55 7    Q.    Your tests, though, they don't indicate when that

09:32:58 8    residue got on this pouch, do they?

09:33:01 9    A.    They do not.

09:33:02 10   Q.    They don't indicate who put that residue on this

09:33:05 11   pouch or when that residue was put there?

09:33:07 12   A.    That is correct.

09:33:07 13   Q.    And they certainly don't indicate how long the

09:33:11 14   residue had been on the pouch?

09:33:14 15   A.    That's correct.

09:33:14 16   Q.    It could have been 2015?

09:33:16 17   A.    Any time before when I analyzed it.

09:33:18 18   Q.    '16?

09:33:19 19   A.    Yes, sir.

09:33:20 20   Q.    '17?

09:33:20 21   A.    Correct.

09:33:21 22   Q.    Even 2018?

09:33:23 23   A.    Sure.

09:33:24 24   Q.    But as far as you know, you can't date when that

09:33:27 25   residue got there or who put it there?

Brewer - cross

09:33:30  1    A.      I cannot.

09:33:35  2    Q.      And so I think you would agree that in your line of

09:33:39  3    work, chain of custody analysis is an important piece of

09:33:45  4    evidentiary testing, is that a fair assessment?

09:33:48  5    A.      Yes, chain of custody is very important.

09:33:50  6    Q.      And sample integrity from what comes from that pouch

09:33:55  7    or that piece of evidence is also important; right?

09:33:58  8    A.      In terms of chain of custody, is that what you mean

09:34:01  9    by sample integrity?

09:34:04 10    Q.      Yes.

09:34:04 11    A.      Yes.

09:34:05 12    Q.      And it's something that's routinely done in your line

09:34:08 13    of work in forensic toxicology and chemistry, is that fair?

09:34:13 14    A.      Do you mean maintaining the chain of custody?

09:34:17 15    Q.      I mean testing the chain of custody or analyzing the

09:34:20 16    chain of custody.

09:34:23 17    A.      We are required to maintain an accurate chain of

09:34:26 18    custody, I wouldn't say I analyze it or test it.

09:34:29 19    Q.      But in this case, when you received the pouch, no one

09:34:33 20    asked you to do fingerprint testing on this pouch, only to

09:34:38 21    test the residue, is that right?

09:34:39 22    A.      This came into the laboratory as what's called a

09:34:42 23    single unit submission, so it came in strictly for chemistry

09:34:46 24    exam.

09:34:47 25    Q.      I understand.

Brewer - cross

09:34:47  1              So you tested the residue that you would collect

09:34:51  2  from this pouch and that's it?

09:34:53  3  A.       Correct.

09:34:54  4  Q.       Not the pouch itself, not the fingerprints, not the

09:34:56  5  DNA that might have been on this pouch?

09:34:59  6  A.       Those are outside my area of expertise.

09:35:02  7  Q.       But you wouldn't know from your testing who had

09:35:05  8  handled this pouch, before, how long, how many people, you

09:35:09  9  wouldn't know that?

09:35:09 10  A.       No, chemistry exams do not determine that.

09:35:12 11  Q.       And so, in your test, you can't tell when the residue

09:35:24 12  got on here, who put it there, how long it had been there or

09:35:28 13  who handled that?

09:35:30 14  A.       Correct.

09:35:30 15  Q.       And that's because it's not possible from your tests?

09:35:33 16  A.       Correct, my testing is limited to chemistry.

09:35:36 17              MR. KOLANSKY:  Thank you, Dr. Brewer.  No

09:35:38 18  further questions.

09:35:38 19              THE COURT:  Thank you.

09:35:39 20              Any redirect.

09:35:40 21              MR. WISE:  No, Your Honor.  Thank you.

09:35:42 22              THE COURT:  All right.  Thank you, sir, you may

09:35:44 23  step down.

09:35:45 24              Mr. Hines, what's next.

09:35:46 25              MR. HINES:  The United States calls Special

Romig - direct

09:35:50  1    Agent Joshua Romig.

09:35:59  2                COURTROOM DEPUTY:  Please raise your right hand.

09:36:03  3    Please state and spell your full name for the record.

09:36:16  4                THE WITNESS:  Joshua Romig, R-O-M-I-G.

09:36:23  5                JOSHUA ROMIG, having been duly sworn, was

09:36:28  6    examined and testified as follows:

09:36:30  7                        DIRECT EXAMINATION

09:36:31  8    BY MR. HINES:

09:36:37  9    Q.     Good morning, sir.

09:36:38 10    A.     Good morning.

09:36:39 11    Q.     Sir, where do you work?

09:36:41 12    A.     For the Drug Enforcement Administration in

09:36:43 13    Philadelphia, Pennsylvania.

09:36:45 14    Q.     What is your title?

09:36:46 15    A.     I am currently the Assistant Special Agent in charge.

09:36:49 16    Q.     How long have you served with the DEA?

09:36:51 17    A.     Since 2008.

09:36:53 18    Q.     What are the various titles you have had over that

09:36:56 19    course of time?

09:36:56 20    A.     With the DEA?

09:36:58 21    Q.     Yes, sir?

09:36:58 22    A.     I was a Special Agent, when I got hired, we're all

09:37:02 23    Special Agents, and then in 2018, I got promoted to group

09:37:11 24    supervisor of a group in Philadelphia, and then for about a

09:37:11 25    year before I did my headquarters time, I was the resident

Romig - direct

09:37:15  1    agent in charge in Allentown, Pennsylvania.

09:37:17  2    Q.      How about prior law enforcement experience before you

09:37:21  3    got into the DEA?

09:37:21  4    A.      I started my law enforcement career in 1999, in the

09:37:25  5    Baltimore City Police Department, I was a patrol officer,

09:37:28  6    and then assigned to the patrol division, I should say, and

09:37:31  7    then I was a Berks County Detective assigned to the

09:37:34  8    narcotics unit there for about seven years.

09:37:37  9    Q.      In Berks County, Pennsylvania?

09:37:39 10    A.      In Reading, Pennsylvania, yes, sir.

09:37:41 11    Q.      During the course of your, what is that, 24-year

09:37:46 12    career with law enforcement?

09:37:47 13    A.      It will be 25 in August.

09:37:48 14    Q.      Have you investigated narcotic offenses sort of

09:37:53 15    throughout that time period?

09:37:54 16    A.      Primarily over that 25 years, that's what I have

09:37:56 17    done.

09:37:57 18    Q.      What kind of experience have you obtained during the

09:38:00 19    course of investigating narcotics offenses over that time

09:38:05 20    period?

09:38:06 21    A.      That's an interesting -- I mean that's literally all

09:38:10 22    I've done for the last quarter century, even in the patrol

09:38:14 23    division in Baltimore, one of my primary duties was to

09:38:18 24    investigate drug offenses, I was assigned to the Northwest

09:38:23 25    District, which is, the general area is Park Heights,

Romig - direct

09:38:27 1    Pimlico Raceway, the Preakness, and very high drug

09:38:30 2    distribution area back then, open air drug markets, guys

09:38:34 3    selling on the street, open air hand to hand, so one of my

09:38:38 4    duties was to investigate drug crimes even as a uniformed

09:38:43 5    Patrolman.  Even in the patrol division, I had the

09:38:45 6    opportunity to work in a plain clothes capacity, also in an

09:38:49 7    undercover capacity to purchase drugs as, I was pretending

09:38:54 8    to be a drug user.  And then once I left the Baltimore

09:38:59 9    Police Department, and got hired by the Berks County

09:39:02 10    District Attorney's office, my primary function in the drug

09:39:04 11    unit there, was to investigate drug crimes.

09:39:07 12            I did that for over five of the years that I was

09:39:13 13    assigned to the DA's office, was just investigate drug

09:39:17 14    trafficking offenses.  I was very briefly assigned to the

09:39:21 15    warrant unit before I got hired by DEA, because my boss

09:39:25 16    didn't want me to get involved in anymore court cases

09:39:28 17    because he knew I was leaving.  And then since I have been a

09:39:33 18    DEA agent, the only thing, we're a single mission agency,

09:39:37 19    all we do is investigate drug trafficking.  There are

09:39:40 20    nuances to those drug trafficking cases, we investigate

09:39:45 21    money laundering when it comes to drugs, we investigate some

09:39:49 22    firearm offenses when it comes to drug traffickers, theft of

09:39:49 23    firearms, but my primary responsibility is to investigate

09:39:54 24    drug trafficking.

09:39:54 25    Q.    During the course of that experience, have you

Romig - direct

09:39:56 1   investigated both small scale drug trafficking and large

09:40:00 2   scale drug trafficking?

09:40:01 3   A.     Over the last 25 years both, certainly, I mean, the,

09:40:05 4   I will say the more my career has progressed, especially

09:40:10 5   with DEA, we want to target the higher level drug

09:40:15 6   traffickers with the Drug Enforcement Administration, we

09:40:18 7   don't want to target smaller level distributors.

09:40:21 8   Q.     During the course of those investigations, do you

09:40:24 9   often have to start off the small scale level and work your

09:40:28 10  way up within an organization to get to the top?

09:40:30 11  A.     Yes, very rarely, unless you have a highly placed

09:40:34 12  informant or some other method to start big.  Typically you

09:40:38 13  will have to start on a smaller scale, and I have had the

09:40:42 14  ability or the -- I have had to do that numerous times,

09:40:49 15  especially in New York when I first started, I was assigned

09:40:51 16  to the New York Division, and then moving on to Allentown,

09:40:55 17  Pennsylvania when I left New York, I had to start with some

09:40:58 18  smaller purchases and then work my way up to federal wire

09:41:02 19  taps on bigger targets.

09:41:03 20  Q.     Is the goal to work your way up to disrupt and

09:41:06 21  dismantle the ultimate source of supply?

09:41:09 22  A.     Yes, always.

09:41:10 23  Q.     During the course of your investigations, have you

09:41:13 24  had the occasion to interview arrestees, confidential

09:41:18 25  sources, and individuals who are using or purchasing

Romig - direct

09:41:20  1    narcotics?

09:41:21  2    A.      Yes.  Over the last 25 years, or almost 25 years,

09:41:25  3    that's primarily been one of my main functions.

09:41:28  4    Q.      Have you reviewed messages, electronic evidence,

09:41:33  5    phone messages, things of that nature by individuals who use

09:41:38  6    narcotics or seek to purchase them?

09:41:40  7    A.      Yes.

09:41:40  8    Q.      And during the course of that experience, have you

09:41:43  9    learned the language in which drug users and drug addicts

09:41:47 10    speak with drug sellers to communicate about purchasing

09:41:51 11    drugs?

09:41:52 12    A.      Yes.

09:41:52 13    Q.      Have you previously been qualified as an expert in

09:41:55 14    the field of drug trafficking and coded language?

09:41:59 15    A.      I have.

09:41:59 16    Q.      In which courts have you been qualified as an expert

09:42:03 17    to the best you can recall?

09:42:04 18    A.      Yeah, so I was qualified as an expert for the first

09:42:07 19    time in the Circuit Court of Maryland, which is the, we're

09:42:12 20    not in Pennsylvania, we're in Delaware, disregard, Circuit

09:42:16 21    Court of Maryland I was qualified in a crack cocaine case,

09:42:19 22    again, as I described earlier where I was also actually the

09:42:22 23    affiant in that case, the investigating agent, I was in

09:42:26 24    uniform, but hiding out in an abandoned house watching a guy

09:42:32 25    sell crack cocaine, doing hand to hand with users, I

Romig - direct

09:42:35 1  testified as an expert and gave an opinion of whether the

09:42:38 2  drugs we seized from him were for the purpose of delivering

09:42:42 3  the drugs or for the purposes of using the drugs and that

09:42:45 4  was again, Circuit Court of Maryland, probably 2001.

09:42:49 5  Q.    Since that time, and I don't mean to interrupt,

09:42:52 6  moving forward, have you been qualified on a number of

09:42:54 7  occasions?

09:42:55 8  A.    Common Pleas Court, which is the equivalent of

09:42:59 9  Circuit Court in Pennsylvania, the Circuit Court of

09:43:01 10 Maryland, the Common Pleas Court of Pennsylvania, numerous

09:43:05 11 times as an expert witness to render opinions as to whether

09:43:08 12 drugs were possessed for purpose of selling them, or for the

09:43:13 13 purpose of using them.

09:43:14 14        And then I was qualified as an expert in New

09:43:17 15 York in a grand jury proceeding, I was qualified in a

09:43:21 16 special narcotic court proceeding, I was qualified as an

09:43:24 17 expert in Federal Court, in Philadelphia, in the Eastern

09:43:27 18 District of Pennsylvania several times, I was qualified as

09:43:29 19 an expert in coded language and drug money laundering in

09:43:33 20 this district, in Wilmington, in Federal Court in this

09:43:37 21 building two years ago, maybe a little less than two years

09:43:42 22 ago.  And I think that's it.

09:43:48 23 Q.    Okay.

09:43:48 24        MR. HINES:  At this time, Your Honor, we offer

09:43:50 25 Special Agent Romig as an expert in the manner and means of

Romig - direct

09:43:53  1    drug trafficking and coded language.

09:43:55  2                MR. LOWELL:  No objection.

09:43:57  3                THE COURT:  Thank you.  He will be recognized as

09:44:00  4    an expert.

09:44:00  5    BY MR. HINES:

09:44:01  6    Q.      Agent Romig, I would like to start by asking you some

09:44:04  7    general questions about the drug trade.  Based on your

09:44:07  8    training and experience, can you please describe how

09:44:10  9    generally the drug product like cocaine makes its way into

09:44:14  10   the United States and gets to the distributors?

09:44:18  11   A.      If you're saying specifically cocaine --

09:44:20  12               MR. LOWELL:  Your Honor, I object, can we go to

09:44:22  13   side-bar?

09:46:08  14               (Side-bare discussion.

09:46:08  15               MR. LOWELL:  Your Honor, the reason that I am

09:46:08  16   objecting is that I don't understand the relevance of -- if

09:46:08  17   it is relevant beyond its prejudice versus probative value

09:46:08  18   of having long testimony about how cocaine is grown,

09:46:08  19   processed, distributed -- shipped into the United States, I

09:46:08  20   mean, that's not what this case is about.  He's talked about

09:46:08  21   his purpose is to stop distribution.  We don't have any

09:46:08  22   objection to the idea that he can interpret texts or

09:46:08  23   messages, but the idea that we're now going to take a long

09:46:08  24   road from how it's grown to how it's produced to how it's

09:46:08  25   brought in the United States, I don't see the relevance in

Romig - direct

09:46:08  1    the case.

09:46:08  2              MR. HINES:  It's not going to be a long road,

09:46:08  3    I'm merely establishing if the jury understands what cocaine

09:46:08  4    is and generally where it comes from to get to its source

09:46:08  5    distribution points, and that forms the basis for Mr. Romig

09:46:08  6    to testify about how he knows what the drugs are and how the

09:46:08  7    language works in the drug trade so he can give an opinion

09:46:08  8    to the messages which I seek to put up.  This won't be a

09:46:08  9    long road.

09:46:08 10              MR. LOWELL:  Ten feet, 2 miles, what's the

09:46:08 11    length of the road?

09:46:08 12              MR. HINES:  Not as long as the roads you travel,

09:46:08 13    Mr. Lowell.

09:46:08 14              MR. LOWELL:  Well, that's very -- okay.  I just

09:46:08 15    want to see.  I may object if it goes longer, but

09:46:08 16    understanding that, let's go.

09:46:08 17              (End of side-bar.

09:46:12 18    BY MR. HINES:

09:46:12 19    Q.    Agent Romig, I'll re-ask the question.  Could you

09:46:16 20    briefly describe how, where cocaine originates and then

09:46:20 21    ultimately how it gets to a state like Delaware or

09:46:23 22    California?

09:46:23 23    A.    Sure.  So cocaine is different from the other drugs,

09:46:27 24    in that it's produced primarily in the South American Andean

09:46:33 25    region, which is Columbia, Peru, the countries in South

Romig - direct

09:46:37  1    America.   And then it is transported numerous ways.   The

09:46:45  2    main method of transportation is through Mexico.   The

09:46:48  3    Mexican Cartels control transportation as they have for

09:46:51  4    years.   And it will be transported across our land, southern

09:46:56  5    boarder.   That's the main method.   There are dozens of other

09:47:00  6    methods where cocaine, how it gets here from Columbia,

09:47:03  7    including airplanes, through the Caribbean corridor, also

09:47:09  8    ships, container ships through Ecuador and the Dominican

09:47:13  9    Republic, but again the primary method is across our

09:47:17 10    southern boarder through Mexico.

09:47:19 11    Q.     Why is there a demand for it in the United States?

09:47:22 12    A.     That's an interesting question.   We have a lot of

09:47:24 13    cocaine users in the United States, so Colombians and

09:47:32 14    Peruvians continue to produce it and the distributors

09:47:34 15    continue to sell it, it's basic economics, it's no different

09:47:38 16    than any other product, anything that there is demand for,

09:47:40 17    the distributors will find a way to distribute it to make

09:47:44 18    money.

09:47:44 19    Q.     And what is crack cocaine?

09:47:46 20    A.     Crack cocaine is cocaine.   There is really only a

09:47:51 21    level difference on chemistry, it's a more easily smokeable

09:47:56 22    form of cocaine and it's actually -- it's actually cocaine

09:48:00 23    based, so it's a more pure form of cocaine powder.   Cocaine

09:48:06 24    powder, which is how the cocaine is transported to the

09:48:09 25    United States, cocaine hydrochloride, when you -- you can

Romig - direct

09:48:14 1    cut cocaine, as distributors typically do, to make more

09:48:18 2    money on their product, they add adulterants to it or other

09:48:25 3    products to it.  One of the more common products that they

09:48:27 4    add to make more of it, to make more money, is an inositol

09:48:31 5    which is a dietary supplement.  If you cook it to make it

09:48:35 6    into a crack cocaine the inositol actually falls to the

09:48:40 7    bottom and wouldn't stick to the crack cocaine.  An example,

09:48:42 8    if you have an ounce, 28.35 grams of powdered cocaine and

09:48:49 9    you cook that into crack, if there is inositol or another

09:48:54 10   nonactive, or noncontrolled substance or ingredient that's

09:48:56 11   cut there, you will lose that product.  So if the drug

09:48:59 12   dealer had cut his cocaine powder with three grams of

09:49:03 13   inositol, when you cook it into crack, you'll only have like

09:49:09 14   25 grams of crack, you wouldn't have a full ounce.  That's a

09:49:12 15   long winded way of explaining that, but that's the best I

09:49:15 16   can do.

09:49:15 17   Q.    Now, do agents routinely consult you for interpreting

09:49:20 18   electronic messages, texts, things of that nature in

09:49:24 19   connection with their drug investigation?

09:49:26 20   A.    Yes.  My primarily, when I started with DEA, one of

09:49:30 21   the ways that we use to be able to target higher level

09:49:35 22   violators was through wire taps.  So for nine years as a

09:49:40 23   working Special Agent with the DEA in New York and

09:49:42 24   Allentown, my primary function was to conduct wire tap

09:49:47 25   investigations.  So I have literally listened to thousands

Romig - direct

09:49:50 1   and thousands and thousands of calls, intercepted calls

09:49:53 2   between buyers and sellers, and then looked at or reviewed

09:50:00 3   thousands of text messages, WhatsApp messages, again,

09:50:07 4   between buyers and sellers.

09:50:08 5   Q.    So wire taps occur when law enforcement is actively

09:50:13 6   investigating an individual as they're committing the crime,

09:50:17 7   is that right?

09:50:17 8   A.    It can, yes.

09:50:18 9   Q.    Are there cases in which you review or testify where

09:50:22 10  you are sort of looking back, looking back at a set of data

09:50:25 11  like messages from someone's phone without the benefit of a

09:50:28 12  wire tap at that time?

09:50:30 13  A.    Yes.  I mean, again, before -- sorry to cut you off.

09:50:34 14  Before conducting dozen of federal wire taps when I was a

09:50:40 15  County Detective, I had the ability to participate in state

09:50:43 16  wire tap investigations, but I also had the ability to

09:50:46 17  download defendant's cell phones, look at defendant's cell

09:50:50 18  phones upon arrest, and you know, again, interpret codes and

09:50:54 19  language, you know, intricate codes, rudimentary codes, yes.

09:50:59 20  Q.    So in those instances, when you're looking back, do

09:51:03 21  you only have the benefit of what is actually written out in

09:51:06 22  the form of a message usually?

09:51:09 23  A.    I mean, sometimes there is some context if I was able

09:51:12 24  to interview the defendant, if I was able to interview

09:51:16 25  somebody who knew the defendant, like an informant who could

Romig - direct

09:51:20  1    help with the coded language.  Sometimes there is none of

09:51:22  2    that at all, and all you have to go on is the messages.

09:51:25  3    Q.      And does that, in cases in which you reviewed, are

09:51:30  4    there sometimes gaps in messages with where a person, a

09:51:34  5    target, a defendant isn't actually communicating by written

09:51:37  6    message during a period of time?

09:51:38  7    A.      Of course, especially this day and age, there is so

09:51:44  8    many different applications that people use, so it's

09:51:48  9    sometimes frustrating for law enforcement, but there is --

09:51:51 10    you know, there is standard text messages, SMS, there is

09:51:56 11    iMessages, there is WhatsApp, there is Signal, there is

09:51:59 12    Telegram, there is Serena, so many telecommunications

09:52:03 13    platforms, and if a user switches to a different platform,

09:52:06 14    you're not going to have those communications sometimes.

09:52:09 15    Q.      Do some of those platforms have end to end encryption

09:52:12 16    where the communications are not preserved?

09:52:15 17    A.      They do.

09:52:16 18    Q.      In this case, first of all, did you have any personal

09:52:19 19    involvement in the investigation of the defendant, Robert

09:52:22 20    Hunter Biden?

09:52:22 21    A.      None whatsoever.

09:52:23 22    Q.      Were you consulted as you are in other cases to

09:52:26 23    review a summary chart of some text messages that you

09:52:30 24    understand were on the defendant's electronic devices?

09:52:34 25    A.      Yes.

Romig - direct

09:52:34  1   Q.    I'm going to show you was been marked as government
09:52:39  2   Exhibit 18, and we're going to go through some of those
09:52:42  3   messages that have been read into the record previously but
09:52:46  4   without the benefit of interpretation.
09:52:48  5         If you could please go and look at this first
09:52:50  6   string of messages, the one I'm going to ask you about
09:52:53  7   specifically is Row 3, but there is some context around that
09:52:57  8   that I would like you to indicate for us, Mr. Romig, if it
09:53:03  9   helps to interpret it.  The message on Row 3 says "if you
09:53:06 10   can be here by 6:45, I can do another 1.4 on top what you
09:53:13 11   owe," looks like a typo, top of what you owe, from Mr. Biden
09:53:19 12   to Clifford O'Brien.  Do you see that message there?
09:53:22 13   A.    Yes.
09:53:23 14   Q.    Based on your training and experience, do you have an
09:53:26 15   opinion as to what 1.4 means and what this message means?
09:53:31 16   A.    Yeah, but just to be clear -- yes, but just to be
09:53:35 17   clear, not just based on this message independent of
09:53:37 18   anything else, it's based on my review of all of the
09:53:41 19   testimony, all of the messages, and based on that, this
09:53:46 20   message and the messages that precede it, I would say that
09:53:50 21   he's asking for another 1.4 grams on top of whatever O'Brien
09:53:56 22   is bringing, or whoever is running for O'Brien, is bringing.
09:53:59 23   Q.    Turning to row-- well, you said 1.4 grams.  Is grams
09:54:05 24   a weight or a term used in drug trafficking?
09:54:09 25   A.    Yes.  So it is, yes.  So it's a little confusing in

Romig - direct

09:54:13  1    the United States because the traffickers like I said, the

09:54:17  2    producers are from South America, the traffickers are from

09:54:21  3    Mexico, so there are two different measuring systems that

09:54:24  4    we're using obviously, there is kilograms and pounds.

09:54:28  5    However, to make it more easily understandable, a dime bag,

09:54:33  6    a $10 bag of crack cocaine is typically around a 10th of a

09:54:38  7    gram of crack cocaine, which is one hit, that's one dosage

09:54:43  8    unit of crack cocaine.  So if somebody is on the street and

09:54:45  9    wants to get high and has $10, they'll buy a $10 bag.  So

09:54:51 10    1.4 grams would be the equivalent of about 14 dime bags of

09:54:55 11    crack cocaine.  Obviously, just like any other product, if

09:54:58 12    you buy in bulk, the price is going to come down, the more

09:55:01 13    you buy, the price gets cheaper.  The smaller dosage units

09:55:06 14    you buy, the more expensive it's going to be.

09:55:08 15    Q.    And the follow-up message here on Row 4 to that

09:55:14 16    message when Mr. O'Brien says "I'm stuck in traffic, bro,

09:55:20 17    with all your shit, ha, ha, ha, ha, ha", did that inform

09:55:24 18    your understanding of the 1.4 in the prior message?

09:55:27 19    A.    That to me would mean he's on the highway with all

09:55:30 20    the product in the car.

09:55:31 21    Q.    Turning to Rows 20 and 21.  Were you asked to look at

09:55:36 22    the images that are in Rows 20, 21, that Clifford O'Brien

09:55:42 23    exchanged with Hunter Biden and that Hunter Biden exchanged

09:55:44 24    with Clifford O'Brien?

