AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Delaware

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH
RHBDC@ICLOUD.COM THAT IS STORED AT
PREMISES CONTROLLED BY APPLE, INC.

)
)
)
)
)
)

Case No. 19- 234 M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein

**FILED**
**AUG 29 2019**
US DISTRICT COURT
DISTRICT OF DELAWARE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C § 7201 | Tax Evasion |
| 26 U.S.C § 7203 | Willful Failure to File Tax Returns or Pay Taxes |
| 26 U.S.C § 7206(1) | False Tax Returns |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Joseph A. Ziegler, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/29/2019

City and state: Wilmington, Delaware

*Judge's signature*

Honorable Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
RHBDC@ICLOUD.COM THAT IS
STORED AT PREMISES CONTROLLED
BY APPLE, INC.

Case No. ___19-234M___

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Joseph A. Ziegler, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with the Apple, Inc. email address **rhbdc@icloud.com** (hereinafter "the Subject Apple Account") as further described in Attachment A that is stored at premises owned, maintained, controlled, or operated by Apple, Inc., ("Apple") an email provider headquartered at 1 Infinite Loop, Cupertino, CA 95014.

2.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.     I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been since January of 2010. I am currently assigned to the Washington D.C. Field Office working out of Atlanta, Georgia. I am assigned to the International Tax & Financial

1

Crimes Group. Upon joining IRS-CI, I attended the Federal Law Enforcement Training Center in Glynco, Georgia. There, I received instruction on tax related courses, investigative techniques, search and seizures, and various other aspects of federal law enforcement for approximately six months. I have received training, both formal and informal, in the enforcement and investigation of these laws, interviewing techniques, and the use of physical and electronic surveillance. Through my training and experience, I have become familiar with the techniques used by individuals who violate the federal tax laws and who engage in other financial crimes. I have participated in a range of financial investigations and have been the affiant on a number of tax-related search warrants.

4.      In connection with my official duties, I investigate criminal violations of federal tax law and related statutes, including tax evasion (26 U.S.C. § 7201), willful failure to file tax returns and pay tax (26 U.S.C. § 7203), willfully filing false tax returns (26 U.S.C. § 7206(1)), and conspiracy to defraud the IRS (18 U.S.C. § 371), and violations of the Bank Secrecy Act, such as willful failure to file a Report of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314; 5322(a); 5322(b)).

5.      The facts set forth in this Affidavit are based on my personal observations, my training and experience, information obtained from other FBI and IRS agents and analysts, subpoenaed records, financial records, records obtained pursuant to a court order issued under 18 U.S.C. § 2703(d), publicly available information, and IRS records. Because I submit this Affidavit for the limited purpose of showing probable cause, I have not included in this Affidavit each and every fact that I have learned in this investigation. Rather, I have set forth only facts sufficient to establish probable cause to issue a search warrant for the email account identified above. Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SUMMARY OF THE INVESTIGATION

7.     The Federal Bureau of Investigation and the Internal Revenue Service – Criminal Investigation are currently conducting a criminal tax investigation into Robert Hunter Biden ("the SUBJECT"). The investigation has thus far revealed that the SUBJECT and/or entities he controls have concealed from the IRS and underreported a substantial amount of foreign and domestic earned income since at least 2014. In so concealing this income, there is probable cause to believe that the SUBJECT has filed a false IRS Form 1040, 2014 U.S. Individual Income Tax Return ("Form 1040") by not reporting income, in violation of 26 U.S.C. § 7206(1); has evaded the payment of some of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201; has willfully failed to timely and fully pay individual income taxes for 2015, in violation of 26 U.S.C. § 7203; has evaded assessment of his 2016, 2017, and 2018 individual income taxes, in violation of 26 U.S.C. § 7201; has willfully failed to timely file individual income tax returns for the tax years 2016 and 2017, in violation of 26 U.S.C. § 7203; and has willfully failed to timely pay individual income taxes for 2018, in violation of 26 U.S.C. § 7203. In addition, there is also probable cause to believe that the SUBJECT has willfully failed to timely file an IRS Form 1120,

U.S. Corporation Income Tax Return ("Form 1120") for the tax year 2017, in violation of 26 U.S.C. § 7203.

8.     The SUBJECT is a graduate of Yale Law School and Georgetown University and has worked as a lobbyist and political consultant, as well as provided legal services, operating primarily out of Washington, D.C.   Since 1997, the SUBJECT has been a member of the Connecticut Bar, with no record of attorney discipline.  He is also currently a member in good standing of the District of Columbia Bar, having been admitted in 2007.

9.     The IRS investigation concerning the SUBJECT started in November of 2018 as a result of an investigation involving a United Kingdom ("U.K.") company currently under investigation by IRS-CI for failing to report and withhold tax on payments made to U.S. contractors.  Research on the company yielded bank reports indicating that the SUBJECT made payments to a U.S. contractor, who also had received payments from that U.K. company.  A review of the SUBJECT's individual income tax filings was performed which indicated the SUBJECT had failed to file his 2016 and 2017 Forms 1040 and a 2017 corporate tax return for an entity for which he appears to be the responsible party.

10.     At all times relevant to this Affidavit, the SUBJECT has been involved with multiple companies.  Bank records and tax return filings reveal the SUBJECT is the owner of the entities Owasco, PC and Owasco, LLC.  Owasco, PC had articles of incorporation filed in the District of Columbia in January of 2006, and was considered a C-corporation for tax purposes.  A C-corporation is a separate entity for tax purposes, meaning it is required to pay income taxes on the business income earned during the tax year.  Additionally, most C-corporations are required to file a corporate tax return each year, regardless of whether the corporation had any gross receipts

that year.[1]  Per IRS tax records, the SUBJECT is the 100% shareholder of Owasco, PC.  During 2015, IRS and public records indicate that the SUBJECT started an additional business, Owasco, LLC.  Owasco, LLC had articles of incorporation filed in Delaware in December 2015 and is considered a "disregarded entity" for tax purposes. A disregarded entity means that for tax purposes it is not recognized as an entity separate from its owner, in this case the SUBJECT.

11.    The SUBJECT, Owasco, PC, and Owasco, LLC have direct or indirect ownership interests in a number of other entities, including Rosemont Seneca Partners, LLC; Rosemont Seneca Technology Partners, LLC; RSTP II Alpha Partners, LLC; RSTP II Bravo Partners, LLC; RSP Holdings, LLC; Seneca Global Advisors, LLC; Skaneateles, LLC; and Eudora Global, LLC. All of these entities are considered "flow-through entities" under the tax law.  For a flow-through entity, the income or loss of the entity is treated as income or loss for the investor or owner; as relevant here, the investor or owner is the SUBJECT and/or Owasco, PC.

12.    For the tax years 2014 through 2017, the SUBJECT received IRS Forms W-2, Wage and Tax Statement ("Form W-2") from the law firm Boies, Schiller & Flexner, LLP.  The SUBJECT also received Forms W-2 from his corporation, Owasco, PC.

