AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware



In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Apple MacBook Pro Laptop Computer Serial Number FVFXC2MMHV29; Western Digital External Hard Drive Serial Number WX21A19ATFF3

)
)
)
)
)
)

Case No. 19- 309m

## APPLICATION FOR A SEARCH WARRANT

SEALED

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C § 7201 | Tax Evasion |
| 26 U.S.C § 7203 | Willful Failure to File Tax Returns or Pay Taxes |
| 26 U.S.C § 7206(1) | False Tax Returns |

The application is based on these facts:

See attached Affidavit.

DEC 13 2019

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Joseph A. Ziegler, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12|13|2019

_____
*Judge's signature*

City and state: Wilmington, Delaware

Honorable Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

APPLE MACBOOK PRO LAPTOP
COMPUTER SERIAL NUMBER
FVFXC2MMHV29; WESTERN DIGITAL
EXTERNAL HARD DRIVE SERIAL
NUMBER WX21A19ATFF3

Case No. 19-309m

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Joseph A. Ziegler, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been since January of 2010. I am currently assigned to the Washington D.C. Field Office working out of Atlanta, Georgia. I am assigned to the International Tax & Financial Crimes Group. Upon joining IRS-CI, I attended the Federal Law Enforcement Training Center in Glynco, Georgia. There, I received instruction on tax-related courses, investigative techniques, search and seizures, and various other aspects of federal law enforcement for approximately six months. I have received training, both formal and informal, in the enforcement and investigation of these laws, interviewing techniques, and the use of physical and electronic surveillance. Through my training and experience, I have become familiar with the techniques used by individuals who violate the federal tax laws and who engage in other financial crimes. I have

1

participated in a range of financial investigations and have been the affiant on a number of tax-related search warrants.

3.    In connection with my official duties, I investigate criminal violations of federal tax law and related statutes, including tax evasion (26 U.S.C. § 7201), willful failure to file tax returns and pay tax (26 U.S.C. § 7203), willfully filing false tax returns (26 U.S.C. § 7206(1)), and conspiracy to defraud the IRS (18 U.S.C. § 371), and violations of the Bank Secrecy Act, such as willful failure to file a Report of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314; 5322(a); 5322(b)).

4.    The facts set forth in this Affidavit are based on my personal observations, my training and experience, information obtained from other FBI and IRS agents and analysts, subpoenaed records, financial records, records obtained pursuant to court orders issued under 18 U.S.C. § 2703(d), publicly available information, and IRS records. Because I submit this Affidavit for the limited purpose of showing probable cause, I have not included in this Affidavit each and every fact that I have learned in this investigation. Rather, I have set forth only facts sufficient to establish probable cause to issue a search warrant for the electronic devices identified below. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.    The property to be searched is an Apple MacBook Pro Laptop Computer; Serial Number FVFXC2MMHV29 (hereinafter "TARGET MACBOOK PRO") and a Western Digital External Hard Drive; Serial Number WX21A19ATFF3 (hereinafter "TARGET EXTERNAL HARD DRIVE"). The TARGET MACBOOK PRO and the TARGET EXTERNAL HARD

DRIVE are currently located at the FBI-Wilmington Resident Agency, 500 Delaware Avenue, Suite 300 Wilmington, Delaware, 19801.

6.     The applied-for warrant would authorize the forensic examination of the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE for the purpose of identifying electronically stored data particularly described in Attachment B.

## SUMMARY OF THE INVESTIGATION

7.     The Federal Bureau of Investigation and IRS-CI are currently conducting a criminal tax investigation into Robert Hunter Biden ("the SUBJECT").  The investigation has thus far revealed that the SUBJECT and/or entities he controls have concealed from the IRS and underreported a substantial amount of foreign and domestic income since at least 2014.  In so concealing this income, there is probable cause to believe that the SUBJECT has filed a false IRS Form 1040, 2014 U.S. Individual Income Tax Return ("Form 1040") by not reporting income, in violation of 26 U.S.C. § 7206(1); has evaded the payment of some of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201; has willfully failed to timely and fully pay individual income taxes for 2015, in violation of 26 U.S.C. § 7203; has evaded assessment of his 2016, 2017, and 2018 individual income taxes, in violation of 26 U.S.C. § 7201; and has willfully failed to timely file Forms 1040 for the tax years 2016, 2017, and 2018, in violation of 26 U.S.C. § 7203. In addition, there is also probable cause to believe that the SUBJECT has willfully failed to timely file an IRS Form 1120, U.S. Corporation Income Tax Return ("Form 1120" or "corporate tax return") for the tax years 2017 and 2018, in violation of 26 U.S.C. § 7203.

8.     The SUBJECT is a graduate of Yale Law School and Georgetown University and has worked as a lobbyist, political consultant, and provided legal services, operating primarily out of Washington, D.C.  Since 1997, the SUBJECT has been a member of the Connecticut Bar, with

no record of attorney discipline. He is also currently a member in good standing of the District of Columbia Bar, having been admitted in 2007.

9.      The IRS investigation concerning the SUBJECT started in November of 2018 as a result of an investigation involving a United Kingdom ("U.K.") company for failing to report and withhold tax on payments made to U.S. contractors. Research on the company yielded bank reports indicating that the SUBJECT made payments to a U.S. contractor, who also had received payments from that U.K. company. A review of the SUBJECT's individual income tax filings was performed that indicated the SUBJECT had failed to file his 2016 and 2017 Forms 1040 and a 2017 corporate tax return for an entity for which he appears to be the responsible party.

10.      At all times relevant to this Affidavit, the SUBJECT has been involved with multiple companies. Bank records and tax return filings reveal the SUBJECT is the owner of the entities Owasco, PC and Owasco, LLC. Owasco, PC had articles of incorporation filed in the District of Columbia in January of 2006, and was considered a C-corporation for tax purposes. A C-corporation is a separate entity for tax purposes, meaning it is required to pay income taxes on the business income earned during the tax year. Additionally, most C-corporations are required to file a corporate tax return each year, regardless of whether the corporation had any gross receipts that year.[1] Per IRS tax records, the SUBJECT is the 100% shareholder of Owasco, PC. During 2015, IRS and public records indicate that the SUBJECT started an additional business, Owasco, LLC. Owasco, LLC had articles of incorporation filed in Delaware in December 2015 and is considered a "disregarded entity" for tax purposes. A disregarded entity means that for tax purposes it is not recognized as an entity separate from its owner, in this case the SUBJECT.

---

[1] *See generally* 26 U.S.C. § 6012(a)(2); IRS Publication 542, Corporation Publication. While there are exceptions to this rule, based on the investigation to date, none of the exceptions appear to apply to Owasco, PC.

11.     The SUBJECT, Owasco, PC, and Owasco, LLC have direct or indirect ownership interests in a number of other entities, including:  Rosemont Seneca Partners, LLC; Rosemont Seneca Technology Partners, LLC; RSTP II Alpha Partners, LLC; RSTP II Bravo Partners, LLC; RSP Holdings, LLC; Seneca Global Advisors, LLC; Skaneateles, LLC; Rosemont Seneca Advisors, LLC; and Eudora Global, LLC.  All of these entities are considered "flow-through entities" under the tax law.  For a flow-through entity, the income or loss of the entity is treated as income or loss for the investor or owner; as relevant here, the investor or owner is the SUBJECT and/or Owasco, PC.

12.     For the tax years 2014 through 2017, the SUBJECT received IRS Forms W-2, Wage and Tax Statement ("Form W-2") from various sources, including the law firm Boies, Schiller & Flexner, LLP and his corporation, Owasco, PC.

