27.    In April 2015, an Application for Extension was filed for the SUBJECT. In or around October 2015, the SUBJECT filed his 2014 Form 1040, which was signed under penalty of perjury. The SUBJECT filed jointly with his then-wife and William Morgan ("Morgan") of Morgan Wingate & Co., PC, is listed as the paid preparer of the Form 1040.[11] On his 2014 Form 1040, the SUBJECT reported $819,500 in wages and a handful of other, minor sources of income adding up to a total income of $847,328. The wages reported comprised $216,000 from Boies Schiller & Flexner, LLP, $3,500 from Georgetown University, and $600,000 from Owasco, PC. All of these amounts were reported on Forms W-2 issued to the SUBJECT and were attached to the tax return. Despite receiving at least $315,000 from Burisma, the SUBJECT's Form 1040 does not reflect any of that income.[12] Therefore, there is probable cause to believe that the SUBJECT filed a false 2014 Form 1040 in violation of 26 U.S.C. § 7206(1).

___

[11] The Washington Post reported that William Morgan died on or about June 26, 2019. *See* "William "Bill" Morgan, Jr." *available at* https://www.legacy.com/obituaries/washingtonpost/obituary.aspx?fhid=2167&n=william-morgan-bill&pid=193272189

[12] I have also examined the $600,000 in wages reported from Owasco, PC on the SUBJECT's 2014 Form 1040, and while the investigation has not yet identified the ultimate source of these funds, it does not appear to represent the payments from Burisma. According to its tax filings, Owasco, PC is a corporation wholly owned by the SUBJECT. Owasco, PC filed a 2014 Form 1120. This return was also prepared by Morgan. Most of the income Owasco, PC reports was derived from its 75% ownership of Skaneateles, LLC, a partnership. In turn, the vast majority of the income Skaneateles, LLC reported on its 2014 Form 1065 was derived from its 83% ownership of Seneca Global Advisors, LLC and its 99.5% ownership of RSP Holdings, LLC. The 2014 Forms 1065 for Seneca Global Advisors, LLC and RSP Holdings, LLC did not specifically identify the sources of the majority of their income. Nothing on the Owasco, PC, Skaneateles, LLC, Seneca Global Advisors, LLC, or RSP Holdings, LLC tax returns mentioned any income from Burisma, nor do the amounts reported on these returns match the Burisma payments. Moreover, the transfers of these fees were made to the SUBJECT's personal bank account. Finally, as noted above, in the subsequent tax year, the SUBJECT reported Burisma director's fees on his 2015 Form 1040, separate and in addition to reporting wages from Owasco, PC.

**B.** *2015 Tax Year*

28.     As described below, there is probable cause to believe that the SUBJECT (1) evaded payment of some of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201; and (2) willfully failed to pay all of his 2015 individual income taxes, in violation of 26 U.S.C. § 7203.

29.     According to bank records from Morgan Stanley, in 2015, Burisma continued sending payments to the RSB Morgan Stanley Accounts, as well as another RSB account held at Bank of New York Mellon ("RSB Bank of New York Account"). Similar to the 2014 payments, these accounts received two separate payments of approximately $83,333.33 each month from bank accounts held by Burisma at AS Privatbank, Hellenic Bank LTD, and the Bank of Cyprus Public Company LTD. The total in 2015 paid by Burisma to the RSB Morgan Stanley Accounts and RSB Bank of New York Account was approximately $2,142,363. The memo lines of the wire details indicate they were for "consulting services" or "Monthly Director Fee."

30.     Bank records from various financial institutions further show that during 2015, the RSB Morgan Stanley Accounts sent multiple wires totaling approximately $295,333 to the SUBJECT's USAA personal bank accounts, the same two personal bank accounts that received $315,000 during 2014. The RSB Morgan Stanley Accounts sent an additional wire totaling approximately $97,979 to a third USAA personal bank account in which the SUBJECT was signatory of.[11] The total paid by the RSB Morgan Stanley Accounts to the SUBJECT's three personal USAA accounts was approximately $393,312. In addition to these transfers, the RSB Morgan Stanley Accounts sent three wires totaling approximately $20,000 to a Wells Fargo

---

[13] Also listed as a signer on the SUBJECT's third USAA bank account was the SUBJECT's ex-wife, Kathleen Biden and the SUBJECT's minor daughter █████████

account held by Owasco, PC ("Owasco, PC Wells Fargo Account"). The SUBJECT was a signatory on this account as well as its owner. In addition to these transfers, in December of 2015, the RSB Bank of New York Account sent multiple wires totaling approximately $171,666.33 to the Owasco, PC Wells Fargo Account. The total paid by the RSB Morgan Stanley Accounts and RSB Bank of New York Account to the SUBJECT and Owasco, PC Wells Fargo Account in 2015 was approximately $584,979. As in 2014, Burisma sent no payments directly to the SUBJECT in 2015. Accordingly, there is probable cause to believe that the $584,979, just like the $315,000 received in 2014, were Burisma director's fees.

31.    In April 2016, an Application for Extension was filed for the SUBJECT for his 2015 Form 1040. In or around October 2016, the SUBJECT filed his 2015 Form 1040. As with his 2014 Form 1040, the SUBJECT appeared to have signed this Form 1040 under the penalties of perjury, and the Form 1040 stated that Morgan was the paid preparer. On a "Statement 1" attached to his 2015 Form 1040, for "Miscellaneous Income," the SUBJECT acknowledged receiving income from Burisma in the form of directors' fees. Specifically, he reported $833,330 as "Burisma Board of Directors' Fees" and -$277,780 as a "Burisma Board of Directors' Fees Referral Fee." This resulted in a reported net amount of income from Burisma of $555,550, which is slightly less than the amount received by the SUBJECT and Owasco, PC from the RSB Morgan Stanley Accounts and RSB Bank of New York Account in 2015.

32.    When the SUBJECT filed his 2015 Form 1040, the SUBJECT reported that his total tax due for 2015 was $820,801, and that while he had already paid some taxes, he still owed $176,550. According to IRS records, the SUBJECT did not pay this tax due when filing his Form 1040.