09:55:46 25    A.    Yes.

Romig - direct

09:55:46  1   Q.      And did you see the title on the photograph in Row 21

09:55:51  2   in which Mr. -- the defendant sent Clifford O'Brien?

09:55:55  3   A.      Yes.

09:55:56  4   Q.      And what does that title say, can you see it?

09:55:59  5   A.      Yes, which under any value known to any market in the

09:56:04  6   world, what I paid is 60 percent greater.

09:56:06  7   Q.      What do you see in the photographs here, based on

09:56:09  8   your training and experience?

09:56:10  9   A.      I mean, I see what appears to be crack cocaine.

09:56:13 10   Again just to be clear, could be compressed powder, again,

09:56:17 11   cocaine comes into this country, they press it into kilogram

09:56:21 12   bricks, they can press it into a million things based on how

09:56:26 13   it's hidden, it can be hidden in tires, car parts, I have

09:56:31 14   seized 150 kilograms hidden in fake bananas, plantains, in a

09:56:37 15   55,000 pound shipping container, it can be hidden inside

09:56:40 16   anything.  But typically the cocaine powder is pressed into

09:56:44 17   kilogram bricks with hydraulic presses.  Even when the coke

09:56:48 18   gets here, typically dealers can repress it once it's cut

09:56:52 19   like we talked about with the inositol, it can be repressed

09:56:56 20   to appear that it hasn't been tampered with for

09:57:01 21   distribution.  When it's pressed, the powder, not crack, but

09:57:04 22   cocaine hydrochloride, cocaine powder is pressed into a

09:57:08 23   brick, it appears very similar to crack, this to me looks

09:57:11 24   like crack, but without the chemistry knowledge, it could

09:57:15 25   also be pressed cocaine off of a brick of cocaine, but

Romig - direct

09:57:18  1    again, it appears to be cocaine.

09:57:20  2    Q.      In the second image that the defendant sent, is there

09:57:23  3    a digital scale in the background?

09:57:26  4    A.      There is.

09:57:26  5    Q.      Are digital scales used by drug purchasers and drug

09:57:30  6    sellers?

09:57:30  7    A.      Yes.

09:57:31  8    Q.      Why are digital scales used?

09:57:33  9    A.      To verify that the person paying for the product got

09:57:37  10   what they paid for.

09:57:37  11   Q.      When Mr. Biden says "which under any value known to

09:57:42  12   any market in the world, what I paid is 60 percent greater,"

09:57:45  13   based on your training and experience, do you have an

09:57:46  14   understanding or an opinion about what he's talking about

09:57:48  15   there?

09:57:49  16   A.      I do, the person that sent that message is clearly

09:57:52  17   upset that the amount is a lot smaller than what he paid

09:57:55  18   for, only 4.7 grams it appears by the scale.

09:57:59  19   Q.      Based on the arithmetic that you were doing earlier,

09:58:02  20   as far as a tenth of a gram being a hit, roughly how many

09:58:07  21   uses is 4.7 grams for a user?

09:58:09  22   A.      Mr. Hines, don't ask me to do math, I'm sorry, it's

09:58:13  23   4.7 times .1, I would need a calculator for it.  3.5 grams

09:58:19  24   is commonly referred to as an 8-Ball on the street, an

09:58:23  25   eighth of an ounce, when I was doing undercover or using

Romig - direct

09:58:27 1    CI's, an eighth of an ounce varied for $120 all the way up

09:58:32 2    to $220 based on the buyer/seller relationship.

09:58:35 3    Q.      Directing your attention to the rows 27 and 28, and

09:58:40 4    there is surrounding messages here, actually let's go to the

09:58:46 5    previous page, please.  The defendant says "come get, how

09:58:54 6    much I owe?  Can you get baby powder?"  On the following

09:58:58 7    page says "the really soft stuff."  Based on your training

09:59:01 8    and experience, do you have an opinion on what the coded

09:59:04 9    language is that we see in this messages?

09:59:06 10   A.      Yes.  They're asking for powdered cocaine, not crack

09:59:11 11   cocaine.

09:59:11 12   Q.      And as you testified earlier, powdered cocaine can be

09:59:15 13   cooked into crack cocaine; is that right?

09:59:17 14   A.      Correct, very easily, baking soda, water, heat.

09:59:20 15   Q.      And the date of this message, is that May 6, 2018, on

09:59:25 16   the bottom there, do you see that May 6, 2018?

09:59:28 17   A.      It is.  May 5th is the first message and then May 6th

09:59:33 18   is the second.

09:59:34 19   Q.      Thank you.  "Really soft stuff", does that also

09:59:37 20   inform your interpretation?

09:59:39 21   A.      Yes, he's asking for cocaine powder, again, this is a

09:59:42 22   rudimentary pretty standard code.

09:59:47 23   Q.      Turning next to Row 32, actually Row 31.  The word

09:59:57 24   "party favor" is used there from the defendant to an

10:00:00 25   individual named Vladimir Peteov, as stated in his contacts,

Romig - direct

10:00:07 1   do you have an opinion based on your training and experience

10:00:09 2   as to what "party favor" is a reference to?

10:00:11 3   A.      Generally drugs, but if this is buyer/seller

10:00:16 4   dependent, generally drugs, I can't tell you whether it's

10:00:21 5   cocaine, crack cocaine, but just generally drugs.  That's

10:00:24 6   going to be based on whatever the relationship was between

10:00:27 7   the buyer and seller prior to this message, or prior to the

10:00:30 8   last time that they met or did some sort of deal, drug deal.

10:00:35 9   Q.      Now, I would like to turn to Rows 74 to 80, please.

10:00:42 10  The series of messages that the jury has seen between

10:00:45 11  someone named Michael and the defendant, do you see where it

10:00:49 12  starts, "you want ten grams", in the middle of the page?

10:00:52 13  A.      Yes.

10:00:52 14  Q.      Again, grams is a language in the drug trade used

10:00:58 15  about the weight of the drug, right?

10:00:59 16  A.      Yeah, again, based on all the other messages and my

10:01:03 17  review of the testimony, I would say this is either ten

10:01:06 18  grams of crack, cocaine base, or cocaine powder.

10:01:10 19  Q.      You said in review of the testimony, have you been

10:01:12 20  listening to some of the testimony during this trial?

10:01:14 21  A.      I have, been on the third floor in the overflow room

10:01:19 22  watching on a closed circuit.

10:01:21 23  Q.      Does the language in which those witnesses have

10:01:24 24  spoken inform the basis of your testimony here today as well

10:01:30 25  in addition to your experience?

Romig - direct

10:01:30 1    A.       Yes, and the review of all the messages.

10:01:33 2    Q.       You heard, for example, Zoe Kestan testify in this

10:01:37 3    case?

10:01:37 4    A.       I did.

10:01:39 5    Q.       And this message is in July of 2018, correct, the end

10:01:43 6    of July, July 25th?

10:01:45 7    A.       July 25th, 2018, all three of these messages.

10:01:49 8    Q.       If you look at the following page, when after the

10:01:53 9    defendant says "Y" do you understand "Y" to be a reference

10:02:01 10   to yes?

10:02:01 11   A.       Yes.  Yes and yes.

10:02:03 12   Q.       At the bottom of the page, Michael tells the

10:02:06 13   defendant "he said 600".  Do you have an opinion as to what

10:02:10 14   he's referencing?

10:02:11 15   A.       $600 for the ten grams.

10:02:13 16   Q.       Is that about the fair market value of cocaine or

10:02:19 17   crack cocaine around July of 2018?

10:02:22 18   A.       I think it's pretty significantly higher than the

10:02:24 19   fair market value, but again, those are based on

10:02:29 20   buyer/seller relationships.  I can give you plenty of

10:02:31 21   examples of where I would make an undercover purchase or I

10:02:34 22   would have a CI make a purchase, a confidential informant

10:02:38 23   make a purchase, and we go to the same dealer on the same

10:02:42 24   day and a different confidential source, or a different

10:02:47 25   undercover would get the product for a lot more, or a lot

Romig - direct

10:02:50 1  less, that's based on a seller buyer relationship.

10:02:53 2  Q.      Based on your experience, do the sellers size up the

10:02:57 3  client or customer and see what they might be willing to pay

10:02:59 4  for the product?

10:03:00 5  A.      100 percent, that's what happens, like any other

10:03:03 6  sale, drugs are no different.

10:03:04 7  Q.      Turning to Row 87, the defendant says "I need more

10:03:13 8  chore boy, but regardless come back and yes."  What is chore

10:03:17 9  boy?

10:03:17 10  A.      It's a -- it's a scouring pad, so it's the pieces of

10:03:24 11  the scouring pad that are used as a filter for the pipe, for

10:03:28 12  a crack pipe, or a meth pipe, or you know --

10:03:32 13  Q.      Is that common?

10:03:33 14  A.      Yes, very common.

10:03:35 15  Q.      Turning to Rows 172 to 181, someone asked the

10:03:43 16  defendant "what did you need", on that first row.  And then

10:03:47 17  there is a series of text messages and then the defendant

10:03:50 18  responds "ounce", is ounce another term used in the drug

10:03:56 19  trade?

10:03:56 20  A.      Yeah, that's just based on the difference between our

10:04:00 21  measuring systems, but an ounce is 28.35 grams, and it's one

10:04:05 22  of the most commonly distributed quantities of cocaine and

10:04:10 23  crack cocaine.

10:04:11 24  Q.      And this message is in November of 2018, correct?

10:04:14 25  A.      Correct, November 27th, 2018.

Romig - direct

10:04:17  1    Q.    Turning to the following page, an individual says

10:04:26  2    "it's only going to be 1450 instead of the 16", what did you

10:04:30  3    understand that to mean based on your training and

10:04:32  4    experience?

10:04:32  5    A.    $1,450.

10:04:37  6    Q.    Instead of $1,600?

10:04:39  7    A.    Yes.

10:04:39  8    Q.    Turning to the next page on the line, on Row 180,

10:04:46  9    individual says "yes and then 17 gram pure, give him 1,100,

10:04:50 10    you'll be happy."  What did you understand that to be based

10:04:53 11    on your training and experience?

10:04:54 12    A.    That the distributor didn't have access to the ounce,

10:04:58 13    he only had 17 grams instead of 23.85, and the discount was

10:05:03 14    going to be $1,100 for the 17 grams, not $1,100 discount, it

10:05:07 15    was going to cost $1,100 for the 17 grams.

10:05:11 16    Q.    Turning to Row 208.  Have you looked at this video in

10:05:19 17    advance of your testimony today?

10:05:21 18    A.    I have.

10:05:22 19    Q.    And the object displayed in the defendant's hand, do

10:05:27 20    you have an opinion as to what that is based on your

10:05:29 21    training and experience?

10:05:30 22    A.    Based on my training and experience, but also based

10:05:33 23    on again the totality of all the evidence that I have

10:05:36 24    reviewed, it appears to be a crack pipe.

10:05:39 25    Q.    And this is another line item in the year 2018;

Romig - direct

10:05:44 1    correct?

10:05:45 2    A.    It's 12/22/2018.

10:05:50 3    Q.    Turning to Row 213, could we please play that video,

10:06:04 4    Ms. Vo?

10:06:05 5          Agent Romig, did you review this video in

10:06:23 6    advance of your testimony that we're about to play?

10:06:26 7    A.    I did.

10:06:27 8          (Video played.)

10:06:40 9    BY MR. HINES:

10:06:41 10   Q.    Did you hear in that video, an individual say "2.07

10:06:46 11   without the bag", or words to that effect?

10:06:48 12   A.    Correct.   I did hear that.

10:06:50 13   Q.    And do you have an opinion based on your training and

10:06:52 14   experience and your hearing the testimony in this case as to

10:06:56 15   what that's in reference to?

10:06:57 16   A.    Yes, visually you could see the scale, it appears to

10:07:01 17   be just over two grams of either crack cocaine, or again

10:07:04 18   could potentially be compressed powder that looks like crack

10:07:09 19   cocaine, cocaine powder that looks like crack cocaine.

10:07:12 20   Q.    Is that consistent with how you testified earlier

10:07:14 21   that drug purchasers will sometimes weigh the product that

10:07:17 22   they get to verify that they received what they paid for?

10:07:21 23   A.    Correct.

10:07:22 24   Q.    Now, turning next to the next row, page -- Row 214 in

10:07:30 25   the summary chart.   Do you have an opinion based on your

Romig - direct

10:07:36 1   training and experience and hearing the witnesses in this

10:07:38 2   case, as to what is in the hand of that individual in

10:07:43 3   Row 214?

10:07:44 4   A.    Yes, it looks like a crack pipe.

10:07:48 5   Q.    Row 216, if we zoom in on the object next to the book

10:07:58 6   in the right photograph, just the right photograph?

10:08:03 7   A.    Yep, a little bit more elaborate, the object, but

10:08:07 8   again, it appears to be a crack pipe.

10:08:09 9   Q.    Is this a device that you have seen or similar

10:08:13 10  looking devices during the course of your investigations

10:08:15 11  when you, for example, arrested defendants or searched

10:08:19 12  locations?

10:08:20 13  A.    Yes.

10:08:22 14  Q.    Can you describe how that device works?

10:08:24 15  A.    You can see the burn mark on the side of the glass

10:08:30 16  pipe.  You put the crack in there, you have the filter

10:08:34 17  pretty much close to where the burn mark is, and you can

10:08:37 18  smoke out of the top, a white piece out of the top.  The

10:08:40 19  smoke will go in the bottom and come up through the stem

10:08:43 20  into your mouth.

10:08:45 21  Q.    Row 222?

10:08:47 22  A.    Not your mouth, but whoever's mouth is smoking the

10:08:50 23  pipe, sorry.

10:08:51 24  Q.    Thank you for that clarification, agent.

10:08:53 25        Row 222, the defendant says, "one full."  Based

Romig - direct

10:08:59  1    on everything we have been talking about, training,

10:09:01  2    experience, hearing the witnesses, and the reviewing of the

10:09:04  3    surrounding context, do you have an opinion as to what that

10:09:06  4    message is in reference to?

10:09:08  5    A.    I would say that's one full ounce, but again, it

10:09:10  6    could be dependent on the prior codes between the buyer and

10:09:14  7    seller, so it could be one full eight ball, 3.5 grams, could

10:09:19  8    be one gram, you know, probably not one gram, you wouldn't

10:09:22  9    say one full for that.  Mostly it's one ounce, 28.35 grams.

10:09:29 10    Q.    Turning to Row 271, the defendant says "I think it

10:09:36 11    may be fentan.  What did you understand fentan to mean?

10:09:41 12    A.    Fentanyl.

10:09:42 13    Q.    What is Fentanyl?

10:09:43 14    A.    Fentanyl, for lack of a better description or a -- I

10:09:48 15    should say as a simple description, it's synthetic heroin,

10:09:53 16    it's replaced, really, Columbian heroin in this country.

10:09:58 17    Fentanyl is produced in Mexico and it's probably, I would

10:10:06 18    argue, one of the more, if not the most dangerous drug being

10:10:07 19    distributed in America today, it's certainly the focus of

10:10:12 20    DEA.

10:10:12 21    Q.    Is --

10:10:13 22    A.    One of our primary focuses, I should say.

10:10:16 23    Q.    Do drug resellers sometimes cut or mix Fentanyl into

10:10:22 24    cocaine related products and sell those to drug purchasers?

10:10:25 25    A.    They do, unfortunately.

Romig - direct

10:10:27 1   Q.      And in some instances, do drug purchasers buy, by

10:10:34 2   mistake Fentanyl instead of cocaine or crack cocaine?

10:10:37 3   A.      They do, unfortunately.  Just to be clear, Fentanyl

10:10:40 4   is like heroin, a narcotic, not a stimulant like cocaine, so

10:10:45 5   it's not what the user of cocaine or crack cocaine is

10:10:48 6   looking for.

10:10:49 7   Q.      Is cocaine and cocaine base, crack, a stimulant?

10:10:53 8   A.      Stimulants.

10:10:54 9   Q.      And are they also a controlled substance?

10:10:57 10  A.      They're both schedule two controlled substances,

10:11:00 11  they're the same.

10:11:01 12  Q.      And that's a matter of Federal Law, they're

10:11:05 13  controlled substances?

10:11:06 14  A.      Correct.

10:11:06 15  Q.      Now, the final message I would like to ask you about,

10:11:10 16  Row 287, Agent Romig, an individual says "I have a ball on

10:11:18 17  me", and then if we zoom out, Ms. Vo, the defendant

10:11:25 18  responds, "dude, did you just scam me.  Feels like it."

10:11:29 19  There is later messages in which they're talking about

10:11:32 20  whatever they're talking about.  Based on your training and

10:11:34 21  experience and everything you have heard in this case, do

10:11:37 22  you have an opinion as to what is being referenced when the

10:11:40 23  individual says I have a ball on me?

10:11:42 24  A.      Yeah, I would say that that's an eight ball, which

10:11:44 25  we've talked about or I have talked about, 3.5 grams of

Romig - cross

10:11:49  1  cocaine or crack cocaine.  The descriptions from some of the

10:11:53  2  other witnesses about a marble, that's fairly accurate for

10:11:58  3  an eight ball, three-and-a-half grams, the ping pong ball or

10:12:01  4  a little bit larger, you're probably getting closer to an

10:12:05  5  ounce, 28.35 grams.

10:12:10  6  Q.    All right, Agent Romig.  Thank you.

10:12:12  7           MR. HINES:  I have no further questions at this

10:12:14  8  time, Your Honor.

10:12:15  9           THE WITNESS:  Thank you.

10:12:15 10           THE COURT:  Thank you.

10:12:17 11           Cross-exam.

10:12:17 12           MR. LOWELL:  Yes, Your Honor.

10:12:19 13                    CROSS-EXAMINATION

10:12:19 14  BY MR. LOWELL:

10:12:25 15  Q.    Good morning, agent, my name is Abbe Lowell, I'm one

10:12:29 16  of Hunter's lawyers.

10:12:30 17  A.    Good morning, sir.

10:12:31 18  Q.    Good morning to you all.

10:12:33 19           I would like if I can in the time I'm here to

10:12:36 20  talk to you about this case and not generalities about how

10:12:41 21  various drugs are grown and processed, okay?

10:12:45 22  A.    Yes, sir.

10:12:47 23  Q.    To begin with, I just wanted to make sure I got this

10:12:50 24  right.  In your background, in your work experience, you

10:12:54 25  said you were a member of the Baltimore Police?

Romig - cross

| | | |
|---|---|---|
| 10:12:57 | 1 | A.       I was. |
| 10:12:57 | 2 | Q.       Tell me those years again? |
| 10:12:59 | 3 | A.       August of 1999, and I left for the Berks County |
| 10:13:05 | 4 | Detectives in April 2001. |
| 10:13:07 | 5 | Q.       So that was about two years? |
| 10:13:08 | 6 | A.       Yes, sir. |
| 10:13:09 | 7 | Q.       Berks County in? |
| 10:13:10 | 8 | A.       Reading, Pennsylvania. |
| 10:13:12 | 9 | Q.       Okay.  When you were in Baltimore, what was your job? |
| 10:13:16 | 10 | A.       I was assigned to the patrol division. |
| 10:13:19 | 11 | Q.       Meaning you were on the street? |
| 10:13:20 | 12 | A.       I was. |
| 10:13:20 | 13 | Q.       And you were working drugs when you were on the |
| 10:13:23 | 14 | street? |
| 10:13:23 | 15 | A.       Yes. |
| 10:13:23 | 16 | Q.       In the City of Baltimore? |
| 10:13:25 | 17 | A.       Yes, sir. |
| 10:13:29 | 18 | Q.       In your introducing your expertise and what you are |
| 10:13:33 | 19 | testifying about, you indicated that your job and the job of |
| 10:13:37 | 20 | your colleagues is to be trying to break up large scale |
| 10:13:42 | 21 | distribution of drugs? |
| 10:13:45 | 22 | A.       Correct. |
| 10:13:46 | 23 | Q.       Usually not individual users? |
| 10:13:48 | 24 | A.       That's correct. |
| 10:13:49 | 25 | Q.       And you don't have any reason to understand that what |

10:13:53  1  **Mr. Biden is on trial for has anything to do with him being**

10:13:57  2  **a distributor?**

10:13:58  3  A.      **Nothing that I have reviewed would indicate that.**

10:14:00  4  Q.      **And you're not investigating, or you didn't**

10:14:04  5  **investigate him for the time he was using?**

10:14:06  6  A.      **I have never done that, no.**

10:14:08  7  Q.      **You went over all those texts that had people's names**

10:14:11  8  **and numbers, some of which you just went over with**

10:14:14  9  **Mr. Hines, and there were people that seemed to be the**

10:14:17 10  **distributors, or at least the people that were selling him**

10:14:21 11  **narcotics.  Did you see those people's texts?**

10:14:24 12  A.      **Yes, sir.**

10:14:24 13  Q.      **So as your job to try to break up large scale**

10:14:28 14  **distribution, did you look into those people?**

10:14:31 15  A.      **I didn't look into anybody in this investigation.**

10:14:34 16  **This is not my investigation.**

10:14:36 17  Q.      **Got it.  So did you see anything in trying to sort**

10:14:39 18  **out those messages to confirm their meaning that you went to**

10:14:43 19  **try to find those people that were being communicated with?**

10:14:48 20  A.      **No.  Again, this is -- was, I should say, an FBI**

10:14:53 21  **investigation, and I did not do anything as a DEA agent to**

10:14:58 22  **target any of the individuals, including the sellers.**

10:15:00 23  Q.      **Notwithstanding that, you said your mission is to**

10:15:04 24  **break up large scale distribution.**

10:15:07 25  A.      **I'm not sure what you're asking.**

10:15:09  1    Q.      My question was, you didn't do that, not that you

10:15:12  2    don't know that it was done, not withstanding that you said

10:15:16  3    your goal --

10:15:17  4    A.      The DEA, as far as I know, but specifically me, or

10:15:21  5    any of the groups that I supervise did not investigate any

10:15:24  6    of the people based on my review of the sellers in this

10:15:28  7    investigation.

10:15:28  8    Q.      You mentioned something about a process that mixes

10:15:32  9    and I think you used the word inositol right?

10:15:36 10    A.      Inositol, it is a dietary supplement.

10:15:38 11    Q.      And you mentioned that cocaine comes from a variety

10:15:42 12    of sources in the world, South America I think is what you

10:15:45 13    mentioned?

10:15:46 14    A.      Primarily South America, Columbia.

10:15:49 15    Q.      Again, turning to this case, do you have any idea

10:15:53 16    where the drugs that were used by Hunter at any point, where

10:15:56 17    those came from?

10:15:56 18    A.      Meaning what country they were produced in?

10:15:59 19    Q.      Yeah, to the extent he was using what you saw he was

10:16:03 20    using, did you --

10:16:04 21    A.      Most likely --

10:16:05 22    Q.      I didn't say most likely, I'm asking do you know,

10:16:08 23    because there were multiple countries that you mentioned

10:16:10 24    where these come from?

10:16:12 25    A.      I don't know which country they came from.

Romig - cross

10:16:14  1   Q.      How are they imported into the United States?

10:16:17  2   A.      I do not know.

10:16:18  3   Q.      How were they distributed once they were imported

10:16:21  4   into the United States?

10:16:22  5   A.      By the distributors that were --

10:16:25  6   Q.      In this case?

10:16:26  7   A.      By the distributors in these messages.

10:16:29  8   Q.      How do you know, once it came in, how did they

10:16:32  9   distribute to the people they were selling it to, do you

10:16:35 10   know?

10:16:35 11   A.      Specifically in this case, by the review of the

10:16:37 12   messages.

10:16:38 13   Q.      You know somebody was in the car with his stuff in

10:16:41 14   it, but other than that with those other messages, when you

10:16:45 15   know amounts, how did that get to the place where it was

10:16:47 16   provided to Hunter?

10:16:48 17   A.      How did the distributors in these messages get those

10:16:52 18   drugs?

10:16:52 19   Q.      Yeah.

10:16:53 20   A.      I can only surmise, I don't know.

10:16:54 21   Q.      So you didn't do that?

10:16:56 22   A.      No.

10:16:56 23   Q.      You mentioned, I think at one point, a number of

10:17:00 24   times where you would see a large amount of product that is

10:17:03 25   imported in some fashion, I think once you said stuffed into

Romig - cross

10:17:06  1    a plantain?

10:17:08  2    A.       Hundreds of plantains, yes.

10:17:11  3    Q.       I'm sorry, a crate.  But you weren't referring to

10:17:14  4    anything in this case?

10:17:16  5    A.       No.

10:17:21  6    Q.       So I would like to go back over with you some of the

10:17:25  7    things that you identified.  Mr. Radic, would you put back

10:17:33  8    on the screen, please, government Exhibit 18.  Did you

10:17:48  9    receive this summary chart from others in the investigation?

10:17:48 10    A.       I did.

10:17:49 11    Q.       And then your job, I think as you explained it, was

10:17:52 12    to go through and as you just did interpret based on your

10:17:56 13    expertise what terms mean, correct?

10:18:01 14    A.       Yes, sir.