13.    As described more below, the SUBJECT has not filed Forms 1040 for several tax years.  In several years relevant to this Affidavit, however, the IRS received an IRS Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return ("Application for Extension") for the SUBJECT.  By filing an Application for Extension, a taxpayer can automatically extend his or her time to file a tax return for up to six months (for example, from April 15 to October 15). The Application for Extension does not, however, extend

---

[1] *See generally* 26 U.S.C. § 6012(a)(2); IRS Publication 542, Corporation Publication.  While there are exceptions to this rule, based on the investigation to date, none of the exceptions appear to apply to Owasco, PC.

the time a taxpayer has to *pay* taxes owed. When filing the Application for Extension, the taxpayer is also required to estimate and pay his or her total tax liability.

14.    IRS records, as of August 19, 2019, show the following information regarding the SUBJECT's Forms 1040 and tax payments for the 2014 through 2018 tax years:[2]

|  | 2014 | 2015 | 2016 No Return Filed | 2017 No Return Filed | 2018 No Return Filed |
|---|---|---|---|---|---|
| Wages | $819,500 | $745,372 | - | - | - |
| Interest Income | $154 | $137 | - | - | - |
| Taxable Refunds | $357 | $1,267 | - | - | - |
| Schedule D Income | $0 | $609,786 | - | - | - |
| Schedule E Income | $24,880 | $292,395 | - | - | - |
| Other Income | $2,437 | $829,251 | - | - | - |
| Total Income Per Tax Return | $847,328 | $2,478,208 | - | - | - |
| Taxable Income Per Tax Return | $721,166 | $2,335,597 | - | - | - |
| Total Tax Per Tax Return | $239,076 | $820,801 | - | - | - |
| Federal Income Tax Withholdings Per Tax Return (From Form W-2 Wages) | $231,725 | $206,087 | N/A | N/A | N/A |
| Federal Income Tax Withholdings Per IRS Records (From Forms W-2 Wages) | N/A | N/A | $399,887 | $123,857 | $38,465 |
| Other Taxes Paid Per Tax Filings (including excess social security withholdings, estimated tax payments made and payments made with extensions) | $15,271 | $438,694 | $30,000[3] | $0 | $0 |
| Other Taxes Paid after Tax Filings Per IRS Records | - | $70,000 | - | - | - |
| Total Taxes Paid to Date Per IRS Records | $246,996 | $714,781 | $429,887 | $123,857 | $38,465 |

---

[2] The IRS has not received Forms 1040 for the SUBJECT for the tax years 2016 through 2018.

[3] While no Form 1040 was filed, the SUBJECT filed and/or caused to be filed an IRS Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return ("Application for Extension") for his 2016 Form 1040 along with a $30,000 tax payment.

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Tax Refunds Issued Per IRS Records | $7,920 | - | N/A | N/A | N/A |
| Total Tax, Penalties and Interest Outstanding Per IRS Records | - | $157,825 | N/A | N/A | N/A |

15. IRS records, as of August 19, 2019, show the following information reported on Owasco, PC's corporate tax returns for the 2014 through 2018 tax years[4]:

|  | 2014 | 2015 | 2016 | 2017 No Return Filed | 2018 No Return Filed |
|---|---|---|---|---|---|
| Gross Receipts | $17,500 | $316,666 | $1,550,965 | - | - |
| Capital Gain | $0 | $293,477 | $0 | - | - |
| Other Income | $700,918 | $885 | $6,335 | - | - |
| Total Income Per Tax Return | $718,427 | $611,195 | $1,557,307 | - | - |
| Officer Comp. | $600,000 | $365,403 | $1,295,000 | - | - |
| Other Deductions | $66,573 | $264,046 | $117,043 | - | - |
| Total Deductions | $666,573 | $629,449 | $1,412,043 | - | - |
| Taxable Income Per Tax Return | $13,339 | $(18,254) | $127,010 | - | - |
| Total Tax Per Tax Return | $4,669 | $0 | $44,454 | - | - |
| Total Taxes Paid Prior to April 15th Per IRS Records | $6,000 | $9,000 | - | - | - |
| Total Taxes Paid after Tax Filings Per IRS Records | - | - | $45,673 |  |  |
| Total Taxes Paid to Date Per IRS Records | $6,000 | $9,000 | $45,673 | - | - |
| Tax Refunds Issued Per IRS Records | $(1,331) | $(9,000) | - | - | - |

---

[4] The IRS has not received corporate tax returns for Owasco, PC for the tax years 2017 and 2018.

## STATEMENT OF PROBABLE CAUSE

### A. *2014 Tax Year*

16.    As described below, there is probable cause to believe that the SUBJECT filed a false Form 1040 for tax year 2014, in violation of 26 U.S.C. § 7206(1), by failing to report at least $315,000 in income that he received for serving as a director of a Ukrainian natural gas producer.

17.    In April 2014, the SUBJECT was appointed to the board of directors of Burisma Holdings Limited ("Burisma"), Ukraine's largest private natural gas producer. This is confirmed by multiple sources. Burisma's website, dated August 1, 2016, featured a photo of the SUBJECT, noting his appointment as "Director" in April 2014. News articles, including in the *New York Times* and *The New Yorker*,[5] also reported that the SUBJECT was appointed to Burisma's board in April 2014. In the *New York Times* article, the SUBJECT acknowledged his role with Burisma and stated: "I explicitly limited my role to focus on corporate governance best practices to facilitate Burisma's desire to expand globally."

18.    Burisma's website and the *New York Times* article also stated that Devon Archer ("Archer") was appointed to the board of directors of Burisma at approximately the same time that the SUBJECT was. According to IRS tax filings and *The New Yorker* article, the SUBJECT and Archer have ownership interests, directly or indirectly, in a number of the same business entities and they are involved together in multiple business ventures, both domestic and international.

19.    According to IRS and public records, Rosemont Seneca Bohai LLC ("RSB") is a partnership in which Archer holds a 99% interest. According to bank records from various

---

[5] Kenneth P. Vogel and Luliia Mendel, *Biden Faces Conflict of Interest Questions That Are Being Promoted by Trump and Allies*, N.Y. Times, May 1, 2019 at www.nytimes.com/2019/05/01/us/politics/biden-son-ukraine.html; Adam Entous, *Will Hunter Biden Jeopardize His Father's Campaign?*, The New Yorker, July 1, 2019, at www.newyorker.com/magazine/2019/07/08/will-hunter-biden-jeopardize-his-fathers-campaign.

financial institutions, starting in or around April 2014, a Morgan Stanley bank account held in the name of RSB ("RSB Morgan Stanley Account") received two separate payments of approximately $83,333.33 each month from a bank account held by Burisma at AS Privatbank located in Latvia. All told, in 2014, Burisma transferred approximately $1,538,505 to the RSB Morgan Stanley Account.