13.     As described more below, the SUBJECT has not filed Forms 1040 for several tax years.  In several years relevant to this Affidavit, however, the IRS received an IRS Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return ("Application for Extension") for the SUBJECT.  By filing an Application for Extension, a taxpayer can automatically extend his or her time to file a tax return for up to six months (for example, from April 15 to October 15).  The Application for Extension does not, however, extend the time a taxpayer has to *pay* taxes owed.  When filing the Application for Extension, the taxpayer is also required to estimate and pay his or her total tax liability.

14.     IRS records, as of December 2, 2019, show the following information regarding the SUBJECT's Forms 1040 and tax payments for the 2014 through 2018 tax years:[2]

---

[2] As of December 2, 2019, the IRS has not received Forms 1040 for the SUBJECT for the tax years 2016, 2017, and 2018.

| | 2014 | 2015 | 2016 No Return Filed | 2017 No Return Filed | 2018 No Return Filed |
|---|---|---|---|---|---|
| Wages | $819,500 | $745,372 | - | - | - |
| Interest Income | $154 | $137 | - | - | - |
| Taxable Refunds | $357 | $1,267 | - | - | - |
| Schedule D Income | $0 | $609,786 | - | - | - |
| Schedule E Income | $24,880 | $292,395 | - | - | - |
| Other Income | $2,437 | $829,251 | - | - | - |
| Total Income Per Tax Return | $847,328 | $2,478,208 | - | - | - |
| Taxable Income Per Tax Return | $721,166 | $2,335,597 | - | - | - |
| Total Tax Per Tax Return | $239,076 | $820,801 | - | - | - |
| Federal Income Tax Withholdings Per Tax Return (From Form W-2 Wages) | $231,725 | $206,087 | N/A | N/A | N/A |
| Federal Income Tax Withholdings Per IRS Records (From Forms W-2 Wages) | N/A | N/A | $399,887 | $123,857 | $38,465 |
| Other Taxes Paid Per Tax Filings (including excess social security withholdings, estimated tax payments made and payments made with extensions) | $15,271 | $438,694 | $30,000[3] | $0 | $0 |
| Other Taxes Paid after Tax Filings Per IRS Records | - | $70,000 | - | - | - |
| Total Taxes Paid to Date Per IRS Records | $246,996 | $714,781 | $429,887 | $123,857 | $38,465 |
| Tax Refunds Issued Per IRS Records | $7,920 | - | N/A | N/A | N/A |
| Total Tax, Penalties and Interest Outstanding Per IRS Records | - | $159,721 | N/A | N/A | N/A |

[3] While no Form 1040 was filed, the SUBJECT filed and/or caused to be filed an Application for Extension for his 2016 Form 1040 along with a $30,000 tax payment.


15.     IRS records, as of December 2, 2019, show the following information reported on Owasco, PC's corporate tax returns for the 2014 through 2018 tax years[4]:

|  | 2014 | 2015 | 2016 | 2017 No Return Filed | 2018 No Return Filed |
|---|---|---|---|---|---|
| Gross Receipts | $17,500 | $316,666 | $1,550,965 | - | - |
| Capital Gain | $0 | $293,477 | $0 | - | - |
| Other Income | $700,918 | $885 | $6,335 | - | - |
| Total Income Per Tax Return | $718,427 | $611,195 | $1,557,307 | - | - |
| Officer Comp. | $600,000 | $365,403 | $1,295,000 | - | - |
| Other Deductions | $66,573 | $264,046 | $117,043 | - | - |
| Total Deductions | $666,573 | $629,449 | $1,412,043 | - | - |
| Taxable Income Per Tax Return | $13,339 | $(18,254) | $127,010 | - | - |
| Total Tax Per Tax Return | $4,669 | $0 | $44,454 | - | - |
| Total Taxes Paid Prior to April 15th Per IRS Records | $6,000 | $9,000 | - | - | - |
| Total Taxes Paid after Tax Filings Per IRS Records | - | - | $45,673 | | |
| Total Taxes Paid to Date Per IRS Records | $6,000 | $9,000 | $45,673 | - | - |
| Tax Refunds Issued Per IRS Records | $(1,331) | $(9,000) | - | - | - |

## STATEMENT OF PROBABLE CAUSE

### A.  *2014 Tax Year*

16.     As described below, there is probable cause to believe that the SUBJECT filed a false Form 1040 for tax year 2014, in violation of 26 U.S.C. § 7206(1), by failing to report at least $315,000 in income that he received for serving as a director of a Ukrainian natural gas producer.

17.     In April 2014, the SUBJECT was appointed to the board of directors of Burisma Holdings Limited ("Burisma"), Ukraine's largest private natural gas producer.  This is confirmed

---

[4] As of December 2, 2019, the IRS has not received corporate tax returns for Owasco, PC for the tax years 2017 and 2018.

by multiple sources. Burisma's website, dated August 1, 2016, featured a photo of the SUBJECT, noting his appointment as "Director" in April 2014. News articles, including in the *New York Times* and *The New Yorker*,[5] also reported that the SUBJECT was appointed to Burisma's board in April 2014. In the *New York Times* article, the SUBJECT acknowledged his role with Burisma and stated: "I explicitly limited my role to focus on corporate governance best practices to facilitate Burisma's desire to expand globally."

18.     Burisma's website and the *New York Times* article also stated that Devon Archer ("Archer") was appointed to the board of directors of Burisma at approximately the same time that the SUBJECT was. According to IRS tax filings and *The New Yorker* article, the SUBJECT and Archer have ownership interests, directly or indirectly, in a number of the same business entities and they are involved together in multiple business ventures, both domestic and international.

19.     According to IRS and public records, Rosemont Seneca Bohai LLC ("RSB") is a partnership in which Archer holds a 99% interest. According to bank records from Morgan Stanley, starting in or around April 15, 2014, two Morgan Stanley bank accounts held in the name of RSB ("RSB Morgan Stanley Accounts") began receiving payments from a bank account held by Burisma at AS Privatbank located in Latvia. Each month, Burisma typically sent two separate payments of approximately $83,333.33 to the Morgan Stanley Accounts. All told, in 2014, Burisma transferred approximately $1,538,503 to the RSB Morgan Stanley Accounts.

20.     A review of financial records shows no direct payment from Burisma to the SUBJECT in 2014. However, between June 2014 and December 2014, the RSB Morgan Stanley

---

[5] Kenneth P. Vogel and Luliia Mendel, "Biden Faces Conflict of Interest Questions That Are Being Promoted by Trump and Allies," N.Y. Times, May 1, 2019, *available at* www.nytimes.com/2019/05/01/us/politics/biden-son-ukraine.html.; Adam Entous, *Will Hunter Biden Jeopardize His Father's Campaign?*, The New Yorker, July 1, 2019, at www.newyorker.com/magazine/2019/07/08/will-hunter-biden-jeopardize-his-fathers-campaign.

Accounts sent multiple wire transfers totaling approximately $315,000 to the SUBJECT's two personal bank accounts at USAA.

21.    Given the structure of the monthly payments, whereby Burisma sent two separate and equal payments to the RSB Morgan Stanley Accounts, beginning in the month Archer and the SUBJECT joined Burisma's board of directors, there is probable cause to believe these payments represent directors' fees for Archer and the SUBJECT.  Moreover, as set forth below, payments from Burisma were identified on the SUBJECT's 2015 Form 1040 as either consulting and/or directors' fees.