33.     On or about December 5, 2016, the IRS assessed delinquency penalties and interest totaling approximately $12,130 in connection with the 2015 Form 1040 and mailed a letter to the SUBJECT at ███████████████████ in Washington DC, which was listed as the SUBJECT's mailing address on his 2015 Form 1040. This letter informed the SUBJECT of potential tax levies and the amount he owed the IRS for the 2015 tax year. According to IRS records, on or about June 29, 2017, the IRS received a letter from the SUBJECT dated May 1, 2017 regarding the delinquency. The SUBJECT also wrote a letter dated August 1, 2017 and sent with it a $10,000 payment for his 2015 individual income taxes which referenced the delinquency notice he received. In addition, the tax debt was brought to the SUJBECT's attention during divorce proceedings in the Superior Court of the District of Columbia ("the Divorce Case").[14]

34.     According to Wells Fargo bank records and IRS records, beginning around May 1, 2017, and ending on or about March 5, 2018, the SUBJECT made seven separate $10,000 payments to the IRS totaling $70,000 for the 2015 tax year. Each of these payments was a personal check signed by the SUBJECT and drawn on a personal account he had at Wells Fargo. When he stopped paying the IRS in March 2018, the SUBJECT still owed the IRS over $100,000 for 2015. The unpaid amount continued accumulating interest and, as of December 2, 2019, the SUBJECT owed approximately $159,721 for the 2015 tax year. As of December 2, 2019, the SUBJECT has not made any payment to the IRS for that tax year since March 5, 2018.

---

[14] Mot. To Enjoin Further Dissipation of Marital Assets, *Biden v. Biden*, 2016 DRB 004433, at 2 (D.C. Super. Ct. Fam. Div. Feb. 23, 2017).

14

35.    As explained in more detail below, between 2016 (when he filed his 2015 Form 1040 and failed to pay his self-assessed taxes in full) and 2018 (when he stopped making $10,000 a month payments on his 2015 tax debt), the SUBJECT received significant sums of money, well in excess of what he owed for his 2015 tax debt, yet he did not pay in full the tax due and owing. Since the SUBJECT stopped paying the IRS on March 5, 2018 for any of his taxes owed, the SUBJECT's business bank accounts have received alleged income deposits of approximately $2,975,507. Additionally, the business bank accounts have made significant transfers to the SUBJECT's personal accounts and payments on his behalf.

36.    Moreover, as discussed below, there is probable cause to believe that the SUBJECT filed or caused to be filed false Applications for Extension for his 2016, 2017, and 2018 Forms 1040. These Applications for Extension significantly underreported his tax liabilities for those years. By doing so, the SUBJECT also concealed from the IRS that he was earning substantial income in those years, thus hiding funds on which the IRS could seek to collect to pay off the SUJBECT's outstanding tax debt for 2015. Therefore, there is probable cause to believe that the SUBJECT has evaded payment of his 2015 individual income taxes, in violation of 26 U.S.C. § 7201, and willfully failed to pay all of his 2015 individual income taxes, in violation of 26 U.S.C. § 7203.

C.    *2016 Tax Year*

37.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment of his individual income taxes for the tax year 2016, in violation of 26 U.S.C. § 7201; and (2) willfully failed to timely file his Form 1040 for the tax year 2016, in violation of 26 U.S.C. § 7203.

38.    According to Wells Fargo bank records, in 2016, Burisma bank accounts held at the Bank of Cyprus and the Cyprus Development Bank began making regular monthly payments to the Owasco, PC Wells Fargo Account.[16] The Owasco, PC Wells Fargo Account received nine months of regular wires of $83,333 and three additional wires in the amounts of $83,731, $84,992, $83,293 from Burisma, for a total of approximately $1,002,017. Each of the wires from Burisma stated "RFB/ Owasco, PC/ Robert Biden."

39.    According to Wells Fargo and Bank of America bank records, during 2016, in addition to the Burisma payments, the Owasco, PC Wells Fargo Account received $551,005 from a Bank of America account held in the name of Robinson Walker, LLC ("Robinson Walker Bank of America Account"). According to IRS records, Robinson Walker, LLC is controlled by John Robinson Walker, who is a business associate of the SUBJECT's and a signer on the Robinson Walker Bank of America Account. Beginning in or around February 2016, through on or about May 26, 2017, the Robinson Walker Bank of America Account received payments totaling approximately $2,561,718 from an account at the Bank of Cyprus in the name of Bladon Enterprises Limited ("Bladon").[17] $2,203,546 of this amount was paid in 2016 and the remaining $358,172 was paid in 2017. Almost immediately after receiving these payments, the Robinson Walker Bank of America Account typically divided the payments into three equal

---

[16] In addition to Burisma paying the Owasco, PC Wells Fargo Account, Burisma started to make payments to Archer's personal bank account held at Citibank during the 2016 tax year. In 2016, Archer's Citibank bank account received approximately half of what Archer and the SUBJECT jointly received in 2015 (approximately $916,663), thus supporting that in 2014 and 2015 Archer received funds for both himself and the SUBJECT.

[17] A news article stated that Bladon was a real estate development corporation registered in Cyprus that operated in Romania that was owned by a Romanian citizen, Gabriel Popoviciu. *See Romanian Investor Develops Large Residential Complex in Office Area*, Romania-Insider, October 6, 2016 at https://www.romania-insider.com/romanian-investor-develops-large-residential-complex-office-area.

shares, sending one-third to the Owasco, PC Wells Fargo Account, one-third to Walker's personal account, and one-third to an account in Abu Dhabi held in the name of European Energy and Infrastructure.

40.    In or around April 2017, the SUBJECT did not file a Form 1040, but did file an Application for Extension. The application reported a tax liability of $30,000. Around the same time, the SUBJECT submitted a $30,000 payment to the IRS in the form of a check personally signed by the SUBJECT. Because of the Application for Extension, the SUBJECT's Form 1040 was due no later than October 15, 2017. He did not file a Form 1040 by that date, or any date since. On or about August 6, 2018, the IRS mailed a non-filing notice to the SUBJECT to his address of record at the IRS: 2900 K Street NW, Washington, DC 20007. Public records confirm that this is an address associated with the SUBJECT.