10:18:02 15    Q.       Would you go please to the first one you did.  That

10:18:06 16    would be Row 3, Mr. Radic.  Do you see it?  You said there

10:18:09 17    was one reference to 1.4, and I think there is a typo.  But

10:18:15 18    you saw that and you interpreted that to be a reference to

10:18:19 19    an amount of drug?

10:18:20 20    A.       Yes, sir.

10:18:20 21    Q.       And would you go, Mr. Radic, please, to the next one,

10:18:24 22    which was Row 20 and 21 -- oh, I'm sorry.  And what's the

10:18:28 23    date of that?

10:18:29 24    A.       The date of this text?

10:18:32 25    Q.       Yeah, when it was flashed on the screen and enlarged,

Romig - cross

10:18:35  1   I didn't see the column with the date, so I'm asking you

10:18:38  2   what the date is for that?

10:18:39  3   A.    4/18/2018.

10:18:42  4   Q.    Mr. Radic, could you go to rows 20 and 21.  You see

10:18:46  5   that you identified and you explained that it could be

10:18:49  6   powder, it could be compressed powder, it could be crack,

10:18:52  7   and you have identified a scale.  Yes?

10:18:55  8   A.    Yes, sir.

10:18:55  9   Q.    And the date of that row and the row under it, 20 and

10:19:00 10   21, the date of that one?

10:19:01 11   A.    4/27/2018 and 4/28/2018.

10:19:13 12   Q.    Mr. Radic, could you go to Row 26, which you talked

10:19:13 13   about, please?  You talked about baby powder and you

10:19:16 14   referenced baby powder as being a reference to I think

10:19:19 15   powder cocaine?

10:19:21 16   A.    Correct.

10:19:21 17   Q.    And the date of that one?

10:19:23 18   A.    May 6, 2018.

10:19:27 19   Q.    And then you identified Row 27 right below it.

10:19:31 20   Mr. Radic, the real soft stuff, which was right after that

10:19:34 21   row before, and you interpreted that again as being in

10:19:37 22   reference to powder?

10:19:39 23   A.    Yes.

10:19:39 24   Q.    And the date of that one?

10:19:41 25   A.    Also May 6, 2018.

Romig - cross

10:19:43  1    Q.       And if you go to the next one you did, which was

10:19:48  2    Row 31.  And that's party favor, right?

10:19:51  3    A.       Yes.

10:19:52  4    Q.       Which didn't mean a little hat or little candle?

10:19:56  5    A.       I do not believe it means that, I believe it's a

10:19:58  6    reference to drugs.

10:19:59  7    Q.       And again if it is, what is the date of that one?

10:20:02  8    A.       May 6, 2018.

10:20:03  9    Q.       Would you go to the one that you did next, which is

10:20:07 10    Row 74, please, Mr. Radic.  And there is a reference there

10:20:11 11    to ten grams.  Do you see that?

10:20:12 12    A.       Yes, sir.

10:20:13 13    Q.       And you interpreted that as being a reference to a

10:20:15 14    weight of some drug; yes?

10:20:17 15    A.       Yes, again, I'm assuming either cocaine or crack

10:20:21 16    cocaine.

10:20:21 17    Q.       Right.  And the date of that one?

10:20:22 18    A.       July 25th, 2018.

10:20:25 19    Q.       And then you went to Row 87.  And that's a reference

10:20:31 20    to chore boy that you said?

10:20:33 21    A.       Yes, sir.

10:20:33 22    Q.       And that's what you explained.  And the date of that

10:20:37 23    one?

10:20:38 24    A.       August 8, 2018.

10:20:40 25    Q.       And then the next reference that you did was to

10:20:44  1    Row 174.  And that is ounce, and again your interpretation

10:20:50  2    of that was to a weight of, or an amount of drugs?

10:20:54  3    A.      Yes, that would make an ounce of cocaine or crack

10:20:58  4    cocaine.

10:20:58  5    Q.      And the date of that one?

10:20:59  6    A.      November 27th, 2018.

10:21:03  7    Q.      Okay.  And then you went to Row 180.  And there was,

10:21:17  8    do you see that reference on 180?

10:21:19  9    A.      Yes, sir.

10:21:19 10    Q.      And the date of that one?

10:21:21 11    A.      November 28, 2018.

10:21:25 12    Q.      And then you went to Row 208.  That was a picture

10:21:38 13    that you identified, and there is something in Mr. Biden's

10:21:44 14    hand and you identified that as a crack pipe?

10:21:47 15    A.      Yes.  Just to be clear, I had the benefit of viewing

10:21:50 16    the whole video, so it's a little bit clearer.

10:21:53 17    Q.      Yeah, I'm sorry, I know you read it.  And the date of

10:21:58 18    that one?

10:21:58 19    A.      Is December 22nd, 2018.

10:22:01 20    Q.      Okay.  Then you went and identified Row 213, 213.

10:22:09 21    And that was the one that there was also a video, and I

10:22:12 22    think that was played, perhaps, and the date of that one?

10:22:15 23    A.      December 29th, 2018.

10:22:18 24    Q.      And then you identified the row that's 214 right

10:22:24 25    below it or the next page.  And that one you identified as

Romig - cross

10:22:28 1   him holding a pipe, a hand holding a pipe?

10:22:32 2   A.    Yes, sir.

10:22:33 3   Q.    And the date of that one is now in the next year,

10:22:36 4   right, what's the date?

10:22:37 5   A.    January 14th, 2019.

10:22:41 6   Q.    And then you identified what's on Row 222.  And you

10:22:49 7   were talking about what this meant, one full, to you is a

10:22:53 8   reference, to again, an amount of drugs?

10:22:55 9   A.    Yes, I would suspect an ounce of cocaine or crack

10:23:00 10   cocaine based on everything else.

10:23:01 11   Q.    And that's even a month later than the one before,

10:23:04 12   that's at the end of February right, what's the date?

10:23:07 13   A.    February 26, 2019.

10:23:09 14   Q.    And then you went to Row 271.  And the reference

10:23:20 15   there was it may be fentan, and you explained to us what

10:23:24 16   fentan was, right?

10:23:25 17   A.    Yes, sir.

10:23:25 18   Q.    And the date is at the end of, again, that same day

10:23:29 19   of February 26th of 2019?

10:23:33 20   A.    Yes, sir.

10:23:33 21   Q.    And when you were reviewing this chart, not to do it

10:23:37 22   again, you did see how many on that one day on February 26th

10:23:43 23   of the backs and forth for the potential person that's

10:23:46 24   supplying him drugs, correct, quite a number?

10:23:48 25   A.    Yeah, I would have to go over it again.

Romig - cross

10:23:51  1    Q.      More than one?  I withdrawal the question, it's been

10:23:57  2    established.

10:23:57  3    A.      Okay.

10:23:58  4    Q.      Would you look at Row 287, which was maybe the last

10:24:01  5    one you did, and that's talking about "dude, did you try --

10:24:05  6    that's the, I have a ball on me", do you see that?

10:24:08  7    A.      Yes, sir.

10:24:09  8    Q.      You identified a ball as being maybe that 8-ball?

10:24:12  9    A.      Correct.

10:24:12 10    Q.      What's the date of this one?

10:24:14 11    A.      March 4th, 2019.

10:24:16 12    Q.      So with all those references, let me ask you this.

10:24:19 13    In part of what you did to interpret the texts and to get as

10:24:23 14    you say the "full flavor" of the backs and forth, did you

10:24:26 15    read Hunter Biden's book?

10:24:28 16    A.      No, I had excerpts from the book provided to me, and

10:24:34 17    I listened to the FBI agent's testimony, who is seated at is

10:24:39 18    the table, Erika, but I did not read the book.

10:24:43 19    Q.      But you did hear those or see the excerpts?

10:24:46 20    A.      I heard the ones played in court and I read over some

10:24:50 21    of the excerpts in the book.

10:24:51 22    Q.      If you did that, you know that Hunter in his book

10:24:54 23    wrote about all the use of his drugs in 2016 and 2017 and

10:24:58 24    the parts of 2018, you heard that played in court, correct?

10:25:02 25    A.      Yes, sir.

Romig - cross

10:25:03  1    Q.      When you combined that, you saw that the things that

10:25:06  2    you have identified as being references to drug use, he

10:25:09  3    himself identified for the time he was using?

10:25:11  4    A.      Yes, sir.

10:25:15  5    Q.      Now, please, I would like you -- I'm sorry, one more.

10:25:19  6    Could you go to, Mr. Radic, Row 216.  Remember when you

10:25:29  7    identified somebody holding a crack pipe that's a tube, do

10:25:34  8    you remember that?

10:25:34  9    A.      Yes, well nobody is holding it, it's on the table it

10:25:38 10    appears.

10:25:38 11    Q.      I don't mean here, I mean on the earlier one when you

10:25:42 12    saw a hand?

10:25:43 13    A.      Yes, sir.

10:25:43 14    Q.      It's a tube, a thin straight tube?

10:25:46 15    A.      Yes, sir.

10:25:47 16    Q.      On this one, which is 216, in 2019, you identified

10:25:53 17    this object on the table?

10:25:55 18    A.      Yes, sir.

10:25:56 19    Q.      Isn't that what's familiarly known as a bong?

10:25:59 20    A.      It doesn't appear to be a water bong for marijuana,

10:26:04 21    the reason why I say that is the charred part of the pipe,

10:26:09 22    but yes, it absolutely could be used as a bong as well.

10:26:12 23    Q.      Meaning it could be used to smoke weed?

10:26:15 24    A.      You could smoke meth out of there, you could smoke

10:26:19 25    heroin out of there.

Romig - cross

| 10:26:20 | 1 | Q. | You could smoke weed out of there? |

10:26:20  1   Q.    You could smoke weed out of there?

10:26:22  2   A.    You could smoke pipe tobacco.

10:26:26  3   Q.    It's a water pipe?

10:26:27  4   A.    No, I don't know that it is a water bong.

10:26:30  5   Q.    It has the ability, you see that bottom part, isn't

10:26:33  6   that a place where people could do that, they would fill it

10:26:36  7   with water?

10:26:36  8   A.    I do, but it doesn't appear, what it looks like on

10:26:40  9   the bottom.

10:26:40 10   Q.    At that occasion where the photo was taken?

10:26:43 11   A.    Correct.

10:26:43 12   Q.    It doesn't mean it wasn't used in that fashion?

10:26:46 13   A.    Absolutely.

10:26:47 14   Q.    So weed could be in there at some point?

10:26:50 15   A.    Any drug could be in there, even a noncontrolled

10:26:53 16   substance.

10:26:54 17   Q.    The date of that photo is January 31, 2019?

10:27:01 18   A.    Yes, sir.

10:27:02 19   Q.    Could you please, Mr. Radic, go on government

10:27:06 20   Exhibit 18, to start with Row 88.  I want to pick up this.

10:27:14 21   First, on Row 87, what's the date with the chore boy?

10:27:22 22   A.    August 8th, 2018.

10:27:24 23   Q.    You see the next one is October 8th of 2018, do you?

10:27:29 24   A.    Yes, sir.

10:27:31 25   Q.    And now I don't know if you have it in front of you,

10:27:34  1    so we're going to skim through Rows 88 to the next page,

10:27:39  2    please, Mr. Radic.  Stay there.  Can you look up and see --

10:27:42  3    you can see it on your screen?

10:27:43  4    A.    I can.

10:27:44  5    Q.    Do you see those texts?

10:27:46  6    A.    I do.

10:27:46  7    Q.    And then could you go to the next page, Mr. Radic, do

10:27:51  8    you see those texts?

10:27:52  9    A.    I do.

10:27:52 10    Q.    You see the date, these are now October of 2018;

10:27:56 11    right?

10:27:57 12    A.    Yes, sir.

10:27:57 13    Q.    Take a look at those.  All right.  If you go to the

10:28:01 14    next page, please.  And you see those texts?

10:28:04 15    A.    Yes, sir.

10:28:06 16    Q.    Okay.  Now, you see on the 13th, go back one, please,

10:28:15 17    Mr. Radic.  Now go forward one, and go forward one.  Okay.

10:28:21 18    Look at those texts.  Go forward one.  Go forward one.

10:28:33 19    That's still in October of '18.  Please go forward one.

10:28:40 20    Would you go another one?  Do you see a reference to a

10:28:44 21    Bernard at 10:13; right?

10:28:49 22    A.    Yes.  119.

10:28:51 23    Q.    Do you see that one?

10:28:52 24    A.    I do.

10:28:53 25    Q.    You didn't do any independent investigation of who

Romig - cross

10:28:57  1    Bernard is or whether he even exists did you?

10:29:00  2    A.    No, I didn't do any investigation in this case.

10:29:02  3    Q.    Got it.

10:29:02  4    A.    I just was provided the messages that you see in

10:29:05  5    front of you.

10:29:06  6    Q.    And no need to interpret, because there is a word

10:29:10  7    dealer there, so you didn't need to interpret that one?

10:29:13  8    A.    A lot of these messages don't need much

10:29:16  9    interpretation for me, correct.

10:29:17 10    Q.    Go to the next one.  That's to Rows 125.  Please go

10:29:22 11    one more, please.  I'm sorry, go back, you saw there is a

10:29:26 12    reference in that to sleeping on a car, smoking crack, you

10:29:30 13    don't need to interpret that?

10:29:31 14    A.    I don't think I need to interpret that, no, sir.

10:29:34 15    Q.    You don't know whether that's accurate or not,

10:29:36 16    whether that's where he was at the time; right?

10:29:40 17    A.    I don't.

10:29:41 18    Q.    Next one.  Look at those.  Next one, please,

10:29:49 19    Mr. Radic.  And again, we're in October of 2018, right?

10:29:58 20    A.    Correct.

10:29:59 21    Q.    If you go to the next one, take a look at those.

10:30:04 22    Like, for example, 1:35 on the 16th of October is one that

10:30:09 23    says "hey buddy, it's Richie Jones, checking in", that's no

10:30:15 24    reference to drugs or anything like that, right?

10:30:17 25    A.    It doesn't appear to be, no.

Romig - cross

10:30:19  1    Q.      Go to the next one, Mr. Radic.  With that.  Go to one

10:30:24  2    more, please.  Okay.  We're in the end of October 2018.  Go

10:30:28  3    to one more.  1:49.  And we're still in October.  Right?

10:30:35  4    And then the next one.  Do you see that's at the going into

10:30:42  5    November and after, do you see that?

10:30:43  6    A.      Yes, sir.

10:30:44  7    Q.      When you reviewed this chart before you came to court

10:30:47  8    or at any point in your investigation, in what I just showed

10:30:52  9    you from the period of time from August of 2018 through

10:30:55 10    November of '18, there is no reference in what you saw or

10:31:00 11    analyzed of 1.4, is there, in those texts that I just went

10:31:06 12    through with you?

10:31:08 13    A.      No, I'm not sure when that 1.4 text was, but no, not

10:31:12 14    in the ones we just reviewed.

10:31:14 15    Q.      No reference or photo of any scale with white rocks

10:31:17 16    on it in the texts I identified for you between August and

10:31:22 17    November of 2018; correct?

10:31:25 18    A.      Correct.

10:31:25 19    Q.      No reference to baby powder in that period of time?

10:31:29 20    A.      Correct.

10:31:29 21    Q.      No reference to soft stuff in that period of time?

10:31:33 22    A.      Correct.

10:31:34 23    Q.      No reference to party favor in that period of time?

10:31:38 24    A.      Correct.

10:31:39 25    Q.      No reference to grams in that period of time?

Romig - cross

10:31:43  1    A.      Correct.

10:31:44  2    Q.      No reference to chore boy in that period of time?

10:31:48  3    A.      That's correct.

10:31:48  4    Q.      No reference to one full in that period of time?

10:31:52  5    A.      Correct.

10:31:52  6    Q.      No reference to fentan in that period of time?

10:31:55  7    A.      Yes.  Correct.

10:31:57  8    Q.      And no reference of a ball in that period of time?

10:32:02  9    A.      Correct.

10:32:02 10    Q.      Those last 4 or 5 were all the way into 2019 as we

10:32:05 11    went through on the screen a moment ago, right?

10:32:08 12    A.      Yes, sir.

10:32:08 13    Q.      And in that period of time, there is no pictures of a

10:32:12 14    drug being used, right, no holding of a pipe, right?

10:32:15 15    A.      None that I reviewed.

10:32:16 16    Q.      No bags on a scale, right?

10:32:18 17    A.      No, sir.

10:32:19 18    Q.      No bags at all?

10:32:20 19    A.      Correct.

10:32:21 20    Q.      No videos of him weighing any drugs, right?

10:32:24 21    A.      None that I reviewed, no.

10:32:26 22    Q.      So all that you identified and what I went through

10:32:31 23    with you, were for the years I said before and after the

10:32:35 24    period of August of 2018 through the time that we identified

10:32:41 25    those in November of '18, that would be a fair statement I

Romig - redirect

10:32:45  1   just made, isn't it?

10:32:46  2   A.      With the exception of the October text that we talked

10:32:49  3   about, where he said he was smoking crack.

10:32:51  4   Q.      I did those too.  We identified those too.  You'll

10:32:56  5   agree with me, no pictures, no photos, no scales, no white

10:32:59  6   rocks, no chore boy, no fentan, no ball, no ounce, no grams,

10:33:04  7   none of that?

10:33:05  8   A.      Yes, sir, outside those two messages, you are

10:33:08  9   correct.

10:33:08 10           MR. LOWELL:  That's all I have.

10:33:11 11           THE COURT:  Redirect?

10:33:12 12                   REDIRECT EXAMINATION

10:33:12 13   BY MR. HINES:

10:33:12 14   Q.      Mr. Lowell asked you some questions about those

10:33:14 15   October messages and in response you said some messages

10:33:18 16   don't really need interpretation?

10:33:20 17   A.      Correct.

10:33:20 18   Q.      What did you mean by that?

10:33:22 19   A.      I think those messages are pretty clear, I don't

10:33:24 20   think you need me as an expert to provide any kind of

10:33:27 21   information about those texts.

10:33:29 22   Q.      One of them, for example, the one we've seen over and

10:33:32 23   over, sleeping on a car smoking crack, crack is a controlled

10:33:37 24   substance as you talked about earlier?

10:33:39 25   A.      Correct.

Romig - redirect

10:33:40 1    Q.      Mr. Lowell asked you in that time frame of October

10:33:43 2    whether you saw anything related to, you know, the messages

10:33:50 3    that were code, while you have been sitting in this trial,

10:33:54 4    did you see any other evidence regarding the month of

10:33:57 5    October or that time frame that is consistent with someone

10:34:01 6    who is using narcotics?

10:34:02 7    A.      Yes.   Special Agent Jensen's testimony, where she

10:34:07 8    went over some of the cash withdrawals.

10:34:10 9    Q.      Those were large cash withdrawals --

10:34:13 10            MR. LOWELL:   That's beyond the scope, but I'm

10:34:15 11   happy to get the cash -- we can talk about that.   I'm happy

10:34:22 12   to, but I want to point out it's beyond the scope.

10:34:27 13           MR. HINES:   I have one follow-up since he opened

10:34:29 14   the door about October in asking what he saw.

10:34:33 15           THE COURT:   Okay.

10:34:33 16   BY MR. HINES:

10:34:34 17   Q.      So there were almost daily large cash withdrawals in

10:34:39 18   the amounts of hundreds and thousands of dollars that you

10:34:42 19   saw that have informed your interpretation in this case, is

10:34:46 20   that right?

10:34:46 21   A.      Can you repeat that one more time, did you say

10:34:49 22   hundreds of thousands of dollars?

10:34:50 23   Q.      There were almost daily withdrawals of hundreds of

10:34:53 24   dollars or thousands of dollars?

10:34:56 25   A.      Yes, that I heard correctly, correct.

Romig - recross

10:34:58  1    Q.      That's consistent with someone who is using and

10:35:02  2    abusing narcotics, right?

10:35:03  3    A.      Well, again, coupled with all the other evidence, I

10:35:07  4    can review that and make an interpretation as to what at

10:35:10  5    least some of that cash is being used for, correct.

10:35:12  6    Q.      And what is your interpretation?

10:35:14  7    A.      That some of that cash is being used to purchase

10:35:17  8    drugs.

10:35:19  9              MR. HINES:  No further questions.

10:35:23 10                    RECROSS-EXAMINATION

10:35:24 11    BY MR. LOWELL:

10:35:25 12    Q.      Is large withdrawals of cash on any day that is in

10:35:29 13    the amounts that they said used for things other than drugs?

10:35:32 14    A.      It absolutely can be, yes.

10:35:34 15    Q.      Can it be used to give your family cash to pay for

10:35:38 16    their expenses or living?

10:35:40 17    A.      Absolutely.

10:35:41 18    Q.      And can it be used to purchase goods if you don't

10:35:44 19    have a usable credit card at the time?

10:35:46 20    A.      Absolutely.

10:35:47 21    Q.      Can it be used to pay for the place that you checked

10:35:51 22    yourself in for rehabilitation if they'll take it that way?

10:35:54 23    A.      Yes, as far as I know.

10:35:55 24    Q.      Can it be used for a person's living expenses

10:35:59 25    themselves to pay for their rent, their groceries, anything?

Romig - recross

10:36:04 1     A.      Yes, sir.

10:36:05 2     Q.      So when Mr. Hines asked you a moment ago whether you

10:36:09 3     heard Agent Jensen give her view as to whether there is --

10:36:14 4     defined large amounts of cash, you don't know in this case

10:36:18 5     as opposed to your experience what that cash was used for,

10:36:22 6     right?

10:36:22 7     A.      No, actually I'm -- I'm specifically looking at those

10:36:27 8     cash withdrawals in reference to this case because of all

10:36:31 9     the other evidence.

10:36:32 10    Q.      Correct.

10:36:34 11    A.      The exact opposite is true, if this was someone who

10:36:37 12    didn't have all these other messages and was withdrawing

10:36:41 13    $1,600, $1,500 in cash, I may think that there is absolutely

10:36:46 14    nothing to that.  The reason that it stands out is because

10:36:49 15    of the other evidence.

10:36:50 16    Q.      I understand your connection, but it's your making

10:36:53 17    that connection.  So when you were doing that to make that

10:36:56 18    connection, did you look at his bank account statements to

10:36:58 19    see where the cash went, if there was a debit, whether or

10:37:01 20    not there was a specific withdrawal that went to a rehab

10:37:04 21    place, did it go to another person's account like his

10:37:07 22    daughter, did you see and make the evaluation yourself as to

10:37:11 23    where this money went?

10:37:12 24    A.      I don't know where the cash went.  I did not trace

10:37:17 25    the cash, if that's what you're asking.  I didn't

Romig - recross

10:37:20 1    participate in this investigation, again I'll reiterate,

10:37:23 2    only reviewed the evidence that was provided to me.

10:37:25 3    Q.    Okay.  So as I leave this podium, other than seeing

10:37:29 4    the cash, you cannot say on any particular day with any

10:37:34 5    amount whether it was used for -- I'm sorry, that's not my

10:37:37 6    last question, I apologize.  I think you said for example

10:37:40 7    1.4 could cost $140, right?

10:37:45 8    A.    Correct.

10:37:46 9    Q.    You mentioned three point something could be 220?

10:37:50 10   A.    Correct.

10:37:51 11   Q.    That's dollars meaning 120, 140, 220, right?

10:37:56 12   A.    Yes, sir.

10:37:56 13   Q.    Thousands and thousands of dollars, how much was --

10:38:00 14   how much is a kilo, 2.2 pounds?

10:38:03 15   A.    2.2 pounds, yes, sir.

10:38:05 16   Q.    And how much does that cost?

10:38:07 17   A.    Depends.

10:38:08 18   Q.    Upwards of perhaps $60,000, right?

10:38:11 19   A.    No, probably not.  In 2018, I would say probably

10:38:14 20   somewhere in the range of 35 to $40,000.

10:38:17 21   Q.    So when we're talking about a buy of hundred dollars

10:38:20 22   here and a hundred dollars there, that's not thousands and

10:38:23 23   thousands of dollars that's being withdrawn right?

10:38:26 24   A.    No the amounts I saw in the thousand dollar range

10:38:29 25   were some of the references, the $1,400 an ounce, then I saw

10:38:32 1  the withdrawals of 1,600, which is pretty close.  I think

10:38:35 2  there may have even been a reference in a text to 1,600, but

10:38:39 3  I'm not certain, it could have been 14.

10:38:42 4  Q.    This will be my last questions.

10:38:44 5         The period of time that I asked you if you saw

10:38:47 6  any scales, saw any powders, saw anything you identified,

10:38:51 7  did you compare that to the withdrawals at that time that

10:38:54 8  were happening in cash?

10:38:55 9  A.    Say that one more time.

10:38:56 10  Q.    Turning to October of 2018, on the things that people

10:38:59 11  can use cash for.

10:39:01 12  A.    Yes.

10:39:01 13  Q.    You didn't see any reference in those to the cash

10:39:04 14  being used for drugs in that period, did you?

10:39:06 15  A.    In other words, were those specific messages lined up

10:39:09 16  with the cash withdrawals.

10:39:10 17  Q.    Yes.

10:39:11 18  A.    No.

10:39:12 19         MR. LOWELL:  Thank you.

10:39:13 20         THE COURT:  Anything further?

10:39:14 21         MR. HINES:  No, Your Honor.

10:39:15 22         THE COURT:  Thank you, sir.  You're excused.

10:39:17 23         THE WITNESS:  Thank you, ma'am.