20.     A review of financial records shows no direct payment from Burisma to the SUBJECT in 2014. However, between June 2014 and December 2014, the RSB Morgan Stanley Account sent multiple wire transfers totaling approximately $315,000 to the SUBJECT's two personal bank accounts at USAA.

21.     Given the structure of the monthly payments, whereby Burisma sent two separate and equal payments to the RSB Morgan Stanley Account, beginning in the month Archer and the SUBJECT joined Burisma's board of directors, there is probable cause to believe these payments represent directors' fees for Archer and the SUBJECT. Moreover, as set forth below, payments from Burisma were identified on the SUBJECT's 2015 Form 1040 as either consulting and/or directors' fees.

22.     In April 2015, an Application for Extension was filed for the SUBJECT. In or around October 2015, the SUBJECT filed his 2014 Form 1040, which was signed under penalty of perjury. The SUBJECT filed jointly with his then-wife and William Morgan ("Morgan") of Morgan Wingate & Co., PC, is listed as the paid preparer of the Form 1040. On his 2014 Form 1040, the SUBJECT reported $819,500 in wages and a handful of other, minor sources of income adding up to a total income of $847,328. The wages reported comprised $216,000 from Boies Schiller & Flexner, LLP, $3,500 from Georgetown University, and $600,000 from Owasco, PC. All of these amounts were reported on Forms W-2 issued to the SUBJECT and were attached to

9

the tax return. Despite receiving at least $315,000 from Burisma, the SUBJECT's Form 1040 does

not reflect any of that income.[6] Therefore, there is probable cause to believe that the SUBJECT

filed a false 2014 Form 1040 in violation of 26 U.S.C. § 7206(1).

### B. *2015 Tax Year*

23.    As described below, there is probable cause to believe that the SUBJECT has (1)

evaded payment of some of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201,

and (2) willfully failed to pay all of his 2015 individual income taxes, in violation of 26 U.S.C.

§ 7203.

24.    According to bank records from various financial institutions, in 2015, Burisma

continued sending payments to the RSB Morgan Stanley Account, as well as another RSB account

held at Bank of New York Mellon ("RSB Bank of New York Account"). Similar to the 2014

payments, these two accounts received two separate payments of approximately $83,333.33 each

month from bank accounts held by Burisma at AS Privatbank, Hellenic Bank LTD, and the Bank

of Cyprus Public Company LTD. The total in 2015 paid by Burisma to the RSB Morgan Stanley

---

[6] I have also examined the $600,000 in wages reported from Owasco, PC on the SUBJECT's 2014 Form 1040, and while the investigation has not yet identified the ultimate source of these funds, it does not appear to represent the payments from Burisma. According to its tax filings, Owasco, PC is a corporation wholly owned by the SUBJECT. Owasco, PC filed a 2014 corporate tax return. This return was also prepared by Morgan. Most of the income Owasco, PC reports was derived from its 75% ownership of Skaneateles, LLC, a partnership. In turn, the vast majority of the income Skaneateles, LLC reported on its 2014 IRS Form 1065, U.S. Return of Partnership Income ("Form 1065"), was derived from its 83% ownership of Seneca Global Advisors, LLC and its 95% ownership of RSP Holdings, LLC. The 2014 Forms 1065 for Seneca Global Advisors, LLC and RSP Holdings, LLC do not specifically identify the sources of the majority of their income. Nothing on the Owasco, PC, Skaneateles, LLC, Seneca Global Advisors, LLC, or RSP Holdings, LLC tax returns mention any income from Burisma, nor do the amounts reported on these returns match the Burisma payments. Moreover, the transfers of these fees were made to the SUBJECT's personal bank account. Finally, as noted above, in the subsequent tax year, the SUBJECT reported Burisma director's fees on his 2015 Form 1040, in addition to reporting wages from Owasco, PC.

Account and RSB Bank of New York Account was $1,941,131. The memo lines of the wire details indicate they were for "consulting services" or "Monthly Director Fee."

25.     Bank records from various financial institutions further show that during 2015, the RSB Morgan Stanley Account and RSB Bank of New York Account sent multiple wires totaling $386,979 to the SUBJECT's USAA personal bank accounts, the same two personal bank accounts that received $315,000 during 2014. Accordingly, there is probable cause to believe that the $386,979, just like the $315,000 received in 2014, are the Burisma director's fees.[7]

26.     In April 2016, an Application for Extension was filed for the SUBJECT for his 2015 Form 1040. In or around October 2016, the SUBJECT filed his 2015 Form 1040. As with his 2014 Form 1040, the SUBJECT appears to have signed this Form 1040 under the penalties of perjury, and the Form 1040 stated that Morgan was the paid preparer. On a "Statement 1" attached to his 2015 Form 1040, for "Miscellaneous Income," the SUBJECT acknowledged receiving income from Burisma in the form of directors' fees. Specifically, he reported $833,330 as "Burisma Board of Directors' Fees" and -$277,780 as a "Burisma Board of Directors' Fees Referral Fee." This resulted in a reported net amount of income from Burisma of $555,550.

27.     When he filed his 2015 Form 1040, the SUBJECT reported that his total tax due for 2015 was $820,801, and that while he had already paid some taxes, he still owed $176,550. According to IRS records, the SUBJECT did not pay this tax due when filing his Form 1040.

28.     On or about December 5, 2016, the IRS assessed delinquency penalties and interest totaling approximately $12,130 in connection with the 2015 Form 1040 and mailed a letter to the SUBJECT at ▮▮▮▮▮▮▮▮▮▮ in Washington DC, which is listed as the SUBJECT's

---

[7] As set forth below, the SUBJECT declared that he had received a total of $833,330 as director's fees from Burisma in 2015. However, as of this date, the investigation has been unable to identify the accounts for which the remaining director fees of $446,351 were deposited.

11

mailing address on his 2015 Form 1040. This letter informed the SUBJECT of potential tax levies and the amount he owed the IRS for the 2015 tax year. According to IRS records, on or about June 29, 2017, the IRS received a letter from the SUBJECT dated May 1, 2017 regarding the delinquency. The SUBJECT also wrote a letter dated August 1, 2017 and sent with it a $10,000 payment for his 2015 individual income taxes which referenced the delinquency notice he received. In addition, the tax debt was brought to the SUJBECT's attention during divorce proceedings in the Superior Court of the District of Columbia ("the Divorce Case").[8]

29.     According to Wells Fargo bank account records and IRS records, beginning around May 1, 2017, and ending on or about March 5, 2018, the SUBJECT made seven separate $10,000 payments to the IRS totaling $70,000 for the 2015 tax year. Each of these payments was a personal check signed by the SUBJECT and drawn on a personal account he had at Wells Fargo. When he stopped paying the IRS in March 2018, the SUBJECT still owed the IRS over $100,000 for 2015. The unpaid amount continued accumulating interest and, as of August 19, 2019, the SUBJECT owed approximately $152,090 for the 2015 tax year. As of August 19, 2019, the SUBJECT has not made any payment to the IRS for that tax year since March 5, 2018.