22.    In April 2015, an Application for Extension was filed for the SUBJECT.  In or around October 2015, the SUBJECT filed his 2014 Form 1040, which was signed under penalty of perjury.  The SUBJECT filed jointly with his then-wife and William Morgan ("Morgan") of Morgan Wingate & Co., PC, is listed as the paid preparer of the Form 1040.[6]  On his 2014 Form 1040, the SUBJECT reported $819,500 in wages and a handful of other, minor sources of income adding up to a total income of $847,328.  The wages reported comprised $216,000 from Boies Schiller & Flexner, LLP, $3,500 from Georgetown University, and $600,000 from Owasco, PC. All of these amounts were reported on Forms W-2 issued to the SUBJECT and were attached to the tax return.  Despite receiving at least $315,000 from Burisma, the SUBJECT's Form 1040 does not reflect any of that income.[7]  Therefore, there is probable cause to believe that the SUBJECT filed a false 2014 Form 1040 in violation of 26 U.S.C. § 7206(1).

---

[6] The Washington Post reported that William Morgan died on or about June 26, 2019. *See* "William "Bill" Morgan, Jr." *available at* https://www.legacy.com/obituaries/washingtonpost/obituary.aspx?fhid=2167&n=william-morgan-bill&pid=193272189

[7] I have also examined the $600,000 in wages reported from Owasco, PC on the SUBJECT's 2014 Form 1040, and while the investigation has not yet identified the ultimate source of these funds, it

**B.  *2015 Tax Year***

23.     As described below, there is probable cause to believe that the SUBJECT (1) evaded payment of some of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201; and (2) willfully failed to pay all of his 2015 individual income taxes, in violation of 26 U.S.C. § 7203.

24.     According to bank records from Morgan Stanley, in 2015, Burisma continued sending payments to the RSB Morgan Stanley Accounts, as well as another RSB account held at Bank of New York Mellon ("RSB Bank of New York Account"). Similar to the 2014 payments, these accounts received two separate payments of approximately $83,333.33 each month from bank accounts held by Burisma at AS Privatbank, Hellenic Bank LTD, and the Bank of Cyprus Public Company LTD. The total in 2015 paid by Burisma to the RSB Morgan Stanley Accounts and RSB Bank of New York Account was approximately $2,142,363. The memo lines of the wire details indicate they were for "consulting services" or "Monthly Director Fee."

25.     Bank records from various financial institutions further show that during 2015, the RSB Morgan Stanley Accounts sent multiple wires totaling approximately $295,333 to the

---

does not appear to represent the payments from Burisma. According to its tax filings, Owasco, PC is a corporation wholly owned by the SUBJECT. Owasco, PC filed a 2014 Form 1120. This return was also prepared by Morgan. Most of the income Owasco, PC reports was derived from its 75% ownership of Skaneateles, LLC, a partnership. In turn, the vast majority of the income Skaneateles, LLC reported on its 2014 Form 1065 was derived from its 83% ownership of Seneca Global Advisors, LLC and its 99.5% ownership of RSP Holdings, LLC. The 2014 Forms 1065 for Seneca Global Advisors, LLC and RSP Holdings, LLC did not specifically identify the sources of the majority of their income. Nothing on the Owasco, PC, Skaneateles, LLC, Seneca Global Advisors, LLC, or RSP Holdings, LLC tax returns mentioned any income from Burisma, nor do the amounts reported on these returns match the Burisma payments. Moreover, the transfers of these fees were made to the SUBJECT's personal bank account. Finally, as noted above, in the subsequent tax year, the SUBJECT reported Burisma director's fees on his 2015 Form 1040, separate and in addition to reporting wages from Owasco, PC.

SUBJECT's USAA personal bank accounts, the same two personal bank accounts that received $315,000 during 2014. The RSB Morgan Stanley Accounts sent an additional wire totaling approximately $97,979 to a third USAA personal bank account in which the SUBJECT was signatory of.[8] The total paid by the RSB Morgan Stanley Accounts to the SUBJECT's three personal USAA accounts was approximately $393,312. In addition to these transfers, the RSB Morgan Stanley Accounts sent three wires totaling approximately $20,000 to a Wells Fargo account held by Owasco, PC ("Owasco, PC Wells Fargo Account"). The SUBJECT was a signatory on this account as well as its owner. In addition to these transfers, in December of 2015, the RSB Bank of New York Account sent multiple wires totaling $171,666.33 to the Owasco, PC Wells Fargo Account. The total paid by the RSB Morgan Stanley Accounts and RSB Bank of New York Account to the SUBJECT and Owasco, PC Wells Fargo Account in 2015 was approximately $584,979. As in 2014, Burisma sent no payments directly to the SUBJECT in 2015. Accordingly, there is probable cause to believe that the $584,979, just like the $315,000 received in 2014, were Burisma director's fees.

26.    In April 2016, an Application for Extension was filed for the SUBJECT for his 2015 Form 1040. In or around October 2016, the SUBJECT filed his 2015 Form 1040. As with his 2014 Form 1040, the SUBJECT appeared to have signed this Form 1040 under the penalties of perjury, and the Form 1040 stated that Morgan was the paid preparer. On a "Statement 1" attached to his 2015 Form 1040, for "Miscellaneous Income," the SUBJECT acknowledged receiving income from Burisma in the form of directors' fees. Specifically, he reported $833,330 as "Burisma Board of Directors' Fees" and -$277,780 as a "Burisma Board of Directors' Fees

---

[8] Also listed as a signer on the SUBJECT's third USAA bank account was the SUBJECT's ex-wife, Kathleen Biden and the SUBJECT's minor daughter ████████

Referral Fee." This resulted in a reported net amount of income from Burisma of $555,550, which is slightly less than the amount received by the SUBJECT and Owasco, PC from the RSB Morgan Stanley Accounts and RSB Bank of New York Account in 2015.

27.     When the SUBJECT filed his 2015 Form 1040, the SUBJECT reported that his total tax due for 2015 was $820,801, and that while he had already paid some taxes, he still owed $176,550. According to IRS records, the SUBJECT did not pay this tax due when filing his Form 1040.

28.     On or about December 5, 2016, the IRS assessed delinquency penalties and interest totaling approximately $12,130 in connection with the 2015 Form 1040 and mailed a letter to the SUBJECT at ▮▮▮▮▮▮▮▮▮▮ in Washington DC, which was listed as the SUBJECT's mailing address on his 2015 Form 1040. This letter informed the SUBJECT of potential tax levies and the amount he owed the IRS for the 2015 tax year. According to IRS records, on or about June 29, 2017, the IRS received a letter from the SUBJECT dated May 1, 2017 regarding the delinquency. The SUBJECT also wrote a letter dated August 1, 2017 and sent with it a $10,000 payment for his 2015 individual income taxes which referenced the delinquency notice he received. In addition, the tax debt was brought to the SUJBECT's attention during divorce proceedings in the Superior Court of the District of Columbia ("the Divorce Case").[9]

---

[9] Mot. To Enjoin Further Dissipation of Marital Assets, *Biden v. Biden*, 2016 DRB 004433, at 2 (D.C. Super. Ct. Fam. Div. Feb. 23, 2017).

29.     According to Wells Fargo bank records and IRS records, beginning around May 1, 2017, and ending on or about March 5, 2018, the SUBJECT made seven separate $10,000 payments to the IRS totaling $70,000 for the 2015 tax year. Each of these payments was a personal check signed by the SUBJECT and drawn on a personal account he had at Wells Fargo. When he stopped paying the IRS in March 2018, the SUBJECT still owed the IRS over $100,000 for 2015. The unpaid amount continued accumulating interest and, as of October 16, 2019, the SUBJECT owed approximately $159,721 for the 2015 tax year. As of December 2, 2019, the SUBJECT has not made any payment to the IRS for that tax year since March 5, 2018.