41.    While the SUBJECT failed to file a 2016 Form 1040, later, in or around July 2018, Owasco, PC untimely filed its 2016 corporate tax return, signed by the SUBJECT and prepared by Morgan. On a Form 1120-E ("Compensation of Officers"), attached to Owasco, PC's corporate tax return, the company reported a deduction of $1,295,000 for compensation paid to the SUBJECT. Consistent with this, IRS records also show that for the tax year 2016, Owasco, PC issued a Form W-2 to the SUBJECT reporting wages of $1,295,000 and $361,620 in federal income tax withholdings. The Owasco, PC Wells Fargo Account bank records show multiple payroll payments and transfers from that account to the SUBJECT in 2016. IRS records also show a Form W-2 to the SUBJECT issued from Boies, Schiller, & Flexner, LLP reporting wages of $216,000 and $38,267 in federal income tax withholdings.

42.    For 2016, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $20,700 of gross

income. Accordingly, based on the income and withholdings reported on the Forms W-2, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040. Based on this reported individual income of approximately $1,500,000, using a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000, and giving credit for the $30,000 estimated payment and the $399,887 in federal tax withholdings, there is probable cause to believe the SUBJECT had substantial unreported and unpaid taxes for the 2016 tax year.[18] Accordingly, there is probable cause to believe that the SUBJECT has evaded the assessment of his 2016 individual income taxes, in violation of 26 U.S.C. § 7201, and willfully failed to file a 2016 Form 1040, in violation of 26 U.S.C. § 7203.

### D. *2017 Tax Year*

43.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment of his individual income taxes for the tax year 2017 by, among other things, filing a false Application for Extension and paying for personal expenses directly from the Owasco, PC Wells Fargo Account, in violation of 26 U.S.C. § 7201; (2) willfully failed to timely file his Form 1040 for the tax year 2017, in violation of 26 U.S.C. § 7203; and (3) willfully failed to timely file a corporate tax return for Owasco, PC, in violation of 26 U.S.C. § 7203.

44.    In 2017, the Owasco, PC Wells Fargo Account received regular wires from Burisma, as well as significant sums from several other sources. The Owasco, PC Wells Fargo Account received regular monthly wires from Burisma totaling approximately $630,556. The memo lines for each wire stated "RFB/ Owasco, PC/ Robert Biden."

---

[18] For purposes of this warrant, I have assumed that the $1,295,000 in compensation reported by Owasco, PC as paid to the SUBJECT represented the majority of the funds the Owasco, PC Wells Fargo Account received from Burisma and Robinson Walker, LLC.

45.    In addition to the Burisma payments, in 2017 the Owasco, PC Wells Fargo Account received other substantial deposits, totaling $2,761,959, to its bank account as follows:

    a.    deposits and wires totaling approximately $1,445,387 from Hudson West III LLC as further described in paragraphs 46 – 48 below;

    b.    a wire for approximately $100,000 from CEFC Infrastructure Inv;

    c.    deposits and transfers totaling approximately $666,572 from Skaneateles LLC as further described in paragraph 49 below; and

    d.    deposits and wires totaling approximately $550,000 from Robinson Walker LLC and approximately $61,727 from John R. Walkers personal bank account for a total of approximately $611,727 as as further described in paragraph 50 below.

46.    In 2017, the Owasco, PC Wells Fargo Account received regular wires from Hudson West III, LLC ("HWIII"). According to records provided by Cathay Bank, at the time of its formation, HWIII was solely owned by Hudson West V, LLC ("HWV").[19] Cathay Bank records indicated that an individual named Gongwen Dong ("Dong") was the president of HWV and a signatory on the HWIII Cathay Bank account. According to Manta.com, a website listing business information, Dong is also the Director of U.S.-based CEFC Infrastructure.

47.    HWIII had two accounts at Cathay Bank, ending in -8969 and -8992 ("HWIII Cathay Bank Accounts"). The HWIII Cathay Bank account ending in -8969 was opened in August of 2017 and closed in November of 2018; the HWIII Cathay Bank account ending in -8992 was opened in October of 2017 and closed in November of 2018. Dong served as the original

---

[19] According to records provided by Cathay Bank, HWV is owned by Kaiyan US Fund III LP, which is owned by multiple unknown entities.

signatory authority for both accounts. According to Cathay Bank, the accounts were funded by a $5 million loan from Northern International Capital wired in from DBS Bank in Hong Kong. According to Cathay Bank, the parties did not have a formal loan agreement but agreed that the loan would accrue 5% interest and HWIII would repay the loan once it had cash flow.

48.    On August 2, 2017, HWV and Owasco, PC entered into an "Amended and Restated Limited Liability Company Agreement of HWIII" ("HWIII Amended LLC Agreement"). Through the HWIII Amended LLC Agreement, Owasco, PC and HWV each took 50% ownership of HWIII.[20] Dong signed the HWIII Amended LLC Agreement as president of HWV and the SUBJECT signed the agreement as the co-chairman of Owasco, PC. Under the HWIII Amended LLC Agreement, the SUBJECT was named a manager of HWIII and was entitled to compensation of $100,000 per month and a one-time retainer fee of $500,000. According to the HWIII Amended LLC Agreement, the SUBJECT, through Owasco, PC, contributed no capital to HWIII. After the execution of the HWIII Amended LLC Agreement, HWIII began making regular monthly transfers to the Owasco, PC Wells Fargo Account. The HWIII Cathay Bank Accounts made no transfers to any personal accounts attributed to the SUBJECT. In total, from August 2, 2017, through the end of 2017, approximately $1,445,387 was transferred from the HWIII Cathay Bank accounts to the Owasco, PC Wells Fargo Account. According to bank records, $555,000 was then transferred to an account at PNC Bank held in the name of the Lion Hall Group.[21] After accounting for these

---

[20] According to email correspondence referenced by Cathay Bank, on or about April 2, 2018, HWV's 50% ownership interest in HWIII was transferred to Coldharbour Capital LLC. Cathay Bank records indicate that Coldharbour Capital LLC is 50% owned by Mervyn Yan and 50% owned by an unknown individual. Owasco, PC retained its 50% ownership in HWIII. Shortly thereafter, on April 12, 2018, Yan and the SUBJECT became signatories on the HWIII Cathay Bank Accounts.