10:39:19 24         MR. HINES:  Your Honor, subject to the admission

10:39:24 25  of exhibits in this case, at this time the United States

10:39:28  1    rests.

10:39:29  2              THE COURT:  All right.  Thank you.  All right,

10:39:32  3    members of the jury we're going to take our morning break

10:39:34  4    now.  We may have some procedural things that we need to

10:39:38  5    address, so it might be a little bit longer, but it will

10:39:42  6    probably be maybe 20 to 30 minutes.  All right.  Thank you.

10:39:46  7              COURTROOM DEPUTY:  All rise.

10:39:48  8              (Jury exiting the courtroom at 10:39 a.m.)

10:40:15  9              THE COURT:  All right.  Mr. Lowell, you can be

10:40:28 10    seated.  Mr. Lowell, why don't you make your motion.  But

10:40:32 11    before you do, I would asked you before if you gave us all

10:40:35 12    your exhibits and we have the exhibits you sent us, is that

10:40:41 13    all the exhibits you have for any witnesses you are going to

10:40:44 14    call?

10:40:48 15              MR. LOWELL:  I'm sorry, for the ones today you

10:40:51 16    mean, if we're calling any of the witnesses today?  I mean

10:40:54 17    for any of the witnesses we're calling or potentially

10:40:57 18    calling, you have all the exhibits today.

10:40:59 19              THE COURT:  I have seven exhibits and they are

10:41:01 20    things like --

10:41:03 21              MR. LOWELL:  My colleagues are nodding their

10:41:05 22    heads.

10:41:05 23              THE COURT:  So you have no exhibits for

10:41:07 24    Mr. Clemons, Mr. Turner, Mr. Palimere.

10:41:10 25              MR. LOWELL:  Other than the government Exhibits,

10:41:12   1   which are in evidence.

10:41:13   2                THE COURT:  Other than the government exhibits

10:41:14   3   which are in evidence.

10:41:15   4                MR. LOWELL:  Or if they're not in evidence,

10:41:17   5   they're a government exhibit that has yet to be, but I don't

10:41:20   6   know that there is one.

10:41:21   7                THE COURT:  But I asked that you give them to me

10:41:24   8   so that if there are disputes, I have them handy.

10:41:27   9                MR. LOWELL:  I understand, I'm a little confused

10:41:30  10   myself.  If government Exhibit 10A is in evidence, and it's

10:41:33  11   been talked about.

10:41:34  12                THE COURT:  Yeah.

10:41:35  13                MR. LOWELL:  That would be -- did I need to give

10:41:37  14   it to you again?

10:41:38  15                THE COURT:  Because what we did is you're

10:41:40  16   supposed to give them to me in like a direct folder so I

10:41:44  17   have --

10:41:44  18                MR. LOWELL:  I didn't understand that, I thought

10:41:46  19   it was in evidence.

10:41:47  20                THE COURT:  So the only exhibits that you're

10:41:49  21   going to use with those folks are things that are already in

10:41:52  22   evidence?

10:41:53  23                MR. LOWELL:  Yes, ma'am.  I'm sorry I didn't

10:41:55  24   know that you wanted them again.

10:41:57  25                THE COURT:  Okay.

10:41:57  1              MR. LOWELL:  And so with the government resting

10:42:01  2      subject to that, as we have talked about in terms of the

10:42:04  3      schedule, we are orally now making a motion under federal

10:42:09  4      rule of criminal procedure 29 for a judgment of acquittal.

10:42:14  5      Orally, I will tell the Court the three grounds, and as I

10:42:19  6      promised this afternoon, we will be submitting to the Court

10:42:22  7      and to counsel a motion that will explain the grounds, the

10:42:27  8      first ground, as we talked about at the beginning of the

10:42:30  9      case, will be a motion for a judgment of acquittal based on

10:42:34 10      this case's charges being unconstitutional under the second

10:42:38 11      amendment.  As applied to the facts and the people, the

10:42:41 12      person in this case.

10:42:43 13              The second, and it's hard to describe, is that

10:42:45 14      the section that is being charged in Count 3, which is a

10:42:50 15      combination of 922(g) and I think 924(a).  We will present

10:42:55 16      to Your Honor that that section has been amended and its

10:42:58 17      amendment means the period of time about which this case

10:43:02 18      depends did not have an offense as charged in Count 3.  It's

10:43:06 19      hard to describe better than that, but I think --

10:43:08 20              THE COURT:  As I understand the change in 924

10:43:11 21      was a change that was made in 2021 or 2022 to increase the

10:43:18 22      penalty from the maximum of 10 years to a maximum of

10:43:22 23      15 years.

10:43:22 24              MR. LOWELL:  Yes, but in that period of time it

10:43:24 25      had an effect on the statute that was in effect when the

10:43:27  1    offense was charged, when it was created.

10:43:29  2              THE COURT:  So can you help me understand what

10:43:31  3    you're talking about?

10:43:32  4              MR. LOWELL:  I can try orally, but I am in the

10:43:36  5    process of putting it together.  When a statute is amended,

10:43:40  6    and we will give you the case law, it has an impact on

10:43:43  7    whether or not it is the affect of repealing the statute

10:43:45  8    that existed at the time at which the statute was amended.

10:43:49  9    And we will set out the case law to indicate that that's the

10:43:53 10    event in this case, that's the best I can do at the moment.

10:43:55 11    I'm not prepared to make the argument, but I promise you it

10:43:58 12    will be spelled out quickly.

10:44:02 13              THE COURT:  So essentially, the argument is that

10:44:04 14    in increasing the penalty, there was a wiping out of the

10:44:14 15    statute for times before that?

10:44:19 16              MR. LOWELL:  A period of time before that.

10:44:21 17              THE COURT:  Okay.

10:44:21 18              MR. LOWELL:  All right.  And third, you're

10:44:24 19    smiling.

10:44:25 20              THE COURT:  That's something only congress could

10:44:27 21    do, right, intend to increase the penalty for a gun charge

10:44:33 22    and essentially wipe out the statute?

10:44:39 23              MR. LOWELL:  Wipe out the statute, judge, but it

10:44:39 24    will be as a defect in this case.

10:44:40 25              THE COURT:  We'll take a look.

10:44:42 1          MR. LOWELL:  And that's all I'm asking you to

10:44:43 2      do.

10:44:44 3          THE COURT:  Okay.

10:44:44 4          MR. LOWELL:  I know by your smile that means

10:44:46 5      you're likely skeptical.

10:44:48 6          THE COURT:  No, no, I didn't mean I was

10:44:51 7      skeptical, it's kind --

10:44:53 8          MR. LOWELL:  Interesting concept.

10:44:54 9          THE COURT:  Interesting concept.

10:44:56 10         MR. LOWELL:  Thank you, I think it's an

10:44:57 11     interesting concept myself, the third is something the Court

10:45:00 12     is used to, which will be the standard on the sufficiency,

10:45:03 13     especially as connected to the Second Amendment as applied.

10:45:07 14     As indicated, that will be in Your Honor's and the counsel's

10:45:11 15     possession by midafternoon at the latest.

10:45:13 16         THE COURT:  Okay.

10:45:14 17         MR. LOWELL:  And I understand the Court's

10:45:16 18     intentions is to reserve accordingly.

10:45:18 19         THE COURT:  But I appreciate you letting me know

10:45:20 20     what is coming.

10:45:24 21         Anything else that we need to address?

10:45:29 22         MR. HINES:  I think for just housekeeping, who

10:45:33 23     are they calling?

10:45:34 24         MR. LOWELL:  The first witnesses depending on

10:45:37 25     who is in the courtroom is Jason Turner, and the second

10:45:39  1    witness will be Ron Palimere, and then we'll see where we're

10:45:44  2    at.

10:45:52  3                    MR. HINES:  All right.  We'll take the morning

10:45:54  4    recess I guess and continue.  Is that what Your Honor would

10:45:57  5    like us to do?

10:45:58  6                    THE COURT:  Sure.

10:45:58  7                    MR. HINES:  Thank you.

10:46:01  8                    COURTROOM DEPUTY:  All rise.

10:46:39  9                    (A brief recess was taken.)

11:10:17 10                    COURTROOM DEPUTY:  All rise.

11:12:02 11                    (Jury entering the courtroom at 11:12 a.m.)

11:12:19 12                    THE COURT:  All right, everyone, welcome back,

11:12:36 13    again, everyone else please be seated.  Mr. Lowell, what's

11:12:39 14    next?

11:12:40 15                    MR. LOWELL:  What's next, Your Honor, is that we

11:12:42 16    would like Jason Turner to be a witness in this case.

11:12:48 17                    COURTROOM DEPUTY:  Please raise your right hand.

11:12:57 18    Please state and spell your full name for the record.

11:13:09 19                    THE WITNESS:  Jason Turner, J-A-S-O-N,

11:13:15 20    T-U-R-N-E-R.

11:13:17 21                    JASON TURNER, having been duly sworn was

11:13:22 22    examined and testified as follows:

11:13:25 23                         DIRECT EXAMINATION

11:13:26 24    BY MR. LOWELL:

11:13:33 25    Q.      Good morning, Mr. Turner.  Without giving us your

Turner - direct

11:13:37  1    specific address, can you tell us where you live?

11:13:40  2    A.    Wilmington, Delaware.

11:13:41  3    Q.    How long have you lived in Wilmington?

11:13:43  4    A.    Five years.

11:13:46  5    Q.    Calling your attention to the year of 2018, where

11:13:50  6    were you employed?

11:13:51  7    A.    StarQuest Shooters and Survival Supply.

11:13:54  8    Q.    What is that store?

11:13:55  9    A.    It's a gun shop and survival store.

11:13:58 10    Q.    And how long had you been employed there by 2018?

11:14:01 11    A.    Five or six years.

11:14:03 12    Q.    Prior to that, did you work in some other form of

11:14:06 13    store that sold firearms or survival equipment?

11:14:09 14    A.    No.

11:14:10 15    Q.    Where are you employed today?

11:14:11 16    A.    U.S. Mint, Philadelphia.

11:14:14 17    Q.    Got it.

11:14:15 18          So calling your attention to that day, do you

11:14:18 19    remember a day of -- I'm sorry, who is the owner of that

11:14:21 20    store?

11:14:22 21    A.    Ron Palimere, junior.

11:14:24 22    Q.    Is he presently still the owner of that store?

11:14:27 23    A.    As far as I know.

11:14:28 24    Q.    Do you have any contact with him these days?

11:14:31 25    A.    No.

Turner - direct

11:14:31 1    Q.      At that time in-- I want to call your attention to

11:14:35 2    the month of October of 2018, and specifically, I want to

11:14:38 3    talk to you about October the 12th of 2018, okay?

11:14:42 4    A.      Okay.

11:14:43 5    Q.      Were you employed and working on that day?

11:14:45 6    A.      October the 12th, and October 18th.

11:14:51 7    Q.      Those are the two days you remember working?

11:14:53 8    A.      Yeah, as far as I remember.

11:14:55 9    Q.      So let's talk about the 12th, okay?

11:14:57 10   A.      Okay.

11:14:57 11   Q.      What's your normal schedule, do you work every day --

11:15:01 12   in that period of time did you work every day in the store?

11:15:04 13   A.      At least two days off a week depending.

11:15:07 14   Q.      Okay.  But you remember on the 12th, when we're

11:15:10 15   talking about a gun sale that occurred with Hunter, you were

11:15:13 16   there that day?

11:15:15 17   A.      Yes.

11:15:15 18   Q.      What is your job at that period, on that day, what's

11:15:19 19   your job at the store?

11:15:20 20   A.      Key holder, background, like run the NIC system, sell

11:15:27 21   firearms.

11:15:28 22   Q.      Sometimes you would sell?

11:15:30 23   A.      Correct.

11:15:30 24   Q.      When you say run the NICS, N-I-C-S, that is the

11:15:33 25   background check?

Turner - direct

11:15:34  1    A.       Correct.

11:15:35  2    Q.       You're not just the person who works in the back,

11:15:38  3    sometimes you're selling, is that true?

11:15:40  4    A.       Correct.

11:15:40  5    Q.       So on that date in particular, were you on the sales

11:15:44  6    floor, do you remember?

11:15:45  7    A.       I might have been on the sales floor, might have not

11:15:48  8    been on the sales floor.

11:15:50  9    Q.       On that day, do you recall the first the time that

11:15:53 10    you became aware that Hunter was in the store?

11:15:55 11    A.       When the background check was brought to me because

11:15:58 12    at that time it was in the evening, and I was running

11:16:01 13    background checks.

11:16:02 14    Q.       So at that point of the day, your job was to run

11:16:05 15    background checks?  Were there others that day that were

11:16:08 16    purchasing weapons?

11:16:10 17    A.       Correct.

11:16:11 18    Q.       So you would run those for whoever needed to have

11:16:14 19    that done?

11:16:14 20    A.       Yup.

11:16:14 21    Q.       At that point then, you're in the back room, is that

11:16:17 22    right?

11:16:17 23    A.       In the back room, out front, answering questions for

11:16:21 24    the staff.

11:16:21 25    Q.       Right.  When it comes to running a background check,

Turner - direct

11:16:24  1    do you do that in the front or do you do that in the back?

11:16:27  2    A.    In the back.

11:16:28  3    Q.    You do it by way of some computer or laptop?

11:16:31  4    A.    Yes.

11:16:31  5    Q.    Looking at that day, you became aware of Hunter being

11:16:34  6    in the store when you ran a background check?

11:16:37  7    A.    Background check, paper was brought to me, so the

11:16:42  8    4473 was brought to me.

11:16:44  9    Q.    When you say the 4473, you mean the ATF form that

11:16:49  10   somebody filled out?

11:16:50  11   A.    Correct.

11:16:50  12   Q.    You said evening.  Do you know the time period?

11:16:53  13   A.    Not off the top of my head.

11:16:55  14   Q.    Can we put on the screen government Exhibit 12.  12A,

11:17:09  15   I'm sorry.  Can you see that on your screen, Mr. Turner?

11:17:13  16   A.    Uh-huh.

11:17:14  17   Q.    Do you recognize what that is?

11:17:16  18   A.    That would be the printout from the NIC system.

11:17:19  19   Q.    And the NIC system is what we are referring to as the

11:17:21  20   background check?

11:17:22  21   A.    Correct.

11:17:23  22   Q.    And was it your understanding by looking at this that

11:17:26  23   you're the one who ran that check that day?

11:17:28  24   A.    Submitted by me.

11:17:30  25   Q.    Do you see at the bottom it says your name?

Turner - direct

11:17:33 1    A.      Yes, that's me.

11:17:34 2    Q.      You would have done that.  Do you see the time of

11:17:37 3    this, it says created 6:36 on top, created date

11:17:43 4    October 12th?

11:17:43 5    A.      Yes.

11:17:44 6    Q.      That would indicate what?

11:17:45 7    A.      The time.

11:17:45 8    Q.      The time of?

11:17:47 9    A.      When it was created.

11:17:48 10   Q.      Meaning the time you ran the check?

11:17:50 11   A.      Correct.

11:17:51 12   Q.      And if you look at the bottom, it says retrieve date,

11:17:54 13   do you see that?

11:17:56 14   A.      Correct.

11:17:56 15   Q.      And you see the time?

11:18:00 16   A.      One minute apart.

11:18:01 17   Q.      Meaning that you ran the check and the results came

11:18:03 18   back in a minute?

11:18:04 19   A.      Yes.

11:18:04 20   Q.      And the results were to proceed?

11:18:06 21   A.      Correct.

11:18:06 22   Q.      So looking at this, would this be the time that you

11:18:10 23   first became aware that Hunter was in the store seeking to

11:18:13 24   purchase something?

11:18:15 25   A.      No, I would have had his paperwork in my hand, I

Turner - direct

11:18:18  1    would have read the paperwork.

11:18:19  2    Q.      Somewhat right before 6:36?

11:18:23  3    A.      Correct.

11:18:23  4    Q.      So you're in the back room, who brings you the

11:18:30  5    paperwork?

11:18:30  6    A.      Gordon brought me the paperwork.

11:18:30  7    Q.      Gordon Cleveland?

11:18:31  8    A.      Correct.

11:18:31  9    Q.      When he brought you the paperwork, when you say

11:18:34 10    paperwork, am I understanding you to say that that included

11:18:37 11    the 4473 form?

11:18:39 12    A.      Yes.

11:18:39 13    Q.      Was there anything else?

11:18:40 14    A.      A copy of the passport.

11:18:42 15    Q.      Was it a copy of the passport or the actual passport?

11:18:45 16    A.      Whatever is in that paperwork bundle from, with the

11:18:51 17    4473, that's what he brought me.

11:18:52 18    Q.      And when you got the form, I want you to be clear

11:18:56 19    about this, you got the 4473, was Hunter's signature on the

11:19:02 20    form at that point?

11:19:04 21    A.      No, it was not, because it was my -- the way you do

11:19:09 22    it, is you review the form making sure that all the boxes

11:19:13 23    are checked, making sure that all the information is on the

11:19:17 24    form properly.  You can't run a background check until it's

11:19:20 25    been signed.

Turner - direct

11:19:20  1    Q.      But you just told me a minute ago --

11:19:23  2    A.      I did not run his background check until it was

11:19:26  3    signed.

11:19:26  4    Q.      So let me --

11:19:28  5    A.      When I --

11:19:29  6    Q.      Stop, stop, stop, let's me get the sequence, a moment

11:19:33  7    ago you said when you got the form it was not signed?

11:19:35  8    A.      Correct.

11:19:36  9    Q.      Did you get the form later when it was signed?

11:19:38 10    A.      Yes.

11:19:38 11    Q.      Let's talk about the sequence?

11:19:40 12    A.      Okay.

11:19:40 13    Q.      Mr. Cleveland comes in and brings the form and it's

11:19:43 14    not signed?

11:19:44 15    A.      Correct.

11:19:45 16    Q.      And he brought in a copy of some form of

11:19:52 17    identification at that point or the actual thing?

11:19:53 18            MR. WISE:  Your Honor, I object at this point,

11:19:55 19    the questions are all leading.  Which is fine on cross,

11:19:57 20    they're calling him, they should ask sort of what happened.

11:20:01 21            MR. LOWELL:  Okay, I will do it.

11:20:02 22    BY MR. LOWELL:

11:20:03 23    Q.      All right.  Let's start over.  What is it, the first

11:20:06 24    time that you saw the form, that you saw along with the

11:20:10 25    form, if anything?

Turner - direct

11:20:12  1    A.       So the form should have had the form itself, and a

11:20:18  2    copy of the identification because that's what the form

11:20:21  3    requires.  Everything on there, on that form, all the

11:20:25  4    directions are right there.  Not only for the purchaser, but

11:20:28  5    for the person disposing of the firearm.  The person selling

11:20:31  6    the gun.  It's all on there.

11:20:34  7    Q.       That's in the -- sorry, I want to take this in small

11:20:38  8    pieces.  When you say it's all there, you mean the

11:20:41  9    directions --

11:20:42 10    A.       The directions are on there.

11:20:43 11    Q.       Sir --

11:20:44 12             THE COURT:  Mr. Turner, see this guy down here,

11:20:47 13    that's Dale, he's my court reporter and he can only take

11:20:51 14    down one person at a time, so if you talk while Mr. Lowell

11:20:54 15    is talking, he gets mad at me, so you've got to wait for him

11:20:58 16    to finish and then he'll wait for you to finish your answer.

11:21:00 17    Got it.

11:21:01 18             THE WITNESS:  Be mad at me, that's all right.

11:21:04 19    BY MR. LOWELL:

11:21:04 20    Q.       That's all right, he's been mad at me the whole

11:21:07 21    trial.

11:21:07 22             So when my question was, Mr. Cleveland comes in

11:21:13 23    with a copy and you said to me there are everything, all

11:21:18 24    that's on the form, that means directions for the seller and

11:21:21 25    for the buyer, right?

Turner - direct

11:21:23  1    A.      Correct.

11:21:24  2    Q.      And what are some of the directions for the seller?

11:21:29  3    A.      In the individual boxes, it says sign here, or this

11:21:34  4    information is required here.

11:21:36  5    Q.      For the seller?

11:21:37  6    A.      Yeah.

11:21:38  7    Q.      And what --

11:21:39  8    A.      You need to have a copy, a photographic copy, so I

11:21:42  9    need a picture of a state ID, or some other federally issued

11:21:47 10    identification.

11:21:49 11    Q.      Okay.

11:21:49 12    A.      So a passport.

11:21:51 13    Q.      In this case you said a passport?

11:21:54 14    A.      Correct.

11:21:54 15    Q.      When Mr. Cleveland first comes in, just to be as

11:21:58 16    clear as we can be about the sequence, he has the form which

11:22:01 17    is not signed; is that right?

11:22:03 18    A.      Yes.

11:22:04 19    Q.      And he has a copy of the passport?

11:22:06 20    A.      Yes.

11:22:06 21    Q.      Now, when he came in with that form, was Mr. Palimere

11:22:10 22    in the office at the same time?

11:22:12 23    A.      No.

11:22:12 24    Q.      Where was he?

11:22:13 25    A.      I don't know.

Turner - direct

11:22:14  1    Q.      Did Mr. Palimere come on the scene in this exchange

11:22:18  2    with Mr. Cleveland at any time?

11:22:20  3    A.      Not that I know of.

11:22:22  4    Q.      So Mr. Cleveland came in, and he presented this to

11:22:25  5    you, and he handed this to you, right?

11:22:28  6    A.      No, he put it in a pile because there are four other

11:22:32  7    checks that were going on.

11:22:33  8    Q.      So it wasn't just -- are you indicating that what you

11:22:36  9    were working on was not just the form that had anything to

11:22:39 10    do with Hunter?

11:22:40 11    A.      No, I was running probably three other backgrounds.

11:22:43 12    Q.      Was this put on the pile?

11:22:44 13    A.      Right next to it, right in order.

11:22:47 14    Q.      And did Mr. Cleveland wait when you did that then?

11:22:51 15    A.      No, he went back out to attend to the sales floor.

11:22:54 16    Q.      Without the form and without the copy of the

11:22:56 17    passport?

11:22:57 18    A.      Correct.

11:22:58 19    Q.      When he went back out to the floor, did you see what

11:23:02 20    he did?

11:23:02 21    A.      No.

11:23:03 22    Q.      How long did it take you, then, to run the checks you

11:23:07 23    did by the time you went to the one that's up on the screen?

11:23:11 24    A.      I have no idea.  That was 2018.

11:23:13 25    Q.      So -- but is it your memory, though, that there were

Turner - direct

11:23:18  1    ones you were working on before this?

11:23:20  2    A.      Yes.

11:23:20  3    Q.      So in a time sequence, if you run this at 6:36, that

11:23:25  4    would mean that you got this form sometime prior and you

11:23:30  5    were working on other things before you got this?

11:23:32  6    A.      On other background checks, correct.

11:23:34  7    Q.      But you're sure that the form you got had no

11:23:38  8    signature on it?

11:23:38  9    A.      Positive.

11:23:40 10    Q.      Then you get to this one.  Did you have any

11:23:43 11    conversation with Mr. Cleveland when he first brought you

11:23:46 12    the form without the signature and then the copy?

11:23:49 13    A.      No.

11:23:49 14    Q.      He just left it for you?

11:23:51 15    A.      Yes.

11:23:51 16    Q.      And then he left?

11:23:53 17    A.      Went back out on the sales floor.

11:23:55 18    Q.      And what did you do next?

11:23:57 19    A.      Took the next one in the pile.

11:23:59 20    Q.      Which was not yet Hunter's?

11:24:02 21    A.      Probably not Hunter's, maybe it was.

11:24:04 22    Q.      You don't know?

11:24:05 23    A.      I don't remember.

11:24:06 24    Q.      Okay.  Eventually you got to his?

11:24:08 25    A.      Yep.

Turner - direct

11:24:08 1    Q.    And you ran that at that point?

11:24:11 2    A.    No.

11:24:11 3    Q.    What did you do?

11:24:12 4    A.    You have to review the form.

11:24:13 5    Q.    Okay.  So you reviewed the form and what happened?

11:24:16 6    A.    Make sure there is a first name in the first name box

11:24:19 7    and a last name in the last name box, make sure all of the

11:24:22 8    boxes are checked correctly, and then you open it up and you

11:24:26 9    make sure that the buyer has signed the form.

11:24:29 10   Q.    But when you did that --

11:24:30 11   A.    Before you would even type in your log in, you look

11:24:33 12   at all these things.

11:24:35 13   Q.    Okay.

11:24:35 14   A.    If it was missing information, close the form, go

11:24:40 15   find my salesperson, make him get me the right information.

11:24:45 16   Q.    Was it missing information?

11:24:46 17   A.    It was missing information.

11:24:48 18   Q.    Okay.  So among other things, it was missing a

11:24:51 19   signature?

11:24:51 20   A.    Yes.

11:24:52 21   Q.    So then what happened?

11:24:53 22   A.    Took it to the sales floor, to my sales associate.

11:24:56 23   Q.    You went outside?

11:24:57 24   A.    Went out to the front of the store, correct.

11:25:00 25   Q.    Did you bring anything with you when you went out to

Turner - direct

11:25:02  1    the floor?

11:25:03  2    A.      The paperwork.

11:25:03  3    Q.      Meaning?

11:25:04  4    A.      The 4473 and a copy of the passport.