30.     As explained in more detail below, between 2016 (when he filed his 2015 Form 1040 and failed to pay his self-assessed taxes in full) and 2018 (when he stopped making $10,000 a month payments on his 2015 tax debt), the SUBJECT received significant sums of money, well

---

[8] Mot. To Enjoin Further Dissipation of Marital Assets, *Biden v. Biden*, 2016 DRB 004433, at 2 (D.C. Super. Ct. Fam. Div. Feb. 23, 2017).

in excess of what he owed for his 2015 tax debt, yet he did not pay in full the tax due and owing. Since the SUBJECT stopped paying the IRS on March 5, 2018 for any of his taxes owed, the SUBJECT's business bank accounts have received alleged income deposits of approximately $2,975,507. Additionally, the business bank accounts have made significant transfers to the SUBJECT's personal accounts and payments on his behalf.

31.    Moreover, as discussed below, there is probable cause to believe that the SUBJECT filed or caused to be filed false Applications for Extension for his 2016, 2017, and 2018 Forms 1040. These Applications for Extension significantly underreported his tax liabilities for those years. By doing so, the SUBJECT also concealed from the IRS that he was earning substantial income in those years, thus hiding funds on which the IRS could seek to collect to pay off the SUJBECT's outstanding tax debt for 2015. Therefore, there is probable cause to believe that the SUBJECT has evaded payment of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201, and willfully failed to pay all of his 2015 individual income taxes, in violation of 26 U.S.C. § 7203.

### C.  *2016 Tax Year*

32.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment on his individual income taxes for the tax year 2016, by, among other things, filing a false Application for Extension, in violation of 26 U.S.C. § 7201; and (2) willfully failed to timely file his Form 1040 for the tax year 2016, in violation of 26 U.S.C. § 7203.

33.    According to Wells Fargo bank records, in 2016, Burisma bank accounts held at the Bank of Cyprus and the Cyprus Development Bank began making regular monthly payments

13

to a Wells Fargo account held by Owasco, PC ("Owasco, PC Wells Fargo Account").[10] In addition

to being the owner of Owasco, PC, the SUBJECT was a signatory on this account. The Owasco,

PC Wells Fargo Account received nine months of regular wires of $83,333 and three additional

wires in the amounts of $83,731, $84,992, $83,293 from Burisma, for a total of approximately

$1,002,017. Each of the wires from Burisma stated "RFB/ Owasco, PC/ Robert Biden."

34.     According to Wells Fargo and Bank of America bank records, during 2016, in

addition to the Burisma payments, the Owasco, PC Wells Fargo Account received $551,005 from

a Bank of America account held in the name of Robinson Walker, LLC ("Robinson Walker Bank

of America Account"). According to IRS records, Robinson Walker, LLC is controlled by John

Robinson Walker, who is a business associate of the SUBJECT's and a signer on the Robinson

Walker Bank of America Account. Beginning in or around February 2016, through on or about

May 26, 2017, the Robinson Walker Bank of America Account received payments totaling

approximately $2,561,718 from an account at the Bank of Cyprus in the name of Bladon

Enterprises Limited ("Bladon").[11]  $2,213,546 of this amount was paid in 2016 and the remaining

$358,172 was paid in 2017. Almost immediately after receiving these payments, the Robinson

Walker Bank of America Account typically divided the payments into three equal shares, sending

---

[10] In addition to Burisma paying the Owasco, PC Wells Fargo Account, Burisma started to make payments to Archer's personal bank account held at Citibank during the 2016 tax year. In 2016, Archer's Citibank bank account received approximately half of what Archer and the SUBJECT jointly received in 2015 (approximately $916,663), thus supporting that in 2014 and 2015 Archer received funds for both himself and the SUBJECT.

[11] A news article states that Bladon is a real estate development corporation registered in Cyprus and operating in Romania that is owned by a Romanian citizen, Gabriel Popoviciu. *See Romanian Investor Develops Large Residential Complex in Office Area*, Romania-Insider, October 6, 2016 at    https://www.romania-insider.com/romanian-investor-develops-large-residential-complex-office-area.

one third to the Owasco, PC Wells Fargo Account, one third to Walker's personal account, and one third to an account in Abu Dhabi held in the name of European Energy and Infrastructure.

35.    In or around April 2017, the SUBJECT did not file a Form 1040, but did file an Application for Extension. The application reported a tax liability of $30,000. Around the same time, the SUBJECT submitted a $30,000 payment to the IRS in the form of a check personally signed by the SUBJECT. Because of the Application for Extension, the SUBJECT's Form 1040 was due no later than October 15, 2017. He did not file a Form 1040 by that date, or any date since. On or about August 6, 2018, the IRS mailed a non-filing notice to the SUBJECT to his address of record at the IRS: 2900 K Street NW, Washington, DC 20007. Public records confirm that this is an address associated with the SUBJECT.

36.    While the SUBJECT failed to file a 2016 Form 1040, later in or around July 2018, Owasco, PC untimely filed its 2016 corporate tax return, signed by the SUBJECT and prepared by Morgan. On a Form 1120-E ("Compensation of Officers"), attached to Owasco, PC's corporate tax return, the company reported a deduction of $1,295,000 for compensation paid to the SUBJECT. Consistent with this, IRS records also show that for the tax year 2016, Owasco, PC issued a Form W-2 to the SUBJECT reporting wages of $1,295,000 and $361,620 in federal income tax withholdings. The Owasco, PC Wells Fargo Account bank records show multiple payroll payments and transfers from that account to the SUBJECT in 2016. IRS records also show a Form W-2 to the SUBJECT issued from Boies, Schiller, & Flexner, LLP reporting wages of $216,000 and $38,267 in federal income tax withholdings.

37.    For 2016, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $20,700 of gross income. Accordingly, based on the income and withholdings reported on the W-2 Forms, there is

probable cause to believe that the SUBJECT was obligated to file a Form 1040. Based on this individual income of approximately $1,500,000 (per the Forms W-2), using a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000, and giving credit for the $30,000 estimated payment and the $399,887 in federal tax withholdings, there is probable cause to believe the SUBJECT had substantial unreported and unpaid taxes for the 2016 tax year.[12] Accordingly, there is probable cause to believe that the SUBJECT has evaded the assessment of his 2016 individual income taxes, in violation of 26 U.S.C. § 7201, and willfully failed to file a 2016 Form 1040, in violation of 26 U.S.C. § 7203.

### D.  *2017 Tax Year*

38.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment on his individual income taxes for the tax year 2017 by, among other things, filing a false Application for Extension and paying for personal expenses directly from the Owasco, PC Wells Fargo Account, in violation of 26 U.S.C. § 7201; (2) willfully failed to timely file his Form 1040 for the tax year 2017, in violation of 26 U.S.C. § 7203; and (3) willfully failed to timely file a corporate tax return for Owasco, PC, in violation of 26 U.S.C. § 7203.