30.     As explained in more detail below, between 2016 (when he filed his 2015 Form 1040 and failed to pay his self-assessed taxes in full) and 2018 (when he stopped making $10,000 a month payments on his 2015 tax debt), the SUBJECT received significant sums of money, well in excess of what he owed for his 2015 tax debt, yet he did not pay in full the tax due and owing. Since the SUBJECT stopped paying the IRS on March 5, 2018 for any of his taxes owed, the SUBJECT's business bank accounts have received alleged income deposits of approximately $2,975,507. Additionally, the business bank accounts have made significant transfers to the SUBJECT's personal accounts and payments on his behalf.

31.     Moreover, as discussed below, there is probable cause to believe that the SUBJECT filed or caused to be filed false Applications for Extension for his 2016, 2017, and 2018 Forms 1040. These Applications for Extension significantly underreported his tax liabilities for those years. By doing so, the SUBJECT also concealed from the IRS that he was earning substantial income in those years, thus hiding funds on which the IRS could seek to collect to pay off the SUJBECT's outstanding tax debt for 2015. Therefore, there is probable cause to believe that the SUBJECT has evaded payment of his 2015 individual income taxes, in violation of 26 U.S.C.

13

§ 7201, and willfully failed to pay all of his 2015 individual income taxes, in violation of 26 U.S.C. § 7203.

### C. *2016 Tax Year*

32.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment of his individual income taxes for the tax year 2016, in violation of 26 U.S.C. § 7201; and (2) willfully failed to timely file his Form 1040 for the tax year 2016, in violation of 26 U.S.C. § 7203.

33.    According to Wells Fargo bank records, in 2016, Burisma bank accounts held at the Bank of Cyprus and the Cyprus Development Bank began making regular monthly payments to the Owasco, PC Wells Fargo Account.[11]  The Owasco, PC Wells Fargo Account received nine months of regular wires of $83,333 and three additional wires in the amounts of $83,731, $84,992, $83,293 from Burisma, for a total of approximately $1,002,017.  Each of the wires from Burisma stated "RFB/ Owasco, PC/ Robert Biden."

34.    According to Wells Fargo and Bank of America bank records, during 2016, in addition to the Burisma payments, the Owasco, PC Wells Fargo Account received $551,005 from a Bank of America account held in the name of Robinson Walker, LLC ("Robinson Walker Bank of America Account").  According to IRS records, Robinson Walker, LLC is controlled by John Robinson Walker, who is a business associate of the SUBJECT's and a signer on the Robinson Walker Bank of America Account.  Beginning in or around February 2016, through on

---

[11] In addition to Burisma paying the Owasco, PC Wells Fargo Account, Burisma started to make payments to Archer's personal bank account held at Citibank during the 2016 tax year. In 2016, Archer's Citibank bank account received approximately half of what Archer and the SUBJECT jointly received in 2015 (approximately $916,663), thus supporting that in 2014 and 2015 Archer received funds for both himself and the SUBJECT.

or about May 26, 2017, the Robinson Walker Bank of America Account received payments totaling approximately $2,561,718 from an account at the Bank of Cyprus in the name of Bladon Enterprises Limited ("Bladon").[12]  $2,203,546 of this amount was paid in 2016 and the remaining $358,172 was paid in 2017.  Almost immediately after receiving these payments, the Robinson Walker Bank of America Account typically divided the payments into three equal shares, sending one-third to the Owasco, PC Wells Fargo Account, one-third to Walker's personal account, and one-third to an account in Abu Dhabi held in the name of European Energy and Infrastructure.

35.    In or around April 2017, the SUBJECT did not file a Form 1040, but did file an Application for Extension.  The application reported a tax liability of $30,000.  Around the same time, the SUBJECT submitted a $30,000 payment to the IRS in the form of a check personally signed by the SUBJECT.  Because of the Application for Extension, the SUBJECT's Form 1040 was due no later than October 15, 2017.  He did not file a Form 1040 by that date, or any date since.  On or about August 6, 2018, the IRS mailed a non-filing notice to the SUBJECT to his address of record at the IRS:  2900 K Street NW, Washington, DC 20007.  Public records confirm that this is an address associated with the SUBJECT.

36.    While the SUBJECT failed to file a 2016 Form 1040, later, in or around July 2018, Owasco, PC untimely filed its 2016 corporate tax return, signed by the SUBJECT and prepared by Morgan.  On a Form 1120-E ("Compensation of Officers"), attached to Owasco, PC's corporate tax return, the company reported a deduction of $1,295,000 for compensation paid to the

---

[12] A news article stated that Bladon was a real estate development corporation registered in Cyprus that operated in Romania that was owned by a Romanian citizen, Gabriel Popoviciu.  *See Romanian Investor Develops Large Residential Complex in Office Area*, Romania-Insider, October 6, 2016 at https://www.romania-insider.com/romanian-investor-develops-large-residential-complex-office-area.

SUBJECT. Consistent with this, IRS records also show that for the tax year 2016, Owasco, PC issued a Form W-2 to the SUBJECT reporting wages of $1,295,000 and $361,620 in federal income tax withholdings. The Owasco, PC Wells Fargo Account bank records show multiple payroll payments and transfers from that account to the SUBJECT in 2016. IRS records also show a Form W-2 to the SUBJECT issued from Boies, Schiller, & Flexner, LLP reporting wages of $216,000 and $38,267 in federal income tax withholdings.

37.    For 2016, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $20,700 of gross income. Accordingly, based on the income and withholdings reported on the Forms W-2, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040. Based on this reported individual income of approximately $1,500,000, using a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000, and giving credit for the $30,000 estimated payment and the $399,887 in federal tax withholdings, there is probable cause to believe the SUBJECT had substantial unreported and unpaid taxes for the 2016 tax year.[13] Accordingly, there is probable cause to believe that the SUBJECT has evaded the assessment of his 2016 individual income taxes, in violation of 26 U.S.C. § 7201, and willfully failed to file a 2016 Form 1040, in violation of 26 U.S.C. § 7203.

**D.    *2017 Tax Year***

38.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment of his individual income taxes for the tax year 2017 by, among other things,

---

[13] For purposes of this warrant, I have assumed that the $1,295,000 in compensation reported by Owasco, PC as paid to the SUBJECT represented the majority of the funds the Owasco, PC Wells Fargo Account received from Burisma and Robinson Walker, LLC.

filing a false Application for Extension and paying for personal expenses directly from the Owasco, PC Wells Fargo Account, in violation of 26 U.S.C. § 7201; (2) willfully failed to timely file his Form 1040 for the tax year 2017, in violation of 26 U.S.C. § 7203; and (3) willfully failed to timely file a corporate tax return for Owasco, PC, in violation of 26 U.S.C. § 7203.

39.     According to records provided by Wells Fargo, in 2017, the Owasco, PC Wells Fargo Account received regular wires from Burisma, as well as significant sums from several other sources.  The Owasco, PC Wells Fargo Account received regular monthly wires from Burisma totaling approximately $630,556.  The memo lines for each wire stated "RFB/ Owasco, PC/ Robert Biden."

40.     In addition to the Burisma payments, in 2017 the Owasco, PC Wells Fargo Account received other substantial deposits, totaling $2,761,959, to its bank account as follows:

     a.   deposits and wires totaling approximately $1,445,387 from Hudson West III LLC as further described in paragraphs 41-43 below;

     b.   a wire for approximately $100,000 from CEFC Infrastructure Inv;

     c.   deposits and transfers totaling approximately $666,572 from Skaneateles LLC as further described in paragraph 44 below; and

     d.   deposits and wires totaling approximately $550,000 from Robinson Walker LLC and approximately $61,727 from John R. Walker's personal bank account for a total of approximately $611,727 as further described in paragraph 45 below.