[21] According to records from PNC Bank, the Lion Hall Group is a company owned by the SUBJECT's uncle, James Biden and his wife, Sara Biden. Under the HWIII Amended LLC

transfers, the amounts to the Owasco, PC Wells Fargo Account is consistent with the HWIII Amended LLC Agreement.

49.     As discussed set forth in ¶ 19, since some time in 2015, the SUBJECT has owned 75% of Skaneateles LLC ("Skaneateles"), through Owasco, LLC.[22]  Skaneateles is a partnership and considered a flow-through entity for tax purposes, meaning income and deductions would appear on the SUBJECT's Form 1040.   According to IRS records, Skaneateles issued a Schedule K-1[23] to Owasco, LLC, which reported the following income and deductions:  ordinary Business Loss of $(116,763), guaranteed payments of $37,000, interest income of $54, net long-term capital gain of $450,256, net section 1231 loss of $(25), other income of $39,025, and other deductions of $5,826.

50.     IRS records indicate that Robinson Walker LLC issued a Form 1099-MISC to Owasco, PC, showing $400,000[24] of non-employee compensation and a second Form 1099-MISC to the SUBJECT reporting Non-Employee Compensation of $201,198.

51.     IRS records also indicate that Owasco, PC issued a Form W-2 to the SUBJECT, reporting wages of $427,854 and $122,352 of income tax withholdings for the 2017 tax year.  In

---

Agreement, James Biden also served as a manager of HWIII and was entitled to $65,000 a month in compensation.

[22] According to IRS records, Owasco, PC transferred its ownership of Skaneateles, LLC to Owasco, LLC in 2015.

[23] A Schedule K-1 is an income document which is filed with the IRS for partnership tax returns. The Schedule K-1 reports the ownership interest in the entity, information for the partner's capital account and any income and deductions which flow through from the entity which is required to be reported on the owner's tax return.

[24] It is unknown at this time why there is an approximately $211,727 difference between the Form 1099 and actual amounts paid to Owasco, PC reflected in the bank records.

addition, Boies, Schiller & Flexner LLP, also issued a Form W-2 to the SUBJECT, reporting wages of $48,000 and $1,505 of income tax withholdings.

52.    In addition to the deposits made to the Owasco, PC Wells Fargo Account in 2017, there were multiple expenditures made from that account in 2017 that appear to be personal in nature.[25] Personal expenditures made from business bank accounts in this situation would result in taxable income to the SUBJECT. These distributions include, but are not limited to, the following:

| Item Description | Amount Paid in 2017 |
|---|---|
| Payments to the SUBJECT's personal bank accounts | $1,297,433 |
| Payments to Columbia University | $33,287 |
| Payments made to suspected escorts | $22,500 |
| Payments to pornographic websites | $7,328 |
| Payments to Ain & Bank PC – Family Law Firm[26] | $52,000 |
| Total | $1,412,548[27] |

53.    While it appears that at least $1,412,548 in payments from the Owasco, PC Wells Fargo Account in 2017 were personal in nature, nearly all of the approximately $2,823,686 deposited into the account in 2017 were spent over the course of the year. In previous years, when the SUBJECT filed corporate tax returns for Owasco, PC, the corporation's expenses—other than wages or compensation paid to the SUBJECT—were relatively small compared to the

_____

[25] Based on my review bank records, prior to 2017, the SUBJECT appeared to use the Owasco, PC Wells Fargo Account for solely business purposes, and in lieu of paying for personal expenditures directly from the Owasco, PC Wells Fargo Account he instead transferred funds to his personal bank accounts.

[26] Based on court filings in the SUBJECT's divorce case, this firm represented the SUBJECT.

[27] As of January 1, 2017, the Owasco, PC Wells Fargo Account had an account balance of approximately $21,700. Therefore, the $1,412,548 of expenditures described in the table above could not have been made without the alleged income deposits to the Owasco, PC Wells Fargo Account.

corporation's income. Many of the other funds spent from the Owasco, PC Wells Fargo Account could be personal expenses, but your affiant is taking a relatively conservative calculation of only treating $1,412,548 as personal in nature.

54.    For 2017, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $20,800 of gross income. Accordingly, based on the income and withholdings reported on the Schedule K-1 to Owasco, LLC, the 1099-MISC for $201,198 from Robinson Walker LLC to the SUBJECT, the W-2 from Owasco, PC to the SUBJECT, the W-2 from Boies, Schiller & Flexner LLP to the SUBJECT, and the additional income attributable to personal distributions from Owasco, PC, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040. In addition to these forms, the SUBJECT himself confirmed a substantial level of income for 2017. According to court records in the Divorce Case, on January 6, 2017, the SUBJECT filed an "Answer to Complaint for Absolute Divorce." In paragraph 12, the SUBJECT "admits that he currently earns income sufficient to support himself and contribute to the support of his children and [Kathleen Biden]." The Answer contained an affirmation that the statements in the Answer were "true and accurate to the best of my knowledge, information, and belief" that was signed by the SUBJECT.

55.    According to IRS records, in or around April 2018, an Application for Extension was filed for the SUBJECT's Form 1040. This application reported no tax liability, and no payments accompanied it. With an Application for Extension, the SUBJECT's Form 1040 was due no later than October 15, 2018. He did not file his Form 1040 by that date. As of December 2, 2019, IRS records show that he still has not filed his 2017 Form 1040.