11:25:07  5    Q.      And then when you went back to the floor, did you

11:25:10  6    speak to Mr. Cleveland?

11:25:11  7    A.      Yes.

11:25:11  8    Q.      What is it that you said to Mr. Cleveland?

11:25:14  9    A.      I told him that he was missing the supplementary

11:25:17 10    identification because you can't do just a passport alone,

11:25:21 11    it has no address on it.  And it didn't have a signature.

11:25:24 12    Q.      It did not yet?

11:25:26 13    A.      Correct.

11:25:26 14    Q.      So part of the form was filled, whatever you said,

11:25:31 15    you went out and spoke to Mr. Cleveland and told him what

11:25:34 16    you just said?

11:25:35 17    A.      Uh-huh.

11:25:36 18    Q.      You only spoke to Mr. Cleveland?

11:25:38 19    A.      Correct.

11:25:38 20    Q.      Did you at any point when you went back out talk to

11:25:42 21    Mr. Biden at all?

11:25:43 22    A.      No.

11:25:43 23    Q.      Never?

11:25:44 24    A.      No.

11:25:44 25    Q.      Not a word?

Turner - direct

11:25:46  1    A.      No.

11:25:46  2    Q.      You didn't ask Mr. Biden for anything?

11:25:48  3    A.      No.

11:25:48  4    Q.      You didn't seek him to go and get some other form of

11:25:51  5    papers?

11:25:52  6    A.      No.

11:25:52  7    Q.      You just spoke to Mr. Cleveland?

11:25:54  8    A.      Correct.

11:25:54  9    Q.      After you spoke to Mr. Cleveland, what did

11:25:57 10    Mr. Cleveland do?

11:25:57 11    A.      He went and followed the orders that he was given, he

11:26:00 12    got a supplementary I.D., and had him sign the paperwork.

11:26:06 13    Q.      At that point?

11:26:06 14    A.      At that point.

11:26:07 15    Q.      How do you know that that is what Mr. Cleveland did?

11:26:08 16    A.      Because I waited by the back office door.

11:26:11 17    Q.      Say it again?

11:26:12 18    A.      I waited by the back office door.

11:26:15 19    Q.      And watched Mr. Cleveland?

11:26:16 20    A.      Correct.

11:26:16 21    Q.      Where was Mr. Biden?

11:26:18 22    A.      In the front of the store.

11:26:20 23    Q.      Where?

11:26:21 24    A.      Over by the sales counter.

11:26:23 25    Q.      You told Mr. Cleveland something and you went back to

Turner - direct

11:26:26  1    the door?

11:26:26  2    A.    Yep.

11:26:27  3    Q.    And Mr. Cleveland went outside?

11:26:28  4    A.    No, Mr. Cleveland never left the store.

11:26:31  5    Q.    You didn't talk to Mr. Biden, we understand that?

11:26:33  6    A.    Correct.

11:26:34  7    Q.    You just said something about a supplemental form of

11:26:36  8    identification?

11:26:37  9    A.    Uh-huh.

11:26:38 10    Q.    Because you told Mr. Cleveland that the passport was

11:26:40 11    not sufficient?

11:26:41 12    A.    Correct.

11:26:43 13    Q.    Can you put up government Exhibit 12 -- 10A, please.

11:26:54 14    And it's in evidence.

11:26:55 15              So do you recognize this five years later as the

11:26:59 16    form or just because it's on the screen?

11:27:05 17    A.    That looks about right.

11:27:07 18    Q.    Okay.  Can you turn to the next page?  And you see on

11:27:11 19    the next page it says U.S. passport 01052027?

11:27:17 20    A.    Uh-huh.

11:27:17 21    Q.    Do you recognize that writing?

11:27:19 22    A.    That looks like mine.

11:27:20 23    Q.    And you are the person that put that on that says

11:27:24 24    U.S. passport, correct?

11:27:26 25    A.    Correct.

Turner - direct

11:27:26 1  Q.      A minute ago you said you went to speak to

11:27:29 2  Mr. Cleveland and you said to him that that wasn't

11:27:31 3  sufficient because it did not have an address on it.  And

11:27:34 4  you see the passport is what you wrote on, right?

11:27:37 5  A.      Correct.

11:27:39 6  Q.      When did you write that on it?

11:27:40 7  A.      Somewhere in filling out his NICS check.

11:27:44 8  Q.      You see the books next to it, line 18(b), right under

11:27:51 9  it?

11:27:51 10 A.      Correct.

11:27:51 11 Q.      It says supplemental government issued documentation,

11:27:55 12 if the identification document does not show current

11:27:58 13 residence, government issued photo identification, do you

11:28:05 14 see that?

11:28:05 15 A.      Yes.

11:28:05 16 Q.      If it doesn't show residence, do you see that?

11:28:09 17 A.      Correct.

11:28:09 18 Q.      You a moment ago said that the passport doesn't have

11:28:13 19 somebody's address?

11:28:14 20 A.      Correct.

11:28:14 21 Q.      Then you said that you told Mr. Cleveland something,

11:28:16 22 right?

11:28:16 23 A.      He needed to get further government issued

11:28:22 24 identification with an address on it.

11:28:25 25 Q.      Right.  And if he did, what would you do with that?

Turner - direct

11:28:29  1   A.        I would have written it right in there.

11:28:32  2   Q.        But you don't see such writing in there, do you?

11:28:33  3   A.        When I wrote that out, I wrote the car registration.

11:28:34  4   Q.        You don't see such a writing in there, do you?

11:28:36  5   A.        When I wrote that out, I wrote car registration.

11:28:40  6   Q.        When you wrote this out, you wrote car registration

11:28:47  7   here or car registration there?

11:28:49  8   A.        18(b), car registration.

11:28:53  9   Q.        You wrote it?

11:28:54 10   A.        I wrote it.

11:28:56 11   Q.        Where is it?

11:28:57 12   A.        I wrote vehicle registration in there.

11:29:00 13   Q.        I'm asking you if you did and this is the form, where

11:29:03 14   is it on the form that you say you wrote?

11:29:06 15   A.        It's not there.

11:29:07 16             MR. WISE:  Your Honor, may we approach side-bar?

11:29:09 17             (Side-bar discussion.

11:31:03 18             MR. WISE:  So this line of questioning was

11:31:03 19   excluded, he has a memory of writing it, he hasn't

11:31:03 20   established when, he's not impeached him, he said he

11:31:03 21   remembered writing it in.  He's asking him about the day,

11:31:03 22   but he's not distinguishing, and this is simply irrelevant,

11:31:03 23   a secondary form of ID is irrelevant.

11:31:03 24             MR. LOWELL:  Wow.  I have no idea he was about

11:31:03 25   to say what he just said, that he wrote in a different form

Turner - direct

11:31:03  1    of identification.

11:31:03  2              THE COURT:  He's confused as to the time.

11:31:03  3              MR. LOWELL:  I know he is and I'm not going

11:31:03  4    there but he said it, so I just wanted to ask who wrote it,

11:31:03  5    where is it, I didn't know he was going to say that, judge.

11:31:03  6              MR. WISE:  He did know that because the Jencks

11:31:03  7    that we gave you from Palimere, said Palimere told him to

11:31:03  8    write it.

11:31:03  9              MR. LOWELL:  Two years later.

11:31:03 10              MR. WISE:  That's not your question.

11:31:03 11              MR. LOWELL:  I'm asking him on that day, I'm

11:31:03 12    asking him on that day.

11:31:03 13              THE COURT:  What you can do now is you can just

11:31:03 14    say there is nothing about the vehicle registration.  It is

11:31:03 15    not written in this box on this version of the form.

11:31:03 16              MR. LOWELL:  Okay.  But let's be clear on the

11:31:03 17    record, when you say I knew he was going -- I had no idea he

11:31:03 18    was going to say that.

11:31:03 19              THE COURT:  I take your word for that.  I didn't

11:31:03 20    know he was going to say that.

11:31:03 21              (End of side-bar.

11:31:06 22    BY MR. LOWELL:

11:31:15 23    Q.    So what I was asking you is from whatever you just

11:31:17 24    said about the testimony of anything having to do with the

11:31:20 25    registration, you and I can be clear that on this form that

Turner - direct

11:31:24 1   has the date on it, there is no such reference in

11:31:27 2   line 18(b), right?

11:31:28 3   A.      There should be.

11:31:29 4   Q.      Okay.  So you went out, spoke to Mr. Cleveland, you

11:31:37 5   saw Mr. Biden do something, come back, right?  And then did

11:31:42 6   you then go back into the back room?

11:31:45 7   A.      Yes.  Sat down and entered his information into the

11:31:48 8   NICS system.

11:31:49 9   Q.      With the form as it presently then stood?

11:31:53 10  A.      Correct.

11:31:53 11  Q.      As the form as it then was in existence?

11:31:57 12  A.       (Witness nodded.

11:31:59 13  Q.      Did Mr. Cleveland go back inside with you?

11:32:01 14  A.      He was still on the sales floor.

11:32:03 15  Q.      And Mr. Biden was still on the sales floor?

11:32:05 16  A.      Correct.  Nobody left the store.

11:32:07 17  Q.      I'm sorry?

11:32:09 18  A.      None of the staff left the store.

11:32:11 19  Q.      Okay, I understand, I'm just trying to create the

11:32:15 20  time sequence, okay?

11:32:16 21  A.      Sure.

11:32:16 22  Q.      Now you get the form as you understood it to exist as

11:32:19 23  that looked, or maybe not, and you went and did the NICS?

11:32:23 24  A.      Correct.

11:32:23 25  Q.      And we showed you the NICS form.  After that, how did

Turner - direct

11:32:30  1    you communicate, if you did, the results of that background

11:32:34  2    check to Mr. Cleveland or anybody else?

11:32:37  3    A.      Well, if you scroll or focus on that form --

11:32:44  4    Q.      I should go to the next page anyway, Mr. Radic, just

11:32:48  5    to make sure we're acclimated.  On top where it says Colt

11:32:53  6    manufacturer, do you recognize that handwriting?

11:32:56  7    A.      That looks like my handwriting.

11:32:58  8    Q.      Where would you have put that on?

11:33:00  9    A.      While I was running the form.

11:33:02 10    Q.      Okay.  And then there is a StarQuest Shooters stamp

11:33:06 11    and a number on the right, what is that, do you recognize

11:33:13 12    that?

11:33:13 13    A.      That would be an address and the number on the right

11:33:15 14    would be the FFL.

11:33:18 15    Q.      FFL meaning the license?

11:33:20 16    A.      Correct.

11:33:20 17    Q.      Who put that on?

11:33:22 18    A.      That gets put on by the filing secretary.

11:33:24 19    Q.      Is that stamp of the store's name and its license

11:33:27 20    number on the forms already?

11:33:28 21    A.      No.

11:33:28 22    Q.      Are they put in each time a gun is purchased?

11:33:32 23    A.      Each time a gun is purchased.

11:33:34 24    Q.      And then I see that there is, the blue name of Gordon

11:33:39 25    Cleveland and the signature, do you see that?

Turner - direct

11:33:41 1    A.    Yes.

11:33:42 2    Q.    And it says sales, do you see that?

11:33:43 3    A.    Uh-huh.

11:33:44 4    Q.    There is a date and that looks like your handwriting;

11:33:47 5    is that right?

11:33:47 6    A.    Correct.

11:33:48 7    Q.    How did that come about?

11:33:49 8    A.    I probably dated it while sitting there.

11:33:53 9    Q.    Was that before or after Mr. Cleveland signed it?

11:33:56 10   A.    It would have been after Mr. Cleveland signed it.

11:33:58 11   Q.    Would that be before or after you saw the form with

11:34:02 12   Mr. Hunter Biden's signature on it?

11:34:04 13   A.    It would have been after.

11:34:05 14   Q.    So now you ran the check, and my question was how did

11:34:09 15   you communicate proceed to whoever you needed to communicate

11:34:14 16   it to?

11:34:14 17   A.    On the other page, I would have finished filling out

11:34:17 18   the document where it said proceed.  Right there.

11:34:22 19   Q.    So now --

11:34:23 20   A.    He --

11:34:25 21   Q.    Go ahead?

11:34:26 22   A.    Proceed, put the date on there, and the NTN number,

11:34:30 23   which is a transaction number, and I would have put my name

11:34:33 24   in the box that said I ran it.

11:34:35 25   Q.    Okay.  I see that this date and the NICS number is in

Turner - direct

| | | |
|---|---|---|
| 11:34:41 | 1 | red ink, do you see that? |
| 11:34:42 | 2 | A.    Uh-huh. |
| 11:34:43 | 3 | Q.    As was the date next to Mr. Cleveland's name and |
| 11:34:46 | 4 | signature, and your name, Jason V. Turner is in black ink? |
| 11:34:52 | 5 | A.    Right. |
| 11:34:52 | 6 | Q.    Is that your handwriting for your name? |
| 11:34:55 | 7 | A.    Yes. |
| 11:34:55 | 8 | Q.    When did you put that on versus the red? |
| 11:34:59 | 9 | A.    All at the same time. |
| 11:35:01 | 10 | Q.    You switched pen colors? |
| 11:35:03 | 11 | A.    Yes. |
| 11:35:03 | 12 | Q.    How come? |
| 11:35:04 | 13 | A.    Because the date, proceed and NTN number now stand |
| 11:35:08 | 14 | out on the form so during the yearly ATF audit it makes it |
| 11:35:13 | 15 | easier to see those numbers. |
| 11:35:15 | 16 | Q.    And then when you did that, now you put the red in |
| 11:35:18 | 17 | and put your name, you still have that form; right? |
| 11:35:22 | 18 | A.    Yes. |
| 11:35:22 | 19 | Q.    And then what did you do with it? |
| 11:35:24 | 20 | A.    Took the form and the firearm out front. |
| 11:35:27 | 21 | Q.    So at the point at which you did this, did you have |
| 11:35:30 | 22 | the firearm back there as well? |
| 11:35:32 | 23 | A.    Yes, because I needed the information off the gun. |
| 11:35:35 | 24 | Q.    So Mr. Cleveland brought you the form at one point, |
| 11:35:40 | 25 | right? |

1147

Turner - direct

11:35:40  1   A.      Uh-huh.

11:35:41  2   Q.      And a copy of the passport; right?  You went out and

11:35:48  3   spoke to Mr. Cleveland.  When you went out to get

11:35:50  4   Mr. Cleveland and tell him about the form, is that when you

11:35:54  5   picked up the gun?

11:35:54  6   A.      No, he brought the gun with him the first time.

11:35:57  7   Q.      So I'm sorry I got confused.  So the first time when

11:36:00  8   he comes in, he brings in the form, the copy of the

11:36:03  9   passport, and the gun?

11:36:04 10   A.      Uh-huh.

11:36:05 11   Q.      So the gun is no longer out on the showroom?

11:36:08 12   A.      No.

11:36:09 13   Q.      And you went back outside to tell Mr. Cleveland --

11:36:13 14   A.      Out front, not outside.

11:36:15 15   Q.      Outside of the back room?

11:36:17 16   A.      Correct.

11:36:17 17   Q.      To see Mr. Cleveland and talk to him, the gun was

11:36:20 18   behind, back in the back room?

11:36:22 19   A.      Uh-huh.

11:36:22 20   Q.      That never left?

11:36:23 21   A.      No.

11:36:23 22   Q.      Until you were done?

11:36:25 23   A.      Correct.

11:36:26 24   Q.      So now after you did this, you communicated to

11:36:29 25   Mr. Cleveland by bringing what?

Turner - direct

11:36:30  1    A.      The form and the firearm.

11:36:32  2    Q.      The form, the firearm, and the copy of the passport?

11:36:35  3    A.      Correct.

11:36:35  4    Q.      Did you ever see the actual passport?

11:36:37  5    A.      No.

11:36:38  6    Q.      Did he ever -- so you're saying he never, as you

11:36:42  7    remembered it, brought the actual passport, only a copy?

11:36:46  8    A.      Mr. Cleveland made a copy.

11:36:48  9    Q.      In the back room or in the front?

11:36:50 10    A.      In the book room where the copier was.

11:36:52 11    Q.      Did you see him do that?

11:36:54 12    A.      It's down the hallway.

11:36:55 13    Q.      I'm just asking, did you see him do that?

11:36:57 14    A.      No.

11:36:58 15    Q.      When did he do that?

11:36:59 16    A.      Somewhere in between Mr. Biden filling out the form

11:37:01 17    and picking out his firearm.

11:37:04 18    Q.      And then you took the gun, the form, and you went

11:37:08 19    back outside after the NICS check?

11:37:11 20    A.      Uh-huh.

11:37:11 21    Q.      And you gave them to Mr. Cleveland?

11:37:13 22    A.      Correct.

11:37:14 23    Q.      Still no conversation with Hunter?

11:37:16 24    A.      Correct.

11:37:17 25    Q.      And then what did you do thereafter?

Turner - direct

11:37:19 1    A.    I went back to the back office to run more background

11:37:22 2    checks.

11:37:22 3    Q.    And that was the end of your involvement at that

11:37:25 4    point that day?

11:37:27 5    A.    Yes.

11:37:27 6    Q.    Had any conversations with Mr. Palimere that day

11:37:30 7    about the form?

11:37:32 8    A.    No.

11:37:32 9    Q.    And he was not in the back room with you?

11:37:34 10   A.    No.

11:37:35 11   Q.    And then when the sale ended, did you have any

11:37:38 12   further conversations with Mr. Cleveland?

11:37:41 13   A.    About football, whatever was going on that day, yeah.

11:37:46 14   Q.    Say that again.

11:37:47 15   A.    We worked together.

11:37:48 16   Q.    No, I mean about the sale?

11:37:50 17   A.    About the sale, no.

11:37:52 18   Q.    Can I also show you what is in evidence as

11:37:56 19   Government's Exhibit 13, and put it up on the screen,

11:38:00 20   please, Mr. Radic.

11:38:01 21            So we saw the NICS checks dated, you're doing it

11:38:08 22   at 6:36 and it comes back at 6:37, and you can see that this

11:38:12 23   is what, do you recognize this document?

11:38:14 24   A.    That looks like a sales receipt from the shop.

11:38:16 25   Q.    That's the way those sales receipts looked?

Turner - direct

11:38:19  1   A.       At the time, yeah.

11:38:20  2   Q.       And you see the date is the same date and the time is

11:38:24  3   6:53?

11:38:25  4   A.       All right.

11:38:26  5   Q.       Do you see that on top?

11:38:28  6   A.       Yes.

11:38:28  7   Q.       Okay.  And you see the user of this is Gordon, that

11:38:32  8   means he's the salesperson?

11:38:34  9   A.       Correct.

11:38:34 10   Q.       And did you see that that day?

11:38:37 11   A.       Maybe at night when we were locking up and doing the

11:38:41 12   last minute paperwork.

11:38:42 13   Q.       So do you remember that you ran the check, and it

11:38:45 14   came back at 6:37, right?

11:38:48 15   A.       Yes.

11:38:48 16   Q.       And you see that this sale was completed at 6:53,

11:38:53 17   right?

11:38:53 18   A.       Correct.

11:38:54 19   Q.       That's 16 minutes between the two, right?

11:38:56 20   A.       Yes.

11:38:56 21   Q.       So did you know what happened between the time that

11:38:59 22   you ran the check and the time that the sale was completed?

11:39:03 23   A.       No.

11:39:04 24   Q.       Would that have been the time in which you brought

11:39:06 25   back the gun, the form, the copy of the passport?

Turner - direct

11:39:11  1    A.        Probably.

11:39:12  2    Q.        Because according to your sequence you --

11:39:15  3    A.        You're not understanding how gun shop life is.  It's

11:39:19  4    like going to the barber shop, we have regular customers

11:39:24  5    that would come in every day just to hang out, talk about

11:39:27  6    the local news.  I can go to a gun shop today and spend two

11:39:34  7    hours in there and it not seem like anything.

11:39:38  8    Q.        Okay.

11:39:38  9    A.        So you're trying to set a time frame.  That's not

11:39:43 10    going to happen.  Like, I can literally go to a gun shop and

11:39:49 11    be there for an hour-and-a-half and it not seem like I was

11:39:52 12    there for an hour-and-a-half.

11:39:53 13    Q.        I understand what you're saying.  I get it.  What I'm

11:39:56 14    asking you, though, since we have two date parts, we know

11:40:00 15    when the NICS was done and received right, that's not

11:40:03 16    anything but what it says, 6:36 and 37, and we know that

11:40:08 17    this sale occurs at 6:53, I'm asking you, is it in that

11:40:15 18    period between the two, that you had testified, that you

11:40:20 19    went back out, you had the gun, you had the form, you had

11:40:22 20    the photo ID, it had to happen in that period of time?

11:40:23 21    A.        You're saying that the form ran in a minute.

11:40:26 22    Q.        6:37 is when it came back?

11:40:27 23    A.        Now I got to sit and write all that information that

11:40:30 24    was on there.  So there is your 16 minutes, I write slow.

11:40:34 25    Q.        I see.  So that time was taken from the time between

Turner - direct

11:40:38  1    your writing it, coming back out, and that's when the sale

11:40:40  2    was consummated?

11:40:42  3    A.        Yes.

11:40:42  4    Q.        Did you see that sale being running up then in that

11:40:45  5    period?

11:40:46  6    A.        No.   I literally would have been going back to run

11:40:50  7    more backgrounds.

11:40:51  8    Q.        I understand, but your understanding is that time

11:40:53  9    period between the NICS and the sale, was taken up by you?

11:40:57 10    A.        Okay.

11:40:58 11               MR. WISE:   Objection, that's not what he said.

11:41:00 12    BY MR. LOWELL:

11:41:00 13    Q.        Let me ask him, let me do it again.   We know two

11:41:03 14    times, right?

11:41:05 15    A.        Yes.

11:41:06 16               MR. WISE:   Now he's leading him.

11:41:07 17    BY MR. LOWELL:

11:41:08 18    Q.        Well that's already been established?

11:41:10 19               MR. WISE:   He should ask non-leading questions.

11:41:12 20    BY MR. LOWELL:

11:41:12 21    Q.        So between the time of 6:37 when the NICS check was

11:41:16 22    done, and 6:53 when this is consummated, what happened?

11:41:20 23               MR. WISE:   Asked and answered, he's already

11:41:22 24    answered it.

11:41:23 25               THE WITNESS:   I put on my ritual robes and went

Turner - direct

11:41:26  1   and sat in a marble room, what do you want me to say to you

11:41:30  2   counselor?

11:41:30  3   BY MR. LOWELL:

11:41:30  4   Q.     I would like to you to tell me as best as you can

11:41:33  5   remember -- let me finish sir, whether that was the time

11:41:36  6   period it took for to you run the NICS check and then to do

11:41:39  7   the paperwork, come back outside with the gun, the form, the

11:41:43  8   NICS check completed?

11:41:44  9              MR. WISE:  He's already asked the question and

11:41:46 10   he's answered it.

11:41:48 11              THE COURT:  So Mr. Turner, if anything that you

11:41:51 12   remember, you can respond, you can respond.  If you don't

11:41:55 13   remember something, you don't have to make something up,

11:41:58 14   whatever you remember to answer Mr. Lowell's question, you

11:42:01 15   can do so.

11:42:02 16              THE WITNESS:  Sure.  I ran his background check.

11:42:06 17   I filled out the rest of the form.  I took the gun out to

11:42:10 18   the front.

11:42:13 19   BY MR. LOWELL:

11:42:13 20   Q.     And then the sale was consummated?

11:42:16 21   A.     As far as I know.

11:42:17 22   Q.     Thank you.  I have no other questions.  Thank you.

11:42:22 23              THE COURT:  Thank you.

11:42:23 24              Cross.

11:42:24 25              MR. WISE:  Thank you, Your Honor.

Turner - cross

**CROSS-EXAMINATION**

11:42:26  1

11:42:26  2    BY MR. WISE:

11:42:32  3    Q.      Good morning, Mr. Turner.

11:42:33  4    A.      Good morning.

11:42:34  5    Q.      So you were subpoenaed by the defense as a witness,

11:42:37  6    right?

11:42:38  7    A.      Correct.

11:42:38  8    Q.      Did they try to talk with you before they did that,

11:42:41  9    before you testified here today?

11:42:43 10    A.      That's a whole mess of stuff right there.

11:42:47 11    Q.      Really?

11:42:49 12    A.      I got the subpoena, I had to call them.

11:42:51 13    Q.      Uh-huh.

11:42:53 14    A.      And they can't be on time for nothing.

11:42:57 15    Q.      What does that mean?

11:42:58 16    A.      I work third shift.

11:43:00 17    Q.      Uh-huh.

11:43:01 18    A.      And so I should be sleeping right now.

11:43:05 19    Q.      What does third shift mean?

11:43:07 20    A.      Third shift, that's on the other side of the clock

11:43:10 21    from everybody else, I go in at 6:00 p.m., I get done at 5

11:43:15 22    a.m.

11:43:15 23    Q.      Is that what you got done today?

11:43:17 24    A.      Yes.

11:43:18 25    Q.      All right.  So I just have a -- you and I have never

Turner - cross

11:43:22  1    met, right, Mr. Turner?

11:43:24  2    A.      I don't even know you from nobody.

11:43:26  3    Q.      I just have a couple of questions?

11:43:29  4            THE COURT:  Did you introduce yourself?