39.    In 2017, the Owasco, PC Wells Fargo Account continued to receive regular wires from Burisma, as well as significant sums from several other sources. The Owasco, PC Wells Fargo Account received regular monthly wires from Burisma totaling approximately $630,556. The memo lines for each wire stated "RFB/ Owasco, PC/ Robert Biden."

---

[12] For purposes on this warrant, I have assumed that the $1,295,000 in compensation paid by Owasco, PC to the SUBJECT includes the majority of the funds Owasco, PC received as payment of Burisma Director's fees and the payments from Robinson Walker, LLC and that this amount does not represent additional compensation paid by Owasco, PC to the SUBJECT, that would have the effect of increasing his likely tax liability.

40.     In addition to the Burisma payments, in 2017 the Owasco, PC Wells Fargo Account received other substantial deposits, totaling $2,761,959, to its bank account as follows:

    a.   deposits and wires totaling approximately $1,445,387 from an account held in the name of Hudson West III, LLC at Cathay Bank ("Hudson West III Cathay Bank Account");

    b.   a wire for approximately $100,000 from CEFC Infrastructure Inv;

    c.   deposits and transfers totaling approximately $666,572 from Skaneateles, LLC; and

    d.   deposits and wires totaling $550,000 from Robinson Walker, LLC.

41.     According to public records and information from various financial institutions, Gongwen Dong originally owned Hudson West III, LLC.  Dong operated Hudson West III, LLC from his personal residence in Great Neck, New York.  Hudson West III, LLC is an operating company that sources large projects, including liquefied natural gas, shale, solar and port infrastructures in the United States.   According to Manta.com, a website listing business information, Dong is also the Director of U.S.-based CEFC Infrastructure.

42.     Records provided by Cathay Bank regarding the Hudson West III Cathay Bank Account revealed the following information:

    a.   Cathay Bank reported that on August 3, 2017, the account opened and listed Dong as the original signature authority;

    b.   Cathay Bank reported that on August 3, 2017, DBS Bank Hong Kong Limited, in the name of Northern International Capital, funded a $5 million loan into the account.  At the time of the loan, Northern International Capital was an investment company, which lacked access to the United States.  Cathay Bank

reported that the purpose of this loan was to make investments in the United States through Hudson West III, LLC;

c. Cathay Bank reported that despite the size of this loan, no loan agreement existed between Hudson West III, LLC and Northern International Capital;

d. Cathay Bank reported that subsequent funds paid into the Owasco, PC Wells Fargo Account from the Hudson West III Cathay Bank Account appeared to be monthly consulting fees, as well as reimbursements and normal business expenses;

e. Cathay Bank reported that at some point the ownership structure of Hudson West III, LLC changed, and Owasco, PC (owned by the SUBJECT) and Coldharbour Capital, LLC (owned by Mervyn Yan) replaced Dong;

f. In or around April 2018, the SUBJECT and Mervyn Yan replaced Dong as authorized signatories over the account; and

g. The account closed on November 16, 2018.

43.    According to IRS records, since 2015, the SUBJECT has owned 75% of Skaneateles LLC ("Skaneateles"), through Owasco, LLC.[13]  Skaneateles is a partnership and considered a flow-through entity for tax purposes, meaning income and deductions would appear on the SUBJECT's Form 1040.  According to IRS records, Skaneateles issued a Form K-1[14] to

---

[13] According to IRS records, Owasco, PC transferred its ownership of Skaneateles, LLC to Owasco, LLC in 2015.

[14] A Form K-1 is an income document which is filed with the IRS for partnership tax returns. The Form K-1 reports the ownership interest in the entity, information for the partner's capital account and any income and deductions which flow through from the entity which is required to be reported on the owner's tax return.

Owasco, LLC, which reported the following income and deductions: Ordinary Business Loss of $(116,763), guaranteed payments of $37,000, interest income of $54, net long-term capital gain of $450,256, net section 1231 loss of $(25), other income of $39,025, and other deductions of $5,826.

44.    IRS records indicate that Robinson Walker, LLC issued a Form 1099-MISC to Owasco, PC, showing $400,000[15] of non-employee compensation and a second Form 1099-MISC to the SUBJECT reporting Non-Employee Compensation of $201,198.

45.    IRS records also indicate that Owasco, PC issued a Form W-2 to the SUBJECT, reporting wages of $427,854 and $122,352 of income tax withholdings for the 2017 tax year. In addition, Boies, Schiller & Flexner LLP, also issued a Form W-2 to the SUBJECT, reporting wages of $48,000 and $1,505 of income tax withholdings.

46.    In addition to the deposits made to the Owasco, PC Wells Fargo Account in 2017, there were multiple expenditures made from that account in 2017 that appear to be personal in nature.[16] Personal expenditures made from business bank accounts in this situation would result in taxable income to the SUBJECT. These distributions include, but are not limited to, the following:

| Item Description | Amount Paid in 2017 |
| --- | --- |
| Payments to the SUBJECT's personal bank accounts | $1,297,433 |
| Payments to Columbia University | $33,287 |
| Payments to suspected escorts | $22,500 |
| Payments to pornographic websites | $7,328 |

---

[15] It is unknown at this time why there is an approximately $150,000 difference between the Form 1099 and actual amounts paid to Owasco, PC reflected in the bank records.

[16] Based on my review bank records, prior to 2017, the SUBJECT appeared to use the Owasco, PC Wells Fargo Account for solely business purposes, and in lieu of paying for personal expenditures directly from the Owasco, PC Wells Fargo Account he instead transferred funds to his personal bank accounts.

| Payments to Ain & Bank PC – Family Law Firm[17] | $52,000 |
| Total | $1,412,548[18] |

47.    While it appears that at least $1,412,548 in payments from the Owasco, PC Wells Fargo Account in 2017 were personal in nature, nearly all of the funds deposited into the account in 2017 were spent over the course of the year.    In previous years, when the SUBJECT filed tax returns for Owasco, PC, the corporation's expenses—other than wages or compensation paid to the SUBJECT—were relatively small compared to the corporation's income.    Many of the other funds spent from the Owasco, PC Wells Fargo Account could be personal expenses, but your affiant is taking a relatively conservative calculation of only treating $1,412,548 as personal in nature.

48.    For 2017, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $20,800 of gross income.    Accordingly, based on the income and withholdings reported on the K-1 to Owasco, LLC, the 1099-MISC for $201,198 from Robinson Walker LLC to the SUBJECT, the W-2 from Owasco, PC to the SUBJECT, the W-2 from Boies, Schiller & Flexner LLP to the SUBJECT, and the additional income attributable to personal distributions from Owasco, PC, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040.    In addition to these forms, the SUBJECT himself confirmed a substantial level of income for 2017.    According to court records in the Divorce Case, on January 6, 2017, the SUBJECT filed an "Answer to Complaint for Absolute Divorce."    In paragraph 12, the SUBJECT "admits that he currently earns income

---

[17] Based on court filings in the SUBJECT's divorce case, this firm represented the SUBJECT.