41.     In 2017, the Owasco, PC Wells Fargo Account received regular wires from Hudson West III, LLC ("HWIII").  According to records provided by Cathay Bank, at the time of

its formation, HWIII was solely owned by Hudson West V, LLC ("HWV").[14]  Cathay Bank records indicated that an individual named Gongwen Dong ("Dong") was the president of HWV and a signatory on the HWIII Cathay Bank account.   According to Manta.com, a website listing business information, Dong is also the Director of U.S.-based CEFC Infrastructure.

42.    HWIII  had  two  accounts  at  Cathay  Bank,  ending  in  -8969  and  -8992 ("HWIII Cathay Bank Accounts").  The HWIII Cathay Bank account ending in -8969 was opened in August of 2017 and closed in November of 2018; the HWIII Cathay Bank account ending in -8992 was opened in October of 2017 and closed in November of 2018.  Dong served as the original signatory authority for both accounts.  According to Cathay Bank, the accounts were funded by a $5 million loan from Northern International Capital wired in from DBS Bank in Hong Kong. According to Cathay Bank, the parties did not have a formal loan agreement but agreed that the loan would accrue 5% interest and HWIII would repay the loan once it had cash flow.

43.    Based on records provided by Cathay Bank, on August 2, 2017, HWV and Owasco, PC entered into an "Amended and Restated Limited Liability Company Agreement of HWIII" ("HWIII Amended LLC Agreement").  Through the HWIII Amended LLC Agreement, Owasco, PC and HWV each took 50% ownership of HWIII.[15]  Dong signed the HWIII Amended LLC Agreement as president of HWV and the SUBJECT signed the agreement as the co-chairman of

---

[14] According to records provided by Cathay Bank, HWV is owned by Kaiyan US Fund III LP, which is owned by multiple unknown entities.

[15] According to email correspondence referenced by Cathay Bank, on or about April 2, 2018, HWV's 50% ownership interest in HWIII was transferred to Coldharbour Capital LLC. Cathay Bank records indicate that Coldharbour Capital LLC is 50% owned by Mervyn Yan and 50% owned by an unknown individual.  Owasco, PC retained its 50% ownership in HWIII. Shortly thereafter, on April 12, 2018, Yan and the SUBJECT became signatories on the HWIII Cathay Bank Accounts.

Owasco, PC. Under the HWIII Amended LLC Agreement, the SUBJECT was named a manager of HWIII and was entitled to compensation of $100,000 per month and a one-time retainer fee of $500,000. According to the HWIII Amended LLC Agreement, the SUBJECT, through Owasco, PC, contributed no capital to HWIII. Other records provided by Cathay Bank showed that after the execution of the HWIII Amended LLC Agreement, HWIII began making regular monthly transfers to the Owasco, PC Wells Fargo Account. The HWIII Cathay Bank Accounts made no transfers to any personal accounts attributed to the SUBJECT. In total, from August 2, 2017, through the end of 2017, approximately $1,445,387 was transferred from the HWIII Cathay Bank accounts to the Owasco, PC Wells Fargo Account. According to bank records, $555,000 was then transferred to an account at PNC Bank held in the name of the Lion Hall Group.[16] After accounting for these transfers, the amounts to the Owasco, PC Wells Fargo Account is consistent with the HWIII Amended LLC Agreement.

44.     Since some time in 2015, the SUBJECT has owned 75% of Skaneateles LLC ("Skaneateles"), through Owasco, LLC.[17] Skaneateles is a partnership and considered a flow-through entity for tax purposes, meaning income and deductions would appear on the SUBJECT's Form 1040. According to IRS records, Skaneateles issued a Schedule K-1[18] to Owasco, LLC,

---

[16] According to records from PNC Bank, the Lion Hall Group is a company owned by the SUBJECT's uncle, James Biden and his wife, Sara Biden. Under the HWIII Amended LLC Agreement, James Biden also served as a manager of HWIII and was entitled to $65,000 a month in compensation.

[17] According to IRS records, Owasco, PC transferred its ownership of Skaneateles, LLC to Owasco, LLC in 2015.

[18] A Schedule K-1 is an income document which is filed with the IRS for partnership tax returns. The Schedule K-1 reports the ownership interest in the entity, information for the partner's capital account and any income and deductions which flow through from the entity which is required to be reported on the owner's tax return.

which reported the following income and deductions: ordinary Business Loss of $(116,763), guaranteed payments of $37,000, interest income of $54, net long-term capital gain of $450,256, net section 1231 loss of $(25), other income of $39,025, and other deductions of $5,826.

45.    IRS records indicate that Robinson Walker LLC issued a Form 1099-MISC to Owasco, PC, showing $400,000[19] of non-employee compensation and a second Form 1099-MISC to the SUBJECT reporting Non-Employee Compensation of $201,198.

46.    IRS records also indicate that Owasco, PC issued a Form W-2 to the SUBJECT, reporting wages of $427,854 and $122,352 of income tax withholdings for the 2017 tax year. In addition, Boies, Schiller & Flexner LLP, also issued a Form W-2 to the SUBJECT, reporting wages of $48,000 and $1,505 of income tax withholdings.

47.    In addition to the deposits made to the Owasco, PC Wells Fargo Account in 2017, there were multiple expenditures made from that account in 2017 that appear to be personal in nature.[20] Personal expenditures made from business bank accounts in this situation would result in taxable income to the SUBJECT. These distributions include, but are not limited to, the following:

---

[19] It is unknown at this time why there is an approximately $211,727 difference between the Form 1099 and actual amounts paid to Owasco, PC reflected in the bank records.

[20] Based on my review bank records, prior to 2017, the SUBJECT appeared to use the Owasco, PC Wells Fargo Account for solely business purposes, and in lieu of paying for personal expenditures directly from the Owasco, PC Wells Fargo Account he instead transferred funds to his personal bank accounts.

| Item Description | Amount Paid in 2017 |
| --- | --- |
| Payments to the SUBJECT's personal bank accounts | $1,297,433 |
| Payments to Columbia University | $33,287 |
| Payments made to suspected escorts | $22,500 |
| Payments to pornographic websites | $7,328 |
| Payments to Ain & Bank PC – Family Law Firm[21] | $52,000 |
| Total | $1,412,548[22] |

48.     While it appears that at least $1,412,548 in payments from the Owasco, PC Wells Fargo Account in 2017 were personal in nature, nearly all of the approximately $2,823,686 deposited into the account in 2017 were spent over the course of the year. In previous years, when the SUBJECT filed corporate tax returns for Owasco, PC, the corporation's expenses—other than wages or compensation paid to the SUBJECT—were relatively small compared to the corporation's income. Many of the other funds spent from the Owasco, PC Wells Fargo Account could be personal expenses, but your affiant is taking a relatively conservative calculation of only treating $1,412,548 as personal in nature.

49.     For 2017, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $20,800 of gross income. Accordingly, based on the income and withholdings reported on the Schedule K-1 to Owasco, LLC, the 1099-MISC for $201,198 from Robinson Walker LLC to the SUBJECT, the W-2 from Owasco, PC to the SUBJECT, the W-2 from Boies, Schiller & Flexner LLP to the SUBJECT, and the additional income attributable to personal distributions from Owasco, PC, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040. In addition to

---

[21] Based on court filings in the SUBJECT's divorce case, this firm represented the SUBJECT.

[22] As of January 1, 2017, the Owasco, PC Wells Fargo Account had an account balance of approximately $21,700. Therefore, the $1,412,548 of expenditures described in the table above could not have been made without the alleged income deposits to the Owasco, PC Wells Fargo Account.

these forms, the SUBJECT himself confirmed a substantial level of income for 2017. According to court records in the Divorce Case, on January 6, 2017, the SUBJECT filed an "Answer to Complaint for Absolute Divorce." In paragraph 12, the SUBJECT "admits that he currently earns income sufficient to support himself and contribute to the support of his children and [Kathleen Biden]." The Answer contained an affirmation that the statements in the Answer were "true and accurate to the best of my knowledge, information, and belief" that was signed by the SUBJECT.