56.    For present purposes, excluding all 2017 income other than the $1,412,548 in personal expenses paid from Owasco, PC for the SUBJECT, there is probable cause to believe the

SUBJECT had unreported and unpaid taxes in the 2017 tax year.[28] In reaching this conclusion, based on my training and experience, I have allowed for the deduction of alimony paid to SUBJECT's ex-wife of $333,000 during the 2017 tax year, used a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000,[29] and considered the $123,857 in federal tax withholdings. Thus, there is probable cause to believe that the SUBJECT willfully failed to file a 2017 Form 1040, in violation of 26 U.S.C. § 7203, and that the SUBJECT evaded the assessment of his 2017 individual income taxes, in violation of 26 U.S.C. § 7201.

57.     According to IRS records, in or around June 2018, an IRS Form 7004, Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns ("Application for Corporate Extension"), was filed for Owasco, PC's 2017 corporate tax return. This application reported no tax liability, and no payments accompanied the application. With an extension, Owasco, PC's tax return was due no later than October 15, 2018. As of December 2, 2019, IRS records show that he still has not filed the Owasco, PC, 2017 Form 1120. It is clear, based on the transactions described above, that Owasco, PC existed in 2017, and therefore was required to file a corporate tax return.[30] Thus, there is probable cause to believe that the SUBJECT willfully failed to file a 2017 Form 1120 for his wholly owned corporation, Owasco, PC, in violation of 26 U.S.C. § 7203.

---

[28] The Forms W-2, 1099, and Schedule K-1, which report additional income to the SUBJECT, would only increase the income taxes that he owes. To be conservative, I have not included this additional income, as some (but not all) of the income reported on those forms could have been deposited into the Owasco, PC Wells Fargo Account.

[29] This estimate is based on the largest itemized and exemption deduction used for the 2014 and 2015 tax filings for the SUBJECT.

[30] The SUBJECT signed Owasco, PC's 2016 corporate tax return in July 2018, just one month after the Application for Corporate Extension was filed for Owasco, PC's 2017 corporate tax return.

### E. *2018 Tax Year*

58.    As described below, there is probable cause to believe that the SUBJECT (1) evaded assessment of his individual income taxes for the tax year 2018 by, among other things, filing a false Application for Extension and paying for personal expenses directly from the Owasco, PC Wells Fargo Account in violation of 26 U.S.C. § 7201; (2) willfully failed to timely file his Form 1040 for the tax year 2018, in violation of 26 U.S.C. § 7203; and (3) willfully failed to timely file the 2018 corporate tax return for Owasco, PC, in violation of 26 U.S.C. § 7203.

59.    In 2018, the Owasco, PC Wells Fargo Account received regular wires from Burisma, totaling approximately $491,939. The memo lines for each wire stated "RFB/ Owasco, PC/ Robert Biden."

60.    In addition to the Burisma payments, in 2018 the Owasco, PC Wells Fargo Account received other substantial deposits, totaling $2,731,494, as follows:

  a.   approximately 15 deposits and wires totaling approximately $2,187,494 from HWIII;[31] and

  b.   a transfer from an Owasco, LLC Wells Fargo Bank account for approximately $544,000.

61.    The $544,000 transfer from the Owasco, LLC to Owasco, PC was made possible by a $1,000,000 wire received by Owasco, LLC from the HWIII Cathay Bank Accounts on or about March 22, 2018. The memo line of this $1,000,000 wire stated that the wire was for

---

[31] There is probable cause to believe that most of the money received from the HWIII Cathay Bank Accounts in 2018 would be considered income to the SUBJECT, and not a loan or return of capital. These payments, as in 2017, appeared to be the fees paid to the managers of HWIII as a part of the HWIII Amended LLC Agreement. *See supra* ¶ 48. According to bank records, approximately $843,999 was then transferred from the Owasco, PC Wells Fargo Account to the Lion Hall Group account at PNC Bank.

"Dr Patrick Ho Chi Ping Representation."[32]  According to court records, in late 2017, Chi Ping Patrick Ho ("Ho") was charged in the Southern District of New York for violations of the Foreign Corrupt Practices Act and money laundering (Case No. 1:17-cr-779).[33]  According to the indictment in that case, Ho was involved in bribing officials in Chad and Uganda in exchange for business for the company he represented.  According to a *New York Times* article, Ho was a representative of a company called CEFC China.[34]  According to *The New Yorker* article, the SUBJECT became aware of a possible investigation of Ho and, prior to the indictment, agreed to represent Ho "to figure out whether Ho was in legal jeopardy in the U.S."[35]  Later, in December 2018, Ho was convicted at trial.

62.     IRS records also indicate that Owasco, PC issued a Form W-2 to the SUBJECT, reporting wages of $159,000 and $38,465 of income tax withholdings for the 2018 tax year.

63.     In addition to the deposits made to the Owasco, PC Wells Fargo Account in 2018, there were multiple expenditures made from that account that appear to be personal in nature. These include, but are not limited to the following:

| Item Description | Amounts Paid in 2018 |
|---|---|
| Payments to the SUBJECT's personal bank accounts | $1,044,129 |
| Payments to Columbia University | $30,000 |
| Payments made to suspected escorts | $124,000 |
| Payments to pornographic websites | $13,008 |

---

[32] This was the majority of income deposited to the Owasco, LLC bank account during 2018.

[33] According to Cathay Bank, the SUBJECT informed them that Owasco, LLC was the legal entity through which he was paid for part of his legal work. The SUBJECT never entered an appearance on behalf of Ho in the criminal action, nor did it appear that any of the funds derived from the $1 million wire were sent to any of the law firms that entered appearances on behalf of Ho.

[34] Matthew Goldstein, *Ex-Hong Kong Official Gets Lighter Sentence in Bribery Case*, N.Y. Times, March 25, 2019 at www.nytimes.com/2019/03/25/business/cefc-china-patrick-ho-bribery.html.

[35] Adam Entous, *supra* note 10.

| Payments to Chateau Marmont – California hotel | $43,692 |
| Payments to family members | $40,450 |
| Total | $1,295,279 |

64.    As of January 1, 2018, the Owasco, PC Wells Fargo Account had an account balance of approximately $14,300. Therefore, the $1,295,279 of expenditures described above could not have been made without the alleged income deposits to the Owasco, PC bank account. These expenditures appear personal in nature and would result in taxable income to the SUBJECT.