11:43:32  5            MR. WISE:  I'm not sure.  I will.

11:43:35  6            THE COURT:  He said he doesn't know you.

11:43:37  7    BY MR. WISE:

11:43:37  8    Q.      My name is Leo wise, I represent the United States in

11:43:40  9    this case.  Nice to meet you.

11:43:43 10            So if we could have government Exhibit 10A on

11:43:48 11    the screen.  This is the form that Mr. Biden filled out that

11:43:53 12    Mr. Lowell asked you about, right?

11:43:55 13    A.      Correct.  Actually that form is wrong.

11:43:58 14            THE COURT:  Just take it one step at a time,

11:44:00 15    only answer the questions that he asks.

11:44:02 16            THE WITNESS:  Yes, ma'am.

11:44:03 17    BY MR. WISE:

11:44:03 18    Q.      So the first page, this is all filled out by the

11:44:06 19    person buying the gun; right?

11:44:09 20    A.      Except for that top corner on the right-hand side.

11:44:13 21    Q.      Got it.  So looking at the form as it is on the

11:44:16 22    screen, this is all information that comes in this case from

11:44:21 23    Mr. Biden himself, right?

11:44:23 24    A.      Correct.

11:44:23 25    Q.      That includes, if we could highlight the questions in

Turner - cross

11:44:27  1    the middle, and it's question E, if you could enlarge that

11:44:35  2    as well.   That includes are you an unlawful user of or

11:44:43  3    addicted to marijuana or depressant stimulant narcotic drug

11:44:48  4    or any other controlled substance, right?

11:44:51  5    A.    Correct.

11:44:51  6    Q.    Now you run the background checks, correct?

11:44:53  7    A.    Correct.

11:44:53  8    Q.    The background checks don't tell you whether the

11:44:58  9    person trying to buy the gun has answered that question

11:45:01 10    truthfully or they've lied, right?

11:45:04 11    A.    Correct.

11:45:04 12    Q.    For that question, you have to depend on whoever is

11:45:08 13    buying the gun, being truthful about their own drug use or

11:45:12 14    addiction; right?

11:45:14 15    A.    Correct.

11:45:14 16    Q.    Nothing you do in the one minute when they run that

11:45:18 17    check tells you whether they're using drugs or addicted to

11:45:23 18    it, right?

11:45:24 19    A.    Correct.

11:45:24 20    Q.    And when you got this form, we can come out of that

11:45:29 21    -- when you got this form to run the background check like

11:45:32 22    you said you did every day or whenever you worked, this was

11:45:36 23    all filled out; right?

11:45:38 24    A.    Correct.

11:45:38 25    Q.    And it had been filled out by Mr. Biden, right?

11:45:42 1    A.      Correct.

11:45:42 2    Q.      And you said you noticed it was missing his

11:45:47 3    signature; correct?

11:45:48 4    A.      Correct.

11:45:48 5    Q.      So that's what you raised; right?

11:45:52 6    A.      Yes.

11:45:52 7    Q.      You raised it with Mr. Cleveland or whomever?

11:45:55 8            But there was nothing, nothing from this first

11:45:58 9    page that he hadn't filled out?

11:46:00 10   A.      No, the first page was correct.

11:46:04 11           MR. WISE:  That's it, Your Honor.  Thank you.

11:46:06 12           THE COURT:  Thank you.

11:46:08 13           Redirect.

11:46:08 14                  REDIRECT EXAMINATION

11:46:09 15   BY MR. LOWELL:

11:46:10 16   Q.      You understand, sir, can we go back to the first page

11:46:14 17   of government Exhibit 10A, please?  There we are again.  You

11:46:25 18   said that this is not right.  Why wasn't this right?

11:46:28 19           MR. WISE:  Objection, Your Honor.

11:46:29 20           THE COURT:  Sustained.

11:46:31 21           MR. LOWELL:  All right.

11:46:32 22   BY MR. LOWELL:

11:46:32 23   Q.      Did you see Mr. Biden check those boxes?

11:46:35 24   A.      No.

11:46:36 25   Q.      So when Mr. Wise just asked you whether Mr. Biden

Turner - redirect

11:46:41 1    checked those, you have no idea whether he did or not or

11:46:44 2    when?

11:46:45 3    A.      Well, it wouldn't have been Gordon, so unless

11:46:49 4    somebody else filled that form out for him.

11:46:51 5    Q.      Right.  But the next page, when you saw the boxes

11:46:57 6    checked, that signature wasn't on it?

11:46:59 7    A.      It was not on it.  And I went out front.

11:47:03 8    Q.      As between-- that's all I asked.  As between you and

11:47:07 9    Mr. Cleveland, who was having interactions with Mr. Biden?

11:47:11 10   A.      Mr. Cleveland.

11:47:12 11   Q.      So you didn't see Mr. Biden in any state that you

11:47:16 12   could tell whether he was drunk or using anything that would

11:47:19 13   cause you any concern?

11:47:20 14   A.      No.

11:47:20 15   Q.      As between you and Mr. Cleveland, that would be

11:47:24 16   Mr. Cleveland then if that was the case?

11:47:25 17   A.      If that was the case, yes.

11:47:28 18   Q.      And the last question that I have for you, then, is

11:47:39 19   when -- do you know what --

11:47:40 20            MR. LOWELL:  I don't have any other questions

11:47:43 21   for you.

11:47:44 22            THE COURT:  All right.  Thank you, sir.  You are

11:47:46 23   excused.  I hope you get some sleep.

11:47:48 24            THE WITNESS:  Thank you, ma'am.

11:47:50 25            THE COURT:  All right.  Mr. Lowell, what's next?

Palimere - direct

11:47:53  1          MR. LOWELL:  We would like the jury to hear from

11:47:56  2    Ron Palimere.

11:48:02  3          COURTROOM DEPUTY:  Please raise your right hand.

11:48:06  4    Please state and spell your full name for the record.

11:50:02  5          THE WITNESS:  Ronald Palimere, Jr.  R-O-N-A-L-D,

11:50:25  6    P-A-L-I-M-E-R-E, Jr.

11:50:29  7          RONALD PALIMERE, JR., having been duly sworn was

11:50:34  8    examined and testified as follows:

11:50:36  9                    DIRECT EXAMINATION

11:50:37 10    BY MR. LOWELL:

11:50:41 11    Q.    Good morning, Mr. Palimere.

11:50:43 12    A.    Good morning.

11:50:43 13    Q.    My name is Abbe Lowell, we've never met?

11:50:46 14    A.    No, sir.

11:50:46 15    Q.    Never spoken?

11:50:47 16    A.    No, sir.

11:50:48 17    Q.    You have spoken to the prosecutors and investigators

11:50:50 18    in the case, right?

11:50:51 19    A.    Yes, sir.

11:50:52 20    Q.    And we have --

11:50:54 21          MR. WISE:  Your Honor, I object to that

11:50:56 22    question, prosecutors and investigators, we've never met as

11:51:01 23    well.

11:51:01 24          MR. LOWELL:  I'm sorry.

11:51:02 25    BY MR. LOWELL:

Palimere - direct

| | | |
|---|---|---|
| 11:51:03 | 1 | Q.    You have met with members of the FBI? |
| 11:51:07 | 2 | A.    Yes, sir. |
| 11:51:07 | 3 | Q.    Even recently; correct? |
| 11:51:08 | 4 | A.    Yes, sir. |
| 11:51:09 | 5 | Q.    And you're here because we have subpoenaed you, |
| 11:51:14 | 6 | meaning, we, the lawyers that are representing Mr. Biden? |
| 11:51:17 | 7 | A.    Yes, sir. |
| 11:51:18 | 8 | Q.    What do you do for a living? |
| 11:51:20 | 9 | A.    I own StarQuest Shooters and Survival Supply. |
| 11:51:23 | 10 | Q.    For how long have you owned the store? |
| 11:51:25 | 11 | A.    About 12 years. |
| 11:51:27 | 12 | Q.    And before that, did you have any other stores like |
| 11:51:30 | 13 | that, any other survival or shooting stores or gun stores? |
| 11:51:34 | 14 | A.    No, sir. |
| 11:51:35 | 15 | Q.    You're still the owner? |
| 11:51:37 | 16 | A.    Yes, sir. |
| 11:51:37 | 17 | Q.    And as an owner, other than of course owning it, in |
| 11:51:44 | 18 | terms of day to day sales, what's your responsibility? |
| 11:51:47 | 19 | A.    Just general operations, you know, the bookkeeping, |
| 11:51:51 | 20 | the sales, the ordering of products, that kind of stuff. |
| 11:51:56 | 21 | Q.    Did you yourself ever make sales? |
| 11:51:59 | 22 | A.    No, sir. |
| 11:52:00 | 23 | Q.    You have salespeople for that? |
| 11:52:01 | 24 | A.    Yes, sir. |
| 11:52:02 | 25 | Q.    I want to call your attention to October of 2018, the |

Palimere - direct

11:52:06  1    date about which this trial is.  Okay.  You were the owner

11:52:09  2    of the store?

11:52:10  3    A.      Yes, sir.

11:52:10  4    Q.      Were you in the store on that day?

11:52:14  5    A.      At some point I was in the store, yes.

11:52:17  6    Q.      Do you know what time or what part of the day you

11:52:20  7    were there?

11:52:20  8    A.      I'm usually in and out of the store during the day.

11:52:24  9    Q.      Did there come a time in the afternoon that you

11:52:27 10    recall who you now know to be Hunter Biden came in the

11:52:32 11    store?

11:52:32 12    A.      Yes, sir.

11:52:32 13    Q.      Where were you then?

11:52:34 14    A.      I believe I was next door at -- I had owned another

11:52:39 15    business next door at the time and I was called over to the

11:52:42 16    shop.

11:52:43 17    Q.      Who called you over to the shop?

11:52:45 18    A.      I don't remember.

11:52:46 19    Q.      At the time, was there a person named Gordon

11:52:49 20    Cleveland who worked in the shop?

11:52:50 21    A.      Yes, sir.

11:52:51 22    Q.      Was there a person named Jason Turner who worked in

11:52:54 23    the shop?

11:52:54 24    A.      Yes, sir.

11:52:55 25    Q.      Do you recall whether it was either one of those two

Palimere - direct

11:52:58 1    people?

11:52:58 2    A.    I believe it was one of those people.

11:53:00 3    Q.    But did you cannot remember which one?

11:53:03 4    A.    I do not remember which one.

11:53:04 5    Q.    Whoever it was called you to come over?

11:53:06 6    A.    Correct.

11:53:07 7    Q.    Was that because Mr. Biden was in the store?

11:53:09 8    A.    Any time we have certain, we call them celebrities,

11:53:15 9    they usually will call me in.

11:53:16 10   Q.    Did you at that point that they called you already

11:53:19 11   know that the celebrity was Hunter Biden?

11:53:22 12   A.    No, sir, they just called me over and said we need

11:53:26 13   you next door.

11:53:27 14   Q.    He didn't use the word celebrity, they called just

11:53:30 15   you over?

11:53:31 16   A.    Yes.

11:53:31 17   Q.    Did you come over?

11:53:32 18   A.    Yes.

11:53:32 19   Q.    When you came in, what did do you?

11:53:34 20   A.    I have a desk in the back off the floor, I went and

11:53:37 21   sat at my desk.

11:53:38 22   Q.    Did you go through the back to get to your office?

11:53:40 23   A.    Yes, sir.

11:53:40 24   Q.    You didn't come through the store?

11:53:42 25   A.    No.

Palimere - direct

11:53:42  1    Q.      Now as I understand it, you're sitting in the back

11:53:45  2    room?

11:53:46  3    A.      Correct.

11:53:46  4    Q.      And who is there with you?

11:53:48  5    A.      Typically it would be my desk and then across from me

11:53:52  6    would be a desk where Jason would be sitting doing

11:53:56  7    background checks.

11:53:57  8    Q.      By Jason, you mean Jason Turner?

11:54:00  9    A.      Jason Turner, yes.

11:54:02 10    Q.      When you came back from wherever you were back into

11:54:04 11    the store, Mr. Turner was in the office then?

11:54:07 12    A.      Correct, yes.

11:54:08 13    Q.      As far as you know, what was he doing?

11:54:10 14    A.      Typically he would be doing background checks or

11:54:13 15    whatever clerical stuff he was doing off to the side.

11:54:16 16    Q.      So you came back, you're in the office and he's in

11:54:19 17    the office, do you see Mr. Cleveland at that moment?

11:54:22 18    A.      I don't believe he was in the back at the time, no.

11:54:25 19    Q.      Did there come a time that you did see Mr. Cleveland?

11:54:28 20    A.      Yes, at some point he came back, yes.

11:54:30 21    Q.      So one thing I want to establish from the beginning,

11:54:33 22    from the moment you got back in the store, in the office,

11:54:36 23    Jason Turner was there?

11:54:38 24    A.      I believe to the best of my recollection he was in

11:54:41 25    the back when I arrived.

Palimere - direct

11:54:42  1    Q.      Okay.  So when in the sequence then did you have any

11:54:45  2    interaction with Mr. Cleveland?

11:54:48  3    A.      Gordon came back, there was discussion about the use

11:54:54  4    of a passport, he just asked if I was okay with him using a

11:54:58  5    passport for the sale.

11:55:00  6    Q.      When Mr. Cleveland came in the back room, what was he

11:55:08  7    holding in his hand or bringing in?

11:55:09  8    A.      I don't recall.

11:55:10  9    Q.      Well, did he have a passport to show you?

11:55:15 10    A.      I don't recall what he had in his hands at the time.

11:55:17 11    Q.      Did he have a copy of a passport?

11:55:20 12    A.      He should have, but I can't --

11:55:23 13    Q.      You can't remember?

11:55:24 14    A.      I can't remember.

11:55:25 15    Q.      When he came in the back room with that, was he also

11:55:28 16    carrying a firearm?

11:55:30 17    A.      His personal firearm?

11:55:31 18    Q.      No, no, a sales firearm from the front, do you

11:55:34 19    remember him --

11:55:35 20    A.      I don't believe he would have brought that back, no.

11:55:37 21    Q.      So what you can recall, he was there, and he asked

11:55:40 22    you a question?

11:55:41 23    A.      Correct.

11:55:42 24    Q.      And the question was about the passport?

11:55:44 25    A.      Correct.

Palimere - direct

11:55:45  1    Q.      What did you understand, what was the question?

11:55:48  2    A.      We typically, or at that point, I don't know that

11:55:51  3    we've ever had a passport used as a form of identification

11:55:55  4    and he just said is it okay if we use this.

11:55:58  5    Q.      And does a passport have an address on it?

11:56:01  6    A.      At that time, I believe it had an address and it was

11:56:06  7    a type of identification just like any other type of

11:56:10  8    identification.

11:56:12  9    Q.      Mr. Radic, can you put up, please, government 10A.

11:56:20 10    You recognize this form, right?

11:56:21 11    A.      Yes.

11:56:21 12    Q.      It's a 4473 ATF form?

11:56:25 13    A.      Yes.

11:56:25 14    Q.      Would you flip through it, Mr. Radic, to the last

11:56:29 15    page.  Before do you that, you see it says in 18(a) U.S.

11:56:34 16    passport, correct?

11:56:35 17    A.      Yes.

11:56:35 18    Q.      Mr. Radic, would you flip to the end, do you see

11:56:38 19    that?

11:56:38 20    A.      Yes, sir.

11:56:39 21    Q.      Do you recognize what that is?

11:56:40 22    A.      That's a United States passport.

11:56:42 23    Q.      Can you look at it carefully?

11:56:45 24    A.      Yes.

11:56:46 25    Q.      Do you see it?

Palimere - direct

11:56:47  1    A.      Yes.

11:56:47  2    Q.      Does it have an address on it?

11:56:49  3    A.      No, sir.

11:56:50  4    Q.      You see the handwriting on the left, do you see it?

11:56:52  5    A.      Yes, sir.

11:56:53  6    Q.      Do you recognize that, I mean whose it is, do you

11:56:56  7    recognize whose that is?

11:56:58  8    A.      Would you want me to guess?

11:57:00  9    Q.      No, if you can't recognize it, just tell me you can't

11:57:04 10    recognize it?

11:57:04 11    A.      I can't say with any certainty whose it is.

11:57:07 12    Q.      That's fine.  You can take that down.

11:57:09 13            Go back to the first page, Mr. Radic, and then

11:57:15 14    go to the second page.

11:57:16 15            And you see on the form, the form of

11:57:18 16    identification that's used says U.S. passport, right?

11:57:22 17    A.      Yes.

11:57:22 18    Q.      But as we just established, it doesn't have a

11:57:25 19    residence on it, does it, the passport?

11:57:29 20    A.      What you just showed me, no, I don't see an address

11:57:31 21    on it.

11:57:32 22    Q.      So Mr. Cleveland comes in and he asks you, can you

11:57:35 23    take a passport?

11:57:36 24    A.      Correct.

11:57:36 25    Q.      What did you say?

Palimere - direct

11:57:38 1   A.      I said yeah, sure, not thinking anything else about

11:57:43 2   it, yeah, sure, take a passport.

11:57:45 3   Q.      Even though it didn't have a residence on it?

11:57:47 4   A.      We didn't discuss that, not that I can recall.

11:57:50 5   Q.      Why did you understand he was asking if you could

11:57:53 6   take a passport?

11:57:54 7                   MR. WISE:  Objection, he can't --

11:57:56 8                   MR. LOWELL:  I agree, bad question.  What did he

11:57:59 9   say to you about the passport?

11:58:00 10                   MR. WISE:  And then that's hearsay.

11:58:01 11                   THE COURT:  That's hearsay.

11:58:03 12  BY MR. LOWELL:

11:58:03 13  Q.      I'll withdraw that question.

11:58:04 14                   What did you tell Mr. Cleveland when

11:58:07 15  Mr. Cleveland came in holding or asking anything?

11:58:10 16  A.      Yeah, sure, take the passport.

11:58:13 17  Q.      And after he did that, do you recall him having

11:58:18 18  anything in his hand, paper, passport, or just asked the

11:58:22 19  question?

11:58:22 20  A.      I don't recall.  The only thing I can remember is

11:58:25 21  this-- him asking hey, can we take this as a form of

11:58:30 22  identification.

11:58:30 23  Q.      And you said sure?

11:58:31 24  A.      Sure.

11:58:31 25  Q.      Were you trying to have the sale go in a hurry?

Palimere - direct

11:58:36  1    A.      Yeah, I was trying to --

11:58:42  2    Q.      I just asked --

11:58:43  3    A.      Yeah.

11:58:43  4    Q.      Were you trying for it to happen in a hurry?

11:58:46  5    A.      I was trying to not hold the sale up.

11:58:49  6    Q.      How is that different than trying to get it done in a

11:58:52  7    hurry?

11:58:52  8    A.      By not having him in the back for 20 minutes and

11:58:56  9    going through a bunch of discussion, just saying yep, take

11:58:59 10    it and proceed with running the background check.

11:59:02 11    Q.      Are you familiar with the expression about

11:59:07 12    Mr. Cleveland called "whale hunter"?

11:59:09 13    A.      Yes.

11:59:10 14    Q.      You're smiling, so you do?

11:59:11 15    A.      Yes.

11:59:12 16    Q.      What is that?

11:59:13 17    A.      He is very good at selling a lot of the more

11:59:18 18    expensive products that we have in the store.

11:59:22 19    Q.      Okay.  Meaning bringing in the whale?

11:59:26 20    A.      You can draw however you want from a term whale

11:59:29 21    hunter, it's just --

11:59:31 22    Q.      But that's what it means to you, being very

11:59:34 23    successful at bringing in and selling more expensive items?

11:59:38 24    A.      He's very good at selling the expensive items that we

11:59:42 25    have for sale in the store.

Palimere - direct

| | | |
|---|---|---|
| 11:59:43 | 1 | Q. So Mr. Cleveland leaves and is Mr. Turner still in |
| 11:59:46 | 2 | the back room with you? |
| 11:59:47 | 3 | A. Yes. |
| 11:59:47 | 4 | Q. What do you recall happening next after you have told |
| 11:59:50 | 5 | Mr. Cleveland go ahead? |
| 11:59:52 | 6 | A. That's it. You know, I don't -- I didn't have |
| 11:59:55 | 7 | anymore interaction at that point. |
| 11:59:57 | 8 | Q. With whom? |
| 11:59:58 | 9 | A. Cleveland or Turner. |
| 12:00:02 | 10 | Q. Okay. You mean when you say interaction, Mr. Turner |
| 12:00:05 | 11 | is in there doing his background checks, right? |
| 12:00:08 | 12 | A. Correct. |
| 12:00:08 | 13 | Q. Did there come a time that you observed Mr. Turner |
| 12:00:11 | 14 | taking any form and running the background check that was |
| 12:00:14 | 15 | involved in this purchase? |
| 12:00:15 | 16 | A. No, I went about doing my work at my desk. |
| 12:00:18 | 17 | Q. Not paying attention to what he was doing? |
| 12:00:20 | 18 | A. No. |
| 12:00:21 | 19 | Q. After Mr. Cleveland went out the first time, did you |
| 12:00:23 | 20 | see Mr. Cleveland come back in with any form or that was it? |
| 12:00:26 | 21 | A. I don't recall anything else. |
| 12:00:29 | 22 | Q. Okay. So the one exchange is the thing you remember? |
| 12:00:32 | 23 | A. The exchange between me and, I believe it was Gordon, |
| 12:00:37 | 24 | about the passport, yes. |
| 12:00:38 | 25 | Q. Did you go outside from the point at which |

Palimere - direct

12:00:41  1    Mr. Cleveland came in the back room to the point at which

12:00:43  2    the sale was completed?

12:00:45  3    A.      Can you ask that again?

12:00:47  4    Q.      Did you go to the showroom?

12:00:49  5    A.      No.

12:00:49  6    Q.      From the time that you -- Mr. Cleveland and you had

12:00:53  7    the conversation and then you went back -- he went back

12:00:56  8    outside?

12:00:56  9    A.      No, sir, I stayed in my station.

12:00:58 10    Q.      So you never went back in the storeroom?

12:01:01 11    A.      No.

12:01:01 12    Q.      The showroom?

12:01:02 13    A.      I wasn't in the showroom at all.

12:01:04 14    Q.      You just came to the back?

12:01:06 15    A.      Correct.

12:01:06 16    Q.      So you have no idea whether or not Mr. Cleveland

12:01:10 17    spoke to Mr. Biden at that point or not?

12:01:12 18    A.      No.

12:01:12 19    Q.      And you had no conversations after that exchange with

12:01:16 20    Mr. Turner?

12:01:17 21    A.      No.

12:01:17 22    Q.      Did you see him run a NICS check for any gun that

12:01:23 23    Mr. Biden sought, or did, bought that day?

12:01:25 24    A.      Did I observe him running a NICS check?

12:01:28 25    Q.      Yes.

Palimere - direct

12:01:28  1   A.     No I did not.

12:01:29  2   Q.     Do you know that he did?

12:01:30  3   A.     Yes, I did.

12:01:31  4   Q.     Can you place in time when the exchange you just said

12:01:35  5   happened that day of October 12th, 2018?

12:01:38  6   A.     If you bring up the NICS check, I can tell you

12:01:42  7   exactly the time.

12:01:43  8   Q.     Will you bring up the government Exhibit 12A.  And

12:01:47  9   now looking at that, does that help tell you when it

12:01:51 10   happened?

12:01:51 11   A.     So, yeah, October 12th, 2018, at 6:36 p.m. was

12:01:58 12   created and status date one minute later, 6:37 got a status

12:02:03 13   proceed.

12:02:04 14   Q.     When you see that time of 6:37, does that help

12:02:08 15   acclimate or help the sequence of when the exchange with you

12:02:11 16   and Mr. Cleveland about the passport occurred?

12:02:14 17   A.     That would tell me that prior to 6:36 when the

12:02:19 18   background check was created, Mr. Cleveland would have asked

12:02:22 19   me if he could take a passport, yeah.

12:02:24 20   Q.     Do you know how many minutes or time before that,

12:02:27 21   that that happened?

12:02:28 22   A.     No.

12:02:30 23   Q.     For Mr. Turner to run a background check, what does

12:02:34 24   he have to have in his possession?

12:02:37 25   A.     All of the necessary requirements to fill in the data

Palimere - direct

12:02:41  1    to fill in on the screen there, all these questions have to

12:02:45  2    be answered for him to run this background check.

12:02:47  3    Q.      That would be the last name, middle name, age,

12:02:52  4    height, weight, whatever is there?

12:02:54  5    A.      Correct.

12:02:54  6    Q.      Whatever he needs?

12:02:56  7    A.      Yes.

12:02:56  8    Q.      He doesn't need the form itself, he just needs the

12:03:00  9    information that's reflected on that?

12:03:01 10    A.      He's pulling the information from the form and typing

12:03:04 11    it in on the FBI NICS website to fill in the blanks to get

12:03:09 12    this answer.

12:03:09 13    Q.      And the NICS form has the need for that information?

12:03:12 14    A.      Correct.

12:03:13 15    Q.      You can see from the bottom who is the one who then

12:03:15 16    ran it?

12:03:16 17    A.      Submitted by Jason V. Turner, retrieved by

12:03:20 18    Jason V. Turner.

12:03:21 19    Q.      So did you observe him running this?

12:03:24 20    A.      No, I did not observe him running this.