[18] As of January 1, 2017, the Owasco, PC Wells Fargo Account had an account balance of approximately $21,700.    Therefore, the $1,412,548 of expenditures described in the table above could not have been made without the alleged income deposits to the Owasco, PC Wells Fargo Account.

sufficient to support himself and contribute to the support of his children and [Kathleen Biden]."
The Answer contained an affirmation that the statements in the Answer were "true and accurate to
the best of my knowledge, information, and belief" that was signed by the SUBJECT.

49.    According to IRS records, in or around April 2018, an Application for Extension
was filed for the SUBJECT's Form 1040.  This application reported no tax liability, and no
payments accompanied the tax return extension.   With an Application for Extension, the
SUBJECT's Form 1040 was due no later than October 15, 2018.  He did not file his Form 1040
by that date.  As of August 19, 2019, IRS records show that he still has not filed his 2017 Form
1040.

50.    For present purposes, excluding all 2017 income other than the $1,412,548 in
personal expenses paid from Owasco, PC for the SUBJECT, there is probable cause to believe the
SUBJECT had unreported and unpaid taxes in the 2017 tax year.[19] In reaching this conclusion,
based on my training and experience, I have allowed for the deduction of alimony paid to
SUBJECT's ex-wife of $333,000 during the 2017 tax year, used a conservative estimate of the
SUBJECT's unreported deductions and exemptions of $126,000,[20] considered the $123,857 in
federal tax withholdings, and the $0 estimated payment included in the extension application.
Thus, there is probable cause to believe that the SUBJECT failed to file a 2017 Form 1040, in
violation of 26 U.S.C. § 7203, and that the SUBJECT evaded the assessment of his 2017 individual
income taxes, in violation of 26 U.S.C. § 7201.

---

[19] The Forms W-2, 1099, and K-1, which report additional income to the SUBJECT, would only
increase the income taxes that he owes.  To be conservative, I have not included this additional
income, as some (but not all) of the income reported on those forms could have been deposited
into the Owasco, PC Wells Fargo Account.

[20] This estimate is based on the largest itemized and exemption deduction used for the 2014 and
2015 tax filings for the SUBJECT.

51.     According to IRS records, in or around June 2018, an IRS Form 7004, Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns ("Application for Corporate Extension"), was filed for Owasco, PC's 2017 corporate tax return.  This application reported no tax liability, and no payments accompanied the application. With an extension, Owasco, PC's tax return was due no later than October 15, 2018.  No return was filed by that date.  It is clear, based on the transactions described above, that Owasco, PC existed in 2017, and therefore was required to file a corporate tax return.[21]

### E.  *2018 Tax Year*

52.     As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment on his individual income taxes for the tax year 2018 by, among other things, filing a false Application for Extension and paying for personal expenses directly from the Owasco, PC Wells Fargo Account, in violation of 26 U.S.C. § 7201; and (2) willfully failed to timely pay his taxes due for that year, in violation of 26 U.S.C. § 7203.

53.     In 2018, the Owasco, PC Wells Fargo Account continued to receive regular wires from Burisma, totaling approximately $491,939.  The memo lines for each wire stated "RFB/ Owasco, PC/ Robert Biden."

54.     In addition to the Burisma payments, in 2018 the Owasco, PC Wells Fargo Account received other substantial deposits, totaling $2,731,494, as follows:

      a.  approximately 15 deposits and wires totaling approximately $2,187,494 from the Hudson West III Cathay Bank Account[22]; and

---

[21] Eric Schwerin, Owasco, PC's secretary signed Owasco, PC's 2014 and 2015 corporate tax returns. The SUBJECT signed Owasco, PC's 2016 corporate tax return.

[22] There is probable cause to believe that the money received from Hudson West III, LLC in 2018 would be considered income.  These payments, as in 2017, appear to include consulting

22

b. a transfer from an Owasco, LLC Wells Fargo Bank account for approximately $544,000.

55.     The $544,000 transfer from the Owasco, LLC to Owasco, PC was made possible by a $1,000,000 wire received by Owasco, LLC from the Hudson West III Cathay Bank Account on or about March 22, 2018. The memo line of this $1,000,000 wire stated that the wire was for "Dr Patrick Ho Chi Ping Representation."[23] According to court records, in late 2017, Chi Ping Patrick Ho ("Ho") was charged in the Southern District of New York for violations of the Foreign Corrupt Practices Act and money laundering (Case No. 1:17-cr-779).[24] According to the indictment in that case, Ho was involved in bribing officials in Chad and Uganda in exchange for business for the company he represented. According to a *New York Times* article, Ho was a representative of a company called CEFC China.[25] According to *The New Yorker* article, the SUBJECT became aware of a possible investigation of Ho and, prior to the indictment, agreed to represent Ho "to figure out whether Ho was in legal jeopardy in the U.S."[26] Later, in December 2018, Ho was convicted at trial.

---

fees. *See supra* ¶ 42. Moreover, according to Cathay Bank, the ownership of Hudson West III, LLC only "recently changed." Even if the ownership structure changed when the SUBJECT became a signatory on the account in April 2018, there is no information to indicate that the payments made from the Hudson West III Cathay Bank Account to Owasco, PC constitute a loan and/or a return of capital. None of the approximately 15 wires from Hudson West III, LLC to Owasco, PC included any notes in the memo line.

[23] This was the majority of income deposited to the Owasco, LLC bank account during 2018.

[24] The SUBJECT never entered an appearance on behalf of Ho in the criminal action, nor do any of the funds derived from the $1 million wire appear to be sent to any of the law firms that did enter an appearance on behalf of Ho.

[25] Matthew Goldstein, *Ex-Hong Kong Official Gets Lighter Sentence in Bribery Case*, N.Y. Times, March 25, 2019 at www.nytimes.com/2019/03/25/business/cefc-china-patrick-ho-bribery.html.

[26] Adam Entous, *supra* note 5.

56.    IRS records also indicate that Owasco, PC issued a Form W-2 to the SUBJECT, reporting wages of $159,000 and $38,465 of income tax withholdings for the 2018 tax year.

57.    In addition to the deposits made to the Owasco, PC Wells Fargo Account in 2018, there were multiple expenditures made from that account that appear to be personal in nature. These include, but are not limited to the following:

| Item Description | Amount Paid in 2018 |
|---|---|
| Payments to the SUBJECT's personal bank accounts | $1,044,129 |
| Payments to Columbia University | $30,000 |
| Payments to suspected escorts | $124,000 |
| Payments to pornographic websites | $13,008 |
| Payments to Chateau Marmont – California hotel | $43,692 |
| Payments to family members | $40,450 |
| **Total** | **$1,295,279** |

58.    As of January 1, 2018, the Owasco, PC Wells Fargo Account had an account balance of approximately $14,300. Therefore, the $1,295,279 of expenditures described above could not have been made without the alleged income deposits to the Owasco, PC bank account. These expenditures appear personal in nature and would result in taxable income to the SUBJECT.