50.     According to IRS records, in or around April 2018, an Application for Extension was filed for the SUBJECT's Form 1040. This application reported no tax liability, and no payments accompanied it. With an Application for Extension, the SUBJECT's Form 1040 was due no later than October 15, 2018. He did not file his Form 1040 by that date. As of December 2, 2019, IRS records show that he still has not filed his 2017 Form 1040.

51.     For present purposes, excluding all 2017 income other than the $1,412,548 in personal expenses paid from Owasco, PC for the SUBJECT, there is probable cause to believe the SUBJECT had unreported and unpaid taxes in the 2017 tax year.[23] In reaching this conclusion, based on my training and experience, I have allowed for the deduction of alimony paid to SUBJECT's ex-wife of $333,000 during the 2017 tax year, used a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000,[24] and considered the $123,857 in federal tax withholdings. Thus, there is probable cause to believe that the SUBJECT willfully

[23] The Forms W-2, 1099, and Schedule K-1, which report additional income to the SUBJECT, would only increase the income taxes that he owes. To be conservative, I have not included this additional income, as some (but not all) of the income reported on those forms could have been deposited into the Owasco, PC Wells Fargo Account.

[24] This estimate is based on the largest itemized and exemption deduction used for the 2014 and 2015 tax filings for the SUBJECT.

failed to file a 2017 Form 1040, in violation of 26 U.S.C. § 7203, and that the SUBJECT evaded the assessment of his 2017 individual income taxes, in violation of 26 U.S.C. § 7201.

52.     According to IRS records, in or around June 2018, an IRS Form 7004, Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns ("Application for Corporate Extension"), was filed for Owasco, PC's 2017 corporate tax return. This application reported no tax liability, and no payments accompanied the application. With an extension, Owasco, PC's tax return was due no later than October 15, 2018. As of December 2, 2019, IRS records show that he still has not filed the Owasco, PC, 2017 Form 1120. It is clear, based on the transactions described above, that Owasco, PC existed in 2017, and therefore was required to file a corporate tax return.[25] Thus, there is probable cause to believe that the SUBJECT willfully failed to file a 2017 Form 1120 for his wholly owned corporation, Owasco, PC, in violation of 26 U.S.C. § 7203.

### E.   *2018 Tax Year*

53.     As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment of his individual income taxes for the tax year 2018 by, among other things, filing a false Application for Extension and paying for personal expenses directly from the Owasco, PC Wells Fargo Account in violation of 26 U.S.C. § 7201; (2) willfully failed to timely file his Form 1040 for the tax year 2018, in violation of 26 U.S.C. § 7203; and (3) willfully failed to timely file the 2018 corporate tax return for Owasco, PC, in violation of 26 U.S.C. § 7203.

---

[25] The SUBJECT signed Owasco, PC's 2016 corporate tax return in July 2018, just one month after the Application for Corporate Extension was filed for Owasco, PC's 2017 corporate tax return.

54.    According to records obtained from Wells Fargo, in 2018, the Owasco, PC Wells Fargo Account received regular wires from Burisma, totaling approximately $491,939. The memo lines for each wire stated "RFB/ Owasco, PC/ Robert Biden."

55.    In addition to the Burisma payments, the Wells Fargo records showed that in 2018 the Owasco, PC Wells Fargo Account received other substantial deposits, totaling $2,731,494, as follows:

      a.    approximately 15 deposits and wires totaling approximately $2,187,494 from HWIII;[26] and

      b.    a transfer from an Owasco, LLC Wells Fargo Bank account for approximately $544,000.

56.    The $544,000 transfer from the Owasco, LLC to Owasco, PC was made possible by a $1,000,000 wire received by Owasco, LLC from the HWIII Cathay Bank Accounts on or about March 22, 2018. Records from Cathay bank showed that the memo line of this $1,000,000 wire stated that the wire was for "Dr Patrick Ho Chi Ping Representation."[27] According to court records, in late 2017, Chi Ping Patrick Ho ("Ho") was charged in the Southern District of New York for violations of the Foreign Corrupt Practices Act and money laundering (Case No. 1:17-cr-779).[28] According to the indictment in that case, Ho was involved in bribing officials in Chad

---

[26] There is probable cause to believe that most of the money received from the HWIII Cathay Bank Accounts in 2018 would be considered income to the SUBJECT, and not a loan or return of capital. These payments, as in 2017, appeared to be the fees paid to the managers of HWIII as a part of the HWIII Amended LLC Agreement. *See supra* ¶ 48. According to bank records, approximately $843,999 was then transferred from the Owasco, PC Wells Fargo Account to the Lion Hall Group account at PNC Bank.

[27] This was the majority of income deposited to the Owasco, LLC bank account during 2018.

[28] According to Cathay Bank, the SUBJECT informed them that Owasco, LLC was the legal entity through which he was paid for part of his legal work. The SUBJECT never entered an appearance

and Uganda in exchange for business for the company he represented. According to a *New York Times* article, Ho was a representative of a company called CEFC China.[29] According to *The New Yorker* article, the SUBJECT became aware of a possible investigation of Ho and, prior to the indictment, agreed to represent Ho "to figure out whether Ho was in legal jeopardy in the U.S."[30] Later, in December 2018, Ho was convicted at trial.

57.     IRS records also indicate that Owasco, PC issued a Form W-2 to the SUBJECT, reporting wages of $159,000 and $38,465 of income tax withholdings for the 2018 tax year.

58.     In addition to the deposits made to the Owasco, PC Wells Fargo Account in 2018, there were multiple expenditures made from that account that appear to be personal in nature. These include, but are not limited to the following:

| Item Description | Amounts Paid in 2018 |
|---|---|
| Payments to the SUBJECT's personal bank accounts | $1,044,129 |
| Payments to Columbia University | $30,000 |
| Payments made to suspected escorts | $124,000 |
| Payments to pornographic websites | $13,008 |
| Payments to Chateau Marmont – California hotel | $43,692 |
| Payments to family members | $40,450 |
| **Total** | **$1,295,279** |

59.     As of January 1, 2018, the Owasco, PC Wells Fargo Account had an account balance of approximately $14,300. Therefore, the $1,295,279 of expenditures described above

---

on behalf of Ho in the criminal action, nor did it appear that any of the funds derived from the $1 million wire were sent to any of the law firms that entered appearances on behalf of Ho.

[29] Matthew Goldstein, *Ex-Hong Kong Official Gets Lighter Sentence in Bribery Case*, N.Y. Times, March 25, 2019 at www.nytimes.com/2019/03/25/business/cefc-china-patrick-ho-bribery.html.

[30] Adam Entous, *supra* note 5.

could not have been made without the alleged income deposits to the Owasco, PC bank account. These expenditures appear personal in nature and would result in taxable income to the SUBJECT.

60.    For 2018, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $24,000 of gross income. Accordingly, based on the income and withholdings reported on the Schedule K-1 to Owasco, LLC, the Form W-2 from Owasco, PC to the SUBJECT, and the additional income attributable to personal distributions from Owasco, PC, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040 for the tax year 2018.

61.    In or around April 2019, an Application for Extension was filed for the SUBJECT's 2018 Form 1040. This application reported no tax liability, and no payments accompanied the application. With an extension, the SUBJECT's Form 1040 was not due until October 15, 2019. As of December 2, 2019, the IRS has not received the SUBJECT's 2018 Form 1040.