65.    For 2018, using the most generous filing threshold for a person under age 65 (the married-filing-jointly status), the amount triggering the filing requirement was $24,000 of gross income. Accordingly, based on the income and withholdings reported on the Schedule K-1 to Owasco, LLC, the Form W-2 from Owasco, PC to the SUBJECT, and the additional income attributable to personal distributions from Owasco, PC, there is probable cause to believe that the SUBJECT was obligated to file a Form 1040 for the tax year 2018.

66.    In or around April 2019, an Application for Extension was filed for the SUBJECT's 2018 Form 1040. This application reported no tax liability, and no payments accompanied the application. With an extension, the SUBJECT's Form 1040 was not due until October 15, 2019. As of December 2, 2019, the IRS has not received the SUBJECT's 2018 Form 1040.

67.    For present purposes, excluding all 2018 income other than the $1,295,279 in personal expenses paid from Owasco, PC Wells Fargo Account for the SUBJECT, along with the $456,000 that HWIII paid to Owasco LLC that was not then transferred to the Owasco, PC Wells Fargo Account, there is probable cause to believe the SUBJECT had unreported and unpaid taxes

in the 2018 tax year.[36]  In reaching this conclusion, based on my training and experience, I have used a conservative estimate of the SUBJECT's unreported deductions and exemptions of $126,000,[37] and considered the $38,465 in federal tax withholdings. Thus, there is probable cause to believe that the SUBJECT willfully failed to file a 2018 Form 1040, in violation of 26 U.S.C. § 7203, and that the SUBJECT evaded the assessment of his 2018 individual income taxes, in violation of 26 U.S.C. § 7201.

68.     According to IRS records, in or around July of 2019, an IRS Form 7004, Application for Automatic Extension of Time to File Certain Business Income Tax, Information, and Other Returns ("Application for Corporate Extension"), was filed for Owasco, PC's 2018 corporate tax return. This application reported no tax liability, and no payments accompanied the application. With an extension, Owasco, PC's Form 1120 was due no later than October 15, 2019. As of December 2, 2019, no corporate tax return has been received by the IRS for Owasco, PC for the 2018 tax year. It is clear, based on the transactions described above, that Owasco, PC existed in 2018, and therefore was required to file a corporate tax return. Thus, there is probable cause to believe that the SUBJECT willfully failed to file a 2018 Form 1120 for his wholly owned corporation, Owasco, PC, in violation of 26 U.S.C. § 7203.

### F.   *Google Account 1*

69.     Records provided by Google regarding Google Account 1 show that this account was registered to Eric Schwerin.

---

[36] The Forms W-2, 1099, and Schedule K-1, which report additional income to the SUBJECT, would only increase the income taxes that he owes. To be conservative, I have not included this additional income, as some (but not all) of the income reported on those forms could have been deposited into the Owasco, PC Wells Fargo Account.

[37] This estimate is based on the largest itemized and exemption deduction used for the 2014 and 2015 tax filings for the SUBJECT.

70.     Based on my training and experience and my discussions with other IRS and FBI agents and analysts, individuals who engage in tax avoidance schemes typically create multiple different business entities and bank accounts to make it difficult for law enforcement to trace the flow of income.  Such individuals often communicate through email with their various business partners, their employees, and individuals from whom they are receiving money, as well as with their accountants and/or tax preparers concerning business dealings, corporate structures, and the tax consequences associated with those events.

71.     Based on the information discussed in the probable cause section of this affidavit as well as my training and experience, there is probable cause that Schwerin used Google Account 1 to communicate with the SUBJECT, as well as with other business partners and business employees, tax return preparers, and other individuals regarding the SUBJECT, and the co-owned businesses with Schwerin.  There is also probable cause to believe that the Google Account 1 contains evidence of business discussions made on behalf of the SUBJECT, which are relevant to the tax offenses currently under investigation.[38]

72.     Records provided by Google for Google Account 1 show that Google Account 1 communicated with multiple email accounts associated with the SUBJECT, to include the Google account hbiden@rosemontseneca.com.  The records show that between January of 2014 and November of 2018, Google Account 1 sent approximately 3,747 emails directly to hbiden@rosemontseneca.com (the email account appears in the "To" field) and between January of 2014 and August of 2017, Google Account 1 sent approximately 987 emails in which it copied hbiden@rosemontseneca.com (the email account appears in the "CC" field).  The records also

---

[38] Examples of these types of communications are set forth in the paragraphs below and are offered as a demonstration of probable cause, rather than as an exhaustive list of relevant communications.

show that between January of 2014 and January of 2018, Google Account 1 received directly from

hbiden@rosemontseneca.com (Google Account 1 appears in the "To" field) approximately 700

emails and between January of 2014 and September of 2017, Google Account 1 was copied on

approximately 255 emails from hbiden@rosemontseneca.com (Google Account 1 appears in the

"CC" field). When compared with the records provided by Google for the email account

hbiden@rosemontseneca.com, between January of 2014 and October of 2019, Google Account

1 sent approximately 3,168 emails directly to hbiden@rosemontseneca.com (the email account

appears in the "To" field) and between January of 2014 and August of 2017, Google Account 1

sent approximately 875 emails in which it copied hbiden@rosemontseneca.com (the email

account appears in the "CC" field). The records also show that between July of 2015 and January

of 2018, Google Account 1 received directly from hbiden@rosemontseneca.com (Google

Account 1 appears in the "To" field) approximately 297 emails and between July of 2015 and

September of 2017, Google Account 1 was copied on approximately 135 emails from

hbiden@rosemontseneca.com (Google Account 1 appears in the "CC" field). Based on this

comparison, there is probable cause to believe that there will be unique emails in Google Account

1 communicating with hbiden@rosemontseneca.com that were not recovered in the previously

issued search warrant, in which Schwerin and the SUBJECT would have communicated about

their businesses, business expenditures and receipts, and tax related topics.