12:03:26 21    Q.      But this is the form that's generated if that's

12:03:29 22    happening?

12:03:30 23    A.      That is the form, yes, that's printed out from the

12:03:33 24    actual NICS website.

12:03:35 25    Q.      Before you said that somebody called you to come into

Palimere - direct

12:03:37  1   the store because there was -- I'm sorry, somebody called

12:03:42  2   you, and you came in the store through the back?

12:03:45  3   A.    Correct.

12:03:45  4   Q.    And I think you said they do that customarily when

12:03:49  5   there is a "celebrity"?

12:03:53  6   A.    A celebrity, or some sale, something they need me to

12:03:58  7   be involved with.

12:03:58  8   Q.    Is that what you needed to be involved with that day,

12:04:04  9   was the issue of the passport?

12:04:04 10   A.    I don't recall.  I don't recall why I was called

12:04:06 11   over.

12:04:07 12   Q.    But whatever the reason was you never went out to the

12:04:11 13   showroom?

12:04:11 14   A.    No.

12:04:12 15   Q.    Did you therefore never see anything that Mr. Biden

12:04:17 16   did that day?

12:04:17 17   A.    I didn't observe anything that he did that day, no.

12:04:20 18   Q.    And one last time, when Mr. Cleveland came in, at the

12:04:25 19   point he asked you about the passport, are you clear that he

12:04:30 20   did not carry with him the gun he was selling to Mr. Biden?

12:04:35 21        MR WISE:  I don't understand, objection, he's

12:04:37 22   already asked and answered this, one last time is to repeat

12:04:41 23   the same thing over and over again.

12:04:43 24        MR. LOWELL:  Over and over, twice, I'm sorry I

12:04:45 25   thought because you did that, I could do that.

Palimere - direct

12:04:47  1            THE COURT:  All right.  We'll let him ask it one

12:04:50  2    last time.

12:04:50  3    BY MR. LOWELL:

12:04:51  4    Q.    You never saw the gun that Mr. Biden purchased that

12:04:53  5    day being brought to the back room?

12:04:55  6    A.    Yeah, I don't recall anything that Mr. Cleveland

12:04:58  7    brought back at the time.

12:04:59  8    Q.    Would it be unusual for the person to bring the gun

12:05:02  9    back in the room, that backroom for the check to occur?

12:05:05 10    A.    It could be, it could go either way, there isn't a --

12:05:10 11    there isn't a set rule that says the firearm being purchased

12:05:13 12    stays on the floor or comes to the back.  It's up to the

12:05:16 13    discretion of the salesman, I guess if he wants to bring it

12:05:19 14    in the back.

12:05:20 15    Q.    On that day you have no memory of which happened?

12:05:23 16    A.    No.

12:05:23 17            MR. LOWELL:  That's all I have, Judge.

12:05:25 18            THE COURT:  Thank you.

12:05:25 19            Cross-exam?

12:05:26 20            MR. WISE:  No thank you.  I don't have any

12:05:29 21    questions.

12:05:29 22            THE COURT:  Thank you, sir.  Thanks for coming

12:05:31 23    in.  You are excused.

12:05:32 24            All right.  Mr. Lowell, what's next?

12:05:37 25            MR. LOWELL:  Your Honor, based on our

N. Biden - direct

| | |
|---|---|
| 12:05:39 1 | conversation with counsel -- can you approach? |
| 12:06:59 2 | (Side-bar discussion:) |
| 12:06:59 3 | MR. LOWELL:  I thought our plan was because we |
| 12:06:59 4 | wanted the opportunity to consider Naomi and Jimmy Biden |
| 12:06:59 5 | that we were going to wait and do it at the break so we |
| 12:06:59 6 | could get ready, we told her that, I don't know if she's |
| 12:06:59 7 | available at this moment, I can find her just because I |
| 12:06:59 8 | thought we said we were going to do an early lunch. |
| 12:06:59 9 | MR. WISE:  Our understanding is she's got an |
| 12:06:59 10 | scheduling issue, too, my preference we start with her, get |
| 12:06:59 11 | her done. |
| 12:06:59 12 | MR. LOWELL:  I didn't mind, I just wanted to |
| 12:07:12 13 | start with her. |
| 12:07:13 14 | (End of side-bar.) |
| 12:07:24 15 | MR. LOWELL:  Your Honor, we would like the jury |
| 12:07:25 16 | to hear from Naomi Biden. |
| 12:07:30 17 | COURTROOM DEPUTY:  Please raise your right hand. |
| 12:07:32 18 | Please state and spell your full name for the record. |
| 12:07:42 19 | THE WITNESS:  Naomi King Biden, N-A-O-M-I, |
| 12:07:47 20 | K-I-N-G, B-I-D-E-N. |
| 12:07:51 21 | NAOMI KING BIDEN, having been duly sworn was |
| 12:07:56 22 | examined and testified as follows: |
| 12:07:58 23 | DIRECT EXAMINATION |
| 12:07:59 24 | BY MR. LOWELL: |
| 12:08:01 25 | Q.     Good afternoon, Naomi. |

N. Biden - direct

12:08:03  1    A.      Hi.

12:08:03  2    Q.      Can you tell the jury a little bit about yourself,

12:08:07  3    where you live?

12:08:07  4    A.      I live in D.C., in Georgetown.

12:08:11  5    Q.      And what do you do for a living?

12:08:13  6    A.      I'm an attorney, at a law firm in D.C.

12:08:16  7    Q.      And where did you go to college?

12:08:20  8    A.      I went to UPenn.

12:08:22  9    Q.      University of Pennsylvania?

12:08:24 10    A.      Uh-huh.

12:08:25 11    Q.      And you went to law school?

12:08:26 12    A.      Yes.

12:08:26 13    Q.      Where did you go to law school?

12:08:28 14    A.      Columbia.

12:08:30 15    Q.      That's in New York?

12:08:31 16    A.      Yes.

12:08:32 17    Q.      You are the daughter of Hunter Biden?

12:08:36 18    A.      Yes.

12:08:37 19    Q.      And your mom is?

12:08:38 20    A.      Kathleen Buhle.

12:08:40 21    Q.      Do you have any siblings?

12:08:42 22    A.      Two sisters.

12:08:44 23    Q.      And their names?

12:08:45 24    A.      And a brother, who I love.

12:08:47 25    Q.      And their names are?

N. Biden - direct

12:08:48  1    A.      Finnegan, Maisy, and Beau.

12:08:53  2    Q.      When your mom and dad got divorced, how old were you?

12:08:59  3    A.      I was --

12:09:02  4    Q.      Already an adult?

12:09:04  5    A.      An adult, 23 maybe.

12:09:06  6    Q.      You were in college or after.  Before that you and

12:09:09  7    your sisters, you lived together?

12:09:12  8    A.      Yes.

12:09:12  9    Q.      I want to call your attention to the year of 2018,

12:09:17 10    and particularly in the summer, meaning August and in

12:09:25 11    September of 2018.  Can I call your attention to that?

12:09:27 12    A.      Yes.

12:09:27 13    Q.      Did there come a time in that period of August and

12:09:31 14    September that you understood that your dad was living in

12:09:34 15    Los Angeles?

12:09:35 16    A.      Yes.

12:09:35 17    Q.      And when that happened, did there come a time that

12:09:38 18    you visited him there?

12:09:39 19    A.      Yes, I visited him with my boyfriend, now my husband.

12:09:44 20    Q.      What's his name?

12:09:45 21    A.      Peter.

12:09:46 22    Q.      So how did it turn about that you and Peter went to

12:09:50 23    Los Angeles?

12:09:51 24    A.      I hadn't seen my dad in a really long time and I knew

12:09:56 25    he was in rehab facility there and he reached out and he

N. Biden - direct

| | | |
|---|---|---|
| 12:10:00 | 1 | said that he would organize the trip if we came to visit |
| 12:10:05 | 2 | him. |
| 12:10:05 | 3 | Q.      So you and Peter both flew out and he made the |
| 12:10:05 | 4 | arrangements? |
| 12:10:10 | 5 | A.      We drove actually, but yes. |
| 12:10:12 | 6 | Q.      You drove across? |
| 12:10:13 | 7 | A.      We drove from Wyoming. |
| 12:10:15 | 8 | Q.      Where were you at the time, you were in Wyoming? |
| 12:10:17 | 9 | A.      In Wyoming, at Peter's parents house. |
| 12:10:21 | 10 | Q.      You went from Wyoming and you drove to LA? |
| 12:10:25 | 11 | A.      Yes. |
| 12:10:25 | 12 | Q.      Do you remember whether that was towards the end of |
| 12:10:27 | 13 | August? |
| 12:10:28 | 14 | A.      Yes. |
| 12:10:28 | 15 | Q.      And when you got to LA, did you see your dad? |
| 12:10:31 | 16 | A.      Yeah, we did. |
| 12:10:33 | 17 | Q.      How so, where was he, and where were you? |
| 12:10:36 | 18 | A.      We met him at a coffee shop, and we had lunch with |
| 12:10:43 | 19 | him, and we met his sober coach. |
| 12:10:47 | 20 | Q.      Okay.  So back to that period of time where he asked |
| 12:10:51 | 21 | you to come, you said you knew that he was in a period of |
| 12:10:54 | 22 | rehab, right? |
| 12:10:56 | 23 | A.      Yeah. |
| 12:10:56 | 24 | Q.      And do you remember the name of that rehab place? |
| 12:10:59 | 25 | A.      Um -- |

N. Biden - direct

| | | |
|---|---|---|
| 12:11:02 | 1 | Q. | Do you think it was called The View? |
| 12:11:04 | 2 | A. | Yeah, it was, sorry. |
| 12:11:06 | 3 | Q. | It's okay. |
| 12:11:07 | 4 | A. | I'm nervous. |
| 12:11:08 | 5 | Q. | Don't be nervous, can I get you water? |
| 12:11:11 | 6 | A. | No, I'm good. |

12:11:02  1   Q.      Do you think it was called The View?

12:11:04  2   A.      Yeah, it was, sorry.

12:11:06  3   Q.      It's okay.

12:11:07  4   A.      I'm nervous.

12:11:08  5   Q.      Don't be nervous, can I get you water?

12:11:11  6   A.      No, I'm good.

12:11:12  7   Q.      When you got there to see your dad, he was in a rehab

12:11:16  8   place, when you actually got to see him, was he already in

12:11:19  9   the residence, or did you know whether he now left, was he

12:11:23 10   still there in residence?

12:11:24 11   A.      Yes.

12:11:24 12   Q.      You said something about a sober coach, what's that?

12:11:27 13   A.      Like a sponsor, I guess.

12:11:29 14   Q.      So you, the sober coach, Peter, and your dad went to

12:11:33 15   lunch?

12:11:34 16   A.      Yes.

12:11:34 17   Q.      How did your dad seem?

12:11:36 18   A.      He seemed like the clearest that I had seen him since

12:11:39 19   my uncle died, and he just seemed really great.

12:11:43 20   Q.      And you spent some time with him then?

12:11:45 21   A.      Yeah.

12:11:46 22   Q.      And then after you and your dad and Peter had lunch,

12:11:49 23   where did you and Peter go?

12:11:51 24   A.      We went to Santa Barbara.

12:11:54 25   Q.      Did you drive there?

N. Biden - direct

12:11:55  1    A.      Yeah.

12:11:56  2    Q.      And after you saw your dad on that date, did there

12:12:00  3    come a time that you communicated with him?

12:12:05  4    A.      Yes.

12:12:06  5    Q.      How did you communicate, by phone or text or both?

12:12:09  6    A.      Text.

12:12:09  7    Q.      Do you recall what you told your dad after seeing

12:12:12  8    him?

12:12:12  9    A.      Yeah, I told him that I was so proud of him and I was

12:12:16 10    so proud to introduce Peter to him.

12:12:18 11    Q.      So then you and Peter went to Santa Barbara, and he,

12:12:22 12    as far as you knew, went back to The View?

12:12:25 13    A.      Yes.

12:12:27 14    Q.      I would like to take you forward from that date to a

12:12:31 15    time in October.  In October, were you yet in law school --

12:12:40 16    of 2018?

12:12:41 17    A.      Yes, so I was in my second year.

12:12:43 18    Q.      And so calling your attention to the end of the month

12:12:45 19    of October of 2018, were you going to, or already in New

12:12:53 20    York by the end of the month?

12:12:55 21    A.      I was going to New York.

12:12:57 22    Q.      Where were you going from?

12:12:58 23    A.      From D.C.

12:13:01 24    Q.      And how did you get from D.C. to New York?

12:13:04 25    A.      We borrowed my dad's truck because we had to -- Peter

N. Biden - direct

12:13:10  1    was moving in with me in New York, so we had to move his

12:13:13  2    furniture from D.C. where he was living to New York and the

12:13:17  3    truck was big.

12:13:18  4    Q.      And the truck at that point and where you wanted to

12:13:22  5    use it, was located in D.C.?

12:13:23  6    A.      Yes.

12:13:24  7    Q.      Did your sisters use the truck as well?

12:13:27  8    A.      Yes, from time to time.

12:13:28  9    Q.      So you picked up the truck in D.C. but your dad

12:13:31 10    wasn't there when you picked it up, right?

12:13:33 11    A.      No.

12:13:33 12    Q.      So you and Peter got the car, the truck loaded and

12:13:37 13    you drove it where?

12:13:38 14    A.      To New York.

12:13:40 15    Q.      When you got to New York, what did you do?

12:13:45 16    A.      We unloaded the truck.

12:13:48 17    Q.      At your apartment?

12:13:49 18    A.      Yes.

12:13:50 19    Q.      And so did there come a time when you, Peter, and the

12:13:54 20    truck in New York got to see your dad?

12:13:57 21    A.      Yes.

12:13:57 22    Q.      How did that come about?

12:13:58 23    A.      He was coming to New York to see me and because he

12:14:03 24    needed the truck back.

12:14:04 25    Q.      And so how did he get to New York, do you know?

12:14:07  1    A.      He drove my pop's Cadillac.

12:14:10  2    Q.      When you say pops, that means your grandfather?

12:14:14  3    A.      Yes.

12:14:14  4    Q.      Hunter's dad, Joe Biden?

12:14:17  5    A.      Yes.

12:14:17  6    Q.      When he drove it up, do you recall about what day it

12:14:20  7    was in October, was that October 15th?

12:14:22  8    A.      Yeah.

12:14:23  9    Q.      And you were already -- where were you, were you

12:14:26 10    moved into your apartment?

12:14:27 11    A.      Yeah.

12:14:27 12    Q.      When your dad drove up in pop's car, did you get to

12:14:31 13    see him?

12:14:32 14    A.      Yeah.

12:14:33 15    Q.      Did you and Peter have any occasions to interact with

12:14:36 16    him?

12:14:37 17    A.      Yes.

12:14:37 18    Q.      How did he seem at that point at the end of October?

12:14:40 19    A.      He seemed great, he seemed hopeful.

12:14:43 20    Q.      Did he seem in comparison to the way you saw him when

12:14:47 21    he was at The View?

12:14:48 22    A.      Yes.

12:14:48 23    Q.      And you had occasion to see him that day, or that

12:14:51 24    period?

12:14:52 25    A.      Yes.

12:14:52  1    Q.       Did there come a time that -- and Peter did something

12:14:57  2    to, with the truck, or pop's car?

12:15:00  3    A.       Yes, they switched the cars, we had my pop's car, and

12:15:05  4    my dad took the truck back.

12:15:07  5    Q.       Do you know -- that was a couple of days later?

12:15:10  6    A.       Yes.

12:15:10  7    Q.       So Peter and you kept the black Cadillac, right?

12:15:14  8    A.       Yes.

12:15:15  9    Q.       And then your dad took the truck back?

12:15:18 10    A.       Witness nodding yes.

12:15:21 11    Q.       When you took the truck from Washington D.C. to New

12:15:25 12    York, what was the condition of the inside of the truck?

12:15:27 13    A.       It was in good condition.

12:15:28 14    Q.       By that I mean was there any laundry thrown around,

12:15:32 15    any things that you could determine were left in the truck

12:15:36 16    by your dad?

12:15:37 17    A.       No.

12:15:39 18    Q.       I want to talk about the Raptor truck a minute.

12:15:47 19    Would you put up DX -- can you look at Exhibit 12 in your

12:15:56 20    book.  So the condition of the truck is where we were at.  I

12:16:29 21    asked you what was inside and you said there was nothing

12:16:32 22    particular left behind.

12:16:34 23             When you gave the truck to your dad in New York,

12:16:38 24    did you see strewn about, any, what we'll call drug

12:16:43 25    paraphernalia?

12:16:43  1   A.      No.

12:16:44  2   Q.      Did you see any white powder residue or anything like

12:16:48  3   that?

12:16:48  4   A.      No.

12:16:49  5   Q.      And we're clear that's at the end of October, or at

12:16:53  6   least 18th, 19th?

12:16:54  7   A.      Yes.

12:16:55  8   Q.      That would be before October 13th, right -- I'm

12:16:58  9   sorry, that would be after October 13th?

12:17:00 10   A.      Yes.

12:17:00 11   Q.      And after October 14th?

12:17:02 12   A.      Yes.

12:17:02 13   Q.      So if there is an exchange between your dad and

12:17:06 14   Hallie Biden on the 13th and the 14th, this is all

12:17:10 15   afterwards?

12:17:11 16   A.      Yes.

12:17:11 17           MR. WISE:  Objection.  Exchange between Hallie

12:17:14 18   Biden.

12:17:14 19           MR. LOWELL:  If there is a text between the two

12:17:16 20   or any communications -- I'm sorry, judge, I'll withdraw, if

12:17:21 21   there is any communication between your dad and Hallie Biden

12:17:25 22   that would be on those days, 13th, 14th, you saw him after.

12:17:29 23           MR. WISE:  Objection, he hasn't established a

12:17:31 24   foundation she knows --

12:17:32 25           THE COURT:  I mean, everybody knows dates

N. Biden - direct

12:17:34  1   Mr. Lowell so I don't think you need to --

12:17:36  2              MR. LOWELL:  Thank you.

12:17:37  3   BY MR. LOWELL:

12:17:38  4   Q.      So now, your dad has the truck, when you gave your

12:17:43  5   dad the truck, I want you to describe the inside of it.

12:17:46  6   Does the truck have a console?

12:17:48  7   A.      Yes.

12:17:49  8   Q.      And underneath the console, what's there?

12:17:52  9   A.      It's like a safe.

12:17:54 10   Q.      And meaning it's a steel or metal object?

12:17:59 11   A.      Yeah.

12:17:59 12   Q.      Does it have a lock or does it not have a lock?

12:18:01 13   A.      It has a lock.

12:18:03 14   Q.      And when you and Peter had it at the period of time

12:18:07 15   in October, was the safe working?

12:18:09 16   A.      Yes.

12:18:10 17   Q.      Was it broken?

12:18:11 18   A.      No.

12:18:13 19   Q.      Was the combination lock working?

12:18:16 20   A.      We couldn't open it, so yeah.

12:18:18 21   Q.      How do you know all the things that I just asked you

12:18:21 22   about?

12:18:21 23   A.      Because we tried to open it.

12:18:23 24   Q.      And?

12:18:25 25   A.      And we were not successful.

N. Biden - cross

12:18:27  1    Q.      And so after your dad picked up the truck that was

12:18:31  2    the condition you understood it was in still, it still had

12:18:34  3    the lock, I mean the safe, et cetera?

12:18:36  4    A.      Yes.

12:18:36  5    Q.      When you had the truck in New York and your father

12:18:41  6    left, and you're describing what was under the console, was

12:18:47  7    there any leather pouch lying around the car?

12:18:53  8    A.      No.

12:18:53  9    Q.      And that's where you left it?

12:18:56 10    A.      Yes.

12:18:56 11    Q.      And then you left to go with Peter or you stayed in

12:19:00 12    New York?

12:19:00 13    A.      I stayed in New York, yes.

12:19:02 14            MR. LOWELL:  Thank you, Ms. Biden.

12:19:03 15            THE COURT:  Thank you.

12:19:05 16            Cross-exam.

12:19:05 17            MR. WISE:  Thank you, Your Honor.

12:19:06 18                 CROSS-EXAMINATION

12:19:09 19    BY MR. WISE:

12:19:18 20    Q.      Good afternoon, Ms. Biden.

12:19:20 21    A.      Hi.

12:19:20 22    Q.      My name Leo Wise, I represent the United States.

12:19:23 23    We've never met before, right?

12:19:25 24    A.      No.

12:19:26 25    Q.      So I'll try to perhaps go in the order that

N. Biden - cross

12:19:33  1    Mr. Lowell did.  When you visited your dad in California,

12:19:36  2    you said it was for lunch?

12:19:38  3    A.      Yes.

12:19:39  4    Q.      Was that an hour or two?

12:19:42  5    A.      We went to lunch and then we went shopping.

12:19:46  6    Q.      Okay.  So all told, sort of an afternoon?

12:19:49  7    A.      Yeah, an afternoon.

12:19:50  8    Q.      I think you said you hadn't seen him for a really

12:19:54  9    long time before that?

12:19:55 10    A.      Perhaps, yeah, at least a few months because Peter

12:19:59 11    hadn't met him.

12:20:02 12    Q.      Were you aware before that your father reached out to

12:20:06 13    you about visiting him in rehab that he had been using

12:20:10 14    drugs?

12:20:11 15    A.      Yes, I knew that he was struggling with addiction.

12:20:16 16    Q.      Had he ever used drugs in front of you?

12:20:19 17    A.      No.

12:20:19 18    Q.      So you knew when he was struggling -- you knew he was

12:20:24 19    struggling with addiction but he didn't use drugs in front

12:20:27 20    of you?

12:20:28 21    A.      No, I mean, I knew when he was struggling, I didn't

12:20:32 22    see him, we didn't communicate.

12:20:34 23    Q.      Before he went to California -- when did you first

12:20:41 24    become aware that he was struggling with addiction?

12:20:45 25    A.      I can't recall, but after my uncle died things got

N. Biden - cross

12:20:51  1  bad.

12:20:51  2  Q.    And so that was in 2015; right?

12:20:56  3  A.    Yeah.

12:20:57  4  Q.    And then you saw him again in 2018, right, in August?

12:21:03  5  A.    Yes.  I mean, I saw him in between 2015 and 2018.

12:21:08  6  Q.    In that period of time from 2015 I guess, to whenever

12:21:11  7  you hadn't seen him leading up to the visit in 2018, you

12:21:17  8  understood he was struggling with addiction in that period

12:21:18  9  of time?

12:21:19 10  A.    Yes.

12:21:19 11  Q.    So in that period of time when you were seeing him

12:21:22 12  and you knew he was struggling with addiction, he still

12:21:25 13  wasn't using in front of you, right?

12:21:28 14  A.    Yeah -- yeah, I mean we didn't see him for whenever

12:21:33 15  he was using, no.

12:21:36 16  Q.    You never saw -- you say you never saw him when he

12:21:40 17  was using.  Would you know if he was using or not?

12:21:43 18  A.    No, but I don't remember -- I don't recall any

12:21:47 19  prolonged periods of time, hours, that we spent with him.

12:21:52 20  Q.    What -- what do you mean by that?

12:21:55 21  A.    Just that we would see him for like an hour, maybe,

12:22:00 22  at a time, during that period, but no, I never saw him use.

12:22:05 23  Q.    So did you ever observe what it looked like when he

12:22:16 24  was using?

12:22:18 25  A.    I -- I don't -- I don't know.

N. Biden - cross

12:22:23  1    Q.      So if he was using, is it fair to say you don't know

12:22:28  2    what that looks like?

12:22:31  3    A.      I guess.   I guess not.

12:22:37  4    Q.      So I want to -- I want to talk about -- ask you some

12:22:43  5    questions to follow-up on Mr. Lowell about when he came up

12:22:45  6    to New York, okay?  Do you remember being asked about that?

12:22:50  7    A.      Yes.

12:22:50  8    Q.      So we're talking about the week, I wasn't sure on the

12:23:00  9    dates, we're talking about the week of October the 15th,

12:23:03 10    does that sound about right?

12:23:04 11    A.      Yes.

12:23:05 12    Q.      Just to put a kind of bookend on it, do you remember

12:23:11 13    when he actually got the truck back, do you remember the day

12:23:15 14    when he got the truck back in that week?

12:23:19 15    A.      Right before he left.

12:23:21 16    Q.      Do you remember what day he left on?

12:23:24 17    A.      No.

12:23:27 18    Q.      All right.  Do you remember texting him or did you

12:23:30 19    text him when he was up in New York when you were trying to

12:23:34 20    arrange to see him?

12:23:38 21    A.      Yes.  I mean, yeah, it refreshed my memory.

12:23:43 22    Q.      You have refreshed your memory.  Did you look at some

12:23:45 23    of those text messages?

12:23:47 24    A.      Yes.

12:23:47 25    Q.      Before testifying?

N. Biden - cross

12:23:51  1    A.       The texts, yes.

12:23:58  2    Q.       Now, it was difficult to actually get to see him;

12:24:02  3    right?

12:24:03  4    A.       I don't recall.

12:24:05  5    Q.       Would it refresh your memory to show you some of the

12:24:10  6    text messages from that time?

12:24:11  7    A.       Sure.

12:24:12  8             MR. WISE:  Your Honor, I have government

12:24:14  9    Exhibit 120, which are text messages.  I can provide a copy

12:24:20 10    to defense counsel.