59.    In or around April 2019, an Application for Extension was filed for the SUBJECT's 2018 Form 1040. This application reported no tax liability, and no payments accompanied the application. With an extension, the SUBJECT's Form 1040 is not due until October 15, 2019. Nonetheless, even a valid extension does not extend the time to pay taxes due and the evidence outlined above indicates that the SUBJECT's tax liability for 2018 is substantially greater than the "zero" reported on his Application for Extension.

60.    Considering only the personal expenses paid from the Owasco, PC Wells Fargo Account for the SUBJECT, and providing for the deductions for the SUBJECT through the use of a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000,

24

the $0 estimated payment and the $38,465 in federal tax withholdings, there is probable cause to believe the SUBJECT had unreported and unpaid personal taxes for the 2018 tax year.[27] Therefore, there is probable cause to believe that the SUBJECT failed to timely pay taxes due to the United States and evaded the payment of his 2018 individual income taxes.

### F. *The Subject Apple Account*

61.    Records provided by Apple regarding the Subject Apple Account show that this account was registered in SUBJECT's name.

62.    Based on my training and experience and my discussions with other IRS and FBI agents and analysts, individuals who engage in tax avoidance schemes typically create multiple different business entities and bank accounts to make it difficult for law enforcement to trace the flow of income. Such individuals often communicate through email with their various business partners, their employees, and individuals from whom they are receiving money, as well as with their accountants and/or tax preparers concerning business dealings, corporate structures, and the tax consequences associated with those events.

63.    Based on the information discussed in the probable cause section of this affidavit as well as my training and experience, there is probable cause to believe that the SUBJECT used the Subject Apple Account to communicate with various business partners, employees, his tax return preparer, and individuals from whom the SUBJECT received a substantial amount of

---

[27] The $1 million paid by Hudson West III, LLC to Owasco, LLC, described as for the representation of Ho, would actually be income to the SUBJECT, since Owasco, LLC is a disregarded entity. Taking this into consideration, along with the fact that Owasco, LLC transferred $544,000 to the Owasco, PC Wells Fargo Account, would result in additional unreported income and additional unpaid taxes.

money.[28]  There is also probable cause to believe that the SUBJECT Apple Account contains evidence of business and personal expenditures made by SUBJECT, which are relevant to the tax offenses currently under investigation.[29]

64.      Records provided by Apple show that between March 2015 and July 2015, the Subject Apple Account communicated with the email accounts of two individuals associated with Burisma.  According to a *Forbes* article, Vadym Pozharskyi ("Pozharskyi"), who is quoted in the article, serves as an Advisor to the Board of Directors at Burisma Group.[30]  According to the Burisma website as of August 26, 2019, Alan Apter ("Apter") is Chairman of the Board of Directors for Burisma, and was appointed in May 2013.  The Subject Apple Account exchanged at least the following quantity of emails with Burisma-linked email accounts:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| v.pozharskyi.███████com | 16 | 19 |
| alan.a█████com | 1 | 0 |
| alan.█████.com | 1 | 0 |

---

[28] Unless stated otherwise, there is probable cause to believe the email addresses discussed below are associated with the individuals named based upon the "To" and/ or "From" line of the email communication detail provided by Apple and the naming conventions of the email users.

[29] Examples of these types of communications are set forth in the paragraphs below and are offered as a demonstration of probable cause, rather than as an exhaustive list of relevant communications.

[30] Mfonobong Nsehe, *Ukraine's Burisma Group Looks to Expand into Africa and Other Emerging Market*, Forbes, August 22, 2017 at https://www.forbes.com/sites/mfonobongnsehe/2017/08/22/ukraines-burisma-group-looks-to-expand-into-africa/.

In total, the Subject Apple Account sent at least 18 emails to Burisma-linked email accounts and received at least 19 emails from Burisma-linked email accounts. Based on this summary, as well as the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the SUBJECT discussed the nature, purpose, and circumstances surrounding the payments made to him by Burisma.

65.     Records provided by Apple show that between March 2015 and July 2015, the Subject Apple Account communicated with email accounts associated with Devon Archer ("Archer"), who was the owner of Rosemont Seneca Bohai and was also on the Board of Directors for Burisma. The Subject Apple Account exchanged at least the following quantity of emails with email accounts associated with Archer:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| devon████.com | 4 | 5 |
| darcher█████████om | 5 | 2 |
| darcher█████████com | 32 | 0 |

Based on this summary, and the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the SUBJECT and Archer communicated about the nature, purpose, and circumstances surrounding the payments made by Archer to the SUBJECT, including their respective roles at Burisma.

66.     Records provided by Apple show that between April 2018 and April 2019 the Subject Apple Account communicated with the email account associated with the SUBJECT's tax return preparer William Morgan ("Morgan"). I know that this email account belongs to Morgan, because this email account was listed on the Morgan Wingate website for Morgan. The

Subject Apple Account exchanged at least the following quantity of emails with the email account associated with Morgan:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| ███@morganwingate.com | 3 | 12 |

Based on this summary, and the information previously articulated in the probable cause section to this affidavit, there is probable cause to believe that Morgan communicated with the SUBJECT about topics relevant to his income; his expenditures; his tax situation; and his tax filings and/or failure to file with the IRS.

67.    Records provided by Apple show that between January 2014 and June 2019, the Subject Apple Account communicated with email accounts associated with Eric Schwerin ("Schwerin"), the SUBJECT's business partner. Schwerin is a 25% owner of Skaneateles and through Skaneateles also holds an ownership interest, along with the SUBJECT, in Rosemont Seneca Partners, LLC, RSP Holdings, LLC, and Seneca Global Advisors, LLC. In addition, bank records show that Schwerin is a joint signer for the SUBJECT's Owasco, PC Wells Fargo bank account, and retains power of attorney status for the Owasco, LLC Wells Fargo bank account. The Subject Apple Account sent and received at least the following quantity of emails with email accounts associated with Schwerin:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| Ericschwerin███com | 0 | 2 |
| eschwerin███com | 0 | 3 |
| eschwerin███com | 23 | 35 |

Based on this summary, and the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the SUBJECT and Schwerin communicated about business and tax-related topics.

68.     Records provided by Apple show that between August 2017 and June 2018, the Subject Apple Account communicated with two email accounts of individuals associated with Hudson West III, LLC and CEFC Infrastructure. Gongwen Dong ("Dong") was the prior owner of Hudson West III, LLC and CEFC Infrastructure. Mervyn Yan ("Yan") is the present co-owner of Hudson West III, LLC, along with the SUBJECT. The Subject Apple Account sent and received at least the following quantity of emails with email accounts associated with Dong and Yan:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| gongwen.dong████com | 20 | 25 |
| mervyn.yan████com | 0 | 2 |
| mervyn.yan████com | 0 | 2 |
| mervyn.yan████com | 23 | 32 |

Based on this summary, and the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the SUBJECT, Dong and Yan communicated about the nature, purpose, and circumstances surrounding the payments made from Hudson West III, LLC and CEFC Infrastructure to Owasco, PC and Owasco, LLC.