62.    For present purposes, excluding all 2018 income other than the $1,295,279 in personal expenses paid from Owasco, PC Wells Fargo Account for the SUBJECT, along with the $456,000 that HWIII paid to Owasco LLC that was not then transferred to the Owasco, PC Wells Fargo Account, there is probable cause to believe the SUBJECT had unreported and unpaid taxes in the 2018 tax year.[31] In reaching this conclusion, based on my training and experience, I have used a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000,[32] and considered the $38,465 in federal tax withholdings. Thus, there is probable cause

---

[31] The Forms W-2, 1099, and Schedule K-1, which report additional income to the SUBJECT, would only increase the income taxes that he owes. To be conservative, I have not included this additional income, as some (but not all) of the income reported on those forms could have been deposited into the Owasco, PC Wells Fargo Account.

[32] This estimate is based on the largest itemized and exemption deduction used for the 2014 and 2015 tax filings for the SUBJECT.

26

to believe that the SUBJECT willfully failed to file a 2018 Form 1040, in violation of 26 U.S.C. § 7203, and that the SUBJECT evaded the assessment of his 2018 individual income taxes, in violation of 26 U.S.C. § 7201.

63.    According to IRS records, in or around July of 2019, an IRS Form 7004, Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns ("Application for Corporate Extension"), was filed for Owasco, PC's 2018 corporate tax return. This application reported no tax liability, and no payments accompanied the application. With an extension, Owasco, PC's Form 1120 was due no later than October 15, 2019. As of December 2, 2019, no corporate tax return has been received by the IRS for Owasco, PC for the 2018 tax year. It is clear, based on the transactions described above, that Owasco, PC existed in 2018, and therefore was required to file a corporate tax return. Thus, there is probable cause to believe that the SUBJECT willfully failed to file a 2018 Form 1120 for his wholly owned corporation, Owasco, PC, in violation of 26 U.S.C. § 7203.

### F.    *Target MacBook Pro and Target External Hard Drive*

64.    On or about November 7, 2019, following a tip provided to law enforcement, FBI Special Agents interviewed Confidential Witness #1 (hereinafter "CW1"). CW1 is the owner of a computer store located in Wilmington, DE (hereinafter "Wilmington Computer Store"). The following paragraphs are based on information provided by CW1 to law enforcement.

65.    On or about April 12, 2019, the SUBJECT brought three Apple brand laptop computers, including the TARGET MACBOOK PRO, to the Wilmington Computer Store for repair. According to CW1, the SUBJECT was seeking to repair these computers and retrieve data from these computers because they were either damaged or malfunctioning. The SUBJECT informed CW1 that the computers, including the TARGET MACBOOK PRO, belonged to him.

27

CW1 inspected the computers to assess whether CW1 could repair and retrieve data from these computers. Based on this inspection, CW1 only retained the TARGET MACBOOK PRO for further repair and data retrieval. Accordingly, CW1 returned the other two Apple computers back to the SUBJECT and retained the TARGET MACBOOK PRO in CW1's possession at the Wilmington Computer Store for repairs. The SUBJECT also provided a password to CW1 to access the TARGET MACBOOK PRO, even though CW1 did not require a password to access the data and complete the requested repairs.

66.    On or about April 12, 2019, the SUBJECT signed an invoice for the repair and recovery services for the TARGET MACBOOK PRO, which included a total labor cost of $85.00. Payment for the labor cost was due at the time the services were completed. The invoice also contained language that indicated if the SUBJECT's computer equipment was left with the Wilmington Computer Store for a period of 90 days after the SUBJECT was notified that services were completed, the equipment would be treated as abandoned and the Wilmington Computer Store would be held harmless for any damage or loss of the property. The SUBJECT left a telephone number         , an email address (rhbdc@icloud.com), and an online billing account for CW1 to contact him when the repair services were complete.

67.    According to CW1, prior to starting any repairs on the TARGET MACBOOK PRO, CW1 requested that the SUBJECT provide an external hard drive so that CW1 could back-up the data from the TARGET MACBOOK PRO to the external hard drive. On or about April 16, 2019, the SUBJECT provided CW1 the TARGET EXTERNAL HARD DRIVE.

68.    According to CW1, the data from the TARGET MACBOOK PRO could be accessed by CW1 while the computer was being repaired. As part of the repair service, CW1 created a backup file of the TARGET MACBOOK PRO's data, which was saved to the

Wilmington Computer Store's server. According to CW1, backup files such as the file previously described are typically retained for several weeks after the customer retrieves their device before being purged. This is done as a precautionary measure for the customer in the event that they are unable to access their data after their device is returned. CW1 also backed-up the data from the TARGET MACBOOK PRO onto the TARGET EXTERNAL HARD DRIVE.

69.    On or about April 17, 2019, CW1 completed the computer repair and data recovery services for the TARGET MACBOOK PRO.

70.    Between on or about April 17, 2019, and on or about April 24, 2019, CW1 made several attempts to notify the SUBJECT that the repair and data recovery services for the TARGET MACBOOK PRO were complete and that payment was now due for these services. CW1 initially left a voicemail for the SUBJECT by calling the ▇▇▇▇▇▇ telephone number provided by the SUBJECT. CW1 next used an online billing application to submit a request for payment to the SUBJECT. Finally, CW1 left another voicemail at the ▇▇▇▇▇ provided by the SUBJECT and sent another request for payment using the online billing application. As of the date of this affidavit, the SUBJECT has not retrieved, or caused any other person to retrieve, the TARGET MACBOOK PRO or the TARGET EXTERNAL HARD DRIVE from the Wilmington Computer Store, nor has he made any payment for the completed services, or contacted the store regarding the status of these devices.

71.    In or around late July 2019, CW1 became aware of media reports regarding the SUBJECT and his connection to the country of Ukraine. CW1 became curious about information contained on the SUBJECT's TARGET MACBOOK PRO. CW1 accessed the Wilmington Computer Store's server and viewed certain portions of the backup data from the TARGET MACBOOK PRO, including emails sent to and from the SUBJECT, between the years 2014-2019.

29

At the time he did this, CW1 did not inform anyone that CW1 was intending to access the data, nor was CW1 ordered, directed, or advised to do so by anyone, including any law enforcement officer.

72.    CW1 viewed "hundreds" of emails between the SUBJECT and other individuals. These emails related to Burisma, as well as communications between the SUBJECT and Devon Archer, Eric Schwerin, and other individuals. CW1 observed, for example, that Schwerin assisted the SUBJECT with his finances. Based on the investigation, I know that Schwerin is the SUBJECT's business partner[33] and that bank records from Wells Fargo show that Schwerin is a joint signer for the SUBJECT's Owasco, PC bank account, and retains power of attorney status for the SUBJECT'S Owasco, LLC bank account. Accordingly, there is probable cause to believe that the SUBJECT and Schwerin communicated about business dealings, payments, expenditures, and tax-related topics.