73.    Records provided by Google for Google Account 1 show that Google Account 1

communicated with multiple email accounts associated with the SUBJECT, to include an Apple

account rhbdc@icloud.com. The records show that between April of 2014 and June of 2019,

Google Account 1 sent approximately 34 emails directly to rhbdc@icloud.com (the email account

appears in the "To" field) and between October of 2015 and April of 2019, Google Account 1 sent

approximately 17 emails in which it copied **rhbdc@icloud.com** (the email account appears in the "CC" field). The records also show that between January of 2014 and June of 2019, Google Account 1 received directly from **rhbdc@icloud.com** (Google Account 1 appears in the "To" field) approximately 21 emails and between March of 2015 and April of 2019, Google Account 1 was copied on approximately 7 emails from **rhbdc@icloud.com** (Google Account 1 appears in the "CC" field). When compared with the records provided by Apple for the email account **rhbdc@icloud.com**, between April of 2014 and June of 2019, Google Account 1 sent approximately 34 emails directly to **rhbdc@icloud.com** (the email account appears in the "To" field) and between October of 2015 and April of 2019, Google Account 1 sent approximately 13 emails in which it copied **rhbdc@icloud.com** (the email account appears in the "CC" field). The records also show that between January of 2014 and February of 2017, Google Account 1 received directly from **rhbdc@icloud.com** (Google Account 1 appears in the "To" field) approximately 11 emails and between March of 2015 and April of 2019, Google Account 1 was copied on approximately eight emails from **rhbdc@icloud.com** (Google Account 1 appears in the "CC" field). Based on this comparison, there is probable cause to believe that there will be unique emails in Google Account 1 communicating with **rhbdc@icloud.com** that were not recovered in the previously issued search warrant, in which Schwerin and the SUBJECT would have communicated about their businesses, business expenditures and receipts, and tax related topics.

74.    Records provided by Google show that Google Account 1 communicated with █████████@morganwingate.com, which is the email address for the SUBJECT's tax return preparer, William Morgan ("Morgan").    I know that this email account belonged to William Morgan because this email account was listed on the Morgan Wingate, PC website for him.  In addition, Google Account 1 communicated with several other email accounts with the

@morganwingate.com domain, which is linked to the SUBJECT and SUBJECT's businesses return preparer Morgan Wingate. Google Account 1, between January of 2014 and July of 2019, exchanged approximately the following quantity of emails with Morgan Wingate-linked email accounts:

| Account Name | Number of Emails sent by Google Account 1 | Number of Emails received by Google Account 1 |
|---|---|---|
| ███@morganwingate.com | 101 | 84 |
| ███@morganwingate.com | 54 | 0 |
| ███@morganwingate.com | 15 | 14 |
| ███@morganwingate.com | 1 | 1 |
| ███@morganwingate.com | 2 | 3 |
| ███@morganwingate.com | 7 | 11 |
| ███@morganwingate.com | 8 | 7 |
| ███@morganwingate.com | 4 | 4 |
| ███@morganwingate.com | 10 | 13 |
| ███@morganwingate.com | 45 | 50 |
| ███@morganwingate.com | 17 | 34 |
| ███@morganwingate.com | 3 | 5 |
| ███@morganwingate.com | 4 | 4 |
| ███@morganwingate.com | 3 | 0 |
| ███@morganwingate.com | 4 | 1 |
| ███@morganwingate.com | 2 | 0 |

Based on this summary, and the information described in the probable cause section to this affidavit, there is probable cause to believe that Morgan and Morgan Wingate employees communicated with Schwerin about topics relevant to the SUBJECT and SUBJECT's business income; the SUBJECT's personal and business expenditures; the SUBJECT's personal and business tax situation; and the SUBJECT's personal and business tax filings and/or failure to file with the IRS.

75.    Records provided by Google for Google Account 1 show that Google Account 1 exchanged emails exclusively with email accounts with the @burisma.com domain, which we believe is linked to Burisma Holdings. In this paragraph of the affidavit, I only focus on the emails sent to and received exclusively by Google Account 1 (in other words, Google Account 1 may also have been copied on or otherwise received additional emails with these email addresses). The records show that between October of 2015 and November of 2017, Google Account 1 exchanged approximately the following quantity of emails exclusively with Burisma-linked email accounts:

| Account Name | Number of Emails sent by Google Account 1 | Number of Emails received by Google Account 1 |
|---|---|---|
| devon.a███████com | 9 | 9 |
| vadym.p███████com | 20 | 11 |

Based on this summary, as well as the information articulated in the probable cause section of this affidavit, there is probable cause to believe that Schwerin, Archer, and Vadym Pozharskyi discussed the nature, purpose, and circumstances surrounding the payments made to the SUBJECT by Burisma.

76.    Records provided by Google for Google Account 1 show that Google Account 1 exchanged emails exclusively with email addresses associated with Archer. In this paragraph of the affidavit, I only focus on the emails sent to and received exclusively by Google Account 1 (in other words, Google Account 1 may also have been copied on or otherwise received additional emails with these email addresses). The records show that between January of 2014 and May of 2018, Google Account 1 exchanged approximately the following quantity of emails exclusively with Archer-linked email accounts:

| Account Name | Number of Emails sent by Google Account 1 | Number of Emails received by Google Account 1 |
|---|---|---|
| darche██████com | 14 | 21 |
| darche██████████com | 26 | 8 |
| darche████████com | 85 | 30 |
| darche████████com | 105 | 76 |
| devon.archer█████eu | 9 | 12 |

Based on this summary, and the information articulated in the probable cause section of this affidavit, there is probable cause to believe that Schwerin and Archer communicated about the nature, purpose, and circumstances surrounding the payments made by and to Archer and his business entities to the SUBJECT and his business entities, including their respective roles at Burisma and Rosemont Seneca-affiliated entities.