12:24:23 11             MR. LOWELL:  We haven't seen these.

12:24:26 12             MR. WISE:  We didn't know she was testifying.

12:24:29 13             MR. LOWELL:  I haven't seen them.

12:24:30 14             THE COURT:  It's cross.

12:24:31 15             MR. LOWELL:  I understand that, but in terms of

12:24:33 16    source, authenticity, things that we discussed when it was

12:24:36 17    my presenting, I haven't seen them before.  I would like to

12:24:39 18    have a moment, if I may.

12:24:41 19             THE COURT:  You can have a moment.

12:24:42 20             MR. WISE:  If I can approach, I'll give

12:24:45 21    Ms. Biden a copy.

12:24:47 22             MR. LOWELL:  Can you tell me, this is like

12:24:50 23    twenty pages in it?

12:24:51 24             MR. WISE:  Yes.

12:24:52 25             MR. LOWELL:  Are you using all twenty pages?

N. Biden - cross

12:24:54  1            MR. WISE:  It depends if her memory needs to be

12:24:58  2    refreshed for them or not.

12:25:01  3            MR. LOWELL:  It's for refreshing purposes for

12:25:04  4    right now.

12:25:05  5            MR. WISE:  We'll start there.

12:25:06  6            THE COURT:  May I have a copy?

12:25:08  7            MR. WISE:  Yes, Your Honor, I think and we have

12:25:10  8    it electronically.

12:25:19  9    BY MR. WISE:

12:25:46 10    Q.    So the first one, the first text I want to ask you

12:25:50 11    about if you recall, and we'll start it that way, Ms. Biden,

12:25:53 12    is actually I think one of the messages you may have

12:25:55 13    reviewed in preparation for your testimony, just a point of

12:26:00 14    reference, I think the first one I'm going to ask you about

12:26:03 15    is in defense 16C, I'm not sure if they gave you a binder.

12:26:09 16    Is a defense binder up there?  Just to be clear, what I'm

12:26:13 17    asking you about, the first one is from that binder, there

12:26:18 18    is a message -- well, you remember your father on December

12:26:30 19    the 17th asking you where, or I guess it's you, you asking

12:26:36 20    your father "when are you getting the car?"

12:26:39 21            MR. LOWELL:  That's a misstatement, it's

12:26:42 22    October.

12:26:43 23            MR. WISE:  I'm sorry.  October.

12:26:45 24    BY MR. WISE:

12:26:45 25    Q.    Do you remember on the 17th you asking your father

| 12:26:48 | 1 | when he was getting the car?  Do you remember that? |
| 12:26:53 | 2 | A.    Yes. |
| 12:26:53 | 3 | Q.    So was he in New York by the 17th? |
| 12:26:59 | 4 | A.    I assume so because he asked when I'm getting the |
| 12:27:04 | 5 | car. |
| 12:27:04 | 6 | Q.    The first text, do you remember texting him asking |
| 12:27:08 | 7 | when he was coming to get it? |
| 12:27:10 | 8 | A.    I mean, I don't recall sending the text.  But looking |
| 12:27:15 | 9 | at them, I know that I sent them. |
| 12:27:18 | 10 | Q.    Well, does it -- first of all, seeing the text does |
| 12:27:23 | 11 | that refresh your memory about whether you sent it or not? |
| 12:27:27 | 12 | A.    Yeah, I mean this is my number, it was like five |
| 12:27:30 | 13 | years ago, I don't remember every text I sent. |
| 12:27:32 | 14 | Q.    If you don't remember, that's fine just to say you |
| 12:27:35 | 15 | don't remember.  But if you do, that's equally fine. |
| 12:27:40 | 16 | A.    I remember. |
| 12:27:43 | 17 | Q.    And is that because you hadn't seen him yet? |
| 12:27:46 | 18 | A.    No, it was because he needed the car back, if I |
| 12:27:51 | 19 | recall. |
| 12:27:51 | 20 | Q.    Do you remember how many times you saw him in New |
| 12:27:55 | 21 | York? |
| 12:27:55 | 22 | A.    No. |
| 12:27:55 | 23 | Q.    Was it once? |
| 12:27:59 | 24 | A.    Probably, if he was only there for three days. |
| 12:28:01 | 25 | Q.    So in that three days, you think you saw him one |

N. Biden - cross

12:28:05 1  time?

12:28:06 2  A.      Probably.

12:28:07 3  Q.      So the time on that message, do you remember sending

12:28:13 4  that text at like 2:45 in the afternoon?

12:28:22 5  A.      I see the text.

12:28:24 6  Q.      Well, is the time on that text 2:45?

12:28:29 7  A.      Yes.

12:28:30 8  Q.      All right.  And then do you remember getting a

12:28:35 9  response from your father much later that day around almost

12:28:41 10 midnight?

12:28:44 11 A.      Yeah.  I mean, I see the text.

12:28:47 12 Q.      Would you remember -- do you remember you texted him

12:28:49 13 in the afternoon on the 17th and then he didn't respond

12:28:52 14 until almost midnight?

12:28:54 15 A.      No, I don't remember it.

12:28:56 16 Q.      All right.  If you now look at then government

12:29:00 17 Exhibit 120, on the second page of the exhibit, which is

12:29:09 18 1717, do you see the text from your father that reads, "are

12:29:15 19 you up?"  At 11:40 p.m.?

12:29:18 20 A.      Yes.

12:29:19 21 Q.      And then again, he says, "please call me."  Right?

12:29:24 22 A.      Yeah.

12:29:24 23 Q.      So at this point, he didn't have the truck back on

12:29:27 24 the 17th and if I understand, he's responding to you trying

12:29:31 25 to set that up; is that right?

N. Biden - cross

12:29:33   1    A.      Yeah, that's what it looks like.

12:29:36   2    Q.      And then did you respond to him much later, sort of

12:29:43   3    in the middle of the night?

12:29:46   4    A.      Yeah.

12:29:47   5    Q.      And did he actually ask you then at 2 o'clock in the

12:29:51   6    morning "where are the keys to the truck?"  And "can Peter

12:29:54   7    bring to 57th and 5th, and I'll trade cars with him?"

12:29:58   8    A.      Yes.

12:29:59   9    Q.      So your father is asking if you can exchange the car

12:30:03   10   at 2 o'clock in the morning on the 18th now at 57th and 5th?

12:30:12   11   A.      Yes.  Well, I don't drive.

12:30:23   12   Q.      But --

12:30:24   13   A.      That's why he's saying will Peter bring it.

12:30:27   14   Q.      But it's 2 o'clock in the morning when he's asking

12:30:29   15   you to do this, right?

12:30:30   16   A.      That's what the time stamp says, but I don't recall

12:30:33   17   it being that late.

12:30:36   18   Q.      All right.  But that is -- do you recall even the

12:30:38   19   text exchange?

12:30:40   20   A.      I recall trying to coordinate with him about

12:30:45   21   exchanging the cars.

12:30:47   22   Q.      And you said you don't recall it being that late, but

12:30:50   23   if you look at the text, did you send him a text immediately

12:30:53   24   before that saying you had fallen asleep and that's why you

12:30:58   25   had missed his earlier text closer to midnight?

N. Biden - cross

12:31:01 1    A.      Yeah.

12:31:03 2    Q.      All right.  Do you know what your father was doing at

12:31:05 3    2 o'clock in the morning and why he was asking you for the

12:31:08 4    car then?

12:31:09 5    A.      No.

12:31:16 6    Q.      And then --

12:31:22 7            MR. LOWELL:  Hold on a second.

12:31:25 8            THE WITNESS:  Thank you.

12:31:28 9    BY MR. WISE:

12:31:44 10   Q.      And were you surprised that he was reaching out to

12:31:46 11   you in the middle of the night to get the car?

12:31:49 12   A.      To be honest, I don't remember any of this except

12:31:52 13   that I remember that I exchanged -- we exchanged the car

12:31:56 14   with my dad and he still seemed good and I was hopeful, the

12:32:07 15   specifics of all these --

12:32:09 16   Q.      The next text, after asking Peter to bring to 57th

12:32:14 17   and 5th, and I'll trade cars with him at 2:21, you asked him

12:32:18 18   "right now?"  With a question mark, right?

12:32:22 19   A.      Yes.

12:32:22 20   Q.      And then you said "keys are with us at my apartment."

12:32:26 21   Because he had asked you where the keys were, right?

12:32:29 22   A.      Uh-huh.

12:32:30 23   Q.      And then it looks like he didn't respond again;

12:32:35 24   right?

12:32:40 25   A.      Yeah.

N. Biden - cross

12:32:41  1    Q.      All right.  So did you try -- well, it is sort of the

12:32:47  2    next day, but did you try then in the daytime on the 18th,

12:32:51  3    just like you had done on the 17th to try to set up when

12:32:55  4    you're going to get him this car back?

12:33:01  5    A.      Yeah.

12:33:03  6    Q.      And so did you text him -- did you send him a text

12:33:07  7    sort of in the afternoon on the 18th trying to do that?

12:33:11  8    A.      Yes.

12:33:13  9    Q.      And again, were you unsuccessful in trying to set up

12:33:24 10    a meeting with your father to get him the car back?  Now on

12:33:39 11    the 18th?

12:33:42 12    A.      I think they did exchange the car.

12:33:46 13    Q.      Well, if we go to the next page, did you send your

12:33:52 14    father a series of texts where you told him that you were in

12:33:59 15    Brooklyn, but that you could have Peter meet him and trade,

12:34:05 16    then did you ask your father if he had seen Peter and did he

12:34:10 17    ask if -- and did you ask if you would get to see him, in

12:34:14 18    other words, your dad?

12:34:15 19    A.      Yes.

12:34:16 20    Q.      And was your dad's response no?  This is on

12:34:34 21    page 1719?

12:34:35 22    A.      I think he's saying no to did he call.

12:34:37 23    Q.      Your next message then is "so no see you?!"

12:34:46 24    A.      Yeah.

12:34:47 25    Q.      And then you said, it looks like you did sort of an

N. Biden - cross

| | | |
|---|---|---|
| 12:34:51 | 1 | unhappy face, and the next text? |
| 12:34:56 | 2 | A.    Are you asking? |
| 12:34:57 | 3 | Q.    Yes. |
| 12:34:58 | 4 | A.    Yes. |
| 12:34:58 | 5 | Q.    And then the next one is "I'm really sorry, dad, I |
| 12:35:02 | 6 | can't take this."  And then "I don't know what to say, I |
| 12:35:06 | 7 | just miss you so much, I just want to hang out with you." |
| 12:35:11 | 8 | Right? |
| 12:35:11 | 9 | A.    Yeah. |
| 12:35:12 | 10 | Q.    And then it looks like -- by this point it's about |
| 12:35:15 | 11 | 10 o'clock in the night on the 18th; right?  And then your |
| 12:35:22 | 12 | father says "I'm sorry, I have been so unreachable, it's not |
| 12:35:30 | 13 | fair to you."  And that's at 10:30 now on the 18th; right? |
| 12:35:36 | 14 | A.    Uh-huh. |
| 12:35:38 | 15 | Q.    Do you know why he had been so unreachable? |
| 12:35:51 | 16 | A.    No. |
| 12:35:52 | 17 | Q.    Do you know what he had been doing on the 17th and |
| 12:35:55 | 18 | the 18th when you were trying to set up giving the car back |
| 12:35:58 | 19 | to him? |
| 12:35:59 | 20 | A.    I don't remember. |
| 12:36:01 | 21 | Q.    Did he tell you he was meeting with someone named |
| 12:36:08 | 22 | Frankie? |
| 12:36:08 | 23 | A.    I don't remember. |
| 12:36:10 | 24 | Q.    Did he tell you that he had Frankie come to his hotel |
| 12:36:14 | 25 | room? |

N. Biden - cross

12:36:15 1    A.      No.  I don't remember.

12:36:18 2    Q.      I'm sorry, I didn't hear you?

12:36:20 3    A.      I don't remember.

12:36:21 4    Q.      Did he tell you he had given someone named Frankie an

12:36:26 5    access code to his Wells Fargo account?

12:36:30 6    A.      No.

12:36:39 7    Q.      And then I guess, it's now 10:40, 10:30, 10:45 on the

12:36:47 8    18th.  Was it finally then on the 19th that you were able to

12:36:51 9    arrange to meet your dad to get him the car?

12:37:03 10   A.      Yes.

12:37:03 11   Q.      And I think Mr. Lowell asked you this, and I want to

12:37:08 12   pick up there.  So -- or I don't know that he did ask you.

12:37:12 13   When did you actually get the truck?  If the 19th is when

12:37:17 14   you gave it back to your father, when did you get it?

12:37:21 15   A.      Whenever we picked -- got Peter's stuff from his

12:37:27 16   house in D.C.

12:37:28 17   Q.      Do you remember how many days -- do you remember how

12:37:31 18   many days you had the truck?

12:37:33 19   A.      No.

12:37:34 20   Q.      All right.  So you got it at some point, drove it up

12:37:40 21   to New York, and then gave it back to your father on the

12:37:43 22   19th; right?

12:37:45 23   A.      I guess, yes.

12:37:47 24   Q.      Okay.  I think Mr. Lowell asked you this, but you

12:37:51 25   said when you got it, the condition it was in was, it was in

12:37:55  1    good condition, I think that's the phrase.  So when you got

12:38:04  2    it, did you see what I am going to refer to as drug remnants

12:38:10  3    in the interior of the car?

12:38:12  4    A.    No.

12:38:13  5    Q.    Did you see drug paraphernalia in the interior of the

12:38:17  6    car?

12:38:17  7    A.    No.

12:38:17  8    Q.    And this may seem like a strange question, but in the

12:38:24  9    period of time that you had it, did you put any drug

12:38:28 10    paraphernalia in the car?

12:38:29 11    A.    No.

12:38:32 12    Q.    Did you put any, it's going to seem like an even

12:38:37 13    weirder question, but did you ever use drugs?

12:38:41 14    A.    No.

12:38:41 15    Q.    So you wouldn't have done anything that left any drug

12:38:47 16    remnants in the truck, is that fair to say?

12:38:49 17    A.    Yes.

12:38:51 18    Q.    And when you gave it back to your father on the 19th,

12:38:59 19    there was no drug paraphernalia in it, right?

12:39:02 20    A.    No.

12:39:03 21    Q.    And there were no drug remnants in it, right?  Is

12:39:09 22    that right?

12:39:09 23    A.    Yes, that's right.

12:39:11 24    Q.    So if drug paraphernalia was later found in the car,

12:39:14 25    that would had to have been put there after you gave it back

N. Biden - redirect

12:39:18  1    to your father on the 19th; right?

12:39:23  2            MR. LOWELL:  And the assumption is she doesn't

12:39:26  3    know, it's the same thing they objected when I did that,

12:39:29  4    judge.

12:39:30  5            THE COURT:  Yes.

12:39:33  6    BY MR. WISE:

12:39:33  7    Q.      Just to be clear, no drug paraphernalia in the car

12:39:37  8    when you had it on the 19th, right?

12:39:39  9    A.      No.

12:39:39 10    Q.      And no drug remnants on the car when you had it on

12:39:42 11    the 19th, right?

12:39:44 12    A.      No.

12:39:45 13    Q.      And that's when you gave it back to your father and

12:39:47 14    he left with it, right?

12:39:49 15    A.      Yes.

12:39:59 16            MR. WISE:  Nothing further, Your Honor.  Thank

12:40:01 17    you.

12:40:07 18                    REDIRECT EXAMINATION

12:40:09 19    BY MR. LOWELL:

12:40:11 20    Q.      Naomi, almost done.

12:40:12 21            In the text that Mr. Wise showed you about what

12:40:15 22    time of night, you didn't understand, or did you when he's

12:40:19 23    in the middle of the night asking you whether he was asking

12:40:22 24    you to drive in the middle of the night to exchange the car

12:40:25 25    in the middle of the night or whenever?

N. Biden - redirect

| | | |
|---|---|---|
| 12:40:27 | 1 | A.    Yes. |
| 12:40:27 | 2 | Q.    And when you were hard to see him in that period of |
| 12:40:30 | 3 | time, didn't you tell him that that was part your fault |
| 12:40:35 | 4 | because you were going to court, you were doing other |
| 12:40:37 | 5 | things? |
| 12:40:37 | 6 | A.    Yes, I was doing an internship at the court house in |
| 12:40:42 | 7 | Brooklyn, and it was like an hour commute. |
| 12:40:46 | 8 | Q.    Notwithstanding which day you were asked about, there |
| 12:40:49 | 9 | is no confusion in your head that you had time to spend with |
| 12:40:52 | 10 | your father while he was in New York, even if it's not in |
| 12:40:55 | 11 | that one day that this exchange occurred, is that true? |
| 12:40:58 | 12 | A.    To the best of my recollection. |
| 12:41:03 | 13 | Q.    And there is no doubt in your mind when you left the |
| 12:41:06 | 14 | truck off with him, the safe was intact? |
| 12:41:08 | 15 | A.    Yeah, there is no doubt. |
| 12:41:11 | 16 | Q.    And when you were asking -- when he was asking |
| 12:41:15 | 17 | questions and you were talking about the years that you knew |
| 12:41:18 | 18 | him and saw him, et cetera, you were saying when he was |
| 12:41:21 | 19 | struggling, he was not communicative, you're not seeing him, |
| 12:41:25 | 20 | right? |
| 12:41:26 | 21 | A.    Yeah. |
| 12:41:26 | 22 | Q.    Is that what you meant? |
| 12:41:28 | 23 | A.    Yes. |
| 12:41:29 | 24 | Q.    But in October of '18, was he communicative? |
| 12:41:34 | 25 | A.    Yes. |

```
12:41:34  1    Q.      Were you seeing him?

12:41:36  2    A.      Yes.

12:41:37  3    Q.      Was that after you said you were proud of him?

12:41:40  4    A.      Yes.

12:41:42  5                MR. LOWELL:  That's all I have.

12:41:44  6                THE COURT:  All right.  Thank you.  You may step

12:41:48  7    down.

12:41:49  8                We are going to take our lunch break.

12:41:52  9                MR. LOWELL:  Yes, ma'am.

12:41:53 10                THE COURT:  We're going to take our lunch break

12:41:55 11    and come back in about an hour.

12:41:57 12                COURTROOM DEPUTY:  All rise.

12:41:59 13                (Jury exiting the courtroom at 12:41 p.m.)

12:42:28 14                THE COURT:  Very quick side-bar.

12:43:52 15                (Side-bar discussion.

12:43:52 16                THE COURT:  I just want to make sure we're

12:43:52 17    candid about anything, it was in the courtroom and the juror

12:43:52 18    on the end.

12:43:52 19                MR. LOWELL:  Back row.

12:43:52 20                THE COURT:  Back row on the end, at one point it

12:43:52 21    was when you were waiting for Ms. Biden to come -- no, it

12:43:52 22    was after Mr. Turner testified, and he just pulled Mark over

12:43:52 23    and said, if the prosecutor, and Mark said, can't talk about

12:43:52 24    it.  But that was -- I just wanted you to know so that there

12:43:52 25    is no discussions going on that you don't know about.
```

12:43:52  1                MR. LOWELL:  Thank you for that.

12:43:52  2                MR. HINES:  Thank you, Your Honor.

12:43:52  3                MR. LOWELL:  See you after lunch.

12:43:52  4                (End of side-bar.)

12:43:52  5                COURTROOM DEPUTY:  All rise.

12:44:21  6                (A luncheon recess was taken.)

13:38:25  7                THE COURT:  All right.  So I understand with

13:38:29  8      timing and everything we're going to break for the day?

13:38:32  9                MR. LOWELL:  Yes, ma'am.

13:38:32 10                THE COURT:  Normally -- everyone can sit down.

13:38:35 11      I would normally just allow the jury to go, but given that

13:38:40 12      it's Friday, I just want to give them sort of an admonition

13:38:44 13      of don't talk, don't listen, don't do anything, just because

13:38:47 14      it's a weekend, if that's okay with you guys.

13:38:51 15                MR. LOWELL:  What we are going to ask you to

13:38:53 16      add, I heard it and it makes sense, it's not a surprise to

13:38:56 17      the outside world that in the middle of this trial this week

13:38:59 18      a few members of Congress decided to make news by making

13:39:03 19      accusations against my client, that's not about this case,

13:39:07 20      so the question is not to read anything --

13:39:09 21                THE COURT:  Not just the case, but anybody

13:39:12 22      involved in the case.

13:39:12 23                MR. LOWELL:  Could you do that?

13:39:14 24                THE COURT:  Yes, I'm happy to do that.

13:39:16 25                MR. HINES:  Your Honor, just so I'm clear, at

13:39:18  1    this point we understand that no more defense witnesses

13:39:21  2    absent a decision by the defendant.

13:39:23  3            MR. LOWELL:  We've decided not to call that

13:39:25  4    witness regardless of the timing issue and that's fair to

13:39:27  5    you, of course.  But we have to make that other decision and

13:39:30  6    do the other things.  Okay.

13:39:33  7            THE COURT:  There were two other potential ones.

13:39:35  8            MR. LOWELL:  Again, because of the wonderful job

13:39:37  9    that my colleague did, we don't need to call Dr. Coyer, we

13:39:44 10    are down to that last decision.

13:39:46 11            THE COURT:  The last decision.  And I do have

13:39:48 12    jury instructions which I'll send out to you guys and let's

13:39:51 13    plan to be here, can we do 8:15 on Monday?

13:39:55 14            MR. HINES:  Yes.  I just want to make clear that

13:39:59 15    we are still considering whether we may do a rebuttal case

13:40:02 16    in light of some of the information.

13:40:04 17            THE COURT:  That's fine.  I want to make sure

13:40:06 18    we're ready to go to the extent --

13:40:08 19            MR. LOWELL:  Assuming that there is only one

13:40:10 20    potential witness, will you know with that decision will be

13:40:14 21    made.

13:40:15 22            MR. HINES:  I will know when you make the

13:40:16 23    decision.  If you tell me over the weekend I can let you

13:40:19 24    know.

13:40:19 25            MR. LOWELL:  We'll figure that out together.

13:40:22  1          THE COURT:  Let's bring the jury in, and

13:40:24  2   hopefully they're back.

13:40:29  3          I'm just going to tell them that I have some

13:41:53  4   things that I need to work out so that's why I'm letting

13:41:57  5   them go.

13:43:33  6          (Jury entering the courtroom at 1:43 p.m.)

13:43:39  7          THE COURT:  All right.  Members of the jury,

13:44:01  8   thanks for coming back.  So everyone can be seated.

13:44:06  9          So we are starting to wrap up the evidence in

13:44:09 10   this case.  And that means that I have some things I need to

13:44:12 11   take care of in terms of making sure I have the jury

13:44:15 12   instructions that I am going to give to you ultimately when

13:44:18 13   all the evidence is finished.

13:44:21 14          So in order for us to get that done in an

13:44:23 15   efficient manner, what I am going to do is I am going to

13:44:27 16   excuse you all early today so you can enjoy a long weekend,

13:44:31 17   maybe get some warmth outside of this courtroom because I

13:44:35 18   know it's crazy cold, but trust me, it's better than when

13:44:39 19   it's hot because that's gross.

13:44:41 20          I wanted to bring you in before I did that so I

13:44:44 21   can just remind you, it's going to be a weekend and you may

13:44:47 22   be hanging out with your family, may be hanging out with

13:44:50 23   friends and they might just be curious because you're on

13:44:53 24   this jury.  You really cannot talk with anyone.  It's

13:44:56 25   graduation season.  You may be at a party or a barbecue.

13:45:00  1    You may go to religious services where people want to talk

13:45:04  2    about it or hear about it.  You cannot be involved in that.

13:45:08  3    Okay?  And if you are, you have to get yourself out of it

13:45:12  4    and you're going to have to tell us about it just so that we

13:45:16  5    can ensure that nothing has been said that would affect your

13:45:19  6    opinions because we just really want to make sure this is

13:45:22  7    fair for everybody involved.  Okay.

13:45:24  8            And so, I know you're not going to do any

13:45:27  9    research on your own, but just I ask you don't look at

13:45:31 10    anything about this case, and when I say this case, I mean

13:45:34 11    any of the parties involved in it, anything that could

13:45:37 12    possibly get you to a place where you might accidentally see

13:45:41 13    something about this case.

13:45:42 14            All right.  With that, I will wish you a very

13:45:45 15    happy long weekend or longish weekend and a half a day.

13:45:49 16            Safe travels to you all and we'll see you here

13:45:52 17    on Monday morning.

13:45:54 18                COURTROOM DEPUTY:  All rise.

13:45:56 19                (Jury exiting the courtroom at 1:45 p.m.)

13:46:26 20                THE COURT:  All right.  Anything we need to

13:46:28 21    discuss?

13:46:29 22                MR. HINES:  Did you say 8:15 Monday?

13:46:32 23                THE COURT:  8:15, does that work for everybody.

13:46:34 24                MR. HINES:  Yes.

13:46:35 25                THE COURT:  8:15.  Have a good weekend.

13:46:38  1                COURTROOM DEPUTY:  Court is adjourned.

13:46:45  2                    (Court adjourned at 1:46 p.m.)

3

4                I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

5

6                                /s/ Dale C. Hawkins
                                Official Court Reporter
7                                U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25