69.     Records provided by Apple show that between April 2014 and June 2017, the Subject Apple Account communicated with email accounts associated with John Robinson Walker

("Walker"). Walker is the owner of Robinson Walker LLC. The Subject Apple Account sent and received at least the following quantity of emails with email accounts associated with Walker:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| rob█████com | 0 | 1 |
| rwalker█████com | 4 | 1 |
| rob.walker█████com | 6 | 6 |
| rob█████com | 4 | 2 |

Based on this summary, and the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the SUBJECT and Walker discussed the nature, purpose, and circumstances surrounding the payments made by Walker to the SUBJECT and/or his business entities.

70.    Records    provided    by    Apple    show    that    between February 2014 and July 2019, the Subject Apple Account communicated with the email accounts associated with Catherine "Katie" Dodge ("Dodge"). According to Dodge's LinkedIn profile, she was employed as the Executive Assistant to the President at Rosemont Seneca Partners from October 2012 to June 2015, who according to FBI records was Schwerin. After that time, Dodge remained involved in the financial management of the SUBJECT's business entities. According to records received from the payroll company ADP LLC, between May 2018 and December 2018, Dodge was the listed contact for Owasco, PC, listing the dodgekatie█████account, and was on the Owasco, PC payroll during that time. In addition, she signed the contract with ADP LLC on behalf of Owasco, PC on May 1, 2018, listing her title as "administrator." Based on bank and payroll records, Dodge received payroll disbursements from Owasco, PC in 2018, as well as

payments from the SUBJECT's personal Wells Fargo Account and/or Owasco, PC's Wells Fargo bank account through February 2019. The Subject Apple Account sent and received at least the following quantity of emails with email accounts associated with Dodge:

| Account Name | Number of Emails sent by the Subject Apple Account | Number of Emails received by the Subject Apple Account |
|---|---|---|
| kdodg█████████com | 13 | 1 |
| dodgekatie█████com | 29 | 117 |
| katie██████com | 3 | 15 |

Based on this summary, and the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the SUBJECT and Dodge communicated about the nature, purpose, and circumstances surrounding Owasco, PC's business dealings and payments and expenditures made by the SUBJECT and/or his business entities.

71.    Records provided by Apple show that between January 2014 and July 2019, the Subject Apple Account received emails from various vendors, indicative of receipts for business and/or personal expenses including, but not limited to, restaurants, restaurant reservation services, hotels, and air travel. Other records obtained from DropBox show that the Subject Apple Account is the email account associated with the SUBJECT's DropBox Account. DropBox is an electronic file transferring system used for both peer to peer file transfers of large files which can be uploaded to a cloud based server. In addition, the Subject Apple Account is the email account associated with personal and business bank accounts at Wells Fargo, held in the names of the SUBJECT, Owasco, PC, and Owasco, LLC. Based on this information and the information previously articulated in the probable cause section of this affidavit, there is probable cause to believe that the

Subject Apple Account contains information about the SUBJECT's business and personal expenses which are relevant to the tax crimes being investigated.

72.     In general, an email that is sent to an Apple subscriber is stored in the subscriber's "mail box" on Apple's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Apple's servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Apple's servers for a certain period of time. In a letter to Apple dated April 11, 2019, a 90-day preservation request for the Subject Apple Account was sent to Apple pursuant to 18 U.S.C. § 2703(f).  A request for the extension of this preservation was sent to Apple on or about July 11, 2019.  Thus, there is probable cause to believe that emails and other information contained within the Subject Apple Account exist and will be found on Apple's servers.

## BACKGROUND CONCERNING EMAIL

73.     In my training and experience, I have learned that Apple provides a variety of on-line services, including electronic mail ("email") access, to the public.   Subscribers obtain an account by registering with Apple. During the registration process, Apple asks subscribers to provide basic personal information.  Therefore, the computers of Apple are likely to contain stored electronic communications (including retrieved and unretrieved email for Apple subscribers) and information concerning subscribers and their use of Apple services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

74.     An Apple subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

emails), and other files, on servers maintained and/or owned by Apple. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

75.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

76.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

77.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

78.     This application seeks a warrant to search all responsive records and information under the control of Apple, a provider subject to the jurisdiction of this court, regardless of where Apple has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Apple's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

79.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts

lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement.

## FILTER REVIEW PROCEDURES

80.     Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges. The procedures include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## CONCLUSION

81.    Based on the forgoing, I request that the Court issue the proposed search warrant. The government will execute this warrant by serving the warrant on Apple, Inc. Because the warrant will be served on Apple, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

82.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Joseph A. Ziegler
Special Agent
Internal Revenue Service-
Criminal Investigation

Subscribed and sworn to before me on ___August 29_____, 201 7

HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

36

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with **rhbdc@icloud.com** that is stored at premises owned, maintained, controlled, or operated by Apple, Inc., a company headquartered at 1 Infinite Loop, Cupertino, CA 95014.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Apple, Inc. (the "Provider")**

For the time period January 2014 to the present, to the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f) on or about April 11, 2019 and on or about July 11, 2019, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

2

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

II.    **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of tax evasion (26 U.S.C. § 7201), willful failure to file tax returns and failure to pay income tax (26 U.S.C. § 7203), and willfully filing false tax returns (26 U.S.C. § 7206(1)), those violations involving Robert Hunter Biden or any entity he owns or controls, occurring after January 1, 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) All financial and other bookkeeping information and records, including correspondence regarding the same;

(b) All records and information relating to federal, state, and foreign individual, corporate, employment and property taxes, including correspondence regarding the same;

(c) All records and information pertaining to personal and business expenditures including correspondence regarding the same;

(d) All records and information reflecting business operations and business ownership, including business incorporation documents, employment records, paychecks, business expenses, business income, investments, and work schedules, including correspondence regarding the same;

(e) Evidence indicating how and when the email account was accessed or used to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(f) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

4

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI or IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## BUSINESS RECORDS PURSUANT TO FEDERAL RULES
## OF EVIDENCE 902(11) and 902(13)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct. I am employed by Apple, Inc., and my official

title is _____. I am qualified to authenticate the records attached

hereto because I am familiar with how the records were created, managed, stored, and retrieved.

I state that each of the records attached hereto is the original record or a true duplicate of the

original record in the custody of Apple, Inc. and that I am the custodian of the attached records

consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of a regularly conducted

business activity of Apple, Inc.; and were made by Apple, Inc. as a regular practice; and

    b.    such records generated by Apple, Inc.'s electronic process or system that

produces an accurate result, specifically that:

        1.    the records were copied from electronic devices, storage mediums, or files

in the custody of Apple, Inc. in a manner to ensure that they are true duplicates of the original

records; and

        2.    the process or system is regularly verified by Apple, Inc. and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of

the Federal Rules of Evidence.

| | |
|---|---|
| Date | Signature |