73.    CW1 also observed emails between the SUBJECT and an assistant with the first name of either Katie or Kathy (whom I believe to be Katie Dodge), with whom he corresponded. According to Dodge's LinkedIn profile, she was employed as the Executive Assistant to the President at Rosemont Seneca Partners from October 2012 to June 2015. After that time, Dodge

---

[33] Publicly available information indicates that Schwerin and the SUBJECT have been owners of and/or employed by the same business entities for over 15 years. For example, Schwerin and the SUBJECT were partners at a lobbying firm, Oldaker, Biden & Belair, LLP, from approximately 2002 through 2008. In or around 2009, Schwerin, the SUBJECT and others founded and continue to operate Rosemont Seneca Partners, LLC, where Schwerin has served as Founding Partner and Managing Director since the entity's founding. *See* The White House Office of the Press Secretary, *President Obama Announces More Key Administration Posts*, March 10, 2015 at https://obamawhitehouse.archives.gov/the-press-office/2015/03/10/president-obama-announces-more-key-administration-posts; Associated Press, *Biden's Son Ends D.C. Lobby Work*, Sept, 13, 2008 at https://www.latimes.com/archives/la-xpm-2008-sep-13-na-bidenson13-story.html; Adam Entous, *supra* note 5.

remained involved in the financial management of the SUBJECT's business entities. According to records received from the payroll company ADP LLC, between May 2018 and December 2018, Dodge was the listed contact for Owasco, PC, listing the <u>dodgekatie</u> ▮▮▮▮▮▮ account, and was on the Owasco, PC payroll during that time. In addition, she signed the contract with ADP LLC on behalf of Owasco, PC on May 1, 2018, listing her title as "administrator." Based on bank and payroll records, Dodge received payroll disbursements from Owasco, PC in 2018, as well as payments from the SUBJECT's personal Wells Fargo Account and/or the Owasco, PC's Wells Fargo Account through February 2019. Accordingly, there is probable cause to believe that the SUBJECT and Dodge communicated about the nature, purpose, and circumstances surrounding Owasco, PC's business dealings and payments and expenditures made by, on behalf of or for the benefit of the SUBJECT and/or his business entities.

74.    Based upon the emails viewed by CW1, CW1 became concerned about CW1's personal safety and the Wilmington Computer Store's reputation. Because of this, CW1 deleted the TARGET MACBOOK PRO's backup file from the Wilmington Computer Store's server.

75.    Based on information received from Apple, the TARGET MACBOOK PRO was registered to the SUBJECT's Apple iCloud account on October 21, 2018, which utilized the SUBJECT's Apple ID and the SUBJECT's email address of rhbdc@icloud.com. The TARGET MACBOOK PRO was also registered to the address of 1209 Barley Mill Road, Wilmington, Delaware, and the phone number of ▮▮▮▮▮▮ which I know are both associated with the SUBJECT. For example, the ▮▮▮▮ address is the location where the SUBJECT's father resides and is also a location where the SUBJECT has been known to periodically reside. The phone number (202) 552-9396 was previously registered in the SUBJECT's name. The ▮▮▮▮▮ ▮▮▮ telephone number and the rhbdc@icloud.com email address also match the contact

31

information provided by the SUBJECT to CW1 when he requested repair work for the TARGET MACBOOK PRO. The product was described as Mac Book Pro 13.3 inches, space gray, 2.3 GHZ/8GB/256GB. Apple also provided a DSID of 436512608 for this device.

76.    The TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE are currently in the lawful possession of the FBI. It came into the FBI's possession in the following way: On or about December 9, 2019, the United States Attorney's Office for the District of Delaware issued a grand jury subpoena to CW1 for the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE. CW1 also provided consent for law enforcement agents to seize the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE. Therefore, while the FBI might already have all necessary authority to examine the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE, I seek this additional warrant out of an abundance of caution to be certain that an examination of the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE will comply with the Fourth Amendment and other applicable laws.

77.    The TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE are currently in storage at the FBI-Wilmington Resident Agency, 500 Delaware Avenue, Suite 300 Wilmington, Delaware, 19801. In my training and experience, I know that the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE first came into the possession of the FBI.

78.    Based on my training and experience and my discussions with other IRS and FBI agents and analysts, individuals who engage in tax avoidance schemes typically create multiple

32

business entities and bank accounts to make it difficult for law enforcement to trace the flow of income. Such individuals often use their computers to record and track their businesses activities, and develop income statements, tax returns and other business documents that are used to operate a business. Such individuals also typically create and save business documents and related schedules on their computers concerning their business dealings. Moreover, such individuals also typically use computers to communicate through email (or other communication platforms) with their various business partners, their employees, and individuals from whom they are receiving money, as well as with their accountants and/or tax preparers concerning business dealings, corporate structures, and the tax consequences associated with those events. These individuals may (and typically do) save or download such communications onto the computers.

79.     Based on the information discussed in the probable cause section of this affidavit as well as my training and experience, there is probable cause that the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE would contain the SUBJECT's email communication with various individuals concerning his businesses, as well as communications with other business partners and business employees, tax return preparers, and other individuals regarding the SUBJECT. There is also probable cause to believe that the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE contain evidence of business discussions, documents, presentations and schedules created by or on behalf of the SUBJECT, which are relevant to the tax offenses currently under investigation.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

80.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE, in whatever form they are found. One form in which the records

might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

81.    *Probable Cause*. There is probable cause to believe that things that were once stored on the TARGET MACBROOK PRO and the TARGET EXTERNAL HARD DRIVE may still be stored there, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system

34

configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

82.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET MACBROOK PRO and the TARGET EXTERNAL HARD DRIVE were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET MACBROOK PRO and the TARGET EXTERNAL HARD DRIVE because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage

media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

83.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET

36

MACBROOK PRO and the TARGET EXTERNAL HARD DRIVE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

84.     *Manner of execution.*  Because this warrant seeks only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### FILTER REVIEW PROCEDURES

85.     Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges.  The procedures include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

### CONCLUSION

86.     Based on the forgoing, I request that the Court issue the proposed search warrant.  I submit that this affidavit supports probable cause for a warrant to search the following property: (1) Apple MacBook Pro Laptop Computer; Serial Number FVFXC2MMHV29 ("TARGET MACBOOK PRO"); and (2) Western Digital External Hard Drive; Serial Number WX21A19ATFF3 ("TARGET EXTERNAL HARD DRIVE").  The TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE are currently located at the FBI-Wilmington Resident Agency, 500 Delaware Avenue, Suite 300 Wilmington, Delaware, 19801.

37

## REQUEST FOR SEALING

87.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Joseph A. Ziegler
Special Agent
Internal Revenue Service-
Criminal Investigation

Subscribed and sworn to before me on  December 13        , 2019

HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

38

**ATTACHMENT A**

**Property to be Searched**

The property to be searched is the following:  (1) Apple MacBook Pro Laptop Computer; Serial Number FVFXC2MMHV29 ("TARGET MACBOOK PRO"); and (2) Western Digital External Hard Drive; Serial Number WX21A19ATFF3 ("TARGET EXTERNAL HARD DRIVE").  The TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE are currently located at the FBI-Wilmington Resident Agency, 500 Delaware Avenue, Suite 300 Wilmington, Delaware, 19801.

## ATTACHMENT B

### Particular Things to be Seized

All information that constitutes fruits, contraband, evidence, and instrumentalities of tax evasion (26 U.S.C. § 7201), willful failure to file tax returns and failure to pay income tax (26 U.S.C. § 7203), and willfully filing false tax returns (26 U.S.C. § 7206(1)), those violations involving Robert Hunter Biden or any entity he owns or controls, occurring after January 1, 2014, including, for the TARGET MAC BOOK PRO and the TARGET EXTERNAL HARD DRIVE listed on Attachment A, information pertaining to the following matters:

(a) All financial and other bookkeeping information and records, including correspondence regarding the same;

(b) All records and information relating to federal, state, and foreign individual, corporate, employment and property taxes, including correspondence regarding the same;

(c) All records and information pertaining to personal and business expenditures including correspondence regarding the same;

(d) All records and information reflecting business operations and business ownership, including business incorporation documents, employment records, paychecks, business expenses, business income, investments, and work schedules, including correspondence regarding the same;

(e) Evidence indicating the state of mind of the owner and user of the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE as it relates to the crime under investigation;

2

(f) Evidence of user attribution showing who used or owned the TARGET MACBOOK PRO and the TARGET EXTERNAL HARD DRIVE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI or IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.