77.    Records provided by Google for Google Account 1 show that Google Account 1 exchanged emails exclusively with email addresses associated with Walker. In this paragraph of the affidavit, I only focus on the emails sent to and received exclusively by Google Account 1 (in other words, Google Account 1 may also have been copied on or otherwise received additional

emails with these email addresses). The records show that between January of 2014 and April of 2019, Google Account 1 exchanged approximately the following quantity of emails exclusively with Walker-linked email accounts:

| Account Name | Number of Emails sent by Google Account 1 | Number of Emails received by Google Account 1 |
|---|---|---|
| robinsonwalker█████com | 2 | 1 |
| rob████com | 19 | 22 |
| rob████████com | 43 | 26 |
| rob.walker████com | 1 | 1 |
| rwalker██████████com | 561 | 89 |
| rwalker█████████com | 3 | 1 |

Based on this summary, and the information articulated in the probable cause section of this affidavit, there is probable cause to believe that Schwerin and Walker communicated about the nature, purpose, and circumstances surrounding the payments made by Walker and his business entities to the SUBJECT and his business entities.

78.     Records provided by Google for Google Account 1 show that Google Account 1 exchanged emails exclusively with email addresses associated with Katie Dodge ("Dodge") (in other words, Google Account 1 may also have been copied on or otherwise received additional emails with these email addresses). According to Dodge's LinkedIn profile, she was employed as the Executive Assistant to the President at Rosemont Seneca Partners from October 2012 to June 2015. After that time, Dodge remained involved in the financial management of the SUBJECT's business entities. According to records received from the payroll company ADP LLC, between May 2018 and December 2018, Dodge was the listed contact for Owasco, PC, listing the

dodgekatie█████████.com_account, and was on the Owasco, PC payroll during that time.  In addition, she signed the contract with ADP LLC on behalf of Owasco, PC on May 1, 2018, listing her title as "administrator."  Based on bank and payroll records, Dodge received payroll disbursements from Owasco, PC in 2018, as well as payments from the SUBJECT's personal Wells Fargo Account and/or Owasco, PC's Wells Fargo bank account through February 2019. In this paragraph of the affidavit, I only focus on the emails sent to and received exclusively by Google Account 1. The records show that between January of 2014 and March of 2019, Google Account 1 exchanged approximately the following quantity of emails exclusively with Dodge-linked email accounts:

| Account Name | Number of Emails sent by Google Account 1 | Number of Emails received by Google Account 1 |
|---|---|---|
| kdodge███████com | 654 | 232 |
| katie█████.com | 27 | 18 |
| dodgekatie███com | 18 | 12 |

Based on this summary, and the information articulated in the probable cause section of this affidavit, there is probable cause to believe that the Schwerin and Dodge communicated about the nature, purpose, and circumstances surrounding Owasco, PC's business dealings and payments and expenditures made by the SUBJECT and/or his business entities.

79.    In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Google's servers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.  On September 3, 2019, a 90-day preservation request for Google Account 1 was

sent to Google pursuant to 18 U.S.C. § 2703(f). A request for the extension of this preservation was sent on December 2, 2019. Thus, there is probable cause to believe that emails and other information contained within Google Account 1 exist and will be found on Google's servers.

## BACKGROUND CONCERNING EMAIL

80.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public.    Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information.   Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

81.    A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

82.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.   Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information

may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

83.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

84.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

85.    This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information.  The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

86.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or

39

exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## FILTER REVIEW PROCEDURES

87.    Review of the items described in Attachment A and Attachment B will be conducted pursuant to established procedures designed to collect evidence in a manner consistent with professional responsibility requirements concerning the maintenance of attorney-client and other operative privileges. The procedures include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

## CONCLUSION

88.    Based on the forgoing, I request that the Court issue the proposed search warrant regarding Google Account 1. The government will execute this warrant by serving the warrant on Google, Inc. Because the warrant will be served on Google, Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

89.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Joseph A. Ziegler
Special Agent
Internal Revenue Service-
Criminal Investigation

Subscribed and sworn to before me on _December 13_ , 2019

HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

This warrant applies to information associated with

eschwerin█████████com ("Google Account 1"), which is stored at premises owned,

maintained, controlled, or operated by Google, Inc., a company headquartered at 1600

Amphitheatre Parkway, Mountain View, CA 94043.

1

## ATTACHMENT B

### Particular Things to be Seized

1.      **Information to be disclosed by Google, Inc. (the "Provider")**

For the time period January 2014 to the present, to the extent that the information

described in Attachment A is within the possession, custody, or control of the Provider,

regardless of whether such information is stored, held or maintained inside or outside of the

United States, and including any emails, records, files, logs, or information that has been deleted

but is still available to the Provider, or has been preserved pursuant to requests made under

18 U.S.C. § 2703(f) on or about September 3, 2019 and December 2, 2019, the Provider is

required to disclose the following information to the government for each account or identifier

listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or

preserved copies of emails sent to and from the account, draft emails, the source and destination

addresses associated with each email, the date and time at which each email was sent, and the

size and length of each email;

b.      All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP

address used to register the account, log-in IP addresses associated with session times and dates,

account status, alternative email addresses provided during registration, methods of connecting,

log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

2

d.      All records or other information stored at any time by an individual using the

account, including address books, contact and buddy lists, calendar data, pictures, and files;

All records pertaining to communications between the Provider and any person regarding the

account, including contacts with support services and records of actions taken. The Provider is

hereby ordered to disclose the above information to the government within **14 days** of issuance

of this warrant.

II.    **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of tax evasion (26 U.S.C. § 7201), willful failure to file tax returns and failure to pay income tax (26 U.S.C. § 7203), and willfully filing false tax returns (26 U.S.C. § 7206(1)), those violations involving Robert Hunter Biden or any entity he owns or controls, occurring after January 1, 2014, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) All financial and other bookkeeping information and records, including correspondence regarding the same;

(b) All records and information relating to federal, state, and foreign individual, corporate, employment and property taxes, including correspondence regarding the same;

(c) All records and information pertaining to personal and business expenditures including correspondence regarding the same;

(d) All records and information reflecting business operations and business ownership, including business incorporation documents, employment records, paychecks, business expenses, business income, investments, and work schedules, including correspondence regarding the same;

(e) Evidence indicating how and when the email account was accessed or used to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(f) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation; and

4

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI or IRS-CI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.